**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE | Master File 06-MD-1775 (JG) (VVP) |
| AIR CARGO SHIPPING SERVICES ANTITRUST LITIGATION | **ALL CASES** |
| MDL No. 1775 | |

**MEMORANDUM OF LAW IN SUPPORT OF
LUFTHANSA'S MOTION TO DISMISS COUNTS VI AND VII
OF PLAINTIFFS' FIRST CONSOLIDATED
AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iv

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................... 4

ARGUMENT ........................................................................................................................ 7

I.   COUNTS VI AND VII SHOULD BE DISMISSED BECAUSE THEY VIOLATE
     PRINCIPLES OF INTERNATIONAL COMITY ................................................................ 7

     A.   U.S. Adjudication of Antitrust Claims Involving Wholly Foreign Commerce
          Would Violate Principles of International Comity Asserted by Many Foreign
          Sovereigns and Recognized by All Three Branches of the U.S. Government ............... 9

     B.   The EC Treaty and EU Regulatory Framework Constitute a Carefully-Balanced
          and Exclusive Structure for Enforcement of Article 81 That Is Incompatible
          with Adjudication Outside the EU ..................................................................... 13

     C.   Dismissal of Article 81 Claims on Comity Grounds Is Required by the Public
          Law Character of Antitrust Regulation ............................................................... 20

     D.   Adjudicating Counts VI and VII in the United States Would Undermine the
          Sovereign Interests of European Governments in Developing and Enforcing
          Their Own Evolving Laws and Would Damage International Antitrust
          Cooperation ................................................................................................ 25

          1.   For This Court to Interpose Itself as Arbiter of Diverse and Unsettled
               Aspects of European Antitrust Law Would Undermine Sovereign European
               Interests In Developing and Enforcing Their Own Evolving Antitrust Laws ......... 25

          2.   Imposing U.S. Litigation Procedures on European Antitrust Claims
               Would Undermine Sovereign Policy Judgments Made in Europe ........................ 29

          3.   Adjudicating Counts VI and VII in the United States Would Deprive The
               EU of Control Over Crucial Incentives Underpinning Its Leniency
               Programs .............................................................................................. 31

          4.   Adjudicating Counts VI and VII in the United States Would Undermine
               International Antitrust Cooperation ........................................................... 34

II.   COUNTS VI AND VII SHOULD BE DISMISSED UNDER THE DOCTRINE OF
      *FORUM NON CONVENIENS* ................................................................36

      A.   Plaintiffs' Decision to Bring Their Foreign-Law Claims in a U.S.
           Court is Entitled to Minimal Deference.........................................37

      B.   Plaintiffs Have Adequate Alternative Forums ...............................39

      C.   The Public Interest Factors Weigh Decisively In Favor of Dismissal ...........40

           1.   The Eastern District of New York Has Only a Tenuous Connection to
                this Litigation, While European Countries have a Strong Interest in
                Adjudicating Plaintiffs' Claims ...........................................41

           2.   Adjudicating Plaintiffs' Foreign-Law Claims Would Offend Notions of
                International Comity and Promote Forum Shopping................................43

           3.   Adjudicating Plaintiffs' Claims Would Require This Court to Resolve
                Difficult Choice-of-Law Problems and Decide Novel and Complex Issues
                of European Competition Law..............................................44

                a)   Under New York's Choice-of-Law Principles, the Laws of
                     Multiple Other Jurisdictions Besides England Would Apply to
                     the Varied Commerce Addressed in Counts VI and VII ..................45

                b)   Litigating Counts VI and VII in this Court Would Unavoidably
                     Embroil the Court in Complex and Unsettled Questions of
                     Foreign Antitrust Law.................................................47

      D.   The Private Interest Factors Support Dismissal.................................49

           1.   It Would be Difficult for the Court to Access Evidence for Counts VI and
                VII, Which is Located Almost Exclusively Abroad ..............................50

                a)   Counts VI and VII Implicate Route-Specific Evidence Unique to the
                     European Routes at Issue in Those Counts............................50

                b)   It Would be Difficult to Obtain Evidence from Abroad..................52

                c)   Litigation in Europe Would Streamline Discovery on Issues
                     Related to Counts VI and VII ......................................54

           2.   This Court's Judgment on Counts VI and VII May Be Unenforceable in
                Many Relevant Jurisdictions Abroad....................................55

           3.   Litigation of EU-Commerce Claims Together With U.S.-Commerce
                Claims Will Not Result In Efficiencies ...................................56

III. THIS COURT SHOULD DISMISS COUNTS VI AND VII FOR LACK OF
     SUBJECT MATTER JURISDICTION ...................................................................................58

CONCLUSION..................................................................................................................................59

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alfadda v. Fenn*, 159 F.3d 41 (2d Cir. 1998)................................................................42

*Alpine Pharmacy v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir. 1973) ............21

*American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821 (2d Cir. 1968) ............21

*Associated General Contractors v. California  State Council of Carpenters*,
   459 U.S. 519 (1983) ................................................................................23

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)............................................................21

*Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681 (S.D.N.Y. 2003),
   *aff'd*, 98 Fed. Appx. 47 (2d Cir. 2004)................................................38, 42

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................25, 26

*Bersch v. Drexel Firestone, Inc*., 519 F.2d 974 (2d Cir. 1975) ....................................55

*Blanco v. Blanco Industrial de Venezuela, S.A.,* 997 F.2d 974 (2d Cir. 1993)............39

*Bland v. New York*, 263 F. Supp. 2d 526 (E.D.N.Y. 2003) ........................................18

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*,
   402 U.S. 313 (1971) ................................................................................18

*Bodner v. Banque Paribas*, 202 F.R.D. 370 (E.D.N.Y. 2000)....................................53

*Bonime v. Avaya*, Inc., No. 06-cv-1630, 2006 WL 3751219
   (E.D.N.Y. Dec. 20, 2006)........................................................................58

*Capital Currency Exchange, N.V. v. National  Westminster Bank PLC*,
   155 F.3d 603 (2d Cir. 1998) ........................................................24, 40, 50

*DeYoung v. Beddome*, 707 F. Supp. 132  (S.D.N.Y. 1989) ....................................41, 47

*Del Fierro v. Pepsico*, 897 F. Supp. 59 (E.D.N.Y. 1995).............................................55

*Empagran, S.A. v. F. Hoffmann-La Roche Ltd.,* No. 00-cv-1686,
   2001 WL 761360 (D.D.C. June 7, 2001) ................................................48, 49

*Empagran, S.A. v. F. Hoffmann-La Roche Ltd.,* 453 F. Supp. 2d 1
   (D.D.C. 2006) .................................................................................... *passim*

*Epperson v. Entertainment Express, Inc.,* 242 F.3d 100 (2d Cir. 2001)........................................18

*Evolution Online Systems, Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505
    (2d Cir. 1998) ...............................................................................................38, 39

*F. Hoffmann-La Roche Ltd. v. Empagran, S.A.,* 542 U.S. 155 (2004) ................................. *passim*

*Feinstein v. Firestone Tire & Rubber Co.,* 535 F. Supp. 595 (S.D.N.Y. 1982) ...........................57

*First American Corp. v. Price Waterhouse LLP,* 154 F.3d 16 (2d Cir. 1998)...............................54

*Fortner Enterprises v. U. S. Steel Corp.,* 394 U.S. 495 (1969) .....................................................21

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947) ..................................................................... *passim*

*Hamilton v. Accu-Tek,* 47 F. Supp. 2d 330 (E.D.N.Y. 1999) .......................................................45

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968)................................52

*Hawaii v. Standard Oil Co.,* 405 U.S. 251 (1972)..................................................................21, 23

*Hilton v. Guyot,* 159 U.S. 113 (1895) ...........................................................................................7

*Howe v. Goldcorp Investments, Ltd.,* 946 F.2d 944 (1st Cir. 1991) .............................................41

*Huntington v. Attrill,* 146 U.S. 657 (1892) ..................................................................................20

*Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).................................................................23, 52

*In re Ford Motor Company Ignition Switch Products Liability Litigation,*
    174 F.R.D. 332 (D.N.J. 1997) ...............................................................................45

*In re Grand Jury Subpoena Dated August 9, 2000,* 218 F. Supp. 2d 544 (S.D.N.Y 2002),
    *aff'd,* 318 F.3d 379 (2d Cir. 2003) ........................................................................53

*In re Matter of Arbitration between Monegasque De Reassurances S.A.M. (Monde Re) v.
    Nak Naftogaz of Ukraine,* 158 F. Supp. 2d 377 (S.D.N.Y. 2001),
    *aff'd* 311 F.3d 488 (2d Cir. 2002) ......................................................39, 41, 43, 47, 49

*In re Rezulin Products  Liability  Litigation,* 390 F. Supp. 2d 319 (S.D.N.Y. 2005) ..............45, 46

*In re Union Carbide Corp. Gas Plant Disaster at Bhopal,* 809 F.2d 195 (2d Cir. 1987) ............50

*Information Resources, Inc. v. Dunn & Bradstreet Corp.,* 127 F. Supp. 2d 411
    (S.D.N.Y. 2000) ................................................................................... *passim*

*Iragorri v. United Technologies Corp.,* 274 F.3d 65 (2d Cir. 2001) ................................37, 38, 57

*Iwanowa v. Ford Motor Co*., 67 F. Supp. 2d 424 (D.N.J. 1999) .....................................................7

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.,* 412 F.3d 418 (2d Cir. 2005) ...............7

*Klaxon Co. v. Stentor Electric Manufacturing Co*., 313 U.S. 487 (1941) .....................................45

*Koster v. (American) Lumbermens Mutual Casualty Co*., 330 U.S. 518 (1947) .........................36

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007) .....................25, 26

*Lyons v. Westinghouse Electric Corp*., 222 F.2d 184 (2d Cir. 1955) ...........................................24

*M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972) ...........................................................38

*McGaughey v. Treistman*, No. 05-cv-7069, 2007 WL 24935 (S.D.N.Y. Jan. 4, 2007)................58

*Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373 (1985) ......................2, 24

*Minpeco, S.A. v. ContiCommodity Services, Inc.,* 116 F.R.D. 517 (S.D.N.Y. 1987) ...................53

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614 (1985) ............21, 22, 23

*Moore v. Mitchell*, 30 F.2d 600 (2d Cir. 1929)............................................................................21

*Moragne v. States Marine Lines, Inc*., 398 U.S. 375 (1970) ........................................................13

*Multi-Juice, S.A. v. Snapple Beverage Corp*., No. 02 Civ. 4635, 2003 WL 1961636
   (S.D.N.Y. Apr. 25, 2003) ........................................................................................................9

*Murray v. British Broadcasting Corp*., 81 F.3d 287 (2d Cir. 1996)..............................................50

*Olympic Corp. v. Societe Generale*, 462 F.2d 376 (2d Cir. 1972)................................................55

*Paraschos v. YBM Magnex International, Inc*., 130 F. Supp. 2d 642 (E.D. Pa. 2000) ..................7

*Pasquantino v. United States*, 544 U.S. 349 (2005) ....................................................................20

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).................................................................. *passim*

*Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003) .............36, 39, 40, 47

*Purdue Frederick Co. v. Steadfast Insurance Co.*, 8 Misc. 3d 1014(A) (N.Y. Sup. 2005)...........45

*Scottish Air International, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224
   (2d Cir. 1996) ........................................................................................................................37

*Sequihua v. Texaco, Inc*., 847 F. Supp. 61 (S.D. Tex. 1994).........................................................7

*Sinochem International Co., v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184 (2007)...............36

*Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522 (1987)...........................................................................53, 54

*Spatola v. United States*, 925 F.2d 615 (2d Cir. 1991) ....................................................8

*Stewart v. Adidas A.G.*, No. 96 Civ. 6670, 1997 WL 218431 (S.D.N.Y. Apr. 30, 1997) .......42, 55

*Torres v. Southern Peru Copper Corp.,* 965 F. Supp. 899 (S.D. Tex. 1996), *aff'd,* 113 F.3d 540 (5th Cir. 1997) ..........................................................................................7

*Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512 (11th Cir. 1994) ........................7

*United Mine Workers v. Gibbs*,  383 U.S. 715 (1966).......................................................48, 57, 59

*VictoriaTea.com, Inc. v. Cott Beverages Canada*, 239 F. Supp. 2d 377 (S.D.N.Y. 2003)............55

*Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007) ....................................................7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).........................................21

## INTERNATIONAL CASES

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58 (H.L.)...........................................24

Case C-126/97, *Eco Swiss China Time Ltd. v. Benetton International NV* [1999] E.C.R. I-3055................................................................................................................22

Case C-453/99, *Crehan v. Courage* [2001] E.C.R. I-6297....................................................15, 16

*Rookes v. Barnard*, [1964] A.C. 1129 ..........................................................................48

## TREATIES, STATUTES, RULES & REGULATIONS

Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the Enforcement of their Competition Laws, art. III (entitled "Positive Comity"), U.S.-E.C., June 4, 1998, State Dept. No. 98-106, 1998 WL 428268 (Treaty)...................34

Agreement on the European Economic Area, May 5, 2004, 2004 O.J. (L 223), art. 53 ..........6, 35

Antitrust Criminal Penalties Enforcement and Reform Act of 2004, Pub. L. No. 108-237, §213(a)-(b), 118 Stat. 665 (June 22, 2004) ...............................................................4, 5, 33

Cong. Rec. S3614 (Daily ed. Apr. 2, 2004) (statement of Senator Hatch)...................................33

Consolidated Version of the Treaty Establishing the European Community,
   Maastricht, Rome, and Amsterdam, 7 February 1992, 25 March 1957,
   2 October 1996 (36 I.L.M. 56 (1998)) .............................................................................. *passim*

Council Regulation 17/62, art. 9, 1962 O.J. (L 13) ................................................................14, 15

Council Regulation 1206/2001, 2001 O.J. (L 174) ......................................................................54

Council Regulation 1/2003, Modernization Regulation, 2003 O.J. (L1)1 (EC)....16, 17, 19, 23, 31

European Commission, *Notice on the Cooperation between the Commission and the Courts of
   the EU Member States in the Application of Articles 81 and 82
   EC*, 2004 O.J. (C 101) 54 ........................................................................................................26

European Communities Act, 1972, ch. 68 (UK)............................................................................6

*Foreign Trade Antitrust Improvements Act:  Hearing on H.R. 2326 Before the
   Subcommittee on Monopolies and Commercial Law of the House
   Committee on the Judiciary*, 97th Congress, 1st Session 79 (1981) ...................................13

Hague Convention on the Taking of Evidence
   Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970,
   23 U.S.T. 1555, T.I.A.S. No. 7444 (entered into force Oct. 7, 1972) .........................52, 54

H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.C.C.A.N. 2487, 2499 ..........................................12

15 U.S.C. § 6(a) ...........................................................................................................................12

28 U.S.C. § 1332(d) .....................................................................................................................58

28 U.S.C. § 1367............................................................................................................................58

Fed. R. Civ. P. 23(b)(3)................................................................................................................57

Fed. R. Civ. P. 44.1......................................................................................................................13

## OTHER MATERIALS

Amici Curiae Brief for the Federal Republic of Germany, United Kingdom of Great Britain
   and Northern Ireland, Japan, the Swiss Confederation, and the Kingdom
   of the Netherlands, *Empagran, S.A. v. F. Hoffmann-La Roche Ltd.*, 417 F.3d 1267
   (D.C. Cir. 2005) (No. 01-7115), 2005 WL 3873712....................................................10, 29

Amici Curiae Brief for the United States and the U.S. Federal Trade Commission,
   *Empagran, S.A v. F. Hoffmann-La Roche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005)
   (No. 01-7115), 2005 WL 388672 .............................................................................. *passim*

Amici Curiae Brief for the Federal Republic of Germany and Belgium, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004) (No. 03-724), 2004 WL 226388 .....................................................................................9, 30

Amici Curiae Brief for the United Kingdom of Great Britain and Northern Ireland, Ireland and the Kingdom of the Netherlands, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004) (No. 03-724), 2004 WL 226597 .................................................10, 30

Amicus Curiae Brief for the United States, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004) (No. 03-724), 2004 WL 234125 ...............................................11, 12

Hans W. Baade, *The Operation of Foreign Public Law*, 30 Tex. Int'l L.J. 429 (1995) ...............20

Margaret Bloom, *Should Foreign Purchasers Have Access to U.S. Antitrust Damages Remedies?  A Post-Empagran Perspective from Europe*, 61 N.Y.U. Ann. Surv. Am. L. 433 (2005) ..................................................................................................................28

Michelle Cini & Lee McGowan, *Competition Policy in the European Union* 41 (1998) .............14

Commission of the European Communities, Commission Staff Working Paper, Annex to the Green Paper:  "Damages Actions for Breach of the EC Antitrust Rules" (COM(2005) 672 final) (Dec. 19, 2005) ....................22, 25, 30, 31, 47

*Competition Law and Policy in the European Union 2005* ..........................................................15

Christopher Kerse &  Nicolas Kahn, *E.C. Antitrust Procedure* (2005)...................................15, 16

Neelie Kroes, European Commissioner for Competition Policy, Speech at Commission/IBA Joint Conference on EC Competition Policy, *Reinforcing the Fight Against Cartels and Developing Private Antitrust Damage Actions:  Two Tools For A More Competitive Europe* (Speech/07/128) (Mar. 8, 2007) ...............................29, 32

Philip J. McConnaughay, *Reviving the "Public Law Taboo" in International Conflict Of Laws*, 35 Stan. J. Int'l L. 255 (1999) ...........................................................................20

Tom McNamara, *International Forum Selection and Forum Non Conveniens*, 34 International Law 558 (2000) ...........................................................................................39

Gerald F. Masoudi, Deputy Assistant Attorney General, Antitrust Division., U.S. Department of Justice, Speech at the Cartel Conference in Budapest, Hungary, *Cartel Enforcement in the United States (and Beyond)* (Feb. 16, 2007)..................................................................................32

Office of Fair Trading [UK], Discussion Paper on Private Actions in Competition Law: *Effective Redress for Consumers and Business*, OFT 916 (April 18, 2007)...........43, 46, 48

*Regulatory Reform in International Air Cargo Transportation*, OECD Workshop
    on Regulatory Reform in International Air Cargo Transportation
    in Paris (July 5-6, 1999) ...................................................................................51

Denis Waelbroeck, et al., *Ashurst Study on the Conditions of Claims for Damages in
    Case of Infringement of EC Competition Rules* (Aug. 31, 2004)......................................27

Richard Whish, *Competition Law* (4th ed. 2001)................................................................8, 14, 3

**INTRODUCTION**

Defendants Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. (collectively, "Lufthansa") have settled with Plaintiffs all claims relating to shipments within, to, or from the United States in exchange for $85 million and Lufthansa's substantial and valuable cooperation.[1]  While that settlement awaits this Court's approval, the Court has stayed Lufthansa's obligation to answer or otherwise respond to Counts I through V of the First Consolidated Amended Complaint.  *See* Order (Dkt. Entry Apr. 27, 2007).  For purposes of this Motion to Dismiss, therefore, Plaintiffs assert against Lufthansa no claims under U.S. law or involving U.S. commerce.  The only claims at issue with respect to Lufthansa are the purely foreign-law/foreign-commerce claims in Counts VI and VII.

In these Counts, Plaintiffs allege that Defendants fixed the prices of airfreight cargo shipping services on "shipments within, to, from, or between any European Union Member State (*excluding shipments to or from the U.S.*)."[2]  By their terms, these Counts involve European commerce and have no connection whatever to United States commerce.  *None* of the named class representatives advancing these Counts is a U.S. company or individual; *all but one* of the class representatives, and most members of the applicable classes as defined in those Counts, are European.  Many of the Defendant air cargo carriers are European corporations; only two Defendants (one wholly owned by the other) are nationals of the United States.

These predominately European classes do not allege that the conduct at issue in Counts VI and VII violated any law of the United States; after the Supreme Court's recent decision in *F.*

---

[1] Effective July 1, 2007, Swiss International Air Lines Ltd. is a wholly owned subsidiary of Deutsche Lufthansa AG.  Lufthansa Cargo AG is also a wholly owned subsidiary of Deutsche Lufthansa AG.

[2] Compl. ¶ 374 (relating to Count VI) (emphasis added); ¶ 407 (relating to Count VII) (emphasis added).

*Hoffmann-La Roche Ltd. v. Empagran*, S.A., 542 U.S. 155 (2004) ("*Empagran I*"), they could not do so.  Instead, in Counts VI and VII Plaintiffs assert that Defendants' alleged price-fixing activities violated Article 81 of the Treaty Establishing the European Community ("EC Treaty"), a treaty among European nations to which the United States is not a party.  No court in the United States has ever adjudicated claims for damages arising under Article 81, much less claims—such as those Plaintiffs advance in Counts VI and VII—based entirely on transactions having no U.S. connection, among parties virtually all of whom are foreign to the United States.

In fact, only recently has the European Union ("EU") afforded courts of its Member States—the 27 countries that are parties to the EC Treaty—jurisdiction to apply Article 81 in its entirety.  In so doing, the EU has imposed a complex and detailed regulatory framework for civil enforcement of antitrust claims—a framework that entails active and defined cooperation among EU and Member State courts and regulatory bodies, *i.e.*, the European Commission, the European Court of Justice, and the national courts and competition authorities of each EU Member State. Obviously, the EU's design does not include U.S. courts.  Just as U.S. antitrust laws contemplate exclusive jurisdiction in the federal courts of *this* country to adjudicate civil antitrust claims under the Sherman Act, *see Marrese v. Amer. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 379-80 (1985), the EU structure plainly contemplates exclusive jurisdiction in the courts of the EU Member States for antitrust claims under Article 81.

This Court would violate the sovereign interests of the EU and its Member States in several ways if it were the first U.S. tribunal to assert jurisdiction over Article 81 claims.  *First*, U.S. adjudication of European antitrust law claims would nullify Europe's finely wrought framework for adjudicating such claims, evading structures deemed crucial by European sovereigns to define the roles of and ensure coordination among the European Commission, European Court of Justice,

- 2 -

and the national courts of Member States.  *Second,* it would frustrate the EU's and each of the 27

Member State's sovereign interests in developing and defining their own evolving antitrust laws,

by resolving in the context of this case fundamental and controversial—but as yet unsettled—

issues such as the availability of a pass-on defense and the ability of indirect purchasers to recover

damages under European law.  *Third*, the application of U.S. procedural rules to Article 81 claims

would override each Member State's sovereign judgments concerning the procedural framework

that should govern private antitrust claims—judgments that establish the incentives to bring suit

and the costs and burdens that the litigation of EC Treaty claims will impose on European litigants.

*Fourth,* U.S. adjudication of Article 81 claims would undermine the efficacy of antitrust leniency

programs in Europe by depriving European regulators of the ability to define the risks of self-

reporting violations of the EC Treaty.  The U.S. government has recognized the importance of

respecting European sovereignty, observing that overreaching by the United States would disrupt

U.S. policies, including international cooperation in antitrust enforcement and the U.S. Department

of Justice's leniency program.

For these reasons, and those discussed *infra*, this Court should dismiss Plaintiffs' EU-law

claims in Counts VI and VII on the ground of international comity.

Alternatively, for related reasons, this Court should dismiss Counts VI and VII under the

doctrine of *forum non conveniens*.  As compared with Europe's strong interest in vindicating its

own competition policies under *European* law with respect to *European* conduct by predominantly

*European* parties affecting *European* markets, the U.S. interest in adjudicating Counts VI and VII

is virtually non-existent.  Moreover, the claims raise a host of novel and complex choice-of-law

issues as well as unsettled questions of substantive foreign competition law, including the viability

of a pass-on defense, indirect purchaser standing, and the availability of exemplary damages—

questions of first impression under European law that are plainly best suited for litigation in courts in the European Union.  In light of the comity concerns expressed above—in particular the EU Member States' and the EU's own strong interests in developing and enforcing their own evolving competition policies and related procedures for the administration of civil justice in that context— these public factors weigh decisively in favor of dismissal.  Private factors, too, support dismissal. In particular, the witnesses and evidence related to Counts VI and VII are located abroad and may prove difficult for litigants in a U.S. proceeding to obtain for EU-law claims.  Moreover, the enforceability in Europe of an Article 81 judgment from a U.S. court is subject to serious question.

Finally, this Court should dismiss Counts VI and VII because there is no subject matter jurisdiction over Plaintiffs' EU-law claims.

For all of these reasons, and the grounds stated by the other Defendants, this Court should dismiss Counts VI and VII.

## BACKGROUND

This litigation grows out of the investigation of price-fixing activity in the air cargo industry by competition authorities around the world.  Lufthansa has been accepted into the leniency programs of the U.S. Department of Justice ("DOJ"), European Commission, and other authorities, and is actively cooperating in these ongoing investigations.  In addition to this litigation in the United States, Lufthansa and other defendants are currently parties in private suits in Canada and Australia.

*Lufthansa's Settlement of Claims Involving U.S. Commerce*.  Under the Antitrust Criminal Penalties Enforcement and Reform Act of 2004 ("ACPERA"), Pub. L. No. 108-237, 118 Stat. 665, Lufthansa, as the DOJ leniency applicant, is entitled to reduced damages in exchange for

cooperating with civil plaintiffs.[3]  Following several months of negotiations, in September 2006, Lufthansa and Plaintiffs represented by Cohen, Milstein, Hausfeld, & Toll, PLLC executed a Settlement Agreement that resolves claims involving air cargo shipping services for shipments within, to, or from the United States.[4]  That agreement was subsequently adopted by all class counsel appointed by this Court, including all counsel appointed to represent direct and indirect purchasers.  The Settlement Agreement requires Lufthansa to pay $85 million and to provide substantial cooperation—including attorney proffers, documents, interviews, and depositions—to the Plaintiffs in pursuing claims arising from U.S. commerce.[5]

   *Plaintiffs' Consolidated Complaint*.  On February 8, 2007, Plaintiffs filed a Consolidated Complaint containing seven class action counts.  Plaintiffs allege that Defendants conspired to levy inflated surcharges (including a fuel surcharge, a security surcharge, a war risk surcharge, and a U.S. Customs surcharge); agreed to eliminate or prevent discounting of prices; agreed on yields (a weighted average of all base rates charged on all products); and allocated customers, routes, or territories.  Compl. ¶¶ 82, 83.[6]  Counts I through V, which relate to commerce to, from, or within the United States, are the subject of Lufthansa's settlement, now pending approval by this Court.

---

[3] Specifically, ACPERA provides that "in any civil action alleging a violation of section 1 or 3 of the Sherman Act, or alleging a violation of any similar State law, based on conduct covered by a currently effective antitrust leniency agreement, the amount of damages recovered by or on behalf of a claimant from an antitrust leniency applicant" who provides "satisfactory cooperation" as defined in the statute "shall not exceed that portion of the actual damages sustained by such claimant which is attributable to the commerce done by the applicant in the goods or services affected by the violation." § 213(a)-(b).

[4] At that point, the more than 80 class action complaints that had been consolidated in the Eastern District of New York alleged Sherman Act violations and did not allege violations of foreign law.

[5] Pursuant to the terms of the Settlement Agreement, Lufthansa has already paid the full settlement amount into escrow and has already begun its cooperation.

[6] Prices for air freight shipping services are comprised of two main components, base rates and surcharges.

Counts VI and VII, by contrast, relate to commerce to, from, and within the European Union, *excluding shipments to or from the United States.  Id*. ¶¶ 374, 407.

Thus, Counts VI and VII, by definition, relate solely to commerce that is unconnected to the United States.  The subclass defined in Count VI would be composed of direct and indirect purchasers located "outside the United States" who purchased *both* shipping services within, to, or from the United States and shipping services within, to, or from the European Union (but excluding shipments to or from the United States).  Compl. ¶ 374.  Their claims in Count VI exclude their claims related to U.S.-connected commerce, which are addressed in other counts.  *Id.* The subclass under Count VII would be composed of direct and indirect purchasers who purchased shipping services within, to, or from the European Union (but excluding shipments to or from the United States).  *Id. ¶* 407.

In these Counts, Plaintiffs seek damages (compensatory and exemplary) and injunctive relief for the breach of the following European treaties and laws:

- a statutory duty imposed under Article 81(1) of the Treaty on European Union and Consolidated Version of the Treaty Establishing the European Community, Maastricht, Rome, and Amsterdam, 7 February 1992, 25 March 1957, 2 October 1996 (36 I.L.M. 56 (1998)) ("EC Treaty") (Ex. A); or

- a statutory duty imposed under Article 53(1) of the Agreement Creating the European Economic Area, 1 January 2004 ("EEA Agreement") (Ex. B); and/or

- a statutory duty not to infringe Article 81(1) of the EC Treaty, imposed under Section 2(1) of a United Kingdom statute entitled the European Communities Act 1972 (Ex. C).

*See* Comp. ¶¶ 392 (Count VI), 425 (Count VII).  These Counts also allege facts uniquely relevant to the European-law claims.  Evidently in an effort to conform with the requirements of EC and UK law, Plaintiffs allege that the effect of the conspiracy was to prevent, restrict, or distort competition within the EU common market, *see id.* ¶ 420; that the conspiracy was not

indispensable to the attainment of improved production or distribution of goods or the promotion of technical or economic progress, *id.* ¶ 422; and that European consumers were denied a fair share of any resulting benefits, *id*. *See* EC Treaty, art. 81 (Ex. A).

**ARGUMENT**

**I.  COUNTS VI AND VII SHOULD BE DISMISSED BECAUSE THEY VIOLATE PRINCIPLES OF INTERNATIONAL COMITY**

Under the doctrine of international comity, U.S. courts decline to exercise jurisdiction where a foreign sovereign has an interest in enforcing its own laws,[7] or where another nation has an overriding interest in the dispute.[8]  The doctrine has been described by the Supreme Court as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  The doctrine "is clearly concerned with maintaining amicable working relationships between nations."  *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.*, 412 F.3d 418, 423 (2d Cir. 2005).  Such deference "fosters international cooperation

---

[7] *See, e.g., Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 490 (D.N.J. 1999) (dismissing claims on ground of international comity and explaining that "[a]lthough courts are not bound by a foreign government's pronouncement of which claims are cognizable, the principles of international comity dictate that a court not interfere with a foreign sovereign's pronouncement of its law"); *Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642, 645 (E.D. Pa. 2000) ("The rationale for dismissals based on comity is not based simply on a lack of familiarity with the particular foreign law, but rather is in deference to the foreign country's legal, judicial, legislative, and administrative system of handling disputes over which it has jurisdiction, in a spirit of international cooperation."); *see also Voda v. Cordis Corp.*, 476 F.3d 887, 900 (Fed. Cir. 2007) (denying supplemental jurisdiction over foreign patent law claims because as a matter of comity it would disrupt the foreign procedures in place for resolution of such claims).

[8] *See, e.g., Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1521 (11th Cir. 1994) ("There appears to be no clear federal interest in trying this case . . . .  [T]he public interest in the litigation is more conspicuous in Germany . . . ."); *Torres v. Southern Peru Copper Corp.*, 965 F. Supp. 899, 908-09 (S.D. Tex. 1996) (declining to exercise jurisdiction because Peru had greater interests), *aff'd*, 113 F.3d 540 (5th Cir. 1997); *Sequihua v. Texaco, Inc.*, 847 F. Supp. 61, 63 (S.D. Tex. 1994) (declining to exercise jurisdiction because Ecuador had greater interests).

and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) (quotations omitted).

For a U.S. court to adjudicate Plaintiffs' Article 81 claims—involving wholly European commerce, primarily foreign parties, and arising under a European treaty to which the United States is not a party—would seriously contravene principles of international comity.  The EU has established a complex regulatory framework for adjudicating such claims that involves careful coordination between the national courts and competition authorities of the EU Member States and the EU.  Like the Sherman Act—which contemplates exclusive enforcement by the U.S. federal courts—the EU regulatory scheme for Article 81 claims clearly contemplates exclusive European enforcement.  The involvement of a U.S. court would override the important sovereign interests of the EU and European governments in developing and applying their own evolving antitrust laws to conduct affecting European markets.

Both U.S. courts to address the issue to-date have denied jurisdiction over antitrust claims arising under the EC Treaty.  In 2000, the Southern District of New York refused to exercise jurisdiction over an antitrust claim under Article 82[9] of the EC Treaty, on the ground that a U.S. court is not in a position to decide unresolved questions of European competition law, particularly because it has no ability to seek guidance from the European Court of Justice.  *See Information Resources, Inc. v. Dunn & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2000). Similarly, on remand from the Supreme Court, the district court in *Empagran* itself cited comity as

---

[9] Article 82 of the EC Treaty addresses the unilateral conduct of firms in a dominant market position.  Article 81, by contrast, deals with agreements and concerted practices that are harmful to competition.  *See, e.g.*, Richard Whish, *Competition Law* 149 (4th ed. 2001).  Plaintiffs' EC Treaty claims in Counts VI and VII arise solely under Article 81 (and its analog in the EEA Agreement, Article 53), *see* Compl. ¶¶ 392 (Count VI); 425 (Count VII), but the sovereign and comity concerns are the same.

one basis for declining supplemental jurisdiction over EU-law antitrust claims in Article 81.  *See*

*Empagran, S.A. v. F. Hoffmann-La Roche Ltd.*, 453 F. Supp. 2d 1, 12 (D.D.C. 2006) (*Empagran*

*II*).[10]

    The same result is compelled here.

### A.    U.S. Adjudication of Antitrust Claims Involving Wholly Foreign Commerce Would Violate Principles of International Comity Asserted by Many Foreign Sovereigns and Recognized by All Three Branches of the U.S. Government

    In analogous contexts and for reasons applicable here, European sovereigns (and other U.S.

allies and trading partners) have voiced strong opposition to interference with their competition

regimes occasioned by U.S. civil litigation directed at commerce not touching the United States.

All three branches of the U.S. government have recognized the comity concerns that require

dismissal of Counts VI and VII here.

    In *Empagran I*, the U.S. Supreme Court considered whether principles of comity counseled

against applying the Sherman Act to foreign commerce having no meaningful connection to the

United States.  An extraordinary number of important U.S. allies and trading partners—including

the United Kingdom, Ireland, the Netherlands, Germany, Belgium, Canada, and Japan—appeared

as *amici* to assert strong objections to U.S. interference with their competition laws.  And although

*Empagran* involved the application of U.S. substantive law to foreign conduct, these foreign

sovereigns objected as well to the imposition of procedural features of the U.S. litigation system on

essentially foreign disputes.  *See, e.g.*, Brief for the Governments of the Federal Republic of

Germany and Belgium as Amici Curiae, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S.

155 (2004), (No. 03-724), 2004 WL 226388 (hereinafter "Germany and Belgium Br.") at 14

---

[10] In *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635, 2003 WL 1961636 at *5 (S.D.N.Y. Apr. 25, 2003), the court dismissed an Article 86 (now Article 82) claim along with a number of others for failure to state a claim, but did not address comity or any other threshold ground for dismissal.

(arguing for "Germany's and Belgium's sovereign rights to make their own choices about how to structure and apply their competition laws in determining liability and imposing remedies").[11]

Moreover, these U.S. allies warned that assertions of jurisdiction by U.S. courts in foreign competition disputes could harm international relations, spark retaliatory legislation, and hamper international cooperation in the antitrust sphere.  On remand in *Empagran*, certain foreign governments, including the United Kingdom and Germany, argued that:

> Effective antitrust enforcement in an increasingly global economy depends on close governmental cooperation and coordination as well as respect for the decisions of other nations. . . . But such cooperation depends on reciprocal respect for the enforcement practices, priorities and jurisdiction of the other country. This would be undermined by jurisdictional actions that could, as the Supreme Court noted, be viewed as 'legal imperialism.'

Foreign Governments' D.C. Cir. Br. at 21-23.[12]

The U.S. Executive Branch has recognized the validity of these concerns.  The United States as *amicus* urged the Supreme Court to "consider the large number of antitrust statutes

---

[11] *See also* Brief for the United Kingdom of Great Britain and Northern Ireland, Ireland, and the Kingdom of the Netherlands as Amici Curiae, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004), (No. 03-724), 2004 WL 226597 (hereinafter "U.K. Br.") at 13 (listing—to them—problematic features of the U.S. litigation system, such as "generous class action certifications," "broad discovery rules," "jury trials," and "subsidized contingency fee arrangements"); Brief for the Federal Republic of Germany, United Kingdom of Great Britain and Northern Ireland, Japan, the Swiss Confederation, and the Kingdom of the Netherlands as Amici Curiae, *Empagran, S.A. v. F. Hoffmann-La Roche Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005), (No. 01-7115), 2005 WL 3873712 (hereinafter "Foreign Governments' D.C. Cir. Br.") at 1 (arguing that the "differences in these [foreign countries'] legal systems . . . reflect deliberate policy choices that should be respected by the United States' commitment to international comity").

[12] *See also* Germany and Belgium Br. at 26, 27 ("One consequence of foreign disapproval with U.S. encroachments on other nation-states' antitrust enforcement efforts will be a refusal to enforce judgments obtained in U.S. lawsuits. . . . This reaction, in turn has its own consequences for international relations and diplomacy."); Foreign Governments' D.C. Cir. Br. at 23, 24 (noting examples where foreign governments have been "outraged" by U.S. private antitrust decisions involving foreign commerce and observing that "[t]hese cases are noteworthy because they generated intense reaction and retaliation against the United States which affected intergovernment cooperation.  The private actions in the *Uranium Cartel* [*In re Uranium Antitrust Litig.*, 617 F.2d 1247 (7th Cir. 1980)] case caused several countries to enact statutes blocking discovery of documents and other information needed to prosecute foreign defendants.").

around the world that deter and punish cartel activity."  Brief for the United States as Amicus

Curiae, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542  U.S. 155 (2004), (No. 03-724), 2004

WL 234125 (hereinafter "United States Br.") at 24.  The United States continued:

> [A]pproximately 100 countries now have comprehensive antitrust laws . . .[that]
> allow private lawsuits to recover damages for antitrust violations or provide for
> damages in conjunction with administrative proceedings. . . . These countries have
> enacted the remedies that their governments consider appropriate, and United States
> law should not promote forum shopping that undermines those sovereign
> judgments.

*Id.*  On remand in the D.C. Circuit, the United States elaborated on its concerns over forum

shopping, noting that "[w]hile some countries' antitrust regimes fairly can be described as

developing, this is no reason to circumvent and stunt them by drawing private antitrust litigation

away to U.S. courts."  Brief for the United States and the U.S. Federal Trade Commission as

Amici Curiae, *Empagran, S.A. v. F. Hoffmann-La Roche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005),

(No. 01-7115), 2005 WL 388672 (hereinafter "United States D.C. Cir. Br.") at 24-25.  Using

language equally applicable here, the United States also opined that the *Empagran* plaintiffs

> would treat the United States as the world's antitrust policeman, as if all private
> antitrust litigation must be filed here. *But this is 'legal imperialism*,' 124 S. Ct. at
> 2369, *and the foreign governments that participated in the Supreme Court as amici
> properly believe their enforcement capabilities and methods of compensation to
> injured consumers to be appropriate*.

*Id.* (emphasis added).  Finally, the United States urged careful consideration of past instances of

discord and retaliatory legislation sparked by aggressive assertions of U.S. jurisdiction.  *Id.* at 26;

*see also* United States Br. at 21, 22 (noting that an aggressive assertion of U.S. jurisdiction could

"result in tension with our trading partners and attempts by foreign countries to enact statutory

counter-reactions to any judgments entered in such suits," including blocking statutes and refusals

to enforce U.S. judgments); *see also* U.K. Br. at 16.

In *Empagran I*, the U.S. Judicial Branch concurred.  The Supreme Court held that principles of comity counseled against applying the Sherman Act to foreign commerce having no meaningful relationship to the United States.  As the Court explained, this country should allow other nations to make their "own determination[s]" about how best to protect their citizens from anticompetitive conduct that affects commerce within their own borders but not within ours; a contrary result would have amounted to "legal imperialism."  542 U.S. at 165.

These comity concerns point to dismissal here.  As in *Empagran I*, the commerce put at issue by Plaintiffs in Counts VI and VII occurred in foreign markets and had no connection to the United States.  As in *Empagran I*, if U.S. courts endeavored to apply European antitrust law to European-commerce claims using US procedures, they would "supplant," *id.*, foreign governments as rightful arbiters of their own antitrust laws, regulators of their own markets, and architects of their own governing systems of civil justice.  The Supreme Court's concern with comity would hardly be served if, following *Empagran I*, federal courts stopped adjudicating foreign-commerce claims under the Sherman Act only to begin doing so under foreign antitrust law.

The U.S. Congress—like the Executive and Judicial Branches—has also recognized these concerns.  By its terms, the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") defines the reach of the Sherman Act, *see* 15 U.S.C. § 6a, but its legislative history reflects Congress' larger goal of encouraging other countries to develop their own private antitrust enforcement regimes, and the need for the United States to refrain from overreaching, if this is to occur.  As the House Judiciary Committee Report observed, the exercise of restraint by the United States "could encourage our trading partners to take more effective steps to protect competition in their markets."  H.R. Rep. No. 97-686, at 14 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2499; *see*

*also* House Hearing[13] at 85 (statement of James Atwood) (leaving enforcement with respect to transactions with exclusively foreign effects to other nations "will encourage the development of foreign antitrust programs that will be similar to ours" and "will bring about over time a better, clearer, more effective regime of antitrust cooperation across borders"); *id*. at 92-93 (noting that appropriate restraint by the United States "would make clear to foreign governments that the protection of competition within their home markets is their responsibility, not the responsibility of the United States").[14]

     **B.**     **The EC Treaty and EU Regulatory Framework Constitute a Carefully-Balanced and Exclusive Structure for Enforcement of Article 81 That Is Incompatible with Adjudication Outside the EU**

     The complex European framework for adjudication of civil claims arising under Article 81 of the EC Treaty is plainly incompatible with adjudication of such claims in U.S. courts.[15]

     The EC Treaty was signed in 1957 by six European nations.  Twenty-seven nations are now signatories and comprise the European Union.   Primary objectives of the EC Treaty are to provide "an internal market characterized by the abolition, as between Member States, of obstacles to the free movement of goods, persons, services and capital," and "a system ensuring that

---

[13] *See* Foreign Trade Antitrust Improvements Act: Hearing on H.R. 2326 Before the Subcomm. On Monopolies and Commercial Law of the House Comm. on the Judiciary, 97th Cong., 85 (1981) ("House Hearing").

[14] In exercising its discretion, this Court can and should take into account these clear expressions of U.S. policy.  *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 390-91 (1970) ("[A] legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved.  The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.").

[15] Pursuant to Fed. R. Civ. P. 44.1, Lufthansa submits the Declarations of George Bermann, Ulrich Immenga, and Nicholas Green, QC, to address certain foreign-law questions implicated by Plaintiffs' claims in Counts VI and VII.  Lufthansa also cites to the Declaration of Jurgen Basedow submitted by the other Defendants.

competition in the internal market is not distorted."  EC Treaty, arts. 3, 4.  As relevant to the

allegations in Counts VI and VII, Article 81 provides that:[16]

> [T]he following shall be prohibited as incompatible with the common market:  all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the common market, and in particular those which:
>
> (a)  directly or indirectly fix purchase or selling prices or any other trading conditions;
>
> (b)  limit or control production, markets, technical development, or investment;
>
> (c)  share markets or sources of supply; [… .]

Under Article 81(3), this prohibition "may  . . .  be declared inapplicable" to any practice at issue

"which contributes to improving the production or distribution of goods or to promoting technical

or economic progress, while allowing consumers a fair share of the resulting benefit," and which

does not "(a) impose on the undertakings concerned restrictions which are not indispensable to the

attainment of these objectives; [or] (b) afford such undertakings the possibility of eliminating

competition in respect of a substantial part of the products in question."  *Id.*  (Ex. A)

The European Commission ("Commission") plays a central role in enforcing the provisions

of the EC Treaty, including Article 81.[17]  In 1962, the EU legislative body passed Regulation

17/62, which delegated to the Commission power to administer and enforce EC competition law.[18]

---

[16] Articles 81 and 82 were previously numbered Articles 85 and 86, respectively.

[17] The European Commission is part of the executive branch of the European Union.  *See, e.g.*, Michelle Cini and Lee McGowan, *Competition Policy in the European Union*  41 (1998) ("European competition policy is *de facto* a Commission policy.  It is the Commission that determines what the policy is and how it is implemented on the ground.  It is the Commission that identifies a breach of the rules, undertakes the investigation and decides whether to take a formal decision.  And it is the Commission that fines, and even establishes the level of the penalty.").

[18] *See* Council Regulation 17/62, art. 9, 1962 O.J. (L 13) 204 ("The Commission shall have power to apply Article [81(1)] and Article [82] of the Treaty."); *see also* Whish, at 216 (explaining that Regulation 17/62 "confer[ed] wide powers upon the Commission, for example to request

In particular, Regulation 17/62 gave the Commission, and no other governmental body, the power to grant an exemption under Article 81(3).[19]  *See* Green Decl. ¶ 43 n.21.

The highest court of the European Union—the European Court of Justice ("ECJ")—also plays a central role in shaping European competition policy.[20]  The ECJ is comprised of one judge from each of the 27 Member States and has jurisdiction over all matters of EC law.  Its decisions are binding in all EU Member States.  *See* Kerse and Kahn, at 445.  Under Article 234 of the EC Treaty, the EU Member State courts have the ability to refer questions of EC law directly to the ECJ for a preliminary ruling.  EC Treaty, art. 234 (Ex. D).  For lower courts of each Member State, such a referral is discretionary, but the court of last resort in each Member State is required to refer questions of EC law to the ECJ.  *Id.*  That referral structure is a fundamental mechanism for maintaining the primacy and uniformity of EC law and ensuring control over the development of that law by the organs of the EU.  Green Decl. ¶¶ 30-32; Basedow Decl. ¶¶ 15-19.

Until this decade, it was unsettled whether the national courts of EU Member States were obligated to provide a damages remedy for violation of Articles 81 and 82.[21]  It was not until 2001, in *Crehan v. Courage*, that the ECJ confirmed that damages must be made available in the national

---

information, to carry out on-the-spot investigations, . . . and to impose penalties for transgression of the competition rules").

[19] *See id.* ("Subject to review of its decision by the Court of Justice, the Commission shall have sole power to declare Article [81(1)] inapplicable pursuant to Article [81(3)] of the Treaty.").  *See also Competition Law and Policy in the European Union* 2005 at 10, *available at* http://www.oecd.org/dataoecd/7/41/35908641.pdf (noting that Regulation 17/62 "marginalised the national agencies and courts by giving the Commission priority in investigations under Community law and exclusive competence over the key subject of exemptions").

[20] The other EU court, the Court of First Instance ("CFI") was established in 1989 and has jurisdiction to review, among other things, decisions by the Commission concerning Article 81.  Appeals from the CFI lie directly with the ECJ.  *See* Christopher Kerse and Nicholas Kahn, *EC Antitrust Procedure* 445 (5th ed. 2005).

[21] *See* Basedow Decl. ¶¶ 24-26; *see also* Whish, at 276-277 (explaining how, in 2001, ECJ had yet to address whether damages were available to private parties in the Member States' courts).

courts.  *See* Case C-453/99 *Crehan v. Courage* [2001] E.C.R. I-6297 (Ex. E); Basedow Decl.

¶¶ 25-26.  In *Crehan*, the ECJ ruled that "the national courts whose task it is to apply the

provisions of Community law in areas within their jurisdiction must ensure that those rules take

effect and must protect the rights which they confer on individuals."  *Crehan*, at ¶ 25.  The *Crehan*

court further established that Article 81 serves to preempt certain features of national law.  *Id.* ¶ 28

(holding that England's national rule that a party to an illegal agreement cannot claim damages for

harm resulting from that agreement must give way in favor of each nation's duty under EU law to

provide an adequate damages remedy for violation of Article 81); *see also* Basedow Decl. ¶ 27

(discussing *Crehan*).

In 2002, the Council of the European Union passed Regulation No. 1/2003, which is known

as the "Modernization Regulation."  (Ex. F.)  This Regulation provided that the "national courts

[of the EU Member States] shall have the power to apply Article 81 and 82 of the EC Treaty."  *See*

Mod. Reg., art. 6.  The Regulation also granted the national courts authority—previously held

exclusively by the European Commission—to apply the defense established under Article 81(3).[22]

The Modernization Regulation thus empowers the national courts of the *EU Member States*—and

no other courts—to apply Article 81 of the EC Treaty.  *See* Green Decl. ¶¶ 20-23, 45-46.

The Modernization Regulation mandates an interactive relationship between the

Commission and the Member State courts and promotes uniformity in the application of Article 81

by setting forth precise regulations detailing *how* the Member State courts should coordinate with

---

[22] *See* Mod. Reg., recital no. 7 ("National courts have an essential part to play in applying the Community competition rules.  When deciding disputes between private individuals, they protect the subjective rights under community law, for example by awarding damages to the victim of infringements.  The role of the national courts here complements that of the competition authorities of the Member States.  They should therefore be allowed to apply Article 81 and 82 of the Treaty in full.").

the Commission.[23]  The national courts are required, "without delay," to "forward to the Commission a copy of any written judgment . . . deciding on the application of Article 81 or Article 82 of the Treaty."  Mod. Reg., art. 15(2).  Additionally, national courts may request the Commission to transmit to them information in its possession or its "opinion on questions concerning the application of the Community competition rules."  *Id.* art. 15(1).[24]

Moreover, Member State courts must defer to the Commission's determinations and proceedings.  The Modernization Regulation provides that, when Member State courts "rule on agreements, decisions or practices under Article 81 or Article 82 of the Treaty which are already the subject of a Commission decision, they cannot take decisions running counter to the decision adopted by the Commission."  *Id.* art. 16(1).  Thus, unlike plaintiffs under the Sherman Act, who are not "bound" by the results of the DOJ's enforcement activities, plaintiffs under Article 81 are bound by Commission determinations as to whether any prohibited activity occurred.

Additionally, the Member State courts "must . . . avoid giving decisions which would conflict with a decision contemplated by the Commission in proceedings it has initiated," *id.*, and, "may assess whether it is necessary to stay [their] proceedings" during the pendency of Commission proceedings.  *Id.*  The practical effect of this Regulation is that the national courts of

---

[23] In this way, the Modernization Regulation codifies a number of more general principles and duties under EC law, such as the principle of supremacy, the duty to secure legal certainty and uniformity of law, the duty to refer EC questions to the ECJ, and the duty of cooperation.  *See* Green Decl. ¶¶ 20-21.

[24] The Regulation also makes clear that "[t]he Commission and the competition authorities of the Member States shall apply the Community competition rules in close cooperation," *id.* art. 11(1), for example, by requiring the Member States' competition authorities to notify the Commission in writing before their first investigative measures, *see id.* art. 11(3), and providing that "[t]he initiation by the Commission of proceedings . . . shall relieve the competition authorities of the Member States of their competence to apply Article 81 and 82 of the Treaty," *see id.* art. 11(6).  Further, a network, called the "European Competition Network," facilitates coordination between the Commission and the various competition agencies in the Member States.  *See* *http://ec.europa.eu/comm/competition/ecn/index_en.html* (last visited July 8, 2007).

EU Member States cannot entertain Article 81 damages actions during the pendency of a Commission proceeding.  *See* Basedow Decl. ¶ 23; Green Decl. ¶¶ 41-42.

A U.S. court adjudicating claims under Article 81 could not comply with—and has no place in—the regulatory structure imposed by the Modernization Regulation.  Unlike an EU Member State court, for instance, a U.S. court would have no right to request from the Commission its opinion on the application of Article 81 or information in its possession regarding the parties' conduct.  By the same token, the Commission would not be required to provide such information to courts outside of the EU.  *See* Green Decl. ¶¶ 37, 46.

More importantly, unlike a European court, a U.S. court adjudicating an Article 81 claim would not be obligated to—and likely could not—defer unconditionally to Commission findings with respect to the conduct at bar.  Plaintiffs have no role in Commission proceedings and thus could not be bound by Commission findings exonerating defendants of prohibited conduct, or its determination that the exemption of Article 81(3) applied.  Nor would plaintiffs likely be permitted to use findings of infringement to bind defendants because the Commission does not afford litigants many of the rights traditionally afforded by U.S. courts—*e.g.,* the right to cross-examine witnesses.[25]  Thus, whereas EC law mandates that the Commission's current investigation of the air cargo industry and its findings regarding the very conduct at issue in the instant case must control the outcome of civil litigation brought under Article 81, a U.S. court would make

---

[25] *See Epperson v. Entm't Express, Inc*., 242 F.3d 100, 108 (2d Cir. 2001) (quoting *United States v. Hussein,* 178 F.3d 125, 129 (2d Cir. 1999)) (collateral estoppel, or issue preclusion, "applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits").  "Due process prohibits estopping" those who have not had the "full and fair" opportunity to litigate.  *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971).  In the analogous agency context, courts have clearly stated that a "full and fair opportunity to litigate" exists only when the agency "employ[s] procedures substantially similar to those used in a court of law."  *Bland v. New York*, 263 F. Supp. 2d 526, 551 (E.D.N.Y. 2003).

independent findings.  The resulting potential for inconsistent adjudication clashes fundamentally with the European civil remedial scheme.

Nor, with respect to legal questions under the EC Treaty, is there any mechanism in place that would allow U.S. courts to obtain an opinion from the ECJ on an unresolved issue of EC law.  *See* Basedow Decl. ¶ 19 ("The reference procedure . . . is only available to courts in Member States. . . .A reference to the Court of Justice can not be made by a court in a third state, nor can it be made by a private party. . ."); Green Decl. ¶¶ 32, 46.  Recognizing this fundamental problem, the Southern District of New York denied jurisdiction over a claim under Article 82 of the EC Treaty.  *See Information Resources, Inc.*, 127 F. Supp. 2d at 417 (concluding that, unlike an EU national court, a U.S. court "does not have th[e] option" of seeking an opinion from the ECJ on questions of EC law; instead, "it would have to decide what European Community law would be, *de novo*"); *see also Empagran II*, 453 F. Supp. 2d at 11 (refusing to exercise jurisdiction over plaintiffs' Article 81 claims, especially in light of the comity concerns implicated by the need to apply "novel, complex and developing foreign law").  Thus, contrary to the EU's plan for civil adjudication, a U.S. court insistent on adjudicating Article 81 claims would proceed without the guidance and control of the ECJ.

In sum, the EU regulatory system for enforcement of Article 81—established to ensure both "that competition in the common market is not distorted" and that Article 81 is "applied effectively and uniformly in the Community"[26]—contemplates *exclusive* enforcement in and among the courts and competition authorities of Member States, and the EU itself.  For that reason, as in *Information Resources* and *Empagran* on remand, this Court should dismiss Counts VI and VII and require those Article 81 claims to be adjudicated in European courts.

---

[26] Mod. Reg., recital no. 1.

C.      **Dismissal of Article 81 Claims on Comity Grounds Is Required by the Public Law Character of Antitrust Regulation**

Out of respect for foreign sovereignty, courts in the United States have long declined to enforce the public laws of foreign states, leaving such enforcement to the sovereigns who promulgate them.  As discussed in this section, antitrust law is quintessentially public law. [27] Europe's commitment of antitrust civil enforcement exclusively to its own judicial framework— like the Sherman Act's exclusive commitment to the U.S. federal courts—is consistent with the public nature of antitrust law.  Indeed, as discussed *infra*, European courts have recognized that Sherman Act claims can be adjudicated only in the United States, and the only two U.S. district courts to address the question of their jurisdiction over EC competition law claims dismissed them based in part on similar considerations.

Public laws—such as antitrust, labor, penal, securities, and tax laws—are those that aim to ensure "the proper functioning of the state, and the realization of the state's conception of the public interest,"[28] and they are inherently creatures of the sovereign that issues them.[29]  Judge Learned Hand commented:

> [T]o pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted [sic]

---

[27] *See* Bermann Decl. ¶¶ 18, 20;  *see also*, *e.g.*, Philip J. McConnaughay, *Reviving the "Public Law Taboo" in International Conflict of Laws*, 35 Stan. J. Int'l L. 255, 256 (1999) (identifying antitrust law among other public laws, including securities law, exchange controls, and general economic regulation).

[28] Hans W. Baade, *The Operation of Foreign Public Law*, 30 Tex. Int'l L. J. 429, 447 (1995).  As such, public laws differ from private laws, which serve primarily to protect the interests of private parties.

[29] *See Huntington v. Attrill*, 146 U.S. 657, 669 (1892) (noting that "the jurisdiction of crimes is local" because crimes "are a breach and violation of public rights and duties, which affect the whole community, considered as a community"); *Pasquantino v. United States*, 544 U.S. 349, 368 (2005) (purpose of rule barring actions involving foreign revenue laws is "to guard [against the] judicial evaluation of the policy-laden enactments of other sovereigns").

to other authorities.  It may commit the domestic state to a position which would seriously embarrass its neighbor.

*Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (Hand, J., concurring).

By its nature, antitrust law is inextricably bound up with sovereign policy determinations concerning the appropriate balance of government intervention in the marketplace.  *See* Bermann Decl.  ¶¶ 18, 20.  Thus, in the United States, courts have recognized that "[t]he antitrust laws  . . . were enacted for the protection of *competition*, not *competitors*."  *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  United States courts have also recognized that "[a] claim under the antitrust laws is not merely a private matter," because there is a "pervasive public interest in enforcement of the antitrust laws."  *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826, 827-828 (2d Cir. 1968); *see also Alpine Pharmacy v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir. 1973) (noting that antitrust law in particular "depends heavily on the notion of the private attorney general as the vindicator of the public policy") (internal quotations and citations omitted).[30]

Similarly, Article 81—like the other provisions of the EC Treaty—is public in nature and aims to protect competition within the European common market.  *See* Bermann Decl. ¶¶ 21-22.  Article 81 seeks to prevent injury to the "common market," not individual competitors.  *See* EC Treaty, art. 81(1) (prohibiting agreements and practices whose effect is "the prevention, restriction or distortion of competition within the common market"); art. 81(3) (affording a defense for

---

[30] *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) (recognizing "fundamental importance to American democratic capitalism of the regime of the antitrust laws"); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (private plaintiffs protect the "free-enterprise system envisaged by Congress" by "serv[ing] as private attorneys general"); *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) (private plaintiffs "vindicate the important public interest in free competition");  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) (encouraging private antitrust actions "serve[s] the high purpose of enforcing the antitrust laws").

conduct that "contributes to improving the production or distribution of goods or to promoting

technical or economic progress, while allowing consumers a fair share of the resulting benefit").

Plaintiffs' Count VI and VII allegations provide ready illustration of the public-law nature of

Article 81 claims.  In those Counts, they claim:

> Defendants agreed to and engaged in concerted practices which appreciably and
> foreseeably affected trade between Member States, and prejudiced the realization of
> a market between Member States. These concerted practices had as their object and
> effect the prevention, restriction and distortion of competition within the common
> market and were conducted in a manner incompatible with the common market.

Compl. ¶ ¶ 387, 420.  Moreover, as was discussed above, the European Court of Justice only

recently recognized a claim for private damages under Article 81 at all, and this recognition was

aimed in large part at better reaching the public goal of a competitive economy.  *See, e.g*,

Commission of the European Communities, Commission Staff Working Paper, Annex to the

Green Paper: "Damages Actions for Breach of the EC Antitrust Rules" (COM (2005) 672 final)

(Dec. 19, 2005) at ¶ 10 ("Commission Staff Working Paper") (Ex. G) ("Facilitating and increasing

private enforcement of EC antitrust rules would further add to the efficiency of competition law

enforcement, and make an important contribution to the key objective of ensuring open and

competitive markets in the EU's internal market."); Bermann Decl. ¶ 22.[31]

Additional features of the U.S. and EU antitrust regimes underscore the public-law nature

of civil antitrust litigation.  For example, in the United States, Congress deviated from the

compensatory goals that are the hallmark of private tort remedies to provide expressly for treble

damages and attorneys' fees for successful plaintiffs in Sherman Act cases.  "The treble-damages

provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme,"

---

[31] The European Court of Justice declared in its *Eco Swiss* judgment that "the provisions of Article
81 EC (ex Article 85) may be regarded as a matter of public policy." Case C-126/97, *Eco Swiss
China Time Ltd. v. Benetton Int'l NV* [1999] at ¶ 36, E.C.R. I-3055.

*Mitsubishi Motors. Corp.*, 473 U.S. at 635, and reveals Congress's intent to incentivize a group of "private attorneys general" to aid in the enforcement of the public policy goals expressed in the federal antitrust laws, *Standard Oil Co.*, 405 U.S. at 262 ("By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'").  Moreover, the Supreme Court construed § 4 of the Clayton Act to provide a private cause of action to direct purchasers only—regardless whether, as an economic matter, more remote indirect purchasers may have suffered the actual injury from the challenged conduct.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977).  As the Court later reaffirmed, "[t]he existence of an identifiable class of [direct purchasers] whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general."  *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

Similarly, in the EU, the detailed framework for adjudicating Article 81 claims—which requires close coordination among the principal institutions at the EU level (including the Commission and the ECJ) and between EU institutions and the Member State courts and competition authorities—flows from and reflects the public-law nature of Article 81.  *See* Bermann Decl. ¶¶ 33-36.  This framework is designed to ensure that private enforcement actions complement and are consistent with public policy and public enforcement as developed, coordinated, and pursued by the European Commission.  As stated in the first clause of the Modernization Regulation:  "In order to establish a system which ensures that competition in the common market is not distorted, Articles 81 and 82 of the Treaty must be applied *effectively and uniformly in the Community*."  Mod. Regulation 1/2003 (emphasis added) (Ex. F).  Indeed, as compared to the United States, the public-law nature of antitrust regulation may be even more

- 23 -

pronounced in the EU given that Member State courts are *prohibited* from awarding damages in the event that the institution charged with public enforcement of Article 81—the Commission—determines that no infringement occurred, and required to offer a remedy where the Commission finds a violation.

One consequence of the inherent public nature of antitrust law in the United States is the Supreme Court's determination that "federal antitrust claims are within the *exclusive jurisdiction* of the federal courts." *Marrese v. Amer. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379-80 (1985) (citing *Gen. Inv. Co. v. Lake Shore & Mich. Southern Ry. Co.*, 260 U.S. 261, 287 (1922)) (emphasis added). Judge Hand articulated at least part of the rationale, explaining that the private remedy provided under the Sherman and Clayton Acts

> was part of the effort to prevent monopoly and restraints of commerce; and it was natural to wish it to be uniformly administered, being national in scope. … Obviously, an administration of the Acts, at once effective and uniform, would best be accomplished by an untrammeled jurisdiction of the federal courts.

*Lyons v. Westinghouse Elec. Corp.*, 222 F.2d 184, 189 (2d Cir. 1955) (Hand, J.). Critically for present purposes, the Second Circuit has noted that "English courts will not enforce the Sherman Act." *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998) (citing *British Nylon Spinners Ltd. v. Imperial Chem. Indus., Inc.* [1953] 1 Ch. 19 (A.C. 1952)). The British House of Lords too has recognized that responsibility for applying the Sherman Act lies exclusively within the United States. *British Airways Bd. v. Laker Airways Ltd.* [1985] 1 A.C. 58 [H.L.], at 79 ("The Clayton Act which creates the civil remedy with threefold damages for criminal offences under the Sherman Act is, under English rules of conflict of laws, purely territorial in its application…." and "there is a single forum only that is of competent jurisdiction to determine the merits" of claims asserted under it—namely the U.S. federal courts).

Just as the United Kingdom recognizes the United States as the exclusive forum for adjudication of Sherman Act claims, U.S. courts should continue to show concomitant respect to the EU and its 27 Member States by declining jurisdiction over Article 81 claims.  *See, e.g.*, *Information Resources*, 127 F. Supp. 2d at 417; *Empagran II*, 453 F. Supp. 2d at 12.  In doing so, U.S. courts will allow the European courts and the European Commission to develop and administer European competition law according to their own view of the European public interest. *See* Bermann Decl. ¶¶ 32-47.

> **D.     Adjudicating Counts VI and VII in the United States Would Undermine the Sovereign Interests of European Governments in Developing and Enforcing Their Own Evolving Laws and Would Damage International Antitrust Cooperation**

Adjudication of Counts VI and VII by this Court outside of the European framework described above would damage both the development of European competition law and the current cooperation between the United States and Europe in policing anticompetitive behavior at the international level.

> **1.     *For This Court to Interpose Itself as Arbiter of Diverse and Unsettled Aspects of European Antitrust Law Would Undermine Sovereign European Interests In Developing and Enforcing Their Own Evolving Antitrust Laws***

Adjudication of Plaintiffs' claims in Counts VI and VII would require this Court to decide a host of diverse and unsettled questions of European competition law that the countries of Europe and the organs of the EU themselves have not yet had the chance to resolve.  Although Article 81 provides the substantive prohibition on anticompetitive conduct, the *national law* of each Member State establishes the parameters of the cause of action and private damages remedies for violation of Article 81.[32]  As the U.S. Supreme Court's very recent holdings in the *Twombly* and *Leegin*

---

[32] *See* Commission Staff Working Paper at ¶ 22 (footnote omitted) (Ex. G) ("The conditions for the exercise of this right to a remedy to damages are, in the absence of Community law rules on the

cases make clear,[33] even after more than a century of experience with the Sherman Act, U.S. courts continue to struggle to achieve the appropriate balance with respect to private actions under the U.S. antitrust laws.  So, too, courts and governments of each EU Member State have made—and are in the course of making—similar policy judgments with respect to the causes of action that will drive their own private enforcement schemes.  And even when they make these judgments, they are susceptible to being overridden by EC law if found to frustrate the effectiveness of Article 81.

Given that there is little precedent in Europe regarding private litigation under Article 81, this Court would be entering uncharted territory in adjudicating Counts VI and VII.  *See Information Resources*, 127 F. Supp. 2d at 411 ("European countries' laws are neither uniform nor individually fully developed with respect to issues arising under the [EC] Treaty.").[34]  Were this

---

matter, to be determined by national law . . ."); *European Commission Notice on the Co-operation Between the Commission and the Courts of the EU Member States in the Application of Articles 81 and 82* EC, 2004 O.J. (C 101) 54, at ¶ 9 (Ex. H) ("The procedural conditions for the enforcement of EC competition rules by national courts and the sanctions they can impose in case of an infringement of those rules, are largely covered by national law.").

[33] *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) (revisiting and strengthening pleading standards for plaintiffs alleging conspiracies in violation of § 1 of the Sherman Act); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007) (overruling nearly 100 years of precedent and holding that resale price maintenance agreements are not *per se* violations of § 1 of the Sherman Act but must instead be evaluated under the rule of reason).

[34] In their Complaint, Plaintiffs cite the national law of only one EU jurisdiction—the United Kingdom.  *See* Compl. ¶¶ 392(a), 425(a) (citing Section 2(1) of the European Communities Act 1972).  Notably, Plaintiffs have since claimed that "[t]he only foreign law claims that plaintiffs allege are those under the EC Treaty and the analogous EEA Agreement" and they have asserted that this Court would not be required to apply the antitrust laws of any particular foreign jurisdictions.  *See* Letter from Kaplan to Judge Amon (May 7, 2007) at note 2 (Dkt. No. 422).  This is incorrect.  As described in more detail below, many of the legal issues implicated by Plaintiffs' Article 81 claims (*e.g.*, the availability of a pass-on defense) depend on the applicable *national* law, not on Article 81 itself.  Moreover, the English law cited by Plaintiffs cannot alone apply to the full amount of European commerce at issue in Counts VI and VII, portions of which have no connection to England at all.  *See infra* pp. 27, 44-49; Basedow Decl. ¶¶ 38-46 (concluding that the laws of multiple jurisdictions apply to Plaintiffs' claims).

Court to adjudicate Counts VI and VII, it would be required to decide at least the following issues

under the various *EU Member State* laws that would apply to a given subset of transactions:

- May *indirect* purchasers recover damages?

- Are Defendants entitled to raise a pass-on defense?

- Are exemplary damages available for Article 81 claims and, if so, what are the applicable standards?

- What is the standard for proving causation?

The courts of the various Member States have not addressed many of these questions, and where

they have, or where there are hints of an answer, the results are diverse.  In August 2004, the

European Commission released a comprehensive study, known as the "Ashurst Comparative

Report," which found that Member States had widely differing causes of action and remedial

schemes for enforcing Article 81.[35]  The Ashurst Report highlights the fact that, as regards causes

of action for breaches of both national and EC competition law, "[t]he picture that emerges . . . on

damages actions for breach of competition law in the enlarged EU is one of astonishing diversity

and total underdevelopment."  *Id.* at 1.  The report also emphasizes the significant and unsettled

nature of issues such as the availability of a pass-on defense, the ability of indirect purchasers to

bring claims, and a range of other issues.  *See*, *e.g.*, *id.* at 1-9 (Executive Summary).

Not only would it be inappropriate for this Court to resolve the numerous unanswered

questions of European law outside of the European regulatory framework, but to do so would

affirmatively hamper the development of such law.  *See* Bermann Decl. ¶41.  If this Court

adjudicates Counts VI and VII, future foreign plaintiffs would be encouraged to bring their EC

competition claims to *United States* courts, thereby bypassing Member States' courts.  Indeed, if

---

[35] *See* Denis Waelboeck, *et al.*, Ashurst Study on the Conditions of Claims for Damages in Case of Infringement of EC Competition Rules (Aug. 31, 2004) ("Ashurst Comparative Report") (Ex. I).

this Court agrees to adjudicate Counts VI and VII, it could generate a wave of forum shopping by foreign plaintiffs who would bring their foreign-law competition claims in the United States to take advantage of its liberal class action procedures, broad discovery rules, and jury trials.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 252 n.18 (1981) (listing these among the features that are "extremely attractive to foreign plaintiffs").  The U.S. courts would be adjudicating the world's antitrust violations, to the detriment of both the U.S. courts and the world's other sovereigns.  As the United States has explained, "[w]hile some countries' antitrust regimes fairly can be described as developing, this is no reason to circumvent and stunt them by drawing private antitrust litigation away to U.S. courts."  United States D.C. Cir. Br. at 24.

Following the *Empagran* decisions, the former UK Director of Competition Enforcement observed that, although private antitrust enforcement is "so far little developed in Europe," private enforcement in European courts is "expected to grow in the coming years."  Margaret Bloom, *Should Foreign Purchasers Have Access to U.S. Antitrust Damages Remedies?  A Post-Empagran Perspective from Europe*, 61 N.Y.U. Ann. Surv. Am. L. 433, 454 (2005).  If foreign purchasers had access to U.S. antitrust damages remedies with respect to foreign commerce, "[it would] attract away cases from the EU national courts that might otherwise be litigated in Europe."  *Id.* at 451.  This, she wrote, would in turn "inhibit the development of the substantial body of jurisprudence that is necessary to facilitate the private enforcement of antitrust claims.  The lack of precedent will lead to uncertainty, increased risk for claimants, and therefore, a reluctance to bring litigation in Europe—and a failure to reap the benefits of private enforcement."  *Id.*  Although these observations were in reference to the availability of Sherman Act claims to address violations in foreign commerce, they apply here with equal force.  To the extent European competition law is developed in U.S. courts, plainly it will *not* be developed by European institutions.  Thus, the

adjudication of Article 81 claims by U.S. courts would draw cases away from the Member State courts and tend to choke off the European development of EU competition law.

### 2. *Imposing U.S. Litigation Procedures on European Antitrust Claims Would Undermine Sovereign Policy Judgments Made in Europe*

Were a U.S. court to adjudicate Plaintiffs' Article 81 claims, not only would it usurp EU Member State courts' proper role in resolving the myriad questions of first impression presented by those claims, but it would apply *U.S. procedures* to those claims, thus overriding the contrary judgments about the administration of civil justice made by European sovereigns. These sovereigns have deliberately and repeatedly rejected central features of the U.S. litigation system—such as liberal discovery, jury trials, and contingent fees—as contrary to their notions of public policy in general and, more specifically, as inimical to the balance of interests they have struck in designing their own antitrust enforcement regimes.[36] Applying these features of the U.S. litigation system to EC competition claims would subvert the legitimate sovereign judgments of each European nation in shaping its own competition policy by creating precisely the incentives and imposing precisely the burdens they have sought to avoid.[37]

In their *Empagran amici* briefs, the foreign sovereigns argued that expansion of U.S. jurisdiction would "ignore the laws of [] sovereign nations and override their deliberate policy decisions not to adopt a liberal, jury-based . . . system." Foreign Governments' D.C. Cir. Br. at 14. Germany and Belgium identified the "controversial features of the U.S. legal system" to include

---

[36] Neelie Kroes, the European Commissioner for Competition Policy, recently explained that "[c]ertain features of the US private competition litigation system are simply not compatible with our European traditions," stressing the need to find "truly European solutions, grounded in our European legal traditions and culture." Neelie Kroes, European Commissioner for Competition Policy, Speech at Commission/IBA Joint Conference on EC Competition Policy, (Speech/07/128) at 5-6 (Mar. 8, 2007), *available at* http://europa.eu/rapid/pressReleasesAction.do?reference= SPEECH/07/128&format=HTML&aged=1&language=EN&guiLanguage=en.

[37] These features of the U.S. litigation system may also conflict with principles embodied in EC law. *See* Green Decl. ¶ 56.

- 29 -

"extensive discovery, jury trials, class actions, [and] contingent fees."[38]  Similarly, the United

Kingdom, Ireland, and the Netherlands noted that various features of the American system

"strongly favor private antitrust plaintiffs," such as "generous class action certifications, broad

discovery rules . . . jury trials, subsidized contingency fee arrangements, [and] asymmetrical rules

on payment of attorneys' fees."  U.K. Br. at 11-14.  As these countries pointedly observed, the

absence of these features in their own private enforcement regimes "are not simple oversights."  *Id.*

at 15-16.[39]  To the contrary, these sovereigns' choices reflect policy decisions about the

appropriate incentives for private enforcement of European competition law and the appropriate

level of costs and other burdens litigation should be permitted to impose on litigants.

        The European Commission has explained that, "[w]hile private enforcement has important

advantages both for individuals and undertakings as well as for society in general, any debate on

how private enforcement could be facilitated should carefully consider the costs which are

associated with furthering private competition law litigation in the case of unmeritorious or not

well founded claims. . . . The ultimate objective should be to foster a competition culture, not a

litigation culture."  Commission Staff Working Paper ¶ 12 (Ex. G).  Explaining why it rejects

certain features of U.S. litigation, the Commission further pointed out that "[t]he U.S. system is

often perceived as encouraging unmeritorious or vexatious litigation . . . The protection of rights

deriving from Community competition law is important, but it is also important to keep excessive

---

[38] Germany and Belgium Br. at 9-12 (noting that, "[c]ompared to the United States, for example, the German system sets a different balance between the civil and administrative punishment of violations of competition law").

[39] *See also id.* (noting that, in Germany and Belgium, the "'loser pays' rule for attorneys fees applies in each country and competition law claims are heard either by judges or by administrative tribunals unlikely to be swayed by emotional appeals common to United States treble damages jury trials").

litigation in check and to try to achieve some form of moderation in the enforcement system." *Id.* ¶ 47.

To be sure, U.S. courts in some circumstances apply foreign substantive law without applying the procedural features of the relevant foreign system. Unlike the one-off adjudication in U.S. court of a private contract claim under foreign law, however, Plaintiffs' sweeping proposal to divorce Article 81 claims from the regulatory framework established by the Modernization Regulation and the policy judgments embedded in each Member State's law implicates far more serious considerations of comity. It threatens to disrupt sovereign judgments made by foreign countries and the EU as a whole in creating a civil enforcement mechanism for Article 81 claims, including, among others, judgments about setting the appropriate incentives for private parties to enforce Article 81 and judgments about how much expense and business interference is appropriate during the course of discovery. *See* United States D.C. Cir. Br. at 8 ("Converting U.S. courts into magnets that draw foreign plaintiffs' cartel suits away from their own judicial systems . . . would undermine the sovereign decisions of foreign governments about remedies and procedures.").

Thus, only by declining jurisdiction over European antitrust claims can U.S. courts allow European institutions to calibrate the incentives and consequences of litigation about European commerce under European laws. Only by declining jurisdiction over such claims, therefore, can U.S. courts properly respect those nations' policy judgments about how best to bring about in Europe a "competition culture, not a litigation culture," Commission Working Paper ¶ 12.

**3.**   ***Adjudicating Counts VI and VII in the United States Would Deprive The EU of Control Over Crucial Incentives Underpinning Its Leniency Programs***

Moreover, setting a precedent supporting U.S. adjudication of Article 81 claims would also undermine European amnesty programs—vital tools in the detection and prosecution of European

cartel behavior.  Over the years, competition authorities across the world have come to rely heavily on their leniency programs to induce cartel members to report anticompetitive behavior in exchange for immunity from criminal prosecution.[40]  At present, the European Commission as well as 24 of the 27 EU Member States have leniency programs in place.[41]  U.S. adjudication of Article 81 claims involving wholly European commerce would significantly change the calculus for companies considering whether to report behavior affecting European commerce to European authorities.  In weighing the costs and benefits of self-reporting, companies would have to consider a new creature—the consolidation of all EC antitrust-law claims in a single class action in U.S. court with massive discovery obligations and plaintiffs incentivized by contingent fees.

With respect to the U.S. amnesty program, the United States enforcement authorities explained in *Empagran* that:

> Plaintiffs' theory threatens to upset the balance of incentives and disincentives that drives the amnesty program.  If consumers from around the world suddenly could bring class action suits in U.S. courts against international cartels—suits that the federal courts have not previously entertained and that cartel members never had reason to anticipate—the massive increase in potential civil liability would radically tilt the scale of incentives for conspirators against seeking amnesty. And when cartel members forgo, or hesitate to seek, amnesty, the government loses its most potent weapon for cracking international cartels.

United States D.C. Cir. Br. at 20.  Clearly, allowing U.S. civil justice rules and U.S. courts and juries to establish the incentives and consequences of civil litigation of EU competition claims

---

[40] The European Commission has identified its leniency program as an important part of its fight against cartel behavior.  *See, e.g.*, Kroes, Commission/IBA Joint Conf. on EC Competition Policy, *supra* note 36.  The DOJ Antitrust Division considers its leniency program to be the "greatest single driver of [its] success." *See* Gerald F. Masoudi, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, Speech at the Cartel Conference in Budapest, Hungary, *Cartel Enforcement in the United States (and Beyond)* at 6 (Feb. 16, 2007) *available at* http://www.usdoj.gov/atr/public/speeches/221868.htm.

[41] *See* http://ec.europa.eu/comm/competition/ecn/leniency_programme_nca.pdf.

would deprive European authorities of the ability to calibrate the incentives surrounding a

company's decision to apply for leniency.

Importantly, in the Antitrust Criminal Penalty Enforcement and Reform Act ("ACPERA"),

Congress recently has attempted precisely to *diminish* the civil liability faced by leniency

applicants in this country.[42]  Acceptance of jurisdiction over claims such as those in Counts VI and

VII would conflict squarely with this Congressional effort.  As in *Empagran*:

> Plaintiffs' claims here conflict with the purposes of the new statute. The prospect of
> facing unprecedented class actions for foreign injuries in U.S. courts, even with
> single damages, will weaken the incentive to seek amnesty provided by de-trebling
> and discourage cartel members who do not qualify for amnesty but otherwise may
> want to cooperate with the government, e.g., by plea agreement. Expanded civil
> liability also risks undermining foreign amnesty programs (see 124 S. Ct. at 2366-
> 68), which are not affected by [ACPERA], and thereby interferes again with the
> sovereign authority of other nations.

United States D.C. Cir. Br. at 21.

In sum, accepting Plaintiffs' invitation to entertain a new mode of private antitrust

litigation would immediately and significantly raise the costs of self-reporting, thus disrupting

leniency programs in Europe and frustrating Congress's intentions in passing ACPERA.  This is

yet another way in which U.S. policy and considerations of comity point to the inappropriateness

of the United States as a forum for these claims.

---

[42] Recognizing that potential applicants carefully consider the magnitude of civil liability that they
will face as the price of self-reporting, in 2004 Congress enacted ACPERA, Pub. L. No. 108-237,
118 Stat. 665.  *See* Cong. Rec. S3614 (daily ed. Apr. 2, 2004) (statement of Sen. Hatch) ("Though
[the Department's Corporate Leniency Program] has been successful, a major disincentive to self
reporting [sic] still exists, the threat of exposure to a possible treble damage lawsuit by the victims
of the conspiracy. . . . This provision addresses this disincentive to self-reporting.  Specifically, it
amends the antitrust laws to modify the damage recovery from a corporation and its executives to
actual damages.").  As the United States has explained, "Congress made a policy judgment that the
amnesty program is a critical element of anti-cartel enforcement—because it triggers the exposure
and criminal prosecution of cartels—and that damages in private civil suits against cartels should
be decreased, not increased, in order to motivate conspirators to seek amnesty. That policy
judgment is entitled to deference."  United States D.C. Cir. Br. at 22.

**4.**      *Adjudicating Counts VI and VII in the United States Would Undermine International Antitrust Cooperation*

The United States has noted the increasing importance of cooperation among the world's antitrust authorities in detecting and prosecuting international cartels,[43] and it has expressed concern that if U.S. courts begin to adjudicate foreign-commerce claims, this could strain the good will that is essential to global antitrust cooperation.[44]  On remand in *Empagran*, the United States explained that "the dialogue and network of cooperation that the United States has developed with foreign authorities depend on mutual good will and reciprocity."  United States D.C. Cir. Br. at 25-25.  Adjudication of Plaintiffs' Article 81 claims here could disrupt the United States' ability to cooperate effectively with its foreign counterparts in the future.

Existing cooperation agreements in place between the United States and the European Community provide a mechanism for the United States to ask the European Commission to apply EC competition law to European behavior, and similarly, for the European Commission to ask the United States to apply its own laws to U.S. behavior.[45]  This agreement contemplates a cooperative

---

[43] United States D.C. Cir. Br. at 25 ("Effective prosecution of an international cartel requires coordination of investigative strategies among enforcement agencies of many nations because conspiratorial meetings frequently take place in more than one country and witnesses and documentary evidence may be scattered around the world. The United States therefore has made increasing use of Mutual Legal Assistance Treaties with foreign nations, which can be used for evidence gathering in criminal antitrust investigations. Since the 1990s, the United States has entered antitrust cooperation agreements with the European Community and six other countries.").

[44] *Id.* at 26 (stating concern that if foreign governments fear that their cooperation will be used for damages actions in U.S. courts, that "they perceive as inappropriate, cooperation will be strained, to the overall detriment of international cartel enforcement").

[45] *See* Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the Enforcement of their Competition Laws, art. III (entitled "Positive Comity"), U.S.-E.C., June 4, 1998, State Dept. No. 98-106, 1998 WL 428268, at * 3 (Treaty) (Ex. J) ("The competition authorities of a Requesting Party may request the competition authorities of a Requested Party to investigate and, if warranted, to remedy anticompetitive activities in accordance with the Requested Party's competition laws. Such a request may be made regardless of whether the activities also violate the Requesting Party's competition laws, and regardless of whether the competition authorities of the Requesting Party

relationship between Europe and the United States in combating worldwide anticompetitive behavior that has extraterritorial effects—and it is consistent with the conclusion that European competition law should be applied exclusively by European institutions and U.S. competition law by U.S. institutions.  Nowhere in this cooperative scheme is there any provision contemplating adjudication of the EC Treaty by a U.S. court, or of the Sherman Act by a European court.  For this Court to act outside of the cooperative relationship established by the agreement would disrupt this system of reciprocal enforcement.  *See* Bermann Decl.  ¶¶ 43-47.

*        *        *

In deference to the exclusive regulatory framework Europe has established for the application of Article 81; in recognition of the public-law nature of antitrust law; in consideration of the important European sovereign interests in developing and applying their own laws with their own litigation procedures to conduct affecting European markets; in recognition of the complete absence of any U.S. interest with respect to the commerce at issue; and for all of the additional reasons discussed above, this Court should dismiss Counts VI and VII on the ground of international comity. [46]

---

have commenced or contemplate taking enforcement activities under their own competition laws.").

[46] As mentioned above, Plaintiffs also allege that Defendants' conduct violated Article 53 of the EEA Agreement.  Signed in 1991, the EEA Agreement—between the States of the European Community and the European Free Trade Association ("EFTA") States (Norway, Iceland, and Liechtenstein)—prohibits the same anticompetitive behavior (*e.g.,* price-fixing) reached by Article 81 of the EC Treaty.  The regulatory scheme contemplated by the EEA Agreement likewise involves careful coordination with the European Commission and other European governmental bodies.  *See Whish*, at 52-53 ("An important principle of the EEA Agreement is that there should be cooperation between the European Commission and the [EFTA Surveillance Authority], in order to develop and maintain uniform surveillance throughout the European Economic Area and in order to promote a homogenous implementation, application and interpretation of the provisions of the Agreement.").  Consequently, the same comity concerns warrant dismissal of Plaintiffs' claims under Article 53(1) of the EEA Agreement.

## II.    COUNTS VI AND VII SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

Even if comity did not of its own force warrant dismissal—and it does, for the reasons set

forth above—the doctrine of *forum non conveniens* counsels this Court to dismiss Counts VI and

VII because that course would "best serve the convenience of the parties and the ends of justice."[47]

Counts VI and VII plainly should be adjudicated in Europe, not the United States.  As

discussed above, those claims are brought largely by European class representatives (and no U.S.

class representatives) on behalf of largely European purported classes against many

European defendants solely under European laws and involving European commerce that by

definition is unconnected to the United States.  The EU and its Member States manifestly have a

strong interest in resolving these claims, while New York and the United States have at most

a tenuous connection to them.  Courts in Europe obviously are better equipped than this Court

to resolve complex questions of evolving competition law in the EU and its Member States.

Moreover, given the complexity of the claims and the enormous volume of European commerce at

issue, it would be unreasonable to impose jury duty for these claims on citizens of New York, and

they would constitute a clearly unwarranted imposition on this Court's resources.  In addition,

virtually all of the witnesses and documentary evidence regarding Counts VI and VII would be

located in Europe and would be significantly more difficult to obtain in this Court than in

European tribunals.  And the enforceability of a U.S. Article 81 judgment in foreign courts is open

---

[47] *Koster v. (American) Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 527 (1947); *see also Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003).  *See also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947) (*forum non conveniens* requires a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute" in the interests of convenience or to serve the ends of justice).  The Supreme Court recently held that because it is a non-merits ground for dismissal, a court may rule on a *forum non conveniens* motion before resolving issues of personal and subject-matter jurisdiction.  *Sinochem Int'l Co., v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1192 (2007).

to doubt, which further detracts from the convenience of this forum.  Accordingly, dismissal of these counts under the doctrine of *forum non conveniens* is clearly appropriate.

*Forum non conveniens* analysis proceeds in three steps:  The court first determines the level of deference due to the plaintiffs' choice of forum; then ascertains whether an adequate alternative forum exists; and finally balances the relevant public and private interest factors favoring the potential forums.  *See Iragorri v. United Technologies Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc).  A court enjoys discretion to dismiss part of a lawsuit on *forum non conveniens* grounds while adjudicating the remaining claims.  *See*, *e.g., Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234-35 (2d Cir. 1996).

### A.   Plaintiffs' Decision to Bring Their Foreign-Law Claims in a U.S. Court is Entitled to Minimal Deference

A plaintiff suing *in his home forum* is generally entitled to "great deference."  *Iragorri*, 274 F.3d at 71.  "[T]he choice of a United States forum by a *foreign* plaintiff," however, "is entitled to less deference."  *Id.* (emphasis added).  As the Supreme Court has observed, "federal courts have routinely given less weight to a foreign plaintiff's choice of forum."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n.23 (1981).

The eight named Plaintiffs bringing Counts VI and VII are entities based in Sweden, Finland, and Hong Kong; none claims to be a citizen of the United States.  They seek to represent subclasses composed either entirely or predominantly of foreign companies and individuals.[48] Thus, these foreign Plaintiffs and purported classes assert claims based on transactions occurring entirely outside of the United States and arising entirely under foreign law.  Their choice of a U.S.

---

[48] The subclass under Count VI is limited to entities and person located "outside the United States."  Compl. ¶ 374.  The subclass under Count VII is restricted to entities and persons that purchased services for shipments within Europe and between Europe and the rest of the world, but excluding the United States.  Compl. ¶ 407.  As such, it seems certain that only a small fraction of the members of the subclass in Count VII reside in the United States.

forum, under these circumstances, can be attributed to little more than "forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries." *Iragorri*, 274 F.3d at 71 (noting that likely motivations for choice of forum affects the level of deference owed).[49]  "[F]orum shopping is the antithesis of the bona fide connection to the plaintiffs' chosen forum that would cause the Court to defer to the plaintiffs' desires," and such "tactical maneuver[s]" deserve only "little" deference. *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 698 (S.D.N.Y. 2003), *aff'd*, 98 Fed. Appx. 47 (2d Cir. 2004).

Moreover, suit in the United States would violate forum selection clauses contained in many of the contracts used by Defendants, which specify that all disputes must be adjudicated in courts of foreign countries.  Lufthansa Cargo, for example, employs contracts for air cargo shipments that include forum selection clauses specifying Germany as the place of exclusive jurisdiction.[50]  Courts should not defer to a plaintiff's choice of a U.S. forum over one where it has expressly contracted to proceed.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).[51]

---

[49] *See also Empagran II*, 453 F. Supp. 2d at 12 n. 12 (suggesting plaintiffs asserting European-law competition claims bypassed European courts not because of the "unavailability of an adequate mechanism to obtain relief, but quite simply the procedural differences that make litigating in European courts less favorable from the perspective of the economics of litigation and damages awards").

[50] Lufthansa Cargo uses four main types of standard agreements:  Capacity Purchase Agreements ("CPA") and Guaranteed Capacity Agreements ("GCA"); Special Rate Agreements ("SRA")/Key Account Agreements ("KAA"); Global Partnership Agreements ("GPA"); and Incentive Agreements, each of which typically contains a forum selection clause appointing Frankfurt/Main, Germany as the exclusive place of jurisdiction. (Sample standard agreements attached as Exs. K1-K8.)  German courts consistently have found such forum selection clauses to be valid and to cover alleged antitrust law violations.  *See* Immenga Decl. at ¶¶ 33-45.  Lufthansa reserves the right, should this Court assert jurisdiction over Counts VI and VII, to seek dismissal of the claims of individual customers on the basis of forum selection clauses contained in their contracts.

[51] The Second Circuit has indicated that the presence of forum selection clauses—even when they appear only in drafts of contracts—"eliminate[] [the defendant's] burden of 'establishing that the other *Gulf Oil* private and public factors weigh heavily in favor of adjudication in [a foreign] forum' . . . .  In essence, the district court would begin its forum non conveniens assessment of *Gulf Oil* factors with a level set of balances, rather than one weighted heavily in favor of the

### B.    Plaintiffs Have Adequate Alternative Forums

The EU Member State courts offer a more-than-adequate alternative forum for Plaintiffs'

Count VI and VII claims.  "An alternative forum is adequate if the defendants are amenable to

service of process there and if it permits litigation of the subject matter of the dispute."  *Pollux*

*Holding Ltd.*, 329 F.3d at 75.  To be considered inadequate, a forum's remedy must be "clearly

unsatisfactory."  *Piper*, 454 U.S. at 255 n.22.[52]

A European court clearly would recognize the type of claim Plaintiffs assert in Counts VI

and VII—the principal "adequacy" issue in most cases.  Indeed, under the EC Treaty, EU Member

States are *required* to provide an adequate remedy for the Article 81 claims Plaintiffs assert here.

*See* Basedow Decl. ¶¶ 25-26 (discussing *Crehan* decision).  European courts therefore, without

question, will "permit[] litigation of the subject matter of the dispute."  *Pollux Holding Ltd.*, 329

F.3d at 75.[53]

---

plaintiff's choice of forum."  *Evolution Online Systems, Inc. v. Koninklijke PTT Nederland N.V.*,
145 F.3d 505 (2d Cir. 1998) (citing *Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., Ltd.*,
860 F. Supp. 1055, 1066 (D.N.J. 1994)).

[52] *See also Blanco v. Blanco Indust. de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) ("[T]he
unavailability of beneficial litigation procedures similar to those available in the federal district
courts does not render an alternative forum inadequate."); *In re Matter of Arbitration between
Monegasque De Reassurances S.A.M. (Monde Re) and Nak Naftogaz of Ukraine*, 158 F. Supp. 2d
377, 385 (S.D.N.Y. 2001), *aff'd*, 311 F.3d 488 (2d Cir. 2002) ("*Monde Re*") ("[P]rinciples of
comity and the self-fulfilling consequences of a pronouncement of deficiency in the quality of
justice in another state, compel judicious restraint from our courts in accepting invitations to
engage in such value judgments.").

[53] The courts of the EU Member States are routinely held to be adequate alternative forums for
purposes of *forum non conveniens* analysis.  *See generally* Tom McNamara, *International Forum
Selection and Forum Non Conveniens*, 34 International Law, 558, 560-61 (2000) (listing thirteen
foreign forums that U.S. courts have consistently deemed as adequate: Canada, Cayman Islands,
Columbia, France, Germany, Greece, Hong Kong, Liechtenstein, Netherlands, Pakistan, Peru,
Switzerland, and the United Kingdom).

Plaintiffs have asked the Court to apply English law to provide damages for their claims in Counts VI and VII.[54]  If these damages claims are viable under English law they can certainly be brought in English courts.  *See Pollux,* 329 F.3d at 75 (noting that, "with several of appellants' claims asserted under English statutory law, there can be no doubt that England permits litigation to resolve commercial disputes of the type presented in this case").  The Second Circuit has affirmed the dismissal of Sherman Act claims on the ground that English courts offer an adequate damages remedy for antitrust violations.  *See Capital Currency Exchange, N.V. v. Nat'l Westminister Bank PLC,* 155 F.3d 603, 609-10 (2d Cir. 1998).  Thus, dismissal is plainly permissible where Plaintiffs themselves have invoked English law.

Finally, the allegations in Counts VI and VII involve commerce that touches the European Union, and no other commerce.  To the extent Defendants are located in or have a business presence in Europe, they are presumptively amenable to service of process in Europe.  European courts provide an adequate—and, as we demonstrate below, more appropriate and convenient—forum for these claims.

## C.     The Public Interest Factors Weigh Decisively In Favor of Dismissal

The Court must "weigh the public and private interests identified in *Gilbert* to determine which forum 'will be the most convenient and will best serve the ends of justice.'"  *Capital Currency*, 155 F.3d at 609 (internal citations omitted); *see also Gilbert*, 330 U.S. at 508.  As the Supreme Court set forth in *Gilbert*, those public interest factors include (a) the connection between each forum and the claims and the interest in having local disputes decided at home, (b) imposing jury duty on a community which has no relation to the litigation, and (c) the interest of having foreign law decided by a foreign tribunal.  *Gilbert*, 330 U.S. at 508-509.

---

[54] *See supra*, note 34.

Courts have applied the *Gilbert* factors with an eye towards serving two of the core

purposes of the *forum non conveniens* doctrine—the promotion of international comity and the

prevention of forum shopping.  As then-Judge Breyer explained:

> [T]he increased extent to which commerce is international [] and the greater likelihood that
> an act performed in one country will affect citizens of another, all argue for expanded
> efforts to help the world's legal systems work together, in harmony, rather than at cross
> purposes.  To insist that American courts hear cases where the balance of convenience and
> the interests of justice require that they be brought elsewhere will simply encourage an
> international forum-shopping that would increase the likelihood that decisions made in one
> country will cause (through lack of awareness or understanding) adverse effects in another,
> eroding uniformity or thwarting the aims of law and policy.

*Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 950 (1st Cir. 1991) (upholding *forum non conveniens*

dismissal of a federal securities suit in favor of a Canadian forum).[55]

Here, the public interest factors weigh decisively in favor of dismissal.

> ### 1.  *The Eastern District of New York has Only a Tenuous Connection to this Litigation, While European Countries have a Strong Interest in Adjudicating Plaintiffs' Claims*

Courts have consistently recognized that "'there is legitimate interest in ensuring that

disputes with little connection to the district be litigated elsewhere.'"  *In re Matter of Arbitration*

*between Monegasque De Reassurances S.A.M. (Monde Re) and Nak Naftogaz of Ukraine*, 158 F.

Supp. 2d 377, 387 (S.D.N.Y. 2001), *aff'd*, 311 F.3d 488 (2d Cir. 2002) ("*Monde Re*") (granting

dismissal in favor of Ukranian forum).  "Jury duty is a burden that ought not to be imposed upon

the people of a community which has no relation to the litigation" and there is a "local interest in

---

[55] Many courts have noted the connection between *forum non conveniens* and comity.  *See Monde Re*, 158 F. Supp. 2d at 382 (noting that *forum non conveniens* promotes comity, prevents U.S. courts from "becoming the courthouse to the world," and respects the sovereignty of foreign states "insofar as United States courts would, in some cases, derogate from the authority of foreign judicial systems that otherwise could appropriately exercise their own jurisdiction over such cases"); *DeYoung v. Beddome*, 707 F. Supp. 132, 138, 140 (S.D.N.Y. 1989) (noting complementary *forum non conveniens* and international comity principles warranting dismissal).

having localized controversies decided at home," within the "view and reach" of those people most affected. *Gilbert*, 330 U.S. at 508-509.

Unlike the United Kingdom and the rest of Europe, the Eastern District of New York has an exceedingly weak connection to, and interest in, Plaintiffs' European-law/European-commerce claims. Counts VI and VII by definition have no relation to U.S. commerce at all, and the parties and claims have extensive connections to the EU. *See generally supra* pp. 5-6.

Given the tenuous connection between Plaintiffs' claims and the Eastern District of New York, and the extensive connections with the EU, there can be no justification for burdening this Court, nor the jurors of this District, with evaluating extensive additional testimonial and documentary evidence—in an already complex matter—regarding liability for cargo shipments that could have originated or terminated *anywhere in the world except the United States*. Nor is there cause, given the availability of European courts, for burdening this District and its jurors with the difficult task of identifying and applying the national law of England, and likely of many other European jurisdictions as well, to this evidence. In similar circumstances, courts have consistently exercised their discretion to dismiss claims in which the U.S. has merely an attenuated interest.[56]

By contrast, the United Kingdom and other European countries have a strong and plainly legitimate interest in adjudicating Counts VI and VII, given that many of the Defendants are based in Europe, the alleged price-fixing violations affected commerce to, from, and within Europe, and

---

[56] *See, e.g.*, *Alfadda v. Fenn*, 159 F.3d 41, 46 (2d Cir. 1998) (holding that "the interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily in favor of France"); *Stewart v. Adidas A.G.*, No. 96 Civ. 6670, 1997 WL 218431, at *7 (S.D.N.Y. Apr. 30, 1997) ("New York, the local forum, has very little interest in adjudicating Stewart's German law claims. The actions of which Stewart complains took place largely outside of the United States and involve foreign law. … It would simply be unfair to impose the burden of service on a New York jury because of the attenuated contact of New York to the controversy."); *see also Base Metal Trading*, 253 F. Supp. 2d at 712-13 (granting dismissal in favor of Russian forum where "Russia's interest in adjudicating this action is far greater than any interest the United States has in adjudicating the dispute").

the applicable law is said (by Plaintiffs themselves) to be European.  As described above, the

European interest is all the stronger given that the European Union and the EU Member States

have created amenable forums for, and are actively encouraging, private competition litigation in

their national courts.  *See supra* pp. 14-17, 25-29; *see also*, *e.g.*, *Empagran II*, 453 F. Supp. 2d at

12 n.12 (refusing to "ignore comity and permit jurisdiction over foreign plaintiffs pursuing

foreign-law claims, especially when the European Union is in the process of attempting to

'stimulate' private actions for antitrust violations in its own jurisdictions."); Office of Fair Trading

[UK], Discussion Paper on Private Actions in Competition Law:  Effective Redress for Consumers

and Business, OFT 916 (April 18, 2007) ("OFT Discussion Paper") (Ex. L) (discussing efforts at

the EC and national levels to encourage private competition litigation); Bermann Decl. ¶¶ 33-34.

> **2.    *Adjudicating Plaintiffs' Foreign-Law Claims Would Offend Notions of International Comity and Promote Forum Shopping***

One function of the doctrine of *forum non conveniens* is to protect the sovereignty of other

countries and to "help[] prevent this country's judicial system from becoming the courthouse to the

world."  *Monde Re*, 158 F. Supp. 2d at 382.  As described in more detail above, *see supra* p. 12,

the extraordinary exercise of federal jurisdiction called for by Counts VI and VII would ignore the

Supreme Court's teachings of comity and restraint.  *See generally Empagran I*, 542 U.S. 155

(2004).  The EU has established a complex regulatory framework for adjudicating claims under

Article 81 that is unlike any structure in the United States and to which U.S. courts have no access

and are not answerable.  Unsurprisingly in that light, no U.S. court has ever adjudicated Article 81

claims outside of this framework; and, as set forth *supra,* pp. 25-35, to do so would violate the

sovereign interests of the EU and Member State governments for several reasons.

*First*, it would frustrate Europe's interest in developing and enforcing its own evolving

antitrust laws.  *See supra* pp. 25-29.  *Second,* the application of U.S. procedural rules to Article 81

claims would override sovereign judgments made by each European nation about the procedural framework applicable to such claims, including important policy choices concerning discovery, attorney's fees, and jury trials.  *See supra* pp. 29-31.  *Third*, if a U.S. court decided to resolve disputes among foreign parties concerning European commerce under European laws, it would undermine the efficacy of both European and U.S. leniency programs.  *See supra* pp. 31-33.  And *fourth*, U.S. adjudication of Article 81 claims would be inconsistent with the system in place for international antitrust cooperation between the United States and Europe.  *See supra* pp. 34-35.

The strong interests in respecting foreign legal systems and avoiding "legal imperialism," *Empagran I*, 542 U.S. at 165, thus counsel in favor of dismissing Counts VI and VII so that they may be heard in more appropriate European forums.

**3.**     ***Adjudicating Plaintiffs' Claims Would Require This Court to Resolve Difficult Choice-of-Law Problems and Decide Novel and Complex Issues of European Competition Law***

In considering a *forum non conveniens* motion, courts have recognized the appropriateness of adjudicating claims in a forum that is "at home" with the governing law, "rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gilbert*, 330 U.S. at 509; *see also Piper*, 454 U.S. at 251.  The choice-of-law problems posed by Plaintiffs' claims are truly daunting.  Additionally, the difficulties inherent in resolving various issues of first impression under English and other European national antitrust laws, as well as EC law, would be enormous for a U.S. court unfamiliar with national or applicable transnational legal rules and structures.

Although the Complaint is unclear, Plaintiffs are apparently seeking to apply the cause of action for breach of Article 81 that is furnished by the law of a single jurisdiction—England—for cargo shipments within Europe and between Europe and the rest of the world (except the United States), despite the fact that only a fraction of those transactions have any actual connection with

England.[57]  As explained below, English law cannot supply the rule of decision with regard to the wide swath of commerce encompassed by Counts VI and VII.  Instead, it is likely that the laws of at least 27 different EU Member States and three additional EFTA States would apply to the commerce in those Counts.  *See also* Basedow Decl. ¶ 41; Green Decl. ¶¶ 57-58.

> a) **Under New York's Choice-of-Law Principles, the Laws of Multiple Other Jurisdictions Besides England Would Apply to the Varied Commerce Addressed in Counts VI and VII**

Under the New York choice-of-law rules applicable here,[58] price-fixing violations are treated as torts for purposes of choice-of-law analysis.[59]  In tort cases, the "law of the jurisdiction" with "the greatest concern with the specific issues raised in the litigation" controls.[60]

> Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort. . . . In cases where the defendant's tortious conduct and the plaintiff's injury occur in different states the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred.

*Hamilton v. Accu-Tek*, 47 F. Supp. 2d 330, 335-37 (E.D.N.Y. 1999) (applying New York choice-of-law rules) (internal quotation omitted).

Under these principles, assuming *arguendo* that this Court decided to adjudicate Counts VI and VII, English law would apply, *at most*, to: 1) claims of putative class members that reside in England; 2) claims against British Airways and DAX, the only Defendants that reside in England;

---

[57] *See supra* note 34.

[58] *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941) (district court sitting in diversity applies choice-of-law rules of the state in which it is located).  This Court must undertake the choice-of-law analysis with respect to the claims of each putative class member.  *See, e.g.*, *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997).

[59] *See Purdue Frederick Co. v. Steadfast Ins. Co.*, 8 Misc. 3d 1014(A) (N.Y. Sup. 2005) (New York characterizes antitrust actions as torts).

[60] *In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 335 (S.D.N.Y. 2005).

and 3) claims arising from cargo shipping services that involve shipments to or from England. Most of the claims in Counts VI and VII likely fall outside that ambit.

For example, where a Spanish company purchased Lufthansa Cargo's services to ship cargo from Spain to Poland, the governing law could be Spanish, Polish, or German, but in no event could it be English. Alternatively, where a French company purchased Lufthansa Cargo's services to ship cargo from France to Tokyo (or any other destination in the rest of the world), England could have no interest in the French company's antitrust claims against this German entity because England would lack "any relationship or contact with the occurrence[s] or the parties." *Rezulin*, 390 F. Supp. 2d at 335.

Although it is clear that English law cannot apply to all the claims at issue in Counts VI and VII, it is a significantly more difficult task to identify which other jurisdictions' laws *do apply*. That fact itself counsels in favor of dismissal. The *forum non conveniens* doctrine is designed in part to save courts from having to "untangle problems in conflict of laws." *Gilbert*, 330 U.S. at 508-509. Under New York's choice-of-law principles, at least the laws of the other 26 Member States of the European Union besides England (as well as the laws of EFTA states, Norway, Iceland, and Liechtenstein), would potentially apply to different subsets of the claims at issue. *See* Basedow Decl. ¶¶ 40-41; Green Decl. ¶¶ 57-58; *see also* Bermann Decl. ¶ 54.

In fact, both the European Commission and the UK's Office of Fair Trading have recognized that under extant European choice-of-law rules, multiple national laws regarding remedies for violation of Article 81 would apply in the case of a cartel that spanned national boundaries.[61] *See* Green Decl. ¶¶ 57-59. Plaintiffs cannot somehow escape this choice-of-law

---

[61] *See* OFT Discussion Paper at 6.25 (Ex. L) ("In general, the law applicable to a non-contractual obligation arising out of a restriction of a competition should be the law of the country where the market is or is likely to be affected. However, as regards competition infringements affecting the

reality through the expedient of pleading only Article 81 and English law.  Under both New York and European choice-of-law rules, it is simply impermissible to apply one country's laws to commerce that had no meaningful effect on that country's market.

Given the vast amounts of commerce encompassed under Counts VI and VII, determining which jurisdiction's law applies to which claims would require an extraordinarily difficult and burdensome exercise in New York choice-of-law analysis.  That factor should be given considerable weight here.

> **b)**     **Litigating Counts VI and VII in this Court Would Unavoidably Embroil the Court in Complex and Unsettled Questions of Foreign Antitrust Law**

In addition to raising complex choice-of-law questions, Counts VI and VII unavoidably implicate a number of unsettled questions of foreign law.  "The doctrine of forum non conveniens, however, is designed in part to help courts avoid conducting complex exercises in comparative law. . . . [T]he public interest factors point towards dismissal where the court would be required to 'untangle problems in . . . law foreign to itself.'"  *Piper*, 454 U.S. at 251.

Courts frequently cite the need to apply foreign law as a factor that strongly supports dismissal.[62]  This factor has even greater force here because, as described above (*supra* pp. 25-29),

---

market in more than one country, this rule may require several different laws to be applied by the court to the same case, raising the costs of private actions and making the outcome less predictable."); Commission Staff Working Paper at 69 (Ex. G) (observing that "if damages are sustained in several countries and/or there are multiple claimants from different countries, the laws of all the countries concerned would have to be applied").

[62] *See, e.g.*, *Pollux Holding Ltd.*, 329 F.3d at 76 (upholding dismissal where, "owing to the fact that the overwhelming majority of plaintiff's claims necessitate the application of English law, the trial court concluded that choice of law considerations strongly tipped in favor of litigation in England."); *Monde Re*, 158 F. Supp. 2d at 387 ("[C]ourts have a legitimate interest in avoiding the difficulty with questions of conflicts of law and the application of foreign law."), *aff'd* 311 F.3d 488, 500 (2d Cir. 2002) ("Ukranian courts are better suited than United States courts for the resolution of these legal questions."); *DeYoung*, 707 F. Supp. at 139 (holding that Canadian law

EC competition law is at present rife with questions of first impression and therefore particularly burdensome to discern and apply.  *See, e.g.*, *Information Resources, Inc.*, 127 F. Supp. 2d 411 (S.D.N.Y. 2001) (declining supplemental jurisdiction because European antitrust law is "novel and complex," and noting that the various European countries' antitrust laws are "neither uniform nor fully developed"); *Empagran, S.A. v. F. Hoffmann-La Roche Ltd.,* No. Civ. 001686, 2001 WL 761360, at *8 (D.D.C. June 7, 2001) (similar).  As the Supreme Court has noted, "[n]eedless decisions of [foreign] law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

Even if only English law were deemed applicable—and as noted, this appears inconsistent with governing choice-of-law rules—the difficulties in discerning applicable rules weigh heavily in favor of dismissal.  Many features of the Article 81 cause of action remain unsettled in England and are the subject of heated debate.  A few key examples include: (1) whether a pass-on defense is available, such that defendants can show that plaintiffs passed any overcharges on to their customers, and what its potential parameters are;[63] (2) to what extent indirect purchasers have standing to sue for price-fixing;[64] and (3) whether exemplary damages are available under English law.[65]  It would be extremely challenging—and inappropriate—for a U.S. court to decide issues of

---

would apply under choice-of-law principles, which would "compel this Court to apply an unfamiliar body of law, a prospect that argues strongly for dismissal.")

[63] *See* Basedow Decl. ¶ 75;  Green Decl. ¶¶ 52-55.

[64] To what extent indirect purchasers have standing to sue for price fixing is "one of the most controversial issues in relation to private actions in competition law," both in England and in other countries.  OFT Discussion Paper at ¶ 6.18 (Ex. L).  *See also* Green Decl. ¶¶ 52-55.

[65] Generally, under English tort law, exemplary damages (whose purpose is to punish, not to compensate) are available in certain categories of cases, including "where the damage has been caused by an action calculated to make a profit (i.e. it was calculated that it would be more profitable to take the action and incur the risk of an ordinary damages claim)."  *Rookes v Barnard*

first impression in all of these areas, and particularly challenging to determine whether exemplary damages are appropriate, and the size of any such award.   *See* Basedow Decl. ¶¶ 64-70; Green Decl. ¶¶ 7, 47-55.  English courts have yet to settle these issues, and a U.S. court should not be the first to do so.  "Here, [England] has a great interest in applying its own laws, . . . while this Court has an interest in avoiding the intricacies attendant to the application of [English] law."  *Monde Re*, 158 F. Supp. 2d at 387.

Moreover, because choice-of-law principles in fact would require application of various European legal schemes to different transactions, the complexity and burdensomeness of the task Plaintiffs would set for this Court is compounded many times.  *See* Basedow Decl. ¶¶ 40-41, 64-78 (unsettled law in various European countries); Green Decl. ¶¶ 47-55, 57-59 (unsettled law in England); Bermann Decl. ¶ 39.  The cause of action for breach of Article 81 is as undefined in most European countries as it is in the United Kingdom.  For example, Professor Immenga's Declaration outlines some of the particular difficulties this Court would face in applying German law.  *See* Immenga Decl. ¶¶ 10-29.  In these circumstances, "it would be more efficient and in the best interest of comity to allow the foreign courts to adjudicate the claims arising out of alleged violations of their own laws."  *Empagran*, 2001 WL 761360, at *8.

For all of these reasons, the public interest factors weigh decisively in favor of dismissal.

**D.     The Private Interest Factors Support Dismissal**

Where a case involves foreign parties, foreign transactions, foreign law, and the interests of foreign sovereigns in shaping their own public law, the public interest factors provide overwhelming grounds for dismissal.  The private interest factors, which the Supreme Court has

---

[1964] A.C. 1129.  It is uncertain whether English courts will conclude that price-fixing suits fall into this category of cases, and, if so, whether EC law would permit such damages.  *See* Basedow Decl. ¶¶ 69-70; Green Decl. ¶¶ 49-51.

described as the "practical problems that make trial of a case easy, expeditious and inexpensive," *Gilbert*, 330 U.S. at 508, also favor dismissal in this case. Courts consider several factors in the private interest analysis: (a) the relative ease of access to sources of proof; (b) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining attendance of willing witnesses; (c) questions of enforceability of judgment if one is obtained; and (d) other efficiency considerations. *Id.* at 508-509. Each of these factors favors adjudication of European law/European commerce claims in Europe.

**1.      *It would be Difficult for the Court to Access Evidence for Counts VI and VII, Which Is Located Almost Exclusively Abroad***

The allegations in Counts VI and VII arise from shipments to, from, and within the Member States of the European Union. They specifically exclude U.S.-related shipments. Evidence of the business practices relevant to Plaintiffs' claims in Counts VI and VII is therefore scattered in many locations around the world, *but not the United States*. This Circuit repeatedly has dismissed cases on *forum non conveniens* grounds when most evidence is located abroad.[66]

**a)      Counts VI and VII Implicate Route-Specific Evidence Unique to the European Routes at Issue in Those Counts**

In a price-fixing case in the transportation industry such as this one, a large portion of the evidence of pricing behavior is route-specific and therefore depends on both the original location

---

[66] *See Murray v. British Broadcasting Corp.*, 81 F.3d 287, 293 (2d Cir. 1996) (recognizing that private interest factors strongly favor dismissal when most witnesses and physical and documentary evidence are located in another forum); *Capital Currency Exchange,* 155 F.3d at 611 (dismissing U.S. antitrust claims and common law claims in favor of an English forum on *forum non conveniens* grounds because most of the witnesses and documentary evidence were located in England); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal*, 809 F.2d 195, 203 (2d Cir. 1987) (dismissing case on grounds of *forum non conveniens* where "proof bearing on the issues to be tried is almost entirely located [abroad, including] the principal witnesses and documents . . .").

of the cargo and the destination.[67]   Plaintiffs' allegations of price-fixing, customer allocation, and route allocation over all of the routes into and out of Europe necessarily implicate thousands of individual routes that do not touch the United States.  As such, evidence related to Plaintiffs' allegations in Counts VI and VII that Defendants conspired to fix yields and surcharges would necessarily be located in the numerous countries engaged in commerce that touches the European Union because local conditions can, and do, affect the rates and surcharges charged in each locale. In addition, the rate a carrier charges depends on product type, which is generally based on speed or transport conditions for a given shipment, and which also can differ by route.[68]

In addition, to determine damages in a price-fixing case, the Court must estimate how much the Plaintiffs actually paid over what they would have paid absent the alleged conspiracies. Determining the price Plaintiffs would have paid on each route absent the alleged collusion will require detailed evidence concerning supply and demand conditions unique to each of the thousands of non-U.S. related routes potentially at issue in Counts VI and VII.[69]

---

[67] *See* "Regulatory Reform in International Air Cargo Transportation," presented at the OECD Workshop on Regulatory Reform in International Air Cargo Transportation in Paris, at 32 (July 5-6, 1999), *available at* http://www.oecd.org/dataoecd/1/28/1821288.pdf ("OECD Air Cargo Report") ("Supply-demand balance varies by routes and types of services and market rates reflect these differences.  Because it is closely linked to inventory levels, cargo business turns down early in the business cycle, and total demand is cyclical on individual markets.").

[68] *See* OECD Air Cargo Report, at 17, 31 ("Another important element in the air cargo rating structure is Class Rates.  These are rates applicable to specifically designated classes of goods such as books, newspapers, live animals, valuable cargo etc.  These goods often require special handling.").

[69] Predicting the demand for air freight services during the alleged conspiracy requires understanding both how much air freight was shipped during that time, how much cargo was shipped on other substitutable modes of transportation, and also how much cargo was not shipped at all but may have been at a lower price.  *See, e.g.*, OECD Air Cargo Report, at 21.  Similarly, predicting supply conditions absent the collusion depends on many local cost factors.  All of this evidence, which is specific to each market, would be the subject of extensive discovery from abroad.

In light of the different legal standards governing Plaintiffs' Article 81 claims in Counts VI and VII and Plaintiffs' Sherman Act claims in Counts I through V, moreover, the additional route-specific evidence implicated by Counts VI and VII is even more substantial.  Whereas a Sherman Act plaintiff need only prove that competitors agreed to fix, stabilize, or maintain prices in interstate commerce to establish a *per se* violation, Article 81 requires that Plaintiffs present evidence proving that the object or effect of the agreement was the "prevention, restriction, or distortion of competition."  EC Treaty, art. 81(1).  This European-law analysis requires the court to determine whether the alleged agreement "improve[ed]" the flow of goods or promoted "technical or economic progress" in Europe; whether European consumers obtained their "fair share" of the benefit; and whether the alleged agreement imposed restrictions "not indispensable" to obtaining those benefits.   EC Treaty, art. 81(3) (Ex. A); *see also* Compl. ¶¶ 389, 316, 422.

Finally, because unlike U.S. federal law, European law may allow claims by indirect purchasers, this Court in resolving such claims would have to wade through "long and complicated proceedings involving massive evidence and complicated theories," from which the Supreme Court sought to spare U.S. courts.  *Hanover Shoe, Inc.  v. United Shoe Machinery Corp*., 392 U.S. 481, 493 (1968) (rejecting pass-on defense); *see also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 732-33 (1977) (rejecting indirect purchaser standing).  Trying Plaintiffs' Article 81 claims in this Court would plainly introduce into this litigation additional issues of proof depending on additional evidence—virtually all of which is located abroad.

### b)       It Would be Difficult to Obtain Evidence from Abroad

As demonstrated, the vast majority of the evidence relevant to Counts VI and VII is located overseas.  In U.S. federal court, there are two main avenues for pursuing documents and witnesses located abroad: the Federal Rules of Civil Procedure and the Hague Convention.  *See* Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for

signature Mar. 18, 1970, 23 U.S.T. 1555, T.I.A.S. No. 7444 (entered into force Oct. 7, 1972)

("Hague Convention").  The difficulty of obtaining evidence through both of these mechanisms

further counsels against adjudication of these Counts in the United States.  *See generally* Bermann

Decl. ¶¶ 49-52.

　　　If discovery is sought under the Federal Rules, the parties and this Court will face

significant difficulties because foreign jurisdictions are generally hostile to U.S.-style discovery,

particularly in antitrust suits, and many have erected blocking statutes to protect their companies

and citizens from expansive discovery by U.S. courts.  *See* Bermann Decl. ¶ 51 (describing, for

example, Swiss and French statutes).

　　　When a party from whom discovery is requested invokes a blocking statute for protection,

a U.S. court balances the competing interests of the nations whose laws are in conflict to decide

whether it should order the party to comply in violation of the foreign blocking statute.  *See*

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the Southern Dist. of Iowa*, 482

U.S. 522, 544 n.29 (1987).[70]  Here, it would be particularly difficult for a U.S. court to order

Lufthansa or any other foreign defendant to violate a blocking statute, because the United States

has little interest in compelling production of documents located in foreign countries solely to

adjudicate claims involving wholly non-US transactions arising under foreign law.  *See* Bermann

Decl. ¶ 52.  It would be unprecedented for a U.S. court to apply a foreign country's antitrust law

---

[70] The Second Circuit considers four factors:  (1) the competing interests of the nations whose laws
are in conflict; (2) the hardship of compliance on the party from whom discovery is sought; (3) the
importance to the litigation of the information and documents requested; and (4) the good faith of
the party resisting discovery.  *See In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp.
2d 544, 554 (S.D.N.Y 2002), *aff'd* 318 F.3d 379 (2d Cir. 2003); *Bodner v. Banque Paribas*, 202
F.R.D. 370, 374-375 (E.D.N.Y. 2000).  *See, e.g.*, *Minpeco, S.A. v. ContiCommodity Servs., Inc.*,
116 F.R.D. 517, 523 (S.D.N.Y. 1987) (recognizing that the United States has a strong national
interest in enforcing its antitrust laws, but holding that the defendant should not be forced to
produce documents located in Switzerland in contravention of foreign law).

and simultaneously order a party to produce discovery in violation of that same foreign sovereign's blocking statutes.  *See id.*

Equally problematic would be the use of the Hague Evidence Convention.  The Hague procedures can be slow, complicated, and subject to various restrictions.  *See Aerospatiale*, 482 U.S. at 542-44; *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding that the Hague Convention would not provide adequate access to documents in the UK); Bermann Decl. ¶ 50.  Typically, a letter of request for a deposition or a document can take six to twelve months, and many of the countries from which Plaintiffs are likely to seek documents have filed reservations refusing to produce pre-trial documents.[71]  Whether operating under the Federal Rules or the Hague Convention, the parties would encounter serious difficulties in gaining access to the vast majority of evidence and witnesses, which are located abroad.

### c)      Litigation in Europe Would Streamline Discovery on Issues Related to Counts VI and VII

By contrast, if an English court or another court in the European Union adjudicates Plaintiffs' claims, it would have access to procedures that would facilitate discovery from fellow Member States.  European Council Regulation 1206/2001 replaced the Hague Convention for discovery requests among EU Member States, establishing accelerated procedures for obtaining discovery of documents and witnesses located in the various Member States.  This Regulation contemplates requests for direct transmission of discovery materials between the courts of Member States, and it provides that courts shall comply with such discovery requests within 90 days.  *See* Council Regulation 1206/2001, 2001 O.J. (L 174) 1 (Ex. M).  It also eliminates the requested

---

[71] *See* Status Table for the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U.S.T. 1555, T.I.A.S. No. 7444, *available at* http://www.hcch.net/index_en.php?act=conventions.status&cid=82 (last visited July 18, 2007).

court's discretion to avoid coercing a national to comply with the discovery. Thus, with respect to evidence and witnesses located in Europe, a European court would have a clear advantage vis-à-vis this Court. *See* Bermann Decl. ¶ 53. The difficulty of accessing necessary evidence for Counts VI and VII weighs strongly in favor of dismissal.

> **2.      *This Court's Judgment on Counts VI and VII May Be Unenforceable in Many Relevant Jurisdictions Abroad***

The possibility that foreign courts would not enforce an Article 81 judgment from a U.S. court also strongly counsels in favor of dismissal. *See Gilbert*, 330 U.S. at 508; *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 379 (2d Cir. 1972) (holding that because it was "very doubtful that French courts would enforce [the] judgment," dismissal on *forum non conveniens* grounds was warranted because the court's judgment "would quite likely be worthless"); *see also VictoriaTea.com, Inc. v. Cott Beverages Canada*, 239 F. Supp. 2d 377, 384 (S.D.N.Y. 2003) (Canadian forum more convenient, despite U.S. citizenship of one plaintiff, because "no impediment to the enforceability of a judgment" would exist).

There is a distinct possibility that if this Court decides to adjudicate Counts VI and VII outside of the EU regulatory scheme, it will lead to litigation in Europe on the question whether the EC Treaty can be enforced in any court besides those of the Member States. European courts could deem unenforceable a U.S. judgment under Article 81. *See* Green Decl. ¶¶ 6, 10. Moreover, several U.S. courts have expressed doubts that courts in Europe will enforce a U.S. class action judgment. *See, e.g.*, *Bersch v. Drexel Firestone Inc.*, 519 F.2d 974, 996-97 (2d Cir. 1975) (noting evidence that Germany and Switzerland "would not recognize a United States judgment in favor of the defendant as a bar to an action by their own citizens"); *Stewart*, 1997 WL 218431, at *7 ("uncertainty" about German courts' enforcement of U.S. judgment "is a significant factor in the balance of convenience factors"); *Del Fierro v. Pepsico*, 897 F. Supp. 59, 64 (E.D.N.Y. 1995)

(dismissing in favor of Philippine forum in part because "judgment for [defendant] would not bar foreign class members from relitigating the same issues in the Philippines").

       **3.**      ***Litigation of EU-Commerce Claims Together With U.S.-Commerce Claims Will Not Result In Efficiencies***

Plaintiffs have asserted that there will be great efficiencies in adjudicating the EC Treaty claims and Sherman Act claims in one forum. *See* Letter from Kaplan to Judge Amon (May 7, 2007), at note 3 (Dkt. No. 422.) But at best these assertions are greatly overstated. It is inevitable that there will be litigation regarding the price-fixing alleged by Plaintiffs in various forums throughout the world. Suits are already pending in Canada and Australia regarding the same alleged conspiracy. The scope of those suits overlaps in part with Plaintiffs' European-commerce claims, but also covers commerce (between non-U.S. and non-European points of departure and arrival) not at issue in any Count of the Complaint here. Indeed, although Plaintiffs have sought to pursue in this Court their claims regarding U.S. and European commerce, they have notably omitted any claims relating to, for example, commerce within or among Asia, Africa, Australia, Canada, Mexico, or South America. Thus, Plaintiffs have effectively conceded that claims arising out of the alleged price-fixing will be litigated in more than one forum.

In any event, no great efficiencies will result by attempting to try the US- and European-commerce claims in one forum. As an initial matter, as shown above, there are significant differences in the evidence required to prove Counts I through V as compared to Counts VI and VII. Furthermore, the assumption upon which the claimed efficiencies depend—that the Sherman Act and European-law claims will be certified for class treatment and tried together—is very likely wrong. Indeed, adjudicating the European-law claims in the United States would only complicate and protract the litigation.

*First*, class certification of Counts VI and VII faces very real hurdles.  For example, the application of multiple sets of European national laws, each posing complex issues of first impression, *see supra* pp. 25-29, 44-49, and the difficulty of adjudicating a pass-on defense potentially available under those laws, *see supra* p. 48, would seriously undercut the manageability of the class litigation.  *See* Fed. R. Civ. P. 23(b)(3); *see, e.g.*, *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595, 607 (S.D.N.Y. 1982) (denying class certification due to, *inter alia*, problems of manageability).  In undertaking a *forum non conveniens* analysis, a court should look realistically at how the claims at issue will actually be tried.  *See Iragorri*, 274 F.3d at 74 ("the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues").  To the extent certification of classes for Counts VI and VII is unlikely, Plaintiffs' claimed efficiencies cannot materialize.

*Second*, the complexity of the multiple sets of laws, the vast amounts of evidence located in a number of different countries, and, in particular, the complexity of the expert evidence that would be required on damages, means that all claims alleged in the Complaint cannot be tried at once.  Rather, separate trials will be necessary to avoid jury confusion, significantly reducing or even eliminating the economies of scale urged by Plaintiffs.  *Cf. Gibbs*, 383 U.S. at 726 ("Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed. Rule Civ. Proc. 42(b).").

*       *       *

In sum, an analysis of both the public and private interests demonstrates that the United States does not offer the best—or even a proper—forum for this dispute.  Counts VI and VII should be dismissed on *forum non conveniens* grounds.

## III.    THIS COURT SHOULD DISMISS COUNTS VI AND VII FOR LACK OF SUBJECT MATTER JURISDICTION

As the basis for this Court's jurisdiction over the EU-law claims in Counts VI and VII, Plaintiffs assert diversity jurisdiction under 28 U.S.C. § 1332(d) (Class Action Fairness Act ("CAFA")) and supplemental jurisdiction under 28 U.S.C. § 1367.  Neither applies.

This Court does not have original diversity jurisdiction under CAFA because Plaintiffs "may not utilize CAFA jurisdiction" where they could not have instituted a class action and recovered on a class-wide basis for the European-law claims they assert.  *See Bonime v. Avaya, Inc.*, No. 06-cv-1630, 2006 WL 3751219, at * 2 (E.D.N.Y. Dec. 20, 2006) ("action[s] based on state law which concededly would be barred in the state courts" should not proceed "in federal court solely because of the fortuity [of] diversity") (internal citations omitted).  Even if they could, CAFA would not supply the necessary jurisdiction here because the classes proposed for Counts VI and VII would not be certified.  *See McGaughey v. Treistman*, No. 05-cv-7069, 2007 WL 24935, at *3 (S.D.N.Y. Jan. 4, 2007) (no CAFA jurisdiction where class is not certified); *see supra* p. 57 (noting reasons the proposed classes would not be certified).

This Court should decline to exercise supplemental jurisdiction because the litigation of the European-law claims would "substantially predominate" over the federal claims because of their legal novelty and complexity and, in part due to the pass-on defense that is potentially applicable, their onerous evidentiary requirements.  28 U.S.C. § 1367 (1), (2).  As discussed above, English law would apply only to a subset of the foreign commerce at issue.  This Court would be required to apply the laws of multiple foreign jurisdictions, all of which are currently in the process of

resolving a host of unsettled questions.  *See supra* pp. 25-29, 44-49.  This is therefore a case where "considerations of judicial economy, convenience, and fairness to litigants," *Gibbs*, 383 U.S. at 726, as well as comity concerns and the potential unenforceability of this Court's judgments abroad, all counsel against exercising supplemental jurisdiction.  *See, e.g.*, *Information Resources, Inc.*, 127 F. Supp. 2d at 417-18 (denying supplemental jurisdiction over Article 82 claims that would present "novel and complex issues").

## CONCLUSION

For the foregoing reasons, and for the grounds stated by the other Defendants with respect to these counts, this Court should dismiss Counts VI and VII.


Respectfully Submitted,


 /s/ David W. Ogden
_____
David W. Ogden
Eric Mahr
Rachel Z. Stutz
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

*Counsel for Deutsche Lufthansa AG,
Lufthansa Cargo AG, and Swiss International
Air Lines Ltd.*

Dated:  July 18, 2007