## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE | Master File 06-MD-1775 (JG) (VVP) |
| AIR CARGO SHIPPING SERVICES ANTITRUST LITIGATION | **ALL CASES** |
| MDL No. 1775 | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' AND ETHIOPIAN'S MOTIONS TO DISMISS UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM AND UNDER THE STATUTE OF LIMITATIONS**

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES............................................................................................ iii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS...............................................................................................3

    Plaintiffs...........................................................................................................................3

    Defendants .......................................................................................................................4

    The Conspiracy ...............................................................................................................5

        Fuel Surcharges .............................................................................................6

        Security Surcharge.........................................................................................7

        War Risk Surcharge.......................................................................................8

        U.S. Customs Surcharge ...............................................................................8

        Discounts Eliminated.....................................................................................9

        Yields.............................................................................................................9

        Customer Allocation......................................................................................9

    Lufthansa Is In The DOJ Leniency Program..................................................................10

    Fraudulent Concealment..................................................................................................10

ARGUMENT...................................................................................................................12

I.       THE SHERMAN ACT § 1 ALLEGATIONS OF THE COMPLAINT READILY
       SATISFY RULE 8(A). ...........................................................................................12

      A.     *Twombly* Did Not Change the Applicability of Rule 8 to the Antitrust Allegations
           of the Complaint. ..............................................................................................12

      B.     The Complaint States Facts Consistent with a "Plausible" Violation of Sherman
           Act § 1. .............................................................................................................15

|     | C. | The Non-Surcharge Allegations Cannot Be Considered Separately from the Surcharge Allegations | 18 |
|-----|----|--------------------------------------------------------------------|----|
|     | D. | The Complaint Clearly Supplies Defendants with Fair Notice of Plaintiffs' Claims. | 20 |
| II. |    | DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS. | 24 |
|     | A. | Concealment Was Shown. | 25 |
|     | B. | Plaintiffs Did Not Know of Their Claims until February 2006 | 26 |
|     | C. | Plaintiffs Did Not Lack Due Diligence. | 26 |
|     |    | CONCLUSION | 27 |

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                              <u>**Page**</u>

*Athletes Foot of Delaware, Inc. v. Ralph Libonati Co.*,
    445 F. Supp. 35 (D. Del. 1977) ........................................................................22

*Barr v. Dramatists Guild, Inc.*,
    573 F. Supp. 555 (S.D.N.Y. 1983) ....................................................................22

*Behrend v. Comcast Corp.*,
    Nos. 03-6604, 2007 WL 2221415 (E.D. Pa. Aug. 1, 2007) .............................17

*Bell Atl. Corp. v. Twombly*,
    ___ U.S. ___, 127 S. Ct. 1955 (2007) .........................................1, 3, 12, 13, 14, 15, 16, 17

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .........................................................................................13

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993) ..............................................................................15

*City of Groton v. Conn. Light & Power Co.*,
    662 F.2d 921 (2d Cir. 1981) .........................................................................19, 20

*City of Mishawaka, Ind. v. American Elec. Power Co.*,
    616 F.2d 976 (7th Cir. 1980) .............................................................................19

*Conley v. Gibson*,
    355 U.S. 41 (1957) ......................................................................................13, 14

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) .....................................................................2, 18, 19, 20, 23

*Erickson v. Pardus*,
    ___ U.S. ___, 127 S. Ct. 2197 (2007) ..........................................................3, 14

*Glaberson v. Comcast Corp.*,
    No. 03-6604, 2006 WL 2559479 (E.D. Pa. Aug. 31, 2006) .............................19

*Heart Disease Research Found. v. Gen. Motors Corp.*,
    463 F.2d 98 (2d Cir. 1972) ................................................................................15

*Higgins v. New York Stock Exchange, Inc.*,
    942 F.2d 829 (2d Cir. 1991) ..............................................................................24

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003)....................................................................................23

*In re Commercial Explosives Litig.*,
    945 F. Supp. 1489 (D. Utah 1996) .......................................................................................23

*In re Consumer Credit Counseling Servs. Antitrust Litig.*,
    Nos. MDL 97MS233 (RMU), 97-CV-1741, 1997 WL 755019 (D.D.C. Dec. 4, 1997) ...19

*In re Elevator Antitrust Litig.*,
    No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006) ...........................18

*In re Fine Paper Antitrust Litig.*,
    685 F.2d 810 (3d Cir. 1982) .................................................................................................23

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) .................................................................................................20

*In re Ins. Brokerage Antitrust Litig.*,
    MDL No. 1663, 2006 WL 2850607 (D.N.J. Oct. 3, 2006) ................................................21

*In re NASDAQ Market-Makers Antitrust Litig.*,
    894 F. Supp. 703 (S.D.N.Y. 1995) ......................................................................................23

*In re Nine West Shoes Antitrust Litig.*,
    80 F. Supp. 2d 181 (S.D.N.Y. 2000) ...................................................1, 13, 25, 26, 27

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007)...................................................23

*In re Parmalat Sec. Litig.*,
    479 F. Supp. 2d 332 (S.D.N.Y. 2007) .................................................................................26

*In re Vitamins Antitrust Litig.*,
    No. Misc. 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000) ...............2, 21, 22, 23

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007) .................................................................................................14

*ITT World Commc'ns Inc. v. Western Union Tel. Co.*,
    524 F. Supp. 702 (S.D.N.Y. 1981) ......................................................................................19

*Jung v. Ass'n of Am. Medical Colls.*,
    300 F. Supp. 2d 119 (D.D.C. 2004)......................................................................................23

*Kahn v. Ibiquity Digital Corp.*,
   No. 06 Civ. 1536 (NRB), 2006 WL 3592366 (S.D.N.Y. Dec. 7, 2006) ............................18

*Klebanow v. New York Produce Exch.*,
   344 F.2d 294 (2d Cir. 1965) ..........................................................................................18

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ......................................................................................................25

*Lerner v. Fleet Bank*,
   459 F.3d 273 (2d Cir. 2006) ..........................................................................................26

*Litle v. Arab Bank, PLC*,
   No. CV-04-5449 (NG) (VVP), 2007 WL 895504 (E.D.N.Y. Mar. 22, 2007) ................26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...............................................................................................13, 14

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ...............................................................................................13, 14

*Nagler v. Admiral Corp.*,
   248 F.2d 319 (2d Cir. 1957) .....................................................................................18, 22

*Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981) .......................................................................................19, 20

*State of New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988) ...................................................................................25, 26

*State Teachers Ret. Bd. v. Fluor Corp.*,
   654 F.2d 843 (2d Cir. 1981) ..........................................................................................24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ......................................................................................................24

## Statutes and Rules

Sherman Act
  § 1, 15 U.S.C. § 1 ................................1, 2, 3, 10, 12, 13, 14, 15, 18, 19, 20, 21, 22, 24, 27
  § 2, 15 U.S.C. § 2 ...............................................................................................................19

Clayton Act
  § 4B, 15 U.S.C. § 15b...........................................................................................................24

Federal Rules of Civil Procedure
  8 ............................................................................................................................1, 12, 13, 21
  8(a)...........................................................................................................................12, 13, 14
  8(a)(2) ...........................................................................................................................14, 15
  9 ............................................................................................................................................13
  9(b)..........................................................................................................................1, 13, 21
  12(b)(6)...................................................................................................................1, 13, 14
  15(a)......................................................................................................................................24

## INTRODUCTION

Plaintiffs submit this memorandum in opposition to that portion of the motions of

defendants (other than Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International

Air Lines Ltd.[1]) to dismiss plaintiffs' First Amended Consolidated Complaint (the "Complaint")

under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a sufficient

factual basis for plaintiffs' claims under the Sherman Act § 1, 15 U.S.C. § 1, and of Ethiopian

Airlines Enterprise ("Ethiopian") to dismiss those claims against it under the statute of

limitations.[2]

On a motion to dismiss, the Sherman Act § 1 allegations are to be evaluated under Rule 8

of the Federal Rules of Civil Procedure, while the fraudulent concealment allegations are to be

evaluated under Rule 9(b) of the Federal Rules of Civil Procedure. *In re Nine West Shoes*

*Antitrust Litig.*, 80 F. Supp. 2d 181, 185, 191 (S.D.N.Y. 2000). There is no heightened pleading

standard for antitrust claims, *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1973

n.14, 1974 (2007); they, like other claims, "may be supported by showing any set of facts

consistent with the allegations of the complaint," *id.* at 1969. All plaintiffs must do is

"identify[ ] facts that are suggestive enough to render a § 1 conspiracy *plausible.*" *Id.* at 1965

(emphasis added).

The conspiracy alleged by plaintiffs here is unquestionably plausible. The Complaint

alleges that the Lufthansa defendants are in the antitrust leniency program of the United States

---

[1] Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. are collectively called Lufthansa or the Lufthansa defendants.

[2] Defendants present their arguments on these points in their Memorandum of Law in Support of Defendants' Motion To Dismiss, dated July 18, 2007 ("Def. Mem."), at 2 and 51-57, and Ethiopian presents its arguments in its Memorandum of Law in Support of Motion To Dismiss by Defendant Ethiopian Airlines Enterprise's [sic] (EAE), dated July 13, 2007 ("Eth. Mem."), at 1-3, 11-17.

Department of Justice ("DOJ") for reporting price-fixing and other activity in the air cargo industry violating Sherman Act § 1.[3] The Complaint details this concerted activity in levying inflated surcharges, preventing discounting, agreeing on yields, and allocating customers, which were not justified by costs, were inconsistent with the fungible nature of the services provided, and were announced to the public with pretextual reasons. These facts are sufficient to provide fair notice to defendants of the claims against them; "[p]leading of evidence is not required." *In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2000 WL 1475705, at \*12 (D.D.C. May 9, 2000). An overt act need not be pled against each defendant, "because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits." *Id.* at \*11. Further, in evaluating the sufficiency of the facts in the Complaint, the Court may not dismember the non-surcharge allegations from the surcharge allegations as urged by defendants. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Regarding the applicability of the four-year statute of limitations to Ethiopian, it does not apply to any conspiratorial actions after February 8, 2003. In addition, the Complaint alleges more than sufficient specific facts of defendants' concealment, plaintiffs' ignorance of the conspiracy, and no lack of plaintiffs' diligence so as to equitably toll the statute for actions prior to February 8, 2003.

There is no basis to dismiss the Complaint for failing to state a claim under Sherman Act § 1 or under the statute of limitations.

---

[3] Since the filing of the motions to dismiss, on August 1, 2007, British Airways Plc and Korean Air Lines Co., Ltd. have pled guilty to criminal Informations in the United States District Court for the District of Columbia, Crim. Nos. 07-183-JDB, 07-184-JDB, describing a combination and conspiracy to fix cargo rates (base rates, fees and surcharges) charged to customers for international air shipments, including to and from the United States, from at least January 1, 2000, through at least February 14, 2006.

## STATEMENT OF FACTS

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, ___ U.S. ___, 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*, 127 S. Ct. at 1965). The Complaint, filed on February 8, 2007, makes the following allegations, which must be accepted as true for purposes of defendants' motions.

**Plaintiffs**

Plaintiffs asserting claims under Sherman Act § 1 include U.S. Direct Purchaser Plaintiffs, U.S. Indirect Purchaser Plaintiffs, U.S. Direct Foreign Plaintiffs, E.U. Direct Foreign Plaintiffs, and E.U. Foreign Plaintiffs.

- U.S. Direct Purchaser Plaintiffs are Benchmark Export Services; Fleurchem, Inc.; FTS International Express, Inc.; JSNP, Inc.; Ralph Olarte d/b/a Olarte Transport Services; R.I.M. Logistics, Ltd.; S.A.T. Sea & Air Transport, Inc.; Sul-American Export, Inc.; and TNT Freight Management U.S.A., Inc. Complaint ¶¶ 143-52.

- U.S. Indirect Purchaser Plaintiffs are Sangean American, Inc.; JCK Industries, Inc.; Leis by Ron, Inc.; Alluvion, Inc.; Maria's Collections, Inc.; Printing Technologies, Inc.; and Paradiso, Inc. Complaint ¶¶ 178-85.

- U.S. Direct Foreign Plaintiffs are TNT Freight Management (Singapore) Pte Ltd.; TNT Freight Management (Australia) Pty Ltd.; and TNT Freight Management (Hong Kong) Limited, each of whom is headquartered outside the United States. Complaint ¶¶ 226-29.

- E.U. Direct Foreign Plaintiffs are TNT Freight Management (Denmark) A/S and Deutscher Speditions und Logistikverband e.V. Complaint ¶¶ 262-64.

• E.U. Indirect Foreign Plaintiffs are TNT Freight Management (Sweden) AB;
Association des Utilisateurs du Transport de Fret; and Deutscher Speditions und Logistikverband
e.V. Complaint ¶¶ 311-14.

**Defendants**

The defendants are Air Canada; AC Cargo LP; Société Air France ("Air France");
Koninklijke Luchtvaart Maatschappij N.V. ("KLM Royal Dutch Airlines" or "KLM");
Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline; Air Mauritius Ltd.; Alitalia Linee Aeree
Italiane S.p.A. ("Alitalia"); All Nippon Airways Co., Ltd.; Asiana Airlines Inc.; British Airways
Plc ("British Airways"); Cargolux Airlines International S.A. ("Cargolux"); Cathay Pacific
Airways, Ltd.; Air China Limited d/b/a Air China; Air China Cargo Company Limited d/b/a Air
China Cargo; DAS Air Ltd. d/b/a DAS Air Cargo ("DAS");[4] Lufthansa; El Al Israel Airlines
Ltd.; Emirates, named in the Complaint as Emirates Airlines d/b/a Emirates; Ethiopian, named in
the complaint as Ethiopian Airlines Corp.; Japan Airlines International Company Ltd. ("JAL
Cargo"); Kenya Airways Limited; Korean Air Company, Ltd.; LAN Airlines S.A.; LAN Cargo
S.A.; Martinair Holland N.V.; Air New Zealand Ltd., named in the Complaint as Airways
Corporation of New Zealand Limited d/b/a Airways New Zealand; Nippon Cargo Airlines Co.,
Ltd.; Atlas Air Worldwide Holdings, Inc.; Polar Air Cargo, Inc.; Qantas Airways Limited; Saudi
Arabian Airlines, Ltd.; Scandinavian Airlines System ("SAS Cargo"); Singapore Airlines
Limited; Singapore Airlines Cargo Pte Ltd;[5] South African Airways (Proprietary) Limited, now
known as South African Airways Ltd.; Thai Airways International Public Company, Ltd. and

---

[4] DAS has not answered or moved. On July 11, 2007, plaintiffs filed a Praecipe for entry of a Certificate
of Default against DAS.

[5] Singapore Airlines Cargo Pte Ltd and Singapore Airlines Limited are together called Singapore Airlines.

Viação Aérea Rio-Grandense, S.A. ("VARIG")[6] (collectively "Defendants").  Complaint ¶¶ 23-68.

Each of the Defendants provided Airfreight Shipping Services – paid, private air transport of freight or other cargo by any airline acting as an airfreight shipping services provider – throughout the world, including in the U.S. and in this district.  Complaint ¶¶ 1, 3, 23-68. Defendant airfreight carriers charged base rates typically priced by weight or volume, surcharges (extra fees to a customer above and beyond basic freight charges) and other fees to airfreight customers in the United States and throughout the world.  Complaint ¶¶ 69, 85.  Airfreight Shipping Services are a fungible, commodity product so that price is the primary factor driving customer choice among airfreight carriers.  Complaint ¶ 78.

**The Conspiracy**

Defendants acted in concert pursuant to a single, overarching conspiracy to artificially inflate the prices of Airfreight Shipping Services.  Complaint ¶ 20.  Beginning no later than January 1, 2000, and continuing through February 8, 2007, Defendants conspired to fix, raise, maintain or stabilize the prices of Airfreight Shipping Services through a number of mechanisms, including concertedly levying inflated surcharges (Fuel Surcharges, Security Surcharges, War Risk Surcharges, and U.S. Customs Surcharges), jointly agreeing to eliminate or prevent discounting of price for Airfreight Shipping Services, agreeing on yields, and allocating customers, routes, or territories, as a result of which, plaintiffs and other members of the classes paid artificially high prices for Airfreight Shipping Services and were injured and damaged in their business and property.  Complaint ¶¶ 19, 70, 81-83, 169-70, 206, 250-51, 287, 337.

---

[6] VARIG is in bankruptcy proceedings, and a stay of other proceedings has issued.

Beginning in at least late December 1999, Defendants exchanged information regarding a variety of surcharges, including the Fuel Surcharge, in furtherance of their agreement to act in concert with one another to fix the overall prices of Airfreight Shipping Services. Complaint ¶ 84. As the conspiracy progressed, Defendants intensified their joint meetings, communications, and agreements regarding price increases. Complaint ¶ 93. Secret meetings and communications included discussions at the highest levels of the respective companies and occurred in various venues, including Europe, the United States, South America and Asia. Complaint ¶ 93. Defendants concertedly policed one another's compliance with their joint price agreements and, among other things, secretly met and communicated about compliance with their agreements. Complaint ¶ 95.

### Fuel Surcharges

At the time the conspiracy commenced, many airlines had similar Fuel Surcharge pricing systems which, if independently implemented in a competitive market, would have been the foundation for the timing and amount of upward or downward pricing movements triggered by multiple factors, including spot fuel prices. Complaint ¶ 86. Through secret meetings and communications, Defendants jointly agreed on the factors triggering each pricing system, the resulting price change to be implemented upon the occurrence of those factors, and the timing of that change. Complaint ¶ 87. Among other things, Defendants agreed on harmonization of the Fuel Surcharge; implementation of the Fuel Surcharge; extensions of the Fuel Surcharge; currency issues; capping the Fuel Surcharge (by shipment or by weight); and refusing to discount the Fuel Surcharge to freight forwarders. Complaint ¶ 88. Defendants privately exchanged price and cost information for the purpose of monitoring and enforcing agreed-upon Fuel Surcharge levels and publicly announcing agreed-upon Fuel Surcharge increases in advance of their

6

implementation in order to ensure coordination among Defendants on the Fuel Surcharge levels.
Complaint ¶ 89.

In 2002, Defendants jointly agreed to and initiated a four-step Fuel Surcharge increase
program, where specific factors would trigger only one step per period, at a $.05 increase per
step, capped at the fourth step.  Complaint ¶ 90.  By the end of 2003 or beginning of 2004, these
factors triggered the fourth and final step of the four-step program.  Defendants then met to
jointly agree on additional steps to implement price increases in concert beyond the original four-
step program.  Complaint ¶ 91.  As a result, Defendants jointly imposed additional, multiple-step
price increases, all at identical amounts per step.  Complaint ¶92.  All additional steps were
preceded by multiple meetings, communications, and agreements among Defendants concerning
such increases.  Complaint ¶ 92.  Secret meetings and communications often were initiated when
one Defendant's methodology suggested an increase and that Defendant would contact other
Defendants to seek reassurances that all Defendants would adopt the same increase.  Complaint
¶ 93.  Defendants also sought reassurances to apply the Fuel Surcharge increases consistently
throughout all world regions.  Complaint ¶ 93.  Where the Fuel Surcharges were not being
applied consistently, Defendants often undertook corrective action in order to ensure consistent
application.  Complaint ¶ 94.

**Security Surcharge**

Following the September 11, 2001 attacks, Defendants met and communicated and
jointly agreed to impose a Security Surcharge upon their customers, which remained in effect
thereafter.  Complaint ¶ 97.  Secret meetings and communications included discussions at the
highest levels of the respective companies and occurred in various venues, including Europe, the
United States, and Africa.  Complaint ¶ 97.  Defendants jointly acted to facilitate agreements

7

regarding exceptions, discounting, and caps relating to the Security Surcharge. Complaint ¶ 98. The Security Surcharge imposed by Defendants bore little or no relationship to external costs. Complaint ¶100. As of December 5, 2005, for example, the prevailing Security Surcharges were set at a uniform $0.15, regardless of differences in actual security costs for different localities. Complaint ¶ 100.

### War Risk Surcharge

Following the outbreak of the war in Iraq in 2003, Defendants again met, communicated, and jointly agreed to further increase prices of Airfreight Shipping Services by imposing on their airfreight customers another surcharge, the War Risk Surcharge. Complaint ¶ 101. Secret joint meetings, communications, and agreements specifically addressed individual Defendants' agreements concerning, and implementation of, the War Risk Surcharge. Complaint ¶ 102. The War Risk Surcharge was terminated by Defendants approximately one month after its implementation. Complaint ¶ 103.

### U.S. Customs Surcharge

Beginning around late 2003, Defendants met, communicated and jointly agreed to further increase prices of Airfreight Shipping Services through a U.S. Customs Surcharge. Complaint ¶ 104. Since 2003, Airfreight Carriers have been required to prepare and submit to U.S. Customs a manifest of all goods that the carrier will offload in the United States. Complaint ¶ 105. This manifest, originating from the airfreight customer, must be received by the airfreight carrier and then submitted electronically to U.S. Customs by the airfreight carrier before its airplane enters United States airspace. Complaint ¶ 105. Since 2003, Defendants secretly met, communicated and jointly agreed to charge uniform flat fees to airfreight customers for each Defendant's preparation and submission of these manifests. Complaint ¶ 106. These secret meetings and

8

discussions occurred in Europe, Asia and elsewhere. Complaint ¶ 106. Defendants concertedly agreed that they would charge airfreight customers a flat fee of 8 Euros per manifest received from the airfreight customer in a manual or paper format, and 2 Euros per manifest received in electronic format. Complaint ¶ 106. These U.S. Customs Surcharges were jointly implemented by Defendants beginning in August 2004 and continued thereafter. Complaint ¶ 107.

### Discounts Eliminated

Airfreight carriers historically and typically allow freight forwarders a discount on Airfreight Shipping Services secured by the freight forwarder. Complaint ¶ 108. During the time from January 1, 2000, through February 8, 2007, Defendants met, communicated and jointly agreed to increase prices for Airfreight Shipping Services by concertedly refusing to pay certain discounts to freight forwarders with respect to Airfreight Shipping Services. Complaint ¶ 109. As a result of these secret meetings and communications, Defendants collusively agreed to refuse to provide discounts to freight forwarders with respect to surcharges. Complaint ¶ 110.

### Yields

Data available to all Airfreight Carriers show yields (revenues per ton-mile) for the industry as a whole. Complaint ¶ 111. In furtherance of their agreement, Defendants privately exchanged individual airfreight carriers' yields. Complaint ¶ 112. During the time from January 1, 2000, through February 8, 2007, Defendants met, discussed and jointly agreed to concertedly increase their yields on Airfreight Shipping Services. Complaint ¶ 113.

### Customer Allocation

During the time from January 1, 2000, through February 8, 2007, Defendants met, communicated and jointly agreed to increase, maintain or stabilize Airfreight Shipping Services prices by allocating their customers where necessary in order to minimize a customer's ability to

access competitive rates. Complaint ¶ 114. In furtherance of their conspiracy to increase Airfreight Shipping Services prices, Defendants, at times, jointly and secretly agreed to and did refrain from pursuing and/or acquiring each other's customers. Complaint ¶ 115.

**Lufthansa Is In The DOJ Leniency Program**

Prior to December 31, 2005, the Lufthansa defendants applied to the DOJ to participate in the DOJ's leniency program for reporting illegal antitrust activity by reporting price-fixing activity and other conduct potentially violative of Sherman Act § 1 in the air cargo industry in the United States and elsewhere. Complaint ¶¶ 139-140. Based on their report to the DOJ and consistent with and pursuant to the DOJ leniency policy, the Lufthansa defendants were accepted into the leniency program and extended full federal government immunity for the reported price-fixing activities. Complaint ¶ 141.

**Fraudulent Concealment**

By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. Complaint ¶ 123. In addition, Defendants affirmatively concealed their unlawful conduct in a manner that precluded detection by (i) meeting and communicating secretly, (ii) agreeing not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of the conspiracy, and (iii) giving false and pretextual reasons for their surcharges during the time from January 1, 2000, through February 8, 2007. Complaint ¶¶ 117, 120-22, 124, 135. Each of the Defendants' surcharge announcements during January 1, 2000, through February 8, 2007, constituted implicit statements that the surcharges in question were legitimate and the result of legitimate competitive market forces. Complaint ¶ 125. The surcharges announced by Defendants and reported in public sources were consistently ascribed by

Defendants and others to normal market forces and considerations, including increases in costs.

Complaint ¶ 126. Examples are:

- JAL Cargo posted on its website an explanation of Fuel Surcharges and Security Surcharges that attributed them solely to rising costs and did not disclose that they were set collusively. Complaint ¶ 127.

- Cargolux's website had a web page tying Fuel Surcharges to upward or downward fuel costs but did not disclose the conspiratorial nature of the mechanism for setting the Fuel Surcharges. Complaint ¶ 128.

- SAS Cargo attributed Security Surcharges primarily to cost factors without identifying the conspiracy relating to it. Complaint ¶ 129.

- British Airways attributed Fuel Surcharges to cost factors with no reference to its collusive activities.[7] Complaint ¶ 130.

- KLM and Air France issued press releases announcing Fuel Surcharge increases purportedly on the basis of rising costs without setting forth the collusive mechanism used to set the surcharges. Complaint ¶ 131.

- Singapore Airlines made similar pretextual announcements. Complaint ¶ 132.

- Alitalia made similar pretextual announcements. Complaint ¶ 132.

- Lufthansa made similar pretextual announcements. Complaint ¶ 132.

These false or misleading explanations for surcharges lulled plaintiffs into believing that

the increases were normal, legitimate and the result of competitive market forces, rather than the

---

[7] On August 1, 2007, British Airways pled guilty to a criminal Information in the United States District Court for the District of Columbia, Crim. No. 07-183-JDB, stating, among other things, that "[f]rom at least as early as January 1, 2000 and continuing until at least February 14, 2006, . . . Defendant's co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the cargo rates [base rate, fees, and surcharges] charged to customers for international air shipments, including to and from the United States[, which] Defendant joined and participated in. . . . Defendant and its co-conspirators . . . combined and conspired to do, . . . among other things: a. participating in meetings, conversations, and communications to discuss the cargo rates to be charged on shipments to and from the United States; b. agreeing, during those meetings, conversations, and communications, on certain components of the cargo rates to charge on shipments to and from the United States; c. levying cargo rates in the United States and elsewhere in accordance with the agreements reached; and d. engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon cargo rates." ¶¶ 5, 6, 8.

product of collusive efforts. Complaint ¶¶ 133-34. Plaintiffs and class members did not have

and could not have had contemporaneous access to sufficient information regarding Defendants'

costs, and thus they had to rely on the truthfulness of Defendants' purported cost justifications.

Complaint ¶ 126. A reasonable person under the circumstance would not have been alerted to

investigate the legitimacy of Defendants' surcharges, and Defendants' explanations caused

plaintiffs and class members to accept the increases without undertaking further inquiry.

Complaint ¶¶ 133-34.

Because of the deceptive practices and techniques of secrecy employed by Defendants,

plaintiffs and class members were unaware of, did not discover, and could not have discovered

through the exercise of reasonable diligence (which they in fact exercised) the existence of the

conspiracy until February 2006, when the investigations by the DOJ and foreign antitrust

regulators became public. Complaint ¶¶ 118, 119, 135. None of the facts or information

available to plaintiffs and class members prior to February 2006, if investigated with reasonable

diligence, could or would have led to the discovery of the conspiracy prior to February 2006.

Complaint ¶ 137. Until February 2006, plaintiffs and class members had no knowledge of the

conspiracy or of any facts or information which would have caused a reasonably diligent person

to investigate whether a conspiracy existed. Complaint ¶ 136. Plaintiff Fleurchem, Inc. filed the

first action in this Court on February 17, 2006. *See* 1:06-cv-00706-JG-VVP, docket no. 1.

## ARGUMENT

I.    **The Sherman Act § 1 Allegations Of The Complaint Readily Satisfy Rule 8(a).**

   A.    ***Twombly* Did Not Change the Applicability of Rule 8 to the Antitrust Allegations of the Complaint.**

Defendants mistakenly argue that *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct.

1955 (2007), requires this Court to dismiss plaintiffs' Complaint as insufficiently pleading a

12

factual basis for plaintiffs' Sherman Act § 1 claims. *See* Def. Mem. at 2, 55, 56. *Twombly* is not a revolution in pleading requirements, even for Sherman Act § 1 cases. *Twombly* unambiguously affirmed that Rule 8(a), not any heightened pleading standard under Rule 9(b), applies to antitrust claims. *Twombly*, 127 S. Ct. at 1973 n.14 ("[i]n reaching this conclusion, we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9"),[8] and 1974 ("we do not require heightened fact pleading of specifics").

*Twombly* did only two things. First, it retired the language of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that a complaint could not be dismissed "unless it appears beyond doubt that no set of facts in support of [the plaintiff's] claim . . . would entitle him to relief," in favor of the "standard[ that,] once a claim has been stated adequately, it may be *supported by showing any set of facts consistent with the allegations* in the complaint."[9] *Twombly*, 127 S. Ct. at 1968, 1969 (emphasis added). Second, it aligned the requirements for pleading a claim under Sherman Act § 1 with the doctrinal development in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993), that mere conscious parallelism is not a violation of § 1. *Id.* at 1964. In making this second point, the Supreme Court adapted the standard of *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) – that a plaintiff's evidence of a § 1 conspiracy at trial or on summary judgment must tend to exclude the "possibility" of independent action – to require that

---

[8] Ethiopian's suggestion (Eth. Mem. at 14) that Rule 9(b) applies here because the Complaint alleges fraudulent conduct is wrong as a matter of fact and law. The only mention of fraud in the Complaint is in connection with the fraudulent concealment that equitably tolled the statute of limitations. The court in *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 185, 191 (S.D.N.Y. 2000), on a motion to dismiss under Rule 12(b)(6), tested plaintiffs' Sherman Act § 1 allegations under Rule 8 standards and their fraudulent concealment allegations under Rule 9(b).

[9] This change cannot be read to imply a new requirement that plaintiffs' claims here "differentiate among the dozens of defendant carriers." Def. Mem. at 2.

a plaintiff on a motion to dismiss "identify[ ] facts that are suggestive enough to render a § 1 conspiracy *plausible*," *Twombly*, 127 S. Ct. at 1965 (emphasis added).[10] *Id.* at 1965-66.

Thus, after *Twombly*, the applicability of Rule 8(a) to the Complaint here has not changed. "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 127 S. Ct. at 1964 (quoting *Conley v. Gibson*, 355 U.S. at 47). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, ___ U.S. ___, 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*, 127 S. Ct. at 1965).

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Twombly*, 127 S. Ct. at 1964. "Factual allegations must [only] be enough to raise a right to relief above the speculative level." *Id.* at 1965. The factual allegations must only "nudge[ ] the[ ] claims across the line from conceivable to plausible." *Id.* at 1974; *cf. Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*" (emphasis in original)).

---

[10] "Plausibility" has meaning in the context of evaluating Sherman Act § 1 claims. In *Matsushita*, the Supreme Court said "that if the factual context renders respondents' claim *implausible* – if the claim makes no economic sense – respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." 475 U.S. at 587 (emphasis added). Later, in the same opinion, the Court said, "In *Monsanto*, [465 U.S. at 762-64,] we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are *implausible*." 475 U.S. at 593 (emphasis added).

**B.     The Complaint States Facts Consistent with a "Plausible" Violation of Sherman Act § 1.**

The Complaint readily meets the requirements of Rule 8(a)(2) by presenting facts consistent with the allegations of a Sherman Act § 1 violation. *See Twombly*, 127 S. Ct. at 1969. To state a claim under § 1, plaintiffs must allege (1) "a combination or some form of concerted action between at least two legally distinct economic entities," which (2) "constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). *Per se* violations include horizontal price fixing and market division. *Id.*

The Complaint here alleges *per se* unreasonable restraints of trade of allocating customers (¶¶ 114, 115) and artificially inflating prices (¶¶ 19-20, 70, 81) through yields (¶¶ 82, 113), Fuel Surcharges (¶¶ 82-83, 88), Security Surcharges (¶¶ 82-83, 97), War Risk Surcharges (¶¶ 82-83, 101) and U.S. Custom Surcharges (¶¶ 82-83, 106-07). The Complaint also alleges repeated concerted action and agreements among the Defendants through secret meetings and communications. Complaint ¶¶ 20, 81-84, 87, 88, 90-93, 95, 97-98, 101-02, 104, 106-07, 109-10, 113.

The allegations of the Complaint are "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action;" they are "suggestive enough to render a § 1 conspiracy plausible."[11] *Twombly*, 127 S. Ct. at 1965.

The Complaint describes how, before the conspiracy commenced, the Defendants had Fuel Surcharge pricing systems that would affect the timing and movement of their pricing based

---

[11] In *Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 99, 100 (2d Cir. 1972), quoted by Defendants (Def. Mem. at 52), the Second Circuit found "no facts [we]re alleged supporting an antitrust conspiracy" against a putative class consisting of the approximately 125 million persons "residing in the metropolitan areas of the United States." That implausible case is inapplicable to the facts pled here.

on multiple factors. Complaint ¶ 86. Yet, beginning in late December 1999, Defendants agreed
on the factors triggering each pricing system, the resulting price change and the timing of the
change, including harmonization of the Fuel Surcharge, capping it, accounting for currency
issues, and, contrary to normal practice, refusing to discount it to their freight forwarder
customers. Complaint ¶¶ 87, 88, 108, 110. This harmonization occurred despite the fact that
Airfreight Shipping Services are a fungible commodity, which means that, in the absence of
collusion, there would be competition on price. Complaint ¶ 78. The Complaint further details
the four-step increase in Fuel Surcharges announced and implemented beginning in 2002,
followed by additional steps at the end of 2003 or beginning of 2004 when the first four steps
had been reached. Complaint ¶¶ 90-92. Similarly, the War Risk Surcharge was unprecedented
and lasted but one month following the outbreak of the Iraq war. Complaint ¶¶ 101, 103.

The following portion of footnote 4 of *Twombly* therefore applies:

"[C]omplex and historically unprecedented changes in pricing structure made at
the very same time by multiple competitors, and made for no other discernible
reason" would support a plausible inference of conspiracy.

127 S. Ct. at 1966 (quoting respondents' and petitioners' briefs). Plaintiffs here have alleged that
just such complex and historically unprecedented changes in the pricing structure for Fuel
Surcharges and the War Risk Surcharge occurred and those changes were inconsistent with the
economics of the industry.[12]

---

[12] The facts set forth in the Complaint are far different from the inadequate allegations in *Twombly*. The
complaint in *Twombly* alleged a restraint of trade in two ways. *Twombly*, 127 S. Ct. at 1962. First, the
defendant ILECs engaged in parallel conduct in their respective service areas purportedly through unfair
agreements with CLECs for access to ILEC networks, inferior connections to the networks, and billing to
sabotage CLEC's customer relations. *Id.* Second, the ILECs failed to seek to become CLECs in other
ILECs' pre-existing territories. *Id.* Plaintiffs in *Twombly* did not make "any independent allegation of
actual agreement among the ILECs." *Id.* at 1970. The Court found that the first alleged restraint was
"routine market conduct" representing "the natural, unilateral reaction of each ILEC intent on keeping its
regional dominance," so that "there is no reason to infer that the companies had agreed among themselves
to do what was only natural anyway." *Id.* at 1971. Regarding the second alleged restraint, the Court

The Security Surcharge and the U.S. Customs Surcharge do not bear a relationship to costs. The Defendants set a uniform Security Surcharge bearing no relationship to variations in costs while agreeing on exceptions, discounting and caps. Complaint ¶¶ 98, 100. The U.S. Customs Surcharge imposed flat rates with a large differential depending on whether the information was provided by the customer in electronic or paper form, which surcharge was jointly implemented by Defendants beginning in August 2004, despite the logical presumption that each Defendant's costs of compliance with U.S. Customs would not be identical. Complaint ¶¶ 105-07. Such facts bring the alleged agreements to fix Security Surcharges and U.S. Customs Surcharges outside the realm of mere speculation. *Cf. Twombly*, 127 S. Ct. at 1965 ("[f]actual allegations must be enough to raise a right to relief above the speculative level").

The Complaint also describes the mechanism for agreement on yields through the private exchange of individual carrier's yields that were otherwise collected by a third party only for the purpose of disclosing the yields for the whole industry. Complaint ¶¶ 111-13. This is more than mere conscious parallelism. It is not in the unilateral self-interest of an airfreight carrier to tell a competitor its own yields – for fear that the competitor in this industry of fungible, commodity services would undercut its prices – unless there were also an agreement not to compete on price.

---

found that "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 1972. Thus, "[t]he principal problem the Supreme Court seems to have found with the complaint in *Twombly* is that, while it alleged independent non-competitive conduct, it failed to allege any facts compelling the inference that this conduct arose from an agreement among the defendants not to compete." *Behrend v. Comcast Corp.*, Nos. 03-6604, 07-218, 07-219, 2007 WL 2221415, at *5 (E.D. Pa. Aug. 1, 2007). Here, the Complaint alleges facts more than sufficient to show that it is plausible that there was an anti-competitive *agreement* among Defendants involving complex, unprecedented changes in pricing behavior and not merely independent behavior.

17

The customer allocation also is more than conclusory allegations.[13] The Complaint describes the characteristics of the customers that were allocated: "where necessary in order to minimize a customer's ability to access competitive rates." Complaint ¶ 114. That allegation directly ties the customer allocation to the agreement to fix prices.

Moreover, Lufthansa's participation in the DOJ leniency program underscores the plausibility of the alleged conspiracy.

### C.   The Non-Surcharge Allegations Cannot Be Considered Separately from the Surcharge Allegations.

Since the Complaint clearly alleges a plausible violation of Sherman Act § 1, defendants seek to dismember the unitary conspiracy by arguing that individual pieces, that is, the non-surcharge allegations – "(a) refusing to offer discounts to customers; (b) increasing 'yields'; and (c) allocating customers" – are insufficient to state a claim. Def. Mem. at 53. Under *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), "[t]he character and effect of a [Sherman Act § 1] conspiracy are not to be judged by dismembering it and viewing its separate parts."[14] Here, the refusal to offer discounts to freight forwarder customers occurred in

---

[13] *In re Elevator Antitrust Litig.*, No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006), relied on by Defendants (Def. Mem. at 54, 56), is far from being on point. There, "at the argument of the motion [to dismiss], the court asked plaintiffs' attorney if she could describe *any* specific claims of wrongdoing *whatever*. She replied that *she could not do so*." *Id.* at *8 (emphasis added). As discussed above, there are numerous specific claims of wrongdoing in the Complaint here.

Similarly, in *Kahn v. Ibiquity Digital Corp.*, No. 06 Civ. 1536 (NRB), 2006 WL 3592366 (S.D.N.Y. Dec. 7, 2006), also discussed by Defendants (Def. Mem. at 54, 56), "beyond the pleadings barred by the *Noerr-Pennington* doctrine, plaintiffs only offer[ed] bare conclusions and allegations 'based on information and belief'." *Id.* at *5.

Equally, in *Klebanow v. New York Produce Exch.*, 344 F.2d 294 (2d Cir. 1965), quoted by Defendants (Def. Mem. at 52-53), the complaint "furnishe[d] not the slightest clue as to what conduct by the defendants is deemed to constitute 'an illegal contract combination and conspiracy.'" *Id.* at 299 (quoting *Nagler v. Admiral Corp.*, 248 F.2d 319, 322-23 (2d Cir. 1957)). Defendants are far from clueless here.

[14] Although *Continental Ore* was decided in the context of a motion for a directed verdict after trial, 370 U.S. at 695-96, its precepts have been applied on motions to dismiss antitrust complaints. *See In re*

18

the context of fixing surcharges (specifically the Fuel Surcharges), and the customer allocation occurred to minimize certain customers' ability to access competitive rates.  Complaint ¶¶ 88, 110, 114.  Both are inseparable from other aspects of the conspiracy.  Similarly, Defendants' agreement on yields is just another mechanism synergistic with the surcharges through which the single conspiracy operated.  Complaint ¶ 82.  *See Glaberson v. Comcast Corp.*, No. 03-6604, 2006 WL 2559479, at *12 n.10, *14 (E.D. Pa. Aug. 31, 2006) (court refused to take a piecemeal approach on a motion to dismiss and consider swap agreements constituting horizontal market allocations separately from acquisitions of competing companies and exclusionary conduct toward a potential competitor).[15]

---

*Consumer Credit Counseling Servs. Antitrust Litig.*, Nos. MDL 97MS233 (RMU), 97-CV-1741, 1997 WL 755019, at *5 (D.D.C. Dec. 4, 1997) (court cannot consider alleged anti-competitive acts separately on a motion to dismiss); *ITT World Commc'ns Inc. v. Western Union Tel. Co.*, 524 F. Supp. 702, 704 (S.D.N.Y. 1981) ("[i]n considering [a] motion to dismiss, the complaint must be read as a whole").

[15] Defendants' cases discussed in Def. Mem. at 55 in fact support plaintiffs' point that the allegations in the Complaint must be considered as a whole.

Defendants cite *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76 (2d Cir. 1981), where the jury answered 14 special interrogatories, one of which asked whether each of six exclusionary practices were anti-competitive.  *Id.* at 94.  The jury found that only one of the six alleged practices was anti-competitive.  In upholding that verdict, the Second Circuit "found . . . that in numerous critical respects Northeastern's proof was utterly lacking.  Under such circumstances, treating Northeastern's claims collectively cannot have any synergistic effect."  *Id.* at 95 n.28.  Thus, *Northeastern Tel.* confirms the validity of *Continental Ore*'s directive that the facts must be considered as a whole.

The full relevant text of *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981), also discussed by Defendants, is:

> Generally we agree with the *dictum* in *City of Mishawaka* that "(i)t is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor," 616 F.2d at 986.  *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. at 699, 82 S. Ct. at 1410 (Sherman Act plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").  Even though many of the issues the municipalities raise are interrelated and interdependent, however, we must, like the municipalities' briefs, analyze the various issues individually.  Moreover, we reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act.  The proper inquiry is whether, qualitatively, there is a "synergistic

**D.    The Complaint Clearly Supplies Defendants with Fair Notice of Plaintiffs' Claims.**

Defendants contend that "[t]he Complaint provides absolutely no basis for the thirty defendants to understand which of the surcharge-related 'mechanisms' they are accused of implementing." Def. Mem. at 56.  The answer is: all.

The Lufthansa defendants are in the DOJ leniency program for reporting price-fixing activity and other conduct potentially violative of Sherman Act § 1.  Complaint ¶¶ 140-41.  They did not violate § 1 by themselves; all other Defendants participated as well.

The analysis of the Third Circuit in a similar situation in *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004), is informative.  The court found:

> The District Court concluded that the record "undoubtedly evidences that several of the settling defendants conspired to fix prices."  App. 46.  We agree.  The most compelling basis for this conclusion is a document that [defendant] LOF submitted to the Department of Justice's Antitrust Division in 1995.  The Antitrust Division had a "Corporate Leniency Policy" in effect at the time . . . LOF sought leniency under the policy in 1995 . . . One reasonable interpretation of LOF's statement is that LOF agreed with one or more competitor[s] to increase the price of all types of flat glass.

*Id.* at 363.

The court concluded: "If six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also a party to the agreement.  That is especially so if the sister firm's behavior mirrored that of the five conceded coconspirators." *Id.*

---

effect." *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76 at 95 n.28 (2d Cir. 1981).

Thus, not only does *City of Groton* endorse the applicability of *Continental Ore*, it requires that the facts be considered *qualitatively* together in analyzing plaintiffs' claims.  Qualitatively analyzing together the facts in the Complaint shows a single, plausible conspiracy operating through several inter-related mechanisms.

This analysis is equally applicable here to Lufthansa's entry into the DOJ leniency program, and it applies to all Defendants whose behavior the Complaint alleges was the same.

Thus, Defendants are left with the argument that the Complaint "entirely fail[s] to differentiate among the dozens of defendant carriers" in contravention of the "fair notice" mandate. Def. Mem. at 2, 56.[16] On these issues, *In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000), is quite instructive.

In *Vitamins*,

> [t]he complaints . . . describe[d] a massive, long-running international conspiracy among defendants and their co-conspirators to artificially inflate the prices of certain vitamins and vitamin products, allocate shares of the vitamin market among the defendants and their co-conspirators, predetermine sales volume in the vitamin industry, eliminate competition, limit supply, and commit other practices constituting *per se* violations of Section 1 of the Sherman Act.

*Id.* at *1. Similarly, the Complaint here describes a massive, long-running international conspiracy among the Defendants to allocate customers (¶¶ 114, 115) and artificially inflate prices (¶¶ 19-20, 70, 81) through yields (¶¶ 82, 113), Fuel Surcharges (¶¶ 82-83, 88), Security Surcharges (¶¶ 82-83, 97), War Risk Surcharges (¶¶ 82-83, 101) and U.S. Custom Surcharges (¶¶ 82-83, 106-07).

In *Vitamins*, defendants argued, as do Defendants here (Def. Mem. at 56), that their motion to dismiss should be granted because plaintiffs' allegations did not provide defendants with fair notice of the claims against them and did not sufficiently link each individual defendant to the overall conspiracy. *Id.* at *9. In analyzing the former argument, the *Vitamins* court described the allegations as follows:

---

[16] Defendants cite *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2006 WL 2850607 (D.N.J. Oct. 3, 2006). *See* Def. Mem. at 56. That decision is inapposite, because the court evaluated the complaint there under Rule 9(b), not Rule 8. *Id.* at *11.

> All of the . . . Complaints . . . allege that the named defendants: (a) agreed to
> exchange and did exchange current and future price information about vitamins;
> (b) agreed to coordinate and did coordinate price levels and price movements of
> vitamins; (c) agreed on prices and price levels of vitamins; (d) agreed to fix,
> maintain and/or increase, and did fix, maintain and/or increase, prices and price
> levels of vitamins; (e) agreed to allocate and did allocate vitamin customers and
> sales volumes; (f) agreed to allocate and did allocate market share in each market;
> (g) agreed to control or reduce, and did control or reduce, output; and (h) agreed
> to stabilize and/or increase the price of vitamins sold outside the United States in
> order to stabilize and/or increase the price of vitamins sold in the United States.

*Id.* at *11.

The *Vitamins* court concluded, "These allegations clearly provide defendants with fair notice of plaintiffs' claims. . . . Pleading of the evidence is not required and is on the whole undesirable at this stage in the litigation. *Nagler* [*v. Admiral Corp.*], 248 F.2d [319,] 326 [(2d Cir. 1957)] ('It is a matter for the discovery process, not for allegations of detail in the complaint. The complaint should not be burdened with possibly hundreds of specific instances; and if it were, it would be comparatively meaningless at trial where the parties could adduce further pertinent evidence if discovered. They can hardly know all their evidence, down to the last detail, long in advance of trial.')." *Vitamins*, 2000 WL 1475705, at *11-*12. The same conclusion and reasoning applies here to the similar allegations of the Complaint.

The *Vitamins* court also had no trouble rejecting the argument that the allegations were insufficient to link each defendant to the conspiracy.

> [D]efendants' contention that plaintiffs must specifically allege acts committed by
> each defendant to show its involvement in the conspiracy is baseless. "An overt
> act need not be pleaded against each defendant, because a single overt act by just
> one of the conspirators is enough to sustain a conspiracy claim even on the
> merits."[17]

---

[17] *See also Barr v. Dramatists Guild, Inc.*, 573 F. Supp. 555, 559 (S.D.N.Y. 1983) (quoting *Athletes Foot of Delaware, Inc. v. Ralph Libonati Co.*, 445 F. Supp. 35, 50 (D. Del. 1977)) ("there is no requirement [in a Sherman Act § 1 case] that a plaintiff plead with particularity every overt act allegedly committed by a defendant in furtherance of a conspiracy or the precise role played by an alleged conspirator").

*Id.* at \*11 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712

(S.D.N.Y. 1995)) (footnote added).

"Plaintiffs in this circuit have not been required to specify individual acts of each

defendant in an antitrust conspiracy allegation." *Ice Cream Liquidation, Inc. v. Land O'Lakes,*

*Inc.*, 253 F. Supp. 2d 262, 278 (D. Conn. 2003). Other courts have also concluded that

"[a]ntitrust conspiracy allegations need not be detailed defendant by defendant. *See In re Fine*

*Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (district court should not

'compartmentalize' a conspiracy claim by conducting 'a seriatim examination of the claims

against each of five conspiracy defendants as if they were separate lawsuits') (citing *Continental*

*Ore . . .*)." *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at \*5 (E.D. Pa. Aug. 3,

2007). *See also In re Commercial Explosives Litig.*, 945 F. Supp. 1489, 1492 (D. Utah 1996)

(complaint alleging acts of conspiracy by defendants generally "fairly informs [one defendant]

that it is accused of engaging in a conspiracy to fix the prices of commercial explosives and that

it did so by such activities as meeting with competitors to discuss and agree on prices, discussing

the setting of prices over the telephone, exchanging pricing documents, agreeing to raise prices,

imposing fabricated surcharges, and retaliating against Thermex for refusing to go along").

---

*Jung v. Ass'n of Am. Medical Colls.*, 300 F. Supp. 2d 119 (D.D.C. 2004), cited by Defendants (Def. Mem. at 57), is not to the contrary. There the plaintiffs improperly used the generic term "defendants" without distinguishing among defendants that played different roles at different levels in the alleged conspiracy, such as the "organizational defendants (organizations and associations that participate[d] in the administration of graduate medical education in the United States) and the institutional defendants (universities, medical schools, foundations, hospitals, health systems and medical centers that sponsor medical residency programs)." *Id.* at 125. For example, the court found that "[p]laintiffs' allegations themselves evidence the ambiguity inherent in the global term 'defendants.' Surely paragraph 83 of the complaint, for example, does not mean that all the defendants design the Match Program or that each defendant is in a position to implement it." *Id.* at 164. Here the Defendants are all air cargo carriers in a similar situation, and each participated in the conspiracy in the same way by artificially raising prices (surcharges and yields) and allocating customers.

In sum, the Complaint states a set of facts that more than plausibly shows that the

Defendants conspired to allocate customers and artificially raise prices through agreements on

yields, Fuel Surcharges, Security Surcharges, the War Risk Surcharge and the U.S. Customs

Surcharge.[18]  The Sherman Act § 1 claims should not be dismissed.[19]

## II.   Defendants' Fraudulent Concealment Tolled The Statute Of Limitations.

Ethiopian alone moves to dismiss the Complaint as time-barred under the statute of

limitations.  Eth. Mem. at 15-17.  Ethiopian does not cite a single antitrust case involving

equitable tolling of the antitrust statute of limitations on the ground of fraudulent concealment,

and it betrays a misunderstanding as to the accrual of antitrust claims and the facts that will result

in the equitable toll.

Clayton Act § 4B, 15 U.S.C. § 15b, provides:  "Any action to enforce any cause of action

under [the antitrust laws] shall be forever barred unless commenced within four years after the

cause of action accrued."

> In the context of a continuing antitrust conspiracy, such as the price-fixing
> scheme alleged in this action, the general limitation rule "has usually been
> understood to mean that each time a plaintiff is injured by an act of the defendants
> a cause of action accrues to him to recover the damages caused by that act and
> that, as to those damages, the statute of limitations runs from the commission of
> the act." [*Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 832 (2d Cir.
> 1991)] (quoting *Zenith* [*Radio Corp. v. Hazeltine Research, Inc.*], 401 U.S. [321,]
> 338, 91 S. Ct. 795 [(1971)]).  The Supreme Court has explained further that in the
> case of a price-fixing conspiracy that "brings about a series of unlawfully high
> priced sales over a period of years, each overt act that is part of the violation and

---

[18] It is interesting that the Complaint is far more detailed than the presumably adequately pled criminal
Informations filed by the DOJ against British Airways Plc and Korean Air Lines Co., Ltd. on August 1,
2007, in the United States District Court for the District of Columbia under Crim. Nos. 07-183-JDB and
07-184-JDB, respectively.

[19] If, for some reason, the Court decides that additional facts should be pled, plaintiffs request that they be
granted leave to file an amended complaint to correct any such deficiencies.  Rule 15(a) of the Federal
Rules of Civil Procedure provides that leave to amend shall be freely given unless there is undue delay,
bad faith, futility of the amendment or prejudice.  *See State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d
843, 856 (2d Cir. 1981).

that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr* [*v. A.O. Smith Corp.*], 521 U.S. [179,] 189, 117 S. Ct. 1984 [(1997)] (internal quotations omitted).

*In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000).  Thus, Ethiopian is not entitled to a dismissal of any claims based on sales of Airfreight Shipping Services after February 8, 2003, four years prior to the date the Complaint first naming Ethiopian was filed.  As explained next, plaintiffs' allegations of fraudulent concealment are more than sufficient to equitably toll the statute of limitations thereby preventing dismissal on that ground of any of plaintiffs' claims against Ethiopian based on purchases prior to February 8, 2003.

To plead or prove fraudulent concealment in this Circuit, antitrust plaintiffs must allege (1) concealment – the defendant concealed from plaintiffs the existence of plaintiffs' claims; (2) ignorance – plaintiffs remained ignorant of the claims until some point within four years of the commencement of the action; and (3) diligence – plaintiffs' continuing ignorance was not attributable to lack of diligence. *See State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  Plaintiffs may allege concealment by showing either (a) the conspiracy was of such a nature as to be self-concealing, or (b) the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy. *Id.*  All these elements were pled with requisite specificity in the Complaint.

### A.    Concealment Was Shown.

By alleging a price-fixing scheme, plaintiffs have sufficiently alleged a self-concealing conspiracy satisfying the first element. *Nine West*, 80 F. Supp. 2d, at 193.  In addition, plaintiffs have detailed affirmative actions of concealment by Defendants including (i) meeting and communicating secretly, (ii) agreeing not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of the conspiracy, and (iii) giving

25

specifically detailed false and pretextual reasons for the surcharges.[20]  Complaint ¶¶ 117, 120-22,

124-32.  While Ethiopian is correct that it is not specifically identified as having committed an

affirmative act of fraudulent concealment (Eth. Mem. at 16), as long as it is alleged to have been

a member of the conspiracy, as it is, the affirmative acts of others are also attributable to it.  *See*

*Hendrickson*, 840 F.2d at 1084-85 ("it was entirely appropriate for the court to allow use of the

Amfar defendants' actions against the other coconspirators – even if the latter did not know of

the actions – since they were acts in furtherance of the conspiracies").[21]

### B.    Plaintiffs Did Not Know of Their Claims until February 2006.

The second element – plaintiffs' ignorance – is clearly satisfied by the Complaint.  It

states, "[U]ntil February of 2006, Plaintiffs and the members of the Classes had no knowledge of

the alleged conspiracy."  Complaint ¶ 136.  The first complaint was filed in this Court by

plaintiff Fleurchem, Inc. on February 17, 2006.

### C.    Plaintiffs Did Not Lack Due Diligence.

Plaintiffs also satisfy the third element of not lacking diligence.  *Nine West*, in which the

court found fraudulent concealment sufficiently pled and this element satisfied, is on point.

There the complaint alleged:

---

[20] Ethiopian argues that plaintiffs must specify the fraudulent statements, identify the speaker, state where and when the statements were made, and explain why they were fraudulent.  *See* Eth. Mem. at 16. Plaintiffs satisfy each of these criteria in paragraphs 125-31 of the Complaint.  *Cf. Litle v. Arab Bank, PLC*, No. CV-04-5449 (NG) (VVP), 2007 WL 895504, at *3 (E.D.N.Y. Mar. 22, 2007) (rejecting fraudulent concealment where plaintiffs "make only generalized and conclusory statements about the time, place and manner of the defendant's allegedly fraudulent conduct").

Ethiopian's citation (Eth. Mem. at 16) to *Lerner v. Fleet Bank*, 459 F.3d 273 (2d Cir. 2006), is way off base.  There, the court analyzed whether plaintiffs had pled a New York state law claim for common law fraud where no affirmative misrepresentation had been made, but there was only arguably a failure to disclose.  *Id.* at 291-92.  This has no bearing on whether Defendants here affirmatively misrepresented the bases for the increases in surcharges to conceal their collusion.

[21] No conspiracy was alleged in *In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 339-40 (S.D.N.Y. 2007), relied on by Ethiopian (Eth. Mem. at 16).

Plaintiffs and the other class members could not have discovered the conspiracy at
an earlier date by the exercise of due diligence because of the affirmative,
deceptive practices and techniques of secrecy employed by Defendants, including,
but not limited to: (1) the selective use by the Defendants of "promotional
windows" to create the false appearance that discounting was occurring through
ordinary market forces; and (2) hiding the existence and purpose of the Off Limits
Lists from the consuming public.

*Id.* 80 F. Supp. 2d at 193.

Here, the public attribution of increased surcharges to normal market forces and
considerations, including increases in costs, so as to hide the existence and purpose of
Defendants' collusion (Complaint ¶¶ 125-31, 133-34) is analogous to the allegations in *Nine
West*. Moreover, the Complaint (¶¶ 118, 126, 133-34) states that plaintiffs and class members
exercised reasonable diligence but did not have and could not have had contemporaneous access
to sufficient information regarding Defendants' costs to have ascertained the truth instead of
relying on Defendants' purported cost justifications. In addition, as in *Nine West*, "[o]nce
plaintiffs were alerted to their potential claims by the media, they promptly filed suit and thus
have satisfied the due diligence requirement." *Id.*

\* \* \*

Thus, plaintiffs have pled with specificity the elements of fraudulent concealment which
will equitably toll the statute of limitations. Ethiopian's motion to dismiss on the ground of the
statute of limitations should be denied.

## CONCLUSION

For all the foregoing reasons, defendants' and Ethiopian's motions to dismiss plaintiffs'
claims under Sherman Act § 1 for failing to state a sufficient factual basis and Ethiopian's
motion to dismiss those claims against it under the statute of limitations should be denied.

Dated: New York, New York
      August 22, 2007

27

Respectfully submitted,

Robert N. Kaplan (RK-3100)
Gregory K. Arenson (GA-2426)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Gary L. Specks (GS-8767)
**KAPLAN FOX & KILSHEIMER LLP**
423 Sumac Road
Highland Park, Illinois 60035
(847) 831-1585

By: */s/ Gregory K. Arenson*

*Co-Lead Counsel*

Barbara J. Hart (BH-3231)
Hollis L. Salzman (HS-5994)
Kellie Lerner (KL-0927)
**LABATON SUCHAROW & RUDOFF LLP**
100 Park Avenue
New York, New York 10017-5563
(212) 907-0700

By: */s/ Barbara J. Hart*

*Co-Lead Counsel*

Howard J. Sedran
Austin Cohen
**LEVIN, FISHBEIN, SEDRAN & BERMAN**
510 Walnut Street
Philadelphia, PA 19106
(215) 592-1500

By: */s/ Howard J. Sedran*

*Co-Lead Counsel*

Christopher Lovell (CL-2595)
Jody Krisiloff (JK-1453)
Peggy J. Wedgworth (PW-7371)
Imtiaz A. Siddiqui (IS-4090)
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, Suite 58
New York, NY 10110
(212) 608-1900

By: */s/ Christopher Lovell*

*U.S. Indirect Purchaser Class and Subclass Counsel*

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900

By: */s/ W. Joseph Bruckner*

*U.S. Indirect Purchaser Class and Subclass Counsel*

Joseph W. Cotchett
Steve N. Williams
**COTCHETT, PITRE & MCCARTHY**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

By: */s/ Joseph W. Cotchett*

*U.S. Indirect Purchaser Class and Subclass Counsel*

Michael D. Hausfeld
Charles E. Tompkins
Andrew B. Bullion
Hilary K. Ratway
Andrea L. Hertzfeld
**COHEN, MILSTEIN, HAUSFELD &**
   **TOLL, P.L.L.C.**
1100 New York Avenue N.W.
Washington, D.C. 20005
(202) 408-4600

By: _/s/ Michael D. Hausfeld_

*Co-Lead Counsel and Co-Lead Counsel*
*Principally Responsible for the Foreign Claims*

Henry Cirillo, Esq.
**THE FURTH FIRM LLP**
225 Bush Street, 15th Floor
San Francisco, CA  94104-4249
(415) 433-2070

By: _/s/ Henry Cirillo_

*U.S. Indirect Purchaser Class and*
* Subclass Counsel*

29

## CERTIFICATE OF SERVICE

I, Gregory K. Arenson, declare that, on August 22, 2007, I caused true and correct copies of Plaintiffs' Memorandum of Law in Opposition to Defendants' and Ethiopian's Motions To Dismiss Under Rule 12(b)(6) for Failure To State a Claim and Under the Statute of Limitations to be delivered via the Court's ECF system to all counsel of record and to counsel on the attached service list by depositing the same in the U.S. Mail, postage prepaid.

/s/ Gregory K. Arenson
Gregory K. Arenson

Service List

Jeffrey J. Corrigan
Spector, Roseman & Kudroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103

Marc I. Gross
Pomerantz, Haudek, Black & Grossman
100 Park Avenue
26th Floor
New York, NY 10017

Marvin Srulowitz
16 East 34th Street, Suite 1600
New York, NY 10016-4328

Gina Marie Tufaro
Abbey Gardy LLP
212 East 39th Street
New York, NY 10016

Eric J. Belfi
Labaton Sucharow & Rudoff LLP
100 Park Avenue
New York, NY 10017

John D. Lovi
Steptoe & Johnson LLP
1330 Connecticut Avenue., NW
Washington, DC 20036

Michael Lyle
Weil Gotshal & Manges LLP
1300 Eye Street NW
Suite 900
Washington, DC 20005