1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                                    :
                                    :   06-MD-01775 (JG)
                                    :
                                    :
IN RE:                              :
                                    :   United States Courthouse
AIR CARGO SHIPPING                  :   Brooklyn, New York
SERVICES ANTITRUST                  :
LITIGATION,                         :
                                    :   Tuesday, April 29, 2008
                                    :   10:00 a.m.
                                    :
                                    :
                                    :
                                    :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT ON MOTION TO
DISMISS
BEFORE THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S :


Gregory K. Arenson
Robert N. Kaplan
Kaplan, Fox & Kilsheimer LLP
805 Third Avenue
22nd Floor
New York, NY 10022
212-687-1980 / 212-687-7714 (fax)
garenson@kaplanfox.com


Gary L. Specks
Kaplan Fox & Kilsheimer, LLP
203 North Lasalle Street
Chicago, IL 60601
312-558-1584 / 312-558-1585 (fax)
gspecks@kaplanfox.com

David Jarrett Arp
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
202-955-8678 / 202-530-9527 (fax)
jarp@gibsondunn.com


Gregory Scott Asciolla
Morissa Falk
Hollis R. Salzman
Labaton Sucharow
140 Broadway
New York, NY 10005
212-907-0700 / 212-883-7527 (fax)
gasciolla@labaton.com


Michael R. Atadika
ATADIKA & ATADIKA
60 East 42nd Street
Suite 1436
New York, NY 10165
212-983-1320 / 212-983-9167 (fax)
Atadika@earthlink.net


Ryan Gordon Blanch
The Blanch Law Firm
350 Fifth Avenue
68th Floor
New York, NY 10118
212-736-9721 / 212-378-4325 (fax)
rblanch@blanch-law.com


W. Joseph Bruckner
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
612-339-6900 / 612-339-0981 (fax)
Wjbruckner@locklaw.com

Edward B. Schwartz
Deana L. Cairo
DLA Piper US LLP
500 8th Street, NW
Washington, DC 20004
202-799-4000 / 202-799-5523 (fax)
deana.cairo@dlapiper.com


Terry Calvani
Freshfields Bruckhaus Deringer LLP
701 Pennsylvania Ave Nw
Suite 600
Washington, DC 20004
202-777-4505 / 202-777-4555 (fax)
terry.calvani@freshfields.com


Wayne A. Cross
Heather K. McDevitt
White & Case LLP
1155 Ave Of The Americas
New York, NY 10036
(212) 819-8797 / (212) 354-8113 (fax)
wcross@whitecase.com


Robert M. Disch
Sheppard Mullin Richter & Hampton
1300 I Street, NW
11th Floor East
Washington, DC 2005-3314
202-218-0024 / 202-312-9422 (fax)
rdisch@sheppardmullin.com


David E. Everson
Stinson Morrison Hecker LLP
1201 Walnut Street
Suite 2500
Kansas City, MO 64106
816-842-8600 / 816-691-3495 (fax)
deverson@stinson.com

4

Michael D. Hausfeld
Charles E. Tompkins
Andrea L. Hertzfeld
Cohen, Milstein, Hausfeld & Toll, PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3934
202-408-4600 / 202-408-4699 (fax)
mhausfeld@cmht.com


Victor Day Hendrickson
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
212-841-5700 / 212-841-5725 (fax)
victorhendrickson@gmail.com


George F. Hritz
Sabrina H. Cochet
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
212-918-3517 / 212-918-3100 (fax)
gfhritz@hhlaw.com


William Karas
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC 20036
202-429-3000 / 202-429-3902 (fax)
wkaras@steptoe.com


Andrew J. Morganti
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119
amorganti@milberg.com


Daryl Andrew Libow
Sullivan & Cromwell
1701 Pennsylvania Ave, N.W.
Washington, DC 20006
202-956-7650 / 202-293-6330 (fax)
libowd@sullcrom.com

5

Charles R. Price
William R. Sherman
Latham & Watkins LLP
555 11th Street NW
Washington, DC 20004
202-637-2200
Randy.price@lw.com


Christopher Lovell
Imtiaz A. Siddiqui
Lovell Stewart Halebian LLP
500 5th Ave, 58th Floor
New York, NY 10110
212-608-1900 / 212-719-4677 (fax)
isiddiqui@lshllp.com


Richard A. Walker
Kaplan, von Ohlen & Massamillo, LLC
120 North LaSalle Street
24th Floor
Chicago, Illinois 60602
rwalker@kvolaw.com


Peter E. Halle
Willard Tom
Joseph Brooks
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
202-739-5225 / 202-739-3001 (fax)
phalle@morganlweis.com


William T. Miller
Kimberly N. Shaw
Baker & Miller PLLC
2401 Pennsylvania Ave Nw
Suite 300
Washington, DC 20037
202-663-7822 / 202-663-7849 (fax)
tmiller@bakerandmiller.com

6

1      David W. Ogden
       Eric Mahr
2      Caroline T. Nguyen
       Wilmer Cutler Pickering Hale and Dorr
3      1875 Pennsylvania Avenue, Nw
       Washington, DC 20006
4      202-663-6440 / 202-663-6363 (fax)
       david.ogden@wilmerhale.com
5


6      Ryan Paul Poscablo
       Weil, Gotshal and Manges, LLP
7      767 Fifth Avenue
       New York, NY 10153
8      212-310-8496 / 212-310-8007 (fax)
       ryan.poscablo@weil.com
9


10     Howard J. Sedran
       Levin, Fishbein, Sedran & Berman
11     510 Walnut Street
       Suite 500
12     Philadelphia, PA 19106
       215-592-1500 / 215-592-4663 (fax)
13     hsedran@lfsblaw.com


14
       Ian Simmons
15     Alexander Paul Okuliar
       O'Melveny & Myers LLP
16     1625 Eye St, Nw
       Washington, DC 20006
17     (202)383-5300 / (202)383-5414 (fax)
       isimmons@omm.com
18

19     Charles J. Simpson, Jr.
       James A. Calderwood
20     Zuckert, Scoutt & Rasenberger, LLP
       888 Seventeenth Street, Nw
21     Suite 700
       Washington, DC 20006
22     202-298-8660 / 202-342-0683 (fax)
       cjsimpson@zsrlaw.com
23

24

25

7

1          Allan Steyer
           Steyer Lowenthal Boodrookas Alvarez & Smith LLP
2          One California Street, Third Floor
           San Francisco, CA 94111
3          415-421-3400
           415-421-2234 (fax)
4          asteyer@steyerlaw.com

5

           George N. Tompkins, Jr.
6          Wilson Elser Moskowitz Edelman & Dicker LLP
           150 East 42nd Street
7          New York, NY 10017
           212-490-3000 / 212-490-3038 (fax)
8          george.tompkinsjr@wilsonelser.com

9

           Adir Gurion Waldman
10         Wachtell Lipton Rosen & Katz
           51 West 52nd Street
11         New York, NY 10019-6150
           212-403-1000 / 212-403-2000 (fax)
12         agwaldman@wlrk.com

13

           James R. Warnot
14         Linklaters LLP
           1345 Avenue Of The Americas
15         New York, NY 10105
           212-903-9000 / 212-903-9100 (fax)
16         jim.warnot@linklaters.com

17

18

19

20  Court Reporter:  Victoria A. Torres Butler, CRR
                      Official Court Reporter
21                      Telephone: (718) 613-2607
                        Facsimile: (718) 613-2324
22                      E-mail:    VButlerRPR@aol.com

23  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

24

25

Proceedings                                8

1              (In open court.)

2              COURTROOM DEPUTY:  All rise.

3              THE COURT:  Good morning.  Please, be seated.

4              ALL:  Good morning.

5              THE COURT:  I'm going to take just a moment to get

6     acquainted on the bells and whistles here because I'm not

7     familiar with them either.  I gather some of you have become

8     familiar.

9              (Discussion held off the record.)

10             (Pause in the proceedings.)

11             THE COURT:  All right.  Good morning.

12             You want to call the case, Jim?

13             COURTROOM DEPUTY:  Yes, Civil Cause for Oral

14    Argument in 06-MD-1775, In Re:  Air Cargo Shipping Services

15    Antitrust Litigation, Magistrate Judge Pohorelsky presiding.

16             THE COURT:  Good morning, again.

17             As you already know, we'll be proceeding in a pretty

18    formal fashion because of the various devices that people want

19    to use, and the only way really to do that effectively, I

20    think, is from the podium.

21             So, the way I envision proceeding, and who knows

22    what will happen as this goes on, is that the movants will

23    have the first chance to speak, the movants' representative,

24    and then the opposition, and then some rebuttal.  There may be

25    surrebuttal, we may go back and forth a few times, as I think

Proceedings                                    9

1   of more questions to ask.

2           But I would like to start by having whoever speaks

3   first with respect to a given issue, start with their

4   presentation, let me know what they've prepared in terms of

5   visual aids that they want me to be aware of and that they may

6   use in their arguments, so that I'll be aware.

7           I'd like you to be able to present the argument in

8   the way that you envisioned, as much as possible

9   understanding, of course, that I'm going to be interrupting

10  you with questions as we go along.

11          So, are there any questions or suggestions about how

12  we should proceed?  Other than what I've articulated so far?

13          (No response.)

14          THE COURT:  All right.  Thank you for preparing, or

15  letting me know who's going to be carrying the ball on these

16  issues.  So, I might as well start with the first one.

17          I guess it's Mr. Schwartz, carrying the ball for the

18  defendants?

19          MR. SCHWARTZ:  Yes, Your Honor.

20          THE COURT:  Okay.

21          (Pause in the proceedings.)

22          MR. SCHWARTZ:  Your Honor, I do have a visual

23  presentation.  Our cover slide is up on the screen now.

24          (The above-referred to slide was published to the

25  courtroom.)

1           MR. SCHWARTZ:  And if it might be helpful, we also

2    have hardcopies of the slides themselves that we're prepared

3    to hand up, if you'd like.

4           THE COURT:  I guess it wouldn't hurt for me to have

5    them.  I'm not sure how much use I'll make of them, but if you

6    want to.

7           MR. SCHWARTZ:  Sure.  And we also have copies for

8    plaintiffs' counsel, if they'd like some.

9           THE COURT:  Yes, please.  To the extent they are

10   interested, they should receive copies, as well.  Thank you.

11   ARGUMENT I

12   BY MR. SCHWARTZ:

13          MR. SCHWARTZ:  Thank you, Your Honor.  Edward

14   Schwartz, DLA Piper, Counsel for Cathay Pacific Airways

15   Limited, and I will be addressing the FTAIA motion.

16          Your Honor, as I believe you are aware, the

17   plaintiffs are alleging that they were harmed by allegedly

18   paying overcharges as a result of a global conspiracy to fix

19   the prices for air cargo services.  And plaintiffs, of course,

20   bear the burden of properly alleging subject matter

21   jurisdiction as to each of those claims.  But that they have

22   clearly failed to do so with respect to those claims

23   predicated upon purchases of air cargo services for shipments

24   originating in a foreign country, regardless of the

25   destination to which the goods were ultimately shipped.

1      THE COURT:  Okay.  Here's the first question I do

2  have because I want to get a -- you used the phrase "foreign

3  purchases," I think, in your brief.  And I think you concede

4  that domestic purchases of air cargo services, there is

5  subject matter jurisdiction for those.

6      MR. SCHWARTZ:  That is correct, Your Honor.

7      THE COURT:  So, how do you specifically define

8  foreign purchases, and distinguish those from domestic

9  purchases?

10      And just to sharpen this a little bit, what about an

11  American or domestic United States purchaser of services who

12  actually purchases the services here for transport of goods

13  from abroad to the United States as opposed to that purchaser

14  going, again, a domestic purchaser going to a foreign market,

15  if you want to call it that, and purchasing the same services?

16      And is there any legitimate way to draw a line

17  between those two?

18      MR. SCHWARTZ:  Well, there is, Your Honor.

19      First, the plaintiffs have divided their claims by

20  location of purchaser.  Counts 1 and 2 are brought on behalf

21  of purchasers located within the United States.  Counts 3

22  through 7 are brought by foreign purchasers.

23      THE COURT:  No, I understand that distinction.

24      But the location of the purchaser is one thing.  The

25  location of the purchase is another.

Argument I / Schwartz                    12

1    MR. SCHWARTZ:  And that exactly correct, Your Honor.

2    THE COURT:  Okay.

3    MR. SCHWARTZ:  And that is a fundamental element of

4    our analysis and argument.

5    A domestic purchaser would, of course, be in Count 1

6    if it's a direct purchaser, Count 2, if it's an indirect

7    purchaser.

8    If a purchaser physically located in the U.S.

9    reaches into foreign commerce, and reaches agreement with a

10   carrier for a shipment originating from a foreign country, for

11   purposes of the FTAIA, and in particular for purposes of the

12   threshold import commerce exception, within that threshold

13   language of the FTAIA, that would be treated as a foreign, not

14   a domestic purchase.

15   THE COURT:  Because I mean, again, are you talking

16   about a domestic purchaser who calls Berlin and, you know,

17   asks some freight forwarder in Berlin or somebody, a

18   manufacturer in Berlin, to ship goods to him, to the

19   United States, or let's say take -- that's not exactly right.

20   Contracts directly with the carrier --

21   MR. SCHWARTZ:  Right.

22   THE COURT:  -- in Berlin.  That's the one I'm really

23   thinking of.  Calls Lufthansa in Berlin and says, I want to

24   ship BMW parts to the United States.

25   Is that one of the purchases that is barred by the

Argument I / Schwartz                    13

1    FTAIA, or that there's no subject matter jurisdiction?

2              MR. SCHWARTZ:  Yes.  Let me say preliminarily, that

3    to the extent, if any, that such transactions exist, they are

4    atypical.   And the plaintiffs and defendants are in agreement

5    on this.

6              The plaintiffs concede, at pages 14 and 15 of their

7    opposition, that the way those transactions are typically done

8    is that it would be a freight forwarder.

9              Let's say hypothetically, we're talking about a

10   shipment of wine from Spain, somewhere in the world.

11   Typically, indeed the vast majority, at a minimum, of those

12   transactions will be entered into between a freight forwarder

13   and the carrier in Spain.  Why?  Because it is the local

14   freight forwarders that have the relationships with the

15   carriers.

16             Now --

17             THE COURT:  Okay.  But then, what about if the same

18   United States purchaser contacts Lufthansa here and says, can

19   you get these goods shipped here?  Again, maybe that's the

20   atypical case.

21             I mean, your argument is that that's a -- is that a

22   pretty small universe of transactions?

23             MR. SCHWARTZ:  It may not ever happen, but let's

24   assume for the purposes of your question it does happen.

25             THE COURT:  Yes.

1          MR. SCHWARTZ:  That specific hypothetical was

2   addressed directly by the Second Circuit in its decision in

3   Kruman.  Charlotte Kruman, named plaintiff, a resident of

4   New Jersey, traveled up to New York to visit with Christie's

5   in New York.

6          In fact, can we please go to the slide reflecting

7   the Kruman transaction.

8          (The above-referred to slide was published to the

9   courtroom.)

10         MR. SCHWARTZ:  Your Honor, we're showing you now a

11  slide -- and this is slide number three -- that graphically

12  demonstrates the Charlotte Kruman transaction.

13         Resident of New Jersey, Charlotte Kruman, travels to

14  New York, visits with Christie's in New York, sees a

15  photograph of a watch that she thought she might want to buy.

16  This watch happened to be one being sold at auction in London.

17         Next slide, please.

18         (The above-referred to slide was published to the

19  courtroom.)

20         MR. SCHWARTZ:  She made a bid.  And Christie's

21  New York transferred the bid to Christie's London.  So, she

22  dealt with Christie's New York.

23         Next slide, please.

24         (The above-referred to slide was published to the

25  courtroom.)

1          MR. SCHWARTZ:  She won the auction conducted in

2   London.  Won the watch.

3          Next slide.

4          (The above-referred to slide was published to the

5   courtroom.)

6          MR. SCHWARTZ:  Christie's imposed a buyer's premium

7   pursuant to the alleged global conspiracy, fixing prices

8   globally on auction services for buyer's premiums and seller's

9   commissions; conspiracies between Christie's, a U.K. company,

10  Sotheby's, a Michigan company.  She dealt with Christie's.

11         Next slide, please.

12         (The above-referred to slide was published to the

13  courtroom.)

14         MR. SCHWARTZ:  She paid the allegedly inflated

15  buyer's premium to Christie's.

16         The Court held this was not a domestic transaction,

17  did not involve import commerce.

18         The reason is simply, that it is a simple analysis

19  under the threshold import commerce exception.  You look at

20  the conduct.  You look at the conduct.

21         Here, the relevant conduct was the imposition of the

22  alleged overcharge on the buyer's premium at the auction in

23  London.  The fact that Ms. Kruman dealt with Christie's

24  New York, even that she provided the bid to Christie's

25  New York, was irrelevant.  The case doesn't even address

1    whether Christie's New York sent her the bill or whether it

2    was Christie's London that issued it.  It didn't matter.  Even

3    though, even though the plaintiffs claimed in that case a

4    global conspiracy to fix prices everywhere in the

5    United States.

6              Because the fundamental analysis under the

7    Sherman Act divides the world in two:  There is U.S. conduct

8    and U.S. effects, and there's foreign conduct and foreign

9    effects.  And for purposes of the narrow threshold import

10   commerce exception, the Court looks only at the conduct and

11   sees where is the overcharge imposed.  And the fact that

12   Ms. Kruman was in New York was irrelevant.  The fact that she

13   dealt with Christie's New York was irrelevant.

14             And that's exactly the situation that we would have

15   here if we're dealing with a, say, a U.S. freight forwarder

16   who contacts Lufthansa overseas, or even contacts them here.

17             If the arrangement being made was for a shipment of

18   goods originating in Germany, the relevant conduct would be

19   the imposition of the alleged overcharge at the point of

20   origin because prices attach at the point of origin, not at

21   the point of destination.

22             THE COURT:  Is that, that's an industry standard, so

23   to speak?

24             MR. SCHWARTZ:  It's the way the industry works.

25   Pricing -- let's talk about surcharges for a moment, which are

1  obviously, an important part of the plaintiffs' case.

2         Surcharges are applied X; X, the point of

3  origination.  That is where the surcharges are set.  But the

4  Court, as the Court in Kruman, doesn't even need to get into

5  that kind of factual inquiry, because again, the threshold of

6  import commerce exception is actually a simple analysis.  Is

7  it a foreign price or is it a domestic price?

8         And it's deemed to be a foreign price if it's a

9  transaction originating in foreign commerce.

10        And originating doesn't mean where did the first act

11 occur.  Originating means where was the price applied by the

12 defendant?  Because it is the defendant's conduct and only the

13 defendant's conduct that is relevant in applying that narrow

14 threshold import commerce exception.

15        THE COURT:  So, the long and short of it is that a

16 foreign purchase, for your purposes, the purposes of your

17 argument, is any purchase, transportation, services for goods

18 that are shipped from a point outside the United States to the

19 United States.

20        MR. SCHWARTZ:  Yes.  And those are the precise

21 transactions as to which we're moving under 1 and 2, domestic.

22 And truly, the foreign purchasers, 3 through 5.  And for the

23 for Counts 3 through 5, foreign purchasers making purchases

24 for shipments originating in a foreign country with foreign

25 pricing, those are a no-brainer under our motion.  That could

1   not be more clear.  There is no argument, no reasonable

2   argument that those shipments involve somehow domestic

3   conduct, let alone an import market for purposes of the narrow

4   threshold import commerce exception.

5           THE COURT:  You mean, I'm sorry.  You're talking

6   about purchases of services for transportation of goods

7   between foreign points?

8           MR. SCHWARTZ:  Yes.  Entirely outside the

9   United States.

10           THE COURT:  Where they're not to or from the

11   United States, is that the distinction you're making?  I'm

12   sorry.

13           MR. SCHWARTZ:  Well, the distinction, what I'm

14   addressing now are those claims brought under Counts 3

15   through 5 by foreign purchasers.

16           THE COURT:  Right, foreign purchasers.

17           MR. SCHWARTZ:  What we're saying is for those

18   purchases by foreign purchasers, for shipments originating in

19   a foreign country, it does not matter where the shipment goes.

20           THE COURT:  Okay.

21           MR. SCHWARTZ:  Because it's a foreign price that was

22   charged.

23           THE COURT:  Right.

24           MR. SCHWARTZ:  If we could go -- go to slide number

25   two, please, the overview of the FTAIA.

1           (The above-referred to slide was published to the

2    courtroom.)

3           MR. SCHWARTZ:  It might be helpful, just very

4    briefly, to do a quick overview of the mechanics of the FTAIA.

5           The first question in any FTAIA inquiry is:  Does

6    the defendant's conduct involve foreign trade or foreign

7    commerce?  No dispute with the plaintiffs there.

8           The second question is:  If it does, is it not

9    import or import commerce?  If it is import commerce out of

10   the FTAIA, doesn't apply, still applies standing analysis, and

11   that is a separate argument that I will be addressing.

12          If it does not, if the defendant's conduct does not

13   involve import trade or import commerce, then you go to what

14   is really the heart of the FTAIA.  That's the effects test.

15          THE COURT:  But I don't see much argument from the

16   plaintiffs on the effects test.

17          MR. SCHWARTZ:  I don't think we get much, frankly.

18          THE COURT:  All right.  They focus their argument,

19   at least in their opposition papers unless I overlooked

20   something, on the import trade or commerce.

21          MR. SCHWARTZ:  They take a shot at 6(a)(2), which is

22   the only element under the effects test under which we're

23   moving.  We're not moving under 6(a)(1).  Only under 6(a)(2),

24   and that is the plaintiffs' burden to properly allege their

25   claims arise directly from independent harm to U.S. commerce.

1   We don't think there is, frankly, a serious argument under

2   6(a)(2).  If the plaintiffs -- the plaintiffs are putting

3   their acts in the import commerce basket.

4           They want to get out of the FTAIA.  Why?  Because

5   they can't satisfy the effects test.  Because they can't.

6           And we believe -- and we think this is absolutely

7   the correct analysis -- that it cannot be the case that claims

8   that cannot ultimately satisfy the effects test and, in fact,

9   fail by a wide margin, can't be taken out of FTAIA analysis.

10  Congress clearly did not intend that claims that don't satisfy

11  the effects test, which is a codification of the ALCOA test

12  that predated the enactment of the FTAIA in 1982, cannot give

13  rise to Sherman Act jurisdiction.

14          Can we go to the next slide, please.

15          (The above-referred to slide was published to the

16  courtroom.)

17          MR. SCHWARTZ:  This is an excerpt of the relevant

18  language for purposes of our motion of the FTAIA.  So, this is

19  the threshold language that contains the import commerce

20  threshold test.

21          The purpose of this part of the FTAIA is simple and

22  narrow.  It does nothing more than defines the scope of the

23  conduct that will be subject to the effects test in the

24  statute.  And the import commerce exception is simply, all it

25  says is:  If it is import commerce, it is -- if it's not

Argument I / Schwartz                    21

1   import commerce, we go to the effects test.

2              And there are three critical points about this test.

3   And the words drive the analysis, as the Third Circuit

4   properly said in <u>Turicentro</u>.

5              First, import trade or import commerce, for purposes

6   of our motion, we don't have a dispute with plaintiffs over

7   what that means; if bringing in of goods or maybe, maybe a

8   service into the United States, we're not arguing that it

9   doesn't apply to services.  Unclear, though.

10             Second, conduct.  This is critical.  It is only

11  defendant's conduct that is analyzed in applying the import

12  commerce exception.  It's not the effects of the conduct.

13  That's in the effects test.  And as the Third Circuit

14  correctly said in <u>Turicentro</u>, if conduct involving import

15  commerce is interpreted broadly, it eviscerates the meaning of

16  the reference to import trade or import commerce in the

17  effects test in of 6(a)(1).

18             In other words, conduct involving import trade or

19  commerce cannot be the same as conduct affecting import trade

20  or commerce, or this has no meaning.  There would be no

21  conduct involving import trade or commerce left to analyze

22  here.  So, conduct involving import trade or import commerce

23  must be given a narrow construction.

24             So, and again, it's because the import commerce

25  exception is intended just to be a quick look.  A presumption.

Argument I / Schwartz                          22

1   If the conduct involves import trade or commerce, it's so

2   obvious that it's going to have the correct effect, the

3   inadequate effect on U.S. commerce, we don't need to bother

4   with the effects test.

5          But if it's a close call, if it's not crystal clear

6   that the conduct directly targets an import market or

7   possibly, even as the Third Circuit said in Carpet Group,

8   solely targets an import market as the defendants did in that

9   case, the only case plaintiffs cite in which the Court held

10  that yes, the import commerce exception applies, then you've

11  got to get to the effects test.

12         So, the conclusions from the proper construction and

13  application of the operative words from the import commerce

14  exception are:  One, the relevant conduct here.  The relevant

15  conduct was only the alleged agreement to fix prices, and then

16  the application of that agreement in the imposition of the

17  overcharges.  The flying of the planes, the unloading of the

18  cargo, where they went is irrelevant.  The harm that

19  plaintiffs are alleging arose from the imposition of the

20  overcharges, and it didn't fly with the cargo in the belly of

21  the aircraft to wherever the aircraft is going.

22         THE COURT:  So, your definition of conduct involving

23  trade, to the extent that it applies in this case, is the

24  actual application of the charge to a particular item that's

25  being transported.

1        MR. SCHWARTZ:  I think, Your Honor, that there are,

2   that is the second and here the operative element.

3        I think the predicate element has to be the

4   agreement to fix prices, which is the essence of the

5   violation.  But obviously, without the imposition, the conduct

6   didn't harm the plaintiffs.

7        THE COURT:  Well, but for domestic, for purchases of

8   air transport services occurring domestically, the agreement

9   may have been abroad, it's the imposition of the charge here

10  that you concede gives rise to Sherman Act jurisdiction.

11       MR. SCHWARTZ:  That's correct.  If it is a domestic

12  transaction.  And domestic pricing, presumably applied, so

13  yes, we're not arguing, we're not moving such transactions.

14       THE COURT:  Okay.

15       MR. SCHWARTZ:  Now, let me just touch briefly.  We

16  don't need to go back to the slide.

17       The Kruman transaction, again, plaintiffs tried to

18  distinguish Kruman and Turicentro and CSR by saying all these

19  cases, the facts here unlike the facts here, had only

20  incidental contact with the United States and began and ended

21  in foreign, not domestic commerce.

22       We saw, of course, that's completely incorrect with

23  respect to Charlotte Kruman, with respect to other class

24  representatives.  The transaction began and ended with

25  Charlotte Kruman in the United States.

1          THE COURT:  But that was a purchase of goods in a

2     foreign market.

3          Here we're talking about a purchase of services

4     which arguably, and I think the plaintiffs argue, actually

5     occurs both places.  I mean, the service occurs both abroad

6     and here.

7          MR. SCHWARTZ:  Well, I think that the, I have two

8     points about that, Your Honor.

9          I think Kruman is directly analogous to here.  What

10     the relevant -- what Charlotte Kruman purchased that was

11     relevant for purpose of plaintiffs' claims, as the Court

12     correctly held, was the purchase of the auction services.  The

13     watch came out of that.  The plaintiffs in that case were not

14     claiming that Charlotte Kruman or anyone else overpaid for the

15     good, it was for the service being provided at auction.

16          Just as here, plaintiffs are claiming that they

17     overpaid for the service.

18          THE COURT:  But the service, again, occurred

19     entirely overseas.  The auction occurred over there.  I mean,

20     as opposed to the transportation of goods.

21          MR. SCHWARTZ:  Well, Your Honor, I respectfully

22     suggest that a very significant part of the defendant's

23     conduct in Kruman occurred in the United States.  Christie's

24     New York showed her the watch.  Christie's New York took the

25     bid from her.  We don't know, it's not addressed, Christie's

1   New York may have actually sent her the bill and received the

2   payment reflecting the overcharge for the buyer's premium.

3            Another named plaintiff, Sophie Magee, resident of

4   Flint, Michigan -- this by the way is in the complaint filed

5   by Cohen & Milstein.  Sophie Magee resident of Flint, Michigan

6   wanted to sell paintings at auction.  Goes to visit with

7   Sotheby's Chicago.  Sotheby's again, is a Michigan company.

8   Makes arrangements to have those paintings auctioned in

9   London.  Sotheby's puts them on tour in the United States,

10  Boston, New York and then two foreign cities.  Paintings are

11  sold.  Allegedly, inflated seller's commission is charged by

12  Sotheby's.

13           Sotheby's had a lot of action in the United States

14  on that transact.

15           Ion, but the relevant conduct was the imposition of

16  the alleged overcharge to the seller's commission in the

17  London auction.  So, the conclusion in that case was it

18  doesn't matter; that whatever happened in the United States is

19  not the alleged conduct that violated the Sherman Act.

20           Just as the Second Circuit said in Kruman.  It is

21  only that conduct that violated the act that is relevant in

22  applying the narrow threshold import commerce test.

23  Everything else, we don't care about.

24           Just as in Turicentro, a case brought by foreign

25  travel agents against four U.S. carriers in IATA, claiming a

1   conspiracy to fix commissions paid to foreign travel agents.

2   Didn't matter that they're domestic carriers, they're

3   obviously flying in and out of the United States, tickets were

4   sold to U.S. passengers who are coming in and out of the

5   United States.   The facts there are directly analogous to

6   those here.

7          Travel agents there play the role of middlemen

8   between the ultimate consumer of the service being provided by

9   the air carrier and the carrier, just as the forwarder does

10  here for the shipment of freight.

11         But, the operative fact is that it was foreign

12  commissions, commissions being paid to foreign travel agents

13  that were fixed in that case.   And so, the Court said, it

14  doesn't matter that there were, that defendant had contacts in

15  the U.S., didn't matter there were passengers flying in and

16  out of the U.S., didn't even matter they were U.S. carriers.

17  Just as here, this again could not be more clear when we're

18  talking about the foreign purchasers under Counts 3 through 5.

19         Can we go to the first map slide, please.

20         (The above-referred to slide was published to the

21  courtroom.)

22         MR. SCHWARTZ:   It might be helpful, just to

23  illustrate briefly a hypothetical transaction falling within

24  Counts 3 through 5.   This is one brought, hypothetically under

25  Count 4, brought by purchasers for shipments between Europe

Argument I / Schwartz                    27

1    and the United States.

2           So, if a shipper wants to send goods from Spain, and

3    let's assume the forwarder is a direct purchaser claim.  The

4    forwarder is the plaintiff.  The shipper would contact the

5    forwarder in Spain and reach agreement for a price, a rate,

6    possibly surcharges, here properly denominated in Euros on the

7    agreement.

8           Next slide, please.

9           (The above-referred to slide was published to the

10   courtroom.)

11          MR. SCHWARTZ:  The next step would be the freight

12   forwarder, this is the plaintiff, would make arrangements with

13   a carrier.  An agreement that would include, of course, what

14   the forwarder's going to ship, crates of wine, to a

15   destination and a price.  It would be the rate and it would be

16   the surcharge that the carrier imposed.

17          THE COURT:  I see.  Okay.  Sorry, I did something

18   here.

19          (Discussion held off the record.)

20          (Pause in the proceedings.)

21          THE COURT:  Okay.  Thank you.

22          MR. SCHWARTZ:  Okay, here we go.

23          Of course, the carrier and the forwarder are going

24   to agree on a rate and any applicable surcharges.  This is the

25   element of the transaction that allegedly violated the

1  Sherman Act for purpose of this claim.   This is the conduct

2  that's relevant.

3           Can we go to the next slide, please.

4           (The above-referred to slide was published to the

5  courtroom.)

6           MR. SCHWARTZ:   And the plaintiffs are not contending

7  that they would have a claim for this transaction if the wine

8  was shipped to Dublin.

9           Now, they are seeking relief under the EC Treaty

10 under Article 81, but they concede there's no Sherman Act

11 jurisdiction for this claim.

12          Next slide, please.

13          (The above-referred to slide was published to the

14 courtroom.)

15          MR. SCHWARTZ:   And it doesn't matter whether the

16 wine is going to Dublin, or Paris, or Brussels, or Frankfurt,

17 or anywhere else in Europe, it's the exact same result.

18          Next slide please.

19          (The above-referred to slide was published to the

20 courtroom.)

21          MR. SCHWARTZ:   And indeed, it doesn't matter whether

22 the wine is shipped to Dublin, or Frankfurt, or Paris, or

23 New Delhi or even New York.

24          The harm was felt with the imposition of the alleged

25 overcharge when the carrier reached agreement with the freight

1    forwarder in Spain.

2         The sole case that the plaintiffs' cite in which the

3    Court held that the import commerce exception applied

4    completely supports these conclusions and the analysis, as

5    reflected in our motion, Your Honor, <u>Carpet Group</u> the Third

6    Circuit decision in <u>Carpet Group</u>.

7         Plaintiff retail rug importer, a rug importer sued

8    an association of wholesaler rug importers.  The Oriental Rug

9    Importers Association accused the defendants -- and some of

10   its members and officers -- plaintiff accused the defendants

11   of conspiring to block plaintiff's efforts to import rugs

12   directly from foreign countries and thereby cutting out the

13   wholesaler rug middlemen defendants.

14        The Court held that that conduct involved import

15   commerce because the defendants' conduct solely targeted what

16   was clearly an import market.  The defendants describe

17   themselves as importers.  The defendants' conduct was targeted

18   directly at reducing imports, the quantity of imports, the

19   volume of imports of rugs into the United States, thereby

20   raising the price, effectively.

21        Interestingly, the Court held that it was because

22   that conduct so directly targeted an import market that the

23   import commerce exception applied.  And the Court held that if

24   the defendants had only taken steps to one, prevent or at

25   least dissuade the foreign export countries, Pakistan and

1    India, from supporting the plaintiff's rug trade shows by

2    getting its suppliers in those countries to attend the shows,

3    or two, even if the defendants had only done that and tried to

4    dissuade rug retailers in the U.S. from supporting the

5    plaintiff's shows, even that conduct may have been too

6    indirect standing alone to involve import commerce for purpose

7    of the narrow threshold import commerce exception.  It was

8    only because the defendants also targeted their own members

9    and dissuaded them, that was direct enough.  This is the only

10   case the plaintiffs cite.  The only case.

11           And what we have here is --

12           THE COURT:  They were looking at the effects test

13   then; were they not?

14           MR. SCHWARTZ:  I believe that they were looking --

15   in the application of the import commerce exception,

16   Your Honor, they were looking solely at the defendants'

17   conduct.  They were looking at the conduct.

18           What did the conduct target?  What market did it

19   target is the real question.

20           And the Court held properly in that case that

21   defendants' conduct targeted solely what could only be fairly

22   characterized as an import market for rugs.

23           THE COURT:  Okay.

24           Maybe you should take a couple minutes on standing

25   and I'll let the plaintiffs respond.

Argument I / Schwartz                          31

1           MR. SCHWARTZ:   If I could very briefly address

2     6(a)(2), Your Honor.

3           THE COURT:   Okay.

4           MR. SCHWARTZ:   We don't think that there's a

5     legitimate dispute over this.   The plaintiffs clearly don't

6     satisfy the proximate cause test, which they must satisfy

7     under the Empagran II test, and which every other court has

8     addressed.

9           The plaintiffs' allegations are, for example, that

10    the defendants' conduct had adverse effects on -- that the

11    adverse effects of defendants' conduct are interdependent

12    with, and are linked between foreign and U.S. commerce.

13    Defendants could not have maintained their international price

14    fixing arrangement without impacting adversely the price of

15    the various freight shipping services to, from, within the

16    U.S.   It's all a "but for" test.   It's a "but for" argument.

17    It's all the -- it's precisely the kind of "but for"

18    interdependence arbitrage theory that every court to address

19    it, including Ciano, III, and Latino Quimica have properly

20    rejected.   And we just don't think there's a legitimate issue

21    at this point.

22          Your Honor, what I would like to do at this point is

23    since standing is, for us, a separate argument, if that's okay

24    with you, is to give the plaintiffs an opportunity to address

25    FTAIA.   And then if it's okay, I'll do an encore and address

1    standing, briefly?

2          THE COURT:  All right.  Let's do it that way.

3    That's fine.  Because I'm going to have you back anyway, so.

4          MR. SCHWARTZ:  Okay.

5          THE COURT:  All right.  Mr...

6          MR. TOMPKINS:  Tompkins, Your Honor.

7          THE COURT:  Tompkins.  Yes, thank you.

8          COURTROOM DEPUTY:  Counsel, are you using a podium

9    laptop as opposed to the table?

10          MR. TOMPKINS:  Laptop.

11          COURTROOM DEPUTY:  Okay.

12          (Pause in the proceedings.)

13   ARGUMENT I

14   BY MR. TOMPKINS:

15          MR. TOMPKINS:  Well, let me start by saying the

16   plaintiffs and defendants do agree on a number of elements in

17   this case.  We apparently agree on -- that's heartening.  We

18   apparently agree that the relevant test is whether the conduct

19   involves import commerce.

20          THE COURT:  So, are you conceding that you're really

21   not relying on the domestic effects aspect?

22          MR. TOMPKINS:  I'm not saying that we don't meet the

23   domestic effects test.  However, I am saying we never have to

24   get there.

25          It's a challenging and difficult conceptual analysis

1    that we just don't have to reach because in this case, the

2    question of whether or not the conduct involves import

3    commerce is a pretty straightforward question.

4         And I think the challenge in a case that is as

5    straightforward as this is that the parties are analogizing

6    from hard cases back to easy cases.  Some of these hard cases

7    that the parties have been talking about commissions and

8    foreign markets are much more challenging than a case here,

9    which involves an alleged price fix on the cost of shipping a

10   good to the United States.

11        Let me just start by saying, the defendants concede

12   that they challenge they're only moving as to purchases in

13   foreign markets of air freight shipping services for shipments

14   from foreign countries to the U.S.  So, what they're

15   challenging is shipping services when goods, imports, are

16   loaded onto planes and flown to the U.S. by air.

17        That makes the analysis much simpler, frankly,

18   because the Kruman's case, and the defendants also -- I won't

19   belabor this point -- the defendants also agree that the

20   question is whether their conduct involved import commerce.

21        I'm going to skip this slide because this analysis

22   is not necessary.

23        So, the question is, what conduct involves import

24   commerce?  And that question has essentially already been

25   answered by the Second Circuit in the Kruman's case.  If you

1    read the quote there, in the <u>Kruman</u> case, what you were

2    dealing with was a commission that was charged by a service,

3    by an auctioneer basically abroad.

4            What the Court said was that that did not qualify as

5    conduct involving import commerce.  And the Court specifically

6    contrasted it with conduct that would involve import commerce.

7    And that would be conduct that involved trade in, and

8    subsequent movement of goods.

9            Now, here, Your Honor, this case involves the

10   subsequent movement of goods into the United States.  What the

11   defendants do, the service they provide is to fly goods into

12   the United States.  And the conduct was to allegedly increase

13   certain surcharges that increase the cost of flying goods into

14   the United States.

15           THE COURT:  But the critical word there is of the

16   goods that were purchased and sold, isn't it?  I mean, trade

17   in and subsequent movement of the goods that were purchased

18   and sold.  It's not just of, you know, the focus is not on

19   movement.  It's on goods.

20           MR. TOMPKINS:  Your Honor, the focus is on what

21   involves import commerce.  And it's important to think about

22   the fact that that's a phrase, not a word.  It's not just

23   imports, obviously.  It's something that is broader than that.

24   And the question is:  What conduct involves import commerce?

25   Well, obviously, fixing the price of imports does.  But

1    something else has to, as well, because otherwise the phrase

2    wouldn't be involves import commerce, it would be imports.

3            And the question is:  If conduct targeting the cost

4    of shipping a good into the United States doesn't involve an

5    import commerce, what would?  It seems like this is a

6    clear-cut case.

7            But what the defendants have done is they have

8    agreed among themselves to increase the cost for an importer

9    who wants to ship something here.  That should be conduct that

10   involves import commerce under any reasonable application of

11   that phrase.

12           And importantly, it's conduct that the

13   Second Circuit has already indicated is at least sufficient.

14   I'm not suggesting this sets the outer bounds of what might

15   qualify as involving import commerce, but I am saying that

16   this identifies examples of conduct that does involve import

17   commerce.  And one of the examples is commerce directed at the

18   subsequent movement of goods into the United States.

19           Does that answer your question?

20           THE COURT:  It answers up to a point.  But no, it

21   ultimately, everything turns, it seems to me, on whether the

22   providing of that service, whether the, for the Court -- what

23   I'm grappling with is where is the service provided, and what

24   is, what is the market for the service, and where is that

25   market?  And I'm not sure that either side has yet helped me

1   find the solution to that question.

2           MR. TOMPKINS:  Let me try and address that question

3   first by focusing on the word conduct, per se.

4           The defendants' conduct under Mr. Schwartz' analysis

5   was fixing the service provided abroad.  That definition is

6   clearly too narrow because if that definition applied, then

7   you could fix the price of an actual import abroad, let's say

8   the wine example.  You fix a price for a case of wine and then

9   ship it to the United States.  I mean, that would be --

10  clearly, fixing the price of a case of wine that is shipped to

11  the United States involves import commerce.  It seems like

12  that must, if anything does.

13          So, looking at the conduct as merely being the fix

14  in a foreign location cannot be the correct analysis.

15          What you have --

16          THE COURT:  But let's take the Kruman's case.  The

17  Kruman's case, the price of the good was fixed abroad.  Now,

18  the good could have gone anywhere.  It wasn't found for the

19  United States, necessarily, could have gone anywhere.  But,

20  the price was fixed abroad, brought to the United States.  The

21  United States purchaser of the good was affected by that.

22          So, why isn't that actionable?  I mean, you're

23  saying if the price is fixed abroad and comes to the

24  United States, it's actionable under the Sherman Act.

25          MR. TOMPKINS:  Well, if the price of the import is

1    fixed abroad and it comes into the United States, that's

2    conduct involving import commerce.

3           But to answer your questions about Kruman's, the

4    service, the service there was providing an auction service.

5    It occurred exclusively in the foreign market.  The auction

6    took place in a foreign market, it was completed in foreign

7    market.  And when it was done, the good could be shipped

8    anywhere.

9           THE COURT:  You're right.

10          MR. TOMPKINS:  If you paid a hundred Euros for the

11   good, you could ship it to the United States or you could ship

12   it France.

13          Here, the service that is being provided is the

14   service of shipping something to the United States.  I think

15   the way we expressed in the briefs is this:  In the Kruman's

16   case, once the auctioneer finished and the good was sold, the

17   service was done.  You could not complain to the auctioneer

18   about the service being inadequately performed.  There was

19   nothing left to do.

20          Here, once I pay for my, the shipment in England or

21   in Spain -- the plane has to fly to the United States and

22   arrive in the United States for the transaction to be

23   complete.  To put it in the most concrete terms, in Kruman's,

24   once I buy the auctioned good, no matter where it goes, I

25   can't go back to the auctioneer and say give me my money back

1   because the auctioneer has performed the service that he or

2   she was hired to perform.

3              Here, in contrast, if the defendant didn't fly the

4   good to the United States, you could get your money back.   And

5   that makes a big difference in the analysis.   The service is

6   provided, it starts abroad, but it ends in the United States

7   by definition.

8              THE COURT:   I understand.

9              MR. TOMPKINS:   Okay.

10             I think one point to highlight is that this case is,

11  because it involves the transportation industry, it is very

12  different than these other cases that have been analyzed.   And

13  I think it's one of the -- that was one of my opening points

14  was that it's hard to take cases involving the Kruman's and

15  Turicentro case.   At their heart they stand for the

16  proposition that you can fix the price of foreign auction, you

17  can fix the charge for a foreign auctioneer's services, and it

18  doesn't matter where the product is shipped.   Excuse me,

19  commissioned.   A foreign commission can be fixed.   Kruman's

20  involves auctions.   Turicentro involves travel agents, but

21  essentially, you can fix the commission charged by a foreign

22  agent.

23             These cases are different, because what's being

24  fixed here is the cost of shipping something into the United

25  States.   So, you can't take those Kruman and Turicentro cases

Argument I / Tompkins                    39

1   too far or else you leave no conduct left that quote, involves

2   import commerce.

3            And again, I come back to the point that the conduct

4   in this case targeted the movement of goods into the

5   United States.  That's the target.  The service for the

6   movement of goods into the United States was targeted by

7   defendants' conduct.  In fact, let me go to the next slide

8   here to highlight this point.

9            One of the specific allegations in the complaint is

10  that the defendants agreed to charge flat fees to air freight

11  customers for the defendants' preparation and submission of

12  U.S. Customs required manifests.  And let me just explain that

13  for a second.

14           After 9/11, the U.S. Customs Department began to

15  require that the air carriers, while they were en route,

16  provide a manifest of all the goods on their plane.  It only

17  applied to the United States.  It was a requirement that U.S.

18  Customs instituted and only obviously was applicable to

19  flights coming here.

20           The defendants first decided that they wanted to

21  impose a surcharge to recapture the cost of complying with

22  that requirement.  And then, they, at least allegedly in the

23  complaint, they agreed on the amount of that surcharge.

24           Now, it's hard to imagine conduct more clearly

25  targeting the United States market, more clearly targeting the

1    market for United States' imports than an agreement by the

2    defendants to fix the actual cost of complying with U.S.

3    Customs requirements that are required of importers to the

4    United States.

5           So, to argue that this is somehow was a conspiracy

6    targeting a foreign market is just not patently plausible.

7           THE COURT:  At least that aspect of it as opposed to

8    some of the other surcharges.

9           MR. TOMPKINS:  The fuel surcharge, for example, it's

10   not as clear because it doesn't have U.S. Customs in the

11   title, but the surcharge is for the cost of fuel of flying the

12   plane to the United States.  The fuel wouldn't be expended if

13   the plane wasn't flying here.  When the price of fuel rose,

14   the defendants agreed among themselves to recapture those

15   costs.

16          THE COURT:  But the fuel surcharges applied across

17   the board.  It wasn't targeted at shipments to the

18   United States.  As I understand it, it was targeted to

19   shipments anywhere.

20          So, to the extent, I'm taking from your argument

21   that you're focusing on the case that you cited, and the

22   defendants were distinguishing with respect to the targeting

23   of the, any competitive conduct of price fixing to the

24   United States market, but go ahead.

25          MR. TOMPKINS:  Well, let me be clear.  The fuel

1   surcharge did apply no matter where the goods were going, but

2   plaintiffs are only seeking relief under the Sherman Act for

3   the fuel surcharges that were applied to shipments into the

4   United States.  For those fuel surcharges, the charge itself

5   was a charge imposed to recapture the cost of flying here.

6   And in that case, it was clearly directed at U.S. commerce.

7         I mean, you are correct that a fuel surcharge

8   directed at a flight into China, for example, might affect

9   Chinese commerce.  But here we're limited to flights within

10  the United States, and so it did target U.S. commerce.

11        THE COURT:  I understand.

12        MR. TOMPKINS:  I also note that the defendants'

13  argument regarding the tax statute -- let me move on to that

14  for a second, because it's one of the highlights of the

15  argument.  That is, you have to read the term "involved" --

16  the phrase "involves import commerce" narrowly in order to

17  give meaning to the second prong of the statute.

18        There are two points to make with that:  One, the

19  defendants aren't reading the phrase "involves import

20  commerce" over broadly.  They're reading the phrase "involves

21  import commerce" to include conduct directed at the market for

22  imports, or the market for the subsequent movement of imports

23  into the United States.  That leaves lots of conduct that

24  potentially could have a direct, you know, foreseeable effect

25  on the U.S. import market, but does not itself involve the

1    U.S. import market.

2            And two examples of that are actually contained in

3    the Department of Justice Antitrust Enforcement Guidelines,

4    which are foreign vertical restrictions, and certain

5    intellectual property licenses might be conduct that would not

6    involve U.S. import market, but could nevertheless have a

7    direct and foreseeable effect on the U.S. import market.

8            I only raise these examples to address this, the

9    statutory concerns the defendants raise.  It really is not --

10   it has no weight because plaintiffs' reading of the import

11   commerce exception is not nearly as broad as the defendants

12   would suggest.

13           THE COURT:  What is the, moving to the standing

14   argument -- what is the antitrust injury here for the foreign

15   purchased service?

16           MR. TOMPKINS:  The foreign purchased service suffer

17   the same antitrust injury as the domestic purchaser.  They

18   paid more to ship goods into the United States than they would

19   have otherwise.

20           In the context of import commerce, it's important to

21   remember --

22           THE COURT:  But why is that an antitrust injury here

23   if the foreign purchaser is purchasing it overseas?

24           MR. TOMPKINS:  Two reasons:  One, because Congress

25   passed the FTAIA and specifically excluded from its gamut

Argument I / Tompkins                          43

1   conduct involving the import commerce market.  That is -- a

2   harm directed at the U.S. import market is going to, almost by

3   definition, be a harm directed to some degree, to a large

4   degree, at U.S. importers who are themselves likely to be

5   foreign entities.

6            THE COURT:  So, are you saying that once -- that

7   there is no separate -- once the Court finds, if it does, that

8   the FTAIA does not bar the claims here, then it necessarily

9   follows that there is antitrust standing.

10           MR. TOMPKINS:  In the context of this case, yes,

11  Your Honor.  I'm not sure.  There may be certain cases out

12  there.  I know the defendants have not cited any cases where

13  the manufactures have satisfied the FTAIA and then failed the

14  standing test.  The cases that are cited are cases where

15  essentially, the standing analysis just follows on.

16           THE COURT:  Okay.  So, the antitrust injury here is

17  the fact that somebody in the United States is going to pay

18  more because there's a bigger charge on the transportation of

19  goods to the United States?

20           MR. TOMPKINS:  The antitrust injury to the

21  plaintiffs -- remember, the domicile of the plaintiff is

22  irrelevant to the analysis.

23           The antitrust injury to the plaintiffs is that they

24  paid more to ship goods to the U.S. than they would have

25  otherwise.

Argument I / Tompkins                    44

1        THE COURT:  But the antitrust injury has to be here,

2   as I understand.  Doesn't it?  It has to occur here.

3        MR. TOMPKINS:  I'm not sure I understand the

4   question, Your Honor.  The antitrust -- I mean, the injury to

5   the U.S. economy --

6        THE COURT:  Yes.

7        MR. TOMPKINS:  Okay.  I'm sorry.

8        The injury to the U.S. economy is that it costs more

9   to ship goods to the U.S. than it otherwise would have, but

10  it's the same injury that occurred to the importers.  It costs

11  them more to ship goods here.  The U.S. economy is invariably

12  harmed by an agreement to increase the cost of importing goods

13  here.  That's precisely why, as Mr. Schwartz conceded,

14  Congress created an exception for the FTAIA for import

15  commerce.  It's a quick look, as he said.  If something

16  involves import commission, it's got to have a direct and

17  reasonably foreseeable effect on U.S. commerce.  Because

18  fixing the cost of bringing goods here impacts U.S. commerce

19  almost by definition.  That's why it's excluded.

20       Does that answer your question?

21       THE COURT:  I'm not sure it does.  I think what

22  you're saying, it comes back to, to whether or not the Court

23  finds that this involves import commerce.  If it involves

24  import trade or commerce, then you're saying, by definition,

25  therefore, it must be an antitrust injury for purposes -- an

1  United States antitrust injury as opposed to foreign antitrust

2  injury.

3         MR. TOMPKINS:  I think that's the importance of the

4  import commerce exclusion, Your Honor.  There's two ways that

5  you can have an antitrust claim for a foreign -- involving a

6  foreign entity.

7         One is, if you meet the two-prong test.  And that is

8  a test designed by its very nature to determine whether there

9  is impact, sufficient impact, on U.S. commerce.  That's in the

10  first prong of the test.

11         But the other way to satisfy that is to show that

12  the conduct involved an import market.  As Mr. Schwartz said,

13  you don't have to do any more because once you know the

14  conduct involved the U.S. import market, it, by definition,

15  harmed U.S. commerce.  That's why Congress wrote that

16  exclusion in the first place.

17         And to go through to the standing analysis, the

18  plaintiffs have alleged an antitrust injury, which is they

19  paid too much for their goods.  And critically, they're not

20  only the most efficient enforcers, they're really the only

21  enforcers.  And this is something that has to be considered in

22  light of the nature of imports.

23         Congress has said that conduct involving import

24  commerce is unlawful.  There is no body, no entity that can

25  force and seek redress for that conduct except for importers.

1   And importers are largely going to be foreign entities.  That

2   is one thing we agree on.

3             So, there is no effective means of redress if the

4   plaintiffs here aren't allowed to bring their claims.  Not

5   only are they the most efficient enforcers, if they aren't

6   permitted to enforce their plans, what will end up happening

7   is all the purchases for inbound shipments that occurred

8   abroad, which was most of the purchases, there will be no

9   ability for any plaintiff to claim damages based on those

10  purchases.

11            THE COURT:  At least not here.

12            MR. TOMPKINS:  Well.

13            THE COURT:  They could presumably, assert the claims

14  overseas.

15            MR. TOMPKINS:  But the assertion of the claims

16  overseas isn't going to redress the harm to U.S. commerce

17  necessarily, especially not in the fashion that Congress

18  intended it.  I mean, the Sherman Act sets up a system that is

19  designed to deter and redress violations that impact U.S.

20  commerce.  And Congress has decreed that conduct involving

21  U.S. commerce creates that requisite impact.

22            THE COURT:  I understand.

23            MR. TOMPKINS:  And so, in order to enforce that

24  intent of Congress, the importers in this case have to be

25  allowed to bring their claims.  If they're not, they'll be

1   under deterrence within the United States, under deterrence on

2   the effect of U.S. commerce.

3            Remember, U.S. commerce was affected by the

4   inter-shipping costs.  The amount of that effect cannot be

5   redressed unless the importers are allowed to pursue their

6   claims.

7            THE COURT:  All right.  Thank you.

8            Mr. Schwarz?  Yes, I'll give you five minutes or so.

9            MR. SCHWARTZ:  Very briefly, Your Honor.

10  ARGUMENT I

11  BY MR. SCHWARTZ:

12           MR. SCHWARTZ:  First, I'd like to respond briefly to

13  some of the FTAIA arguments made by Mr. Tompkins.

14           First, Mr. Tompkins made the point that because this

15  case involves the substantive movement of goods, that that

16  must involve -- in effect, Defendants' conduct must involve

17  import commerce.  But that argument is completely contrary to

18  the holding in Turicentro,  It must be construed narrowly or

19  there's nothing left to analyze for import commerce in the

20  effects test of 6(a)(1).  It has to be much more narrow than

21  Mr. Tompkins is arguing.  And plaintiffs did not address that

22  point for the Turicentro Court's holding in their opposition.

23           Second, when plaintiffs argue that this conduct must

24  involve import commerce to the U.S. because the conduct

25  increased the price of shipping goods to the U.S., that's an

1    effects argument.  You don't get to that issue unless the

2    conduct falls within the scope of the FTAIA and is subjected

3    to the effects test codified in 6(a)(1) and 6(a)(2).

4           THE COURT:  Well, but I understand the distinction

5    you're making between the effects test and the first part of

6    the FTAIA definition of what's barred, or remains under the

7    Sherman Act.

8           It's, it's hard to keep this all straight in terms

9    of the negatives.  The FTAIA bars jurisdiction except for

10   import commerce.

11          But in any event, but one way to try to define

12   whether it's import commerce or not is whether or not it does,

13   in fact, affect the price of goods here.

14          I mean that's their argument, I think.  It's, you

15   know, how to define what is, what does import commerce, what

16   does that phrase encompass, import trade and import commerce,

17   what does it encompass.  Well, they will argue that it

18   encompasses anything that, in fact, affects the price of goods

19   that are imported into the United States.

20          MR. SCHWARTZ:  That does seem to be their argument,

21   but I think it's completely contrary to the proper application

22   of the import commerce exception.  Because the exception

23   applies only where the defendant's conduct directly targets an

24   import market, and the conduct --

25          THE COURT:  Well, what about the surcharge for, you

1   know, the manifest, the cost of manifest, the surcharge of the

2   manifest, directly targets the imports to the United States.

3          MR. SCHWARTZ:  Where a foreign freight, freight

4   forwarder, let's say someone in Spain, contacts, makes an

5   agreement with the carrier in Spain to pay any, whatever the

6   price is, the all-in price, which would include the rate, and

7   surcharges, fuel surcharge, whatever else was applied,

8   including this, maybe it's called a Customs surcharge --

9          THE COURT:  Yes.

10         MR. SCHWARTZ:  -- the carrier is still setting the

11  price and applying the price in Spain.

12         Just as Mr. Tompkins said, it really is just like

13  the fuel surcharge.  The fuel wouldn't be expended if the

14  plane wasn't going to the United States.  And maybe even

15  there's some relationship between the amount of fuel surcharge

16  imposed on shipments originating from Spain with fuel costs in

17  the U.S.  We don't know.  It doesn't matter.  Just like it

18  doesn't matter --

19         THE COURT:  What if the contracting is done abroad

20  for the provision of services entirely within the United

21  States.

22         I mean, I don't know, let's say somebody -- you

23  contract with a foreign construction company to build

24  something here in the United States.  And they fix the price

25  abroad, but the services are all provided here, as opposed to

Argument I / Schwartz                     50

1    this.   I mean, here we have services provided, they would

2    argue in two places.   I mean, both abroad and here.

3             And anyway, I'm struggling with where the service,

4    to some extent, where the service is provided, and how that

5    affects the definition of import commerce.

6

7             (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        ARGUMENT I

2        BY MR. SCHWARTZ: (Continuing.)

3        MR. SCHWARTZ:  (Continuing.)  Well, maybe.

4        THE COURT:  And how that affects the definition of

5   import commerce.

6        MR. SCHWARTZ:  I think I can directly address that

7   issue, Your Honor, in the follow way.

8             The Court doesn't need to look at that to find

9   where, and in what places, was most of the conduct.  It's just

10  like in Kruman, arguably there was a whole lot more conduct by

11  the defendants in the United States than in London, but it

12  didn't matter because the service, the crux of the plaintiffs'

13  claim for purposes of foreign auction purchases of services

14  was overseas.

15            Just like here where we're talking about the

16  purchase of air cargo services originating from overseas, the

17  only conduct that's relevant is the imposition of a surcharge.

18  It doesn't matter that defendants spent a whole lot of time

19  building terminals, hiring and firing employees in the U.S.,

20  unloading cargo.  It's not the source of plaintiffs' injury,

21  that's not the nature of the alleged violation.

22            In going to your hypothetical about the

23  construction that actually is the plaintiffs', what we refer

24  to as the "American in Paris."  An American travels to Paris

25  and make arrangements for the shipment of goods from the

1   United States.  We're not moving as to that, we would say

2   that's domestic commerce.  And it's not an export, it's not an

3   export just like the transaction subject to our motion that's

4   domestic.  The transactions as to which we are moving are

5   foreign.

6               Transportation.  It's true transportation, by

7   definition, involves movement from point A to point B.  The

8   Court doesn't need to find a geographical nexus anymore than

9   the Court did in <u>Touricentro</u>.  It only mattered that foreign

10  commissions being fixed.

11          THE COURT:  Take just a moment on the notion that if

12  it involves import commerce, antitrust automatically follows.

13          MR. SCHWARTZ:  Well, first, it's clearly not true

14  that the jurisdictional analysis drives the standing analysis.

15  In fact, there is one case of the Galvin Supplement that we

16  cited in our papers in which the Court held there was subject

17  matter jurisdiction but there was no standing.

18              The Court in the Microsoft case, in <u>In Re:</u>

19  <u>Microsoft</u> did not address whether or not there was subject

20  matter jurisdiction, it went directly to the standing point.

21  And, what the -- and what the plaintiffs' argument that if the

22  conduct, the defendants 'conduct, involves import commerce,

23  they must have standing that's clearly incorrect.  It may mean

24  that somebody has standing, it doesn't mean --

25          THE COURT:  Well, who else?  I mean, aren't they the

1    ones suffering the injury.

2         MR. SCHWARTZ:  Well, there would be domestic

3    purchasers who might be better suited to actually bring the

4    claim, who might be the more efficient enforcers.  It doesn't

5    mean that either of their claims can be directly tied,

6    directly tied to the conduct affecting U.S. commerce because

7    it's an injury test.  It's really an effect test, and the

8    Court doesn't need to get to that in reaching the import

9    commerce test.

10        I want to make one point in response to

11   Mr. Tompkins's point that these claims are really drawn from

12   Kruman.

13        These goods are coming into the United States

14   and the transaction there ended when the auction gavel went

15   down and it was over; and here it's very different.  The goods

16   are coming into the U.S.  It's directly analogous if Charlotte

17   Kruman, instead of getting her antique watch that she bought,

18   got a $29 Seiko in the box.  I don't think that she would have

19   considered the transaction to be over.

20        In fact, the plaintiffs argue on appeal in

21   Kruman, and we have a copy of the brief if Your Honor would

22   like one, that had jurisdictional discovery been permitted in

23   that case, the plaintiffs would have been able to show that

24   the defendants were directly involved in the shipping of the

25   goods in that case in helping the plaintiffs work through

1  customs and arranging transportation and they said expressly

2  in their brief that was part of the services that the

3  defendants were providing exactly here.

4           The Court didn't need to get into that inquiry.

5  The Court did not need to let the parties engage in discovery

6  to address that issue.  It did not matter that the defendants

7  in that case were involved in shipping goods, the stuff came

8  to the U.S. any more than it matters here.  On the customs

9  side, it's all part of the price.  Again, it's just like the

10 fuel surcharge.

11          THE COURT:  Okay.  Let's take just a brief recess

12 and did you want to say one thing, Mr. Tompkins?

13          MR. TOMPKINS:  I have one minute.

14          THE COURT:  I will give you a brief recess.

15          ARGUMENT I

16          BY MR. TOMPKINS

17          MR. TOMPKINS:  Your Honor, I want to clarify one

18 point.

19          The plaintiffs' argument is not that it

20 increases the cost of goods imported into the United States.

21 I mean, that's certainly likely to be the case, but it's the

22 defendants' conspiracy increased the cost of the service.  It

23 increased the cost of the service, and the service here is

24 shipping goods into the United States.

25          I want to make that distinction very clear

1   because the nature of the service is what's critical to the

2   import analysis.  A service that is directed and the

3   subsequent movement into the United States is import commerce

4   and it's different than auctioneering services provided in

5   these other cases and because it's different, it does involve

6   import commerce.

7                    It doesn't matter whether they are ultimately

8   goods or ultimately the price was increased, that's probably

9   true.  What matters is it costs more to fly it here and that

10  by definition involves import commerce.  It's the process of

11  importing paid for by importers to carriers who bring things

12  here which is to import it.

13                    Did I take more than 60 seconds?

14            THE COURT:  I don't think so.  Well, you know, quick

15  question.

16                    If it's a foreign exporter who's paying the

17  charge, right, for the shipping?  Why is that -- you're saying

18  it's the importing.  We're take Counts 3 through 5.

19            MR. TOMPKINS:  Yes.

20            THE COURT:  They have a foreign purchaser of the

21  services purchasing.  Why does that have any -- isn't that too

22  indirect in terms of the injury here.

23            MR. TOMPKINS:  No.  In fact, Your Honor, it's the

24  only entity that can bring a direct claim.

25            THE COURT:  They can bring a direct claim over in

1    Europe.

2            MR. TOMPKINS:   That's true, Your Honor.

3            THE COURT:   The fact -- I mean, the distinction

4    that's drawn is not because I don't understand the antitrust

5    laws to be such that, well, we have to give them a forum to

6    bring their claims if they have a claim.

7            MR. TOMPKINS:   But, Your Honor, a claim in Europe

8    isn't going to address the harm to U.S. commerce.   Remember

9    that for a flight to the U.S. --

10           THE COURT:   But, I mean, the harm to U.S. commerce,

11   that's where I'm having a little difficulty, particularly,

12   where you have a foreign purchaser.   Where you have a foreign

13   purchaser what is -- what's the harm to U.S. commerce.

14           MR. TOMPKINS:   The harm to U.S. commerce is if you

15   view them simply whether or not they are domestic or foreign.

16   What harm is it if it costs more to bring goods into the

17   United States.

18           THE COURT:   Okay.

19           MR. TOMPKINS:   The --

20           THE COURT:   I understand.   Okay.   So, let's take a

21   brief recess.   Let's get back in seven or eight minutes, so

22   11:30.

23           (Recess taken.)

24           (Judge VIKTOR V. POHORELSKY takes the bench.)

25           THE COURT:   All right.   Let's see, Mr. Sherman, is

1  it who will be handle the Twombly, the §12(b)(6) issue.

2         ARGUMENT II

3         BY MR. SHERMAN

4         MR. SHERMAN:  Good morning, Your Honor.  William

5  Sherman from the firm of Latham & Watkins.  I represent

6  Singapore Air who will be arguing on behalf of the Twombly

7  Rule 8 issue.

8              I apologize, I don't have any audiovisual

9  matter for the Court.  I am going to try to keep you

10  interested with the force of my argument.

11         THE COURT:  Okay.

12         MR. SHERMAN:  And actually, Your Honor, I want to

13  start by saying this really should be referred to as the

14  Twombly and In Re:  Elevator argument because the Court is

15  obviously well aware of the Twombly decision and the Second

16  Circuit's decision in In Re:  Elevator Antitrust Litigation

17  last fall following Twombly.

18              Those two cases from the Supreme Court and the

19  Second Circuit really set the stage here for the Court's

20  evaluation of the plaintiffs' complaint and really mandate its

21  dismissal.

22              Now, the Court, as the Court is aware, the

23  Supreme Court's decision in Twombly has established the

24  standard for courts considering a motion to dismiss in

25  antitrust class actions.  Twombly is important here in after

1    the last two respects.

2          First, <u>Twombly</u> holds that plaintiffs can't

3    simply advance conclusory allegations.   Rather, with respect

4    to the Section I claim they most quote, "Stating a claim

5    requires a complaint with enough factual matter taken as true,

6    to suggest an agreement was made."

7          THE COURT:   What more would they have to do here?

8    They're specific enough in that they talk about agreements to

9    fix surcharges, a variety of surcharges.   They specify the

10   surcharges, they also said there was agreements on allocating

11   customers.

12          So, what more factual detail does <u>Twombly</u>

13   require?

14          MR. SHERMAN:   Well, Your Honor, I'm going to break

15   that into two separate answers with respect to the

16   non-surcharge allegations and the surcharge allegations.

17          THE COURT:   Okay.

18          MR. SHERMAN:   First, let me answer generally your

19   question, because what the plaintiffs allege with respect to

20   all of their allegations is very, very little in the way of

21   actual factual material that the Supreme Court required and

22   <u>In Re:  Elevator</u> required.

23          Those factual allegations where they actually

24   allege facts such as a five cent surcharge or a 15 cent

25   surcharge are what I understand put into essentially three or

1  four paragraphs in the complaint all with respect to surcharge

2  allegations.

3          For the rest, it's exactly the sort of

4  conclusory allegations that the Supreme Court in the Second

5  Circuit say are not enough.  They're formulaic recitations of

6  "Defendants conspired," "Defendants met and agreed," but there

7  isn't the factual material, the factual material to give, to

8  give flavor to that.

9          Now, what could they have done?  Well,

10 traditionally, what plaintiffs do in these sorts of cases they

11 allege parallel conduct.  Now, the Supreme Court has said,

12 "No."  Not in <u>Monsanto</u>, <u>Matsushita</u>, and now <u>Twombly</u>.  But

13 plaintiffs could have alleged, well, the defendants set

14 surcharges and here they are, here are the surcharges, and you

15 will see that there are parallel surcharges they were raised

16 at the same time, parallel conduct.

17         They allege, for example, that there was a

18 refusal to discount.  Well, certainly, within their

19 information would be the ability to say -- because they're the

20 freight forwarders -- "Here are our usual discounts," "Here

21 are the discounts we got in the past," "Here, starting at this

22 point we got into discounts."

23         None of that sort of thing is in the complaint.

24 Was there an opportunity to form a conspiracy?  Well, the

25 plaintiffs say defendants met and conspired, but there's

1    nothing about when and where.

2              Now, several courts have said, "You're not

3    required to give us the facts of all the secret meetings," but

4    certainly plaintiffs are required to give some factual

5    material.  Were there trade association meetings?  Were there

6    other opportunities that defendants could have met and

7    supposedly carried out this conspiracy?  Again, that was not

8    enough of an opportunity but these are the sorts of factual

9    material that the Supreme Court and the Second Circuit would

10   presumably accept.

11             Other plus factors of the these are all

12   traditional ways of alleging.  None of this is in the

13   complaint, Your Honor, it's all just a little formulaic.

14   "They conspired; they agreed," that simply is not enough.

15             Now, let me take it in the two sections because

16   there really is a difference with respect to the non-surcharge

17   allegations.

18             On refusal to discount which is contained in

19   three paragraphs.  On concerted increase in yields, whatever

20   that means, and it's not explained in the complaint, addressed

21   in three paragraphs.  The allegation of customers in two

22   paragraphs.  In all of those allegations, there's no factual

23   material at all.  There's not even the minimal factual

24   material they give us with respect to surcharges, it's simply

25   three conclusory paragraphs.

1          "Defendants met and communicated or met and

2     discussed and jointly agreed," and frankly plaintiffs don't

3     seriously argue that they give you factual material in there.

4     They don't disagree with us, there's nothing there.

5          What they do is try to save those by saying

6     they're synergies.  They're synergies between these

7     allegations and the surcharge allegations, so you should

8     ignore the fact that we don't give you have any factual

9     material on these non-surcharge allegations.  Well, there's no

10    case that says they're allowed to do that, and respectfully,

11    the Supreme Court and the Second Circuit decision suggest they

12    can't.  Either they have factual materials to flesh out the

13    claims or they don't and they don't.

14         Now, just a word on this the synergies, because

15    the synergistic effect that plaintiffs want to use to keep

16    those, those non-surcharge allegations in the complaint.

17         First, there's nothing.  Not only is there

18    nothing about the factual material for non-surcharge

19    allegations, there's nothing no the complaint to suggest that

20    they're in any way tied to the surcharge allegations.  In

21    other words, in their briefs they say, "Well, there is an

22    synergistic effect," but you can search the complaint in vain

23    to find any suggestion in their factual allegations that

24    there's any such effect.

25         Second, if one of the claims is deficient you

1   can't save it by tieing it to another one; and this sort of

2   turns on the one case plaintiffs cite for this synergistic

3   effect which is the Continental case, but that case doesn't

4   apply here.   That's a case where the Supreme Court looked at

5   the proof put into the case and the Ninth Circuit looked at

6   the proof at the end of case.   It says nothing about the

7   requirements in pleading and to the extent that it would apply

8   here.

9           The Second Circuit has clarified in

10  Northeastern Telephone where they have say in numerous

11  respects, Northeastern's proof was utterly lacking.   Under

12  such circumstances, treating Northeastern's claims

13  collectively could not have any synergistic effect of, well,

14  that's directly relevant here, Your Honor, when they got

15  claims are factual material.   They simply have no way to keep

16  them in the case by putting them into their surcharge

17  allegations.

18           Now, let me talk for a second by the surcharge

19  allegations because there is a minimal amount of factual

20  allegation for actual surcharges; it's essentially in two

21  paragraphs.

22           They allege a four-step increase program, five

23  cents per step.   Security surcharge:   They make a minimal

24  factual allegation and the same with their customers

25  surcharges.

1           Now, we believe that those are not sufficient

2    under either <u>Twombly</u> or <u>In Re:  Elevator</u>, but what we really

3    take exception with, in terms of those surcharge allegations,

4    is that there's absolutely nothing tieing the allegations to

5    any of the particular defendants.

6           It's simply a blunderbuss allegation, nothing

7    about who did what or when.  And, again, this is the sort of

8    factual material that they could have supplied that the

9    Supreme Court would request, and the Second Circuit, this is

10   where <u>In Re:  Elevator</u> really is right on point because there

11   are very similar allegations in <u>In Re:  Elevator</u>.

12          There, the plaintiffs allege that defendants

13   participated in meetings in the United States and Europe to

14   discuss pricing and market divisions.  They agreed to fix the

15   price of elevators and services.  They rigged bids for sales

16   and maintenance; exchanged price quotes; allocated market;

17   elusively required customers to enter long-term maintenance

18   contracts; collectively took actions to drive independent

19   repair companies out of business.

20          If anything, if anything, much more factual

21   detail and factual matter than we have here; and yet, the

22   Second Circuit said the list is in entirely general terms

23   without any specification of any particular activities by any

24   particular defendant and the Second Circuit affirmed the

25   dismissal of the complaint without leave to replead.

1        THE COURT:  Would it be your argument that the

2   plaintiffs would have to allege with specificity some conduct

3   by each individual defendant?

4            In other words, say something that each

5   individual defendant did that they have to, that they can't

6   just say, "Defendants agreed."

7        MR. SHERMAN:  Absolutely, Your Honor.  Absolutely.

8   That's what In Re:  Elevator stands for.  We cite a number

9   cases in our briefs which stand for the same proposition but

10  that's the most recent pronouncement by the Second Circuit on

11  that issue.

12       THE COURT:  Now, how far does it get there?

13       MR. SHERMAN:  I'm sorry.

14       THE COURT:  Go ahead.

15       MR. SHERMAN:  That's the question.  The questions

16  is:  How much do they have to say?

17       THE COURT:  How far does it get them when they got

18  four defendants who already said we've agreed; we did.

19       MR. SHERMAN:  Yes.

20       THE COURT:  So, and they -- so they've -- it seems

21  like that gets them pretty far down the road of talking about,

22  at least with those four defendants, that they specifically

23  agreed as to various matters.

24       MR. SHERMAN:  And the key to that, Your Honor, I

25  agree with you at least, as it applies to those four

1    defendants, it gets them started down the road.

2            Now, does it exclude, does it excuse their need

3    and the obligation to put it in their pleading, no.  No, it

4    doesn't.  The Supreme Court has never said that if there's an

5    amnesty applicant or if there is a guilty plea.  It relieves a

6    plaintiff of putting factual material in their complaint; it

7    certainly doesn't.  It gets them down the road, presumably, of

8    being able to make those factual allegations but they haven't

9    here, they haven't.

10           And certainly, certainly, it cannot be the

11   case -- and this seems to be plaintiffs argument -- because

12   they have continually referenced the "Lufthansa Amnesty

13   Application" and the guilty pleas.  But that cannot be the

14   case if a defendant seeks amnesty or if a defendant pleads

15   guilty; that, then plaintiffs can file a case against the

16   entire industry and say, "Well, it's enough, we've got someone

17   who has pleaded guilty; there has to be something to connect

18   everyone else to those guilty pleas."

19           And, frankly, the pleas themselves don't do it

20   because the pleas do not say we conspired with the entire

21   industry.  The pleas have of a component, a geographic

22   component.  Three of the pleas specifically refer to Trans

23   Pacific, the plea of B.A.

24           Although the component is necessarily in the

25   plea, this discussion of their flights from the U.S. to Great

1  Britain, but there is nothing to suggest there is a conspiracy

2  with the entire industry.  There is nothing to suggest a

3  conspiracy over a worldwide commerce as plaintiffs have

4  alleged here.

5              In fact, Lufthansa came into court and told

6  Your Honor that the information that they had would probably

7  exonerate some of the defendants in the face of that.  It

8  can't simply be the case and the guilty pleas and Lufthansa's

9  amnesty application isn't enough when they haven't alleged

10  anything about the particular carriers.

11              And just on that for a second.  The plaintiffs,

12  of course, answered this which say, "Well, we don't need to

13  say anything specific because we allege that all the carriers

14  did this."

15              Well, that's not enough, Your Honor.  Again, it

16  goes back to the conclusory allegation, and frankly, some of

17  their complaint belies that because they, in some cases, say

18  that certain surcharges were not applied uniformly.  They say

19  with respect to the security surcharge, with a few exceptions,

20  the defendants did this.

21              So, even their own complaint by its terms

22  doesn't allow them to say that everybody did everything.  And,

23  the question of how and why a carrier that doesn't fly, for

24  example, a Trans Pacific flight would have had conspired with

25  the airlines that do it is never explained by the plaintiffs.

1   There is simply no factual material to support that sort of

2   conclusory statement that "Everybody did it and this is the

3   nature of the industry."  And, in fact, Mr. Schwartz has spent

4   some time with you this morning about the nature of the

5   industry is here to here, point to here.

6                    There are different markets from, for example,

7   or different city pairs where you're shipping from point A to

8   point B.  There's nothing to suggest that a carrier shipping

9   Trans Pacific would have any reason or any ability to conspire

10  with a carrier who is shipping, say, from South America to

11  Africa.  There is simply nothing there and plaintiffs have

12  given you nothing.

13             THE COURT:  So, you're suggesting that there would

14  be multiple small conspiracies here with --

15             MR. SHERMAN:  I'm obviously not suggesting that.

16             THE COURT:  You're not suggesting that, but the

17  Court ought to look at it in terms of what that the conspiracy

18  couldn't possibly be global because there aren't and many of

19  the carriers only operate in certain regions.

20             MR. SHERMAN:  That's exactly right, and there is

21  nothing here to asking you that.  Let's not forget they

22  brought 30 something carriers into this case without any

23  reason to suggest that there's a reason to do it.

24                    And another point that the Court made in

25  Twombly is especially important here because although they're

1   not in court now on the issue of discovery.  Plaintiffs'

2   theory seems to let us get by this by saying, "We can open up

3   broad discovery."  Well, the Court made it clear that, because

4   of the enormous cost of discovery in these cases, that's not

5   allowable.  Indeed, this Court needs to test the allegations

6   to make sure they're plausible with respect to the various

7   defendants before allowing that to happen.

8            Just briefly, Your Honor, on the question of

9   whether the case ought to be dismissed with prejudice.  In Re:

10   Elevator, again, is instructive.  And, again, there is at

11   that in In Re:  Elevator.  The plaintiffs here have had plenty

12   of time to perfect their allegations.  In fact, this Court

13   invited them to fix their complaint at a previous hearing,

14   they declined.

15            And, in In Re:  Elevator, the Court denied

16   leave to replead even in the case of an EC Statement of

17   Probable Wrongdoing because it concluded that the plaintiffs

18   second amended complaint contained as much specificity that it

19   has to muster.  Plaintiffs have had the same complaints and we

20   respectfully suggest that Court, in the case Twombly and

21   In Re:  Elevator and that ought to be dismissed with prejudice

22   and because they have had their chance and properly pleaded

23   their claims.

24            THE COURT:  Okay.  Thank you.  Mr. Arenson?

25            MR. ARENSON:  Yes, it is, Your Honor.

1          THE COURT:  Okay.  Do you have any bells and

2   whistles?

3          MR. ARENSON:  I am too old fashioned and I have no

4   bells and whistles and will try not to bother you as well.

5          THE COURT:  I'm still reasonably fresh.  By

6   1 o'clock or 2 o'clock it will be a different story.

7              Okay.

8          ARGUMENT II

9          BY MR. ARENSON

10          MR. ARENSON:  I will introduce myself, at least to

11   the court reporter.

12              I am Greg Arenson of Kaplan, Fox and we

13   represent the plaintiffs here.

14              Let me start first with <u>Twombly</u>.  The issue

15   there was plausibility.  Plausibility of the claims asserted

16   there and here, Your Honor, my adversaries tried to

17   distinguish between the security, sorry, the surcharge and the

18   non-surcharge claims.  They have conceded the plausibility of

19   the surcharge allegations.

20              If you take a look at their reply, Page 87,

21   they say quote, "They," referring to the plaintiffs, "set up a

22   straw man by arguing that the surcharge related allegations

23   are plausible.

24              " The Rule 8 opposition at 15 to 18.  "At

25   issue, the defendants have not contested for the purposes of

1    this motion."

2                So, Your Honor, we know that there is a portion

3    of the complaint that satisfies <u>Twombly</u>.  Those --

4          THE COURT:  I don't know if it satisfies <u>Twombly</u>, it

5    satisfies the notion of plausibility; and to some extent, it

6    would be impossible for the Court to ignore.

7                In the case of four defendants who have pleaded

8    or who have accepted responsibility, three pleaded guilty, one

9    acknowledged that there's not a plausible antitrust claim, so,

10   you know, but I do -- I am troubled.

11               Frankly, I do find an awful lot of generalities

12   and not very much specificity about how this price fixing

13   occurred; and I'm also very troubled by the fact that we've

14   got 30 or however many defendants and as to at least all but

15   four of them, there's just nothing at all to indicate what --

16   how they participated in what they did and the suggestion that

17   there's really a number of different, you know, regions here a

18   number of different potential sub-conspiracies if you want to

19   call it that if there are conspiracies at all.

20               There's just not very much meat on these bones

21   and I'm very troubled by it particularly in light of what

22   Mr. Sherman said in, I guess, his penultimate point.  <u>Twombly</u>

23   was ultimately focused on not unleashing broad, costly

24   discovery on the parties without more specificity and,

25   frankly, I don't find it here and I am troubled by the fact

1   that given that you had Lufthansa's cooperation now for a year

2   or more there's not more.

3            MR. ARENSON:   The complaint was filed, Your Honor,

4   back in February --

5            THE COURT:   I understand.

6            MR. ARENSON:   -- of 2007 before we had much of

7   Lufthansa's cooperation and we need to take a look at what the

8   complaint said.

9            But if I might go back to <u>Twombly</u> for another

10  moment because there is another aspect that we think does bear

11  on what is troubling Your Honor.

12           THE COURT:   Okay.

13           MR. ARENSON:   As I started out, I believe it's

14  basically a plausibility case; that, in the <u>Sherman Antitrust</u>

15  <u>Case</u> you got alleged facts that will give rise to

16  interpretation that the claim is plausible, and I still

17  suggest that defendants have conceded we've done that with

18  regard to the surcharges but I will put that to the side for

19  the moment, though, I want to come back to it.

20           There's also the aspect of notice and <u>Twombly</u>

21  made it clear, and it's stated at Page 1974.  Quote, "We do

22  not require the heightened fact pleading of specifics."

23           And, in Footnote 14 on the previous page, 1973,

24  it says quote, "We do not apply any heightened pleading

25  standard, nor do we seek to broaden the scope of Federal Rules

Argument II - Mr. Arensen                    72

1    of Civil Procedure §9."

2              Clearly, the Supreme Court is telling us once I

3    suggest you get over the plausibility hurdle you don't have to

4    do as much in order to provide notice to the defendants,

5    because if you go to the beginning of the discussion by

6    Justice Souter as to what the standard is with regard to

7    pleading back on Page 1964 he said quote, "Federal Rule of

8    Civil Procedure §8(a)(2) requires only a short and plain

9    statement of the claim showing that the pleader is entitled to

10   relief in order to give the defendant fair notice of what the

11   claim is and the grounds upon which it rests."

12             THE COURT:  All right.

13             MR. ARENSON:  So, the purpose to give notice fair

14   notice is satisfied by a short and plain statement.  It's not

15   all of these bells and whistles that Mr. Sherman is suggesting

16   we should have all of these opportunities to conspire in

17   Africa and Europe and wherever.  We don't have to do that,

18   that's where the short and plain statement comes in that's

19   where Rule 8(a)(2) says we're not in Rule 9(b).

20             THE COURT:  The plain statement has to say what a

21   specific defendants did.  The fact that you can make a

22   plausible claim that four people here have conspired does not

23   mean that you have of a plausible claim that 33 others did.

24             MR. ARENSON:  Let's see what we say in the

25   complaint.

1              THE COURT:  Okay.

2              MR. ARENSON:  I am going to go through some of the

3    paragraphs there and see how much detail we actually do

4    provide and how much notice we do provide to the defendants.

5              THE COURT:  It's not notice, it's not notice.

6    That's not the issue.

7                   I'm talking about plausible claims against the

8    plaintiffs, the defendants here who were not, who haven't

9    pleaded guilty to anything and who haven't accepted

10   responsibility.

11                  I mean, it's just everybody is lumped together

12   here, that's one of my fundamental problems here.  You take

13   from the fact that there's been some proof of a conspiracy, I

14   mean more than proof there is acceptance of responsibility of

15   a conspiracy and now you're asking the Court to now basically

16   involve the entire international air transport industry in an

17   antitrust case and I'm having trouble with that.

18             MR. ARENSON:  I don't think we're involving the

19   entire air transport industry first, Your Honor, we only have,

20   to give you a round number, 30 defendants.  We haven't named

21   Turkish Airlines which might be involved; we didn't name Air

22   Malaysia which may be involved.  So it isn't everybody, there

23   actually was some selection involved in this process.

24             THE COURT:  And that's what needs to be in the

25   complaint.  That's what needs to be in the complaint.  What is

1    the selection mechanism?

2           MR. ARENSON:   When we say the defendants at the end

3    of 1999 jointly agreed on factors triggering the fuel

4    surcharge pricing system.

5           THE COURT:   Where are you reading from?

6           MR. ARENSON:   I am more or less paraphrasing

7    Paragraph 87 of the complaint.

8           THE COURT:   Okay.

9           MR. ARENSON:   Triggering the fuel surcharge pricing

10   system, the resulting price change to be implemented by the

11   occurrence of those factors and the timing of that change.

12          Well, all 30 defendants that we have named

13   participated in that.   Do we have to list all 30 of the

14   defendants for participating in the changes to the surcharges

15   that were implemented actually were agreed upon at the end of

16   1999 for implementation.

17          THE COURT:   Don't you have to give each defendant

18   notice of what they did?

19          MR. ARENSON:   We just did.

20          THE COURT:   You're saying that each and every

21   defendant did the exact same thing?

22          MR. ARENSON:   Yes, that's right.   And maybe they all

23   didn't get around in a room to do it, but with their contacts

24   around the world they were able to impose a fuel surcharge in

25   2002.   Again, we're being -- the question is when we say when.

1           The defendant, this is Paragraph 90 of the

2    complaint, Your Honor, "The defendants jointly grieved and

3    initiated a four-step fuel surcharge increase program where

4    specific factors would trigger only one step per period and a

5    five cent which would increase at the fourth step.  We allege

6    because we say defendants, each and every one of them, did it

7    and if each and every one of them did it, do we have to list

8    all 30 so they know what it is they did.  Isn't this specific

9    enough?

10          Certainly, to give them notice, it's conceded

11   that it's plausible to say that they were involved in the fuel

12   surcharge program.  And then, at the end of 2003 and beginning

13   of 2004, and that's in the next paragraph, Paragraph 91,

14   "Those factors trigger the fourth and final step of the

15   four-step program.  Defendants then met to jointly agree on

16   additional steps to implement price increases in concert

17   beyond the original four-step program."

18          And, in Paragraph 92, we say they jointly

19   imposed additional multiple step price increases all at

20   identical amounts per step.

21          Eventually, Your Honor, we don't say this in

22   the complaint, they got up to the tenth step; they did it

23   several times.  We do additional steps which were preceded by

24   multiple meetings, communications, and agreements.  We do have

25   30 defendants here, do we have to list every single e-mail

Argument II - Mr. Arensen                    76

1    that went back and forth between the defendants?

2              THE COURT:   No, of course, not.

3              MR. ARENSON:   Right.  So where do you draw the line?

4              THE COURT:   I don't know.

5              MR. ARENSON:   Okay.

6              THE COURT:   That's what I'm trying to figure out.

7              MR. ARENSON:   That's right.

8              What I suggest if you're supposed to give a

9    short and plain explanation under Rule 8(a)(2) do you have to

10   say more than there was this agreement in 2002, a four-step

11   program, five cents per step, than when they get to the end of

12   that.   They go around they meet and they agree and they add

13   more steps on and that's what we did and that's what we

14   allege.

15             They not only did they do that, but we say they

16   involved other matters in Paragraph 88, if I can go back?   We

17   generalize a little bit, but after all, we're trying to give

18   notice to the defendants of what they did.   Defendants agreed

19   on the harmonization of the fuel surcharge, the implementation

20   of the fuel surcharge, the extension of the fuel surcharge

21   beyond the four steps.

22             Currency issues, Euros and dollars.   Capping

23   the fuel surcharge by shipment or by weight.   And refusing to

24   discount the fuel surcharge to freight forwarders.

25             And let me just focus a little bit on that last

Argument II - Mr. Arensen                    77

1    one.   Mr. Sherman said nowhere in that complaint do we tie the

2    discounts to the surcharges, right there in Paragraph 88 we

3    do.

4                So, how much detail do we have to give?  Do we

5    have to name each of the 30 defendants who did participate in

6    the fuel surcharge overcharges.  Do we have to say that Air

7    Korea did it?  Do we have to say that Qantas did it?  Do we

8    have to say that Cathay Pacific did it, or is it sufficient to

9    say that they did do it, all of them, because they did it do

10   because of the differences here between some of the cases that

11   the defendants have cited.

12               Here, all the defendants were in the same

13   situation and they all applied the surcharge.  This is not

14   In Re:  Elevator where all you've got is general statements.

15   We don't have these general statements of the 2002 four-step

16   program, 2003, what are we going to do?  We're going to add it

17   on and continue on at the steps.  That, I submit, is

18   sufficient specificity.

19               How about the security surcharge?

20   Paragraph 97, "Following the September 11th attacks,

21   defendants met and jointly agreed to impose a security

22   surcharge which remained in effect thereafter."  So now they

23   know when.   "Secret meetings and communications including

24   discussions at the highest levels of Re:  Respective Companies

25   occurred in various venus Europe, United States, and Africa."

1   Well, do we have to say that there were meetings in Nairobi

2   and Johannesburg and Cairo?  Isn't it sufficient to say that

3   there were meetings in Africa?

4           THE COURT:  Why not.

5           MR. ARENSON:  Well, because if you're trying to

6   plead a complaint that's plausible and to give notice to the

7   other side do you have to plead that kind of evidentiary

8   detail?  I would be --

9           THE COURT:  I guess I'm asking why not give some

10  evidentiary detail.  I'm saying you have to plead every fact.

11          MR. ARENSON:  But we just said --

12          THE COURT:  I understand the argument.

13          MR. ARENSON:  I don't mean to cut you off, Your

14  Honor.

15          There has to be a line, I think you and I at

16  least agree on that.  I assume that the defendant might agree

17  on that, but I think that would draw very close to let's go to

18  trial when you actually put all your proof in, that's what you

19  have to allege.

20          I still think, and the Supreme Court said it in

21  Twombly, that it is notice pleading regime.  Yes, you have to

22  have more facts if you are pleading an antitrust case to show

23  that it's plausible.  But beyond that, how much more do you

24  have to have in order to give notice to the defendants.  Do

25  you have to say that they met in Tokyo?  Do you have to say a

1  that they met at the Oak Bar over in Manhattan?  Isn't it

2  sufficient to say they met in United States; they met in

3  Africa; they met in Europe.   Where do you draw that line?

4              I suggest that we have sufficient facts so

5  they're not in any kind of questioning mind as to what it is

6  that they did.  They know there was a security surcharge that

7  was imposed.  They know that they had meetings at the highest

8  levels, do we have to list every single executive of the

9  companies that participated?  Can we do that at the outset of

10 the case even if you are in a case where you don't have an

11 amnesty applicant?  Is that really feasible to ask victims of

12 an antitrust conspiracy to come in with that kind of detail?

13 You'll never get a case beyond a motion to dismiss, that can't

14 be right.

15            THE COURT:  Well, what about Lufthansa's statement

16 that what they said, and I don't recall this, but I'm relying

17 on Mr. Sherman, that upon their cooperation it would exonerate

18 some of them.

19            MR. ARENSON:  I might disagree with that statement,

20 Your Honor.

21            THE COURT:  Okay.

22            MR. ARENSON:  Based on our investigation maybe not

23 based just solely on what it is that Lufthansa knows.

24            THE COURT:  Which suggests, then, that these

25 meetings were not great convocations of 37 people or 37

1  companies or how many, I didn't count, them but that there was

2  something a little bit less formal than that, right?  That's

3  probably what happened, if it happened at all, and some more

4  evidentiary detail than just a global conspiracy that the

5  defendants meet and communicated and jointly agreed," those

6  are all sort of -- they are in the nature of conclusory,

7  conclusory assertions as opposed to the sort of.

8          MR. ARENSON:  Your Honor, we didn't just say they

9  met and they agreed.

10         THE COURT:  No, you're right.  You've given at

11 least, as to the surcharges, you've given some more detail of

12 what they agreed upon.  It's a little bit less clear about how

13 they claim to do that, I'm assuming that they didn't, you

14 know, all gather in Nairobi at one time and sit down and so

15 that's part of what's troubling me.

16         MR. ARENSON:  Right.  Do we say they met in Africa?

17 Do we say they met in the United States?  We don't say that.

18 We don't say they met in the Oak Bar in Manhattan or they met

19 in Europe.  We didn't say they met in Istanbul and Frankfurt

20 and Paris and Milan.

21            If we did say that, does it not provide them

22 any more notice?  Is that any more of a factual pleading that

23 they have, that we have to, one, demonstrate a claim; and two,

24 let them know the scope of what it is they're going to be

25 investigating through discovery.  I don't think the Supreme

Argument II - Mr. Arensen                          81

1  Court was saying that in <u>Twombly</u>.  I don't think the Second

2  Circuit was saying that in <u>Northeastern</u> or in <u>Elevators</u>.

3          THE COURT:  Okay.

4          MR. ARENSON:  Okay.  Let me go the through customs

5  surcharge.  There's another example.

6              Since beginning in late 2003, this is our

7  Paragraph 104.  Actually, let me start with 105.  Since 2003,

8  air freight carriers have been required to prepare and submit

9  to U.S. Customs a manifest of all goods that the carrier will

10 offload in the United States.  The manifest must be received

11 by the air freight carrier and then submitted electronically

12 to U.S. Customs by the air freight carrier before its airplane

13 enter United States airspace.

14              Since 2003, the defendants secretly met,

15 communicated, and jointly agreed to charge uniform, flat fees

16 to air freight customers for each defendants' preparation of

17 manifests in Paragraphs 106.  The meetings and discussions

18 took place in Europe, Asia, America and elsewhere, not Africa.

19 So maybe it didn't happen in Nairobi.

20              Paragraph 4 of 106 defendants concertedly

21 agreed that they would charge €8 per manifest received from

22 air freight customer in manual paper, €2 per manual received

23 in an electronic format.

24              So now again we did say defendants did that.

25 We know that the defendants who were shipping into the States

1   are charging the fees.  It's in Euros, it's flat, doesn't seem

2   to bear any relation to whether it really has to go through

3   some manual processing or some electronic processing.

4              Are they not on notice of what it is that we

5   allege?  Are they on notice of when it occurred?  2003, the

6   surcharges were implemented in 2004 I believe it says.   The

7   next one, Paragraph 107, implemented by the defendants

8   beginning in August, 2004 and continued thereafter.

9              THE COURT:  Take just a couple minutes on the

10  non-surcharge allegation if you would.

11             MR. ARENSON:  I would be happy to.

12             THE COURT:  Those are much less detailed, they don't

13  really provide any detail about, well, I guess the refusing to

14  discount, it says they refused to discount.

15             MR. ARENSON:  Right.

16             THE COURT:  Not with respect to surcharges I mean

17  which is --

18             MR. ARENSON:  Remember the defendants have conceded

19  that on the surcharges it's plausible.

20             THE COURT:  Right.

21             MR. ARENSON:  The discounts, Paragraph 88, it's

22  right in there and it links down obviously later on to where

23  we take them out separately.

24             Let's look at Paragraph 89, Your Honor.

25             THE COURT:  I saw that the converted increases in

Argument II - Mr. Arensen                    83

1   years and the allocation of customers, there's not much detail

2   at all about what was even accomplished by that.  I mean,

3   concertedly agreed to concertedly increase their yield.  I

4   don't even know what that means.  I mean, I guess it --

5          MR. ARENSON:  I think the defendants do know what it

6   means, Your Honor.

7          THE COURT:  Okay.

8          MR. ARENSON:  And the pleading --

9          THE COURT:  Help me.

10         MR. ARENSON:  I'll try, I will step outside the

11  complaint and explain if you want, but I think it's implied in

12  the complaint.  But what yields rely revenue per ton mile.

13         THE COURT:  I'm sorry.

14         MR. ARENSON:  Yields are revenue per ton mile.

15         THE COURT:  How they jointly agreed increasing

16  yields.

17         MR. ARENSON:  The complaint alleges that the data is

18  available to all air freight carriers for the industry as a

19  whole, that's Paragraph 111.  And they, through IATA, they

20  don't say IATA, but that's what it is; that's the trade

21  association.  And in furtherance of their agreement, we allege

22  that the defendants privately exchange an individual air

23  freight carrier's yields, that's in Paragraph 112.

24              So now they know each others' yields, revenue

25  per ton mile, and they can agree that we'll raise the revenue

1    per ton mile on your routes into the United States starting

2    now by five percent.  How can you do that?  There are a

3    variety of ways doing that:  You can raise the rates, raise

4    the fuel surcharges, whatever it is.

5              THE COURT:  Then why isn't that pleaded?

6              MR. ARENSON:  Because.

7              THE COURT:  I mean, if that's sort of, like, a means

8    and methods of this conspiracy, that would give some meat to

9    the generalized allegations to these conclusory allegations to

10   concertedly increase their yields, I didn't understand what

11   this meant.  And now I understand what that means, it's still

12   generalized.  It still doesn't tell me what they did,

13   accomplish that purpose.

14             MR. ARENSON:  Let's hypothesize the following

15   agreement that two airlines, we'll keep it simple rather than

16   30, although I believe that 30 may have been involved.

17                  The two airlines say, "Let's increase our

18   yields on shipments from Europe to New York by five percent."

19   The implementation is up to your local people on the ground,

20   we don't care about that, but the point is you and me are

21   going to charge our customers by five percent more so that the

22   yields go up.

23             THE COURT:  But why don't you plead then if that's

24   what they did.

25             MR. ARENSON:  I would suggest that is what we pled,

1   because if you take a look at Paragraph 113 call it January 1,

2   2000, to February 8, 2007, which is the date of the filing in

3   Brooklyn, the defendants met discussed and jointly agreed to

4   concertedly increase their yields on air freight shipment

5   services.

6           It didn't say they this five percent in 2004

7   and they did it three percent in 2005 or whatever.  I agree

8   that it doesn't have that kind of detail, but do we need to

9   have that kind of detail to put them on notice as to what was

10  going on with the yields.

11          They understand what yields are, we understand

12  what yield are, Your Honor now understands what yields are,

13  and if the agreement is let's have it go up five percent, then

14  that's what we are saying.

15      THE COURT:  The same problem with the increase --

16  the allocation of customers.

17      MR. ARENSON:  Paragraph 114 on that one, Your Honor.

18      THE COURT:  Yes.

19      MR. ARENSON:  Because what it says is, "During the

20  time from January 1, 2000, through February 8, 2007," which is

21  the date for the complaint, "defendants met communicated and

22  jointly agreed to increase maintain or stabilize air freight

23  shipping services prices by allocating their customers where

24  necessary in order to minimize a customer's ability to access

25  competitive rates."

1          So we're only talking about a certain aspect of

2   customer allocation.  It's not that the defendants sat down in

3   a room and said, "This particular freight forwarder," Aim,

4   which is one the plaintiffs, "will be Lufthansa's freight

5   forwarder," and the rest of us Korean Air, Air France will not

6   be doing that.

7          We are saying that where there was a problem

8   then perhaps the air freight customer had enough business that

9   could effect the competitive rates could get a negotiation

10  going.  The defendants agreed in that situation that they were

11  going to minimize the customer's ability to access competitive

12  rates.

13          THE COURT:  Why isn't that pleaded with a little bit

14  more specificity as to how this was done?  I mean this is --

15  these are very generalized.  I think I know the answer, the

16  answer is going to be, "Well, how much do we have to do?"

17          MR. ARENSON:  Let me just say this.  If, in fact,

18  you suggest that we haven't pled it with enough specificity,

19  contrary to what Mr. Sherman said, I think we should be given

20  an opportunity to put those facts into an amended complaint.

21          THE COURT:  Okay.  Thank you, Mr. Arenson.  Let me

22  give Mr. Sherman a brief chance to respond.

23          I am primarily concerned with the surcharge

24  allegations and I will go back to asking the question I asked

25  you at the outset since Mr. Arenson now sees that increased

1    when they say, "defendants," they mean the defendants met and

2    agreed.  They did all meet in one place, they met and agreed.

3    Indeed, they mean that every single one of the defendants were

4    an involved in this.

5             Well how much more detail is required with

6    respect to the surcharges, since there's a fair amount of

7    detail as to the amounts of surcharges when they came into

8    being roughly, and so how much more do they have to plead for

9    that?

10             MR. SHERMAN:  Well, Your Honor, first let me say it

11   is interesting because Mr. Arenson, in describing what they

12   allegedly pleaded, added facts to virtually everything he

13   described.  He purported to read to you Paragraphs 113 and

14   114, but he didn't read the paragraphs, he added a timeframe.

15             THE COURT:  That's not the surcharges.

16   Paragraphs 113 and 114 have to do with a non-surcharge

17   allegation, that's what I'm asking about here.

18             MR. SHERMAN:  Fair enough, Your Honor.

19             With regard to the surcharges, again, their own

20   complaint belies the allegation that all defendants were

21   involved.  They say it in places it was applied unevenly.  If

22   it is indeed their allegation that all defendants met in

23   Africa on a particular date, then it ought to be in the

24   complaint.  All defendants met in Africa on this date to

25   discuss X.

1          THE COURT:  So, you would say they do have to

2    describe with some specificity the meetings that occurred.

3          ARGUMENT II

4          MR. SHERMAN

5          MR. SHERMAN:  With some specificity, yes, Your

6    Honor.  There needs to be some factual matter and it --

7          THE COURT:  Where is that?  Let me ask you what

8    authority is there for that?

9          MR. SHERMAN:  Again, I think it's directly out of

10   Twombly and out of In Re:  Elevator and it sounded to me like

11   Mr. Arenson was reading from In Re:  Elevator.

12          In going through the paragraphs in describing

13   what they allege, it's extremely similar to the allegations in

14   In Re:  Elevator.  And, again, it's not simply is it

15   plausible, is it alleged as to all the defendants here, and

16   that's exactly what the Second Circuit hit on in saying the

17   list is entirely, entirely in general terms without any

18   specification of particular activities by any particular

19   defendant.

20          Now, why is it you raise a number of times with

21   Mr. Arenson why isn't it pleaded in there?  Well, he said, We

22   shouldn't have to well why it is given the amount of time

23   given the fact that they have had access to Lufthansa's

24   materials.  Why is it that plaintiffs haven't amended their

25   complaint, haven't sought to amend their complaint to add the

1    sort of details and Mr. Arenson just stood here and told you.

2              Well, Your Honor, I suggest that the reason is

3    because if they added the specifics and pleaded with the

4    specificity required by Twombly in the Second Circuit it would

5    show that indeed all defendants did not meet in Nairobi or

6    wherever any particular time; that, in fact, they don't have a

7    basis for alleging a worldwide conspiracy with respect to

8    surcharges or anything else.

9              That's exactly why the Supreme Court and the

10   Second Circuit require factual matter and not just a

11   generalities.  Defendants are no longer required to respond to

12   generalities, and indeed, I respectfully disagree with

13   Mr. Arenson.  It's true that the Supreme Court did not do away

14   with the notice pleading of §8(a) but to suggest that Twombly

15   effected in change in the pleading requirements.

16             I understand that plaintiffs want to believe

17   that, but it's simply not the case in retiring the Connolly v.

18   Gibson "No Set of Facts" language, the Supreme Court made it

19   pretty clear that what plaintiffs have been doing for years is

20   what plaintiffs attempt to do here:  Make general allegations

21   and say, well, you could conceive of a set of facts.  We

22   couldn't prove which would tie this up and it is no longer any

23   good under the Supreme Court.  You got to show your cards now

24   or you got to fold, and plaintiffs haven't done it here and

25   it's clear they haven't done it just by what Mr. Arenson told

1   you.

2           THE COURT:   Okay.

3           MR. SHERMAN:   Unless you have other questions.

4           THE COURT:   No, I think you answered the question.

5                Let's move to the preemption.

6                I am going to shift the order of argument

7   because, frankly, the decision by the Supreme Court recently,

8   and I guess it was a more recent Second Circuit case, poses a

9   substantial hurdle.  It seems to me for the argument, that for

10  one branch of the ADA Preemption argument that the plaintiffs

11  have made and I'm not terribly persuaded by the distinction

12  drawn between foreign carriers and air carriers; and I think

13  it's best if I left why they're preempted first with the frank

14  pronouncement acknowledged by the Court that the Court is

15  really troubled by.  I think the defendants have a pretty

16  strong argument here.  So, is it Mr. Lovell?

17          ARGUMENT III

18          BY MR. LOVELL

19          MR. LOVELL:   Yes, Your Honor.  We do have a slide

20  presentation.  I would like to get right at this foreign air

21  carrier/air carrier issue.  I think that's the new ground for

22  Your Honor in this case.

23               In 1938, Congress enacted the Federal Aviation

24  Act.  It has a slightly different title which we'll get it up

25  in a second in 1938.  From 1938 forward, Your Honor, Congress

1  defined foreign air carrier and air carrier mutually

2  exclusively.  Foreign air carriers have to be from somewhere

3  else; air carriers have to be from the United States.  Foreign

4  air carriers cannot do domestic flights.  Air carriers,

5  depending on their certificate or exemption can.  That was

6  carried forward for 40 years with no preemption provision, no

7  express preemption provision in the statute.

8              In 1978, Congress enacted the ADA.

9               Can you get slide three up there?

10             Let me keep going, Judge.  If we ever get it up

11  we'll discuss it.  I think we can lay it, it's clear to me

12  anyway.

13             In 1978 --

14        THE COURT:  I'm listening, but I don't want you to

15  feel distracted.  I'm perfectly willing to wait for a second

16  if you're close.

17        MR. LOVELL:  In 1978, The Airline Deregulation Act

18  was enacted.  It carried forward the same statutory

19  distinctions between air carrier and foreign air carrier, two

20  entirely different terms and two entirely different functions,

21  so they're different persons with different functions.

22             Next slide.

23             Now, in the Airline Deregulation Act, Your

24  Honor, Congress deregulated domestic airlines.  It did not

25  deregulate foreign airlines, only the domestic airline

1    industry was deregulated.

2                    Go to the next slide.

3                    Now, in the ADA, for the first time, Congress

4    inserted a preemption provision into the federal aviation

5    legislation, and as the Supreme Court has said, and as

6    Congress said, the purpose of the preemption provision was to

7    protect the deregulation of domestic aviation from regulation

8    by the states and those are our cites.

9                    Go to the next one.

10                   So, we come to the language of the provision at

11   issue.  The provision was enacted in the ADA in '78; there's a

12   one word amendment.  In '84, and defendants said there was no

13   change by the '94 amendment, so we're looking with the

14   exception of one word which we'll come to that way and Your

15   Honor has to decide.

16                   "...no state...shall enact, enforce any law,"

17   et cetera, "of any air carrier having authority under

18   subchapter IV of this chapter to provide interstate air

19   transportation."

20                   Each of these terms is a defined term.  First

21   of all, an air carrier -- if you go back to slide two -- air

22   carrier has never been a shorthand term in the statutory law

23   of the Federal Government for air carrier and foreign air

24   carrier.  Air carrier has always been used in every provision

25   except for one or two exceptions where it couldn't mean just

1   air carrier as air carriers are domestic entities.

2                   Likewise, when Congress wants to include both

3   air carrier and foreign air carrier with the benefits or

4   burdens of a provision, Congress invariably uses both terms.

5                   Okay let's go back.

6                   Next one.

7                   Next one.

8                   Now, in this Circuit, there is a binding

9   decision the U.S. v. Keuylian on what the Federal Aviation Act

10  is doing when is uses "air carrier" and "foreign air carrier."

11  U.S. v. Keuylian says they are mutually exclusive terms.  This

12  mutual exclusivity are upset in subsequent Second Circuit

13  cases or any subsequent court in the Second Circuit.

14                  On the contrary, the foreign air carriers --

15  this is the third bullet up there -- have used the

16  distinctions over and over to get the benefit of complying

17  with the figures in the FAA that says this applies to an air

18  carrier and there is no case that goes against it in this

19  circuit.

20                  I would say Your Honor is almost bound when you

21  see the words "air carrier" in the FAA.  It means air carriers

22  and it does not include foreign air carriers going back to the

23  preemption provision.

24                  Back the other way.

25                  So, Judge, if Congress wanted to include

1   foreign air carriers who couldn't provide the benefits of

2   deregulation as they couldn't operate domestically, but if

3   Congress wanted to put them into the express preemption they

4   would have said, as they say in all the other sections, air

5   carrier and foreign air carrier; Congress didn't do that.

6          Now, in air carrier, an air carrier is not

7   someone who has received a certificate or an exemption.  An

8   air carrier is anybody who is acting.  So, if you haven't

9   received a certificate or an exemption you're still an air

10  carrier.  If you're flying and all of these are

11  prosecutions -- they're in our first brief, Your Honor.

12         THE COURT:  Yes.

13         MR. LOVELL:  Of people who were air carriers but

14  they hadn't been authorized yet.

15         Now they do not get the benefit of preemption?

16         Let's go to the next slide.

17         By the original language, we looked at the

18  language under subchapter IV.  You don't have preemption

19  benefits until you have from the federal government either a

20  certificate or an exemption.

21         Now, this Hughes case had to confront the

22  following question.  Is an exemption good enough to qualify

23  for preemption?  Do you need to get a certificate; and they

24  said "having authority to" means both either a certificate or

25  an exemption.

1          Let's go to the next one.

2          The Civil Aeronautics Board in 1979 came up

3   with the "Walter Alston Rule."  It was a final rule, but it

4   was called an interim policy and what it was an interpretation

5   of this preemption provision and some other things.

6               As we said in each of the bullets here, Judge,

7   the Civil Aeronautics Board's binding interpretation of the

8   preemption provision is that either an exemption or a

9   certificate will entitle you to preemption but not until you

10  obtain it.

11              So, if we go back to the original language,

12  preemption is limited to air carriers; and moreover, it's

13  limited to air carriers who have actually gotten the

14  certificate or got the exemption.

15              And, so, this -- it's in the last bullet --

16  this 1979 interpretation completely agrees with plaintiffs'

17  interpretation in the statute.  We did not put in cases on

18  deference which Your Honor is probably familiar with now.

19              Let's go to the next one.

20              Now, the third clause that was up there

21  originally in the statute is interstate air transportation.

22  It's an air carrier having authority to conduct interstate air

23  transportation.  That's the first bullet; this is the

24  congressional definition.  It's between states or territories,

25  overseas transportation.  The second definition is another

Argument III - Mr. Lovell                    96

1    part of domestic air transportation, but it involves

2    territories or possessions the way it says, Your Honor.

3             THE COURT:  Mm-hmm.

4             MR. LOVELL:  So, a foreign air carrier is not an air

5    carrier.  But also a foreign air carrier can't provide

6    interstate air transportation.  A foreign air carrier can only

7    get a permit for foreign -- the third bullet -- for foreign

8    air transportation.

9             So, Congress has excluded foreign air carriers

10   from the preemption, from the expressed preemption provision

11   in this case.

12            Okay, let's go to the next one.

13            The summary of the 1978 preemption provision is

14   limited only to air carriers who have received their

15   certificate or been exempt to provide interstate air

16   transportation.  Deregulation was extended to overseas air

17   transportation but preemption did not.  Preemption was not

18   given to those air carriers who had a certificate to engage in

19   overseas air transportation in the '78 statute.

20            Okay, let's go to the next one.

21            Let's skip that, let's come back to the next

22   one.

23            Now we go to the next statute.

24            In 1984, The Civil Aeronautics Board Sunset Act

25   of 1984.  The CAB is going out of business, they did a good

Argument III - Mr. Lovell                    97

1    job, they got things deregulated, and was renamed the

2    Department of Transportation.  The Department of

3    Transportation is going to take over and is going to run the

4    airways and other things, too.

5                In '84 they have the legislative history.  This

6    legislative history confirms what was said by Congress in '78

7    and the Supreme Court decision on deregulation was centered

8    only included, not centered on, only included domestic

9    aviation.

10                The second bullet.

11                Hearings for the '84 act have led the committee

12    to conclude that deregulation has generally been successful

13    and that there should be no change in the major reform of the

14    ADA, the deregulation of domestic air carrier routes and

15    rates.  It says before they were phased in at different times.

16                And the third bullet.

17                This act clarifies and completes the program

18    established in with this [8] for the deregulation of domestic

19    aviation.

20                I'm sorry for repeating myself, Your Honor.

21                The foreign air carriers couldn't do domestic

22    aviation.  They couldn't do anything that this act was

23    clarifying and completing.

24                Let's go.

25                In 1984, there was a one-word amendment to the

1    preemption provision.  The word "interstate" in this third

2    clause where we put the bracket in, the third bracket up

3    there, was deleted.  So, now it says, "Any air carrier having

4    authority under subchapter IV of this chapter to provide air

5    transportation no longer is it limited to interstate."

6                    Let's go to the next one.

7                    The legislative history shows no intent to

8    include foreign air carriers within preemption.  First of all,

9    they still can't do domestic.  Second of all, the House bill

10   states, this is the very scant legislative history, and I

11   would say it's not as clear as it could be, but a lot of times

12   that's the way it is with Congress.

13                   Things are not as clear as it could be and

14   that's a big part of what you do, Your Honor, and there's a

15   gap between what was intended in the language a little bit, or

16   it's not totally a map, and here they have it in Section 9 of

17   the House bill makes an amendment to conform the regulatory

18   format in the FAA to interstate and overseas cargo with the

19   regulatory format, et cetera.

20                   Next bullet.

21                   Deletion of "interstate" was necessary to all

22   carriers having authority in the air carriers having authority

23   to provide interstate were entitled to preemption.  This

24   picked up the air carriers who did overseas air cargo and also

25   it subjected anybody in the domestic airline industry to the

1  rigors of competition and it gave them the benefit of

2  preemption.

3              The 1994 amendments.  This is the last

4  amendment that has been made, this statute hasn't been amended

5  since then.  The 1994 amendment to the preemption provision,

6  defendants assert, has no substantive change.  The amendment

7  was made to read as follows and they took out "having

8  authority" to "may provide" in what we say in our brief in a

9  different section of the FAA, "may provide" has been

10  interpreted to mean "having authority."

11              So, the defendants are in essence right, and

12  through all of these statutory changes, the Congress has

13  carried forward the mutual exclusivity of air carriers and

14  foreign air carriers?  The definition and the mutual

15  exclusivity are in the function.  So, still, if you're going

16  to provide the domestic aviation education benefits of

17  deregulation, you have to be an air carrier and you have to be

18  one with authority that may provide transportation under this

19  subpart.

20              Okay, go to the next one.

21              Now, we say, Your Honor, that there's only one

22  way this statute can be read and that applies to a preemption;

23  express preemption applies to a subset of air carriers.  We

24  don't have the burden to show that it can only be read that

25  way.  If the preemption standards mean anything, strong

1  preemption, strong presumption against preemption.

2       THE COURT:  Didn't the Supreme Court say exactly the

3  opposite here?  The Supreme Court just basically said, no,

4  whatever may apply to other preemption arguments.  The ADA

5  Preemption was meant to be read broadly --

6       MR. LOVELL:  Yes, I agree with Your Honor that the

7  phrase, there's two different issues.  There's the

8  jurisprudential issue, but that's probably the adjective for

9  what happens with Your Honor is confronted with in a motion or

10  what standards you use and then what does the language mean.

11       Yes, the Supreme Court says the language is

12  broad, you have to look at the words.  Second, when you then

13  look at the words this standard has not been thrown out.

14       The defendants' statement that it's a broad

15  statute is correct.  However, in this Circuit under

16  Abdu-Brisson and other cases you look at, you look at under

17  the same Supreme Court said, "The strong presumption under

18  preemption."

19       THE COURT:  I'm just not gathering the distinction

20  you're making.  On one hand, the Supreme Court has said,

21  "broadly."  Now, you say you read it broadly and you read it

22  narrowly.  I don't know how I can harmonize those two

23  concepts.

24       MR. LOVELL:  I agree.  I'm not saying it very well,

25  but I think the distinction is this for any statute Your Honor

1   is confronted with there is a strong presumption against

2   preemption.  The burden is on the movant in express preemption

3   provisions are narrowly construed all of that jurisprudential

4   law applies.

5            As far as the judicial tests all apply.  But

6   the Supreme Court has told you this is a broad provision,

7   okay?  I'm going to still put it through the same judicial

8   hopper but I know when it's going in it's a broad provision.

9            THE COURT:  Okay.

10           MR. LOVELL:  I hope that's good.

11           THE COURT:  I better understand the argument let me

12  put it that way.

13           MR. LOVELL:  Thank you, Your Honor.

14                Next slide.

15           Now, this was not changed by the recent

16  decisions we say, Your Honor, and we say in this Circuit it

17  remains good law.  The defendants, from their opening brief,

18  have argued it.  Abdu-Brisson held at the motion to dismiss

19  stage Delta could not overcome its initial presumption of

20  preemption by establishing that the purpose of the state law

21  could be frustrated.  In the recent Supreme Court case, it

22  says at least this has to be shown.  It does not say that

23  something more has to be shown.

24                Let's go to the next one, all right.

25                So here's the plaintiffs' versus defendants'

Argument III - Mr. Lovell                              102

1   interpretation.   This is all addressed to foreign air carrier,

2   air carrier.

3            The first bullet on the left is our view that

4   is does not change the use and meaning of virtually the same

5   language when the provision was amended in '84.  I think even

6   the defendants will concede if Your Honor will ask them when

7   they stand up that the '78 statute was limited to air carriers

8   and that there is no way that they could have been included in

9   that.  They will concede that, I believe.

10           Now, the burden is on them to say in '84 when

11  one word is taken out that Congress intended through that one

12  word to explode this preemption provision that has been

13  limited to domestic aviation and make it worldwide and bring

14  in all foreign air carriers when all the legislative history

15  shows you have the opposite.

16           In the selected bullet we agree with the CAB

17  policy --

18           THE COURT:  What was the reason?  You're talking

19  about the elimination of the word "interstate."

20           MR. LOVELL:  I can tell you one reason for sure, and

21  I think it's of a sufficient reason, because overseas people

22  were overseas air cargo, the definitions that we went through.

23           THE COURT:  Foreign?  There was three classes of

24  transportation:  Interstate --

25           MR. LOVELL:  We'll get to the definitions.  Here it

1    is, Your Honor.

2              THE COURT:  Yes.

3              MR. LOVELL:  Interstate.

4              THE COURT:  So there's four definitions.  If we're

5    going to go by definitions, it's the last definition that now

6    would apply, right?  They took out interstate and made it

7    applicable to all air transportation.

8              MR. LOVELL:  Yes, Your Honor, they didn't change the

9    words "air carrier."

10             THE COURT:  No.  I mean, that's the tricky part.  I

11   don't disagree.

12             MR. LOVELL:  Okay; all right.

13                  If you're coming from where I'm coming from,

14   the Second Circuit law and the statutory definitions and

15   everything, air carrier means air carrier.

16                  Get the other sections of law up there where

17   they -- where Congress uses both air carrier and foreign air

18   carrier.

19                  If you turn to the '84 amendment, Your Honor,

20   they had created a preemption provision that didn't do what

21   they said they were doing.  Congress said, "We are going to

22   protect from regulation that which we've deregulated."  It

23   does not protect deregulation over air carriers who had

24   overseas transport, they took that out; and in doing that,

25   they then protected all air carriers.

Argument III - Mr. Lovell                104

1          Now, our brief is alcoholic full of these other

2    provisions.

3          THE COURT:  I didn't follow what you just said.  But

4    one thing that it seems to me is a canon of statutory

5    construction is that you look at the language of the statute

6    and that legislative intent informs that only when the

7    language of the statute is not clear and unambiguous.

8          MR. LOVELL:  Plaintiff totally agrees.

9          THE COURT: It seems that most of your argument is

10   fixed on legislative intent when legislative intent is not

11   where I should be focusing my and, in fact, I would suggest

12   that the current Supreme Court has even furthered, sort of

13   derided the reliance on the legislative intent.

14         MR. LOVELL:  I agree with Your Honor on that, too,

15   and Justice Stevens is a great proponent of mock preemption

16   would not go along with Justice Ginsburg in the recent trilogy

17   and said she's right on the legislative history, Congress

18   didn't intend that, but we have too many authorities.

19              There is a hierarchy if you look at the words

20   first.  If the words are clear and consistent if anything is

21   clear, if the legislative history, the structure of the

22   statute, in fact, the structure may be part of -- I think is

23   part of the way Lexicon and some other cases go to look at the

24   words does not mean, "Just look at the words of the section

25   that you are interpreting," you also have to look at the whole

1    statute:  The definition, how the terms are used in other

2    parts of the statute that is looking at the statutory words

3    albeit where you go first.  You don't go beyond that if the

4    words are clear, let's go back to the preemption.

5           THE COURT:  Your argument really focuses on whether

6    air carrier means something more than that original definition

7    of air carrier.

8           MR. LOVELL:  And our argument is that it can.  Go

9    back to the only preemption.  I think it's seven.

10              Here it is, Your Honor.  We think it's over of

11   the -- given that for 40 years before and 30 years since air

12   carrier and foreign air carrier are mutually exclusive in the

13   Keuylian case says that and the Second Circuit says they're

14   mutually exclusive.  It would not mean anything if you look at

15   the language and look at the air word "carrier."

16              The shorthand for air carrier and foreign air

17   carrier never, in all of the sections of the law, if they mean

18   foreign air carrier they bring it in.  There's one section

19   that says, "Air carrier holding a permit."

20              Now, you have Hobson's Choice, I don't know who

21   Hobson was.  A permit can only go to a foreign air carrier and

22   so statutorily defined as air carrier and you have a permit

23   and that's the one section that the defendants cite in their

24   brief and they're right.

25              There, you know, they have this principle and

1    we totally agree with you the word is superfluous and they're

2    going to add a superfluous word.  Even if carrier is defined,

3    if the statute is going to be off or a permit is going to be

4    off.

5            So, the only way it can be there -- or not off

6    -- the matter of reading is Congress slipped, as it slips from

7    time to time, in the cases we see when it left out overseas in

8    the language.  But when you look at this language, here it

9    couldn't be clearer; air carrier just means air carriers.

10            Now, if you want to read the other clauses they

11    further tie it down to air carrier, interstate air

12    transportation.  Now --

13            If you go to '84, to the current statute, all

14    that they did is take out the word "interstate," Your Honor,

15    so it's any air carrier having authority you have to get the

16    exemption or certificate for air transportation which brings

17    in the overseas.  It breaks in the whole U.S. air carrier

18    airline industry who Congress wants to be subject to the

19    benefits of competition.  The plain language of the statute

20    couldn't, I submit, Your Honor, I know I'm -- it couldn't get

21    any clearer.  Air carrier.

22            Now, what are we going to do, explode air

23    carrier and say this one time they meant shorthand, no way.

24        THE COURT:  Okay.  I understand the argument.  Okay,

25    let me let the defendants respond or the movants respond.

1          Mr. Sherman again.

2          ARGUMENT III

3          BY MR. SHERMAN

4          MR. SHERMAN:  Sorry, Your Honor.

5          THE COURT:  You have whistles and bells this time?

6          MR. SHERMAN:  Still no whistles and bells.

7          Your Honor, I must confess that I was trying to

8  keep up with Mr. Lovell.  I had a problem.

9          THE COURT:  Here's -- he says that the Federal

10  Aviation Act of which the ADA is part of it as I understand.

11          MR. SHERMAN:  Yes.

12          THE COURT:  It defines foreign air carriers and air

13  carriers separately.

14          MR. SHERMAN:  I am prepared to address that.

15          THE COURT:  That's my most fundamental question.

16          MR. SHERMAN:  I understand that and there are a

17  couple of problems with the indirect plaintiffs' argument on

18  that.  The first problem is that no Court has ever accepted

19  that their interpretation.

20          THE COURT:  Only one court really addressed, as I

21  recall, was that the Lawal court and the Supreme Court sort of

22  wasn't asked but addressed it but didn't it's -- if it didn't

23  apply --

24          MR. SHERMAN:  It was specifically raised in the

25  Supreme Court in the Morales case.

1        THE COURT:  But not decided.

2        MR. SHERMAN:  Well, in finding preemption as to all

3   airlines there --

4        THE COURT:  Okay.

5        MR. SHERMAN: -- the Supreme Court certainly decided

6   it, decided sub silentio, but there was no question that it

7   was raised in the Supreme Court.  There was a jurisdictional

8   question that can't be waived and, therefore, the Court's

9   decision has to have rejected the argument with respect to the

10  foreign carrier.

11        Admittedly, in the opinion they don't address

12  it, but they could not have come to the decision that they

13  came to if you accept the plaintiffs' reading.

14        Now Lawal court in the same year, 1992,

15  expressly addressed the argument that they made and rejected

16  it.  And rejected it for the very reason that Your Honor

17  brought up which is that the Court found that the language of

18  the statute is unambiguous and no need to go to the

19  legislative history when the statute is unambiguous.

20        THE COURT:  Why did they not go to definitions in

21  the statute, that's what I'm --

22        MR. SHERMAN:  Your Honor, the problem with the

23  plaintiffs' argument that what they want you to do is to stop

24  reading at words "air carrier."  That's not what the

25  preemption statute says.  The preemption statute says --

1            THE COURT:  I know, but I understand the argument

2     that follows from there.  You're saying it's air carrier has

3     further defined --

4            MR. SHERMAN:  Exactly.  Exactly.

5                 It's air carrier, a state as a political

6     subdivision of a state may not enact or enforce a law or

7     regulation or provision related to a price route or service of

8     an air carrier that may provide air transportation under this

9     subpart.

10                Now, if they had stopped at air carrier, we

11    might have a different case, but the words "that may provide

12    air transportation under this subpart," well, we need to look

13    at that.  It's subpart II that they refer to.  Subpart II

14    governs economic regulation of both U.S. and foreign air

15    carriers.

16                The subpart includes Section 41302 which

17    authorizes DOT to grant permits to foreign air carriers.  The

18    term "air transportation" clearly includes foreign air

19    transportation and foreign air carriers.  So, you can't stop

20    with the word air carrier, you read the term in the context of

21    the statute.

22                Mr. Lovell admitted he said, well, once or

23    twice they actually used the term "air carrier" and it doesn't

24    mean just domestic.  Well, that's right, and they do that in

25    other circumstances where the context of the language

1    application to clear that, it can't be simply a domestic

2    carrier.   49 U.S.C. 44901(h)(1) talks about an air carrier

3    providing air transportation under a certificate issued under

4    Section 411102 which is a U.S. carrier or a permit issued

5    under Section 41302 which is a foreign air carrier.

6              THE COURT:   Wait, back up on that.  I wasn't

7    following that entirely.

8              MR. SHERMAN:   This is section 49 U.S.C.

9    Section 44901.

10             THE COURT:   Subpart IV.

11             MR. SHERMAN:   This is the section that Mr. Lovell

12   was referring to when Congress has included the words "air

13   carrier" but then distinguished and included both carriers who

14   get certificates that U.S. carriers and carriers who get

15   permits which is foreign carriers.  So, clearly, there is at

16   least one other instance where looking at the contention you

17   realize that what it means here.

18             THE COURT:   Okay.

19             MR. SHERMAN:   There's also the case which we cited

20   to you of South African Airways v. Dole which is an '87 case

21   by the D.C. circuit.  There is a case where the Anti-Apartheid

22   Act directed revocation of the right of any air carrier

23   designated by the Government of South Africa and a case was

24   brought when the rights were revoked and the airline came in

25   and said, "Well, wait a minute, any carrier designated by the

1    government of South Africa has to mean a U.S. carrier," and

2    the D.C. Circuit said it's ridiculous.

3              Obviously, Congress didn't mean to allow the

4    government of South Africa to designate a U.S. air carrier.

5    You have to look at the context to discover what the words

6    actually mean.

7              Now, as I said, Lawal is the only case that

8    specifically addresses plaintiffs' contentions and rejects

9    them because Lawal did just that.   Lawal looked at the full

10   language of the paragraph.   The Court in Lawal said -- if you

11   look at the full language -- it's unambiguous.   So, you got

12   Lawal, you got Morales which is a Supreme Court case, and then

13   you got a number of decisions over the years which have

14   applied preemption to foreign carriers even if not expressly

15   going through the analysis that the Lawal court went through.

16   But, to be clear, if this court accepted plaintiffs' argument

17   and didn't apply preemption to foreign carriers, you would be

18   the first court ever to do that.   And verify that the

19   preemption provisions do not apply to foreign carriers and the

20   Court started by asking Mr. Lovell about recent cases.   The

21   recent Rowe case and the recent Cuomo decision in the Second

22   Circuit.   Mr. Lovell didn't address it but I would like to

23   address it.

24             THE COURT:   That goes to a different part of the

25   argument.

1          MR. SHERMAN:   The Cuomo decision didn't.   The point

2     Mr. Lovell made in that they both confirmed that whatever he

3     says about the general presumption about preemption, it's

4     clear that the Supreme Court has said this ADA Preemption is

5     to be construed broadly.   Rowe confirmed that the Cuomo case

6     followed that and reemphasized that but the Cuomo case this

7     was The Passenger Bill of Rights which I'm sure the Court is

8     aware of.   The Passenger Bill of Rights Act was passed because

9     of the stories about people being stuck on planes for hours on

10    the tarmac and in deciding that the act was preempted clearly.

11          The Act applied to foreign airlines as well as

12    domestic airlines.   The Second Circuit didn't say, "Well, wait

13    a minute.   We're only going to apply this to domestic

14    airlines."   The Second Circuit, again, a case not expressly

15    addressing it but another case where, in overturning the

16    statute because it's preempted the Court, included foreign

17    carriers within the decision.

18          (Continued on the next page.)

19

20

21

22

23

24

25

1   ARGUMENT III (continued)

2   BY MR. SHERMAN:

3         MR. SHERMAN:   Just to go briefly to a couple of

4   points that Mr. Lovell made.

5         His claim that Abdu-Brisson says in the Second

6   Circuit that the statute must frustrate of purpose of the ADA,

7   this is another thing that Rowe speaks directly to.   This is a

8   recent Supreme Court decision.   And it doesn't say the

9   qualified language, as suggested by Mr. Lovell.   It says this:

10  "In respect to preemption" -- this is a quote.   "In respect to

11  preemption, it makes no difference whether a state law is

12  consistent or inconsistent with the Federal regulation."

13        Mr. Lovell spent a lot of time sort of bouncing

14  around the legislative history.   I do want to correct one

15  thing that he says of our argument.   We don't say that neither

16  the 1984 nor the 1994 statute, change in the statute affected

17  any substantive difference.   We say that only about 1994.   And

18  we don't say it.   It was said in the statute, and reiterated

19  by the Supreme Court in their, in the decision, the Wolens

20  decision.

21        The 1984, as you noted and as he admitted, affected

22  a pretty big change.   It took out the word "interstate" and it

23  left the word "foreign commerce," or it left the rest of the

24  terms that include foreign carriers and foreign commerce.

25  There's nothing in the legislative history to suggest why, but

1    it's out.

2         And the statute that we're dealing with now is the

3    statute with the provision that has -- if you read the whole

4    language of that paragraph clearly in context, does not stop

5    with the word air carrier, and Abdu-Brisson was the proper

6    analysis of it.

7         THE COURT:  I'm sorry, I didn't follow you.  You say

8    Abdu-Brisson is the proper analysis?

9         MR. SHERMAN:  I'm sorry, I used the wrong case.

10   Lawal is the proper analysis.  Abdu-Brisson was the wrong

11   analysis.

12        You know, again, Your Honor, we agree with you --

13   I'm sorry.  The case of Culian, Mr. Lovell raised and

14   suggested that this is a Second Circuit authority that you

15   must follow on air carrier versus foreign air carrier.  Not at

16   all.

17        Culian was a case about a criminal prosecution of an

18   individual for bringing firearms onto a plane.  And that

19   decision looked at an entirely separate provision in making

20   the point about carrier versus air carrier.  We don't deny --

21        THE COURT:  Air carrier versus foreign air carrier.

22        MR. SHERMAN:  Air carrier versus foreign air

23   carrier, yes.

24        We don't contest that, as a general matter, those

25   two provisions are set out separately in the statute.  But

1    they can't cite -- there are no cases, which examine the term

2    in the preemption provision and come to the conclusion that

3    they want to come to.

4         THE COURT:  Well, but the interesting part of the

5    argument, though, is that you are saying that I should look at

6    the deletion of interstate from air transportation and rely on

7    the statutory definition of air transportation in interpreting

8    that portion.

9         MR. SHERMAN:  I'm just noting that it's out.  So

10   that the statute that we're dealing with now is, I mean, I'm

11   not sure why it matters that he went back to the original

12   1978, when in 1984 the words were taken out.  The statute as

13   it stands today doesn't have that --

14        THE COURT:  Right, but what I'm saying is that the

15   phrase "air transportation," what does that mean?  You're not

16   relying on the broader definition of air transportation as set

17   out in the FAA, which was up there.  You're just saying

18   whatever it means, it means.  And the fact that they took out

19   interstate means it must be broader than just interstate air

20   transportation.

21        MR. SHERMAN:  Exactly.  Exactly.

22        And Your Honor, the fact that, let's accept

23   Mr. Lovell's argument for a minute, although I don't think you

24   need to go to legislative history.

25        The fact that Congress in 1978 may have been focused

1    on domestic deregulation does not say anything in the absence

2    of a specific statutory prohibition against applying this to

3    foreign carriers.  It doesn't say anything about whether it

4    ought to be applied.

5            The preemption provision is clear, if you read it in

6    its entirety.  And every case that's examined it, every court

7    that's examined it, has held that it applies to foreign

8    carriers.  I suggest that this court should do the same.

9            THE COURT:  Okay.  Thank you.

10           Mr. Lovell?  There you are.  I'll give you, I mean

11   you can have a few minutes.

12   ARGUMENT III

13   BY MR. LOVELL:

14           MR. LOVELL:  I know it's five to 1:00, Your Honor.

15           I want to go over the Morales decision.  In their

16   reply brief they made a new argument that although -- I think

17   it's more efficient if I just say what happened.

18           THE COURT:  Yes.

19           MR. LOVELL:  Morales, the Attorneys Generals who

20   were involved never raised the foreign air carrier issue until

21   the schtunkey (phonetic) plaintiff in the Lawal case contacted

22   them when they did their reply brief in the Supreme Court and

23   said hey, you want to argue this.  In their reply brief they

24   raised for the first time an issue that wasn't in the

25   questions presented, that wasn't in the Court below.  It had

1    never been considered by any court.  And the Supreme Court

2    said nothing about it.

3           So, we cited all of these Supreme Court decisions,

4    involving Supreme Court jurisprudential rules when they don't

5    decide questions that aren't included in the questions

6    presented originally, weren't raised in the Court below, only

7    appear in a reply brief.

8           But then, the defendants came back, and so,

9    therefore <u>Morales</u> does not address this.  It was not raised.

10   The res judicata with the Attorneys Generals in that case,

11   yeah, but it's not stare decisis for anybody.

12          In their reply brief the defendants come back and

13   say well, they must have really considered it, it must really

14   be law because it was the only way there would have been

15   subject matter jurisdiction over the foreign air carriers is

16   if there was an ADA preemption issue as to them, so they had

17   to think about foreign air carriers.  Not true.  The 10

18   intervening foreign air carriers intervened as of right under

19   24A.  British Airways was likewise entitled.  That's in our

20   bullets, and I've given the slides to everybody.

21          Moreover -- this is the last bullet, Your Honor --

22   not one of the defendants' subject matter jurisdiction cases

23   holds or implies that a foreign air carrier could use the ADA

24   preemption provision to establish Federal jurisdiction.  It

25   wasn't in the case.

1          So, Your Honor is left with the statute, not --

2    Morales didn't take this away from it.  In the defendants'

3    opening papers, they said:  Interpret the statute.  In the

4    reply papers, they put in five new arguments.  One which is,

5    you can't interpret the statute, Morales is decided.  Not

6    true.

7          So the whole issue comes down to this, Your Honor.

8    The defendants do not say that the '78 statute covered foreign

9    air carriers.  And I wouldn't expect Mr. Sherman unnecessarily

10   to say that, and that's fine.

11         But their whole argument comes down to this.  Would

12   you put the '84 statute up.

13         (The above-referred to slide was published to the

14   courtroom.)

15         MR. LOVELL:  I submit to Your Honor, that if you

16   take their data points and compare it -- go to the preemption.

17   The '84 preemption.

18         (The above-referred to slide was published to the

19   courtroom.)

20         MR. LOVELL:  It all comes done to this, Your Honor.

21   Mr. Sherman says, if it stops at air carriers, the foreign air

22   carriers would have no preemption.  It all comes down to

23   having authority under subchapter four of this chapter to

24   provide air transportation.  Okay.  That has full meaning if

25   it's limited to air carriers.  That does not need to be

1  exploded into foreign air carriers to have meaning.  I think

2  if Your Honor looks at their data points, the South African

3  Air case, the statute could have no meaning unless you gave up

4  the normal way of doing things and applied this to South

5  Africa.

6           THE COURT:  You'll have to just explain that in a

7  little more detail.  I'm not following that argument.

8           MR. LOVELL:  In South African Airways, which is not

9  a Second Circuit case, Congress only used the word air

10  carrier, but they did apply the statute to South African

11  Airways.  And it was anti-Apartheid Act.  The only one who

12  could be covered was South African Airways.  Airlines.

13           THE COURT:  No, but what I'm focusing on is that

14  phrase, "having authority under subchapter four of this

15  chapter to provide air transportation."

16           MR. LOVELL:  Yes.

17           THE COURT:  "As a delimitation, or as an expression

18  of what the words air carrier means."

19           And so that, to the extent that an air carrier has

20  authority under subchapter four of this chapter to provide air

21  transportation, it is covered.  That's their argument, I

22  think.

23           MR. LOVELL:  Yes, and that's true.

24           THE COURT:  And so, but you were saying somehow

25  that's --

1          MR. LOVELL:  Sorry, Judge.  I know I'm interrupting.

2          THE COURT:  That's all right, go ahead.

3          MR. LOVELL:  My answer's already there.  An air

4    carrier is not a foreign air carrier.  Over and over again, 52

5    times.

6          THE COURT:  Okay, I see.

7          MR. LOVELL:  Congress says air carrier and foreign

8    air carrier.  This 2 and 3 are limiting phrases on air

9    carrier.  They are not expanding phrases to throw it out, and

10   that's why I say just look at the statute.

11         Do you have the statute?

12         (The above-referred to slide was published to the

13   courtroom.)

14         THE COURT:  Why is it not, why is it not, why is the

15   Court, I guess your argument is the Court should always

16   interpret air carrier, that phrase, consistent with the

17   definition provided elsewhere in the act unless it is clear

18   that the --

19         MR. LOVELL:  That's what we're trying to say.

20         THE COURT:  -- unless it's absolutely clear that it

21   was not meant to.

22         MR. LOVELL:  Yes.  In those data two points that

23   they have, yes, that's my argument.  Under the Second Circuit,

24   you always have to interpret air carrier to be air carrier

25   unless there is no other way to do it.  And their two data

1   points, 44904 and the South African Airways case put the

2   Hobson's choice to the Court.   And there is no Hobson's choice

3   here.

4          You can easily -- and here's two other sections

5   here.   Here's just examples of 52 times when Congress uses

6   both.   49 U.S.C. 40109(a)(1):   "An air carrier not engaged

7   directly in operating aircraft in air transportation."

8          Well, the defendants' reading is air transportation

9   could pick up part of -- no, no, but Congress always goes on.

10  "B:   A foreign carrier not engaged directly in operating

11  aircraft in foreign air transportation."

12         Over and over, Congress will use both terms, and

13  both will have an adjective restricting phrase afterwards.

14  And we put 26 examples in our brief.   And the Lawal case is

15  just wrong.

16         Lawal is just wrong.   Lawal thought, as defendants

17  argue, that that expanded the first.   I know it's 1:00

18  o'clock, Judge, I better stop.

19         THE COURT:   I understand.

20         MR. LOVELL:   It narrows the phrase, Your Honor.   And

21  because it narrows the phrase, Your Honor is not confronted

22  with the situation of those two cases.

23         Your Honor can give full meaning to the statute by

24  reading it the way the plaintiffs want to.   And Your Honor

25  does not read the statute, and renders the definition

1  superfluous if you use those data points that the defense has,

2  of those two cases, and bring it in here when the statute

3  makes perfect sense this way.

4         THE COURT:  What renders what superfluous?  That's

5  the part of the argument I'm not following.

6         MR. LOVELL:  The definition -- in other words, to

7  read the statute doesn't just mean read this section.  It

8  means read from 1938 forward.  Air carrier and foreign air

9  carrier are different.  And the minute you say you're

10  exploding air carrier into a shorthand term for air carrier

11  and foreign air carrier, you are rendering superfluous the

12  statutory definition, which is in the first hierarchy.  You're

13  supposed to look at all the language in the statute in

14  interpreting any provision.

15         THE COURT:  I see.

16         MR. LOVELL:  Okay.  And that's what Lawal did.

17  Lawal rendered the definition superfluous in order to say the

18  broadest possible meaning, if we get to the -- the broadest

19  possible meaning of having authority in air carrier.  In order

20  to give the broadest possible meaning of that, I am going to

21  disregard the statutory definition of air carrier.  52 other

22  provisions of law would have to change.  All the times that

23  the defendants have gotten the benefit of this in all their

24  cases, everything would have to change if there's an adjective

25  phrase that could apply to both.

1              THE COURT:  Okay.  I think I get it.

2              MR. LOVELL:  It can only apply to foreign air

3      carrier.

4              MR. SHERMAN:  I'm sorry, can you give me one more

5      minute?

6              Mr. Lovell's presented sort of a moving target.  I

7      just want to make sure that at least one or two things that he

8      said are clear for the Court in terms of defendants'

9      provision.  I'm happy to do from here.

10             THE COURT:  All right.

11             MR. SHERMAN:  Thank you, Your Honor.

12             On the Morales and Maddox case, the Morales case,

13     Maddox below.  First of all, as the Lawal Court held, as many

14     courts have held, on a question of subject matter jurisdiction

15     there can be no waiver.

16             THE COURT:  All right.  I follow that argument.

17             MR. SHERMAN:  All right.  The Lawal, the Court

18     specifically held that "Congress preempted this area to

19     maintain uniformity and avoid the conclusion and burdens that

20     would result if interstate and international airlines were

21     required to respond."

22             So, it wasn't just raised that the question of

23     international was present below as well as in the Supreme

24     Court.

25             Mr. Lovell said we concede -- and if I gave this

Argument III / Mr. Lovell                    124

1    impression to the Court, I apologize -- we don't concede that

2    if you stop at the word air carrier, that there's no

3    preemption for foreign airlines.

4         We say when you look at the whole provision, it's

5    clear.  But the problem is that even if you were to stop at

6    foreign air carrier --

7         THE COURT:  At foreign?

8         MR. SHERMAN:  I'm sorry, at air carrier, what they

9    suggest just makes no sense in the larger context of the

10   statute.

11        Congress intended to deregulate the airline industry

12   and specifically with regard to rates, routes and services.

13   It would make no sense in doing that if, without saying

14   anything, what they intended to do was not allow any Federal

15   regulation, but indeed allow all the states and indeed

16   subdivisions of the states.

17        THE COURT:  I understand that.  Although one would

18   have to concede that before the words interstate air

19   transportation came out, interstate came out, and that it was

20   designed to only affect domestic.

21        MR. SHERMAN:  No, I don't agree, Your Honor.

22        THE COURT:  You don't concede that?

23        MR. SHERMAN:  No.  The statute was focused on

24   interstate.  Although it's not clear whether they meant

25   interstate as opposed to intrastate, because they specifically

1    allowed continued regulation of airlines within the state.

2    But without any express provision about the foreign air

3    carriers, I don't agree that interstate necessarily meant at

4    that time.

5              THE COURT:  Okay.

6              MR. SHERMAN:  And in terms of the _Lawal_, of course

7    Mr. Lovell's going to say it's wrong.  How could he say

8    otherwise?  It directly defeats their position.

9              There's a rule of construction that Congress has

10   presumed to be aware of decisions.  The _Lawal_ decision, the

11   _Morales_ decision, all happened before the 1994 recodification

12   where Congress made no substantive change in the statute.

13             I suggest that this court should do what every other

14   court has done in looking at this provision.

15             THE COURT:  All right.  I've got it.  Thank you,

16   folks.

17             We'll reconvene at 2:20.  That gives us an hour and

18   15 minutes.

19             MR. HAUSFELD:  Your Honor, may I request, what is

20   the agenda for this afternoon?

21             THE COURT:  Well, we'll pick up in the order that we

22   had before.  I can't remember.  Let me see.

23             I think we start off with the foreign law claims.

24             MR. HAUSFELD:  Thank you.

25   (Continued on following page with AFTERNOON SESSION.)

Argument III / Lovell

1              AFTERNOON SESSION

2      ARGUMENT III.

3      BY MR. LOVELL:

4              THE COURT:  All right.

5              MR. LOVELL:  Your Honor, Chris Lovell.  Could I,

6      talking at lunch about the oral argument, and being used to

7      singing for my supper for 30 years as a contingent, we would

8      like to put in a three-page letter, if that would be okay, to

9      cover the point at the end about what the statute means when

10     interstate run out.

11             THE COURT:  I've got so much paper here.  If I let

12     you put in three pages, they would want to put in six, and

13     then you'll want three more.  Is it something that really is

14     not within the papers that you already submitted?

15             MR. LOVELL:  Well, your Honor, I actually don't

16     know.  If you will accept our surreply, the answer is

17     two-thirds yes, because you haven't accepted our surreply,

18     and one third is pulling something out that is more directly

19     responsive going over how Congress handles this situation and

20     other things.  It is in our brief.  It is in the brief that

21     we put in, our paper brief.  So, I mean, I could do two pages

22     and leave out what I already covered.  Two pages.  Will you

23     take two pages?

24             THE COURT:  I think I think anxious what point it is

25     you want to elicit.

127

Argument III / Lovell

1        MR. LOVELL:  Sorry, your Honor.  Congress when it

2  has wanted to include foreign air carry in a provision has a

3  pattern in the legislative history and changes in the statute

4  it has done.  It is like your Honor said, if air carrier can

5  only have a meaning that relates to the foreign air carry,

6  that's one thing.  I wanted to pull that stuff out of our

7  brief and show it to your Honor.

8        THE COURT:  Out of the brief that you already

9  submitted, though?

10        MR. LOVELL:  Well, no.  Some of it is in the

11  surreply.  Only in the reply did they bring up one of the

12  issues.  They only brought up this 44901 in their reply and

13  we haven't addressed that at all.

14        THE COURT:  You want to address 44901?

15        MR. LOVELL:  Yes.

16        THE COURT:  And that was on the notion that it was

17  only addressed in the reply papers, I mean?

18        MR. LOVELL:  Only came up in the reply.  But the

19  Overlobby? case (ph) and the South African Airways case were

20  the other two parts of the letter, your Honor.

21        THE COURT:  I see.

22        Mr. Sherman, is it true that you raised this in your

23  reply?  I mean, I'm not saying there's anything wrong with

24  that.  But should I give Mr. Lovell a chance to put in his

25  two cents on that?  You will say no, and I will say, what if

Argument III / Lovell

1    I give you your two pages on it?

2         MR. SHERMAN:  Let me tell you why the answer for us

3    is no.  The same reason we didn't think that their surreply

4    should be accepted by the court.  We made the basic argument,

5    which I tried to make today, the plaintiffs raised a number

6    of arguments in their lengthy opposition.  We attempted to

7    respond to those arguments in the reply.  We didn't raise new

8    arguments in our reply.  We responded to their argument.

9         I think it is safe to say that Mr. Lovell here today

10   had a chance to make all of the points that he made in his

11   surreply, and he made a lot of the points.  As far as I could

12   tell, he may have made them all between what he said and the

13   power point he put out and handed up to the court.  We don't

14   think there's any reason for the court to have any further

15   briefs on this.

16        THE COURT:  Mr. Lovell, you make a very attractive

17   presentation, but I do think that the points you made are

18   adequately covered.  They were adequately covered in your

19   argument, and if I permit further papers on this, I will get

20   those same requests with respect to every other issue that we

21   touch on today, and I have quite enough.

22        MR. LOVELL:  I understand.

23        THE COURT:  I mean, I did get your handout.  I think

24   it was useful in terms of tracking through your argument.

25   And I do have the benefit of the transcript, which we will

Argument IV / Warnot

1    undoubtedly be consulting.  So I don't think any of the

2    points that you made will be lost.

3              MR. LOVELL:  Thank you.

4              THE COURT:  All right.  So let's move to item number

5    four, Foreign Law Claims.  Give me a moment.  Let me pull out

6    my papers and we'll get started on that.

7              Mr. Warnot?

8    ARGUMENT IV

9    BY MR. WARNOT:

10             MR. WARNOT:  James Warnot of Linklaters LLP for

11   Societe Air France, and I'm making this argument on behalf of

12   the entire defense.

13             As your Honor noted, Mr. Ogden would be arguing as

14   well.  Lufthansa has made a separate motion on the foreign

15   law claims, and we have discussed in advance how we are going

16   to handle this.  So we'll try, to the extent possible, to

17   eliminate duplication of what we say.

18             Broadly speaking, the issue before the court is

19   whether this is going to be the first U.S. court to accept

20   litigation in the United States of a European union statutory

21   antitrust claim between a bunch of foreign parties involving

22   conduct that occurred outside the United States.  That's what

23   plaintiffs are asking you to do by accepting jurisdiction in

24   this case.  This motion applies to four of the counts, Counts

25   Four, Five, Six and Seven, and at least as to a couple of

130

Argument IV / Warnot

1    those counts, they don't impact the United States in any way

2    because they are for shipments from the EU to places around

3    the world, except for the United States.

4         THE COURT:  Just to help me out, because I

5    consistently get confused about this, Counts Six and Seven

6    are claims involving entirely overseas transactions,

7    transactions that took place overseas, and shipments that

8    went from point to point outside of the United States?

9         MR. WARNOT:  That's Seven.

10        THE COURT:  That's seven.

11        MR. WARNOT:  Six is mixed U.S., non U.S.  it is only

12   foreign plaintiffs.  The class is composed of people outside

13   of the United States, both direct and indirect purchasers,

14   and the shipments at issue are shipments from the EU, places

15   outside of the United States, as well as to the United

16   States, but only under Article 81.

17        THE COURT:  Right.  Well, some of those would be

18   encompassed elsewhere, would they not?

19        MR. WARNOT:  Well --

20        THE COURT:  Would be encompassed under some of the

21   other counts, Sherman Act counts?

22        MR. WARNOT:  Potentially Counts Four and Five are

23   somewhat different classes.

24        Count Four is the direct U.S. purchaser -- excuse

25   me, direct U.S. shipments where the class members are

Argument IV / Warnot

1   entities within the European union who are making shipments

2   to the United States and direct purchasers.

3        Count Five is the same thing, except they are

4   indirect purchasers.  But the class -- both the class

5   representatives and the class definition were all in favor of

6   those Europeans only.

7        THE COURT:  Okay.  Right.

8        MR. WARNOT:  The way I want to proceed, your Honor,

9   is to first examine jurisdiction, does the court have

10  jurisdiction?  And then, you know, if it were to have

11  jurisdiction, should it exercise that jurisdiction?  And,

12  finally, do the plaintiffs state a claim for relief, assuming

13  the answer to the first two is "yes."

14       So the first question is, is there jurisdiction

15  under the Class Action Fairness Act, CAFA.  And CAFA, as I'm

16  sure the court is aware, has relaxed diversity of citizenship

17  requirements and has a relaxed amount in controversy

18  requirement, and it permits its class members to aggregate

19  individual amounts of controversy.  But it has the

20  requirement that it is a class action, and in assumption in

21  that is that it is a claim properly brought as a class

22  action.  And the short answer to whether in fact the claim

23  like this has been answered by judges of this court three

24  times in the last year and a half, as well as by Judge Baer,

25  and we talked quite a bit in the papers about the Bonime

Argument IV / Warnot

1   case.

2          In addition, we cited Judge Bianco's decision in

3   <u>Holster v. Gatco</u>, in March 2007.  What we didn't cite was

4   Judge Block's <u>Gratt v. Eurotravel</u>, 2007 West Law 2693903,

5   very similar case, though.  And of similar import is Judge

6   Baer's decision in <u>Giovanniello v. New York Law Publishing</u> in

7   August of 2007.

8          In each of those cases, there was a claim, actually

9   a federal statute, but a federal statute for can there was no

10  federal question jurisdiction, and a claim that could only be

11  brought under the state procedures.  And under the statute in

12  New York, again not the statutory class action procedures,

13  but it is a statute that determines whether something can

14  even be brought as a class action.  Those claims could not be

15  brought as a class action in state court, because in fact

16  they had a statutory penalty associated with them.

17         In analyzing that case, I would just look to Judge

18  Amon first.  She said that provision for eerie purposes, it

19  is substantive, rather than procedural, and, as a result, the

20  state law governs.  There can't be a class; therefore, you

21  can't have CAFA; therefore, there's no subject matter

22  jurisdiction.  And it is very clear in that case that the

23  basis for the decision wasn't anything peculiar about the

24  language of the underlying statute.  It was the fact that the

25  application of CPLR 901(b), which was a state statute

133

Argument IV / Warnot

1   prohibiting a class action in those circumstances, was

2   substantive because it was determinative of whether the

3   outcome would be the same in state or federal court, and the

4   rule of guaranty trust.

5          We had the same situation here.  There's no New York

6   State statute.  We have claims brought under foreign law, and

7   the same rulings apply in diversity cases, whether it is

8   state law or foreign law, in which for each EU member state

9   it's a fundamental aspect of their law, the claims are

10  personal and they can't be brought on a class basis, at least

11  not on a class basis as we know it here, namely an opt out

12  class action.  And there doesn't seem to be any dispute on

13  that from plaintiffs.

14         Now, what plaintiffs are saying is that in fact all

15  we are arguing is that there's a different rule of procedure.

16  It conflicts with Federal Rule of Civil Procedure 23, and,

17  therefore, under Hanna v. Plumer, the federal rule controls.

18         The first problem with this argument, it's been

19  rejected by the courts that have ruled on this issue

20  recently.  It was only done inferentially, really, by Judge

21  Amon in her decision in Bonime.  There's a footnote referring

22  to the issue that having been decided in the other case, and

23  it was addressed directly by Judge Bianco in the Holster

24  case, by Judge Block in the Gratt case, and by Judge Bear in

25  the Leider v. Ralfe, which is discussed in more detail in the

Argument IV / Warnot

1    papers.  The reason that these courts looked at it in this

2    way is because they held that Rule 23 establishes

3    requirements for class certification, commonality, et cetera,

4    et cetera; whereas, there's a threshold question as to

5    whether a particular claim is even eligible for class

6    treatment in the first place.  That's what CPLR 901 really

7    addresses.

8         Actually, in CPLR 901, which is the New York Class

9    Action statute, 901(a) is really the counterpart to Rule 23

10   where you look at whether a class is certified; but 901(b)

11   establishes a substantive rule saying you can't have a class

12   action in circumstances like the circumstances present in

13   that case, and those are the same circumstances present here.

14        Now, one thing that I should note that both the a

15   and Holster cases are presently on appeal to the Second

16   Circuit, and that appeal was argued on March 12th, and

17   presumably sometime before too long we are going to have a

18   decision.

19        The second point is if there's no diversity

20   jurisdiction, should the court exercise supplemental

21   jurisdiction?

22        The parties haven't really argued about whether

23   there's a common separate act.  I think for purposes of this

24   argument we are not disputing that, but there are three

25   reasons that the court shouldn't exercise supplemental

Argument IV / Warnot

1    jurisdiction.

2         The first one is the same reason the court shouldn't

3    exercise diversity jurisdiction, namely that the nature of

4    this claim bringing an Article 81 as a class action, when

5    that is not recognized, and it would be, you know,

6    fundamentally contrary to European law.  It is no less

7    abhorring under supplemental jurisdiction, than it would be

8    under diverse jurisdiction.  Judge Baer ruled to that effect

9    in Leider v. Ralfe, which was in a little bit of a different

10   context, because there the defendant had defaulted and he was

11   looking at class certification, but he so held, and we cited

12   that in our papers.

13        In addition, you need to look to the factors under

14   28 U.S.C. 1367(c), two of which we relied upon for saying

15   there shouldn't be supplemental jurisdiction.

16        The first is complex issues of foreign law.

17        Now, the plaintiffs say, oh, this is really simple.

18   You got Article 81.  You got Section One.  They both prohibit

19   agreement, and that's the end of the story.  There's nothing

20   complex about it at all.  I mean, there are a whole lot of

21   problems with that.

22        First of all, their main claims under English law,

23   which I will get to later, doesn't cover most of the class

24   members here, but was just under English law.  There are

25   still a lot of issues that are not at all simple, and in fact

Argument IV / Warnot

1    are decided under English law, probably for most of which is

2    the status of the pass on defense and whether indirect

3    purchasers have standing.

4         As set forth in our declaration of Richard Plender

5    QC, both of those issues are undecided under English law, and

6    those issues are obviously very important to the case.  You

7    know, would we have the pass on defense, the direct

8    purchasers to the indirect purchasers have claims, meet

9    pretty fundamental issues in this case.

10         So where those things are undecided, it would be

11   inappropriate to be asking you to decide these issues of

12   English law, when English courts haven't decided yet; and the

13   fact that an issue of foreign law has not yet been decided,

14   it is in fact one of the factors that the courts rely on in

15   rejecting supplemental jurisdiction.

16         In addition to that, there's I guess I will call it

17   the catchall provision of 28 U.S.C. 1367(c), or the so-called

18   exceptional circumstances provision.

19         Now, clearly, exception means exception, rather than

20   the rule.  But, you know, as the Ninth Circuit held in the

21   Executive Software case, which was adopted as the standard in

22   the Second Circuit Russian News Agency case, that inquiry is

23   not particularly burdensome.  You have to look at the

24   surrounding facts and see whether this indicates that it

25   makes sense to keep it in this court.  As in our papers, the

Argument IV / Warnot

1   same comity considerations for arguing that it should be

2   dismissed on comity considerations alone, would constitute

3   the exceptional circumstances.

4          I then move on to a form non-convenience.  All I am

5   going to say on that, Mr. Ogden will be arguing it, and we'll

6   be relying entirely on his argument.

7          The secondary discretionary argument is the doctrine

8   of comity.  Again, Mr. Ogden will largely handle that, but I

9   would like to make a couple of points.

10         Plaintiffs whole opposition depends upon their

11  argument that you can't have a comity dismissal unless

12  there's a conflict between the law that is sought to be

13  applied and U.S. law.

14         Now, we say that is wrong as a matter of law.

15  Lufthansa articulates it somewhat differently.  We followed

16  the language in Justice Scalia's dissent in Hartford Fire in

17  which we say there's prescriptive comity and prescriptive

18  comity is a doctrine where a plaintiff seeks to have a United

19  States court apply U.S. statutory law for conduct occurring

20  outside the United States.  In that situation, what the court

21  has to look at is, is there in fact a conflict - and there's

22  a provision in the cases about how strong that conflict has

23  to be - but is there a conflict between charging someone

24  based on exterior conduct under our laws versus having been

25  treated under the laws of jurisdiction in which they acted.

Argument IV / Warnot

1  That's really the only context in which an analysis makes

2  sense.

3          Comity, of course, is a much more flexible doctrine.

4  In fact, in the Biggio case in the Second Circuit, when the

5  lower court had dismissed on comity grounds, based on a case

6  in the Ninth Circuit called Timberlane, which essentially

7  applies the same test, you look at whether there's a

8  conflict.  The Second Circuit in Biggio said that's the wrong

9  test.  The test in this case is whether adjudication of the

10  claim would offend amicable working relationships with the

11  other sovereign, and for a whole host of reasons that

12  plaintiffs really haven't contested because they relied so

13  much on this conflict argument.  That's certainly the case,

14  and I will permit Mr. Ogden to get into all of those, and not

15  bog this proceeding down with covering it twice.

16          I want to spend just a couple of minutes addressing

17  the notion that accepting jurisdiction would advance comity.

18  This is an argument that plaintiffs put forward.  Our

19  response to that would be, with all due respect, that's

20  certainly more.  It is nothing more than displaying attitude

21  that we in the United States know best how to litigate, and

22  we in the United States know best how to handle your claims.

23  And it's in the context of a situation where Europe's highest

24  court has said to national courts, you must adjudicate these

25  claims.  You must provide a remedy for people in Europe.

139

Argument IV / Warnot

1          It is almost like saying because it takes us 50

2     years to try to implement Brown v. Board of Education, that

3     courts in some other countries should take on those claims.

4     European courts being around for a long time have established

5     procedures.  Whether we disagree or agree with those

6     procedures doesn't advance comity to take away those cases

7     from them here in the United States.  There's no connection

8     to them.

9          I would lastly turn, assuming the court has

10    jurisdiction and decides appropriately to exercise that

11    jurisdiction, have they in fact stated a claim?

12          So they stated the claim two different ways.

13          The first way is directly under Article 81 and

14    Article 53 of the EEA, and that clearly doesn't state a

15    claim.  I don't think they are really trying to say anymore

16    that it does.  Certainly their experts say you can't do that

17    because properly stating the claim under Article 81 is an

18    amalgam of both European law and member state law.  But in

19    addition to that, they stated a claim under English law that

20    incorporates Article 81, then you need to look at English law

21    and see in fact how that works with respect to this class.

22          What the plaintiffs' expert has said is - and again

23    when I say plaintiffs' expert, what I'm really referring to

24    is plaintiff's co-lead counsel's partner sitting in London,

25    but we'll put that aside for a minute - he notes that the

Argument IV / Warnot

1    plaintiffs have pleaded English law and assume,

2    quote/unquote, that our conflict laws would permit those

3    claims to be the entire class.  I would say that's a bad

4    assumption.

5           First of all, our conflicts laws, looking at classic

6    New York interest analysis and looking at the claims of a

7    freight forwarder in Austria shipping product to Singapore,

8    how is it that English law -- that our conflict ruling were

9    points to English law?  It is an impossibility.  Our expert

10   has indicated English laws are not much different from that.

11   Our expert Richard Plender QC, who I would add since February

12   1st is Mr. Justice Plender in high court.

13          THE COURT:  Not your partner.

14          MR. WARNOT:  Not a partner, but maybe it adds a

15   little something to his declaration.  He explains how it

16   would work if they try it, assert the claims of the entire

17   class under English law as pleaded.

18          First of all, is the issue of class members who have

19   nothing to do with England, and where the conduct at issue

20   has nothing to do with England and produces no effects on

21   England.  Those claims would fail to state a claim for relief

22   under English law.  And I have not seen anything

23   contradicting that from anything put in by the plaintiffs,

24   because they have in fact just assumed that England law

25   covers everything.

141

Argument IV / Warnot

1          The second category of individuals are people who

2     are not named plaintiffs, but who in fact perhaps might be

3     residents in England, and against who perhaps conduct may

4     have been directed.  As to those, because of the absence of a

5     class mechanism in England, they won't state a claim another.

6     So by our count, that leaves us Volvo Logistics (UK) Limited,

7     and that's it.  That all of the rest, Counts Four, Five, Six

8     and Seven fail to state a claim.  Unless you have questions,

9     I will turn it over to Mr. Ogden.

10          THE COURT:  One question.

11          Mr. Ogden will be addressing for non-convenience, as

12    I understand it, but one of the steps in the Court's analysis

13    is whether there's an adequate alternative forum.  Maybe you

14    can address that on behalf of all of the other defendants, as

15    opposed to just Lufthansa, who is carrying its freight only

16    for Lufthansa.

17          MR. WARNOT:  Yes.  We are adopting their argument as

18    well.  Very simple, the requirement of an adequate

19    alternative forum doesn't require the procedures to be the

20    same; doesn't require the remedies to be the same.

21          THE COURT:  But is there a single forum where this

22    could all happen?

23          MR. WARNOT:  I don't view that as requiring that

24    there would be -- that there needs to be a single forum where

25    this could all happen, where class actions aren't allowed in

142

Argument IV / Warnot

1    Europe.  What you got is a situation where European court of

2    justice, to which all member states have agreed to abide by

3    its decisions, has said you must provide a remedy.  There's

4    nothing in form non-convenience law that I know of that says

5    where you bring a claim on behalf of a widely scattered class

6    - and in fact that claim is not properly brought as a class

7    action - that there has to be a single forum for each and

8    every one of those class members in bringing a claim.

9              THE COURT:  Okay.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    ARGUMENT IV (Continued)

2    BY MR. WARNOT:

3              MR. WARNOT:   And in fact that claim is not properly

4    brought in the class action.   Because there has to be a single

5    forum where each and every one of those class members can

6    bring a claim.

7              THE COURT:   Okay.   All right.

8              MR. WARNOT:   Thank you.

9    ARGUMENT IV

10   BY MR. OGDEN:

11             MR. OGDEN:   David Ogden, Your Honor, for Deutsche

12   Lufthansa AG, Lufthansa Cargo and Swiss International

13   Airlines, three companies under common ownership that are not

14   members of the joint defense group, somewhat differently

15   situated.   My clients are leniency applicants.

16             As you know, Your Honor, we've been accepted into

17   the liens and programs of both the Justice Department here in

18   the United States and the European Commission.

19             And as Your Honor is also aware, we have, our

20   clients have reached a settlement with respect to all U.S.

21   represented commerce preliminarily approved now by the judge

22   following your recommendation, which includes Counts 1 through

23   5 and such parts of count 6 and 7 as involved commerce to,

24   from or within the United States.

25             What we have not settled, my clients have not

1   settled, Counts 6 and 7 to the extent they involved commerce,

2   as Your Honor put it, exclusively in points in Europe and

3   places elsewhere in the world, not including the

4   United States.   Claims that are brought in by the plaintiffs

5   only pursuant to European law in the course of their

6   complaint.

7           Now we do, although not a member of the joint

8   defense group, we do agree with the arguments that Mr. Warnot

9   has made and that the other defendants have made with respect

10  to those claims.   And we agree that there's no jurisdiction

11  under CAFA, and should not be jurisdiction as a matter of

12  supplemental jurisdiction in this court, for the reasons that

13  they've stated and I will revisit them.

14          But we make the further submission, Your Honor, that

15  even if there were jurisdiction here, they would be

16  appropriate for this court to dismiss under the principles of

17  foreign nonconvenience and under the principles of comity,

18  which are related doctrines, but doctrines that are distinct.

19  And I want to make just a few points in support of that

20  submission.

21          First, I think it is difficult to imagine a set of

22  claims that could be configured in a way that would be more

23  appropriate for foreign nonconvenience dismissal than these.

24  The Gilbert case, which addresses the doctrine at the Supreme

25  Court level, talks about the question being a question of the

1    nexus of this forum versus the other forum to the facts and

2    the law involved in the claims.  And here, with respect to the

3    claims that we're talking about, we have exclusively foreign

4    commerce, indeed the United States is the only country in the

5    world that is not connected to the commerce that's at issue in

6    this count because it is between Europe and everywhere else.

7             Exclusively foreign law, only under the law of these

8    claims, only sought to be adjudicated under the law and under

9    the law of England.  Exclusively foreign named plaintiffs.

10   All of the named plaintiffs that have come before this court

11   to advance these claims are domiciliaries of foreign

12   countries.

13            THE COURT:  I thought that six was, wasn't that

14   foreign and U.S. mixed?

15            MR. OGDEN:  Six is foreign and U.S. mixed commerce.

16            THE COURT:  Commerce, but not domiciliaries.

17            MR. OGDEN:  It doesn't -- but it is exclusively

18   foreign domiciliaries.  But my point is, seven I think admits

19   the possibility of U.S. domiciliaries within the class, but

20   all of the named plaintiffs in Count 7 are foreign.

21            THE COURT:  Okay.

22            MR. OGDEN:  And similarly, with respect to Count 6;

23   all of the named plaintiffs are foreign.  And so, that the --

24   so that the existence of U.S. based entities with those claims

25   are hypothetical, although possible from the point of view of

1   form nonconvenience doctrine, the key issue that other courts

2   have looked at is the residence of the named plaintiff because

3   it is they whose convenience is primarily at issue since they

4   will be prosecuting the claims.

5             And finally, the defendants are overwhelmingly

6   foreign.  Two out of the 39 defendants are U.S. entities and

7   they are under common ownership.  Now, in these circumstances,

8   there should be really no deference accorded to the

9   plaintiffs' choice of the U.S. forum.  The case law, in

10  particular the recent decision in the Austrian ski train

11  disaster case, is perhaps the most recent one to identify that

12  if a foreign plaintiff decides to bring a case in the United

13  States based on foreign law and concerning primarily foreign

14  events, their choice of forum is due very little, if any,

15  deference.  And obviously, their convenience is not

16  particularly served by it and it would appear to be a matter

17  of a forum chart.

18            I want to turn next to the critical issue that

19  Your Honor identified, which is the question as to whether

20  there is an adequate alternative forum.

21            And I think the answer to that is that clearly for

22  the claim that the plaintiffs have pled, which they seek to

23  rely entirely on EU law supplemented as it must be as

24  Mr. Warnot observed, by a national law, they relied entirely

25  on English law.  And their expert witnesses have said England

Argument IV / Mr. Ogden                    147

1   under English choice of law principles would apply English law

2   to all of the claims.  And that is the submission that the

3   plaintiffs have brought to this court in the United States.

4          We don't know entirely with certainty what choice of

5   law principles the English courts would apply, but that's the

6   claim that the plaintiffs have brought here.  We think

7   clearly, England -- or if not England some other court in the

8   EU -- would be an adequate alternative forum.  The test there

9   is whether the defendants would be amenable to service in that

10  other forum and whether the courts would permit litigation of

11  the subject matter of the claim, that's Pollack's holding, for

12  example.  The Second Circuit lays that out, but that's really

13  black letter law.

14         With respect to amenability to service, the

15  plaintiffs have not intended that any defendant is not

16  amenable to service in England, for example.  And their

17  experts, Mr. Layton and Mr. Smith, have explained in their

18  affidavit, in their declaration, they lay out the argument for

19  the reason why all defendants are amenable to service.  They

20  say that because there are U.K. defendants, they can bring in

21  all other EU domiciled defendants pursuant to Article 6(1) of

22  Regulation 44/2001, which allows all EU domiciled

23  co-defendants to be brought in if there is a domiciliary

24  reform state who is a defendant, and in the interest of

25  justice so serve.  And again, it is the opinion of plaintiffs'

1    expert at paragraphs 24 to 25 and paragraph 30 of the Layton

2    and Smith affidavit.

3             And with respect to non-EU, the non-EU defendants,

4    they also say they can be brought before a single English

5    tribunal pursuant to English Rule of Civil Procedure 6.20.

6    And this is laid out in their submission.  And they say that

7    the rules in England would permit -- this is a quote:  "The

8    concentration of proceedings and claims in a single

9    well-equipped English forum, further submitting the law would

10   apply to all the claims".

11            Again, whether or not that's so, the key point is

12   that the plaintiffs have not contested the amenability of

13   service of the defendants in England.

14            Second, as to whether England permits the litigation

15   of the subject matter of these claims, the Second Circuit has

16   already decided that issue resoundingly in the affirmative in

17   the Capital Currency Exchange decision, which is a

18   Second Circuit decision 1998 where plaintiffs sought to bring

19   claims under the Sherman Act.  And the Second Circuit approved

20   dismissal of those claims under forum nonconvenience so that

21   they could be litigated in Europe under European law saying

22   that Europe courts are open and provide a remedy.  It's not

23   identical, but it doesn't have to be.  And they sustained the

24   dismissal there on the ground that England was an adequate

25   alternative forum.

1              And you know, that conclusion really is one that I

2     think as a matter of comity and respect for the coordinate

3     system of justice in Europe, this court really has to reach.

4     It is a principle of European law, which has been identified

5     in the Courage decision, which is cited in all of the papers;

6     that the member states must provide an effective remedy for a

7     violation of rights under Article 81.  The remedy must be

8     effective if there's a violation of rights and the court has

9     set aside actual rules that limit that in any respect.  That

10    means that it can't be practicably impossible or excessively

11    difficult.  That's the formulation that the Europeans insist

12    that the national courts observe in providing damages remedies

13    to persons whose rights have been violated under Article 81.

14             And so, particularly given the Second Circuit's

15    ruling, but as a matter of respect for that system, this court

16    I don't think could take the decision that the remedies

17    afforded will not be effected given that European courts are

18    fulfilling that mandate.  So, we believe there's clearly an

19    adequate forum.  I think plaintiffs' own experts have

20    identified that.

21             And then, when we turn to the convenience factors,

22    they overwhelmingly favor an English forum, Your Honor.  There

23    is, as Mr. Warnot observed, a requirement for any court

24    carrying European law claims, whether that's this court or a

25    court in the EU, to decide any number of unresolved issues of

Argument IV / Mr. Ogden                    150

1   European law; issues under the European substantive law,

2   issues under national law.  Mr. Warnot identified a number of

3   them, but they include standard fault that needs to be met to

4   recover damages, statute of limitations, whether exemplary

5   damages or other forms of damages are available, indirect

6   purchaser standing, the pass-on defense, standards for

7   causation.  All of these arise and many of them are

8   unresolved.

9           THE COURT:  In English law, too?

10          MR. OGDEN:  Many of them, as Mr. Warnot observed,

11  are unresolved in English law as they apply to antitrust laws.

12  And even the Courage decision was a case in which an English

13  rule that limited the rights of a plaintiff who was a

14  participant in an illegal agreement to recover, that was a

15  rule of English law that the European court of justice set

16  aside saying that it interfered with the effective remedy.

17  And so, what English law is, how it applies to antitrust

18  claims and whether European law requires an adjustment in

19  those rules on any number of different respects will need to

20  be resolved.

21          Now, but it's clear that whatever the rule would be

22  in England as to whether English law governs every claim, it's

23  absolutely certain that that would not be the rule in this

24  court.  This court would have to apply the forums choice of

25  law principle, not England's choice of law principle,

1  New York's choice of law principle under well-established

2  cases requires an issue-by-issue, claim-by-claim decision as

3  to what law governs so that claims of Portuguese shippers,

4  shipping between Portugal and Nigeria, would have to be judged

5  under an interest-balancing approach that would presumably

6  dictate a different law than English shippers shipping from

7  England to Russia, depending on the nationality of carrier,

8  where the agreement was reached, where the injury occurred. At

9  least all three in one jurisdictions of Europe will have their

10  laws in play in these European claims under New York choice of

11  law principles.

12         And consequently, the choice of law challenges faced

13  will be staggering.  And even after you've decided what law

14  applies, you've got to decide what the law is when in many

15  cases it hasn't been squarely decided by that national

16  authority.  Obviously, that exercise would much better be done

17  by a court in the European Union than by a court in the

18  United States.

19         Additionally, the location of the evidence here and

20  the difficulty of getting access to it will be far greater in

21  the United States, the difficulties, than in Europe.  Now, the

22  plaintiffs have suggested that there are great efficiencies

23  potentially that could be obtained by litigating this matter

24  jointly; the U.S. and the European claims.  But lots of

25  evidence is going to be given.  These claims involve different

1   routes.   They involve different carriers.   They involve

2   different markets.   They involve different forwarders and they

3   involve different shippers.   All of that different

4   constellation is going to generate different analysis with

5   potential to impact on the market, damages, pass-on defense

6   and a host of issues where there will be individualized proof

7   required, and probably with respect to liability to the extent

8   that proof extends beyond surcharges to other issues.   That's

9   going to be decentralized proof that's going to be found round

10  the world.

11          And in consequence of that, big issues will arise

12  with respect to the blocking statutes and privacy laws in

13  Europe where -- and utilization of the Hague Convention.   All

14  these requirements, these barriers imposed by European law to

15  the U.S. discovery process will be a real problem in this

16  context.   A much greater problem potentially.

17          THE COURT:   Why greater than if they were over -- if

18  it was a, let's posit that there may be required, if this

19  court declines jurisdiction, multiple actions in multiple

20  different foreign states.

21          Then won't the same problems occur in terms of

22  getting access to records across national boundaries?

23          MR. OGDEN:   The European legal system will allow,

24  through its own internal mechanisms, will allow the discovery

25  through the mechanisms of the European civil process, and the

1  regulatory system that's administered by the ECJ will allow

2  evidence to be obtained from between various different

3  entities in the EU.  And because this evidence primarily

4  concerns travel between the EU and the rest of the world,

5  those mechanisms, the respect that the French are required to

6  accord to the U.K., or that the Germans are required to accord

7  to the Spanish, et cetera, will allow for the normal operation

8  of their evidentiary process and the discovery process to

9  centralize that information.

10        For this court it will be tough because this court

11  would be enforcing European substantive law and would be

12  looking at the issue as to whether to override European laws

13  that block discovery from the United States.  It wouldn't

14  block discovery internal to the EU, but would block discovery

15  from the United States in the name of European substantive

16  law.  I think the balance always comes out that European

17  procedural limitations would be --

18        THE COURT:  All right.  I have to limit your time.

19  You need to wrap it up.

20        MR. OGDEN:  I appreciate that.  I just want to

21  emphasize two other points.

22        One, is that the judgment from this court if it took

23  these cases would very likely not be enforced.

24        THE COURT:  Certainly subject to collateral attack.

25        MR. OGDEN:  Subject to litigation and substantial

1    attack.

2              And there would be a risk of parallel engaging going

3    on in Europe that would not be stayed under the principles of

4    European law.

5              THE COURT:  I'm sorry, restate that last?

6              MR. OGDEN:  European law, under the modernization

7    regulation as discussed in the Layton and Smith memorandum,

8    again at paragraphs 29 to 30, would call for a second file of

9    case in Europe on the same subject matter; generally to be

10   stayed in deference to a pending proceeding underway in

11   another EU country.  But according to that affidavit, because

12   of the rights that a European plaintiff would have to

13   adjudication of claims under Article 81, they would not stay

14   that proceeding in favor of this one.

15             THE COURT:  Well, have some such proceedings been

16   filed there?

17             MR. OGDEN:  Not at this point.  Not at this point.

18             THE COURT:  Okay.  Thank you.

19             MR. OGDEN:  Thank you.

20             THE COURT:  Mr. Hausfeld.

21   ARGUMENT IV

22   BY MR. HAUSFELD:

23             MR. HAUSFELD:  Good afternoon, Your Honor.

24             THE COURT:  Good afternoon.

25             MR. HAUSFELD:  Sometimes I find that some bells and

Argument IV / Mr. Hausfeld                    155

1   whistles can be of assistance, and in this particular case,

2   there is an adage about old dogs needing to adapt every once

3   in a while.  And so, I have adapted to some new technology.

4   But likewise, old laws sometimes need to adapt as well.

5          And as the Second Circuit stated in the <u>Curley</u>

6   <u>versus AMR Corporation</u> that the Courts in the Second Circuit

7   should be flexible in taking issues relating to the law of

8   foreign nations because such issues can be expected to come to

9   Federal courts with increasing frequency as the global economy

10  expands and cross-border transactions increase.  And I think

11  both counsel for the defense aptly illustrated the fact that

12  this is a case which invokes applying old venerable good law

13  to new circumstances.

14         We've heard from counsel that essentially European

15  law is so different from the United States that it would, in

16  essence, mire this court in a complexity of decisions which it

17  could never extricate itself and assort manageably.  They use

18  terms such as if this court were to exercise either diversity

19  jurisdiction, which they really have no good argument does not

20  apply because the plain language of the diversity statute

21  grants jurisdiction, or discretionary jurisdiction under

22  supplemental authorities.

23         What they say is that the exercise of any

24  jurisdiction by this court over foreign claims in this global

25  situation would nullify, frustrate, undermine or override

Argument IV / Mr. Hausfeld                    156

1   European law.  I'd like to --

2          THE COURT:  Let me tell you what my main concern is.

3   And that is that European law does not seem to be that

4   well-developed.  And there are a number of issues that will

5   undoubtedly arise and the typical, the typical reaction in the

6   Second Circuit to that is when there's a State law that we're

7   asked to interpret or asked to pass on, where there's been no

8   real authority and it's a real serious question, we send it

9   off on certification.  And we don't have that possibility

10  here.

11         And it really does trouble me that this court will

12  be basically announcing principles of general application

13  throughout Europe and having no real slate to write on.  I

14  mean, we would basically be taking affidavit after affidavit

15  from foreign law experts who would only be opining based on

16  what they think the European community is going to do because

17  there's no law out there upon which to rest their decision.

18  And it just doesn't seem like a particularly -- it just

19  doesn't seem like an exercise that this court ought to jump

20  into.

21         MR. HAUSFELD:  I would agree, Your Honor.  Except if

22  you accept that reasoning, if there's really no law, then

23  there can't be an adequate forum.  The issue --

24         THE COURT:  No, no.  There is an adequate forum to

25  decide these new principles.  I mean, these principles that

1   need development.  And the adequate forum is over there where

2   the law is, where the European community, you know, enacted

3   the treaty and set up the legal structure.

4           MR. HAUSFELD:  And if I could request Your Honor's

5   indulgence --

6           THE COURT:  Okay.

7           MR. HAUSFELD:  -- in making a distinction between

8   process and substance.

9           There is no ambiguity with regard to the substance

10  of European competition law.  There is underdevelopment in

11  terms of the process which is desired to be constructed to

12  achieve the objective, but the objective is unequivocal.

13          THE COURT:  But how to achieve the objective?  I

14  don't know whether you want to call it process or substantive,

15  they're two different things.  You know, the objective is to

16  eliminate price fixing as far as it makes sense, I suppose.

17          That's what you would say; right?

18          MR. HAUSFELD:  Yes, but I think two events have

19  occurred that assist this court in understanding how U.S.

20  litigation involving European claims in particular applying

21  European law can bridge that gap.

22          THE COURT:  Okay.

23          MR. HAUSFELD:  Let's look at the policy in Europe,

24  which we claim is extremely clear.

25          Every citizen has a right to compensation for harm

1    suffered as a result of an infringement of European law.

2    That's guaranteed by community law for every member state

3    throughout the entirety of the union.  What the European

4    Commission, which is the chief judicial body in essence for

5    policy determination for the entirety of the union says, that

6    private right are an essential complement to public

7    enforcement and that private enforcement has to be real.

8    Rights that cannot be enforced and enforced effectively, it is

9    noted throughout Europe, are not rights at all.

10              So, what has the European community told us with

11   regard to infringements of their competition law?  It says

12   that community law demands an effective system for damages,

13   but at this point in time the law within the member states is

14   underdeveloped.

15              Why is it undeveloped?  Because there are situations

16   in which the victims of a cartel -- and the victims of a

17   cartel, Your Honor, are all purchasers in the market infected

18   by the cartel.  Infringements of European competition law for

19   price fixing are no different than price fixing under

20   Section 1 of the Sherman Act.  They are combinations of

21   enterprises or companies which manipulate and interfere with

22   the free market.  Not just the market of one purchaser, but of

23   the entirety of the market.  So, a price fixing cartel or

24   conspiracy impacts all purchasers in the market.

25              And what the European Commission says, and is the

1   law throughout the European Union, if you have a cartel which

2   infects a market, it impacts all purchasers in that market,

3   and you have to have an effective system which allows all

4   those purchasers in the market to retrieve what was taken from

5   them by the cartel.

6           So, what else do we see about the policy so that

7   there's no ambiguity, Your Honor, in terms of what Europe

8   seeks to achieve and what it is that they need to construct in

9   order to achieve what they seek?

10          The union has said that they must ensure in this

11  increasingly complex and interconnected world that their

12  national civil justice systems are able to effectively respond

13  to disputes which cross national boundaries.  A recognition by

14  itself, Your Honor, that judicial systems in any member state

15  must reach to those transactions which may originate outside

16  their boundaries and affect their citizens within their

17  boundaries as well as citizens of other states.

18          And so, the European Commission unequivocally states

19  that, faced with global problems, we need to design truly

20  global solutions; the antithesis of having each member state

21  decide within the judicial system of that member state and

22  that member state alone the impacts of a global cartel which

23  affect not only the members of those individual member states,

24  but as well the citizens of other states on other continents.

25          So, what is it that the commission tells us at this

1   point is the policy unequivocally throughout the European

2   Union for all member states?  It says:  Collective redress

3   mechanisms are an absolute must.  Not discretionary.  Not to

4   be debated, but are a must.  If you're going to devise and

5   design and construct a global solution to a global problem,

6   there has to be a collective mechanism.  Individual suits by

7   individuals pursuing individual relief is insufficient.

8   Ineffective.

9           But now, Your Honor, we come to the issue that you

10  raise; what does the European Union recognize?  Well, right

11  now they say the hurdles are too great.  Our system is too

12  ineffective.  We cannot achieve the desired unequivocal

13  unambiguous objective of providing the right to every victim

14  of an infringement of European law the compensation to which

15  it is entitled.  And they are not shameful, nor are they

16  difficult in stating their objective.  The primary objective

17  of European law, particularly with regard to infringements of

18  Article 81, price fixing cartels, is full compensation for all

19  damages suffered as a result of the European Commission

20  antitrust rules.

21          And we see within the European Union an

22  understanding of the interaction of global economic force.

23  What they advocate, what they acknowledge, what they seek to

24  achieve is coherence in competition law and enforcement around

25  the globe.  Not compartmentalization, not each member state

1    deciding its interpretation of an unambiguous law.   Price

2    fixing is price fixing in every member state.   Price fixing is

3    equally prohibited in the United States and is no different

4    than price fixing infringements in each of the member states

5    of the union.

6            THE COURT:   The one, I think I know where you're

7    going with your presentation, Mr. Hausfeld.   But I must tell

8    you, you quote a good deal from the white paper and you quote

9    from some individuals who are at the Commission.   But that

10   announcement of the Commission or of some small group of

11   people who have goals that they would like to set for the

12   European Union and the European Commission is not a

13   commandment for this court to act.   It's a commandment maybe

14   for the European community to do what it has to do to provide

15   those mechanisms.

16            But it seems to me that as far as I understand the

17   way that the European treaty works is that the, the treaty

18   announces the objectives or the law that's to be, the law that

19   should be applied and then leaves it to the member states to

20   actually provide an enforcement mechanism.   And it's not for

21   the, it doesn't seem like it's for the United States to now

22   decide for each of those member states the enforcement

23   mechanism to apply.

24            And to the extent that a more robust and collective

25   mechanism is to be provided, that's a question for the

Case 1:06-md-01775-JG -VVP  Document 786  Filed 09/25/08  Page 162 of 303

1    European community to do, not for this court.

2            MR. HAUSFELD:  I take Your Honor's question as the

3    underpinning of the difficulty in making the connection

4    between European law and U.S. law and the rights of foreign

5    purchasers to seek justice in a U.S. court for violations of

6    those laws.  And let me make that connection, if I can.

7            When you say the fact that Europe has an unequivocal

8    unambiguous objective which they seek to construct is -- and I

9    think I wrote this down accurately -- is not a commandment to

10   this court to act.

11           THE COURT:  Or any court here, for that matter.

12           MR. HAUSFELD:  That's not our position, Your Honor.

13           But it is our position that the fact that there are

14   those laws which are unequivocal and unambiguous and direct in

15   terms of the objective they seek, which coincide precisely

16   with the laws of this country, is not a reason not to act if

17   the Court otherwise has the ability to act.  That's the

18   difference.

19           THE COURT:  Well, the problem is, though, it's taken

20   us a hundred years to develop the antitrust law here; right?

21           And so, what you're asking is -- because they have

22   announced some similar objectives that we now import our

23   conception of how to deal with antitrust problems and you

24   know, and use that as the model for developing their law in

25   this area.

MR. HAUSFELD: No. And I say no to that quickly, Your Honor, because what you just asked --

THE COURT: How can it be otherwise? What else are we going to rely on?

I'll let you finish answering.

MR. HAUSFELD: I appreciate it, Your Honor, because you're precisely at the critical question upon which the assertion of jurisdiction essentially pivots.

What I tried to establish is that there is no uncertainty in the substance of European law.

THE COURT: What about the -- let's take one aspect. Let me just interrupt you for a moment.

MR. HAUSFELD: Yes.

THE COURT: The pass-through defense. Indirect purchaser. What about that?

MR. HAUSFELD: I intend to get to all of that and show you how courts in the United States have already successfully dealt with each and every issue raised by the defense with regard to the uncertainties of European law.

Because the white paper not only gave objectives for policy in terms of what is an infringement, but they clearly stated what the law of the European Union must be.

THE COURT: But not what it is.

MR. HAUSFELD: Excuse me?

THE COURT: But not what it is. The European

1    Commission is not the -- I mean, the white paper is not the

2    statement of the law; is it?

3              MR. HAUSFELD:  Yes, it is.  Because the flip-side

4    is:  Is there precedent that says no, this is not the law.

5              THE COURT:  I'm sorry, say that again?

6              MR. HAUSFELD:  The flip-side.

7              THE COURT:  There's no precedent to say otherwise.

8              MR. HAUSFELD:  Exactly.  And what the, under the

9    treaty Rowe, which formed the union and its regulations, they

10   are no longer a loose confederation of independent states with

11   respect to most purposes.  There is a unity.  And there's what

12   they call the Principle of Effectiveness.

13             And under the Principle of Effectiveness no member

14   state can fail to provide effective relief to any law applying

15   to the entirety of the union.  So, by establishing its

16   principles, it sets forth in parameters this is the law that

17   each member state must follow.

18             THE COURT:  But then if they say they need a

19   collective action, why doesn't everybody, why aren't all the

20   states providing the collective action like a class action

21   here?

22             MR. HAUSFELD:  First of all, the white paper just

23   came out last week.

24             THE COURT:  Well, maybe --

25             MR. HAUSFELD:  Second of all, Your Honor, again if I

Argument IV / Mr. Hausfeld                    165

1    proceed, I think you will see how this all develops consistent

2    with that construction --

3              THE COURT:  Okay.

4              MR. HAUSFELD:  -- of an effective system within the

5    union.

6              THE COURT:  I am interested in the arguments about

7    how American law jurisprudence has already developed the

8    European community law with respect to pass-through defenses

9    and indirect purchaser rights.

10             I mean, are there specific cases that have dealt

11   with that?

12             MR. HAUSFELD:  Yes, if I can?

13             THE COURT:  Okay.

14             MR. HAUSFELD:  Under EU practice and policy, this is

15   the law at this point throughout the union; that a victim of

16   competition law infringements has to be fully compensated, not

17   treble damages, not double damages, single damages, but with

18   the right of prejudgment interest.

19             Just last Friday in the United States District Court

20   in the Northern District of California, Judge Brier entered an

21   order approving a settlement of a claim by British citizens

22   against Virgin Atlantic and British Airways for fixing the

23   prices of fuel surcharges on passenger flights from the U.K.

24   to destinations other than the U.S..

25             What was most instructive is Justice Brier had no

1   difficulty, neither did the defendant, in saying that the very

2   same conduct which violated United States law also violated

3   European law.  Same set of facts.

4        What the Court did as well in that case is approve a

5   settlement that was consistent with European law.  The

6   United States class of those passengers that flew Virgin

7   Atlantic and British Airways was an opt-out mechanism.  The

8   European class, the U.K. class, was opt-in.  So, only those

9   passengers that affirmatively opt into the class, consistent

10  with the present process in the U.K. and elsewhere throughout

11  the union, would be permitted essentially to participate.

12       That solves a lot of problems, Your Honor.  It

13  solves the problems of there not being a New York law which

14  authorizes class actions as an opt-out.  We're not asking for

15  an opt-out.  As Judge Brier determined, an opt-in mechanism

16  was permissible and consistent with European law, and that was

17  what was ordered.  It also addresses the issue of

18  enforceability because if those persons who become part of the

19  litigation are only those who opt-in and affirmatively elect

20  to be bound by a judgment, there is no question that the

21  judgment of the U.S. court will be challenged outside the

22  United States as being unenforceable.

23       Likewise --

24       THE COURT:  I'm sorry, there's no question that it

25  won't be challenged?

1          MR. HAUSFELD:  Yes.

2          THE COURT:  Okay.  Right.  That's what I thought you

3    said, okay.

4          MR. HAUSFELD:  And likewise, there is no difficulty

5    in there being an affront to European law because the damages

6    that were made available to the non-U.S. passengers were

7    single damages.  There were no double damages asked for, no

8    treble damages asked for; just damages, consistent with

9    prevailing European law.

10          By the way, slide 17 outlines the approach that was

11    taken with regard to the British Airways/Virgin Atlantic

12    settlement and the ability of the Court to accept jurisdiction

13    and make the distinctions that we just spoke of, consistent

14    with both the application of U.S. law and EU law.

15          (The above-referred to slide was published to the

16    courtroom.)

17          Now, defendants raise the issue of indirect standing

18    and pass-on, which is also a matter of allocation.  Who has

19    standing to sue what the damages in terms of the chain of

20    distribution and how do you make that allocation?

21          Well, the European Union presently has a practice

22    that says indirect purchasers should be able to rely on the

23    rebuttable presumption that the illegal overcharge was passed

24    on to them in its entirety.

25          First of all, Your Honor, an indirect purchaser

1   purchases damage or injury derivative of the direct

2   purchaser's injury.  The two combined can never exceed that of

3   the impact on the market as a whole.  The impact in the market

4   is a hundred percent.  Usually, the first purchaser bears the

5   entirety and then it may get passed on down the chain of

6   distribution.

7           So, within the European Union indirect purchasers

8   have an equal right to at least allege an injury derived from

9   the first purchase in a market impacted or infringed by a

10  cartel.  But the union specifically states, and it is the

11  preference throughout the union that issues regarding

12  allocation be determined by mechanisms such as arbitration or

13  mediation between the parties seeking the allocation from the

14  fund.

15          In other words, once the market impact is

16  determined, the defendants' rights are concluded and it's a

17  matter of, as between the direct and indirect purchasers in

18  the chain of distribution of who is entitled to that.

19          THE COURT:  Let me, can I switch you off this

20  subject?  I mean, it sounds like it seems to me I'm getting an

21  education in European Commission law, which sort of gets past

22  the --

23          MR. HAUSFELD:  Next slide Your Honor?

24          THE COURT:  Well, one of the questions that was

25  raised by the defendants was whether the claims here are going

1   to be determined by English law or not.  It seems like the

2   claims are asserted under English law.

3           Are they accurate?  Are they right about that?

4           MR. HAUSFELD:  Claims can be asserted under English

5   law looking to see whether there was a forum, but the claims

6   are essentially asserted under EU law.  Was there an

7   infringement of Article 81 prohibiting price fixing cartels?

8   That is the single law which applies uniformly throughout all

9   member states in the European Union.

10          THE COURT:  But could they all be adjudicated, then,

11  in one forum?

12          MR. HAUSFELD:  Absolutely.

13          THE COURT:  And then, why isn't that an adequate

14  alternative forum, then?

15          MR. HAUSFELD:  If I could get to that in a second?

16  I would like to give the Court the example of what occurred in

17  this litigation.

18          THE COURT:  But this litigation we're talking about,

19  this isn't the context of a settlement, and that's not as

20  instructive to me as what's going to happen in a, we're not --

21  maybe we'll get a settlement.  We've already got one, so it's

22  possible I suppose we'll have a settlement down the line.

23          But I guess I'm not as, the finding by Judge Brier

24  that he could approve a settlement of, I guess, it's -- you're

25  saying he's approving a settlement of EU, of EC treaty.  Or

1    EU.   Is it EC treaty?   The EC treaty claims.

2              MR. HAUSFELD:   Yes.

3              THE COURT:   It is not whether this court can

4    adjudicate disputes about or should adjudicate disputes

5    involving European law.

6              MR. HAUSFELD:   That's a fundamental difference and

7    I'd like to get to that in a moment.

8              After we say what happened in this court, not as an

9    indication of what would happen in Europe, but of the fact

10   that using the same mechanisms that would be available in

11   Europe, this court has already addressed the issue of pass-on

12   allocation because there was a determination by a mediator

13   with respect to the damages that different levels of

14   purchasers in the chain of distribution could and should

15   recover.

16             THE COURT:   You're talking about in connection with

17   the Lufthansa settlement.

18             MR. HAUSFELD:   Yes.

19             THE COURT:   All right.

20             MR. HAUSFELD:   But if there's a judgment,

21   Your Honor, we're going to involve, we're going to need to

22   involve the same mechanism.   And that is:   Can we mediate

23   that?   And that's what Europe says should be done.

24             So, we're looking to see, what is it that remains

25   outstanding that this court is at least urged not to do

1   because it can't do when, in fact, other courts, both this

2   court and the Northern District of California have already

3   done.

4            THE COURT:  But that's when the parties have agreed

5   to that.  I mean, that's just, it's a different circumstance

6   in my mind between finding a mechanism for distributing a

7   settlement versus, you know, adjudicating all the disputes

8   that are going to occur in connection with the litigation.

9            I mean, it's a lot.  As you said, we don't have to

10  worry about whether those people who opt-in are going to

11  challenge anything that's done here in a foreign jurisdiction.

12  If this case as actively litigated, which at this point I have

13  to assume it will be, this court will be asked to decide a

14  myriad number of questions of European community law, which we

15  are going to say is binding on the parties before us, but

16  which are announcing principles of application in Europe.

17           MR. HAUSFELD:  Can I, again --

18           THE COURT:  Let me can you a question:  Of what

19  authority is the settlement here regarding any of these issues

20  going to -- I mean, is the European Commission looking to what

21  the United States does with European community antitrust

22  claims?

23           MR. HAUSFELD:  If I can separate a difficult

24  concept?  And that is, this court acting beyond its authority

25  to reach out to do something which it otherwise doesn't have

1    the authority to do.

2              THE COURT:  Okay.  It's not so much that.

3              MR. HAUSFELD:  Okay, then.

4              THE COURT:  I'm not really challenging whether the

5    Court could decide issues of foreign law.  The Court can.

6              MR. HAUSFELD:  Yes.

7              THE COURT:  It's whether it should.

8              MR. HAUSFELD:  Okay.  Now, let's stop right there.

9    Whether it should.

10             First of all, under diversity jurisdiction, under

11   the plain language.  And even the defendants don't make much

12   of this other than to say well, we should ignore the plain

13   language.  This court has mandatory diversity jurisdiction.

14   That, in essence, puts it in the position of applying foreign

15   law to a litigation that it already has legitimate original

16   jurisdiction.

17             Now, the issue then becomes discretionary

18   jurisdiction under supplemental.  But I'd like to hold off on

19   that for just a moment and get to the heart of what I believe

20   is Your Honor's concerns.

21             What would you need to decide in foreign law that

22   would be novel with respect to that foreign law?  Under

23   United States law, Your Honor's going to be deciding whether

24   or not there was a global conspiracy to fix prices which

25   impacted U.S. commerce, whether that includes commerce to the

Argument IV / Mr. Hausfeld                        173

1    United States as well as from the United States.   That is an

2    issue you have to decide.

3            With regard to foreign law under the treaty of Rowe,

4    you have to decide whether there was a price fixing cartel

5    which violated Article 81.   The same issue.   There's nothing

6    novel.   Would you have to decide, as the defendant said,

7    issues of passing on?   Well, technically, you wouldn't.

8    Because what you could do is decide the issues of liability

9    and then send the remaining case back to Europe, if you

10   wanted, for an allocation.   But you also could decide issues

11   of allocation using the same processes that Europe prefers in

12   terms of mediation and arbitration.

13           You wouldn't be deciding an opt-out class action

14   because we're willing, as Judge Brier did, to make the

15   distinction and say okay, if that's the objection to applying

16   a uniform clear infringement violation of European law in the

17   United States, we'll have the same process.   An opt-in class.

18   Only those who determine to come into this litigation to avail

19   themselves of this forum, a single forum in which their claims

20   can be litigated, doesn't violate any European principle.

21           Likewise, in adopting an opt-in process, there's no

22   issue of enforceability, of a U.S. judgment on absent class

23   members outside the United States, because there are none.

24   Only those who affirmatively opt-in to the U.S. litigation are

25   bound.   Anyone who doesn't opt-in is free to do what they want

1    at any time.  They're not bound by anything, nor are they

2    prohibited from filing a case elsewhere.  So, that's not a

3    limitation.

4            There's no standing question because we have both

5    direct and indirect foreign purchasers here.  Whatever the

6    rule is with regard to standing that is claimed not to have

7    been worked out, which we believe the European Commission has

8    made clear is an entitlement to all levels of distribution, is

9    not an issue because there are both parties present.

10           And the last thing that they raise is attorney's

11   fees in terms of contingencies.  Well, if there is no opt-out

12   class, we're not going to be requesting attorney's fees which

13   would diminish the recovery to the class.  We'll adopt the

14   European rule that if we prevail, the those who opt-in get

15   their full damage, and attorney's fees and expenses are added

16   on top.

17           So, I don't believe that there's any issue

18   practically that faces this court which is not manageable and

19   which is not consistent both with the application of U.S. law

20   to the U.S. class and European law to those European

21   businesses or persons who choose to opt-in to the U.S.

22   litigation.

23           THE COURT:  Let's assume that the claims, in fact,

24   will proceed under -- you said they proceed under Article 81.

25           MR. HAUSFELD:  Yes.

1      THE COURT:  But somehow there's an English component

2   to this and I'm not sure I follow exactly what that is.

3      Is it procedural?

4      MR. HAUSFELD:  Within each member state there are

5   separate nation rules for infringements.

6      THE COURT:  Okay.  So, you would rely on the English

7   one?

8      MR. HAUSFELD:  No.  At this point, Your Honor,

9   because the white paper has made it so clear that there is a

10  single overriding substantive law with regard to infringements

11  of Article 81 by price fixing cartels, that is what we rely

12  on.

13     THE COURT:  So, is it your position that you could

14  assert an Article 81 claim in any court in Europe that would

15  reach all transactions touching the European Union?

16     MR. HAUSFELD:  The difficulty with that statement,

17  Your Honor, is I don't know if I could get jurisdiction over

18  all of the defendants in every member state.  But ideally, if

19  I could, a judgment, a judgment that there was an infringement

20  of Article 81 by numbers of companies would be applicable

21  throughout the European Union.  And the example I'd like to

22  cite to Your Honor is the European Commission's statement of

23  objections.

24     That statement, which I think defense counsel opened

25  the door to in saying we could not state a claim for violation

1   of European law, is several hundred pages long.  It details

2   date, time, place, persons in attendance, what was said, what

3   was not said.  And --

4           THE COURT:  I'm not sure I know what you're

5   referring to.

6           MR. HAUSFELD:  In the European Union, the European

7   Commission, which is like our Department of Justice Antitrust

8   Division.

9           THE COURT:  Right.

10          MR. HAUSFELD:  Instead of issuing an indictment,

11  issues a statement of objections.

12          THE COURT:  Okay.  So, as to this price fixing.

13          MR. HAUSFELD:  As to this cartel.

14          THE COURT:  Right.

15          MR. HAUSFELD:  And they outline all of the acts

16  which constituted an infringement or violation of Article 81

17  throughout the entirety of the union by all of the companies

18  that were named in that statement of objections.  That would

19  be our statement of the claim.  That statement of objections

20  is binding in all member states.  That statement of objections

21  states that for all members of states there was a violation of

22  Article 81 by those companies named in that statement of

23  objections.

24          So, there is a singularity to the infringement by

25  the defendant in all member states which constitutes a single

1    violation of a single law.  That's what Your Honor would be

2    applying under either diversity jurisdiction or under

3    supplemental jurisdiction.

4         THE COURT:  Okay.

5         MR. HAUSFELD:  If Your Honor has any questions on

6    comity, I'd like to address that since regrettably it's been

7    the case that our office has been principally involved in the

8    making of some of the law on comity in the last ten years.

9         THE COURT:  Let's see.  No, I don't think there's

10   anything.

11        MR. HAUSFELD:  Defense counsel is correct.  There

12   are two aspects to comity.  There's comity in terms of

13   conflict of laws and I think, as conceded by defense counsel

14   this afternoon, there is no conflict of loss.

15        THE COURT:  Right.  I would like you, I'm glad you

16   picked up on that.  Their argument is that that's not --

17   they're not arguing under that strand.

18        They argue that there's a different strand of the

19   comity doctrine that they're relying on, and particularly

20   point to Biggio.  So, yes, address that, if you will.

21        MR. HAUSFELD:  So, there is no conflict of law which

22   is significant because in saying there is no conflict of law,

23   Your Honor, that's an admission that there is a confluence of

24   law.  Or a harmony or a convergence in the law.  The law in

25   the EU, Article 81, is the same as Section 1.  The conspiracy

Argument IV / Mr. Hausfeld                           178

1    to price fix in violation of Section 1 of the Sherman Act is

2    the same cartel which infringed the terms of Article 81 of the

3    European treaty.  So, then we go to the concept of comity in

4    courts.  Let's look at the cases which are cited by the

5    defendants.

6              The first is the <u>Ivanova versus Ford Motor</u> case

7    involving German forced enslaved laborers.  And what the Court

8    says in relation to comity is that a U.S. court should not

9    interfere with a foreign sovereign's pronouncements of its

10   law.

11

12              (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ARGUMENT IV

2          MR. HAUSFELD

3          MR. HAUSFELD: (Continuing) In the hundreds of pages

4   of arguments that have been made by defendants in writing and

5   of the time expended this afternoon by the defendants, they

6   have not identified one pronouncement of EU Law that would be

7   interfered with by a decision by this court; that the price

8   fixing cartel engaged in by these defendants was not equally a

9   violation of Section 1 as well as Article 81 of The European

10  Code.

11          The second aspect of comity, of course, was

12  whether or not a decision by a U.S. court would disrupt a

13  foreign procedure in place for the resolution of the claims

14  being sought to be litigated in a U.S. court.  That's very

15  significant, because we just heard Mr. Ogden say that there is

16  no litigation right now in place in Europe, so there could be

17  no disruption of any foreign procedures.

18          There is no present case on file in Europe

19  which this court would disrupt and there is no foreign

20  pronouncement of law that would be interfered with.  And this

21  court, in terms of what the Second Circuit has said, almost

22  using the identical words issued by the European Union that

23  "Federal courts should expect with increasing frequency to

24  apply foreign law as global economies expand and cross border

25  transactions increase."

1          THE COURT:  I'm going to have to ask you to wrap it

2     up, Mr. Hausfeld.

3          MR. HAUSFELD:  Actually that was --

4          THE COURT:  That wrapped it up.

5          MR. HAUSFELD:  That was my wrap up, Your Honor.

6          THE COURT:  I'm going to let either Mr. Ogden or

7     Mr. Warnot react to this to the impact of the opt-in opt-out

8     issue.  The opt-in opt-out option, let's call it that.

9          ARGUMENT IV

10         BY MR. WARNOT

11         MR. WARNOT:  I will make just a couple of points

12    from here if that's okay, Your Honor?

13         THE COURT:  Okay.

14         MR. WARNOT:  First of all, the White Paper is not

15    European Law.  It's no more European Law than the report of

16    the Antitrust Modernization Committee is U.S. law.  If you

17    look at Mr. Basedow's affidavit, it specifies the various

18    sources of European Law and the White Paper certainly isn't

19    one of them.

20         THE COURT:  Could you give me your take of what the

21    interrelationship is between the European Commission and the

22    various member states in terms of announcing law and in terms

23    of, you know, what can and cannot the EC do in terms of

24    requiring member states to quote, "Provide an effective

25    remedy."

Argument IV - Mr. Warnot                    181

1          MR. WARNOT:   Well, The European Court of Justice has

2   said that, "The member states must provide," they must enforce

3   Article 81.   What can be done at the Commission level is to

4   legislate; and once the Commission legislates, that's binding

5   on the member states.   Opinions and recommendations are not

6   binding on the member states.

7          THE COURT:   Okay.   It's a legislative body as well.

8          MR. WARNOT:   Not the Commission, the community as a

9   whole.   There is a legislature.   The Commission is more like

10  the Executive.   Then, the member states have to effectuate

11  regulations when they're enacted into law and if there is a

12  dispute as to whether, in fact, it's being done right you go

13  up to The European Court of Justice.   Any European court,

14  whether it's an appellate court or trial court, has the option

15  to seek an opinion from The European Court of Justice.

16         THE COURT:   You mean any member state's court?

17         MR. WARNOT:   Yes.   The way that the law will be

18  developed in the European Law is the way the law gets

19  developed here.   You have cases; the cases go up on appeal

20  where necessary.   You go to The European Court of Justice to

21  get opinions on various points of law.   With the way to make

22  sure the law stays completely undeveloped is to give European

23  plaintiffs a forum in the U.S. where they can have a jury

24  trial and contingency fees and broad discovery, all the things

25  that go along with litigation and why would they stay in

1   Europe if they can just come here.  Of course, that's not what

2   the U.S. judicial system is about.

3                The excerpt that Mr. Hausfeld showed you from

4   the <u>Virgin</u> stipulation neglected to include the various

5   language that's in the following paragraph of that

6   stipulation.

7                "Notwithstanding the stipulation contained in

8   Paragraph 4, which refers to above, both plaintiffs and Virgin

9   Atlantic agree that such stipulation is not a concession that

10  this court or any court in the United States has jurisdiction

11  over claims arising under the laws of any nation or

12  jurisdiction other than the United States."

13               That's Exhibit 7 of the plaintiff's brief.

14               Let me make just a couple of other points.

15               The test on comity according to <u>Bigio</u> whether

16  it would effect amicable working relationships with another

17  sovereign.  We haven't admitted there is no conflict.

18               As Your Honor rightly pointed out, the point

19  that we made that's not the question in the application of the

20  comity analysis in the <u>Iguanowa</u> case.  The issue there was

21  interfering with pronouncements of a foreign sovereign.  Well,

22  here we have lots of pronouncements from the European

23  Commission as set north in our papers as to what they're

24  trying to do to develop private rights of action for

25  Competition Law in the European community and we've set forth

Argument IV - Mr. Ogden                    183

1  in our papers all the ways that this court, taking

2  jurisdiction over this case, would interfere with that and I

3  think those are the only points I can make.

4          THE COURT:  All right.  Mr. Ogden.

5          ARGUMENT IV

6          MR. OGDEN

7          MR. OGDEN:  Couple of things, Your Honor.

8                  First, a little bit more about the interplay

9  because I think it really is very important between European

10 Law and National Law and how that functions.

11                 European Law and Article 81 provides the

12 question as to whether there was a violation of substantive

13 law.  But all of the other laws that relate to civil damages

14 recovery is to be supplied by National Law.

15         THE COURT:  Including -- one thing that occurred to

16 me what about sufficiency evidence to establish.

17         MR. OGDEN:  Exactly.

18         THE COURT:  Is that something that would be

19 relegated to the member states?

20         MR. OGDEN:  Yes.  So that the standard of proof, for

21 example, in different states in Europe includes a probability

22 standard, high degree of probability standard, beyond a

23 reasonable doubt standard, there are a variety of them.  And

24 on the face of it, that question would be entrusted to the

25 national courts to develop and apply their rules.  They're

1    obligated to have an equivalency.

2              There, is in addition to the effectiveness

3    principle, there is an equivalency principle.  So, there is an

4    obligation for the national state to record to European laws

5    an equivalent rule to the one they apply to cognate similar

6    kinds of laws.  So that procedure is applied that is in turn

7    subject to this requirement of effectiveness.

8              So, presumptively National Law on fault,

9    statute of limitations, damages; what categories of damages

10   are available, the standard of proof as we just discussed,

11   issues of standing like indirect purchaser standing, the

12   availability of a pass-on defense, a causation standard as to

13   whether it's direct or but for, et cetera.  Attorneys fees.

14   All of those are presumptively subject to National Law

15   enforcement.

16             Now, there is an appeal which a plaintiff can

17   take if a plaintiff doesn't think that the remedy provided by

18   National Law or the procedure or the subsidiary set of rules

19   which obviously are some of them substantive, some of them

20   procedural.  If they don't afford an effective remedy, they

21   can take that question to The European Court of Justice.  Any

22   national court, the trial level court, the lowest court to the

23   highest court, can send a question of European Law to The

24   European Court of Justice.

25             THE COURT:  The Court can as well as the litigants?

1           MR. OGDEN:   The court may send it at the lower

2    level; the litigants could certainly request that.   When the

3    litigants appeal to the highest court, there is a mandatory

4    referral to The European Court of Justice to decide issues of

5    European Law and it's in the context of that type of appeal

6    like you get the Courage v. Crayhan case where The European

7    Court of Justice said that the British law which disabled a

8    person who entered into an illegal agreement from suing about

9    its violating antitrust law had to be set aside because it

10   denied an effective legal remedy.   There is a subvening

11   federal, if you will, obligation that the ECJ enforces that

12   remedies be effective.   But subject to that, National Law

13   supplies the rule.

14           THE COURT:   You said something about comparable.

15           MR. OGDEN:   There is a Rule of Equivalency which is

16   the other principle that's talked about in the affidavits, the

17   expert affidavits, that Your Honor has many pages of which

18   talks about the requirement.

19               England can't provide a less generous rule to a

20   plaintiff suing under EU Law than it provides to a plaintiff

21   suing under English Competition Law, that's the Rule of

22   Equivalency.   Then, there's the Rule of Effectiveness that

23   says, "Even if you give the equivalent rule, it has to be

24   effective," and it's that mandate that the European courts,

25   The European Court of Justice, will be working out in the

1   context of suggestions of the White Paper; and in the context

2   of policy arguments, get made by the European Commission.  The

3   courts are going to implement this and this is mandate of

4   effectiveness.

5           I did also want to observe it is true there are

6   no cases presently in European courts; that's because the

7   European Commission currently has under consideration this

8   very matter.  It's deciding whether it's going to adjudicate a

9   violation and once it does that, Your Honor, that will trigger

10  the right to file lawsuits in national courts and if there is

11  a determination of a violation that --

12          THE COURT:  You've lost me a little bit.  What's the

13  issue that's under consideration?

14          MR. OGDEN:  The European Commission is not just

15  antitrust division, it actually adjudicates violations of law,

16  and it currently has under consideration a Statement of

17  Objections against these defendants, many of these same

18  defendants, in which it's going to determine whether Article

19  81 was violated.

20          THE COURT:  Okay.

21          MR. OGDEN:  When it makes that determination, that

22  determination will be binding on all European courts; and at

23  that point, civil damages actions can be brought that will be

24  based on that determination by the EC that there's a

25  violation.

1              Mr. Hausfeld has suggested one possible way to

2    go.  There would be for this court to just adjudicate a

3    violation of Article 81 and leave the damages to the National

4    Courts of Europe but that's exactly what the European

5    Commission is doing right now.  There is no need for this

6    court to adjudicate these issues to create a determination of

7    a violation of Article 81 because the European Commission,

8    believe it or not, actually is proceeding to enforce European

9    Law at the present time which will trigger that exact process

10   without this court's assistance.

11             THE COURT:  Okay.

12             MR. OGDEN:  So, for all of these reasons, Your

13   Honor, we think that this court should let a right of

14   effectiveness that Mr. Hausfeld has so accurately described be

15   enforced by European courts.  We think they're fully capable

16   of doing so and there is no reason this court should continue

17   to entertain this action.

18             MR. HAUSFELD:  May I Your Honor.

19             ARGUMENT IV

20             BY MR. HAUSFELD

21             THE COURT:  Okay, one minute.

22             MR. HAUSFELD:  I will try.

23             They're correct that the European member states

24   must enforce Article 81.  There is no question, and Article 81

25   is simple:  Was there a price-fixing cartel which infringed

1   that article.  Same issue as is here substantively identical.

2   They're somewhat incorrect or it's interesting with regard to

3   the Statement of Objections.  The Statement of Objections is

4   greater than an indictment in the eight years that the

5   commission has issued Statement of Objections.  Less than one

6   percent of those Statement of Objections has that statement

7   not been reduced to a final judgment and in essence equivalent

8   to an indictment of the defendants.

9              So, the sufficiency of the evidence and the

10  causation with respect to the fact of infringement is

11  literally already established.  But, we can live with no jury

12  in the United States as well if that's what they're concerned

13  about as opposed to what it is that they're really seeking,

14  because what they are saying is this court may take

15  jurisdiction or has jurisdiction under diversity and may take

16  jurisdiction under comity but it should leave foreign law to

17  development in foreign nations, while, at this very time, they

18  concede there is no forum which would effectively redress the

19  damage which has been caused by the cartel which caused an

20  infringement of Article 81 as well as Section 1 of the Sherman

21  Act.  What they seek is not the best forum, what they seek

22  really at this time is no forum.

23             THE COURT:  I don't follow that.  If the Statement

24  of Objections is binding on all the member states, then the

25  member states now have to afford a remedy for those

1   violations, right?

2           MR. HAUSFELD:  That's what would follow logically,

3   and the issue becomes, you know, when you form a more perfect

4   union sometimes it takes some time in order to get to that

5   formation to get that formation into the most effective system

6   that harmonizes the entirety of what's been combined.

7           THE COURT:  Okay.

8           MR. HAUSFELD:  At the present time, that

9   harmonization doesn't exist but the law, the substantive law,

10  does and the processes that we have put forth to the Court,

11  the no contingency --

12          THE COURT:  Wouldn't this court be required to try

13  to figure out what the member states are going to do with that

14  -- to provide the remedy.  They're the ones that have to

15  decide the remedy, don't they?  And we are bound by their law

16  as to remedy.

17          MR. HAUSFELD:  No.

18          THE COURT:  Why not.

19          MR. HAUSFELD:  Because the remedy that we have

20  suggested is the remedy that would be in place now if the

21  cases were brought.

22          THE COURT:  I'm just not following that.

23              I thought that the remedy was up to the member

24  states; and, of course, the member states have to make sure

25  that is an effective remedy and the member states have to make

1    sure it's an equivalent remedy.  But the member states have

2    different remedies, it seems to me, at least there's a

3    possibility.

4             I'm going to have to educate myself or Judge

5    Gleeson as to what all the member United States would do with

6    that state of objections, right?

7             MR. HAUSFELD:  No.

8             THE COURT:  Why not?  Aren't we bound to if, sitting

9    in diversity, which is that's the analogy I'm drawing.

10             MR. HAUSFELD:  Yes.

11             THE COURT:  I have to apply the law of the state

12   that -- well, first, I got to make a Choice of Law Analysis

13   and then the Choice of Law Analysis, it seems to me, would

14   inevitably lead to foreign states, wouldn't it, and then I

15   have to apply their law.

16             MR. HAUSFELD:  There is a difference, Your Honor,

17   again in terms of building or a highway under construction and

18   the building or highway having no design.

19             THE COURT:  Your metaphor is a good one but I'm not

20   sure I am following you.

21             MR. HAUSFELD:  Let me try it this way.

22             If you take the principle of effectiveness and

23   take the acknowledgement that Article 81 is mandatory, what

24   we're left with in Europe at the present time is they know the

25   procedures that have to be put in place.  It's a matter of

1    time for them to be enacted or put in place.

2              In the interim, this court has jurisdiction and

3    what we're asking this court in terms of the construction is

4    to apply those remedies which are available should be

5    available in every jurisdiction which are just waiting

6    implementation.

7              THE COURT:   Okay, I think I get the argument.

8              Let's take about ten minutes, folks.   See you

9    then.

10             (Recess taken.)

11             (Judge VIKTOR V. POHORELSKY takes the bench.)

12             THE COURT:   Is everybody back?   Did I come in early?

13             MR. ARENSON:   I think it's a different group over

14   there.

15             THE COURT:   Oh, I see.   Some people left.

16             MR. SHERMAN:   We just moved.

17             THE COURT:   Are there more bells and whistles?   Are

18   there going to be more things posted?

19             All right?

20             Well, then let's move to the next issue here

21   which is the Foreign Sovereign Immunities Act issues.   And

22   there was a question about who was going to argue on behalf --

23   well, not who, but in what order I suppose.

24             Has that been moved out with respect to the

25   arguments?

1        ARGUMENT V

2        BY MR. BLANCH

3        MR. BLANCH:  Ryan Blanch representing Saudi Arabian

4    Airlines.

5            Did we allocate the time per attorney but the

6    other three counsel, the FSIA defendants, would like to be

7    heard as well but I think we can avoid any redundancy of

8    argument.

9        THE COURT:  Yes, I would like to avoid that.  So

10   there are four in total who want to argue.

11       MR. SPECKS:  There are four defendants and I will be

12   speaking on behalf of the claims.

13       THE COURT:  Then I still have a couple of other more

14   limited issues, I guess.  So, you didn't know how much total

15   time I was going to permit.

16       MR. BLANCH:  We plan on staying inside of the total

17   time parameters.

18       THE COURT:  Well, let's start.  There are slightly

19   different issues.

20       MR. SPECKS:  I would like half the time.

21       THE COURT:  I would like to limit the movant to

22   about 30 minutes and then 15 minutes to the defendants if

23   they're prepared.  I mean the plaintiffs.

24            Why don't you get started Mr. Blanch and we can

25   sort it out.

Argument V - Mr. Blanch                      193

1          MR. BLANCH:  I represent Saudi Arabian Airlines.  I

2    think if we get right to it, I think the problem that what I

3    would characterize as plaintiff's overbroad complaint creates

4    as to all defendants when we discuss <u>Twombly</u> and notice

5    issues.  I think all of those problems are really magnified

6    when that same plaintiff purports to wrap in a foreign

7    sovereign into its grasp.

8                The Foreign Sovereign Immunity Act is pretty

9    specific and pretty rigorous and it definitely prohibits

10   allowing plaintiffs to cast this loosely woven net that's

11   industry wide and seeks to bring in every airlines.

12                Under the Direct Effects Test as well as

13   plaintiffs' argument with respect to the waiver, they just

14   can't meet the hurdles that are required using the same

15   complaint and what I think as a procedural matter.  If it is

16   procedural, I think that plaintiffs have really had their

17   opportunity here to overcome their burden to show that there

18   is a commercial activity exception or other exception that

19   applies to the foreign sovereign immunity status that we have

20   asserted.  I think plaintiffs have not contested that we are,

21   in fact, a foreign sovereign.

22          THE COURT:  Except as to one I think it's South

23   Africa, there is a real contested --

24          MR. ARENSON:  Yes.

25          THE COURT:  But as to Saudi Arabia you're Saudi

Argument V - Mr. Blanch                    194

Arabia.

MR. BLANCH:  As to Saudi Arabia, I think it's conceded.  The important note is the plaintiffs have a burden of providing evidence to show that an exception applies and it failed to do this, there is absolutely no evidence provided whatsoever.

The closest they came to providing evidence was to provide the waiver.  The waiver, however, is not really evidence of anything other than a waiver exists and that waiver itself is need to be narrowly construed and has parameters as to what at that waives, it's a blanket waiver as to any lawsuit.

THE COURT:  Let me jump back to the pleadings.  At least in their argument they assert various facts that would suggest that the commercial activity exception would apply.  And, if those facts were pleaded, then if the facts that they state in their papers were pleaded, would you concede that that would establish the commercial activity exception.

MR. BLANCH:  If I understand the question, Your Honor, you said that you --

THE COURT:  Let me see if maybe I'm not framing your argument properly.

My understanding that the thrust of the attack on the pleadings as they now are framed with respect to the foreign instrumentalities is that they do not plead with

Argument V - Mr. Blanch                          195

1    enough specificity the jurisdictional basis for getting

2    jurisdiction under the foreign sovereign immunities act they

3    don't plead enough facts.

4            MR. BLANCH:   That's correct.

5            THE COURT:   But they do try to supply some facts in

6    their argument they're not pleading but they supply some facts

7    about the activities of the various defendants in terms of the

8    air transport services they supply.

9                My question really is that they were given the

10   opportunity to plead those facts wouldn't that get them over

11   the hump in terms of establishing the commercial activity

12   exception.

13           MR. BLANCH:   I would have two responses and they

14   both result in the same answer which is no.   The first issue

15   is, you know, have they adequately pleaded those facts

16   specifically enough in order to show an exception.   The answer

17   to that is no, and if they were to replead those, if they

18   already have the opportunity, they certainly could have

19   submitted a complaint.   But even if they were able to

20   specifically allege the kind of acts that would give rise to,

21   arguably, the commercial activity exception they are required

22   to come forward with actual evidence to show that and they

23   have not come forward with any evidence.

24           THE COURT:   They have to come forward with evidence

25   at some point, obviously.   But in terms of establishing

1    jurisdiction, at the outset, the Court doesn't usually have an

2    evidentiary hearing.  They permit the Court, unless there's a

3    real question as to it on the face of the pleadings as to the

4    legitimacy of the facts, I guess.  But if they plead the

5    facts, the Court is supposed to accord those facts, you know,

6    all reasonable inferences in their favor, right?

7              MR. BLANCH:  I respectfully disagree with that.

8    However I would like to back up and restate that even if they

9    were to plead those facts specifically.  That hasn't been done

10   and that is not where we are.

11             THE COURT:  I understand that.

12             MR. BLANCH:  However, every court, I believe it's

13   every court, I can't provide citations, but somewhere in the

14   brief it says that the once we assert that we are a foreign

15   sovereign, the plaintiffs have the burden to provide evidence

16   and that every court uses evidence; and now I'm not talking

17   about having a complete trial or an evidentiary hearing on the

18   matter, but I think that has been done before as well as at an

19   evidentiary hearing but some scintilla of evidence to put us

20   on notice and show us what they're talking about.

21             THE COURT:  What do you mean?  What do you mean by

22   evidence?  You mean affidavits?

23             MR. BLANCH:  Perhaps an evidence, for example, we

24   submitted an affidavit because we're required to put forth

25   some evidence that we are a foreign sovereign is a conclusory

Argument V - Mr. Blanch                     197

1   statement that we're a foreign sovereign, we have to sort of

2   show it.  It's a little easier to do, I suppose, than show a

3   commercial activity exception but it wouldn't be that

4   difficult.

5              In other words, all of the evidence that is

6   required to show us a bill, show us an invoice, show us one

7   plaintiff that was directly harmed by direct and immediate

8   impact by commercial activity that took place outside the

9   United States that gives rise to the claim and has a direct

10  impact, we're not.

11             Regardless of whether the claim is sufficient

12  as to all the other defendants, we contest that it is not but

13  we're not in the same boat as the other defendants and it

14  wouldn't be too onerous or too difficult to provide by way of

15  an attachment some evidence to saying here's John Doe, he

16  purchased this; here's the inflation amount; here's where the

17  conspiracy occurred.  Here's what Saudi Arabian Airlines

18  conspired with, and here's what the claim is about or

19  otherwise you just have this sweeping, conclusory, broad

20  complaint that's meant to apply to all defendants but clearly

21  does not.

22             One of the examples that came up, and I think

23  it was discussed today.  In the complaint, plaintiffs broadly

24  allege as to all defendants that meetings took place at the

25  highest level.  Well, with respect to Saudi Arabian Airlines's

1  organizational chart, that means that they would be alleging

2  that King Abdullah who was at the of the organizational chart

3  was conspiring with all 30 airlines.  I don't think they meant

4  to say that it was that broadly sweeping.

5          THE COURT:  Nairobi is not that far away.

6          MR. BLANCH:  Sorry.

7          THE COURT:  Never mind:

8          MR. SPECKS:  Also the Oil Cartel.

9          THE COURT:  I'm sorry, I shouldn't have interrupted.

10  I understand the gist of that argument.

11          Move to the waiver issue, if you would, because

12  that seems to be an even stronger argument why there's

13  jurisdiction here.

14          MR. BLANCH:  Okay.

15          I would argue it's not, Your Honor, because

16  again these are difficult arguments to make with respect to

17  the waiver and the Direct Effects Test because both of them

18  require us to look back at the complaint and say, "Is the

19  waiver meant to waive this kind of lawsuit?"

20          And when the complaint was that amorphous and

21  that broad and that occurred in the world and we don't know

22  what plaintiffs even apply to us, it's difficult to say the

23  complaint becomes a moving target at that point but

24  generally -- not generally -- always waivers.  The case law is

25  strictly construed or narrowly construed.

Argument V - Mr. Blanch                    199

1          The Court in <u>Worldwide</u> uses the language that a

2  waiver must be clear, complete, unambiguous and unmistakable

3  in terms of what it is actually waiving.  So, if we look at

4  the language of the waiver, it talks about waiving.  I'm not

5  going to read it to the Court, I assume the Court is very

6  familiar with it, but waiving claims arising from air

7  transport.

8          Well, this case is not about air transport,

9  this case is about price fixing or the setting of a price for

10  air cargo space regardless of where the destination is.

11  Plaintiffs cite some argument about where we fly to and from,

12  where Saudi Arabia has offices.  That also sounds like they're

13  confusing the issues with something broader that would apply

14  to something more like a minimum contacts analysis for

15  personal jurisdiction.

16          For this, they have to show it doesn't matter

17  where we fly, what's relevant is the commercial activity which

18  is creation of contracts, we don't know if contracts exist and

19  the price setting which they allege was a result of price

20  fixing which resulted in an increase at least on surcharges.

21          So, if I can encapsulate what I'm saying

22  here --

23          THE COURT:  How is that not related to air

24  transportation?  I don't understand shall the distinction

25  you're making here.

1          MR. BLANCH:   The distance is based on the language

2    of the waiver.

3          THE COURT:   The waiver is, and I don't have the

4    language of it, but it's a standard waiver clause that's part

5    of the authorization process, right?

6                Am I right about that?

7                So, it's a standard clause that applies to

8    everybody as I recall.

9          MR. BLANCH:   That's true.   The waiver essentially

10   becomes a contract and the waiver has to be analyzed and clear

11   on its face just as a contract would be and, in fact, the

12   courts go a step further and say it's got to be narrowly

13   construed and really clear as what's being waived when you

14   read the language of the waiver.   It sounds like it's waiving

15   anticipated lawsuits deriving from running a air transport

16   service which is when the goods arrive, the goods were broken,

17   the plane crashes, those all sorts of things go to air

18   transport.   In fact, plaintiff cites cases that all talk about

19   plane crashes.

20         THE COURT:   Okay.

21         MR. BLANCH:   Here we have the setting of prices for

22   cargo space and I would make the analogy that is akin to a

23   broker, for example, that simply sells the space regardless of

24   where that airplane is going, the broker is washing his hands

25   of the transaction once the space is sold.

1          The mere fact that the airline also handles the

2   shipping themselves doesn't mean it gives rise to plaintiff's

3   claim it simply doesn't.

4          THE COURT:  Okay.  Have you completed your

5   presentation, Mr. Blanch?

6          MR. BLANCH:  If I may have 30 seconds to make sure I

7   didn't get too thrown off.

8          I want to conclude with one more point Your

9   Honor mentioned earlier.

10          I believe it was during the <u>Twombly</u> argument

11   that it looks like from this complaint that you're just

12   plaintiffs were just sort of lumping all the other defendants

13   in and that's exactly what is happening with respect to the

14   complaint as to all defendants but it's even more so the case

15   with a foreign sovereign.

16          You simply can't lump us in, you have to come

17   forward with evidence.  You have to single us out and say,

18   well, why are we in this specifically, not that generally,

19   there was a global conspiracy at the highest level because for

20   us I don't think it was King Fahd.

21          THE COURT:  In a sense, it's the heightened pleading

22   placement required by the Foreign Sovereign Immunities Act.

23          MR. BLANCH:  That's what it is.  Was there a direct

24   effect because a direct effect of what?  Which conspiracy?

25   Which meeting?  Which contract?  Which pricing?  It's just not

1   there, so there is no way to get very deep in the analysis on

2   the complaint unless they come forward with an actual

3   example --

4                THE COURT:  Okay.

5                MR. BLANCH:  -- of what the harm is.

6                THE COURT:  Okay.  Thank you.  So Mr. Priver.

7                MR. PRIVER:  It's Mr. Priver, Your Honor.

8                THE COURT:  Mr. Priver.

9                ARGUMENT V

10               BY MR. PRIVER

11               MR. PRIVER:  Mark Priver on behalf of Thai Airlines.

12                    I want to clarify a couple of things that the

13   Court raised and also that Mr. Blanch addressed.

14                    I think it is important for the court to find

15   that the sole basis of jurisdiction against these -- at least

16   three of the defendants -- about which there is no question

17   whether they qualify as a foreign state under the Foreign

18   Sovereign Immunity Act.  The sole basis this is that not

19   Sherman Act, not diversity, not CAFRA it's nothing else but

20   that.

21                    The sole question we're dealing with here is

22   why we should be in the case and the rest of us should be in

23   this case at all which is why, Your Honor, I believe that it's

24   more than just a heightened pleading standard.  It is as if

25   you read many of these cases and I don't recall reading

1    anywhere it was just on the pleadings.  But if you read

2    <u>Philatech</u> and some of the other cases that follow.  It talks

3    about that it is the plaintiff's obligation once the defendant

4    advances evidence tending to show that it is a foreign

5    sovereign the presumption of immunity arises, and then the

6    burden shifts to the plaintiff to produce evidence and I

7    assume, as I would imagine everybody else does, that when the

8    courts use evidence, they mean evidentiary facts.  They're not

9    talking about argument or pleading.

10               Now, the argument and pleading may later on or

11   could give the plaintiffs a ticket to jurisdictional

12   discovery, but we are now here on the second amended complaint

13   and they have not advanced any evidence whatsoever that tends

14   to show in the case of my client, Thai Airways, or any of the

15   other defendants, number one, that we participated in any kind

16   of conspiracy anywhere; and number two, whether that

17   conspiracy, if we did participate in it, had a direct effect

18   on the pricing of air cargo services in the United States.

19               The case under the commercial activity

20   exception focuses on the concept of the language "based upon."

21   The complaint, the action has to be based upon a commercial

22   activity and then there's three different prongs.  The "based

23   upon" analysis requires the Court to consider what the

24   gravamen of the complaint is, and in this case the gravamen of

25   the complaint is not the harm which is the price, the gravamen

Argument V - Mr. Priver                          204

1    of the complaint is the unlawful conspiracy because without

2    that, there is no case.

3              So the plaintiffs have to show, in opposition

4    to these motions, in which view with evidence which they have

5    failed to do that there is a connection between a conspiracy

6    that they have yet to prove and the commercial behavior of my

7    client and these other defendants in this court, excuse me, in

8    the United States; and they have not advanced a single

9    declaration by a single member of their class that purchased

10   air transportation on any one of these carriers.

11             THE COURT:  Okay.  So, the evidence that you would

12   say they would have to produce is some sort of a declaration,

13   some sort of statement under oath that is to establish a set

14   of jurisdictional facts under the FSIA.

15             MR. PRIVER:  At a bare minimum, they have to at

16   least show that somebody within the class purchased

17   transportation on Thai Airways because they don't get a ticket

18   to prosecute an antitrust lawsuit against us because of the

19   behavior of other alleged conspirators.

20             THE COURT:  Okay.

21             MR. PRIVER:  The law is clear, there needs to be a

22   connection between the alleged conspiracy and our commercial

23   activity in the United States, not somebody else's.

24             THE COURT:  Understood.

25             MR. PRIVER:  On the waiver issues, the waive doesn't

Argument V - Mr. Priver                    205

1   prove anything.  What the waiver does is it reincorporates the

2   law of the commercial activity exception and I have it here.

3   Basically, it states, "Carrier agrees to waive sovereign

4   immunity with the qualification but only with respect to those

5   actions or proceedings that are based on the carrier's

6   operation in international air transportation; that, according

7   to the contract of carriage include points in the U.S. as a

8   point of origin, point of destination more agreed stopping

9   place, et cetera.

10              That "based on" language is the same language

11   that's used in the commercial activity exception.  The based

12   upon -- on and upon are synonymous.  The case law that talks

13   about construing waivers which Mr. Blanch referred to the

14   Worldwide Minerals case, 296 F.3d 1154, Page 1162.  "In

15   general, explicit waivers of sovereign immunity are narrowly

16   construed in favor of the sort and are not large in general."

17              This is a quotation, actually, "Explicit

18   waivers of sovereign immunity are narrowly construed in favor

19   of the sovereign and are not enlarged beyond what the language

20   requires."

21              Sorry for going so fast.

22              So, again, the DOT -- and this is basically a

23   contract, and the case law is telling the Court that it must

24   construe the language essentially against the DOT and in favor

25   of the sovereign.  So, because it seems that they use the same

Argument V - Mr. Priver                    206

1  language based, "based upon," that they use in the commercial

2  activity exception, there is the analytical framework for

3  determining whether the waiver applies is the same analytical

4  framework you would use to evaluate whether the commercial

5  activity exception applies.

6           In other words, that the gravamen of the

7  complaint, the unlawful conspiracy, resulted in super

8  competitive prices being charged by Thai Airways and the other

9  foreign sovereign air carriers here in the United States.

10 Plaintiffs would have to go on to prove that their clients,

11 some or all of them, whichever ones that did actually purchase

12 that transportation.  Either from a point of origin in the

13 United States to, in my client's case, Bangkok or vice versa

14 or that they purchased the contract of carriage and none of

15 that is done.  None of that is done by way of evidence and it

16 is certainly not done by way of pleading.

17           So, I would urge the Court that here today in

18 the absence of any proof that the complaint is based upon Thai

19 Airways's commercial activity or that it has waived its

20 sovereign immunity with respect to this particular action that

21 this action would be dismissed under the Foreign Sovereign

22 Immunities Act in toto.

23           THE COURT:  Without leave to replead.

24           MR. PRIVER:  Proof without leave to replead because

25 this is if you look at <u>Philatech</u> they had almost a full-blown

Argument VI-A - Mr. Atadika                    207

1    trial and pleading is not just the only issue and it's not

2    like the plaintiffs didn't know what their burden was in this

3    situation.

4              So, I would ask the Court to dismiss the case

5    in its entirety.

6              THE COURT:  All right.

7              MR. PRIVER:  Thank you.

8              THE COURT:  Mr. Atadika.

9              ARGUMENT VI-A

10             BY MR. ATADIKA

11             MR. ATADIKA:  Good afternoon, Your Honor.

12             I think this case can be looked at from the

13   very simplified approach and a complicated one as far as the

14   defendants who are subject to the FSIA are concerned.  In a

15   simple way, Your Honor has to see whether or not the pleadings

16   that have been advanced by the plaintiffs, whether those

17   pleadings actually catch the FSIA defendants; whether they

18   are, in fact, able to obtain jurisdiction for this court to

19   determine matters affecting foreign sovereigns.

20             Now, Your Honor, my first submission that when

21   the plaintiffs began this litigation, they probably never

22   thought that there were companies or airlines that were

23   subject to -- that were not, in fact -- were owned by foreign

24   sovereigns and not subject to the general jurisdiction of this

25   court.

1          The FSIA defendants are very unique, they are

2     unique, so before you can obtain jurisdiction against an FSIA

3     defendant, you have to plead the FSIA with us an inclusive law

4     under which any foreign sovereign can be proceeded against.

5     That, when you look at the totality of the pleadings, there's

6     no way you can see that the FSIA defendants were ever in the

7     vision of the plaintiffs.

8          THE COURT:  I agree.

9          MR. ATADIKA:  It was only later on --

10         THE COURT:  I agree.

11         MR. ATADIKA:  -- that they concede in adding some

12    other people, some other company.

13         In fact, the only paper that I have here

14    applicable to my airlines is Paragraph 47 of the Amended

15    Statement of Claim and apart from that there is nothing more.

16    In fact, anybody who wants to sue an FSIA defendant must

17    realize that foreign governments are not subject to jury

18    trial; and in this case, it's actually proceeding on the basis

19    of going before a jury trial and the foreign sovereigns are

20    not subject to trial.

21         So, basically, we are saying that if you want

22    to approach this from a simple angle, there is no pleading

23    which searches and concerns specifically the FSIA defendant.

24         Based on that alone, this action should be

25    dismissed against those people, those companies, because

1   there's nothing envisaged whatsoever that deals with the

2   contemplation of this.   There is nothing at all.

3           So, if you want to go into the complicated

4   aspect of the case, then you proceed beyond that and say,

5   well, what about the commercial exception, the commercial

6   activity exception; and on that, Your Honor, we submit most

7   respectfully that under the FSIA, the issue of foreign

8   commercial activity has to be legal activity because, and on

9   this point I have to refer Your Honor to the terrorist acts on

10  September 11th which we have cited in our cases and that is

11  the Second Circuit decision.   It says, "The Second Circuit has

12  made it very clear that fore the purposes of FSIA, a

13  commercial activity must be one in which the private person

14  can engage lawfully."

15          THE COURT:   I understand this argument; I'm not

16  persuaded by it, but I understand the argument so you don't

17  need to carry on.   I read it from your papers, it's not

18  persuasive to me.   You are best off moving to something else.

19          MR. ATADIKA:   We ask respectfully that may have to

20  reconsider it went as far as it could be to the Second

21  Circuit.

22          THE COURT:   Okay.

23          MR. ATADIKA:   And Your Honor I see your position on

24  that.

25          THE COURT:   Yes.

1        MR. ATADIKA:  Now, the evidence, Your Honor, we have

2   raised is if the airline was not properly served.

3        THE COURT:  What would be required?  I'm not sure I

4   understand that the service has to be some higher level

5   official and that's because and I'm not sure I follow why that

6   was required.

7        MR. ATADIKA:  Your Honor, there is an -- I would

8   like to draw your attention to the FSIA provisions on this

9   because I think --

10        THE COURT:  It's right out of the statute.

11        MR. ATADIKA:  Your Honor, this is Section 1608 which

12   applies to service.  First of all, the first way to deliver

13   service to -- delivery of a copy, by the delivery of a copy of

14   a summons and complaint in accordance with a special

15   arrangement, the service between the plaintiff and the foreign

16   state.  In other words, by a prearranged procedure which has

17   already been agreed upon by the parties.

18        THE COURT:  Yes.

19        MR. ATADIKA:  Secondly, you can do so by delivery of

20   the Summons and Complaint to an officer of the defendant.

21        Now, in this particular case, we have provided

22   an affidavit that the person that was served was not an

23   officer of the airline.  Now, the plaintiffs countered to say

24   that, well, he was an employee about the, Your Honor, FSIA is

25   the only law which applies to sovereigns and is very exclusive

1   so they got to go very closely, examine it.  By the wording,

2   if they don't serve the document according to the express

3   language of the statute it will not be a proper service.  Your

4   Honor, they say --

5          THE COURT:  How can they properly effect service in

6   the United States?

7          MR. ATADIKA:  Your Honor, we provided an affidavit

8   of a list of officers who are at the level that can be served

9   and this is an affidavit, Your Honor.

10          THE COURT:  Okay.

11          MR. ATADIKA:  And, Your Honor, we also said that

12   even if -- they said it was a substantial complaint but we

13   don't accept that it was a substantial complaint, Your Honor.

14          THE COURT:  Okay.

15          MR. ATADIKA:  Your Honor, the other argument that we

16   have advanced is that we were brought into this lawsuit in

17   February 2007.  This action --

18          THE COURT:  This is the statute of limitations

19   argument.

20          MR. ATADIKA:  Yes, Your Honor.

21          THE COURT:  Let's deal with that later.  I will deal

22   with that later.  We will focus on the FSIA arguments.

23          MR. ATADIKA:  Your Honor, as far as the FSIA is

24   concerned, we believe that the plaintiffs have not met their

25   burden under the provisions of that act.

1          THE COURT:  Thank you.  Mr. Cross.

2          ARGUMENT VI-A

3          BY MR. CROSS

4          MR. CROSS:  Yes, Your Honor.

5               I'm Wayne Cross from White & Case representing

6     South African Airways.  We have a slightly different issue, as

7     you noted, from the other defendant under the FSIA.  There has

8     been a question raised by the plaintiff as to whether or not

9     we ARE a foreign sovereign.

10         THE COURT:  Let me just jump ahead of you if you

11    will permit me.  There's not a factual dispute, it seems to

12    me, about whether or not at the time of service South African

13    Airways was a foreign instrumentality.  In other words, there

14    was a plan in place for it to become one but that plan had not

15    reached fruition at the time that the action was brought and

16    served.

17              Am I right about that fact?

18         MR. CROSS:  You are right as to one prong of

19    Section 1603(b).

20              §1603(b) has two prongs to it.  One is you have

21    to be an instrumentality of a foreign sovereign by either

22    being an organ of a foreign sovereign or by being a

23    majority-owned entity, a majority of the stock being owned by

24    a foreign sovereign.  There is sovereign -- there is no

25    factual dispute, that is a ministerial dispute.  At the time

Argument VI-A - Mr. Cross                          213

1    the client was filed, it had not been completed.

2                On the other hand, it's also not disputed -- at

3    least I don't think it's disputed -- that at the time in

4    February of 2007.  When the complaint was filed, South African

5    Airways was an organ of South Africa, a department of the

6    Department of Public Enterprises was operating it as an

7    agency.  They were directing as an agency of South Africa.

8                THE COURT:  You are relying on the notion because my

9    next question was going to be why should the Court deviate

10   from the normal rule which you examine jurisdiction at the

11   time of service, at the time of the bringing of the action.

12               You're saying at the time of the bringing of

13   the action, in fact, under 1603(a) was a quote, "Organ," of

14   the South African government and is there a test for deciding

15   what's an organ.

16               MR. CROSS:  There are a series of facts articulated

17   in the briefs.

18               THE COURT:  Okay.

19               MR. CROSS:  The test is, it's a fluid test, that is

20   to be applied liberally.  It has to do with who is actually in

21   control and to what extent of the employees and the Government

22   to what extent are the activities of sovereign activities.

23               THE COURT:  And you would agree you have to make a

24   prima facie showing as to that.

25               MR. CROSS:  And in our initial affidavit

1    establishing foreign sovereign, attempting to establish we're

2    a foreign sovereign we lay out those factors.  But also lay

3    out the underlying legislation and statements of principle

4    about why the company was being acquired.

5              So, to be clear, though, I'm not relying

6    strictly on the organ aspect of it, I believe that we were at

7    the time the client was filed as an organ of South Africa; as

8    a result of that, FSIA jurisdiction attached.

9              In addition to, that however, while you

10   articulate what you why shouldn't I follow the normal rule

11   that jurisdiction attaches at the trial --

12             THE COURT:  The Court examines the jurisdiction.

13             MR. CROSS:  Typically the Court is examining

14   jurisdiction under either federal question or diversity as of

15   that date, and as of that date you don't defeat diversity by

16   moving out of the state or moving into the state, but this is

17   Foreign Sovereign Immunity Jurisdiction.

18             Our papers establish, and I believe it's a

19   fact, that while there are a couple of cases including a

20   Supreme Court case that says that you measure FSIA

21   jurisdiction as of the date of the filing of the complaint.

22   There is no case that says that you do not look at the status

23   of the sovereign at the time the motion is made.

24             Each of those cases are cases the Dole case in

25   particular which is a Supreme Court case.

1          Dole against Patrick looked at a situation

2   where the entity had lost its foreign status, its sovereign

3   status, prior to the filing of the complaint and said we're

4   dealing with comity and the Supreme Court articulated, "When

5   we look at present political reality, we're dealing with

6   comity here.  How do we deal with our neighbor states if an

7   entity is not a foreign sovereign at the time we have to deal

8   with that, we're not going to give it foreign sovereign

9   status."

10         In all of the cases that I have looked at in

11  post filing events where an entity becomes sovereign after the

12  fact, after the filing, have hoarded comity because burdens of

13  proof are articulated in Dole under the principles of comity

14  which are to protect foreign sovereigns to some extent subject

15  to exception to some extent from the inconvenience and burden

16  of being dragged in our courts and subject to a jury trial.

17         Those principles apply equally post filing at

18  the date of filing.  The most recent example of that which is,

19  I don't know how to say this, I don't mean it do be

20  disrespectful but it's very Posnerian.  Judge Posner writing

21  for the Seventh Circuit reversed a district Court case that

22  held that an entity that ceased to be sovereign post filing

23  lost its right to a nonjury trial because it was no longer a

24  sovereign.

25         Judge Posner said, "Oh, no we do view these

Argument VI-A - Mr. Cross                    216

1   cases at the day of the filing."  And nonetheless, and I will

2   read what Judge Posner says quoting from <u>Dole</u>.  He says,

3   "Alitalia's change of status might be a good reason to do away

4   with jury trial but it is quite apart from the practical

5   concerns of preparation of predictability that we have

6   emphasized."

7               So far that is the purpose of the Foreign

8   Sovereign Immunity Act.  I quote further, "To give foreign

9   states and instrumentalities from the inconvenient gesture of

10  comity from the United States does not fall out of the picture

11  when a foreign state entity is privatized."

12              All the other cases that we cited and I'm not

13  aware of a case that stands for the proposition that where you

14  got a foreign entity -- let me make one thing clear:  As we

15  stand here, there is no question of fact that we are a foreign

16  sovereign.  We have completed everything; all the shares are

17  owned by the South African government.  So, as we stand here

18  today, we're a foreign sovereign.

19              So, the question is for you is, okay, where are

20  your links?  Is that enough to deny us comity?  Nothing else

21  has happened in this case and there is not one case that

22  stands for that proposition.  So, if there is a question of

23  fact as to whether we should be accorded sovereign status.

24              Finally, and I won't belabor this because it's

25  in our papers.

1             There is a doctrine supported by two cases both

2      in the Second Circuit, unfortunately, that stand for the

3      proposition that there is something called a de facto

4      sovereign under the Foreign Sovereign Immunity Act which is

5      akin to what I just argued which is:  If an entity status

6      changes to sovereign status post filing, there can be a

7      finding that depending on what its status is notwithstanding

8      the fact that it was not technically a sovereign at the date

9      of filing.

10            It was de facto sovereign because its

11     sovereignty was imminently inevitable.  That principle was

12     articulated by Justice Harlan when he was sitting in the

13     Second Circuit on <u>Mubarak</u>.  It was a foreign immunity case but

14     foreign sovereign immunity hadn't passed yet.  The question

15     was for jurisdictional purposes:  Was the State of India,

16     prior to the time it achieved full independence from the

17     British Empire, and it was clear it had not achieved full

18     independence from the British Empire, but it was clear that

19     all the steps that were necessary to be taken to accomplish

20     that had been accomplished.  It was only a matter of timing

21     that Justice Harlan that binds de facto sovereign prior to the

22     filing of the complaint even though it was, in fact,

23     sovereign.

24            Judge Sweet and Judge Sweet followed that the

25     Republic of Palau because of the imminency piece of that,

1   Palau hadn't been finalized in the five years since removal

2   and the Second Circuit said, well, the principle stands but,

3   you know, it's not imminent anymore so the principle doesn't

4   apply.   That also stands for the proposition that as of the

5   date of filing we were sovereign.

6                There's kind of three legs to my argument.   At

7   the end of the baseline as I said we are sovereign as we stand

8   here and the question is, you know, are you prepared absent

9   any cases that are directly to the contrary to say we're not

10  going to accord the South African government the benefits of

11  sovereignty.   Simply we were late, we concede we were late.

12  We were in the process, it just takes time to get through that

13  process.

14                If you'll indulge me briefly.

15            THE COURT:   Just very briefly.

16            MR. CROSS:   I want to address one question that you

17  asked Mr. Blanch.

18                You said if the evidence that they put forward

19  in response to the motion were pled would that be enough?   And

20  at least in the case of South Africa, my answer would be no,

21  because the evidence, at least in the case of South Africa,

22  and there are pages from the website that establish nothing

23  more than that.   We have an office in Thailand for air cargo,

24  we have an office in Johannesburg for air cargo and we have

25  airplanes to and from the United States.   That's not enough

1   evidence to establish that we engage in any contact in the

2   United States that's connected to this conspiracy or, for that

3   matter, that we even contract cargo services in the United

4   States.

5                Now, it may be that it may establish that we

6   contract for air cargo services outside the United States but

7   when you reach that step, then you have to face the effects

8   test which is conduct outside the United States under the

9   Foreign Sovereign Immunity Act under the commercial activity

10  exception which says, "Conduct outside of the United States

11  must have a direct, nontrivial substantial effect on U.S.

12  commerce."

13               It also has to be connected to the conspiracy,

14  they pled that; and B, I think I heard Mr. Tompkins say this

15  morning that they eschewed attempted establishment in response

16  to a question that you asked about the FTAIA and the effects

17  test.  Whether they were arguing the effects test or whether

18  they are arguing the imports exception.

19               I think Mr. Tompkins said something like we

20  think we might be able to do that, it's a very complicated,

21  very challenging intellectual exercise and we haven't done

22  that.  So, I think that, A, the only evidence one could find

23  in this record is that we may do some air cargo business off

24  shore which may come to the United States, but I think the

25  plaintiffs have eschewed attempting to remove the kind of

1   effects under the Foreign Sovereign Immunity Act to get out

2   from under the exception.

3                    Thank you.

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    ARGUMENT VI-A (Continued)

2    BY MR. CROSS:

3           THE COURT:  Okay?  Can I ask one question of you?

4    Let me just ask Mr. Cross one question.

5           MR. CROSS:  Sure.

6           THE COURT:  .  The way that would normally proceed,

7    it seems to me is, let's assume the plaintiffs, the

8    defendants, plaintiffs, plead adequate facts in the complaint

9    to establish or to suggest that they could establish the

10   jurisdictional basis for their claims.  Then you, I guess,

11   could say well, we're a foreign sovereign, but they have

12   already pleaded facts to indicate they could get over that.

13          The next step would be that there would be required

14   to make some sort of evidentiary submission to support the

15   facts.

16          MR. CROSS:  I believe that's right.  I think the

17   standard of proof cases talk about if we're going to make a

18   motion under the Foreign Sovereign Immunities Act, then we

19   have to establish a prima facie case that we're a foreign

20   sovereign.  And they have to come forward with evidence.

21          THE COURT:  At that point.  Since you've made the

22   motion at the point when --

23          MR. CROSS:  Okay.  And then we came forward with an

24   affidavit and they came forward with their web.

25          THE COURT:  Thank you.

1            That's not Mr. Tompkins now, it's Mr. Specks.

2    ARGUMENT VI-B

3    BY MR. SPECKS:

4            MR. SPECKS:   Good evening, Your Honor.   Gary Specks

5    of Kaplan Fox on behalf of the plaintiffs.

6            If I may, the first thing I would like to address is

7    some statements that have been made by some of the SI

8    defendants to the effect that there are no facts supporting

9    our jurisdictional, our jurisdiction over the SI defendants

10   and what I regard as a misstatement of the standard on a

11   Rule 12(b)(1) motion that occurs before discovery has taken

12   place.

13           First of all, prior to discovery, a plaintiff facing

14   a jurisdictional motion which challenges the illegal

15   sufficiency of the complaint's jurisdictional allegations can

16   defeat that motion by pleading allegations that are legally

17   sufficient to make out a prima facie showing of jurisdiction,

18   or, and/or, by relying upon materials outside of the pleadings

19   that contain averments of fact, which if proven or if credited

20   by the Court, would be sufficient to establish jurisdiction.

21           Now, not only do we have allegations in the

22   complaint that establish the commercial activity exception, if

23   taken as true, we've also submitted a substantial appendix of

24   materials outside the complaint which contain averments of

25   fact, which if credited by the Court, also establish that the

1    jurisdiction over the SI defendants.

2         THE COURT:  I'm troubled by I guess it does come

3    back to the Twombly issue.  I don't see a single specific

4    allegation as to any, any of these four who have raised the

5    FSIA.  It just talks about the defendants in a very global

6    way.

7         MR. SPECKS:  Your Honor, we have very specific

8    allegations as to each of the defendants and they include the

9    SI defendants to the effect that they are engaged in

10   commercial activity in the United States and throughout the

11   world in terms of being involved in, they say, air freight

12   shipping services within the United States and throughout the

13   world, among other things.

14        I would refer Your Honor, there's -- we set forth

15   these jurisdictional allegations in our brief.  It begins,

16   it's called Plaintiffs' Statement of Jurisdictional Facts.  It

17   begins at page 3 of our brief and continues on page --

18        THE COURT:  You know --

19        MR. SPECKS:  -- page 8.

20        THE COURT:  -- it would be a lot easier if you

21   pointed to the complaint.

22        MR. SPECKS:  We're citing the complaint, Your Honor.

23        THE COURT:  I understand.  But maybe rather than --

24   direct me to the complaint as opposed to the brief.

25        MR. SPECKS:  So...

Argument VI-B / Mr. Specks                    224

1                THE COURT:  I see that you do --

2                MR. SPECKS:  -- allegation with respect to

3       defendant, South African Airways.

4                THE COURT:  Right.  So, you're talking about in the

5       early --

6                MR. SPECKS:  Right.  The allegations that they're

7       engaged in commercial activity.  If they're engaged in

8       commercial activity within the meaning of the FSIA, the Court

9       has jurisdiction over them.  It's an exception to sovereign

10      immunity.

11               There are also numerous documents.

12               THE COURT:  You're saying by virtue of say, let me

13      look at page --

14               MR. SPECKS:  Just as an example.

15               THE COURT:  Where is it?  Where you had defined the

16      defendant parties.  And I'm looking for one of these four

17      here.

18               Yes, at 47.  Paragraph 47.  The assertion is that:

19      "Defendant Ethiopian Airlines Corp. is a foreign company

20      located in Bole International Airport, Addis Ababa.  Ethiopian

21      conducts air freight shipping services throughout the world

22      including the U.S. and this district".

23               And that's what you're saying satisfies the

24      jurisdiction?

25               MR. SPECKS:  No, Your Honor, that's a single

1  allegation among many allegations in many documents that are

2  attached in an appendix to our brief where we also attach

3  registrations showing that they're doing business in the

4  United States, that they have offices in the United States,

5  that they are shipping air freight into and out of cities in

6  the United States, all of which go to the commercial

7  activities exception and bear on whether or not they are

8  entitled to sovereign immunity in this case.

9          THE COURT:  So, just you would point me to the

10  appendix to your brief, and that is -- you don't have to do it

11  right now.

12          MR. SPECKS:  Okay.

13          THE COURT:  But you would say that the appendix,

14  coupled with the assertions in the complaint, satisfy your

15  evidentiary showing, the evidentiary showing that's necessary

16  under the test that the defendants advance.

17          MR. SPECKS:  Your Honor, prior to discovery a

18  standard on a Rule 12(b)(1) motion is that you are not

19  required to make a -- when you say evidentiary showing, in

20  terms of actually submitting admissible evidence -- because

21  we've had no discovery, we've had no opportunity to discover

22  any of the facts.

23          THE COURT:  All I'm asking you is, is that -- I

24  mean, there is some language in the cases that says that there

25  has to be an evidentiary showing, a showing of evidence.

1          And I'm only asking you if what you're saying is

2   that the evidentiary showing in the it appendix and in the

3   pleadings is sufficient to satisfy that burden?  That's all

4   I'm asking.

5          MR. SPECKS:  Yes.  The complaint allegations, which

6   must be taken as truth at this juncture --

7          THE COURT:  Right.

8          MR. SPECKS:  -- in addition to the evidentiary

9   materials that are in the appendix, which we summarize in our

10  brief --

11         THE COURT:  Okay.

12         MR. SPECKS:  -- as jurisdictional statement of

13  facts.

14         THE COURT:  All right.

15         MR. SPECKS:  So, I do take issue with what

16  defendants are saying the standard is and the idea that we

17  haven't submitted any quote, "facts" on the issue.

18         THE COURT:  Okay.

19         MR. SPECKS:  That's my first point.

20         My second point, on the waiver.  I don't think the

21  waiver could be much clearer than it is, Your Honor.  I mean,

22  it says it:  "Applies in any actions or proceedings brought

23  against these defendants in courts of the U.S. that are based

24  on their operations and international air transportation that,

25  according to the contract of carriage, includes any point in

1    the U.S. as a point of origin, point of destination or agreed

2    stopping place".

3              This is a condition that the Department of

4    Transportation imposes on these foreign air carriers as a

5    condition to them flying into and out of the United States.

6              THE COURT:   And does the appendix cite to such

7    operations?

8              MR. SPECKS:   Yes.

9              THE COURT:   Okay.   That there's, in other words,

10   identified contracts of carriage where, with some point in the

11   United States.

12             MR. SPECKS:   Absolutely.

13             THE COURT:   Okay.

14             MR. SPECKS:   And frankly, I'm, I mean, you might

15   want to ask the defendants why, how they can come in here and

16   claim sovereign immunity when they have in their possession

17   explicit waivers of that sovereign immunity.   I was kind of

18   shocked, frankly.

19             Thai Airways.   We now have a new heightened pleading

20   standard being proposed by Thai Airways.   Even the Supreme

21   Court in Twombly said that there are no heightened pleading

22   standards except as provided in the Federal Rules of Civil

23   Procedure, and if you want to impose one, you have to amend

24   the Federal rules.

25             There are no heightened pleading standards simply

1   because --

2              THE COURT:   That was my language.

3              MR. SPECKS:   Right.

4              THE COURT:   I think that what they're taking from

5   the FSIA cases is that there is a requirement that there be

6   sufficient pleadings, sufficient statements in the pleadings

7   to establish subject matter jurisdiction.   I'm not sure if

8   that's accurate.   I thought that's what they were saying.

9              What about, does the waiver of sovereign immunity

10  mean that they have, they haven't waived a right to a jury --

11  I mean, their right not to have a jury trial?

12             MR. SPECKS:   Absolutely they have, Your Honor.   If

13  they're not a foreign state, if they waive their sovereign

14  immunity, they are subject to our demand for a jury trial.

15             If they are a foreign state, and they may be subject

16  to some other exception to immunity, but they would still be

17  entitled to a nonjury trial in that case.

18             THE COURT:   I'm sorry, say that again.

19             MR. SPECKS:   All right.

20             There's one defendant.   South African Airways.

21  There is a real issue as to whether or not they are a foreign

22  state.

23             THE COURT:   All right.   The others are foreign

24  states.

25             MR. SPECKS:   That is significant because if they are

1   not a foreign state, then they are subject to being tried

2   before a jury.  Otherwise, they would not be.

3          THE COURT:  Okay.  That's what I'm saying.  So, the

4   others have retained the right not to be tried by a jury.

5          MR. SPECKS:  Right.  But that doesn't mean they're

6   immune.

7          THE COURT:  Understood.  They come into this court,

8   but they're still required to answer the claims.  They just

9   retain a right not to have those decided by a jury.  Okay.

10         Now, talk about South Africa and their acquired

11  status.  Well, both arguments; the organ argument and then --

12         MR. SPECKS:  Counsel for South African Airlines said

13  well, there's no case standing preventing Your Honor from

14  considering these post-filing developments in the South

15  Africa's status in determining whether or not they're a

16  foreign state.

17         Well, there's only one case, Your Honor.  It's

18  called the Patrickson case and it was decided by the

19  U.S. Supreme Court.  And what it says is that you determine

20  the foreign state status of an entity at the time of filing.

21  Period.  End of story.  That's the holding of the case.

22         THE COURT:  Patrickson?

23         MR. SPECKS:  Yes.  Dole, I believe.

24         THE COURT:  Dole, yes.

25         MR. SPECKS:  Dole Foods.

1          THE COURT:  Yes, that's the way I know it.

2          MR. SPECKS:  Now, after realize that the Patrickson

3    case destroyed their theory that just because an intermediate

4    subsidiary owned stock in South African Airways, once they

5    realize that under Patrickson that wasn't enough to give them

6    sovereign immunity or foreign state status, they started

7    arguing that they're somehow an organ of a foreign state as of

8    the date of the that the complaint was filed.

9          But there isn't any showing, there isn't any factual

10   showing of any of the factors that are required to show that

11   South African Airways was an organ of a foreign state.  The

12   only, the only thing they point to, they say in June of 2006,

13   that South African Airways began reporting to the Department

14   of Public Enterprises.  However, at that point in time, their

15   stock was still owned by an intermediate subsidiary.

16         Now that factor alone, I'm sorry, does not establish

17   their status as an organ of a foreign state.  They have the

18   burden on that.  It is their burden to show that by a

19   preponderance of the evidence.  And they have not done so.

20   They don't even address any of the factors under the case law

21   that you're supposed to look at.

22         So, I would suggest, Your Honor, that --

23         THE COURT:  Their submission on that issue, you say,

24   does not touch on any of the issues that the Court should look

25   at.

1            MR. SPECKS:  The only possible point they make in

2    any of their submissions that could bear on that is they point

3    out that in June of 2006, they claim that South African

4    Airways began reporting to the Department of Public

5    Enterprises of the Republic of South Africa.  Okay?  But there

6    are numerous other factors that the courts consider and weigh

7    in determining whether or not an entity is an organ of a

8    foreign state.  And none of those are addressed.  So, the fact

9    that they raise that one point can't in itself establish their

10   status as a foreign state.

11            To the extent Your Honor is inclined not to accept

12   our position or is inclined to accept their position that

13   they've made some kind of a prima facie showing or proven that

14   they are an organ of a foreign state, we would request

15   discovery on that issue because it is very much a factual

16   issue which we have not had an opportunity to address.  And

17   thus far, South African Airways has resisted all discovery.

18            If Your Honor has any questions in particular about

19   what we've submitted, I would be happy to answer them.  It's

20   late.  I'm not going to repeat what is in our brief.  We

21   believe that there's waiver here; that South African Airways

22   is not a foreign state entitled to sovereign immunity; that

23   the commercial activity exception to sovereign immunity

24   applies; and that the motion should be denied.

25            THE COURT:  And as far as subjecting a foreign

1   sovereign to discovery on the issue of whether they are a

2   foreign sovereign, is there authority for that?

3            MR. SPECKS:  Absolutely.  Until the, what the

4   decisions generally say, Your Honor, is that until the

5   jurisdictional issue has been determined, any discovery that

6   takes place as to someone claiming sovereign immunity should

7   be limited to the jurisdictional issue.

8            THE COURT:  To that.  Okay.

9            MR. SPECKS:  Thank you, Your Honor.

10           THE COURT:  All right.

11           MR. ATADIKA:  Your Honor, I just, if you give me a

12   little chance, Your Honor?

13           MR. BLANCH:  Your Honor?

14           THE COURT:  You're looking for a response, too?  A

15   very brief one.

16           MR. BLANCH:  Very briefly.

17           THE COURT:  Very briefly.  I'll take the responses,

18   rebuttals, in the order in which people argued.

19           So, Mr. Blanch?  Mr. Priver, you were second.

20           MR. PRIVER:  I was second.

21           THE COURT:  Yes, go ahead.

22   ARGUMENT VI-B

23   BY MR. PRIVER:

24           MR. PRIVER:  The fact that Thai Airways engages in

25   commercial activity in the United States and executed a waiver

1   does not establish the applicability of the commercial

2   activity exception.

3              The case law is clear and the recent decision by the

4   Second Circuit in <u>Kensington International</u> which is reported

5   at 505 F.3d 147, specifically at page 155, discusses the case

6   law that's been extent in the Circuit, including <u>Re: Society</u>

7   <u>International</u>, that you have to look at the gravamen of the

8   complaint when trying to determine whether the action is based

9   upon the commercial activity.

10             If the complaint is not based upon the commercial

11  activity, then the commercial activity exception does not

12  apply.  And you look at the gravamen of the complaint, which

13  is, in this case, the alleged conspiracy.

14             THE COURT:  Well, it's price fixing.

15             MR. PRIVER:  It's for price fixing.

16             THE COURT:  It's the application or the charging of

17  a fixed price as to air transportation.

18             MR. PRIVER:  But the price is the effect.  The fact

19  that there's a price charged in the United States for air

20  cargo transportation is not alone sufficient to get over the

21  commercial activity exception.

22             There has to be a connection based upon causal

23  connection between the alleged gravamen and the harm,

24  essentially.  And so, that's what we're saying is deficient in

25  this case.  And it's not just a pleading issue.  If you,

1   again, Philatech and a legion of other cases, talks

2   extensively about the evidence that's submitted in support of

3   the motion.

4          THE COURT:  Wait.  I really need to understand what

5   you're saying because I'm not.  It's escaping me.

6          A fixed, an artificially fixed price by definition

7   causes harm; does it not?

8          An artificially fixed price, because of a conspiracy

9   to fix the price, that's a given.  It's a harm.

10          MR. PRIVER:  And I would agree with that.

11          THE COURT:  Okay.  So, what distinction are you

12   trying to draw?

13          MR. PRIVER:  They have to make a showing.  Their

14   say-so in their complaint based on a conclusion that there was

15   this agreement between 39 carriers to set prices globally does

16   not have a tendency in law or fact to prove, number one, that

17   Thai Airways was a part of that conspiracy.

18          THE COURT:  But you're saying they need to have more

19   specific, a more specific showing of your client's actual

20   participation in a price fixing conspiracy --

21          MR. PRIVER:  Correct.

22          THE COURT:  -- that resulted in an artificial price

23   being charged --

24          MR. PRIVER:  In the U.S.

25          THE COURT:  -- on a contract of carriage touching

1    the United States.

2                    MR. PRIVER:  Yes.

3                    THE COURT:  Okay.

4                    MR. PRIVER:  And just on the pleading issue, again,

5    and this is in the brief <u>Jin versus</u> --

6                    THE COURT:  Counsel you need to go a little slower

7    for our court reporter's sake.  It's been a long day for her,

8    too.

9                    MR. PRIVER:  <u>Jin versus Ministry of State State</u>

10   <u>Security</u> 475 F. Sub. 2d, at page 60, the Court again makes

11   clear that "because subject matter jurisdiction focuses on the

12   court's power to hear the case, the Court must give the

13   plaintiffs factual allegations closer scrutiny when involving

14   a 12(b)(1) motion than would be required for a 12(b)(6) motion

15   for failure to state a claim".

16                    So, the idea that conclusory allegations of this

17   complaint satisfy that, I think, is sheer fantasy.

18                    And on the discovery issue, and this is cited in a

19   footnote, the <u>Stutts against De Deitrich Group</u>, 465 Fed. Sup.

20   2d. 156/169, Eastern District of New York.  "District courts

21   in this circuit routinely reject requests for jurisdictional

22   discovery where a plaintiff's allegations are insufficient to

23   make out a prima facie case of jurisdiction".

24                    The whole point of this, Your Honor, is to keep the

25   foreign sovereign from having to assume and engage in the

1    burdens of litigation if the plaintiffs in the first instance

2    can't make a necessary showing in their pleading.

3              Not only have the plaintiffs failed do that in their

4    pleading, which is why they never asked for and probably never

5    got any jurisdictional discovery, but here we are on this

6    motion asking the Court to let us out of this case because we

7    don't really belong here.  They've had their opportunity to

8    present the evidence and all they've shown this court is

9    matters that --

10             THE COURT:  They make the argument that 12(b)(1)

11   motions, in 12(b)(1) motions the Court can look outside the

12   pleadings, in essence, and look to an appendix and look to

13   their brief.

14             And is it your argument that the Court can't do that

15   in an FSIA?

16             MR. PRIVER:  No, absolutely not.  The court can.

17             But I don't recall and again, I don't have a

18   photographic recollection of the record, but the only thing

19   that I recall the plaintiffs have ever set forth is that we do

20   business in the United States.

21             THE COURT:  Okay.  I understand.  But the appendix,

22   the Court is permitted to look to the appendix.

23             MR. PRIVER:  Absolutely.  And they have an

24   obligation to produce evidence that shows that we were part of

25   a conspiracy and that that resulted in super-competitive

1   prices for the cargo shipments that were shipped from the

2   United States in Bangkok.

3                THE COURT:  Okay.

4                MR. PRIVER:  Okay?

5        Thank you, Your Honor.

6                THE COURT:  Mr. Atadika, you wanted to say a few

7   words?

8                MR. ATADIKA:  Yes, Your Honor.

9                THE COURT:  Mr. Blanch does, too.

10       But folks, just a couple minutes.  I think I

11  understood the arguments.

12       Mr. Blanch, you were first.  So, go ahead.

13  ARGUMENT VI-B

14  BY MR. BLANCH:

15               MR. BLANCH:  Less than one minute, Your Honor.

16       There are two things counsel said on rebuttal which

17  I view as incorrect.

18       The claimant is shocked that we're coming here

19  asking to assert FSIA in light of the waiver.  Waivers are

20  narrowly construed.  A narrow construction of a waiver does

21  not mean you waiver everything under the sun.

22               THE COURT:  Okay.

23               MR. BLANCH:  The second point is that the waiver,

24  even if the Court were to find that the waiver were effective

25  and applied to this case, to essentially co-extend it with the

1  commercial activity exception, that's got to be based upon

2  commercial activity giving rise to the claim, that means that

3  it would effectively have the same effect as the commercial

4  activity exception.

5          If the Court were to find there were a commercial

6  activity exception in any case, that does not operate to

7  subject a foreign sovereign to a jury trial.

8          THE COURT:  Understood.  And they concede that.  I

9  think, they concede that.

10          MR. BLANCH:  I believe plaintiffs' counsel is saying

11  that in light of the waiver, they can be hauled into a jury

12  trial.

13          THE COURT:  No, they don't concede.  That's not the

14  argument.  I didn't understand that to be the argument.

15          MR. SPECKS:  I did not say that.

16          THE COURT:  I think the FSIA, and you know I don't

17  have the statute clearly in mind, I think the FSIA designates

18  what the circumstances are in which the Court can acquire

19  jurisdiction to decide subject matter jurisdiction, and it

20  also says that in such cases the foreign sovereign retains the

21  right not to have a jury determine the case.

22          I think that's what the FSIA says.

23          MR. BLANCH:  So, either way it's conceded that no

24  foreign sovereign in any event would ever be subjected to a

25  jury trial.

1         THE COURT:  As long as their foreign sovereigns.  I

2    think that's right.

3         Okay.  Mr. Atadika?

4    ARGUMENT VI-B

5    BY MR. ATADIKA:

6         MR. ATADIKA:  Your Honor, Michael Atadika for

7    Ethiopian Airlines.  Again Your Honor, just two points.

8         Point number one, the fact that you have the

9    appendix to look at and the complaint cannot cure what is

10   fatal in this case.  To take an FSIA defendant to court you

11   need to go through the language of the Act and you've got to

12   really pin the facts of the case on the defendant.

13        Just telling you, Your Honor, that you can look at

14   the appendix and then putting one or two paragraphs cannot --

15   it's a very serious law emphasized, only exclusively reserved

16   for sovereigns, and for very good reason.  So, I am submitting

17   most respectfully that the plaintiffs have not shown anything

18   for you to change that policy.

19        THE COURT:  Understand that the fact that I, that I

20   have to look at the appendix does not mean that I'm suggesting

21   that the appendix is sufficient.

22        I'm permitted to look at the appendix, but I think

23   all parties agree I'm permitted to look at the appendix do see

24   if they supply enough of the evidentiary basis for want of a

25   better word to provide subject matter jurisdiction.  And

1    that's the only issue.

2           I'm not suggesting that -- I don't believe I ever

3    actually looked at the appendix and I'll confess that to

4    everybody.  So, but now I will.

5           MR. ATADIKA:  And Your Honor, I'm submitting that

6    even if you look at it, it cannot cure the defects of the

7    pleadings on the -- as far as the FSIA defendants.

8           THE COURT:  Okay.  So, you're saying everything has

9    to rise and fall on the pleadings; I am not permitted to look

10   at the appendix.

11          MR. ATADIKA:  No, no, Your honor.  I did not say

12   that.

13          THE COURT:  Okay.  What are you saying?

14          MR. ATADIKA:  FSIA is a unique jurisdiction.  It's a

15   unique regime.  And for you to take a foreign sovereign to

16   court, you've got to plead it.  And they have not shown

17   anything in any of these complaints that enough of an -- that

18   Ethiopian Airlines is an FSIA defendant.  It's not there.

19          THE COURT:  Okay.

20          MR. ATADIKA:  Your Honor, the other point I would

21   like to highlight is the question of the waiver.

22          Now, we have submitted that a waiver, the waiver

23   clause comes from the permission that is given to an airline.

24   And that language, Your Honor, is in the Warsaw Convention.

25   So, we are submitting that if, in fact, the waiver language

1   which comes from that document, then Warsaw Convention should

2   apply to this matter.

3           Now, the Warsaw Convention also has exclusive

4   jurisdiction in the sense that you can only apply for remedies

5   that are specifically allowed by the Warsaw Convention.  So,

6   if they are now relying on the language of the relation, which

7   is in fact in international air transportation, we submit most

8   respectfully, Your Honor, that the Warsaw Convention will

9   apply.  If it is so, they have not pled that in any of the

10  pleadings to support that allegation that we have waived.  And

11  then they go into the -- I don't know whether, Your Honor, you

12  got my submission on that.

13          They have resorted to the waiver language in a

14  document which is furnished to the airlines allowing them to

15  be, to do business in the United States.  However, that

16  document is part of the Warsaw Convention language.  So, if

17  they are now trying to rely on that waiver, most respectfully

18  then, they are subjecting themselves to the regime of the

19  Warsaw Convention.  And the remedies there do not allow for

20  antitrust claims.

21          So, that's our position.

22          THE COURT:  Okay.

23          MR. ATADIKA:  That they cannot.

24          THE COURT:  I understand.

25          Mr. Cross?

1        MR. CROSS:  Yes.  I will take less than one minute.

2   ARGUMENT VI-B

3   BY MR. CROSS:

4        I encourage you to look at the appendix.  All of the

5   appendix; ours, theirs, everyone's.

6        THE COURT:  Okay.  I will be doing that.

7        MR. CROSS:  Secondly, Mr. Specks did say one thing

8   that I think I need to correct.

9        He said the only thing we had done to act as an

10  organ of the state of the Republic of South Africa was to

11  report to the Department of Public enterprise.

12

13        (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1              ARGUMENT VI-A

2              BY MR. CROSS

3              MR. CROSS:  (Continuing) That is why I encourage you

4      to read the other affidavit, too, which is attached to the

5      motion papers.  It makes it sound like we're reporting like

6      school children reporting to the principal, the Department of

7      Public Enterprise, which runs the airline.

8              THE COURT:  I'm sorry.

9              MR. CROSS:  The Department of Public Enterprise

10     after June 2006 was running an airline and reported to by

11     somebody that was functionally operating this airline.

12             THE COURT:  You assumed operational control but had

13     not yet owned it?

14             MR. CROSS:  The shares were delisted by the prior

15     owner and were being listed by the government and the

16     government changed the purposes of the airline to promote

17     tourism, to promote the transportation hub and --

18             THE COURT:  I think I remember that.

19             MR. CROSS:  That's the point.

20             THE COURT:  Mr. Specks, very quickly.

21             ARGUMENT VI-A

22             BY MR. SPECKS

23             MR. SPECKS:  This operational control nonsense that

24     he is giving you it's not in the affidavit that was submitted.

25             THE COURT:  Fine, I'm going to look at the papers.

1  I assure you.

2          MR. SPECKS:  With respect to this Warsaw Convention

3  nonsense, if you look and read the waiver.

4          THE COURT:  If you would be useful without

5  characterizing just make the argument.  Maybe you think it's

6  nonsense but I'm going to have to take -- I'm going to

7  consider it.

8          MR. SPECKS: It says the waiver is with respect to

9  those actions instituted and against it in another or tribunal

10  in the United States are, A, based on its operations in

11  international air transportation.  That, according to the

12  contract of carriage include a point in the U.S. as a point of

13  origin/point of destination; or agreed stopping place; or for

14  which the contract of carriage with persons in the United

15  States then it says "Or," O-R;

16              B based on a claim under any international

17  agreement or treaties, that's the Warsaw Convention.  So the

18  word "or" is disjunctive.

19          THE COURT:  Understood.  I understand the argument.

20              Let's go to the final issue and that's the Air

21  Mauritius.  Actually, we have a statute of limitations issue.

22  I don't really need argument on it, I understand the issue and

23  I don't need argument.  But Air Mauritius has a substantial

24  personal jurisdiction motion and so who is here for Air

25  Mauritius.

1          ARGUMENT VI -A

2          BY MR. DONOVAN

3          MR. DONOVAN:  Richard Donovan, Kelly, Drye & Warren.

4               I conferred with counsel at the break and given

5     the late hour we've agreed to cut back to the bare minimum, it

6     will just take a minute or two to make our points and to

7     emphasize what are some of the things that have been raised

8     and answer questions that Your Honor might have.

9          THE COURT:  Let me ask a question right off the bat.

10    Do I have to have an evidentiary hearing on the various

11    aspects of -- put aside for the moment this service that the

12    notion that I examine service under New Jersey law.  I am

13    forgoing that frankly I'm not persuaded that I should look at

14    New Jersey law at this point.

15               I mean, if you'd served -- if the plaintiffs

16    had served their action in New Jersey with a New Jersey

17    district court, then and then transferred it here or had it

18    transferred here then clearly that would be the right

19    procedure but I'm not persuaded that I look to New Jersey law

20    to that -- well, in any event -- neither side shouldn't burden

21    themselves with argument on that.

22               But, I think I am examining this under New York

23    law.  There is plenty of basis, it seems to me, or at least

24    there's plenty of room for argument about whether there are

25    sufficient indicia of doing business of transacting business

1    here out of which these claims arise such that I may have to

2    have evidentiary hearing so tell me about that.

3              MR. DONOVAN:  Your Honor, there are a lot of

4    arguments, but I don't think you need an evidentiary hearing

5    because I don't think any of the facts would meet the

6    plaintiff's burden here.

7              The plaintiff's agree at Page 13 of their memo

8    that the standard at this point is that they must come forward

9    with because we have challenged jurisdiction and there has

10   been jurisdictional discovery.  They can't rest on the

11   allegations of their complaint and they have done that in the

12   form of a submission of a number of documents which were

13   produced in discovery or they obtained from the Web.

14             And, what we're saying is that they've gone

15   ahead and submitted those facts but they do not prove what

16   they need to prove to meet either the minimum contacts the

17   various jurisdictional bases or at least, more importantly,

18   due process and to show that it would be reasonable for this

19   court to exercise jurisdiction over our client.

20             Our clients business is centered in Europe,

21   Asia, and Africa and perhaps it may be subject to jurisdiction

22   in one of those countries or continents and that's also where

23   the alleged conspiracy apparently took place.  Plaintiffs

24   concede in their proof that it didn't happen here; it was

25   outside the United States.

1              THE COURT:  But don't you charge prices here for

2       transportation of goods out of the United States and to the

3       United States, too, for that matter; but you impose charges

4       here, you solicit business here in New York through the agent

5       who has the authority to bind your airline, and I understand

6       that your airline itself, I guess, doesn't fly here but you

7       have arrangements with other airlines to where they'll pick up

8       the goods here and then transfer it to you.  But you're the

9       one that arranges for that all carriage through your agent.  I

10      mean, why is it that doing business here?

11             MR. DONOVAN:  It's not, Your Honor.

12             First of all, in terms of the agent you can put

13      that aside because the Second Circuit said in the <u>Wiwa</u> case,

14      quoting the New York Court of Appeals, that you don't look at

15      the agent's actions to satisfy, or I should say, impute the

16      actions to the foreign defendant unless it was an exclusive

17      arrangement which it was not.  This agent represents the eight

18      other airlines and so in an is not sufficient.

19             Secondly, the decision about what prices to

20      charge is made in Mauritius as set forth in the declarations

21      that we have submitted to the Court and there is nothing that

22      contradicts that.

23             So, when you're talking this morning about,

24      well, okay, the decision to apply quote, unquote, "The fixed

25      price," whether it was surcharges or what have you a decision

1   is made in Mauritius and they set what the rates are.  And

2   then the only thing the New York agent does is it takes an

3   order, somebody comes up and says, "I want to send something

4   to Mauritius."  They take that order, they can't even

5   themselves confirm that, they can't enter into the contract.

6   They have to then go back and check with headquarters in

7   Mauritius to find out if space is available on a particular

8   flight and to confirm what the fee would be and those are key

9   distinctions for a jurisdictional argument, Your Honor.

10           THE COURT:  Okay.  There was a variety of other

11   things.  You do solicit business and the argument is you have

12   to have solicitation plus something.

13           MR. DONOVAN:  There are a couple of things with

14   that.  We really don't solicit business very much.  We have a

15   website, that's about it, and there is no other showing of

16   solicitation.

17               But, secondly, as in, in fact, there was a

18   recent opinion by Judge Glasser who pointed out in a case

19   called <u>Sikorsky Aircraft</u> which came out at the time that we

20   were filing our reply memo where he pointed out under the

21   cases in the Second Circuit, in order to have solicitation you

22   have to have five percent or more of the company's revenues to

23   constitute substantial solicitation; and we've shown in the

24   facts we submitted to Your Honor our revenues from sales that

25   connect in any way to New York are way less than that and

1     that's --

2           THE COURT:   But they're still in the hundreds of

3     thousands of dollars?

4           MR. DONOVAN:   Yes.

5           THE COURT:   Where does Judge Glasser get the five

6     percent from?

7           MR. DONOVAN:   He cites a number of different cases

8     from different district court decisions and looks at what the

9     percentage was in each case.

10          THE COURT:   Okay.  So, it's -- okay.  A survey of

11    the cases, basically.

12          MR. DONOVAN:   Essentially, yes, Your Honor.   And,

13    that ties into the reasonableness point:   Why it would not be

14    reasonable to exercise jurisdiction in this case even if Your

15    Honor found that one of the jurisdictional bases was met which

16    we do not believe they were.

17               But just quickly, just a few of the salient

18    facts here.   We were in the process of closing our New Jersey

19    office when we were served with the complaint and I think you

20    are allowed to take that into account in terms of the

21    reasonableness issue and the burden on a foreign defendant if

22    it's forced to come into this court and defend itself.

23               Secondly, there's no specific proof against our

24    client which Your Honor has already observed here.

25    Paragraph 30 of the complaint is the only one and the

1   allegations are similar to the one that you just read

2   regarding one of the other foreign defendants.  They're just

3   very generic.

4                Another thing I want to point out to Your Honor

5   is that we are not involved at all in the European

6   investigation.  Our client, to our knowledge, has not been

7   named in that and we are not involved here so that is not

8   dispute.

9            THE COURT:  You are not naming that statement of

10  objections?

11           MR. DONOVAN:  Correct, Your Honor, I have not seen

12  the statement but that is what I am told.

13           THE COURT:  Who has seen it?  Only plaintiffs I

14  guess.

15           MR. ARENSON:  The plaintiffs haven't seen it.

16           MR. TOMPKINS:  The parties that are named there.

17           THE COURT:  You wanted to see it.

18           MR. ARENSON:  Yes, Your Honor.

19           MR. TOMPKINS:  Yes.

20           THE COURT:  In a big way.

21           MR. TOMPKINS:  I am --

22           MR. ARENSON:  They let us see it.

23           MR. WARNOT:  They are obligated by European

24  Commission Law to look.

25           THE COURT:  Sorry for interrupting.

1          MR. DONOVAN:  You mentioned the connection with

2   other airlines.  Your Honor understood that we do not, in

3   fact, land any planes in the U.S., our planes never come here.

4   We do have an interline agreement with other carriers so that

5   shipments can be made to or from but we criticized, Your

6   Honor, dozens of cases that say that's not enough to find

7   jurisdiction.  Otherwise, every carrier or railroad would be

8   subject to jurisdiction anywhere that somebody connected to

9   their railroad or bought a connecting ticket.

10          THE COURT:  But no single thing is enough, I don't

11   mean to suggest that.  But you don't take these things in

12   isolation.  You look at all the factors.

13          MR. DONOVAN:  Agreed, Your Honor, and what we're

14   saying is we still have to have a jurisdictional basis and

15   overall, if you're looking at the reasonableness, you have to

16   look at everything.  And, in particular, I would say under the

17   cases that we've cited, the miniscule percent of our sales

18   that have to do with the United States is a very key factor.

19   It's one of the cases noted.  We would spend much more money

20   defending this complex litigation than we ever have received

21   in revenues from U.S. based commerce.  And as you could tell

22   this is going to be a very expensive case to litigate

23   especially if Your Honor does not grant the motion to dismiss.

24             The other thing is just the obvious one that

25   Mauritius is a small country on the other side of the world.

Argument VI-A - Mr. Donovan                    252

1    I dare say that most of us didn't even know where it was

2    until --

3              THE COURT:  I'm still not entirely sure.  It's

4    somewhere in the Indian Ocean.

5              MR. DONOVAN:  Yes, Your Honor, in the Indian Ocean

6    off the southwest coast of Africa.

7              THE COURT:  Off of Madagascar.

8              MR. DONOVAN:  It takes 30 hours to get there.  You

9    have to change planes two or three times, and yes, these are

10   the days of modern air travel.  But it's not just like hopping

11   a flight to London, this is really is on the other side of the

12   world and it's not easy to come back and forth.

13              In terms of reasonableness, the other factors

14   are where is the evidence located.  Well, obviously, the

15   evidence with respect to us is located there which is not easy

16   to get to and from the sound of it, most of the evidence in

17   this case is going to be outside the United States, or

18   certainly much of it.

19              The other thing, Your Honor, that relates also

20   to reasonableness is that plaintiffs can obtain full relief in

21   this case from the other defendants.  They don't need us here,

22   we don't add very much and that's a factor that the courts

23   have also considered.

24              THE COURT:  Explain why that is.

25              MR. DONOVAN:  Well, Your Honor, there are many or

1    defendant with larger pockets than us if it's a conspiracy

2    case.

3              THE COURT:  Okay oh, I see joint and several

4    liability.

5              MR. DONOVAN:  Yes, Your Honor.

6              THE COURT:  I got it.

7              MR. DONOVAN:  Putting aside the fact that as I've

8    said there is nothing whatsoever, not a single fact to connect

9    us to this alleged conspiracy.  I will stop there unless you

10   have questions.

11             THE COURT:  I think you've covered it.  You did say

12   that the Internet website is not an interactive website.  You

13   can't place orders on it?  It's merely a -- it's a presence of

14   some kind here, right?  Or it's a presence wherever it can be

15   viewed.

16             MR. DONOVAN:  Yes, Your Honor.

17             Under the cases that deal with websites as a

18   basis for jurisdiction, this is more in the nature of what we

19   would a passive website where you can get information and you

20   can submit a request that says you're interested in shipping

21   something and get more information that way but you cannot

22   place an order.

23             THE COURT:  You get information about rates.

24             MR. DONOVAN:  What happens is if you submit

25   something and say, "I'm interested," you would then be

Argument VI-A - Mr. Asciolla                 254

1    contacted by the local agent who would try to answer your

2    questions, give you rates and availabilities, and what have

3    you.

4              THE COURT:  Okay.

5              MR. DONOVAN:  Thank you, Your Honor.

6              MR. ASCIOLLA:  Greg Asciolla for the plaintiffs.

7              Good evening, Your Honor.  I'm going to be very

8    brief.  I guess I will start there must be I guess it's late

9    that I just want to quickly address New Jersey.

10              I'm disappointed that you don't think that's

11   sufficiently a strong argument, but I would urge you to look

12   at Judge Scheindlin's opinion in In Re:  Ski Train Fire where

13   she did an extensive analysis on why it's proper when a

14   defendant is named as a transferee in an MDL proceeding to

15   look at the transferor.

16              THE COURT:  There was no transferor; it was never

17   transferred.  It is the potential transferor because you could

18   have sued them, but you didn't so this was never transferred.

19              MR. ASCIOLLA:  We couldn't sue them there.

20              THE COURT:  Why couldn't you?  We're still getting

21   claim -- cases filed here that are then added.  There is

22   nothing that prohibits somebody from filing a case somewhere

23   else.

24              MR. ASCIOLLA:  Actually, Your Honor, if you look at

25   her case and the cases that she cites the proper place to name

1    new defendants in MDL proceedings is the transferee court.

2              THE COURT:  Where is that stated?

3              MR. ASCIOLLA:   In Re:  Ski Train Fire.

4              THE COURT:  Where in the case?  Where is the rule

5    that says that?  That's Judge Scheindlin's statement, I don't

6    even know I will look at the case but I'm not persuaded

7    frankly by just a judicial pronouncement that the Court

8    ignores the rules of civil procedure or even the MDL that case

9    this court has the jurisdiction over the transferor court

10   that's it but there is no transferor court.

11             So, why do I look -- does that mean that once

12   the case is consolidated in court that the Court can use any

13   state court jurisdiction anywhere to establish jurisdiction

14   here.

15             MR. ASCIOLLA:  It would mean that you would look to

16   every jurisdiction where a transferor court is to find

17   jurisdiction.

18             THE COURT:  You mean a transferor court could be?

19             MR. ASCIOLLA:  No, let's take this case for instance

20   it would be the nine transferor courts that made up the

21   80 cases that are before you.

22             THE COURT:  Okay.

23             MR. ASCIOLLA:  So you could look back at any one of

24   those nine.

25             THE COURT:  Any one of those nine and the District

Argument VI-A - Mr. Asciolla                256

1    of New Jersey was one of them.

2         MR. ASCIOLLA:  And we have chose New Jersey because

3    Air Mauritius concedes there was personal jurisdiction they

4    don't concede due process satisfied they conceded that and we

5    picked New York for its obvious contacts with respect to, in

6    particular, the acts of its agent there not because the MDL

7    moved the cases here but that there's jurisdiction over Air

8    Mauritius here.

9         THE COURT:  Okay.

10        MR. ASCIOLLA:  If you think of it another way, if we

11   are -- well, if it's proper to be serving, I'm sorry, naming a

12   defendant here in this case, I don't think it would be fair to

13   plaintiffs to have to be stuck only naming defendants that

14   happen to do business in New York.  Suppose --

15        THE COURT:  No, of course, not but you could file

16   acquire jurisdiction where you can acquire jurisdiction and

17   then have the case transferred just like it happens all the

18   time in MDL cases.

19             Cases are filed around the country and even

20   after the case has been consolidated somewhere new cases get

21   filed and they get transferred in and that's the proper

22   procedure it seems to me.  I don't see why that shouldn't have

23   been followed here.

24             I mean, you know, well any way --

25        MR. ASCIOLLA:  Okay.  Looking at Section 301 for

1    here in New York, I think it's a classic case of looking at

2    the agent's contacts here and finding that Air Mauritius is

3    doing business in New York and if you look at what this agent

4    was doing here on behalf of Air Mauritius in New York to have

5    an agency agreement where they were expressly authorized to

6    make cargo sales over the services of Air Mauritius and they

7    had a number of other services that they were providing on

8    behalf of Air Mauritius here soliciting, promoting, and

9    selling air cargo transportation employing staff --

10           THE COURT:  But they say they weren't soliciting and

11   that's why I was getting to the point of whether I need to

12   have an evidentiary hearing on this.

13           I mean, if the agent was solicited, and then

14   there's a question about whether they're exclusive or not or

15   how exclusive they were.  There is no question that Avia was

16   representing other airlines and you're saying that exclusivity

17   is not dispositive.

18           MR. ASCIOLLA:  It is not dispositive, it is a

19   factor.

20           THE COURT:  It would be helpful.

21           MR. ASCIOLLA:  One of many factors.

22           THE COURT:  Are there disputed factual issues about

23   how Avia is -- is it Avia or Avia how you this conducted their

24   business that I need to hold an evidentiary hearing.

25           MR. ASCIOLLA:  I don't think there is any question

1    or dispute as to what Avia is doing.

2            THE COURT:  Okay.

3            MR. ASCIOLLA:  I think if you just look at all the

4    things in their agency agreement I don't think there is any

5    dispute that they are sell the services of Air Mauritius and

6    deriving standing revenues for Air Mauritius here in New York.

7                And I think if you look across the spectrum of

8    cases for §301 underpinning them all is that the agent is here

9    doing the business that Air Mauritius or the principal would

10   otherwise be doing if it weren't for the agent being here.

11   And here Air Mauritius was here, well, it was in New Jersey.

12   It was here doing the business of Air Mauritius of selling air

13   cargo services and when it left and Avia took that role.  It's

14   doing the exact same -- I'm sorry -- it's providing the same

15   exact same service that is Air Mauritius did.  Basically, Avia

16   stepped in Air Mauritius's shoes.

17               As far as the revenues, they're substantial.

18   They average almost a million dollars a year and if you look

19   up the Nippon case that was about $600,000, that was an

20   Eastern District of New York case that satisfactory the

21   solicitation plus.  I think another important factors.

22           THE COURT:  What is it it's the volume of sales.

23           MR. ASCIOLLA:  Right.  Right.

24           THE COURT:  Putting aside the percentage of their

25   overall revenue.

1           MR. ASCIOLLA:  Courts to look at both they look

2    percentage with much more skepticism because you are making so

3    much money that percent an could be very, very tiny and yet a

4    large number in the United States.  I think another important

5    factor with respect to Air Mauritius's relationship with the

6    agent is that they have I just want to get the wording right,

7    a very large degree of control over them and, again, it shows

8    that this really is in essence Air Mauritius here.

9           I think if you look at the contacts of Avia,

10   you can easily say that this is a classic case where an agent,

11   where you couldn't look at an agent's contacts and find

12   jurisdiction over the principal and I would urge the court to

13   look at the McLaughlin case which is strikingly similar to

14   this case.  In that case the agency agreement looked almost

15   identical.

16          THE COURT:  Is that a New York.

17          MR. ASCIOLLA:  Eastern District of New York case

18   1985 found at 602 F. Supp.  29 and the Court found that,

19   "Without question a foreign company was undisputed doing its

20   business in New York with its agent under §301."

21          If I can touch upon the reasonableness factor

22   with respect to the due process argument.

23          THE COURT:  Yes.

24          MR. ASCIOLLA:  I think it would be a minimal burden

25   for Air Mauritius to be part of this litigation because

1    witnesses are here no New York, witnesses possibly are here in

2    New Jersey, and when litigation started Air Mauritius put into

3    storage all of their documents from their business for the

4    many years they were in New Jersey into storage in New Jersey.

5    So, there's going to be a very minimal burden as far as some

6    of the witnesses potential witnesses and certainly some of the

7    occupants.

8              Also, I understand it's a tiny island but Air

9    Mauritius is an international sophisticated airline.  If

10   anybody has a lesser burden to travel it would be people

11   involved with involved with airline it might be funny, but we

12   have, we submitted documents itineraries of when various

13   business people from Mauritius from Air Mauritius traveled to

14   the United States when they were looking for a potential agent

15   to replace Air Mauritius and sell their cargo services here in

16   the United States.

17             So, I think it's very, very strong argument

18   under §301 and Air Mauritius's contacts through its agent.

19        THE COURT:  Okay.  All right.  Thank you very much.

20   I think -- are there any loose ends I still need to hear from

21   people on?

22             MR. DONOVAN:  Can I have 30 seconds?  I'm sorry, I

23   know.

24             THE COURT:  Okay.

25

1        ARGUMENT VI-A

2        BY MR. DONOVAN

3        MR. DONOVAN:  I just need to correct the record on a

4    couple of things.

5              First of all, in terms of the evidence it's not

6    true that all our documents are in New Jersey.  The documents

7    that are in New Jersey really are just those that relate to

8    the operations in the New Jersey office but the vast majority

9    of our documents are in Mauritius.

10             Likewise, the witnesses that will know anything

11   about our involvement with other defendants and participation

12   in any conspiracy are in Mauritius, they're not in New Jersey.

13   There is nobody left in New Jersey at this point.

14             And, on the control point, I would just refer

15   Your Honor to the Miller case from the New York Court of

16   Appeals I think this case is much more like that one than the

17   cases that counsel cited.

18             There was not a large degree of control by us

19   over the business of Avia cargo we only had control over their

20   dealings represent us which is a crucial distinction in terms

21   of jurisdiction.  It's not like the case where went the way

22   after parent sub but there is an issue about the did the

23   parent control the sub in the construction that is not what

24   happened here again as I think I said.

25             THE COURT:  The distinction you're making is that

1  while you had control over what they did on behalf of you, you

2  didn't have control over what they did the rest of the time.

3           MR. DONOVAN:  Correct, we didn't run their airways.

4           THE COURT:  You didn't run their operation?

5           MR. DONOVAN:  Right.

6           THE COURT:  In fact, part of your argument is that

7  you had such substantial control that they were very limited

8  in what they could do.

9           MR. DONOVAN:  Correct.

10           THE COURT:  Everything had to be cleared through you

11  and Air Mauritius.

12           MR. DONOVAN:  My last point is they could not bind

13  us we made our own decisions in Mauritius about whether to

14  accept particular proposals.

15                Thank you, Your Honor.

16           THE COURT:  Thank you very much.

17                I do want to just make the point that the

18  advocacy has really been remarkable both on the papers and in

19  the arguments today I really appreciate it.  It's been a

20  pleasure to hear so many good litigators advocate their

21  positions.  So thank you.

22           MR. ARENSON:  Thank you, Your Honor, thank you for

23  were you patience.

24           (WHEREUPON, the proceedings were adjourned.)

25                     *   *   *

263

I N D E X

WITNESS                                                      PAGE


        ARGUMENT I

        BY MR. SCHWARTZ                              10

        ARGUMENT I

        BY MR. TOMPKINS                              32

        ARGUMENT I

        BY MR. SCHWARTZ                              47

        ARGUMENT I

        BY MR. SCHWARTZ: (Continuing.)               51

        ARGUMENT I

        BY MR. TOMPKINS                              54

        ARGUMENT II

        BY MR. SHERMAN                               57

        ARGUMENT II

        BY MR. ARENSON                               69

        ARGUMENT II

        MR. SHERMAN                                  88

        ARGUMENT III

        BY MR. LOVELL                                90

        ARGUMENT III

        BY MR. SHERMAN                               107

264

1          ARGUMENT III (continued)

2          BY MR. SHERMAN                          113

3          ARGUMENT III

4          BY MR. LOVELL                           116

5

6          ARGUMENT III.

7          BY MR. LOVELL                           126

8          ARGUMENT IV

9          BY MR. WARNOT                           129

10         ARGUMENT IV

11         BY MR. OGDEN                            143

12         ARGUMENT IV

13         BY MR. HAUSFELD                         154

14         ARGUMENT IV

15         MR. HAUSFELD                            179

16         ARGUMENT IV

17         BY MR. WARNOT                           180

18         ARGUMENT IV

19         MR. OGDEN                               183

20         ARGUMENT IV

21         BY MR. HAUSFELD                         187

22         ARGUMENT V

23         BY MR. BLANCH                           192

24         ARGUMENT V

25         BY MR. PRIVER                           202

1          ARGUMENT VI -A

2          BY MR. ATADIKA                              207

3          ARGUMENT VI -A

4          BY MR. CROSS                                212

5          ARGUMENT VI -B

6          BY MR. SPECKS                               222

7          ARGUMENT VI -B

8          BY MR. PRIVER                               232

9          ARGUMENT VI -B

10         BY MR. BLANCH                               237

11         ARGUMENT VI -B

12         BY MR. ATADIKA                              239

13         ARGUMENT VI -B

14         BY MR. CROSS                                242

15         ARGUMENT VI -A

16         BY MR. CROSS                                243

17         ARGUMENT VI -A

18         BY MR. SPECKS                               243

19         ARGUMENT VI  -A

20         BY MR. DONOVAN                              245

21         ARGUMENT VI -A

22         BY MR. DONOVAN                              260

23

24

25

## $

**$29** [1] - 53:18
**$600,000** [1] - 258:19

## '

**'78** [5] - 92:11, 96:19, 97:6, 102:7, 118:8
**'84** [9] - 92:12, 97:5, 97:11, 102:5, 102:10, 103:19, 106:13, 118:12, 118:17
**'87** [1] - 110:20
**'94** [1] - 92:13
**'conduct** [1] - 52:22
**'s** [1] - 204:23

## 0

**06-MD-01775** [1] - 1:4
**06-MD-1775** [1] - 8:14

## 1

**1** [12] - 11:20, 12:5, 17:21, 69:6, 85:1, 85:20, 143:22, 158:20, 177:25, 178:1, 179:9, 188:20
**10** [2] - 117:17, 263:6
**100** [1] - 2:20
**10005** [1] - 2:7
**10017** [1] - 7:7
**10019-6150** [1] - 7:11
**10022** [2] - 1:19, 4:13
**10036** [1] - 3:12
**10036-8704** [1] - 4:8
**10105** [1] - 7:15
**10110** [1] - 5:8
**10118** [1] - 2:16
**10119** [1] - 4:21
**10153** [1] - 6:7
**10165** [1] - 2:12
**104** [1] - 81:7
**105** [1] - 81:7
**1050** [1] - 2:2
**106** [2] - 81:17, 81:20
**107** [2] - 82:7, 263:24
**10:00** [1] - 1:8
**1100** [1] - 4:3
**111** [1] - 83:19
**1111** [1] - 5:17
**112** [1] - 83:23
**113** [4] - 85:1, 87:13, 87:16, 264:2
**114** [3] - 85:17, 87:14, 87:16
**1154** [1] - 205:14
**1155** [1] - 3:11
**116** [1] - 264:4
**1162** [1] - 205:14
**11:30** [1] - 56:22
**11th** [4] - 3:16, 5:3, 77:20, 209:10
**12(b)(1** [5] - 222:11, 225:18, 235:14, 236:10, 236:11
**12(b)(6** [1] - 235:14
**120** [1] - 5:12
**1201** [1] - 3:20

**1211** [1] - 4:8
**126** [1] - 264:7
**129** [1] - 264:9
**12th** [1] - 134:16
**13** [1] - 246:7
**1300** [1] - 3:15
**1330** [1] - 4:16
**1345** [1] - 7:14
**1367(c** [2] - 135:14, 136:17
**14** [2] - 13:6, 71:23
**140** [1] - 2:7
**143** [1] - 264:11
**1436** [1] - 2:11
**147** [1] - 233:5
**15** [5] - 13:6, 58:24, 69:24, 125:18, 192:22
**150** [1] - 7:6
**154** [1] - 264:13
**155** [1] - 233:5
**156/169** [1] - 235:20
**1603(a** [1] - 213:13
**1603(b)** [1] - 212:19
**1608** [1] - 210:11
**1625** [1] - 6:16
**17** [1] - 167:10
**1701** [1] - 4:24
**179** [1] - 264:15
**18** [1] - 69:24
**180** [1] - 264:17
**183** [1] - 264:19
**187** [1] - 264:21
**1875** [1] - 6:3
**19106** [1] - 6:12
**192** [1] - 264:23
**1938** [4] - 90:23, 90:25, 122:8
**1964** [1] - 72:7
**1973** [1] - 71:23
**1974** [1] - 71:21
**1978** [6] - 91:8, 91:13, 91:17, 96:13, 115:12, 115:25
**1979** [1] - 95:2, 95:16
**1982** [1] - 20:12
**1984** [6] - 96:24, 96:25, 97:25, 113:16, 113:21, 115:12
**1985** [1] - 259:18
**1992** [1] - 108:14
**1994** [5] - 99:3, 99:5, 113:16, 113:17, 125:11
**1998** [1] - 148:18
**1999** [2] - 74:3, 74:16
**1:00** [2] - 116:14, 121:17
**1st** [1] - 140:12

## 2

**2** [5] - 11:20, 12:6, 17:21, 69:6, 120:8
**2000** [2] - 85:2, 85:20
**20004** [4] - 3:3, 3:7, 5:3, 5:18
**20005-3934** [1] - 4:4
**20006** [4] - 4:24, 6:3, 6:16, 6:21
**2002** [3] - 74:25, 76:10, 77:15
**2003** [6] - 75:12, 77:16, 81:6, 81:7, 81:14, 82:5
**20036** [2] - 2:2, 4:17

**20037** [1] - 5:23
**2004** [4] - 75:13, 82:6, 82:8, 85:6
**2005** [1] - 85:7
**2005-3314** [1] - 3:16
**2006** [3] - 230:12, 231:3, 243:10
**2007** [8] - 71:6, 85:2, 85:20, 132:3, 132:4, 132:7, 211:17, 213:4
**2008** [1] - 1:8
**202** [1] - 264:25
**202)383-5300** [1] - 6:17
**202)383-5414** [1] - 6:17
**202-218-0024** [1] - 3:17
**202-293-6330** [1] - 4:25
**202-298-8660** [1] - 6:22
**202-312-9422** [1] - 3:17
**202-342-0683** [1] - 6:22
**202-408-4600** [1] - 4:5
**202-408-4699** [1] - 4:5
**202-429-3000** [1] - 4:17
**202-429-3902** [1] - 4:17
**202-530-9527** [1] - 2:3
**202-637-2200** [1] - 5:4
**202-663-6363** [1] - 6:4
**202-663-6440** [1] - 6:4
**202-663-7822** [1] - 5:23
**202-663-7849** [1] - 5:23
**202-739-3001** [1] - 5:18
**202-739-5225** [1] - 5:18
**202-777-4505** [1] - 3:8
**202-777-4555** [1] - 3:8
**202-799-4000** [1] - 3:3
**202-799-5523** [1] - 3:3
**202-955-8678** [1] - 2:3
**202-956-7650** [1] - 4:25
**203** [1] - 1:23
**207** [1] - 265:2
**212** [3] - 3:12, 265:4
**212-310-8007** [1] - 6:8
**212-310-8496** [1] - 6:8
**212-378-4325** [1] - 2:17
**212-403-1000** [1] - 7:11
**212-403-2000** [1] - 7:11
**212-490-3000** [1] - 7:7
**212-490-3038** [1] - 7:7
**212-608-1900** [1] - 5:9
**212-687-1980** [1] - 1:20
**212-687-7714** [1] - 1:20
**212-719-4677** [1] - 5:9
**212-736-9721** [1] - 2:17
**212-841-5700** [1] - 4:9
**212-841-5725** [1] - 4:9
**212-883-7527** [1] - 2:8
**212-903-9000** [1] - 7:15
**212-903-9100** [1] - 7:15
**212-907-0700** [1] - 2:8
**212-918-3100** [1] - 4:13
**212-918-3517** [1] - 4:13
**212-983-1320** [1] - 2:12
**212-983-9167** [1] - 2:12
**215-592-1500** [1] - 6:12
**215-592-4663** [1] - 6:12
**2200** [1] - 2:20
**222** [1] - 265:6
**22nd** [1] - 1:19
**23** [3] - 133:16, 134:2, 134:9

All Word // In Re:   Air Cargo Antitrust Litigation _____

2

**232** [1] - 265:8
**237** [1] - 265:10
**239** [1] - 265:12
**24** [1] - 148:1
**2401** [1] - 5:22
**242** [1] - 265:14
**243** [2] - 265:16, 265:18
**245** [1] - 265:20
**24A** [1] - 117:19
**24th** [1] - 5:12
**25** [1] - 148:1
**2500** [1] - 3:20
**26** [1] - 121:14
**260** [1] - 265:22
**2693903** [1] - 132:4
**28** [2] - 135:14, 136:17
**29** [2] - 154:8, 259:18
**296** [1] - 205:14
**2:20** [1] - 125:17
**2d** [2] - 235:10, 235:20

---

## 3

**3** [9] - 11:21, 17:22, 17:23, 18:14, 26:18, 26:24, 55:18, 120:8, 223:17
**30** [20] - 67:22, 70:14, 73:20, 74:12, 74:13, 75:8, 75:25, 77:5, 84:16, 105:11, 126:7, 148:1, 154:8, 192:22, 198:3, 201:6, 249:25, 252:8, 260:22
**300** [1] - 5:22
**301** [1] - 256:25
**312-558-1584** [1] - 1:24
**312-558-1585** [1] - 1:24
**32** [1] - 263:8
**33** [1] - 72:23
**350** [1] - 2:15
**354-8113** [1] - 3:12
**37** [2] - 79:25
**39** [2] - 146:6, 234:15

---

## 4

**4** [3] - 26:25, 81:20, 182:8
**40** [2] - 91:6, 105:11
**40109(a)(1** [1] - 121:6
**411102** [1] - 110:4
**41302** [2] - 109:16, 110:5
**415-421-2234** [1] - 7:3
**415-421-3400** [1] - 7:3
**42nd** [2] - 2:11, 7:6
**44/2001** [1] - 147:22
**44901** [3] - 110:9, 127:12, 127:14
**44901(h)(1** [1] - 110:2
**44904** [1] - 121:1
**465** [1] - 235:19
**47** [4] - 208:14, 224:18, 263:10
**475** [1] - 235:10
**49** [3] - 110:2, 110:8, 121:6

---

## 5

**5** [7] - 17:22, 17:23, 18:15, 26:18, 26:24, 55:18, 143:23

---

**50** [1] - 139:1
**500** [4] - 3:2, 4:4, 5:8, 6:11
**505** [1] - 233:5
**51** [2] - 7:10, 263:12
**510** [1] - 6:11
**52** [3] - 120:4, 121:5, 122:21
**52nd** [1] - 7:10
**53** [1] - 139:14
**54** [1] - 263:14
**55401** [1] - 2:21
**555** [1] - 5:3
**57** [1] - 263:16
**58th** [1] - 5:8
**5th** [1] - 5:8

---

## 6

**6** [4] - 1:8, 143:23, 144:1, 145:22
**6(1** [1] - 147:21
**6(a)(1** [1] - 48:3
**6(a)(1)** [3] - 19:23, 21:17, 47:20
**6(a)(2** [2] - 19:21, 19:23, 31:2
**6(a)(2)** [2] - 20:2, 48:3
**6.20** [1] - 148:5
**60** [3] - 2:11, 55:13, 235:10
**600** [1] - 3:7
**602** [1] - 259:18
**60601** [1] - 1:23
**60602** [1] - 5:13
**612-339-0981** [1] - 2:21
**612-339-6900** [1] - 2:21
**613-2324** [1] - 7:21
**613-2607** [1] - 7:21
**64106** [1] - 3:21
**68th** [1] - 2:16
**69** [1] - 263:18

---

## 7

**7** [5] - 11:22, 143:23, 144:1, 145:20, 182:13
**700** [1] - 6:21
**701** [1] - 3:6
**718** [2] - 7:21, 7:21
**767** [1] - 6:7

---

## 8

**8** [6] - 57:7, 69:24, 85:2, 85:20, 97:18, 223:19
**8(a)(2** [2] - 72:19, 76:9
**80** [1] - 255:21
**805** [1] - 1:18
**81** [31] - 28:10, 130:16, 135:4, 135:18, 139:13, 139:17, 139:20, 149:7, 149:13, 154:13, 160:18, 169:7, 173:5, 174:24, 175:11, 175:14, 175:20, 176:16, 176:22, 177:25, 178:2, 179:9, 181:3, 183:11, 186:19, 187:3, 187:7, 187:24, 188:20, 190:23
**816-691-3495** [1] - 3:21
**816-842-8600** [1] - 3:21
**819-8797** [1] - 3:12

---

**87** [2] - 69:20, 74:7
**875** [1] - 4:12
**88** [4] - 76:16, 77:2, 82:21, 263:20
**888** [1] - 6:20
**89** [1] - 82:24
**8th** [1] - 3:2

---

## 9

**9** [1] - 98:16
**9(b)** [1] - 72:19
**9/11** [1] - 39:14
**90** [2] - 75:1, 263:22
**901** [2] - 134:6, 134:8
**901(a** [1] - 134:9
**901(b** [2] - 132:25, 134:10
**91** [1] - 75:13
**92** [1] - 75:18
**94111** [1] - 7:2
**97** [1] - 77:20

---

## A

**a.m** [1] - 1:8
**Ababa** [1] - 224:20
**Abdu** [6] - 100:16, 101:18, 113:5, 114:5, 114:8, 114:10
**Abdu-Brisson** [6] - 100:16, 101:18, 113:5, 114:5, 114:8, 114:10
**Abdullah** [1] - 198:2
**abhorring** [1] - 135:7
**abide** [1] - 142:2
**ability** [7] - 46:9, 59:19, 67:9, 85:24, 86:11, 162:17, 167:12
**able** [9] - 9:7, 53:23, 65:8, 74:24, 159:12, 167:22, 195:19, 207:18, 219:20
**above-referred** [17] - 9:24, 14:8, 14:18, 14:24, 15:4, 15:12, 19:1, 20:15, 26:20, 27:9, 28:4, 28:13, 28:19, 118:13, 118:18, 120:12, 167:15
**abroad** [15] - 11:13, 23:9, 24:5, 34:3, 36:5, 36:7, 36:17, 36:20, 36:23, 37:1, 38:6, 46:8, 49:19, 49:25, 50:2
**absence** [3] - 116:1, 141:4, 206:18
**absent** [2] - 173:22, 218:8
**absolute** [1] - 160:3
**absolutely** [6] - 20:6, 63:4, 120:20, 150:23, 194:5, 236:16
**Absolutely** [7] - 64:7, 169:12, 227:12, 228:12, 232:3, 236:23
**accept** [11] - 60:10, 108:13, 115:22, 126:16, 129:19, 156:22, 167:12, 211:13, 231:11, 231:12, 262:14
**acceptance** [1] - 73:14
**accepted** [7] - 70:8, 73:9, 107:18, 111:16, 126:17, 128:4, 143:16
**accepting** [2] - 129:23, 138:17
**access** [5] - 85:24, 86:11, 88:23, 151:20, 152:22
**accomplish** [2] - 84:13, 217:19
**accomplished** [2] - 83:2, 217:20
**accord** [4] - 153:6, 196:5, 218:10
**accordance** [1] - 210:14
**accorded** [2] - 146:8, 216:23

All Word // In Re:  Air Cargo Antitrust Litigation _____3

**according** [6] - 154:11, 182:15, 205:6, 211:2, 226:25, 244:11
**account** [1] - 249:20
**accurate** [2] - 169:3, 228:8
**accurately** [2] - 162:9, 187:14
**accused** [2] - 29:9, 29:10
**achieve** [6] - 157:12, 157:13, 159:8, 159:9, 160:12, 160:24
**achieved** [2] - 217:16, 217:17
**acknowledge** [1] - 160:23
**acknowledged** [2] - 70:9, 90:14
**acknowledgement** [1] - 190:23
**acquainted** [1] - 8:6
**acquire** [3] - 238:18, 256:16
**acquired** [2] - 214:4, 229:10
**Act** [38] - 16:7, 20:13, 23:10, 25:19, 28:1, 28:10, 36:24, 41:2, 46:18, 48:7, 90:24, 91:17, 91:23, 93:9, 96:24, 107:10, 110:22, 112:8, 112:11, 119:11, 130:21, 131:15, 148:19, 158:20, 178:1, 188:21, 191:21, 193:8, 201:22, 202:18, 202:19, 206:22, 216:8, 217:4, 219:9, 220:1, 221:18, 239:11
**act** [15] - 17:10, 25:21, 97:11, 97:17, 97:22, 112:10, 120:17, 134:23, 161:13, 162:10, 162:16, 162:17, 195:2, 211:25, 242:9
**acted** [1] - 137:25
**acting** [2] - 94:8, 171:24
**action** [28] - 25:13, 131:20, 131:22, 132:12, 132:14, 132:15, 133:1, 133:12, 134:12, 135:4, 142:7, 143:4, 164:19, 164:20, 173:13, 182:24, 187:17, 203:21, 206:20, 206:21, 208:24, 211:17, 212:15, 213:11, 213:13, 233:8, 245:16
**Action** [2] - 131:15, 134:9
**actionable** [2] - 36:22, 36:24
**actions** [11] - 57:25, 63:18, 141:25, 152:19, 166:14, 186:23, 205:5, 226:22, 244:9, 247:15, 247:16
**actively** [1] - 171:12
**activities** [6] - 63:23, 88:18, 195:7, 213:22, 225:7
**activity** [36] - 193:18, 194:15, 194:18, 195:11, 195:21, 197:3, 197:8, 199:17, 203:19, 203:22, 204:23, 205:2, 205:11, 206:2, 206:5, 206:19, 209:6, 209:8, 209:13, 219:9, 222:22, 223:10, 224:7, 224:8, 231:23, 232:25, 233:2, 233:9, 233:11, 233:21, 238:1, 238:2, 238:4, 238:6
**acts** [5] - 20:3, 176:15, 195:20, 209:9, 256:6
**actual** [9] - 22:24, 36:7, 40:2, 58:21, 62:20, 149:9, 195:22, 202:2, 234:19
**ADA** [11] - 90:10, 91:8, 92:3, 92:11, 97:14, 100:4, 107:10, 112:4, 113:6, 117:16, 117:23
**adage** [1] - 155:2
**adapt** [2] - 155:2, 155:4
**adapted** [1] - 155:3
**add** [6] - 76:12, 77:16, 88:25, 106:2, 140:11, 252:22
**added** [5] - 87:12, 87:14, 89:3, 174:15, 254:21
**adding** [1] - 208:11

**Addis** [1] - 224:20
**addition** [7] - 132:2, 135:13, 136:16, 139:19, 184:2, 214:9, 226:8
**additional** [3] - 75:16, 75:19, 75:23
**Additionally** [1] - 151:19
**address** [26] - 15:25, 31:1, 31:18, 31:24, 31:25, 36:2, 42:8, 47:21, 51:6, 52:19, 54:6, 56:8, 107:14, 108:11, 111:22, 111:23, 117:9, 127:14, 141:14, 177:6, 177:20, 218:16, 222:6, 230:20, 231:16, 254:9
**addressed** [14] - 14:2, 24:25, 31:8, 60:20, 102:1, 107:20, 107:22, 108:15, 127:13, 127:17, 133:23, 170:11, 202:13, 231:8
**addresses** [4] - 111:8, 134:7, 144:24, 166:17
**addressing** [6] - 10:15, 18:14, 19:11, 112:15, 138:16, 141:11
**adds** [1] - 140:14
**adequate** [11] - 141:13, 141:18, 146:20, 147:8, 148:24, 149:19, 156:23, 156:24, 157:1, 169:13, 221:8
**adequately** [2] - 128:18, 195:15
**Adir** [1] - 7:9
**adjective** [3] - 100:8, 121:13, 122:24
**adjourned** [1] - 262:24
**adjudicate** [6] - 138:24, 170:4, 186:8, 187:2, 187:6
**adjudicated** [2] - 145:8, 169:10
**adjudicates** [1] - 186:15
**adjudicating** [1] - 171:7
**adjudication** [2] - 138:9, 154:13
**adjustment** [1] - 150:18
**administered** [1] - 153:1
**admissible** [1] - 225:20
**admission** [1] - 177:23
**admits** [1] - 145:18
**admitted** [3] - 109:22, 113:21, 182:17
**Admittedly** [1] - 108:11
**adopt** [1] - 174:13
**adopted** [1] - 136:21
**adopting** [2] - 141:17, 173:21
**advance** [6] - 58:3, 129:15, 138:17, 139:6, 145:11, 225:16
**advanced** [4] - 203:13, 204:8, 207:16, 211:16
**advances** [1] - 203:4
**adversaries** [1] - 69:16
**adverse** [2] - 31:10, 31:11
**adversely** [1] - 31:14
**advocacy** [1] - 262:18
**advocate** [2] - 160:23, 262:20
**Aeronautics** [3] - 95:2, 95:7, 96:24
**affect** [5] - 41:8, 48:13, 124:20, 159:16, 159:23
**affected** [4] - 36:21, 47:3, 113:16, 113:21
**affecting** [3] - 21:19, 53:6, 207:19
**affects** [3] - 48:18, 50:5, 51:4
**affidavit** [14] - 147:18, 148:2, 154:11, 156:14, 180:17, 196:24, 210:22, 211:7, 211:9, 213:25, 221:24, 243:4, 243:24
**affidavits** [3] - 185:16, 185:17, 196:22
**affirmatively** [3] - 166:9, 166:19, 173:24

**affirmed** [1] - 63:24
**afford** [2] - 184:20, 188:25
**afforded** [1] - 149:17
**affront** [1] - 167:5
**Africa** [24] - 67:11, 72:17, 77:25, 78:3, 79:3, 80:16, 81:18, 87:23, 87:24, 110:23, 111:1, 111:4, 119:5, 193:23, 213:5, 213:7, 214:7, 218:20, 218:21, 229:10, 231:5, 242:10, 246:21, 252:6
**Africa's** [1] - 229:15
**African** [22] - 110:20, 119:2, 119:8, 119:10, 119:12, 121:1, 127:19, 212:6, 212:12, 213:4, 213:14, 216:17, 218:10, 224:3, 228:20, 229:12, 230:4, 230:11, 230:13, 231:3, 231:17, 231:21
**afternoon** [6] - 125:20, 154:23, 154:24, 177:14, 179:5, 207:14
**AFTERNOON** [2] - 125:25, 126:1
**afterwards** [1] - 121:13
**AG** [1] - 143:12
**agency** [5] - 213:7, 257:5, 258:4, 259:14
**Agency** [1] - 136:22
**agenda** [1] - 125:20
**agent** [17] - 38:22, 247:4, 247:9, 247:12, 247:17, 248:2, 254:1, 256:6, 257:3, 257:13, 258:8, 258:10, 259:6, 259:10, 259:20, 260:14, 260:18
**agent's** [3] - 247:15, 257:2, 259:11
**agents** [5] - 25:25, 26:1, 26:7, 26:12, 38:20
**aggregate** [1] - 131:18
**agree** [32] - 27:24, 32:16, 32:17, 32:18, 33:19, 46:2, 64:25, 75:15, 76:12, 78:16, 83:25, 85:7, 100:6, 100:24, 102:16, 104:14, 106:1, 114:12, 124:21, 125:3, 139:5, 144:8, 144:10, 156:21, 182:9, 208:8, 208:10, 213:23, 234:10, 239:23, 246:7
**agreed** [34] - 35:8, 39:10, 39:23, 40:14, 59:6, 60:14, 61:2, 63:14, 64:6, 64:18, 64:23, 74:3, 74:15, 76:18, 77:21, 80:5, 80:9, 80:12, 81:15, 81:21, 83:3, 83:15, 85:3, 85:22, 86:10, 87:2, 142:2, 171:4, 205:8, 210:17, 227:1, 244:13, 245:5
**Agreed** [1] - 251:13
**agreement** [28] - 12:9, 13:4, 22:15, 22:16, 23:4, 23:8, 27:5, 27:7, 27:13, 28:25, 40:1, 44:12, 49:5, 58:6, 76:10, 83:21, 84:15, 85:13, 135:19, 150:14, 151:8, 185:8, 234:15, 244:17, 251:4, 257:5, 258:4, 259:14
**agreements** [3] - 58:8, 58:10, 75:24
**agrees** [3] - 95:16, 104:8, 205:3
**agwaldman@wlrk.com** [1] - 7:12
**ahead** [7] - 40:24, 64:14, 120:2, 212:10, 232:21, 237:12, 246:15
**aided** [1] - 7:23
**aids** [1] - 9:5
**Aim** [1] - 86:3
**AIR** [1] - 1:6
**Air** [40] - 8:14, 57:6, 73:21, 77:6, 86:5, 91:4, 92:24, 105:19, 106:21, 114:21, 114:22, 119:3, 122:8, 129:11, 244:20, 244:23, 244:24, 256:3, 256:7, 257:2, 257:4, 257:6, 257:8, 258:5, 258:6, 258:9,

258:11, 258:12, 258:15, 258:16, 259:5, 259:8, 259:25, 260:2, 260:8, 260:13, 260:15, 260:18, 262:11

**air** [220] - 10:19, 10:23, 11:4, 23:8, 26:9, 33:13, 33:16, 39:10, 39:15, 51:16, 73:16, 73:19, 81:8, 81:11, 81:12, 81:16, 81:22, 83:18, 83:22, 85:4, 85:22, 86:8, 90:12, 90:20, 91:1, 91:2, 91:3, 91:4, 91:19, 92:17, 92:18, 92:21, 92:23, 93:1, 93:3, 93:10, 93:14, 93:17, 93:21, 93:22, 94:1, 94:4, 94:5, 94:6, 94:8, 94:9, 94:13, 95:12, 95:13, 95:21, 95:22, 96:1, 96:4, 96:5, 96:6, 96:8, 96:9, 96:14, 96:15, 96:16, 96:18, 96:19, 97:14, 97:21, 98:3, 98:4, 98:8, 98:22, 98:24, 99:13, 99:14, 99:17, 99:23, 102:1, 102:2, 102:7, 102:14, 102:22, 103:7, 103:9, 103:15, 103:17, 103:23, 103:25, 105:6, 105:7, 105:11, 105:12, 105:15, 105:16, 105:18, 105:21, 105:22, 106:9, 106:11, 106:15, 106:16, 106:17, 106:22, 107:12, 108:24, 109:2, 109:5, 109:8, 109:10, 109:12, 109:14, 109:17, 109:18, 109:19, 109:20, 109:23, 110:2, 110:3, 110:5, 110:12, 110:22, 111:4, 114:5, 114:15, 114:20, 114:21, 114:22, 115:6, 115:7, 115:15, 115:16, 115:19, 116:20, 117:15, 117:17, 117:18, 117:23, 118:9, 118:21, 118:24, 118:25, 119:1, 119:9, 119:15, 119:18, 119:19, 119:20, 120:3, 120:4, 120:7, 120:8, 120:16, 120:24, 121:6, 121:7, 121:8, 121:11, 122:8, 122:10, 122:11, 122:19, 122:21, 123:2, 124:2, 124:6, 124:8, 124:18, 125:2, 127:2, 127:4, 127:5, 195:8, 199:6, 199:8, 199:10, 199:23, 200:15, 200:17, 203:18, 204:10, 205:6, 206:9, 218:23, 218:24, 219:6, 219:23, 223:11, 224:21, 225:5, 226:24, 227:4, 233:17, 233:19, 241:7, 244:11, 252:10, 257:9, 258:12

**aircraft** [4] - 22:21, 121:7, 121:11
**Aircraft** [1] - 248:19
**Airline** [2] - 91:17, 91:23
**airline** [17] - 91:25, 98:25, 106:18, 110:24, 124:11, 201:1, 210:2, 210:23, 240:23, 243:7, 243:10, 243:11, 243:16, 247:5, 247:6, 260:9, 260:11
**Airlines** [11] - 73:21, 119:12, 143:13, 192:4, 193:1, 197:17, 202:11, 224:19, 229:12, 239:7, 240:18
**airlines** [21] - 66:25, 84:15, 84:17, 91:24, 91:25, 108:3, 112:11, 112:12, 112:14, 123:20, 124:3, 125:1, 193:11, 198:3, 207:22, 208:14, 241:14, 247:7, 247:18, 251:2, 257:16
**Airlines's** [1] - 197:25
**airplane** [2] - 81:12, 200:24
**airplanes** [1] - 218:25
**Airport** [1] - 224:20
**airspace** [1] - 81:13
**airways** [2] - 97:4, 262:3
**Airways** [28] - 10:14, 110:20, 117:19, 119:8, 119:11, 119:12, 121:1, 127:19, 165:22, 166:7, 203:14, 204:17, 206:8, 212:6, 212:13, 213:5, 224:3, 227:19, 227:20, 228:20, 230:4, 230:11, 230:13,

231:4, 231:17, 231:21, 232:24, 234:17
**Airways's** [1] - 206:19
**Airways/Virgin** [1] - 167:11
**akin** [2] - 200:22, 217:5
**albeit** [1] - 105:3
**ALCOA** [1] - 20:11
**alcoholic** [1] - 104:1
**Alexander** [1] - 6:15
**Alitalia's** [1] - 216:3
**ALL** [1] - 8:4
**all-in** [1] - 49:6
**Allan** [1] - 7:1
**allegation** [13] - 60:21, 62:20, 62:24, 63:6, 66:16, 82:10, 87:17, 87:20, 87:22, 223:4, 224:2, 225:1, 241:10
**allegations** [46] - 31:9, 39:9, 58:3, 58:16, 58:20, 58:23, 59:2, 59:4, 60:17, 60:22, 61:7, 61:9, 61:16, 61:19, 61:20, 61:23, 62:17, 62:19, 63:3, 63:4, 63:11, 65:8, 68:5, 68:12, 69:19, 69:22, 84:9, 86:24, 88:13, 89:20, 222:15, 222:16, 222:21, 223:8, 223:15, 224:6, 225:1, 226:5, 235:13, 235:16, 235:22, 246:11, 250:1
**allege** [19] - 19:24, 58:19, 58:24, 59:11, 59:17, 62:22, 63:12, 64:2, 66:13, 75:5, 76:14, 78:19, 82:5, 83:21, 88:13, 168:8, 195:20, 197:24, 199:19
**alleged** [21] - 15:7, 15:22, 16:19, 22:15, 25:16, 25:19, 28:24, 33:9, 45:18, 51:21, 59:13, 66:4, 66:9, 71:15, 88:15, 204:19, 204:22, 233:13, 233:23, 246:23, 253:9
**allegedly** [6] - 10:17, 15:14, 27:25, 34:12, 39:22, 87:12
**Allegedly** [1] - 25:11
**alleges** [1] - 83:17
**alleging** [6] - 10:17, 10:20, 22:19, 60:12, 89:7, 198:1
**allocate** [1] - 192:5
**allocated** [1] - 63:16
**allocating** [2] - 58:10, 85:23
**allocation** [10] - 83:1, 85:16, 86:2, 167:18, 167:20, 168:12, 168:13, 170:12, 173:10, 173:11
**allow** [9] - 66:22, 111:3, 124:14, 124:15, 152:23, 152:24, 153:1, 153:7, 241:19
**allowable** [1] - 68:5
**allowed** [8] - 46:4, 46:25, 47:5, 61:10, 125:1, 141:25, 241:5, 249:20
**allowing** [3] - 68:7, 193:10, 241:14
**allows** [2] - 147:22, 159:3
**almost** [8] - 43:2, 44:19, 93:20, 139:1, 179:21, 206:25, 258:18, 259:14
**alone** [7] - 18:3, 30:6, 137:2, 159:22, 208:24, 230:16, 233:20
**Alston** [1] - 95:3
**alternative** [4] - 141:13, 141:19, 146:20, 147:8, 148:25, 169:14
**Alvarez** [1] - 7:1
**amalgam** [1] - 139:18
**ambiguity** [2] - 157:9, 159:7
**amenability** [2] - 147:14, 148:12
**amenable** [3] - 147:9, 147:16, 147:19
**amend** [2] - 88:25, 227:23
**amended** [6] - 68:18, 86:20, 88:24, 99:4, 102:5, 203:12

**Amended** [1] - 208:14
**amendment** [8] - 92:12, 92:13, 97:25, 98:17, 99:4, 99:5, 99:6, 103:19
**amendments** [1] - 99:3
**America** [2] - 67:10, 81:18
**American** [4] - 11:11, 51:24, 165:7
**Americas** [3] - 3:11, 4:8, 7:14
**amicable** [2] - 138:10, 182:16
**amnesty** [4] - 65:5, 65:14, 66:9, 79:11
**Amnesty** [1] - 65:12
**Amon** [2] - 132:18, 133:21
**amorganti@milberg.com** [1] - 4:21
**amorphous** [1] - 198:20
**amount** [8] - 39:23, 47:4, 49:15, 62:19, 87:6, 88:22, 131:17, 197:16
**amounts** [3] - 75:20, 87:7, 131:19
**AMR** [1] - 155:6
**analogizing** [1] - 33:5
**analogous** [3] - 24:9, 26:5, 53:16
**analogy** [2] - 190:9, 200:22
**analysis** [35] - 12:4, 15:18, 16:6, 17:6, 19:10, 20:7, 20:9, 21:3, 29:4, 32:25, 33:17, 33:21, 36:4, 36:14, 38:5, 43:15, 43:22, 45:17, 52:14, 55:2, 111:15, 114:6, 114:8, 114:10, 114:11, 138:1, 140:6, 141:12, 152:4, 182:20, 199:14, 202:1, 203:23, 254:13
**Analysis** [2] - 190:12, 190:13
**analytical** [2] - 206:2, 206:3
**analyze** [2] - 21:21, 47:19
**analyzed** [3] - 21:11, 38:12, 200:10
**analyzing** [1] - 132:17
**Andrea** [1] - 4:2
**Andrew** [2] - 4:19, 4:23
**angle** [1] - 208:22
**announced** [1] - 162:22
**announcement** [1] - 161:10
**announces** [1] - 161:18
**announcing** [3] - 156:12, 171:16, 180:22
**answer** [18] - 35:19, 37:3, 44:20, 58:18, 86:15, 86:16, 126:16, 126:18, 128:2, 131:13, 131:22, 146:21, 195:14, 195:16, 218:20, 229:8, 231:19, 245:8, 254:1
**answer's** [1] - 120:3
**answered** [4] - 33:25, 66:12, 90:4, 131:23
**answering** [1] - 163:5
**answers** [2] - 35:20, 58:15
**Anti** [1] - 110:21
**anti** [1] - 119:11
**Anti-Apartheid** [1] - 110:21
**anti-Apartheid** [1] - 119:11
**anticipated** [2] - 200:15
**antique** [1] - 53:17
**antithesis** [1] - 159:20
**ANTITRUST** [1] - 1:7
**Antitrust** [6] - 8:15, 42:3, 57:16, 71:14, 176:7, 180:16
**antitrust** [32] - 42:14, 42:17, 42:22, 43:9, 43:16, 43:20, 43:23, 44:1, 44:4, 44:25, 45:1, 45:5, 45:18, 52:12, 56:4, 57:25, 70:9, 73:17, 78:22, 79:12, 129:21, 150:11, 150:17, 160:20, 162:20, 162:23, 171:21, 185:9, 186:15, 204:18, 241:20

**anxious** [1] - 126:24
**anyway** [3] - 32:3, 50:3, 91:12
**apart** [2] - 208:15, 216:4
**Apartheid** [2] - 110:21, 119:11
**apologize** [2] - 57:8, 124:1
**appeal** [7] - 53:20, 134:15, 134:16, 181:19, 184:16, 185:3, 185:5
**Appeals** [2] - 247:14, 261:16
**appear** [2] - 117:7, 146:16
**appellate** [1] - 181:14
**appendix** [20] - 222:23, 225:2, 225:10, 225:13, 226:2, 226:9, 227:6, 236:12, 236:21, 236:22, 239:9, 239:14, 239:20, 239:21, 239:22, 239:23, 240:3, 240:10, 242:4, 242:5
**applicability** [1] - 233:1
**applicable** [5] - 27:24, 39:18, 103:7, 175:20, 208:14
**applicant** [2] - 65:5, 79:11
**applicants** [1] - 143:15
**Application** [1] - 65:13
**application** [15] - 22:13, 22:16, 22:24, 30:15, 35:10, 48:21, 66:9, 110:1, 132:25, 156:12, 167:14, 171:16, 174:19, 182:19, 233:16
**applied** [22] - 17:2, 17:11, 23:12, 29:3, 29:23, 36:6, 39:17, 40:16, 41:3, 49:7, 66:18, 77:13, 87:21, 111:14, 112:11, 116:4, 119:4, 137:13, 161:19, 184:6, 213:20, 237:25
**applies** [23] - 19:10, 22:10, 22:23, 48:23, 64:25, 93:17, 99:22, 99:23, 101:4, 116:7, 129:24, 138:7, 150:17, 151:14, 169:8, 193:19, 194:4, 200:7, 206:3, 206:5, 210:12, 210:25, 231:24
**Applies** [1] - 226:22
**apply** [42] - 19:10, 21:9, 41:1, 62:4, 62:7, 71:24, 100:4, 101:5, 103:6, 107:23, 111:17, 111:19, 112:13, 119:10, 122:25, 123:2, 133:7, 137:19, 147:1, 147:5, 148:10, 150:11, 150:24, 150:20, 161:23, 179:24, 183:25, 184:5, 190:11, 190:15, 191:4, 194:15, 197:20, 198:22, 199:13, 215:17, 218:4, 233:12, 241:2, 241:4, 241:9, 247:24
**applying** [11] - 17:13, 21:11, 25:22, 49:11, 116:2, 155:12, 157:20, 164:14, 172:14, 173:15, 177:2
**appreciate** [2] - 153:20, 163:6, 262:19
**approach** [4] - 151:5, 167:10, 207:13, 208:22
**appropriate** [2] - 144:16, 144:23
**appropriately** [1] - 139:10
**approve** [2] - 166:4, 169:24
**approved** [2] - 143:21, 148:19
**approving** [2] - 165:21, 169:25
**aptly** [1] - 155:11
**Arabia** [4] - 193:25, 194:1, 194:2, 199:12
**Arabian** [4] - 192:3, 193:1, 197:17, 197:25
**arbitrage** [1] - 31:18
**arbitration** [2] - 168:12, 173:12
**ARE** [1] - 212:9
**area** [2] - 123:18, 162:25
**Arenson** [11] - 1:17, 68:24, 69:12,

86:21, 86:25, 87:11, 88:11, 88:21, 89:1, 89:13, 89:25
**ARENSON** [49] - 68:25, 69:3, 69:9, 69:10, 71:3, 71:6, 71:13, 72:13, 72:24, 73:2, 73:18, 74:2, 74:6, 74:9, 74:19, 74:22, 76:3, 76:5, 76:7, 78:5, 78:11, 78:13, 79:19, 79:22, 80:8, 80:16, 81:4, 82:11, 82:15, 82:18, 82:21, 83:5, 83:8, 83:10, 83:14, 83:17, 84:6, 84:14, 84:25, 85:17, 85:19, 86:17, 191:13, 193:24, 250:15, 250:18, 250:22, 262:22, 263:18
**arguably** [3] - 24:4, 51:10, 195:21
**argue** [13] - 24:4, 40:5, 47:23, 48:17, 50:2, 53:20, 61:3, 116:23, 121:17, 177:18, 191:22, 192:10, 198:15
**argued** [5] - 101:18, 134:16, 134:22, 217:5, 232:18
**arguing** [13] - 21:8, 23:13, 47:21, 57:6, 69:22, 129:13, 133:15, 137:1, 137:5, 177:17, 219:17, 219:18, 230:7
**ARGUMENT** [69] - 1:12, 10:11, 32:13, 47:10, 51:1, 54:15, 57:2, 69:8, 88:3, 90:17, 107:2, 113:1, 116:12, 126:2, 129:8, 143:1, 143:9, 154:21, 179:1, 180:9, 183:5, 187:19, 192:1, 202:9, 207:9, 212:2, 221:1, 222:2, 232:22, 237:13, 239:4, 242:2, 243:1, 243:21, 245:1, 261:1, 263:5, 263:7, 263:9, 263:11, 263:13, 263:15, 263:17, 263:19, 263:21, 263:23, 264:1, 264:3, 264:6, 264:8, 264:10, 264:12, 264:14, 264:16, 264:18, 264:20, 264:22, 264:24, 265:1, 265:3, 265:5, 265:7, 265:9, 265:11, 265:13, 265:15, 265:17, 265:19, 265:21
**argument** [105] - 9:7, 12:4, 13:21, 17:17, 18:1, 18:2, 19:11, 19:15, 19:18, 20:1, 31:16, 31:23, 40:20, 41:13, 41:15, 42:14, 47:17, 48:1, 48:14, 48:20, 52:21, 54:19, 57:10, 57:14, 64:1, 65:11, 78:12, 90:6, 90:9, 90:10, 90:16, 101:11, 104:9, 105:5, 105:8, 106:24, 107:17, 108:9, 108:15, 108:23, 109:1, 111:16, 111:25, 113:15, 115:5, 115:23, 116:16, 118:11, 119:7, 119:21, 120:15, 120:23, 122:5, 123:16, 126:6, 128:4, 128:8, 128:19, 128:24, 129:11, 133:18, 134:24, 137:6, 137:7, 137:11, 138:13, 138:18, 141:17, 147:18, 155:19, 177:16, 191:7, 192:8, 193:13, 194:14, 194:22, 195:6, 198:10, 198:12, 199:11, 201:10, 203:9, 203:10, 209:15, 209:16, 211:15, 211:19, 218:6, 229:11, 236:10, 236:14, 238:14, 244:5, 244:19, 244:22, 244:23, 245:21, 245:24, 248:9, 248:11, 254:11, 259:22, 260:17, 262:6
**Argument** [1] - 8:14
**arguments** [18] - 9:6, 47:13, 100:4, 118:4, 128:6, 128:7, 128:8, 144:8, 165:6, 179:4, 186:2, 191:25, 198:16, 211:22, 229:11, 237:11, 246:4, 262:19
**arise** [5] - 19:25, 150:7, 152:11, 156:5, 246:1
**arises** [1] - 203:5
**arising** [2] - 182:11, 199:6
**arose** [1] - 22:19
**Arp** [1] - 2:1

**arrangement** [4] - 16:17, 31:14, 210:15, 247:17
**arrangements** [4] - 25:8, 27:12, 51:25, 247:7
**arranges** [1] - 247:9
**arranging** [1] - 54:1
**arrive** [2] - 37:22, 200:16
**article** [1] - 188:1
**Article** [33] - 28:10, 130:16, 135:4, 135:18, 139:13, 139:14, 139:17, 139:20, 147:21, 149:7, 149:13, 154:13, 160:18, 169:7, 173:5, 174:24, 175:11, 175:14, 175:20, 176:16, 176:22, 177:25, 178:2, 179:9, 181:3, 183:11, 186:18, 187:3, 187:7, 187:24, 188:20, 190:23
**articulate** [1] - 214:10
**articulated** [5] - 9:12, 213:16, 215:4, 215:13, 217:12
**articulates** [1] - 137:15
**artificial** [1] - 234:22
**artificially** [2] - 234:6, 234:8
**Asciolla** [2] - 2:5, 254:6
**ASCIOLLA** [18] - 254:6, 254:19, 254:24, 255:3, 255:15, 255:19, 255:23, 256:2, 256:10, 256:25, 257:18, 257:21, 257:25, 258:3, 258:23, 259:1, 259:17, 259:24
**Asia** [2] - 81:18, 246:21
**aside** [8] - 139:25, 149:9, 150:16, 185:9, 245:11, 247:13, 253:7, 258:24
**aspect** [10] - 32:21, 40:7, 71:10, 71:20, 86:1, 133:9, 163:11, 179:11, 209:4, 214:6
**aspects** [2] - 177:12, 245:11
**assert** [7] - 46:13, 99:6, 140:16, 175:14, 194:14, 196:14, 237:19
**asserted** [5] - 69:15, 169:2, 169:4, 169:6, 193:20
**assertion** [3] - 46:15, 163:8, 224:18
**assertions** [2] - 80:7, 225:14
**assist** [1] - 157:19
**assistance** [2] - 155:1, 187:10
**associated** [1] - 132:16
**association** [3] - 29:8, 60:5, 83:21
**Association** [1] - 29:9
**assort** [1] - 155:17
**assume** [10] - 13:24, 27:3, 78:16, 140:1, 171:13, 174:23, 199:5, 203:7, 221:7, 235:25
**assumed** [2] - 140:24, 243:12
**assuming** [3] - 80:13, 131:12, 139:9
**assumption** [2] - 131:20, 140:4
**assure** [1] - 244:1
**asteyer@steyerlaw.com** [1] - 7:4
**Atadika** [5] - 2:10, 207:8, 237:6, 239:3, 239:6
**ATADIKA** [28] - 2:10, 207:10, 207:11, 208:9, 208:11, 209:19, 209:23, 210:1, 210:7, 210:11, 210:19, 211:7, 211:11, 211:15, 211:20, 211:23, 232:11, 237:8, 239:5, 239:6, 240:5, 240:11, 240:14, 240:20, 241:23, 265:2, 265:12
**Atadika@earthlink.net** [1] - 2:13
**Atlantic** [4] - 165:22, 166:7, 167:11, 182:9
**attach** [2] - 16:20, 225:2
**attached** [3] - 214:8, 225:2, 243:4

**attaches** [1] - 214:11
**attachment** [1] - 197:15
**attack** [3] - 153:24, 154:1, 194:23
**attacks** [1] - 77:20
**attempt** [1] - 89:20
**attempted** [2] - 128:6, 219:15
**attempting** [2] - 214:1, 219:25
**attend** [1] - 30:2
**attendance** [1] - 176:2
**attention** [1] - 210:8
**attitude** [1] - 138:20
**attorney** [1] - 192:5
**attorney's** [3] - 174:10, 174:12, 174:15
**Attorneys** [3] - 116:19, 117:10, 184:13
**attractive** [1] - 128:16
**atypical** [2] - 13:4, 13:20
**auction** [14] - 14:16, 15:1, 15:8, 15:22, 24:12, 24:15, 24:19, 25:6, 25:17, 37:4, 37:5, 38:16, 51:13, 53:14
**auctioned** [2] - 25:8, 37:24
**auctioneer** [5] - 34:3, 37:16, 37:17, 37:25, 38:1
**auctioneer's** [1] - 38:17
**auctioneering** [1] - 55:4
**auctions** [1] - 38:20
**audiovisual** [1] - 57:8
**August** [2] - 82:8, 132:7
**Austria** [1] - 140:7
**Austrian** [1] - 146:10
**authorities** [2] - 104:18, 155:22
**authority** [23] - 88:8, 92:17, 94:24, 95:22, 98:4, 98:22, 99:8, 99:10, 99:18, 106:15, 114:14, 118:23, 119:14, 119:20, 122:19, 151:16, 156:8, 171:19, 171:24, 172:1, 232:2, 247:5
**authorization** [1] - 200:5
**authorized** [2] - 94:14, 257:5
**authorizes** [2] - 109:17, 166:14
**automatically** [1] - 52:12
**avail** [1] - 173:18
**availabilities** [1] - 254:2
**availability** [1] - 184:12
**available** [8] - 83:18, 150:5, 167:6, 170:10, 184:10, 191:4, 191:5, 248:7
**Ave** [5] - 3:6, 3:11, 4:24, 5:8, 5:22
**Avenue** [12] - 1:18, 2:2, 2:15, 2:20, 4:3, 4:8, 4:12, 4:16, 5:17, 6:3, 6:7, 7:14
**average** [1] - 258:18
**averments** [2] - 222:19, 222:24
**Avia** [9] - 257:15, 257:23, 258:1, 258:13, 258:15, 259:9, 261:19
**Aviation** [3] - 90:23, 93:9, 107:10
**aviation** [7] - 92:4, 92:7, 97:9, 97:19, 97:22, 99:16, 102:13
**avoid** [3] - 123:19, 192:7, 192:9
**aware** [10] - 9:5, 9:6, 10:16, 57:15, 57:22, 112:8, 125:10, 131:16, 143:19, 216:13
**awful** [1] - 70:11

**B**

**B.A** [1] - 65:23
**bad** [1] - 140:3
**Baer** [2] - 131:24, 135:8

**Baer's** [1] - 132:6
**Baker** [1] - 5:21
**balance** [1] - 153:16
**balancing** [1] - 151:5
**ball** [2] - 9:15, 9:17
**Bangkok** [2] - 206:13, 237:2
**Bar** [2] - 79:1, 80:18
**bar** [1] - 43:8
**bare** [2] - 204:15, 245:5
**barred** [2] - 12:25, 48:6
**barriers** [1] - 152:14
**bars** [1] - 48:9
**Based** [2] - 79:22, 208:24
**based** [27] - 46:9, 79:23, 137:24, 138:5, 145:24, 146:13, 156:15, 186:24, 200:1, 203:20, 203:21, 203:22, 205:5, 205:10, 205:11, 206:1, 206:18, 225:24, 233:8, 233:10, 233:22, 234:14, 238:1, 244:10, 244:16, 251:21
**Basedow's** [1] - 180:17
**baseline** [1] - 218:7
**bases** [2] - 246:17, 249:15
**basic** [1] - 128:4
**basis** [13] - 89:7, 132:23, 133:10, 133:11, 195:1, 202:15, 202:18, 208:18, 221:10, 239:24, 245:23, 251:14, 253:18
**basket** [1] - 20:3
**bat** [1] - 245:9
**Bear** [1] - 133:24
**bear** [5] - 10:20, 71:10, 82:2, 225:7, 231:2
**bears** [1] - 168:4
**become** [3] - 8:7, 166:18, 212:14
**becomes** [5] - 172:17, 189:3, 198:23, 200:10, 215:11
**BEFORE** [1] - 1:13
**began** [6] - 23:20, 23:24, 39:14, 207:21, 230:13, 231:4
**beginning** [4] - 72:5, 75:12, 81:6, 82:8
**begins** [2] - 223:15, 223:17
**behalf** [12] - 11:20, 57:6, 129:11, 141:14, 142:5, 191:22, 192:12, 202:11, 222:5, 257:4, 257:8, 262:1
**behavior** [2] - 204:6, 204:19
**belabor** [2] - 33:19, 216:24
**belies** [2] - 66:17, 87:20
**bells** [5] - 8:6, 69:1, 69:4, 72:15, 107:5, 107:6, 154:25, 191:17
**belly** [1] - 22:20
**belong** [1] - 236:7
**below** [4] - 116:25, 117:6, 123:13, 123:23
**bench** [2] - 56:24, 191:11
**benefit** [5] - 93:16, 94:15, 99:1, 122:23, 128:25
**benefits** [6] - 93:3, 94:1, 94:19, 99:16, 106:19, 218:10
**Berlin** [5] - 12:16, 12:17, 12:18, 12:22, 12:23
**Berman** [1] - 6:10
**best** [5] - 90:13, 138:21, 138:22, 188:21, 209:18
**better** [5] - 53:3, 101:11, 121:18, 151:16, 239:25
**between** [37] - 11:17, 13:12, 15:9, 18:7,

26:8, 26:25, 31:12, 48:5, 49:15, 61:6, 69:17, 76:1, 77:10, 90:12, 91:19, 95:24, 98:15, 128:12, 129:21, 137:12, 137:23, 145:6, 151:4, 153:2, 153:4, 157:7, 162:4, 168:13, 168:17, 171:6, 180:21, 183:9, 204:5, 204:22, 210:15, 233:23, 234:15
**beyond** [10] - 75:17, 76:21, 78:23, 79:13, 105:3, 152:8, 171:24, 183:22, 205:19, 209:4
**Bianco** [1] - 133:23
**Bianco's** [1] - 132:2
**bid** [4] - 14:20, 14:21, 15:24, 24:25
**bids** [1] - 63:15
**big** [5] - 38:5, 98:14, 113:22, 152:11, 250:20
**bigger** [1] - 43:18
**Biggio** [3] - 138:4, 138:8, 177:20
**Bigio** [1] - 182:15
**bill** [5] - 16:1, 25:1, 98:9, 98:17, 197:6
**Bill** [2] - 112:7, 112:8
**bind** [2] - 247:5, 262:12
**binding** [8] - 93:8, 95:7, 171:15, 176:20, 181:4, 181:6, 186:22, 188:24
**binds** [1] - 217:21
**bit** [11] - 11:10, 76:17, 76:25, 80:2, 80:12, 86:13, 98:15, 131:25, 135:9, 183:8, 186:12
**black** [1] - 147:13
**Blanch** [11] - 2:14, 2:15, 192:3, 192:24, 201:5, 202:13, 205:13, 218:17, 232:19, 237:9, 237:12
**BLANCH** [28] - 192:2, 192:3, 192:16, 193:1, 194:2, 194:19, 195:4, 195:13, 196:7, 196:12, 196:23, 198:6, 198:14, 200:1, 200:9, 200:21, 201:6, 201:23, 202:5, 232:13, 232:16, 237:14, 237:15, 237:23, 238:10, 238:23, 264:23, 265:10
**blanket** [1] - 194:11
**Block** [1] - 133:24
**block** [4] - 29:11, 153:13, 153:14
**Block's** [1] - 132:4
**blocking** [1] - 152:12
**blown** [1] - 206:25
**blunderbuss** [1] - 63:6
**BMW** [1] - 12:24
**board** [1] - 40:17
**Board** [3] - 95:2, 96:24, 139:2
**Board's** [1] - 95:7
**boat** [1] - 197:13
**Bockius** [1] - 5:17
**body** [3] - 45:24, 158:4, 181:7
**bog** [1] - 138:15
**Bole** [1] - 224:20
**bones** [1] - 70:20
**Bonime** [2] - 131:25, 133:21
**Boodrookas** [1] - 7:1
**border** [2] - 155:10, 179:24
**Boston** [1] - 25:10
**bother** [2] - 22:3, 69:4
**bought** [2] - 53:17, 251:9
**bouncing** [1] - 113:13
**bound** [6] - 93:20, 166:20, 173:25, 174:1, 189:15, 190:8
**boundaries** [4] - 152:22, 159:13, 159:16, 159:17

**bounds** [1] - 35:14
**box** [1] - 53:18
**bracket** [2] - 98:2
**brainer** [1] - 17:25
**branch** [1] - 90:10
**break** [2] - 58:14, 245:4
**breaks** [1] - 106:17
**bridge** [1] - 157:21
**brief** [36] - 11:3, 53:21, 54:2, 54:11, 54:14, 56:21, 86:22, 94:11, 99:8, 101:17, 104:1, 105:24, 116:16, 116:22, 116:23, 117:7, 117:12, 121:14, 126:20, 126:21, 127:7, 127:8, 182:13, 196:14, 223:15, 223:17, 223:24, 225:2, 225:10, 226:10, 231:20, 232:15, 235:5, 236:13, 254:8
**briefly** [13] - 19:4, 23:15, 26:23, 31:1, 32:1, 47:9, 47:12, 68:8, 113:3, 218:14, 218:15, 232:16, 232:17
**briefs** [5] - 37:15, 61:21, 64:9, 128:15, 213:17
**Brier** [5] - 165:20, 165:25, 166:15, 169:23, 173:14
**bring** [18] - 46:4, 46:25, 53:3, 55:11, 55:24, 55:25, 56:6, 56:16, 102:13, 105:18, 122:2, 127:11, 142:5, 143:6, 146:12, 147:20, 148:18, 193:11
**bringing** [7] - 21:7, 44:18, 114:18, 135:4, 142:8, 213:11, 213:12
**brings** [1] - 106:16
**Brisson** [6] - 100:16, 101:18, 113:5, 114:5, 114:8, 114:10
**Britain** [1] - 66:1
**British** [8] - 117:19, 165:21, 165:22, 166:7, 167:11, 185:7, 217:17, 217:18
**broad** [10] - 42:11, 68:3, 70:23, 100:12, 100:14, 101:6, 101:8, 181:24, 197:19, 198:21
**broaden** [1] - 71:25
**broader** [4] - 34:23, 115:16, 115:19, 199:13
**broadest** [3] - 122:18, 122:20
**Broadly** [1] - 129:18
**broadly** [8] - 21:15, 41:20, 100:5, 100:21, 112:5, 197:23, 198:4
**Broadway** [1] - 2:7
**broken** [1] - 200:16
**broker** [2] - 200:23, 200:24
**Brooklyn** [2] - 1:6, 85:3
**Brooks** [1] - 5:16
**brought** [29] - 11:20, 11:22, 18:14, 25:24, 26:24, 26:25, 36:20, 67:22, 108:17, 110:24, 127:12, 131:21, 132:11, 132:14, 132:15, 133:6, 133:10, 142:6, 143:4, 144:4, 147:3, 147:6, 147:23, 148:4, 186:23, 189:21, 211:16, 212:15, 226:22
**Brown** [1] - 139:2
**Bruckhaus** [1] - 3:6
**Bruckner** [1] - 2:19
**Brussels** [1] - 28:16
**build** [1] - 49:23
**building** [3] - 51:19, 190:17, 190:18
**bullet** [10] - 93:15, 95:15, 95:23, 96:7, 97:10, 97:16, 98:20, 102:3, 102:16, 117:21
**bullets** [2] - 95:6, 117:20

**bunch** [1] - 129:21
**burden** [21] - 10:20, 19:24, 99:24, 101:2, 102:10, 193:17, 194:3, 196:15, 203:6, 207:2, 211:25, 215:15, 226:3, 230:18, 245:20, 246:6, 249:21, 259:24, 260:5, 260:10
**burdens** [4] - 93:4, 123:19, 215:12, 236:1
**burdensome** [1] - 136:23
**business** [23] - 63:19, 86:8, 96:25, 219:23, 225:3, 236:20, 241:15, 245:25, 246:20, 247:4, 247:10, 248:11, 248:14, 256:14, 257:3, 257:24, 258:9, 258:12, 259:20, 260:3, 260:13, 261:19
**businesses** [1] - 174:21
**Butler** [1] - 7:20
**buy** [2] - 14:15, 37:24
**buyer's** [5] - 15:6, 15:8, 15:15, 15:22, 25:2
**BY** [62] - 10:12, 32:14, 47:11, 51:2, 54:16, 57:3, 69:9, 90:18, 107:3, 113:2, 116:13, 126:3, 129:9, 143:2, 143:10, 154:22, 180:10, 187:20, 192:2, 202:10, 207:10, 212:3, 221:2, 222:3, 232:23, 237:14, 239:5, 242:3, 243:2, 243:22, 245:2, 261:2, 263:6, 263:8, 263:10, 263:12, 263:14, 263:16, 263:18, 263:22, 263:24, 264:2, 264:4, 264:7, 264:9, 264:11, 264:13, 264:17, 264:21, 264:23, 264:25, 265:2, 265:4, 265:6, 265:8, 265:10, 265:12, 265:14, 265:16, 265:18, 265:20, 265:22

## C

**CA** [1] - 7:2
**CAB** [2] - 96:25, 102:16
**CAFA** [4] - 131:15, 132:21, 144:11
**CAFRA** [1] - 202:19
**Cairo** [2] - 3:1, 78:2
**Calderwood** [1] - 6:19
**California** [3] - 7:2, 165:20, 171:2
**Calvani** [1] - 3:5
**cannot** [17] - 20:7, 20:8, 20:12, 21:19, 36:14, 47:4, 65:10, 65:13, 91:4, 158:8, 160:12, 180:23, 239:9, 239:14, 240:6, 241:23, 253:21
**canon** [1] - 104:4
**capable** [1] - 187:15
**Capital** [1] - 148:17
**Capping** [1] - 76:22
**cards** [1] - 89:23
**care** [2] - 25:23, 84:20
**CARGO** [1] - 1:6
**Cargo** [2] - 8:14, 143:12
**cargo** [25] - 10:19, 10:23, 11:4, 22:18, 22:20, 51:16, 51:20, 98:18, 98:24, 102:22, 199:10, 200:22, 203:18, 218:23, 218:24, 219:3, 219:6, 219:23, 233:20, 237:1, 257:6, 257:9, 258:13, 260:15, 261:19
**Caroline** [1] - 6:2
**Carpet** [3] - 22:7, 29:5, 29:6
**carriage** [8] - 205:7, 206:14, 226:25, 227:10, 234:25, 244:12, 244:14, 247:9

**carried** [4] - 60:7, 91:6, 91:18, 99:13
**carrier** [129] - 12:10, 12:20, 13:13, 26:9, 27:13, 27:16, 27:23, 28:25, 49:5, 49:10, 66:23, 67:8, 67:10, 81:9, 81:11, 81:12, 90:21, 91:1, 91:19, 92:17, 92:21, 92:22, 92:23, 92:24, 93:1, 93:3, 93:10, 93:18, 93:21, 94:5, 94:6, 94:8, 94:10, 95:22, 96:4, 96:5, 96:6, 97:14, 98:3, 99:17, 102:1, 102:2, 103:9, 103:15, 103:17, 103:18, 105:6, 105:7, 105:12, 105:15, 105:16, 105:17, 105:18, 105:19, 105:21, 105:22, 106:2, 106:9, 106:11, 106:15, 106:17, 106:21, 106:23, 108:10, 108:24, 109:2, 109:5, 109:8, 109:10, 109:20, 109:23, 110:2, 110:4, 110:5, 110:13, 110:22, 110:25, 111:1, 111:4, 114:5, 114:15, 114:20, 114:21, 114:22, 114:23, 116:20, 117:23, 119:10, 119:18, 119:19, 120:4, 120:7, 120:8, 120:9, 120:16, 120:24, 121:6, 121:10, 122:8, 122:9, 122:10, 122:11, 122:19, 122:21, 123:3, 124:2, 124:6, 124:8, 127:4, 151:7, 251:7
**Carrier** [1] - 205:3
**carrier's** [2] - 83:23, 205:5
**carrier/air** [1] - 90:21
**carriers** [73] - 13:15, 25:25, 26:2, 26:16, 39:15, 55:11, 66:10, 66:13, 67:19, 67:22, 81:8, 83:18, 90:12, 91:2, 91:3, 91:4, 93:1, 93:14, 93:21, 93:22, 94:1, 94:13, 95:12, 95:13, 96:9, 96:14, 96:18, 97:21, 98:8, 98:22, 98:24, 99:13, 99:14, 99:23, 102:7, 102:14, 103:23, 103:25, 106:9, 107:12, 107:13, 109:15, 109:17, 109:19, 110:13, 110:14, 110:15, 111:14, 111:17, 111:19, 112:17, 113:24, 116:3, 116:8, 117:15, 117:17, 117:18, 118:9, 118:21, 118:22, 118:25, 119:1, 125:3, 152:1, 204:10, 206:9, 227:4, 234:15, 251:4
**carry** [2] - 127:2, 127:5, 209:17
**carrying** [4] - 9:15, 9:17, 141:15, 149:24
**cartel** [14] - 158:16, 158:17, 158:18, 158:23, 159:1, 159:5, 159:22, 168:10, 173:4, 176:13, 178:2, 179:8, 187:25, 188:19
**Cartel** [1] - 198:8
**cartels** [3] - 160:18, 169:7, 175:11
**Case** [3] - 3:11, 71:15, 212:5
**case** [219] - 8:12, 13:20, 15:25, 16:3, 17:1, 20:7, 22:9, 22:23, 24:13, 25:17, 33:1, 33:4, 33:8, 33:18, 33:25, 34:1, 34:9, 35:6, 36:8, 36:10, 36:16, 36:17, 37:16, 38:10, 38:15, 39:4, 40:21, 41:6, 43:10, 46:24, 47:15, 52:15, 52:18, 53:23, 53:25, 54:7, 54:21, 61:10, 62:2, 62:3, 62:5, 62:6, 62:16, 65:11, 65:14, 65:15, 66:8, 67:22, 68:9, 68:16, 68:20, 70:7, 71:14, 73:17, 78:22, 79:10, 79:13, 89:17, 90:8, 90:22, 93:18, 94:21, 96:11, 101:21, 105:13, 107:25, 109:11, 110:19, 110:20, 110:21, 110:23, 111:7, 111:12, 111:21, 112:5, 112:6, 112:14, 112:15, 114:9, 114:13, 114:17, 116:6, 116:21, 117:10, 117:25, 119:3, 119:9, 121:1, 121:14, 123:12, 127:19, 129:24, 132:1, 132:5, 132:17, 132:22, 133:22, 133:24,

134:13, 136:6, 136:9, 136:21, 136:22, 138:4, 138:5, 138:9, 138:13, 144:24, 146:9, 146:11, 146:12, 150:12, 154:9, 155:1, 155:12, 166:4, 171:12, 173:9, 174:2, 177:7, 178:6, 179:18, 182:20, 183:2, 185:6, 198:24, 199:8, 199:9, 201:14, 202:22, 202:23, 203:14, 203:19, 203:24, 204:2, 205:12, 205:14, 205:23, 206:13, 207:4, 207:12, 208:18, 209:4, 210:21, 214:20, 214:22, 214:24, 214:25, 215:21, 216:13, 216:21, 217:13, 218:20, 218:21, 221:19, 225:8, 228:17, 229:13, 229:17, 229:18, 229:21, 230:3, 230:20, 233:3, 233:5, 233:13, 233:25, 235:12, 235:23, 236:6, 237:25, 238:6, 238:21, 239:10, 239:12, 247:13, 248:18, 249:9, 249:14, 251:22, 252:17, 252:21, 253:2, 254:22, 254:25, 255:4, 255:6, 255:8, 255:12, 255:19, 256:12, 256:17, 256:20, 257:1, 258:19, 258:20, 259:10, 259:13, 259:14, 259:17, 261:15, 261:16, 261:21

**cases** [76] - 23:19, 33:6, 38:12, 38:14, 38:23, 38:25, 43:11, 43:12, 43:14, 55:5, 57:18, 59:10, 64:9, 66:17, 68:4, 77:10, 93:13, 95:17, 100:16, 104:23, 106:7, 111:20, 115:1, 117:22, 121:22, 122:2, 122:24, 132:8, 133:7, 134:15, 137:22, 139:6, 151:2, 151:15, 153:23, 165:10, 178:4, 181:19, 186:6, 189:21, 200:18, 202:25, 203:2, 209:10, 214:19, 214:24, 215:10, 216:1, 216:12, 217:1, 218:9, 221:17, 225:24, 228:5, 234:1, 238:20, 248:21, 249:7, 249:11, 251:6, 251:17, 251:19, 253:17, 254:21, 254:25, 255:21, 256:7, 256:18, 256:20, 258:8, 261:17

**Cases** [1] - 256:19
**cast** [1] - 193:10
**catch** [1] - 207:17
**catchall** [1] - 136:17
**categories** [1] - 184:9
**category** [1] - 141:1
**Cathay** [2] - 10:14, 77:8
**causal** [1] - 233:22
**causation** [3] - 150:7, 184:12, 188:10
**CAUSE** [1] - 1:12
**caused** [2] - 188:19
**causes** [1] - 234:7
**ceased** [1] - 215:22
**cent** [1] - 58:24, 75:5
**centered** [3] - 97:7, 97:8, 246:20
**centralize** [1] - 153:9
**cents** [3] - 62:23, 76:11, 127:25
**certain** [7] - 34:13, 42:4, 43:11, 66:18, 67:19, 86:1, 150:23
**Certainly** [3] - 75:10, 139:16, 153:24
**certainly** [15] - 54:21, 59:18, 60:4, 65:7, 65:10, 108:5, 138:13, 138:20, 180:18, 185:2, 195:18, 206:16, 252:18, 260:6
**certainty** [1] - 147:4
**certificate** [12] - 91:5, 94:7, 94:9, 94:20, 94:23, 94:24, 95:9, 95:14, 96:15, 96:18, 106:16, 110:3
**certificates** [1] - 110:14
**certification** [3] - 134:3, 135:11, 156:9
**certified** [1] - 134:10
**cetera** [7] - 92:17, 98:19, 134:3, 134:4,

**chain** [4] - 167:19, 168:5, 168:18, 170:14
**challenge** [3] - 33:4, 33:12, 171:11
**challenged** [3] - 166:21, 166:25, 246:9
**challenges** [2] - 151:12, 222:14
**challenging** [5] - 32:25, 33:8, 33:15, 172:4, 219:21
**chance** [6] - 8:23, 68:22, 86:22, 127:24, 128:10, 232:12
**change** [16] - 74:10, 74:11, 89:15, 92:13, 97:13, 99:6, 102:4, 103:8, 113:16, 113:22, 122:22, 122:24, 125:12, 216:3, 239:18, 252:9
**changed** [2] - 101:15, 243:16
**changes** [4] - 74:14, 99:12, 127:3, 217:6
**chapter** [5] - 92:18, 98:4, 118:23, 119:15, 119:20
**characterize** [1] - 193:3
**characterized** [1] - 30:22
**characterizing** [1] - 244:5
**charge** [13] - 22:24, 23:9, 38:17, 39:10, 41:4, 41:5, 43:18, 55:17, 81:15, 81:21, 84:21, 247:1, 247:20
**charged** [7] - 18:22, 25:11, 34:2, 38:21, 206:8, 233:19, 234:23
**charges** [1] - 247:3
**charging** [2] - 82:1, 137:23, 233:16
**Charles** [3] - 4:2, 5:1, 6:19
**Charlotte** [8] - 14:3, 14:12, 14:13, 23:23, 23:25, 24:10, 24:14, 53:16
**chart** [3] - 146:17, 198:1, 198:2
**check** [1] - 248:6
**Chicago** [3] - 1:23, 5:13, 25:7
**chief** [1] - 158:4
**children** [1] - 243:6
**China** [1] - 41:8
**Chinese** [1] - 41:9
**choice** [11] - 121:2, 146:9, 146:14, 147:1, 147:4, 150:24, 150:25, 151:1, 151:10, 151:12
**Choice** [3] - 105:20, 190:12, 190:13
**choose** [1] - 174:21
**chose** [1] - 256:2
**Chris** [1] - 126:5
**Christie's** [17] - 14:4, 14:14, 14:20, 14:21, 14:22, 15:6, 15:9, 15:10, 15:15, 15:23, 15:24, 16:1, 16:2, 16:13, 24:23, 24:24, 24:25
**Christopher** [1] - 5:6
**Ciano** [1] - 31:19
**circuit** [3] - 93:19, 110:21, 235:21
**Circuit** [63] - 14:2, 21:3, 21:13, 22:7, 25:20, 29:6, 33:25, 35:13, 57:19, 59:5, 60:9, 61:11, 62:5, 62:9, 63:9, 63:22, 63:24, 64:10, 81:2, 88:16, 89:4, 89:10, 90:8, 93:8, 93:12, 93:13, 100:15, 101:16, 103:14, 105:13, 111:2, 111:22, 112:12, 112:14, 113:6, 114:14, 119:9, 120:23, 134:16, 136:20, 136:22, 138:4, 138:6, 138:8, 147:12, 148:15, 148:18, 148:19, 155:5, 155:6, 156:6, 179:21, 209:11, 209:21, 215:21, 217:2, 217:13, 218:2, 233:4, 233:6, 247:13, 248:21
**Circuit's** [2] - 57:16, 149:14

**circumstance** [1] - 171:5
**circumstances** [11] - 62:12, 109:25, 133:1, 134:12, 134:13, 136:18, 137:3, 146:7, 155:13, 238:18
**citations** [1] - 196:13
**cite** [11] - 22:9, 29:2, 30:10, 62:2, 64:8, 105:23, 115:1, 132:3, 175:22, 199:11, 227:6
**cited** [16] - 40:21, 43:12, 43:14, 52:16, 77:11, 110:19, 117:3, 132:2, 135:11, 149:5, 178:4, 209:10, 216:12, 235:18, 251:17, 261:17
**cites** [4] - 92:8, 200:18, 249:7, 254:25
**cities** [2] - 25:10, 225:5
**citing** [1] - 223:22
**citizen** [1] - 157:25
**citizens** [4] - 159:16, 159:17, 159:24, 165:21
**citizenship** [1] - 131:16
**city** [1] - 67:7
**City** [1] - 3:21
**Civil** [9] - 8:13, 72:1, 72:8, 95:2, 95:7, 96:24, 133:16, 148:5, 227:22
**CIVIL** [1] - 1:12
**civil** [5] - 152:25, 159:12, 183:13, 186:23, 255:8
**cjsimpson@zsrlaw.com** [1] - 6:22
**Claim** [1] - 208:15
**claim** [65] - 27:3, 28:1, 28:7, 28:11, 45:5, 46:9, 51:13, 53:4, 55:24, 55:25, 56:6, 56:7, 58:4, 70:9, 71:16, 72:9, 72:11, 72:22, 72:23, 80:13, 80:23, 113:5, 129:21, 131:12, 131:21, 131:22, 132:8, 132:10, 134:5, 135:4, 138:10, 139:11, 139:12, 139:15, 139:17, 139:19, 140:21, 141:5, 141:8, 142:5, 142:6, 142:8, 143:3, 143:6, 146:22, 147:6, 147:11, 150:22, 151:2, 157:24, 165:21, 175:14, 175:25, 176:19, 197:9, 197:11, 197:18, 201:3, 227:16, 231:3, 238:2, 244:16, 254:21
**claim"** [1] - 235:15
**claim-by-claim** [1] - 151:2
**claimant** [1] - 237:18
**claimed** [2] - 16:3, 174:6
**claiming** [4] - 24:14, 24:16, 25:25, 232:6
**Claims** [3] - 129:5, 144:4, 169:4
**claims** [77] - 10:21, 10:22, 11:19, 18:14, 19:25, 20:7, 20:10, 24:11, 43:8, 46:4, 46:13, 46:15, 46:25, 47:6, 53:5, 53:11, 56:6, 61:13, 61:25, 62:12, 62:15, 68:23, 69:15, 69:18, 73:7, 125:23, 129:15, 130:6, 132:14, 133:6, 133:9, 135:22, 136:8, 138:22, 138:25, 139:3, 140:3, 140:6, 140:16, 140:21, 144:10, 144:22, 145:2, 145:3, 145:8, 145:11, 145:24, 146:4, 147:2, 148:8, 148:15, 148:19, 148:20, 149:24, 150:18, 151:3, 151:10, 151:24, 151:25, 154:13, 155:24, 157:20, 168:25, 169:2, 169:5, 170:1, 171:22, 173:19, 174:23, 179:13, 182:11, 192:12, 199:6, 221:10, 229:8, 241:20, 246:1
**claims"** [1] - 148:10
**clarified** [1] - 62:9
**clarifies** [1] - 97:17
**clarify** [2] - 54:17, 202:12

clarifying [1] - 97:23
class [51] - 23:23, 57:25, 130:12, 130:25, 131:4, 131:5, 131:18, 131:20, 131:21, 132:12, 132:14, 132:15, 132:20, 133:1, 133:10, 133:11, 133:12, 134:3, 134:5, 134:10, 134:11, 135:4, 135:11, 135:23, 139:21, 140:3, 140:17, 140:18, 141:5, 141:25, 142:5, 142:6, 142:8, 143:4, 143:5, 145:19, 164:20, 166:6, 166:8, 166:9, 166:14, 173:13, 173:17, 173:22, 174:12, 174:13, 174:20, 204:9, 204:16
Class [2] - 131:15, 134:8
classes [2] - 102:23, 130:23
classic [3] - 140:5, 257:1, 259:10
clause [5] - 95:20, 98:2, 200:4, 200:7, 240:23
clauses [1] - 106:10
clear [45] - 18:1, 22:5, 26:17, 35:6, 40:10, 40:25, 54:25, 68:3, 71:21, 80:12, 89:19, 89:25, 91:11, 98:11, 98:13, 104:7, 104:20, 104:21, 105:4, 110:1, 111:16, 112:4, 116:5, 120:17, 120:20, 123:8, 124:5, 124:24, 132:22, 150:21, 157:24, 173:16, 174:8, 175:9, 199:2, 200:10, 200:13, 204:21, 209:12, 214:5, 216:14, 217:17, 217:18, 233:3, 235:11
clear-cut [1] - 35:6
cleared [1] - 262:10
clearer [3] - 106:9, 106:21, 226:21
Clearly [1] - 72:2
clearly [24] - 10:22, 20:10, 29:16, 31:5, 36:6, 36:10, 39:24, 39:25, 41:6, 52:13, 52:23, 109:18, 110:15, 112:10, 114:4, 136:19, 139:14, 146:21, 147:7, 149:18, 163:21, 197:20, 238:17, 245:18
client [7] - 203:14, 204:7, 213:1, 214:7, 246:19, 249:24, 250:6
client's [2] - 206:13, 234:19
clients [5] - 143:15, 143:20, 143:25, 206:10, 246:20
close [3] - 22:5, 78:17, 91:16
closely [1] - 211:1
closer [1] - 235:13
closest [1] - 194:7
closing [1] - 249:18
co [3] - 139:24, 147:23, 237:25
co-defendants [1] - 147:23
co-extend [1] - 237:25
co-lead [1] - 139:24
coast [1] - 252:6
Cochet [1] - 4:11
Code [1] - 179:10
codification [1] - 20:11
codified [1] - 48:3
cognate [1] - 184:5
Cohen [2] - 4:3, 25:5
coherence [1] - 160:24
coincide [1] - 162:15
collateral [1] - 153:24
Collective [1] - 160:2
collective [4] - 160:6, 161:24, 164:19, 164:20
collectively [2] - 62:13, 63:18
combinations [1] - 158:20
combined [2] - 168:2, 189:6

coming [7] - 26:4, 39:19, 53:13, 53:16, 103:13, 237:18
comity [28] - 137:1, 137:2, 137:8, 137:11, 137:17, 137:18, 138:5, 138:17, 139:6, 144:17, 149:2, 177:6, 177:8, 177:12, 177:19, 178:3, 178:8, 179:11, 182:15, 182:20, 188:16, 215:4, 215:6, 215:12, 215:13, 216:10, 216:20
Comity [1] - 138:3
commandment [3] - 161:13, 162:9
commerce [117] - 12:9, 12:12, 15:17, 15:19, 16:10, 17:6, 17:9, 17:14, 18:4, 19:7, 19:9, 19:13, 19:20, 19:25, 20:3, 20:19, 20:24, 20:25, 21:1, 21:5, 21:12, 21:15, 21:16, 21:19, 21:20, 21:21, 21:22, 21:24, 22:1, 22:3, 22:10, 22:13, 23:21, 25:22, 29:3, 29:15, 29:23, 30:6, 30:7, 30:15, 31:12, 32:19, 33:3, 33:20, 33:24, 34:5, 34:6, 34:21, 34:24, 35:2, 35:5, 35:10, 35:15, 35:17, 36:11, 37:2, 39:2, 41:6, 41:9, 41:10, 41:16, 41:20, 41:21, 42:11, 42:20, 43:1, 44:15, 44:17, 44:18, 44:23, 44:24, 45:4, 45:9, 45:15, 45:24, 46:16, 46:20, 46:21, 47:2, 47:3, 47:17, 47:19, 47:24, 48:10, 48:12, 48:15, 48:16, 48:22, 50:5, 51:5, 52:2, 52:12, 52:22, 53:6, 53:9, 55:3, 55:6, 55:10, 56:8, 56:10, 56:13, 56:14, 66:3, 113:23, 113:24, 143:21, 143:23, 144:1, 145:4, 145:5, 145:15, 172:25, 219:12, 251:21
Commerce [1] - 145:16
commercial [38] - 193:18, 194:15, 194:18, 195:11, 195:21, 197:3, 197:8, 199:17, 203:19, 203:21, 204:6, 204:22, 205:2, 205:11, 206:1, 206:4, 206:19, 209:5, 209:8, 209:13, 219:9, 222:22, 223:10, 224:7, 224:8, 225:6, 231:23, 232:25, 233:1, 233:9, 233:10, 233:11, 233:21, 238:1, 238:2, 238:3, 238:5
Commission [25] - 143:18, 158:4, 158:25, 159:18, 160:19, 161:9, 161:10, 161:12, 164:1, 168:21, 171:20, 174:7, 176:7, 180:21, 181:3, 181:4, 181:8, 181:9, 182:23, 186:2, 186:7, 186:14, 187:5, 187:7, 250:24
commission [8] - 25:11, 25:16, 34:2, 38:19, 38:21, 44:16, 159:25, 188:5
Commission's [1] - 175:22
commissioned [1] - 38:19
commissions [6] - 15:9, 26:1, 26:12, 33:7, 52:10
committee [1] - 97:11
Committee [1] - 180:16
common [3] - 134:23, 143:13, 146:7
commonality [1] - 134:3
communicated [4] - 61:1, 80:5, 81:15, 85:21
communications [2] - 75:24, 77:23
community [12] - 156:16, 157:2, 158:2, 158:10, 158:12, 161:14, 162:1, 165:8, 171:14, 171:21, 181:8, 182:25
companies [10] - 63:19, 79:9, 80:1, 143:13, 158:21, 175:20, 176:17, 176:22, 207:22, 208:25
Companies [1] - 77:24
company [8] - 15:9, 15:10, 25:7, 49:23,

208:12, 214:4, 224:19, 259:19
company's [1] - 248:22
comparable [1] - 185:14
compare [1] - 118:16
compartmentalization [1] - 160:25
compensated [1] - 165:16
compensation [3] - 157:25, 160:14, 160:18
Competition [2] - 182:25, 185:21
competition [7] - 99:1, 106:19, 157:10, 158:11, 158:18, 160:24, 165:16
competitive [6] - 40:23, 85:25, 86:9, 86:11, 206:8, 236:25
complain [1] - 37:17
complaint [82] - 25:4, 39:9, 39:23, 57:20, 58:5, 59:1, 59:23, 60:13, 60:20, 61:16, 61:19, 61:22, 63:25, 65:6, 66:17, 66:21, 68:13, 68:18, 70:3, 71:3, 71:8, 72:25, 73:25, 74:7, 75:2, 75:22, 77:1, 78:6, 83:11, 83:12, 83:17, 85:21, 86:20, 87:20, 87:24, 88:25, 144:6, 193:3, 193:15, 195:19, 197:20, 197:23, 198:18, 198:20, 198:23, 201:11, 201:14, 202:2, 203:12, 203:21, 203:24, 203:25, 204:1, 206:7, 206:18, 210:14, 211:12, 211:13, 213:4, 214:21, 215:3, 217:22, 221:8, 222:22, 222:24, 223:21, 223:22, 223:24, 225:14, 226:5, 230:8, 233:8, 233:10, 233:12, 234:14, 235:17, 239:9, 246:11, 249:19, 249:25
Complaint [1] - 210:20
complaint's [1] - 222:15
complaints [2] - 68:19, 240:17
complement [1] - 158:6
complete [3] - 37:23, 196:17, 199:2
completed [4] - 37:6, 201:4, 213:1, 216:16
completely [6] - 23:22, 29:4, 47:17, 48:21, 95:16, 181:22
completes [1] - 97:17
completing [1] - 97:23
complex [4] - 135:16, 135:20, 159:11, 251:20
complexity [1] - 155:16
complicated [3] - 207:13, 209:3, 219:20
complying [3] - 39:21, 40:2, 93:16
component [4] - 65:21, 65:22, 65:24, 175:1
composed [1] - 130:12
Computer [1] - 7:23
Computer-aided [1] - 7:23
computerized [1] - 7:23
concede [20] - 11:3, 13:6, 23:10, 28:10, 33:11, 102:6, 102:9, 123:25, 124:1, 124:18, 124:22, 188:18, 194:17, 208:11, 218:11, 238:8, 238:9, 238:13, 246:24, 256:4
conceded [9] - 44:13, 69:18, 71:17, 75:10, 82:18, 177:13, 194:3, 238:23, 256:4
concedes [1] - 256:3
conceding [1] - 32:20
conceive [1] - 89:21
concentration [1] - 148:8
concept [3] - 171:24, 178:3, 203:20
conception [1] - 162:23

All Word // In Re:   Air Cargo Antitrust Litigation _____ 10

**concepts** [1] - 100:23
**conceptual** [1] - 32:25
**concern** [1] - 156:2
**concerned** [4] - 86:23, 188:12, 207:14, 211:24
**concerning** [1] - 146:13
**concerns** [5] - 42:9, 153:4, 172:20, 208:23, 216:5
**concert** [1] - 75:16
**concerted** [1] - 60:19
**concertedly** [5] - 81:20, 83:3, 84:10, 85:4
**concession** [1] - 182:9
**conclude** [2] - 97:12, 201:8
**concluded** [2] - 68:17, 168:16
**conclusion** [5] - 25:17, 115:2, 123:19, 149:1, 234:14
**conclusions** [2] - 22:12, 29:4
**conclusory** [11] - 58:3, 59:4, 60:25, 66:16, 67:2, 80:6, 80:7, 84:9, 196:25, 197:19, 235:16
**concrete** [1] - 37:23
**condition** [2] - 227:3, 227:5
**conduct** [96] - 15:20, 15:21, 16:7, 16:8, 16:10, 16:18, 17:12, 17:13, 18:3, 19:6, 19:12, 20:23, 21:10, 21:11, 21:12, 21:14, 21:18, 21:19, 21:21, 21:22, 22:1, 22:6, 22:14, 22:15, 22:22, 23:5, 24:23, 25:15, 25:19, 25:21, 28:1, 29:14, 29:15, 29:17, 29:22, 30:5, 30:17, 30:18, 30:21, 31:10, 31:11, 32:18, 33:2, 33:20, 33:23, 34:5, 34:6, 34:7, 34:12, 34:24, 35:3, 35:9, 35:12, 35:16, 36:3, 36:4, 36:13, 37:2, 39:1, 39:3, 39:7, 39:24, 40:23, 41:21, 41:23, 42:5, 43:1, 45:12, 45:14, 45:23, 45:25, 46:20, 47:16, 47:23, 47:24, 48:2, 48:23, 48:24, 51:9, 51:10, 51:17, 52:22, 53:6, 59:11, 59:16, 64:2, 95:22, 129:22, 137:19, 137:24, 140:19, 141:3, 166:2, 219:8
**Conduct** [1] - 219:10
**conducted** [2] - 15:1, 257:23
**conducts** [1] - 224:21
**confederation** [1] - 164:10
**conferred** [1] - 245:4
**confess** [2] - 107:7, 240:3
**configured** [1] - 144:22
**confirm** [2] - 248:5, 248:8
**confirmed** [2] - 112:2, 112:5
**confirms** [1] - 97:6
**conflict** [13] - 137:12, 137:21, 137:22, 137:23, 138:8, 138:13, 140:2, 140:8, 177:13, 177:14, 177:21, 177:22, 182:17
**conflicts** [2] - 133:16, 140:5
**confluence** [1] - 177:23
**conform** [1] - 98:17
**confront** [1] - 94:21
**confronted** [3] - 100:9, 101:1, 121:21
**confused** [1] - 130:5
**confusing** [1] - 199:13
**Congress** [43] - 20:10, 42:24, 44:14, 45:15, 45:23, 46:17, 46:20, 46:24, 90:23, 90:25, 91:8, 91:24, 92:3, 92:6, 93:2, 93:4, 93:25, 94:3, 94:5, 96:9, 97:6, 98:12, 99:12, 102:11, 103:17, 103:21, 104:17, 106:6, 106:18, 110:12, 111:3,

115:25, 119:9, 120:7, 121:5, 121:9, 121:12, 123:18, 124:11, 125:9, 125:12, 126:19, 127:1
**congressional** [1] - 95:24
**connect** [3] - 65:17, 248:25, 253:8
**connected** [4] - 145:5, 219:2, 219:13, 251:8
**Connecticut** [2] - 2:2, 4:16
**connecting** [1] - 251:9
**connection** [10] - 139:7, 162:3, 162:6, 170:16, 171:8, 204:5, 204:22, 233:22, 233:23, 251:1
**Connolly** [1] - 89:17
**consequence** [1] - 152:11
**consequently** [1] - 151:12
**consider** [3] - 203:23, 231:6, 244:7
**consideration** [3] - 186:7, 186:13, 186:16
**considerations** [2] - 137:1, 137:2
**considered** [5] - 45:21, 53:19, 117:1, 117:13, 252:23
**considering** [2] - 57:24, 229:14
**consistent** [10] - 104:20, 113:12, 120:16, 165:1, 166:5, 166:9, 166:16, 167:8, 167:13, 174:19
**consistently** [1] - 130:5
**consolidated** [2] - 255:12, 256:20
**conspiracies** [4] - 15:9, 67:14, 70:18, 70:19
**conspiracy** [40] - 10:18, 15:7, 16:4, 26:1, 40:5, 54:22, 59:24, 60:7, 66:1, 66:3, 67:17, 73:13, 73:15, 79:12, 80:4, 84:8, 89:7, 158:24, 172:24, 177:25, 197:17, 201:19, 201:24, 203:16, 203:17, 204:1, 204:5, 204:22, 206:7, 219:2, 219:13, 233:13, 234:8, 234:17, 234:20, 236:25, 246:23, 253:1, 253:9, 261:12
**conspirators** [1] - 204:19
**conspire** [2] - 67:9, 72:16
**conspired** [7] - 59:6, 59:25, 60:14, 65:20, 66:24, 72:22, 197:18
**conspiring** [2] - 29:11, 198:3
**constellation** [1] - 152:4
**constitute** [2] - 137:2, 248:23
**constituted** [1] - 176:16
**constitutes** [1] - 176:25
**construct** [3] - 159:8, 160:5, 162:8
**constructed** [1] - 157:11
**construction** [11] - 21:23, 22:12, 49:23, 51:23, 104:5, 125:9, 165:2, 190:17, 191:3, 237:20, 261:23
**construe** [1] - 205:24
**construed** [10] - 47:18, 101:3, 112:5, 194:10, 198:25, 200:13, 205:16, 205:18, 237:20
**construing** [1] - 205:13
**consulting** [1] - 129:1
**consumer** [1] - 26:8
**contact** [3] - 23:20, 27:4, 219:1
**contacted** [2] - 116:21, 254:1
**contacts** [13] - 13:18, 16:16, 26:14, 49:4, 74:23, 199:14, 246:16, 256:5, 257:2, 259:9, 259:11, 260:18
**contain** [2] - 222:19, 222:24
**contained** [4] - 42:2, 60:18, 68:18, 182:7

**contains** [1] - 20:19
**contemplation** [1] - 209:2
**contending** [1] - 28:6
**contention** [1] - 110:16
**contentions** [1] - 111:8
**contest** [2] - 114:24, 197:12
**contested** [5] - 69:25, 138:12, 148:12, 193:20, 193:23
**context** [15] - 42:20, 43:10, 109:20, 109:25, 111:5, 114:4, 124:9, 135:10, 138:1, 138:23, 152:16, 169:19, 185:5, 186:1
**Continental** [1] - 62:3
**continents** [2] - 159:24, 246:22
**contingencies** [1] - 174:11
**contingency** [2] - 181:24, 189:11
**contingent** [1] - 126:7
**continually** [1] - 65:12
**continue** [2] - 77:17, 187:16
**Continued** [9] - 50:7, 112:18, 125:25, 142:10, 143:1, 178:12, 220:4, 221:1, 242:13
**continued** [4] - 82:8, 113:1, 125:1, 264:1
**continues** [1] - 223:17
**Continuing** [5] - 51:2, 51:3, 179:3, 243:3, 263:12
**contract** [14] - 49:23, 200:10, 200:11, 201:25, 205:7, 205:23, 206:14, 219:3, 219:6, 226:25, 234:25, 244:12, 244:14, 248:5
**contracting** [1] - 49:19
**Contracts** [1] - 12:20
**contracts** [4] - 63:18, 199:18, 227:10
**contradicting** [1] - 140:23
**contradicts** [1] - 247:22
**contrary** [6] - 47:17, 48:21, 86:19, 93:14, 135:6, 218:9
**contrast** [1] - 38:3
**contrasted** [1] - 34:6
**control** [11] - 213:21, 243:12, 243:23, 259:7, 261:14, 261:18, 261:19, 261:23, 262:1, 262:2, 262:7
**controls** [1] - 133:17
**controversy** [2] - 131:17, 131:19
**convenience** [6] - 137:4, 141:11, 142:4, 146:3, 146:15, 149:21
**Convention** [10] - 152:13, 240:24, 241:1, 241:3, 241:5, 241:8, 241:16, 241:19, 244:2, 244:17
**convergence** [1] - 177:24
**converted** [1] - 82:25
**convocations** [1] - 79:25
**cooperation** [3] - 71:1, 71:7, 79:17
**coordinate** [1] - 149:2
**copies** [2] - 10:7, 10:10
**copy** [3] - 53:21, 210:13
**Corp** [1] - 224:19
**Corporation** [1] - 155:6
**Correct** [4] - 234:21, 250:11, 262:3, 262:9
**correct** [14] - 11:6, 12:1, 20:7, 22:2, 23:11, 36:14, 41:7, 100:15, 113:14, 177:11, 187:23, 195:4, 242:8, 261:3
**correctly** [2] - 21:14, 24:12

**cost** [16] - 33:9, 34:13, 35:3, 35:8, 38:24, 39:21, 40:2, 40:11, 41:5, 44:12, 44:18, 49:1, 54:20, 54:22, 54:23, 68:4

**costly** [1] - 70:23

**costs** [7] - 40:15, 44:8, 44:10, 47:4, 49:16, 55:9, 56:16

**counsel** [11] - 10:8, 155:11, 155:14, 175:24, 177:11, 177:13, 192:6, 237:16, 238:10, 245:4, 261:17

**Counsel** [4] - 10:14, 32:8, 229:12, 235:6

**counsel's** [1] - 139:24

**count** [4] - 80:1, 141:6, 143:23, 145:6

**Count** [7] - 12:5, 12:6, 26:25, 130:24, 131:3, 145:20, 145:22

**countered** [1] - 210:23

**counterpart** [1] - 134:9

**countries** [7] - 29:12, 29:25, 30:2, 33:14, 139:3, 145:12, 246:22

**country** [9] - 10:24, 12:10, 17:24, 18:19, 145:4, 154:11, 162:16, 251:25, 256:19

**counts** [4] - 129:24, 130:1, 130:21

**Counts** [13] - 11:20, 11:21, 17:23, 18:14, 26:18, 26:24, 55:18, 129:24, 130:5, 130:22, 141:7, 143:22, 144:1

**couple** [15] - 30:24, 82:9, 107:17, 113:3, 129:25, 137:9, 138:16, 180:11, 182:14, 192:13, 202:12, 214:19, 237:10, 248:13, 261:4

**Couple** [1] - 183:7

**coupled** [1] - 225:14

**Courage** [3] - 149:5, 150:12, 185:6

**course** [15] - 9:9, 10:19, 12:5, 23:22, 27:13, 27:23, 66:12, 76:2, 125:6, 138:3, 144:5, 179:11, 182:1, 189:24, 256:15

**COURT** [458] - 1:1, 8:3, 8:5, 8:11, 8:16, 9:14, 9:20, 10:4, 10:9, 11:1, 11:7, 11:23, 12:2, 12:15, 12:22, 13:17, 13:25, 16:22, 17:15, 18:5, 18:10, 18:16, 18:20, 18:23, 19:15, 19:18, 22:22, 23:7, 23:14, 24:1, 24:18, 27:17, 27:21, 30:12, 30:23, 31:3, 32:2, 32:5, 32:7, 32:20, 34:15, 35:20, 36:16, 37:9, 38:8, 40:7, 40:16, 41:11, 42:13, 42:22, 43:6, 43:16, 44:1, 44:6, 44:21, 46:11, 46:13, 46:22, 47:7, 48:4, 48:25, 49:9, 49:19, 51:4, 52:11, 52:25, 54:11, 54:14, 55:14, 55:20, 55:25, 56:3, 56:10, 56:18, 56:20, 56:25, 57:11, 58:7, 58:17, 64:1, 64:12, 64:14, 64:17, 64:20, 67:13, 67:16, 68:24, 69:1, 69:5, 70:4, 71:5, 71:12, 72:12, 72:20, 73:1, 73:5, 73:24, 74:5, 74:8, 74:17, 74:20, 76:2, 76:4, 76:6, 78:4, 78:9, 78:12, 79:15, 79:21, 79:24, 80:10, 81:3, 82:9, 82:12, 82:16, 82:20, 82:25, 83:7, 83:9, 83:13, 83:15, 84:5, 84:7, 84:23, 85:15, 85:18, 86:13, 86:21, 87:15, 88:1, 88:7, 90:2, 90:4, 91:14, 94:12, 96:3, 100:2, 100:19, 101:9, 101:11, 102:18, 102:23, 103:2, 103:4, 103:10, 104:3, 104:9, 105:5, 106:24, 107:5, 107:9, 107:12, 107:15, 107:20, 108:1, 108:4, 108:20, 109:1, 110:6, 110:10, 110:18, 111:24, 114:7, 114:21, 115:4, 115:14, 116:9, 116:18, 119:6, 119:13, 119:17, 119:24, 120:2, 120:6, 120:14, 120:20, 121:19, 122:4, 122:15, 123:1, 123:10, 123:16, 124:7,

124:17, 124:22, 125:5, 125:15, 125:21, 126:4, 126:11, 126:24, 127:8, 127:14, 127:16, 127:21, 128:16, 128:23, 129:4, 130:4, 130:10, 130:17, 130:20, 131:7, 140:13, 141:10, 141:21, 142:9, 143:7, 145:13, 145:16, 145:21, 150:9, 152:17, 153:18, 153:24, 154:5, 154:15, 154:18, 154:20, 154:24, 156:2, 156:24, 157:6, 157:13, 157:22, 161:6, 162:11, 162:19, 163:3, 163:11, 163:14, 163:23, 163:25, 164:5, 164:7, 164:18, 164:24, 165:3, 165:6, 165:13, 166:24, 167:2, 168:19, 168:24, 169:10, 169:13, 169:18, 170:3, 170:16, 170:19, 171:4, 171:18, 172:2, 172:4, 172:7, 174:23, 175:1, 175:6, 175:13, 176:4, 176:9, 176:12, 176:14, 177:4, 177:9, 177:15, 180:1, 180:4, 180:6, 180:13, 180:20, 181:7, 181:16, 183:4, 183:15, 183:18, 184:25, 185:14, 186:12, 186:20, 187:11, 187:21, 188:23, 189:7, 189:12, 189:18, 189:22, 190:8, 190:11, 190:19, 191:7, 191:12, 191:15, 191:17, 192:9, 192:13, 192:18, 192:21, 193:22, 193:25, 194:13, 194:21, 195:5, 195:24, 196:11, 196:21, 198:5, 198:7, 198:9, 199:23, 200:3, 200:20, 201:4, 201:21, 202:4, 202:6, 202:8, 204:11, 204:20, 204:24, 206:23, 207:6, 207:8, 208:8, 208:10, 209:15, 209:22, 209:25, 210:3, 210:10, 210:18, 211:5, 211:10, 211:14, 211:18, 211:21, 212:1, 212:10, 213:8, 213:18, 213:23, 214:12, 218:15, 221:3, 221:6, 221:21, 221:25, 223:2, 223:18, 223:20, 223:23, 224:1, 224:4, 224:12, 224:15, 225:9, 225:13, 225:23, 226:7, 226:11, 226:14, 226:18, 227:6, 227:9, 227:13, 228:2, 228:4, 228:18, 228:23, 229:3, 229:7, 229:22, 229:24, 230:1, 230:23, 231:25, 232:8, 232:10, 232:14, 232:17, 232:21, 233:14, 233:16, 234:4, 234:11, 234:18, 234:22, 234:25, 235:3, 235:6, 236:10, 236:21, 237:3, 237:6, 237:9, 237:22, 238:8, 238:13, 238:16, 239:1, 239:19, 240:8, 240:13, 240:19, 241:22, 241:24, 242:6, 243:8, 243:12, 243:18, 243:20, 243:25, 244:4, 244:19, 245:9, 247:1, 248:10, 249:2, 249:5, 249:10, 250:9, 250:13, 250:17, 250:20, 250:25, 251:10, 252:3, 252:7, 252:24, 253:3, 253:6, 253:11, 253:23, 254:4, 254:16, 254:20, 255:2, 255:4, 255:18, 255:22, 255:25, 256:9, 256:15, 257:10, 257:20, 257:22, 258:2, 258:22, 258:24, 259:16, 259:23, 260:19, 260:24, 261:25, 262:4, 262:6, 262:10, 262:16

**Court** [156] - 7:20, 7:20, 15:16, 16:10, 17:4, 22:9, 24:11, 26:13, 29:3, 29:14, 29:21, 29:23, 30:20, 34:4, 34:5, 35:22, 43:7, 44:22, 51:8, 52:8, 52:9, 52:16, 52:18, 53:8, 54:4, 54:5, 57:9, 57:14, 57:18, 57:22, 58:21, 59:4, 59:11, 60:9, 61:11, 62:4, 63:9, 65:4, 67:17, 67:24, 68:3, 68:5, 68:12, 68:15, 68:20, 70:6, 72:2, 73:15, 78:20, 81:1, 89:9, 89:13, 89:18, 89:23, 90:7, 90:14, 92:5, 97:7, 100:2, 100:3, 100:11, 100:17, 100:20, 101:6, 101:21, 104:12, 107:18, 107:21,

107:25, 108:5, 108:7, 108:17, 110:10, 111:12, 111:20, 112:4, 112:7, 112:16, 113:8, 113:19, 116:22, 116:25, 117:1, 117:3, 117:4, 117:6, 120:15, 121:2, 123:8, 123:13, 123:17, 123:24, 124:1, 144:25, 162:17, 165:19, 166:4, 167:12, 169:16, 172:5, 178:7, 181:1, 181:13, 181:15, 181:20, 184:21, 184:24, 184:25, 185:4, 185:7, 185:25, 189:10, 196:1, 196:2, 196:5, 199:1, 199:5, 202:13, 203:23, 205:23, 206:17, 207:4, 213:9, 214:12, 214:13, 214:20, 214:25, 215:4, 215:21, 222:20, 222:25, 224:8, 227:21, 229:19, 230:24, 235:10, 235:12, 236:6, 236:11, 236:14, 236:22, 237:24, 238:5, 238:18, 247:14, 247:21, 255:7, 255:12, 259:18, 261:15

**court** [134] - 8:1, 31:7, 31:18, 66:5, 68:1, 69:11, 93:13, 107:20, 107:21, 108:14, 111:15, 111:16, 111:18, 116:6, 116:8, 117:1, 125:13, 125:14, 128:4, 128:13, 128:14, 129:18, 129:19, 131:9, 131:16, 131:23, 132:15, 133:3, 134:20, 134:25, 135:2, 136:25, 137:19, 137:20, 138:5, 138:24, 139:9, 140:12, 142:1, 144:12, 144:16, 145:10, 147:3, 147:7, 149:3, 149:8, 149:15, 149:23, 149:24, 149:25, 150:15, 150:24, 151:17, 152:19, 153:10, 153:22, 155:16, 155:18, 155:24, 156:11, 156:19, 157:19, 161:13, 162:1, 162:5, 162:10, 162:11, 166:21, 170:3, 170:8, 170:11, 170:25, 171:2, 171:13, 171:24, 172:13, 174:18, 175:14, 178:8, 179:7, 179:12, 179:14, 179:19, 179:21, 181:13, 181:14, 181:16, 182:10, 183:1, 184:22, 184:23, 185:1, 185:3, 187:2, 187:6, 187:13, 187:16, 188:14, 189:12, 191:2, 191:3, 196:12, 196:13, 196:16, 202:14, 204:7, 207:18, 207:25, 229:7, 235:7, 236:8, 236:16, 239:10, 240:16, 245:17, 246:19, 249:8, 249:22, 255:1, 255:9, 255:10, 255:12, 255:13, 255:16, 255:18, 259:12

**court's** [2] - 187:10, 235:12

**Court's** [5] - 47:22, 57:19, 57:23, 108:8, 141:12

**Courthouse** [1] - 1:6

**COURTROOM** [4] - 8:2, 8:13, 32:8, 32:11

**courtroom** [17] - 9:25, 14:9, 14:19, 14:25, 15:5, 15:13, 19:2, 20:16, 26:21, 27:10, 28:5, 28:14, 28:20, 118:14, 118:19, 120:13, 167:16

**Courts** [3] - 155:6, 187:4, 259:1

**courts** [36] - 57:24, 60:2, 123:14, 133:19, 134:1, 136:12, 136:14, 138:24, 139:3, 139:4, 146:1, 147:5, 147:10, 148:22, 149:12, 149:17, 155:9, 163:17, 171:1, 178:4, 179:23, 183:25, 185:24, 186:3, 186:6, 186:10, 186:22, 187:15, 200:12, 203:8, 215:16, 226:23, 231:6, 235:20, 252:22, 255:20

**cover** [3] - 9:23, 126:9, 135:23

**covered** [7] - 118:8, 119:12, 119:21, 126:22, 128:18, 253:11

**covering** [1] - 138:15

**covers** [1] - 140:25
**CPLR** [3] - 132:25, 134:6, 134:8
**crashes** [2] - 200:17, 200:19
**crates** [1] - 27:14
**Crayhan** [1] - 185:6
**create** - 187:6
**created** [2] - 44:14, 103:20
**creates** [2] - 46:21, 193:3
**creation** - 199:18
**credited** [2] - 222:19, 222:25
**criminal** [1] - 114:17
**critical** [6] - 21:2, 21:10, 34:15, 55:1, 146:18, 163:7
**critically** [1] - 45:19
**criticized** [1] - 251:5
**Cromwell** [1] - 4:23
**CROSS** [23] - 212:3, 212:4, 212:18, 213:16, 213:19, 213:25, 214:13, 218:16, 221:2, 221:5, 221:16, 221:23, 242:1, 242:3, 242:7, 243:2, 243:3, 243:9, 243:14, 243:19, 265:4, 265:14, 265:16
**Cross** [5] - 3:10, 212:1, 212:5, 221:4, 241:25
**cross** [2] - 155:10, 159:13, 179:24
**cross-border** [1] - 155:10
**CRR** [1] - 7:20
**crucial** [1] - 261:20
**Crutcher** [1] - 2:1
**crux** [1] - 51:12
**crystal** [1] - 22:5
**CSR** [1] - 23:18
**Culian** [2] - 114:13, 114:17
**Cuomo** [4] - 111:21, 112:1, 112:5, 112:6
**cure** [2] - 239:9, 240:6
**Curley** [1] - 155:5
**Currency** [2] - 76:22, 148:17
**current** [2] - 104:12, 106:13
**customer** [3] - 81:22, 86:2, 86:8
**customer's** [2] - 85:24, 86:11
**customers** [10] - 39:11, 58:11, 60:21, 62:24, 63:17, 81:16, 83:1, 84:21, 85:16, 85:23
**customs** [3] - 54:1, 54:8, 81:4
**Customs** [8] - 39:12, 39:14, 39:18, 40:3, 40:10, 49:8, 81:9, 81:12
**cut** [3] - 35:6, 78:13, 245:5
**Cutler** [1] - 6:2
**cutting** [1] - 29:12

# D

**D.C** [2] - 110:21, 111:2
**damage** [3] - 168:1, 174:15, 188:19
**damages** [23] - 46:9, 149:12, 150:4, 150:5, 152:5, 158:12, 160:19, 165:17, 167:5, 167:7, 167:8, 167:19, 170:13, 183:13, 184:9, 186:23, 187:3
**dare** [1] - 252:1
**Daryl** [1] - 4:23
**data** [6] - 83:17, 118:16, 119:2, 120:22, 120:25, 122:1
**date** [12] - 85:2, 85:21, 87:23, 87:24, 176:2, 214:15, 214:21, 215:18, 217:8, 218:5, 230:8

**David** [4] - 2:1, 3:19, 6:1, 143:11
**david.ogden@wilmerhale.com** [1] - 6:4
**days** [1] - 252:10
**DC** [13] - 2:2, 3:3, 3:7, 3:16, 4:4, 4:17, 4:24, 5:3, 5:18, 5:23, 6:3, 6:16, 6:21
**de** [3] - 217:3, 217:10, 217:21
**De** [1] - 235:19
**deal** [7] - 161:8, 162:23, 211:21, 215:6, 215:7, 253:17
**dealing** [7] - 16:15, 34:2, 114:2, 115:10, 202:21, 215:4, 215:5
**dealings** [1] - 261:20
**deals** [1] - 209:1
**dealt** [6] - 14:22, 15:10, 15:23, 16:13, 163:18, 165:10
**Deana** [1] - 3:1
**deana.cairo@dlapiper.com** [1] - 3:4
**debated** [1] - 160:4
**decentralized** [1] - 152:9
**decide** [19] - 92:15, 117:5, 136:11, 149:25, 151:14, 156:25, 159:21, 161:22, 171:13, 172:5, 172:21, 173:2, 173:4, 173:6, 173:8, 173:10, 185:4, 189:15, 238:19
**decided** [14] - 39:20, 108:1, 108:5, 108:6, 118:5, 133:22, 136:1, 136:12, 136:13, 148:16, 151:13, 151:15, 229:9, 229:18
**decides** [2] - 139:10, 146:12
**deciding** [6] - 112:10, 161:1, 172:23, 173:13, 186:8, 213:14
**decision** [41] - 14:2, 29:6, 57:15, 57:16, 57:23, 61:11, 90:7, 93:9, 97:7, 108:9, 108:12, 111:21, 112:1, 112:17, 113:8, 113:19, 113:20, 114:19, 116:15, 125:10, 125:11, 132:2, 132:6, 132:23, 133:21, 134:18, 146:10, 148:17, 148:18, 149:5, 149:16, 150:12, 151:2, 156:17, 179:7, 179:12, 209:11, 233:3, 247:19, 247:24, 247:25
**decisions** [9] - 101:16, 111:13, 117:3, 125:10, 142:3, 155:16, 232:4, 249:8, 262:13
**decisis** [1] - 117:11
**declaration** [5] - 136:4, 140:15, 147:18, 204:9, 204:12
**declarations** [1] - 247:20
**declined** [1] - 68:14
**declines** [1] - 152:19
**decreed** [1] - 46:20
**deemed** [1] - 17:8
**deep** [1] - 202:1
**defaulted** [1] - 135:10
**defeat** [2] - 214:15, 222:16
**defeats** [1] - 125:8
**defects** [1] - 240:6
**defend** [1] - 249:22
**Defendant** [1] - 224:19
**defendant** [37] - 17:12, 26:14, 38:3, 63:24, 64:3, 64:5, 65:14, 72:10, 74:17, 74:21, 75:1, 78:16, 88:19, 135:10, 147:15, 147:24, 166:1, 173:6, 176:25, 203:3, 208:3, 208:16, 208:23, 210:20, 212:7, 224:3, 224:16, 228:20, 239:10, 239:12, 240:18, 247:16, 249:21, 253:1,

254:14, 256:12
**defendant's** [7] - 17:12, 17:13, 19:6, 19:12, 21:11, 24:22, 48:23
**defendants** [155] - 9:18, 13:4, 22:8, 29:9, 29:10, 29:13, 29:16, 29:24, 30:3, 30:8, 32:16, 33:11, 33:18, 33:19, 34:11, 35:7, 39:10, 39:20, 40:2, 40:14, 40:22, 41:19, 42:9, 42:11, 43:12, 51:11, 51:18, 52:22, 53:24, 54:3, 54:6, 59:13, 59:25, 60:6, 63:5, 63:12, 64:18, 64:22, 65:1, 66:7, 66:20, 68:7, 69:25, 70:7, 70:14, 71:17, 72:4, 72:21, 73:4, 73:8, 73:20, 74:2, 74:12, 74:14, 75:2, 75:6, 75:25, 76:1, 76:18, 77:5, 77:11, 77:12, 77:21, 78:24, 80:5, 81:14, 81:20, 81:24, 81:25, 82:7, 82:18, 83:5, 83:22, 85:3, 85:21, 86:2, 86:10, 87:1, 87:3, 87:20, 87:22, 87:24, 88:15, 89:5, 90:15, 92:12, 99:6, 99:11, 101:17, 102:6, 105:23, 106:25, 117:8, 117:12, 118:8, 121:16, 122:23, 141:14, 144:9, 146:5, 146:6, 147:9, 147:19, 147:20, 147:21, 147:23, 148:3, 148:13, 167:17, 168:25, 172:11, 175:18, 178:5, 179:4, 179:5, 179:8, 186:17, 186:18, 188:8, 192:6, 192:11, 192:22, 193:4, 195:7, 197:12, 197:13, 197:20, 197:24, 201:12, 201:14, 202:16, 203:15, 204:7, 207:14, 207:17, 208:1, 208:6, 221:8, 222:8, 222:9, 223:1, 223:5, 223:8, 223:9, 225:16, 226:16, 226:23, 227:15, 240:7, 250:2, 252:21, 255:1, 256:13, 261:11
**Defendants** [8] - 31:13, 59:6, 61:1, 64:6, 75:15, 76:18, 89:11
**defendants'** [29] - 29:15, 29:17, 30:16, 30:21, 31:10, 31:11, 36:4, 39:7, 39:11, 41:12, 54:22, 81:16, 100:14, 101:25, 117:22, 118:2, 121:8, 123:8, 168:16
**Defendants'** [1] - 47:16
**defending** [1] - 251:20
**Defense** [1] - 177:11
**defense** [14] - 122:1, 129:12, 136:2, 136:7, 143:14, 144:8, 150:6, 152:5, 155:11, 163:14, 163:19, 175:24, 177:13, 184:12
**defenses** [1] - 165:8
**deference** [4] - 95:18, 146:8, 146:15, 154:10
**deficient** [2] - 61:25, 233:24
**define** [3] - 11:7, 48:11, 48:15
**defined** [6] - 91:1, 92:20, 105:22, 106:2, 109:3, 224:15
**defines** [2] - 20:22, 107:12
**definitely** [1] - 193:9
**definition** [29] - 22:22, 36:5, 36:6, 38:7, 43:3, 44:19, 44:24, 45:14, 48:6, 50:5, 51:4, 52:7, 55:10, 95:24, 95:25, 99:14, 103:5, 105:1, 105:6, 115:7, 115:16, 120:17, 121:25, 122:6, 122:12, 122:17, 122:21, 131:5, 234:6
**definitions** [6] - 102:22, 102:25, 103:4, 103:5, 103:14, 108:20
**degree** [5] - 43:3, 43:4, 183:22, 259:7, 261:18
**Deitrich** [1] - 235:19
**deleted** [1] - 98:3

**deletion** [1] - 115:6
**Deletion** [1] - 98:21
**Delhi** [1] - 28:23
**delimitation** [1] - 119:17
**delisted** [1] - 243:14
**deliver** [1] - 210:12
**delivery** [3] - 210:13, 210:19
**Delta** [1] - 101:19
**demand** [1] - 228:14
**demands** [1] - 158:12
**demonstrate** [1] - 80:23
**demonstrates** [1] - 14:12
**denied** [3] - 68:15, 185:10, 231:24
**denominated** [1] - 27:6
**deny** [2] - 114:20, 216:20
**Department** [13] - 39:14, 42:3, 97:2, 143:17, 176:7, 213:6, 227:3, 230:13, 231:4, 242:11, 243:6, 243:9
**department** [1] - 213:5
**DEPUTY** [4] - 8:2, 8:13, 32:8, 32:11
**deregulate** [2] - 91:25, 124:11
**deregulated** [4] - 91:24, 92:1, 97:1, 103:22
**deregulation** [8] - 92:7, 94:2, 97:7, 97:12, 97:14, 97:18, 99:17, 103:23, 116:1
**Deregulation** [3] - 91:17, 91:23, 96:16
**derided** [1] - 104:13
**Deringer** [1] - 3:6
**derivative** [1] - 168:1
**derived** [1] - 168:8
**deriving** [2] - 200:15, 258:6
**describe** [2] - 29:16, 88:2
**described** [2] - 87:13, 187:14
**describing** [2] - 87:11, 88:12
**design** [3] - 159:19, 160:5, 190:18
**designate** [1] - 111:4
**designated** [2] - 110:23, 110:25
**designates** [1] - 238:17
**designed** [3] - 45:8, 46:19, 124:20
**desired** [2] - 157:11, 160:12
**destination** [7] - 10:25, 16:21, 27:15, 199:10, 205:8, 227:1, 244:13
**destinations** [1] - 165:24
**destroyed** [1] - 230:3
**detail** [17] - 58:12, 63:21, 73:3, 77:4, 78:8, 78:10, 79:12, 80:4, 80:11, 82:13, 83:1, 85:8, 85:9, 87:5, 87:7, 119:7, 133:25
**detailed** [1] - 82:12
**details** [2] - 89:1, 176:1
**deter** [1] - 46:19
**determination** [7] - 158:5, 170:12, 186:11, 186:21, 186:22, 186:24, 187:6
**determinative** [1] - 133:2
**determine** [7] - 45:8, 173:18, 186:18, 207:19, 229:19, 233:8, 238:21
**determined** [5] - 166:15, 168:12, 168:16, 169:1, 232:5
**determines** [1] - 132:13
**determining** [3] - 206:3, 229:15, 231:7
**deterrence** [2] - 47:1
**Deutsche** [1] - 143:11
**develop** [3] - 162:20, 182:24, 183:25
**developed** [4] - 156:4, 165:7, 181:18,
181:19
**developing** [1] - 162:24
**development** [2] - 157:1, 188:17
**developments** [1] - 229:14
**develops** [1] - 165:1
**deverson@stinson.com** [1] - 3:22
**deviate** [1] - 213:9
**devices** [1] - 8:18
**devise** [1] - 160:4
**Dicker** [1] - 7:6
**dictate** [1] - 151:6
**difference** [7] - 38:5, 60:16, 113:11, 113:17, 162:18, 170:6, 190:16
**differences** [1] - 77:10
**different** [52] - 38:12, 38:23, 53:15, 55:4, 55:5, 67:6, 67:7, 69:6, 70:17, 70:18, 90:24, 91:20, 91:21, 97:15, 99:9, 100:7, 109:11, 111:24, 122:9, 130:23, 133:15, 135:9, 139:12, 140:10, 150:19, 151:6, 151:25, 152:1, 152:2, 152:3, 152:4, 152:20, 153:2, 155:15, 157:15, 158:19, 161:3, 170:13, 171:5, 177:18, 183:21, 190:2, 191:13, 192:19, 203:22, 212:6, 249:7, 249:8
**differently** [2] - 137:15, 143:14
**difficult** [9] - 32:25, 144:21, 149:11, 160:16, 171:23, 197:4, 197:14, 198:16, 198:22
**difficulties** [1] - 151:21
**difficulty** [6] - 56:11, 151:20, 162:3, 166:1, 167:4, 175:16
**diminish** [1] - 174:13
**direct** [25] - 12:6, 27:3, 30:9, 41:24, 42:7, 44:16, 55:24, 55:25, 130:13, 130:24, 130:25, 131:2, 136:7, 162:14, 168:1, 168:17, 174:5, 184:13, 197:7, 197:9, 201:23, 201:24, 203:17, 219:11, 223:24
**Direct** [2] - 193:12, 198:17
**directed** [9] - 35:17, 41:6, 41:8, 41:21, 43:2, 43:3, 55:2, 110:22, 141:4
**directing** [1] - 213:7
**directly** [28] - 12:20, 14:2, 19:25, 22:6, 24:9, 26:5, 29:12, 29:18, 29:22, 48:23, 49:2, 51:6, 52:20, 53:5, 53:6, 53:16, 53:24, 62:14, 88:9, 113:7, 121:7, 121:10, 125:8, 126:18, 133:23, 139:13, 197:7, 218:9
**disabled** [1] - 185:7
**disagree** [6] - 61:4, 79:19, 89:12, 103:11, 139:5, 196:7
**disappointed** [1] - 254:10
**disaster** [1] - 146:11
**Disch** [1] - 3:14
**discount** [5] - 59:18, 60:18, 76:24, 82:14
**discounts** [5] - 59:20, 59:21, 59:22, 77:2, 82:21
**discover** [2] - 111:5, 225:21
**discovery** [28] - 53:22, 54:5, 68:1, 68:3, 68:4, 70:24, 80:25, 152:15, 152:24, 153:8, 153:13, 153:14, 181:24, 203:12, 222:11, 222:13, 225:17, 225:21, 231:15, 231:17, 232:1, 232:5, 235:18, 235:22, 236:5, 246:10, 246:13
**discretionary** [4] - 137:7, 155:21,
160:3, 172:17
**discuss** [4] - 63:14, 87:25, 91:11, 193:4
**discussed** [7] - 61:2, 85:3, 129:15, 133:25, 154:7, 184:10, 197:23
**discusses** [1] - 233:5
**discussion** [2] - 65:25, 72:5
**Discussion** [2] - 8:9, 27:19
**discussions** [2] - 77:24, 81:17
**disjunctive** [1] - 244:18
**DISMISS** [1] - 1:13
**dismiss** [6] - 57:24, 79:13, 101:18, 144:16, 207:4, 251:23
**dismissal** [6] - 57:21, 63:25, 137:11, 144:23, 148:20, 148:24
**dismissed** [6] - 68:9, 68:21, 137:2, 138:5, 206:21, 208:25
**displaying** [1] - 138:20
**dispositive** [2] - 257:17, 257:18
**dispute** [11] - 19:7, 21:6, 31:5, 133:12, 181:12, 212:11, 212:25, 250:8, 258:1, 258:5
**disputed** [3] - 213:2, 213:3, 257:22
**disputes** [4] - 159:13, 170:4, 171:7
**disputing** [1] - 134:24
**disregard** [1] - 122:21
**disrespectful** [1] - 215:20
**disrupt** [2] - 179:12, 179:19
**disruption** [1] - 179:17
**dissent** [1] - 137:16
**dissuade** [2] - 29:25, 30:4
**dissuaded** [1] - 30:9
**distance** [1] - 200:1
**distinct** [1] - 144:18
**distinction** [15] - 11:23, 18:11, 18:13, 48:4, 54:25, 56:3, 90:11, 100:19, 100:25, 157:7, 173:15, 199:24, 234:11, 261:20, 261:25
**distinctions** [4] - 91:19, 93:16, 167:13, 248:9
**distinguish** [3] - 11:8, 23:18, 69:17
**distinguished** [1] - 110:13
**distinguishing** [1] - 40:22
**distracted** [1] - 91:15
**distributing** [1] - 171:6
**distribution** [5] - 167:20, 168:6, 168:18, 170:14, 174:8
**district** [3] - 215:21, 245:17, 249:8
**District** [8] - 165:19, 165:20, 171:2, 235:20, 255:25, 258:20, 259:17
**DISTRICT** [2] - 1:1, 1:1
**district"** [1] - 224:22
**diverse** [1] - 135:8
**diversity** [14] - 131:16, 133:7, 134:19, 135:3, 155:18, 155:20, 172:10, 172:13, 177:2, 188:15, 190:9, 202:19, 214:14, 214:15
**divided** [1] - 11:19
**divides** [1] - 16:7
**Division** [1] - 176:8
**division** [1] - 186:15
**divisions** [1] - 63:14
**DLA** [2] - 3:2, 10:14
**doctrine** [7] - 137:7, 137:18, 138:3, 144:24, 146:1, 177:19, 217:1
**doctrines** [2] - 144:18

All Word // In Re:  Air Cargo Antitrust Litigation _____ 14

**document** [4] - 211:2, 241:1, 241:14, 241:16
**documents** [8] - 224:11, 225:1, 246:12, 260:3, 260:12, 261:6, 261:9
**Doe** [1] - 197:15
**dogs** [1] - 155:2
**Dole** [8] - 110:20, 214:24, 215:1, 215:13, 216:2, 229:23, 229:24, 229:25
**dollars** [3] - 76:22, 249:3, 258:18
**domestic** [43] - 11:4, 11:8, 11:11, 11:14, 12:5, 12:14, 12:16, 15:16, 17:7, 17:21, 18:2, 23:7, 23:11, 23:12, 23:21, 26:2, 32:21, 32:23, 42:17, 52:2, 52:4, 53:2, 56:15, 91:4, 91:24, 91:25, 92:7, 93:1, 96:1, 97:8, 97:14, 97:18, 97:21, 98:9, 98:25, 99:16, 102:13, 109:24, 110:1, 112:12, 112:13, 116:1, 124:20
**domestically** [2] - 23:8, 94:2
**domicile** [1] - 43:21
**domiciled** [2] - 147:21, 147:22
**domiciliaries** [4] - 145:11, 145:16, 145:18, 145:19
**domiciliary** [1] - 147:23
**done** [30] - 13:7, 30:3, 35:7, 37:7, 37:17, 49:19, 59:9, 71:17, 86:14, 89:24, 89:25, 118:20, 125:14, 127:4, 133:20, 151:16, 170:23, 171:3, 171:11, 181:3, 181:12, 196:9, 196:18, 206:15, 206:16, 219:21, 230:19, 242:9, 246:11
**DONOVAN** [28] - 245:2, 245:3, 246:3, 247:11, 248:13, 249:4, 249:7, 249:12, 250:11, 251:1, 251:13, 252:5, 252:8, 252:25, 253:5, 253:7, 253:16, 253:24, 254:5, 260:22, 261:2, 261:3, 262:3, 262:5, 262:9, 262:12, 265:20, 265:22
**Donovan** [1] - 245:3
**door** [1] - 175:25
**Dorr** [1] - 6:2
**DOT** [3] - 109:17, 205:22, 205:24
**double** [2] - 165:17, 167:7
**doubt** [1] - 183:23
**down** [15] - 53:15, 64:21, 65:1, 65:7, 80:14, 82:22, 86:2, 106:11, 118:7, 118:11, 118:22, 138:15, 162:9, 168:5, 169:22
**dozens** [1] - 251:6
**dragged** [1] - 215:16
**draw** [6] - 11:16, 76:3, 78:17, 79:3, 210:8, 234:12
**drawing** [1] - 190:9
**drawn** [3] - 53:11, 56:4, 90:12
**drive** [2] - 21:3, 63:18
**drives** [1] - 52:14
**Drye** [1] - 245:3
**Dublin** [3] - 28:8, 28:16, 28:22
**due** [5] - 138:19, 146:14, 246:18, 256:4, 259:22
**Dunn** [1] - 2:1
**duplication** [1] - 129:17
**During** [1] - 85:19
**during** [1] - 201:10

**E**

**e-mail** [1] - 75:25

**E-mail** [1] - 7:22
**early** [2] - 191:12, 224:5
**easier** [2] - 197:2, 223:20
**easily** [2] - 121:4, 259:10
**East** [3] - 2:11, 3:16, 7:6
**Eastern** [3] - 235:20, 258:20, 259:17
**EASTERN** [1] - 1:1
**easy** [3] - 33:6, 252:12, 252:15
**EC** [7] - 28:9, 68:16, 169:25, 170:1, 180:23, 186:24
**ECJ** [2] - 153:1, 185:11
**economic** [2] - 109:14, 160:22
**economies** [1] - 179:24
**economy** [4] - 44:5, 44:8, 44:11, 155:9
**Edelman** [1] - 7:6
**educate** [1] - 190:4
**Education** [1] - 139:2
**education** [2] - 99:16, 168:21
**Edward** [2] - 3:1, 10:13
**EEA** [1] - 139:14
**eerie** [1] - 132:18
**effect** [27] - 22:2, 22:3, 41:24, 42:7, 44:17, 47:2, 47:4, 47:16, 53:7, 61:15, 61:22, 61:24, 62:3, 62:13, 77:22, 86:9, 135:8, 182:16, 201:24, 203:17, 211:5, 219:11, 222:8, 223:9, 233:18, 238:3
**effected** [2] - 89:15, 149:17
**effective** [16] - 46:3, 149:6, 149:8, 150:16, 158:12, 159:3, 164:14, 165:4, 180:24, 184:20, 185:10, 185:12, 185:24, 189:5, 189:25, 237:24
**effectively** [6] - 8:19, 29:20, 158:8, 159:12, 188:18, 238:3
**effectiveness** [5] - 184:2, 184:7, 186:4, 187:14, 190:22
**Effectiveness** [3] - 164:12, 164:13, 185:22
**Effects** [2] - 193:12, 198:17
**effects** [29] - 16:8, 16:9, 19:14, 19:16, 19:22, 20:5, 20:8, 20:11, 20:23, 21:1, 21:12, 21:13, 21:17, 22:4, 22:11, 30:12, 31:10, 31:11, 32:21, 32:23, 47:20, 48:1, 48:3, 48:5, 140:20, 219:7, 219:16, 219:17, 220:1
**effectuate** [1] - 181:10
**efficiencies** [1] - 151:22
**efficient** [4] - 45:20, 46:5, 53:4, 116:17
**efforts** [1] - 29:11
**eight** [3] - 56:21, 188:4, 247:17
**either** [14] - 8:7, 35:25, 53:5, 63:2, 94:19, 94:24, 95:8, 155:18, 177:2, 180:6, 212:21, 214:14, 238:23, 246:16
**Either** [2] - 61:12, 206:12
**elect** [1] - 166:19
**electronic** [2] - 81:23, 82:3
**electronically** [1] - 81:11
**element** [5] - 12:3, 19:22, 23:2, 23:3, 27:25
**elements** [1] - 32:16
**Elevator** [15] - 57:14, 57:16, 58:22, 63:2, 63:10, 63:11, 64:8, 68:10, 68:11, 68:15, 68:21, 77:14, 88:10, 88:11, 88:14
**elevators** [1] - 63:15
**Elevators** [1] - 81:2
**elicit** [1] - 126:25

**eligible** [1] - 134:5
**eliminate** [2] - 129:17, 157:16
**elimination** [1] - 102:19
**Elser** [1] - 7:6
**elsewhere** [6] - 81:18, 120:17, 130:18, 144:3, 166:10, 174:2
**elusively** [1] - 63:17
**Empagran** [1] - 31:7
**emphasize** [2] - 153:21, 245:7
**emphasized** [2] - 216:6, 239:15
**Empire** [2] - 217:17, 217:18
**employee** [1] - 210:24
**employees** [2] - 51:19, 213:21
**employing** [1] - 257:9
**en** [1] - 39:15
**enact** [2] - 92:16, 109:6
**enacted** [7] - 90:23, 91:8, 91:18, 92:11, 157:2, 181:11, 191:1
**enactment** [1] - 20:12
**encapsulate** [1] - 199:21
**encompass** [2] - 48:16, 48:17
**encompassed** [2] - 130:18, 130:20
**encompasses** [1] - 48:18
**encore** [1] - 31:25
**encourage** [2] - 242:4, 243:3
**End** [1] - 229:21
**end** [9] - 46:6, 62:6, 74:2, 74:15, 75:12, 76:11, 126:9, 135:19, 218:7
**ended** [3] - 23:20, 23:24, 53:14
**ends** [2] - 38:6, 260:20
**enforce** [7] - 46:6, 46:23, 92:16, 109:6, 181:2, 187:8, 187:24
**enforceability** [2] - 166:18, 173:22
**enforced** [4] - 153:23, 158:8, 187:15
**Enforcement** [1] - 42:3
**enforcement** [6] - 158:7, 160:24, 161:20, 161:22, 184:15
**enforcers** [4] - 45:20, 45:21, 46:5, 53:4
**enforces** [1] - 185:11
**enforcing** [1] - 153:11
**engage** [5] - 54:5, 96:18, 209:14, 219:1, 235:25
**engaged** [6] - 121:6, 121:10, 179:8, 223:9, 224:7
**engages** [1] - 232:24
**engaging** [1] - 154:2
**England** [19] - 37:20, 140:19, 140:20, 140:21, 140:24, 141:3, 141:5, 145:9, 146:25, 147:7, 147:16, 148:7, 148:13, 148:14, 148:24, 150:22, 151:7, 185:19
**England's** [1] - 150:25
**English** [35] - 135:22, 135:24, 136:1, 136:5, 136:12, 139:19, 139:20, 140:1, 140:8, 140:9, 140:10, 140:17, 140:22, 146:25, 147:1, 147:5, 148:4, 148:5, 148:9, 149:22, 150:9, 150:11, 150:12, 150:15, 150:17, 150:22, 151:6, 169:1, 169:2, 169:4, 175:1, 175:6, 185:21
**enlarged** [1] - 205:19
**enormous** [1] - 68:4
**enslaved** [1] - 178:7
**ensure** [1] - 159:10
**enter** [3] - 63:17, 81:13, 248:5
**entered** [3] - 13:12, 165:20, 185:8
**enterprise** [1] - 242:11

**Enterprise** [2] - 243:7, 243:9
**enterprises** [1] - 158:21
**Enterprises** [3] - 213:6, 230:14, 231:5
**entertain** [1] - 187:17
**entire** [8] - 65:16, 65:20, 66:2, 73:16, 73:19, 129:12, 140:3, 140:16
**Entirely** [1] - 18:8
**entirely** [15] - 24:19, 49:20, 63:22, 88:17, 91:20, 110:7, 114:19, 130:6, 137:6, 146:23, 146:24, 147:4, 252:3
**entirety** [10] - 116:6, 158:3, 158:5, 158:23, 164:15, 167:24, 168:5, 176:17, 189:6, 207:5
**entities** [7] - 43:5, 46:1, 93:1, 131:1, 145:24, 146:6, 153:3
**entitle** [1] - 95:9
**entitled** [8] - 72:9, 98:23, 117:19, 160:15, 168:18, 225:8, 228:17, 231:22
**entitlement** [1] - 174:8
**entity** [13] - 45:6, 45:24, 55:24, 212:23, 215:2, 215:7, 215:11, 215:22, 216:11, 216:14, 217:5, 229:20, 231:7
**entrusted** [1] - 183:24
**envisaged** [1] - 209:1
**envision** [1] - 8:21
**envisioned** [1] - 9:8
**equal** [1] - 168:8
**equally** [3] - 161:3, 179:8, 215:17
**equipped** [1] - 148:9
**Equivalency** [2] - 185:15, 185:22
**equivalency** [2] - 184:1, 184:3
**equivalent** [4] - 184:5, 185:23, 188:7, 190:1
**Eric** [1] - 6:1
**escaping** [1] - 234:5
**eschewed** [2] - 219:15, 219:25
**especially** [3] - 46:17, 67:25, 251:23
**essence** [8] - 23:4, 99:11, 155:16, 158:4, 172:14, 188:7, 236:12, 259:8
**essential** [1] - 158:6
**Essentially** [1] - 249:12
**essentially** [14] - 33:24, 38:21, 43:15, 58:25, 62:20, 138:6, 155:14, 163:8, 166:11, 169:6, 200:9, 205:24, 233:24, 237:25
**establish** [21] - 117:24, 163:9, 183:16, 194:18, 204:13, 214:1, 214:18, 218:22, 219:1, 219:5, 221:9, 221:19, 222:20, 222:22, 222:25, 228:7, 230:16, 231:9, 233:1, 255:13
**established** [5] - 57:23, 97:18, 139:4, 151:1, 188:11
**establishes** [2] - 134:2, 134:11
**establishing** [5] - 101:20, 164:15, 195:11, 195:25, 214:1
**establishment** [1] - 219:15
**et** [7] - 92:17, 98:19, 134:3, 134:4, 153:7, 184:13, 205:9
**Ethiopian** [4] - 224:19, 224:20, 239:7, 240:18
**EU** [22] - 130:2, 130:14, 133:8, 146:23, 147:8, 147:21, 147:22, 148:3, 149:25, 153:3, 153:4, 153:14, 154:11, 165:14, 167:14, 169:6, 169:25, 170:1, 177:25, 179:6, 185:20
**Europe** [42] - 26:25, 28:17, 56:1, 56:7,

63:13, 72:17, 77:25, 79:3, 80:19, 81:18, 84:18, 138:25, 142:1, 144:2, 145:6, 148:21, 148:22, 149:3, 151:9, 151:21, 152:13, 154:3, 154:9, 156:13, 157:23, 158:9, 159:7, 162:7, 170:9, 170:11, 170:23, 171:16, 173:9, 173:11, 175:14, 179:16, 179:18, 182:1, 183:21, 187:4, 190:24, 246:20
**Europe's** [1] - 138:23
**European** [126] - 129:20, 131:1, 135:6, 139:4, 139:18, 142:1, 143:18, 144:5, 148:21, 149:4, 149:17, 149:24, 150:1, 150:15, 150:18, 151:10, 151:17, 151:24, 152:14, 152:23, 152:25, 153:11, 153:12, 153:15, 153:16, 154:4, 154:6, 154:12, 155:14, 156:1, 156:3, 156:16, 157:2, 157:10, 157:20, 157:21, 158:1, 158:3, 158:10, 158:18, 158:25, 159:1, 159:18, 160:1, 160:10, 160:14, 160:17, 160:19, 160:21, 161:12, 161:14, 161:17, 162:1, 162:4, 163:10, 163:19, 163:22, 163:25, 165:8, 166:3, 166:5, 166:8, 166:16, 167:5, 167:9, 167:21, 168:7, 168:21, 169:9, 170:5, 171:14, 171:20, 171:21, 173:16, 173:20, 174:7, 174:14, 174:20, 175:15, 175:21, 175:22, 176:1, 176:6, 178:3, 179:9, 179:22, 180:15, 180:18, 180:21, 181:1, 181:13, 181:15, 181:18, 181:20, 181:22, 182:22, 182:25, 183:9, 183:11, 184:4, 184:21, 184:23, 184:24, 185:4, 185:5, 185:6, 185:24, 185:25, 186:2, 186:6, 186:7, 186:14, 186:22, 187:4, 187:7, 187:8, 187:15, 187:23, 250:5, 250:23
**Europeans** [2] - 131:6, 149:11
**Euros** [4] - 27:6, 37:10, 76:22, 82:1
**Eurotravel** [1] - 132:4
**evaluate** [1] - 206:4
**evaluation** [1] - 57:20
**evening** [2] - 222:4, 254:7
**event** [3] - 48:11, 238:24, 245:20
**events** [3] - 146:14, 157:18, 215:11
**Eventually** [1] - 75:21
**Everson** [1] - 3:19
**everywhere** [2] - 16:4, 145:6
**evidence** [45] - 151:19, 151:25, 153:2, 153:3, 183:16, 188:9, 194:4, 194:5, 194:7, 194:9, 195:22, 195:23, 195:24, 196:15, 196:16, 196:19, 196:22, 196:23, 196:25, 197:5, 197:15, 201:17, 203:4, 203:6, 203:8, 203:13, 204:4, 204:11, 206:15, 210:1, 218:18, 218:21, 219:1, 219:22, 221:20, 225:20, 225:25, 230:19, 234:2, 236:8, 236:24, 252:14, 252:15, 252:16, 261:5
**evidentiary** [21] - 78:7, 78:10, 80:4, 153:8, 196:2, 196:17, 196:19, 203:8, 221:14, 225:15, 225:19, 225:25, 226:2, 226:8, 239:24, 245:10, 246:2, 246:4, 257:12, 257:24
**eviscerates** [1] - 21:15
**exact** [5] - 28:17, 74:21, 187:9, 258:14, 258:15
**Exactly** [6] - 109:4, 115:21, 164:8, 183:17
**exactly** [12] - 12:1, 12:19, 16:14, 54:3,

59:3, 67:20, 88:16, 89:9, 100:2, 175:2, 187:4, 201:13
**examine** [5] - 115:1, 131:9, 211:1, 213:10, 245:17
**examined** [2] - 116:6, 116:7
**examines** [1] - 214:12
**examining** [2] - 214:13, 245:22
**example** [18] - 31:9, 36:8, 40:9, 41:8, 59:17, 66:24, 67:6, 81:5, 147:12, 147:16, 169:16, 175:21, 183:21, 196:23, 200:23, 202:3, 215:18, 224:14
**examples** [7] - 35:16, 35:17, 42:2, 42:8, 121:5, 121:14, 197:22
**exceed** [1] - 168:2
**except** [6] - 45:25, 48:9, 92:25, 130:3, 131:3, 227:22
**Except** [2] - 156:21, 193:22
**exception** [54] - 12:12, 15:19, 16:10, 17:6, 17:14, 18:4, 20:24, 21:12, 21:25, 22:10, 22:14, 29:3, 29:23, 30:7, 30:15, 42:11, 44:14, 48:22, 63:3, 92:14, 136:19, 193:18, 194:4, 194:15, 194:18, 195:12, 195:16, 195:21, 197:3, 203:20, 205:2, 205:11, 206:2, 206:5, 209:5, 209:6, 215:15, 219:10, 219:18, 220:2, 222:22, 224:9, 225:7, 228:16, 231:23, 233:2, 233:11, 233:21, 238:1, 238:4, 238:6
**exceptional** [2] - 136:18, 137:3
**exceptions** [2] - 66:19, 92:25
**excerpt** [2] - 20:17, 182:3
**excessively** [1] - 149:10
**exchange** [1] - 83:22
**Exchange** [1] - 148:17
**exchanged** [1] - 63:16
**exclude** [1] - 65:2
**excluded** [3] - 42:25, 44:19, 96:9
**exclusion** [2] - 45:4, 45:16
**exclusive** [8] - 93:11, 105:12, 105:14, 210:25, 241:3, 247:16, 257:14, 257:15
**exclusively** [6] - 37:5, 91:2, 144:2, 145:3, 145:17, 239:15
**Exclusively** [2] - 145:7, 145:9
**exclusivity** [4] - 93:12, 99:13, 99:15, 257:16
**excuse** [3] - 65:2, 130:24, 204:7
**Excuse** [2] - 38:18, 163:24
**executed** [1] - 232:25
**executive** [1] - 79:8
**Executive** [2] - 136:21, 181:10
**exemplary** [1] - 150:4
**exempt** [1] - 96:15
**exemption** [9] - 91:5, 94:7, 94:9, 94:20, 94:22, 94:25, 95:8, 95:14, 106:16
**exercise** [12] - 131:11, 134:20, 134:25, 135:3, 139:10, 151:16, 155:18, 155:23, 156:19, 219:21, 246:19, 249:14
**Exhibit** [1] - 182:13
**exist** [3] - 13:3, 189:9, 199:18
**existence** [1] - 145:24
**exists** [1] - 194:9
**exonerate** [2] - 66:7, 79:17
**expand** [1] - 179:24
**expanded** [1] - 121:17
**expanding** [1] - 120:9
**expands** [1] - 155:10

**expect** [2] - 118:9, 179:23
**expected** [1] - 155:8
**expended** [3] - 40:12, 49:13, 179:5
**expenses** [1] - 174:15
**expensive** [1] - 251:22
**expert** [7] - 139:22, 139:23, 140:9, 140:11, 146:25, 148:1, 185:17
**experts** [4] - 139:16, 147:17, 149:19, 156:15
**Explain** [1] - 252:24
**explain** [3] - 39:12, 83:11, 119:6
**explained** [3] - 60:20, 66:25, 147:17
**explains** [1] - 140:15
**explanation** [1] - 76:9
**explicit** [2] - 205:15, 227:17
**Explicit** [1] - 205:17
**explode** [2] - 102:12, 106:22
**exploded** [1] - 119:1
**exploding** [1] - 122:10
**export** [3] - 29:25, 52:2, 52:3
**exporter** [1] - 55:16
**express** [6] - 91:7, 94:3, 99:23, 101:2, 125:2, 211:2
**expressed** [2] - 37:15, 96:10
**expression** [1] - 119:17
**expressly** [5] - 54:1, 108:15, 111:14, 112:14, 257:5
**extend** [1] - 237:25
**extended** [1] - 96:16
**extends** [1] - 152:8
**extension** [1] - 76:20
**extensive** [1] - 254:13
**extensively** [1] - 234:2
**extent** [18] - 10:9, 13:3, 22:23, 40:20, 50:4, 62:7, 70:5, 119:19, 129:16, 144:1, 152:7, 161:24, 213:21, 213:22, 215:14, 215:15, 231:11, 233:6
**exterior** [1] - 137:24
**extremely** [2] - 88:13, 157:24
**extricate** [1] - 155:17
**Eye** [1] - 6:16

**F**

**F.3d** [2] - 205:14, 233:5
**FAA** [5] - 93:17, 93:21, 98:18, 99:9, 115:17
**face** [5] - 66:7, 183:24, 196:3, 200:11, 219:7
**faced** [2] - 151:12, 159:19
**faces** [1] - 174:18
**facie** [5] - 213:24, 221:19, 222:17, 231:13, 235:23
**facing** [1] - 222:13
**Facsimile** [1] - 7:21
**fact** [87] - 14:6, 15:23, 16:11, 16:12, 20:8, 26:11, 34:22, 39:7, 43:17, 48:13, 48:18, 52:15, 53:20, 55:23, 56:3, 61:8, 66:5, 67:3, 68:12, 70:13, 70:25, 71:22, 72:21, 73:13, 78:10, 86:17, 88:23, 89:6, 104:11, 104:22, 115:18, 115:22, 115:25, 131:22, 132:15, 132:24, 133:14, 135:25, 136:13, 136:14, 137:21, 138:4, 139:11, 139:21, 140:24, 141:2, 142:6, 143:3, 155:11, 162:7, 162:13, 170:9, 171:1,

**facto** [3] - 217:3, 217:10, 217:21
**factor** [6] - 230:16, 251:18, 252:22, 257:19, 259:5, 259:21
**factors** [16] - 60:11, 74:3, 74:11, 75:4, 75:14, 135:13, 136:14, 149:21, 214:2, 230:10, 230:20, 231:6, 251:12, 252:13, 257:21, 258:21
**facts** [41] - 23:19, 26:5, 58:24, 60:3, 71:15, 78:22, 79:4, 86:20, 87:12, 89:21, 136:24, 145:1, 166:3, 194:14, 194:16, 195:3, 195:5, 195:6, 195:10, 195:15, 196:4, 196:5, 196:9, 203:8, 204:14, 213:16, 221:8, 221:12, 221:15, 222:8, 225:22, 226:13, 226:17, 239:12, 246:5, 246:15, 248:24, 249:18
**Facts** [2] - 89:18, 223:16
**factual** [34] - 17:5, 58:5, 58:12, 58:21, 58:23, 59:7, 60:4, 60:8, 60:22, 60:23, 61:3, 61:8, 61:12, 61:18, 61:23, 62:15, 62:19, 62:24, 63:8, 63:20, 63:21, 65:6, 65:8, 67:1, 80:22, 88:6, 89:10, 212:11, 212:25, 230:9, 231:15, 235:13, 257:22
**Fahd** [1] - 201:20
**fail** [4] - 20:9, 140:21, 141:8, 164:14
**failed** [5] - 10:22, 43:13, 194:5, 204:5, 236:3
**failure** [1] - 235:15
**fair** [4] - 72:10, 72:13, 87:6, 256:12
**Fair** [1] - 87:18
**fairly** [1] - 30:21
**Fairness** [1] - 131:15
**Falk** [1] - 2:5
**fall** [3] - 57:17, 216:10, 240:9
**falling** [1] - 26:23
**falls** [1] - 48:2
**familiar** [4] - 8:7, 8:8, 95:18, 199:6
**fantasy** [1] - 235:17
**far** [20] - 9:12, 39:1, 64:12, 64:17, 64:21, 101:5, 128:11, 151:20, 157:16, 161:16, 198:5, 207:13, 209:20, 211:23, 216:7, 231:17, 231:25, 240:7, 258:17, 260:5
**fashion** [2] - 8:18, 46:17
**fashioned** [1] - 69:3
**fast** [1] - 205:21
**fatal** [1] - 239:10
**fault** [2] - 150:3, 184:8
**favor** [29] - 1:20, 1:24, 2:3, 2:8, 2:12, 2:17, 2:21, 3:3, 3:8, 3:12, 3:17, 3:21, 4:5, 4:9, 4:13, 4:17, 4:25, 5:9, 5:18, 5:23, 6:4, 6:8, 6:12, 6:17, 6:22, 7:3, 7:7, 7:11, 7:15
**feasible** [1] - 79:11
**February** [6] - 71:4, 85:2, 85:20, 140:11, 211:17, 213:4
**Fed** [1] - 235:19
**Federal** [14] - 71:25, 72:7, 90:23, 92:23, 93:9, 107:9, 113:12, 117:24, 124:14, 133:18, 155:9, 179:23, 227:22, 227:24

**federal** [9] - 92:4, 94:19, 132:9, 132:10, 133:3, 133:17, 185:11, 214:14
**fee** [1] - 248:8
**fees** [8] - 39:10, 81:15, 82:1, 174:11, 174:12, 174:15, 181:24, 184:13
**felt** [1] - 28:24
**few** [6] - 8:25, 66:19, 116:11, 144:19, 237:6, 249:17
**Fifth** [2] - 2:15, 6:7
**figure** [2] - 76:6, 189:13
**figures** [1] - 93:17
**file** [5] - 65:15, 154:8, 179:18, 186:10, 256:15
**filed** [10] - 25:4, 71:3, 154:16, 213:1, 213:4, 214:7, 230:8, 254:21, 256:19, 256:21
**filing** [18] - 85:2, 174:2, 214:21, 215:3, 215:11, 215:12, 215:17, 215:18, 215:22, 216:1, 217:6, 217:9, 217:22, 218:5, 229:14, 229:20, 248:20, 254:22
**final** [4] - 75:14, 95:3, 188:7, 244:20
**finalized** [1] - 218:1
**finally** [2] - 131:12, 146:5
**Finally** [1] - 216:24
**Fine** [1] - 243:25
**fine** [2] - 32:3, 118:10
**finish** [1] - 163:5
**finished** [1] - 37:16
**Fire** [3] - 137:16, 254:12, 255:3
**firearms** [1] - 114:18
**firing** [1] - 51:19
**firm** [1] - 57:5
**Firm** [1] - 2:15
**First** [23] - 11:19, 21:5, 47:12, 47:14, 58:2, 58:18, 61:17, 92:20, 98:8, 123:13, 135:22, 140:5, 140:18, 144:21, 164:22, 167:25, 172:10, 180:14, 183:8, 210:12, 222:13, 247:12, 261:5
**first** [49] - 8:23, 9:3, 9:16, 11:1, 17:10, 19:5, 26:19, 36:3, 39:20, 45:10, 45:16, 48:5, 52:13, 69:14, 73:19, 87:10, 90:13, 92:3, 94:11, 95:23, 102:3, 104:20, 105:3, 107:18, 111:18, 116:24, 121:17, 122:12, 129:19, 131:9, 131:13, 131:14, 132:18, 133:18, 134:6, 135:2, 135:16, 139:13, 168:4, 168:9, 178:6, 190:12, 195:14, 207:20, 210:12, 222:6, 226:19, 236:1, 237:12
**Fishbein** [1] - 6:10
**five** [15] - 47:8, 58:24, 62:22, 75:5, 76:11, 84:2, 84:18, 84:21, 85:6, 85:13, 116:14, 118:4, 218:1, 248:22, 249:5
**Five** [4] - 129:25, 130:22, 131:3, 141:7
**fix** [20] - 10:18, 16:4, 22:15, 23:4, 26:1, 33:9, 36:7, 36:8, 36:13, 38:16, 38:17, 38:21, 40:2, 49:24, 58:9, 63:14, 68:13, 172:24, 178:1, 234:9
**fixed** [14] - 26:13, 36:17, 36:20, 36:23, 37:1, 38:19, 38:24, 52:10, 104:10, 233:17, 234:6, 234:8, 247:24
**fixing** [25] - 15:7, 31:14, 34:25, 36:5, 36:10, 40:23, 44:18, 70:12, 157:16, 158:19, 158:23, 160:18, 161:2, 161:4, 165:22, 169:7, 173:4, 175:11, 176:12, 179:8, 187:25, 199:9, 199:20, 233:14, 233:15, 234:20

flat [3] - 39:10, 81:15, 82:1

flavor [1] - 59:8

flesh [1] - 61:12

flew [1] - 166:6

flexible [2] - 138:3, 155:7

flight [5] - 41:8, 56:9, 66:24, 248:8, 252:11

flights [5] - 39:19, 41:9, 65:25, 91:4, 165:23

Flint [2] - 25:4, 25:5

flip [2] - 164:3, 164:6

flip-side [2] - 164:3, 164:6

Floor [6] - 1:19, 2:16, 3:16, 5:8, 5:12, 7:2

flown [1] - 33:16

fluid [1] - 213:19

fly [9] - 22:20, 34:11, 37:21, 38:3, 55:9, 66:23, 199:11, 199:17, 247:6

flying [9] - 22:17, 26:3, 26:15, 34:13, 40:11, 40:13, 41:5, 94:10, 227:5

focus [5] - 19:18, 34:18, 34:20, 76:25, 211:22

focused [3] - 70:23, 115:25, 124:23

focuses [1] - 105:5, 203:20, 235:11

focusing [4] - 36:3, 40:21, 104:11, 119:13

fold [1] - 89:24

folks [3] - 125:16, 191:8, 237:10

follow [12] - 51:7, 104:3, 114:7, 114:15, 123:16, 164:17, 175:2, 188:23, 189:2, 203:2, 210:5, 214:10

followed [4] - 112:6, 137:15, 217:24, 256:23

Following [1] - 77:20

following [14] - 50:7, 57:17, 84:14, 94:22, 110:7, 119:7, 122:5, 125:25, 143:22, 178:12, 182:5, 189:22, 190:20, 242:13

follows [5] - 43:9, 43:15, 52:12, 99:7, 109:2

Foods [1] - 229:25

Footnote [1] - 71:23

footnote [2] - 133:21, 235:19

FOR [1] - 1:12

force [3] - 45:25, 57:10, 160:22

forced [2] - 178:7, 249:22

Ford [1] - 178:6

fore [1] - 209:12

Foreign [15] - 91:2, 91:3, 102:23, 129:5, 191:21, 193:8, 201:22, 202:17, 206:21, 214:17, 216:7, 217:4, 219:9, 220:1, 221:18

foreign [250] - 10:24, 11:2, 11:8, 11:14, 11:22, 12:9, 12:10, 12:13, 16:8, 17:7, 17:8, 17:9, 17:16, 17:22, 17:23, 17:24, 18:7, 18:15, 18:16, 18:18, 18:19, 18:21, 19:6, 23:21, 24:2, 25:10, 25:24, 26:1, 26:11, 26:12, 26:18, 29:12, 29:25, 31:12, 33:8, 33:13, 33:14, 36:14, 37:5, 37:6, 38:16, 38:17, 38:19, 38:21, 40:6, 42:4, 42:14, 42:16, 42:23, 43:5, 45:1, 45:5, 45:6, 46:1, 49:3, 49:23, 51:13, 52:5, 52:9, 55:16, 55:20, 56:12, 56:15, 90:12, 90:20, 91:1, 91:19, 91:25, 92:23, 93:3, 93:10, 93:14, 93:22, 94:1, 94:5, 96:4, 96:5, 96:6, 96:7, 96:9, 97:21, 98:8,

99:14, 102:1, 102:14, 103:17, 105:12, 105:16, 105:18, 105:21, 107:12, 108:10, 109:14, 109:17, 109:18, 109:19, 110:5, 110:15, 111:14, 111:17, 111:19, 112:11, 112:16, 113:23, 113:24, 114:15, 114:21, 114:22, 116:3, 116:7, 116:20, 117:15, 117:17, 117:18, 117:23, 118:8, 118:21, 119:1, 120:4, 120:7, 121:10, 121:11, 122:8, 122:11, 123:2, 124:3, 124:6, 124:7, 125:2, 125:23, 127:2, 127:5, 129:14, 129:21, 130:12, 133:6, 133:8, 135:16, 136:13, 144:17, 144:23, 145:3, 145:7, 145:9, 145:11, 145:14, 145:15, 145:18, 145:20, 145:23, 146:6, 146:12, 146:13, 152:20, 155:8, 155:24, 156:15, 162:4, 171:11, 172:5, 172:14, 172:21, 172:22, 173:3, 174:5, 178:9, 179:13, 179:17, 179:19, 179:24, 182:21, 188:16, 188:17, 190:14, 193:6, 193:19, 193:21, 194:25, 195:2, 196:14, 196:25, 197:1, 201:15, 202:17, 203:4, 206:9, 207:19, 207:23, 208:4, 208:17, 208:19, 209:7, 210:15, 212:9, 212:13, 212:21, 212:22, 212:24, 214:1, 214:2, 215:2, 215:7, 215:8, 215:14, 216:8, 216:11, 216:14, 216:15, 216:18, 217:13, 217:14, 221:11, 221:19, 224:19, 227:4, 228:13, 228:15, 228:21, 228:23, 229:1, 229:16, 229:20, 230:6, 230:7, 230:11, 230:17, 231:8, 231:10, 231:14, 231:22, 231:25, 232:2, 235:25, 238:7, 238:20, 238:24, 239:1, 240:15, 247:16, 249:21, 250:2, 259:19

foreseeable [3] - 41:24, 42:7, 44:17

forget [1] - 67:21

forgoing [1] - 245:13

form [6] - 59:24, 137:4, 142:4, 146:1, 189:3, 246:12

formal [2] - 8:18, 80:2

format [3] - 81:23, 98:18, 98:19

formation [2] - 189:5

formed [1] - 164:9

forms [1] - 150:5

formulaic [2] - 59:5, 60:13

formulation [1] - 149:11

forth [11] - 8:25, 76:1, 136:4, 164:16, 182:25, 189:10, 196:24, 223:14, 236:19, 247:20, 252:12

forum [32] - 56:5, 141:13, 141:19, 141:21, 141:24, 142:7, 143:5, 145:1, 146:9, 146:14, 146:17, 146:20, 147:8, 147:10, 148:9, 148:20, 148:25, 149:19, 149:22, 156:23, 156:24, 157:1, 169:5, 169:11, 169:14, 173:19, 181:23, 188:18, 188:21, 188:22

forums [1] - 150:24

forward [16] - 90:25, 91:6, 91:18, 99:13, 122:8, 138:18, 195:22, 195:23, 195:24, 201:17, 202:2, 218:18, 221:20, 221:23, 221:24, 246:8

forwarder [15] - 12:17, 13:8, 13:12, 16:15, 26:9, 27:3, 27:4, 27:5, 27:12, 27:23, 29:1, 49:4, 86:3, 86:5, 140:7

forwarder's [1] - 27:14

forwarders [4] - 13:14, 59:20, 76:24, 152:2

four [25] - 25:25, 59:1, 62:22, 64:18,

64:22, 64:25, 70:7, 70:15, 72:22, 75:3, 75:15, 75:17, 76:10, 76:21, 77:15, 103:4, 118:23, 119:14, 119:20, 129:5, 129:24, 192:10, 192:11, 223:4, 224:16

Four [4] - 129:25, 130:22, 130:24, 141:7

four-step [6] - 62:22, 75:3, 75:15, 75:17, 76:10, 77:15

fourth [2] - 75:5, 75:14

Fox [4] - 1:18, 1:22, 69:12, 222:5

framed [1] - 194:24

framework [2] - 206:2, 206:4

framing [1] - 194:21

France [3] - 37:12, 86:5, 129:11

Francisco [1] - 7:2

frank [1] - 90:13

Frankfurt [3] - 28:16, 28:22, 80:19

frankly [12] - 19:17, 20:1, 33:17, 61:2, 65:19, 66:16, 70:25, 90:7, 227:14, 227:18, 245:13, 255:7

Frankly [1] - 70:11

free [2] - 158:22, 173:25

freight [32] - 12:17, 13:8, 13:12, 13:14, 16:15, 26:10, 27:11, 28:25, 31:15, 33:13, 39:10, 49:3, 59:20, 76:24, 81:8, 81:11, 81:12, 81:16, 81:22, 83:18, 83:23, 85:4, 85:22, 86:3, 86:4, 86:8, 140:7, 141:15, 223:11, 224:21, 225:5

French [1] - 153:5

frequency [2] - 155:9, 179:23

fresh [1] - 69:5

Freshfields [1] - 3:6

Friday [1] - 165:19

fruition [1] - 212:15

frustrate [2] - 113:6, 155:25

frustrated [1] - 101:21

FSIA [31] - 192:6, 204:14, 207:14, 207:17, 208:1, 208:2, 208:3, 208:6, 208:16, 208:23, 209:7, 209:12, 210:8, 210:24, 211:22, 211:23, 212:7, 214:8, 214:20, 223:5, 224:8, 228:5, 236:15, 237:19, 238:16, 238:17, 238:22, 239:10, 240:7, 240:14, 240:18

FTAIA [24] - 10:15, 12:11, 12:13, 13:1, 18:25, 19:4, 19:5, 19:10, 19:14, 20:4, 20:9, 20:12, 20:18, 20:21, 31:25, 42:25, 43:8, 43:13, 44:14, 47:13, 48:2, 48:6, 48:9, 219:16

fuel [28] - 40:9, 40:11, 40:12, 40:13, 40:16, 40:25, 41:3, 41:4, 41:7, 49:7, 49:13, 49:15, 49:16, 54:10, 74:3, 74:9, 74:24, 75:3, 75:11, 76:19, 76:20, 76:23, 76:24, 77:6, 84:4, 165:23

fulfilling [1] - 149:18

full [11] - 104:1, 111:9, 111:11, 118:24, 121:23, 160:18, 174:15, 206:25, 217:16, 217:17, 252:20

full-blown [1] - 206:25

fully [2] - 165:16, 187:15

function [1] - 99:15

functionally [1] - 243:11

functions [3] - 91:20, 91:21, 183:10

fund [1] - 168:14

fundamental [7] - 12:3, 16:6, 73:12, 107:15, 133:9, 136:9, 170:6

fundamentally [1] - 135:6

funny [1] - 260:11

**furnished** [1] - 241:14
**furtherance** [1] - 83:21
**furthered** [1] - 104:12

# G

**Galvin** [1] - 52:15
**gamut** [1] - 42:25
**gap** [2] - 98:15, 157:21
**garenson@kaplanfox.com** [1] - 1:20
**Gary** [1] - 1:22, 222:4
**gasciolla@labaton.com** [1] - 2:8
**Gatco** [1] - 132:3
**gather** [2] - 8:7, 80:14
**gathering** [1] - 100:19
**gavel** [1] - 53:14
**general** [11] - 63:22, 77:14, 77:15, 88:17, 89:20, 112:3, 114:24, 156:12, 205:15, 205:16, 207:24
**generalities** [3] - 70:11, 89:11, 89:12
**generalize** [1] - 76:17
**generalized** [3] - 84:9, 84:12, 86:15
**generally** [7] - 58:18, 97:12, 154:9, 198:24, 201:18, 232:4
**Generals** [2] - 116:19, 117:10
**generate** [1] - 152:4
**generic** [1] - 250:3
**generous** [1] - 185:19
**geographic** [1] - 65:21
**geographical** [1] - 52:8
**George** [2] - 4:11, 7:5
**george.tompkinsjr@wilsonelser.com** [1] - 7:8
**German** [1] - 178:7
**Germans** [1] - 153:6
**Germany** [1] - 16:18
**gesture** [1] - 216:9
**gfhritz@hhlaw.com** [1] - 4:14
**Gibson** [2] - 2:1, 89:18
**Gilbert** [1] - 144:24
**Ginsburg** [1] - 104:16
**Giovanniello** [1] - 132:6
**gist** [1] - 198:10
**given** [19] - 9:3, 21:23, 67:12, 71:1, 80:10, 80:11, 86:19, 88:22, 88:23, 96:18, 105:11, 117:20, 149:14, 149:17, 151:25, 195:9, 234:9, 240:23, 245:4
**glad** [1] - 177:15
**Glasser** [2] - 248:18, 249:5
**Gleeson** [1] - 190:5
**global** [17] - 10:18, 15:7, 16:4, 67:18, 80:4, 155:9, 155:24, 159:19, 159:20, 159:22, 160:5, 160:22, 172:24, 179:24, 201:19, 223:5
**globally** [2] - 15:8, 234:15
**globe** [1] - 160:25
**goals** [1] - 161:11
**goods** [50] - 10:25, 11:12, 12:18, 13:19, 16:18, 17:17, 18:6, 21:7, 24:1, 24:20, 27:2, 33:15, 34:8, 34:10, 34:11, 34:13, 34:16, 34:17, 34:19, 35:18, 39:4, 39:6, 39:16, 41:1, 42:18, 43:19, 43:24, 44:9, 44:11, 44:12, 44:18, 45:19, 47:15, 47:25, 48:13, 48:18, 51:25, 53:13, 53:15, 53:25, 54:7, 54:20, 54:24, 55:8, 56:16, 81:9,

200:16, 247:2, 247:8
**Gordon** [1] - 2:14
**Gotshal** [1] - 6:6
**Government** [3] - 92:23, 110:23, 213:21
**government** [8] - 94:19, 111:1, 111:4, 213:14, 216:17, 218:10, 243:15, 243:16
**governments** [1] - 208:17
**governs** [4] - 109:14, 132:20, 150:22, 151:3
**grant** [2] - 109:17, 251:23
**grants** [1] - 155:21
**graphically** [1] - 14:11
**grappling** [1] - 35:23
**grasp** [1] - 193:7
**Gratt** [2] - 132:4, 133:24
**gravamen** [7] - 203:24, 203:25, 206:6, 233:7, 233:12, 233:23
**Gray** [1] - 4:7
**Great** [1] - 65:25
**great** [4] - 79:25, 104:15, 151:22, 160:11
**greater** [4] - 151:20, 152:16, 152:17, 188:4
**Greg** [2] - 69:12, 254:6
**Gregory** [2] - 1:17, 2:5
**grieved** [1] - 75:2
**Grindal** [1] - 2:19
**ground** [3] - 84:19, 90:21, 148:24
**grounds** [2] - 72:11, 138:5
**Group** [4] - 22:7, 29:5, 29:6, 235:19
**group** [4] - 143:14, 144:8, 161:10, 191:13
**gspecks@kaplanfox.com** [1] - 1:24
**guaranteed** [1] - 158:2
**guaranty** [1] - 133:4
**guess** [19] - 9:17, 10:4, 70:22, 78:9, 82:13, 83:4, 90:8, 120:15, 136:16, 169:23, 169:24, 192:14, 196:4, 221:10, 223:2, 247:6, 250:14, 254:8
**Guidelines** [1] - 42:3
**guilty** [8] - 65:5, 65:13, 65:15, 65:17, 65:18, 66:8, 70:8, 73:9
**Gurion** [1] - 7:9

# H

**Hague** [1] - 152:13
**Hale** [1] - 6:2
**Halebian** [1] - 5:7
**half** [2] - 131:24, 192:20
**Halle** [1] - 5:15
**Hampton** [1] - 3:15
**hand** [3] - 10:3, 100:20, 213:2
**handed** [1] - 128:13
**handle** [4] - 57:1, 129:16, 137:8, 138:22
**handles** [2] - 126:19, 201:1
**handout** [1] - 128:23
**hands** [1] - 200:24
**Hanna** [1] - 133:17
**happy** [2] - 82:11, 123:9, 231:19
**hard** [5] - 33:6, 38:14, 39:24, 48:8
**hardcopies** [1] - 10:2
**Harlan** [2] - 217:12, 217:21
**harm** [18] - 19:25, 22:18, 23:6, 28:24, 43:2, 43:3, 46:16, 56:8, 56:10, 56:13,

56:14, 56:16, 157:25, 202:5, 203:25, 233:23, 234:7, 234:9
**harmed** [4] - 10:17, 44:12, 45:15, 197:7
**harmonization** [2] - 76:19, 189:9
**harmonize** [1] - 100:22
**harmonizes** [1] - 189:6
**harmony** [1] - 177:24
**Hartford** [1] - 137:16
**Hartson** [1] - 4:12
**hauled** [1] - 238:11
**HAUSFELD** [69] - 125:19, 125:24, 154:22, 154:23, 154:25, 156:21, 157:4, 157:7, 157:18, 157:23, 162:2, 162:12, 163:1, 163:6, 163:13, 163:16, 163:24, 164:3, 164:6, 164:8, 164:22, 164:25, 165:4, 165:12, 165:14, 167:1, 167:4, 168:23, 169:4, 169:12, 169:15, 170:2, 170:6, 170:18, 170:20, 171:17, 171:23, 172:3, 172:6, 172:8, 174:25, 175:4, 175:8, 175:16, 176:6, 176:10, 176:13, 176:15, 177:5, 177:11, 177:21, 179:2, 179:3, 180:3, 180:5, 187:18, 187:20, 187:22, 189:2, 189:8, 189:17, 189:19, 190:7, 190:10, 190:16, 190:21, 264:13, 264:15, 264:21
**Hausfeld** [8] - 4:1, 4:3, 154:20, 161:7, 180:2, 182:3, 187:1, 187:14
**headquarters** [1] - 248:6
**hear** [3] - 235:12, 260:20, 262:20
**heard** [4] - 155:14, 179:15, 192:7, 219:14
**hearing** [8] - 68:13, 196:2, 196:17, 196:19, 245:10, 246:2, 246:4, 257:12, 257:24
**Hearings** [1] - 97:11
**heart** [3] - 19:14, 38:15, 172:19
**heartening** [1] - 32:17
**Heather** [1] - 3:10
**Hecker** [1] - 3:19
**heightened** [7] - 71:22, 71:24, 201:21, 202:24, 227:19, 227:21, 227:25
**held** [20] - 8:9, 15:16, 22:9, 24:12, 27:19, 29:3, 29:14, 29:21, 29:23, 30:20, 52:16, 101:18, 116:7, 123:13, 123:14, 123:18, 134:2, 135:11, 136:20, 215:22
**Help** [1] - 83:9
**help** [1] - 130:4
**helped** [1] - 35:25
**helpful** [4] - 10:1, 19:3, 26:22, 257:20
**helping** [1] - 53:25
**Hendrickson** [1] - 4:7
**Hertzfeld** [1] - 4:2
**hierarchy** [2] - 104:19, 122:12
**high** [2] - 140:12, 183:22
**higher** [1] - 210:4
**highest** [7] - 77:24, 79:7, 138:23, 184:23, 185:3, 197:25, 201:19
**highlight** [2] - 38:10, 39:8, 240:21
**highlights** [1] - 41:14
**highway** [2] - 190:17, 190:18
**hired** [1] - 38:2
**hiring** [1] - 51:19
**history** [12] - 97:5, 97:6, 98:7, 98:10, 102:14, 104:17, 104:21, 108:19, 113:14, 113:25, 115:24, 127:3
**hit** [1] - 88:16

hmm [1] - 96:3
hoarded [1] - 215:12
Hobson [1] - 105:21
Hobson's [3] - 105:20, 121:2
Hogan [1] - 4:12
hold [2] - 172:18, 257:24
holding [5] - 47:18, 47:22, 105:19, 147:11, 229:21
holds [2] - 58:2, 117:23
Hollis [1] - 2:6
Holster [3] - 132:3, 133:23, 134:15
honor [1] - 240:11
Honor [226] - 9:19, 9:22, 10:13, 10:16, 11:6, 11:18, 12:1, 14:10, 23:1, 24:8, 24:21, 29:5, 30:16, 31:2, 31:22, 32:6, 34:9, 34:20, 43:11, 44:4, 45:4, 47:9, 51:7, 53:21, 54:17, 55:23, 56:2, 56:7, 57:4, 57:12, 58:14, 60:13, 62:14, 64:7, 64:24, 66:6, 66:15, 68:8, 68:25, 69:16, 70:2, 71:3, 71:11, 73:19, 75:2, 75:21, 78:14, 79:20, 80:8, 82:24, 83:6, 85:12, 85:17, 87:10, 87:18, 88:6, 89:2, 90:19, 90:22, 90:25, 91:24, 92:15, 93:20, 94:11, 95:18, 96:2, 97:20, 98:14, 99:21, 100:6, 100:9, 100:25, 101:13, 101:16, 102:6, 103:1, 103:8, 103:19, 104:14, 105:10, 106:14, 106:20, 107:4, 107:7, 108:16, 108:22, 114:12, 115:22, 116:14, 117:21, 118:1, 118:7, 118:15, 118:20, 119:2, 121:20, 121:21, 121:23, 121:24, 123:11, 124:21, 125:19, 126:5, 126:15, 127:1, 127:4, 127:7, 127:20, 129:13, 131:8, 143:11, 143:16, 143:19, 144:2, 144:14, 146:19, 149:22, 154:23, 156:21, 158:17, 159:7, 159:14, 160:9, 162:12, 163:2, 163:6, 164:25, 166:12, 167:25, 168:23, 170:21, 175:8, 175:17, 175:22, 177:1, 177:5, 177:23, 180:5, 180:12, 182:18, 183:7, 185:17, 186:9, 187:13, 187:18, 190:16, 194:20, 198:15, 201:9, 202:7, 202:23, 207:11, 207:15, 207:20, 209:6, 209:9, 209:23, 210:1, 210:7, 210:11, 210:24, 211:4, 211:7, 211:9, 211:11, 211:13, 211:15, 211:20, 211:23, 212:4, 222:4, 223:7, 223:14, 223:22, 224:25, 225:17, 226:21, 228:12, 229:13, 229:17, 230:22, 231:11, 231:18, 232:4, 232:9, 232:11, 232:12, 232:13, 235:24, 237:5, 237:8, 237:15, 239:6, 239:7, 239:13, 240:5, 240:20, 240:24, 241:8, 241:11, 245:8, 246:3, 247:11, 248:9, 248:24, 249:12, 249:15, 249:24, 250:4, 250:11, 250:18, 251:2, 251:6, 251:13, 251:23, 252:5, 252:19, 252:25, 253:5, 253:16, 254:5, 254:7, 254:24, 261:15, 262:15, 262:22
Honor's [4] - 157:4, 162:2, 172:20, 172:23
HONORABLE [1] - 1:13
hope [1] - 101:10
hopper [1] - 101:8
hopping [1] - 252:10
host [2] - 138:11, 152:6
hour [2] - 125:17, 245:5
hours [2] - 112:9, 252:8
House [2] - 98:9, 98:17

Howard [1] - 6:10
Hritz [1] - 4:11
hsedran@lfsblaw.com [1] - 6:13
hub [1] - 243:17
Hughes [1] - 94:21
hump [1] - 195:11
hundred [4] - 37:10, 162:20, 168:4, 176:1
hundreds [2] - 179:3, 249:2
hurdle [2] - 72:3, 90:9
hurdles [2] - 160:11, 193:14
hurt [1] - 10:4
hypothesize [1] - 84:14
hypothetical [4] - 14:1, 26:23, 51:22, 145:25
hypothetically [2] - 13:9, 26:24

I

Ian [1] - 6:14
IATA [3] - 25:25, 83:19, 83:20
idea [2] - 226:16, 235:16
ideally [1] - 175:18
identical [5] - 75:20, 148:23, 179:22, 188:1, 259:15
identified [6] - 146:19, 149:4, 149:20, 150:2, 179:6, 227:10
identifies [1] - 35:16
identify [1] - 146:11
ignore [2] - 61:8, 70:6, 172:12
ignores [1] - 255:8
Iguanowa [1] - 182:20
II [9] - 31:7, 57:2, 69:8, 88:3, 109:13, 263:15, 263:17, 263:19
III [11] - 31:19, 90:17, 107:2, 113:1, 116:12, 126:2, 263:21, 263:23, 264:1, 264:3, 264:6
IL [1] - 1:23
illegal [4] - 150:14, 167:23, 185:8, 222:14
Illinois [1] - 5:13
illustrate [1] - 26:23
illustrated [1] - 155:11
imagine [3] - 39:24, 144:21, 203:7
immediate [1] - 197:7
imminency [1] - 217:25
imminent [1] - 218:3
imminently [1] - 217:11
immune [1] - 229:6
immunities [1] - 195:2
Immunities [2] - 191:21, 201:22, 206:22, 221:18
immunity [19] - 193:19, 203:5, 205:4, 205:15, 205:18, 206:20, 217:13, 217:14, 224:10, 225:8, 227:16, 227:17, 228:9, 228:14, 228:16, 230:6, 231:22, 231:23, 232:6
Immunity [7] - 193:8, 202:18, 214:17, 216:8, 217:4, 219:9, 220:1
impact [12] - 45:9, 46:19, 46:21, 130:1, 152:5, 168:3, 168:15, 180:7, 197:8, 197:10
impacted [2] - 168:9, 172:25
impacting [1] - 31:14
impacts [2] - 44:18, 158:24, 159:2,

159:22
implement [3] - 75:16, 139:2, 186:3
implementation [4] - 74:16, 76:19, 84:19, 191:6
implemented [4] - 74:10, 74:15, 82:6, 82:7
implied [1] - 83:11
implies [1] - 117:23
import [106] - 12:12, 15:17, 15:19, 16:9, 17:6, 17:14, 18:3, 18:4, 19:9, 19:13, 19:20, 20:3, 20:19, 20:24, 20:25, 21:1, 21:5, 21:11, 21:14, 21:16, 21:18, 21:19, 21:21, 21:22, 21:24, 22:1, 22:6, 22:8, 22:10, 22:13, 25:22, 29:3, 29:11, 29:14, 29:16, 29:22, 29:23, 30:6, 30:7, 30:15, 30:22, 32:19, 33:2, 33:20, 33:23, 34:5, 34:6, 34:21, 34:24, 35:2, 35:5, 35:10, 35:15, 35:16, 36:7, 36:11, 36:25, 37:2, 39:2, 41:16, 41:19, 41:21, 41:25, 42:1, 42:6, 42:7, 42:10, 42:20, 43:1, 43:2, 44:14, 44:16, 44:23, 44:24, 45:4, 45:12, 45:14, 45:23, 47:17, 47:19, 47:24, 48:10, 48:12, 48:15, 48:16, 48:22, 48:24, 50:5, 51:5, 52:12, 52:22, 53:8, 55:2, 55:3, 55:6, 55:10, 55:12, 132:5, 162:22
importance [1] - 45:3
important [11] - 17:1, 34:21, 42:20, 57:25, 67:25, 136:6, 183:9, 194:3, 202:14, 258:21, 259:4
importantly [2] - 35:12, 246:17
imported [2] - 48:19, 54:20
importer [3] - 29:7, 35:8
importers [10] - 29:8, 29:17, 40:3, 43:4, 44:10, 45:25, 46:1, 46:24, 47:5, 55:11
Importers [1] - 29:9
importing [3] - 44:12, 55:11, 55:18
imports [13] - 29:18, 29:19, 33:15, 34:23, 34:25, 35:2, 40:1, 41:22, 45:22, 49:2, 219:18
impose [5] - 39:21, 74:24, 77:21, 227:23, 247:3
imposed [8] - 15:6, 16:11, 27:16, 41:5, 49:16, 75:19, 79:7, 152:14
imposes [1] - 227:4
imposition [9] - 15:21, 16:19, 22:16, 22:19, 23:5, 23:9, 25:15, 28:24, 51:17
impossibility [1] - 140:9
impossible [2] - 70:6, 149:10
impression [1] - 124:1
impute [1] - 247:15
Imtiaz [1] - 5:7
IN [1] - 1:5
inadequate [1] - 22:3
inadequately [1] - 37:18
inappropriate [1] - 136:11
inbound [1] - 46:7
incidental [1] - 23:20
inclined [2] - 231:11, 231:12
include [14] - 27:13, 41:21, 49:6, 93:2, 93:22, 93:25, 98:8, 113:24, 127:2, 150:3, 182:4, 205:7, 223:8, 244:12
included [7] - 97:8, 102:8, 110:12, 110:13, 112:16, 117:5
includes [6] - 109:16, 109:18, 143:22, 172:25, 183:21, 226:25
including [7] - 31:19, 49:8, 77:23,

144:3, 214:19, 224:22, 233:6
**Including** [1] - 183:15
**inclusive** [1] - 208:3
**inconsistent** [1] - 113:12
**inconvenience** [1] - 215:15
**inconvenient** [1] - 216:9
**incorporates** [1] - 139:20
**incorrect** [4] - 23:22, 52:23, 188:2, 237:17
**increase** [17] - 34:12, 34:13, 35:8, 44:12, 60:19, 62:22, 75:3, 75:5, 83:3, 84:10, 84:17, 85:4, 85:15, 85:22, 155:10, 179:25, 199:20
**increased** [5] - 47:25, 54:22, 54:23, 55:8, 86:25
**increases** [4] - 54:20, 75:16, 75:19, 82:25
**increasing** [3] - 83:15, 155:9, 179:23
**increasingly** [1] - 159:11
**indeed** [8] - 13:11, 28:21, 87:22, 89:5, 89:12, 124:15, 145:4
**Indeed** [2] - 68:5, 87:3
**independence** [2] - 217:16, 217:18
**independent** [3] - 19:25, 63:18, 164:10
**India** [2] - 30:1, 217:15
**Indian** [2] - 252:4, 252:5
**indicate** [2] - 70:15, 221:12
**indicated** [2] - 35:13, 140:10
**indicates** [1] - 136:24
**indication** [1] - 170:9
**indicia** [1] - 245:25
**indictment** [3] - 176:10, 188:4, 188:8
**Indirect** [1] - 163:14
**indirect** [17] - 12:6, 30:6, 55:22, 107:17, 130:13, 131:4, 136:2, 136:8, 150:5, 165:9, 167:17, 167:22, 167:25, 168:7, 168:17, 174:5, 184:11
**Individual** [1] - 160:6
**individual** [7] - 64:3, 64:5, 83:22, 114:18, 131:19, 159:23, 160:7
**individualized** [1] - 152:6
**individuals** [3] - 141:1, 160:7, 161:9
**indulge** [1] - 218:14
**indulgence** [1] - 157:5
**industry** [16] - 16:22, 16:24, 38:11, 65:16, 65:21, 66:2, 67:3, 67:5, 73:16, 73:19, 83:18, 92:1, 98:25, 106:18, 124:11, 193:11
**Ineffective** [1] - 160:8
**ineffective** [1] - 160:12
**inevitable** [1] - 217:11
**inevitably** [1] - 190:14
**infected** [1] - 158:17
**infects** [1] - 159:2
**inferences** [1] - 196:6
**inferentially** [1] - 133:20
**inflated** [2] - 15:14, 25:11
**inflation** [1] - 197:16
**information** [6] - 59:19, 66:6, 153:9, 253:19, 253:21, 253:23
**informs** [1] - 104:6
**infringed** [3] - 169:8, 178:2, 187:25
**infringement** [10] - 158:1, 160:14, 163:21, 169:7, 173:16, 175:19, 176:16, 176:24, 188:10, 188:20

**infringements** [6] - 158:11, 160:17, 161:4, 165:16, 175:5, 175:10
**Infringements** [1] - 158:18
**initial** [2] - 101:19, 213:25
**initiated** [1] - 75:3
**injury** [22] - 42:14, 42:17, 42:22, 43:16, 43:20, 43:23, 44:1, 44:4, 44:8, 44:10, 44:25, 45:1, 45:2, 45:18, 51:20, 53:1, 53:7, 55:22, 151:8, 168:1, 168:2, 168:8
**inquiry** [4] - 17:5, 19:5, 54:4, 136:22
**inserted** [1] - 92:4
**inside** [1] - 192:16
**insist** [1] - 149:11
**instance** [3] - 110:16, 236:1, 255:19
**instead** [1] - 53:17
**Instead** [1] - 176:10
**instituted** [2] - 39:18, 244:9
**instructive** [3] - 68:10, 165:25, 169:20
**instrumentalities** [2] - 194:25, 216:9
**instrumentality** [2] - 212:13, 212:21
**insufficient** [2] - 160:7, 235:22
**intellectual** [2] - 42:5, 219:21
**intend** [3] - 20:10, 104:18, 163:16
**intended** [7] - 21:25, 46:18, 98:15, 102:11, 124:11, 124:14, 147:15
**intent** [6] - 46:24, 98:7, 104:6, 104:10, 104:13
**inter** [1] - 47:4
**inter-shipping** [1] - 47:4
**interaction** [1] - 160:22
**interactive** [1] - 253:12
**interconnected** [1] - 159:11
**interdependence** [1] - 31:18
**interdependent** [1] - 31:11
**interest** [7] - 140:6, 147:24, 151:5, 165:18
**interest-balancing** [1] - 151:5
**interested** [5] - 10:10, 57:10, 165:6, 253:20, 253:25
**interesting** [3] - 87:11, 115:4, 188:2
**Interestingly** [1] - 29:21
**interfere** [3] - 158:21, 178:9, 183:2
**interfered** [3] - 150:16, 179:7, 179:20
**interfering** [1] - 182:21
**interim** [2] - 95:4, 191:2
**interline** [1] - 251:4
**intermediate** [2] - 230:3, 230:15
**internal** [2] - 152:24, 153:14
**international** [7] - 31:13, 73:16, 123:20, 123:23, 205:6, 226:24, 241:7, 244:11, 244:16, 260:9
**International** [4] - 143:12, 224:20, 233:4, 233:7
**Internet** [1] - 253:12
**interplay** [1] - 183:8
**Interpret** [1] - 118:3
**interpret** [4] - 118:5, 120:16, 120:24, 156:7
**interpretation** [8] - 71:16, 95:4, 95:7, 95:16, 95:17, 102:1, 107:19, 161:1
**interpreted** [2] - 21:15, 99:10
**interpreting** [3] - 104:25, 115:7, 122:14
**interrelationship** [1] - 180:21
**interrupt** [1] - 163:12
**interrupted** [1] - 198:9

**interrupting** [3] - 9:9, 120:1, 250:25
**interstate** [25] - 92:18, 95:21, 95:22, 96:6, 96:15, 98:1, 98:5, 98:18, 98:21, 98:23, 102:19, 103:6, 106:11, 106:14, 113:22, 115:6, 115:19, 123:20, 124:18, 124:19, 124:24, 124:25, 125:3, 126:10
**Interstate** [2] - 102:24, 103:3
**intervened** [1] - 117:18
**intervening** [1] - 117:18
**intrastate** [1] - 124:25
**introduce** [1] - 69:10
**invariably** [2] - 44:11, 93:4
**investigating** [1] - 80:25
**investigation** [2] - 79:22, 250:6
**invited** [1] - 68:13
**invoice** [1] - 197:6
**invokes** [1] - 155:12
**involve** [22] - 15:17, 18:2, 19:6, 19:13, 30:6, 34:6, 35:4, 35:16, 41:25, 42:6, 47:16, 47:24, 55:5, 73:16, 151:25, 152:1, 152:2, 152:3, 170:21, 170:22
**involved** [26] - 29:14, 33:20, 34:7, 41:15, 45:12, 45:14, 53:24, 54:7, 73:21, 73:22, 73:23, 75:11, 76:16, 84:16, 87:4, 87:21, 116:20, 143:23, 144:1, 145:2, 177:7, 223:11, 250:5, 250:7, 260:11
**involvement** [1] - 261:11
**involves** [27] - 22:1, 32:19, 33:2, 33:9, 33:23, 34:9, 34:21, 34:24, 35:2, 35:10, 36:11, 38:11, 38:20, 39:1, 41:16, 41:19, 41:20, 44:16, 44:23, 47:15, 52:7, 52:12, 52:22, 55:10, 96:1
**involving** [21] - 21:14, 21:18, 21:21, 21:22, 22:22, 34:5, 35:15, 37:2, 38:14, 43:1, 45:5, 45:23, 46:20, 73:18, 117:4, 129:21, 130:6, 157:20, 170:5, 178:7, 235:13
**Ion** [1] - 25:15
**irrelevant** [5] - 15:25, 16:12, 16:13, 22:18, 43:22
**isiddiqui@lshllp.com** [1] - 5:9
**isimmons@omm.com** [1] - 6:17
**island** [1] - 260:8
**isolation** [1] - 251:12
**issue** [77] - 9:3, 31:20, 48:1, 51:7, 54:6, 57:1, 57:7, 64:11, 68:1, 69:14, 69:25, 73:6, 90:21, 92:11, 100:8, 116:20, 116:24, 117:16, 118:7, 118:20, 129:18, 130:14, 133:19, 133:22, 136:13, 140:18, 140:19, 145:5, 146:1, 146:3, 146:18, 148:16, 151:2, 153:12, 156:23, 160:9, 163:18, 166:17, 167:17, 170:11, 172:17, 173:2, 173:5, 173:22, 174:9, 174:17, 180:8, 182:20, 186:13, 188:1, 189:3, 191:20, 195:14, 198:11, 207:1, 209:7, 212:6, 223:3, 226:15, 226:17, 228:21, 230:23, 231:15, 231:16, 232:1, 232:5, 232:7, 233:25, 235:4, 235:18, 240:1, 244:20, 244:21, 244:22, 249:21, 261:22
**issue-by-issue** [1] - 151:2
**issued** [5] - 16:2, 110:3, 110:4, 179:22, 188:5
**issues** [37] - 9:16, 76:22, 100:7, 127:12, 135:16, 135:25, 136:5, 136:6, 136:9, 136:11, 149:25, 150:1, 150:2, 152:6, 152:8, 152:11, 155:7, 155:8, 156:4,

168:11, 171:19, 172:5, 173:7, 173:8, 173:10, 176:11, 184:11, 185:4, 187:6, 191:21, 192:14, 192:19, 193:5, 199:13, 204:25, 230:24, 257:22

**issuing** [1] - 176:10

**Istanbul** [1] - 80:19

**item** [2] - 22:24, 129:4

**itineraries** [1] - 260:12

**itself** [8] - 41:4, 41:25, 155:17, 159:14, 194:10, 231:9, 247:6, 249:22

**IV** [19] - 92:18, 94:18, 98:4, 110:10, 129:8, 143:1, 143:9, 154:21, 179:1, 180:9, 183:5, 187:19, 264:8, 264:10, 264:12, 264:14, 264:16, 264:18, 264:20

**Ivanova** [1] - 178:6

## J

**James** [3] - 6:19, 7:13, 129:10

**January** [2] - 85:1, 85:20

**jarp@gibsondunn.com** [1] - 2:3

**Jarrett** [1] - 2:1

**Jersey** [20] - 14:4, 14:13, 245:12, 245:14, 245:16, 245:19, 249:18, 254:9, 256:1, 256:2, 258:11, 260:2, 260:4, 261:6, 261:7, 261:8, 261:12, 261:13

**JG** [1] - 1:4

**Jim** [1] - 8:12

**jim.warnot@linklaters.com** [1] - 7:16

**Jin** [2] - 235:5, 235:9

**job** [1] - 97:1

**Johannesburg** [1] - 78:2, 218:24

**John** [1] - 197:15

**Johnson** [1] - 4:16

**joint** [3] - 143:14, 144:7, 253:3

**jointly** [12] - 61:2, 74:3, 75:2, 75:15, 75:18, 77:21, 80:5, 81:15, 83:15, 85:3, 85:22, 151:24

**Joseph** [2] - 2:19, 5:16

**Jr** [2] - 6:19, 7:5

**JUDGE** [1] - 1:14

**Judge** [32] - 8:15, 56:24, 91:10, 93:25, 95:6, 120:1, 121:18, 131:24, 132:2, 132:4, 132:5, 132:17, 133:20, 133:23, 133:24, 135:8, 165:20, 166:15, 169:23, 173:14, 190:4, 191:11, 215:20, 215:25, 216:2, 217:24, 248:18, 249:5, 254:12, 255:5

**judge** [1] - 143:21

**judged** [1] - 151:4

**judges** [1] - 131:23

**judgment** [8] - 153:22, 166:20, 166:21, 170:20, 173:22, 175:19, 188:7

**judicata** [1] - 117:10

**judicial** [7] - 101:5, 101:7, 158:4, 159:14, 159:21, 182:2, 255:7

**jump** [3] - 156:19, 194:13, 212:10

**juncture** [1] - 226:6

**June** [3] - 230:12, 231:3, 243:10

**jurisdiction** [106] - 10:21, 11:5, 13:1, 20:13, 23:10, 28:11, 48:9, 52:17, 52:20, 117:15, 117:22, 117:24, 123:14, 129:23, 131:9, 131:10, 131:11, 131:14, 132:10, 132:22, 134:20, 134:21, 135:1, 135:3, 135:7, 135:8, 135:15, 136:15, 137:25,

138:17, 139:10, 139:11, 144:10, 144:11, 144:12, 144:15, 152:19, 155:19, 155:21, 155:24, 163:8, 167:12, 171:11, 172:10, 172:13, 172:16, 172:18, 175:17, 177:2, 177:3, 182:10, 182:12, 183:2, 188:15, 188:16, 191:2, 191:5, 195:2, 196:1, 198:13, 199:15, 202:15, 207:18, 207:24, 208:2, 213:10, 214:8, 214:11, 214:12, 214:14, 214:21, 222:9, 222:17, 222:20, 223:1, 224:9, 224:24, 228:7, 235:11, 238:19, 239:25, 240:14, 241:4, 244:24, 246:9, 246:19, 246:21, 249:14, 251:7, 251:8, 253:18, 255:9, 255:13, 255:16, 255:17, 256:3, 256:7, 256:16, 259:12, 261:21

**Jurisdiction** [1] - 214:17

**jurisdiction"** [1] - 235:23

**jurisdictional** [22] - 52:14, 53:22, 108:7, 195:1, 203:11, 204:14, 217:15, 221:10, 222:9, 222:14, 222:15, 223:15, 226:12, 232:5, 232:7, 235:21, 236:5, 246:10, 246:17, 248:9, 249:15, 251:14

**Jurisdictional** [1] - 223:16

**jurisdictions** [1] - 151:9

**jurisprudence** [1] - 165:7

**jurisprudential** [1] - 100:8, 101:3, 117:4

**jury** [16] - 181:23, 188:11, 208:17, 208:19, 215:16, 216:4, 228:10, 228:11, 228:14, 229:2, 229:4, 229:9, 238:7, 238:11, 238:21, 238:25

**justice** [2] - 142:2, 147:25, 149:3, 150:15, 159:12, 162:5

**Justice** [20] - 42:3, 72:6, 104:15, 104:16, 137:16, 140:12, 143:17, 165:25, 176:7, 181:1, 181:13, 181:15, 181:20, 184:21, 184:24, 185:4, 185:7, 185:25, 217:12, 217:21

## K

**Kansas** [1] - 3:21

**Kaplan** [6] - 1:17, 1:18, 1:22, 5:11, 69:12, 222:5

**Karas** [1] - 4:15

**Katz** [1] - 7:10

**keep** [9] - 48:8, 57:9, 61:15, 62:15, 84:15, 91:10, 107:8, 136:25, 235:24

**Kelly** [1] - 245:3

**Kensington** [1] - 233:4

**Keuylian** [3] - 93:9, 93:11, 105:13

**key** [5] - 64:24, 146:1, 148:11, 248:8, 251:18

**Kilsheimer** [2] - 1:18, 1:22

**Kimberly** [1] - 5:21

**kind** [17] - 17:5, 31:17, 78:7, 79:5, 79:12, 85:8, 85:9, 195:20, 198:19, 203:15, 218:6, 219:25, 227:17, 231:13, 253:14

**kinds** [1] - 184:6

**King** [2] - 198:2, 201:20

**knowledge** [1] - 250:6

**knows** [2] - 8:21, 79:23

**Korea** [1] - 77:7

**Korean** [1] - 86:5

**Kruman** [23] - 14:3, 14:7, 14:12, 14:13,

15:23, 16:12, 17:4, 23:17, 23:18, 23:23, 23:25, 24:9, 24:10, 24:14, 24:23, 25:20, 34:1, 38:25, 51:10, 53:12, 53:17, 53:21

**Kruman's** [9] - 33:18, 33:25, 36:16, 36:17, 37:3, 37:15, 37:23, 38:14, 38:19

## L

**Labaton** [1] - 2:6

**laborers** [1] - 178:7

**lacking** [1] - 62:11

**laid** [1] - 148:6

**land** [1] - 251:3

**language** [51] - 12:13, 20:18, 20:19, 89:18, 92:10, 94:17, 94:18, 95:11, 98:15, 100:10, 100:11, 102:5, 104:5, 104:7, 105:15, 106:8, 106:19, 108:17, 109:25, 111:10, 111:11, 113:9, 114:4, 122:13, 132:24, 137:16, 155:20, 172:11, 172:13, 182:5, 199:1, 199:4, 200:1, 200:4, 200:14, 203:20, 205:10, 205:19, 205:24, 206:1, 211:3, 225:24, 228:2, 239:11, 240:24, 240:25, 241:6, 241:13, 241:16

**laptop** [1] - 32:9

**Laptop** [1] - 32:10

**large** [5] - 43:3, 205:16, 259:4, 259:7, 261:18

**largely** [2] - 46:1, 137:8

**larger** [2] - 124:9, 253:1

**Lasalle** [2] - 1:23, 5:12

**last** [14] - 57:17, 58:1, 76:25, 95:15, 99:3, 103:5, 117:21, 131:24, 154:5, 164:23, 165:19, 174:10, 177:8, 262:12

**lastly** [1] - 139:9

**late** [6] - 81:6, 218:11, 231:20, 245:5, 254:8

**Latham** [2] - 5:2, 57:5

**Latino** [1] - 31:19

**law** [195] - 92:16, 92:22, 101:4, 101:17, 101:20, 103:14, 103:16, 105:17, 109:6, 113:11, 117:14, 122:22, 125:23, 129:15, 132:20, 133:6, 133:8, 133:9, 135:6, 135:16, 135:22, 135:24, 136:1, 136:5, 136:12, 136:13, 137:12, 137:13, 137:14, 137:19, 139:18, 139:19, 139:20, 140:1, 140:8, 140:9, 140:17, 140:22, 140:24, 142:4, 144:5, 145:2, 145:7, 145:8, 145:9, 146:9, 146:13, 146:23, 146:24, 146:25, 147:1, 147:5, 147:13, 148:9, 148:21, 149:4, 149:24, 150:1, 150:2, 150:9, 150:11, 150:15, 150:17, 150:18, 150:22, 150:25, 151:1, 151:3, 151:6, 151:11, 151:12, 151:13, 151:14, 152:14, 153:11, 153:16, 154:4, 154:6, 155:7, 155:12, 155:15, 156:1, 156:3, 156:6, 156:15, 156:17, 156:22, 157:2, 157:10, 157:21, 158:1, 158:2, 158:11, 158:12, 158:13, 158:18, 159:1, 160:14, 160:17, 160:24, 161:1, 161:18, 162:4, 162:20, 162:24, 163:10, 163:19, 163:22, 164:2, 164:4, 164:14, 164:16, 165:7, 165:8, 165:15, 165:16, 166:2, 166:3, 166:13, 166:16, 167:5, 167:9, 167:14, 168:21, 169:1, 169:2, 169:5, 169:6, 169:8, 170:5, 171:14, 172:5, 172:15, 172:21, 172:22,

All Word // In Re: Air Cargo Antitrust Litigation _____22

**172**:23, 173:3, 173:16, 174:19, 174:20, 175:10, 176:1, 177:1, 177:8, 177:21, 177:22, 177:24, 178:10, 179:20, 179:24, 180:16, 180:22, 181:11, 181:17, 181:18, 181:21, 181:22, 183:13, 185:7, 185:9, 186:15, 188:16, 188:9, 189:15, 190:11, 190:15, 198:24, 204:21, 205:2, 205:12, 205:23, 208:3, 210:25, 230:20, 233:3, 233:6, 234:16, 239:15, 245:12, 245:14, 245:19, 245:23

**Law** [26] - 2:15, 129:5, 132:4, 132:6, 179:6, 180:15, 180:18, 181:18, 182:25, 183:10, 183:11, 183:14, 184:8, 184:14, 184:18, 184:23, 185:5, 185:12, 185:20, 185:21, 187:9, 190:12, 190:13, 250:24

**law.com** [1] - 2:17

**Lawal** [19] - 107:21, 108:14, 111:7, 111:9, 111:10, 111:12, 111:15, 114:10, 116:21, 121:14, 121:16, 122:16, 122:17, 123:13, 123:17, 125:6, 125:10

**lawfully** [1] - 209:14

**laws** [11] - 56:5, 137:24, 137:25, 140:2, 140:5, 140:10, 150:11, 151:10, 152:12, 153:12, 155:4, 162:6, 162:14, 162:16, 177:13, 182:11, 183:13, 184:4, 184:6

**lawsuit** [4] - 194:12, 198:19, 204:18, 211:16

**lawsuits** [2] - 186:10, 200:15

**lay** [4] - 91:11, 147:18, 214:2

**lays** [1] - 147:12

**Layton** [3] - 147:17, 148:1, 154:7

**lead** [2] - 139:24, 190:14

**least** [30] - 19:19, 29:25, 35:13, 39:22, 40:7, 46:11, 64:22, 64:25, 69:10, 70:14, 78:16, 80:11, 101:22, 110:16, 123:7, 129:25, 133:10, 151:9, 168:8, 170:25, 190:2, 194:14, 199:20, 202:15, 204:16, 213:3, 218:20, 218:21, 245:23, 246:17

**leave** [4] - 39:1, 63:25, 68:16, 126:22, 187:3, 188:16, 206:23, 206:24

**leaves** [3] - 41:23, 141:6, 161:19

**led** [1] - 97:11

**left** [14] - 21:21, 37:19, 39:1, 47:19, 90:13, 102:3, 106:7, 113:23, 118:1, 190:24, 191:15, 258:13, 261:13

**legal** [4] - 152:23, 157:3, 185:10, 209:8

**legally** [1] - 222:16

**legion** [1] - 234:1

**legislate** [1] - 181:4

**legislates** [1] - 181:4

**legislation** [2] - 92:5, 214:3

**legislative** [17] - 97:5, 97:6, 98:7, 98:10, 102:14, 104:6, 104:10, 104:13, 104:17, 104:21, 108:19, 113:14, 113:25, 115:24, 127:3, 181:7

**legislature** [1] - 181:9

**legitimacy** [1] - 196:4

**legitimate** [4] - 11:16, 31:5, 31:20, 172:15

**legs** [1] - 218:6

**Leider** [2] - 133:25, 135:9

**lengthy** [1] - 128:6

**leniency** [1] - 143:15

**Less** [2] - 188:5, 237:15

**less** [8] - 74:6, 80:2, 80:12, 82:12, 135:6, 185:19, 242:1, 248:25

**lesser** [1] - 260:10

**letter** [3] - 126:8, 127:20, 147:13

**letting** [1] - 9:15

**level** [8] - 144:25, 181:3, 184:22, 185:2, 197:25, 201:19, 210:4, 211:8

**levels** [4] - 77:24, 79:8, 170:13, 174:8

**Levin** [1] - 6:10

**Lewis** [1] - 5:17

**Lexicon** [1] - 104:23

**liability** [3] - 152:7, 173:8, 253:4

**liberally** [1] - 213:20

**Libow** [1] - 4:23

**libowd@sullcrom.com** [1] - 4:25

**licenses** [1] - 42:5

**liens** [1] - 143:17

**light** [4] - 45:22, 70:21, 237:19, 238:11

**likely** [3] - 43:4, 54:21, 153:23

**likewise** [3] - 117:19, 155:4, 167:4

**Likewise** [4] - 93:2, 166:23, 173:21, 261:10

**limit** [3] - 149:9, 153:18, 192:21

**limitation** [1] - 174:3

**limitations** [5] - 150:4, 153:17, 184:9, 211:18, 244:21

**limited** [12] - 41:9, 95:12, 95:13, 96:14, 98:5, 102:7, 102:13, 118:25, 150:13, 192:14, 232:7, 262:7

**Limited** [2] - 10:15, 141:6

**limiting** [1] - 120:8

**line** [5] - 11:16, 76:3, 78:15, 79:3, 169:22

**linked** [1] - 31:12

**Linklaters** [2] - 7:14, 129:10

**links** [2] - 82:22, 216:20

**Lipton** [1] - 7:10

**list** [7] - 63:22, 74:13, 75:7, 75:25, 79:8, 88:17, 211:8

**listed** [1] - 243:15

**listening** [1] - 91:14

**literally** [1] - 188:11

**litigants** [3] - 184:25, 185:2, 185:3

**litigate** [2] - 138:21, 251:22

**litigated** [4] - 148:21, 171:12, 173:20, 179:14

**litigating** [1] - 151:23

**Litigation** [2] - 8:15, 57:16

**litigation** [20] - 129:20, 147:10, 148:14, 153:25, 157:20, 166:19, 169:17, 169:18, 171:8, 172:15, 173:18, 173:24, 174:22, 179:16, 181:25, 207:21, 236:1, 251:20, 259:25, 260:2

**LITIGATION** [1] - 1:7

**litigators** [1] - 262:20

**live** [1] - 188:11

**LLC** [1] - 5:11

**LLP** [21] - 1:18, 1:22, 2:1, 3:2, 3:6, 3:11, 3:19, 4:7, 4:12, 4:16, 4:20, 5:2, 5:7, 5:17, 6:6, 6:15, 6:20, 7:1, 7:6, 7:14, 129:10

**loaded** [1] - 33:16

**local** [3] - 13:13, 84:19, 254:1

**located** [5] - 11:21, 12:8, 224:20, 252:14, 252:15

**location** [5] - 11:20, 11:24, 11:25, 36:14, 151:19

**Lockridge** [1] - 2:19

**logically** [1] - 189:2

**Logistics** [1] - 141:6

**London** [10] - 14:16, 14:21, 15:2, 15:23, 16:2, 25:9, 25:17, 51:11, 139:24, 252:11

**long-term** [1] - 63:17

**look** [86] - 15:19, 15:20, 21:25, 44:15, 51:8, 67:17, 69:20, 71:7, 82:24, 85:1, 100:12, 100:13, 100:16, 104:5, 104:19, 104:23, 104:24, 104:25, 105:14, 105:15, 106:8, 109:12, 111:5, 111:11, 115:5, 120:10, 122:13, 124:4, 132:17, 134:10, 135:13, 136:23, 137:21, 138:7, 139:20, 157:23, 178:4, 180:17, 198:18, 199:3, 206:25, 208:5, 214:22, 215:5, 224:13, 230:21, 230:24, 233:7, 233:12, 236:11, 236:12, 236:22, 239:9, 239:13, 239:20, 239:22, 239:23, 240:6, 240:9, 242:4, 243:25, 244:3, 245:13, 245:19, 247:14, 250:24, 251:12, 251:16, 254:11, 254:15, 254:24, 255:6, 255:11, 255:15, 255:23, 257:3, 258:3, 258:7, 258:18, 259:1, 259:9, 259:11, 259:13

**looked** [12] - 62:4, 62:5, 94:17, 111:9, 114:19, 134:1, 146:2, 207:12, 215:1, 215:10, 240:3, 259:14

**Looking** [1] - 256:25

**looking** [21] - 30:12, 30:14, 30:16, 30:17, 36:13, 92:13, 105:2, 110:16, 125:14, 135:11, 140:5, 140:6, 153:12, 169:5, 170:24, 171:20, 224:16, 232:14, 251:15, 257:1, 260:14

**looks** [4] - 16:10, 119:2, 201:11, 249:8

**loose** [2] - 164:10, 260:20

**loosely** [1] - 193:10

**loss** [1] - 177:14

**lost** [4] - 129:2, 186:12, 215:2, 215:23

**LOVELL** [46] - 90:18, 90:19, 91:17, 94:13, 96:4, 100:6, 100:24, 101:10, 101:13, 102:20, 102:25, 103:3, 103:8, 103:12, 104:8, 104:14, 105:8, 116:13, 116:14, 116:19, 118:15, 118:20, 119:8, 119:16, 119:23, 120:1, 120:3, 120:7, 120:19, 120:22, 121:20, 122:6, 122:16, 123:2, 126:3, 126:5, 126:15, 127:1, 127:10, 127:15, 127:18, 128:22, 129:3, 263:22, 264:4, 264:7

**Lovell** [19] - 5:6, 5:7, 90:16, 107:8, 109:22, 110:11, 111:20, 111:22, 112:2, 113:4, 113:9, 113:13, 114:13, 116:10, 123:25, 126:5, 127:24, 128:9, 128:16

**Lovell's** [3] - 115:23, 123:6, 125:7

**Lowenthal** [1] - 7:1

**lower** [2] - 138:5, 185:1

**lowest** [1] - 184:22

**Lufthansa** [13] - 12:23, 13:18, 16:16, 65:12, 66:5, 79:23, 129:14, 137:15, 141:15, 141:16, 143:12, 170:17

**Lufthansa's** [6] - 66:8, 71:1, 71:7, 79:15, 86:4, 88:23

**lump** [1] - 201:16

**lumped** [1] - 73:11

**lumping** [1] - 201:12

**lunch** [1] - 126:6

# M

**Madagascar** [1] - 252:7
**Maddox** [2] - 123:12, 123:13
**Magee** [2] - 25:3, 25:5
**MAGISTRATE** [1] - 1:14
**Magistrate** [1] - 8:15
**magnified** [1] - 193:5
**Mahr** [1] - 6:1
**mail** [2] - 7:22, 75:25
**main** [2] - 135:22, 156:2
**maintain** [2] - 85:22, 123:19
**maintained** [1] - 31:13
**maintenance** [2] - 63:16, 63:17
**major** [1] - 97:13
**majority** [4] - 13:11, 212:23, 261:8
**majority-owned** [1] - 212:23
**Malaysia** [1] - 73:22
**man** [1] - 69:22
**manageable** [1] - 174:18
**manageably** [1] - 155:17
**mandate** [4] - 57:20, 149:18, 185:24, 186:3
**mandatory** [3] - 172:13, 185:3, 190:23
**Manges** [1] - 6:6
**Manhattan** [2] - 79:1, 80:18
**manifest** [7] - 39:16, 49:1, 49:2, 81:9, 81:10, 81:21
**manifests** [2] - 39:12, 81:17
**manipulate** [1] - 158:21
**manual** [3] - 81:22, 82:3
**manufacturer** [1] - 12:18
**manufactures** [1] - 43:13
**map** [2] - 26:19, 98:16
**March** [2] - 132:3, 134:16
**margin** [1] - 20:9
**Mark** [1] - 202:11
**market** [44] - 11:14, 18:3, 22:6, 22:8, 24:2, 29:16, 29:22, 30:18, 30:22, 35:24, 35:25, 37:5, 37:6, 37:7, 39:25, 40:1, 40:6, 40:24, 41:21, 41:22, 41:25, 42:1, 42:6, 42:7, 43:1, 43:2, 45:12, 45:14, 48:24, 63:14, 63:16, 152:5, 158:17, 158:22, 158:23, 158:24, 159:2, 159:4, 168:3, 168:9, 168:15
**markets** [4] - 33:8, 33:13, 67:6, 152:2
**Massamillo** [1] - 5:11
**material** [14] - 58:21, 59:7, 60:5, 60:9, 60:23, 60:24, 61:3, 61:9, 61:18, 62:15, 63:8, 65:6, 67:1
**materials** [5] - 61:12, 88:24, 222:18, 222:24, 226:9
**Matsushita** [1] - 59:12
**matter** [59] - 10:20, 11:5, 13:1, 16:2, 18:19, 25:18, 26:2, 26:14, 26:15, 26:16, 28:15, 28:21, 37:24, 38:18, 41:1, 49:17, 49:18, 51:12, 51:18, 52:17, 52:20, 54:6, 55:7, 57:9, 58:5, 63:21, 88:6, 89:10, 106:6, 114:24, 117:15, 117:22, 123:14, 132:21, 137:14, 144:11, 146:16, 147:11, 148:15, 149:2, 149:15, 151:23, 154:9, 162:11, 167:18, 168:17, 186:8, 190:25, 193:15, 196:18, 199:16, 217:20, 219:3, 228:7, 235:11, 238:19, 239:25, 241:2, 247:3

**mattered** [1] - 52:9
**matters** [7] - 54:8, 55:9, 64:23, 76:16, 115:11, 207:19, 236:9
**Mauritius** [31] - 244:21, 244:23, 244:25, 247:20, 248:1, 248:4, 248:7, 251:25, 256:3, 256:8, 257:2, 257:4, 257:6, 257:8, 258:5, 258:6, 258:9, 258:11, 258:12, 258:15, 259:8, 259:25, 260:2, 260:9, 260:13, 260:15, 261:9, 261:12, 262:11, 262:13
**Mauritius's** [3] - 258:16, 259:5, 260:18
**McDevitt** [1] - 3:10
**McLaughlin** [1] - 259:13
**MDL** [5] - 254:14, 255:1, 255:8, 256:6, 256:18
**mean** [87] - 12:15, 13:21, 17:10, 18:5, 24:5, 24:19, 34:16, 36:9, 36:22, 41:7, 44:4, 46:18, 48:14, 49:22, 50:1, 50:2, 52:23, 52:24, 52:25, 53:5, 54:21, 56:3, 56:10, 72:23, 73:11, 73:14, 78:13, 82:16, 83:2, 83:4, 84:7, 86:14, 87:1, 87:3, 92:25, 99:10, 99:25, 100:10, 103:10, 104:24, 105:14, 105:17, 109:24, 111:1, 111:3, 111:6, 115:10, 115:15, 116:10, 122:7, 126:21, 127:17, 127:23, 128:23, 135:20, 156:14, 156:25, 164:1, 165:10, 168:20, 171:5, 171:9, 171:20, 181:16, 192:23, 196:21, 196:22, 201:2, 203:8, 215:19, 225:24, 226:21, 227:14, 228:10, 228:11, 229:5, 237:21, 239:20, 245:15, 247:10, 251:11, 255:11, 255:15, 255:18, 256:24, 257:13
**meaning** [13] - 21:15, 21:20, 41:17, 102:4, 118:24, 119:1, 119:3, 121:23, 122:18, 122:19, 122:20, 127:5, 224:8
**means** [24] - 17:11, 21:7, 46:3, 60:20, 83:4, 83:6, 84:7, 84:11, 93:21, 94:24, 103:15, 105:6, 106:9, 110:17, 115:18, 115:19, 119:18, 122:8, 126:9, 136:19, 149:10, 198:1, 238:2
**meant** [9] - 84:11, 100:5, 106:23, 120:21, 124:24, 125:3, 197:20, 198:3, 198:19
**measure** [1] - 214:20
**meat** [2] - 70:20, 84:8
**mechanics** [1] - 19:4
**mechanism** [10] - 74:1, 141:5, 160:6, 161:20, 161:23, 161:25, 166:7, 166:15, 170:22, 171:6
**mechanisms** [7] - 152:24, 152:25, 153:5, 160:3, 161:15, 168:12, 170:10
**mediate** [1] - 170:22
**mediation** [2] - 168:13, 173:12
**mediator** [1] - 170:12
**meet** [10] - 32:22, 45:7, 76:12, 80:5, 87:2, 89:5, 136:8, 193:14, 246:5, 246:16
**meeting** [1] - 201:25
**meetings** [12] - 60:3, 60:5, 63:13, 75:24, 77:23, 78:1, 78:3, 79:7, 79:25, 81:17, 88:2, 197:24
**member** [43] - 133:8, 139:18, 142:2, 144:7, 149:6, 158:2, 158:13, 159:14, 159:20, 159:21, 159:22, 159:23, 160:2, 160:25, 161:2, 161:4, 161:19, 161:22, 164:13, 164:17, 169:9, 175:4, 175:18, 176:20, 176:25, 180:22, 180:24, 181:2,

181:5, 181:6, 181:10, 181:16, 183:19, 187:23, 188:24, 188:25, 189:13, 189:23, 189:24, 189:25, 190:1, 190:5, 204:9
**members** [12] - 29:10, 30:8, 130:25, 131:18, 135:24, 140:18, 142:8, 143:5, 143:14, 159:23, 173:23, 176:21
**memo** [2] - 246:7, 248:20
**memorandum** [1] - 154:7
**mentioned** [2] - 201:9, 251:1
**mere** [1] - 201:1
**merely** [2] - 36:13, 253:13
**met** [28] - 59:6, 59:25, 60:6, 61:1, 75:15, 77:21, 78:25, 79:1, 79:2, 79:3, 80:9, 80:16, 80:17, 80:18, 80:19, 81:14, 85:3, 85:21, 87:1, 87:2, 87:22, 87:24, 150:3, 211:24, 249:15
**metaphor** [1] - 190:19
**methods** [1] - 84:8
**mhausfeld@cmht.com** [1] - 4:5
**Michael** [2] - 2:10, 4:1, 239:6
**Michigan** [4] - 15:10, 25:4, 25:5, 25:7
**Microsoft** [2] - 52:18, 52:19
**middlemen** [2] - 26:7, 29:13
**might** [21] - 9:16, 10:1, 14:15, 19:3, 26:22, 35:14, 41:8, 42:5, 53:3, 53:4, 71:9, 73:21, 78:16, 79:19, 109:11, 141:2, 216:3, 219:20, 227:14, 245:8, 260:11
**Milan** [1] - 80:20
**Milberg** [1] - 4:20
**mile** [4] - 83:12, 83:14, 83:25, 84:1
**Miller** [3] - 5:20, 5:21, 261:15
**million** [1] - 258:18
**Milstein** [2] - 4:3, 25:5
**mind** [4] - 79:5, 171:6, 198:7, 238:17
**Minerals** [1] - 205:14
**minimal** [5] - 60:23, 62:19, 62:23, 259:24, 260:5
**minimize** [2] - 85:24, 86:11
**minimum** [5] - 13:11, 199:14, 204:15, 245:5, 246:16
**miniscule** [1] - 251:17
**ministerial** [1] - 212:25
**Ministry** [1] - 235:9
**Minneapolis** [1] - 2:21
**minute** [11] - 54:13, 110:25, 112:13, 115:23, 122:9, 123:5, 139:25, 187:21, 237:15, 242:1, 245:6
**minutes** [11] - 30:24, 47:8, 56:21, 82:9, 116:11, 125:18, 138:16, 191:8, 192:22, 237:10
**mire** [1] - 155:16
**misstatement** [1] - 222:10
**mixed** [3] - 130:11, 145:14, 145:15
**MN** [1] - 2:21
**MO** [1] - 3:21
**mock** [1] - 104:15
**model** [1] - 162:24
**modern** [1] - 252:10
**modernization** [1] - 154:6
**Modernization** [1] - 180:16
**moment** [10] - 8:5, 16:25, 52:11, 71:10, 71:19, 129:5, 163:12, 170:7, 172:19, 245:11
**money** [4] - 37:25, 38:4, 251:19, 259:3
**Monsanto** [1] - 59:12

**Morales** [10] - 107:25, 111:12, 116:15, 116:19, 117:9, 118:2, 118:5, 123:12, 125:11
**Moreover** [1] - 117:21
**moreover** [1] - 95:12
**Morgan** [1] - 5:17
**Morganti** [1] - 4:19
**Morissa** [1] - 2:5
**morning** [8] - 8:3, 8:4, 8:11, 8:16, 57:4, 67:4, 219:15, 247:23
**Morrison** [1] - 3:19
**Moskowitz** [1] - 7:6
**most** [22] - 37:23, 45:20, 46:5, 46:8, 51:9, 58:4, 64:10, 104:9, 107:15, 135:23, 136:1, 146:11, 164:11, 165:25, 189:5, 209:6, 215:18, 239:17, 241:7, 241:17, 252:1, 252:16
**MOTION** [1] - 1:12
**motion** [29] - 10:15, 17:25, 20:18, 21:6, 29:5, 52:3, 57:24, 70:1, 79:13, 100:9, 101:18, 129:14, 129:24, 214:23, 218:19, 221:18, 221:22, 222:11, 222:14, 222:16, 225:18, 231:24, 234:3, 235:14, 236:6, 243:5, 244:24, 251:23
**motions** [3] - 204:4, 236:11
**Motor** [1] - 178:6
**movant** [2] - 101:2, 192:21
**movants** [2] - 8:22, 106:25
**movants'** [1] - 8:23
**Move** [1] - 198:11
**move** [5] - 41:13, 90:5, 129:4, 137:4, 191:20
**moved** [3] - 191:16, 191:24, 256:7
**movement** [11] - 34:8, 34:10, 34:17, 34:19, 35:18, 39:4, 39:6, 41:22, 47:15, 52:7, 55:3
**moving** [13] - 17:21, 19:23, 23:13, 33:12, 42:13, 52:1, 52:4, 123:6, 198:23, 209:18, 214:16
**Mr..** [1] - 32:5
**Mubarak** [1] - 217:13
**Mullin** [1] - 3:15
**multiple** [5] - 67:14, 75:19, 75:24, 152:19
**must** [41] - 21:23, 31:6, 36:12, 44:25, 47:16, 47:18, 47:23, 52:23, 81:10, 107:7, 113:6, 114:15, 115:19, 117:13, 138:24, 138:25, 142:3, 146:23, 149:6, 149:7, 159:10, 159:15, 160:3, 160:4, 161:7, 163:22, 164:17, 181:2, 187:24, 199:2, 205:23, 208:16, 209:13, 219:11, 226:6, 235:12, 246:8, 254:8
**muster** [1] - 68:19
**mutual** [3] - 93:12, 99:13, 99:14
**mutually** [4] - 91:1, 93:11, 105:12, 105:14
**Myers** [1] - 6:15
**myriad** [1] - 171:14

## N

**N.W** [2] - 4:3, 4:24
**Nairobi** [5] - 78:1, 80:14, 81:19, 89:5, 198:5
**name** [4] - 73:21, 77:5, 153:15, 254:25

**named** [15] - 14:3, 25:3, 73:20, 74:12, 141:2, 145:9, 145:10, 145:20, 145:23, 146:2, 176:18, 176:22, 250:7, 250:16, 254:14
**namely** [2] - 133:11, 135:3
**naming** [1] - 250:9, 256:11, 256:13
**narrow** [10] - 16:9, 17:13, 18:3, 20:22, 21:23, 25:22, 30:7, 36:6, 47:20, 237:20
**narrowly** [10] - 41:16, 47:18, 100:22, 101:3, 194:10, 198:25, 200:12, 205:15, 205:18, 237:20
**narrows** [2] - 121:20, 121:21
**nation** [2] - 175:5, 182:11
**National** [7] - 183:10, 183:14, 184:8, 184:14, 184:18, 185:12, 187:3
**national** [12] - 138:24, 146:24, 149:12, 150:2, 151:15, 152:22, 159:12, 159:13, 183:25, 184:4, 184:22, 186:10
**nationality** [1] - 151:7
**nations** [2] - 155:8, 188:17
**nature** [9] - 45:8, 45:22, 51:21, 55:1, 67:3, 67:4, 80:6, 135:3, 253:18
**Nauen** [1] - 2:19
**nearly** [1] - 42:11
**necessarily** [5] - 36:19, 43:8, 46:17, 65:24, 125:3
**necessary** [7] - 33:22, 85:24, 98:21, 181:20, 217:19, 225:15, 236:2
**need** [45] - 17:4, 22:3, 23:16, 51:8, 52:8, 53:8, 54:4, 54:5, 65:2, 66:12, 71:7, 85:8, 94:23, 108:18, 109:12, 115:24, 118:25, 135:13, 139:20, 150:19, 153:19, 155:4, 157:1, 159:8, 159:19, 164:18, 170:21, 172:21, 187:5, 194:10, 209:17, 234:4, 234:18, 235:6, 239:11, 242:8, 244:22, 244:23, 246:4, 246:16, 252:21, 257:11, 257:24, 260:20, 261:3
**needing** [1] - 155:2
**needs** [7] - 68:5, 73:24, 73:25, 88:6, 141:24, 150:3, 204:21
**negatives** [1] - 48:9
**neglected** [1] - 182:4
**negotiation** [1] - 86:9
**neighbor** [1] - 215:6
**net** [1] - 193:10
**never** [16] - 32:23, 65:4, 66:25, 79:13, 92:22, 105:17, 116:20, 117:1, 155:17, 168:2, 207:21, 236:4, 251:3, 254:16, 254:18
**Never** [1] - 198:7
**nevertheless** [1] - 42:6
**NEW** [1] - 1:1
**new** [10] - 90:21, 116:16, 118:4, 128:7, 155:3, 155:13, 156:25, 227:19, 255:1, 256:20
**New** [79] - 1:6, 1:19, 2:7, 2:12, 2:16, 3:12, 4:3, 4:8, 4:13, 4:21, 5:8, 6:7, 7:7, 7:11, 7:15, 14:4, 14:5, 14:13, 14:14, 14:21, 14:22, 15:24, 15:25, 16:1, 16:12, 16:13, 24:24, 25:1, 25:10, 28:23, 84:18, 132:6, 132:12, 133:5, 134:8, 140:6, 151:1, 151:10, 166:13, 235:20, 245:12, 245:14, 245:16, 245:19, 245:22, 247:4, 247:14, 248:2, 248:25, 249:18, 254:9, 256:1, 256:2, 256:5, 256:14, 257:1, 257:3, 257:4, 258:6, 258:11, 258:20, 261:3

259:16, 259:17, 259:20, 260:1, 260:2, 260:4, 261:6, 261:7, 261:8, 261:12, 261:13, 261:15
**News** [1] - 136:22
**next** [25] - 20:14, 27:11, 28:3, 39:7, 75:13, 82:7, 92:2, 92:9, 94:16, 95:1, 95:19, 96:12, 96:20, 96:21, 96:23, 98:6, 99:20, 101:24, 112:18, 142:10, 146:18, 191:20, 213:9, 220:4, 221:13
**Next** [4] - 14:17, 14:23, 15:3, 15:11, 27:8, 28:12, 28:18, 91:22, 93:6, 93:7, 98:20, 101:14, 168:23
**nexus** [2] - 52:8, 145:1
**Nguyen** [1] - 6:2
**Nigeria** [1] - 151:4
**nine** [3] - 255:20, 255:24, 255:25
**Ninth** [3] - 62:5, 136:20, 138:6
**Nippon** [1] - 258:19
**no-brainer** [1] - 17:25
**nobody** [1] - 261:13
**non** [15] - 58:16, 60:16, 61:9, 61:16, 61:18, 69:18, 82:10, 87:16, 130:11, 137:4, 141:11, 142:4, 148:3, 167:6
**non-convenience** [3] - 137:4, 141:11, 142:4
**non-EU** [1] - 148:3
**non-surcharge** [8] - 58:16, 60:16, 61:9, 61:16, 61:18, 69:18, 82:10, 87:16
**non-U.S** [1] - 167:6
**nonconvenience** [4] - 144:17, 144:23, 146:1, 148:20
**None** [3] - 59:23, 60:12, 206:15
**none** [3] - 173:23, 206:14, 231:8
**nonetheless** [1] - 216:1
**nonjury** [2] - 215:23, 228:17
**nonsense** [3] - 243:23, 244:3, 244:6
**nontrivial** [1] - 219:11
**normal** [4] - 119:4, 153:7, 213:10, 214:10
**normally** [1] - 221:6
**north** [1] - 182:23
**North** [2] - 1:23, 5:12
**Northeastern** [2] - 62:10, 81:2
**Northeastern's** [2] - 62:11, 62:12
**Northern** [2] - 165:20, 171:2
**note** [3] - 41:12, 134:14, 194:3
**noted** [5] - 113:21, 129:13, 158:9, 212:7, 251:19
**notes** [1] - 139:25
**Nothing** [1] - 216:20
**nothing** [34] - 20:22, 37:19, 47:19, 60:1, 61:4, 61:17, 61:18, 61:19, 62:6, 63:4, 63:6, 66:1, 66:2, 67:8, 67:11, 67:12, 67:21, 70:15, 113:25, 117:2, 135:19, 138:20, 140:19, 140:20, 142:4, 173:5, 202:19, 208:15, 209:1, 209:2, 218:22, 247:21, 253:8, 254:22
**notice** [21] - 71:20, 72:4, 72:10, 72:13, 72:14, 73:4, 73:5, 74:18, 75:10, 76:18, 78:6, 78:21, 78:24, 80:22, 82:4, 82:5, 85:9, 89:14, 193:4, 196:20
**noting** [1] - 115:9
**notion** [6] - 52:11, 70:5, 127:16, 138:17, 213:8, 245:12
**notwithstanding** [1] - 217:7
**Notwithstanding** [1] - 182:7

**novel** [2] - 172:22, 173:6
**nowhere** [1] - 77:1
**nullify** [1] - 155:25
**number** [24] - 14:11, 18:24, 32:16, 64:8, 70:17, 70:18, 73:20, 88:20, 111:13, 128:5, 129:4, 149:25, 150:2, 150:19, 156:4, 171:14, 203:15, 203:16, 234:16, 239:8, 246:12, 249:7, 257:7, 259:4
**numbers** [1] - 175:20
**numerous** [3] - 62:10, 224:11, 231:6
**NW** [6] - 2:2, 3:2, 3:15, 4:16, 5:3, 5:17
**Nw** [5] - 3:6, 5:22, 6:3, 6:16, 6:20
**NY** [13] - 1:19, 2:7, 2:12, 2:16, 3:12, 4:8, 4:13, 4:21, 5:8, 6:7, 7:7, 7:11, 7:15

# O

**o'clock** [3] - 69:6, 121:18
**O'Melveny** [1] - 6:15
**Oak** [2] - 79:1, 80:18
**oath** [1] - 204:13
**objection** [1] - 173:15
**Objections** [6] - 186:17, 188:3, 188:5, 188:6, 188:24
**objections** [8] - 175:23, 176:11, 176:18, 176:19, 176:20, 176:23, 190:6, 250:10
**objective** [9] - 157:12, 157:13, 157:15, 160:13, 160:16, 162:8, 162:15
**objectives** [3] - 161:18, 162:22, 163:20
**obligated** [2] - 184:1, 250:23
**obligation** [5] - 65:3, 184:4, 185:11, 203:3, 236:24
**observe** [2] - 149:12, 186:5
**observed** [4] - 146:24, 149:23, 150:10, 249:24
**obtain** [4] - 95:10, 207:18, 208:2, 252:20
**obtained** [3] - 151:23, 153:2, 246:13
**obvious** [3] - 22:2, 251:24, 256:5
**obviously** [14] - 17:1, 23:5, 26:3, 34:23, 34:25, 39:18, 57:15, 67:15, 82:22, 136:6, 146:15, 184:19, 195:25, 252:14
**Obviously** [2] - 111:3, 151:16
**occupants** [1] - 260:7
**occur** [4] - 17:11, 44:2, 152:21, 171:8
**occurred** [7] - 24:18, 24:19, 24:23, 37:5, 44:10, 46:7, 70:13, 77:25, 82:5, 88:2, 129:22, 151:8, 157:19, 169:16, 183:15, 197:17, 198:21
**occurrence** [1] - 74:11
**occurring** [2] - 23:8, 137:19
**occurs** [3] - 24:5, 222:11
**Ocean** [2] - 252:4, 252:5
**OF** [2] - 1:1, 1:12
**offend** [1] - 138:10
**office** [5] - 177:7, 218:23, 218:24, 249:19, 261:8
**officer** [2] - 210:20, 210:23
**officers** [2] - 29:10, 211:8
**offices** [2] - 199:12, 225:4
**official** [1] - 210:5
**Official** [1] - 7:20
**offload** [1] - 114:19
**OGDEN** [23] - 143:10, 143:11, 145:15, 145:17, 145:22, 150:10, 152:23, 153:20,

153:25, 154:6, 154:17, 154:19, 183:6, 183:7, 183:17, 183:20, 185:1, 185:15, 186:14, 186:21, 187:12, 264:11, 264:19
**Ogden** [11] - 6:1, 129:13, 137:5, 137:8, 138:14, 141:9, 141:11, 143:11, 179:15, 180:6, 183:4
**Ohlen** [1] - 5:11
**Oil** [1] - 198:8
**Okuliar** [1] - 6:15
**old** [4] - 69:3, 155:2, 155:4, 155:12
**ON** [1] - 1:12
**once** [17] - 37:16, 37:20, 37:24, 43:6, 43:7, 45:13, 72:2, 109:22, 155:2, 168:15, 181:4, 186:9, 196:14, 200:25, 203:3, 230:4, 255:11
**one** [137] - 9:16, 11:24, 12:22, 12:25, 14:16, 26:24, 29:24, 35:17, 38:10, 38:13, 41:14, 46:2, 48:11, 52:15, 53:10, 53:22, 54:12, 54:13, 54:17, 61:25, 62:1, 62:2, 70:8, 73:12, 75:4, 75:6, 75:7, 77:1, 80:14, 80:23, 82:7, 85:17, 86:4, 87:2, 87:3, 90:10, 92:9, 92:12, 92:14, 92:25, 93:6, 93:7, 95:1, 95:19, 96:12, 96:20, 96:22, 97:25, 98:6, 99:18, 99:20, 99:21, 100:20, 101:24, 102:11, 102:20, 104:4, 105:18, 105:23, 106:23, 107:20, 110:16, 113:14, 117:22, 119:11, 123:4, 123:7, 124:17, 126:18, 127:6, 127:11, 134:14, 135:2, 136:14, 141:12, 142:8, 143:5, 146:11, 149:1, 151:9, 154:14, 158:22, 161:6, 163:11, 168:24, 169:11, 169:21, 175:7, 179:6, 180:19, 183:15, 184:5, 187:1, 187:21, 188:5, 190:19, 193:22, 197:6, 201:8, 203:15, 204:10, 207:13, 209:13, 212:14, 212:18, 216:14, 216:21, 218:16, 219:22, 221:3, 221:4, 224:16, 227:23, 228:20, 229:17, 231:9, 232:15, 234:16, 237:15, 239:8, 239:14, 242:1, 242:7, 246:22, 247:9, 249:15, 249:25, 250:1, 250:2, 251:19, 251:24, 255:23, 255:25, 256:1, 261:16
**One** [14] - 4:20, 7:2, 22:14, 39:9, 41:18, 42:24, 45:7, 118:4, 135:18, 141:10, 153:22, 197:22, 212:20, 257:21
**one-word** [1] - 97:25
**onerous** [1] - 197:14
**ones** [3] - 53:1, 189:14, 206:11
**open** [3] - 8:1, 68:2, 148:22
**opened** [1] - 175:24
**opening** [3] - 38:13, 101:17, 118:3
**operate** [3] - 67:19, 94:2, 238:6
**operating** [4] - 121:7, 121:10, 213:6, 243:11
**operation** [3] - 153:7, 205:6, 262:4
**operational** [2] - 243:12, 243:23
**operations** [4] - 226:24, 227:7, 244:10, 261:8
**operative** [3] - 42:13, 23:2, 26:11
**opining** [1] - 156:15
**opinion** [5] - 108:11, 147:25, 181:15, 248:18, 254:12
**Opinions** [1] - 181:5
**opinions** [1] - 181:21
**opportunities** [2] - 60:6, 72:16
**opportunity** [10] - 31:24, 59:24, 60:8, 86:20, 193:17, 195:10, 195:18, 225:21,

231:16, 236:7
**opposed** [1] - 11:13, 24:20, 32:9, 40:7, 45:1, 49:25, 80:7, 124:25, 141:15, 188:13, 223:24
**opposite** [2] - 100:3, 102:15
**opposition** [8] - 8:24, 13:7, 19:19, 47:22, 69:24, 128:6, 137:10, 204:3
**opt** [21] - 133:11, 166:7, 166:8, 166:9, 166:14, 166:15, 166:19, 171:10, 173:13, 173:17, 173:21, 173:24, 173:25, 174:11, 174:14, 174:21, 180:7, 180:8
**opt-in** [12] - 166:8, 166:15, 166:19, 171:10, 173:17, 173:21, 173:24, 173:25, 174:14, 174:21, 180:7, 180:8
**opt-out** [7] - 166:7, 166:14, 166:15, 173:13, 174:11, 180:7, 180:8
**option** [2] - 180:8, 181:14
**OR** [1] - 244:15
**ORAL** [1] - 1:12
**oral** [1] - 126:6
**Oral** [1] - 8:13
**order** [20] - 41:16, 46:23, 72:4, 72:10, 78:24, 85:24, 90:6, 122:17, 122:19, 125:21, 159:9, 165:21, 189:4, 191:23, 195:16, 232:18, 248:3, 248:4, 248:21, 253:22
  **ordered** [1] - 166:17
  **orders** [1] - 253:13
**organ** [12] - 212:22, 213:5, 213:15, 214:6, 214:7, 229:11, 230:7, 230:11, 230:17, 231:7, 231:14, 242:10
  **Organ** [1] - 213:13
**organizational** [2] - 198:1, 198:2
**Oriental** [1] - 29:8
**origin** [5] - 16:20, 205:8, 206:12, 227:1
**origin/point** [1] - 244:13
**original** [6] - 75:17, 94:17, 95:11, 105:6, 115:11, 172:15
  **originally** [2] - 95:21, 117:6
  **originate** [1] - 159:15
  **originating** [9] - 10:24, 12:10, 16:18, 17:9, 17:10, 17:24, 18:18, 49:16, 51:16
  **Originating** [1] - 17:11
  **origination** [1] - 17:3
**others'** [1] - 83:24
**Otherwise** [2] - 229:2, 251:7
**otherwise** [11] - 35:1, 42:19, 43:25, 44:9, 125:8, 162:17, 163:3, 164:7, 171:25, 197:19, 258:10
**ought** [6] - 67:17, 68:9, 68:21, 87:23, 116:4, 156:19
  **outcome** [1] - 133:3
**outer** [1] - 35:14
**outline** [1] - 176:15
**outlines** [1] - 167:10
**outset** [3] - 79:9, 86:25, 196:1
**outside** [20] - 17:18, 18:8, 83:10, 129:22, 130:8, 130:12, 130:15, 137:20, 159:15, 166:21, 173:23, 197:8, 219:6, 219:8, 219:10, 222:18, 222:24, 236:11, 246:25, 252:17
  **outstanding** [1] - 170:25
**overall** [2] - 251:15, 258:25
**overbroad** [1] - 193:3
**overcharge** [7] - 15:22, 16:11, 16:19, 25:2, 25:16, 28:25, 167:23

**overcharges** [4] - 10:18, 22:17, 22:20, 77:6
**overcome** [2] - 101:19, 193:17
**Overlobby** [1] - 127:19
**overlooked** [1] - 19:19
**overpaid** [2] - 24:14, 24:17
**override** [2] - 153:12, 155:25
**overriding** [1] - 175:10
**overseas** [19] - 16:19, 24:19, 42:23, 46:14, 46:16, 51:14, 51:16, 95:25, 96:16, 96:19, 98:18, 98:24, 102:21, 102:22, 103:24, 106:7, 106:17, 130:6, 130:7
**overturning** [1] - 112:15
**overview** [2] - 18:25, 19:4
**overwhelmingly** [2] - 146:5, 149:22
**own** [6] - 30:8, 66:21, 87:19, 149:19, 152:24, 262:13
**owned** [7] - 207:23, 212:23, 216:17, 230:4, 230:15, 243:13
**owner** [1] - 243:15
**ownership** [2] - 143:13, 146:7

**P**

**P.L.L.P** [1] - 2:19
**PA** [1] - 6:12
**Pacific** [5] - 10:14, 65:23, 66:24, 67:9, 77:8
**page** [15] - 50:7, 71:23, 112:18, 125:25, 126:8, 142:10, 178:12, 220:4, 223:17, 223:19, 224:13, 233:5, 235:10, 242:13
**Page** [5] - 69:20, 71:21, 72:7, 205:14, 246:7
**PAGE** [1] - 263:3
**pages** [10] - 13:6, 126:12, 126:21, 126:22, 126:23, 128:1, 176:1, 179:3, 185:17, 218:22
**paid** [8] - 15:14, 26:1, 26:12, 37:10, 42:18, 43:24, 45:19, 55:11
**paintings** [2] - 25:6, 25:8
**Paintings** [1] - 25:10
**pairs** [1] - 67:7
**Pakistan** [1] - 29:25
**Palau** [2] - 217:25, 218:1
**paper** [9] - 81:22, 126:11, 126:21, 161:8, 163:20, 164:1, 164:22, 175:9, 208:13
**Paper** [3] - 180:14, 180:18, 186:1
**papers** [22] - 19:19, 52:16, 118:3, 118:4, 126:14, 127:17, 128:19, 129:6, 131:25, 134:1, 135:12, 136:25, 149:5, 182:23, 183:1, 194:17, 209:17, 214:18, 216:25, 243:5, 243:25, 262:18
**Paragraph** [20] - 74:7, 75:1, 75:13, 75:18, 76:16, 77:2, 77:20, 81:7, 81:20, 82:7, 82:21, 82:24, 83:19, 83:23, 85:1, 85:17, 182:8, 208:14, 224:18, 249:25
**paragraph** [5] - 75:13, 111:10, 114:4, 148:1, 182:5
**paragraphs** [12] - 59:1, 60:19, 60:21, 60:22, 60:25, 62:21, 73:3, 87:14, 88:12, 148:1, 154:8, 239:14
**Paragraphs** [3] - 81:17, 87:13, 87:16
**parallel** [4] - 59:11, 59:15, 59:16, 154:2
**parameters** [3] - 164:16, 192:17, 194:11

**paraphrasing** [1] - 74:6
**parent** [2] - 261:22, 261:23
**Paris** [5] - 28:16, 28:22, 51:24, 80:20
**part** [24] - 17:1, 20:21, 24:22, 48:5, 54:2, 54:9, 80:15, 96:1, 98:14, 103:10, 104:22, 104:23, 107:10, 111:24, 115:4, 121:9, 122:5, 166:18, 200:4, 234:17, 236:24, 241:16, 259:25, 262:6
**participant** [1] - 150:14
**participate** [3] - 77:5, 166:11, 203:17
**participated** [5] - 63:13, 70:16, 74:13, 79:9, 203:15
**participating** [1] - 74:14
**participation** [2] - 234:20, 261:11
**particular** [23] - 12:11, 22:24, 63:5, 63:23, 63:24, 66:10, 86:3, 87:23, 88:18, 89:6, 134:5, 146:10, 155:1, 157:20, 206:20, 210:21, 214:25, 231:18, 248:7, 251:16, 256:6, 262:14
**particularly** [8] - 56:11, 70:21, 136:23, 146:16, 149:14, 156:18, 160:17, 177:19
**parties** [14] - 33:5, 33:7, 54:5, 70:24, 129:21, 134:22, 168:13, 171:4, 171:15, 174:9, 210:17, 224:16, 239:23, 250:16
**partner** [3] - 139:24, 140:13, 140:14
**parts** [4] - 12:24, 105:2, 127:20, 143:23
**pass** [10] - 136:2, 136:7, 150:6, 152:5, 156:7, 163:14, 165:8, 167:18, 170:11, 184:12
**pass-on** [5] - 150:6, 152:5, 167:18, 170:11, 184:12
**pass-through** [2] - 163:14, 165:8
**passed** [4] - 42:25, 112:8, 167:23, 168:5, 217:14
**passenger** [1] - 165:23
**Passenger** [2] - 112:7, 112:8
**passengers** [6] - 26:4, 26:15, 166:6, 166:9, 167:6
**passing** [1] - 173:7
**passive** [1] - 253:19
**past** [2] - 59:21, 168:21
**patently** [1] - 40:6
**patience** [1] - 262:23
**Patrick** [1] - 215:1
**Patrickson** [4] - 229:18, 229:22, 230:2, 230:5
**pattern** [1] - 127:3
**Paul** [2] - 6:6, 6:15
**Pause** [4] - 8:10, 9:21, 27:20, 32:12
**pay** [3] - 37:20, 43:17, 49:5
**paying** [2] - 10:18, 55:16
**payment** [1] - 25:2
**peculiar** [1] - 132:23
**penalty** [1] - 132:16
**pending** [1] - 154:10
**Pennsylvania** [6] - 3:6, 4:20, 4:24, 5:17, 5:22, 6:3
**penultimate** [1] - 70:22
**people** [19] - 8:18, 72:22, 79:25, 84:19, 94:13, 102:21, 112:9, 130:12, 138:25, 141:1, 161:11, 171:10, 191:15, 208:12, 208:25, 232:18, 260:10, 260:13, 260:21
**per** [12] - 36:3, 62:23, 75:4, 75:20, 76:11, 81:21, 81:22, 83:12, 83:14, 83:25, 84:1, 192:5

**percent** [12] - 84:2, 84:18, 84:21, 85:6, 85:7, 85:13, 168:4, 188:6, 248:22, 249:6, 251:17, 259:3
**percentage** [2] - 249:9, 258:24, 259:2
**perfect** [3] - 68:12, 122:3, 189:3
**perfectly** [1] - 91:15
**perform** [1] - 38:2
**performed** [2] - 37:18, 38:1
**Perhaps** [1] - 196:23
**perhaps** [5] - 86:8, 141:2, 141:3, 146:11, 246:21
**Period** [1] - 229:21
**period** [1] - 75:4
**permissible** [1] - 166:16
**permission** [1] - 240:23
**permit** [14] - 96:7, 105:19, 105:21, 105:22, 106:3, 110:4, 128:19, 138:14, 140:2, 147:10, 148:7, 192:15, 196:2, 212:11
**permits** [4] - 109:17, 110:15, 131:18, 148:14
**permitted** [7] - 46:6, 53:22, 166:11, 236:22, 239:22, 239:23, 240:9
**person** [3] - 185:8, 209:13, 210:22
**personal** [4] - 133:10, 199:15, 244:24, 256:3
**persons** [6] - 91:21, 149:13, 166:18, 174:21, 176:2, 244:14
**persuaded** [5] - 90:11, 209:16, 245:13, 245:19, 255:6
**persuasive** [1] - 209:18
**Peter** [1] - 5:15
**ph** [1] - 127:19
**phalle@morganlewis.com** [1] - 5:19
**phased** [1] - 97:15
**Philadelphia** [1] - 6:12
**Philatech** [3] - 203:2, 206:25, 234:1
**phonetic** [1] - 116:21
**photograph** [1] - 14:15
**photographic** [1] - 236:18
**phrase** [16] - 11:2, 34:22, 35:1, 35:11, 41:16, 41:19, 41:20, 48:16, 100:7, 115:15, 119:14, 120:16, 121:13, 121:20, 121:21, 122:25
**phrases** [2] - 120:8, 120:9
**physically** [1] - 12:8
**pick** [3] - 121:9, 125:21, 247:7
**picked** [3] - 98:24, 177:16, 256:5
**Pickering** [1] - 6:2
**picture** [1] - 216:10
**piece** [1] - 217:25
**pin** [1] - 239:12
**Piper** [2] - 3:2, 10:14
**pivots** [1] - 163:8
**place** [23] - 37:6, 45:16, 81:18, 87:2, 130:7, 134:6, 176:2, 179:13, 179:16, 189:20, 190:25, 191:1, 197:8, 197:24, 205:9, 212:14, 222:12, 232:6, 244:13, 246:23, 253:13, 253:22, 254:25
**place"** [1] - 227:2
**placement** [1] - 201:22
**places** [7] - 24:5, 50:2, 51:9, 87:21, 130:2, 130:14, 144:3
**plain** [9] - 72:8, 72:14, 72:18, 72:20, 76:9, 106:19, 155:20, 172:11, 172:12

**plaintiff** [25] - 14:3, 25:3, 27:4, 27:12, 29:10, 43:21, 46:9, 65:6, 116:21, 137:18, 146:2, 146:12, 150:13, 154:12, 184:16, 184:17, 185:20, 193:6, 197:7, 200:18, 203:6, 210:15, 212:8, 222:13

**Plaintiff** [2] - 29:7, 104:8

**plaintiff's** [11] - 29:11, 30:1, 30:5, 139:24, 182:13, 193:3, 201:2, 203:3, 235:22, 246:6, 246:7

**plaintiffs** [122] - 10:17, 10:19, 11:19, 13:4, 13:6, 16:3, 19:7, 19:16, 20:2, 21:6, 22:9, 22:19, 23:6, 23:17, 24:4, 24:13, 24:16, 28:6, 30:10, 30:25, 31:5, 31:24, 32:16, 41:2, 43:21, 43:23, 45:18, 46:4, 47:21, 47:23, 53:20, 53:23, 53:25, 58:2, 58:19, 59:10, 59:13, 59:25, 60:4, 61:2, 61:15, 62:2, 63:12, 64:2, 65:11, 65:15, 66:3, 66:11, 66:25, 67:11, 68:11, 68:17, 69:13, 69:21, 73:8, 86:4, 88:24, 89:16, 89:19, 89:20, 89:24, 90:10, 121:24, 128:5, 129:23, 130:12, 131:12, 133:13, 133:14, 135:17, 138:12, 138:18, 140:1, 140:23, 141:2, 144:4, 145:9, 145:10, 145:20, 145:23, 146:22, 147:3, 147:6, 147:15, 148:12, 148:18, 151:22, 181:23, 182:8, 192:23, 193:10, 193:16, 193:20, 194:3, 196:15, 197:23, 198:22, 201:12, 203:11, 204:3, 207:2, 207:16, 207:21, 208:7, 210:23, 211:24, 219:25, 221:7, 221:8, 222:5, 235:13, 236:1, 236:3, 236:19, 239:17, 245:15, 250:13, 250:15, 252:20, 254:6, 256:13

**Plaintiffs** [5] - 68:19, 137:10, 199:11, 206:10, 246:23

**plaintiffs'** [27] - 10:8, 17:1, 19:24, 24:11, 29:2, 31:9, 42:10, 51:12, 51:20, 51:23, 52:21, 54:19, 57:20, 95:16, 101:25, 107:17, 108:13, 108:23, 111:8, 111:16, 139:22, 139:23, 146:9, 147:25, 149:19, 193:13, 238:10

**Plaintiffs'** [2] - 68:1, 223:16

**plan** [3] - 192:16, 212:14

**plane** [8] - 37:21, 39:16, 40:12, 40:13, 49:14, 114:18, 200:17, 200:19

**planes** [6] - 22:17, 33:16, 112:9, 251:3, 252:9

**plans** [1] - 46:6

**plausibility** [5] - 69:15, 69:18, 70:5, 71:14, 72:3

**Plausibility** [1] - 69:15

**plausible** [13] - 40:6, 68:6, 69:23, 70:9, 71:16, 72:22, 72:23, 73:7, 75:11, 78:6, 78:23, 82:19, 88:15

**play** [2] - 26:7, 151:10

**Plaza** [1] - 4:20

**plea** [3] - 65:5, 65:23, 65:25

**plead** [13] - 78:6, 78:7, 78:10, 84:23, 87:8, 194:25, 195:3, 195:10, 196:4, 196:9, 208:3, 221:8, 240:16

**pleaded** [16] - 65:17, 68:22, 70:7, 70:8, 73:9, 84:5, 86:13, 87:12, 88:21, 89:3, 140:1, 140:17, 194:16, 194:17, 195:15, 221:12

**pleader** [1] - 72:9

**pleading** [27] - 62:7, 65:3, 71:22, 71:24, 72:7, 78:21, 78:22, 80:22, 83:8, 89:14,

89:15, 195:6, 201:21, 202:24, 203:9, 203:10, 206:16, 207:1, 208:22, 222:16, 227:19, 227:21, 227:25, 233:25, 235:4, 236:2, 236:4

**pleadings** [15] - 194:13, 194:24, 196:3, 203:1, 207:15, 207:17, 208:5, 222:18, 226:3, 228:6, 236:12, 240:7, 240:9, 241:10

**pleads** [1] - 65:14

**pleas** [7] - 65:13, 65:18, 65:19, 65:20, 65:21, 65:22, 66:8

**pleasure** [1] - 262:20

**pled** [6] - 84:25, 86:18, 146:22, 218:19, 219:14, 241:9

**Plender** [3] - 136:4, 140:11, 140:12

**plenty** [3] - 68:11, 245:23, 245:24

**PLLC** [2] - 4:3, 5:21

**Plumer** [1] - 133:17

**plus** [3] - 60:11, 248:12, 258:21

**pockets** [1] - 253:1

**podium** [2] - 8:20, 32:8

**POHORELSKY** [3] - 1:13, 56:24, 191:11

**Pohorelsky** [1] - 8:15

**point** [85] - 16:19, 16:20, 16:21, 17:2, 17:18, 31:21, 31:22, 33:19, 35:20, 38:10, 39:3, 39:8, 47:14, 47:22, 52:7, 52:20, 53:10, 53:11, 54:18, 59:22, 63:10, 67:5, 67:7, 67:8, 67:24, 70:22, 84:20, 112:1, 114:20, 126:9, 126:24, 128:13, 130:8, 134:19, 145:18, 145:25, 148:11, 154:17, 158:13, 160:1, 165:15, 171:12, 175:8, 177:20, 182:18, 186:23, 195:25, 198:23, 201:8, 205:8, 206:12, 209:9, 221:21, 221:22, 225:9, 226:19, 226:20, 226:25, 227:1, 227:10, 230:12, 230:14, 231:1, 231:2, 231:9, 235:24, 237:23, 240:20, 243:19, 244:12, 245:14, 246:8, 249:13, 250:4, 257:11, 261:13, 261:14, 262:12, 262:17

**Point** [1] - 239:8

**pointed** [4] - 182:18, 223:21, 248:18, 248:20

**points** [27] - 18:7, 21:2, 24:8, 38:13, 41:18, 113:4, 118:16, 119:2, 120:22, 121:1, 122:1, 128:10, 128:11, 128:17, 129:2, 137:9, 140:9, 144:2, 144:19, 153:21, 180:11, 181:21, 182:14, 183:3, 205:7, 239:7, 245:6

**policy** [10] - 95:4, 102:17, 157:23, 158:5, 159:6, 160:1, 163:21, 165:14, 186:2, 239:18

**political** [2] - 109:5, 215:5

**Pollack's** [1] - 147:11

**portion** [2] - 70:2, 115:8

**Portugal** [1] - 151:4

**Portuguese** [1] - 151:3

**Poscablo** [1] - 6:6

**poses** [1] - 90:8

**posit** [1] - 152:18

**position** [9] - 125:8, 162:12, 162:13, 172:14, 175:13, 209:23, 231:12, 241:21

**positions** [1] - 262:21

**Posner** [3] - 215:20, 215:25, 216:2

**Posnerian** [1] - 215:20

**possession** [1] - 227:16

**possessions** [1] - 96:2

**possibility** [3] - 145:19, 156:9, 190:3

**possible** [9] - 9:8, 122:18, 122:19, 122:20, 129:16, 145:25, 169:22, 187:1, 231:1

**possibly** [4] - 22:7, 27:6, 67:18, 260:1

**post** [5] - 215:11, 215:17, 215:22, 217:6, 229:14

**post-filing** [1] - 229:14

**posted** [1] - 191:18

**potential** [5] - 70:18, 152:5, 254:17, 260:6, 260:14

**potentially** [3] - 41:24, 151:23, 152:16

**Potentially** [1] - 130:22

**power** [2] - 128:13, 235:12

**practicably** [1] - 149:10

**practical** [1] - 216:4

**practically** [1] - 174:18

**practice** [2] - 165:14, 167:21

**prearranged** [1] - 210:16

**preceded** [1] - 75:23

**precedent** [2] - 164:4, 164:7

**precise** [1] - 17:20

**precisely** [4] - 31:17, 44:13, 162:15, 163:7

**predated** [1] - 20:12

**predicate** [1] - 23:3

**predicated** [1] - 10:23

**predictability** [1] - 216:5

**preempted** [4] - 90:13, 112:10, 112:16, 123:18

**preemption** [55] - 90:5, 91:6, 91:7, 92:4, 92:6, 93:23, 94:3, 94:15, 94:18, 94:23, 95:5, 95:8, 95:9, 95:12, 96:10, 96:13, 96:17, 98:1, 98:8, 98:23, 99:2, 99:5, 99:22, 99:23, 99:25, 100:1, 100:4, 100:18, 101:2, 101:20, 102:12, 103:20, 104:15, 105:4, 105:9, 108:2, 108:25, 111:14, 111:17, 111:19, 112:3, 113:10, 113:11, 115:2, 116:5, 117:16, 117:24, 118:16, 118:17, 118:22, 124:3

**Preemption** [4] - 90:10, 96:17, 100:5, 112:4

**preference** [1] - 168:11

**prefers** [1] - 173:11

**prejudgment** [1] - 165:18

**prejudice** [2] - 68:9, 68:21

**preliminarily** [2] - 13:2, 143:21

**premium** [4] - 15:6, 15:15, 15:22, 25:2

**premiums** [1] - 15:8

**preparation** [3] - 39:11, 81:16, 216:5

**prepare** [1] - 81:8

**prepared** [5] - 9:4, 10:2, 107:14, 192:23, 218:8

**preparing** [1] - 9:14

**preponderance** [1] - 230:19

**prescriptive** [1] - 137:17

**presence** [2] - 253:13, 253:14

**present** [12] - 9:7, 123:23, 134:12, 134:13, 166:10, 174:9, 179:18, 187:9, 189:8, 190:24, 215:5, 236:8

**presentation** [6] - 9:4, 9:23, 90:20, 128:17, 161:7, 201:5

**presented** [3] - 116:25, 117:6, 123:6

**presently** [3] - 134:15, 167:21, 186:6

**presiding** [1] - 8:15

**presumably** [6] - 23:12, 46:13, 60:10, 65:7, 134:17, 151:5

**presumed** [1] - 125:10

**presumption** [8] - 21:25, 100:1, 100:17, 101:1, 101:19, 112:3, 167:23, 203:5

**presumptively** [2] - 184:8, 184:14

**pretty** [10] - 8:17, 13:22, 33:3, 64:21, 89:19, 90:15, 113:22, 136:9, 193:8, 193:9

**prevail** [1] - 174:14

**prevailing** [1] - 167:9

**prevent** [1] - 29:24

**preventing** [1] - 229:13

**previous** [2] - 68:13, 71:23

**Price** [3] - 5:1, 161:1, 161:2

**price** [69] - 17:7, 17:8, 17:11, 18:21, 27:5, 27:15, 29:20, 31:13, 31:14, 33:9, 34:25, 36:7, 36:8, 36:10, 36:17, 36:20, 36:23, 36:25, 38:16, 40:13, 40:23, 47:25, 48:13, 48:18, 49:6, 49:11, 49:24, 54:9, 55:8, 63:15, 63:16, 70:12, 74:10, 75:16, 75:19, 109:7, 157:16, 158:19, 158:23, 160:18, 161:2, 161:4, 169:7, 173:4, 175:11, 176:12, 178:1, 179:7, 187:25, 199:9, 199:19, 203:25, 233:14, 233:15, 233:17, 233:18, 233:19, 234:8, 234:8, 234:9, 234:20, 234:22, 247:25

**price-fixing** [1] - 187:25

**prices** [15] - 10:19, 15:7, 16:4, 16:20, 22:15, 23:4, 85:23, 165:23, 172:24, 200:21, 206:8, 234:15, 237:1, 247:1, 247:19

**Pricing** [1] - 16:25

**pricing** [7] - 17:25, 23:12, 63:14, 74:4, 74:9, 201:25, 203:18

**prima** [5] - 213:24, 221:19, 222:17, 231:13, 235:23

**primarily** [4] - 86:23, 146:3, 146:13, 153:3

**primary** [1] - 160:16

**principal** [3] - 243:6, 258:9, 259:12

**principally** [1] - 177:7

**principle** [14] - 105:25, 149:4, 150:25, 151:1, 173:20, 184:3, 185:16, 190:22, 214:3, 217:11, 218:2, 218:3

**Principle** [2] - 164:12, 164:13

**principles** [13] - 144:16, 144:17, 147:1, 147:5, 151:11, 154:3, 156:12, 156:25, 164:16, 171:16, 215:13, 215:17

**privacy** [1] - 152:12

**private** [4] - 158:6, 158:7, 182:24, 209:13

**privately** [1] - 83:22

**privatized** [1] - 216:11

**Priver** [5] - 202:6, 202:7, 202:8, 202:11, 232:19

**PRIVER** [25] - 202:7, 202:10, 202:11, 204:15, 204:21, 204:25, 206:24, 207:7, 232:20, 232:23, 232:24, 233:15, 233:18, 234:10, 234:13, 234:21, 234:24, 235:2, 235:4, 235:9, 236:16, 236:23, 237:4, 264:25, 265:8

**probability** [2] - 183:21, 183:22

**Probable** [6] - 68:17

**problem** [12] - 85:15, 86:7, 107:8, 107:18, 108:22, 124:5, 133:18, 152:15,

152:16, 160:5, 162:19, 193:2

**problems** [9] - 73:12, 107:17, 135:21, 152:21, 159:19, 162:23, 166:12, 166:13, 193:5

**procedural** [6] - 132:19, 153:17, 175:3, 184:20, 193:15, 193:16

**Procedure** [5] - 72:1, 72:8, 133:16, 148:5, 227:23

**procedure** [8] - 133:15, 179:13, 184:6, 184:18, 210:16, 245:19, 255:8, 256:22

**procedures** [7] - 132:11, 132:12, 139:5, 139:6, 141:19, 179:17, 190:25

**proceed** [5] - 9:12, 131:8, 165:1, 174:24, 209:4, 221:6

**proceeded** [1] - 208:4

**proceeding** [8] - 8:17, 8:21, 138:15, 154:10, 154:14, 187:8, 208:18, 254:14

**Proceedings** [1] - 7:23

**proceedings** [10] - 8:10, 9:21, 27:20, 32:12, 148:8, 154:15, 205:5, 226:22, 255:1, 262:24

**process** [20] - 55:10, 73:23, 152:15, 152:25, 153:8, 157:8, 157:11, 157:14, 166:10, 173:17, 173:21, 187:9, 200:5, 218:12, 218:13, 246:18, 249:18, 256:4, 259:22

**processes** [2] - 173:11, 189:10

**processing** [2] - 82:3

**produce** [3] - 203:6, 204:12, 236:24

**produced** [2] - 7:23, 246:13

**produces** [1] - 140:20

**product** [2] - 38:18, 140:7

**program** [8] - 62:22, 75:3, 75:12, 75:15, 75:17, 76:11, 77:16, 97:17

**programs** [1] - 143:17

**prohibit** [1] - 135:18

**prohibited** [2] - 161:3, 174:2

**prohibiting** [2] - 133:1, 169:7

**prohibition** [1] - 116:2

**prohibits** [2] - 193:9, 254:22

**promote** [2] - 243:16, 243:17

**promoting** [1] - 257:8

**prong** [4] - 41:17, 45:7, 45:10, 212:18

**prongs** [2] - 203:22, 212:20

**pronouncement** [5] - 64:10, 90:14, 179:6, 179:20, 255:7

**pronouncements** [3] - 178:9, 182:21, 182:22

**Proof** [1] - 206:24

**proof** [16] - 62:5, 62:6, 62:11, 73:13, 73:14, 78:18, 152:6, 152:8, 152:9, 183:20, 184:10, 206:18, 215:13, 221:17, 246:24, 249:23

**proper** [10] - 22:12, 48:21, 114:5, 114:8, 114:10, 211:3, 254:13, 254:25, 256:11, 256:21

**properly** [14] - 10:20, 19:24, 21:4, 27:6, 30:20, 31:19, 68:22, 131:21, 139:17, 142:6, 143:3, 194:22, 210:2, 211:5

**property** [1] - 42:5

**proponent** [1] - 104:15

**proposals** [1] - 262:14

**proposed** [1] - 227:20

**proposition** [6] - 38:16, 64:9, 216:13, 216:22, 217:3, 218:4

**prosecute** [1] - 204:18

**prosecuting** [1] - 146:4

**prosecution** [1] - 114:17

**prosecutions** [1] - 94:11

**protect** [4] - 92:7, 103:22, 103:23, 215:14

**protected** [1] - 103:25

**prove** [7] - 89:22, 204:6, 205:1, 206:10, 234:16, 246:15, 246:16

**proven** [2] - 222:19, 231:13

**Provide** [1] - 180:24

**provide** [37] - 34:11, 39:16, 72:4, 73:4, 80:21, 82:13, 92:18, 94:1, 96:5, 96:15, 98:4, 98:23, 99:8, 99:9, 99:16, 99:18, 109:8, 109:11, 118:24, 119:15, 119:20, 138:25, 142:3, 148:22, 149:6, 161:14, 161:20, 164:14, 181:2, 185:19, 189:14, 194:8, 196:13, 196:15, 197:14, 239:25

**provided** [18] - 15:24, 24:15, 26:8, 35:23, 36:5, 37:13, 38:6, 49:25, 50:1, 50:4, 55:4, 120:17, 161:25, 184:17, 194:5, 210:21, 211:7, 227:22

**provides** [2] - 183:11, 185:20

**providing** [11] - 35:22, 37:4, 54:3, 110:3, 149:12, 160:13, 164:20, 194:4, 194:7, 257:7, 258:14

**provision** [37] - 49:20, 91:6, 91:7, 92:4, 92:6, 92:10, 92:11, 92:24, 93:4, 93:23, 95:5, 95:8, 96:10, 96:13, 98:1, 99:5, 101:6, 101:8, 102:5, 102:12, 103:20, 109:7, 114:3, 114:19, 115:2, 116:5, 117:24, 122:14, 123:9, 124:4, 125:2, 125:14, 127:2, 132:18, 136:17, 136:18, 137:22

**provisions** [7] - 101:3, 104:2, 111:19, 114:25, 122:22, 210:8, 211:25

**proximate** [1] - 31:6

**public** [1] - 158:6

**Public** [6] - 213:6, 230:14, 231:4, 242:11, 243:7, 243:9

**published** [17] - 9:24, 14:8, 14:18, 14:24, 15:4, 15:12, 19:1, 20:15, 26:20, 27:9, 28:4, 28:13, 28:19, 118:13, 118:18, 120:12, 167:15

**Publishing** [1] - 132:6

**pull** [2] - 127:6, 129:5

**pulling** [1] - 126:18

**purchase** [10] - 11:25, 12:14, 17:16, 17:17, 24:1, 24:3, 24:12, 51:16, 168:9, 206:11

**purchased** [9] - 24:10, 34:16, 34:17, 42:15, 42:16, 197:16, 204:9, 204:16, 206:14

**purchaser** [26] - 11:11, 11:13, 11:14, 11:20, 11:24, 12:5, 12:6, 12:7, 12:8, 12:16, 13:18, 27:3, 36:21, 42:17, 42:23, 55:20, 56:12, 56:13, 130:24, 150:6, 158:22, 163:15, 165:9, 167:25, 168:4, 184:11

**purchaser's** [1] - 168:2

**purchasers** [26] - 11:21, 11:22, 17:22, 17:23, 18:15, 18:16, 18:18, 26:18, 26:25, 53:3, 130:13, 131:2, 131:4, 136:3, 136:8, 158:17, 158:24, 159:2, 159:4, 162:5, 167:22, 168:7, 168:17, 170:14, 174:5

**purchases** [17] - 10:23, 11:3, 11:4, 11:8, 11:9, 11:12, 12:25, 17:23, 18:6,

18:18, 23:7, 33:12, 46:7, 46:8, 46:10, 51:13, 168:1
**purchasing** [3] - 11:15, 42:23, 55:21
**purported** [1] - 87:13
**purports** [1] - 193:6
**purpose** [10] - 20:21, 24:11, 28:1, 30:6, 72:13, 84:13, 92:6, 101:20, 118:6, 216:7
**purposes** [18] - 12:11, 13:24, 16:9, 17:16, 18:3, 20:18, 21:5, 44:25, 51:13, 69:25, 132:18, 134:23, 164:11, 209:12, 217:15, 243:16
**pursuant** [4] - 15:7, 144:5, 147:21, 148:5
**pursue** [1] - 47:5
**pursuing** [1] - 160:7
**put** [36] - 37:23, 58:25, 62:5, 65:3, 71:18, 78:18, 85:9, 86:20, 94:3, 95:17, 98:2, 101:7, 101:12, 118:4, 118:12, 121:1, 121:14, 126:8, 126:12, 126:21, 127:24, 128:13, 138:18, 139:25, 140:23, 144:2, 189:10, 190:25, 191:1, 196:19, 196:24, 218:18, 245:11, 247:12, 260:2
**puts** [2] - 25:9, 172:14
**Putting** [2] - 253:7, 258:24
**putting** [4] - 20:2, 62:16, 65:6, 239:14

## Q

**Qantas** [1] - 77:7
**QC** [2] - 136:5, 140:11
**qualification** [1] - 205:4
**qualified** [1] - 113:9
**qualify** [4] - 34:4, 35:15, 94:22, 202:17
**quantity** [1] - 29:18
**questioning** [1] - 79:5
**questions** [17] - 9:1, 9:10, 9:11, 37:3, 64:15, 90:3, 116:25, 117:5, 141:8, 168:24, 171:14, 177:5, 231:18, 245:8, 253:10, 254:2
**quick** [4] - 19:4, 21:25, 44:15, 55:14
**quickly** [4] - 163:1, 243:20, 249:17, 254:9
**Quimica** [1] - 31:19
**quite** [3] - 128:21, 131:25, 216:4
**quotation** [1] - 205:17
**Quote** [1] - 71:21
**quote** [15] - 34:1, 39:1, 58:4, 69:21, 71:24, 72:7, 113:10, 148:7, 161:8, 180:24, 213:13, 216:8, 226:17, 247:24
**quote/unquote** [1] - 140:2
**quotes** [1] - 63:16
**quoting** [2] - 216:2, 247:14

## R

**railroad** [2] - 251:7, 251:9
**raise** [11] - 42:8, 42:9, 83:25, 84:3, 88:20, 128:7, 160:10, 167:17, 174:10, 231:9
**raised** [18] - 59:15, 107:24, 108:7, 114:13, 116:20, 116:24, 117:6, 117:9, 123:22, 127:22, 128:5, 163:18, 168:25, 202:13, 210:2, 212:8, 223:4, 245:7
**raising** [1] - 29:20

**Ralfe** [2] - 133:25, 135:9
**Randy.price@lw.com** [1] - 5:4
**Rasenberger** [1] - 6:20
**rate** [4] - 27:5, 27:15, 27:24, 49:6
**rates** [9] - 84:3, 85:25, 86:9, 86:12, 97:15, 124:12, 248:1, 253:23, 254:2
**Rather** [1] - 58:3
**rather** [4] - 84:15, 132:19, 136:19, 223:23
**rblanch@blanch** [1] - 2:17
**rblanch@blanch-law.com** [1] - 2:17
**rdisch@sheppardmullin.com** [1] - 3:17
**RE** [1] - 1:5
**Re** [21] - 8:14, 52:18, 57:14, 57:16, 58:22, 63:2, 63:10, 63:11, 64:8, 68:9, 68:11, 68:15, 68:21, 77:14, 77:24, 88:10, 88:11, 88:14, 233:6, 254:12, 255:3
**reach** [7] - 27:5, 33:1, 149:3, 159:15, 171:25, 175:15, 219:7
**reached** [4] - 28:25, 143:20, 151:8, 212:15
**reaches** [2] - 12:9
**reaching** [1] - 53:8
**react** [1] - 180:7
**reaction** [1] - 156:5
**read** [27] - 34:1, 41:15, 87:13, 87:14, 99:7, 99:22, 99:24, 100:5, 100:21, 106:10, 109:20, 114:3, 116:5, 121:25, 122:7, 122:8, 199:5, 200:14, 202:25, 203:1, 209:17, 216:2, 243:4, 244:3, 250:1
**reading** [11] - 41:19, 41:20, 42:10, 74:5, 88:11, 106:6, 108:13, 108:24, 121:8, 121:24, 202:25
**real** [9] - 30:19, 152:15, 156:8, 156:13, 158:7, 193:23, 196:3, 228:21
**reality** [1] - 215:5
**realize** [4] - 110:17, 208:17, 230:2, 230:5
**really** [60] - 8:19, 12:22, 19:14, 32:20, 42:9, 45:20, 49:12, 53:7, 53:11, 57:13, 57:19, 57:20, 60:16, 63:2, 63:10, 70:17, 79:11, 82:2, 82:13, 90:15, 105:5, 107:20, 117:13, 126:13, 133:20, 134:6, 134:9, 134:22, 135:17, 138:1, 138:12, 139:15, 139:23, 146:8, 147:12, 149:1, 149:3, 155:19, 156:11, 156:22, 172:4, 183:9, 188:13, 188:22, 193:15, 193:16, 194:8, 195:9, 200:13, 234:4, 236:7, 239:12, 244:22, 248:14, 252:11, 259:8, 261:7, 262:18, 262:19
**reason** [18] - 15:18, 67:9, 67:23, 89:2, 102:18, 102:20, 102:21, 108:16, 128:3, 128:14, 134:1, 135:2, 147:19, 162:16, 187:16, 216:3, 239:16
**reasonable** [6] - 18:1, 35:10, 183:23, 196:6, 246:18, 249:14
**reasonableness** [6] - 249:13, 249:21, 251:15, 252:13, 252:20, 259:21
**reasonably** [2] - 44:17, 69:5
**reasoning** [1] - 156:22
**reasons** [5] - 42:24, 134:25, 138:11, 144:12, 187:12
**rebuttable** [1] - 167:23
**rebuttal** [2] - 8:24, 237:16

**rebuttals** [1] - 232:18
**recapture** [3] - 39:21, 40:14, 41:5
**receive** [1] - 10:10
**received** [8] - 25:1, 81:10, 81:21, 81:22, 94:7, 94:9, 96:14, 251:20
**recent** [14] - 64:10, 90:8, 101:15, 101:21, 104:16, 111:20, 111:21, 113:8, 146:10, 146:11, 215:18, 233:3, 248:18
**recently** [2] - 90:7, 133:20
**recess** [3] - 54:11, 54:14, 56:21
**Recess** [2] - 56:23, 191:10
**recitations** [1] - 59:5
**recodification** [1] - 125:11
**recognition** [1] - 159:13
**recognize** [1] - 160:10
**recognized** [1] - 135:5
**recollection** [1] - 236:18
**recommendation** [1] - 143:22
**recommendations** [1] - 181:5
**reconsider** [1] - 209:20
**reconvene** [1] - 125:17
**record** [6] - 8:9, 27:19, 184:4, 219:23, 236:18, 261:3
**recorded** [1] - 7:23
**records** [1] - 152:22
**recover** [3] - 150:4, 150:14, 170:15
**recovery** [2] - 174:13, 183:14
**redress** [6] - 45:25, 46:3, 46:16, 46:19, 160:2, 188:18
**redressed** [1] - 47:5
**reduced** [1] - 188:7
**reducing** [1] - 29:18
**redundancy** [1] - 192:7
**reemphasized** [1] - 112:6
**refer** [6] - 51:23, 65:22, 109:13, 209:9, 223:14, 261:14
**reference** [1] - 21:16
**referenced** [1] - 65:12
**referral** [1] - 185:4
**referred** [19] - 9:24, 14:8, 14:18, 14:24, 15:4, 15:12, 19:1, 20:15, 26:20, 27:9, 28:4, 28:13, 28:19, 57:13, 118:13, 118:18, 120:12, 167:15, 205:13
**referring** [5] - 69:21, 110:12, 133:21, 139:23, 176:5
**refers** [1] - 182:8
**reflected** [1] - 29:5
**reflecting** [2] - 14:6, 25:2
**reform** [2] - 97:13, 147:24
**refusal** [2] - 59:18, 60:18
**refused** [1] - 82:14
**refusing** [2] - 76:23, 82:13
**regard** [14] - 71:18, 72:6, 87:19, 124:12, 157:9, 158:11, 160:17, 163:19, 167:11, 173:3, 174:6, 175:10, 188:2, 222:10
**regarding** [4] - 41:13, 168:11, 171:19, 250:2
**regardless** [3] - 10:24, 199:10, 200:23
**Regardless** [1] - 197:11
**regime** [3] - 78:21, 240:15, 241:18
**regions** [2] - 67:19, 70:17
**registrations** [1] - 225:3
**regrettably** [1] - 177:6
**regulation** [8] - 92:7, 103:22, 109:7, 109:14, 113:12, 124:15, 125:1, 154:7

**Regulation** [1] - 147:22
**regulations** [2] - 164:9, 181:11
**regulatory** [2] - 98:17, 98:19, 153:1
**reincorporates** [1] - 205:1
**reiterated** [1] - 113:18
**reject** [1] - 235:21
**rejected** [5] - 31:20, 108:9, 108:15, 108:16, 133:19
**rejecting** [1] - 136:15
**rejects** [1] - 111:8
**relate** [2] - 183:13, 261:7
**related** [4] - 69:22, 109:7, 144:18, 199:23
**relates** [2] - 127:5, 252:19
**relating** [1] - 155:7
**relation** [3] - 82:2, 178:8, 241:6
**relationship** [2] - 49:15, 259:5
**relationships** [3] - 13:14, 138:10, 182:16
**relaxed** [2] - 131:16, 131:17
**relegated** [1] - 183:19
**relevant** [15] - 15:21, 16:18, 17:13, 20:17, 22:14, 24:10, 24:11, 25:15, 25:21, 28:2, 32:18, 51:17, 62:14, 199:17
**reliance** [1] - 104:13
**relied** [3] - 135:14, 138:12, 146:24
**relief** [8] - 28:9, 41:2, 72:10, 131:12, 140:21, 160:7, 164:14, 252:20
**relieves** [1] - 65:5
**rely** [9] - 83:12, 115:6, 136:14, 146:23, 163:4, 167:22, 175:6, 175:11, 241:17
**relying** [9] - 32:21, 79:16, 115:16, 137:6, 177:19, 213:8, 214:5, 222:18, 241:6
**remained** [1] - 77:22
**remaining** [1] - 173:9
**remains** [3] - 48:6, 101:17, 170:24
**remarkable** [1] - 262:18
**remedies** [8] - 141:20, 149:12, 149:16, 185:12, 190:2, 191:4, 241:4, 241:19
**remedy** [19] - 138:25, 142:3, 148:22, 149:6, 149:7, 150:16, 180:25, 184:17, 184:20, 185:10, 188:25, 189:14, 189:15, 189:16, 189:19, 189:20, 189:23, 189:25, 190:1
**Remember** [3] - 47:3, 56:8, 82:18
**remember** [4] - 42:21, 43:21, 125:22, 243:18
**removal** [1] - 218:1
**remove** [1] - 219:25
**renamed** [1] - 97:1
**rendered** [1] - 122:17
**rendering** [1] - 122:11
**renders** [2] - 121:25, 122:4
**repair** [1] - 63:19
**repeat** [1] - 231:20
**repeating** [1] - 97:20
**replace** [1] - 260:15
**replead** [5] - 63:25, 68:16, 195:17, 206:23, 206:24
**reply** [15] - 69:20, 116:16, 116:22, 116:23, 117:7, 117:12, 118:4, 127:11, 127:12, 127:17, 127:18, 127:23, 128:7, 128:8, 248:20
**report** [2] - 180:15, 242:11

**reported** [2] - 233:4, 243:10
**Reporter** [2] - 7:20, 7:20
**reporter** [1] - 69:11
**reporter's** [1] - 235:7
**reporting** [4] - 230:13, 231:4, 243:5, 243:6
**represent** [4] - 57:5, 69:13, 193:1, 261:20
**representative** [1] - 8:23
**representatives** [2] - 23:24, 131:5
**represented** [1] - 143:21
**representing** [3] - 192:3, 212:5, 257:16
**represents** [1] - 247:17
**Republic** [3] - 217:25, 231:5, 242:10
**request** [6] - 63:9, 125:19, 157:4, 185:2, 231:14, 253:20
**requesting** [1] - 174:12
**requests** [2] - 128:20, 235:21
**require** [7] - 39:15, 58:13, 71:22, 89:10, 141:19, 141:20, 198:18
**required** [29] - 39:12, 40:3, 58:21, 58:22, 60:3, 60:4, 63:17, 81:8, 87:5, 89:4, 89:11, 123:21, 152:7, 152:18, 153:5, 153:6, 189:12, 193:14, 195:21, 196:24, 197:6, 201:22, 210:3, 210:6, 221:13, 225:19, 229:8, 230:10, 235:14
**requirement** [9] - 39:17, 39:22, 131:18, 131:20, 141:18, 149:23, 184:7, 185:18, 228:5
**requirements** [6] - 40:3, 62:7, 89:15, 131:17, 134:3, 152:14
**requires** [6] - 58:5, 72:8, 150:18, 151:2, 203:23, 205:20
**requiring** [2] - 141:23, 180:24
**requisite** [1] - 46:21
**res** [1] - 117:10
**reserved** [1] - 239:15
**residence** [1] - 146:2
**resident** [3] - 14:3, 25:3, 25:5
**Resident** [1] - 14:13
**residents** [1] - 141:3
**resisted** [1] - 231:17
**resolution** [1] - 179:13
**resolved** [1] - 150:20
**resorted** [1] - 241:13
**resoundingly** [1] - 148:16
**respect** [54] - 9:3, 10:22, 23:23, 40:22, 58:3, 58:15, 58:19, 59:1, 60:16, 60:24, 66:19, 68:6, 82:16, 87:6, 89:7, 108:9, 113:10, 128:20, 138:19, 139:21, 143:20, 144:9, 145:2, 145:22, 147:14, 148:3, 149:2, 149:9, 149:15, 152:7, 152:12, 153:5, 164:11, 165:8, 170:13, 172:22, 188:10, 191:24, 193:13, 194:24, 197:25, 198:16, 201:13, 205:4, 206:20, 224:2, 244:2, 244:8, 252:15, 256:5, 259:5, 259:22
**respectfully** [10] - 24:21, 61:10, 68:20, 89:12, 196:7, 209:7, 209:19, 239:17, 241:8, 241:17
**Respective** [1] - 77:24
**respects** [3] - 58:1, 62:11, 150:19
**respond** [9] - 30:25, 47:12, 86:22, 89:11, 106:25, 123:21, 128:7, 159:12
**responded** [1] - 128:8
**response** [6] - 9:13. 53:10. 138:19.

218:19, 219:15, 232:14
**responses** [2] - 195:13, 232:17
**responsibility** [3] - 70:8, 73:10, 73:14
**responsive** [1] - 126:19
**rest** [9] - 59:3, 86:5, 113:23, 141:7, 153:4, 156:17, 202:22, 246:10, 262:2
**restate** [2] - 154:5, 196:8
**restricting** [1] - 121:13
**restrictions** [1] - 42:4
**rests** [1] - 72:11
**result** [9] - 10:18, 28:17, 123:20, 132:19, 158:1, 160:19, 195:14, 199:19, 214:8
**resulted** [4] - 199:20, 206:7, 234:22, 236:25
**resulting** [1] - 74:10
**retail** [1] - 29:7
**retailers** [1] - 30:4
**retain** [1] - 229:9
**retained** [1] - 229:4
**retains** [1] - 238:20
**retiring** [1] - 89:17
**retrieve** [1] - 159:4
**revenue** [5] - 83:12, 83:14, 83:24, 83:25, 258:25
**revenues** [5] - 248:22, 248:24, 251:21, 258:6, 258:17
**reversed** [1] - 215:21
**revisit** [1] - 144:13
**revocation** [1] - 110:22
**revoked** [1] - 110:24
**Richard** [4] - 5:11, 136:4, 140:11, 245:3
**Richter** [1] - 111:2
**ridiculous** [1] - 111:2
**rigged** [1] - 63:15
**rightly** [1] - 182:18
**rights** [11] - 110:24, 149:7, 149:8, 149:13, 150:13, 154:12, 158:9, 162:4, 165:9, 168:16, 182:24
**Rights** [3] - 112:7, 112:8, 158:8
**rigorous** [1] - 193:9
**rigors** [1] - 99:1
**rise** [9] - 8:2, 20:13, 23:10, 71:15, 195:20, 197:9, 201:2, 238:2, 240:9
**risk** [1] - 154:2
**road** [3] - 64:21, 65:1, 65:7
**Robert** [2] - 1:17, 3:14
**robust** [1] - 161:24
**role** [2] - 26:7, 258:13
**room** [3] - 74:23, 86:3, 245:24
**Ropes** [1] - 4:7
**rose** [1] - 40:13
**Rosen** [1] - 7:10
**roughly** [1] - 87:8
**round** [2] - 73:20, 152:9
**route** [2] - 39:15, 109:7
**routes** [4] - 84:1, 97:14, 124:12, 152:1
**routinely** [1] - 235:21
**Rowe** [5] - 111:21, 112:5, 113:7, 164:9, 173:3
**rug** [6] - 29:7, 29:8, 29:13, 30:1, 30:4
**Rug** [1] - 29:8
**rugs** [3] - 29:11, 29:19, 30:22
**Rule** [16] - 57:7, 69:24, 72:7, 72:19, 76:9, 95:3, 133:16, 134:2, 134:9, 148:5,

All Word // In Re:  Air Cargo Antitrust Litigation _____ 31

185:15, 185:21, 185:22, 222:11, 225:18
**rule** [20] - 95:3, 125:9, 133:4, 133:15,
133:17, 134:11, 136:20, 150:13, 150:15,
150:21, 150:23, 174:6, 174:14, 184:5,
185:13, 185:19, 185:23, 213:10, 214:10,
255:4
**ruled** [2] - 133:19, 135:8
**Rules** [1] - 71:25, 227:22
**rules** [10] - 117:4, 148:7, 149:9, 150:19,
160:20, 175:5, 183:25, 184:18, 227:24,
255:8
**ruling** [2] - 140:8, 149:15
**rulings** [1] - 133:7
**run** [4] - 97:3, 126:10, 262:3, 262:4
**running** [2] - 200:15, 243:10
**runs** [1] - 243:7
**Russia** [1] - 151:7
**Russian** [1] - 136:22
**rwalker@kvolaw.com** [1] - 5:13
**Ryan** [3] - 2:14, 6:6, 192:3
**ryan.poscablo@weil.com** [1] - 6:8

# S

**Sabrina** [1] - 4:11
**safe** [1] - 128:9
**sake** [1] - 235:7
**sales** [5] - 63:15, 248:24, 251:17, 257:6,
258:22
**salient** [1] - 249:17
**Salzman** [1] - 2:6
**San** [1] - 7:2
**sat** [1] - 86:2
**satisfactory** [1] - 258:20
**satisfied** [3] - 43:13, 72:14, 256:4
**satisfies** [4] - 70:3, 70:4, 70:5, 224:23
**satisfy** [10] - 20:5, 20:8, 20:10, 31:6,
45:11, 225:14, 226:3, 235:17, 247:15
**Saudi** [8] - 192:3, 193:1, 193:25, 194:2,
197:17, 197:25, 199:12
**save** [2] - 61:5, 62:1
**saw** [2] - 23:22, 82:25
**say-so** [1] - 234:14
**Scalia's** [1] - 137:16
**scant** [1] - 98:10
**scattered** [1] - 142:5
**Scheindlin's** [2] - 254:12, 255:5
**school** [1] - 243:6
**schtunkey** [1] - 116:21
**SCHWARTZ** [59] - 9:19, 9:22, 10:1,
10:7, 10:12, 10:13, 11:6, 11:18, 12:1,
12:3, 12:21, 13:2, 13:23, 14:1, 14:10,
14:20, 15:1, 15:6, 15:14, 16:24, 17:20,
18:8, 18:13, 18:17, 18:21, 18:24, 19:3,
19:17, 19:21, 20:17, 23:1, 23:11, 23:15,
24:7, 24:21, 26:22, 27:11, 27:22, 28:6,
28:15, 28:21, 30:14, 31:1, 31:4, 32:4,
47:9, 47:11, 47:12, 48:20, 49:3, 49:10,
51:2, 51:3, 51:6, 52:13, 53:2, 263:6,
263:10, 263:12
**Schwartz** [6] - 3:1, 9:17, 10:14, 44:13,
45:12, 67:3
**Schwartz'** [1] - 36:4
**Schwarz** [1] - 47:8
**scintilla** [1] - 196:19

**scope** [4] - 20:22, 48:2, 71:25, 80:24
**Scott** [1] - 2:5
**Scout** [1] - 6:20
**screen** [1] - 9:23
**scrutiny** [1] - 235:13
**se** [1] - 36:3
**search** [1] - 61:22
**searches** [1] - 208:23
**seated** [1] - 8:13
**Second** [59] - 14:2, 21:10, 25:20, 33:25,
35:13, 47:23, 57:15, 57:19, 59:4, 60:9,
61:11, 61:25, 62:9, 63:9, 63:22, 63:24,
64:10, 81:1, 88:16, 89:4, 89:10, 90:8,
93:12, 93:13, 98:9, 100:12, 103:14,
105:13, 111:21, 112:12, 112:14, 113:5,
114:14, 119:9, 120:23, 134:15, 136:22,
138:4, 138:8, 147:12, 148:14, 148:15,
148:18, 148:19, 149:14, 155:5, 155:6,
156:6, 164:25, 179:21, 209:11, 209:20,
217:2, 217:13, 218:2, 233:4, 247:13,
248:21
**second** [22] - 19:8, 23:2, 39:13, 41:14,
41:17, 62:18, 66:11, 68:18, 90:25, 91:15,
95:25, 97:10, 134:19, 141:1, 154:8,
169:15, 179:11, 203:12, 226:20, 232:19,
232:20, 237:23
**secondary** [1] - 137:7
**secondly** [1] - 248:17
**Secondly** [4] - 210:19, 242:7, 247:19,
249:23
**seconds** [3] - 55:13, 201:6, 260:22
**secret** [1] - 60:3
**Secret** [1] - 77:23
**secretly** [1] - 81:14
**section** [7] - 99:9, 104:24, 105:18,
105:23, 110:8, 110:11, 122:7
**Section** [15] - 58:4, 98:16, 109:16,
110:4, 110:5, 110:9, 135:18, 158:20,
177:25, 178:1, 179:9, 188:20, 210:11,
212:19, 256:25
**sections** [5] - 60:15, 94:4, 103:16,
105:17, 121:4
**security** [5] - 66:19, 69:17, 77:19,
77:21, 79:6
**Security** [2] - 62:23, 235:10
**Sedran** [2] - 6:10, 6:10
**See** [1] - 191:8
**see** [32] - 19:15, 27:17, 56:25, 59:15,
72:24, 73:3, 93:21, 106:7, 120:6, 122:15,
125:22, 127:21, 136:24, 139:21, 159:6,
160:21, 165:1, 169:5, 170:24, 177:9,
191:15, 194:21, 207:15, 208:6, 209:23,
223:3, 224:1, 239:23, 250:17, 250:22,
253:3, 256:22
**seek** [11] - 45:25, 71:25, 146:22, 159:9,
160:23, 162:5, 162:8, 162:15, 181:15,
188:21
**seeking** [4] - 28:9, 41:2, 168:13, 188:13
**seeks** [4] - 65:14, 137:18, 159:8, 193:11
**seem** [7] - 48:20, 82:1, 133:12, 156:3,
156:18, 156:19, 161:21
**sees** [3] - 14:14, 16:11, 86:25
**Seiko** [1] - 53:18
**selected** [1] - 102:16
**selection** [2] - 73:23, 74:1
**sell** [3] - 25:6, 258:5, 260:15

**seller's** [3] - 15:8, 25:11, 25:16
**selling** [2] - 257:9, 258:12
**sells** [1] - 200:23
**send** [6] - 27:2, 156:8, 173:9, 184:23,
185:1, 248:3
**sense** [8] - 122:3, 124:9, 124:13,
136:25, 138:2, 157:16, 201:21, 241:4
**sent** [2] - 16:1, 25:1
**separate** [9] - 19:11, 31:23, 43:7, 58:15,
114:19, 129:14, 134:23, 171:23, 175:5
**separately** [3] - 82:23, 107:13, 114:25
**September** [2] - 77:20, 209:10
**series** [1] - 213:16
**serious** [3] - 20:1, 156:8, 239:15
**seriously** [1] - 61:3
**serve** [2] - 147:25, 211:2
**served** [8] - 146:16, 210:2, 210:22,
211:8, 212:16, 245:15, 245:16, 249:19
**service** [50] - 21:8, 24:5, 24:15, 24:17,
24:18, 26:8, 34:2, 34:11, 35:22, 35:23,
35:24, 36:5, 37:4, 37:13, 37:14, 37:17,
37:18, 38:1, 38:5, 39:5, 42:15, 42:16,
50:3, 50:4, 51:12, 54:22, 54:23, 55:1,
55:2, 109:7, 147:9, 147:14, 147:16,
147:19, 148:13, 200:16, 210:4, 210:12,
210:13, 210:15, 211:3, 211:5, 212:12,
213:11, 245:11, 245:12, 258:15
**SERVICES** [1] - 1:7
**services** [40] - 10:19, 10:23, 11:4,
11:11, 11:12, 11:15, 15:8, 17:17, 18:6,
21:9, 23:8, 24:3, 24:12, 31:15, 33:13,
33:15, 38:17, 49:20, 49:25, 50:1, 51:13,
51:16, 54:2, 55:4, 55:21, 63:15, 85:5,
85:23, 124:12, 195:8, 203:18, 219:3,
219:6, 223:12, 224:21, 257:6, 257:7,
258:5, 258:13, 260:15
**Services** [1] - 8:14
**serving** [1] - 256:11
**SESSION** [2] - 125:25, 126:1
**set** [24] - 17:3, 57:19, 59:13, 69:21,
89:21, 114:25, 115:16, 136:4, 144:21,
149:9, 150:15, 157:3, 161:11, 166:3,
182:23, 182:25, 184:18, 185:9, 204:13,
223:14, 234:15, 236:19, 247:20, 248:1
**Set** [1] - 89:18
**sets** [3] - 35:14, 46:18, 164:16
**setting** [4] - 49:10, 199:9, 199:19,
200:21
**settled** [2] - 143:25, 144:1
**settlement** [12] - 143:20, 165:21, 166:5,
167:12, 169:19, 169:21, 169:22, 169:24,
169:25, 170:17, 171:7, 171:19
**seven** [4] - 56:21, 105:9, 130:10, 145:18
**Seven** [4] - 129:25, 130:5, 130:9, 141:8
**Seventeenth** [1] - 6:20
**Seventh** [1] - 215:21
**several** [4] - 60:2, 75:23, 176:1, 253:3
**shall** [1] - 199:24
**shameful** [1] - 160:15
**shares** [2] - 216:16, 243:14
**sharpen** [1] - 11:10
**Shaw** [1] - 5:21
**sheer** [1] - 235:17
**Sheppard** [1] - 3:15
**SHERMAN** [52] - 57:3, 57:4, 57:12,
58:14, 58:18, 64:7, 64:13, 64:15, 64:19,

All Word // In Re: Air Cargo Antitrust Litigation _____ 32

64:24, 67:15, 67:20, 87:10, 87:18, 88:4, 88:5, 88:9, 90:3, 107:3, 107:4, 107:6, 107:11, 107:14, 107:16, 107:24, 108:2, 108:5, 108:22, 109:4, 110:8, 110:11, 110:19, 112:1, 113:2, 113:3, 114:9, 114:22, 115:9, 115:21, 123:4, 123:11, 123:17, 124:8, 124:21, 124:23, 125:6, 128:2, 191:16, 263:16, 263:20, 263:24, 264:2

**Sherman** [30] - 5:2, 16:7, 20:13, 23:10, 25:19, 28:1, 28:10, 36:24, 41:2, 46:18, 48:7, 56:25, 57:5, 70:22, 71:14, 72:15, 77:1, 79:17, 86:19, 86:22, 107:1, 118:9, 118:21, 127:22, 130:21, 148:19, 158:20, 178:1, 188:20, 202:19

**shift** [1] - 90:6

**shifts** [1] - 203:6

**ship** [11] - 12:18, 12:24, 27:14, 35:9, 36:9, 37:11, 42:18, 43:24, 44:9, 44:11

**shipment** [9] - 12:10, 13:10, 16:17, 18:19, 26:10, 37:20, 51:25, 76:23, 85:4

**shipments** [20] - 10:23, 17:24, 18:2, 18:18, 26:25, 33:13, 40:17, 40:19, 41:3, 46:7, 49:16, 84:18, 130:2, 130:7, 130:14, 130:25, 131:1, 237:1, 251:5

**shipped** [9] - 10:25, 13:19, 17:18, 28:8, 28:22, 36:10, 37:7, 38:18, 237:1

**shipper** [2] - 27:2, 27:4

**shippers** [3] - 151:3, 151:6, 152:3

**SHIPPING** [1] - 1:6

**Shipping** [1] - 8:14

**shipping** [26] - 31:15, 33:9, 33:13, 33:15, 35:4, 37:14, 38:24, 47:4, 47:25, 53:24, 54:7, 54:24, 55:17, 67:7, 67:8, 67:10, 81:25, 85:23, 140:7, 151:4, 151:6, 201:2, 223:12, 224:21, 225:5, 253:20

**shocked** [2] - 227:18, 237:18

**shoes** [1] - 258:16

**shore** [1] - 219:24

**short** [6] - 17:15, 72:9, 72:14, 72:18, 76:9, 131:22

**shorthand** [4] - 92:22, 105:16, 106:23, 122:10

**shot** [1] - 19:21

**show** [26] - 45:11, 53:23, 78:22, 89:5, 89:23, 99:24, 127:7, 163:17, 193:17, 194:4, 195:16, 195:22, 196:20, 197:2, 197:6, 199:16, 203:4, 203:14, 204:3, 204:16, 230:10, 230:18, 246:18

**showed** [2] - 24:24, 182:3

**showing** [18] - 14:10, 72:9, 213:24, 222:17, 225:3, 225:15, 225:19, 225:25, 226:2, 230:9, 230:10, 231:13, 234:13, 234:19, 236:2, 248:15

**shown** [6] - 101:22, 101:23, 236:8, 239:17, 240:16, 248:23

**shows** [7] - 30:1, 30:2, 30:5, 98:7, 102:15, 236:24, 259:7

**SI** [4] - 222:7, 222:9, 223:1, 223:9

**Siddiqui** [1] - 5:7

**side** [9] - 35:25, 54:9, 71:18, 78:7, 164:3, 164:6, 245:20, 251:25, 252:11

**significant** [4] - 24:22, 177:22, 179:15, 228:25

**Sikorsky** [1] - 248:19

**silentio** [1] - 108:6

**similar** [8] - 63:11, 88:13, 132:5, 162:22, 184:5, 250:1, 259:13

**similarly** [1] - 145:22

**Simmons** [1] - 6:14

**simple** [10] - 15:18, 17:6, 20:21, 84:15, 135:17, 135:25, 141:18, 187:25, 207:15, 208:22

**simpler** [1] - 33:17

**simplified** [1] - 207:13

**simply** [18] - 15:18, 20:24, 56:15, 58:3, 60:14, 60:24, 62:15, 63:6, 66:8, 67:1, 67:11, 88:14, 89:17, 110:1, 200:23, 201:3, 201:16, 227:25

**Simply** [1] - 218:11

**Simpson** [1] - 6:19

**Singapore** [2] - 57:6, 140:7

**singing** [1] - 126:7

**single** [23] - 75:25, 79:8, 87:3, 141:21, 141:24, 142:7, 143:4, 148:4, 148:8, 165:17, 167:7, 169:8, 173:19, 175:10, 176:25, 177:1, 201:17, 204:8, 204:9, 223:3, 224:25, 251:10, 253:8

**singularity** [1] - 176:24

**sit** [1] - 80:14

**sitting** [3] - 139:24, 190:8, 217:12

**situated** [1] - 143:15

**situation** [12] - 16:14, 77:13, 86:10, 121:22, 126:19, 133:5, 137:20, 138:23, 142:1, 155:25, 207:3, 215:1

**situations** [1] - 158:15

**Six** [5] - 129:25, 130:5, 130:11, 141:7, 145:15

**six** [2] - 126:12, 145:13

**skepticism** [1] - 259:2

**Ski** [2] - 254:12, 255:3

**ski** [1] - 146:10

**skip** [2] - 33:21, 96:21

**slate** [1] - 156:13

**slide** [44] - 9:23, 9:24, 14:6, 14:8, 14:11, 14:17, 14:18, 14:23, 14:24, 15:3, 15:4, 15:11, 15:12, 18:24, 19:1, 20:14, 20:15, 23:16, 26:19, 26:20, 27:8, 27:9, 28:3, 28:4, 28:12, 28:13, 28:18, 28:19, 33:21, 39:7, 90:19, 91:9, 91:22, 92:2, 92:21, 94:16, 101:14, 118:13, 118:18, 120:12, 167:10, 167:15, 168:23

**slides** [2] - 10:2, 117:20

**slightly** [3] - 90:24, 192:18, 212:6

**slipped** [1] - 106:6

**slips** [1] - 106:6

**slower** [1] - 235:6

**small** [4] - 13:22, 67:14, 161:10, 251:25

**Smith** [4] - 7:1, 147:17, 148:2, 154:7

**so-called** [1] - 136:17

**So..** [1] - 223:25

**Societe** [1] - 129:11

**Society** [1] - 233:6

**Software** [1] - 136:21

**sold** [7] - 14:16, 25:11, 26:4, 34:16, 34:18, 37:16, 200:25

**sole** [4] - 29:2, 202:15, 202:18, 202:21

**solely** [5] - 22:8, 29:15, 30:16, 30:21, 79:23

**solicit** [3] - 247:4, 248:11, 248:14

**solicitation** [3] - 248:12, 248:16,

248:21, 248:23, 258:21

**solicited** [1] - 257:13

**soliciting** [2] - 257:8, 257:10

**solution** [2] - 36:1, 160:5

**solutions** [1] - 159:20

**solves** [2] - 166:12, 166:13

**someone** [5] - 49:4, 65:16, 94:7, 137:23, 232:6

**sometime** [1] - 134:17

**Sometimes** [1] - 154:25

**sometimes** [2] - 155:4, 189:4

**somewhat** [4] - 130:23, 137:15, 143:14, 188:2

**somewhere** [6] - 13:10, 91:2, 196:13, 252:4, 254:22, 256:20

**Sophie** [2] - 25:3, 25:5

**sophisticated** [1] - 260:9

**Sorry** [7] - 27:17, 107:4, 120:1, 127:1, 198:6, 205:21, 250:25

**sorry** [22] - 18:5, 18:12, 44:7, 64:13, 69:17, 83:13, 97:20, 114:7, 114:9, 114:13, 123:4, 124:8, 154:5, 164:5, 166:24, 198:9, 228:18, 230:16, 243:8, 256:11, 258:14, 260:22

**sort** [21] - 59:3, 59:23, 62:1, 63:7, 67:1, 80:6, 80:7, 84:7, 89:1, 104:12, 107:21, 113:13, 123:6, 168:21, 192:25, 197:1, 201:12, 204:12, 204:13, 205:16, 221:14

**sorts** [5] - 59:10, 60:8, 200:17

**Sotheby's** [6] - 15:10, 25:7, 25:9, 25:12, 25:13

**sought** [5] - 88:25, 137:12, 145:8, 148:18, 179:14

**sound** [2] - 243:5, 252:16

**sounded** [1] - 88:10

**sounds** [3] - 168:20, 199:12, 200:14

**source** [1] - 51:20

**sources** [1] - 180:18

**Souter** [1] - 72:6

**South** [38] - 2:20, 67:10, 110:20, 110:23, 111:1, 111:4, 119:2, 119:4, 119:8, 119:10, 119:12, 121:1, 127:19, 193:22, 212:6, 212:12, 213:4, 213:5, 213:7, 213:14, 214:7, 216:17, 218:10, 218:20, 218:21, 224:3, 228:20, 229:10, 229:12, 229:14, 230:4, 230:11, 230:13, 231:3, 231:5, 231:17, 231:21, 242:10

**southwest** [1] - 252:6

**sovereign** [66] - 138:11, 182:17, 182:21, 193:7, 193:19, 193:21, 195:2, 196:15, 196:25, 197:1, 201:15, 203:5, 205:3, 205:15, 205:18, 205:19, 205:25, 206:9, 206:20, 208:4, 212:9, 212:21, 212:22, 212:24, 213:22, 214:1, 214:2, 214:23, 215:2, 215:7, 215:8, 215:11, 215:22, 215:24, 216:16, 216:18, 216:23, 217:4, 217:6, 217:8, 217:10, 217:14, 217:21, 217:23, 218:5, 218:7, 221:11, 221:20, 224:9, 225:8, 227:16, 227:17, 228:9, 228:13, 230:6, 231:22, 231:23, 232:1, 232:2, 232:6, 235:25, 238:7, 238:20, 238:24, 240:15

**Sovereign** [11] - 191:21, 193:8, 201:22, 202:18, 206:21, 214:17, 216:8, 217:4, 219:9, 220:1, 221:18

**sovereign's** [1] - 178:9

**sovereigns** [7] - 207:19, 207:24, 208:19, 210:25, 215:14, 239:1, 239:16
**sovereignty** [2] - 217:11, 218:11
**space** [5] - 199:10, 200:22, 200:23, 200:25, 248:7
**Spain** [10] - 13:10, 13:13, 27:2, 27:5, 29:1, 37:21, 49:4, 49:5, 49:11, 49:16
**Spanish** [1] - 153:7
**speaking** [2] - 129:18, 192:12
**speaks** [2] - 9:2, 113:7
**special** [1] - 210:14
**specific** [15] - 14:1, 39:9, 58:8, 66:13, 72:21, 75:4, 75:8, 116:2, 165:10, 193:9, 223:3, 223:7, 234:19, 249:23
**specifically** [18] - 11:7, 34:5, 42:25, 64:22, 65:22, 107:24, 111:8, 123:18, 124:12, 124:25, 168:10, 195:16, 195:20, 196:9, 201:18, 208:23, 233:5, 241:5
**specification** [2] - 63:23, 88:18
**specificity** [11] - 64:2, 68:18, 70:12, 70:24, 77:18, 86:14, 86:18, 88:2, 88:5, 89:4, 195:1
**specifics** [2] - 71:22, 89:3
**specifies** [1] - 180:17
**specify** [1] - 58:9
**SPECKS** [42] - 192:11, 192:20, 198:8, 222:3, 222:4, 223:7, 223:19, 223:22, 223:25, 224:2, 224:6, 224:14, 224:25, 225:12, 225:17, 226:5, 226:8, 226:12, 226:15, 226:19, 227:8, 227:12, 227:14, 228:3, 228:12, 228:19, 228:25, 229:5, 229:12, 229:23, 229:25, 230:2, 231:1, 232:3, 232:9, 238:15, 243:22, 243:23, 244:2, 244:8, 265:6, 265:18
**Specks** [5] - 1:22, 222:1, 222:4, 242:7, 243:20
**spectrum** [1] - 258:7
**spend** [2] - 138:16, 251:19
**spent** [3] - 51:18, 67:3, 113:13
**squarely** [1] - 151:15
**St** [1] - 6:16
**stabilize** [1] - 85:22
**staff** [1] - 257:9
**stage** [2] - 57:19, 101:19
**staggering** [1] - 151:13
**stand** [7] - 38:15, 64:9, 102:7, 216:15, 216:17, 217:2, 218:7
**standard** [22] - 16:22, 57:24, 71:25, 72:6, 100:13, 136:21, 150:3, 183:20, 183:22, 183:23, 184:10, 184:12, 200:4, 200:7, 202:24, 221:17, 222:10, 225:18, 226:16, 227:20, 246:8
**standards** [5] - 99:25, 100:10, 150:6, 227:22, 227:25
**standing** [25] - 19:10, 30:6, 30:24, 31:23, 32:1, 42:13, 43:9, 43:14, 43:15, 45:17, 52:14, 52:17, 52:20, 52:23, 52:24, 136:3, 150:6, 167:17, 167:19, 174:4, 174:6, 184:11, 229:13, 258:6
**stands** [6] - 64:8, 115:13, 216:13, 216:22, 218:2, 218:4
**stare** [1] - 117:11
**start** [11] - 9:2, 9:3, 9:16, 32:15, 33:11, 57:13, 69:14, 81:7, 125:23, 192:18, 254:8
**started** [7] - 65:1, 71:13, 111:20, 129:6,

192:24, 230:6, 260:2
**starting** [2] - 59:21, 84:1
**starts** [1] - 38:6
**State** [5] - 133:6, 156:6, 217:15, 235:9
**state** [57] - 101:20, 109:5, 109:6, 113:11, 125:1, 131:12, 132:11, 132:15, 132:20, 132:25, 133:3, 133:8, 139:14, 139:18, 140:21, 141:5, 141:8, 147:24, 158:2, 159:14, 159:20, 159:21, 159:22, 160:25, 161:2, 164:14, 164:17, 175:4, 175:18, 175:25, 184:4, 190:6, 190:11, 194:17, 202:17, 210:16, 214:16, 216:11, 228:13, 228:15, 228:22, 229:1, 229:16, 229:20, 230:6, 230:7, 230:11, 230:17, 231:8, 231:10, 231:14, 231:22, 235:15, 242:10, 255:13
**state's** [1] - 181:16
**state...shall** [1] - 92:16
**statement** [25] - 67:2, 72:9, 72:14, 72:18, 72:20, 79:15, 79:19, 100:14, 164:2, 175:16, 175:22, 175:24, 176:11, 176:18, 176:19, 176:20, 176:22, 188:6, 197:1, 204:13, 226:12, 250:9, 250:12, 255:5
**Statement** [9] - 68:16, 186:16, 188:3, 188:5, 188:6, 188:23, 208:15, 223:16
**statements** [5] - 77:14, 77:15, 214:3, 222:7, 228:6
**STATES** [2] - 1:1, 1:14
**states** [46] - 92:8, 95:24, 98:10, 124:15, 124:16, 142:2, 149:6, 152:20, 158:13, 159:17, 159:18, 159:23, 159:24, 160:2, 161:4, 161:19, 161:22, 164:10, 164:20, 168:10, 169:9, 176:20, 176:21, 176:25, 180:22, 180:24, 181:2, 181:5, 181:6, 181:10, 183:19, 183:21, 187:23, 188:24, 188:25, 189:13, 189:24, 189:25, 190:1, 190:14, 205:3, 215:6, 216:9, 228:24
**States** [160] - 1:6, 11:11, 11:13, 11:21, 12:19, 12:24, 13:18, 16:5, 17:18, 17:19, 18:9, 18:11, 21:8, 23:20, 23:25, 24:23, 25:9, 25:13, 25:18, 26:3, 26:5, 27:1, 29:19, 33:10, 34:10, 34:12, 34:14, 35:4, 35:18, 36:9, 36:11, 36:19, 36:20, 36:21, 36:24, 37:1, 37:11, 37:14, 37:21, 37:22, 38:4, 38:6, 38:25, 39:5, 39:6, 39:17, 39:25, 40:4, 40:12, 40:18, 40:24, 41:4, 41:10, 41:23, 42:18, 43:17, 43:19, 45:1, 47:1, 48:19, 49:2, 49:14, 49:21, 49:24, 51:11, 52:1, 53:13, 54:20, 54:24, 55:3, 56:17, 63:13, 77:25, 79:2, 80:17, 81:10, 81:13, 81:25, 84:1, 91:3, 129:20, 129:22, 130:1, 130:3, 130:8, 130:13, 130:15, 130:16, 131:2, 137:19, 137:20, 138:21, 138:22, 139:7, 143:18, 143:24, 144:4, 145:4, 146:13, 147:3, 151:18, 151:21, 153:13, 153:15, 155:15, 161:3, 161:21, 163:17, 165:19, 166:2, 166:6, 166:22, 171:21, 172:23, 173:1, 173:17, 173:23, 182:10, 182:12, 188:12, 190:5, 197:9, 203:18, 204:8, 204:23, 206:9, 206:13, 211:6, 216:10, 218:25, 219:2, 219:4, 219:6, 219:8, 219:10, 219:24, 223:10, 223:12, 225:4, 225:6, 227:5, 227:11, 232:25, 233:19, 235:1, 236:20, 237:2, 241:15, 244:10, 244:15, 246:25, 247:2,

247:3, 251:18, 252:17, 259:4, 260:14, 260:16
**States'** [1] - 40:1
**stating** [2] - 139:17, 160:16
**Stating** [1] - 58:4
**status** [17] - 136:2, 193:19, 214:22, 215:2, 215:3, 215:9, 216:3, 216:23, 217:5, 217:6, 217:7, 229:11, 229:15, 229:20, 230:6, 230:17, 231:10
**statute** [72] - 20:24, 41:13, 41:17, 91:7, 95:17, 95:21, 96:19, 96:23, 99:4, 99:22, 100:15, 100:25, 102:7, 104:5, 104:7, 104:22, 105:1, 105:2, 106:3, 106:13, 106:19, 108:18, 108:19, 108:21, 108:25, 109:21, 112:16, 113:6, 113:16, 113:18, 114:2, 114:3, 114:25, 115:10, 115:12, 118:1, 118:3, 118:5, 118:8, 118:12, 119:3, 119:10, 120:10, 120:11, 121:23, 121:25, 122:2, 122:7, 122:13, 124:10, 124:23, 125:12, 126:9, 127:3, 132:9, 132:11, 132:13, 132:24, 132:25, 133:6, 134:9, 150:4, 155:20, 184:9, 210:10, 211:3, 211:18, 238:17, 244:21
**statutes** [1] - 152:12
**statutorily** [1] - 105:22
**statutory** [15] - 42:9, 91:18, 92:22, 99:12, 103:14, 104:4, 105:2, 115:7, 116:2, 122:12, 122:21, 129:20, 132:12, 132:16, 137:19
**stay** [2] - 154:13, 181:25
**stayed** [2] - 154:3, 154:10
**staying** [1] - 192:16
**stays** [1] - 181:22
**stenography** [1] - 7:23
**step** [19] - 27:11, 62:22, 62:23, 75:3, 75:4, 75:5, 75:14, 75:15, 75:17, 75:19, 75:20, 75:22, 76:10, 76:11, 77:15, 83:10, 200:12, 219:7, 221:13
**stepped** [1] - 258:16
**steps** [8] - 29:24, 75:16, 75:23, 76:13, 76:21, 77:17, 141:12, 217:19
**Steptoe** [1] - 4:16
**Stevens** [1] - 104:15
**Stewart** [1] - 5:7
**Steyer** [2] - 7:1, 7:1
**Still** [1] - 107:6
**still** [21] - 19:10, 49:10, 69:5, 71:16, 78:20, 84:11, 84:12, 94:9, 98:9, 99:15, 101:7, 135:25, 192:13, 228:16, 229:8, 230:15, 249:2, 251:14, 252:3, 254:20, 260:20
**Stinson** [1] - 3:19
**stipulation** [4] - 182:4, 182:6, 182:7, 182:9
**stock** [3] - 212:23, 230:4, 230:15
**stood** [1] - 89:1
**stop** [8] - 108:23, 109:19, 114:4, 121:18, 124:2, 124:5, 172:8, 253:9
**stopped** [1] - 109:10
**stopping** [3] - 205:8, 227:2, 244:13
**stops** [1] - 118:21
**storage** [2] - 260:3, 260:4
**stories** [1] - 112:9
**story** [3] - 69:6, 135:19, 229:21
**straight** [1] - 48:8
**straightforward** [2] - 33:3, 33:5

**strand** [2] - 177:17, 177:18
**straw** [1] - 69:22
**Street** [12] - 1:23, 2:11, 3:2, 3:15, 3:20, 5:3, 5:12, 6:11, 6:20, 7:2, 7:6, 7:10
**strictly** [2] - 198:25, 214:6
**strikingly** [1] - 259:13
**strong** [8] - 90:16, 99:25, 100:1, 100:17, 101:1, 137:22, 254:11, 260:17
**stronger** [1] - 198:12
**structure** [3] - 104:21, 104:22, 157:3
**struggling** [1] - 50:3
**stuck** [2] - 112:9, 256:13
**stuff** [2] - 54:7, 127:6
**Stutts** [1] - 235:19
**sub** [4] - 70:18, 108:6, 261:22, 261:23
**Sub** [1] - 235:10
**sub-conspiracies** [1] - 70:18
**subchapter** [6] - 92:18, 94:18, 98:4, 118:23, 119:14, 119:20
**subdivision** [1] - 109:6
**subdivisions** [1] - 124:16
**Subject** [1] - 153:25
**subject** [37] - 10:20, 11:5, 13:1, 20:23, 52:3, 52:16, 52:19, 106:18, 117:15, 117:22, 123:14, 132:21, 147:11, 148:15, 153:24, 154:9, 168:20, 184:7, 184:14, 185:12, 207:14, 207:23, 207:24, 208:17, 208:20, 215:14, 215:16, 228:7, 228:14, 228:15, 229:1, 235:11, 238:7, 238:19, 239:25, 246:21, 251:8
**subjected** [3] - 48:2, 98:25, 238:24
**subjecting** [2] - 231:25, 241:18
**submission** [10] - 39:11, 144:14, 144:20, 147:2, 148:6, 207:20, 221:14, 230:23, 241:12, 246:12
**submissions** [1] - 231:2
**submit** [8] - 77:17, 81:8, 106:20, 118:15, 209:6, 241:7, 253:20, 253:24
**submitted** [5] - 81:11, 126:14, 127:9, 195:19, 196:24, 222:23, 226:17, 231:19, 234:2, 240:22, 243:24, 246:15, 247:21, 248:24, 260:12
**submitting** [5] - 148:9, 225:20, 239:16, 240:5, 240:25
**Subpart** [2] - 109:13, 110:10
**subpart** [5] - 99:19, 109:9, 109:12, 109:13, 109:16
**subsequent** [8] - 34:8, 34:10, 34:17, 35:18, 41:22, 55:3, 93:12, 93:13
**subset** [1] - 99:23
**subsidiary** [3] - 184:18, 230:4, 230:15
**substance** [3] - 157:8, 157:9, 163:10
**substantial** [10] - 90:9, 153:25, 211:12, 211:13, 219:11, 222:23, 244:23, 248:23, 258:17, 262:7
**substantive** [15] - 47:15, 99:6, 113:17, 125:12, 132:19, 133:2, 134:11, 150:1, 153:11, 153:15, 157:14, 175:10, 183:12, 184:19, 189:9
**substantively** [1] - 188:1
**subvening** [1] - 185:10
**successful** [1] - 97:12
**successfully** [1] - 163:18
**Sucharow** [1] - 2:6
**sue** [3] - 167:19, 208:16, 254:19

**sued** [2] - 29:7, 254:18
**suffer** [1] - 42:16
**suffered** [2] - 158:1, 160:19
**suffering** [1] - 53:1
**sufficiency** [2] - 183:16, 188:9, 222:15
**sufficient** [19] - 35:13, 45:9, 63:1, 77:8, 77:18, 78:2, 79:2, 79:4, 102:21, 197:11, 222:17, 222:20, 226:3, 228:6, 233:20, 239:21, 245:25, 247:18
**sufficiently** [1] - 254:11
**suggest** [27] - 24:22, 42:12, 58:6, 61:11, 61:19, 66:1, 66:2, 67:8, 67:23, 68:20, 71:17, 72:3, 76:8, 79:4, 84:25, 86:18, 89:2, 89:14, 104:11, 113:25, 116:8, 124:9, 125:13, 194:15, 221:9, 230:22, 251:11
**suggested** [5] - 113:9, 114:14, 151:22, 187:1, 189:20
**suggesting** [7] - 35:14, 67:13, 67:15, 67:16, 72:15, 239:20, 240:2
**suggestion** [2] - 61:23, 70:16
**suggestions** [2] - 9:11, 186:1
**suggests** [1] - 79:24
**suing** [3] - 185:8, 185:20, 185:21
**Suite** [8] - 2:11, 2:20, 3:7, 3:20, 4:4, 5:22, 6:11, 6:21
**suited** [1] - 53:3
**suits** [1] - 160:6
**Sullivan** [1] - 4:23
**summarize** [1] - 226:9
**summary** [1] - 96:13
**summons** [1] - 210:14
**Summons** [1] - 210:20
**sun** [1] - 237:21
**Sunset** [1] - 96:24
**Sup** [1] - 235:19
**super** [2] - 206:7, 236:25
**super-competitive** [1] - 236:25
**superfluous** [1] - 106:1, 106:2, 122:1, 122:4, 122:11, 122:17
**Supp** [1] - 259:18
**supper** [1] - 126:7
**Supplement** [1] - 52:15
**supplemental** [9] - 134:20, 134:25, 135:7, 135:15, 136:15, 144:12, 155:22, 172:18, 177:3
**supplemented** [1] - 146:23
**supplied** [2] - 63:8, 183:14
**suppliers** [1] - 30:2
**supplies** [1] - 185:13
**supply** [4] - 195:5, 195:6, 195:8, 239:24
**support** [5] - 67:1, 144:19, 221:14, 234:2, 241:10
**supported** [1] - 217:1
**supporting** [3] - 30:1, 30:4, 222:8
**supports** [1] - 29:4
**suppose** [4] - 157:16, 169:22, 191:23, 197:2
**Suppose** [1] - 256:14
**supposed** [4] - 76:8, 122:13, 196:5, 230:21
**supposedly** [1] - 60:7
**Supreme** [47] - 57:18, 57:23, 58:21, 59:4, 59:11, 60:9, 61:11, 62:4, 63:9, 65:4, 72:2, 78:20, 80:25, 89:9, 89:13,

89:18, 89:23, 90:7, 92:5, 97:7, 100:2, 100:3, 100:11, 100:17, 100:20, 101:6, 101:21, 104:12, 107:21, 107:25, 108:5, 108:7, 111:12, 112:4, 113:8, 113:19, 116:22, 117:1, 117:3, 117:4, 123:23, 144:24, 214:20, 214:25, 215:4, 227:20, 229:19
**surcharge** [54] - 27:16, 39:21, 39:23, 40:9, 40:11, 41:1, 41:7, 48:25, 49:1, 49:7, 49:8, 49:13, 49:15, 51:17, 54:10, 58:16, 58:24, 58:25, 59:1, 60:16, 61:7, 61:9, 61:16, 61:18, 61:20, 62:16, 62:18, 62:23, 63:3, 66:19, 69:17, 69:18, 69:19, 69:22, 74:4, 74:9, 74:24, 75:3, 75:12, 76:19, 76:20, 76:23, 76:24, 77:6, 77:13, 77:19, 77:22, 79:6, 81:5, 82:10, 86:23, 87:16
**surcharges** [37] - 16:25, 17:3, 27:6, 27:24, 34:13, 40:8, 40:16, 41:3, 41:4, 49:7, 58:9, 58:10, 59:14, 59:15, 60:24, 62:20, 62:25, 66:18, 71:18, 74:14, 77:2, 80:11, 82:6, 82:16, 82:19, 84:4, 87:6, 87:7, 87:15, 87:19, 89:8, 152:8, 165:23, 199:20, 247:25
**Surcharges** [1] - 17:2
**surrebuttal** [1] - 8:25
**surreply** [5] - 126:16, 126:17, 127:11, 128:3, 128:11
**surrounding** [1] - 136:24
**survey** [1] - 249:10
**sustained** [1] - 148:23
**sweeping** [2] - 197:19, 198:4
**Sweet** [2] - 217:24
**Swiss** [1] - 143:12
**switch** [1] - 168:19
**synergies** [3] - 61:6, 61:14
**synergistic** [4] - 61:15, 61:22, 62:2, 62:13
**synonymous** [1] - 205:12
**system** [14] - 46:18, 74:4, 74:10, 149:3, 149:15, 152:23, 153:1, 158:12, 159:3, 159:21, 160:11, 165:4, 182:2, 189:5
**systems** [2] - 159:12, 159:14

---

**T**

---

**table** [1] - 32:9
**talks** [8] - 110:2, 144:25, 185:18, 199:4, 203:2, 205:12, 223:5, 234:1
**target** [6] - 30:18, 30:19, 39:5, 41:10, 123:6, 198:23
**targeted** [9] - 29:15, 29:17, 29:22, 30:8, 30:21, 39:4, 39:6, 40:17, 40:18
**targeting** [5] - 35:3, 39:25, 40:6, 40:22
**targets** [4] - 22:6, 22:8, 48:23, 49:2
**tarmac** [1] - 112:10
**tax** [1] - 41:13
**technically** [2] - 173:7, 217:8
**technology** [1] - 155:3
**Telephone** [2] - 7:21, 62:10
**ten** [2] - 177:8, 191:8
**tendency** [1] - 234:16
**tending** [1] - 203:4
**tends** [1] - 203:13
**tenth** [1] - 75:22

**term** [9] - 41:15, 63:17, 92:20, 92:22, 109:18, 109:20, 109:23, 115:1, 122:10
**terminals** [1] - 51:19
**terms** [47] - 9:4, 37:23, 48:8, 55:22, 63:3, 63:22, 66:21, 67:17, 88:17, 91:20, 92:20, 93:4, 93:11, 105:1, 113:24, 121:12, 123:8, 125:6, 128:24, 152:21, 155:18, 157:11, 159:7, 162:15, 163:21, 167:19, 173:12, 174:11, 177:12, 178:2, 179:21, 180:22, 180:23, 190:17, 191:3, 195:7, 195:11, 195:25, 199:3, 223:11, 225:20, 247:12, 249:20, 252:13, 261:5, 261:20
**terribly** [1] - 90:11
**territories** [2] - 95:24, 96:2
**terrorist** [1] - 209:9
**Terry** [1] - 3:5
**terry.calvani@freshfields.com** [1] - 3:8
**Test** [2] - 193:12, 198:17
**test** [45] - 19:14, 19:16, 19:22, 20:5, 20:8, 20:11, 20:20, 20:23, 21:1, 21:2, 21:13, 21:17, 22:4, 22:11, 25:22, 30:12, 31:6, 31:7, 31:16, 32:18, 32:23, 43:14, 45:7, 45:8, 45:10, 47:20, 48:3, 48:5, 53:7, 53:9, 68:5, 138:7, 138:9, 147:8, 182:15, 213:14, 213:19, 219:8, 219:17, 225:16
**tests** [1] - 101:5
**Thai** [9] - 202:11, 203:14, 204:17, 206:8, 206:18, 227:19, 227:20, 232:24, 234:17
**Thailand** [1] - 218:23
**THE** [458] - 1:13, 8:3, 8:5, 8:11, 8:16, 9:14, 9:20, 10:4, 10:9, 11:1, 11:7, 11:23, 12:2, 12:15, 12:22, 13:17, 13:25, 16:22, 17:15, 18:5, 18:10, 18:16, 18:20, 18:23, 19:15, 19:18, 22:22, 23:7, 23:14, 24:1, 24:18, 27:17, 27:21, 30:12, 30:23, 31:3, 32:2, 32:5, 32:7, 32:20, 34:15, 35:20, 36:16, 37:9, 38:8, 40:7, 40:16, 41:11, 42:13, 42:22, 43:6, 43:16, 44:1, 44:6, 44:21, 46:11, 46:13, 46:22, 47:7, 48:4, 48:25, 49:9, 49:19, 51:4, 52:11, 52:25, 54:11, 54:14, 55:14, 55:20, 55:25, 56:3, 56:10, 56:18, 56:20, 56:25, 57:11, 58:7, 58:17, 64:1, 64:12, 64:14, 64:17, 64:20, 67:13, 67:16, 68:24, 69:1, 69:5, 70:4, 71:5, 71:12, 72:12, 72:20, 73:1, 73:5, 73:24, 74:5, 74:8, 74:17, 74:20, 76:2, 76:4, 76:6, 78:4, 78:9, 78:12, 79:15, 79:21, 79:24, 80:10, 81:3, 82:9, 82:12, 82:16, 82:20, 82:25, 83:7, 83:9, 83:13, 83:15, 84:5, 84:7, 84:23, 85:15, 85:18, 86:13, 86:21, 87:15, 88:1, 88:7, 90:2, 90:4, 91:14, 94:12, 96:3, 100:2, 100:19, 101:9, 101:11, 102:18, 102:23, 103:2, 103:4, 103:10, 104:3, 104:9, 105:5, 106:24, 107:5, 107:9, 107:12, 107:15, 107:20, 108:1, 108:4, 108:20, 109:1, 110:6, 110:10, 110:18, 111:24, 114:7, 114:21, 115:4, 115:14, 116:9, 116:18, 119:6, 119:13, 119:17, 119:24, 120:2, 120:6, 120:14, 120:20, 121:19, 122:4, 122:15, 123:1, 123:10, 123:16, 124:7, 124:17, 124:22, 125:5, 125:15, 125:21, 126:4, 126:11, 126:24, 127:8, 127:14,

127:16, 127:21, 128:16, 128:23, 129:4, 130:4, 130:10, 130:17, 130:20, 131:7, 140:13, 141:10, 141:21, 142:9, 143:7, 145:13, 145:16, 145:21, 150:9, 152:17, 153:18, 153:24, 154:5, 154:15, 154:18, 154:20, 154:24, 156:2, 156:24, 157:6, 157:13, 157:22, 161:6, 162:11, 162:19, 163:3, 163:11, 163:14, 163:23, 163:25, 164:5, 164:7, 164:18, 164:24, 165:3, 165:6, 165:13, 166:24, 167:2, 168:19, 168:24, 169:10, 169:13, 169:18, 170:3, 170:16, 170:19, 171:4, 171:18, 172:2, 172:4, 172:7, 174:23, 175:1, 175:6, 175:13, 176:4, 176:9, 176:12, 176:14, 177:4, 177:9, 177:15, 180:1, 180:4, 180:6, 180:13, 180:20, 181:7, 181:16, 183:4, 183:15, 183:18, 184:25, 185:14, 186:12, 186:20, 187:11, 187:21, 188:23, 189:7, 189:12, 189:18, 189:22, 190:8, 190:11, 190:19, 191:7, 191:12, 191:15, 191:17, 192:9, 192:13, 192:18, 192:21, 193:22, 193:25, 194:13, 194:21, 195:5, 195:24, 196:11, 196:21, 198:5, 198:7, 198:9, 199:23, 200:3, 200:20, 201:4, 201:21, 202:4, 202:6, 202:8, 204:11, 204:20, 204:24, 206:23, 207:6, 207:8, 208:8, 208:10, 209:15, 209:22, 209:25, 210:3, 210:10, 210:18, 211:5, 211:10, 211:14, 211:18, 211:21, 212:1, 212:10, 213:8, 213:18, 213:23, 214:12, 218:15, 221:3, 221:6, 221:21, 221:25, 223:2, 223:18, 223:20, 223:23, 224:1, 224:4, 224:12, 224:15, 225:9, 225:13, 225:23, 226:7, 226:11, 226:14, 226:18, 227:6, 227:9, 227:13, 228:2, 228:4, 228:18, 228:23, 229:3, 229:7, 229:22, 229:24, 230:1, 230:23, 231:25, 232:8, 232:10, 232:14, 232:17, 232:21, 233:14, 233:16, 234:4, 234:11, 234:18, 234:22, 234:25, 235:3, 235:6, 236:10, 236:21, 237:3, 237:6, 237:9, 237:22, 238:8, 238:13, 238:16, 239:1, 239:19, 240:8, 240:13, 240:19, 241:22, 241:24, 242:6, 243:8, 243:12, 243:18, 243:20, 243:25, 244:4, 244:19, 245:9, 247:1, 248:10, 249:2, 249:5, 249:10, 250:9, 250:13, 250:17, 250:20, 250:25, 251:10, 252:3, 252:7, 252:24, 253:3, 253:6, 253:11, 253:23, 254:4, 254:16, 254:20, 255:2, 255:4, 255:18, 255:22, 255:25, 256:9, 256:15, 257:10, 257:20, 257:22, 258:2, 258:22, 258:24, 259:16, 259:23, 260:19, 260:24, 261:25, 262:4, 262:6, 262:10, 262:16
**theirs** [1] - 242:5
**themselves** [11] - 10:2, 29:17, 35:8, 40:14, 43:4, 65:19, 173:19, 201:2, 241:18, 245:21, 248:5
**theory** [3] - 31:18, 68:2, 230:3
**thereafter** [2] - 77:22, 82:8
**thereby** [2] - 29:12, 29:19
**therefore** [6] - 44:25, 108:8, 117:9, 132:20, 132:21, 133:17
**they've** [6] - 9:4, 64:20, 144:13, 231:13, 236:8, 246:14
**They've** [1] - 236:7
**thinking** [1] - 12:23

**third** [7] - 93:15, 95:20, 96:7, 97:16, 98:1, 98:2, 126:18
**Third** [7] - 1:18, 4:12, 7:2, 21:3, 21:13, 22:7, 29:5
**thirds** [1] - 126:17
**thousands** [1] - 249:3
**three** [22] - 14:11, 21:2, 58:25, 60:19, 60:21, 60:25, 70:8, 85:7, 91:9, 102:23, 126:8, 126:12, 126:13, 131:23, 134:24, 143:13, 151:9, 192:6, 202:16, 203:22, 218:6, 252:9
**Three** [1] - 65:22
**three-page** [1] - 126:8
**threshold** [12] - 12:12, 15:19, 16:9, 17:5, 17:14, 18:4, 20:19, 20:20, 25:22, 30:7, 134:4
**throughout** [14] - 156:13, 158:3, 158:9, 159:1, 160:1, 165:15, 166:10, 168:11, 169:8, 175:21, 176:17, 223:10, 223:12, 224:21
**throw** [1] - 120:9
**thrown** [2] - 100:13, 201:7
**thrust** [1] - 194:23
**ticket** [3] - 203:11, 204:17, 251:9
**tickets** [1] - 26:3
**tie** [3] - 77:1, 89:22, 106:11
**tied** [3] - 53:5, 53:6, 61:20
**tieing** [2] - 62:1, 63:4
**ties** [1] - 249:13
**Timberlane** [1] - 138:6
**timeframe** [1] - 87:14
**timing** [2] - 74:11, 217:20
**tiny** [2] - 259:3, 260:8
**title** [2] - 40:11, 90:24
**tmiller@bakerandmiller.com** [1] - 5:24
**TO** [1] - 1:12
**today** [8] - 115:13, 128:5, 128:9, 128:21, 197:23, 206:17, 216:18, 262:19
**together** [1] - 73:11
**Tokyo** [1] - 78:25
**Toll** [1] - 4:3
**Tom** [1] - 5:16
**TOMPKINS** [37] - 32:6, 32:10, 32:14, 32:15, 32:22, 34:20, 36:2, 36:25, 37:10, 38:9, 40:9, 40:25, 41:12, 42:16, 42:24, 43:10, 43:20, 44:3, 44:7, 45:3, 46:12, 46:15, 46:23, 54:13, 54:16, 54:17, 55:19, 55:23, 56:2, 56:7, 56:14, 56:19, 250:16, 250:19, 250:21, 263:8, 263:14
**Tompkins** [12] - 4:2, 7:5, 32:6, 32:7, 47:13, 47:14, 47:21, 49:12, 54:12, 219:14, 219:19, 222:1
**Tompkins's** [1] - 53:11
**ton** [4] - 83:12, 83:14, 83:25, 84:1
**took** [15] - 24:24, 37:6, 63:18, 81:18, 99:7, 103:6, 103:24, 113:22, 115:18, 130:7, 153:22, 197:8, 197:24, 246:23, 258:13
**top** [1] - 174:16
**Torres** [1] - 7:20
**total** [3] - 192:10, 192:14, 192:16
**totality** [1] - 208:5
**totally** [3] - 98:16, 104:8, 106:1
**toto** [1] - 206:22
**touch** [4] - 23:15, 128:21, 230:24,

259:21

**touching** [2] - 175:15, 234:25

**tough** [1] - 153:10

**tour** [1] - 25:9

**Touricentro** [1] - 52:9

**tourism** [1] - 243:17

**Tower** [1] - 4:4

**tracking** [1] - 128:24

**trade** [18] - 19:6, 19:13, 19:20, 21:5, 21:16, 21:18, 21:19, 21:21, 21:22, 22:1, 22:23, 30:1, 34:7, 34:16, 44:24, 48:16, 60:5, 83:20

**traditional** [1] - 60:12

**traditionally** [1] - 59:10

**train** [1] - 146:10

**Train** [2] - 254:12, 255:3

**Trans** [3] - 65:22, 66:24, 67:9

**transact** [1] - 25:14

**transacting** [1] - 245:25

**transaction** [15] - 14:7, 14:12, 15:16, 17:9, 23:12, 23:17, 23:24, 26:23, 27:25, 28:7, 37:22, 52:3, 53:14, 53:19, 200:25

**transactions** [13] - 13:3, 13:7, 13:12, 13:22, 17:21, 23:13, 52:4, 130:6, 130:7, 155:10, 159:15, 175:15, 179:25

**TRANSCRIPT** [1] - 1:12

**transcript** [1] - 128:25

**Transcript** [1] - 7:23

**Transcription** [1] - 7:23

**transfer** [1] - 247:8

**transferee** [2] - 254:14, 255:1

**transferor** [8] - 254:15, 254:16, 254:17, 255:9, 255:10, 255:16, 255:18, 255:20

**transferred** [7] - 14:21, 245:17, 245:18, 254:17, 254:18, 256:17, 256:21

**transport** [10] - 11:12, 23:8, 73:16, 73:19, 103:24, 198:5, 199:7, 199:8, 200:15, 200:18

**transportation** [3] - 17:17, 18:6, 24:20, 38:11, 43:18, 52:6, 54:1, 92:19, 95:21, 95:23, 95:25, 96:1, 96:6, 96:8, 96:16, 96:17, 96:19, 98:5, 99:18, 102:24, 103:7, 106:12, 106:16, 106:8, 109:12, 109:18, 109:19, 110:3, 115:6, 115:7, 115:15, 115:16, 115:20, 118:24, 119:15, 119:21, 121:7, 121:8, 121:11, 124:19, 199:24, 204:10, 204:17, 205:6, 206:12, 226:24, 233:17, 233:20, 241:7, 243:17, 244:11, 247:2, 257:9

**Transportation** [4] - 52:6, 97:2, 97:3, 227:4

**transported** [1] - 22:25

**travel** [7] - 25:25, 26:1, 26:12, 38:20, 153:4, 252:10, 260:10

**Travel** [1] - 26:7

**traveled** [2] - 14:4, 260:13

**travels** [2] - 14:13, 51:24

**treated** [2] - 12:13, 137:25

**treaties** [1] - 244:17

**treating** [1] - 62:12

**treatment** [1] - 134:6

**treaty** [9] - 157:3, 161:17, 164:9, 169:25, 170:1, 173:3, 178:3

**Treaty** [1] - 28:9

**treble** [2] - 165:17, 167:8

**trial** [19] - 78:18, 181:14, 181:24, 184:22, 196:17, 207:1, 208:18, 208:19, 208:20, 214:11, 215:16, 215:23, 216:4, 228:11, 228:14, 228:17, 238:7, 238:12, 238:25

**tribunal** [2] - 148:5, 244:9

**tricky** [1] - 103:10

**tried** [7] - 23:17, 30:3, 69:16, 128:5, 163:9, 229:1, 229:4

**trigger** [4] - 75:4, 75:14, 186:9, 187:9

**triggering** [1] - 74:3

**Triggering** [1] - 74:9

**trilogy** [1] - 104:16

**trouble** [2] - 73:17, 156:11

**troubled** [6] - 70:10, 70:13, 70:21, 70:25, 90:15, 223:2

**troubling** [2] - 71:11, 80:15

**true** [14] - 52:6, 52:13, 55:9, 56:2, 58:5, 89:13, 117:17, 118:6, 119:23, 127:22, 186:5, 200:9, 222:23, 261:6

**truly** [2] - 17:22, 159:19

**trust** [1] - 133:4

**truth** [1] - 226:6

**try** [14] - 36:2, 48:11, 57:9, 61:5, 69:4, 83:10, 129:16, 139:2, 140:16, 187:22, 189:12, 190:21, 195:5, 254:1

**trying** [10] - 76:6, 76:17, 78:5, 107:7, 120:19, 139:15, 182:24, 233:8, 234:12, 241:17

**Tuesday** [1] - 1:8

**Turicentro** [9] - 21:4, 21:14, 23:18, 25:24, 38:15, 38:20, 38:25, 47:18, 47:22

**Turkish** [1] - 73:21

**turn** [6] - 103:19, 139:9, 141:9, 146:18, 149:21, 184:6

**turns** [2] - 35:21, 62:2

**twice** [2] - 109:23, 138:15

**Two** [3] - 42:24, 126:22, 146:6

**two** [56] - 11:17, 16:7, 18:25, 24:7, 25:10, 30:3, 41:18, 42:2, 45:4, 45:7, 50:2, 57:18, 58:1, 58:15, 60:15, 60:21, 62:20, 80:23, 84:15, 84:17, 91:19, 91:20, 92:21, 92:25, 100:7, 100:22, 114:25, 120:22, 120:25, 121:4, 121:22, 122:2, 123:7, 126:17, 126:21, 126:23, 127:20, 127:25, 128:1, 131:13, 135:14, 139:12, 153:21, 157:15, 157:18, 168:2, 177:12, 195:13, 203:16, 212:20, 217:1, 237:16, 239:7, 239:14, 245:6, 252:9

**two-prong** [1] - 45:7

**two-thirds** [1] - 126:17

**Twombly** [28] - 57:1, 57:6, 57:14, 57:15, 57:17, 57:23, 57:25, 58:2, 58:12, 59:12, 63:2, 67:25, 68:20, 69:14, 70:3, 70:4, 70:22, 71:9, 71:20, 78:21, 81:1, 88:10, 89:4, 89:14, 193:4, 201:10, 223:3, 227:21

**type** [1] - 185:5

**typical** [2] - 156:5

**typically** [1] - 13:7

**Typically** [2] - 13:11, 214:13

---

# U

**U.K** [6] - 15:9, 147:20, 153:6, 165:23,

166:8, 166:10

**U.S** [111] - 12:8, 16:7, 16:8, 16:15, 19:25, 22:3, 25:25, 26:4, 26:15, 26:16, 30:4, 31:12, 31:16, 33:14, 33:16, 39:12, 39:14, 39:17, 40:2, 40:10, 41:6, 41:10, 41:25, 42:1, 42:6, 42:7, 43:2, 43:4, 43:24, 44:5, 44:8, 44:9, 44:11, 44:17, 44:18, 45:9, 45:14, 45:15, 46:16, 46:19, 46:21, 47:2, 47:3, 47:24, 47:25, 49:17, 51:19, 53:6, 53:16, 54:8, 56:8, 56:9, 56:10, 56:13, 56:14, 65:25, 81:9, 81:12, 93:9, 93:11, 106:17, 109:14, 110:4, 110:14, 111:1, 111:4, 129:19, 130:11, 130:24, 130:25, 137:13, 137:19, 143:20, 145:14, 145:15, 145:19, 145:24, 146:6, 146:9, 151:24, 152:15, 157:19, 162:4, 162:5, 166:21, 167:6, 167:14, 172:25, 173:22, 173:24, 174:19, 174:20, 174:21, 178:8, 179:12, 179:14, 180:16, 181:23, 182:2, 205:7, 219:11, 224:22, 226:23, 227:1, 229:19, 234:24, 244:12, 251:3, 251:21

**U.S.** [1] - 165:24

**U.S.C** [5] - 110:2, 110:8, 121:6, 135:14, 136:17

**UK** [1] - 141:6

**ultimate** [1] - 26:8

**ultimately** [6] - 10:25, 20:8, 35:21, 55:7, 55:8, 70:23

**unambiguous** [9] - 104:7, 108:18, 108:19, 111:11, 160:13, 161:1, 162:8, 162:14, 199:2

**uncertainties** [1] - 163:19

**uncertainty** [1] - 163:10

**Unclear** [1] - 21:9

**undecided** [2] - 136:5, 136:10

**under** [139] - 15:19, 16:6, 17:21, 17:25, 18:14, 19:22, 19:23, 20:1, 26:18, 26:24, 28:9, 28:10, 31:7, 35:10, 36:4, 36:24, 41:2, 47:1, 48:6, 63:2, 76:9, 89:23, 92:17, 94:18, 98:4, 99:18, 100:15, 100:16, 100:17, 109:8, 109:12, 110:3, 110:5, 117:18, 118:23, 119:14, 119:20, 130:16, 130:20, 131:15, 132:11, 133:6, 133:17, 135:7, 135:8, 135:13, 135:22, 135:24, 136:1, 136:5, 137:24, 137:25, 139:13, 139:17, 139:19, 140:17, 140:22, 143:13, 144:11, 144:16, 144:17, 145:7, 145:8, 146:7, 147:1, 148:19, 148:20, 148:21, 149:7, 149:13, 150:1, 150:2, 151:1, 151:5, 151:10, 154:3, 154:6, 154:13, 155:21, 158:19, 164:8, 164:13, 169:2, 169:4, 169:6, 172:10, 172:18, 173:3, 174:24, 177:2, 177:17, 182:11, 185:20, 185:21, 186:7, 186:13, 186:16, 188:15, 188:16, 190:17, 195:2, 202:17, 203:19, 204:13, 204:14, 206:21, 208:4, 209:7, 211:25, 212:7, 213:13, 214:14, 215:13, 217:4, 219:8, 219:9, 220:1, 220:2, 221:18, 225:16, 230:5, 230:20, 237:21, 244:16, 245:12, 245:22, 248:20, 251:16, 259:20, 260:18

**Under** [6] - 62:11, 120:23, 165:14, 172:22, 193:12, 253:17

**underdeveloped** [1] - 158:14

**underdevelopment** [1] - 157:10

**underlying** [2] - 132:24, 214:3
**undermine** [1] - 155:25
**underpinning** [2] - 162:3, 258:8
**Understood** [4] - 204:24, 229:7, 238:8, 244:19
**understood** [2] - 237:11, 251:2
**underway** [1] - 154:10
**undeveloped** [2] - 158:15, 181:22
**undisputed** [1] - 259:19
**undoubtedly** [2] - 129:1, 156:5
**unenforceable** [1] - 166:22
**unequivocal** [4] - 157:12, 160:12, 162:7, 162:14
**unequivocally** [2] - 159:18, 160:1
**unevenly** [1] - 87:21
**unfortunately** [1] - 217:2
**uniform** [2] - 81:15, 173:16
**uniformity** [1] - 123:19
**uniformly** [2] - 66:18, 169:8
**Union** [14] - 151:17, 159:1, 160:2, 160:10, 160:21, 161:12, 163:22, 167:21, 168:7, 169:9, 175:15, 175:21, 176:6, 179:22
**union** [15] - 129:20, 131:1, 158:3, 158:5, 159:10, 161:5, 164:9, 164:15, 165:5, 165:15, 166:11, 168:10, 168:11, 176:17, 189:4
**unique** [4] - 208:1, 208:2, 240:14, 240:15
**UNITED** [2] - 1:1, 1:14
**United** [160] - 1:6, 11:11, 11:13, 11:21, 12:19, 12:24, 13:18, 16:5, 17:18, 17:19, 18:9, 18:11, 21:8, 23:20, 23:25, 24:23, 25:9, 25:13, 25:18, 26:3, 26:5, 27:1, 29:19, 33:10, 34:10, 34:12, 34:14, 35:4, 35:18, 36:9, 36:11, 36:19, 36:20, 36:21, 36:24, 37:1, 37:11, 37:14, 37:21, 37:22, 38:4, 38:6, 38:24, 39:5, 39:6, 39:17, 39:25, 40:1, 40:4, 40:12, 40:18, 40:24, 41:4, 41:10, 41:23, 42:18, 43:17, 43:19, 45:1, 47:1, 48:19, 49:2, 49:14, 49:20, 49:24, 51:11, 52:1, 53:13, 54:20, 54:24, 55:3, 56:17, 63:13, 77:25, 79:2, 80:17, 81:10, 81:13, 84:1, 91:3, 129:20, 129:22, 130:1, 130:3, 130:8, 130:13, 130:15, 131:2, 137:18, 137:20, 138:21, 138:22, 139:7, 143:18, 143:24, 144:4, 145:4, 146:12, 147:3, 151:18, 151:21, 153:13, 153:15, 155:15, 161:3, 161:21, 163:17, 165:19, 166:2, 166:6, 166:22, 171:21, 172:23, 173:1, 173:17, 173:23, 182:10, 182:12, 188:12, 190:5, 197:9, 203:18, 204:8, 204:23, 206:9, 206:13, 211:6, 216:10, 218:25, 219:2, 219:3, 219:6, 219:8, 219:10, 219:24, 223:10, 223:12, 225:4, 225:6, 227:5, 227:11, 232:25, 233:19, 235:1, 236:20, 237:2, 241:15, 244:10, 244:14, 246:25, 247:2, 247:3, 251:18, 252:17, 259:4, 260:14, 260:16
**unity** [1] - 164:11
**universe** [1] - 13:22
**unlawful** [3] - 45:24, 204:1, 206:7
**unleashing** [1] - 70:23
**Unless** [2] - 90:3, 141:8
**unless** [12] - 19:19, 47:5, 48:1, 119:3, 120:17, 120:20, 120:25, 137:11, 196:2,

202:2, 247:16, 253:9
**unlike** [1] - 23:19
**unloading** [2] - 22:17, 51:20
**unmistakable** [1] - 199:2
**unnecessarily** [1] - 118:9
**unquote** [1] - 247:24
**unresolved** [2] - 149:25, 150:8, 150:11
**up** [50] - 9:23, 10:3, 14:4, 35:20, 46:6, 46:18, 68:2, 69:21, 75:22, 84:19, 84:22, 85:13, 89:22, 90:24, 91:9, 91:10, 93:15, 95:2, 95:20, 98:2, 98:24, 102:7, 103:16, 107:8, 108:17, 110:6, 115:17, 118:12, 119:3, 121:9, 125:21, 127:11, 127:12, 127:18, 128:13, 153:19, 157:3, 177:16, 180:2, 180:4, 180:5, 181:13, 181:19, 189:23, 196:8, 197:22, 247:7, 248:3, 255:20, 258:19
**upset** [1] - 93:12
**urge** [3] - 206:17, 254:11, 259:12
**urged** [1] - 170:25
**US** [1] - 3:2
**useful** [2] - 128:24, 244:4
**uses** [6] - 93:4, 93:10, 103:17, 121:5, 196:16, 199:1
**usual** [1] - 59:20
**utilization** [1] - 152:13
**utterly** [1] - 62:11

**V**

**vain** [1] - 61:22
**variety** [4] - 58:9, 84:3, 183:23, 248:10
**various** [15] - 8:18, 31:15, 64:23, 68:6, 77:25, 153:2, 180:17, 180:22, 181:21, 182:4, 194:14, 195:7, 245:10, 246:17, 260:12
**vast** [2] - 13:11, 261:8
**VButlerRPR@aol.com** [1] - 7:22
**venerable** [1] - 155:12
**venus** [1] - 77:25
**verify** [1] - 111:18
**versa** [1] - 206:13
**versus** [12] - 101:25, 114:15, 114:20, 114:21, 114:22, 137:24, 145:1, 155:6, 171:7, 178:6, 235:5, 235:9
**vertical** [1] - 42:4
**VI** [23] - 207:9, 212:2, 221:1, 222:2, 232:22, 237:13, 239:4, 242:2, 243:1, 243:21, 245:1, 261:1, 265:1, 265:3, 265:5, 265:7, 265:9, 265:11, 265:13, 265:15, 265:17, 265:19, 265:21
**VI-A** [11] - 207:9, 212:2, 221:1, 243:1, 243:21, 261:1, 265:1, 265:3, 265:15, 265:17, 265:21
**VI-B** [10] - 222:2, 232:22, 237:13, 239:4, 242:2, 265:5, 265:7, 265:9, 265:11, 265:13
**vice** [1] - 206:13
**victim** [2] - 160:13, 165:15
**victims** [2] - 79:11, 158:16
**Victor** [1] - 4:7
**victorhendrickson@gmail.com** [1] - 4:9
**Victoria** [1] - 7:20
**view** [7] - 56:15, 102:3, 141:23, 145:25,

204:4, 215:25, 237:17
**viewed** [1] - 253:15
**VIKTOR** [3] - 1:13, 56:24, 191:11
**violate** [1] - 173:20
**violated** [8] - 25:19, 25:21, 27:25, 149:13, 166:2, 173:5, 186:19
**violating** [1] - 185:9
**violation** [17] - 23:5, 51:21, 149:7, 149:8, 173:16, 175:25, 176:16, 176:21, 177:1, 178:1, 179:9, 183:12, 186:9, 186:11, 186:25, 187:3, 187:7
**violations** [4] - 46:19, 162:5, 186:15, 189:1
**Virgin** [4] - 165:22, 166:6, 182:4, 182:8
**virtually** [2] - 87:12, 102:4
**virtue** [1] - 224:12
**vision** [1] - 208:7
**visit** [2] - 14:4, 25:6
**visits** [1] - 14:14
**visual** [2] - 9:5, 9:22
**volume** [2] - 29:19, 258:22
**Volvo** [1] - 141:6
**von** [1] - 5:11

**W**

**Wachtell** [1] - 7:10
**wait** [3] - 91:15, 110:25, 112:12
**Wait** [2] - 110:6, 234:4
**waiting** [1] - 191:5
**waive** [4] - 198:19, 204:25, 205:3, 228:13
**waived** [5] - 108:8, 200:13, 206:19, 228:10, 241:10
**waiver** [40] - 123:15, 193:13, 194:8, 194:9, 194:10, 194:11, 198:11, 198:17, 198:19, 199:2, 199:4, 200:2, 200:3, 200:4, 200:9, 200:10, 200:14, 204:25, 205:1, 206:3, 226:20, 226:21, 228:9, 231:21, 232:25, 237:19, 237:20, 237:21, 237:23, 237:24, 238:11, 240:21, 240:22, 240:25, 241:13, 241:17, 244:3, 244:8
**Waivers** [1] - 237:19
**waivers** [5] - 198:24, 205:13, 205:15, 205:18, 227:17
**waives** [1] - 194:11
**waiving** [4] - 199:3, 199:4, 199:6, 200:14
**Waldman** [1] - 7:9
**Walker** [1] - 5:11
**Walnut** [2] - 3:20, 6:11
**Walter** [1] - 95:3
**wants** [5] - 27:2, 35:9, 93:2, 106:18, 208:16
**Warnot** [9] - 7:13, 129:7, 129:10, 144:8, 146:24, 149:23, 150:2, 150:10, 180:7
**WARNOT** [22] - 129:9, 129:10, 130:9, 130:11, 130:19, 130:22, 131:8, 140:14, 141:17, 141:23, 143:2, 143:3, 143:8, 180:10, 180:11, 180:14, 181:1, 181:8, 181:17, 250:23, 264:9, 264:17
**Warren** [1] - 245:3
**Warsaw** [9] - 240:24, 241:1, 241:3, 241:5, 241:8, 241:16, 241:19, 244:2, 244:17

**washing** [1] - 200:24
**Washington** [14] - 2:2, 2:20, 3:3, 3:7, 3:16, 4:4, 4:17, 4:24, 5:3, 5:18, 5:23, 6:3, 6:16, 6:21
**watch** [6] - 14:15, 14:16, 15:2, 24:13, 24:24, 53:17
**Watkins** [2] - 5:2, 57:5
**Wayne** [2] - 3:10, 212:5
**ways** [5] - 45:4, 60:12, 84:3, 139:12, 183:1
**wcross@whitecase.com** [1] - 3:13
**web** [1] - 221:24
**Web** [1] - 246:13
**website** [5] - 218:22, 248:15, 253:12, 253:19
**websites** [1] - 253:17
**week** [1] - 164:23
**weigh** [1] - 231:6
**weight** [2] - 42:10, 76:23
**Weil** [1] - 6:6
**well-developed** [1] - 156:4
**well-equipped** [1] - 148:9
**well-established** [1] - 151:1
**West** [3] - 4:4, 7:10, 132:4
**whatsoever** [4] - 194:6, 203:13, 209:1, 253:8
**whereas** [1] - 134:4
**WHEREUPON** [1] - 262:24
**whichever** [1] - 206:11
**whistles** [8] - 8:6, 69:2, 69:4, 72:15, 107:5, 107:6, 155:1, 191:17
**white** [5] - 161:8, 163:20, 164:1, 164:22, 175:9
**White** [5] - 3:11, 180:14, 180:18, 186:1, 212:5
**whole** [15] - 51:10, 51:18, 83:19, 104:25, 106:17, 114:3, 118:7, 118:11, 124:4, 135:20, 137:10, 138:11, 168:3, 181:9, 235:24
**wholesaler** [2] - 29:8, 29:13
**wide** [2] - 20:9, 193:11
**widely** [1] - 142:5
**Willard** [1] - 5:16
**William** [4] - 4:15, 5:2, 5:20, 57:4
**willing** [2] - 91:15, 173:14
**Wilmer** [1] - 6:2
**Wilson** [1] - 7:6
**wine** [8] - 13:10, 27:14, 28:7, 28:16, 28:22, 36:8, 36:10
**WITNESS** [1] - 263:3
**witnesses** [6] - 146:25, 260:1, 260:6, 261:10
**Wiwa** [1] - 247:13
**Wjbruckner@locklaw.com** [1] - 2:22
**wkaras@steptoe.com** [1] - 4:18
**Wolens** [1] - 113:19
**won** [1] - 15:1
**Won** [1] - 15:2
**word** [23] - 34:15, 34:22, 36:3, 61:14, 92:12, 92:14, 97:25, 98:1, 102:11, 102:12, 102:19, 105:15, 106:1, 106:2, 106:14, 109:20, 113:22, 113:23, 114:5, 119:9, 124:2, 239:25, 244:18
**wording** [2] - 211:1, 259:6
**words** [31] - 21:3, 21:18, 22:13, 61:21,

64:4, 93:21, 100:12, 100:13, 103:9, 104:19, 104:20, 104:24, 105:2, 105:4, 108:24, 109:11, 110:12, 111:5, 115:12, 119:18, 122:6, 124:18, 168:15, 179:22, 197:5, 206:6, 210:16, 212:13, 227:9, 237:7
**works** [3] - 16:24, 139:21, 161:17
**world** [15] - 13:10, 16:7, 74:24, 130:3, 144:3, 145:5, 152:10, 153:4, 159:11, 198:21, 223:11, 223:13, 224:21, 251:25, 252:12
**worldwide** [3] - 66:3, 89:7, 102:13
**Worldwide** [2] - 199:1, 205:14
**worry** [1] - 171:10
**woven** [1] - 193:10
**wrap** [4] - 153:19, 180:1, 180:5, 193:6
**wrapped** [1] - 180:4
**write** [1] - 156:13
**writing** [2] - 179:4, 215:20
**Wrongdoing** [1] - 68:17
**wrote** [2] - 45:15, 162:9

## Y

**year** [4] - 71:1, 108:14, 131:24, 258:18
**years** [13] - 83:1, 89:19, 91:6, 105:11, 111:13, 126:7, 139:2, 162:20, 177:8, 188:4, 218:1, 260:4
**yield** [2] - 83:3, 85:12
**yields** [12] - 60:19, 83:12, 83:16, 83:23, 83:24, 84:10, 84:18, 84:22, 85:4, 85:10, 85:11, 85:12
**Yields** [1] - 83:14
**YORK** [1] - 1:1
**York** [57] - 1:6, 1:19, 2:7, 2:12, 2:16, 3:12, 4:3, 4:8, 4:13, 4:21, 5:8, 6:7, 7:7, 7:11, 7:15, 14:4, 14:5, 14:14, 14:21, 14:22, 15:24, 15:25, 16:1, 16:12, 16:13, 24:24, 25:1, 25:10, 28:23, 84:18, 132:6, 132:12, 133:5, 134:8, 140:6, 151:10, 166:13, 235:20, 245:22, 247:4, 247:14, 248:2, 248:25, 256:5, 256:14, 257:1, 257:3, 257:4, 258:6, 258:20, 259:16, 259:17, 259:20, 260:1, 261:15
**York's** [1] - 151:1

## Z

**Zuckert** [1] - 6:20

## €

**€2** [1] - 81:22
**€8** [1] - 81:21

## §

**§12(b)(6** [1] - 57:1
**§1603(b** [1] - 212:20
**§301** [3] - 258:8, 259:20, 260:18
**§8(a** [1] - 89:14
**§8(a)(2** [1] - 72:8
**§9** [1] - 72:1