UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

IN RE:

AIR CARGO SHIPPING SERVICES          **REPORT & RECOMMENDATION**

ANTITRUST LITIGATION                 MD 06-1775 (JG) (VVP)

-----------------------------------------------------------x

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 1

   I.   The Counts ......................................................................................................... 4
   II.   Motions to Dismiss........................................................................................... 5

DISCUSSION ................................................................................................................... 6

   I.   The Sherman Act Claims .................................................................................. 6

      A.   Failure To State A Claim..................................................................... 7
      B.   An Implausible Conspiracy ................................................................. 8
      C.   Notice................................................................................................. 18
      D.   Subject-Matter Jurisdiction and the FTAIA ..................................... 21
      E.   Antitrust Standing .............................................................................. 29

   II.   State Law Claims ............................................................................................ 30

      A.   Preemption under the Airline Deregulation Act................................ 30
      B.   The Plaintiffs' State Law Claims Are "Related to a Price . . . of An Air Carrier"..... 31
      C.   State Laws Are Preempted Even Where They Do Not Interfere With or Frustrate the Purpose of the ADA................................................................................ 34
      D.   State Antitrust Laws Are Not Exempt From Preemption As Exercises of State Historical Police Powers ...................................................................................... 36
      E.   Application of ADA Preemption to Foreign Air Carriers ......................... 38

   III.   The EU Law Claims ....................................................................................... 46

      A.   *Forum Non Conveniens* ..................................................................... 47
      B.   International Comity ........................................................................... 58
      C.   Diversity Jurisdiction......................................................................... 67
      D.   Supplemental Jurisdiction.................................................................. 71

   IV.   Foreign Sovereign Immunity ......................................................................... 72

      A.   Sovereign Status of SAA.................................................................... 74
      B.   Waiver of Immunity .......................................................................... 80

CONCLUSION................................................................................................................ 84

POHORELSKY, Magistrate Judge:

Judge Gleeson has referred to me for a Report and Recommendation, pursuant to 28

U.S.C § 636(b)(1), motions by various defendants seeking the dismissal of the plaintiffs'

Sherman Act, state law, and European Union law claims against them.  It is respectfully

recommended that these motions be GRANTED, but with leave to replead the Sherman Act

claims.

### BACKGROUND

The defendants' motions arise in the context of a multi-district putative class action

litigation stemming from the investigation of price-fixing activity in the air cargo industry by

competition authorities around the world.[1]  The defendants are domestic and foreign airlines that

provide airfreight shipping services around the world.  The plaintiffs are direct and indirect

---

[1] The defendants named in the First Consolidated Amended Complaint are Air Canada, AC Cargo LP; Société Air France ("Air France"); Koninklijke Luchtvaart Maatschappij N.V. ("KLM") (Air France and KLM are collectively referred to as the "Air France Defendants"); Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline, Air Mauritius Ltd.; Alitalia Linee Aeree Italiane S.p.A.; All Nippon Airways Co., Ltd.; Asiana Airlines Inc.; British Airways PLC ("British Airways"); Cargolux Airlines International S.A.; Cathay Pacific Airways Ltd. ("Cathay Pacific"); Air China Limited d/b/a Air China; Air China Cargo Company Limited d/b/a Air China Cargo; DAS Air Ltd. d/b/a DAS Air Cargo; Deutsche Lufthansa AG ("Lufthansa AG"), Lufthansa Cargo AG ("Lufthansa Cargo"), Swiss International Air Lines Ltd. ("Swiss International"), Lufthansa, Lufthansa Cargo and Swiss International collectively referred to herein as the "Lufthansa Defendants," or "Lufthansa"]; El Al Israel Airlines, Ltd.; Emirates Airlines d/b/a Emirates; Ethiopian Airlines Corp. ("Ethiopian"); Japan Airlines International Company Ltd. ("Japan Airlines"); Kenya Airways Limited; Korean Air Company, Ltd. ("Korean Air"); LAN Airlines S.A., LAN Cargo S.A.; Martinair Holland N.V. ("Martinair"); Airways Corporation of New Zealand Limited d/b/a Airways New Zealand; Nippon Cargo Airlines Co., Ltd.; Atlas Air Worldwide Holdings, Inc. ("Atlas"); Polar Air Cargo, Inc. ("Polar Air") (Atlas and Polar Air are collectively referred to herein as the "Polar Air Defendants"); Qantas Airways Limited ("Qantas"); Saudi Arabian Airlines, Ltd. ("Saudia"); Scandinavian Airlines System ("SAS"); Singapore Airlines Limited; Singapore Airlines Cargo Pte Ltd; South African Airways (Proprietary) Limited ("SAA"); Thai Airways International Public Co., Ltd. ("TAI"); Viação Aérea Rio-Grandense, S.A.

-1-

domestic and foreign purchasers of the allegedly price-fixed airfreight shipping services.[2]  In addition to litigation in the United States, some defendants here are currently parties in private suits arising out of similar allegations in Canada and Australia.  (Memorandum of Law in Support of Lufthansa's Motion to Dismiss Counts VI and VII of Plaintiffs' First Consolidated Amended Complaint ("EU Mem. in Supp."), Dkt. Entry 507, 4-5.)  Nine defendants – Korean Air, British Airways, Air France, Cathay Pacific, KLM, Martinair, SAS, Japan Airlines and Qantas – have entered guilty pleas in the United States to resolve criminal liability stemming from their admitted participation in a conspiracy to fix air cargo shipping prices.  (*See* Press Release, Department of Justice (June 26, 2008), attached as Exhibit 1 to June 26, 2008 Letter from Plaintiffs, Dkt. Entry 766.)  All have agreed to pay fines ranging from 50 to 350 million dollars.  (*Id.*)

Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. (collectively, "Lufthansa") have applied to the European Commission for immunity from fines in Europe (EU Mem. in Supp. 4-5) in connection with price-fixing in the air cargo industry, pursuant to the Commission's 2002 Notice on Immunity From Fines and Reduction of Fines in Cartel Cases, which requires the applicant to provide the Commission with evidence of the

---

[2] All named plaintiffs are direct or indirect airfreight customers; that is, entities that were charged base rates, surcharges and other fees for airfreight shipping services by the defendant air carriers. (Compl. ¶ 69.)  They are Benchmark Export Services; Fleurchem, Inc.; FTS International Express, Inc.; FTS International Express, Inc.; JSNP, Inc.; Ralph Olarte d/b/a Olarte Transport Services; R.I.M. Logistics, Ltd. ; S.A.T. Sea & Air Transport, Inc.; Sul-American Export, Inc.; TNT Freight Management USA, Inc.; Sangean American, Inc.; JCK Industries; Leis by Ron, Inc.; Alluvion, Inc.; Maria's Collections, Inc.; Printing Technologies, Inc.; Paradiso, Inc.; TNT Freight Management (Singapore) Pte Ltd.; TNT Freight Management (Australia) Pty Ltd.; TNT Freight Management (Hong Kong) Limited; TNT Freight Management (Denmark) A/S; Speditions und Logistikverband e.V.; TNT Freight Management (Sweden) AB; Association des Utilisateurs du Transport de Fret; TNT Freight Management (Finland) Oy; H&M Hennes & Mauritz AB; IKEA Services AB; Volvo Logistics AB; Volvo Parts AB Services AB AB; Lindex KappAhl AB; and Sangean Hong Kong.

suspected infringement.  2002 O.J. (45) 3, at ¶ 11(b).  Lufthansa has also made an application to

the United States Department of Justice ("DOJ") pursuant to its Corporate Leniency Policy, to

report price-fixing activity and/or other conduct potentially violative of Section 1 of the Sherman

Act in the air cargo industry in the United States and elsewhere.  (Compl. ¶ 140.)  The Corporate

Leniency Policy affords entities with knowledge of unlawful conspiracies an opportunity to

avoid criminal prosecution, treble damages, and joint and several liability,[3] so long as they fully

cooperate with the criminal investigation into the alleged conspiracy and cooperate with the civil

plaintiffs in any civil litigation arising from the alleged conspiracy.  *See* Antitrust Criminal

Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 665 (June 22,

2004), 15 U.S.C. § 1 ("ACPERA").

        The plaintiffs' First Consolidated Amended Complaint ("the Complaint" or "Compl.")

alleges the following facts, which are accepted as true for the purpose of this motion.  Since

2000, the defendants, along with unnamed co-conspirators, have engaged in a price-fixing

conspiracy which has affected thousands of routes flown by the defendants worldwide, including

flights to, from, and within the United States, and flights to, from, and within the European

Union.  Price-fixing was accomplished through the concerted imposition of surcharges, as well

as a number of other anti-competitive behaviors and non-surcharge-related mechanisms.

(Compl. ¶ 81.)  The surcharges involved are a fuel surcharge, discussed as early as late 1999 and

implemented in 2002, a security surcharge following the events of September 11, 2001, a war

risk surcharge following the outbreak of the Iraq war in March 2003, and a customs surcharge

---

[3] The leniency applicant/s continues to face individual liability for their participation in the
conspiracy.  *See* ACPERA, 118 Stat. 661-66, § 213 (a) (specifying that damages recoverable from
leniency applicants "shall not exceed that portion of the actual damages sustained by such claimant which
is attributable to the commerce done by the applicant in the goods or services affected by the violation.")

later that year.  (*Id.* ¶ 82-107.)  The non-surcharge anti-competitive behaviors alleged are refusals

to discount airfreight shipping costs for freight forwarders (*id.* ¶ 108-10), information-sharing to

increase yields (*id.* ¶ 111-13), and allocating customers (*id.* ¶ 114-15).

## I.     The Counts

The Complaint asserts seven separate counts for relief, each on behalf of a specific subset

of plaintiffs.  The subsets of plaintiffs differ based on whether they are domestic or foreign, and

whether they purchased services directly from the defendants or indirectly through freight

forwarders or other middlemen.  Count I asserts Sherman Act claims on behalf of domestic

entities who directly purchased airfreight shipping services to, from, or within the United States.

Count II asserts antitrust, consumer protection, and unfair competition state law claims on behalf

of domestic indirect purchasers of airfreight shipping services to, from, or within the United

States.  Count III asserts Sherman Act claims on behalf of foreign direct purchasers of airfreight

shipping services between the United States and countries other than European Union member

states.

The remaining four counts include or are entirely comprised of claims under the antitrust

laws of the European Union.  Count IV asserts Sherman Act and European Union antitrust

claims on behalf of direct foreign purchasers of airfreight shipping services between the United

States and the European Union.  Count V asserts Sherman Act and European Union law claims

on behalf of indirect foreign purchasers of airfreight shipping services between the United States

and the European Union.  Count VI asserts claims under European Union antitrust law on behalf

of direct and indirect European Union purchasers of airfreight shipping services between the

United States and European Union, within the European Union, and between the EU and

countries other than the United States.  Count VII asserts claims under European Union law on

behalf of direct and indirect European Union purchasers of air freight shipping services within

the EU, and between the EU and countries other than the United States.

Lufthansa has entered into a Settlement Agreement with the plaintiffs that resolves claims

involving air cargo shipping services for shipments within, to, or from the United States.  (EU

Mem. in Supp. 4; *see also* Dkt. Entry 681 (adopting Report & Recommendation by undersigned

in favor of approving settlement).)  Lufthansa has thus settled the claims contained in Counts I-

V.  The Settlement Agreement requires Lufthansa to pay $85 million and to provide substantial

cooperation – including attorney proffers, documents, interviews, and depositions – to the

plaintiffs in pursuing claims arising from domestic commerce.  Counts VI and VII remain

pending against Lufthansa.  (EU Mem. in Supp. 5.)

## II.  Motions to Dismiss

This Report and Recommendation addresses in a comprehensive fashion the five pending

motions to dismiss: an omnibus motion,[4] the Lufthansa motion to dismiss Counts VI and VII,

and separate motions by Thai Airways, Saudi Arabian Airways, and South African Airways to

dismiss on grounds of foreign sovereign immunity.[5]  The omnibus motion seeks the dismissal of

---

[4] The omnibus motion is brought on behalf of thirty-four defendants identified in Schedule A to the Notice of Motion, Docket. Entry 500, at 6.  These defendants are Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline, Air Canada, AC Cargo LP, Air China Ltd., Air China Cargo Co., Ltd., Air Mauritius Ltd., Air New Zealand Ltd., Singapore Airlines, Alitalia Linee Aeree Italiane, S.p.A., All Nippon Airways Co., Ltd., Asiana Airlines, Inc., Atlas Air Worldwide Holdings, Inc., British Airways, Plc, Cargolux Airlines International S.A., Cathay Pacific Airways, Ltd., El Al Israel Airlines Ltd., Emirates, Ethiopian Airlines Enterprise, Japan Airlines International Co., Ltd., Kenya Airways Limited, KLM Royal Dutch Airlines, Korean Airlines Co., Ltd., LAN Airlines S.A., LAN Cargo S.A., Martinair Holland N.V., Nippon Cargo Airlines Co., Ltd., Polar Air Cargo LLC, Qantas Airways Ltd., Saudi Arabian Airlines, Ltd.,  Scandinavian Airlines System, Singapore Airlines Cargo Pte Ltd., Societe Air France, South African Airways, and Thai Airways International.

[5] The memorandum in support of the omnibus motion (Dkt. Entry 501) is referred to herein as "Omnibus Mem. in Supp."; the omnibus memorandum in reply (Dkt. Entry 674) is referred to as

all the claims in the Complaint.  Lufthansa, which has settled Counts I-V, argues for the

dismissal of the claims under European Union antitrust law; these arguments are adopted by the

rest of omnibus defendants.  Oral argument on these motions was heard on April 29, 2008.[6]

## DISCUSSION

## I.  The Sherman Act Claims

The plaintiffs' claims under Section 1 of the Sherman Act, asserted in five of seven

counts, form the core of the Complaint.  In their omnibus motion, the defendants argue that the

Sherman Act claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  They

contend that the plaintiffs have not pleaded a plausible antitrust conspiracy, and that the

Complaint fails to give adequate notice of the claims against the defendants.  They further argue,

with respect to Sherman Act claims based on flights from abroad into the United States, that the

plaintiffs lack antitrust standing and that this court lacks subject matter jurisdiction under the

FTAIA.

---

"Omnibus Reply Mem."  The memorandum in support of the Lufthansa Motion (Dkt. Entry 507) is
referred to herein as "EU Mem. in Supp."; the memorandum in reply is referred to herein as "EU Reply
Mem."  The memorandums in support of the Thai Airways (Dkt. Entry 535-1), Saudi Arabian Airways
(Dkt. Entry 544), and South African Airways (Dkt. Entry 538-1) motions are referred to herein,
respectively, as "TAI Mem. in Supp.," "Saudia Mem. in Supp.," and "SAA Mem. in Supp.;" their
memorandums in reply are referred to herein "TAI Reply Mem." (Dkt. Entry 604), "Saudia Reply Mem."
(Dkt. Entry 608), and "SAA Reply Mem." (Dkt. Entry 605).

The plaintiffs filed issue-specific memorandums in opposition as follows: (1) a memorandum of
law in opposition to dismissal under Fed. R. Civ. Proc. 12(b)(6) (Dkt. Entry 563) ("12(b)(6) Opp'n
Mem."); (2) a memorandum in opposition to dismissal of the state law claims pursuant to Airline
Deregulation Act preemption (Dkt. Entry 636) ("ADA Opp'n Mem."); (3) a memorandum in opposition
to dismissal of the EU law claims (Dkt. Entry 640) ( "EU Opp'n Mem."); (4) a memorandum in
opposition to dismissal of the Sherman Act claims under the Free Trade Antitrust Act (Dkt. Entry 637)
("FTAIA Opp'n Mem.); and (5) a memorandum in opposition to the motions by Thai Airways, Saudi
Arabian Airways, and South African Airways (Dkt. Entry 577) ("FSIA Opp'n Mem.").

[6] Separate motions to dismiss by Air Mauritius and Ethiopian were filed, fully briefed, and
argued.  While the motions were under consideration, the plaintiffs moved to voluntarily dismiss Air
Mauritius and Ethiopian Airlines from this action, rendering their motions moot.  (*See* Notices of
Voluntary Dismissal, Dkt. Entries 769, 770; July 22, 2008 Order by Judge Gleeson ("so-ordering"
dismissal).)

### A.  Failure To State A Claim

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal, not the factual, sufficiency of a complaint.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one"); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (*quoting Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)) (prior citations omitted))). The court, therefore, must accept the Complaint's allegations as true, and draw all reasonable inferences in the plaintiffs' favor.  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  In deciding the motion, the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007).  Courts may also consider matters subject to judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) (citing 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004 and Supp. 2007)).

Shortly after the plaintiffs filed their Complaint, the Supreme Court clarified the pleading standard, in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007).  In *Twombly*, the Court explicitly retired the familiar rule from *Conley v. Gibson* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 355 U.S. 41, 45-46 (1957), declaring that the "no set of facts language has been questioned, criticized, and explained away long

-7-

enough," *Twombly*, 127 S. Ct. at 1969.[7]  *Twombly* held that a well-pleaded complaint must contain enough factual matter to "nudge" a plaintiff's "claims across the line from conceivable to plausible," finding that allegations that were merely "consistent" with – as opposed to suggestive of – a claim were insufficient.  *Id.* at 1974.

      *Twombly* explicitly rejected, however, a blanket requirement of heightened fact pleading, and the Court's more recent decision in *Erickson v. Pardus* reaffirmed that the notice pleading standard still determines legal sufficiency as a general matter.  127 S. Ct. 2197, 2200 (2007) (per curiam).  Accordingly, the Second Circuit has interpreted "[t]hese conflicting signals" as "not requiring a universal standard of heightened fact pleading, but . . . instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

**B.  An Implausible Conspiracy**

      1.  Pleading A Sherman Act Claim After *Twombly*

      As *Twombly* was an antitrust case, it provides some specific guidance on how the plausibility standard may be satisfied in a case brought under the Sherman Act.  The Sherman Act regulates anticompetitive behavior, declaring illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1 ("Section 1").  The plaintiffs in *Twombly* claimed that the defendants had engaged in parallel business behavior.  Such "parallel conduct" claims

---

[7] During a conference on May 31, 2007, the court offered the plaintiffs the opportunity to replead their complaint in light of *Twombly*.  (May 31, 2007 Tr. of Pre-Motion Conference Before The Honorable Viktor Pohorelsky, United States Magistrate Judge, Dkt. Entry 785, at 31-32.)  That offer was not accepted.

rely on allegations of lockstep or simultaneous business decisions by defendants as the basis for pleading anti-competitive behavior.

*Twombly* held that a Section 1 allegation of concerted action was legally insufficient when it alleged mere "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical, independent action." *Id.* at 1961. The Court observed that, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination or conspiracy', 'the crucial question is whether the challenged anti-competitive conduct 'stems from independent decision or from an agreement, tacit or express.'" *Id.* at 1964 (*quoting Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984) and *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). *Twombly* indicated that a "factual context suggesting agreement" could take the form of specific allegations about an independent agreement, as well as parallel conduct allegations that are indicative of an agreement, because they are, for instance, historically or commercially unusual. *Id.* at 1967. In whatever way they can, antitrust plaintiffs must establish a "plausible grounds to infer an agreement" by pleading "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 1965.

### 2.  The Plaintiffs' Allegations

The defendants' anticompetitive conduct may be divided into two broad categories. First, the defendants conspired to apply various surcharges to the price of air freight shipping: a fuel surcharge; a security surcharge; a war risk surcharge; and a customs surcharge. Second, the defendants conspired to engage non-surcharge conduct to reduce and eliminate competition,

through a concerted refusal to discount, exchanging information to increase yields, and allocating customers.  These allegations, taken as true on a motion to dismiss, are laid out below in substantially the same level of detail as in the Complaint.

 3.  The Background Allegations

Airfreight shipping services are a fungible commodity product such that the services provided by one carrier may be easily substituted by those provided by another carrier.  (Compl. ¶ 78.)  The primary factor driving customer choice is price.  (*Id.*)  Airfreight carriers typically impose extra fees intended to offset their external costs, known as surcharges.  (*Id.* ¶ 85.)

 4.  The Surcharge Allegations

 *a.  The Fuel Surcharge*

Prior to the conspiracy, many airlines had similar fuel pricing systems in place which used various factors to determine changes in fuel surcharge prices.  (*Id.* ¶ 86.)  By late December 1999, the defendants had made an agreement to fix fuel surcharges.  (*Id.* ¶ 84.)  In 2002, the defendants agreed to implement a progressive four-step fuel surcharge increase, where agreed-upon "increase factors" would trigger a $.05 increase "per step per period."  (*Id.* ¶ 90).  The Complaint does not define the "increase factors," nor the length of the period, nor does it specify whether the four periods were consistent in length.  In late 2003 or early 2004, the defendants met and again agreed to concertedly implement price increases beyond the initial agreement, which resulted in "additional, multi-step price increases, all at identical amounts per step."  (*Id.* ¶¶ 91-92.)  In addition to fixing the fuel surcharges, the defendants agreed on "currency issues, capping the [f]uel [s]urcharge (by shipment or weight)[] and refusing to discount the [f]uel [s]urcharge to freight forwarders."  (*Id*. ¶ 88.)

The fuel surcharges were discussed in "multiple meetings, communications, and

agreements," "[s]ecret meetings," and "at the highest levels," in "various venues, including Europe, the United States, South America and Asia." (*See*, *e.g.*, *id.* ¶¶ 92-93.) The defendants communicated often in order to seek reassurances and police each other's implementation of the surcharge. (*Id*. ¶¶ 93-95.) When necessary, the defendants "undertook corrective action" to ensure compliance with their agreement. (*Id.* ¶ 94.)

### b.  *The Security Surcharge*

After the events of September 11, 2001, the defendants concertedly imposed a security surcharge that was unrelated to the costs of any security-related measure. (*Id.* ¶¶ 96, 97, 100.) The defendants also "jointly acted in order to facilitate agreements regarding exceptions, discounting, and caps" relating to the security surcharge; the substance of the agreements regarding exceptions, discounts and caps, however, are not disclosed by the Complaint. (*Id.* ¶ 98.) The surcharge was agreed upon after the defendants "met," "communicated," and had "secret meetings and communications includ[ing] discussions at the highest levels of the respective companies and occur[ing] in various venues, including Europe, the United States, and Africa." (*Id.* ¶¶ 97, 98.) Most defendants, but not all, "jointly implemented" the surcharge "worldwide"; the complaint does not specify, however, which defendants did not implement the surcharge. (*Id.* ¶¶ 98, 99.)

### c.  *The War Risk Surcharge*

The defendants "met," "communicated," held "secret joint meetings, communications and agreements," and "jointly agreed" to implement a [w]ar [r]isk surcharge sometime following the invasion of Iraq by coalition forces in 2003. (*Id.* ¶¶ 101, 102.) The Complaint does not specify when the surcharge was implemented, but alleges that it was terminated after one month. (*Id.* ¶ 103.)

### d.  The Customs Surcharge

Airfreight customers have been required, since sometime in 2003, to prepare and submit to airfreight carriers a manifest of the goods that will offload in the United States; the carriers must then submit this manifest electronically to United States Customs.  (*Id.* ¶ 105.)  At times "[d]uring this period," the defendants "secretly met, communicated and jointly agreed" that they would charge customers flat fees of eight euros per paper manifest, and flat fees of two euros per electronic manifest.  (*Id.* ¶¶ 103, 106.)  The customs surcharges have been "jointly implemented" since August 2004.  (*Id.* ¶ 107.)

### 5.  The Non-Surcharge Allegations

Sometime during the class period, the defendants conspired with respect to three non-surcharge mechanisms in order to raise and fix airfreight shipping costs.  First, the defendants "met, communicated, and jointly agreed" and held "secret meetings and communications" through which the defendants "collusively agreed to refuse to provide discounts" to freight forwarders.  (*Id.* ¶¶ 108-110.)  Second, the defendants had access to industry-level yield data, exchanged individual yield data, and "met, discussed and jointly agreed to concertedly increase their yields."  (*Id.* ¶¶ 111-113.)  Third, the defendants "met, communicated and jointly agreed" to "allocate[e]" customers so as "to minimize [their] ability to access competitive rates," (*id.* ¶ 114) and the defendants, "at times, jointly and secretly agreed to and did refrain from pursuing and/or acquiring each others' customers," (*id.* ¶¶ 115).

### 6.  Analysis

### a.  Overall Plausibility

The plaintiffs' allegations in the Complaint resemble those held implausible in *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d. Cir. 2007), decided shortly after *Twombly*.  The

*Elevator* complaint alleged that the defendant elevator companies conspired to fix prices for the sale and maintenance of elevators in order to drive independent repair companies out of business. It asserted, in a conclusory fashion similar to the Complaint here, that the defendants

> (a) [p]articipated in meetings in the United States and Europe to discuss pricing and market divisions; (b) agreed to fix prices for elevators and services; (c) rigged bids for sales and maintenance;(d) exchanged price quotes; (e) allocated markets for sales and maintenance; (f) "collusively" required customers to enter long-term maintenance contracts; and (g) collectively took actions to drive independent repair companies out of business.

*Id.* at 51.

The Second Circuit affirmed the district court's dismissal, finding that, after *Twombly*, neither the "[a]verments of agreements made at some unidentified place and time," nor of mere "parallel conduct" raise a plausible inference of an independent agreement. *Id.* at 50.  It also adopted the district court's observation that the allegations of agreement in particular appeared to "enumerates basically every type of conspiratorial activity that one could imagine," but that "[t]he list is in entirely general terms without any specification of any particular activities by any particular defendant[; it] is nothing more than a list of theoretical possibilities which one could postulate without knowing any facts whatever." *Id.* at 50-51; *see also Twombly*, 127 S. Ct. at 1966 (observing that it takes more than "a conclusory allegation of agreement at some unidentified point . . . to show illegality.")  As in *Elevator*, the plaintiffs here have failed to give enough specifics to support a plausible conspiracy.

In connection with each anticompetitive mechanism, the plaintiffs allege that there were "meetings," "secret meetings," "communications," or "joint agreements."  Sometimes they alleged that these "secret meetings" and "communications" were entered into by defendants' representative "at the highest levels" in "various venues including Europe, the United States, and

Africa" or "Europe, the United States, South America and Asia." These allegations are so broad and so vague that they fail to stand for anything, much less raise a plausible inference of an agreement. They are "in entirely general terms without any specification of any particular activities by any particular defendant; it is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *Id.* at 50-51. "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation – for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." *Twombly*, 127 S. Ct. at 1966 (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)). And while the plaintiffs include some chronological details, such as the period of time in which the mechanisms were implemented, these alone are insufficient to raise a plausible inference of an agreement, because "one could postulate [the dates] without knowing any facts whatever" based on the occurrences of parallel conduct. *In re Elevator Antitrust Litigation*, 502 F.3d at 51 (*quoting In re Elevator Antitrust Litigation*, No. 04-CV-1178, 2006 WL 1470994, at *3 (S.D.N.Y. 2006)). [8]

In fact, at times the plaintiffs' allegations appear to assert the implausible – that all thirty defendants, which range from airlines with enormous fleets and broad reach to the national airlines of tiny countries, gathered or otherwise communicated simultaneously, and thereby agreed to implement identical measures in unrelated markets all over the world. There are no allegations in the Complaint indicating why, for instance, a carrier shipping from Asia to the

---

[8] The court finds indistinguishable from the allegations here the conclusory allegations deemed insufficient in *In re Elevator Antitrust Litig.*, No. 04 CV 1178, 2006 WL 1470994, at *8 (S.D.N.Y. May 30, 2006), *Kahn v. iBiquity Digital Corp.*, No. 06 Civ. 1536, 2006 WL 3592366, at *5 (S.D.N.Y. Dec. 7, 2006), and *Klebanow v. New York Produce Exch.*, 344 F.2d 294, 299 (2d Cir. 1965).

United States would have any reason to conspire with a carrier shipping from the South America to Africa.  While the plaintiffs assert that airfreight shipping services provided by any one carrier is fungible, and therefore readily substitutable for the airfreight shipping services provided by any other carrier (Compl. ¶ 78), the disparate markets and actors involved here make the plaintiffs' allegations of a single overarching conspiracy seem *im*plausible.

Furthermore, the complaint fails to tie each defendant into the conspiracy with allegations of something other than bare parallel conduct.  The plaintiffs are not required to plead every detail of every meeting or communication, secret or otherwise, that took place between the defendants, nor must they allege in great detail each defendant's role in the conspiracy.  Nor do they need to allege an overt act by each defendant.  But the problem with the Complaint as it stands now is that it pleads no basis for including *these* particular defendants in *this* suit other than the fact that they allegedly engaged in parallel conduct.  The Complaint does not identify with any specificity how each defendant joined the conspiracy, or what circumstances provided the opportunity to do so.  "Implicit in [*Twombly*] is the notion that the rules do contemplate a statement of circumstances, occurrences, and events in support of the claim being presented."  5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1215. Without further explanation by the plaintiffs, each defendant is unable to discern the grounds on which the claims against the defendant rest.  "Notice pleading requires at a minimum that the pleading give the opposing party notice of  . . . which of *its* actions gave rise to the claims upon which the complaint is based."  *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 32 (2d Cir. 2006) (emphasis added).

-15-

   b.  *The Alleged Conduct Is Insufficiently Idiosyncratic to Suggest*
      *Independent Agreement*

Perhaps belatedly recognizing that their allegations are insufficient in the aftermath of

*Twombly,* the plaintiffs argue that their Complaint should survive despite their failure to plead

any facts evincing an agreement, on the grounds that they have pleaded the sort of business

practices that can only be explained by an independent agreement.  In *Twombly*, the Court

remarked in a footnote that allegations of parallel conduct that reflect "complex and historically

unprecedented changes in pricing structure made at the very same time by multiple competitors,

and made for no other discernible reason," may obviate the need for allegations beyond parallel

conduct.  127 S. Ct. at 1966.  The plaintiffs contend that their fuel and war risk allegations reflect

precisely this type of "complex and historically unprecedented changes" because they were

inconsistent with the economics of the air cargo shipping industry.  (12(b)(6) Opp'n Mem. 16.)

While the fuel and war risk surcharges may have been departures from typical pricing

practices, the plaintiffs fail to take the necessary next step of excluding the possibility that the

defendants' parallel conduct was "in line with a wide swath of rational and competitive business

strategy unilaterally prompted by common perceptions of the market,"  *Twombly*, 127 S. Ct. at

1964.  They fail to allege that the surcharge increases did not correspond to increases in fuel

prices.  They similarly fail to rule out a rational business motivation for the war risk surcharge.

Moreover, the plaintiffs' conclusory assertion that these surcharges would not be uniform absent

collusion has been roundly rejected by the Supreme Court, which has said that parallel behavior

may be a "rational and competitive business strategy."  *Twombly*, 127 S. Ct. at 1964.  As the

Second Circuit has also observed, "Similar pricing can suggest competition at least as plausibly

as it can suggest anticompetitive conspiracy."  *Elevator*, 502 F.3d at 51.

-16-

The plaintiffs also argue that an agreement among the defendants must be inferred because the security surcharge bore "little to no relationship to . . . costs" and that the custom surcharges were flat fees (12(b)(6) Opp'n Mem. 17), but neither the Complaint nor the memorandum indicates why flat or uniform administrative fees are necessarily unusual or otherwise indicative of collusion.  In fact, one would expect that, even in the absence of collusion, there would be some uniformity in the custom surcharges, which appear at first glance to be standard administrative charges.  And an allegation that the security surcharge is unrelated to cost does not rule out that it was set by other rational business motivations other than cost.

Finally, the plaintiffs contend that the yield allegations raise a plausible inference of an agreement among the defendants because it would otherwise go against an airline's self-interest to inform a competitor of its yields.  (*Id.*)  The allegations concerning yields, and the other non-surcharge allegations, however, are too vague and conclusory to adequately state a claim.  The Complaint leaves it unclear what a yield actually is, and what actions the defendants took to increase yields.  The concept of "allocation of customers," and how that is accomplished, is also left ambiguous, leaving the allegations vague and conclusory.  Neither the allegations of yield agreements nor of customer allocation support the finding of an independent agreement.

The plaintiffs' attempts to mold their allegations to satisfy a theory articulated in *Twombly*, a decision published well after they drafted their Complaint, does not succeed.  The defendants' conduct may be explained by a number of non-anti-competitive reasons, and is a far cry from the idiosyncratic business behavior *Twombly* suggests is necessary to proceed under this theory.  Indeed, the plaintiffs' arguments, if accepted by this court, would create exceptions that would swallow the general rule that parallel conduct alone is insufficient to plead an

-17-

antitrust conspiracy under Section 1 of the Sherman Act.  The Complaint, therefore, does not sufficiently allege that the defendants' conduct with respect to these surcharges both constituted "unprecedented changes" and were "made for no other discernible reasons."

> c.  *The Acceptance of Lufthansa into the DOJ Leniency Program is Insufficient to Suggest Independent Agreement Among the Defendants*

The plaintiffs argue that the acceptance of the defendant Lufthansa into the DOJ leniency program for involvement in antitrust violations in the air cargo industry "underscores the plausibility of the alleged conspiracy" as to twenty-nine other named defendants.  (12(b)(6) Opp'n Mem. 18.)  The court disagrees.  The plaintiffs do not allege that the leniency application revealed that Lufthansa conspired with the named defendants.  Their allegations provide no detail about Lufthansa' admitted anti-competitive activities that would tie them to the conspiracy allegations in the instant Complaint.  Indeed, plaintiffs fail to allege that the price-fixing activity and/or other conduct potentially violative of Section 1 of the Sherman Act that Lufthansa reported to the DOJ forms the basis for plaintiffs' instant claims against Lufthansa.  These general allegations do not provide a basis from which to infer that this leniency deal implicates all of these defendants in the broad conspiracy alleged here.[9]

**C.  Notice**

In addition to attacking the plausibility of the plaintiffs' allegations, the defendants argue that the surcharge allegations do not provide sufficient notice of the claims against them. (Omnibus Mem. in Supp. 56.)  Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain only "a short and plain statement of the claim" showing that the pleader is entitled to

---

[9]It bears noting that *Twombly* applies with equal force to the plaintiffs' foreign law claims.  The European Union law claims should be dismissed for the additional and independent reasons articulated in Section III below.

relief, in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley*, 355 U.S. at 47.  The plaintiffs' obligation to provide the "grounds" of their "entitle[ment] to relief," however, requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  *See Papasan v. Allain,* 478 U.S. 265, 286 (1986).  With respect to a complaint naming multiple defendants, Rule 8(a) requires that plaintiffs "indicate clearly the defendants against whom relief is sought, and the basis upon which the relief is sought against the particular defendants."  *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (S.D.N.Y. 1997) (quoting *Mathews v. Kilroe*, 170 F. Supp. 416, 417 (S.D.N.Y. 1959)).

After *Twombly*, however, "the appropriate standard for assessing the sufficiency of pleadings under Rule 8(a) is the source of some uncertainty."  *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (*citing Iqbal*, 490 F.3d at 155).  On the one hand, *Twombly* seemed to replace the notice-pleading standard with a heightened "plausibility" standard, *Iqbal*, 490 F.3d at 157-58; on the other hand, two weeks after issuing *Twombly*, the Court stated that "[s]pecific facts are not necessary," and that the complainant "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson*, 127 S. Ct. at 2200 (*quoting Twombly*, 127 S. Ct. at 1964 (internal quotation marks omitted) (alteration in original)).  *Erickson* also indicated, however, that providing notice alone does not immunize a complaint from dismissal. *Id*.  But *Erickson* failed to clarify whether or how plausibility and notice overlap.

It is perhaps sufficient to say, at this juncture, that the issue of whether adequate notice is a separate requirement or makes an allegation more plausible is unsettled.  The uncertainty surrounding the conceptual contours of notice and plausibility notwithstanding, the court

concludes, in light of the international scope and multi-year term of the conspiracy alleged here, as well as the number of actors allegedly involved, that the plaintiffs have failed to give the defendants sufficient notice of the claims against them.  The plaintiffs allege that thirty separate defendants from dozens of countries have, together with unknown numbers of unnamed co-conspirators consisting of "[a]irfreight carriers, trade groups, or other entities . . . as well as various other persons, companies and corporations" conspired in violation of domestic antitrust law, over a seven-year period, on four different continents.  (Compl. ¶ 72-73.)  This diverse and geographically far-flung group of actors have allegedly come together to impose a fuel surcharge, security surcharge, war risk surcharge, and customs surcharge in their respective markets, and conspired with respect to non-surcharge measures concerning discounts to freight forwarders, the control of yields, and allocation of customers.

Ignoring this broad geographic and economic diversity, the plaintiffs have lumped all the defendants together into every single allegation.  There are no specific allegations as to what each defendant did, whether each defendant engaged in identical conduct with respect to each mechanism, or had a unique role.  Most allegations paint a picture of complete uniformity of action by all defendants; on the other hand, a few allegations indicate significant variation in the actions taken by various unidentified defendants.  The security surcharge allegations, for example, state that, "Defendants, with few exceptions, jointly implemented the agreed upon [s]ecurity [s]urcharge worldwide," thereby also indicating that some defendants did not implement the surcharge.  (Compl. ¶ 99.)  Although the exceptions may have been "few," this ambiguity creates a notice problem.  None of the defendants can be sure whether they are accused of concertedly implementing the security surcharge.

-20-

Similarly, the fuel surcharge allegations indicate that only certain defendants were involved in policing and enforcement, and that fuel surcharges may have been applied inconsistently.  Paragraph 94 of the Complaint injects perhaps the most ambiguity, stating that, "[w]here the [f]uel [s]urcharges were not being applied consistently, [*d*]*efendants* often undertook corrective action in order to ensure consistent application."  (Emphasis added.)  In fact, none of the defendants may be sure of how they are accused of being involved in the fuel surcharge.  The allegations themselves belie that the defendants' conduct was not entirely uniform.

The plaintiffs, given the ambiguities and the vagueness that pervades their surcharge allegations, have failed to meet the Rule 8(a) pleading requirements.  The defendants have been left to guess what they have been accused of doing.  As discussed later in this opinion, the plaintiffs should be afforded an opportunity to cure the defects in their pleadings.  In doing so, they should ensure that the defendants are properly afforded notice of the claims against them.

### D.  Subject-Matter Jurisdiction and the FTAIA

The defendants contend that the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6(a), deprives the court of subject matter jurisdiction over some of the Sherman Act claims. Specifically, they seek the dismissal of Sherman Act claims that are based on the purchase of air cargo services for transportation from locations abroad into the United States.  The defendants also assert that the plaintiffs lack the appropriate antitrust injury, and are inappropriate enforcers of United States antitrust law, and therefore lack antitrust standing.  The defendants' arguments on these grounds lack merit.

1.   Standard for Dismissal for Lack of Subject Matter Jurisdiction

On a motion to dismiss for lack of subject matter jurisdiction, the party asserting

jurisdiction bears the burden of persuasion.  *See Robinson v. Overseas Military Sales Corp.*, 21

F.3d 502, 507 (2d Cir. 1994).  Challenges to subject matter jurisdiction may contest "either the

facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction

in fact."  *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002).  The

defendants' instant motion is a "facial" attack based solely on the sufficiency of the pleadings.

(*See* Omnibus Mem. in Supp. 7 n. 7.)  The defendants' motion, therefore, requires the court to

review whether the allegations on the face of the plaintiffs' Complaint allege facts sufficient to

invoke the jurisdiction of the district court.  *Poodry v. Tonawanda Band of Seneca Indians*, 85

F.3d 874, 887 (2d Cir. 1996).  The "uncontroverted factual allegations in the complaint" will be

accepted as true, *Dow Jones*, 237 F. Supp. 2d at 404, *Shipping Fin. Servs. Corp. v. Drakos*, 140

F.3d 129, 131 (2d Cir. 1998),[10] but "argumentative inferences favorable to the party asserting

---

[10] By contrast, where defendants challenge the factual basis for subject matter jurisdiction, a court is "not obligated to accord presumptive truthfulness to the allegations of the complaint" and "may weigh the evidence on the record accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute."  *Dow Jones*, 237 F. Supp. 2d at 404; *see also Filetech S.A. v. Fr. Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998).

jurisdiction" will not be drawn, *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992).[11]

> 2.   The FTAIA

The FTAIA removes from the reach of the Sherman Act export activities and other commercial activities taking place abroad, unless those activities adversely affect domestic commerce, imports to the United States, or the exporting activities of persons engaged in such activities within the United States.  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (hereinafter *Empagran I*).  The FTAIA provides

> Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect--
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6(a).  The complex language of this provision was deconstructed by the Supreme Court in *Empagran I*.  The Court found that the FTAIA initially places all nonimport activity involving foreign commerce *outside* the Sherman Act's reach.  *Empagran I*, 542 U.S. at 162.

---

[11] As noted in *Boyd v. AWB Ltd.*, it may not be entirely precise to term the FTAIA's limitations as a constraint on a court's jurisdiction.  544 F. Supp. 2d 236, 243 (S.D.N.Y. 2008).  *Boyd* observed that "the express language of the FTAIA – i.e., that the Sherman Act "shall not apply" to certain kinds of foreign conduct – suggests a limitation, not on a court's power to decide the case, but rather, on the substantive applicability of the statute."  Indeed, "such imprecision has significant consequences."  *Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201, 2006 WL 587342, at *4 n. 2 (S.D.N.Y. Mar. 9, 2006) (noting that "[u]nlike merits challenges, challenges to a court's subject matter jurisdiction cannot be waived and can be raised even after trial has concluded and judgment has been entered," and that "factual disputes as to jurisdictional questions are typically resolved by the judge in a pre-trial hearing, not by a jury at trial").  In this case, as in *Boyd*, none of the parties challenge the characterization of the issue as jurisdictional in nature.

The FTAIA "then brings such conduct back within the Sherman Act's reach *provided* that the conduct *both* (1) sufficiently affects American commerce . . . *and* (2) has an effect of a kind that antitrust law considers harmful, i.e. , the "effect" must "giv[e] rise to a [Sherman Act] claim." *Id.* (italics in original) (alterations supplied).

"The initial sentence of [S]ection 6(a), along with its 'import trade or commerce' parenthetical, provides that the antitrust law *shall* apply to conduct 'involving import trade or commerce' with foreign nations." *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000) (emphasis in original). "The Foreign Trade Antitrust Improvements Act does not define the term 'import,' but the term generally denotes a product (or perhaps a service) that has been brought into the United States from abroad." *Turicentro S.A. v. Am. Airlines*, 303 F.3d 293, 303 (3rd Cir. 2002) (*citing* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) (defining an "import" as "something (as an article of merchandise) brought in from an outside source (as a foreign country)"); BLACK'S LAW DICTIONARY (6th ed. 1990) (defining an "import" as a ''product manufactured in a foreign country, and then shipped to and sold in this country")). Moreover, the Section 6(a) language makes clear that not only import commerce, but conduct *involving* import commerce, is never removed from the reach of the Sherman Act. As illustrated by the analysis below, the defendants' conduct at issue involves import trade or import commerce, and plaintiffs' claims based on that conduct remain within the scope of the Sherman Act.

3.   Analysis

To determine whether the plaintiffs' Sherman Act claims are permitted under the FTAIA, the court focuses on two issues. First, what is the *relevant* conduct here? *See Kruman v.*

-24-

*Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir. 2002).  Second, does that conduct "*involve*[]

import trade or import commerce"?  *See Carpet Group*, 227 F.3d at 71 (internal quotes omitted)

(emphasis added).

### a.  The Relevant Conduct

"The relevant inquiry is whether the conduct of the defendants – not the plaintiffs –

involves import trade or commerce."  *Kruman*, 284 F.3d at 395 (*citing Carpet Group*, 227 F.3d

at 71-72).  The defendants would have this court define the relevant conduct narrowly, as only

the "*charging* of supra-competitive prices for air cargo services offered in foreign commerce."

(FTAIA Mem. in Supp. 10 (emphasis added).)  They seek to place the locus of relevant conduct

entirely outside the United States, in an effort to remove culpable conduct from the purview of

United States courts.  The significant conduct here, however, is not reducible to the mere

charging of fixed prices.  In *Kruman v. Christie's Int'l*, the Second Circuit specifically rejected

construing "conduct" to mean "[t]he precise acts that caused injury," or "the imposition of

charges for  . . . services at levels determined or affected by the illicit agreement."  284 F.3d 384,

398 (2d Cir. 2002) (*citing Kruman v. Christie's Int'l PLC*, 129 F. Supp. 2d 620, 625 (S.D.N.Y.

2001)).  "'Conduct' . . . refers to acts that are illegal under the Sherman Act; . . . under the

Sherman Act,  . . . a horizontal price agreement is itself illegal regardless of its effect or

purpose."  *Id.* (*citing United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 489 (1950);

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *United States v. Aluminum*

*Co. of Am.*, 148 F.2d 416, 427 (1945).

The court takes a broader view, therefore, of the relevant conduct.  Because "the essence

of any violation of § 1 is the illegal agreement itself – rather than the overt acts performed in

furtherance of it," *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991), the object of the

-25-

agreement is really the focus of this inquiry.  Here, the defendants are alleged to have agreed to

price-fix the cost of international air cargo transportation through various surcharges and non-

surcharge mechanisms.  Moreover, the air cargo services provided are not rendered in one

location; rather, they were performed along entire transportation routes, touching both the

country of origin and the country of destination.  The relevant conduct here is defendants' global

conspiracy to fix the prices charged for the service of transporting air cargo from abroad into the

United States.  *See In re Korean Air Lines Co., Ltd. Antitrust Litig.*, Order Granting in Part and

Denying in Part Defendants Motion to Dismiss, MDL No. 07-1891 (SJO) (C.D. Cal. June 25,

2008).

### b.   *"Import Trade or Import Commerce"*

Two types of Sherman Act claims that implicate import trade or import commerce fall

outside the scope of the FTAIA.  First, the FTAIA excludes from its reach those claims arising

out of conduct involving "import trade or import commerce" by means of the parenthetical

"(other than import trade or import commerce)" in 15 U.S.C. § 6(a)(1)(A).  Second, the FTAIA

brings back within the reach of the Sherman Act conduct involving nonimport trade or

nonimport commerce when that conduct (1) has a direct, substantial, and foreseeable effect *on*

import trade or import commerce, and (2) the Sherman Act claim arises out of that effect.  15

U.S.C. § 6(a)(1)(A), (2).  These two universes of claims are differentiated by whether the

conduct at issue involves import trade or import commerce, or involves nonimport trade or

nonimport commerce.  If the former is found, then the inquiry ends, and the FTAIA does not

apply.  If the latter is found, than an inquiry regarding the foreseeable effects of the challenged

conduct is required.  The Third Circuit has observed that the FTAIA constructs the two universes

of claims to be mutually exclusive, and then should be interpreted accordingly to give meaning to Congressional intent.  *See Turicentro*, 303 F.3d at 304.

Rather straightforward analysis yields the conclusion that the claims here arise out of conduct involving import commerce.  The conspiracy alleged targeted the transportation of goods by airfreight, a primary vehicle of modern import commerce.  Airfreight, in the global economy, transports large amounts of the goods that travel from abroad into the United States, as alleged in the plaintiffs' complaint.  (Compl. ¶¶ 77-79.)  Transportation to the United States is of course essential to the commerce in those imported goods; the commerce obviously could not occur unless the goods are transported from their country of origin to the United States.  It follows that conduct directed at fixing the cost of airfreight necessarily affects the commerce in the goods transported by airfreight.  The inseparable connection between airfreight and the commerce in imported goods is sufficient to draw the conclusion that the defendants' price-fixing conduct targeting such a primary channel of import trade and commerce "involves 'import trade or import commerce'" within the meaning of the FTAIA.  *Carpet Group*, 227 F.3d at 69.  The plaintiffs' claims based on that price-fixing conduct are therefore not excluded by the FTAIA from the court's subject matter jurisdiction.

The defendants argue that "involves import commerce" should be construed much more narrowly to include only anticompetitive conduct that fixes prices on imported goods.  In support of a narrow construction, they cite *Turicentro*, in which the court explained that, since the FTAIA distinguished between conduct involving import commerce, and conduct involving nonimport commerce that has an effect on import commerce, "[t]o give the latter provision meaning, the former must be given a relatively strict construction."  303 F.3d at 304.  Even a

-27-

"relatively strict" construction of "involves import commerce," however, is broad enough to

encompass anticompetitive conduct by entities other than import merchants, such as

instrumentalities of import trade and import commerce like the air cargo carriers here.  Statutory

construction principles thus do not preclude the conclusion that the defendants' behavior

involves import commerce.

### c.  Lack of Relevant Precedent

In urging this court to find that their alleged conduct does not involve import commerce,

the defendants point to three cases, none of which present a similar factual situation, or provide

much guidance.  In *Kruman v. Christie's International*, the defendant auction houses were

accused of conspiring to fix commissions on foreign auctions.  284 F.3d 384.  In *Turicentro*, the

defendant air carriers and trade association were accused of fixing rates of travel agent

commissions.  303 F.3d 293.  And in *CSR Limited v. Cigna Corporation*, the defendant insurers

were accused of, among other things, engaging in a conspiracy to threaten denial of new or

renewal insurance for a plaintiff unless it withdrew a request for coverage.  405 F. Supp. 2d 526

(D.N.J. 2005).  In each case, the conspiracy had little to do with import commerce: neither

overseas auctions commissions, nor travel agent commissions nor insurance coverage secured

from foreign insurers concern import commerce in any but the most attenuated manner.  These

conspiracies are only tangentially, if at all, related to import commerce.

By contrast, the one case offered by the defendants where a court found a conspiracy to

involve import commerce is on the other end of the spectrum.  In *Carpet Group*, where the

defendants launched a factual challenge to the court's jurisdiction over the plaintiffs' Sherman

Act claims, the plaintiffs established that the defendants conspired to prevent foreign

manufacturers from selling rugs to United States retailers; to prevent at least one American retailer from purchasing rugs directly from foreign manufacturers; to prevent foreign governments and trade associations from sponsoring trade fairs at which retailers could purchase directly from foreign manufacturers; and to prevent an American rug retailers' trade association from sponsoring the trade fairs. 227 F.3d at 73.

The defendants' conduct here falls somewhere in between the conduct in *CSR*, *Kruman* and *Turicentro*, on the one hand, and the import market case of *Carpet Group* on the other. The airfreight shipping price-fixing conspiracy does not target a specific import market, such as the rug market in *Carpet Group*, but the defendants' conduct clearly involves import commerce in a way that conduct involving commissions charged abroad does not. And the defendants' conspiratorial conduct is targeted directly at a channel of import trade and import commerce – the air cargo industry. To the extent that these precedents inform its decision, the court concludes that the conspiracy here concerns conduct closer to that examined in *Carpet Group* than that presented in the three other cases.

### E. Antitrust Standing

To establish standing to bring antitrust claims, plaintiffs "must have suffered an injury the antitrust laws were intended to prevent, and the injury must flow from that which makes the defendant's acts unlawful." *Turicentro*, 303 F.3d at 307. According to the defendants, the foreign purchase plaintiffs cannot show a cognizable antitrust injury because their injuries were sustained in a foreign market. The defendants also contend that the foreign purchase plaintiffs are not proper antitrust plaintiffs because there are other, more appropriate plaintiffs, such as purchasers of air cargo services in the domestic market. (FTAIA Mem. in Supp. 24.) This

argument "implicates many of the same issues as the jurisdictional analysis under the Foreign

Trade Antitrust Improvements Act."  (*Id.*)

In making this argument, the defendants appear to rely on the fact that the court would not

find the plaintiffs' claims cognizable.  Because the court concludes that the plaintiffs' claims

arising from purchases of air cargo services from abroad into the United States may be

cognizable under domestic antitrust law as discussed, it follows that the plaintiffs have asserted

an antitrust injury.  Consequently, the court has no basis to find that these plaintiffs, with

cognizable antitrust injuries, are not the appropriate parties to pursue their claims.  The foreign

purchase plaintiffs have antitrust standing.

## II.  State Law Claims

### A.  Preemption under the Airline Deregulation Act

The indirect domestic purchaser plaintiffs assert claims under state antitrust statutes and

common law, state consumer protection statutes, and state unfair competition statutes for injuries

arising from the defendants' price-fixing conspiracy.[12]  The defendants have moved to dismiss

---

[12] The indirect domestic purchaser plaintiffs assert these claims on their own behalf, as well as on behalf of the U.S. Indirect Purchaser Class, which includes the U.S. Indirect Purchaser Subclass.  (Compl. ¶¶ 192, 193, 213-221.)  The Complaint identifies the individually named U.S. indirect purchaser plaintiffs, and the U.S. indirect purchaser class as "persons and entities in the United States that purchased Airfreight Shipping Services for shipments within, to, or from the United States indirectly from any of the Defendants or any predecessor, subsidiary, or affiliate of each, at any time" during the class period.  (Compl. ¶ 192.)  The U.S. Indirect Purchaser Subclass is comprised of:

[A]ll persons and entities (excluding governmental entities, Defendants, and Defendants' respective predecessors, subsidiaries, affiliates, and business partners) within the States of Alabama, Alaska, Arizona, Arkansas, California, Florida, Hawaii, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and Wyoming, and within the District of Columbia that purchased Airfreight Shipping Services for shipments within, to or from the United States indirectly from any of the Defendants or any predecessor, subsidiary, or affiliate of each, at any time during the period from no later than January 1, 2000 to the present.

-30-

these claims on the ground that they are preempted by the Airline Deregulation Act ("ADA").

Congress enacted the ADA in 1978, after concluding that market forces would promote the

"'efficiency, innovation, and low prices'" as well as the "variety [and] quality of . . . air

transportation services."  *Morales v. Trans World Airlines*, 504 U.S. 374, 378, (1992) (*quoting*

49 U. S. C. App. §§ 1302(a)(4), 1302(a)(9)).  "To ensure that the States would not undo federal

deregulation with regulation of their own," Congress included an express preemption provision.

*Id*.  The express preemption provision of the ADA is codified at 49 U.S.C § 41713(b) (1), and

provides,

> Except as provided in this subsection,[13] a State, political subdivision of a State, or
> political authority of at least 2 States may not enact or enforce a law, regulation,
> or other provision having the force and effect of law related to a price, route, or
> service of an air carrier that may provide air transportation under this subpart.

The plaintiffs offer three arguments to support their view that the ADA preemption

provision does not apply to their claims: (1) the state and common law claims are not "related to

a price of an air carrier" because the state laws do not mention the price of an air carrier, do not

interfere with the purpose of the ADA, and enforcement of the laws does not frustrate the

purpose of the ADA; (2) the defendants have failed to demonstrate that Congress intended to

preempt state antitrust laws; and (3) the term "air carrier" does not include *foreign* air carriers,

which most of the defendants are.

**B.   The Plaintiffs' State Law Claims Are "Related to a Price . . . of An Air Carrier"**

The issue posed by the plaintiffs' first argument is whether their state law claims are

"related to a price . . . of an air carrier."  The key phrase in this provision is "related to," whose

ordinary meaning is "broad," and thus expresses a "broad pre-emptive purpose."  *Morales*, 504

---

[13] The exceptions to which this provision refers are not applicable to the instant claims.

-31-

U.S. at 383 (also describing the language as "deliberately expansive" and "conspicuous for its breadth").[14]  Accordingly, "the Supreme Court has repeatedly emphasized the breadth of the ADA's preemption provision."  *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 222 (2d Cir. 2008) (hereinafter "*AATA*") (citing *Am. Airlines v. Wolens*, 513 U.S. 219, 225-26 (1995); *id.* at 235 (Stevens, J. concurring in part and dissenting in part); *Morales*, 504 U.S. at 383-84; *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. ---, 128 S. Ct. 989, 998 (2008)).

> In *Morales*, the Court determined: (1) that "[s]tate enforcement actions having a connection with, or reference to" carrier "'rates, routes, or services' are pre-empted," (2) that such pre-emption may occur even if a state law's effect on rates, routes or services "is only indirect"; (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation; and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives.

*Rowe*, 128 S. Ct. at 995 (citing to *Morales*, 504 U.S. at 378, 384, 386-87, 390) (internal quotes and emphases omitted).  The ADA does not pre-empt state laws that affect rates, routes, or services in "too tenuous, remote, or peripheral a manner."  *Morales*, 504 U.S. at 390.

The plaintiffs' claims arise from an alleged conspiracy "to fix, raise, maintain, or stabilize prices of Airfreight Shipping services."  (*See* Compl. ¶¶ 81-115.)  They were injured, the plaintiffs allege, because: "[t]he prices charged by" the defendants, and "paid by [the plaintiffs] for Airfreight Shipping Services were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels"; because the plaintiffs had been "required to pay more for Airfreight Shipping Services"; and because the plaintiffs have had to "pay supra-competitive

---

[14] The version of the ADA in effect when the Court decided *Morales* used the phrase "relating to" in place of the phrase "related to" (used in the current version).  This slight change in terminology, which occurred in 1994, had no substantive effect on the provision and does not undercut the precedential value of Morales.  *See N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 75 n. 11 (1st Cir. 2006), *aff'd*, 128 S. Ct. 989 (2008).

prices for Airfreight Shipping Services."  It is appropriate, therefore, that every allegation which

describes the scheme their claims are based on refers to "prices," "surcharges," or "fees."  As the

Complaint plainly illustrates, the plaintiffs are targeting a price-fixing conspiracy, which

controlled the manner which the defendants set prices, or components of prices, for airfreight

shipping services.

Claims arising out of disputes over airline fares "relate[] to the price . . . of an air carrier."

*See*, *e;g.*, *Morales*, 504 U.S. at 383 (holding that enforcement of guidelines on advertising

"related to fares" and through a state's general consumer protection laws was pre-empted by the

ADA);[15] *Lehman v. USAIR Group*, 930 F. Supp.  912, 915-916 (S.D.N.Y. 1996) (finding state

law claims seeking the recovery of excise taxes paid on airline tickets related to the "price . . . of

an air carrier" and therefore preempted); *Statland v. Am. Airlines*, 998 F.2d 539, 542 (7th Cir.),

*cert. denied*, 510 U.S. 1012 (1993) (finding claims concerning practice of withholding

percentage of federal tax on canceled tickets related to price of an air carrier).  The plaintiffs'

claims, arising out of a conspiracy to fix air cargo shipping prices, "relate[] to . . . the price of an

air carrier."

Contrary to the plaintiffs' assertions, it is irrelevant that these claims are brought under

laws of general applicability which do not "mention" or "reference" price.  Claims under state

laws of general applicability are routinely preempted when they concern price, routes and

---

[15]In *Morales*, the Supreme Court addressed the issue of whether the enforcement of guidelines on
fare advertising, promulgated by the National Association of Attorney Generals, through state consumer
protection laws, was preempted by the ADA.  504 U.S. at 379.  After observing that the guidelines
required disclosures of restrictions on price, that advertised fares be available in sufficient quantity to
meet expected demand, and that advertised fares include all taxes and surcharges, *Morales* found that
"[o]ne cannot avoid the conclusion that these aspects of the guidelines 'relate to' airline rates."  *Id.* 387-
88.  If state actions aimed at "[p]rice advertising surely 'relate[] to price," this court must conclude that
the state law claims asserted here aimed at price-fixing "surely relate[] to price."

services of an air carrier.  *Wolens*, 513 U.S. 219 (1995) (finding preempted state law claims

brought under an Illinois Consumer Fraud Act); *In re JetBlue Airways Corp. Privacy Litig*., 379

F. Supp. 2d 299, 315 (E.D.N.Y. 2005) (stating that "[f]or a claim to be preempted . . . the

underlying state law need not expressly refer to air carrier rates, routes or services" and finding

preempted under the ADA claims brought under forty-nine state statutes prohibiting unfair and

deceptive acts and practices).[16]  Indeed, there is no meaningful distinction between the state

deceptive advertising statute preempted in *Morales*, and the state statutes under which plaintiffs

proceed here.  Accordingly, that the state laws at issue fail to expressly refer to price is not

dispositive.

### C.   State Laws Are Preempted Even Where They Do Not Interfere With or Frustrate the Purpose of the ADA

The plaintiffs contend that, under *Abdu-Brisson v. Delta Airlines*, 128 F.3d 77, 83 (2d

Cir. 1997), a state law is "related to the price . . . of an air carrier," and should be preempted, if it

interferes with or frustrate the purpose of the ADA.  They argue that their state law claims do not

frustrate or interfere with the ADA.  (ADA Opp'n Mem. 30-38.)  In *Abdu-Brisson*, the Second

---

[16] The plaintiffs advance a number of alternative arguments that also lack merit.  First, the plaintiffs attempt to draw a distinction between state law claims that concern conspiracies to fix airline prices, and state law claims that concern airline prices, but the argument is semantic, and lacks legal support.  (*See* ADA Opp'n Mem. 33-34) (failing to cite a single opinion where a court drew such a distinction to exempt claims from preemption).  It is defeated by the broad reach of the ADA preemption provision.

The plaintiffs also argue that their state law claims avoid preemption because the defendants' conduct is "outrageous" and "too tenuously related" and "unnecessary to an airlines' [prices]."  (ADA Opp'n Mem. 36-37 (citing *Smith v. Comair, Inc.*, 134 F.3d 254 (4th Cir. 1998).)  Plaintiffs also attempt to argue that, because price-fixing is not "necessary" to an air carrier's operations and price-setting, then the ADA preemption should not be construed to  "insulate air carriers from liability for injuries" caused by it.  The cases cited by plaintiff are inapposite.  In *Comair*, the court found that an airline employee's rude behavior towards a customer was outrageous and therefore constituted intentional infliction of emotional distress.  *See* 134 F.3d at 260.  Finding state laws preempted here does not "insulate[] air carriers for injuries caused by outrageous conduct that goes beyond the scope of normal aircraft operations," (ADA Opp'n Mem. 36-37), particularly where many causes of action are available under federal law.

Circuit suggested that the Supreme Court's narrowing of the scope of the ERISA preemption

carried over to the ADA provision.  128 F.3d at 82 (citing *New York State Conf. of Blue Cross &*

*Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Boggs v. Boggs*, 520 U.S.

833) (observing that  "[r]elated to" appears to be developing, to some degree, to mean whether

state law actually "interferes" with the purposes of the federal statute, in this case airline

deregulation").[17]  However, "[o]ther courts have been understandably reluctant to narrow the

Supreme Court's preemption analysis in *Morales* based upon subsequent interpretations of the

ERISA provision."  *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d at 315 (citing

*United Airlines  v. Mesa Airlines*, 219 F.3d 605, 608 (7th Cir.2000) (Easterbrook, J.) ("[I]f

developments in pension law have undercut holdings in air-transportation law, it is for the

Supreme Court itself to make the adjustment. Our marching orders are clear: follow decisions

until the Supreme Court overrules them.").  Certainly, the Supreme Court's most recent opinion

concerning the ADA provision did not indicate that it was interested in a narrowing of its scope.

*Rowe*, 128 S. Ct. at 1995.  And the Second Circuit has, of course, heeded those implicit

directions by following *Morales*' instructions that, with respect to pre-emption, it makes no

---

[17] The issue in *Abdu-Brissou* was whether an age discrimination suit brought by air pilots under
New York law was preempted by the ADA.  The Second Circuit decided that it was not, finding that it
would have too attenuated of an impact on air carrier prices and services, and was too far removed from
the field of air carrier competitiveness and efficiency, to be within the scope of ADA preemption.  *Abdu-
Brissou*, 128 F.3d at 84-85.  The plaintiffs also cite to *Sakellaridis v. Polar Air Cargo, Inc.*, which cited
*Abdu-Brisson* as authority for the proposition that "[a] provision is not "related to" prices, routes, or
services when the state law does not interfere with the purposes of the federal statute."  104 F. Supp. 2d
160, 163 (E.D.N.Y. 2000).  In *Sakellaridis*, a pre-*Morales* decision, Judge Weinstein found that a
personal injury claim lawsuit brought under New York law by a worker who fell from a scaffold while
preparing to work on an aircraft at JFK International Airport was not preempted by the ADA.  After
*Rowe,* that decision remains well-reasoned to the extent that it relies on the finding that "[e]nforcing state
labor law provisions allowing injured contractors' workers to bring personal injury claims against airlines
would have no significant effect on airline deregulation," rather than whether the New York law frustrates
purpose of the ADA.  104 F. Supp. at 163.

difference whether a state law is "consistent" or "inconsistent" with federal regulation.  *AATA*,
520 F.3d at 222 (quoting *Rowe*, 128 S. Ct. at 995 (quoting *Morales*, 504 U.S. at 384)).

      In any event, allowing the plaintiffs' state law claims to go forward *would* undoubtedly
frustrate the purpose of the ADA, and have a "'significant' and adverse 'impact' in respect to the
federal Act's ability to achieve its pre-emption related objectives."  *Rowe*, 128 S. Ct. at 995
(citing *Morales*, 504 U.S. at 390.)  Prior to the promulgation of the ADA, states were permitted
to "regulate intrastate airfares (including those offered by interstate air carriers) and to enforce
their own laws against deceptive trade practices."  *Morales*, 504 U.S. at 377 (internal citations
omitted).  ADA preemption was intended "[t]o prevent the states from entering the economic
regulatory field."  *Galbut v. Am. Airlines,* 27 F. Supp. 2d 146, 150 (E.D.N.Y. 1997).  Allowing
state actions such as those asserted here to proceed would most certainly lead to a  "patchwork of
state … laws, rules and regulations… inconsistent with Congress's major legislative effort to
leave such decisions, where federally unregulated, to the competitive marketplace."  *Rowe*, 128
S. Ct. at 996 (interpreting identical language regarding preemption of state trucking regulations).

### D.  State Antitrust Laws Are Not Exempt From Preemption As Exercises of State Historical Police Powers

      The plaintiffs also argue that state antitrust laws "comprise a field of traditional state
regulations under the historical police powers of the State," which places the burden on the
defendants to demonstrate that it was Congress's "clear and manifest purpose" to preempt the
plaintiffs' claims here.  (ADA Opp'n Mem. 2, 7 (citing *New York State Conference of Blue
Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995)).)  Although the
Supreme Court has stated that "where federal law is said to bar state action in fields of traditional
state regulation, . . . [it is assumed] that the historic police powers of the States were not to be

superseded by the Federal Act unless that was the clear and manifest purpose of Congress,"

*Travelers Ins. Co.*,  514 U.S. at 655 (internal citations and quotations omitted), the Supreme

Court has also interpreted the ADA preemption language broadly, encompassing even those state

laws that touch upon the fields of traditional state police powers.

A recent Supreme Court case, *Rowe v. New Hampshire*, illustrates the reach of the ADA

preemption language, albeit in the context of another federal statute, the Motor Carrier Act, as

amended by the Federal Aviation Administration Authorization Act ("FAAAA").  In enacting

the Motor Carrier Act of 1980, 94 Stat. 793, Congress sought to deregulate trucking as they had

sought to deregulate the airline industry with the ADA.  And, again, to ensure that states would

not, on their own, "undo the federal deregulation with regulation of their own, Congress

"borrowed" from the ADA its preemption language, and, in 1994, wrote into the FAAAA that "a

State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor

carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1); *see also* §

41713(b)(4)(A) (similar provision for combined motor-air carriers).  *Rowe*, 128 S. Ct. at 993

(2008).

In *Rowe*, the Supreme Court confronted the issue of whether a state law that sought to

regulate carriers that deliver tobacco, and to require shippers of tobacco to use carriers that

provide age verification and signature services, was preempted by the FAAAA.  Due to the

similarity between the language and the purpose of the ADA and FAAAA provisions, the

Supreme Court drew solely on ADA cases, including *Morales* and *Wolens*, in finding that

FAAAA preemption provision applied to the state law.  *Id.* at 994-996.  Notably, *Rowe rejected*

the state's argument that the law should be exempt from preemption because it sought to protect

the public health of New Hampshire citizens, finding that while federal law does not generally preempt state public health regulations, "Congress is unlikely to have intended an implicit general 'public health' exception" for laws that otherwise fall within the scope of the preemption provision. *Id.* at 997.

Given the Court's lockstep interpretation of the ADA and FAAAA preemption provisions, *Rowe*'s holding means that, like the FAAAA, the ADA also preempts state laws enacted in the interest of public health, a conclusion drawn by the Second Circuit in *ATAA*. There, the plaintiffs sought to strike down a state law that was aimed at mandating and regulating services to airline passengers on planes grounded in New York State airports. 520 F.3d at 220. The court noted Justice Ginsburg's observation in *Rowe* that the breadth of the FAAA provision is *in pari materia* with that of the ADA. *Id.* at 222. As a result, it found that the state law in *AATA* did not escape preemption by virtue of its classification as a health and safety regulation. 520 F.3d at 224. Where the breadth of the ADA is such that there is no implicit exception for state laws concerning the traditional state police powers of health and safety, the court is reluctant to conclude that state antitrust laws should be provided with any greater deference.

### E.  Application of ADA Preemption to Foreign Air Carriers

The plaintiffs' final argument concerns the scope of the term "air carrier" in the ADA preemption provision, which is expressly applicable to claims "related to a price, route, or service of *an air carrier* that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1) (emphasis added). The plaintiffs contend that foreign air carriers are not "air carrier[s]," and that state law claims against them are not preempted. Analysis of this issue begins, as with all questions of statutory construction, with the text. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the

statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

The Federal Aviation Act of 1958 ("FAA," not to be confused with the "FAAAA"), as amended by the ADA, defines an "air carrier" as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." 49 U.S.C. § 40102 (a)(2). "Foreign air carrier" is separately defined by the FAA to mean "a person, not a citizen of the United States, undertaking by any means, directly or indirectly, to provide foreign air transportation." *Id.* § 40102 (a)(21). The plaintiffs argue that by specifying "air carrier" and omitting "foreign air carrier," Congress expressly excluded "foreign air carriers from the scope of the ADA preemption provision." (*See* ADA Opp'n Mem. 10-11.)

The term "air carrier" must be interpreted in light of its context, however, and here, the term "air carrier" is subject to a modifying phrase – "that may provide air transportation under this subpart." The subpart referred to, entitled "Economic Regulation," is located in Part A (Air Commerce and Safety) of Subtitle VII (Aviation Programs) of Title 49 (Transportation) of the United States Code. Subpart A provides for the authorization of air transportation by both domestic[18] and foreign air carriers.[19] Expressly included within Subpart A is chapter 413, entitled "Foreign Air Transportation," which authorizes the Department of Transportation (DOT) to grant permits to foreign air carriers allowing them to operate to and from the United States. *See* 49 U.S.C. § 41302 (2000) (providing for permits to provide "foreign air transportation as a foreign air carrier" if certain conditions are met.) Put simply, both domestic air carriers and

_____

[18] See Chapter 411 of Subpart II, which provides for the certification of United States air carriers to provide air transportation to, from, and within the United States. 49 U.S.C. Subpt. VII, Pt. A, Subpt. II.

[19] See Chapter 413 of Subpart II, which provides for the certification of foreign air carriers to provide air transportation to, from, and within the United States. *Id.*

foreign air carriers are "air carrier[s] that may provide air transportation under this subpart," – Subpart A.[20]

This conclusion is buttressed by the Supreme Court's decision in *Morales v. Trans World Airlines*, as well as the decisions of other courts that have followed its lead in applying this provision to foreign air carriers. 504 U.S. 385. In *Morales*, the Supreme Court applied the ADA preemption provision to state advertising guidelines concerning fares to both foreign and domestic air carriers. The issue in *Morales* was the promulgation of Travel Industry Enforcement Guidelines by the National Association of Attorneys General (NAAG), which purported to govern, *inter alia*, the content and format of airline fare advertising. *See Morales*, 504 U.S. at 393-418. There, the Texas Attorney General argued that ADA preemption did not apply to claims against foreign air carriers because the provision did not mention them. *Morales*, No. 90-1604, 1992 WL 525742, at *16, Reply Br. on Merits (Feb. 21, 1992). While the Supreme Court did not expressly address this argument, it found the state law claims preempted as to all respondents, including the eleven foreign air carrier respondents and the two United States air carrier respondents, thereby implicitly rejecting the Texas Attorney General's argument.[21]

---

[20]The plaintiffs also argue that two of the thirty-nine air carriers have failed to satisfy their burden to demonstrate that they were authorized to provide air transportation. Because foreign air carriers require an appropriate certificate to legally provide air transportation, because these certificates are a matter of public record in various places, (Omnibus Reply Mem. 86 n. 63), and because there is no reason to conclude that the airlines operated illegally in the United States, the court declines to conclude that these air carriers have failed to satisfy any such burden.

[21] The plaintiffs' contention that the "petitioner's failure in *Morales* to raise the issue in a timely manner waived their entitlement to, and prevented any such consideration of the merits" (ADA Opp'n Mem. 25), is erroneous. "A challenge to subject matter jurisdiction is not waivable, and may be raised and entertained at any time." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction, see Fed. R. Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); *see also* FED. R. CIV. PROC. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) (noting that a "litigant generally may raise a court's lack of

Shortly after *Morales* was decided, a district court in the Southern District of Texas dealt head-on with the issue of whether the ADA preempts state deceptive trade practices claims against a foreign air carrier. *Lawal v. British Airways PLC*, 812 F. Supp. 713, 718 (S.D. Tex. 1992). *Lawal*, like *Morales*, analyzed the pre-1994 ADA preemption provision, 49 U.S.C. 1305(a)(1) (1998), which prohibited states from enacting or enforcing "any law, rule, regulation, standard or other provision having the force and effect of law relating to rates, routes or services of *any air carrier* having authority under subchapter IV of this chapter to provide air transportation."[22] (Emphasis added.) *Lawal* observed that "air carrier" and "foreign air carrier" were defined exclusively in the FAA, 49 U.S.C. § 40102, but concluded that the preemption provision was "unambiguous" and that its "natural meaning" was that the "preemption provisions of the ADA clearly apply to *foreign air carriers*." *Id.* (emphasis added). Furthermore, as *Lawal* noted, the outcome in *Morales* provided additional support to its conclusion. *Id.* at 718.[23]

The plaintiffs criticize this aspect of *Lawal* strenuously, but to no avail. The court disagrees with the plaintiffs that, in concluding that "any air carrier" included foreign air carrier," *Lawal* made "mere surplusage" of the statutory definitions of "air carrier" and "foreign air

---

subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance").

[22] In 1994, Congress reenacted the Aviation Code. The preemption provision was recodified at 49 U.S.C. § 41713(b)(1) (2000), and the language of the provision was revised to the current language. The revision was intended to effect no substantive change. *See Am. Airlines v. Wolens*, 513 U.S. 219, 223 n.1 (1995) ("Reenacting Title 49 of the U.S. Code in 1994, Congress revised [the language of the preemption provision] . . . Congress intended the revision to make no substantive change.") (citation omitted); *see also* H.R. Rep. No. 103-180, at 1 (1994) ("the purpose of H.R. 1758 is to restate in comprehensive form, without substantive change, certain general and permanent laws related to transportation and to enact those laws as subtitles II, III, V-X of title 49 , United States Code, and to make other technical improvements in the code.") (emphasis added), reprinted in 1994 U.S.C.C.A.N. 818, 818.

[23] Although the plaintiffs argue that *Lawal* incorrectly relied on *Morales* because *Morales* did not directly decide the issue, *Lawal* properly concluded that *Morales* ruled on the issue by implication. *See also* note 4 *supra*.

-41-

carrier"; rather, the court finds that this interpretation gave meaning to the modifying words before and after "air carrier."  Furthermore, the use of the term "*any* air carrier" in the pre-1994 ADA provision is critical, and its import carries over into the interpretation of the provision post-1994.  By using an inclusive modifier, Congress intended to include all air carriers authorized to provide air transportation under Subpart A.

In the fifteen years since *Morales* and *Lawal* were decided, no court has criticized or disagreed with their conclusion that "air carrier" includes "foreign air carrier."  Instead, the First, Seventh and Ninth Circuits have joined the Fifth Circuit in applying the preemption provision to foreign air carriers.  *See*, *e.g.*, *Trans World Airlines v. Mattox*, 897 F.2d 773, 780 (5th Cir. 1990) (state fare advertising law claims against eleven foreign air carriers preempted); *Buck v. Am. Airlines*, 476 F.3d 29, 36 (1st Cir. 2007) (state law claims against six foreign air carriers preempted); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir. 1996) (punitive damages claim against foreign air carrier preempted); *Read-Rite Corp. v. Burlington Air Express*, 186 F.3d 1190, 1197 (1999) (state law claim for cargo damage against foreign air carrier preempted), *am. on denial of reh'g and reh'g en banc* (9th Cir. Sept. 27, 1999).  Although the Second Circuit has not had the occasion to apply the preemption provision to foreign carriers, district courts in this Circuit and others have done so on numerous occasions. *See*, *e.g.*, *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 67 (S.D.N.Y. 1994) (state antitrust claims against foreign air carrier preempted), *Weiss v. El Al Isr. Airlines, Ltd.*, 433 F. Supp. 2d 361, 369-70 (S.D.N.Y. 2006) (state law claims against foreign air carrier preempted); *Nazarian v. Compagnie Nationale Air Fr.*, 989 F. Supp. 504, 510 (S.D.N.Y. 1998) (same); *Elnajjar v. Northwest Airlines*, Nos. H-04-680, H-04-681, 2005 WL 1949545, at *5-6

(S.D. Tex. Aug. 15, 2005) (state law claims against foreign air carrier preempted), *Galileo Int'l, L.L.C. v. Ryanair*, No. 01- C 2210, 2002 WL 314500, at *5 (N.D. Ill. Feb. 27, 2002) (same), *Chukwu v. British Airways Bd. of Dirs.*, 889 F. Supp. 12, 14 (D. Mass. 1995) (same).  This uniform body of case law provides more than adequate support for applying the preemption provision to foreign air carriers.

The plaintiffs do not distinguish any of the latter cases, nor do they offer a single case criticizing the relevant portions of *Lawal*.  The plaintiffs instead argue, by reference to caselaw interpreting *other* provisions, that where a provision expresses only "air carrier," courts have unanimously held that it purposely excluded "foreign air carrier" from its benefits, burdens, or other coverage.  (ADA Opp'n Mem. 10.)  The plaintiffs urge this court to follow a District of Columbia Circuit decision, which interpreted the term "air carrier," as used in a different FAA provision, 49 U.S.C. § 47129(a)(1), to exclude "foreign air carriers."  *Port Auth. of N.Y. and N.J. v. Dep't of Transp.*, 479 F.3d 21, 32 (D.C. Cir. 2007).  Section 47129(a)(1) establishes an expedited mechanism for fee disputes between airlines and airports.  It states, in relevant part,

> The Secretary of Transportation shall issue a determination as to whether a fee imposed upon one or more air carriers (as defined in section 40102 of this title) by the owner or operator of an airport is reasonable if--
> (A) a written request for such determination is filed with the Secretary by such owner or operator; or
> (B) a written complaint requesting such determination is filed with the Secretary by an affected air carrier within 60 days after such carrier receives written notice of the establishment or increase of such fee.

49 U.S.C. § 47129(a)(1).  In *Port Authority*, foreign air carriers filed a complaint under Section 47129(a)(1) protesting fees imposed by the Port Authority.  After the DOT adjudicated the foreign air carriers' claims, the Port Authority appealed, arguing *inter alia* that only domestic air carriers are entitled to Section 47129(a)(1) proceedings.  The court in *Port Authority* agreed that

-43-

"one or more air carriers" referred solely to United States air carriers.  In doing so, however, it found that the "context surrounding air carrier" – the phrase "as defined in [S]ection 40102" – "demands a narrow reading."  (As stated above, Section 40102 defines "air carrier" as a "citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation.")  "[T]he cross-reference to § 40102, contained as it is in the immediate context of the term requiring interpretation, is determinative, and § 47129(a)(1) cannot be read to include foreign air carriers."  *Port Auth.*, 479 F.3d at 32.

*Port Authority* reconciled its decision with *Lawal* by distinguishing Section 47129(a)(1), the DOT fee dispute provision, from Section 41713(b)(1), the ADA preemption provision. Specifically, it noted that while Section 47129(a)(1) explicitly stated "one or more air carriers. . . *as defined in Section 40102*," which supported a *narrow* definition of air carrier, Section 41713(b)(1) "referenced outside language [i.e., subchapter IV] supporting a *broad* definition [of air carrier ]."  *Port Authority*, 479 F.3d at 32 (emphasis added).  Thus, by adopting the view that context is essential to defining the reach of the phrase "air carrier" as it is used in different provisions of the FAA, *Port Authority* actually undercuts, rather than supports, the plaintiffs' argument.

The plaintiffs advance two other arguments that merit brief attention.  First, the plaintiffs point to numerous provisions in the FAA and other statutes where Congress has specified both "air carrier" and "foreign air carrier" and contrast those with other provisions where Congress has specified only one as an indication that the omission of one or the other is a meaningful distinction.  (ADA Opp'n Mem. 13-14.)  The plaintiffs further note that in the thirty years that have passed since Congress enacted the ADA preemption provision, Congress never inserted

-44-

"foreign air carrier" into the ADA preemption.  (*Id.* 7.)  Nevertheless, the fact that Section

41713(b)(1) has been consistently interpreted for over fifteen years to include foreign air carriers,

combined with the fact that Congress has *not* moved to amend the preemption provision,

compels this court to conclude that Congress is satisfied with the manner in which the provision

has been interpreted and applied.

Second, the plaintiffs argue that the FAA savings clause, 49 U.S.C. § 40120(c), which

specifies that "a remedy under this Part is in addition to any other remedies provided by law,"

works together with the preemption provision to preserve claims against foreign air carriers.

This argument rests on the assumption that claims against foreign air carriers do not fall within

the scope of the preemption provision, one which the court declines to make.  Moreover, "[a]

general 'remedies' savings clause cannot be allowed to supersede the specific substantive

preemption provision . . . ; [ ] [the court] do[es] not believe Congress intended to undermine this

carefully drawn statute [the ADA] through a general saving clause."  *Morales*, 504 U.S. at 385.

Finally, it bears noting that excluding foreign air carriers from the scope of ADA

preemption would result in anomalous rulings.  "A statute should be interpreted in a way that

avoids absurd results.'"  *United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) (citations

omitted); *see also Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333

(1938).  One such result here would be that while domestic airlines would be subject solely to

federal laws, foreign airlines, obliged to follow both federal and state regulations, would be

subject to an arbitrary quilt of inconsistent regulations, requirements, and restrictions across the

fifty states.  In addition, it is highly unlikely that Congress intended to allow states to impose

different standards upon foreign air carriers than domestic airlines in violation of the United

States' obligation under various treaties to secure equal treatment of domestic and foreign

airlines.  *See*, *e.g.*, Convention on International Civil Aviation art. 11, Dec. 7, 1944, 61 Stat.

1180, TIAS 1591, 15 U.N.T.S 295 (providing for application of laws and regulations "without

distinction as to nationality" of signatory state's aircraft); Treaty of Friendship, Commerce and

Navigation, U.S.-Japan, arts. V, VII, XXII, Apr. 2, 1953, 4 U.S.T. 2063, 2068, 2069 (providing

that the United States and Japan will ensure that each other's companies, *inter alia*, will be

treated  in terms  "no less favorable" than treatment accorded to their own companies).

Accordingly, applying ADA preemption to both foreign and domestic airlines avoids an

otherwise absurd result.[24]

## III.    The EU Law Claims

In Counts IV through VII of the Complaint, certain plaintiffs assert violations of

European antitrust law (the "EU plaintiffs").[25]  The EU plaintiffs assert that, by engaging in the

anticompetitive behavior described in the Complaint, the defendants violated the antitrust

---

[24] Arguments identical to those made by the parties here have been raised in the context of a motion to dismiss a complaint in multidistrict litigation pending in the Central District of California, *In re Korean Air Lines Co. Ltd. Antitrust Litigation*, MDL No. 1891, CV 07-06542 (C.D. Cal.)  *In re Korean Air Lines* is a class action antitrust litigation brought by ticket purchasers for flights between the United States and Korea, against Korean Air and Asiana Airlines, alleging a conspiracy among these two airlines to fix prices on the purchased flights, and raising state and federal claims.  On July 23, 2008, District Judge James Otero granted the defendants' motion to dismiss the state law claims, finding that they were preempted by the ADA, and that foreign air carriers were included in the scope of the provision.  *Id.*, Dkt. Entry 67 (order granting defendant's motions to dismiss).  Judge Otero's opinion comports with the reasoning and conclusions reached in the section above.

[25] The label "EU plaintiffs" is a reference to the types of claims they assert, rather than a reference to their country of incorporation.  The plaintiffs asserting Count IV are foreign entities who directly purchased air cargo shipping services for shipments from the United States to the EU.  The plaintiffs asserting Count V are foreign entities that indirectly purchased air cargo shipping services for shipments from the United States to the EU.  The plaintiffs asserting Count VI are foreign entities that directly or indirectly purchased shipping services between the United States and the EU, and to, from or between any EU member state, excluding shipments to or from the United States.  The plaintiffs asserting Count VII are foreign and domestic entities who directly or indirectly purchased air cargo shipping services shipments to, from or between any EU member states, excluding shipments to or from the United States.

prohibitions outlined in Article 81(1) of the Treaty Establishing the European Community, Nov. 10, 1997, OJ 2006 C321E/1 ("EC Treaty")[26] and Article 53(1) of the Agreement on the European Economic Area ("EEA Treaty") (hereinafter, "the EU claims").  The EC Treaty regulates competition among the member states of the European Union; the EEA Treaty does so among Iceland, the Principality of Liechtenstein, and the Kingdom of Norway; and both treaties are intended to promote free markets in Europe.

The defendants move to dismiss these claims on the following grounds: failure to state a claim, international comity, *forum non conveniens*, and lack of diversity jurisdiction.  They also urge the court not to exercise supplemental jurisdiction.  Upon review, *forum non conveniens* provides a compelling basis on which to dismiss these claims; international comity concerns weigh in the same direction.  As for diversity and supplemental jurisdiction, although the issue is moot if the court's recommendations concerning *forum non conveniens* and comity are accepted, the court concludes that it could properly assert diversity and supplemental jurisdiction over these claims.

### A.  *Forum Non Conveniens*

The defendants argue that the EU claims should be dismissed because any court in the United States would be an inconvenient and inappropriate forum to adjudicate these claims,

---

[26] In relevant part, Article 81(1) of the EC Treaty states that:

The following shall be prohibited as incompatible with the common market: all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the common market, and in particular those which:
(a) directly or indirectly fix purchase or selling prices or any other trading conditions;
(b) limit or control production, markets, technical development, or investment;
(c) share markets or sources of supply . . . .

Article 53(1) of the EEA Treaty mirrors the language of Article 81(1) of the EC Treaty except that it applies only to Iceland, the Principality of Liechtenstein, and the Kingdom of Norway.

brought under European antitrust law, by largely foreign plaintiffs, against largely foreign

defendants, arising out of events occurring abroad.  The defendants propose that the courts of the

member states of the European Union would provide more convenient and appropriate forums to

adjudicate claims brought under these regional economic treaties.

The *forum non conveniens* analysis proceeds in several stages, as set out in *Iragorri v.*

*United Technologies Corporation*, 274 F.3d 65 (2d Cir. 2001).  First, the court must assess the

amount of deference to be accorded to the plaintiffs' choice of forum.  *Id.* at 70-73.  Then, the

court must conduct the analysis set forth in *Gulf Oil Corporation v. Gilbert*, and consider

whether there is an adequate alternative forum.  330 U.S. 501, 504 (1947).  If there is one, the

court balances public and private interest factors to decide whether, based on the relative

hardships to the parties, the case should be adjudicated in the plaintiffs' chosen forum or in the

alternative forum suggested by the defendants.  *Iragorri*, 274 F.3d at 609; *see also Norex*

*Petroleum, Ltd. v. Access Induss.*, 416 F.3d 146, 155 (2d Cir. 2005); *Gilbert*, 330 U.S. at 508;

*Capital Currency Exch. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998).

      1.   Amount of Deference Owed to Plaintiffs' Choice of Forum – Initial
          Assessment

The deference to be accorded to the plaintiffs' choice of forum begins with a "strong

presumption in favor of the plaintiff[s]' choice of forum."  *Piper Aircraft Co. v. Reyno*, 454 U.S.

235, 255 (1981).  "[U]nless the balance is strongly in favor of the defendant, the plaintiff's

choice of forum should rarely be disturbed."  *Gilbert*, 330 U.S. at 508.  Nevertheless, "the degree

of deference given to a plaintiff's forum choice varies with the circumstances."  *Iragorri*, 274

F.3d at 71.  The greatest deference is typically afforded a plaintiff's choice of its home forum,

*see id.*; *accord Piper Aircraft*, 454 U.S. at 255-56; *Koster v. (Am.) Lumbermens Mut. Cas. Co.*,

330 U.S. 518, 524 (1947), while "less deference" is afforded a foreign plaintiff's choice of a

United States forum, *Iragorri*, 274 F.3d at 71 (*citing Piper Aircraft*, 454 U.S. at 255-56).  "When

the plaintiff's choice is not its home forum . . . the presumption in the plaintiff's favor 'applies

with less force,' for the assumption that the chosen forum is appropriate is in such cases "less

reasonable."  *Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1190-91 (

2007) (*quoting Piper Aircraft*, 454 U.S. at 255-256).

      The thirteen named plaintiffs bringing Counts IV, V, VI, and VII are entities based in

Denmark, Germany, Sweden, France, Finland, and Hong Kong, with none claiming to be a

citizen of the United States.  They seek to represent subclasses composed either entirely or

predominantly of foreign companies and individuals: The subclasses under Counts IV, V and VI

are limited to entities and person located "outside the United States" (Compl. ¶¶ 276, 326, 374),

and the subclass under Count VII is restricted to entities and persons that purchased services for

shipments within Europe and between Europe and the rest of the world, but excluding the United

States.  (Compl. ¶ 407.)  As such, it seems likely that, out of all the plaintiffs asserting European

Union claims, only a fraction of the members of the subclass in Count VII reside in the United

States.  As the EU plaintiffs asserting foreign law claims are mostly foreign and have chosen a

United States forum, their choice of forum deserves comparatively less deference.

      2.   Adequate Alternative Forum

      "An alternative forum is adequate if the defendants are amenable to service of process

there, and if it permits litigation of the subject matter of the dispute."  *Pollux Holding, Ltd. v.

Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) (citing *Piper Aircraft*, 454 U.S. at 254 n.

22, 102 S. Ct. 252; *Capital Currency*, 155 F.3d at 609).  The defendants assert that the courts of

the member states of European Union provide an adequate alternative to litigation in the United

States.  The EU plaintiffs do not dispute that they are amenable to service in the member states

of the European Union.  Nor can they dispute that courts of EU member states are not only

empowered to entertain the litigation of the plaintiffs' EU-law based antitrust claims, they are

*required* under EU law to provide damages as a remedy for violations of EU competition law.

*See* Council Regulation (EC) No. 1/2003 of 16 December 2002 (specifically empowering EC

member State to enforce EC antitrust laws); *see also* Case C-453/99, *Courage v. Crehan*, 2001

E.C.R. I-6297 (answering affirmatively question of whether national courts must enforce EC law

and allow individuals to claim damages for losses due to its violation).

The EU plaintiffs maintain that EU member state courts are nevertheless inadequate

because in practice these courts generally lack sufficient procedural mechanisms to provide

effective redress to individual plaintiffs in antitrust suits.  (EU Opp'n Mem. 48-49.)  Given these

deficiencies, plaintiffs rejected from their forum of choice may very well choose to give up their

pursuit of private damages.  *See, e.g., Capital Currency*, 155 F.3d 603.  Or worse, the forum

found adequate might reject their claims, as in *Piper Aircraft*, where, after the Supreme Court

found Scotland to be an adequate alternative forum and affirmed dismissal on *forum non*

*conveniens* ground, the plaintiffs' application for legal aid in Scotland was denied, and their

claims were ultimately not heard.  In other words, the EU plaintiffs are concerned, perhaps

legitimately, that they will not be able to recover the damages they seek in a forum outside the

United States.

The likelihood that a forum would grant a party the damages they seek is not relevant,

however, to its suitability as an alternative.  The Second Circuit held that the United Kingdom

-50-

was an adequate alternate forum to bring violations of EC antitrust law at a time when it was

unclear whether an English court would even award money damages for such a violation.  *See*

*Capital Currency*, 155 F.3d at 609-10.  The Second Circuit was "satisfied that plaintiffs may

litigate the subject matter of their . . . claims in England," given that English courts – like all

other Member State courts – "are bound to enforce" Articles 81 and 82.[27]  *Id.* at 610.  Indeed, the

court found it sufficient that the courts had the "power" to award damages in these cases, even if

that power had never been excercised.  *Id.*  Since then, the European Court of Justice ("ECJ") has

explicitly confirmed that United Kingdom courts, and other EU member state courts, are obliged

to give effect to the EC antitrust laws by awarding damages through their national laws.

Litigants in European courts have also gone on to recover for private antitrust claims, though

more often through settlement than judgment.  *See* Dennis Walbroeck et al., *Ashurst Study on the*

*Conditions of Claims for Damages in Case of Infringement of EC Competition Rules* (Aug. 31,

2004) ("Ashurst Report"); (Decl. of Spence Weber, Ex. 2 to EU Opp'n Mem., ¶ 59.)  In light of

these developments, litigating private antitrust claims in European courts has only become more

accessible and remunerative since *Capital Currency Exchange*.  Its finding that United Kingdom

courts are adequate alternate forums for EC Treaty antitrust claims remains applicable.

　　　　In summary, a plaintiff's likelihood of recovery of damages simply does not make a

forum more or less adequate.  A forum is adequate where the defendants may be served with

process, and where it "permits litigation of the subject matter."  Based on these two criteria, the

EU plaintiffs have adequate alternative forums in the courts of the member states of the EU

Certainly, at the very least, they have an adequate forum in the courts of the United Kingdom,

---

[27] The *Capital Currency Exchange* opinion refers to Articles 85 and 86 of the Treaty, which were later renumbered as Articles 81 and 82.

the national law under which they seek damages, although there appears to be no reason why

they could not bring a claim for damages in another member state forum.

> 3.   Public and Private Interest Factors

Based on the determination that there is an adequate alternate forum for the EU plaintiffs'

claims, the court proceeds to consider the "totality of circumstances supporting" the plaintiffs'

choice of the United States forum.  The "totality of the circumstances" approach is intended to

ascertain the plaintiffs' motivations for their choice.

> The more it appears that a domestic or foreign plaintiff's choice of forum has
> been dictated by reasons that the law recognizes as valid, the greater the deference
> that will be given to the plaintiff's forum choice.  Stated differently, the greater
> the plaintiff's or the lawsuit's bona fide connection to the United States and to the
> forum of choice and the more it appears that considerations of convenience favor
> the conduct of the lawsuit in the United States, the more difficult it will be for the
> defendant to gain dismissal for *forum non conveniens*. . . .[Where] it appears that
> the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons-
> such as attempts to win a tactical advantage resulting from local laws that favor
> the plaintiff's case, the habitual generosity of juries in the United States or in the
> forum district, the plaintiff's popularity or the defendant's unpopularity in the
> region, or the inconvenience and expense to the defendant resulting from
> litigation in that forum - the less deference the plaintiff's choice commands and,
> consequently, the easier it becomes for the defendant to succeed on a *forum non
> conveniens* motion by showing that convenience would be better served by
> litigating in another country's courts.

*Iragorri*, 274 F.3d at 71-72.

Thus, to answer the question of which forum "will be most convenient and will best serve

the ends of justice," the court must consider a range of public and private interests factors.

*Capital Currency*, 155 F.3d at 609.  The private factors include (1) the interests of the litigants in

having the case tried in a particular forum; (2) the relative ease of access to sources of proof; (3)

the availability of compulsory process for attendance of unwilling witnesses; and (4) the cost of

obtaining attendance of willing witnesses; and (5) all other practical problems that make trial of a

case easy, expeditious, and inexpensive.  *Gilbert*, 330 U.S. at 508.  On the other hand, public interest factors to be considered include (1) court congestion; (2) the interest of forums in having local disputes decided at home; and (3) the interest in having the issues of law decided by courts of the nation whose law is involved.  *Id.* at 508-09.

Moreover, courts can consider "[c]ircumstances generally indicative of forum shopping, that is, plaintiff's pursuit not simply of justice but of 'justice blended with some harassment.'" *Norex*, 416 F.3d at 155 (quoting *Gulf Oil Corp*., 330 U.S. at 507.  Such circumstances include "attempts to win a tactical advantage resulting from: local laws that favor the plaintiff's case; the habitual generosity of juries in the United States or in the forum district; the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum."  *Iragorri*, 274 F.3d at 72.  A court is not required to address each of these factors, but in exercising its discretion, should avoid relying on a single factor "to the exclusion of others more supportive of plaintiff's forum choice."  *Norex*, 416 F.3d at 155.

### a.  Private Interest Factors

Both sides have focused on the location of the evidence, the enforceability of a United States judgment in Europe, and the efficiencies gained by trying the foreign claims together with the other claims asserted in this litigation as the relevant private interest factors.  As to the location of the evidence, it is not at all clear which side, if any, this issue favors.  To the extent that the plaintiffs allege a global conspiracy, all of the plaintiffs' claims will no doubt implicate evidence located abroad.  And if the EU and Sherman Act claims require identical proof, the location of the evidence is irrelevant.  If, however, the EU claims require evidence different and apart from what is needed to prove the Sherman Act claims, and if obtaining that evidence is

-53-

cumbersome for reasons related to its location abroad, then this factor favors an alternate forum. The EU plaintiffs assert that these foreign claims will call upon much of the same evidence and witnesses that are need to prove the Sherman Act claims; the defendants contend that the EU claims would require different evidence.  Lacking information about the evidence required to prove the EU claims, the court is unable to resolve this issue in favor of plaintiffs or defendants.

The enforceability of the resulting United States judgment abroad, however, is somewhat more predictable.  An attempt to enforce a United States judgment on the EU law claims in a European Union court could lead to litigation over the validity of a non-member state court's judgment involving the EC Treaty.  (*See* EU Mem. in Supp. 55-56, Decl. of Nicholas Green, Dkt. Entry 510, ¶ 10; EU Opp'n Mem. 54; *see also* Joint Decla. of Alexander Layton QC and Vincent Smith, Dkt. Entry 649-9, Exh. 8 to the EU Mem. in Supp., ¶ 68 (conceding that the question of the extent to which national courts in the EU would recognize a judgment of this court is a matter for the national laws of each of the Member States).)  The court's judgment could be collaterally attacked on the ground that this court incorrectly applied the governing European antitrust law.  (EU Reply Mem. 30; Layton & Smith Decl. ¶ 74; ¶ 12.4.)  Furthermore, the plaintiffs and defendants' expert submissions and supporting case law agree that United Kingdom courts, much less other EU courts, may not enforce a United States class action judgment as to all class members.  (*See*, *e.g.*, Layton & Smith Decl. ¶ 75; *Bersch v. Drexel Firestone Inc.*, 519 F.2d 974, 996-97 (2d Cir. 1975).)  The uncertainties relating to the unenforceability of a class-action judgment in the EU weigh in favor of dismissal.

The possible application of forum selection clauses also merits consideration.  "Forum selection clauses in international contracts are accorded special deference due to the concerns of

international comity, respect for the capacities of foreign and transnational tribunals, and a sensitivity to the need of the international commercial system for predictability in the resolution of disputes." *Am. Patriot Ins. Agency v. Mut. Risk Mgm't*, 248 F. Supp. 2d 779, 783 (D. Ill. 2003), *aff'd in part, rev'd in part and remanded on other grounds*, 364 F.3d 884 (7th Cir. 2004). Lufthansa asserts that this suit in the United States violates forum selection clauses in many of the contracts used by defendants, which specify particular foreign courts.  (EU Mem. in Supp. 38-39.)  Lufthansa submitted eight different standard agreements, each of which specifies Frankfurt/Main, Germany as the exclusive place of jurisdiction.  No other sample contracts relating to any other defendant, however, have been produced.  Given the lack of documentation, a conclusive determination about whether forum selection clauses appear in relevant contracts and apply to this particular action cannot be made.

### b.  Public interest factors

The parties have identified the following to be the relevant public interest considerations: the forum's interest in adjudicating the plaintiffs' claims, the courts' application and adjudication of foreign law, and the complexity of the claims.

This forum's interest in adjudicating the plaintiffs' EU claims is far from robust.  The plaintiffs assert that the forum's interest in adjudicating the plaintiffs' claims arises from its status as the transferee court designated by the Judicial Panel on Multi-District Litigation. Nevertheless, the court may still examine whether the United States has an interest in adjudicating claims with little or no connection to the United States.  Typically, there is an "appropriateness… in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself."  *Gilbert*, 330 U.S. at 509.  Here, where the court

would be required to apply a different country's law and possibly even untangle laws of multiple

foreign jurisdictions, the exercise is less appropriate, and the court's interest in adjudicating the

plaintiffs' claims is diminished.

As for the presence of foreign law claims, courts are generally "fully capable of applying

foreign law." *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580,

587 (2d Cir. 2005). The application of substantive foreign law "is not alone enough to push the

balance of convenience strongly in favor of the defendant." *Manu Int'l, S.A. v. Avon Products*,

641 F.2d 62, 68 (2d Cir. 1981). At the same time, the application of foreign law is a factor that

may be taken into consideration along with the totality of the circumstances, and it may weigh in

favor of dismissal. *See, e.g., Pollux Holding Ltd.*, 329 F.3d at 76 (upholding dismissal where,

"owing to the fact that the overwhelming majority of plaintiffs' claims necessitate the application

of English law, the trial court concluded that choice of law considerations strongly tipped in

favor of litigation in England."); *Monegasque de Reassurances S.A.M. (Monde Re) v. Nak

Naftogaz of Ukr.*, 158 F. Supp. 2d 377, 387 (S.D.N.Y. 2001) ("[C]ourts have a legitimate interest

in avoiding the difficulty with questions of conflicts of law and the application of foreign law"),

*aff'd*, 311 F.3d 488, 500 (2d Cir. 2002) ("Ukrainian courts are better suited than United States

courts for the resolution of these legal questions."); *De Young v. Beddome*, 707 F. Supp. 132, 139

(S.D.N.Y. 1989) (holding that Canadian law would apply under choice-of-law principles, which

would "compel this Court to apply an unfamiliar body of law, a prospect that argues strongly for

dismissal.")

The underdevelopment of European Union antitrust law, particularly on the member state

level, gives rise to concern that this court would face issues of first impression under the EC

Treaty and the EEA Treaty.  EU antitrust law must be applied in conjunction with national law,

and the EU law claims concern shipments between some 31 different EU jurisdictions, any

number of other nations in the world, as well as the United States.  Moreover, the EU plaintiffs'

clams may implicate a host of undecided foreign law issues: issues of indirect purchaser

standing, the existence of a pass-on defense, the availability of exemplary damages for price-

fixing; the extraterritorial scope of European antitrust law; the proper period for calculating

damages and the applicable rate of interests; and the proper standard for proving causation.  (EU

Reply Mem. 26-27.)  The plaintiffs advance the argument that, if faced with questions of first

impression on EU law, the court could simply solicit an amicus curiae opinion from the

European Commission.  They base this on their experts' belief that the EC "may" extend its

policy of acting as amicus curiae to EU courts to non-EU courts.  Their experts concede that this

belief is simply conjecture.  (Layton & Smith Decl. ¶ 81.)  Furthermore, the EC's amicus curiae

briefs would not be binding on this court.

      The EU plaintiffs also assert, without support, that United Kingdom law could supply the

national law for *all* of the EU claims – the overwhelming majority of which have absolutely no

connection to the United Kingdom.  There is no reason to conclude that United Kingdom law is

the appropriate law to apply to all the claims here.  Instead, the court will likely need to decide

which national member state's laws should apply to each set of claims arising out of the shipping

routes.  It appears certain that the court will need to choose and apply the laws of over thirty

foreign jurisdictions.  The complexity inherent in the determination and application of foreign

law weighs in favor of dismissal.

4.  Conclusion

The above review leads the court to conclude that the EU claims do not belong in United States courts.  First, the choice by the EU plaintiffs, who are largely foreign, of the United States as a forum deserves comparatively less deference.  Second, there are adequate alternative forums, outside the United States, where they can bring their EU claims.  And third, the totality of the circumstances indicates that a foreign forum "will be most convenient and will best serve the ends of justice."  The plaintiffs' EU claims should be dismissed on the grounds of *forum non conveniens*.

## B.  International Comity

"Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."  *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S.D. of Iowa,* 482 U.S. 522, 543 n.27, 107 (1987).

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163-164 (1895).  The Second Circuit has described the boundaries of international comity as "amorphous" and "fuzzy."  *JP Morgan Chase Bank v. Altos Hornos De Mexico*, S.A. 412 F.3d 418, 423 (2d Cir. 2005) (quoting *Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law*, 76 Am.J. Int'l L. 280, 281 (1982)).

-58-

International comity is often cited as a basis for declining jurisdiction where a party seeks the recognition of a foreign judgment. *Royal and Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc*., 466 F.3d 88, 92 (2d. Cir. 2006). International comity may be invoked in favor of abstention where there is a pending foreign proceeding that has yet to reach final judgment (this has been termed "comity of the courts"). *Id.* (citing JOSEPH STORY, COMMENTARIES ON THE CONFLICT OF LAWS § 38 (1834). It has also been used to decline jurisdiction where a foreign sovereign would bar a foreign claim. *See*, *e.g*, *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 431 (D.N.J. 1999) (dismissing claim under German law relating to WWII forced labor where Germany's government had taken position that foreign citizens may not assert direct claims for war-time forced labor against private companies).

A perhaps rarer iteration of the doctrine occurs where the adjudication of claims involves the application of unsettled foreign law. *See*, *e.g.*, *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2000) (concluding that, unlike an EU national court, a United States court would not have the "option" of seeking an opinion from the ECJ on questions of EC law). It is rare because federal courts are under a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Royal and Sun Alliance Ins. Co. of Canada*, 466 F.3d at 92 (*citing Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 817 (1976). "[O]nly the clearest of justifications will warrant dismissal." *Id*. Nevertheless, based on the considerations in this particular case, the court is led to conclude that the adjudication of European Union antitrust claims would undermine the principles of international comity, as well as show a lack of respect for Europe's sovereign interest in maintaining its antitrust enforcement framework.[28]

---

[28] The court's reliance on this iteration of comity obviates the need to address the dispute between the parties over whether there is, or needs to be, a "true conflict" between United States and European

1.   The EC Treaty and EC Regulatory Framework

In addition to burdening this court with obscure questions of EU law, applying European antitrust law in American courts undermines the European Union's stated interest in the development of its own laws, and undermines our country's interest in promoting the development of strong antitrust regulations, particularly in countries like those in the European Union which enjoy a strong tradition of the rule of law.  The EU antitrust law regime is set out in the EC Treaty.  The EC Treaty, initially signed by six European nations, has now been endorsed by twenty-seven signatory nations that constitute the European Union (referred to herein as "member states").  One of the primary objectives of the EC Treaty, and the movement towards the formation of the European Union, was the creation of an economic unit which is "characterized by the abolition as between Member States, of obstacles to the free movement of goods, persons, services and capital," and "a system ensuring that competition in the internal market is not distorted."  EC Treaty, Arts. 3, 4.  The EC Treaty, through Articles 81 and 82, prohibits certain anticompetitive behaviors, but exempts conduct that contributes to, or at the very least does not conflict with, economic progress.

---

Union law.  (*See* EU Opp'n Mem. 32-33, EU Reply Mem. 5-8.)  The plaintiffs argue that "[u]nder binding Second Circuit authority, "[i]nternational comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction."  (EU Opp'n Mem. 32.)  The issue here, however, is not whether compliance with both laws is possible, because, as the plaintiffs concede, United States law does not extend to much of the conduct that gives rise to their EU claims.  Instead, the issue is *which court* will apply the EU law.  A "true conflict" arises when the extraterritorial application of United States law imposes obligations that conflict with that territory's laws.  *See, e.g.*, *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1049-50 (2d Cir. 1996) (faced with conflicting obligations of United States and British bankruptcy laws).

### a.   Public and Private Enforcement of the EC Treaty

In 1962, the EU legislative body delegated to the European Commission the power to administer and enforce EC competition law.[29]  The European Commission, which is part of the executive branch of the European Union, handles the public enforcement of antitrust laws from start to finish: it determines what European competition policy is, how it is implemented on the ground, identifies breaches of the rules, investigates the breach, decides whether to take a formal decision, decides whether to fine the errant party, and at what level.  (See EU Mem. in Supp. 14 n. 17.)  As a governmental institution, the European Commission has been administering and enforcing EC competition law for over forty years.

Private enforcement of antitrust laws, on the other hand, has been an unexplored arena in the European Union.  *See Info. Res., Inc.*, 121 F. Supp. 2d at 417.  Indeed, until this decade, it was unsettled whether the national courts of EU member states were even obligated to provide a damages remedy to private entities for violation of Articles 81 and 82.  In 2001, the ECJ held that damages must be made available in courts of the national member states for violations of EC antitrust laws, confirming that there is an individual private right to antitrust damages.  *Crehan v. Courage*, 2001 E.C.R. I-6297.  The ECJ plays an important role in the interpretation of EC law, and so a brief overview of its form and function follows.

### b.   The Role of the ECJ and Member State Courts in Adjudication of EC Antitrust Law

The ECJ, the highest court of the European Union, is comprised of one judge from each of the 27 member States and has jurisdiction over all matters of EC law.  Its decisions are binding in all EU member states.  CHRISTOPHER KERSE & NICHOLAS KAHN, EC ANTITRUST

---

[29] See Council Regulation 17/62, art. 9, 1962 O.J. (L 13) 204 ("The Commission shall have power to apply Article [81(1)] and Article [82] of the Treaty.")

PROCEDURE, at 445 (5th ed. 2005).  Under Article 234 of the EC Treaty, the EU member states

have the ability to refer questions of EC law directly to the ECJ for a preliminary ruling.  For

lower courts of each Member State, such a referral is discretionary, but the court of last resort in

each member state is required to refer questions of EC law to the ECJ.  *Id.*  The ECJ has an

important role, therefore, in ensuring that interpretations of EU law are applied consistently

throughout the European Union.

Following the *Courage v. Crehan* decision, the Council of the European Union, passed

Regulation No. 1/2003, known as the "Modernization Regulation" ("Mod. Reg.").  This

regulation provides that the "national courts shall have the power to apply Article 81 and 82 of

the EC Treaty," allowing them to "protect the subjective rights under Community Law, for

example by awarding damages to the victims of infringement."  *See* Mod. Reg. Art. 6, prefatory

¶ 7.[30]  The Modernization Regulations provide for a number of mechanisms intended to ensure

uniformity in the application of Article 81 by the EC and the national courts.  *See*, *e.g.*, Mod.

Reg. Art. 11.

For example, the national courts are required to "forward to the Commission a copy of

any written judgment . . . deciding on the application of Article 81 or 82 of the Treaty . . .

without delay after the full written judgment is notified to the parties."  Mod. Reg. Art. 15(2).  In

addition, national courts may ask the Commission to transmit to them information in its

possession or its "opinion on questions concerning the application of the Community

competition rules."  *Id.* Art. 15(1).  Moreover, member state courts must defer to the

Commission's determinations and proceedings.  The Modernization Regulation provides that,

---

[30] The Regulation also decentralized the public enforcement power, which had previously resided
solely in the European Commission, to the competition authorities in the member states.  *Id.* at art. 6.

when member state courts "rule on agreements, decisions or practices under Article 81 or Article

82 which are already the subject of a Commission decision, they cannot take decisions running

counter to the decision adopted by the Commission."  *Id.* Art. 16(1).  The member states "must  .

. . avoid giving decisions which would conflict with a decision contemplated by the Commission

in proceedings it has initiated," *id.*, and "may assess whether it is necessary to stay [their]

proceedings" during the pendency of Commission proceedings.  *Id.*  The practical effect of this

Regulation is that the national courts of EU member states do not entertain Article 81/82

damages actions during the pendency of a Commission proceeding.  (Declaration of Jürgen

Basedow, annexed to Omnibus Mem. in Supp., Dkt. Entry 503, ¶ 23; Green Decl. ¶¶ 41-42.)  In

sum, the Europeans have constructed a framework that operates on the basis of deference to the

European Commission, is intended to promote uniformity, and incorporates a uniquely European

approach.[31]

> 2.   The Adjudication of The Plaintiffs EU Claims By A United States Court
>       Would Undermine EU Sovereign Interests

The adjudication, by this court, or any other United States Courts, of the EU claims

asserted by plaintiffs could not operate within the framework described above, would disturb the

uniformity of EC competition law, and would undermine the European interest in developing its

---

[31] The current EC Commissioner for Competition has expressed that Europe does "not want to cut-and-paste an American style system." See Neelie Kroes, European Commissioner for Competition Policy, Speech at Commission/IBA Joint Conference on EC Competition Policy, (Speech/06/158) at 4 (Mar. 9, 2006), available at http://europa.eu/rapid/pressReleasesAction.do ?reference=SPEECH/06/158&format=HTML&aged=0). Because the features of the U.S. system are "simply not compatible with . . . European traditions," the Commissioner's goal is to find "truly European solutions, grounded in our European legal traditions and culture." Neelie Kroes, European Commissioner for Competition Policy, Speech at Commission/IBA Joint Conference on EC Competition Policy, (Speech/07/128) at 5-6 (Mar. 8, 2007), available at http://europa.eu/ rapid/pressReleasesAction.do?reference=SPEECH/07/128&Format=HTML&aged=0&language=EN&gui Language=en.

own European antitrust law.  The Modernization Regulation contains no procedures for a foreign

court to request from the Commission its opinion on the application of Article 81, or for

information in its possession regarding the parties' conduct.  Conversely, there are no provisions

for procedures by which the Commission would provide such information to foreign courts.

Critically, a United States court adjudicating an Article 81 claim is under no obligation to, and in

fact may be prohibited from, deferring unconditionally to Commission findings concerning the

defendants' conduct.  Although EC law mandates that the Commission's current and on-going

investigation of the air cargo industry, and its findings regarding the conduct at issue, control the

outcome of civil litigation brought under Article 81, United States doctrines of collateral estoppel

mandate that a United States court make independent findings.  In light of the EC's powers of

investigation which exceed those of a United States court, the potential for inconsistent

adjudication is high.[32]

This litigation will undoubtedly raise unsettled issues of EU antitrust law, because the

private enforcement of EU antitrust law is underdeveloped.  A report, issued by the European

Commission in 2004 found that member states had widely different causes of action and

remedial schemes for enforcing Article 81.  *See* Ashurst Report.  Among the many unsettled

issues identified by the Ashurst Report were the questions of whether indirect purchasers may

recover damages, whether defendants are entitled to the pass-on defense, whether exemplary

damages are available for Article 81 claims, and if so, what standards apply, and probably most

fundamentally, what the standard is for proving causation.  *Id.*  This court would be forced to fly

---

[32] It also bears noting that precedent supporting U.S. adjudication of Article 81 claims would also undermine European amnesty programs - vital tools in the detection and prosecution of European cartel behavior, thereby undermining the European interest in regulating anticompetitive behavior within the European Union.  (*See* EU Mem. in Supp. 31-32.)

blind on these unsettled issues, because it does not have a mechanism by which to obtain an

opinion from the ECJ on an unresolved issue of EU antitrust law.  It was the recognition of this

precise problem that led the Southern District of New York to decline to exercise supplemental

jurisdiction over a claim under Article 82 of the EC Treaty in *Information Resources*.  127 F.

Supp. 2d at 417 (finding that unlike EU national courts, it would not have the option of seeking

an opinion from the European Court of Justice on questions of European Community law, but

would need to decide what EC law would be *de novo.*)

> 3.   Courts Have Declined to Adjudicate EC Antitrust Claims

Pointing to a number of cases where courts have adjudicated issues of foreign law, the

plaintiffs argue that European law may easily be applied outside the European legal system and

in United States courts.  While United States courts routinely apply foreign law, *Printz v. United

States,* 521 U.S. 898 (1997), the cases cited by plaintiffs grappled with the comparatively

straightforward application of foreign laws of property, contract and tort, as opposed to foreign

antitrust law.  *See*, *e.g.*, *Rationis,* 426 F.3d at 582 (finding Korean law governed tort litigation);

*Indasu Int'l., C.A. v. Citibank, N.A.*, 861 F.2d 375, 380 (2d Cir. 1988) (applying Ecuadorian

contract law); *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co.

Kg.*, 295 F.3d 59, 66 (1st Cir. 2002) (observing that district court could apply German contract

law and Austrian property law in addition to United States copyright law); *Abogados v. AT&T*,

223 F.3d 932, 935 (9th Cir. 2000) (finding California choice of law points to application of

Mexican law of tortious interference with contract);  *Tschira v. Willingham,*135 F.3d 1077, 1088

(6th Cir. 1998) (applying German fiduciary duty law); *Dorman v. Emerson Elec. Co.*, 23 F.3d

1354 (8th Cir. 1994) (applying Canadian tort law).

By contrast, the three courts that have faced European antitrust claims to date have unanimously declined to adjudicate them.  In 2000, the Southern District of New York refused to exercise jurisdiction over an antitrust claim under Article 82 of the EC Treaty, on the ground that a United States court is not in a position to decide unresolved questions of European competition law.  *See Info. Res.*, 127 F. Supp. 2d at 417.  On remand from the Supreme Court, the district court in *Empagran* cited comity as a basis for declining supplemental jurisdiction over Article 81 claims.  *See Empagran, S.A. v. F. Hoffman-La Roche Ltd.*, 453 F. Supp. 2d 1, 12 (D.D.C. 2006).  In another Southern District of New York case, the court dismissed the Article 86 (prior to its renumbering as Article 82) claim for failure to state a claim, although it did not address comity or any other threshold ground for dismissal.  *Multi-Juice, S. A. v. Snapple Beverage Corp.,* No. 02 4635, 2003 WL 1961636, at *5 (S.D.N.Y. Apr. 25, 2003).

### 4.  Comity Furthers United States Interests

If this court allows the plaintiffs to proceed with their EU claims, it would no doubt "attract away cases from the EU national courts that might otherwise be litigated in Europe." Margaret Bloom, *Should Foreign Purchasers Have Access to U.S. Antitrust Damages Remedies? A Post-Empagram Perspective from Europe*, 61 N.Y.U. ANN. SURV. AM. L. 433, 451 (2005).  The availability of United States courts to adjudicate issues of EU antitrust law would not only crowd them with claims that are not connected to the United States, but would also inhibit the development of jurisprudence within the European Union.  This would hamper the development of robust private enforcement litigation in the European, leading to perpetual uncertainty for claimants and defendants alike.  Indeed, the United States has a stated interest in promoting the development of antitrust regulations in other countries and regions.  In its brief in *Empagran*

after it was remanded to the D.C. Circuit, the United States discussed how forum shopping

becomes more of a concern because the state of the law is undeveloped in the EU: "[w]hile some

countries' antitrust regimes fairly can be described as developing, this is not reason to

circumvent and stunt them by dragging private antitrust litigation away to U.S. courts."  Brief for

the United States and the U.S. Federal Trade Commission as Amici Curiae, *Empagran, S.A. v. F.*

*Hoffmann-La Roche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005) (No. 01-7115), 2005 WL 388672, at

24-25.  Declining to adjudicate EU antitrust claims in favor of that interest will ultimately protect

United States consumers and corporations from anti-competitive behavior abroad, given the

limited reach of our courts and the global nature of commerce.

### C.  Diversity Jurisdiction

The defendants contend that, even if for no other reason, the plaintiffs' claims under

foreign law should be dismissed because this court lacks diversity jurisdiction over them.

Although the conclusion here is that *forum non conveniens* and international comity provide a

firm basis for dismissal of these claims, if the court chooses to adjudicate the foreign law claims,

it could properly assert diversity jurisdiction over them.  Under the new Class Action Fairness

Act, district courts have diversity jurisdiction

> of any civil action in which the matter in controversy exceeds the sum or value of
> $5,000,000, exclusive of interest and costs, and is a class action in which
> …
> (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a
> foreign state and any defendant is a citizen of a State; or
> (C) any member of a class of plaintiffs is a citizen of a State and any defendant is
> a foreign state or a citizen or subject of a foreign state.

28 U.S.C. § 1332(d)(2)(B)-(C).  This relaxed standard of diversity is termed "minimal diversity."

*See*, *e.g.*, *Blockbuster, Inc. v. Galeno*, 472 F.3d 53 (2d Cir. 2006).  These provisions apply to the

-67-

classes asserted here.  The plaintiff classes in Count IV, V, and VI are foreign citizens, and at

least one defendant is a United States citizen; thus, they are minimally diverse under 28 U.S.C. §

1332(d)(2)(B).  Since the plaintiff class in Count VII is comprised of United States citizens and

foreign citizens, and at least one defendant is a foreign citizen, minimal diversity is present under

subsection (C).

Despite the plain language of the statute, the defendants argue that Congress did not

intend CAFA to apply to the plaintiffs here, who are mostly foreign, and who assert foreign law

claims, and charge that its application leads to "absurd results."  The court recognizes that the

plaintiffs' foreign law claims raise complicated choice-of-law, enforceability, and sovereignty

issues.  Those issues, however, are grounds for dismissal under the *forum non conveniens*, or

international comity analysis.  The existence of these issues does not deprive the court of

diversity jurisdiction; rather, they provide a basis on which the court may decline to exercise its

jurisdiction.

The defendants contend that, despite the explicit applicability of CAFA, this court is

barred from asserting diversity jurisdiction under *Erie Railroad Company. v. Tompkins*, 304 U.S.

64 (1938), because the  plaintiffs are unable to bring their European law claims as a class in a

European court.  Under *Erie*, federal courts sitting in diversity over state law claims must apply

state substantive law and federal procedural rules.  *Id.*, 304 U.S. at 78.  *Hanna v. Plumer*, which

developed the test for deciding when state law should apply in federal diversity cases, held that

where a state law directly conflicts with a federal procedural rule, it is generally preempted.  380

U.S. 460, 471 (1965).  This rule has been applied where foreign law claims, rather than state law

-68-

claims, are asserted – a logical extension.  *See, e.g, Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*, 145 F.3d 463, 479 (1st Cir. 1998).

The European Community and its member states do not permit opt-out class actions like those authorized under Rule 23.[33]  Long-standing precedent, however, confirms that the class action device is a procedural device, not a matter of substantive law.  Rule 23, the rule which provides litigants with the right to bring a class action, has been conclusively determined to be a federal procedural rule.  *See, e.g.*, *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) ("[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims."); *Doe v. District of Columbia*, 701 F.2d 948, 960-63 (D.C. Cir. 1983) ("'Rule 23 is considered a procedural rule, rather than one that affects the substance or the merits of litigation.'") (*quoting* H. NEWBERG, CLASS ACTIONS § 2135 (1977).  Where state law lacks or limits the class action device, courts have found a direct collision with Rule 23, and permitted plaintiffs to proceed in a class.  *See, e.g.*, *Lefebvre v. Kelly*, 1987 WL 12036, at *3 (E.D.N.Y. 1987) (Korman, J.); *Briskin v. Glickman*, 267 F. Supp. 600, 604 (S.D.N.Y. 1967); *Kristiansen v. John Mullins & Sons, Inc.*, 59 F.R.D. 99, 110 n. 13-14 (E.D.N.Y. 1973) (suggesting that applying state bar on class actions to pendant state law claims would create a direct collision between state law and federal procedural law); *see also* 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 1758 (3d ed. 2005) (stating that class actions are "availab[le] . . . in a federal court under Rule 23 in a diversity action, even in a state that does not recognize the procedure."); ALBA CONTE & HERBERT B. NEWBERG, NEWBERG

---

[33] This is because European legal principles conceptualize legal rights as resident in the individual and not assertable on behalf of third parties absent consent.  (Affidavit of Dr. Astrid Stadler Decl. in Support of Omnibus Motion to Dismiss, Dkt. Entry 502, ¶ 5.)  "Opt-in" class actions, however, are permitted.  (*Id.* ¶ 9.)

ON CLASS ACTIONS § 7:30 (4th ed. 2002 & Supp. 2008) ("Rule 23 is considered a procedural rule, rather than one that affects the substance or the merits of litigation. Accordingly, it is now settled that Rule 23 governs the certification of class actions in federal courts, even in diversity actions, in which the forum state may have a more restrictive class action rule.").  The fact that plaintiffs could not bring their claims as an opt-out class in Europe does not by itself deprive the court of diversity jurisdiction under *Erie*.

The defendants maintain, however, that the lack of an opt-out class mechanism in Europe is substantive foreign law.  Their argument is premised on the relationship between Section 901(b) of the New York Civil Practice Law and Rules and other statutory claims.  Section 901(b) provides, "[u]nless a statute creating or imposing a penalty, or a minimum measure of recovery *specifically authorizes* the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action."  (Emphasis added.)  In *Bonime v. Avoya*, the court held that Section 901(b) prevented a federal court sitting in diversity to entertain a class action under a federal statute, the Telephone Consumer Protection Act ("TCPA").  The TCPA specifically provided that a class action was authorized only "if otherwise permitted by the laws or rules of court of a State."  No. 06-CV-1630, 2006 WL 3751219, at *4 (E.D.N.Y. Dec. 20, 2006).  *Bonime* found that since the TCPA did not specifically authorize class actions, Section 901(b) would prohibit a state court from allowing a claim under it to proceed as a class action.  *Id. Bonime* further found that Section 901(b) was substantive state law under *Erie*, and that the federal courts sitting in diversity must apply it to bar class actions.  *Id*.

The defendants' argument falls short, however, because they fail to link the TCPA caselaw and the claims at bar in a meaningful manner.  They do not point to any European laws that specifically bar actions in the same manner as Section 901(b).  And they fail to cite European law that directs the court to examine the laws or rules of a foreign country, as does the TCPA.  They have not convinced the court that the absence of an opt-in class action mechanism in the national courts of Europe is analogous to a specific provision of state law.  Clearly, the absence of a procedure is distinguishable from a state prohibition of a procedure.  The lack of a parallel procedure, therefore, does not prevent federal courts from applying the federal rules:

> [T]he federal courts are free to follow the practices and procedures authorized under the Federal Rules or an Act of Congress, despite the fact that a particular practice or procedure might not be available in a state court and might be viewed as "remedial." Thus the absence of a corresponding procedure or remedy in the forum state's court system does not affect the ability of a federal court in a diversity case to do any of the following: to certify and adjudicate a class action under Rule 23 . . .

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, 19 FED. PRAC & PROC. § 4513.

## D.  Supplemental Jurisdiction

As an alternative basis for jurisdiction over the foreign law claims, the plaintiffs suggest supplemental jurisdiction under 28 U.S.C. § 1367.  The statute reads in part:

> Except as provided in subsections (b) and (c) . . . , in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Subsection (c) permits district courts to "decline to exercise supplemental jurisdiction over a claim" where

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(3).  Given the court's conclusion that diversity jurisdiction would exist, the question of supplemental jurisdiction is almost moot.  Nevertheless, the following observations concerning the matter are warranted.  The claims are specifically related to the Sherman Act claims over which the court has diversity jurisdiction such that they are part of the same case or controversy.  However, the foreign claims would no doubt raise "novel and complex issues" of law.  There is the possibility that the foreign law claims would "substantially predominate" over the domestic claims by virtue of their complexity and geographically far-flung scope.  Finally, *forum non conveniens* and comity considerations would likely constitute exceptional circumstances.  The latter considerations would provide substantial reasons for the court to decline supplemental jurisdiction over the EU law claims.

## IV.    Foreign Sovereign Immunity

Thai Airways ("TAI"), South African Airways ("SAA"), and Saudi Arabian Airlines ("Saudia") have each moved separately to dismiss the counts against them on the grounds that they are immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq* ("FSIA").  Federal courts must inquire at the "threshold of every action" against a foreign state whether the exercise of its jurisdiction is appropriate.  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983).

### A.  Sovereign Status and Immunity

The burden of establishing federal jurisdiction typically falls on the party seeking to invoke jurisdiction. *See Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998). That party must allege a proper basis for jurisdiction in his pleadings and must support those allegations with "competent proof" if a party opposing jurisdiction properly challenges those allegations." *See id.* (*quoting McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178 (1936)). In resolving a motion to dismiss for lack of subject matter jurisdiction, the court may consider evidence outside the pleadings, such as affidavits and other documents. *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). Where the FSIA is implicated the burden of proof is different. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (*quoting Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 43 (1989)). "Once a defendant presents a *prima facie* case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993). If the defendants challenge only the legal sufficiency of the plaintiffs' jurisdictional allegations, then the district court should take the plaintiffs' factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiffs. *See*, *e.g.*, *Nelson*, 507 U.S. at 351, 361 (1993); *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

The plaintiffs here initially invoked subject matter jurisdiction under various federal statutes, including federal question and diversity jurisdiction. TAI, SAA and Saudia asserted their foreign sovereign status in their motions to dismiss on grounds of foreign sovereign immunity. The plaintiffs contend that SAA has not presented a *prima facie* case that it qualifies

-73-

for the presumption of sovereign immunity, and that in any event, TAI, SAA, and Saudia have waived any immunity they were entitled to.

### A.  Sovereign Status of SAA

Under the FSIA, foreign states, their political subdivisions, as well as their agencies and instrumentalities, are presumptively immune from suit in United States court.  28 U.S.C. 1603(b)(2).  To qualify as an "agency or instrumentality," an entity must be an "organ" of a foreign state or political subdivision, or have a foreign state or political subdivision hold a majority stake such that "a majority of [its] shares or other ownership interest is owned by a foreign state or political subdivision thereof."  *Id.*  The FSIA provides that foreign states and other eligible entities may waive their immunity "either explicitly or by implication," 28 U.S.C. § 1605(a)(1), as well as by engaging in certain commercial activity that impacts the United States, 28 U.S.C. §§ 1605(a)(2).  The FSIA exceptions to immunities provide the sole basis for asserting subject matter jurisdiction over a controversy involving a foreign state and its instrumentalities in federal court

### 1.  Facts[34]

SAA, a foreign company headquartered in Johannesburg, South Africa, is a public entity, wholly owned by the government of the Republic of South Africa.  (Decl. of Louisa Zando, Exh. 1 to April 28, 2008 Letter from South African Airways to The Honorable Victor V. Pohorelsky, Dkt. Entry 746, ¶ 4; Compl. ¶ 66.)  In 2004, however, the majority shareholder of SAA was Transnet, a public holding company wholly owned by the South African Department of Public Enterprise.  (Ntuli Decl, Exh. 1 annexed to SAA Mem. in Supp., ¶ 3.)  On June 12, 2006,

---

[34] Unless otherwise noted, this section draws on the undisputed facts contained in SAA's and the plaintiffs' memorandums, exhibits and affidavits on this issue.  Where facts are disputed, it will be noted.

Transnet, the South African government, and SAA entered into a Share Sale Agreement that would separate SAA from Transnet, and transfer its shares to the government.  (Ntuli ¶ 6.) Although SAA contends that the Agreement was effective as of March 31, 2006, the Agreement was "subject to the fulfillment of certain conditions" before SAA's status as stand-alone state enterprise was finalized.  (*Id.*)  Those conditions were not met until April 14, 2008, long after the complaint was filed.  (Zando Decl. ¶ 4.)

The South African Cabinet endorsed the Agreement on July 26, 2006 (Ntuli Decl. ¶ 8), and, in October 2006, adopted a draft bill providing the legislative mechanism by which SAA could become a public company.  (*Id.* ¶ 10, South African Airways Bill ("SAA Bill"), Ex. 2 to SAA Mem. in Supp., 3.)  The Chief State Law Advisor certified this draft bill on November 20, 2006; the South African National Assembly adopted the draft bill on March 1, 2007; the South African President in turn assented to the bill on June 14, 2007; and the bill was officially "gazetted" into law on June 27, 2007.  (Ntuli ¶ 10, SAA Bill 6-7.)

By the time SAA filed its motion to dismiss on August 1, 2007, two conditions remained unfulfilled.  First, the International Air Services Council had not yet approved of the transfer of SAA – it had only granted conditional approval subject to the adoption of consumer protections. (SAA Mem in Supp. 4.)  Second, final approvals, consents or waivers from third-party contractors had not yet been received.  (*Id.*)  SAA describes these final conditions as merely "ministerial."  (*Id.*)  SAA asserts that by April 14, 2008, these conditions had been fulfilled, and SAA was officially a stand-alone state-owned enterprise.

-75-

2.   SAA's Status at Filing is Determinative

*Dole Food Co. v. Patrickson* made clear that instrumentality status under the FSIA is set at the time of filing of the complaint.  538 U.S. 468, 480 (2003).  *Dole* reasoned that this conclusion was compelled by the present tense language in 28 U.S.C. 1603(b), which defines an instrumentality as an entity that "*is* an organ" or a "majority of whose shares . . . *is* owned by" a foreign state.  *Id.* at 478.  This is consistent with the long-standing, well-established rule, reaching back to the early 1800s, that jurisdiction is determined by the facts that exist at the time the suit is filed.  *See Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 570 (2004) (citing *Mollan v. Torrance*, 9 Wheat. 537, 539, (1824)).

SAA concedes that the South African government did not hold majority ownership of SAA at the time of filing.  SAA nevertheless argues that to turn a blind eye to SAA's post-filing change of status would be inconsistent with the purpose of the FSIA, which is "to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns."  In effect, SAA argues that, though jurisdiction over SAA, as a citizen of foreign state, initially arose under diversity jurisdiction, SAA's later conversion changed the jurisdictional basis of the suit to the FSIA.  SAA is opposed to the application of the time-of-filing rule, and wants this court to hold that when an entity gains foreign sovereign status at *some point* during the litigation, it should nevertheless be accorded immunity.  This argument is inconsistent with *Dole*.

Indeed, the Seventh Circuit, pointing to *Dole*, recently rejected this very argument as quite simply "wrong."  *Olympia Express, Inc. v. Linee Aeree Italiane, S.P.A*, 509 F.3d 347, 349 (7th Cir. 2008).  In *Olympia*, the defendant Alitalia removed the suit from state court to federal

-76-

court at the start of the litigation because Italy was a majority shareholder at the time; after removal, Alitalia lost instrumentality status. *Id.* The plaintiffs then made a jury trial demand. *Id.* Although sovereign entities are entitled to *non*-jury trials under the removal statute, the district court granted the demand, reasoning that when Alitalia was privatized, the jurisdictional basis of the suit had *switched* – from foreign sovereign immunity to diversity jurisdiction – "seamless[ly]," and Alitalia was no longer entitled to the non-jury trial granted under foreign sovereign immunity jurisdiction. *Olympia Express, Inc. v. Linee Aeree Italiane S.P.A.*, 437 F. Supp. 2d 780, 787 (N.D. Ill. 2006). The Seventh Circuit *reversed* the district court's decision, reiterating that a change in sovereign status would never alter the jurisdictional basis of a suit, which is set at the time of filing.

SAA nevertheless maintains that *Olympia* appellate decision supports its position that post-filing events can invoke foreign sovereign immunity jurisdiction, quoting its observation that the "purpose of foreign sovereign immunity . . . does not fall out of the picture when a foreign-state entity is privatized." 509 F.3d at 352. *Olympia* was not suggesting that the basis for jurisdiction can change post-filing, however; rather, it was noting that the application of the FSIA where an entity has privatized post-filing serves the purposes of the FSIA, because it allows foreign nations freedom to proceed in privatizations which suit their needs without concern that it would affect litigation in the United States. That reasoning is factually inapplicable here.[35] There is no reason to conclude that the "Court has changed its mind and

---

[35] SAA cites to a number of cases from other circuits that were decided before *Dole v. Patrickson*. None of the decisions address the issue of whether an entity became a "foreign state," thereby changing from diversity to FSIA jurisdiction, *after* suit was filed. The Ninth Circuit in *Wolf v. Banco Nacional de Mexico, S.A.*, 739 F.2d 1458, 1460 (9th Cir. 1984), indicated that the nationalization of a publicly-held bank at the summary judgment stage allowed it to become a "foreign state" for the purposes of FSIA, but it conducted no explicit analysis of the issue. Ten years later, the Ninth Circuit, while deciding another

now thinks that jurisdiction under the Foreign Sovereign Immunities Act is determined" at some later point after the complaint is filed.  *Olympia*, 509 F.3d at 348.  SAA is arguing against clear precedent on this issue.

### 3.   SAA is not an Organ, Agency or Instrumentality At Time of Filing

SAA argues that it should nevertheless be accorded sovereign status because its nationalization was "imminent and inevitable" at the time of filing.  This argument is undermined by SAA's concession that "*undisputable* rights to raise FSIA immunities" arise only once reprivatization is complete.  (SAA Mem. in Supp. 7 (emphasis added).)  The privatization of SAA was not completed until some eight months after it moved for dismissal based on foreign sovereign immunity, and almost a year after the suit was filed.  And the Act paving the way for SAA's nationalization was not adopted as law until *after* the complaint was filed.

SAA also argues that it was a *de facto* organ of the South African government at the time of filing, that while its renationalization may not have been formally complete at the time of filing, the South African government had by that time already begun to utilize SAA as its organ, and that the South African Department of Public Enterprises exercised day-to-day administrative oversight over its activities.  It argues, therefore, that, whatever its formal ownership status, SAA

---

issue, noted that *Wolf* "implied that the FSIA may be applicable if a party that becomes a "foreign state" after the commencement of a lawsuit promptly brings its status as a "foreign state" to the district court's attention."  *Straub v. A P Green, Inc.*, 38 F.3d 448, 451 (9th Cir. 1994).  In *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1104, 1106 (5th Cir. 1985), the court again did not decide the issue, but noted that defendant Bancomer was nationalized after the suit was filed in state court, and successfully removed to federal court under 28 U.S.C. § 1441(d).  Under *Dole*, however, which unanimously affirmed that an entity seeking removal to federal courts under 28 U.S.C. § 1441(d) must be an instrumentality at the time suit is filed, it is clear that the district court in *Callejo* erred in permitting removal.

The only case plaintiffs cite which explicitly found that post-filing change of sovereign status affected the applicability of FSIA is *Matton v. British Airways Board, Inc.*, No 85-CV-1268, 1988 WL 117456, at *3 (S.D.N.Y. Oct. 27, 1998).  In *Matton*, the court decided, in an unreported opinion, that the post-filing privatization of an entity changed its jurisdiction over it from FSIA to diversity jurisdiction.  This court is not alone in disagreeing with the reasoning and decision in *Matton*.  *See*, *e.g.*, *Olympia*, 509 F.3d at 350.

was a "*de facto* organ."  (SAA Mem. in Supp. 7 n. 1, citing *Morgan Guaranty Trust Co. of New York v. Republic of Palau,* 924 F.2d 1237, 1238 (2d Cir. 1991) and *Murarka v. Bachrack Bros.*, 215 F.2d 547, 552 (2d Cir. 1954)).  Instead of explaining how SAA was treated or acted as an organ at the time of filing under the relevant caselaw, however, SAA chooses to import the concept of "*de facto*" sovereignty from an inapposite case that touched on the status of India days before its transition from colony to sovereignty was complete.  In *Murarka v. Bachrack Bros.*, the Second Circuit held that India was a *de facto* sovereign in light of its long-time aspirations towards independence, the U.S. recognition of Indian ambassadors, and its achievement of fully independent status a month after the complaint was filed.  215 F.2d at 552. SAA wishes, without precedent, to extend the concept of *de facto* sovereignty to commercial entities that are in the process of being nationalized when a complaint is filed.

Moreover, SAA does not go to any great lengths to demonstrate that it was effectively an organ of the South African government at the time of filing.  SAA asserts that the South African government, through the Department of Public Enterprises exercised day-to-day administrative control at the time of filing.  (Ntuli Decl. ¶ 9.)  Otherwise, SAA fails to address the criteria deemed relevant by the courts for determining whether an organ qualifies as an organ of a foreign state or a political subdivision thereof, such as whether the foreign state created the entity for a national purpose;[36] whether the foreign state actively supervises the entity; whether the foreign state requires the hiring of public employees and pays their salaries; whether the entity holds exclusive rights to some right in the [foreign] country; and how the entity is treated under

---

[36] It should be noted that, according to the Department of Public Enterprise, SAA was nationalized in order to better leverage it for the benefit of the South African economy, and the African continent.  (SAA Bill at 5; *see also* Ntuli Decl. ¶ 17, 18.)  However, SAA does not argue that it could be so leveraged prior to the finalization of the renationalization process.

foreign state law.  *See e.g.*, *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir.2004) (setting out five factors for determining organ status); *Bd. of Regents of the Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 279-81 (5th Cir. 2007) (setting a five-factor framework to assist in determining organ status).  These cases indicate that one factor alone, such as active supervision or control, is not indicative of, or sufficient to establish, organ status.  *See, e.g.*, *Filler,* 378 F.3d at 217-218 (analyzing several criteria for organ status); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3rd Cir. 2003) (noting that, in assessing whether an entity is an organ, "no one [factor] is determinative").  The court is unable, therefore, to make a conclusive determination about whether SAA was an organ of the South African government prior to the completion of its nationalization.  As discussed in the following section, even if SAA was immune as an organ, it would not be able to take full advantage of that status, because it waived immunity in order to transport air cargo into the United States.

### B.  Waiver of Immunity

In 1987, the Federal Department of Transportation decided that all foreign air carriers, regardless of their status, would be required "to waive sovereign immunity from the jurisdiction of U.S. courts in all cases (a) that are based on their operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States."  Amendment of Sovereign Immunity Waivers in Foreign Air Carrier Permits, 52 Fed. Reg. 29600-03, 1987 WL 138835 (Aug. 10, 1987).  The Department thus began requiring all foreign carriers to execute waivers of immunity as a prerequisite to acquiring a permit (or for obtaining an exemption from acquiring a permit) to engage in air transportation to, from, and within the United States.  *Id.*  TAI, SAA and Saudia are foreign air

-80-

carriers under federal law; they are not citizens of the United States, and provide air transportation between the United States and points outside the United States.  49 U.S.C. § 40102(a)(21).  It is unsurprising, therefore, that, according to Department of Transportation records, each of these defendant airlines has waived sovereign immunity in order to receive a permit, or an exemption from the requirement of a permit, in order to lawfully engage in air cargo transportation in the United States during the class period.[37]

Department of Transportation decisions authorizing air transportation provided by TAI, SAA, and Saudia indicates that each received waivers or exemptions in order to lawfully engage in foreign air transportation of cargo and persons.  *See*, *e.g.*, Notice of Action Taken, 2005 WL 4995016 (July 6, 2005) (announcing grant of exemption to TAI to conduct scheduled foreign air transport between Thailand and New York from July 26, 2005 through July 26, 2006 on condition of waiver); Notice of Action Taken, 2002 WL 34099258 (Jan. 18, 2002) (announcing grant of exemption to SAA to conduct foreign air transport between South Africa and points in the United States from January 18, 2002 through January 18, 2004 on condition of identical waiver); Notice of Action Taken, 2007 WL 2676817 (Sept. 4, 2007) (renewing 2004 grant of exemption to Saudia to conduct foreign air transport between Saudi Arabia and points in the United States via Belgium from September 4,2007 - September 4, 2008 on condition of identical waiver).  Although these citations do not cover the entire class period, they are representative and uniform.  Moreover, TA, SAA and Saudia do not deny that they were properly authorized to fly to and from the United States.

---

[37] "A foreign air carrier may provide foreign air transportation only if the foreign air carrier holds a permit issued under this chapter authorizing the foreign air transportation."  49 U.S.C. § 41301.

By agreeing to the above condition, the defendants waived their sovereign immunity to suit with respect to at least some of the claims asserted by plaintiffs.  The instant action is largely "based on [the defendants'] operations in international air transportation that . . . include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States"; Counts I, II, III and IV of the Complaint allege that a class of plaintiffs defined by their purchase of air freight shipping services between to, from and within the United States have been injured, in violation of domestic and foreign laws, by the defendants' anti-competitive price-fixing of those services. (Compl. ¶¶ 159, 192, 239, 276.)  In addition, the airfreight shipping services provided by the defendants defined in Counts I-V are "operations in international air transportation" that were specifically "authorized" by the exemption/permit on condition of, and therefore are subject to, the explicit waiver of immunity.  Finally, the plaintiffs' claims, which center on allegations of global air cargo price-fixing conspiracy, are "based upon" the defendants' "operations in international air transportation."[38]  Even read narrowly, the waiver applies to the defendants' operations – the defendants' operations include the pricing and sale of air cargo shipping services.

---

[38] Saudi Arabian Airways argues that a waiver similar to the one here was noted by the Ninth Circuit to be "limited in scope to 'cases with substantial contact with the United States." (SAA Reply Mem. 4 (citing *Compania Mexicana de Aviacion S.A.v. U.S. Dist. Court,* 859 F.2d 1354, 1359 & n.4 (9th Cir. 1988).)  In *Mexicana*, however, the Ninth Circuit found the waiver inapplicable because defendant's "operations" that were the "subject of [plaintiffs'] action did not occur 'under [the] permit' issued by the U.S. Department of Transportation."  859 F.2d at 1359.  Notably, the plaintiff in Mexican was suing on basis of air transportation services purchased within Mexico for transportation between points solely in Mexico. *Id.*  Here, however, most of defendants' operations which are the "subject of [plaintiffs'] actions" – the air cargo services provided to points in the United States from abroad – occur "under the permit" or exemption, and could only occur pursuant to such permission, issued by the Department of Transportation.  Claims concerning those air cargo services, therefore, are covered by the waiver.

To receive authorization to conduct foreign air transportation in the United States, however, the defendants only waived immunity with respect to those claims that arose from the defendants' provision of air cargo services to, from, or within the United States, or for which the contract of carriage was purchased in the United States. The claims in VII do not fall within the waiver clause, because they are asserted on behalf of a class of plaintiffs who purchased air freight shipping services entirely outside the United States. TAI and Saudia thus enjoy immunity from the claims asserted under Counts VII. (SAA would also enjoy such immunity were it to succeed on a renewed motion for foreign sovereign immunity.)

TAI and Saudia assert that the waiver is not applicable to the plaintiffs' claims; that it should be construed co-extensively with the "commercial activity exception"; and that the commercial activity exception does not apply. The "commercial activity exception" upon which this argument relies is found in a subsection of the FSIA which provides that foreign sovereigns are not immune where

> the action [against them] is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). If the DOT waiver was co-extensive with the commercial activity exception, then the court would be required to address the body of case law that has sought to define the scope of the exception. The court is not required to do that here, however. The language in the waiver does not mirror the language of the commercial activity exception. Nor does the waiver reference the commercial activity exception. Neither TAI nor Saudia has

provided caselaw or other persuasive support for treating the waiver as coterminous with the commercial activity exception.[39]

South African Airlines separately also asserts that the plaintiffs have not met the burden of establishing that each claim is "based upon" the commercial activity in the United States which is the subject of the waiver.  The court is not entirely sure what this means; in any event, the Complaint contains sufficient allegations to allow the court to determine whether or not a particular class purchased air cargo services that are subject to this waiver.  The court is confident, therefore, that it can accurately determine whether the waiver is applicable.

4.   Jury Trials

As foreign sovereigns who have waived immunity, TAI and Saudia remain entitled to non-jury trials, should this litigation proceed to that point.  28 U.S.C. § 1330(a).  SAA will likewise be entitled a non-jury trial if it successfully establishes its sovereign status.

**CONCLUSION**

The plaintiffs have requested leave to replead if the court found additional factual detail necessary in the complaint.  Whether to permit parties to amend their pleadings is a matter entrusted to the court's "sound discretion."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."  "[A] court granting a 12(b)(6) motion

---

[39] The cases the defendants cite involve the application of the commercial activity exception, not the interpretation of a waiver.  *See, e.g.*, *Moses v. Air Afrique*, 2000 WL 306853 (E.D.N.Y. 2000) (Gleeson, J) (finding commercial activity exception inapplicable to suit against airline by airline passenger for assault by airlines' ground crew in Senegal); *Nazarian v. Compagnie Int'l Air Fr.*, 989 F. Supp. at 507 (addressing application of commercial activity exception.)  In fact, neither even *mention* the term waiver.

-84-

should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003) (quotation omitted). Furthermore, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Induss., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Leave to amend, however, should be denied when amendment would be futile. *See*, *e.g*, *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006).

Accordingly, based on the foregoing, the court recommends as follows:

- The Sherman Act claims should be dismissed, without prejudice, and the plaintiffs should be afforded an opportunity to replead these claims.

- The state law claims should be dismissed, with prejudice.

- The EU claims should be dismissed, with prejudice.

       *            *            *            *            *            *

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b); *see*, *e.g.*, *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

_Viktor V. Pohorelsky_
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
September 26, 2008