# Exhibit A

Declaration of Magistrate Judge Edward A. Infante (Ret.)

I, Edward A. Infante, declare:

1.      I am a retired Magistrate Judge for the United States District Court for the
Northern District of California.  I am currently a member of JAMS (formerly known as
Judicial Arbitration & Mediation Services), where my practice focuses on large complex
commercial disputes.  In forming the opinions contained in this declaration, I have relied
on investigation and analysis performed by my partner, Lester J. Levy, Esq., also a
member of JAMS.   I make this declaration voluntarily and, if called as a witness, I could
and would testify competently to the matters set forth herein.

## Terms of Engagement

2.      In or about December 2006, I was contacted by Bruce Simon, formerly a partner
in Cochett, Pitre, Simon & McCarthy, and Michael Hausfeld, a name partner in Cohen,
Milstein, Hausfeld & Toll, in In re Air Cargo Shipping Services Antitrust Litigation, Case
No. 06-MD-1775 (CBA) (VVP), (MDL No. 1775) (E.D.N.Y.) (the "Air Cargo" case).
Counsel asked whether I would be willing to render a written opinion, in the form of a
declaration, in connection with a Settlement Agreement reached between Plaintiffs and
Lufthansa Airlines.  Counsel specifically asked whether I would opine on the fairness,
reasonableness and adequacy of the settlement -- to the settling class members.[1]

---

[1]  I have also been asked by counsel to render a separate opinion with respect to motions for the preliminary approval of settlements
reached between Plaintiffs and Defendants United Airlines and American Airlines in In re International Air Transportation Surcharge
Antitrust Litigation, Case No. 06-CV-3905 (MDL No. 1793) (the "Air Passenger" case).

3.     I agreed to the proposed engagement on two conditions:  First, due to my

schedule and the amount of time that this engagement would require, I asked that counsel

agree that Mr. Levy could assist me.  I have worked with Mr. Levy on other significant

matters and have the highest confidence in his ability and judgment.  Second, I required

that our investigation would be performed independently, that Mr. Levy and I would have

access to any and all documents and witnesses necessary to carry out our charge and that

there would be no guarantee, in advance, as to the outcome of my opinion after our

investigation was completed.   Counsel agreed to each of these conditions.


                    Summary of Allegations in the Amended Consolidated Complaint

4.     Plaintiffs allege that, beginning no later than January 1, 2000 and continuing to

the present ("the Class Period"), Defendants engaged in a global conspiracy to fix, raise,

maintain, or stabilize prices of airfreight shipping services through a number of

mechanisms, including, *inter alia*, concertedly levying inflated surcharges, jointly

agreeing to eliminate or prevent discounting of airfreight shipping services prices, and

agreeing on yields and allocating customers.  Plaintiffs allege that, through these

mechanisms, Defendants artificially inflated the prices of airfreight shipping services

during the Class Period, thereby causing injury to Plaintiffs who, absent Defendants'

allegedly anticompetitive conduct, would have been able to purchase airfreight shipping

services at lower prices.  Plaintiffs further contend that Defendants' unlawful conduct

took place within and had a direct, substantial and reasonably foreseeable effect upon

interstate and international commerce.  Plaintiffs assert that the adverse effects of

Defendants' allegedly anticompetitive conduct on commerce in the United States were

2

interdependent with the adverse effects on commerce worldwide and proximately caused injury to both plaintiffs in the United States and plaintiffs elsewhere. In addition, according to Plaintiffs, by agreeing to and engaging in concerted anticompetitive practices, which appreciably and foreseeably affected trade between European Union Member States, Defendants prejudiced the realization of a market between Member States and prevented, restricted, or distorted competition within the common market in the European Union. Accordingly, Plaintiffs assert that Defendants' conduct was in violation of Section 1 of the Sherman Act, various applicable state antitrust, consumer protection, and unfair competition laws, the common law, Article 81 of the E.C. Treaty, and the EEA Agreement.

### Documents Reviewed and Witnesses Interviewed

5.　We reviewed the original Complaint, the First Amended Consolidated Complaint, filed on February 8, 2007, as well as the Settlement Agreement between Air Cargo Plaintiffs and Defendants Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd., which, we understand, has been signed by all Class Counsel. In addition, we were provided, and reviewed, a copy of Magistrate Judge Victor V. Pohrelsky's Decision and Order, dated November 16, 2006, regarding the appointment of class counsel.

6.　Thereafter, Mr. Levy interviewed the following lawyers by telephone: David Ogden, a partner in Wilmer Cutler Pickering Hale and Dorr LLP, as well as Messrs. Hausfeld and Simon.

<u>Key Settlement Terms</u>

7.      The Settlement Agreement was executed on September 11, 2006.  It resolves the

liability of Lufthansa and related entities for alleged violations of Section 1 of the

Sherman Act, 15 USC Sec. 1, to a putative Settlement Class composed of U.S. and non-

U.S. domiciled purchasers of airfreight cargo shipping services for shipments within, to,

or from the United States during the period from January 1, 2000 to the execution date of

the Settlement Agreement.   The key terms of the settlement agreement are:

8.      The immediate payment of $85,000,000 into a Settlement Fund, established as an

escrow account, to be invested in guaranteed United States and foreign investment

vehicles, with interest earned to become part of the Settlement Fund, pending ultimate

distribution to the Settlement Class in a manner to be determined by court order after

final approval of the Settlement Agreement.

9.      Lufthansa is responsible for all costs of providing notice to the Settlement Class

and for all costs of administering, investing and distributing the Settlement Fund, with

any disputes over such expenditures to be submitted to binding arbitration at Lufthansa's

expense (subject to potential cost-shifting by the arbitrator to the class).

10.     The Agreement obligates Lufthansa, upon execution, to "begin to undertake to

support Plaintiff's prosecution of the Actions [against the remaining defendants] and

begin to provide Cooperation Materials as appropriate."  Cooperation Materials include:

        a.      Making available to class counsel, at Lufthansa's expense, (1) current and

                former directors, officers and employees that have been interviewed by the

                U.S. Department of Justice as part of its investigation of the air cargo

                industry, and (2) five additional current and former directors, officers, and

employees reasonably believed to have knowledge regarding Plaintiffs' claims, (i) for conferences, (ii) for interviews, (iii) to authenticate necessary documents, (iv) to prepare declarations and/or affidavits, and (v) to provide testimony at deposition and/or trial;

b.   Production of the following categories of documents, within five days of the Court's potential grant of preliminary approval:

i.    Worldwide transaction data in electronic format for all of Lufthansa's sales of airfreight cargo shipping services for shipments within, to or from the United States ("Airfreight Shipping Services") for the period January 1, 1993 through September 11, 2006;

(ii)   All price announcements for Airfreight Shipping Services, and/or surcharges related thereto, for shipments within, to, or from the United States for the period January 1, 1993 through September 11, 2006;

(iii)  All documents relating to or reflecting actual or potential communications between two or more air cargo carriers regarding the prices at which, or the customers to whom, Airfreight Shipping Services, and/or surcharges related thereto, would be or had been sold for shipments within, to, or from the United States for the period January 1, 1993 through September 11, 2006;

(iv)  Copies of all documents produced to the U.S. Department of Justice, the European Commission, or any other national competition authority investigating the air cargo industry, provided that such

documents concern air cargo commerce within, to, or from the United States; and

(v)     Other documents relevant to Plaintiffs' claims as alleged in the Class Actions.

11.     The Settlement Agreement further required Lufthansa's counsel to provide, within ten days of its execution, "a general description of the times, places, and corporate participants relating to the conduct at issue . . . ."  If preliminary approval is obtained, the Agreement requires Lufthansa's counsel to "meet as often as is reasonable and necessary with Settlement Class Counsel . . . to support Plaintiff's prosecution of the Actions" and to provide "a detailed proffer of the facts then known regarding the anti-competitive conduct alleged in the Actions."

12.     The agreement further requires Lufthansa to "produce any relevant documents or information obtained through its own internal investigation of the air cargo industry, including factual attorney work product so obtained."

13.     Additionally, the cooperation obligations set forth in the Agreement are subject to binding arbitration at Lufthansa's expense (subject to potential cost-shifting by the arbitrator to the class).

14.     The Agreement acknowledges that "Lufthansa's damages exposure is potentially limited by the terms of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. 108-237, 118 Stat. 665 (June 22, 2004) ("ACPERA"), and also acknowledges that "Lufthansa has thus far cooperated with Settlement Class Counsel in accordance with the provisions of ACPERA."

15.     The Agreement states that "Lufthansa has entered into the U.S. Department of
Justice Antitrust Division's leniency program, which has 'a policy of according leniency
to corporations reporting their illegal antitrust activity at an early stage, if they meet
certain conditions'" and contains an express representation that "on or before December
31, 2005, [Lufthansa] approached the U.S. Department of Justice to make an application
under the Antitrust Division's Corporate Leniency Policy . . . to report possible price-
fixing activity or other conduct potentially violative of Section 1 of the Sherman Act, 15
U.S.C. § 1, in the air cargo industry in the United States and elsewhere.  Lufthansa has,
since that time, provided full and continuing cooperation in connection with the activity
being reported; has been granted conditional leniency pursuant to the Antitrust Division's
Corporate Leniency Policy; and has instituted compliance programs intended to halt and
prevent anticompetitive activity, if any."

16.     The Agreement contains an express provision for modification by court order if
the conditional grant of leniency is revoked.  Thus, the Agreement provides that: "In the
event the U.S. Department of Justice indicts Lufthansa and in connection with such
indictment the leniency granted Lufthansa by the U.S. Department of Justice is by final
order of a court of competent jurisdiction withdrawn, revoked or modified, and if
Lufthansa has exhausted its appeals of such court order, then upon Plaintiffs' motion the
Court may void this agreement, or modify the scope of the release set forth [herein], if
and to an extent proportionate to the reasons for such withdrawal, revocation, or
modification."  The Agreement also provides for rescission in the event the Settlement
Agreement is not finally approved by the court.

Investigative Findings

17.     The Settlement Agreement is the product of lengthy arms-length negotiations,

which occurred over a five-month period. We are informed that the parties met in person

no fewer than fifteen times and met many more times by telephone. Neither the conduct

of the negotiations, nor the terms of the resulting agreement, exhibit any indicia of

collusion.   Counsel alternatively described the negotiations as "long and arduous,"

"extremely contentious" and "highly adversarial." The history of offers and counter-

offers, relayed to us by opposing counsel, supports that view. Moreover, the length and

complexity of the Agreement itself, including the carefully crafted provisions that

preserve the benefits of the settlement for class members, show no signs of collusive

negotiation.

18.     Further, our investigation did not uncover any signs that early settlement

negotiation damaged the class members' interests or resulted in a less favorable

settlement. To the contrary, class counsel arguably had better and potentially more

reliable information with which to negotiate a settlement than might otherwise have been

made available through discovery. The settlement negotiations with Lufthansa occurred

within the broad disclosure of key transactional data and analyses by Lufthansa.

Substantial transactional data was produced by Lufthansa and were reviewed Class

Counsel and its experts. Class Counsel also received numerous proffers setting forth the

detailed workings of the price-fixing cartel that is at issue.

19.     During our investigation, we did not observe anything to suggest that the

settlement with Lufthansa was related to, or conditioned on, the settlements reached with

8

defendants United or American in the Air Passenger case. Negotiations with these defendants proceeded independently.[2]

20.     Class members have already received some of the benefit of the information provided by Lufthansa. This is clearly reflected in the recently filed First Amended Consolidated Complaint, which substantially expands on the inner workings of the antitrust law violations at issue. As a further result of the information disclosed by Lufthansa, new parties were added and unnecessary defendants were removed.

21.     The $85,000,000 settlement amount was reached through fair and informed bargaining. We are informed that during settlement negotiations the parties and their experts constructed and reviewed competing economic models of the relevant market, as affected by the allegedly anti-competitive activity. This complex modeling included air cargo traffic both inbound to, and outbound from, the United States. With these data, the parties negotiated over Lufthansa's alleged share of the affected surcharges, taking into account Lufthansa's more limited civil liability under the terms of ACPERA.

22.     Moreover, since September 11, 2006, the $85 million Settlement Fund has been in a currency-hedging fund at Suntrust Bank accruing interest for the benefit of the Settlement Class. This is intended to protect the class against currency devaluation during the pendency of the settlement approval process. Suntrust Bank agreed to waive all transaction fees and currency exchange fees, which would otherwise apply to settlement amounts to be paid in foreign currencies to non-U.S. Settlement Class members. As of December 29, 2006, the Settlement Fund had accrued an additional $1.5 million from the hedging program, plus interest for the benefit of the Settlement Class.

---

[2] We have provided an independent analysis of the American and United Settlement Agreements for Judge Breyer's consideration in the Air Passenger case.

23.     The Settlement Agreement provides that " . . . because of joint and several liability, this settlement with Lufthansa does not impair Plaintiffs' ability to collect the full amount of damages to which they may be entitled in the Actions." This provision correctly recognizes that to the extent that Plaintiffs' settlement with Lufthansa may ultimately be adjudicated to be less than the full amount of damages attributable to Lufthansa's actions, Plaintiffs may pursue the remainder of their damages from the non-settling defendants.

24.     The settlement with Lufthansa also resolves a number of statutory ambiguities, which might otherwise be the subject of costly litigation. Specifically, ACPERA provides little guidance on the cooperation necessary to limit an amnesty applicant's liability under the statute. We are informed that other amnesty applicants have taken the position that cooperation need not be given immediately, but rather should proceed in conjunction with discovery of the non-settling defendants. Thus, this Agreement defines the scope of the parties' cooperation obligations with a level of definition that is absent from the ACPERA statute itself. The cooperation obligations take effect prior to the approval of the settlement and include pre-discovery, whereas the statute may leave the determination of cooperation until the end of the case. Co-counsel for the class and counsel for Lufthansa both agree that the Settlement Agreement creates certainty for the class by defining the scope of cooperation that is otherwise poorly defined under the statute.

25.     Based on all of the foregoing, it is my considered opinion that the Settlement Agreement is consistent with the policies underlying ACPERA and that the terms are fair, reasonable and adequate to the settling class members. Notably, the Agreement requires

the immediate payment of the $85 million Settlement Fund within a single business day of its execution, rather than requiring payment only upon final court approval. In addition to obtaining the substantial monetary recovery and costs of notice, plus costs of administering, investing and distributing the Settlement Fund, the settling parties will have avoided substantial costs in discovery and motion practice, and the class will have received important information (including work product) that may permit it to proceed more knowledgeably and efficiently in trial against the remaining defendants.

26.     More specific benefits to the class include:

    a.     Receipt by the class of detailed information that explains and supports plaintiffs' prosecution of their case;

    b.     The class will receive Lufthansa's communications with other carriers; will have access to Lufthansa personnel; will have received the results of the Lufthansa's internal investigations (including relevant work product); will receive affidavits to verify the documents produced; and will have the benefit of complex transactional data and explanations from knowledgeable industry personnel; and

    c.     This information has and will continue to be provided early in the litigation, without the need for formal and sometimes limiting discovery procedures, and will be provided in a form most useful to the class.

(Additionally, substantial cooperation and production of key data occurred prior to the execution of the Settlement Agreement.)

d.      Further, the Settlement Agreement defines Lufthansa's cooperation obligations, and establishes an arbitration procedure for the evaluation and enforcement of the settling parties' cooperation obligations.

27.      The provision permitting Plaintiffs to move the Court to have the Settlement voided if Lufthansa is subsequently indicted by the U.S. Department of Justice provides significant protection to the Settlement Class in the event that Lufthansa fails to comply with its obligations as a leniency applicant.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this /3 day of July 2007, at San Francisco, California.

Edward A. Infante