UNITED STATES DISTRICT COURT                    FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :
IN RE:                                            :
                                                  :           MEMORANDUM
AIR CARGO SHIPPING SERVICES                       :           AND ORDER
ANTITRUST LITIGATION                              :
                                                  :           06-MD-1775 (JG) (VVP)
MDL No. 1775                                      :
                                                  :
------------------------------------------------------------X
                                                  :
THIS DOCUMENT RELATES TO:                         :
                                                  :
ALL CASES                                         :
                                                  :
------------------------------------------------------------X

JOHN GLEESON, United States District Judge:

        This multi-district putative antitrust class action litigation stems from an

investigation by governmental authorities of world-wide price-fixing activity in the air cargo

industry.  The defendants are domestic and foreign airlines that provide airfreight shipping

services around the world.[1]  The plaintiffs are direct and indirect domestic and foreign

purchasers of the allegedly price-fixed airfreight shipping services.[2]  The plaintiffs allege that

---

[1]      The defendants named in the First Consolidated Amended Complaint are Air Canada, AC Cargo LP; Société Air France ("Air France"); Koninklijke Luchtvaart Maatschappij N.V. ("KLM"); Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline; Air Mauritius Ltd.; Alitalia Linee Aeree Italiane S.p.A.; All Nippon Airways Co., Ltd.; Asiana Airlines Inc.; British Airways PLC ("British Airways"); Cargolux Airlines International S.A.; Cathay Pacific Airways Ltd. ("Cathay Pacific"); Air China Limited d/b/a Air China; Air China Cargo Company Limited d/b/a Air China Cargo; DAS Air Ltd. d/b/a DAS Air Cargo; Deutsche Lufthansa AG ("Lufthansa AG"); Lufthansa Cargo AG ("Lufthansa Cargo"); Swiss International Air Lines Ltd. ("Swiss International"); El Al Israel Airlines, Ltd.; Emirates Airlines d/b/a Emirates; Ethiopian Airlines Corp. ("Ethiopian"); Japan Airlines International Company Ltd. ("Japan Airlines"); Kenya Airways Limited; Korean Air Company, Ltd. ("Korean Air"); LAN Airlines S.A.; LAN Cargo S.A.; Martinair Holland N.V. ("Martinair"); Airways Corporation of New Zealand Limited d/b/a Airways New Zealand; Nippon Cargo Airlines Co., Ltd.; Atlas Air Worldwide Holdings, Inc. ("Atlas"); Polar Air Cargo, Inc. ("Polar Air"); Qantas Airways Limited ("Qantas"); Saudi Arabian Airlines, Ltd. ("Saudia"); Scandinavian Airlines System ("SAS"); Singapore Airlines Limited; Singapore Airlines Cargo Pte Ltd; South African Airways (Proprietary) Limited ("SAA"); Thai Airways International Public Co., Ltd. ("TAI"); and Viação Aérea Rio-Grandense, S.A.

[2]      All named plaintiffs are direct or indirect airfreight customers; that is, entities that were charged base rates, surcharges and other fees for airfreight shipping services by the defendant air carriers. Compl. ¶ 69.  They are Benchmark Export Services; Fleurchem, Inc.; FTS International Express, Inc.;

since 2000, the defendants, all of whom provide various forms of air cargo shipping services, along with unnamed co-conspirators, have conspired to fix prices through the concerted imposition of surcharges and other anti-competitive behaviors.  Plaintiffs allege that this conspiracy impacted thousands of routes flown throughout the world by defendants, including flights to, from and within the United States, and flights, to, from and within the European Union.

On September 11, 2006 a settlement agreement was signed by plaintiffs' class counsel and counsel for the defendants Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. (collectively "Lufthansa").[3]  Pursuant to the proposed agreement, Lufthansa agreed to pay $85 million, and that sum was deposited into an interest-bearing escrow account on the date the settlement was reached.  In return, Lufthansa is to be released from all claims based on any federal, state, local, statutory, or common law, or any other law, code, rule, or regulation of any country or jurisdiction worldwide, regardless of legal theory or type of relief or damages claimed.

The proposed settlement ("Settlement Agreement") was submitted for preliminary approval on July 13, 2007.  After resolving notice issues, on March 14, 2008, Judge Viktor Pohorelsky entered a Report and Recommendation recommending preliminary approval of the settlement.  On April 4, 2008, I entered an order preliminarily approving the Lufthansa

---

FTS International Express, Inc.; JSNP, Inc.; Ralph Olarte d/b/a Olarte Transport Services; R.I.M. Logistics, Ltd.; S.A.T. Sea & Air Transport, Inc.; Sul-American Export, Inc.; TNT Freight Management USA, Inc.; Sangean American, Inc.; JCK Industries; Leis by Ron, Inc.; Alluvion, Inc.; Maria's Collections, Inc.; Printing Technologies, Inc.; Paradiso, Inc.; TNT Freight Management (Singapore) Pte Ltd.; TNT Freight Management (Australia) Pty Ltd.; TNT Freight Management (Hong Kong) Limited; TNT Freight Management (Denmark) A/S; Speditions und Logistikverband e.V.; TNT Freight Management (Sweden) AB; Association des Utilisateurs du Transport de Fret; TNT Freight Management (Finland) Oy; H&M Hennes & Mauritz AB; IKEA Services AB; Volvo Logistics AB; Volvo Parts AB Services AB; AB Lindex; KappAhl AB; and Sangean Hong Kong.

[3]      The Lufthansa Settlement Agreement was signed by Michael D. Hausfeld, formerly of Cohen, Milstein, Hausfeld & Toll PLLC ("Cohen Milstein") and now of Hausfeld LLP, for plaintiffs.  David Ogden of Wilmer Hale LLP represented Lufthansa.

settlement, certifying the settlement class, appointing Settlement Class Counsel, and directing Settlement Class Counsel to issue notice of the proposed Lufthansa settlement to potential class members.  In addition to publication notice, over 300,000 direct notices were sent to potential class members.  Two class members objected to the proposed settlement; only 42 opted out.  On December 12, 2008, I held a fairness hearing, at which the objectors appeared and argued orally. Following that hearing, as discussed more fully below, I directed Settlement Class Counsel and Lufthansa to answer follow-up questions about the terms of the proposed settlement and further directed Settlement Class Counsel to file a supplemental fee request that was limited to work performed with respect to the settlement with Lufthansa.

I hereby approve the Lufthansa settlement and the plan of allocation.

## BACKGROUND

A.      *Air Cargo Litigation Background*

This action arose out of publicity in February 2006 about a coordinated global antitrust investigation launched by United States, European, Korean, and Canadian competition authorities into anticompetitive conduct in the air cargo industry.  As a result of these reports, over 100 cases alleging antitrust violations were filed in district courts throughout the United States.  On June 20, 2006, after briefing and oral argument, the Judicial Panel on Multidistrict Litigation ordered that pursuant to 28 U.S.C. § 1407, all air cargo lawsuits be transferred and consolidated for pretrial proceedings in this Court.  *See* Declaration of W. Joseph Bruckner, Craig C. Corbitt, Robert N. Kaplan, Christopher Lovell, Hollis L. Salzman, Howard J. Sedran, Charles E. Tompkins, and Steven N. Williams In Support of Final Approval of the Settlement Agreement Between Plaintiffs and Lufthansa, Plaintiffs' Application for Attorneys' Fees and Reimbursement of Expenses, and the Plan of Allocation (hereinafter "Joint Decl.") ¶¶ 8-10.

Following briefing, in a decision and order dated November 15, 2006, Judge Pohorelsky appointed Co-Lead Counsel.[4]  On December 4, 2006, he issued Practice and Procedure Order Number 2, confirming those appointments and setting a schedule for filing of an amended complaint and responses thereto.  Joint Decl. ¶ 13.[5]

The First Consolidated Amended Complaint (the "Complaint") was filed on February 8, 2007.  It alleges that the defendants engaged in a conspiracy to fix prices of airfreight shipping services through mechanisms such as levying inflated surcharges, jointly agreeing to eliminate or prevent discounting of prices, agreeing on yields, and allocating customers.  Compl. ¶ 19.  The seven counts allege violations federal and state antitrust and unfair competition laws, state common law, and European Union law.

B.     *The Lufthansa Settlement Agreement*

1.     *The Proposed Settlement*

For a period of five months beginning in April 2006, settlement negotiations took place between counsel for Lufthansa and plaintiffs' counsel.[6]  On September 11, 2006, the 46-page Lufthansa Settlement Agreement was signed by counsel for Lufthansa and counsel for the plaintiffs.  Lufthansa agreed to pay $85 million and the cost of providing notice to the Settlement

---

[4]     Barbara Hart of Labaton Sucharow LLP, Hausfeld of Cohen Milstein, Robert Kaplan of Kaplan Fox & Kilsheimer LLP, and Howard Sedran of Levin Fishbein, Sedran & Berman were initially appointed Co-Lead Counsel.

[5]     On December 29, 2006, Paradiso, Inc., ("Paradiso") filed the First Amended Class Action Complaint on Behalf of Indirect Purchasers, nearly three weeks in advance of the filing date set by the Court.  On January 4, 2007, Judge Pohorelsky entered an Order to Show Cause directing Paradiso's counsel to explain why the procedure in Practice and Procedure Order Number 2 was insufficient to protect the interests of their client and why the Paradiso complaint should not be stricken.  Paradiso filed a response to the Court's Order to Show Cause on January 10, 2007.  Negotiations between appointed Co-Lead Counsel and counsel for indirect purchasers about the appropriate counsel structure ensued.  Ultimately, these negotiations resulted in a motion to amend Practice and Procedure Order Number 2.  On March 6, 2007 the Court entered Practice and Procedure Order Number 4, which among other things, appointed W. Joseph Bruckner of Lockridge Grindal Nauen PLLP, Michael P. Lehmann of Furth Lehmann & Grant LLP, Christopher Lovell of Lovell Stewart & Halebian LLP, and Steven N. Williams of Cotchell, Pitre & McCarthy as U.S. Indirect Purchaser Counsel.  In addition, the order designated Cohen Milstein as Co-Lead Counsel principally responsible for the prosecution of all foreign purchaser claims.  Since that time various individual attorneys have replaced those initially appointed.  Joint Decl. ¶¶ 17-20.

[6]     Plaintiffs were represented primarily by Hausfeld and counsel subsequently appointed U.S. Indirect Purchaser Counsel.

Class, and $85 million was wired to an interest-bearing escrow account on that date.  In addition, Lufthansa agreed to provide extensive cooperation to plaintiffs relating to the conduct at issue in the litigation.  Joint Decl. ¶ 25.  In return, Lufthansa was to be released from all claims based on any federal, state, local, statutory, or common law, or any other law, code, rule, or regulation of any country or jurisdiction worldwide, regardless of legal theory or type of relief or damages claimed.  Joint Decl. ¶ 23.[7]

The agreement proposes a Settlement Class of "[a]ll persons and entities that purchased airfreight cargo shipping services for shipments within, to or from the United States … including those … that purchased … through freight forwarders, from any air cargo carrier."  The parties to the Settlement Agreement "acknowledge[d] that the Settlement Class include[d] both shippers and freight forwarders, and customers and non-customers of Lufthansa, and that the Settlement Agreement, ma[d]e[ ] no determination as to which Settlement Class Members [we]re entitled to distribution of the Settlement Fund, or as to the formula for determining the amounts to be distributed."  Joint Decl. ¶ 22.

The Settlement Agreement was amended on January 4, 2007, after review by the other Co-Lead Counsel.  Joint Decl. ¶ 26.  This amendment, among other things, (1) carved out of the release of Lufthansa any person who refused to comply with a reasonable request for cooperation, (2) provided for the submission for Court approval of a procedure to determine the allocation of the Settlement Fund among claimants, which allocation itself would have to be approved by the Court,  (3) narrowed the scope of the release of Lufthansa to exclude claims based on, *inter alia*, negligence and breach of contract, and (4) designated all Co-Lead Counsel

---

[7]        Due to the international nature of the alleged conspiracy, as a result of which class members paid the alleged overcharges in different currencies, the fund was invested in a "currency hedging program designed to prevent the devaluation of the fund as a result of fluctuations of the U.S. dollar."  Joint Decl. ¶ 3.  As of November 6, 2008, the amount being held, including interest, amounted to $90,474,823.63 ("the Settlement Fund").  Joint Decl. ¶ 3.

as Settlement Class Counsel.  Joint Decl. ¶ 26.  An additional amendment was added on

February 22, 2007, which included indirect purchasers as representatives for purposes of the

Lufthansa settlement and added U.S. Indirect Purchaser Counsel as Settlement Class Counsel.

Joint Decl. ¶ 27.

       2.    *The Notice Program*

       Prior to seeking preliminary approval of the Settlement Agreement from the

Court, plaintiffs and Lufthansa were required to define the parameters of the notice program and

to choose a claims administrator with worldwide capability.  After interviewing firms that

responded to proposal requests, and at the suggestion of Lufthansa, in early June 2007, The

Garden City Group ("GCG") was chosen as the claims administrator that would be proposed to

the Court.  Joint Decl. ¶ 28.

       A proposed direct and publication notice program was developed in conjunction

with GCG.  It consisted of sending direct mail notice to approximately 80,000 customers in 120

countries as well as issuing publication notice in (1) country-specific nationally syndicated media

in 13 countries, (2) three-to-five newspapers in 20 countries, (3) one publication in 30 countries,

(4) various international publications, and (5) 30 trade publications.  It also included a globally

distributed press release.  In addition, GCG developed a plan to comply with the additional

notice obligations imposed by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S. C. §

1715.  Joint Decl. ¶ 29.

       3.    *Preliminary Approval of the Lufthansa Settlement and Notice Program*

       A motion for preliminary approval of the Settlement Agreement and the notice

program was filed on July 13, 2007.  On October 16, 2007, Judge Pohorelsky filed a Report and

Recommendation recommending preliminary approval after a conference to resolve notice

issues.  On October 25, 2007, plaintiffs submitted a letter motion requesting each defendant's customer list.   At the October 30 conference to resolve notice issues, Judge Pohorelsky ruled that the non-settling defendants had to (1) provide plaintiffs with lists of customers who shipped goods to, from or within the United States during the relevant period, unless they made a showing that production of such lists was too burdensome, and (2) submit a report setting forth each defendant's claim of burden.  Joint Decl. ¶ 31.

On November 20, 2007, 25 non-settling defendants filed a report.  Ultimately, Co-Lead Counsel reached agreements with all but one non-settling defendant regarding the information that could be produced without undue burden.  A report summarizing the outcomes was filed by plaintiffs' counsel on December 21, 2007.  Joint Decl. ¶ 32.

At a subsequent conference, held on January 23, 2008, Judge Pohorelsky found that the agreements between the plaintiffs and non-settling defendants were sufficient to provide individual notice by mail to the settlement class to the extent reasonably practicable in the circumstances, but directed the plaintiffs to submit a revised proposed order containing additional specifics pertaining to publication notice.  Joint Decl. ¶ 33.  Consequently, a revised notice, claim form, proposed Report and Recommendation, and proposed order for preliminary approval of the Lufthansa settlement were filed on February 25, 2008.  A conference was held on March 11, 2008, and three days later, Judge Pohorelsky entered a Report and Recommendation recommending preliminary approval of the Lufthansa settlement.  Joint Decl. ¶ 34.

On April 4, 2008, I entered an order preliminarily approving the settlement, certifying the settlement class, and appointing Settlement Class Counsel.  In addition, I directed that, (1) within 60 days, plaintiffs were to cause notice of the settlement to be mailed to each potential class member whose address had been obtained from any defendant or from

International Air Transport Association ("IATA") and to be posted on a website, and (2) no later than 30 days after commencement of the mailing and no later than 30 days prior to the fairness hearing, publication notice was to be published as described in the papers in support of preliminary approval of the Lufthansa settlement.  Joint Decl. ¶ 35.

The notice of the plan of allocation was sent to more than 300,000 addresses for potential Settlement Class members beginning June 3, 2008.  In order to participate in the Settlement Fund, Settlement Class members were required to complete and return to the claims administrator a proof of claim by February 12, 2009.

C.     *The Allocation Plan*

The Settlement Agreement, as amended, provided for the submission to the Court for approval of a procedure to determine the allocation of the Settlement Fund among claimants. An Agreement Among Counsel for Air Cargo Plaintiffs Regarding an Allocation Procedure for the Lufthansa Settlement Fund (the "Allocation Agreement") was reached on October 15, 2007. It set forth a procedure ("allocation procedure") to determine the allocation of the Settlement Fund among potential claimants and was designed to avoid any potential conflict that Co-Lead Counsel might have in representing more than one group of claimants.  The Allocation Agreement was the result of negotiations among Settlement Class Counsel (Co-Lead Counsel and U.S. Indirect Purchaser Counsel), who were aided by Daniel H. Weinstein[8] in a mediation session held on September 17, 2007.  Joint Decl. ¶ 37.

On October 24, 2007 a motion was filed to approve the allocation procedure embodied in the Allocation Agreement and to appoint Settlement Master Weinstein as a Settlement Master under Rule 53 of the Federal Rules of Civil Procedure.  Following a hearing

---

[8]     Daniel H. Weinstein is a former Judge of the Superior Court of the County of San Francisco, CA and is a mediator with JAMS.  *See* Declaration of Daniel H. Weinstein In Support of Request for Attorneys' Fees and Reimbursement of Litigation Expenses, Ex. A.

held on October 30, 2007, Judge Pohorelsky entered an order approving the allocation procedure and appointing Weinstein as Settlement Master.

Specifically, the allocation procedure provided that Settlement Master Weinstein would serve as a mediator, or if necessary an arbitrator, to develop an allocation plan for the Settlement Fund among claimants.  It also designated counsel to represent various claimants. The allocation procedure provided that counsel for each group of claimants would retain an expert, who would prepare presentations, which would be submitted to Settlement Master Weinstein together with briefing.

In accordance with the allocation procedure and Judge Pohorelsky's October 30, 2007 Order, day-long mediation/arbitration sessions were held in New York City on December 11 and 13, 2007.  The Settlement Master also met separately with counsel for Lufthansa on December 10, 2007.  Despite "vigorous good faith and arms-length negotiations," representatives of the claimants groups were unable to reach an agreement on a plan of allocation.  Settlement Master's Report and Recommendation, filed December 21, 2007, at 4.  As allowed under the Allocation Agreement and October 30, 2007 Order, the proceeding then converted to an arbitration procedure in which the Settlement Master was charged with making a decision as to what allocation plan should be recommended to the Court.  As a result, Settlement Master Weinstein decided on an appropriate plan of allocation, which was embodied in his December 21, 2007 Settlement Master's Report and Recommendation Regarding the Allocation of the Lufthansa Settlement Fund (the "Settlement Master's Report and Recommendation, filed December 21, 2007").

The allocation plan recommended by the Settlement Master provided for U.S. indirect purchasers to receive 18% of the Net Settlement Fund and for U.S. and foreign direct

purchasers to share the remaining 82% of the Net Settlement Fund (after valuing shipments inbound to the United States at 1.625 times their value).  In addition, the plan directed that foreign indirect purchaser claims be paid from the allocation to the foreign direct purchasers.[9] Any funds remaining after payment of all valid U.S. indirect purchasers' claims would be added to the fund to be distributed to direct purchasers.[10]  Settlement Master's Report and Recommendation, filed December 21, 2007, at 5.  On February 25, 2008, revised notices and a claim form were presented to the Court based on the determinations in the December 21, 2007 Settlement Master's Allocation Plan, as amended, and the February 14 Settlement Master's Report and Recommendation.

Judge Pohorelsky entered a Report and Recommendation recommending the adoption of the proposed plan of allocation on March 14, 2008, following a conference held on March 11, 2008.  His Report and Recommendation was based on (1) the Settlement Master's Report and Recommendation, filed December 21, 2007; (2) the Amendment filed thereto on February 25, 2008; and (3) the February 19, 2008 Settlement Master's Report and Recommendation Regarding the Allocation of the Lufthansa Settlement Fund Among Foreign Purchasers.  I adopted Judge Pohorelsky's Report and Recommendation regarding the plan of allocation in an order dated April 4, 2008.

D.    *Attorneys' Fees and Expenses*

Following my preliminary approval of the Lufthansa Settlement Agreement, notices were sent to Settlement Class members explaining that Settlement Class Counsel, who

---

[9]    Although it initially left open how much each foreign group would receive, an additional Settlement Master's Report and Recommendation was filed on February 14, 2008, which pertained to the allocation of the settlement fund to foreign purchasers, and provided that the foreign indirect purchasers would receive 15% of the foreign direct purchasers' share of the Settlement Fund.  Joint Decl. ¶ 41.

[10]   The December 21, 2007 Settlement Master's Allocation Plan was amended on February 25, 2008, to provide that the 1.625 multiplier for inbound shipments was not to have any precedential effect on any issue in the litigation or on future settlements.  Joint Decl. ¶ 17.

undertook this case on a contingency fee basis, would ask the court for an award of attorneys'
fees to be deducted from the Settlement Fund in an amount not to exceed 30% of the Settlement
Fund.  In addition, the notice set forth that the attorneys would seek reimbursement for expenses
actually incurred as a result of the litigation, in an amount not more than $2.5 million.

      Having been appointed pursuant to Rule 53 of the Federal Rules of Civil
Procedure by Judge Pohorelsky, Settlement Master Weinstein was charged with, among other
duties, "determining and recommending to the Court an allocation from the Settlement Fund of
attorneys' fees, expenses and costs."  Settlement Master Weinstein examined the results achieved
and the work undertaken in the context of the standards articulated in *Goldberger v. Integrated
Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), and recommended that plaintiffs' counsel be
awarded attorneys' fees of 25% of the Lufthansa Settlement Fund and be reimbursed
$2,455,088.80 in expenses.  *See* Weinstein Decl. ¶¶ 3-27.  Settlement Class Counsel has moved
for an order adopting Settlement Master Weinstein's recommendation and awarding fees and
expenses in the amounts recommended.

E.     *The Fairness Hearing and the Post-Hearing Submissions*

      A fairness hearing was held on December 12, 2008.  In an order dated December
30, 2008, I directed Settlement Class Counsel and counsel for Lufthansa to answer follow-up
questions about the proposed settlement.  In addition, I directed the filing of a supplemental
submission regarding attorneys' fees.  In the latter regard, the December 30, 2008 order stated as
follows:

> *Supplemental Filing Regarding the Lodestar*
> In addition to answering the above questions, Settlement Counsel are directed to
> submit a supplemental fee application and expense request limited to work
> performed with respect to the Lufthansa Settlement.  I recognize that such an
> accounting is burdensome and suggest the following as guides. *Time to be
> included*: all time pre- September 11, 2006 devoted to negotiating the settlement

with Lufthansa; and time after September 11, 2006 related to executing the final settlement such as preparing for and participating in mediation and arbitration meetings and court conferences with respect to the plan of allocation or notice plan. *Time to be excluded*: time spent briefing, preparing for or arguing the opposition to the motions to dismiss; and time devoted to discovery efforts, including preparing preservation and confidentiality stipulations. I leave any remaining determinations to the good judgment of counsel.

Order dated December 12, 2008, at 2.

DISCUSSION

A.    *The Settlement*

    1.    *The Standard for Approving a Proposed Settlement*

Pursuant to Federal Rule of Civil Procedure 23(e), any settlement or dismissal of a class action requires court approval. In order to approve such a settlement, the court must determine that the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would take if were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000). Judicial discretion should be exercised in light of the general policy favoring settlement. *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982); *see also Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317, 328 (S.D.N.Y. 2005) ("There is a strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy.") (internal quotation marks, footnotes and citations omitted), *aff'd in part and vacated in part*, 443 F.3d 253 (2d Cir. 2006).

To evaluate whether a class settlement is fair, a district court examines (1) the negotiations that led up to the settlement, and (2) the substantive terms of the settlement.  *See In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 145 (E.D.N.Y. 2000).  "The [negotiation] process must be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves.'"  *Id.* at 145-46 (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)). Factors relevant to the substantive fairness of a proposed settlement include:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *See Grinnell*, 495 F.2d at 463.

      a.     *Procedural Fairness*

I find that the Settlement Agreement is procedurally fair because it was the product of arm's length negotiations between experienced and able counsel on all sides.  Counsel for the settling parties contend that the Lufthansa Settlement Agreement was reached after "lengthy and hard-fought negotiations between counsel experienced in complex antitrust and consumer class action litigation."  Memorandum in Support of Plaintiffs' Motion for Final Approval of Settlement with Lufthansa, at 16-17.  There is nothing in the record to suggest otherwise.  According to counsel, the initial negotiation process lasted more than five months and involved at least 15 in-person meetings between Co-Lead Counsel and counsel for

Lufthansa.  *Id.*  The fairness and reasonableness of the $85,000,000 settlement amount is supported by the fact that it was the product of negotiations informed by various experts who "constructed and reviewed competing economic models of the relevant market, as affected by the alleged anti-competitive activity."  Infante Decl. ¶ 21.[11]  Finally there is no indication that the settlement is a product of collusion or that it confers, upon the class representative or any portion of the class, "improper[] . . . preferential treatment."  *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  *See als*o Infante Decl. ¶ 17 ("[T]he length and complexity of the Agreement itself, including the carefully crafted provisions that preserve the benefits of the settlement for class members, show no signs of collusive negotiation."); *id.* at ¶ 18 ("[O]ur investigation did not uncover any signs that early settlement negotiation damaged the class members' interests or resulted in a less favorable settlement.").  In addition, all counsel for the direct and indirect purchasers in the litigation undertook their own investigations and evaluations of the settlement, and they agreed that the settlement is reasonable, fair and in the best interests of the Settlement Class.  Accordingly, I conclude that the Settlement Agreement was reached by a good-faith negotiation that was "fair, adequate, and reasonable, and not a product of collusion."  *Joel A. v. Giuliani*, 218 F.3d at 138.

            b.     *Substantive Fairness*

                i.     *The complexity, expense and likely duration of the litigation*

From the outset, the potential for this complex litigation to consume considerable time and resources has been great.  Complex factual and legal issues are involved.  Protracted, voluminous discovery and dueling experts would no doubt add to the complexity of the proof.  A

---

[11]      In support of the fairness and reasonableness of the settlement amount, the parties submitted the declaration of Edward A. Infante, a retired federal Magistrate Judge with considerable experience in the settlement of class action litigation.  He concluded, based on information provided by the parties concerning the conduct of their negotiations, that "[t]he $85,000,000 settlement amount was reached through fair and informed bargaining."  Plaintiffs' Memorandum of Law in Support of An Award of Attorneys' Fees and Expenses, Ex. 1 ("Infante Decl.") ¶ 21.

jury's verdict would likely be appealed, thereby extending the duration of the litigation.  Indeed,

with respect to the non-settling defendants, this case may yet result in enormous expense and

continue for a long time.  It is undisputed that developing the case against Lufthansa would have

required significant time and expense.  In addition, as a result of Lufthansa's bargained for

cooperation, the Lufthansa Settlement may facilitate a more expeditious outcome of the

remaining claims, and may advance the final resolution of this litigation.

ii.    *The reaction of the class to the settlement*

The small number of objectors to the settlement weighs heavily in favor of

approval.  As noted by plaintiffs, "there are no doubt tens of thousands of persons and entities

that fall within the Settlement Class definition."  Memorandum in Support of Plaintiffs' Motion

for Preliminary Approval of Settlement, at 22.  However, only 42 opted out of the Settlement

Agreement, and no objections were filed.  *See* Alba Conte & Herbert Newberg, *Newberg on*

*Class Actions* § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be

expected in a class action with an extensive notice campaign and a potentially large number of

class members.  If only a small number of objections are received, that fact can be viewed as

indicative of the adequacy of the settlement."); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78,

86-87 (2d Cir. 2001) (holding that "[t]he District Court properly concluded that this small

number of objections [18 where 27,883 notices were sent] weighed in favor of the settlement.").

iii.    *The stage of the proceedings and the amount of discovery*
*completed*

The purpose of the third *Grinnell* factor is to "assure the Court that the counsel for

plaintiffs have weighed their position based on a full consideration of the possibilities facing

them."  *In re Global Crossing Securities and ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004)

(internal quotation marks and citation omitted).  Although the Lufthansa settlement was

concluded relatively early in the litigation process, there is no evidence that the agreement was ill-informed or premature.  Nor is there a requirement that full discovery be completed "as long as the court is assured that the parties had sufficient information about the claims to evaluate intelligently the desirability of settlement."  *In re International Murex Techs Corp. Secs. Litig.*, No. 93 CV 336 (JG), 1996 WL 1088899, at *4 (E.D.N.Y. Dec. 4, 1996); *see also Global Crossing*, 225 F.R.D. at 458-59.  The record shows that plaintiffs' counsel carefully evaluated the adequacy of the settlement and retained an economist who analyzed the economics of the air cargo market and estimated potential damages attributable to Lufthansa.  *See* Infante Decl. ¶¶ 18 and 21 (noting that the information and analysis plaintiffs had available to them was more than sufficient to competently negotiate a settlement).  In addition to the experienced counsel who negotiated the settlement in 2006, other plaintiffs counsel have since reviewed its terms and support its approval.  In sum, this *Grinnell* factor weighs in favor of a conclusion that the settlement is fair and advantageous to the class.

        iv.     *The risks of establishing liability and damages, and of maintaining the class action through the trial*

As noted by plaintiffs, they are continuing to litigate against the non-settling defendants.  Given Lufthansa's leniency application under ACPERA, it is not clear to me that Lufthansa itself would be able to effectively contest its liability at a trial.  Still, trial of the case would involve significant risks to the plaintiffs and any theory of damages would be hotly contested at trial.  *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) ("[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.").  In addition, the defendants could file motions seeking to reduce or decertify the class, and while plaintiffs believe that they would prevail on such motions, there is

nevertheless a risk that they would not.  Not only have plaintiffs eliminated the risk of proving damages as to Lufthansa, but in addition, Lufthansa's obligation under the settlement to cooperate may assist plaintiffs to resolve the action as against the outstanding defendants.

<strong>v.</strong>    <em>The ability of the defendant to withstand a greater judgment</em>

In light of the current economic climate, and the significant financial stresses particular to the airline industry at this time, I find that the settlement represents a significant commitment by Lufthansa.

<strong>vi.</strong>    <em>The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation</em>

The $85 million settlement amount and cooperation agreement are within the range of reasonableness.  The Lufthansa Settlement Agreement provides for substantial payments to the class members now -- relatively early in the litigation -- rather than leaving them with the prospect of uncertain relief later.  It addition, because Lufthansa's exposure is measured, under ACPERA, by considering its settlement as a measure of its own sales without regard to the entire air cargo industry, the $85 million equals approximately 10.5% of Lufthansa's surcharges during the Settlement Class period, a result that that compares favorably to settlements reached in other price-fixing antitrust class actions.  Plaintiffs' Memorandum In Support of Its Motion for Final Approval of Settlement with Lufthansa, at 25.  Additionally, the agreement to cooperate with the plaintiffs has not been factored in to the overall value of the settlement, and it adds significant value.  I find that the reasonableness of the settlement in light of the best possible recovery and all attendant litigation risks weighs in favor of approving the Settlement Agreement.

In sum, I conclude that the Settlement Agreement is both procedurally and substantively fair and therefore I approve it.

B.      *The  Allocation Plan*

     1.      *The Allocation Plan Is Approved*

        "As a general rule, the adequacy of an allocation plan turns on … whether the proposed apportionment is fair and reasonable" under the particular circumstances of the case. *In re Painewebber Ltd. P'ships Litig*., 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (quotation marks omitted). Whether the allocation plan is equitable is "squarely within the discretion of the district court." *In re PaineWebber*, 171 F.R.D. at 132.  I find that the plan is both fair and reasonable, and thus I approve it.

        The proposed allocation plan works as follows.  After payment of any Court-approved attorneys' fees and expenses, taxes and tax expenses relating to the income earned by the settlement fund, any exclusions for opt-outs, and any arbitration expenses described in paragraph 61 of the Settlement Agreement, the remaining funds ("Net Settlement Fund") will be allocated among claimants.  Joint Decl. ¶ 95.  Specifically, 18% of the Net Settlement Fund will be paid to U.S. indirect purchasers and distributed *pro rata* according to the value of their purchases among all such U.S. indirect purchasers.  The remaining 82% of the Net Settlement Fund will be allocated to the U.S. and foreign direct purchase plaintiffs ("Direct claimants") and will be preliminarily divided *pro rata* among all direct purchasers, whether U.S. or foreign, based on the value of their purchases.  The amount allocated to foreign direct purchasers (but not U.S. direct purchasers) will then be reduced by 15% to create a fund to be paid to foreign indirect

purchasers *pro rata* based on the value of foreign indirect purchasers' purchases.[12]  For the purposes of allocating among claimants, the value of shipments into the United States will be multiplied by 1.625, while the value of the shipments within or out of the United States will have no multiplier.  *See* Settlement Master's Report and Recommendation, filed December 21, 2007; Report and Recommendation Regarding the Allocation of the Lufthansa Settlement Fund Among Foreign Purchasers, filed February 19, 2008 (hereinafter "Settlement Master's Report and Recommendation, filed February 19, 2008").

When a plan of allocation is devised by a neutral arbiter following proceedings in which counsel present proposals, arguments, and expert analysis, such proceedings support judicial approval of the resulting plan.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 170 (S.D.N.Y. 2007) (approving plan of allocation where it was the "result of extensive proceedings conducted before [a former U.S. District Court Judge] and his subsequent assessment of counsels' arguments …."); *In re Holocaust Victim Assets Litig.*, 2000 WL 33241660, at *1 (approving plan of allocation by Special Master following "equitable procedures to ensure fair consideration of all proposals for allocation and distribution").

In this case, the plan of allocation is the result of extensive negotiations and proceedings before a Settlement Master in which a thorough legal and economic analysis of the relevant information concerning the claims against Lufthansa and the settlement generally was

---

[12]     More specifically, the Direct claimants will be divided into two groups: (1) the U.S. Direct Purchasers and (2) Foreign Direct Purchasers.  The shares preliminarily allocated to claimants in the Foreign Direct Purchasers group are then added together to create a "Foreign Fund."  Eighty-five (85) percent of the Foreign Fund is to be allocated to Foreign Direct Purchasers ("The Foreign Direct Fund") and 15% of the Foreign Fund is to be allocated to the Foreign Indirect Purchasers (the "Foreign Indirect Fund").  The same 1.000 and 1.625 multipliers for Outbound and Inbound shipments set forth in the Settlement Master's Report and Recommendation, filed December 21, 2007, will be used to calculate final class member shares of the Foreign Direct Fund and Foreign Indirect Fund.  Any funds remaining in the Foreign Indirect Fund after payment of all valid claims will be added to the Foreign Direct Fund for distribution to Foreign Direct Purchasers.

conducted.  With their respective experts, experienced counsel for each of the three groups -- the U.S. Direct Purchasers, the U.S. Indirect Purchasers, and the Foreign Purchasers of air cargo services -- met collectively and independently with Settlement Master Weinstein for a two-day mediation session in New York to debate the merits of their positions.  In addition, Settlement Master Weinstein was aided by his own independent expert and an assistant.  Settlement Master Weinstein noted that "[a]ll parties to the proceedings conducted themselves with the highest degree of skill and professionalism, and Counsel vigorously represented the interest of their clients."  Settlement Master's Report and Recommendation, filed December 21, 2007, at 5. Ultimately, he exercised his authority under the Allocation Agreement to impose a binding resolution because the parties could not agree on an appropriate allocation.  Having carefully considered (1) the arguments and evidence presented by counsel, (2) all other information then available pertaining to the litigation, (3) the recommendations of his independent expert and assistant, and (4) the factors he was authorized to apply pursuant to the terms of the Allocation Agreement,[13] Settlement Master Weinstein recommended the December 21, 2007 Plan of Allocation, which was supplemented by his Report and Recommendation of February 19, 2008. In light of the foregoing, I find that the Special Master's decision regarding the allocation of the Lufthansa Settlement Fund is fair, reasonable, and adequate.  Finally, the small number of opt-outs -- only 46 Settlement Class members filed notices of exclusion as of November 25, 2008 -- suggests that the Settlement Allocation Plan is fair and reasonable. Accordingly, I approve as final the allocation plan.

---

[13]    These factors were: (1) the dollar amount of the relevant air cargo commerce in which each of the three groups participated; (2) the estimated dollar amount of the overcharges; (3) the relative strengths and weakness of each class's claims; (4) the relative strengths and weaknesses of having a class or classes certified under the applicable law; (5) the applicable substantive law with respect to claims or defenses regarding damages' and (6) the intent, terms and circumstances of the Lufthansa Settlement Agreement.  In addition, he considered the position of the parties at the time the Settlement was reached in September 2006, including the risks the parties, including Lufthansa, then faced.

2.      *Objections to the Allocation Plan*

    a.      *Disproportionate Allocation*

Class member Schenker, Inc. ("Schenker") objects to the Allocation Plan,
claiming that it is unfair to class members like Schenker, who made substantial purchases of air
cargo services from Lufthansa, because it compensates all purchasers of air cargo services
regardless of whether they purchased services from Lufthansa or some other air cargo service
provider.  Schenker claims that "at this point in the proceedings it is too speculative to conclude
that the conspiracy currently alleged by Plaintiffs actually involved *all* air cargo defendants and
*all* shipments to, from, or within the United States."  Schenker's Notice of Objections to
Allocation of Lufthansa Settlement Fund and Intention to Appear, filed November 12, 2008, at 5.
Schenker proposes an "equitable" allocation plan in which the Settlement Fund is apportioned
based on each claimant's demonstrated purchases from Lufthansa.  I find Schenker's Objection
unpersuasive.

> The Lufthansa Settlement Class is defined in the Settlement Agreement as:
>
> All persons and entities that purchased airfreight cargo shipping services
> for shipments within, to, or from the United States (hereafter "Airfreight
> Shipping Services"), including those persons and entities that purchased
> Airfreight Shipping Services through freight forwarders, from any air
> cargo carrier (including, without limitation, those defendants named in the
> Actions, and specifically including Lufthansa) and/or any named or
> unnamed co-conspirators (collectively "Defendants") during the period
> from January 1, 2000 to September 11, 2006.  Excluded from the
> Settlement Class are Defendants, their respective parents, employees,
> subsidiaries, and affiliates, and all government entities.

Thus, as negotiated, the Settlement Class included any purchaser of air cargo shipping services
irrespective of the party that the services were purchased from.  The Allocation Plan
recommended by the Settlement Master also does not distinguish between those Class Members
that purchased air cargo services from Lufthansa and those who purchased services from others.

As an initial matter, the claim proposed to be settled is a conspiracy to fix prices in the air cargo industry.  In any such conspiracy, a single carrier is jointly and severally liable to its own customers as well as the customers of other airlines.  In other words, because one party's participation in the conspiracy caused class members who purchased services from other air cargo providers to pay higher fixed prices, each party is liable for the injury suffered by the purchaser whether or not they supplied the services directly.  *See In re Cement and Concrete Antitrust Litigation*, 817 F.2d 1435, 1439 (9th Cir. 1987) ("settling defendants were liable to all class members, not to just those members who purchased cement from them personally … class members who purchased cement from nonsettling defendants had valid claims, and thus were entitled to share in the fund"), *rev'd on other grounds*, *California v. ARC America Corp.*, 490 U.S. 93 (1989).  Thus, payments to class members who were not Lufthansa customers would hardly be a windfall.

Second, Lufthansa persuasively argues that it would hardly make sense for it to resolve only the claims of those who purchased directly from Lufthansa, leaving the company exposed to other companies' customers' claims that Lufthansa is jointly and severally liable for prices charged by others that Lufthansa agreed to fix.  Rather, Lufthansa understandably seeks to achieve a total peace, and in its effort to do so its total liability was considered.

     b.    *Foreign Purchasers*

An objection filed by Brickman Concerts, Inc. ("Brickman"), argues that it is improper to allocate any portion of the settlement funds to foreign purchasers because this Court lacks jurisdiction over the claims of foreign direct purchasers, which are barred under the Foreign Trade Antitrust Improvements Act ("FTAIA") of 1982, 15 U.S.C. § 6a (2000). Brickman posits that the proposed settlement would permit claims against the Settlement Fund

by foreign direct and indirect purchasers, which would improperly dilute the Settlement Fund at the expense of domestic direct and indirect purchasers.

I have since rejected the claim that the FTAIA applies here.  In any event, in the settlement context, it is not necessary to determine which party would have prevailed on the underlying claim being settled.  Rather, the essential question is whether the settlement reflects a reasonable compromise.  *See Newman v. Stein*, 464 F.2d 689, 691-93 (2d Cir. 1972) ("[T]he role of a court in passing upon the propriety of the settlement of a derivative or other class action is a delicate one … we recognized that since '"the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation," the court must not turn the settlement hearing "into a trial or a rehearsal of the trial."' … [I]n any case there is a range of reasonableness with respect to a settlement-a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.")) (citations omitted).  Because I find that allocation plan and settlement reflect a reasonable agreement between the parties, I would accept the proposed settlement irrespective of the outcome of the defendants' claim that the FTAIA bars some of plaintiffs' claims.

C.    *Attorneys' Fees*

In awarding attorneys' fees, the Second Circuit has held that both the "lodestar" method of computation (*i.e.,* hours reasonably expended multiplied by a reasonable hourly rate, plus an enhancement if deemed appropriate) and the "percentage of the fund" method are available to district judges in calculating attorneys' fees in common fund cases.  *See Goldberger*, 209 F.3d at 50.  As one court has noted, "[t]he trend, however, in the Second Circuit appears to be the utilization of the percentage method."  *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,

96 Civ. 0583, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002) (citing *In re American Bank Note,* 127 F. Supp. 2d 418, 431 (S.D.N.Y. 2001) ("Although the law in the Circuit has not been uniform, the trend of the district courts in this Circuit is to use the percentage of the fund approach to calculate attorneys' fees."); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("the trend in this Circuit is toward the percentage method"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 171 (S.D.N.Y. 2007) ("The trend in the Second Circuit, … has been to express attorneys' fees as a percentage of the total settlement, rather than to use the lodestar method to arrive at a reasonable fee.").  The percentage method spares the court and the parties the "cumbersome, enervating, and often surrealistic process of lodestar computation."  *Goldberger*, 209 F.3d at 50 (quotation marks omitted).  Even when the percentage method is used, however, the Second Circuit recommends analyzing the documentation of the hours submitted by counsel as a "cross check" on the reasonableness of the requested percentage.  *See id.*  Courts in this circuit commonly adhere to this practice.  *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (quoting *Goldberger*, 209 F.3d at 49-50).

        Regardless of which method of calculation is employed, the key consideration in awarding fees is what is reasonable under the circumstances.  *Goldberger*, 209 F.3d at 47.  The traditional criteria in determining a reasonable common fund fee include: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  *Id.* at 50.

        The Second Circuit has cautioned district courts, in applying these criteria, not to blindly follow a one-size-fits-all "benchmark" in determining the appropriate fee.  Such a

practice "could easily lead to routine windfalls where the recovered fund runs into the multi-millions." *Id.* at 52; *see also*, *e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 486 ("In many instances the increase [in the fund] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel."). Thus, in megafund cases particularly, courts have "traditionally accounted for these economies of scale by awarding fees in the lower range[s]." *Goldberger*, 209 F.3d at 52; *see also id.* (noting that in cases with recoveries of between $50 and $75 million, courts typically award fees in the range of 11% to 19%); *In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."); *In re NASDAQ*, 187 F.R.D. at 486 (explaining that "absent unusual circumstances, the percentage will decrease as the size of the fund increases" and thus "[i]n cases where a class recovers more than $75-$200 million .... fees in the range of 6-10 percent and even lower are common.") (quotation marks omitted).

In determining a reasonable fee, it is also my responsibility to act as a "fiduciary ... a guardian of the rights of absent class members." *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977) (quotation marks omitted), *abrogated on other grounds by Goldberger*, 209 F.3d 43 (2d Cir. 2000); *see also Goldberger*, 209 F.3d at 52 ("The point is that plaintiffs in common fund cases typically are not fully informed. Nor are they able to negotiate collectively, or at arm's length. This is why we emphasized … that awards in these cases are proper only if made with moderation.") (quotation marks omitted). Accordingly, I must assess

the requested fee award with "a jealous regard to the rights of those who are interested in the fund." *Id.* at 53 (quotation marks omitted).

Settlement Class Counsel have requested a fee of 25% of the Settlement Fund (approximately $21.5 million), the amount recommended by Settlement Master Weinstein.  They assert that the amount is fair and reasonable when examined under the *Goldberger* factors and when "cross-checked" against that lodestar.[14]  With respect to comparing the requested fee to the lodestar, Settlement Class Counsel assert that because 25% of the Settlement Fund is less than the lodestar, the recommended fee represents a deflator, not a multiplier.

Two objections to the requested fees were filed.  The objection filed by Kuehne + Nagel, Panalpina, Inc., Schenker, Inc., EGL, Inc., and Expeditors International of Washington, Inc. (collectively, the "Forwarders") argues that the requested fees are excessive because the attorney work they represent is not limited to that which is related to the Lufthansa Settlement, but rather reflects all of the work undertaken in this litigation from its inception until February 28, 2008.  Specifically, they argue that because only a handful of attorneys were responsible for negotiating the settlement with Lufthansa, an award based on "declarations from sixty-four law firms reflecting over 55,000 hours of attorney time" is unreasonable.  In further support of their position that the requested fees are excessive, they argue that settlement negotiations took place over a relatively brief time period and that Lufthansa was a willing participant in the negotiations because it was an amnesty applicant under the Department of Justice leniency program.

A second objection was filed by class members Brickman Concerts, Inc. and I.O.D. Group LLC ("Brickman").  Brickman filed a "Notice of Intention to Appear and Objection to Proposed Settlement and Request for Attorneys' Fees" on November 21, 2008.

---

[14]      Settlement Class Counsel assert that "[b]etween the time that the cases compromising this Action were filed and the end of February 2008, counsel for Plaintiffs [] incurred $24,884,914.26 in lodestar."  Plaintiffs' Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses, at 6.

They also filed a supplemental "Opposition to Motion for the Approval of an Award of Attorney's [sic] Fees and Expenses" on November 26, 2008.  In pertinent part, they argue that the attorneys' fees are excessive, noting that the attorney awards in securities and antitrust class actions post-*Goldberger* have generally ranged from 4% to 16% of the fund.[15]

The first factor I must consider in evaluating an award of attorneys' fees is the time and labor expended by counsel.  Co-Lead Counsel invested significant time in negotiating the settlement.  This labor has included participating in more than a dozen in-person settlement negotiations, establishing procedures for and engaging in mediation/arbitration proceedings to determine fair fund allocation, and preparing a notice program with GCG.  Counsel's additional efforts with respect to prosecuting the case generally, such as preparing the Complaint, participating in numerous conferences unrelated to the settlement, initiating discovery, negotiating confidentiality and preservation stipulations, and briefing and arguing motions amount to time that should not be considered as part of the present fee application because it is unrelated to the Lufthansa Settlement.  Given the relatively short negotiation period -- approximately five months -- even including the time spent on the allocation plan and notice program, I do not find that the time and labor expended by counsel warrants the 25% fee award.

The second factor is the magnitude and complexities of the litigation.  This litigation is irrefutably complex.  With respect to the case against Lufthansa, counsel spent significant resources gaining an understanding of the airfreight shipping services industry and

---

[15]     Brickman also argues that there was insufficient notice of the attorney fee motion under Fed. R. Civ. P. 23(h).  Specifically Brickman argues that the notice was not reasonable because it failed to tell class members when the fee application would be filed.  As a result, Brickman claims that because objections to the fees were due by November 12, 2008, class members "[we]re forced to guess about what Class Counsel's fee request [wa]s likely to be at the time they file[d] their objections."  Brickman Objection to Proposed Settlement and Request for Attorneys' Fees, filed November 20, 2008, at 4-5.  This argument is unpersuasive since the maximum fee amount that would be requested by counsel was the subject of worldwide direct and publication notice and the fee amount ultimately recommended by Settlement Master Weinstein and sought by Settlement Class Counsel was filed with the court and posted on the Settlement Administrator's website notifying the class of information about this action.

investigating the relevant regulatory and economic concerns in order to negotiate a favorable settlement.

Third, in light of the current economic climate, as well as the scope and nature of the litigation, this action is obviously risky. The airline industry is experiencing especially difficult times. It would not be unreasonable to conclude that the long-term viability of some of the defendants is unclear, and that of course could obviously impact plaintiffs' ability to recover, should they establish liability at trial. The benefit of an early settlement with one defendant may well facilitate speedier resolution with respect to the remaining defendants. On the other hand, Lufthansa has sought the benefits of the DOJ Corporate Leniency Policy. Consequently, the risk in prosecuting claims against it was diminished by its voluntary cooperation. Lufthansa has also applied to the European Commission for immunity from fines in Europe in connection with price-fixing in the air cargo industry. In addition, Lufthansa made an application to the United States Department of Justice pursuant to its Corporate Leniency Policy, to report price-fixing activity and/or other conduct in the air cargo industry in the United States and elsewhere that is potentially violative of Section 1 of the Sherman Act. Compl. ¶ 140.

Fourth, Settlement Class Counsel are highly experienced practitioners in complex litigation generally and antitrust litigation specifically. The settlement was the result of vigorous, arm's-length negotiations with Lufthansa's counsel. In addition, Settlement Counsel has been consistently commended in this case, deservedly so.

The fifth factor is the relationship of the fee to the settlement. For the reasons discussed below, I find an award of 25% of the total settlement to be unreasonable.

The last factor is whether public policy considerations support a substantial fee award. While the Second Circuit has noted that "[i]n the absence of adequate attorneys' fee

awards, many antitrust actions would not be commenced, since the claims of individual litigants,

when taken separately, often hardly justify the expense of litigation," *Alpine Pharmacy, Inc. v.

Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973), fees awarded must nonetheless be

reasonable.  Fee awards should "provid[e] lawyers with sufficient incentive to bring common

fund cases that serve the public interest", *Goldberger*, 209 F.3d at 51, but they should not

provide counsel with a "windfall."

    In light of all of these factors and considering all of the circumstances of this case

to date, I find that the requested attorneys' fee is excessive.  I do not intend to diminish the

commendable efforts of Settlement Counsel, who have no doubt worked vigorously to achieve

this outcome.  Nonetheless, I find that a 25% fee award is not reasonable in light of similar cases

involving mega-funds.  "To avoid routine windfalls where the recovered fund runs into the

multi-millions, courts typically decrease the percentage of the fee as the size of the fund

increases." *In re Interpublic Securities Litigation*, No. 02 Civ. 6527, 2004 WL 2397190, at *11

(S.D.N.Y. Oct. 26, 2004) (12% award of $96 million recovery to the class) (internal citations and

quotation marks omitted).  In cases "with recoveries of between $50 and $75 million, courts have

traditionally accounted for these economies of scale by awarding fees in the lower range of about

11% to 19%." *Goldberger*, 209 F.3d at 52.[16]  *See, e.g.*, *In re Elan Securities Litigation*, 385 F.

Supp. 2d 363 (S.D.N.Y. 2005) (denying 20% request and granting 12% fee from $75 million

settlement fund); *Denney*, 230 F.R.D. at 352-54 (reducing fee percentage from 20% to

---

[16]   Of the cases cited by Settlement Class Counsel for the proposition that courts in the Second
Circuit often award fees in the 25%-35% range, most concerned settlement funds significantly smaller than the $85
million Lufthansa Settlement at issue here.  *See Gwozdsinnky v. Sandler Assoc.*, 159 F.3d 1346 (2d Cir. 1998)
(*summary order*) (25% of $1 million fund); *In re Blech Sec. Litig.*, Nos. 94 Civ. 7696 & 95 Civ. 6422, 2000 WL
661680, at *5 (S.D.N.Y. May 19, 2000) (30% of $800,000 fund); *Adair v. Bristol Tech. Sys., Inc.*, No. 97 Civ. 5974,
1999 WL 1037878, at *4 (S.D.N.Y. Nov. 16, 1999) (33% of $975,000); *Berchin v. Gen. Dynamics Corp.*, No. 93
Civ. 1325, 1996 WL 465752, at *2 (S.D.N.Y. Aug. 14, 1996) (33% of first $3 million); *In re Allstar Inns Sec. Litig.*,
No. 88 Civ. 9282, 1991 U.S. Dist. LEXIS 20402 (S.D.N.Y. Nov. 20 , 1991) (35% of  about $2.3 million).  The
exception is *In re Sumitomo Copper Litg.*, 74 F. Supp. 2d 393 (27.5% of $116 million).

approximately 15.5% of $81.5 million settlement); *In re Interpublic Sec. Litig.*, Nos. 02 Cov.

6527 & 03 Civ. 1194, 2004 WL 2397190 (S.D.N.Y. 2004) (awarding as fees 12% of $77 million

settlement); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 87 (E.D.N.Y. 2002) (reducing

fee from 33% to 12% of $26.5 million settlement).

   I find it inappropriate to grant a fee request in connection with the settlement with

a single defendant by reference to the total number of hours expended on the litigation as a

whole.[17]  While much of the work the attorneys have done is related to the Lufthansa Settlement,

a significant percentage is not.  The other work pertains to other defendants, and counsel should

be compensated for that work if and when they are successful in prosecuting those claims.

Accordingly, I directed Settlement Class Counsel to submit a supplemental fee application and

expenses request limited to work performed with respect to the Lufthansa Settlement.  In their

submission, counsel asserted that the lodestar through December 31, 2008 for work related to the

Lufthansa settlement was $8,286,093.12, and the expenses incurred with respect to the settlement

were $1,572,100.94.  These amounts are adequately supported by the supporting documentation,

and I am not persuaded by the Forwarders' objections to them.  Nor am I persuaded by the

Forwarders' argument that a fee award of approximately $5.5 million is appropriate, as such an

award would diminish the accomplishments of counsel on behalf of the settlement class.

   Taking into account all the factors discussed above, and applying them to this

setting, in which the settlement has been reached with but a single defendant, I conclude that an

award of attorneys' fees in the amount of $12,750,000 is appropriate.  This amount is 15% of the

$85,000,000 fund and a multiplier of approximately 1.5 of the lodestar.

D.  *Class Notice Satisfies Due Process*

---

[17] Here Settlement Class Counsel argues that a fee award of 25% is reasonable given the time and effort that has been devoted to the settlement specifically as well as the litigation as a whole.  Collectively, counsel submit that since March, 2006 they have spent over 55,000 hours on this litigation.

In addition, I find that the class notice as disseminated satisfies the requirements of due process.

CONCLUSION

For the reasons stated above, the Lufthansa Settlement Agreement is approved, and all claims against Lufthansa are dismissed with prejudice as against those members of the settlement class who have not timely exercised their right to be excluded from the Settlement Agreement.  Attorneys' fees are awarded in the amount of $12,750,000, as are expenses in the amount of $1,572,100.94.


So ordered.


John Gleeson, U.S.D.J.

Dated:   September 25, 2009
             Brooklyn, New York