# Exhibit 25



# DEPARTMENT OF JUSTICE

STATEMENT

of

**JOEL I. KLEIN**

Assistant Attorney General
Antitrust Division
U.S. Department of Justice

Before the

Committee on the Judiciary
United States House of Representatives

Concerning

The State of Competition in the Airline Industry

Washington, D.C.
May 19, 1998

Mr. Chairman and members of the Committee, I am pleased to appear before you today to discuss important antitrust issues in today's airline industry. My testimony focuses on how we analyze airline mergers and domestic and international alliances.

**Antitrust Enforcement in the Airline Industry**

Beginning in the 1970s, our nation has in several key industries acted on the recognition that competition serves consumers far better than economic regulation. In particular, the Airline Deregulation Act of 1978 moved the domestic air transportation industry from government regulation to a new era of competition.

Antitrust enforcement is critical to ensuring that the benefits of airline competition sought by Congress are realized by consumers. The Antitrust Division has maintained an active antitrust enforcement program in the airline industry for many years. During the 1980s, the Division recommended that the Department of Transportation (which had authority over airline mergers until 1989) disapprove two mergers, TWA/Ozark and Northwest/Republic, which involved the merger of the only two hub carriers at St. Louis and Minneapolis respectively. The merging carriers were the only airlines providing nonstop service between the hub city and smaller cities in the surrounding region (such as Bismarck, North Dakota, and Cedar Rapids, Iowa).

The Division has also moved aggressively to block acquisition of gates or slots that would eliminate existing or potential hub competition, including Eastern's proposal to sell eight gates to USAir at the gate-constrained Philadelphia International Airport and Eastern's proposed sale of slots and gates at Reagan Washington National Airport to United, which operated a significant hub out of nearby Dulles airport.

The Division has also challenged transactions involving international route authority. For example, with respect to the 1991 investment agreement between British Airways and USAir, the Department brought a civil action under Clayton Act § 7 after we concluded that the transaction threatened competition in gateway city pairs and certain connecting city pairs (in particular, service between Northeast and Mid-Atlantic cities and London).

In addition to challenging transactions that adversely affect the structure of the airline industry, the Division's record demonstrates a commitment to detecting and challenging collusive practices. In 1992, we sued Airline Tariff Publishing Co. and eight major airlines, alleging that the airlines used the ATPCO electronic fare submission and dissemination system to fix prices. The consent decrees ultimately entered into banned improper signaling of future pricing intentions, which had cost consumers up to $2 billion in travel expenses.

Other conduct that we have challenged includes agreements on international fares undertaken outside the scope of the International Air Transport Association[1] and the solicitation by American President Robert Crandall of a price increase from one of his chief rivals, which we challenged as attempted monopolization.[2]

In addition to the law enforcement efforts that I have described, the Antitrust Division engages in competition advocacy in various matters before the Department of Transportation. Because DOT retains significant authority over competitive issues raised by agreements between U.S. and foreign carriers and has the authority to grant antitrust immunity to agreements between

---

[1] See, e.g., United States v. Air Florida, Crim. No. 84-260 (D.D.C. indictment filed July 11, 1984).

[2] See United States v. American Airlines, Inc., 743 F.2d 1114 (5th Cir. 1984), cert. dismissed, 474 U.S. 1001 (1985).

such parties, the Division often brings our expertise to bear in comments to DOT. Overall, we have developed an excellent working relationship with the Department of Transportation.

**International Alliances**

As you can see, the Department of Justice has been working aggressively for many years on a number of fronts to preserve competition in the airline industry since deregulation. Let me turn now to the competitive implications of international aviation marketing alliances which, for the sake of simplicity, I will refer to as "code sharing." The term "code share" can mean as little as one airline allowing another airline to use its computer reservation system codes to sell seats on its planes on routes in which the second airline cannot compete, or as much as comprehensive integration of marketing and operations that involves joint decisions on price, capacity, schedules and other competitively sensitive matters.

Absent an express grant of antitrust immunity by the Department of Transportation, the antitrust laws apply fully to international code shares. To antitrust law enforcement officials, code-sharing agreements are simply forms of corporate integration that fall somewhere between outright merger and traditional arm's length interlining agreements. Like mergers and acquisitions, code-sharing agreements have the potential to be procompetitive--they can create new service, improve existing service, lower costs and increase efficiency, all to the benefit of the traveling public. By the same token, code sharing arrangements can be anticompetitive. They can result in market allocation, capacity limitations, higher fares, or foreclosure of rivals from markets, all to the injury of consumers. The ability to distinguish the latter from the former is crucial for aviation policy makers and antitrust enforcement authorities.

When we conduct an antitrust investigation of a code share, we always analyze the specific terms of each agreement on a case-by-case basis. In assessing the effect on competition, the first necessity is to define the relevant market and measure that market in terms of its participants and concentration. For any proposed code share, we ask whether the code-sharing partners are actual or potential horizontal competitors. From an antitrust viewpoint, the greatest threat to competition comes when two of very few airlines that compete in a market enter into a code-sharing agreement in that market. The same concerns would be present if the two carriers were planning to merge. Any time two of very few airlines in a market act jointly, we are concerned about the effect on competition.

Having defined and measured the relevant market, the next issue we examine is the potential adverse competitive effects of the code share. Here we consider whether the code-share partners will both operate flights in the market and whether their capacity, scheduling, and pricing decisions will remain independent. By independent, I mean that the agreement is structured in a way that gives each carrier the strongest possible incentive to sell seats on the flights it operates rather than on those of its code-share partner, and to cut its prices and increase its operating capacity to gain market share.

Thus, one characteristic of a code-share agreement that can reduce antitrust concerns is independent pricing and marketing of seats on the shared flights. This is often accomplished with block-seat arrangements where the non-operating carrier purchases a fixed number of seats and bears the risk of loss if those seats are not sold. This is far from ideal, however, because the cost of these seats to the non-operator, which is the key determinant of the ultimate fare to the consumer, is set by agreement between competitors. On the other hand, we recognize that compared to joint sales and marketing, a block-seat arrangement can create some additional

- 4 -

incentive for each partner to market its seats aggressively. Finally, it is also preferable from an antitrust perspective if any block-seat agreement is non-exclusive and the time period of the agreement is not unreasonably long.

If independent operations are not contemplated, so that the code-share agreement will reduce or eliminate competition in city-pair markets between the code-share partners, we must consider the extent to which entry into these markets by new competitors is likely to occur in response to anticompetitive behavior of the code-share partners. If sufficient and timely entry can be expected, then the code-share agreement would not be likely to create or facilitate the exercise of market power by the code-share partners. In this regard, an important factor we consider is whether an "open skies" bilateral exists in the market. Open skies means that new entry by a carrier is possible, although we will investigate how likely such entry would be in the event the code-share partners attempted to raise fares or reduce service. On the other hand, where entry is governed by a restrictive bilateral, the threat to competition of a code share on that city pair, particularly if the only two authorized carriers are involved, may be substantial.

And finally, if independent operations by the code-share partners in the relevant city-pair markets are not contemplated and sufficient and timely entry is not likely, we will consider evidence that one of the partners is likely to exit the market absent the code share, or that significant transaction-specific procompetitive efficiencies in serving other city pairs on a code-share basis outweigh the potential competitive harm in the overlap city pair.

In sum, we examine all of the facts and circumstances surrounding each code-share agreement and make our competitive assessment on a case-by-case basis.

How have we applied this analysis to proposed international code-share agreements that we have reviewed? The majority of proposed agreements present no horizontal competitive concerns. Others we have reviewed combined certain horizontal overlaps with significant end-to-end efficiencies. The Department's policy is to seek to exclude from a proposed code share those city pairs on which the proposed alliance partners are two of very few current or likely future competitors.

For agreements where antitrust immunity has been sought from the Department of Transportation, we have recommended that DOT "carve out" certain unrestricted fares involving these city pairs from the order granting antitrust immunity for the alliance agreement, provided that the carve out can reasonably be done without sacrificing important consumer benefits created by the alliance. Thus, we recommended that seven city pairs be carved out of the Delta/Swissair/Sabena/ Austrian alliance (Atlanta-Zurich, Atlanta-Brussels, Cincinnati-Zurich, New York-Brussels, New York-Geneva, New York-Vienna, and New York-Zurich), one for the American/Canadian Air alliance (New York-Toronto), two for the United/Lufthansa alliance (Washington-Frankfurt and Chicago-Frankfurt), and two for the United/Air Canada alliance (Chicago-Toronto and San Francisco-Toronto).

We believe that this carve out approach permits U.S. air passengers to obtain the benefits of increased efficiency and enhanced beyond-gateway service provided by these code-sharing agreements, while avoiding possible diminutions in gateway-to-gateway service or increased air fares as a result of an alliance. Of course, should a proposed code share present the potential for significant diminutions in gateway-to-gateway service while providing little likelihood for

enhanced beyond-gateway service, we are fully prepared to recommend against the approval of the code-share proposal in its entirety.

I should make it clear that, although I have been discussing the way the Department of Justice evaluates international code shares, the Departments of Justice and Transportation share a common interest in protecting competition to ensure that consumers receive the best services at the lowest prices. To date, DOT has accepted all of the carve outs the Justice Department has proposed, with the exception of the four New York/Europe carve outs we sought for the Delta alliance. Even then, DOT required the alliance partners to report fare and other data that will allow us to review the effect of the alliance on price and service on these routes. If the data ultimately show that fares increase or service decreases on any of the four routes, DOT can remedy the harm by expanding the carve out accordingly.

In addition, DOT has prohibited alliance partners from participating in "fare coordination" activities under the auspices of the IATA. The Department of Justice has for years raised concerns to DOT about this type of international cartel activity, and we fully support DOT's efforts in this regard, which will clearly benefit international airline passengers.

**Domestic Alliances**

Alliances between major U.S. carriers, especially those that involve code sharing, are a relatively recent phenomenon. For years, there have been alliances between hub carriers and commuter carriers that serve those hubs. The first significant alliance between major U.S. carriers is the pending alliance between Continental and Northwest. We are also aware, of course, of the recently announced alliances between domestic carriers, American-US Airways

and United-Delta. We are looking at all of these alliances currently. While I cannot comment on the specifics of any particular alliance, there are certain observations that can be made.

While our concern about domestic and international alliances is similar -- we look to see whether there will be a lessening of competition that will harm consumers -- there are likely to be some differences between domestic and international alliances that we will take into account. First, unlike some international alliances in which code-sharing may be the only way in which carriers can serve foreign markets, U.S. carriers have unlimited rights to expand their operations within the U.S. and thus are, at a minimum, potential competitors of one another. Second, unlike many international alliances in which U.S. carriers and their alliance partners do not compete broadly against one another because of laws and treaties, major U.S. carriers -- even those with different regional strengths -- often compete with one another in significant markets and sometimes are the only competitors in those markets, such as hub-to-hub-markets.

This is not to imply that all alliances between U.S. carriers are competitively problematic. Alliances can and do take many different shapes and forms, and the antitrust consequences of an alliance depend both upon the terms of the alliance and the carriers involved. Certain kinds of alliances may deal with matters that are not competitively troublesome. Even those alliances that involve matters that may competitively sensitive -- such as code sharing -- may involve carriers that do not have significant competitive overlap.

Yet, it is also true that some alliances may involve carriers that are substantial competitors, and code sharing that could be used as the means for co-ordinating service and fare offerings; such alliances start to look a lot like a merger. Thus, the Department of Justice will have to determine whether proposed code sharing alliances between U.S. carriers are likely to act

as a disincentive for the alliance partners to enter markets operated by the other or to compete vigorously in markets that they both serve. In short, are such alliances likely to divide and allocate markets or produce high fares? The Department of Justice can make these kinds of assessments only after carefully reviewing the actual terms of each alliance agreement.

Alliances between major domestic carriers represent a new chapter in the history of air carrier agreements. The Department of Justice will fully investigate the competitive effects of these alliances and will challenge any one that we conclude would unreasonably restrain trade or tend substantially to lessen competition. We know that this is an area of profound interest to the Committee -- and to the American public -- and I am here to assure you that it is to us, as well.

I hope that I have helped the Committee understand the approach the Department of Justice is taking with respect to evaluating international and domestic alliances. I believe that the Division's analytical approach is sound, and that, to mix transportation metaphors, we are on the right track with respect to the manner in which we conduct our analyses in this area.

Mr. Chairman, this concludes my prepared remarks. I will be happy to answer any questions that you or other members of the Committee may have.