UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x


IN RE AIR CARGO SHIPPING SERVICES
ANTITRUST LITIGATION,


----------------------------------------------------------x

BENCHMARK EXPORT SERVICES, et. al.,

                              Plaintiffs,          **REPORT AND RECOMMENDATION**
                 - v -
                                                   06–MDL–1775 (JG) (VVP)
CHINA AIRLINES LTD., et. al.,
                                                   10-CV-639 (JG) (VVP)
                              Defendants.
----------------------------------------------------------x

        POHORELSKY, M.J.:

        Judge Gleeson has referred to me for a report and recommendation multiple motions to

dismiss the plaintiffs' complaint made by four corporate defendants – EVA Airways Corporation,

China Airlines Ltd., Malaysia Airlines, and Air India – as well as one individual defendant,

Salvatore Sanfilippo.  This case arises out of an alleged antitrust conspiracy to fix prices in the

international commercial air freight business.  The conspiracy is essentially the same as the one

alleged in a Consolidated Amended Class Action Complaint filed in the *In Re Air Cargo Shipping*

*Services Antitrust Litigation,* Case No. 06-MDL-1775 (JG) (VVP).  That action was brought in 2006

by direct and indirect purchasers of air freight shipping services against roughly 40 airlines or air

carriers.  In 2008, I recommended that the First Consolidated Amended Complaint[1] (the "FCAC")

be dismissed, with leave to replead certain claims brought under the Sherman Act, 15 U.S.C. § 1.

---

[1] For purposes of clarity, the complaint in the original *Air Cargo* MDL will be referred to as the
FCAC, while the 2010 Class Action Complaint against the new defendants will be referred to as the
complaint or the *Benchmark* complaint.  The moving defendants herein will thus be referred to as the
*Benchmark* defendants.

*See In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-MDL-1775, 2008 WL 5958061, at * 8-11 (E.D.N.Y. Sept. 26, 2008). Judge Gleeson adopted most of my recommendations, but did not dismiss the Sherman Act claims, instead finding that the complaint alleged a plausible conspiracy claim under that statute. *See In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-MDL-1775, 2009 WL 3443405, at * 1 (E.D.N.Y. Aug. 21, 2009). In February 2010, several of the direct purchasers instituted separate actions in this court (now consolidated into the master MDL) alleging essentially the same conspiracy against an additional four corporate airline defendants, as well as eight individuals who are corporate officers for the various airlines. The four corporate defendants and Sanfilippo moved to dismiss that class action complaint, and oral argument was held on July 1, 2010. For the reasons that follow, I respectfully recommend that the motions be DENIED.

## I.    FACTUAL BACKGROUND

As mentioned, the allegations herein relate to the same conspiracy as in the *Air Cargo* FCAC and do not refer to any new surcharges, fees, or other anti-competitive activities. Familiarity with those allegations and with the broader conspiracy, described in my prior report and recommendation, is assumed, but it is helpful to revisit the old allegations as well as to describe the new ones.

The plaintiffs – Benchmark Export Services, FTS International Express, Inc., JSNP, Inc., Olarte Transport Service, Inc., R.I.M. Logistics, Ltd., S.A.T. Sea & Air Transport, Inc., and Volvo Logistics AB – are all freight forwarders or otherwise air freight customers involved in the transportation or shipping industry. *See* Complaint, ¶¶ 25-31. All of the plaintiffs purchased air freight shipping services directly from either one or more of the air freight carrier defendants or from

named co-conspirators[2] for shipments to, from, or within the United States. *Id.* Airfreight shipping services are a fungible product such that the services provided by one carrier are easily substitutable for those provided by another carrier. *Id.* ¶ 127. Accordingly, the primary factor driving airfreight customer choice is price. *Id.* In addition to base rates – generally determined by weight or volume – airfreight carriers typically impose surcharges, intended to offset the carriers' external costs. *Id.* ¶¶ 10, 132. Since 2000 and continuing till at least February 14, 2006, the defendants, along with named co-conspirators, engaged in a price-fixing conspiracy which has affected thousands of routes flown by the defendants worldwide. *Id.* ¶¶ 12, 128. Price-fixing was accomplished through anti-competitive conduct that can be divided into two categories: the concerted imposition of surcharges and three other anti-competitive activities and conspiratorial mechanisms. *Id.* ¶¶ 128-29. The surcharges involve a fuel surcharge, discussed as early as late 1999 and implemented in 2002, a security surcharge following the events of September 11, 2001, a war risk surcharge following the invasion of Iraq in March 2003, and a customs surcharge imposed later that year. *Id.* ¶¶ 131-61. The other anti-competitive activities are joint refusals to provide discounts to freight forwarders, the

---

[2] The named co-conspirators are essentially the defendants in the *Air Cargo* FCAC, and include Air Canada, AC Cargo LP, Société Air France ("Air France"), Koninklijke Luchtvaart Maatschappij N.V. ("KLM"), Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline, Alitalia Linee Aeree Italiane S.p.A., All Nippon Airways Co., Ltd., Asiana Airlines Inc., British Airways, Cargolux Airlines International S.A., Cathay Pacific Airways Ltd., Air China Limited d/b/a Air China, Air China Cargo Company Limited d/b/a Air China Cargo, DAS Air Ltd. d/b/a DAS Air Cargo, Deutsche Lufthansa AG, Lufthansa Cargo AG, Swiss International Air Lines Ltd., El Al Israel Airlines, Ltd., Emirates Airlines d/b/a Emirates, Japan Airlines International Company Ltd.,, Korean Air Lines Co., Ltd., LAN Airlines S.A., LAN Cargo S.A., Martinair, Air New Zealand Limited d/b/a Airways New Zealand, Nippon Cargo Airlines Co., Ltd., Atlas Air Worldwide Holdings, Inc., Polar Air Cargo, Inc., Qantas Airways Limited ("Qantas"), Saudi Arabian Airlines, Ltd., Scandinavian Airlines System Group ("SAS"), SAS Cargo, Singapore Airlines Limited, Singapore Airlines Cargo Pte Ltd, South African Airways (Proprietary) Limited, Thai Airways International Public Co., Ltd., and Viação Aérea Rio-Grandense, S.A. All of the named co-conspirators conduct international air freight services, including in the United States and the Eastern District of New York. *See* Complaint, ¶¶ 44-88. Of the defendants named in the *Air Cargo* FCAC, three African companies have been omitted from the list of co-conspirators: Air Mauritius Ltd., Ethiopian Airlines Corp., and Kenya Airways Limited.

exchange of private information to concertedly increase yields,[3] and joint allocation of customers. *Id.* ¶¶ 162-70.  Many of the co-conspirators involved have pleaded guilty to criminal charges brought by the United States Department of Justice, arising out of their participation in the price-fixing conspiracy.  *See infra* note 5.

With respect to concerted increases in yields and allocation of customers, the *Benchmark* complaint retreads the allegations contained in the *Air Cargo* FCAC without offering any further factual detail.  *See* Complaint, ¶¶ 166-70; FCAC, ¶¶ 111-15.  With regard to all the other forms of anti-competitive conduct – the fuel surcharge, the security surcharge, the war risk surcharge, the customs surcharge, and the refusal to provide discounts to freight forwarders – the *Benchmark* complaint pleads additional detail not present in the FCAC.  The new facts relate to dates and locations of specific meetings, the subjects of those discussions, and the identity of the participants. Thus, any identifying specifics with respect to meetings or communications are found only in the *Benchmark* complaint and not in the FCAC.

### Fuel Surcharge

Prior to the conspiracy, many airlines had similar fuel pricing systems in place using various factors to determine changes in fuel surcharges.  *Id.* ¶ 133.  By late 1999, the defendants and named co-conspirators agreed to fix fuel surcharges.  *Id.* ¶ 131.  Towards that end, they shared information, and agreed on certain factors to trigger changes in the pricing structure, as well as the resulting price changes and the timing of the changes.  *Id.* ¶ 134.  This took place through various secret meetings and communications.  *Id.*  For example, Korean Air hosted a meeting on February 14, 2001 in which

---

[3] The complaint defines yield as "revenues per ton-mile."  Yield is calculated by dividing operating revenues by the product of actual revenue tons and miles flown.  Complaint ¶ 11.

the coordination of the fuel surcharge was discussed and agreed upon by Cathay Pacific, Lufthansa, KLM, Malaysia Air, and Singapore Air – all defendants named in the FCAC, except for Malaysia, a *Benchmark* defendant.[4]  *Id.* ¶ 135.  Twelve defendants and co-conspirators, including CAL and EVA, both *Benchmark* defendants, met regularly in New York at the JFK Airport Air Cargo Association and discussed and coordinated fuel surcharges.  *Id.* ¶ 137.  In 2002, the defendants agreed to implement a progressive four-step fuel surcharge increase, where agreed-upon "increase factors" would trigger a $.05 increase "per step per period."  *Id.* ¶ 139.  The Complaint does not define the "increase factors," or the length of the period, nor does it specify whether the four periods were consistent in length.  On September 19, 2002, Air India, a defendant here, hosted a meeting in India with Malaysia Airways (also a *Benchmark* defendant) and 12 other co-conspirators, all identified, and agreed on a uniform fuel surcharge of 5 Rupees per kilogram of cargo, effective in October 2002.  *Id.* ¶ 140.  The complaint also alleges communications in February 2003 between members of the Airline Cargo Council of Switzerland, including but not limited to Air India, Malaysia , CAL, and 20 other identified co-conspirators, resulting in a uniform increase in the fuel surcharge of .22 Swiss Francs per kilogram.  *Id.* ¶ 141.  In late 2003 or early 2004, the defendants and named co-conspirators met and again agreed to concertedly implement price increases beyond the initial agreement, which resulted in "additional, multi-step price increases, all at identical amounts per step."  *Id.* ¶¶ 142-43.  In addition to fixing the fuel surcharges, the defendants agreed on "currency issues, capping the [f]uel [s]urcharge (by shipment or weight)[] and refusing to discount the [f]uel [s]urcharge to freight forwarders."  *Id.* ¶ 136.  The fuel surcharges were discussed

---

[4] This is the sort of allegation about specific meetings or communications that has been included in the *Benchmark* complaint, but is absent from the FCAC.

in "multiple meetings, communications, and agreements," "[s]ecret meetings," and "at the highest levels," in "various venues, including Europe, the United States, South America and Asia." *Id.* ¶¶ 143-44. The defendants communicated often in order to seek reassurances and police each other's implementation of the surcharge. *Id.* ¶¶ 144-46. When necessary, they "undertook corrective action" to ensure compliance with the agreement. *Id.* ¶ 145.

### *Security Surcharge*

After September 11, 2001, the defendants and named co-conspirators concertedly imposed a security surcharge unrelated to the costs of any security-related measures or other external costs. *Id.* ¶¶ 147-48, 152. They "jointly acted in order to facilitate agreements regarding exceptions, discounting, and caps relating to the security surcharge," although the complaint does not reveal the substance of those agreements. *Id.* ¶ 150. The surcharge was agreed upon after the defendants and co-conspirators "met," "communicated," and had "secret meetings and communications includ[ing] discussions at the highest levels of the respective companies and occur[ing] in various venues, including Europe, the United States, and Africa." *Id.* ¶¶ 148-50. On October 12, 2001, Lufthansa provided information about its security surcharge to twelve identified co-conspirators as well as to EVA Airways, in an effort to persuade them to adopt the same surcharges. *See Id.* ¶ 149. Most, but not all defendants and co-conspirators "jointly implemented" the surcharge "worldwide." *Id.* ¶ 151.

### *War Risk Surcharge*

The defendants and named co-conspirators "met," "communicated," held "secret joint meetings, communications and agreements," and "jointly agreed" to implement a [w]ar [r]isk surcharge sometime following the invasion of Iraq in 2003. *Id.* ¶¶ 153-54. On March 20, 2003, Singapore Air provided information on its imposition of the war risk surcharge to to 7 identified co-

conspirators and CAL, in an effort to collectively impose that charge. *See id.* ¶ 155. The Complaint does not specify exactly when the surcharge was implemented, but alleges that it was terminated after one month. *Id.* ¶ 156.

### Customs Surcharge

Since 2003 or 2004, airfreight customers have been required to prepare and submit to airfreight carriers a manifest of the cargo to be offloaded in the United States; the carriers must then electronically submit this manifest to U.S. Customs authorities. *Id.* ¶ 158. Beginning in late 2003, the defendants and named co-conspirators "secretly met, communicated and jointly agreed" that they would charge customers flat fees of eight euros per paper manifest, and flat fees of two euros per electronic manifest. *Id.* ¶¶ 157, 159. The customs surcharges have been "jointly implemented" since August 2004. *Id.* ¶ 161. The Customs Surcharge "bore no relationship to actual additional costs incurrred by the Airfreight Carriers to comply with" customs requirements, and the actual costs would not have been virtually uniform. *See id.* ¶ 160.

### Non-Surcharge Allegations

During the class period, the defendants and named co-conspirators also conspired with respect to three non-surcharge mechanisms in order to raise and fix airfreight shipping costs. First, the defendants "met, communicated, and jointly agreed" and held "secret meetings and communications" through which the defendants "collusively agreed to refuse to provide discounts" to freight forwarders. *Id.* ¶¶ 163-65. On July 28, 2005, CAL and Malaysia met with 7 identified co-conspirators in Singapore and agreed not to provide freight forwarders with discounts on fuel surcharges. *Id* ¶ 164. Second, the defendants had access to industry-level yield data, exchanged individual yield data, and "met, discussed and jointly agreed to concertedly increase their yields."

*Id.* ¶¶ 166-68. Third, the defendants and named co-conspirators "met, communicated and jointly agreed" to "allocate[e]" customers so as "to minimize [their] ability to access competitive rates," and the defendants, "at times, jointly and secretly agreed to and did refrain from pursuing and/or acquiring each others' customers." *Id.* ¶¶ 169-70.

Judge Gleeson found that the allegations with respect to the surcharges and other anti-competitive conduct "establish plausible grounds to infer an agreement among the defendants to artificially inflate the prices of airfreight shipping services and give sufficient notice of the claims against them." *Air Cargo Shipping Services*, 2009 WL 3443405, at *1. He also relied upon guilty pleas in the criminal cases arising out of the same price-fixing conspiracy, finding that the "admissions of price-fixing by so many of the defendants certainly 'are suggestive enough to render a Section 1 conspiracy plausible.'"[5] *Air Cargo*, 2009 WL 3443405, at *1 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## II.    DISCUSSION

### A.  The Motions

The four corporate defendants and Sanfilippo have all moved individually to dismiss the complaint, but they raise common issues, chief among them that the *Benchmark* complaint does not allege a plausible conspiracy under the prevailing pleading standards, and does not sufficiently allege that these defendants in fact joined it. Thus, the five moving defendants contend, pursuant to Federal Rule of Civil Procedure 12(b)(6), that the complaint fails to state a claim. The defendants argue that the complaint is supported only by bare legal conclusions, rather than the factual

---

[5] Guilty pleas have now been entered by 15 different airlines (Air France, KLM, Asiana, British Airways, Cargolux, Cathay Pacific, El Al, Japan Airlines, Korean Air, LAN Cargo, ABSA, Martinair, Nippon Cargo Airlines, Qantas, and SAS), and by 3 individuals (non-moving *Benchmark* defendants) who worked for Martinair, Qantas, and British Airways. *See* Complaint, ¶¶ 97-113.

allegations required for a well-pleaded complaint, and that Judge Gleeson's prior finding that the *Air Cargo* complaint alleged a plausible conspiracy is only of limited value to resolution of these motions. The court will address those issues first as they relate to the four corporate defendants, and will then analyze the sufficiency of the pleadings as to Sanfilippo individually.

Next, the corporate defendants argue that dismissal is warranted on statute of limitations grounds. Specifically, as most of the acts alleged in the complaint occurred prior to the four-year limitations period preceding the filing of the complaint in February 2010, the airlines contend that the complaint is now time-barred. The court first considers whether the complaint sufficiently alleges that the conspiracy existed into the limitations period, because while most of the acts occurred outside the limitations period, sales have continued into the limitations period that would allow the plaintiffs to assert these claims. The statute of limitations discussion also requires the court to consider the reach of the fraudulent concealment doctrine, how that doctrine must be pleaded, and what role it might play in the case and in any available recovery. Lastly with respect to limitations and timeliness issues, the court addresses a provision of the Clayton Act under which the statutory period is tolled pending the resolution of government enforcement actions based on the same subject matter as the plaintiffs' claims.

Lastly, the court will consider three issues raised by only two of the corporate defendants. First, Air India and Malaysia Airlines argue that this action is barred by Air Transport Agreements between the United States and the governments of India and Malaysia, which apply to, among other things, pricing issues that arise between the governments, and how the parties to the agreements may proceed in the face of a pricing dispute. Secondly, Air India contends that as a matter of prudence, the case against it should be dismissed on the basis of the Act of State doctrine, which cautions

courts against adjudicating the validity of the official acts of a foreign sovereign performed in its own territory. Thirdly, Malaysia Airways contests the validity of the method by which it was served with process, and argues that because service did not meet the standards of either the Federal Rules, New York, or California (where service was made), the complaint should be dismissed as against itself.

## B. Rule 12(b)(6), Twombly, and Plausibility

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal, not the factual, sufficiency of a complaint. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'") (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)). At this stage, the court accepts as true all factual allegations in the complaint, views the complaint in the light most favorable to the plaintiff, and draws all reasonable inferences in his favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). Even so, conclusory allegations or conclusions of law "couched" as factual allegations need not be accepted as true. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). Courts may also consider documentary exhibits or written instruments annexed to the complaint, documents integral to the parties' case and on which the complaint relies heavily, and matters subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B CHARLES ALAN

WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004 and Supp. 2007)); *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007)*; Chambers*, 282 F.2d at 152-53; *Int'l Audiotext Network Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *see also* Fed. R. Civ. Pro. 10(c).

For fifty years, the "accepted rule [was] that a complaint should not be dismissed for failure to state a claim unless it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *Twombly* abrogated this standard by requiring enough factual matter so that the plaintiff's entitlement to relief is raised "above the speculative level," reasoning that the "no set of facts language has been questioned, criticized, and explained away long enough." 550 U.S. at 555, 562 (citing authorities). Even so, the Court took care to avoid the imposition of a probability requirement, and instead required a reasonable expectation that discovery could produce adequate evidence to support the elements of the claim. *Id.* at 556; *see also Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). Allegations in the complaint that were merely "consistent" with – as opposed to suggestive of – a claim, were insufficient. *See Twombly*, 550 U.S. at 557. To avoid dismissal, therefore, the facts as pled must "nudge [the plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Mere labels, conclusions, and a "formulaic recitation of the elements of a cause of action" do not suffice to state a plausible claim. *Twombly*, 550 U.S. at 555. In *Iqbal,* the Court fleshed out these plausibility considerations, requiring factual allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S. Ct. at 1949. The court reiterated that plausibility requires that the pleaded facts demonstrate more than a "mere possibility of misconduct." *Id.* at 1949-50. And the

factual allegations must go beyond conclusory labels, legal conclusions, and "threadbare recitals" of the elements of a claim. *Id.* Still, as there is no probability requirement, even claims which appear unlikely to succeed may be entitled to go forward. *See Twombly*, 550 U.S. at 556 (quoting *Scheuer*, 416 U.S. at 236); *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996); *Villager Pond*, 56 F.3d at 378. And while *Twombly* raised the bar for what must be pleaded in a complaint, it explicitly rejected a blanket requirement of heightened fact pleading; the Court's subsequent decision in *Erickson v. Pardus* reaffirmed that the notice pleading standard still determines legal sufficiency as a general matter. *See* 551 U.S. 89, 94 (2007).

As *Twombly* was an antitrust case, it provides specific guidance on how the plausibility standard may be satisfied in a case brought under the Sherman Act. The Sherman Act regulates anti-competitive behavior, and makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The *Twombly* plaintiffs asserted that the defendants had engaged in parallel conduct, relying on allegations of lockstep or simultaneous business decisions by defendants as the basis for pleading anti-competitive behavior. The Court observed that, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination or conspiracy', 'the crucial question is whether the challenged anti-competitive conduct 'stems from independent decision or from an agreement, tacit or express.'" *Id.* at 553 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984) and *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). Thus, it is critical that the factual allegations in the complaint "suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The Section 1 allegation of concerted action in *Twombly* was legally

insufficient because it alleged mere "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical, independent action." 550 U.S. at 548-49. *Twombly* indicated that a "factual context suggesting agreement" could mean specific allegations about an independent agreement, or could be pleaded by parallel conduct allegations that are indicative of an agreement, because they are, for instance, historically or commercially unusual. *Id.* at 549, 557-59 (requiring that parallel conduct allegation be placed "in a context that raises a suggestion of a preceding agreement"). But the core of *Twombly* is that parallel conduct "coupled with only a bare assertion of conspiracy" does not give rise to a plausible claim under the Sherman Act. *See Starr*, 592 F.3d at 322. In whatever way they can, antitrust plaintiffs must establish a "plausible grounds to infer an agreement" by pleading "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

In *Starr v. Sony BMG Music Entm't*, the Second Circuit had occasion to start applying, in the antitrust context, the Supreme Court's recent pronouncements on plausibility. *See* 592 F.3d 314 (2d Cir. 2010). There, the court determined that the complaint alleging price-fixing by record companies in the online music industry stated a plausible claim, and vacated the district court's dismissal. *Id.* at 327. In so doing, it specifically rejected the defendants' contention that the complaint needed to allege facts sufficient to exclude the possibility of independent self-interested conduct on the part of the defendants. *Id.* at 325. The *Starr* decision also noted that since the claim rested on allegations of parallel conduct, the defendants need not have alleged the specific time, place, or person related to each conspiracy allegation. *Id. Starr* rejected another of the defendants' arguments, which was that the Department of Justice's decision not to proceed with its own antitrust investigation of the conduct at issue should be given dispositive weight. *Id.* Ultimately, after

considering factual matter in the form of specific factors highly unique to the online music industry, the court was able to infer that the parallel conduct resulted from an illegal agreement on the part of the defendants. *Id.* at 323-24. Accordingly, the complaint stated a plausible claim because, unlike in *Twombly*, the parallel conduct, in factual context, was suggestive of, as opposed to merely consistent with, an illegal agreement.

*Starr* is not exactly on point, and the factors it considered when placing the parallel conduct in factual context are too unique and idiosyncratic to the online music industry to be of significant value here. Nevertheless, it is the circuit's latest major pronouncement on the pleading requirements under the Sherman Act, and was cited repeatedly by all parties. On the broader level, if the factual matter there was sufficient, the allegations here, which appear to go beyond those in *Starr*, should suffice to state a plausible claim. Three of the specific arguments that the court rejected in *Starr* are instructive. First, whether or not the *Benchmark* plaintiffs needed to allege facts tending to rule out the possibility of independent behavior – and no defendant contends that they are so required at this stage – they have done so. Secondly, the complaint does not depend exclusively on allegations of parallel conduct, as there are specific allegations as to the time and dates of meetings and agreements, the physical location of certain meetings, the participants involved, and the substance of discussions. *See* Complaint, ¶¶ 135, 137, 140-41, 149, 155, 160, 164. Thirdly, unlike in *Starr*, the Department of Justice has chosen to pursue criminal charges against the airlines for the conspiracy that forms the basis of the complaint, and to accept participation in its leniency program on the part of some and guilty pleas on the part of others. Taken together, this tends to call for a similar result as in *Starr*.

Even with the additional *Benchmark* allegations, it remains the case that overall, the claims are not pleaded with a great degree of factual detail or specificity. But the FCAC was pleaded in the same manner, and that complaint sufficiently alleged a plausible conspiracy. *See Air Cargo*, 2009 WL 3443405, at *1. While there is still not too much meat on the bones, if anything, the *Benchmark* Complaint contains more detail than that contained in the FCAC. The complaint makes specific allegations as to multiple meetings, including the (1) dates and time periods, (2) locations, (3) specific participants, and (4) at least the general substance of what was discussed and agreed upon. None of these factual details were present in the FCAC, which relied on identifying "the defendants" collectively. *See* FCAC, ¶¶ 81-115. "There is no question that such allegations – allegations that the defendants met, agreed to fix prices at a certain level, and then did fix prices at that level – state a viable antitrust claim." *In re Publication Paper Antitrust Litigation*, No. 304-MD-1631, 2005 WL 2175139, at *2 (D. Conn. Sept. 7, 2005). These specifics make the conspiracy claim even more plausible, and in combination with the guilty pleas on the part of many of the co-conspirators, there is ample factual matter to suggest that illegal agreements were made and entered into by the defendants.[6] *See Twombly*, 550 U.S. at 556; *Starr*, 592 F.3d at 321.

By way of contrast, the complaint in *Elevator Antitrust Litigation* was deemed deficient because it made conclusory allegations "in entirely general terms without any specification of any particular activities by any particular defendant . . . [and was] nothing more than a list of theoretical

---

[6] Significantly, while the *Benchmark* complaint for the most part makes collective allegations with respect to "the defendants" and/or the "named co-conspirators," almost all of the corporate co-conspirators that entered guilty pleas are alleged by name (in the additional *Benchmark* factual details), at least at some point, to have engaged in specific meetings and discussions with the defendants and certain co-conspirators. Thus, while the *Benchmark* defendants are correct that the guilty pleas on the part of co-conspirators do not establish liability for them, the pleas do raise the inference that they engaged in a plausible conspiracy.

possibilities, which one could postulate without knowing any facts whatever." 502 F.3d 47, 50-51 (2d Cir. 2007) (quoting *In re Elevator Antitrust Litigation*, No. 04-CV-1178, 2006 WL 1470994, at *2-3 (S.D.N.Y. May 30, 2006)). That does not describe the complaint in this case, which possesses what was lacking in *Elevator*.[7] If the entirety of the plaintiffs' allegations was that the defendants conspired to restrain trade and violate the Sherman Act, that would be the sort of conclusory allegation that falls short under *Twombly* and *Iqbal*, and even before. This complaint, however, alleges that particular defendants agreed with other named defendants to impose a particular fuel surcharge, and then provides some limited factual detail to flesh out that allegation. Those allegations go beyond the sort of bare label or legal conclusion that is not presumed true at the 12(b)(6) stage, and they help provide the basis for stating a plausible claim under the Sherman Act.

The defendants make much of the infrequency with which they are individually identified throughout the complaint. That misses the point. *See In re OSB Antitrust Litig.*, No. 06-MDL-826, 2007 WL 2253419, at *5-6 (E.D. Pa. Aug. 3, 2007). The more relevant consideration is whether the instances in which they *are* specifically mentioned or identified sufficiently establish or allow for the reasonable inference that they joined or were members of the alleged conspiracy. *See id.* (citing *Jung v. Ass'n of American Medical Colleges*, 300 F. Supp. 2d 119, 164 n.27 (D.D.C. 2004)). For the most part, the plaintiffs have again adopted a "lump" pleading approach that makes allegations collectively against "the defendants" and the "named co-conspirators" without clarifying exactly who did what and when. While that approach is suspect if used *exclusively* without *any* allegation

---

[7] In a footnote in my prior report and recommendation in *Air Cargo*, I wrote that I found those allegations indistinguishable from the conclusory allegations in the *Elevator Litigation*. *See* 2008 WL 5958061, at *7 n.8. Since the court ultimately determined that the allegations in the FCAC were not so conclusory as to warrant dismissal, in light of the additional factual details pleaded in the *Benchmark* complaint, including the additional guilty pleas, the *Benchmark* complaint is readily distinguishable from both the FCAC and the *Elevator* complaint.

as to each defendant, the *Benchmark* complaint does make specific allegations against specific defendants or groups of defendants and co-conspirators. *See Jung*, 300 F. Supp. 2d at 163-64; *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). No defendant goes unmentioned in the complaint. Each is alleged to have engaged in some specified conduct, even if in the defendants' eyes it amounts to very little. Thus, when the complaint is viewed as a whole, it states a plausible claim that there was a conspiracy, and that it was joined by all of the moving defendants. *See Contintental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (cautioning against "compartmentalizing the various factual components" of the claim); *OSB*, 2007 WL 2253419, at *5-6 (citing cases).

The Supreme Court recognized that there was a line separating what is merely conceivable from what is plausible. *See Twombly*, 550 U.S. at 570. The Court may have been speaking rhetorically, but the point is an important one. Even if the claims are barely nudged across that line, as long as they fall on the other side, that will suffice for surviving a motion to dismiss, wherever they happen to fall on the "plausibility" side. Surely, pleading more factual detail would render the claims more plausible, but that is not necessary. Rule 8(a)(2) only requires a "short and plain statement showing that the pleader is entitled to relief." "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim . . . is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555). To argue that this complaint requires more factual bulk and does not provide fair notice betrays a misconception of how that rule is applied.

The defendants repeatedly point to *LaFlamme v. Societe Air France*, a recent antitrust case in this district in which Judge Matsumoto dismissed a complaint that alleged price-fixing in the air

passenger industry. *See* 702 F. Supp. 2d 136, 154-55 (E.D.N.Y. 2010). While, broadly speaking, the case is similar in that it involves fuel surcharges and other allegedly suspect charges in the air transportation (passenger or freight) industry, it is distinguishable on several grounds. The court noted three principal reasons why the complaint did not state a plausible Sherman Act claim. First, the "direct evidence" of a conspiracy to violate the Sherman Act was "based only on a bald conclusory allegation that 'it *appears* that [d]efendants and others decided to'" inaugurate inflated fuel surcharges without receiving antitrust immunity from the United States Department of Transportation. *Id.* at 147 (emphasis added). This speculative language lacked factual specifics that would provide a basis to infer *actual* unlawful agreement. *Id.* Secondly, the "avenue" for purportedly violating the Sherman Act – attendance and participation in International Air Transport Association ("IATA") meetings – was itself immunized conduct as long as certain parameters were met – and they were met. *Id.* at 148-50. Accordingly, the court concluded that the discussions of fuel surcharges at IATA conferences were immunized and could not form the basis for antitrust liability. *Id.* Thirdly, the court found that the alleged agreement on the fuel surcharge did not even constitute illegal price-fixing under the Sherman Act. *Id.* at 150. The court also found that the allegations of parallel conduct alone, without factual matter suggestive of any illegal agreement, did not, consistent with *Twombly*, give rise to a plausible conspiracy. *Id.* at 152-54. In short, the complaint herein pleads facts that are more suggestive of illegal agreement than those considered in *LaFlamme*. The differences between *LaFlamme* and this case thus go far beyond the nature of the cargo.

Rather than the factually removed decision in *LaFlamme*, the more relevant precedent for this case is Judge Gleeson's determination that the FCAC stated a plausible conspiracy to fix prices

in the commercial air freight business. And the *Benchmark* complaint alleges essentially the same

conspiracy, but with several additional members and several more detailed factual allegations. The

defendants argue that notwithstanding Judge Gleeson's prior determination, the plaintiffs have had

an additional four years to investigate their claims, and have had the benefit of extensive discovery

in the MDL, as well as many additional guilty pleas, and the information obtained from Lufthansa's

participation in the DOJ's corporate leniency program. Accordingly, they argue, the complaint falls

short, implicitly suggesting that the additional four years and wealth of information unavailable at

the time the FCAC was brought creates an obligation to plead with greater factual amplification.

They are not incorrect that the plaintiffs are now in receipt of much information that had previously

been unavailable to them. But that distinction is irrelevant. There is but one pleading standard for

claims of this nature (aside from Rule 9(b)'s requirements for fraudulent concealment). Having

access to more information does not require the plaintiffs to plead with greater factual specificity

than before.[8]  *Cf. Arista Records LLC v. Lime Group LLP*, 532 F. Supp. 2d 556, 585 (S.D.N.Y.

---

[8] EVA notes that the plaintiffs did not make any meaningful attempt to distinguish *Arista Records* and *Vladmir*. The court has, however, and finds both of them readily distinguishable. The favorable language in *Arista* concerned counterclaims, and the court was solely considering at that point whether to grant leave to amend the pleadings, having already determined on other grounds that the counterclaims should be dismissed for failure to allege a plausible conspiracy. *See* 532 F. Supp. 2d at 585. Therefore, having had the benefit of extensive discovery, and having already amended the counterclaims once before, the court found that leave to amend would be futile, but in any case did not prevent the counter-claimants from moving to amend if they alleged additional facts. *See id.* The counterclaims failed because they did not allege a plausible conspiracy; the court was not requiring a different pleading standard in light of the discovery obtained, and did not provide any authority for that proposition. Here, the court has already determined that the complaint alleged a plausible conspiracy, and the *Benchmark* complaint only pleads with greater specificity than does the prior complaint. *Vladimir* is also inapposite, as there, the fraud claim, already amended once, was dismissed because of a failure to plead with particularity. *See* 1997 WL 151330, at *7. While the court did chastise the plaintiff's counsel in light of having been in possession of the defendant's work papers for three years and the extensive discovery obtained, the court dismissed the claim on the basis of "alternative fact pleading," which did not satisfy the heightened pleading requirements under Rule 9(b). *See id.* As this complaint sounds in antitrust violations and not fraud, the requirements of alleging fraud with particularity are not applicable, except with regard to fraudulent concealment. And *Vladimir* dismissed the fraud claim for failing to comply

2007) (denying without prejudice leave to replead counterclaims); *Vladimir v. Deloitte & Touche LLP*, No. 95-CV-10, 1997 WL 151330, at *7 (S.D.N.Y. Mar. 28, 2007) (dismissing fraud claims for failure to plead with particularity). The inquiry is whether the complaint states a plausible claim, and not whether the plaintiffs could have or should have amplified their claims by adding more specifics. The plaintiffs are left with this argument because they are unable to meaningfully distinguish Judge Gleeson's prior determination. If it is not law of the case, it is still highly persuasive, and the instant allegations hew far too closely to, and in fact go beyond, those in the FCAC to call for a different result here.

To this point, the court has only been considering the Rule 12(b)(6) arguments made by the corporate defendants as to the plausibility of the conspiracy. The court now turns its attention to Sanfilippo's individual motion under Rule 12(b)(6) that the allegations directed at him fail to state a plausible claim that he personally joined the conspiracy to fix prices and incurred liability for violating the Sherman Act. From 2001 until at least 2006, Sanfilippo served as regional manager for cargo for the Americas for Air New Zealand, a named co-conspirator also sued in the master *Air Cargo* MDL. *See* Complaint, ¶43. As such, he had knowledge of Air New Zealand's actions alleged in the complaint, and also approved of and participated in them. *Id.* He engaged in collusive discussions between March 2001 and February 2006 with officials of Korean Air, Qantas, Lufthansa, and Polar Air, and they agreed on fuel and security surcharges on routes into and out of the United States. *Id.* Sanfilippo contends that when the conclusory allegations against him are

---

with Rule 9(b), not because possession of extensive records required any additional particularized factual allegation to meet Rule 9(b)'s requirements. *See id.*

stripped away, what is left does not allow the court to infer his participation in the conspiracy. He is mistaken.

Individuals or corporate officers may be subject to liability for a Section 1 violation of the Sherman Act when they "knowingly participate[] in effecting the illegal contract, combination or conspiracy," whether they authorize, order, or help perpetrate the violation. *United States v. Wise*, 370 U.S. 405, 416 (1962); *see also Hartford-Empire Co. v. United States*, 323 U.S. 386, 406-07 (1945). While *Wise* dealt with criminal liability under the Sherman Act, there is little doubt that individual corporate officers may be civilly liable under Section 1 when they knowingly participate in the conspiracy. *See, e.g.*, *First Med Representative, LLC v. Futura Med. Corp.*, 195 F. Supp. 2d 917, 929 (E.D. Mich. 2002); *Continental Orthopedic Appliances v. Health Ins. Plan of Greater New York*, 994 F. Supp. 133, 142 (E.D.N.Y. 1998); *New York v. Cedar Park Concrete Corp.*, 665 F. Supp. 238, 247-48 (S.D.N.Y. 1987); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgm't Corp.*, No. 97-CV-5499, 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000). The *Benchmark* complaint alleges that Sanfilippo did just that. To be sure, it does so in general terms, and the allegations with respect to Sanfillipo's specific conduct are not particularly extensive or detailed. But taken as true, they sufficiently establish his participation and role in the overall conspiracy. The allegation that Sanfilippo had knowledge of Air New Zealand's conduct, approved of it, and participated in it, might not by itself give rise to individual liability under the Sherman Act. However, the allegations that from 2001 to 2006 he engaged in collusive discussions with Korean Air, Qantas, Lufthansa, and Polar Air and agreed on fuel and security surcharges with them provide the sort of factual matter, lacking in *Twombly*, that is suggestive of an illegal agreement in which he was a participant. 550 U.S. at 556. Sanfilippo writes these off as "bare conclusions" or "naked assertions," but they are

more than that. The allegations establish who Sanfilippo spoke with, what was discussed and agreed upon, and provide a general time frame, although it is extremely broad and covers most of the life of the conspiracy. While a more narrow time frame would have been better, specific dates of these discussions and meeting are not needed to state a claim that is plausible on its face. *See Starr*, 592 F.3d at 325. And of the four other alleged co-conspirators involved in the specific Sanfilippo discussions, Korean Air and Qantas have pleaded guilty as a result of their participation in the conspiracy, and Lufthansa has admitted its guilt through its participation in the Department of Justice's leniency program.

It is true that unlike many of the other named co-conspirators, Sanfilippo's employer has not been charged criminally, and has not admitted liability for joining the overall conspiracy. But that only means that, had his employer admitted liability, the claim against him would be more plausible, not that the actual allegations and surrounding circumstances as they stand now are insufficient. And Air New Zealand *is* alleged by name to have engaged in certain activities including: (1) meeting at Air India's office on September 19, 2002 with other identified members of the Cargo Sub-Committee for the Board of Airline Representatives in India, and agreeing on a fuel surcharge increase of 5 rupees per kilogram, (2) receiving information on October 12, 2001 from Lufthansa about its security surcharge, and (3) meeting at Singapore Air's office on July 28, 2005 with other identified members of the Cargo Sub-Committee and agreeing to refuse freight forwarders discounts on fuel surcharges. Complaint ¶¶ 140, 149, 164. While the complaint does not allege that Sanfilippo personally was present for these discussions, or that Air New Zealand participated in them at his behest or with his knowledge, they do make it easier to infer that Air New Zealand joined the conspiracy. In turn, that factual context is more suggestive of Sanfilippo having

joined and directly participated in the conspiracy. In addition, that one of Sanfilippo's individual

co-defendants herein, Jan Lilliebourg, has been indicted, and that three of the other individual co-

defendants have pleaded guilty to criminal charges arising from the conspiracy is not insignificant.[9]

Clearly, individuals participated in the conspiracy. And even if nothing at all were alleged against

Sanfilippo individually, other than that he was a cargo manager for one of the defendants or named

co-conspirators, that might still be enough, as the allegations against the defendants collectively

would essentially mirror those found sufficient in Judge Gleeson's prior determination. It is worth

repeating that in the FCAC, *no* defendant was specifically identified as having taken specific action

with respect to surcharges or other conduct. The expense of discovery and litigation for an

individual is not enough by itself to dismiss an otherwise plausible claim. In short, there is enough

to suggest that Sanfilippo knowingly participated in the conspiracy. Therefore, as against him, the

complaint states a valid Section 1 claim and should not be dismissed.

### C. Statute of Limitations

#### 1. Introduction

When the *Air Cargo* complaint was first brought in 2006 and the court issued its initial report

and recommendation in September 2008, timeliness was not a major issue either in the parties'

arguments or in the court's decision. However, as this complaint was brought in 2010, nearly four

years later, statute of limitations concerns are now present. The court will deal with these issues in

three parts. First, the court uses the continuing conspiracy or continuing violation theory to decide

the point in time at which claims accrue in a price-fixing conspiracy, in order to determine whether

---

[9] Sanfilippo is not linked, via specific facts alleged, to any of the individuals who were charged criminally, so the court should be cautious about inferring too much from those prosecutions. They do, however, provide some context for inferring, in combination with the specific allegations against Sanfilippo, that he joined the conspiracy and may be held liable for it.

they meet the antitrust laws' four-year statute of limitations. Such a task involves a determination of whether the plaintiffs have sufficiently alleged that the conspiracy existed and sales pursuant to the conspiracy were made into 2006. Secondly, the court considers the adequacy of the plaintiffs' allegations with respect to fraudulent concealment. Under that theory, the statute of limitations for these claims would not begin to run until the point when the plaintiffs knew or should have known about the nature of this cause of action. This determination requires the court to assess the sufficiency of the allegations with respect to acts of affirmative concealment on the part of the defendants, or whether the conspiracy was of a nature as to be inherently self-concealing. The court then considers whether the plaintiffs should have been on notice of the claims, and whether they exercised diligence in conducting such an inquiry. It is also necessary to address fraudulent concealment because of its effect on damages and the available recovery, and consequently on the discovery process in this case. The court lastly considers the plaintiffs' arguments for tolling under the Clayton Act as a result of several successive government enforcement actions – specifically, criminal proceedings against various air cargo carriers that are defendants here – and whether the limitations period should have resumed running after the conclusion of the first criminal action, that is, whether as a result of the successive criminal actions, the statutory period has been continuously tolled throughout the entire period from August 2007 to the present. That discussion may affect the scope of recoverable damages as well.

### 2. Antitrust Conspiracy and Continuing Conspiracy Doctrine

In the most general terms, the antitrust laws impose a four-year statute of limitations. Under Section 5(b) of the Clayton Act, which also applies to a Sherman Act claim, "[a]ny action to enforce any cause of action under Section 15, 15a, or 15c of this title shall be forever barred unless

commenced within four years after the cause of action accrued."  15 U.S.C. § 15(b).  The relevant

consideration, then, becomes the point in time when the cause of action accrues, and it is the general

rule that a cause of action under the Sherman Act accrues when the defendant takes some action, or

commits some act that injures the plaintiff's business.  *See Zenith*, 401 U.S. at 338 (citing

authorities).  Thus, with certain exceptions a complaint that relies on acts committed prior to the

four-year limitations period, will usually be barred by the statute of limitations.

The rule is different for a continuing conspiracy, as *Zenith* also recognized immediately after

declaring the general accrual standard.  "In the context of a continuing  conspiracy to violate the

antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean

that each time the plaintiff is injured by an act of the defendants a cause of action accrues to him to

recover the damages caused by that act and that, as to those damages, the statute of limitations runs

from the commission of that act."  *Zenith*, 401 U.S. at 338 (citing cases); *see also Champagne*

*Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088-90 (10th Cir. 2006) (citing cases); *Maricopa*,

303 F. Supp. at 82 (reasoning that in continuing conspiracy, cause of action accrues and the

limitations period begins to run "upon the occurrence of each overt act causing damage to the

plaintiff.").  A continuing conspiracy or continuing violation occurs when "the violator's actions

consist not only of some definitive act in violation of the antitrust laws, but also of a series of

subsequent acts that cause further injury to the plaintiff."  2 P. Areeda & H. Hovenkamp, *Antitrust*

*Law* ¶ 320(c), p. 285 (3d ed. 2007).  "Antitrust law provides that, in the case of a 'continuing

violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales

over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.,*

*each sale to the plaintiff*, 'starts the statutory period running again, regardless of the plaintiff's

knowledge of the alleged illegality at much earlier times.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (quoting 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 338b, p. 145) (rev. ed. 1995)) (emphasis added).

The principle animating limitations considerations involving a continuing antitrust conspiracy is also found in jurisprudence under Section 2, which regulates monopolies. 15 U.S.C. § 2. *Berkey Photo, Inc. v. Eastman Kodak Co.* is a somewhat sprawling case, but in relevant part, the plaintiff charged that the defendant achieved a monopoly through anti-competitive conduct prior to the limitations period, as a result of which the plaintiff purchasers continued to pay overcharges into the limitations period. *See* 603 F.2d 263, 295 (2d Cir. 1979). The court rejected the defendant's limitations argument, finding that a purchaser's antitrust claim does not accrue until it actually pays the overcharge. *Berkey Photo*'s core holding was thus that a "purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anti-competitive actions taken before the limitations period." *Id.* at 296. "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide." *Id.* at 295. The court was speaking there of monopolists, but there is no reason that the principle should differ when it comes to conspirators merely because they play well with others as opposed to achieving a monopoly for themselves. *Berkey Photo* in fact recognized the applicability of that principle in the continuing conspiracy context and drew on it to buttress its argument. *See id.* (quoting *Zenith*, 401 U.S. at 338). For limitations purposes, the "taint of an impure origin does not dissipate after four years if a monopolist [or conspirator] continues to extract excessive prices because of it." *Id.* at 296.

The complaint alleges that "[b]eginning at least as early as January 1, 2000, and *continuing* through at least February 14, 2006, Defendants and Named Co-Conspirators engaged in an *ongoing* conspiracy to fix, raise, maintain and/or stabilize prices of Airfreight Shipping Services." *Id.* ¶ 128 (emphasis added). Since the object of the conspiracy was to provide air freight services at inflated, fixed prices, that the defendants continued to sell such price-fixed services to the plaintiffs and other purchasers is a rational inference to be drawn. *Cf. SJ Advanced Technology & Mfg. Corp v. Junkunc*, 627 F. Supp. 572, 577-78 (N.D. Ill. 1986) (requiring more than "mere" invocation of continuing violation in the absence of overt acts occurring during limitations period). But not only may the court infer it, the plaintiffs allege directly in the complaint that they each purchased air cargo shipping services from one or more of the defendants and/or the named co-conspirators at artificially inflated prices during the class period. *See* Complaint ¶¶ 25-31, 212. The class period is defined earlier in the complaint to cover the period from January 1, 2000 to September 11, 2006. *Id.* ¶ 5. Taking the allegations at face value, the direct purchaser plaintiffs continued to buy shipping services from the defendants until September 2006. The complaint also alleges that the defendants engaged in the three non-surcharge related anti-competitive activities during the class period, again extending to September 2006. *Id.* ¶¶ 162-70. It is also worth noting that of the parties who have entered guilty pleas, the time frame of the charged conspiracy – the same conspiracy, it is alleged, that the moving defendants joined – extends to at least February 14, 2006. *See Complaint ¶¶* 98-113; *see also* Declaration of Jason A. Zweig, dated June 4, 2010, Exhibits 9-20. That alone is not determinative for these defendants, but it does suggest that the overall conspiracy extended into that time period.

All of this supports the timeliness of the claims. The "statute of limitations for antitrust litigation 'runs from the most recent injury caused by the defendants' activities rather than from the violation's inception.'" *Exhaust Unlimited, Inc. v. Cintas Corp.*, 326 F. Supp. 2d 928, 931 (S.D. Ill. 2004) (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004)). Therefore, as the defendants continued to cause injury (through sales) into the limitations period, the claim would be timely. *See Cintas*, 326 F. Supp. 2d at 931 (dismissing limitations defense because, although actionable conduct was initiated seven years prior to filing the complaint, sales by the defendant continued into limitations period and continued to cause injury to the plaintiff); *Molecular Diagnostics Laboratories v. Hoffmann-La Roche, Inc.*, 402 F. Supp. 2d 276, 286 (D. D.C. 2005) (applying continuing violation theory to find that purchaser plaintiff's claim accrued for limitations purposes each time it paid a "supra-competitive" price as a result of the defendants' anti-competitive conduct); *Thomas v. Petro-Wash, Inc.*, 429 F. Supp. 808, 811-12 (M.D.N.C. 1977) (finding that in continuing conspiracy each sale of gas pursuant to conspiratorial agreement constituted an overt act serving to allow cause of action to accrue and rejecting defendants' limitations argument). And not only is the complaint timely, it appears it could have been at any point before September 11, 2010, seven months after it was brought.

Even so, the recovery of damages is limited to acts that occurred within the four-year limitations period that preceded the filing of the complaint. *See, e.g.*, *Klehr*, 521 U.S. at 189; *Zenith*, 401 U.S. at 339. *Klehr* cautioned that the "commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." 521 U.S. at 189-90 (citing *Zenith*, 401 U.S. at 388 and other authorities). Antitrust plaintiffs may not use an "independent, new predicate act as a bootstrap to recover for injuries

caused by other earlier predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190 (citing cases). But it is irrelevant for the question of liability that all the specific allegations with respect to these particular defendants' activities occurred prior to the limitations period. *See Klehr*, 521 U.S. at 189; *Zenith*, 401 U.S. at 388; *Berkey Photo*, 603 F.2d at 295-96. There is no requirement that the plaintiffs identify specific conduct on the part of the defendants during the limitations period. *See Petro-Wash*, 429 F. Supp. at 812-13. The complaint clearly alleges that they joined a conspiracy that was active and selling price-fixed freight transportation services until February 2006. That all of the particular allegations against the *Benchmark* defendants occurred prior to the limitations period is a point that has some superficial appeal and perhaps may have an impact on the recoverable damages, but it offers little reason to find that the claim against them is barred by the statute of limitations. *See, e.g.*, *Petro-Wash*, 429 F. Supp. at 812-13 (rejecting defendant's limitations argument that it took no action during statutory period because the plaintiffs alleged conspiracy on the part of *all* defendants to violate antitrust laws). "Inasmuch as the actions of a co-conspirator will bind the other members of the conspiracy, Texaco's involvement did not terminate with the 1968 agreement, rather, for purposes of the statute of limitations, their involvement continues to the present." *Id.* The agreement was in place, the conspiracy still existed, and the defendants continued to sell air freight shipping services at rates that were fixed or artificially inflated until February 14, 2006. In effect, the defendants are arguing for a subversion of conspiracy principles such that the statute of limitations should have began running even before the conspiracy, according to the well-pleaded allegations of the complaint, was terminated. That argument should be rejected.

### 3. *Fraudulent Concealment*

The court has recommended that the claim itself is not time barred, even without the benefit of fraudulent concealment. Notwithstanding that recommendation, it is still necessary to address fraudulent concealment (1) if the preceding discussion on statute of limitations issues is not accepted by Judge Gleeson; and (2) because of its impact on recoverable damages and the effect it may have on discovery.[10] And the parties seem to have made it the centerpiece of their respective arguments. The doctrine of fraudulent concealment may serve to toll the statute of limitations until the time an antitrust plaintiff discovers the claim. *See Klehr*, 521 U.S. at 194-95 (discussing antitrust law and fraudulent concealment); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *In re Nine West Shoes Antitrust Litigation*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000). In this circuit, a plaintiff who seeks the benefit of fraudulent concealment is required to establish three elements: (1) that the defendant concealed the existence of the cause of action from the plaintiff; (2) that the plaintiff brought suit within the applicable limitations period upon learning of the cause of action; and (3) that the plaintiff's ignorance of the claim did not result from a lack of diligence. *Hendrickson Bros., Inc.*, 840 F.2d at 1083 (citing authorities); *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986); *Cerbone v. Int'l Ladies Garment Workers Union*, 768 F.2d 45, 48 (2d Cir. 1985); *City of Detroit v. Grinnel Corp.*, 495 F.2d 448, 460 (2d Cir. 1974).

Although the burden of establishing fraudulent concealment is on the plaintiff, *see Hendrickson Bros.*, 840 F.2d at 1085-86, at the Rule 12(b)(6) stage, a plaintiff need only *plead* fraudulent concealment, as opposed to affirmatively proving it. *See Hinds County, Miss. v.*

---

[10] The plaintiffs' ability to show that fraudulent concealment should toll the statute of limitations may also have an effect on the scope of any recovery available to the plaintiffs in the master MDL, whose damages might have begun to accrue prior to 2002, the beginning of the limitations period in those cases.

*Wachovia Bank, N.A.* ("*Hinds II*"), 700 F. Supp. 2d. 378, 400 (S.D.N.Y. 2010) (citing *Nine West*, 80 F. Supp. at 192-93). The distinction is an important one, since the defendants attack the adequacy of the proof offered by the plaintiffs in support of fraudulent concealment, a matter the court does not consider on a motion to dismiss. Still, since it is a concept that relies on allegations of fraudulent conduct, courts in this circuit and others require it to be pleaded in accordance with Federal Rule of Civil Procedure 9(b), under which "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See, e.g.*, *National Group for Comm's & Computers, Ltd. v. Lucent Techs Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006); *In re Vitamins Antitrust Litigation*, No. 99-197, 2000 WL 1475705, at *2 (D. D.C. May 9, 2000).

With regard to the first prong, concealment is proven by showing either that "the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083; *see also Nine West*, 80 F. Supp. 2d at 192. The plaintiffs contend that they have adequately pleaded both. With regard to affirmative steps to conceal the existence of the cause of action, the defendants and named co-conspirators proffered false and pretextual reasons justifying the surcharges. *See* Complaint ¶ 179. Prior to the class period, the imposition of surcharges was made public through press announcements, a practice which continued into the class period, and implicitly suggested that the surcharges were legitimate and resulted from competitive market forces. *Id.* ¶ 180. The plaintiffs consistently linked the surcharges to "normal market forces and considerations, including increases in costs." *Id.* ¶ 181. The complaint includes internet addresses for many websites that provide the specific announcements made by many of the named co-conspirators, though none from

the *Benchmark* defendants.[11]  *Id.* ¶¶ 182-87.  The plaintiffs charge that these explanations were designed to "lull" purchasers "into believing that increases were the normal result of competitive market forces rather than the product of collusive efforts" and to "cause them to accept the increases without undertaking further inquiry."  *Id.* ¶ 189.  The plaintiffs were thus "conditioned by experience . . . to expect such Surcharges from time to time."  *Id.* ¶ 180. The announcements hardly constitute overwhelming proof of affirmative concealment, but are sufficient at this stage.  By affirmatively issuing what are alleged to be false and pretextual justifications for imposing new surcharges, they also go beyond mere silence or failure to "own up" to illegal conduct. *See NGI Intern. Precious Metals, Ltd. v. Konsky*, No. 98-CV-3761, 1999 WL1011948, at *3 (E.D.N.Y. Aug. 31, 1999) (quoting *In re Merrill Lynch Limited Partnerships Litigation*, 7 F. Supp. 2d 256, 274 (S.D.N.Y. 1997).  If the plaintiffs relied only on the stock allegations of "secret meetings," "surreptitious communications," "deceptive practices," or agreements "not to discuss publicly or otherwise reveal the nature" of the communications so as to "preclude detection" or "prevent the existence of written records," then perhaps the result might be different.  *See* Complaint ¶¶ 175-77, 191; *Publication Paper*, 2005 WL 2175139, at *3 (concluding that similar allegations were "wholly insufficient under Rule 9(b)" and dismissing with leave to replead).  The allegations as to the false, pretextual press announcements serve to provide some factual heft to the otherwise largely conclusory allegations of actual concealment.  *See, e.g.*, *Vitamins*, 2000 WL 1475705, at * 2-3 (citing *In re Catfish Antitrust Litigation*, 826 F. Supp. 1019, 1031-32 (N.D. Miss. 1993)).

---

[11] It is irrelevant for the *Benchmark* defendants that the fraudulent concealment allegations in large part rely on the announcements made by other members of the conspiracy, as the acts of co-conspirators are imputed to other co-conspirators.  *See Vitamins*, 2000 WL 1475705, at *3 (quoting *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989); *Pinney Dock & Transport Co. v. Penn Central Corp.*, 991 F. Supp. 908, 911 (N.D. Ohio 1998).

Alternatively, the plaintiffs would be able to show that the conspiracy is inherently self-concealing. Whether a collusive price-fixing conspiracy is inherently self-concealing is very much in dispute, both among the parties, and the courts as well. Several courts have recognized that a violation of the antitrust laws through a price-fixing conspiracy is self-concealing in nature such that "a plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct." *Nine West Shoes*, 80 F. Supp. 2d at 193; *see also Hendrickson Bros.*, 840 F.2d at 1083-84; *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, No. 00-CV-7804, 2003 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004). It is questionable whether simply alleging that the price-fixing conspiracy was self-concealing – which the plaintiffs have done – satisfies the first prong of fraudulent concealment and obviates the need to allege specific actions taken by the defendants to conceal their conduct. *See Hinds II*, 700 F. Supp. 2d at 399; *Nine West Shoes*, 80 F. Supp. 2d at 192-93 ("[B]y alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment and under *Hendrickson*, there is no need to require the pleading of affirmative actions taken by the defendants to prevent the plaintiff's discovery of its claim."). Some argue that allowing plaintiffs to discharge their burden by mere allegation that the scheme was self-concealing essentially swallows up the statute of limitations, contrary to Congress' intent in enacting it. *See OBG Tech. Servs., Inc. v. Northrop Grumman Corp.*, 503 F. Supp. 2d 490, 507-08 (D. Conn. 2007); *Publication Paper*, 2005 WL 2175139, at *3 ("[M]erely alleging a price-fixing conspiracy, and nothing more, does not establish the existence of a 'self-concealing' violation."). There is some tension between a standard that allows the plaintiffs to meet their burden by merely alleging the inherently self-concealing quality of the scheme and requiring them to plead fraudulent concealment with particularity. The court is conscious of that tension and does not accept the notion that the

burden of pleading fraudulent concealment with particularity can be met by the cavalier, self-fulfilling allegation that the conspiracy was inherently self-concealing. Thus, the relative ease that might allow plaintiffs to meet their burden at the first step does not excuse the need to plead fraudulent concealment with particularity.

However, there is enough factual matter in the complaint and the surrounding context to bear out the allegation that the conspiracy was inherently self-concealing. In *Publication Paper*, the court found that to establish that a price-fixing conspiracy was inherently self-concealing, plaintiffs needed to

> allege why the circumstances surrounding the announcement of the price increases in question were such that it would necessarily be assumed that they were the result of legitimate market forces. In other words, the plaintiff must allege circumstances that make clear why the announcements of price increases would have conveyed fraudulent information. These allegations need not be lengthy. It would, for example, likely be sufficient for a plaintiff to allege that the industry in question is such that price increases are not abnormal, that such increases are typically ascribed to normal market forces, that an openly collusive price increase would not be tolerated, and that there was nothing suspicious about the circumstances under which each of the pre-limitations period price announcements were made.

2005 WL 2175139, at *4. The plaintiffs have made the requisite allegations, although the defendants argue that they have done little more than merely "copy" that commentary into the complaint. *See* Complaint 180, 189; Memorandum of Law in Support of EVA Airways Corporation's Motion to Dismiss Plaintiffs' Complaint, dated May 14, 2010, at 11-12. To reiterate, the plaintiffs only need to *plead* that the conspiracy was inherently self-concealing, and while the allegations with respect to this element are not overly detailed, they are sufficient.

Secondly, nothing indicates that the plaintiffs have not asserted their claims within four years of discovering them. The complaint makes clear that the plaintiffs did not discover their claims until the investigations by the Department of Justice and foreign antitrust authorities were made public

on February 14, 2006. *See* Complaint ¶¶ 173-74. This action was initiated by filing the complaint on February 12, 2010, which is within four years of discovery, although just barely. The argument that the plaintiffs should have or could have discovered the claims earlier goes to diligence, the third element of fraudulent concealment, to which the court now turns.

An antitrust "plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'[12] *Klehr*, 521 U.S. at 194. "The concealment requirement is satisfied only if the plaintiff shows that it neither knew nor, in the exercise of due diligence, could reasonably have known of the offense."[13] Areeda, *Antitrust Law*, ¶ 320e, p. 319; *see also Hendrickson Bros.*, 840 F.2d at 1083 (requiring ignorance of the claim to not result from lack of due diligence). The court is mindful of other courts' admonition that "[g]eneral assertions of ignorance and due diligence without more specific explanation . . . will not satisfy the pleading requirements." *Masters v. Wilhemina Model Agency, Inc.*, No. 02-CV-4911, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003). The main arguments advanced by the defendants are that (1) the announcements of lockstep price increases and surcharges put the plaintiffs on notice of the claim and precludes their ability show that they exercised due diligence, and that (2) the plaintiffs have made no showing whatsoever of how they exercised due diligence.

These arguments have some initial appeal, but they are ultimately unconvincing. The complaint is short on how, other than by generic assertions, the defendants in fact exercised due

---

[12] The Court was considering fraudulent concealment in a civil RICO context, but made clear that the same standard applies to antitrust cases, and in fact, the Court referred to antitrust authorities as justification for its position. *See Klehr*, 521 U.S. at 194-95.

[13] *Hinds County, Miss. v. Wachovia Bank N.A.* ("*Hinds I*") recognized that case law on the due diligence element of fraudulent concealment has not been terribly consistent in what is required. *See* 620 F. Supp. 2d 499, 521 (S.D.N.Y. 2009).

diligence. *See, e.g.*, *Hinds I*, 620 F. Supp. 2d at 521-22 (finding that "brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception" does not plead due diligence with particularity). The plaintiffs do not assert any specific inquiries they made, but rather that any inquiries would have been futile in any case, given that they lacked information as to costs, other factors, and "contemporaneous information" that might have allowed them to discover the existence of the conspiracy and whether the "claimed justifications for Surcharges were valid." *See* Complaint ¶¶ 180-81, 189; *In re Aspartame Antitrust Litigation*, No. 06-CV-1732, 2007 WL 5215231, at *6-7 (E.D. Pa. Jan. 18, 2007). Clearly they were on notice of the fact that the airlines were simultaneously imposing surcharges; that is not in question. Whether they were on notice of the substance of the claim, which is the conspiratorial agreement on the part of the defendants, and not the existence of the surcharges themselves, is a much closer (and relevant) question. *See Mercedes-Benz*, 157 F. Supp. 2d at 373 (quotations omitted). "The requisite notice required to defeat a claim of fraudulent concealment is an awareness of sufficient facts to identify . . . the particular cause of action at issue, not [notice] of just any cause of action." *Hoffman-La Roche*, 402 F. Supp. 2d at 283-84. The announcements of surcharges or increases now raise a red flag in the overall context of the complaint. But when they were first announced, they went unaccompanied by the other allegations and factual details found in the complaint. Given the government investigations and admissions of liability on the part of many, it makes sense in retrospect that the surcharge announcements and increases should have triggered some inquiries on the plaintiffs' part. But *Twombly* stands for the proposition that parallel conduct by itself – which is basically what the announcements were – does not give rise to a plausible claim, and the same consideration should hold when considering whether these announcements effectively put the plaintiffs on notice of the cause of action. "Courts have

held that knowledge of 'apparent parallel price increases' is not sufficient to demonstrate that plaintiffs should have known that they had an antitrust cause of action." *In re Bulk Extruded Graphite Products Antitrust Litigation*, No. 02-CV-6030, 2007 WL 1062979, at * 3 (D. N.J. Apr. 4, 2007) (citing *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 37 (N.D. Ill. 1984); *King & King Enterprises v. Champlin Petroluem Corp.*, 657 F.2d 1147, 1156 (10th Cir. 1981)). In other words, parallel conduct by itself is not necessarily "'calculated to excite inquiry' [which] give[s] rise to the duty to inquire." *Catfish Litigation*, 826 F. Supp. at 1031; *see also Graphite Products*, 2007 WL 1062979, at *3; *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988).

Of course, other cases are only of limited value here because of particular considerations unique to the industry at issue. It is at least questionable whether diligent inquiry by the plaintiffs would have actually uncovered any anti-competitive conduct. *See Nine West*, 80 F. Supp. 2d at 193. The court in *Nine West* found that the due diligence prong was satisfied by an allegation in the complaint that the plaintiffs "could not have discovered the conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive acts of secrecy employed by Defendants[.]" This complaint makes essentially the same allegations. *See Complaint ¶¶* 191-93. It is worth recalling that it was the government investigations that opened the door for the plaintiffs to walk through. If the announcement of lockstep price increases were curious, even somewhat suspicious, they still did not provide notice to the plaintiffs. Due diligence does not demand such unmitigated cynicism on the part of consumers. *See Graphite Products*, 2007 WL 1062979, at *4 (knowledge of parallel price increases and limited knowledge of government investigation does not establish lack of diligence). This is particularly so in the context of inflated surcharges. Surcharges, by nature, reflect various external costs that the airlines are forced to expend in order to provide

commercial freight services. *See* Complaint ¶¶132-33. And because shipping is a highly fungible service, it is natural to expect that the airlines would be faced with highly similar external costs and variables relating to fuel, security, and customs charges. Thus, that many of the defendants and co-conspirators inaugurated similar surcharges at the same time could be reflective not of any collusive agreement, but of the fact that the competitors were confronted with the same sets of external variables and already had similar pricing structures in place.[14] It is natural to assume that business competitors forced to confront the same external stimuli will react in a similar way, and that such a reaction would not result from any conspiracy.

In short, the court cannot determine as a matter of law that knowledge of the lockstep surcharge increases put the plaintiffs on notice of their antitrust claims and deprives them of the ability to plead reasonable diligence and fraudulent concealment. *See IPO Litigation*, 2004 WL 487222, at *5 (citing *Mercedes-Benz Antitrust Litigation*, 157 F. Supp. 2d 355 373 (D. N.J. 2001)); *Vitamins*, 2000 WL 1475705, at *8. Such a determination is better left to the finder of fact – not this court and not now. Clearly, there are questions of fact that need to be resolved as to whether what the plaintiffs knew and when they knew it "would excite the inquiry of a reasonable person." *Conmar Corp.*, 858 F.2d at 504. Where plaintiffs have at least pleaded fraudulent concealment with particularity, courts have generally been reluctant to dismiss claims at the 12(b)(6) stage on the basis

---

[14] At the same time, this argument is somewhat undercut by allegations elsewhere in the complaint that similar fuel surcharge pricing systems "if independently implemented in a competitive market, would have been the foundation for the timing and amount of upward or downward pricing movements triggered by multiple factors, including spot fuel prices." Complaint ¶133. In other words, this suggests that "pricing shifts would not have occurred uniformly," which is at odds with the lockstep surcharge increases. Memorandum of Law in Support of Malaysia Airlines' Motion to Dismiss the Class Action Complaint, dated May 14, 2010, at 14. To dismiss on the basis of this inconsistency, however, seems unwise.

of a failure to show fraudulent concealment.[15]  *See Flat Panel Litigation*, 586 F. Supp. 2d at 1120 (finding it "generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment" on a motion to dismiss); *In re Sumitomo Copper Litigation*, 120 F. Supp. 2d 328, 346 (S.D.N.Y. 2000); *Vitamins*, 2000 WL 1475705, at *8.  There could be circumstances under which the shortcomings of a complaint make clear that a plaintiff has not asserted fraudulent concealment, and in such a case, it would not be improper to consider fraudulent concealment on a motion to dismiss.  *See, e.g.*, *Publication Paper*, 2005 WL 2175139, at *5-6; *Hinds I*, 620 F. Supp. 2d at 521-22.  But such a complaint would bear little resemblance to this one, which clearly asserts a fraudulent concealment theory.  The proof on this score may fall short at trial or perhaps even on summary judgment, but it does not entitle the defendants to dismissal even before exchanging discovery.[16]

---

[15] One court has stated that the "issue is not whether named Plaintiffs exercised due diligence, as named Plaintiffs argue, but rather whether they have pled fraudulent concealment with particularity." *Hinds I*, 620 F. Supp. 2d at 521 (citing *Publication Paper*, 2005 WL 2175139, at *6 n.7).  While that statement is true, the issues and facts required for both determinations are intimately bound together.

[16] Any contention that the complaint is so lacking in particularity as to deprive the defendants of effective notice of the claim is clearly belied by the face of the complaint, which devotes 23 paragraphs exclusively to the issue of fraudulent concealment.  *See Vitamins*, 2000 WL 1475705, at *2 ("In essence, the rules only require that the 'circumstances of fraud be pled with enough particularity to put the party on notice as to the nature of the claim.'") (quoting *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991)).  It cannot be credibly maintained that the defendants are not on notice of the nature of the claim, and in evaluating whether plaintiffs have pleaded with the requisite particularity, courts should bear in mind the function and purpose of the heightened pleading standard.

### *4. Tacking and Tolling*

The plaintiffs contend, in the alternative, that as plaintiffs in a private antitrust action, they should receive the benefit of the Clayton Act's tolling provisions, triggered by the initiation of a government enforcement action.

> "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations . . . is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

15 U.S.C. § 16(i) (emphasis in statute). Because the government has been instituting criminal proceedings against certain of the defendants since August 2007, the plaintiffs contend that the statute of limitations has been continuously suspended since then, that is, that the overlapping suspension periods should be "tacked on" to the others, and that this action is therefore timely.[17]

There seems to be little dispute that the government has instituted criminal proceedings and that the cause of action asserted in this lawsuit is based on the same general matters and conduct on the part of the airlines. There is also agreement among the parties that the date the first government proceeding was instituted for these purposes was August 1, 2007 when the United States filed informations against Korean Air and British Airways in the District of Columbia. Those proceedings were resolved three weeks later when the airlines entered guilty pleas to the

---

[17] Resolution of the government tolling issue may also have ramifications on damages, because if the plaintiffs' argument is accepted by the court, they would be able to recover for injuries sustained during the entire four-year period that preceded the filing of the first information on August 1, 2007. Therefore, if the limitations period has been continuously tolled since that date, the damages period would extend back to August 1, 2003.

informations on August 24, 2007.  It is also not in contention that enforcement proceedings arising

out of the same general conduct and conspiracy continue to be brought and are still pending, the

most recent being the indictment of the defendant Jan Lilliebourg in August 2009.  *See* Zweig Decl.,

Exhibit 23.  To the court's knowledge, that case has not yet been resolved.  Since August 1, 2007,

there has always been either (a) an enforcement action pending, or (b) one that had been pending

and resolved within the previous year.  The parties also agree that there is a dearth of controlling

authority on this issue, neither the Supreme Court nor the Second Circuit having had occasion to

address it.  The dispute is based on an unresolved question of law, which is whether the statute

should be continuously tolled for the duration of the period beginning on August 1, 2007, even if

there are brief gaps since then in which no proceeding was "pending."  The plaintiffs argue that

"overlapping suspension periods arising from successive government proceedings may be tacked

onto one another so as to suspend the statute of limitations from the date on which the earliest

government proceeding is commenced until one year after the last government case is terminated."

Plaintiffs' Memorandum of Law, at 42.

Some inquiry into congressional purposes in enacting the tolling provision is necessary.  The

Supreme Court has declared that "[c]ongress, believing that 'private antitrust litigation is one of the

surest weapons for effective enforcement of the antitrust laws,' enacted Section 16[i] in order to

'assist private litigants in utilizing any benefits they might cull from government antitrust actions.'"

*Zenith Radio*, 401 U.S. at 336 (quoting *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing

Co.*, 381 U.S. 311, 317-18 (1965)).  Consistent with that principle, the Supreme Court has found,

several times, that the tolling provision in Section 16(i) should be interpreted broadly, as to give the

fullest extent of the benefits it is intended to accord private litigants.  *See Leh v. General Petroleum*

*Corp.*, 382 U.S. 54, 58-59 (1965); *Minnesota Mining*, 381 U.S. at 318-22; *see also Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 569 (10th Cir. 1961); *Maricopa County v. American Pipe & Constr. Co.*, 303 F. Supp. 77, 85 (D. Ariz. 1969) ("[*Minnesota Mining*] and *Leh* unequivocally indicate that the language of 5(b) must be given its broadest application in favor of enabling private litigants to reap every benefit that they possibly can out of any governmental criminal or civil antitrust litigation during the pendency of each and within one year thereafter."). Therefore, the court starts from the proposition that in enacting the tolling provision and making it easier for private litigants to take advantage of government enforcement actions, Congress' preference was to ensure that private litigants could help encourage the vigorous enforcement of the antitrust laws, perhaps at the expense of the repose offered by a rigid, unbending application of the statute of limitations. Clearly, however, Congress did not intend that the statute of limitations should be done away with altogether.

The main case that the plaintiffs rely upon, *Maricopa County v. American Pipe & Constr. Co.*, is distinguishable in several important respects. *See* 303 F. Supp. 77 (D. Ariz. 1969). However, the court made broad pronouncements that are worth considering. There, the defendants had been indicted in March 1964 for violating the Sherman Act by restraining trade in the steel and concrete pipe industry. *Id.* at 79. They pleaded *nolo contendere* in June 1964, and judgments of guilt were entered, disposing of the case. *Id.* at 80. Four days later, the government initiated civil enforcement actions against the defendants for violating the False Claims Act and certain provisions of the Clayton Act. *Id.* Then, in October 1964, the government amended the complaints to seek an injunction preventing continuing violations of the Sherman Act. *Id.* Final judgments were entered against all but one of the defendants in December 1967, and against the remaining defendant in May

1968.  *Id.*  The plaintiff filed suit in April 1969, alleging the same violation of the Sherman Act as in the government's criminal and civil proceedings.  *Id.* at 80-81.  The defendants argued, *inter alia*, that the period (four days) in June 1964 after which the criminal proceedings were terminated but before the civil actions were filed, should have caused the limitations period to begin running again, such that the plaintiff had only until June 1965 (one year after termination of the criminal cases) within which to file its claim.  *Id.* at 81.  The court disagreed, and after analyzing the purpose behind tolling, stated:

> If the periods of the government actions happen to overlap, the end of one tolling period following the termination of a government action does not in any wise [*sic*] disturb or curtail the free flowing river of suspension created by and welling from the filing of any government antitrust proceedings.  Private antitrust litigation may be filed at any time prior to one year after the termination of any criminal or civil proceedings, whenever the same may have been filed, concurrently or successively.  As indicated, if two or more periods of tolling happen to overlap, as is here the case, then since the statutory tolling period has never become moribund or buried, the tolling provisions continue to be viable until the end of the one-year extension following the termination of the last government action to end.

*Id.* at 86.  In short, in enacting the tolling provision, the legislative desire to encourage enforcement of antitrust laws by private parties served to override any arguments against tacking.  *See id.*

While the court was dealing there with a criminal action followed by a successive civil enforcement action, rather than multiple successive criminal actions (as is the case here), that distinction is not material.  That the successive actions here are all criminal actions does little to change things, as long as all the actions deal with substantially the same conspiracy or "substantial identity of subject matter."  *Union Carbide*, 300 F.2d at 570.  The reasoning the court in *Maricopa* relied upon applies just as well to successive criminal prosecutions – so long as each information was filed within one year of resolution of the previous information that was filed, such that the

suspension periods overlapped.[18]  Of course, *Maricopa* is not binding on this court, and the statements that directly apply here may only be dicta, but it is persuasive nevertheless.

The defendants rely principally on limited statements, both dicta, in two pre-*Maricopa* district court cases, *Michigan v. Morton Salt Co.*, 259 F. Supp. 35, 51 (D. Minn. 1966), and *Dickinson v. Kansas City Star Co.*, 173 F. Supp. 423, 425 (W.D. Mo. 1959).  In *Kansas City Star*, the government simultaneously filed criminal and civil actions against the defendants in 1950, which were terminated respectively in June and November of 1957.  *See* 173 F. Supp. at 423.  The plaintiffs brought their private cause of action based on the same conduct in November 1958, within one year of resolution of the government's civil action, but 17 months after the criminal case was resolved.  *Id.* at 424.  The defendants did not contend that the case was time-barred, but only moved to strike allegations from the complaint that the judgment in the criminal case constituted *prima facie* evidence of the plaintiffs' claims, on the grounds that too much time had elapsed to rely on the criminal case as *prima facie* evidence.  *Id.*  The court analogized to limitations considerations, and rejected the defendants' argument, in part because the government actions were filed concurrently and not successively, but announced that "[i]t is the 'tacking' of one limitation to another that would create the intolerable condition that defendants argue in the instant case."

---

[18] *Maricopa* did mention as a caveat that if more than one year had elapsed after the criminal proceedings had terminated and only then had the government initiated its civil enforcement action under the Sherman Act, the tolling provision would *not* have served to resuscitate an already "moribund" claim, that is, a claim already barred by the statute of limitations.  *See* 303 F. Supp. at 86.  That, however, is not what occurred here, for there has not been a gap where the suspension period was not active either by the pendency of a case or by the one-year post-resolution window.  Since the initiation of criminal proceedings in August 2007, there has always been an action pending, or one that had been pending within one year prior.  And while the informations have all resulted in guilty pleas, the case against Lilliebourg has not yet been resolved and is still pending.

*Maricopa* thoroughly demonstrates why that one pronouncement in *Kansas City Star* should not be determinative here, as the Supreme Court's subsequent broad interpretation of Section 16(i) to achieve the maximum benefits to antitrust plaintiffs – *see Leh*, 382 U.S. at 58-59; *Minnesota Mining*, 381 U.S. at 318-22 – serves to cast doubt on the continuing viability of the *Kansas City Star* dicta. *See Maricopa*, 303 F. Supp. at 82-83. Moreover, *Maricopa* illustrates that whether the government actions are criminal or civil, or simultaneous or successive, is not determinative of whether the limitations period should be continuously tolled, as long as the claim never became time-barred. *See* 303 F. Supp. at 82-86.

Similarly, in *Morton Salt*, the court considered the defendants' ancillary argument that "Congress did not intend to toll the statute throughout successive actions." 259 F. Supp. at 51. The court rejected that argument, but noted that "[i]t may be that in some instances tolling the statute during successive government actions would result in treble damages claims of such vintage that it would be patently unreasonable to assume that Congress meant to allow 'tacking' under" Section 5(b)." 259 F. Supp. at 51. *Maricopa* also demonstrates how the judge in *Morton Salt* went on to "water[] down this postulation." *See Maricopa*, 303 F. Supp. at 82-83. This is not an instance where continuous tolling beginning in August 2007 would result in claims of such ancient vintage that it would be patently unreasonable to "tack" under Section 16(i). Nor would it create an "intolerable" condition for the defendants, as criminal liability resulting from this same overall conspiracy has not yet been fully resolved. There is nothing "intolerable" at all about having to defend against a civil suit initiated by private plaintiffs that is brought closely on the heels of a series of government prosecutions. Not only is it not intolerable, it appears entirely consistent with what

Congress intended in enacting Section 16(i). In short, there is very little in either *Morton Salt* or *Kansas City Star* that suggests, much less mandates, a result contrary to what the court recommends.

The defendants also point to a statement from *Camotex, S.R.L. v. Hunt*, where the court was considering an argument that successive *class* actions (the plaintiffs purportedly belonging to those earlier classes as well) tolled the statute of limitations. 741 F. Supp. 1086, 1091 (S.D.N.Y. 1990). Thus, the court was dealing with a different precept, one laid out in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 555 (1974), that "upon the commencement of a class suit, the statute of limitations is tolled for all members of the putative class." *Camotex*, 741 F. Supp. at 1091. The court declared that "[t]olling during successive class actions 'far exceeding the applicable limitations periods' would give rise to 'a situation plainly at odds with the principle of repose that statutes of limitations are designed to achieve.'" (quoting *Korwek v. Hunt*, 646 F. Supp. 953, 965 (S.D.N.Y. 1986)). But there, the court was neither dealing with government actions nor with the Section 16(i) tolling provision. Moreover, the "situation" that the court evoked in *Camotex* is the one called for by Section 16(i) itself, which cuts against any repose offered by the statute of limitations. In other words, the "principle of repose" underlying the statute of limitations is counterbalanced by the fact that Congress also enacted Section 16(i). Applying it here does little to threaten or undo Congress' intent in establishing a statute of limitations in the first instance, for clearly Congress recognized that the principle of repose might not prevail over vigorous enforcement of the antitrust laws and the promotion of competition. *See, e.g.*, *Maricopa*, 303 F. Supp. at 85 ("Congress, with deliberation and specificity, disturbed that 'repose' and overrode that purpose by enacting Section 5(b), to make manifest that in encouraging the enforcement of the antitrust laws by private litigation, tolling of the statute was more important than the repose established thereby.").

The plaintiffs' position here is somewhat undercut by the fact that they filed suit against the original 40 defendants well *before* the government initiated criminal enforcement proceedings in August 2007, although it was the government investigation that, once made public, led to the filing of the private suits. And the additional information they allege in the *Benchmark* complaint was apparently received as a result of Lufthansa's participation in the DOJ leniency program and not from the informations and guilty pleas. Thus, for the purposes of the *Benchmark* cases, the plaintiffs have derived only a modest evidentiary benefit (other than making their claims more plausible) from the government enforcement actions. While this weakens the rationale for tolling under Section 16(i) to some extent – *see Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 569 (10th Cir. 1961); *Morton Salt*, 259 F. Supp. at 50-51 – it is not determinative. The plaintiffs may well derive greater benefits from the criminal prosecutions as they go forward. And it also demonstrates that not only were the plaintiffs not laggard in bringing suit, they were in fact vigilant in doing so ahead of the government, at least in the main *Air Cargo* MDL, although the nearly four-year wait to bring the *Benchmark* complaint is somewhat curious. Still, to use the statute of limitations as a bar to the action seems incongruous with the tolling provision in Section 16(i).

But perhaps the strongest argument in support of tacking comes from the statutory language itself, which speaks of *any* criminal or civil enforcement proceeding initiated by the government. As long as *any* criminal prosecution is initiated within one year of resolving the previous criminal prosecution, it would appear that the statute of limitations ought to be continuously tolled. It does not take any perversion or distortion of the statute to reach that result; rather, it seems to be the most natural interpretation of it. If it was intended that only the first prosecution would trigger suspension of the statute and that the clock would resume running one year after that proceeding was resolved,

Congress could have drafted the statute in such a manner. Since it did not the court should give effect to its broader, more expansive provisions. *See Leh*, 382 U.S. at 58-59; *Minnesota Mining*, 381 U.S. at 318-22. Given the "substantial identity of subject matter" between the criminal informations and this private cause of action, the court should find that the statute of limitations has been tolled since August 1, 2007, and that the damages period extends back to August 2003. Accordingly, initiation of this suit in February 2010 is not barred by Section 16(i).

### D. Air Transport Agreements

The defendants Malaysia Airways and Air India both contend that this suit is barred by bilateral executive agreements known as Air Transport Agreements ("ATA") between the government of the United States and the governments of Malaysia and India that govern pricing disputes arising between the parties.[19] With respect to pricing, Article 12 of the agreements requires each party to "allow prices for air transportation to be established by each designated airline based upon commercial considerations in the marketplace. Intervention by the Parties shall be limited to prevention of unreasonably discriminatory prices or practices, [and] protection of consumers from prices that are unreasonably high or restrictive due to the abuse of a dominant position; and protection of airlines from prices that are artificially low due to direct or indirect governmental subsidy or support." Declaration of Joshua D. Roth, dated May 14, 2010, Exhibit 2 (ATA). The ATA goes on to restrict either party from taking "unilateral action to prevent the inauguration or continuation of a price proposed to be charged or charged by" the airlines. ATA, Art. 12 ¶ 3. It also states that if either party believes that the prices are not consistent with the above considerations,

_____

[19] The text of the two agreements is for all intents and purposes, identical.

it shall notify and request consultations with the other party, and then elaborates certain consultation procedures. *See id.*

The defendants argue that the ATA bars this action because it limits intervention by the parties to only three forms of pricing disputes that do not implicate a collusive price-fixing conspiracy, and then prescribes certain notification and consultation procedures that must be followed. The plaintiffs contend that Article 12 does not address a price-fixing conspiracy in any way, but is instead "limited to" the three forms of pricing activities that specifically appear in the article, and that it therefore has no effect on their ability to bring this action. It is true that Article 12 does not explicitly mention price-fixing, but it is also true that intervention by the parties with respect to pricing is limited to certain categories that are explicitly mentioned. In effect, interpreting the ATAs so broadly as to bar this suit requires resolving two ambiguities decidedly in the defendants' favor: (1) whether Article 12 applies to price-fixing conspiracies, and whether it limits inquiries into such activities; and (2) whether the court's adjudication of a dispute brought by private parties is equivalent to intervention or unilateral action on the part of the United States, in violation of its undertakings in the agreement.

Whatever the answer to the first question – and as shown below, it is doubtful that applicable principles of construction allow for the interpretation that the defendants propose – the parties to the agreement are not before this court and are not parties to this dispute. The agreement is between governments, sets limits on what *government* actions may be taken, and does not purport to affect the rights of private parties. Here, it is private parties who are taking action, not the government as a party to the agreements. The defendants have cited nothing to suggest that this case involves the sort of unilateral action or party intervention regulated in the ATAs. *See Compagnie Noga*

*D'Importation et D'Exportation, SA v. Russian Federation*, 361 F.3d 676, 689 (2d Cir. 2004).

Surely, the judiciary is part of the United States government, but that does not mean that adjudication in the federal courts of pricing disputes between private parties is akin to United States intervention to regulate prices. That is not the most natural reading of Article 12, and the only way those provisions would apply would be to construe them in such a way as to create confusion, ambiguity, and inconsistency. Principles of construction, however, require that they be construed so as to *avoid* conflicts and minimize disputes.

It is a basic tenet of our jurisprudence that international law and domestic legislation should, when possible, be read as consistent with one another, although this principle is stronger when interpreting a federal statute rather than a treaty. *See Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) ("It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."); Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 114; Louis Henkin, *Foreign Affairs and the United States Constitution* 209-10 (2d ed. 1996). Still, courts are sometimes called upon to interpret treaties or international agreements, even if they have more experience construing statutory law and even though the interpretation of international agreements by the Executive Branch is entitled to some deference. *See, e.g., Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230 (1986); *Factor v. Laubenheimer*, 290 U.S. 276, 293-95 (1933) (discussing varying treaty interpretations); *Jones v. Meehan*, 175 U.S. 1, 32 (1899) ("The construction of treaties is the peculiar province of the judiciary[.]"); Henkin, *Foreign Affairs*, supra at 206 ("The courts also interpret treaties in cases before them."). When a treaty and a federal statute conflict, courts will generally give effect to the one that was enacted the latest in time, as the later one will usually

supersede the earlier one.  *See Cook v. United States*, 288 U.S. 102, 118-20 (1933); *Whitney v. Robertson*, 124 U.S. 190, 194 (1888); Restatement § 115, cmts. a-c; Henkin, *Foreign Affairs*, supra at 209-10.

For executive agreements like the ATAs here, however, their status in the face of inconsistent statutes is less clear and has received less uniform treatment in the courts.  *See United States v. Guy W. Capps, Inc.*, 204 F.2d 655 (4th Cir. 1953); Restatement § 115, Reporters' Note 5; Henkin, *Foreign Affairs*, supra, at 228-29.  Some have argued that when the executive agreement touches on a matter within Congressional province – as is the case here, since the ATA purports to regulate commerce with foreign nations – it yields to inconsistent federal statutes and will not be enforced.  *See Capps*, 204 F.2d at 659-60.  The wisdom or propriety of that view is not entirely evident.  *See Henkin*, *Foreign Affairs*, supra at 228-29.  The law in the Second Circuit is a bit more clear in that for an international agreement (or a treaty, for that matter) to supersede a federal statute, there must be a "positive repugnancy" between the language of the agreement and the statute, making the two "irreconcilable."  *Blanco v. United States*, 775 F.2d 53, 61 (2d Cir. 1985) (citing authorities).  This Circuit requires an affirmative showing that evinces an intent to repeal the prior statute.  *See id.*  (citations omitted).

An executive agreement that was concluded "pursuant to a treaty derives its authority from that treaty and has the same effect as the treaty to supersede an earlier inconsistent federal statute."  Restatement § 115, cmt. c.  Malaysia and Air India both contend that the ATAs with the governments of Malaysia and India were entered into pursuant to the Convention on International Civil Aviation [the "Chicago Convention"], and thus have the force of a treaty in superseding prior inconsistent federal statutes.  In other words, they seek to buttress the force of the ATAs by

suggesting that they were concluded to implement treaty obligations. If that position is correct, it has not been demonstrated to the court's satisfaction. After setting out the objectives of the parties in concluding the agreement, the ATA only mentions that the parties are also parties to the Chicago Convention, not that the agreement was concluded pursuant to that treaty. The ATA itself only mentions that both governments "[b]eing Parties to the Convention on International Civil Aviation, opened for signature at Chicago on December 7, 1944, have agreed as follows . . ." In support, Malaysia also cites *British Caledonian Airways, Ltd v. Bond*. *See* 665 F.2d 1153, 1163-64 (D.C. Cir. 1981). While that case *references* the Chicago Convention, it does so under quite different circumstances than are presented here, and cannot fairly be read for the proposition that the ATAs herein were concluded *pursuant to* the Chicago Convention. Nor does it appear that the Chicago Convention directs or authorizes the Executive to conclude Air Transportation Agreements in furtherance of that Convention. *See* 61 Stat. 1180, 15 U.N.T.S. 295. And even if the ATA had the force of a treaty and resulting parity with federal statutes in United States law, that is, if the ATAs were concluded to "implement" the Chicago Convention, it is still doubtful that that would be sufficient to supersede the Sherman Act under these circumstances. "[C]ongressional authorization to make an executive agreement that would supersede federal law is not to be inferred lightly." Restatement § 115, cmt. c. The plaintiffs rightly point out that inferring such an intent on the basis of a 65-year-old treaty that is silent on pricing and antitrust issues is far too tenuous and speculative to supersede the Sherman Act.

Construing the Sherman Act and the ATA consistently with each other begins with an examination of the ATA and its other provisions, which cast much doubt on the defendants' argument. The ATA states in its preamble that the two governments "desir[e] to promote an

international aviation system based on competition among airlines in the marketplace with minimum government interference and regulation." *Id.* The ATA then states that the governments desire to allow the "shipping public a variety of service options at the lowest prices that are not discriminatory and do not represent abuse of a dominant position" and that they "encourage individual airlines to develop and implement innovative and competitive prices." *Id.* Article 12 of the agreement speaks to pricing, but is preceded by Article 11, which governs fair competition, and states that "[e]ach Party shall allow a fair and equal opportunity for the designated airlines of both Parties to compete in providing the international air transportation governed by this Agreement." Given the ATA's strong endorsement of competitive principles and its stated goal of promoting competition, it takes a somewhat skewed interpretation of the overall agreement to suggest that it bars a private party from initiating suit in this court on the basis of price-fixing allegations. Interpreting or applying the ATA in a way that will hinder, instead of help, competition between air cargo carriers thus seems inconsistent with the stated goals of the parties as they signed the agreement. The entire purpose of colluding on joint imposition of inflated surcharges is to circumvent the competitive marketplace. Thus, even if the literal terms of the agreement apply, the purpose of the ATA and its role in helping to foster competition makes the court skeptical that it should be applied to restrict the ability of a private entity to bring antitrust claims against another in one party's court system. Like statutes, international agreements are not always models of clarity in drafting. It seems inconceivable, however, that the ATA would target or proscribe monopolistic pricing practices, but would leave collusive price-fixing activities between competitors unchecked and unactionable in the federal courts.

The defendants cite two cases that are easily distinguishable. The first, *Virgin Atl. Airways Ltd. v. British Airways PLC*, dealt with, among many other allegedly anti-competitive activities, "code-sharing" between cooperating British and American airlines, a practice "whereby one airline's flight is listed in published schedules as a flight of the other airline." *See* 872 F. Supp. 52, 58 (S.D.N.Y. 1994). The court was unclear whether the plaintiff was even attempting to pursue that specific "code-sharing" claim, but dismissed it any event. *Id.* at 62. Dismissal was warranted because code-sharing was specifically authorized by the air transport agreement between the United States and Great Britain. *Id.* Thus, there was an "express conflict" or "positive repugnancy" between the ATA there – which authorized the conduct at issue – and the antitrust laws, and that conflict prevented the court from "'construing the two so as to give effect to both.'" *Id* (citing *Blanco*, 775 F.2d at 61-62). Moreover, the plaintiff itself was also attempting to engage in the same challenged conduct. *See id.* These considerations are not in play, there is no express conflict between the ATAs here and the Sherman Act, and there is nothing in the *Virgin Atlantic* case that speaks to the wisdom of the defendants' position here.

Likewise, *Air Transport Ass'n of America v. City of Los Angeles* is, at most, of only limited value to the defendants. *See* 844 F. Supp. 550 (C.D. Cal. 1994). There, air carriers and their trade association sought to challenge proposed increases in landing fees at Los Angeles International Airport. *Id.* at 552. The plaintiffs contended that the proposed new fees were not "just and reasonable," in violation of the Chicago Convention and Bilateral Air Service Agreements. *Id.* at 556-57. Thus, the court was determining only whether the Chicago Convention and Bilateral Air Service Agreements at issue conferred on air carriers a private cause of action to litigate the challenged conduct in the courts. *See id.* at 557-58. The court held that "nothing in these Bilateral

Agreements indicates that the contracting parties may resort to their respective judicial systems for relief or that individual airlines are granted a private right of action to enforce supposed treaty rights." But again, the plaintiffs there sought to bring that cause of action directly under the Chicago Convention and the Bilateral Agreements, and not, as is the case here, under the Sherman Act. *Id.* at 557-58. Here, it is the defendants themselves who invoke the protections supposedly offered by the ATAs. It would be one thing if the freight forwarders were attempting to use the provisions of the ATA as the basis for a cause of action against the airlines for having violated those agreements. *See Air Transport*, 844 F. Supp. at 557-58. Such a strategy would be dubious. This case, however, is grounded in a violation of the Sherman Act. And just as the ATA was not be used as a sword in *Air Transport*, neither should it be used a shield to immunize conduct that is not explicitly addressed by the agreement, and is only swept into an expansive interpretation of that ambiguous text.[20]

Two additional considerations counsel against the defendants' position. First, the plaintiffs note that airlines based in countries whose governments have concluded similar agreements with the United States have pleaded guilty in United States courts to criminal conduct arising from this price-fixing conspiracy. Certainly, criminal cases initiated by the United States government come closer to running afoul of the consultation and intervention processes for price-related disputes outlined in Article 12 of the ATA than do these civil suits brought by private parties. Nevertheless,

---

[20] The plaintiffs rely on two cases, neither of which is especially useful in resolving this issue. In *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 932 (D.C. Cir. 1984), foreign airlines "ha[d] no claim to antitrust immunity under their air service treaties," but those defendants did not even argue that they were accorded such immunity. In *Airline Pilots Association, International, AFL-CIO v. Taca International Airlines, S.A.*, 748 F.2d 965, 968-69 (5th Cir. 1984), the court was "not persuaded that the parties to the Air Transportation Agreement intended that a dispute between private parties . . . was to be arbitrable under the agreement's provisions" or that they intended the ATA to supersede the statute at issue. That case, however, involved a different ATA, different provisions, different underlying conduct, and a different statute, the Railway Labor Act.

those proceedings were not barred by the ATAs.  Secondly,  the defendants' arguments are undermined by federal statutory law governing air commerce and foreign air transportation, under which the Secretary of Transportation is authorized to accord antitrust immunity in certain situations.  *See* 49 U.S.C. § 41308.  Under that provision, "[w]hen the Secretary of Transportation decides it is required by the public interest, the Secretary . . . may exempt a person affected by the order from the antitrust laws to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order."  *Id.*  Were the ATAs meant to remove price-fixing disputes against foreign airlines from the reach of the federal courts, that statutory exemption would be largely superfluous, except for airlines who might not be covered or designated by an ATA.

In short, following the Circuit's direction, there is no positive repugnancy between the ATA and the Sherman Act such that the two are irreconcilable.  *See Blanco*, 775 F.2d at 61.  Although perhaps not fully consistent, they are not positively repugnant.  It is not difficult to give effect to each.  Nothing in the ATA indicates that it was intended to supersede inconsistent portions of the Sherman Act, that it conferred rights or defenses on private parties, or that it would prevent a private party from initiating a civil action under the antitrust statutes.  It is rather well-settled that the Sherman Act is to be given broad reach.  *See McClain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980) (citing cases).  That reach should not be limited on the basis of questionable, ambiguous provisions that do not naturally lend themselves to such an interpretation.

### E.  Act of State Doctrine

Air India, alone among the defendants, argues that the case against it should be dismissed on account of the Act of State Doctrine.  The Act of State Doctrine is based on prudential considerations, rather than jurisdictional ones, and was developed in the exercise of "judicial self-restraint."  It is grounded in international comity and separation of powers,[21] and holds that United States courts "will generally refrain from examining the validity of a taking by a foreign state of property within its own territory, or from sitting in judgment of other acts of a governmental character done by a foreign state in its own territory and applicable there."  Restatement, § 443; *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964).  It is "designed primarily to avoid judicial inquiry into the acts and conduct of officials of the foreign state, its affairs and its policies, and the underlying reasons and motivations for the actions of the foreign government." *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 452 (2d Cir. 1987); *see also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 n.7 (1976) ("[C]ourts of one country will not sit in judgment on the acts of the government of another done within its own territory."); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (introducing the doctrine into modern American jurisprudence).

The seminal modern case on the act of state doctrine is *Banco Nacional de Cuba v. Sabbatino*, which involved the Cuban government's nationalization of foreign-owned property in

---

[21] Under the Constitution, the adoption of foreign policy is more the province of the Executive and Congress.  *See, e.g.*, *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918).  The primacy of the other branches of government in this domain cautions against excessive judicial action that will upset the constitutional structures governing foreign relations.  *See, e.g.*, *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1987) (citing authorities).  In *National Coalition Government of the Union of Burma v. Unocal, Inc.*, the court explained how the justification for the doctrine has shifted over time from international comity towards separation of powers.  *See* 176 F.R.D. 329, 349 (C.D. Cal. 1997); *see also W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 404-05 (1990) .

Cuba, the classic act of state as the term is used. 376 U.S. at 401-06. Cuba sold the property to the defendant, who in turn paid the company with whom it had originally contracted, and whose property had been expropriated. *See id.* The bank, as the Cuban government's shipping agent, brought suit against the purchaser after the property had been transported to the United States. *See id.* The Court, however, refused to pass judgment on the taking by the Cuban government, even if it violated international law. *See id.* at 428-37. As the expropriation was an official act of state on the part of the Cuban government, the doctrine prevented the Court from "inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Id.* at 401. As shaped by *Sabbatino*, the doctrine is chiefly meant to apply to sovereign conduct of a governmental character, including "constitutional amendments, statutes, decrees and proclamations, and in certain circumstances to physical acts, such as occupation of an estate by the state's armed forces in application of state policy." Restatement § 443, *cmt i.* The main purpose underpinning the doctrine is to avoid "embarrass[ing] the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill*, 425 U.S. at 697 (citing *Sabbatino*, 376 U.S. at 427-28); *see also Unocal*, 176 F.R.D. at 349-50 ("[T]he act of state doctrine embodies the purely prudential concern that judicial inquiry into the validity of a foreign nation's sovereign acts may interfere with Executive and Congressional foreign policy efforts.") (citing cases). In assessing whether the doctrine ought to apply, the Court has endorsed "a sort of balancing approach" to determine whether the policies underlying the doctrine justify its application in a particular case. *See Kirkpatrick*, 493 U.S. at 409 (1990). As part of this balancing approach, courts are expected to look at three factors culled from *Sabbatino*: (1) the degree of international consensus regarding the challenged act; (2) how sharply the court's ruling would tread on national nerves, that is, its potential impact on foreign

relations; and (3) whether the government that performed the challenged act still exists. *See Sabbatino*, 376 U.S. at 428. The party arguing that the court should apply the act of state doctrine bears the burden of proof, which in this case is the defendant. *See Alfred Dunhill*, 425 U.S. at 692-94. Some courts have also required evidence that the government was acting in its sovereign capacity, and evidence of the "depth and nature of the government's interest." *Liu*, 892 F.2d at 1432.

In 1976, the Court had an opportunity to further refine the contours of the act of state doctrine, this time where the foreign sovereign engaged in an act of a commercial, rather than a governmental nature. *See Alfred Dunhill*, 425 U.S. at 691-706. The case once again involved the Cuban revolutionary government's expropriation of privately owned property. *Id.* at 685-90. The facts are somewhat intricate and involved payments to the wrong party, but briefly, the act of state in question was Cuba's repudiation of a commercial debt owed to the importers of Cuban cigars. *Id.* The Court ultimately declined to extend the doctrine to the Cuba's commercial activities in question because the supposed act of state was not sufficiently invested with sovereign authority, in that "[n]o statute, decree, order, or resolution of the Cuban Government itself" showed that Cuba intended to repudiate the debt or confiscate the amounts owed to the importers. *See id.* at 694-95; *see also In re Refined Petroleum Products Antitrust Litigation*, 649 F. Supp. 2d 572, 595 (S.D. Tex. 2009) (providing background and analysis of the decision). Accordingly, it did not constitute an act of state, as the record did not reflect that the officials took the action with governmental, as opposed to commercial, authority. *Alfred Dunhill*, 425 U.S. at 694-95.

The plurality went further by proposing a "commercial activity exception" that would not "extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely

commercial operations." *Id.* at 706. The Justices felt "in no sense compelled to recognize as an act of state the purely commercial conduct of foreign governments in order to avoid embarrassing conflicts with the Executive Branch." *Id.* at 697-98. The plurality distinguished between "public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other," noting that such a distinction was not novel. *Id.* at 795-96 (citing authorities); *see also New York v. United States*, 326 U.S. 572, 579 (1946); *Ohio v. Helvering*, 292 U.S. 360, 369 (1934); *Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. 904, 907 (1824) ("[W]hen a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen."). It was "beyond cavil that . . . the commercial obligations of a foreign government may be adjudicated in those courts otherwise having jurisdiction to enter such judgments." *Alfred Dunhill*, 425 U.S. at 705. The plurality looked to the distinction between governmental and commercial acts found in the United States' "restrictive" approach to foreign sovereign immunity, where sovereign immunity in U.S. courts is "granted only with respect to causes of action arising out of a foreign state's public or governmental actions and not with respect to those arising out of its commercial or proprietary actions."[22] *Id.* at 698.

---

[22] The act of state doctrine should not be confused with the concept of sovereign immunity, which bestows on foreign states immunity from the jurisdiction of United States courts unless certain statutory exceptions apply. *See* 28 U.S.C. § 1604 *et seq.* There are, however, some considerations common to both, inasmuch as the act of state doctrine arose from matters of international comity and foreign sovereignty. *See Alfred Dunhill*, 425 U.S. at 695-706; *cf. International Association of Machinists v. The Organization of Petroleum Exporting Countries*, 649 F.2d 1354, 1360 (9th Cir. 1981) ("[T]he act of state doctrine and the doctrine of sovereign immunity address different concerns and apply in different circumstances."). Since 1952, the United States has taken a "restrictive" approach to sovereign immunity, such that a "commercial exception" exists whereby "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden, B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487 (1983); *see also* 28 U.S.C. § 1604 *et seq.*; *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611-14 (1992) *Verlinden*, 461 U.S. at 486-90;

> [S]ubjecting foreign governments to the rule of law in their commercial dealings presents a much smaller risk of affronting their sovereignty than would an attempt to pass on the legality of their governmental acts. In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private citizens. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on "national nerves."

*Alfred Dunhill*, 425 U.S. at 703-04. Adjudicating the commercial liabilities of a foreign state would do little to impede foreign relations - since a sovereign will not enjoy immunity for those activities in any event. *See id.* at 698-01. The plurality was swayed by the policy of assuring those who deal commercially with a foreign sovereign (in an era in which sovereigns have become increasingly involved as major participants in international trade) that their rights will not go unprotected in U.S. courts, which helps stabilize and promote healthy international commerce.[23] *See id.* at 705-06.

_____

*De Letelier v. Republic of Chile*, 748 F.2d 790, 795-97 (2d Cir. 1984).

This principle was codified in the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), which does not grant immunity for an action "based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of a foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2). Elsewhere, the FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The concept of a commercial activity exception is not similarly enshrined in the act of state doctrine. Perhaps the most helpful way to distinguish between the two is that sovereign immunity is a *jurisdictional* concept, determinative of whether the court has the power to adjudicate the case or the issues involved. *See OPEC*, 649 F.2d at 1359. The act of state doctrine, as a prudential concept, determines whether a court *should* exercise jurisdiction once it has been established. Thus, merely because a court may not be barred from hearing a particular case does not establish that the court ought to, in every case, adjudicate the issues presented to it.

[23] The Second Circuit has neither explicitly adopted nor explicitly rejected the *Dunhill* plurality's proposed commercial activity exception, nor has it drawn as sharp a distinction between a sovereign's public, governmental acts on the one hand, and its private, commercial acts on the other. *See, e.g.*, *Republic of Philippines v. Marcos*, 806 F.2d 344, 358-59 (2d Cir. 1986); *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985) (leaving "for another day" whether to adopt *Dunhill*'s commercial activity exception).

Although the precedential value of the *Dunhill* plurality opinion is not clear – *see Petroleum Products*, 649 F. Supp. 2d at 595-96; *Unocal*, 176 F.R.D. at 349-50 – consideration of the few cases in which commercial or quasi-commercial activity was subject to the act of state doctrine shows that *Dunhill*'s reasoning is instructive, especially given the facts presented here. There is, at most, limited authority for applying it to commercial or quasi-commercial activity. The Ninth Circuit found that the doctrine barred inquiry into price-fixing activities by the Organization of Petroleum Exporting Countries ("OPEC"), but that decision was specific to the nature of the petroleum industry, and relied on the notion that cartels in that industry are tolerated at the international level, or at least are not condemned by international consensus. *See Int'l Ass'n of Machinists and Aerospace Workers v. Org. of Petroleum Exporting Countries*, 649 F.2d 1354, 1358-61 (9th Cir. 1981). The court stated rather strongly that the commercial activity exception to foreign sovereign immunity has not "diluted" the strength of the act of state doctrine. *Id.* at 1360. It admitted, however, that while purely commercial activity by a sovereign entity "may not rise to the level of an act of state," some commercial activity will do so – particularly when the activity in question has a "significant sovereign component" and when the sovereign acts in the public interest. *Id.* Several courts have recognized – even if they have not adopted the *Dunhill* plurality's commercial exception – that exploitation of natural resources is a quintessentially sovereign activity, as opposed to colluding with other airlines to artificially raise the cost of air cargo services. *See, e.g.*, *OPEC*, 649 F.2d at 1361 ("The United States and other nations have supported the principle of supreme state sovereignty over natural resources."); *Petroleum Products*, 649 F. Supp. 2d at 596 (finding that decision of sovereign states to limit production of crude oil to certain levels is "inherently sovereign" rather than purely commercial activity). Additionally in *OPEC*, the other branches of

government were intimately bound up with the foreign policy implications of OPEC's activities and oil production and distribution more generally, such that passing judgment on the legality of OPEC's activities would have been to tread unwisely on ground better maintained by others, leading to the risk of strongly disrupting foreign policy. *See id.* at 1360-61. That the exploitation of oil is a sensitive issue, likely to touch sharply on national nerves, goes without saying, and explains why the court was reluctant to condemn production activities by international cartels, which the "community of nations has thus far been unwilling to denounce." *Id.* at 1361.

Another instance where commercial or quasi-commercial activity was subject to the act of state doctrine was presented in *O.N.E. Shipping*. 830 F.2d at 450. There, the plaintiff alleged a conspiracy between Colombia's state-owned shipping line and two private companies to violate the Sherman Act on account of Colombia's "cargo reservation laws," which required that 50% of licensed bulk cargo imported into Colombia be transported on vessels owned or chartered by Colombia or Colombian companies. *See* 830 F.2d at 450. The court, however, declined to exercise jurisdiction because to do so required inquiry into Colombian cargo reservation laws that were designed to protect Columbian commercial interests and which compelled the conduct in question. *See* 830 F.2d at 452-54; *see also McEderry v. Cathay Pacific Airways, Ltd.*, 678 F. Supp. 1071, 1079 (S.D.N.Y. 1988) (granting dismissal on act of state grounds because conduct at issue was "necessitated" by the United Kingdom's regulatory system). In such circumstances, the court expressed concern that the pursuit of a private antitrust action in an American court would be an "unnecessary irritant" to foreign relations, and would require the court to examine and pass judgment on the "acts and motivations of a foreign sovereign." *Id.* at 453-54.

The hallmark of all the cases applying the act of state doctrine is that the sovereign action was either an official or public act by the government, or involved commercial activity that had some significant sovereign component. *Cf. Kirkpatrick*, 493 U.S. at 405 ("In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.").[24] The only reason to consider the collusion alleged herein to be an "official" or "public" act is that the actor was a sovereign instrumentality. The identity of the actor alone, however, is not determinative of whether the act was official or public. If Air India's actions constitute governmental *acts* in the strict sense, inasmuch as it is an instrumentality of the Indian government, they are not of a governmental *character*. *See* Restatement § 443. Any act of a state-owned company, no matter how trifling or mundane, could be said to be a government act, but it would not necessarily be of a governmental character, and would be questionable as a basis for invoking the act of state doctrine. The activity here could just as easily have been – and allegedly *was* – perpetrated by private, commercial entities. The difference between this case and the cases where the act of state doctrine has been applied is that only the government could have legitimately taken the actions in those cases. *See* Discussion, *supra*.

This court has found no case applying the act of state doctrine to purely commercial conduct on the part of a foreign sovereign. Thus, to speak of a "commercial exception" is somewhat misleading, because it appears doubtful that purely commercial behavior was ever covered by it in the first place. There may be some instances in which a commercial act should be subject to the act

---

[24] The quotation from *Kirkpatrick* is accurate, as far as the court is aware, because it was referring to Supreme Court cases on the act of state doctrine, rather than lower court cases that have applied it to a sovereign's commercial activities. The court is unaware of a Supreme Court decision that barred inquiry into purely commercial activity because of the act of state doctrine.

of state doctrine, but this is not one of them.  *Cf. Petroleum Products*, 649 F. Supp. 2d at 594-96.

Moreover, to speak categorically of a commercial activity *exception* is not truly in keeping with the

Court's pronouncement in *Sabbatino* that it wished to avoid "laying down or reaffirming an

inflexible or all-encompassing rule[.]"  376 U.S. at 428.  Arguably, if courts should not categorically

exempt commercial activity from the act of state doctrine, they should hesitate strongly before

applying it to purely commercial activity on part of a foreign sovereign or its instrumentality that

is calculated to have extraterritorial effect.  Air India does not appear to take issue with the

plaintiffs' assertion that price-fixing of the nature alleged in the complaint is illegal under Indian

law, or that there exists an international consensus against price-fixing and similar anti-competitive

conduct.[25]  *See* Zweig Decl., Exhibits 27-28; Note*, The Applicability of the Antitrust Laws to

International Cartels Involving Foreign Governments*, 91 YALE L. J. 765,783 n.75 (1982) ("[I]n

view of the price-fixing prohibition unanimously adopted by the United Nations General Assembly,

the United States antitrust laws' aversion to price collusion now enjoys a significant measure of

international consensus.").

Collusive price-fixing by a state-owned airline – in violation of the law of that state – is not

the kind of conduct that should receive the protection of the act of state doctrine.  Allowing this case

to go forward in no way calls into question laws or acts of the Indian government – especially since

the conduct complained of, a conspiracy to fix prices, is also proscribed under Indian law.  Unlike

---

[25] *But see Kruman v. Christie's Intern. PLC*, 129 F. Supp. 2d 620, 627 (S.D.N.Y. 2001), *affirmed in part and vacated in part by* 284 F.3d 384 (2d Cir. 2002) (finding "no substantial support for the proposition that there is an international consensus proscribing price fixing that fairly might be characterized as customary international law, much less an international consensus that price fixing gives rise to tort claims on behalf of victims.").  There, however, Judge Kaplan was analyzing whether price-fixing claims could be brought under the Alien Tort Claims Act, that is, whether that conduct violates the law of nations or customary international law.  *See id.*; *see also* 28 U.S.C. § 1350.

*O.N.E. Shipping*, the price-fixing activity was not *compelled* or *mandated* by an act of state or by the laws of a foreign sovereign, but is rather forbidden by it. *See In re Potash Antitrust Litigation*, 686 F. Supp. 2d 816, 825 (N.D. Ill. 2010); *Trugman Nash, Inc. v. New Zealand Dairy Board*, 954 F. Supp. 733, 736 (S.D.N.Y. 1997); *Virgin Atl. Airways Ltd. v British Airways PLC*, 872 F. Supp. 52, 59-60 (S.D.N.Y. 1994); *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 (D. Del. 1970). Were Air India engaging in a price-fixing conspiracy or otherwise violating the Sherman Act in order to comply with Indian laws or regulations, then an act of state would be a more viable defense. *See Nocula v. UGS Corp.*, 520 F.3d 719, 727-28 (7th Cir. 2008) (cautioning American courts against questioning the "act of a foreign sovereign that is lawful under the sovereign's laws"). That, however, is not remotely close to what is alleged here, and adjudicating these claims is at most a *de minimis* encroachment on Indian sovereignty, unlikely to ruffle any feathers in the Indian government. While the complaint does allege activity on the part of Air India in Indian territory, it calls that activity into question only in so far as air cargo routes into and out of the United States are concerned. Clearly, it is not limited to Indian territory, but was designed to produce effects within the United States and elsewhere by essentially targeting international commerce. Therefore, there is little reason to expect that this case will upset or adversely impact relations between India and the United States, and relatedly, there is little risk of trodding improperly on the turf of the Executive or Congress in the management of foreign relations. *See Sabbatino*, 425 U.S. at 428 ("[T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."). Without some risk of embarrassing or otherwise hindering the Executive or Congress in the conduct of foreign relations with India or other states, the concerns animating the act of state doctrine are, for the most part, not

implicated here. Barring inquiry into the legality of Air India's conduct would do little to further the purposes served by the act of state doctrine. It would, however, serve to undermine stability in international commerce, as private entities who have allegedly been harmed would be deprived of a forum within which to redress their grievances. *See Alfred Dunhill*, 425 U.S. at 703-04. That consideration alone would not be sufficient in every case to justify the harm done to foreign relations by passing judgment on an official act of a foreign sovereign, but nothing suggests that allowing the claims to proceed would be any irritant at all to United States-Indian relations. For these reasons, Air India has not carried its burden of establishing that the allegations in question constitute an act of state for the purposes of this discussion.

### F. Service of Process

Lastly, Malaysia Airways contends that the failure to properly serve it with process warrants dismissal of the complaint. This argument has little merit and should be rejected. According to a declaration by the process server, he arrived at the office of Malaysia Airlines in or near Los Angeles on February 16, 2010 and informed the receptionist that he was there to serve legal documents on the airline, and that they were to be given to a person authorized to accept service. *See* Zweig Decl., Exhibit 28 (Declaration of Derek Lee, dated June 3, 2010). The receptionist called someone to receive the documents, and shortly thereafter, Ms. Anjana Gorakshakar appeared, took the documents, and walked away. *Id.* In fact, Ms. Gorakshaskar is the Head of Human Resources and Administration for Malaysia Airways at its Los Angeles office, and performs limited administrative and human resource functions. *See* Declaration of Anjana Gorakshakar, dated May 11, 2010 (Docket No. 1161). According to her declaration, she is not an officer, director, managing

or general agent of Malaysia Airways, is not authorized to accept service of process on its behalf, and was not specifically informed as to the nature of the documents she accepted. *Id.*

Under Rule 4 of the Federal Rules of Civil Procedure, service of process on a corporation may be effected by following state law for service of process in the state where service is made or where the district court is located, or by "delivering a copy of the summons and complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process[.]" Thus, service on Malaysia Airlines must be valid under either California law (where service was attempted) or New York law (where the district court is located), or must have been received by an officer or appropriate agent as called for in Rule 4(h)(1)(B). Under California law, service of process on a corporation is valid if copies of the summons and complaint are delivered to the "president, chief executive officer, or other head of the corporation, a vice president, a secretary or assistant secretary, a treasurer or assistant treasurer, a controller or chief financial officer, a general manager, or a person authorized by the corporation to receive service of process." Cal. C. Civ. Pro. § 416.10. New York law similarly allows for delivery of the summons to "an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." N.Y. C.P.L.R. § 311(a)(1).

The court need not dwell long on whether Gorakshakar, as head of human resources, is an officer of sufficient standing to comply with California or New York law. In California, a managing agent or general manager for the purposes of this discussion is an agent of the corporation of sufficient character to make it "reasonably certain" that the corporation is apprised of service of process. *See Khachatryan v. Toyota Motor Sales, USA, Inc.*, 578 F. Supp. 2d 1224 (C.D. Cal. 2008); *Gray v. Mazda Motor of America*, 560 F. Supp. 2d 928, 930 (C.D. Cal. 2008); *Eclipse Fuel*

*Engineering Co. v. Superior Court*, 307 P.2d 739, 745 (Cal. App. 1957); *Roehl v. Texas Co.*, 291

P. 255, 258 (Cal. App. 1930).  Furthermore, California courts advise that the statute is to be liberally

and broadly construed, emphasizing the importance of whether the defendant received actual notice.

*See Pasadena Medi-Center Associates v. Superior Court*, 511 P.2d 1180, 1184 (Cal. 1973); *Cosper

v. Smith & Wesson Arms Co.*, 346 P.2d 409, 414 (Cal. 1959).  New York is similarly accepting of

a broad approach to the persons who may be served, and also emphasizes whether the attempted

service provided or was calculated to provide fair notice to the defendant.  *See Melkaz Int'l Inc. v.

Flavor Innovation Inc.*, 167 F.R.D. 634, 641-42 (E.D.N.Y. 1996); *Fashion Page, Ltd. v. Zurich Ins.

Co.*, 406 N.E.2d 747 (N.Y. 1980).

The authorities cited by the parties on this issue are not entirely on point.  *See Osrecovery,

Inc. v. One Group Intern., Inc.*, No. 02-CV-8993, 2005 WL 1958359, at *1 (S.D.N.Y. Aug. 15,

2005); *NGV Gaming, Ltd. v. Upstream Point Molate, LLC,* No. C-04-3955, 2009 WL 4258850, at

*2-3 (N.D. Cal. Nov. 24, 2009); *Bender v. Nat'l Semiconductor Corp.*, No. 09-CV-1151, 2009 WL

2912522, at *2-3 (N.D. Cal. Sept. 2, 2009).  But there can be no doubt whatsoever that Malaysia

received actual notice of this suit.  "'[W]hen a defendant receives actual notice of a lawsuit brought

against him, technical imperfections with service will rarely invalidate the service.'" *Dallas v.

Roosevelt Union Free School Dist.*, 644 F. Supp. 2d 287, 292 (E.D.N.Y. 2009) (quoting *Maruzen

Intern., Co. Ltd. v. Bridgeport Merchandise, Inc.*, 770 F. Supp. 155 (S.D.N.Y. 1991)).  And in this

Circuit, Rule 4 is "construed liberally to further the purposes of finding personal jurisdiction in cases

in which the party has received actual notice." *Romandette v. Weetabix Co., Inc.*, 807 F. 2d 309, 311

(2d Cir. 1986) (quoting *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972)).  Such an

approach satisfies the due process considerations underpinning Rule 4.  *See Maruzen*, 770 F. Supp. at 159.

Moreover, accepting Malaysia's argument would mean that a company could successfully avoid service of process and any resulting liability simply by having anyone accept the summons and complaint, even though he or she is *not* authorized to accept service on the company's behalf. Service of process is a more fluid concept than that, and should not open itself to such mischief. Dismissing the whole complaint on the basis of a minor technicality (if that) with respect to service of process – when the defendant was clearly accorded notice of the action – seems highly improvident.  *See Maruzen*, 770 F. Supp. at 159 (citing authorities).  The process server went to Malaysia's corporate office, informed the receptionist that he was there to serve legal documents, and delivered them personally to Gorakshakar, who accepted them and only appeared after the process server announced the purpose of his visit.  Obviously, the summons and complaint were passed along to the appropriate corporate figures such that Malaysia was apprised of the lawsuit. In such circumstances, that should be sufficient.  The process server should not be expected to verify the position and status of the person who appears, after having announced his intention and waited for someone to accept service.  Accepting Malaysia's argument would entail an improper elevation of form over substance, and the court recommends rejecting the argument on deficiencies in service of process.

III.     CONCLUSION

In accordance with the above considerations, the undersigned hereby **RECOMMENDS** that all motions to dismiss be DENIED.

      \*        \*        \*        \*        \*        \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
       September 22, 2010