# EXHIBIT E

**EN**

**EN** **EN**

 COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 2.4.2008
COM(2008) 165 final

**WHITE PAPER on**

**Damages actions for breach of the EC antitrust rules**

{SEC(2008) 404}
{SEC(2008) 405}
{SEC(2008) 406}

EN  EN

# WHITE PAPER on

# Damages actions for breach of the EC antitrust rules

1. **PURPOSE AND SCOPE OF THE WHITE PAPER**

   1.1. **Why a White Paper on damages actions for breaches of the EC antitrust rules?**

Any citizen or business who suffers harm as a result of a breach of EC antitrust rules (Articles 81 and 82 of the EC Treaty) must be able to claim reparation from the party who caused the damage. This **right of victims to compensation** is guaranteed by **Community law**, as the European Court of Justice recalled in 2001 and 2006.[1]

Despite the requirement to establish an effective legal framework turning exercising the right to damages into a realistic possibility, and although there have recently been some signs of improvement in certain Member States, **to date in practice victims of EC antitrust infringements only rarely obtain reparation** of the harm suffered. The amount of compensation that these victims are forgoing is in the range of several billion euros a year.[2]

In its 2005 Green Paper, the Commission concluded that this failure is largely due to **various legal and procedural hurdles** in the Member States' rules governing actions for antitrust damages before national courts. Indeed, such antitrust damages cases display a number of particular characteristics that are often insufficiently addressed by traditional rules on civil liability and procedure. This gives rise to a great deal of **legal uncertainty**.[3] These particularities include the very complex factual and economic analysis required, the frequent inaccessibility and concealment of crucial evidence in the hands of defendants and the often unfavourable risk/reward balance for claimants.

The **current ineffectiveness of antitrust damages actions** is best addressed by a combination of measures at both Community and national levels, in order to achieve effective minimum protection of the victims' right to damages under Articles 81 and 82 in every Member State and a more level playing field and greater legal certainty across the EU.

The European Parliament[4] concurred with the findings in the Green Paper, as did other stakeholders, and called upon the Commission to prepare a White Paper with detailed proposals to address the obstacles to effective antitrust damages actions.

   1.2. **Objectives, guiding principles and scope of the White Paper**

This White Paper considers and puts forward proposals for policy choices and specific measures that would ensure, more than is the case today, that **all victims** of infringements of

---

[1] Case C-453/99, *Courage and Crehan,* [2001] ECR I-6297, and Joined Cases C-295−298/04, *Manfredi,* [2006] ECR I-6619.
[2] See section 2.2 of the Impact Assessment Report (IAR).
[3] See *ibid*., section 2.3.
[4] Resolution of 25 April 2007 (2006/2207(INI)).

EC competition law **have access to effective redress mechanisms so that they can be fully compensated** for the harm they suffered.

This White Paper is to be read in conjunction with two Commission staff working documents: (a) a Commission staff working paper on EC antitrust damages actions ("the SWP") which explains in greater detail the considerations underlying the White Paper and also provides a concise overview of the already existing *acquis communautaire*; and (b) an Impact Assessment Report (the "IAR") analysing the potential benefits and costs of various policy options, and an executive summary of this report.

The **primary objective** of this White Paper is to improve the legal conditions for victims to exercise their right under the Treaty to reparation of all damage suffered as a result of a breach of the EC antitrust rules. **Full compensation** is, therefore, the first and foremost guiding principle.

More effective compensation mechanisms mean that the costs of antitrust infringements would be borne by the infringers, and not by the victims and law-abiding businesses. Effective remedies for private parties also increase the likelihood that a greater number of illegal restrictions of competition will be detected and that the infringers will be held liable.[5] Improving compensatory justice would therefore **inherently** also produce beneficial effects in terms of **deterrence** of future infringements and greater compliance with EC antitrust rules. Safeguarding undistorted competition is an integral part of the internal market and important for implementing the Lisbon strategy. A competition culture contributes to better allocation of resources, greater economic efficiency, increased innovation and lower prices.

The Commission followed the further guiding principle that the legal framework for more effective antitrust damages actions should be based on a genuinely European approach. The policy choices proposed in this White Paper therefore consist of **balanced measures** that are rooted in **European legal culture** and **traditions**.

Another important guiding principle of the Commission's policy is to **preserve strong public enforcement** of Articles 81 and 82 by the Commission and the competition authorities of the Member States. Accordingly, the measures put forward in this White Paper are designed to create an effective system of private enforcement by means of damages actions that complements, but does not replace or jeopardise, public enforcement.

In view of the foregoing and in line with the requirement set out by the Court of Justice that *any* victim of antitrust infringements must be able to exercise his right to compensation effectively, the issues addressed in the White Paper concern, in principle, **all categories of victim**, **all types of breach** of Articles 81 and 82 and **all sectors of the economy**. The Commission also considers it appropriate that the policy should cover both actions for damages which do, and actions which do not, rely on a prior finding of an infringement by a competition authority.

---

[5] See the IAR, section 2.1.

## 2. THE PROPOSED MEASURES AND POLICY CHOICES

### 2.1. Standing: indirect purchasers and collective redress

In the context of legal standing to bring an action, the Commission welcomes the confirmation by the Court of Justice that **"any individual"** who has suffered harm caused by an antitrust infringement must be allowed to claim damages before national courts.[6] This principle also applies to **indirect purchasers**, i.e. purchasers who had no direct dealings with the infringer, but who nonetheless may have suffered considerable harm because an illegal overcharge was passed on to them along the distribution chain.

With respect to **collective redress**, the Commission considers that there is a clear need for mechanisms allowing aggregation of the individual claims of victims of antitrust infringements. Individual consumers, but also small businesses, especially those who have suffered **scattered and relatively low-value damage**, are often deterred from bringing an individual action for damages by the costs, delays, uncertainties, risks and burdens involved. As a result, many of these victims currently **remain uncompensated**. At the rare occasions where a multitude of individual actions are brought in relation to the same infringement, **procedural inefficiencies** arise, for claimants, defendants and the judicial system alike.

The Commission therefore suggests[7] a combination of two complementary mechanisms of collective redress to address effectively those issues in the field of antitrust:

- **representative actions**, which are brought **by qualified entities**, such as consumer associations, state bodies or trade associations, on behalf of identified or, in rather restricted cases, identifiable victims. These entities are either (i) officially designated in advance or (ii) certified on an *ad hoc* basis by a Member State for a particular antitrust infringement to bring an action on behalf of some or all of their members; and

- **opt-in collective actions**, in which victims **expressly decide** to combine their individual claims for harm they suffered into one single action.

Considering that qualified entities will not be able or willing to pursue every claim, it is necessary that these two types of action **complement** each other to ensure effective collective redress for victims of antitrust infringements. In addition, it is important that victims are not deprived of their right to bring an individual action for damages if they so wish. However, safeguards should be put in place to avoid that the same harm is compensated more than once.

These suggestions on damages actions in the field of antitrust are part of the Commission's wider initiative to strengthen collective redress mechanisms in the EU and may develop further within this context.

### 2.2. Access to evidence: disclosure *inter partes*

Competition cases are particularly fact-intensive. Much of the **key evidence** necessary for proving a case for antitrust damages is often **concealed** and, being **held by the defendant** or by third parties, is usually not known in sufficient detail to the claimant.

---

[6] *Manfredi* (see footnote 1), point 61.
[7] For the underlying reasons see Chapter 2 of the SWP.

Whilst it is essential to overcome this structural **information asymmetry** and to improve victims' access to relevant evidence, it is also important to **avoid the negative effects** of **overly broad** and burdensome disclosure obligations, including the **risk of abuses**.

The Commission therefore suggests that across the EU a **minimum level of disclosure *inter partes*** for EC antitrust damages cases should be ensured. Building on the approach in the Intellectual Property Directive (Directive 2004/48/EC), access to evidence should be based on **fact-pleading** and **strict judicial control** of the plausibility of the claim and the proportionality of the disclosure request. The Commission therefore suggests[8] that:

- national courts should, under **specific conditions**, have the power to order parties to proceedings or third parties to **disclose precise categories of relevant evidence**;

- **conditions** for a disclosure order **should include** that the claimant has:

    – **presented all the facts** and **means of evidence** that are **reasonably available** to him, provided that these show **plausible grounds** to suspect that he suffered harm as a result of an infringement of competition rules by the defendant;

    – shown to the satisfaction of the court that he is **unable**, applying all efforts that can reasonably be expected, **otherwise to produce the requested evidence**;

    – specified sufficiently **precise categories** of evidence to be disclosed; and

    – satisfied the court that the envisaged disclosure measure is both **relevant** to the case and **necessary** and **proportionate**;

- adequate protection should be given to corporate statements by leniency applicants and to the investigations of competition authorities;

- to prevent **destruction of relevant evidence** or **refusal** to comply with a disclosure order, courts should have the power to impose sufficiently **deterrent sanctions**, including the option to draw adverse inferences in the civil proceedings for damages.

### 2.3. Binding effect of NCA decisions

Whenever the **European Commission** finds a breach of Article 81 or 82 of the EC Treaty, victims of the infringement can, by virtue of established case law and Article 16(1) of Regulation 1/2003, rely on this decision as binding proof in civil proceedings for damages. For **decisions** by national competition authorities (**NCAs**) finding a breach of Article 81 or 82, similar rules currently exist in only some Member States.

The Commission sees no reason why a final decision[9] on Article 81 or 82 taken by an NCA in the European Competition Network (ECN), and a final judgment by a review court upholding

---

[8] For the underlying reasons see Chapter 3 of the SWP.
[9] In all Member States, NCA decisions are subject to judicial review. NCA decisions are considered *final* when they can no longer be reviewed, i.e. decisions that were not appealed within the applicable time limits and thus accepted by their addressees, and those that were confirmed by the competent review courts.

the NCA decision or itself finding an infringement, should not be accepted in every Member State as irrebuttable proof of the infringement in subsequent civil antitrust damages cases.

A rule to this effect would ensure a more **consistent application** of Articles 81 and 82 by different national bodies and increase **legal certainty**. It would also significantly increase the **effectiveness** and **procedural efficiency** of actions for antitrust damages: if defendants can call into question their own breach of Article 81 or 82 established in a decision by an NCA and, possibly, confirmed by a review court, the courts seized with an action for damages are required to re-examine the facts and legal issues already investigated and assessed by a specialised public authority (and a review court). Such duplication of factual and legal analysis leads to considerable extra costs, duration and imponderability for the victim's action for damages.

The Commission therefore suggests[10] the following rule:

- national courts that have to rule in actions for damages on practices under Article 81 or 82 on which **an NCA** in the ECN has already given a **final decision** finding an infringement of those articles, or on which **a review court** has given a **final judgment** upholding the NCA decision or itself finding an infringement, **cannot take decisions running counter** to any such decision or ruling.

This obligation should apply without prejudice to the right, and possible obligation, of national courts to seek clarification on the interpretation of Article 81 or 82 under Article 234 of the EC Treaty.

The rule set out above confers binding effect only on decisions that are final, i.e. where the defendant has **exhausted all appeal avenues**, and relates only to the **same practices and same undertaking(s)** for which the NCA or the review court found an infringement.

### 2.4. Fault requirement

If the breach of Article 81 or 82 **has been proven**, Member States take diverse approaches concerning the requirement of **fault** to obtain damages.

Some Member States require no fault at all as a condition for an antitrust damages claim, or irrebuttably presume the existence of fault once an infringement has been proven. The Commission sees no policy grounds against such an approach.

As regards the other Member States, the Court's case law on the conditions of civil liability for breaches of directly applicable Treaty rules, such as Articles 81 and 82, and the principle of effectiveness suggest that any fault requirements under national law would have to be limited. The Commission sees no reasons to relieve infringers from liability on grounds of absence of fault other than in cases where the infringer made an excusable error.

The Commission therefore suggests[11] a measure to make it clear, for Member States that require fault to be proven, that:

---

[10] For the underlying reasons see Chapter 4 of the SWP.
[11] For the underlying reasons see Chapter 5 of the SWP.

- once the victim has **shown a breach of Article 81 or 82**, the **infringer should be liable for damages caused unless he demonstrates** that the infringement was the result of a genuinely **excusable error**;

- an error would be **excusable** if a reasonable person applying a high standard of care could not have been aware that the conduct restricted competition.

### 2.5. Damages

The Commission welcomes the confirmation by the Court of Justice of the **types of harm** for which victims of antitrust infringements should be able to obtain compensation.[12] The Court emphasised that victims must, as a minimum, receive **full compensation** of the **real value of the loss suffered**. The entitlement to full compensation therefore extends not only to the **actual loss** due to an anti-competitive price increase, but also to the **loss of profit** as a result of any reduction in sales and encompasses a **right to interest**.

For reasons of legal certainty and to raise awareness amongst potential infringers and victims, the Commission suggests **codifying** in a Community legislative instrument the **current** *acquis communautaire* on the scope of damages that victims of antitrust infringements can recover.

Once the scope of damages is clear, the *quantum* of these damages must be **calculated**. This calculation, implying a comparison with the economic situation of the victim in the **hypothetical scenario** of a competitive market, is often a very cumbersome exercise. It can become **excessively difficult** or even practically impossible, if the idea that the exact amount of the harm suffered must always be precisely calculated is strictly applied. Moreover, far-reaching calculation requirements can be disproportionate to the amount of damage suffered.

To **facilitate** the **calculation of damages**, the Commission therefore intends:[13]

- to draw up a framework with pragmatic, non-binding guidance for **quantification** of damages in antitrust cases, e.g. by means of **approximate methods of calculation** or **simplified rules on estimating** the loss.

### 2.6. Passing-on overcharges

If the direct customer of the infringer fully or partially passed on the illegal overcharge to his own customers (the indirect purchasers), several legal issues can arise. At present, these create a great degree of legal uncertainty and difficulties in antitrust damages actions.

Problems arise, on the one hand, if the **infringer** invokes the passing-on of overcharges **as a defence** against a damages claimant, arguing that the claimant suffered no loss because he passed on the price increase to his customers.

The Commission recalls the Court's emphasis on the **compensatory principle** and its premise that **damages** should be **available to any injured person** who can show a sufficient causal link with the infringement. Against this background, infringers should be allowed to invoke the possibility that the overcharge might have been passed on. Indeed, to deny this defence

---

[12] *Manfredi* (see footnote 1), points 95 and 97.
[13] For the underlying reasons see Chapter 6 of the SWP.

could result in **unjust enrichment** of purchasers who passed on the overcharge and in undue **multiple compensation** for the illegal overcharge by the defendant. The Commission therefore suggests[14] that:

- **defendants** should be **entitled to invoke the passing-on defence** against a claim for compensation of the overcharge. The standard of proof for this defence should be not lower than the standard imposed on the claimant to prove the damage.

Difficulties also arise, on the other hand, if an **indirect purchaser** invokes the passing-on of overcharges as a basis **to show the harm suffered**. Purchasers at, or near the end of the distribution chain are often those most harmed by antitrust infringements, but given their **distance from the infringement** they find it particularly difficult to produce sufficient proof of the existence and extent of passing-on of the illegal overcharge along the distribution chain. If such claimants are unable to produce this proof, they will **not be compensated** and the infringer, who may have successfully used the passing-on defence against another claimant upstream, would retain an **unjust enrichment**.

To avoid such scenario, the Commission therefore proposes to lighten the victim's burden and suggests[15] that:

- indirect purchasers should be able to rely on the rebuttable presumption that the illegal overcharge was passed on to them in its entirety.

In the case of joint, parallel or consecutive actions brought by purchasers at different points in the distribution chain, national courts are encouraged to make full use of all mechanisms at their disposal under national, Community and international law in order to avoid under- and over-compensation of the harm caused by an infringement of competition law.

## 2.7. Limitation periods

While limitation periods play an important role in providing **legal certainty**, they can also be a considerable **obstacle** to recovery of damages, both in stand-alone and follow-on cases.

As regards the **commencement of limitation periods**, victims can face practical difficulties in the event of a continuous or repeated infringement or when they cannot reasonably have been aware of the infringement. The latter occurs frequently in relation to the most serious and harmful competition law infringements, such as cartels, which often remain covert both during and after their lifespan.

The Commission therefore suggests[16] that the limitation period should **not start to run**:

- in the case of a **continuous or repeated infringement**, before the day on which the **infringement ceases**;

- before the victim of the infringement can **reasonably** be expected to **have knowledge of the infringement** and **of the harm** it caused him.

---

[14] For the underlying reasons see Chapter 7 of the SWP.
[15] For the underlying reasons see *ibid*.
[16] For the underlying reasons see Chapter 8 of the SWP.

To keep open the possibility of follow-on actions, measures should be taken to avoid limitation periods expiring while **public enforcement** of the competition rules by competition authorities (and review courts) is **still ongoing**. To this end, the Commission prefers the option of a **new limitation period,** which starts once a competition authority or a review court adopts an infringement decision, over the option of **suspending the limitation period** during the public proceedings.

In the latter case, claimants (and defendants) will sometimes find it **difficult** to **calculate** the remaining period **precisely**, given that the opening and closure of proceedings by competition authorities are not always publicly known. Moreover, if a suspension were to commence at a very late stage of the limitation period, there may **not be enough time** left to prepare a claim.

The Commission therefore suggests[17] that:

- a **new limitation period** of at least **two years** should start once the **infringement decision** on which a follow-on claimant relies has become **final**.

### 2.8. Costs of damages actions

The **costs** associated with antitrust damages actions, and also the **cost allocation rules**, can be a decisive disincentive to bringing an antitrust damages claim, given that these actions may be particularly costly and are generally more complex and time-consuming than other kinds of civil action.

The Commission considers that it would be useful for Member States to reflect on their cost rules and to examine the practices existing across the EU, in order to **allow meritorious actions** where costs would otherwise prevent claims being brought, particularly by claimants whose financial situation is significantly weaker than that of the defendant.

Due consideration should be given to mechanisms fostering **early resolution of cases**, e.g. by settlements. This could significantly reduce or eliminate litigation costs for the parties and also the costs for the judicial system.

Member States could also consider introducing, where appropriate, limits on the level of **court fees** applicable to antitrust damages actions.

Finally, Member States are invited to reflect on their **cost allocation rules** in order to reduce the uncertainty for potential claimants about the costs for which they may be liable. The "loser pays" principle, which prevails in the EU Member States, plays an important function in filtering out unmeritorious cases. However, under certain circumstances, this principle could also discourage victims with meritorious claims. National courts may therefore have to be empowered to derogate from this principle, for example by guaranteeing that an unsuccessful claimant will not have to bear the defendants' costs that were unreasonably or vexatiously incurred or are otherwise excessive.

The Commission therefore encourages[18] Member States:

- to design procedural rules fostering **settlements**, as a way to reduce costs;

---

[17] For the underlying reasons see *ibid*.
[18] For the underlying reasons see Chapter 9 of the SWP.

- to set **court fees** in an appropriate manner so that they do not become a disproportionate disincentive to antitrust damages claims;

- to give national courts the possibility of issuing **cost orders** derogating, in certain justified cases, from the normal cost rules, preferably upfront in the proceedings. Such cost orders would guarantee that the claimant, even if unsuccessful, would not have to bear all costs incurred by the other party.

### 2.9. Interaction between leniency programmes and actions for damages

It is important, for both public and private enforcement, to ensure that leniency programmes are attractive.

Adequate **protection against disclosure in private actions for damages** must be ensured for **corporate statements** submitted by a leniency applicant in order to avoid placing the applicant in a less favourable situation than the co-infringers. Otherwise, the threat of disclosure of the confession submitted by a leniency applicant could have a negative influence on the quality of his submissions, or even dissuade an infringer from applying for leniency altogether.

The Commission therefore suggests[19] that such protection should apply:

- to all **corporate statements** submitted **by all applicants for leniency** in relation to a breach of Article 81 of the EC Treaty (also where national antitrust law is applied in parallel);

- regardless of whether the application for leniency is accepted, is rejected or leads to no decision by the competition authority.

This protection applies where disclosure is ordered by a court, be it **before or after adoption of a decision** by the competition authority. Voluntary disclosure of corporate statements by applicants for immunity and reduction of fines should be precluded at least until a statement of objections has been issued.

A further measure to ensure that leniency programmes continue to be fully attractive could be to limit the civil liability of successful immunity applicants. The Commission therefore puts forward for further consideration[20] the possibility of limiting the **civil liability of the immunity recipient to claims by his direct and indirect contractual partners**. This would help to make the scope of damages to be paid by immunity recipients more predictable and more limited, without unduly sheltering them from civil liability for their participation in an infringement. The immunity recipient would have to bear the burden of proving the extent to which his liability would be limited. However, consideration should be given, in particular, to the need for such a measure and the impact it would have on the full compensation of victims of cartels and on the position of the co-infringers, especially other leniency applicants.

---

[19] For the underlying reasons see Chapter 10, section B.1 of the SWP.
[20] For the underlying reasons see Chapter 10, section B.2 of the SWP.

> The Commission invites comments on this White Paper. They may be sent, by 15 July 2008, either by e-mail to:
>
> comp-damages-actions@ec.europa.eu
>
> or by post to:
>
> European Commission
> Directorate-General for Competition, Unit A 5
> Damages actions for breach of the EC antitrust rules
> B-1049 Brussels.
>
> It is standard practice within DG Competition to publish submissions received in response to a public consultation. However, it is possible to request that submissions, or parts thereof, remain confidential. Should this be the case, please indicate clearly on the front page of your submission that it should not be made public and also send a non-confidential version of your submission to DG Competition for publication.