1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
                         :   06-MD-1775(JG)(VVP)
                         :
                         :

IN RE: AIR CARGO SHIPPING         :   United States Courthouse
SERVICES ANTITRUST LITIGATION    :   Brooklyn, New York
                         :
                         :
                         :   November 25, 2013
                         :   10:00 a.m.
                         :
                         :
                         :
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiffs:    HAUSFELD LLP
                     1700 K Street, Suite 650
                     Washington, DC 20006
                     BY: BRENT W. LANDAU, ESQ.

                     KAPLAN FOX & KILSHEIMER, LLP
                     850 Third Avenue
                     14th Floor
                     New York, New York 10022
                     BY:   GREGORY K. ARENSON, ESQ.
                             GARY L. SPECKS, ESQ.

for the Plaintiffs:    ROBINS, KAPLAN, MILLER & CIRESI, LLP
                     601 Lexington Avenue
                     Suite 3400
                     New York, New York  10022
                     BY:   HOLLIS L. SALZMAN, ESQ.
                          PAUL M. McCAFFREY, TRIAL SUPPORT
                           AND MULTIMEDIA SPECIALIST

```
 1                           LEVIN, FISHBEIN, SEDRAN & BERMAN
                             510 Walnut Street
 2                           Suite 500
                             Philadelphia, PA 19106
 3                           BY:  HOWARD J. SEDRAN, ESQ.
                                  AUSTIN COHEN, ESQ.
 4                                KEITH J. VERRIER, ESQ.

 5
      Atlas Air Worldwide:    ROPES & GRAY LLP
 6    Holdings & Polar Air    Prudential Tower
      Cargo Worldwide, Inc.   800 Boylston Street
 7                            Boston, MA  02199
                              BY:  HARVEY J. WOLKOFF, ESQ.
 8                                 DANIEL BENNETT, ESQ.

 9    Air China Limited:      WILSON, ELSER, MOSKOWITZ,
      Air China Cargo         EDELMAN & DICKER, LLP
10                            150 East 42nd Street
                              New York, New York 10017
11                            BY:  CATHERINE CHEN, ESQ.

12
      Air New Zealand Ltd.:   ANDREWS KURTH LLP
13                            1350 I Street, NW, Suite 1100
                              Washington, DC 20005
14                            BY:  ROSCOE C. HOWARD, JR., ESQ.
                                   MEENA T. SINFELT, ESQ.
15                                 LYNNE UNIMAN, ESQ.

16
      Korean Air Lines Co.:   PAUL HASTINGS
17                            75 East 55th Street
                              New York, NY 10022
18                            BY:  FRANK Y. LEE, ESQ.

19
      Cathay Pacific Airways:  DLA PIPER US LLP
20                             500 Eighth Street, N.W.
                               Washington, D.C. 20004
21                             BY:  DAVID H. BAMBERGER, ESQ.

22
      EVA Airways Corp.:      KIRKLAND & ELLIS LLP
23                            333 South Hope Street
                              Los Angeles, CA  90071
24                            BY:  JASON Y. KELLY, ESQ.
                                   ELIZABETH M. KIM, ESQ.
25
```

```
                    In re:  Air Cargo Shipping Services            3

 1   Nippon Cargo Airlines:      BAKER & HOSTETLER LLP
                                 1050 Connecticut Avenue, NW
 2                               Suite 1100
                                 Washington, DC 20036
 3                               BY:  ROBERT BROOKHISER, ESQ.

 4
     Air India:                  RUSKIN MOSCOU FALTISCHEK
 5                               1425 RXR Plaza
                                 14th Floor, East Tower
 6                               Uniondale, New York 11556
                                 BY:  NATASHA A. MOSKVINA, ESQ.
 7

 8   China Airlines, Ltd.:       SQUIRE SANDERS (US) LLP
                                 1200 19th Street, NW
 9                               Suite 300
                                 Washington, DC 20036
10                               BY:  JAMES V. DICK, ESQ.

11
     Asiana Airlines Inc.:       O'MELVENY & MYERS LLP
12                               1625 Eye Street, N.W.
                                 Washington, D.C.  20006-4001
13                               BY:  IAN SIMMONS, ESQ.
                                      BENJAMIN BRADSHAW, ESQ.
14                                    SCOTT HAMMACK, ESQ.
                                      DYLAN BROWN, ESQ.
15                                    RAMESH NAGARAJAN, ESQ.

16
     Court Reporter:             SHERRY BRYANT, RPR, RMR, CRR
17                               Official Court Reporter
                                 Telephone:  (718) 613-2636
18                               sbryant102@verizon.net

19
     Proceedings recorded by computerized stenography.  Transcript
20   produced by Computer-aided Transcription.

21

22
                         *       *       *
23

24

25
```

In re:  Air Cargo Shipping Services                    4

1          THE CLERK:  Civil cause for oral argument on the

2    hearing on the motions for class certification and Daubert

3    motions of MD-06-1775 in re: Air Cargo Shipping Services,

4    Magistrate Judge Pohorelsky presiding.

5          THE COURT:  All right.  Are there any preliminary

6    matters we should address before getting started?

7          MR. LANDAU:  No, Your Honor.

8          MR. BROOKHISER:  None.

9          THE COURT:  So remind me what the breakdown is in

10   terms of time.

11         MR. LANDAU:  Your Honor, two and a half hours per

12   side for the arguments on class certification.  Then once

13   those are done, 30 minutes per side on the Daubert motion.

14         THE COURT:  And the plaintiffs, of course, will go

15   first on both motions.  Do you want to reserve time for

16   rebuttal out of your time?

17         MR. LANDAU:  Yes, Your Honor.

18         THE COURT:  How much?

19         MR. LANDAU:  I'm going to aim for about 30 minutes.

20         THE COURT:  Okay.  All right.  So do you want

21   somebody to prompt you, or you'll rely on your co-counsel to

22   prompt you?

23         MR. LANDAU:  Yes.

24         THE COURT:  All right.  So it's 10:05.  You may

25   begin.

In re:  Air Cargo Shipping Services                    5

1        MR. LANDAU:  Good morning, Your Honor.  Brent Landau

2   from Hausfeld LLP for the plaintiffs.  We have prepared some

3   slides for today, and we have copies for Your Honor and for

4   the defendants.  I'd like to mark these just for

5   identification as Exhibit 409, Plaintiff's Exhibit 409.

6        THE COURT:  Very well.

7        (So marked.)

8        MR. LANDAU:  And we have them up on the screen as

9   well.

10       Your Honor, we have shown in our papers and at the

11  evidentiary hearing how we will use common evidence to prove

12  our case, how common questions predominate over any individual

13  questions and why Your Honor should grant our motion for class

14  certification.

15       The defendants' argument comes down to three things.

16  I think about it as the see no evil, hear no evil, speak no

17  evil defense.  They say:  We didn't do it; even if we did it,

18  it didn't work; and even if we did it, and it worked, you

19  can't prove it.  They did do it, and it did work, and we can

20  prove it with common evidence.

21       First, I'll talk about the common evidence showing

22  defendants' participation in a global conspiracy.  Then I'll

23  talk about the common evidence showing that defendants'

24  conspiracy worked, including how the industry factors

25  identified by Dr. Tollison facilitated a successful cartel and

In re:  Air Cargo Shipping Services                    6

1    will be established with common evidence.  Finally, I'll talk

2    about Dr. McClave's statistical model and how that can be used

3    as common proof of impact and damages.

4            So first the "we didn't do it" defense.  Twenty-one

5    defendants pleaded guilty to violation of the antitrust laws

6    for fixing air cargo prices, paying over 1.8 billion dollars

7    in criminal fines.  Numerous defendants were also subject to

8    governmental prosecutions around the world:  Europe, Korea,

9    Australia, New Zealand, Canada, South Africa.

10           This is Plaintiff's Exhibit 2.  All exhibits, by the

11   way, Your Honor, are to the briefs that we've submitted in

12   support of class certification or introduced at the hearing.

13           The Department of Justice described this as a single

14   global conspiracy to fix cargo prices.  They noted that

15   evidence ties together the conduct around the world, that it

16   was a pervasive scheme, it was a systematic scheme, and it was

17   a common scheme.

18           Nearly all the criminal informations allege the same

19   conspiracy, from January 2000 until at least February 2006.

20   This is Plaintiff's Exhibit 298.  Now, the guilty plea

21   agreements between the government and each defendant were

22   negotiated.  They're negotiated agreements.  So, of course,

23   they're not identical to one another, but all of them are

24   common proof that the plaintiffs will use to establish the

25   defendants' liability.

In re:  Air Cargo Shipping Services                7

1          Take Polar as an example.  It negotiated a limited

2     plea referencing only shipments to Australia before April

3     2003, even though there's substantial evidence of its

4     participation in meetings and communications around the world

5     throughout the entire conspiracy.

6          According to Dr. Burtis, Polar's plea is

7     inconsistent with an overarching global conspiracy, but that's

8     not what Judge Bates said at the criminal sentencing hearing

9     of Polar.  He said that Polar's plea was not perfect, but he

10    noted that civil plaintiffs are not constrained by plea

11    agreements in proving liability for broader conduct, and

12    that's what the plaintiffs will do here through common

13    evidence.  The plea agreement is certainly not inconsistent

14    with the worldwide conspiracy that we've alleged and intend to

15    prove.

16          In his opening statement, Mr. Wolkoff said that when

17    it came to foreign regulatory proceedings, Polar wasn't named

18    by anybody.  But Polar was named by the Korea Fair Trade

19    Commission as a defendant and fined for conduct involving Hong

20    Kong.

21          And while the fine amount may have been based on

22    shipments from Hong Kong to Korea, the conduct at issue was

23    from Hong Kong to the entire globe.  And over 80 percent of

24    cargo shipped by Polar from Hong Kong went to the United

25    States.  Polar's shipments from Hong Kong to the U.S.

In re:  Air Cargo Shipping Services                    8

1    accounted for 30 percent of its inbound revenue.

2             Polar was also repeatedly referenced in the KFTC

3    separate decision involving routes from Korea worldwide.  So

4    when Dr. Burtis says that there were no regulatory proceedings

5    involving Polar that provide common evidence, she couldn't be

6    more wrong.

7             But still, defendants say they didn't do it.  They

8    ask, where's the e-mail or the memo that shows 39 carriers all

9    getting together, all at the same time, agreeing to fix

10   surcharges for every customer for seven years?  But, Your

11   Honor, that's not how conspiracies work and that's not what

12   the law requires to show a defendant's participation in a

13   conspiracy.  We don't need to show that every defendant was

14   involved in every meeting, every communication, every aspect

15   of the conspiracy.

16            But besides, there is evidence of numerous carriers

17   getting together and agreeing to fix surcharges.  Defendants

18   used this document during Dr. Tollison's cross-examination,

19   and it includes this list of 59 carriers, Plaintiff's Exhibit

20   158, that agreed on a fuel surcharge mechanism from Hong Kong

21   to the world.

22            Now, the defendants argue that they're immune from

23   liability because they say after they reached these

24   agreements, they went to the government for approval.  They're

25   wrong about that being a legal defense, but right or wrong,

In re:  Air Cargo Shipping Services                    9

1   that defense presents a common question that will be answered,

2   as Wal-Mart versus Dukes requires, in one stroke for the

3   entire class, not separately for each individual class member.

4          So they say, even if we did it, it didn't work, but

5   of course defendants' conspiracy worked.  That's why they kept

6   doing it for nearly seven years at great risk to the

7   participants.  Just look at all the criminal fines that were

8   ultimately imposed, all the executives that went to prison in

9   the U.S. for participating in this global cartel.

10          And in their own documents, the defendants

11   recognized how successful their conspiracy had been.

12   Lufthansa called it a key success factor in recent years.

13   That's Exhibit 10.  British Airways noted that 25 percent of

14   its profitability was based on fuel surcharges, Exhibit 275.

15   Emirates saw surcharges as key to profitability in Exhibit

16   276.  Polar noted the yield improvement it got from imposing

17   fuel surcharges in Exhibit 278.  The same thing from Quantas

18   in Exhibit 311.

19          Why did it work?  Dr. Tollison explained how the

20   characteristics of the air cargo industry facilitated a

21   successful conspiracy that would have impacted all or

22   virtually all class members.  He said these factors don't all

23   need to be present for a conspiracy to succeed, but in this

24   case, they all were.

25          The defendants don't dispute that these are the

In re:  Air Cargo Shipping Services                    10

1  factors set out in the economic literature and by courts

2  looking at class certification in antitrust cases.  Just look

3  at EPDM, Titanium Dioxide and other cases.

4       As the Titanium Dioxide court observed, the

5  defendant's standard script in cases like this is to contest

6  whether these industry factors are present in the market.  And

7  true to form, that's what the defendants have done here.

8  Dr. Burtis was the defendant expert in Titanium Dioxide, and

9  the court there rejected these arguments and granted class

10  certification.

11       These factors are part of plaintiffs' common proof

12  of impact.  Some of these, defendants dispute; others, they

13  don't.  Their experts draw different conclusions from these

14  factors than Dr. Tollison does.  We say that's for the trier

15  of fact to sort out, based on the common evidence that we will

16  introduce at trial.

17       There's no dispute about the methodology itself, in

18  other words, whether these are the right factors to consider.

19  They are.  But at the class certification stage, courts do

20  look at these factors and make a determination based on a

21  preponderance of the evidence as to whether these factors are

22  present in a particular industry or not.

23       We have provided more than sufficient evidence for

24  the Court to find that they all were present here, and we ask

25  the Court to make those findings.  Again, even if only some of

In re:  Air Cargo Shipping Services                    11

1    these were present, Dr. Tollison's conclusion would hold and

2    his expert testimony would serve as class-wide proof of

3    impact.

4              Start with the collective power to raise prices.

5    There's no dispute between the parties about the market share

6    figures.  These are Mr. Kaplan's calculations from Exhibit 50

7    to his declaration.  The defendants have about a 60 percent

8    worldwide share.  So there's no factual dispute to resolve,

9    only a question of what conclusions the experts draw from the

10   undisputed facts.

11             Dr. Tollison testified that the economic literature

12   does indicate that between 58 and 60 percent market share is

13   sufficient to facilitate collective action, and the

14   defendants' experts did not dispute that at the evidentiary

15   hearing.  A cartel doesn't need 100 percent participation to

16   be effective, not by a long shot.

17             Dr. Tollison also pointed out that the defendants

18   were members of regional associations, and many of them were

19   members of several.  These regional associations reinforced

20   their collective market power, and there's no dispute about

21   that either.  This is Exhibit 81 to Dr. Tollison's reply

22   declaration.  And to note, Your Honor, these associations also

23   included a number of non-defendants as members and

24   participants.

25             Look at what Air New Zealand said in Exhibit 223.

In re:  Air Cargo Shipping Services          12

1   The fuel surcharge was an industry-driven exercise.

2   Collectively, the airlines had more strength and agents and

3   shippers just had to accept, and it would be difficult to

4   maintain the fuel surcharge if the airlines collectively

5   decided to remove it.  That's how they thought about this at

6   the time it was going on.

7           Defendants talk about the integrators, like Fed Ex,

8   UPS and the like, saying that, because of them, the defendants

9   didn't have a sufficient market share to sustain the cartel.

10  First of all, the integrators are already taken into account

11  in Mr. Kaplan's market share charts.  They're included in the

12  blue portion for non-defendants.  And their share wasn't

13  sufficient to undermine the defendants' conspiracy.

14          Second, the integrators didn't really compete with

15  the defendants when it came to shipment of air cargo.  They

16  focused on small packages and envelopes instead.  Air cargo

17  actually made up a very small percentage of the integrators'

18  revenues, just 1.5 percent of UPS revenues and 6 percent of

19  Fed Ex revenues.  Those figures, Your Honor, come from

20  paragraph 134 of Dr. Tollison's reply declaration.

21          That's why Edward Hernandez of Polar wrote about the

22  integrators that Polar didn't really view them as a

23  competitor.  Nobody relies on them.  That's Exhibit 279.  The

24  existence of the integrators did not undermine the

25  effectiveness of the cartel.

In re:  Air Cargo Shipping Services                    13

1      Your Honor saw John Chiu's testimony from FTS, one

2  of the named plaintiffs.  He said Fed Ex was his least

3  favorite carrier, because small packages took priority and the

4  general cargo was offloaded from the planes.

5      Singapore Airlines wrote in Exhibit 287 that

6  forsaking general cargo carriers for integrators is not a

7  prudent option for shippers today.  And there were more

8  documents and more testimony on this at the evidentiary

9  hearing and in our papers.  The integrators did not undermine

10  the success of the cartel.

11      So there's no real dispute about the worldwide

12  market share of the defendants being sufficient.  That's why

13  the defendants take a narrow focus on individual city pairs.

14  They claim, for example, that SAT, one of the named

15  plaintiffs, only cared about four specific routes over to

16  Asia.  And the defendants showed this slide, which is our

17  slide 30 now, in an effort to show that SAT's world was just

18  four routes.

19      But here's what the defendants' data show were all

20  of the destinations to which SAT shipped cargo during the

21  class period.  All over the world.  That's a lot more than

22  four specific routes over to Asia.  SAT cared about the whole

23  world.

24      And what this map doesn't show are all of the

25  options for indirect shipments, interlining and trucking, that

In re:  Air Cargo Shipping Services                    14

1  SAT and other class members had to get cargo from one place to

2  another.  Your Honor will recall the testimony of Pete Beckett

3  of SAT about shipping cherries to Singapore by way of

4  Copenhagen.

5          Dr. Burtis couldn't think of any economic reason why

6  someone would want to ship cherries to Asia by way of

7  Copenhagen.  She said it seemed a bit out of the way.  And she

8  was asked about it taking much more time.  But look at what

9  Mr. Beckett actually said.  The two flights left within ten

10  minutes of each other and arrived in Singapore within 30

11  minutes of each other, and it was a lot cooler for the

12  cherries in Copenhagen than in Bangkok.

13          So if the price is right, that's a pretty good

14  economic reason.  And it doesn't matter if this happened a lot

15  or a little.  The point is that it was an option.  And that's

16  why the defendants' conspiracy had to be worldwide and why you

17  can't just look at individual city pairs.

18          Your Honor might remember the defendants' discussion

19  of shipment from Dublin to New York.  But there were 13

20  defendants that shipped cargo between those two cities during

21  the class period.  One of them, by the way, was Air China.

22  And do you know what route it took?  Dublin to Mainland China

23  to New York.  Again, it might not have happened a lot, but

24  cargo can go from anywhere to anywhere on just about any

25  airline.

In re:  Air Cargo Shipping Services                    15

1       The defendants love to talk about Dublin to New

2   York, and Your Honor can be sure that they looked for the best

3   example they could find.  From Dublin, what's going on is that

4   Aer Lingus is a major carrier in Ireland.  And it's true we

5   didn't sue Aer Lingus, but so what?

6       Our complaint alleges that there were unnamed

7   coconspirators.  Aer Lingus was a member of IATA, where a

8   common fuel surcharge methodology was devised before it was

9   rejected by the U.S. Government and then imposed by the

10  carriers anyway.  And Air Lingus was a member of the ACCS in

11  Switzerland, an airline association where surcharges were

12  discussed and agreed.

13      And this chart, slide 36, which the defendants

14  introduced during Dr. Tollison's cross-examination, shows that

15  Aer Lingus had surcharges identical to the defendants.  So Aer

16  Lingus wasn't undermining the conspiracy on shipments from

17  Dublin to New York; the conspiracy was working just fine.

18      It was the same thing with Cielos, which Mr. Kaplan

19  identified as a non-defendant with operations in South

20  America.  We didn't sue Cielos either, but that doesn't mean

21  it was not part of the conspiracy.  In fact, as Your Honor

22  saw, the chief commercial officer of Cielos, George Gonzales,

23  was prosecuted and pleaded guilty to participating in the air

24  cargo conspiracy, which the DOJ described as part of the same

25  investigation to which the 21 defendants here pleaded guilty.

In re:  Air Cargo Shipping Services                    16

1   Cielos also did not undermine the effectiveness of the

2   conspiracy.

3            And Your Honor knows that DHL, which owns 49 percent

4   of Polar Worldwide, one of the defendants here, sued United

5   Airlines for participating in a conspiracy with Polar and

6   others.  So just because United isn't a defendant in our case

7   doesn't mean it wasn't a coconspirator, doesn't mean that its

8   share of the market undermined the success of the conspiracy.

9            Remember, there's no dispute about these worldwide

10  numbers.  The defendants had about a 60 percent market share,

11  and there's undisputed economic testimony that that is

12  sufficient to sustain a cartel.

13           So defendants cast aside these worldwide charts.

14  They want to show Your Honor charts like these, which

15  Mr. Kaplan did during his direct examination.  And Mr. Kaplan

16  testified that 99.7 percent of the cargo shipped from Poland

17  to the U.S. went on non-defendant airlines.  But on

18  cross-examination, Mr. Kaplan admitted that he was only

19  counting direct flights.  So he left out cargo that was flown

20  on Lufthansa to Frankfurt and trucked to Poland, and he left

21  out cargo that was flown on Air France to Paris and then

22  trucked to Poland, and he left out all the other ways that

23  cargo can get from one country to another on an indirect

24  flight or through interlining or trucking.

25           You can't just look at the direct flights and leave

1   out the rest.  That doesn't tell you anything about the

2   market.  All these routes are interconnected.  That's why you

3   have to look at the whole world.

4           Remember, we looked at the British Airways

5   destinations from Dulles Airport.  Most of the cargo went on a

6   direct flight from Dulles to Heathrow, but it didn't stop

7   there.  The cargo went on to 197 destinations around the

8   world.  Dr. Tollison explained that, in economic terms, this

9   is called demand side substitutability.

10          The European Commission found that for air cargo,

11  any indirect route is generally substitutable to any direct

12  routes.  That's Exhibit 224.  And Dr. Burtis agreed.  You

13  can't just look at origin destination pairs, because carriers

14  can ship to a destination and then truck elsewhere.

15          But Dr. Burtis tried to analogize air cargo to

16  filling a prescription at a pharmacy.  She said, if you're in

17  New York and you have to fill a prescription, you wouldn't go

18  to a Rite Aid in Washington, D.C.  And, of course, that's

19  right for filling a prescription at a pharmacy, but that just

20  doesn't hold true for air cargo, which wouldn't think twice

21  about getting on a truck in New York, driving down to DC and

22  flying across the Atlantic if the price was right.

23          So all this, Your Honor, is about demand side

24  substitutability, which shows why routes are substitutes for

25  one another.  You have to look at the whole world.  But

In re:  Air Cargo Shipping Services                    18

1   Dr. Tollison also told us about supply side substitutability

2   in the air cargo industry, the idea that airlines can move

3   planes and routes around the world to service different origin

4   and destination pairs.

5             That's another reason why you can't limit the

6   analysis to just origin destination pairs.  The supply side

7   substitutability means that you have to examine the air cargo

8   market around the world, not route by route.  And the

9   defendants as a whole had sufficient market share to sustain

10  the cartel.  That's the same conclusion that was reached by

11  the Australian court regarding air cargo in Exhibit 229.

12            From the supply side perspective, the potential for

13  a Hong Kong to Moscow service is a substitute for a Dubai to

14  Sydney service, because the service is the product supplied by

15  the carrier, not just the identification of the particular

16  route, and carriers could and did move their routes around the

17  world over time.  Dr. Burtis agreed here, too, Polar shifted

18  routes over the class period.  So you can't just look at

19  individual routes, you have to look at the whole world.

20  That's what Dr. Tollison did.

21            And when the defendants in this case communicated

22  with one another about surcharges, they didn't agree to fix

23  the surcharge on just one or another route.  Their agreement

24  was worldwide.  And it had to be worldwide.  That's what Axel

25  Heitmann of Lufthansa wrote to Kevin Poh of Singapore Airlines

In re:  Air Cargo Shipping Services                    19

1   during the conspiracy.  If they didn't implement across the

2   entire world wherever they could, their global customers would

3   come back to them and complain and the cartel would not

4   succeed.

5           So the defendants had the collective power to raise

6   prices.  There also was a lack of close substitutes.  The

7   defendants talked about ocean shipment, but ocean shipping was

8   not a close enough substitute for air shipping that it could

9   undermine the success of the cartel.  That's the question.

10          Why not?  As Mr. Olarte said, it's cheap but slow.

11   Shipping cargo from Los Angeles to Caracas by ocean could take

12   up to 35 days.  That's not much help if you need cargo to get

13   somewhere fast, and the whole point of air cargo is to get

14   something somewhere fast.

15          Just like Mr. Beckett said, ocean freight is a lot

16   cheaper, but you run the risk of deterioration of the product.

17   And if your business is shipping cherries and you want them to

18   arrive at their destination in good condition, it might not be

19   worth the risk to save a little money or a lot of money on

20   shipping by ocean, because rotten cherries aren't worth

21   anything.  Is it possible to send them by ocean?  Maybe so.

22   But does that make ocean shipping a close enough substitute

23   for air shipping that the air cargo cartel would have been a

24   failure because ocean shipping was out there?  No way.

25          Remember, Roger Haack of RIM testified that

In re:  Air Cargo Shipping Services            20

1    sometimes cargo gets diverted from ocean to air if it becomes

2    more urgent, but not the other way around.  Cargo set up to go

3    by air goes by air, not by boat.

4           In his opening statement, Mr. Wolkoff claimed that

5    our experts would say that shipping by ocean wasn't viable for

6    anybody in the entire world.  But that's not what we said.

7    The question isn't whether someone could ship by ocean; the

8    question is whether ocean shipping was a close enough

9    substitute that it would undermine the success of the cartel.

10          We don't need to show a complete absence of

11   substitutes.  That's from the EPDM case.  The price difference

12   tells it all.

13          This is a document prepared by one of the

14   defendants, Atlas, the parent company of Polar, Exhibit 294.

15   There was a huge price difference between sea freight and air

16   freight.  If they were truly close substitutes, then the air

17   freight industry wouldn't exist.

18          The whole reason there is an air freight industry is

19   because the cost savings of going by ocean is not outweighed

20   by the need to get something somewhere fast.  That's why Atlas

21   wrote here in Exhibit 294 that most air freight demand is mode

22   inelastic, because ocean freight is not a close substitute.

23   The possibility of shipping by ocean did not undermine the

24   success of the cartel.  And that's exactly what two other

25   defendants here, Cathay Pacific and Air China, told the

In re:  Air Cargo Shipping Services                    21

1   European Commission.  Air transport of cargo is not

2   substitutable with sea transport of cargo.  That's what they

3   said, and they were right.

4        So there was a lack of close substitutes, and

5   because of that, as Atlas wrote in that document we saw,

6   demand was inelastic.  Those factors facilitated the

7   defendants' successful collusion, and we're going to prove

8   them by common evidence.

9        What does it mean for air cargo services to be

10  interchangeable?  It means that customers had a choice among

11  multiple airlines that could provide the same service, and

12  they could base their decision on price.

13       Of course, the airline had to be able to get the

14  cargo to the right destination at the right time.  That's a

15  given.  That's what customers meant by service.  They mean can

16  the airline fulfill the requirements of the shipment.  They

17  don't mean how gingerly the airline loads the package onto the

18  plane or how polite they are when they answer the phone.

19       Because of the substitutability of all routes, as we

20  saw, customers had many options for shipping cargo from one

21  place to another on many different airlines, making the

22  services interchangeable so that price could be a predominant

23  factor.

24       Dr. Burtis agrees, price was an important factor.

25  And so did Mr. Kaplan.  He's not quarreling that price isn't

In re:  Air Cargo Shipping Services                22

1    important.  Mr. Beckett of SAT said that prices were probably

2    the number one item, and the KFTC found that forwarders or

3    shippers select the carrier with the lowest fares, the lowest

4    prices, and that they're most sensitive to fares compared to

5    other factors.  That interchangeability facilitated

6    defendants' successful collusion, as Dr. Tollison explained.

7            On barriers to entry, all that Mr. Kaplan says is

8    that there was some entry during the class period.

9    Dr. Tollison explained why those entrants weren't really new

10   entrants at all.  But we don't need to show that there were

11   zero entrants, just that it wasn't so easy to enter the market

12   that the cartel was doomed to failure.

13           Again, from the EPDM case, we don't need to show

14   that the entry barriers entirely thwarted new entry, just that

15   they were high enough that the cartel wouldn't be undermined.

16   And there isn't really any dispute, Your Honor, about whether

17   there's a high ratio of fixed to variable costs.  No one has

18   disputed Dr. Tollison's analysis there.  And as Judge Posner

19   said in the High Fructose case, that gives sellers a big

20   incentive to fix prices, which is exactly what the common

21   evidence shows happened here.

22           Now, according to the defendants, the airlines were

23   just wasting their time agreeing to fix surcharges, because,

24   they say, money is fungible.  Here's the hypothetical they

25   used:  The surcharge goes up and the base rate goes down by

In re:  Air Cargo Shipping Services                23

1   exactly the same amount, so they say no impact.  That's their

2   hypothetical, but that's just it, it's a hypothetical, a

3   hypothetical construct, not reality.

4          Mr. Wolkoff said in his opening statement that this

5   hypothetical happened all the time in the real world, and he

6   promised to show Your Honor evidence that it did.  But Your

7   Honor didn't see that evidence, because the record shows that

8   in the rare instances when anything like this happened, they

9   were just outliers or examples of cheating on the cartel.

10         In fact, there's substantial evidence we presented

11  that the defendants went out of their way to not discount base

12  rates when surcharges increased, and that they discussed and

13  agreed on that.  Soon Young Lee of Korean Air testified to

14  that before the Korea Fair Trade Commission.  That was

15  discussed at meetings, market rates should not be lowered even

16  though the fuel surcharge is implemented.  And that was

17  Exhibit 266.  Quantas, same thing, Exhibit 264, at no time

18  should you compensate by reducing your market rate, this will

19  not be accepted at all.

20         And in these minutes from the Singapore RFSS,

21  Exhibit 43, the chairman urged member carriers not to quote or

22  offer lower ad hoc rates to cargo agents after they have

23  adopted a fuel surcharge policy.  Don't lower your base rates

24  when the surcharges go up.  And there are a number of airline

25  codes here, Your Honor, but just for example, CI is China

In re:  Air Cargo Shipping Services                24

1    Airlines, CX is Cathay Pacific, NZ is Air New Zealand, OZ is

2    Asiana.  They and others were all at this meeting where this

3    was discussed.

4           The same thing at this meeting that took place in

5    Japan, Exhibit 155.  An agreement, a common understanding as

6    they put it, no adjustments in net-net rates.  No discounting

7    of the base rates when surcharges went up.

8           Then we have salmon in Chile, the exception that

9    proves the rule.  This is defendants' favorite example.  Your

10   Honor heard it many times, because it's really their only

11   example, and it actually supports our view of the case, not

12   theirs.

13          First of all, when we talk about salmon in Chile,

14   we're talking about an agreement between Polar and LAN to cap

15   the surcharge just for salmon, just from this one origin, at

16   35 cents a kilogram.  They met at the Boston Seafood Show and

17   agreed on it.

18          And the reason was because they understood that the

19   price for that particular product had gone as high as it could

20   go.  And if they increased the surcharge, it would have caused

21   total prices to go higher.  That's what Ron Lane, Polar's

22   declarant, admitted at his deposition.

23          They did not increase the surcharge and let the base

24   rate get negotiated down to cancel it out.  That's not what

25   they did.  In this unique situation, which happened once

In re:  Air Cargo Shipping Services                    25

1  during the conspiracy, five years in and only by agreement,

2  they decided to cap the surcharge.  They agreed to cap the

3  surcharge.  They didn't just discount base rates.  And as

4  Polar's vice-president admitted at the time, this was a rare

5  situation.

6          So it's not so simple as to say money's fungible and

7  be done with it.  In this one example, the best one they can

8  come up with, the airlines didn't increase their surcharge and

9  offset it with base rate decreases.  So it's the exception

10 that proves the rule.  The defendants didn't render their

11 conspiracy pointless by offsetting surcharge increases with

12 base rate decreases.

13         As Dr. Tollison testified, there's no such thing as

14 a perfect cartel.  All cartels have exceptions, cheating and

15 the need for enforcement, but minor differences in the

16 defendants' surcharge practices didn't cause the whole thing

17 to fail.

18         In fact, as Your Honor saw during the opening, there

19 was an effort to build in some differences to the cartel in an

20 effort to avoid detection.  And the defendants take whatever

21 minor differences they can find and they make mountains out of

22 molehills.  The truth is that the cartel worked very well,

23 despite minor imperfections.

24         Dr. Burtis showed these charts of all-in rates from

25 Exhibit 15 to her declaration.  And there are lots of problems

In re:  Air Cargo Shipping Services                   26

1    problems with these charts, Your Honor, including that they

2    concern just one customer for one weight category on one city

3    pair for one surcharge change.  So they don't say anything

4    about impact for other surcharge changes, other weights and

5    other routes for the same customer.

6          In fact, they don't say anything about impact at

7    all.  Dr. Burtis admitted as much during her testimony.  Her

8    charts do not show that customers were not impacted by

9    surcharge increases.

10         Mr. Kaplan had some misleading charts, too.  And he

11   introduced these, Your Honor, in an effort to show that the

12   conspiracy didn't work, that surcharges that's actually

13   applied varied.  Dr. Tollison explained all the problems with

14   these charts, including the use of the wrong currencies and

15   the wrong weight measures, allowing Mr. Kaplan to make it seem

16   like there was a lot more variation than there actually was.

17         This, Kaplan Exhibit 40, according to Mr. Kaplan,

18   shows a wide variation in security surcharges imposed by

19   Lufthansa on shipments from Germany to the U.S.  Mr. Kaplan

20   says, see, these are all over the map.  Lufthansa didn't

21   impose its surcharge consistently.  But we know that's not

22   true.

23         Lufthansa imposed the surcharges it said it was

24   going to impose.  The documents couldn't be clearer on that.

25   And when Dr. Tollison corrected Mr. Kaplan's charts, it shows

In re:  Air Cargo Shipping Services                    27

1  exactly that, surcharges imposed as announced throughout the

2  class period right up until the Lufthansa changed its

3  methodology on October 1st, 2006, immediately after the class

4  period ends.  This is Exhibit 52 to Dr. Tollison's reply

5  declaration, and he provided a number of these charts.

6         It was the same thing with fuel surcharges.

7  Mr. Kaplan used this chart, which is Exhibit 35 to his

8  declaration, in his direct examination, showing fuel

9  surcharges outbound from the U.S. and, again, purporting to

10  show a wide variation in the surcharges that were actually

11  imposed.  But once again, when corrected by Dr. Tollison, it

12  shows surcharges actually imposed in accordance with the

13  announcements.  This is Exhibit 24 to Dr. Tollison's reply

14  declaration.

15         It's worth looking at one more of these.

16  Mr. Simmons used this in Dr. Tollison's cross-examination.  It

17  was Exhibit 28 to his reply declaration.  Your Honor will

18  remember perhaps that Dr. Tollison called those long lines

19  going up from the boxes whiskers.  And that's because Air New

20  Zealand had minimum surcharges that it imposed on low weight

21  shipments.

22         And if you divide a $10 minimum surcharge by a very

23  low weight, like 5 kilograms, you're going to get a high

24  per-kilogram surcharge, like $2 per kilogram.  But that's not

25  because the surcharge amounts varied transaction to

In re:  Air Cargo Shipping Services                    28

1    transaction; it's because there was a consistent application

2    of a minimum, which, as Your Honor can see, resulted in

3    per-kilogram surcharges that were above the agreed-upon

4    amount, not below.  And that's just what Dr. Tollison

5    explained during his testimony:  Charging more than the

6    agreed-upon price doesn't undermine a cartel.

7            So all of defendants' arguments about what a failure

8    their cartel was just don't hold water.  Look at what Judge

9    Bates said at Polar's sentencing hearing, Exhibit 263.  The

10   defendants' misconduct, significant misconduct had a real

11   effect on the marketplace, involving the entire air cargo

12   industry.

13           Defendants succeeded in raising total prices.  That

14   was their aim.  And that's why they kept doing it year after

15   year after year for nearly seven years.  That's why it was

16   worth the huge criminal fines, it was worth going to jail

17   over, because it worked.

18           So they say:  Even if we did it, and even if it

19   worked, you can't prove it.  But we can prove it, and we will

20   prove it with common evidence, defendants' contemporaneous

21   documents, the testimony of defendants' employees, former

22   employees, and cooperating witnesses, and Dr. Tollison's

23   analysis of market conditions and surcharge practices, as well

24   as Dr. McClave's statistical analysis.  All of this is

25   evidence common to the class.

In re:  Air Cargo Shipping Services                29

1        As Judge Cogan noted last year in the vitamin C
2   case, the existence and effect of the conspiracy are the prime
3   issues in a case like this, and they're common across the
4   class.
5        When we go to trial in this case, Your Honor, we're
6   going to spend almost the whole trial on proving the
7   defendants' liability for their conduct.  The proof at trial
8   is going to be common evidence, because it's going to be about
9   what the defendants did.  That's what a trial will look like.
10       In the High-Tech Employee case, which was just
11  decided a few weeks ago, it's 2013 Westlaw 5770992, the Court
12  explained that statistical models have to be considered in the
13  context of the extensive documentary evidence.  Class
14  certification is a holistic qualitative assessment, not bean
15  counting.
16       So the Court has to consider the statistical and
17  other evidence in tandem.  We've set out the common evidence
18  and I've discussed Dr. Tollison's analysis, and Your Honor
19  will recall he set out in his various surcharge charts the
20  coordinated announcements made by the defendants all over the
21  world which an examination of the data shows were applied
22  consistently with those announcements.
23       So let's talk about Dr. McClave's regressions.  Here
24  are the results of Dr. McClave's global inbound model, a
25  positive and highly statistically significant overcharge.  The

In re:  Air Cargo Shipping Services                    30

1   same thing for Dr. McClave's global outbound model, a highly

2   and statistically significant overcharge.  These models are

3   statistical equations that each use 15 million transactions,

4   30 million transactions in total, evidence common to all class

5   members.

6           And this is the same model that would be used by an

7   individual plaintiff if we had separate lawsuits brought by

8   each member of the class.  Everyone would have to look at all

9   the data globally to prove their case.

10          Your Honor heard the defendants say that Dr. McClave

11  just assumed his result.  He did not.  He tested for whether

12  the global conspiracy alleged by the plaintiffs had a

13  class-wide effect.  That's what he's supposed to do, and it's

14  what he did, and he found that it did have a class-wide

15  effect.

16          There's a very important difference, Your Honor,

17  between impact and damages.  Impact is a yes or no question.

18  Damages is about how much.  Dr. McClave's models address both

19  issues, but the two are separate questions.  Defendants,

20  during the course of the evidentiary hearing, often conflated

21  the two, but we need to keep them separate.  I read this

22  morning that it might snow later this week and if we wake up

23  on Friday morning and the question is did it snow last night,

24  the answer is either yes or no.  The answer isn't 3 inches.

25  And if it snowed 3 inches in Brooklyn, 2 inches in Manhattan,

In re:  Air Cargo Shipping Services                    31

1   and 4 inches on Long Island, the answer to the yes or no

2   question did it snow last night is still yes.  The next

3   question might be how much, but that is a different question

4   from the yes or no did it snow last night question.

5           Dr. Tollison explained this.  Dr. McClave's analysis

6   provides a formal econometric way to say yes or no about

7   impact and to devise a formula of damage methodology, both

8   things, but separate questions.

9           Now, Dr. McClave couldn't have been clearer about

10  this.  He's not saying that every single transaction during

11  the nearly seven-year class period on every route had exactly

12  a 6 or a 6.4 percent overcharge.  For purposes of damages --

13  which don't need to be identical or established with precision

14  in an antitrust case.  You can look at the Bigelow case or

15  other Supreme Court cases for that noncontroversial point.

16          For purposes of damages, Dr. McClave suggests using

17  these percentages as the best estimate of the amount of

18  damages, but that is separate from the question of the fact of

19  impact.  Remember, that's a yes or no question.  You don't

20  answer a yes or no question with a number; you answer it yes

21  or no.

22          Defendants call what Dr. McClave did an average.  He

23  told Your Honor that's not what it is.  That's not what a

24  regression model does.  A regression model is a well-accepted

25  method for determining class-wide impact.  And as the Seventh

In re:  Air Cargo Shipping Services                32

1    Circuit said in the Butler case just this year, it would drive

2    a stake through the heart of the class action device to

3    require that every member of the class have identical damages.

4          Here's how Mr. Kaplan defined the issue.  Is Dr.

5    McClave's global model representative of all or virtually all

6    class members?  Representative in terms of impact, the yes or

7    no question.  Mr. Kaplan used that word again and again.  In

8    other words, if the global model shows class-wide impact,

9    which Dr. McClave's model does, is there some component of the

10   class for which that overall conclusion is not representative?

11   Is there some aberration hiding somewhere in the model making

12   it unrepresentative?

13         How do you determine whether the global model is

14   representative?  Well, in statistics, we learned there's a

15   right way and a wrong way to test a model.  Dr. McClave tested

16   his model the right way and the defense consultants did it the

17   wrong way, as Your Honor will hear more about.

18         The right way to test a model, the right way to test

19   whether Dr. McClave's global model is representative of all or

20   virtually all class members is to do recognized statistical

21   tests of robustness.  Sort of like kicking the tires on a new

22   car.  If a model is robust, every which way you test it,

23   that's telling you that it is representative, because if there

24   were some unrepresentative part hiding away in there, the

25   robustness test would flush it out.

In re:  Air Cargo Shipping Services                    33

1        Your Honor heard about the nine separate robustness

2   tests performed by Dr. McClave.  They all showed that no

3   matter which robustness test you run, you still see a positive

4   and statistically significant overcharge.  You still see

5   class-wide impact.

6        For example, Dr. McClave explained his bootstrap

7   test.  Take out months, take out countries at random, run it a

8   thousand times, see what happens.  The model passed with

9   flying colors, as Dr. McClave explained.  And it was the same

10  thing for Dr. McClave's outbound model, all the robustness

11  tests showed that the model was robust and correct.

12       Dr. McClave discussed this in his testimony.

13  Bootstrapping tests can result in dramatic changes if there

14  are problems with the model.  Here, there were no dramatic

15  changes, because Dr. McClave's global models are robust and

16  correct.  If there were some particular subset of the data

17  influencing the results, then Dr. McClave would have found it

18  with his nine robustness tests.  But the robustness tests

19  showed just the opposite:  The global models are

20  representative of all or virtually all class members.

21       One of the robustness tests that Your Honor heard a

22  lot about was Dr. McClave's customer model.  And Dr. McClave

23  was able to use 97.1 percent of the data to run his customer

24  model, looking at over 70,000 individual customers.  That is a

25  massive test of a model's robustness.

In re:  Air Cargo Shipping Services                    34

1          And we know the single transaction customers had to

2     be left out of this particular robustness test.  Even

3     Mr. Kaplan agreed with that during his testimony.  You can't

4     tell anything statistically from just a single transaction.

5     And I'm going to talk about why the customer model is

6     representative of all customers, including those single

7     transaction customers, but as Your Honor can see from this pie

8     chart, the customers with just one transaction represent just

9     0.2 percent of the revenue at issue in this case.

10         Of the customers in the customer model, 96 percent

11    had at least one overcharge during the class period, and the 4

12    percent that didn't accounted for just one-hundredth of one

13    percent of total sales.  That's it.

14         For a class member to be impacted, it means that

15    class member was affected by the conspiracy in some way at

16    some point over nearly seven years, yes or no.  That's it.

17    How much is a different question.  So one dollar overcharge on

18    one transaction on one route at one point in the seven years,

19    that class member was impacted.

20         And given how long this conspiracy lasted and how

21    successful we know it was, you'd be hard-pressed to find a

22    class member that was lucky enough to escape impact

23    altogether, in other words, someone who never paid a penny

24    more than it would have paid but for the conspiracy, someone

25    who was totally immune to the conspiracy's effects.

In re:  Air Cargo Shipping Services                    35

1        We don't have to exclude the possibility that there

2   was a lucky class member out there who managed to escape

3   impact.  The defendants agree with us that the right

4   formulation is all or virtually all.  Virtually all means that

5   there could be some lucky class members out there, and that

6   still won't preclude class certification.  That's what the

7   Seventh Circuit said in the Messner case, the possibility or,

8   indeed, inevitability that a class may include persons who

9   have not been injured does not preclude class certification.

10       Your Honor may recall that Mr. Brookhiser brought

11  this point out on Dr. McClave's cross-examination, when he

12  went through each named plaintiff and read out how many times

13  each one had been overcharged.  Defendant Exhibit 1 is Dr.

14  McClave's retransformed result, and Plaintiff Exhibit 401 is

15  the log domain result.  And I'm going to talk about the

16  difference between the two, but for this purpose, it doesn't

17  matter which one you look at.

18       Mr. Brookhiser made this point:  Benchmark was

19  overcharged 1,667 times, FTS was overcharged 790 times, and so

20  on.  It doesn't matter that Benchmark wasn't overcharged on

21  every single one of its other transactions.  Even one of the

22  1,667 times it was overcharged by itself would be enough to

23  establish impact.  And even if Benchmark was only impacted

24  1,666 times or 1,665 times, that doesn't change whether it was

25  impacted by the conspiracy.  That doesn't change the answer to

In re:  Air Cargo Shipping Services                        36

1    the yes or no question of impact for Benchmark.

2              Now, that's all impact based on impact being defined

3    as at least one overcharge during the class period.  And

4    that's the right way to define impact in an antitrust

5    price-fixing case.

6              This is the Blood Reagents case from last year.  No

7    class members benefit from a price-fixing cartel.  That's why

8    it's unnecessary to consider net overcharges.  A single

9    transaction -- a single overcharge on a single transaction is

10   enough to show impact.  Everything beyond that just goes to

11   the amount of damages, how much.

12             But, as I'll talk about shortly, even if net

13   overcharge was the right measure, even if you should add up

14   all the positives and the negatives from Dr. McClave's

15   customer model, we've satisfied that definition of impact,

16   too.

17             I brought up the log domain, and Your Honor will

18   remember that Dr. McClave's model uses logarithms to compare

19   percentages to one another.  We got into this whole issue

20   because the defendants' consultants didn't like the

21   retransformation formula that Dr. McClave used to convert the

22   logarithms back into dollars.

23             Now, they're wrong about the formula, as you'll hear

24   later.  But because when we're answering the yes or no

25   question about impact, we don't need to know how many dollars.

In re:  Air Cargo Shipping Services                    37

1   The answer to a yes or no question doesn't require a dollar

2   sign in front of it.

3           So, as Dr. McClave explained, we can make the

4   comparison in the log domain.  That answers the yes or no

5   question, and we can argue later about the number of dollars

6   that is.  In fact, Dr. McClave said, not only does staying in

7   the log domain avoid the retransformation controversy, it's

8   actually a better estimate of impact.

9           Dr. McClave didn't just make this up.  It's right

10  there in Stock and Watson, a standard econometric text.  But

11  Mr. Kaplan didn't like this very much.  He put up this quote

12  from Dr. Manning saying no one is interested in log model

13  results, because you can't cash a check for log dollars.

14  Remember, he took out his wallet to show Your Honor there were

15  no log dollars in it.

16          Well, the first thing about that, again, is it

17  depends on the question you're trying to answer.  If the

18  question is the yes or no question of impact, was somebody

19  impacted, yes or no, then you don't need to know how many

20  dollars it is.  The log comparison answers the yes or no

21  question.

22          But there's a much bigger problem with what

23  Mr. Kaplan did here.  Your Honor saw this during Mr. Kaplan's

24  cross-examination.  He only put up part of Dr. Manning's

25  sentence.  When Mr. Arenson showed him the full quote, we

In re: Air Cargo Shipping Services                    38

1    marked it as Exhibit 406, look at what Mr. Kaplan left out of

2    the same sentence.  Estimates based on log models are more

3    precise and robust, more precise and robust.  That's exactly

4    the point.  When you're answering the yes or no question of

5    impact, you want an answer that's precise and robust, and

6    that's what Dr. McClave did in the log domain.

7              This was Mr. Kaplan's defense.  He cited the whole

8    article for Your Honor to read, but he didn't think that

9    language was relevant.  Well, with all due respect to

10   Mr. Kaplan, it couldn't be more relevant.  The yes or no

11   question of impact, getting a precise and robust answer to

12   that question is the key issue here.

13             Here's Dr. McClave again.  The retransformation

14   issue goes to damages, not to impact.  If you're going to

15   retransform, then Dr. McClave used the right formula to do

16   that.  Dr. McClave didn't abandon it during his testimony.

17   Remember the absurd results Mr. Kaplan and Dr. Burtis got when

18   they used their incorrect formula?  But you don't need to

19   retransform to answer the yes or no question about impact, and

20   the most reliable way to answer that question is to stay in

21   the log domain.

22             So now we get to net positive overcharges.  The net

23   overcharges, as I said, combine all the positive and negative

24   results from the customer model to get a single number

25   covering all of a particular customer's transactions.  And as

In re:  Air Cargo Shipping Services                    39

1   I said, this shouldn't be the measure, because nobody benefits

2   from a price-fixing cartel.  Nobody gets undercharged, only

3   overcharged.

4            But let's take the net positive results.  In the log

5   domain, again, the most reliable way to do this, 93 percent of

6   class members in the customer model show net positive

7   overcharges.  That's what Dr. McClave told Your Honor.  And in

8   the log domain, all six named plaintiffs have net positive

9   overcharges.

10            Now, what about the single transaction customers?

11   Even though they make up just two-tenths of 1 percent of the

12   revenue, it seems like defendants talk about them 98 percent

13   of the time.  And yes, there are a lot of them.  But just

14   because they're not in the customer model doesn't mean we

15   haven't provided a methodology that shows -- can show impact.

16            Remember the global model, and that global model has

17   proved robust no matter how many different ways we kick the

18   tires.  And we've shown that for customers with at least two

19   transactions, 93 percent have net positive overcharges, 96

20   percent have at least one overcharge.  So this is strong

21   evidence, as Dr. McClave testified, that the single

22   transaction customers, who have the weakest bargaining power

23   of anyone, were impacted as well.

24            Dr. McClave explained that to Your Honor, the

25   smallest customers would have the least likelihood of being

In re:  Air Cargo Shipping Services                    40

1  able to escape an overcharge.  It all comes back to

2  Mr. Kaplan's point about being representative.  Dr. McClave

3  testified that a sample of 70,000 that shows 93 percent of net

4  positives is certainly adequate to infer that customers with

5  just one transaction were impacted in at least the same

6  proportion.

7         But as Dr. McClave said, that's probably being too

8  conservative, because the buying power of those single

9  transaction customers was weaker.  So probably even a greater

10  percentage of them were impacted.  Dr. Tollison confirmed this

11  during his testimony, as an economic proposition and from

12  common sense.

13         Now, for some reason this became kind of a

14  controversial point during the evidentiary hearing.  What did

15  Dr. Burtis say?  Impossible to know whether small customers

16  have less bargaining power.  Impossible.

17         That's what Mr. Kaplan said, too.  He said, maybe a

18  single transaction customer shipped on American Airlines and

19  that was one of those times when American waived the

20  surcharge.  Let's think about that for a minute.

21         This is what the record shows about American

22  Airlines' surcharge exceptions.  Only 59 of American's many

23  thousands of customers had surcharge exceptions.  By the way,

24  of those 59, 48 had surcharges built into their rates, and

25  that's something that I want to talk about in a bit.  But only

In re:  Air Cargo Shipping Services                    41

1    59 customers had these exceptions.

2            Now, does Mr. Kaplan really think that American

3    Airlines is making one of its 59 exceptions for its smallest

4    customers, someone who's never done business with the airline

5    before who walks up one day and asks, will you waive the

6    surcharge for me?  Does that make any sense at all?  But

7    that's what Mr. Kaplan thinks might have happened.

8            Here's why it's so surprising that defendants raised

9    such a fuss about this at the hearing.  They're the ones who

10   have been saying all along that larger customers have more

11   bargaining power than smaller customers.  That point was in

12   all three of the defendants' briefs in opposition to class

13   certification.

14           So why would we expect the smallest customers, those

15   with just a single transaction among 30 million, to have been

16   able to avoid the impact of the conspiracy when nearly all the

17   customers bigger than them were impacted?  That makes no

18   sense.  Dr. McClave's models are representative of all or

19   virtually all class members, including those smallest

20   customers, the single transaction customers.

21           Let's talk about the defendants' consultants.  We

22   have Dr. Burtis, who has never found a multiple regression

23   analysis sufficient to prove common impact.  Your Honor asked

24   her that, and she answered.  And in over 15 cases, Mr. Kaplan

25   has never found class certification to be appropriate.

In re:  Air Cargo Shipping Services                42

1   Remember, Dr. McClave said he's testified both for and against

2   class certification.  Mr. Kaplan, never appropriate.

3   Mr. Kaplan and Dr. Burtis say they're attacking Dr. McClave's

4   methodology, but really, they're just attacking the results

5   that he gets.

6          This is from the Supreme Court's decision this year

7   in the Amgen case.  Common questions have to predominate, but

8   we don't need to show that the questions will be answered in

9   favor of the class.  The Court's rule at the class

10  certification stage is not to adjudicate the case, it's to

11  select the method best suited to adjudication of the

12  controversy fairly and efficiently.

13         Here's the High-Tech Employee case again, just a few

14  couple of weeks ago.  The Court in that case goes through all

15  the case law, Comcast, Wal-Mart, Rail Freight, everything, and

16  it distills the principles from those.

17         The question is whether the plaintiffs' theory is

18  sufficiently reliable to demonstrate that common evidence can

19  be used to establish impact, can be used.  At class

20  certification, the question for the Court is this:  Have

21  plaintiffs come forward with a methodology using common

22  evidence that if accepted by the trier of fact could be used

23  to establish impact on all or virtually all class members?  Of

24  course, it has to be a model that would be admissible at

25  trial.  Defendants haven't said that it wouldn't be, and they

In re:  Air Cargo Shipping Services                    43

1    haven't moved to exclude our experts under Daubert.

2         We don't have to show that we will win the case.  We

3    still have to have a trial.  At this stage, at class

4    certification, what we have to show is that our methodology,

5    if the trier of fact accepts it, will show class-wide impact

6    that flows from the theory of harm that we've alleged.

7         In other words, if the jury agrees with us, based on

8    common evidence that we present at trial, will we have shown

9    impact on all or virtually all class members resulting from

10   defendants' conspiracy?  Your Honor can think about a model as

11   a tool for the jury.  The tool has to be sufficiently

12   reliable, it has to be based on common evidence, and it has to

13   do what we say it's going to do, show impact on all or

14   virtually all class members.

15        Now, the jury may reject the tool and find against

16   us at trial.  But if the jury accepts the tool we give it,

17   that tool has to support a finding of class-wide impact

18   flowing from the conspiracy.  But it's up to the jury whether

19   to accept the tool or not.  It's for the Court at this stage

20   to determine whether that's a tool that we've provided.

21        And that's all the Supreme Court required in

22   Comcast.  The Second Circuit noted this just this year in the

23   U.S. Food Service case.  That's 729 F.3d 108.  Is our model

24   appropriate and feasible to redress the common harms alleged?

25   Is it consistent with our theory of liability?  Dr. McClave's

In re:  Air Cargo Shipping Services                    44

1    models meet this standard.

2          And this is what Judge Young in Boston said just a

3    week and a half ago in the Nexium case.  Comcast didn't change

4    the rule on what's required for damage models, it just

5    requires that our model directly reflects our theory of

6    liability, and it does.

7          Even though the defendants say that they're

8    attacking Dr. McClave's methodology, they really are just

9    challenging the results that he gets.  And this dispute about

10   the results that you get when you run a model using common

11   evidence is one for trial.  That's the lesson of cases like

12   EPDM and Titanium Dioxide, which granted class certification.

13         Take the defendants' criticism that Dr. McClave

14   should have used ordinary least squares instead of weighted

15   least squares, OLS rather than WLS.  Your Honor may remember

16   that Dr. McClave drew this up on the easel and explained why

17   WLS was the right statistical approach.  The drawing is

18   Exhibit 405.  Now, Mr. Kaplan disagreed.  That's not a big

19   surprise.  He disagreed with just about everything that Dr.

20   McClave did.  That's the kitchen sink approach.

21         And Mr. Kaplan said if Dr. McClave had used OLS

22   instead of WLS, there wouldn't have been an overcharge.  The

23   results would be different.  Here's what that means.  At

24   trial, we're going to put on Dr. McClave and he's going to set

25   out his common methodology.  He'll explain why he had to use

In re:  Air Cargo Shipping Services                    45

1    WLS, just like he explained to Your Honor.  Mr. Kaplan or

2    whoever defendants' expert is at trial, assuming they pass the

3    Daubert test, will get up and tell the jury why Dr. McClave

4    should have used OLS instead, in their opinion.

5            And if the jury agrees with Mr. Kaplan that Dr.

6    McClave's model should be disregarded, defendants are going to

7    win the case, because that means the jury will have rejected

8    our model, and that's the model we're going to have at trial.

9    So we'll win or lose based on what the jury thinks about that.

10           Either way, the evidence before the jury, the

11   evidence that we present at trial is going to be common to all

12   class members.  Answering WLS versus OLS doesn't require

13   individual proof for each member of the class; the jury's

14   going to answer it in one stroke with their verdict.

15           Remember, I said there was a right way and a wrong

16   way to test a model according to statistical practice.  Dr.

17   McClave did it the right way with his nine robustness tests.

18   Well, defendants' consultants did it the wrong way, and Your

19   Honor will hear more about that when we get to the Daubert

20   arguments later.

21           But Mr. Kaplan and Dr. Burtis excluded almost all

22   the data in their models.  And if you do that, if you exclude

23   almost all the data, of course, you're going to get different

24   results.  That's a strategy guaranteed to get you different

25   results.

In re:  Air Cargo Shipping Services                     46

1           If you take a model, specify for 15 million

2      transactions like Dr. McClave's model, and then you apply it

3      without making any modifications to 116 transactions, of

4      course, you're going to get different results.  That's what

5      Dr. McClave said on page 189 of the hearing transcript.  And

6      it's no wonder that Mr. Kaplan and Dr. Burtis have never met a

7      class they thought ought to be certified.  All of their

8      so-called tests exclude almost all the data.  They don't tell

9      you whether the model is really robust.  That's what Dr.

10     McClave's nine robustness tests do.

11          But there's another problem with taking tiny subsets

12     of the data like defendants' consultants did.  The defense

13     consultants' opinions don't match the plaintiff's allegations,

14     as required by Daubert.  For example, Mr. Kaplan separated out

15     each year, but the plaintiffs aren't alleging separate annual

16     conspiracies.  That's not what we alleged.  That's not what

17     we're going to prove.

18          And an expert just can't ignore the allegations and

19     offer opinions totally divorced from the facts.  That's what's

20     happening here.  But Comcast stands for the proposition that

21     an expert's analysis has to be connected to the operative

22     theory of the case, and Mr. Kaplan and Dr. Burtis don't do

23     that.

24          The defendants aren't allowed to recast the

25     plaintiffs' allegations.  Just as in the LCD case and the

In re:  Air Cargo Shipping Services                    47

1   Vitamins case, we have alleged a single overriding conspiracy.

2   They can't just divide it up and then be surprised that

3   they're getting different results.  Of course, they're getting

4   different results.  That's not the conspiracy that we've

5   alleged.  But what makes this even worse is that Mr. Kaplan

6   claims to be assuming that our allegations are true.  That's

7   what he said, but it's not what he did.

8          This was Mr. Kaplan's overcharge analysis by

9   country.  He put this up.  He found no impact in Canada,

10  Australia, New Zealand, South Africa, South Korea, all

11  countries where government regulators, as I put up before,

12  have prosecuted this cartel because of the harm it caused.

13  Mr. Kaplan's analysis is just not consistent with the facts.

14         Here's their next criticism.  They say Dr. McClave

15  should have included more variables in his model.  Well, you

16  don't just add in variables for the sake of adding in

17  variables.  And Dr. McClave explained why his model already

18  accounts for the factors that the defense experts say should

19  have been included.  Dr. McClave explained his formula.  And,

20  for example, he explained how his country carrier variables

21  account for many of the supposedly idiosyncratic factors that

22  Mr. Kaplan and Dr. Burtis say should have been included.

23         So if there was something unusual happening in Chile

24  or anywhere else, the country carrier variable would pick that

25  up.  But what did we hear from Mr. Kaplan and Dr. Burtis?

In re:  Air Cargo Shipping Services                48

1   Despite speculating about all these factors, did they do any

2   testing of them on their own?  Did they include those

3   variables in any of their own models?  Not Mr. Kaplan.  Not

4   Dr. Burtis either.

5          Dr. Burtis said, that wasn't my job.  And that's

6   what Dr. Moore says, too, in his Daubert papers in support of

7   the defendants, not their job.  But that means there has been

8   no showing of any individual issues regarding the appropriate

9   analysis to calculate individual impact.  All that is before

10  the Court is Dr. McClave's analysis.  So on the record before

11  this Court, common issues predominate over individual issues.

12         Mr. Kaplan talked a lot about false positives, but,

13  as he admitted, this is new.  He didn't use that phrase in any

14  of his reports until just last month, when the DC Circuit

15  decided the Rail Freight case based on what it saw as a

16  potential false positive issue in that case.  But there aren't

17  any false positives here.  This is just a late effort by the

18  defendants to force a square peg into a round hole.

19         So let's talk about Rail Freight, which, by the way,

20  in their sur-reply, the defendant said was inapplicable to the

21  facts of this case.  That's what they said.  But this is how

22  the DC Circuit understood the false positive issue in the Rail

23  Freight case.  And I should say that the case is back before

24  Judge Friedman, and this issue is going to be addressed

25  further there.  And what's more, the DC Circuit's opinion

In re:  Air Cargo Shipping Services                    49

1  didn't criticize any of the other findings of Judge Freedman's

2  careful analysis.

3       But let's just take it as the DC Circuit stated it.

4  According to the DC Circuit, it was a group of customers

5  called legacy shippers that were not in the class and, in the

6  DC Circuit's view, could not have been impacted by the

7  conspiracy.  And the DC Circuit said that Dr. Rausser, who was

8  the plaintiff's expert there, conceded that his model measured

9  overcharges to those legacy shippers, those nonclass members.

10  And because the DC Circuit thought those nonclass members,

11  those legacy shippers couldn't have been impacted, Judge

12  Freedman had to address that argument, which he hadn't done.

13       But in our case, Dr. McClave is not saying that

14  there was a 6.4 percent or a 6.0 percent overcharge on every

15  single transaction over nearly seven years.  He's not saying

16  that.  He has a global model, and that global model has proved

17  robust through every appropriate statistical test, showing

18  impact on all or virtually all class members.

19       There's no concession here that Dr. McClave's model

20  is showing impact on nonclass members that couldn't have been

21  impacted.  Again, we have to be careful not to conflate impact

22  and damages.  For purposes of a damage calculation, for which,

23  as I've said, we're allowed some approximation, Dr. McClave

24  suggests applying that single percentage for each class

25  member's purposes as a way to estimate how much, estimate the

In re:  Air Cargo Shipping Services                    50

1    damages.  And that's a reasonable way to do an estimate like

2    that in a case like this.  But that's very different from

3    saying that every single transaction was impacted in the same

4    way.  That's not what Dr. McClave has said.

5              And this is a key point.  Dr. McClave's model

6    properly analyzes impact on all or virtually all class

7    members, not all or virtually all transactions, all or

8    virtually all class members.  It doesn't matter whether there

9    was an overcharge on every single shipment, let alone an

10   identical overcharge on every single shipment, as long as all

11   or virtually all class members were impacted.

12             So if you take a class member with a million

13   shipments over the class period on many different origin

14   destination pairs, the question of impact is a yes or no

15   question for that class member, not a million different yes or

16   no questions, one for each transaction.  The answer is still

17   yes for that class member, even if some of those transactions

18   don't have an overcharge.

19             When defendants talk about false positives in this

20   case, they're really pointing to the zeros that appear in

21   their own transaction data.  But Dr. Tollison showed that the

22   percentage of unexpected zero surcharges in the defendants'

23   transaction data is extremely low and consistent with what you

24   might expect from normal data entry errors by the defendants

25   when they put the numbers in.

In re:  Air Cargo Shipping Services                51

1          Dr. Tollison explained these charts of zero

2    surcharges.  Your Honor will recall he took all the zeros that

3    appeared in the data for these defendants, he accounted for

4    times when it was supposed to be zero.  He also accounted for

5    issues that he learned about with the data where it wasn't

6    accurately reflecting surcharges that were actually imposed,

7    and then he came to the unexpected zero surcharges.

8          How many zeros show up in the data where you

9    wouldn't expect them to be, based on the announcements?  And

10   for inbound fuel surcharges, just 4 percent; for outbound fuel

11   surcharges, just 2 percent.  For inbound security surcharges,

12   4 percent; and for outbound security surcharges, only 1

13   percent unexpected zeros.  And these are all exhibits to

14   Dr. Tollison's reply declaration and slides that he used when

15   testifying before Your Honor.

16         Whether defendants said they were going to impose a

17   surcharge, what this shows is that they did impose a

18   surcharge.  Their surcharge announcements weren't just

19   worthless pieces of paper, they actually translated into real

20   amounts imposed on class members.

21         Mr. Kaplan talked about Air Canada zeros.  But the

22   zero fuel surcharges that you see in the early months of 2002

23   were during the period when the fuel surcharge was suspended

24   by agreement of the carriers.  So it's not surprising to see a

25   lot of zeros in those months; there's supposed to be zeros in

In re:  Air Cargo Shipping Services                    52

1    those months.

2         But when we added security surcharges to this chart,

3    which Mr. Kaplan didn't do, you see that nearly all of those

4    transactions that had the zero fuel surcharge did have a

5    security surcharge.  So you can't just say, as Mr. Kaplan

6    tried to suggest, that there couldn't have been any impact on

7    Air Canada's customers in early 2002, because that ignores the

8    security surcharge that was then in effect.  And the data show

9    that the security surcharge was being imposed during those

10   months on almost every single transaction.

11        THE COURT:  Mr. Landau, is now a good time for

12   taking a brief recess?  Are you in the middle of something

13   that you'd rather not interrupt?

14        MR. LANDAU:  I don't have very much longer, but --

15        THE COURT:  You mean on your direct, before you

16   take --

17        MR. LANDAU:  Correct.  I'm happy to stop now if you

18   would like.

19        THE COURT:  No, that's fine.  If you say not very

20   much longer, that would be fine.

21        MR. LANDAU:  Mr. Simmons questioned, cross-examined

22   Dr. Tollison about this FTS Airway bill for a shipment on

23   Asiana.  Now, Mr. Simmons is Asiana's counsel, and he asked

24   Dr. Tollison, do you see a fuel surcharge here, do you see a

25   security surcharge here?  Mr. Simmons was suggesting that

In re:  Air Cargo Shipping Services                    53

1    there was no surcharge on this shipment, so there couldn't

2    have been any impact.

3            Here's the real story.  We went back and checked

4    Asiana's data.  Of course, Mr. Simmons had that data, too; it

5    came from his clients.  But according to Asiana's transaction

6    data for this very shipment, this is the one they brought up,

7    there were other charges of 20 cents a kilogram, which is

8    exactly the amount that should have been imposed, according to

9    the announced surcharges of 10 cents a kilogram for fuel and

10   10 cents a kilogram for security.  And that's the example the

11   defendants picked, not us.

12           What's also interesting about this is that in

13   Asiana's database, the 20 cents a kilogram appeared in the

14   other charges field, not separate fuel surcharge/security

15   surcharge field.  So what might seem to be a zero in the

16   database isn't necessarily a zero in reality.

17           I think Shakespeare may have written something about

18   a surcharge by any other name.  You can't get too caught up in

19   the terminology.  Here's what NCA said back in January 2000,

20   the very beginning of the conspiracy.  Airlines were imposing

21   fuel surcharges, regardless of the terms they used.  That's

22   Plaintiff's Exhibit 39.  It didn't matter what they called it;

23   it mattered what they did.

24           So Air China decided not to apply a fuel surcharge

25   separately, but they took it into account in all of their

In re:  Air Cargo Shipping Services                    54

1    selling rates.  That's Exhibit 232.  Surcharge by another

2    name.

3              Here's what Stephen Ma of Air China confirmed in his

4    deposition.  (Following video played:)

5              Question:  In the third paragraph, you wrote:

6    "Nevertheless, the fuel cost surcharge is always taken into

7    consideration in all of our selling rates."  Do you see where

8    I am?

9              Answer.  Yes.

10             Question:  Did you -- was that statement true?

11             Answer:  Yes.

12             Question:  And was that statement true throughout

13   the period roughly 2008 to the beginning -- I'm sorry, roughly

14   2002 to the beginning of 2008, when there was no separate fuel

15   surcharge on shipments ex USA?

16             Answer:  That's correct.  (End of video.)

17             MR. LANDAU:  American Airlines did the same thing

18   for shipments from Argentina, Paraguay and Uruguay.  This is

19   Exhibit 239.  When the fuel surcharge went up by five cents

20   elsewhere from those countries, American increased the base

21   rates by the same five cents instead.  It didn't make a

22   difference.  And it's totally consistent with our theory of

23   the case.

24             The same thing for Air New Zealand.  It incorporated

25   fuel surcharges into its rates for a period of time.  Exhibit

In re:  Air Cargo Shipping Services                     55

241.  Sometimes there was a delay in getting governmental
approval for surcharges.  The defendants didn't let that stop
them.  As this Polar e-mail shows, Exhibit 243, they just
implemented a rate increase instead.  And that's what Ron
Lane, Polar's declarant, admitted at his deposition.  Prior to
approval of surcharges in Korea or Japan, they just included
surcharges in their all-in rates.  Customers understood that's
what was going on.

        This Lufthansa document, Exhibit 235, shows the same
thing.  When the airlines couldn't get approval of a surcharge
in Japan in 2000, they implemented an equivalent price
increase.  They got around the regulatory hurdle, and they
were still able to achieve their goal of increasing total
prices through their conspiracy.

        That's one reason why it's appropriate to analyze
total price.  Mr. Kaplan agreed with that.  Your Honor might
recall defendants put up a big board with this excerpt from
page 54 of our opening brief.  That's our theory.  Plaintiffs
allege paying supra-competitive prices, higher total prices,
the mechanism through which the airlines accomplished that
were the agreements on fuel and security surcharges.

        But as we've seen, sometimes those surcharges had to
be called by another name.  That didn't make a difference.
It's consistent with what we've alleged and what we're going
to prove and what Dr. McClave has done.  He had to look at

In re: Air Cargo Shipping Services                56

1    total prices, both to account for situations when surcharges

2    were called by another name or put into base rates, and to

3    account for the possibility the defendants say existed but

4    haven't shown you the evidence to back it up that base rates

5    were discounted when surcharges went up.

6              Dr. McClave had to account for both those things.

7    That's why he looked at total price, because the injury to the

8    class members was paying higher total prices than they would

9    have paid.

10             Our claim is not that the surcharges themselves were

11   too high.  We don't need to show what the surcharges would

12   have been.  The issue is whether total prices would have been

13   lower, absent the conspiracy, and Dr. McClave has shown that

14   we have a method, a class-wide method for proving that they

15   would.

16             These are the Rule 23 requirements.  There's no

17   dispute about numerosity.  As Your Honor has seen, there are

18   questions, many questions of law, in fact, common to all class

19   members.  The claims of the class representatives are typical

20   of the claims of all class members.  They're all asserting the

21   same legal claims.

22             The class representative and class counsel are

23   adequate.  There are no intra-class conflicts here.  We've

24   talked a great deal about predominance.  The antitrust

25   violation is going to be a central issue at trial, and common

In re:  Air Cargo Shipping Services                    57

1    questions predominate as to that.

2          We'll have common proof of impact through documents,

3    testimony and expert opinion, and it will be up to the jury to

4    agree or disagree with us on the merits, but the questions

5    presented to them and the evidence we will use to prove it

6    will be common to all class members.

7          And we've proposed a common method for estimating

8    damages.  But, as I've said, even if there were individual

9    questions as to damages, that by itself would not preclude

10   class certification.

11         A class action here is superior to other methods of

12   adjudication of this controversy.  The alternative to a class

13   action here would be a multitude of individual lawsuits.  Each

14   plaintiff bringing a separate claim would be using the same

15   common evidence and the same type of expert methodology as we

16   are proposing to use here for the whole class.  The trial

17   would look exactly the same.

18         Remember, Judge Bates in the criminal cases deferred

19   to this Court and deferred to this class action as the

20   mechanism for the victims of defendants' illegal cartel to get

21   restitution.  A class action is the superior method of

22   adjudication to accomplish that restitution objective.

23         Your Honor, we've met all of the Rule 23

24   requirements, and we respectfully request that the Court grant

25   our motion for class certification.

In re:  Air Cargo Shipping Services                    58

1          THE COURT:  Well, thank you, Mr. Landau.  We'll take

2    a ten-minute recess.  Well, nine, let's say.  We'll resume at

3    quarter to 12.  By my calculation, you have about 54 minutes

4    left; is that right?

5          MR. LANDAU:  It should be more than I need, Your

6    Honor.

7          THE COURT:  Maybe.  Let me see.  I'll let somebody

8    else do that.  Thank you.  I'll see you at quarter till.

9          (Recess taken.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

In re:  Air Cargo Shipping Services                    59

1           THE COURT:  Please be seated.  Thank you.  Took more

2    time than I thought.  All right.

3           All right.  Who's up for the defendants?

4           MR. BROOKHISER:  I am, Your Honor.  Bob Brookhiser

5    representing Nippon Cargo Airlines, but I'll be speaking on

6    behalf of all of the defendants here today.

7           We don't have the stamina of the plaintiffs'

8    counsel, so we're going to divide this into two parts.  I'm

9    going to address the record after giving a brief overview of

10   the overall argument, and Mr. Simmons is going to apply the

11   law to the record after I'm done.

12          We each have some demonstratives, which I'll pass

13   out for you and with the Court's permission, one for you, and

14   for you.  (Handing.)

15          THE COURT:  Yes.  Thank you.

16          (Pause in proceedings.)

17          MR. BROOKHISER:  You're ready?

18          THE COURT:  Yes, I am.

19          MR. BROOKHISER:  Okay.  Well, let's get started

20   then.  We're going to focus principally I think on the record

21   and what we saw at the hearing, but obviously, the reported

22   record is larger than that and we don't want that to be

23   forgotten as we go through this.

24          We're going to start for maybe five or ten minutes

25   just giving you an overview, kind of a roadmap of where we're

In re:  Air Cargo Shipping Services                    60

1    going to go, the kind of arguments you're going to hear.

2    Probably none of them will surprise you all that much, but to

3    let you know where we're going.

4         Obviously, our bottom line is that the plaintiffs

5    have failed to demonstrate that the class should be certified.

6    They have recognized it's their burden.  We've focused on

7    predominance of damages, but there are other elements that

8    they also haven't demonstrated.

9         We did hear for the first 45 minutes or so about the

10   evidence of the conspiracy, and talk a little bit about that

11   because the conspiracy that is alleged here is broader than

12   the evidence on which the plaintiffs rely.  And whether or not

13   that's relevant to proof of the scope and existence of the

14   conspiracy, the violation element of each class member's

15   claim, it certainly has a ramification or proof of impact in

16   damages, because it involves -- the pleas are different

17   carriers, different routes and countries, different time

18   periods and frankly, different conduct than the conduct that's

19   alleged here.

20        We've heard a little bit about what the elements

21   are, and the two critical ones here are from private

22   plaintiffs, which government plaintiffs don't have to

23   demonstrate to succeed, much less to extract a plea, our

24   impact, which is injury-in-fact and antitrust injury, injury

25   that flows from the violation alleged and it's the sort of

In re: Air Cargo Shipping Services 61

1   injury that the antitrust law seeks to prevent and then

2   damages. The government doesn't have to do any of those

3   things in a criminal or a civil governmental case.

4       In a class action, the plaintiffs must do something

5   more. They must establish these elements for every class

6   member's claim, and for shorthand here, we'll put only the

7   plaintiffs' description of all or virtually all. They have to

8   do that for every -- for all or virtually all class members.

9       And that is important, as we will see, because as

10  the Supreme Court said Rule 23, it's a convenient procedural

11  device, but it doesn't abridge, enlarge or modify any

12  substantive right of the parties, plaintiffs or defendants.

13  You don't get a hall pass simply because your part of some

14  amorphous class and get your case tried if the class

15  representatives haven't established that they can show the

16  elements of your claim, your particular claim, by common

17  evidence. And they haven't done that here and it's important

18  here, given the composition of the class.

19      We had a lot generalities about the class, but the

20  fact remains that -- and this is undisputed -- 80 percent of

21  the class members ship either to or from one country and the

22  United States. So they're not shipping all over the world or

23  receiving shipments from all over the world. Sixty percent of

24  the class members have only one transaction that took place at

25  one time, not some average over seven years. And 40 percent

In re:  Air Cargo Shipping Services                    62

1    of the class members have only low-weight transactions, the

2    ones that you heard Dr. McClave say were the ones that had all

3    the noise and variability in the data and why he weighted his

4    formulas to discount their significance, but those are the

5    claims of 40 percent of the class members.

6            We're going to spend some time on market conditions,

7    and there's really I think is not much dispute about this.

8    Air cargo, the market conditions vary dramatically.  We'll go

9    through this in a little more detail, but there's no dispute

10   that supply and demand conditions vary by route and country,

11   that air cargo competes with other method of transport.  Maybe

12   not a perfect substitute, but certainly in some instances and

13   what we're talking about here is, are all or virtually all

14   class members affected, and the plaintiffs don't get to blink

15   at that question by saying, well, ocean shipping isn't a

16   perfect substitute or isn't a substitute in all cases.

17           There is testimony, including testimony from the

18   defendants' own expert that competition in this industry is

19   cutthroat, price and service composition, not just price, not

20   just service, but both.  And why is that significant?  Because

21   carriers can or customers can go other places, to

22   non-defendants, and they can also -- we heard about cheating.

23   That's a polite word for saying giving a customer a break.

24   And if the competition is cutthroat, you can't just assume

25   that this doesn't happen.

In re:  Air Cargo Shipping Services                    63

1     Following up on that, that prices are negotiated, no

2  dispute over that.  Surcharges vary and are negotiated.  I

3  don't think there is much dispute over that.  The extent of it

4  perhaps is an issue, but the fact that it happens and the

5  claim here is that all or virtually all class members have

6  been affected, that's significant.

7     Many transactions have no surcharges.  Plaintiffs

8  don't like that, and they tried to minimize the significance

9  of that, but it is a real stumbling block for them.  In fact,

10  it's a fatal defect, and customers, we have heard, have

11  different bargaining power.  Why is that significant?  Well,

12  they resisted that and ocean for the first two years of the

13  class certification.  They've now embraced it apparently at

14  the hearing, but it shows that impact isn't necessarily

15  uniform.  It can't be presumed.

16     Now, what kind of evidence did the plaintiffs offer

17  to show that all or virtually all class members were impacted?

18  And we'll go through this in a lot of detail, but the overall

19  picture is, expert testimony is based on unsupported inference

20  and assumption.  But before I go any further, I want to take

21  issue with the yes/no, silages of -- that Mr. Landau mentioned

22  and the snow example.  It may be an impact, may be a yes/no

23  question, but it's not a yes/no question for the class

24  globally.  It's a yes/no question for each member of the

25  class.  And the evidence would have to show that all or

In re:  Air Cargo Shipping Services                    64

1    virtually all of the class members had that answered yes, and

2    it simply doesn't.

3          And the snow example, I think it was -- well, it may

4    have snowed two inches in Manhattan, four inches in Brooklyn,

5    and three inches in the Bronx.  Well, we're talking about a

6    global conspiracy here.  And you don't know where it snowed.

7    You can't answer the yes/ no question unless you look.  And

8    nobody looked here except the defendants' experts.  They just

9    had, well, if it was snowing around the world some -- to some

10   amount, but they didn't look to see whether it snowed in each

11   of the routes in each of the time periods.  So I grant his

12   yes/no answer, but it's got to be for each class member.

13         So let's now look at the brief summary of what the

14   four types of evidence they've used.  Alleged structural

15   characteristics of the air cargo industry -- well, they want

16   to talk globally, but their own experts have indicated that

17   those characteristics aren't uniform.  They're not global,

18   except if you engage in some definitional sort of

19   slight-of-hand by saying, well, I'll just call them global

20   even though I recognize they may not be the same from time to

21   time or customer to customer or route to route or country to

22   country.

23         There's all this evidence about surcharges, which

24   principally is announced surcharges.  Nobody pays an announced

25   price.  They pay a real price.  And the actual surcharges, the

In re:  Air Cargo Shipping Services                    65

1    evidence is undisputed, vary from time to time, route to route

2    and carrier to carrier, but even the announced surcharges, the

3    evidence shows, weren't the same.  They differed from time to

4    time, route to route and carrier to carrier.  Not in every

5    instance, but when you're trying to determine what happened to

6    all or virtually all class members, and when you're trying to

7    assess damages, as Professor McClean said or Dr. McClean said,

8    by applying his damage formula to every class member's

9    transaction -- all of them -- not just a couple, all of them,

10   these are relevant.

11            The plaintiffs' global models cannot differentiate

12   between the injured and uninjured class members.  Dr. McClave

13   admitted that on the stand.  So what do they say?  It is

14   important to understand, as Dr. McClave said, that the model

15   does not say anything about whether all or virtually all class

16   members were injured.  He comes up with this classwide number

17   from which -- he was very specific about this and said it a

18   couple times -- he inferred -- inferred that all or virtually

19   all class members were impacted.  And the evidence shows, I

20   think out of their own mouths, that there really isn't any

21   basis for that.  It's sheer speculation.

22            He admitted readily that the results didn't apply to

23   individual time periods, didn't apply to country tariffs,

24   didn't apply to each weight category, didn't apply to each

25   carrier, didn't apply to each customer.  He admitted that the

In re:  Air Cargo Shipping Services                    66

1   variables don't apply to individual class members.  And in

2   fact, he said that the model was not allowed to vary at all.

3   It was forced to come up with one result.  It wasn't allowed

4   to vary by any of these time periods or any of these factors.

5          So while it may be a very good -- and I know they

6   don't want to use the word "average," but I'm going to use the

7   word "single answer" to try to explain as much as they can

8   about 30 million transactions with one number.  It doesn't

9   say anything at all about what happened to individual class

10  members or individual transactions or individual countries or

11  individual weight categories or individual carriers.

12         In addition to the inherent limitations, his global

13  models omit important variables and beyond that, they don't

14  explain a significant portion of the difference in price that

15  he says he finds.  They leave maybe 30 or 45 percent

16  unexplained.  And when you're talking about a relatively

17  significant number of transactions, that tells you something

18  about the reliability of the model.

19         His customer models don't save the day for them.  He

20  testified that they were largely based on the same global

21  variables.  They weren't allowed to vary by country.  They had

22  one conspiracy variable.  They used the same global conspiracy

23  estimate.  They admitted they didn't apply to two-thirds of

24  the class.

25         He's assumed that an overcharge on one transaction

LISA SCHMID, CCR, RMR

In re:  Air Cargo Shipping Services                    67

1   shows injury, even though he then turned around and said that

2   any one result is subject to random variation and noise and

3   that's why he didn't think these models were reliable.  And so

4   he went back to the customer model -- I'm sorry.  The global

5   model.

6          Then finally, apart from the did they prove that all

7   or virtually all class members were impacted somehow by

8   something -- this one here -- they did not prove that the

9   impact was from the conduct that they're complaining about.

10  Dr. McClave admitted several times and in different ways that

11  it doesn't measure -- his models do not measure the effect of

12  the conspiracy on surcharges.

13         We'll talk a little bit about false positives and we

14  heard about why this apparently was a recent invention in the

15  plaintiffs' mind.  It wasn't.  From the get-go, every single

16  one of the defense experts pointed out that there were plenty

17  of transactions on which there were no surcharges and

18  therefore could not be any overcharges.

19         Mr. Kaplan did, at page 39 of his original report,

20  Dr. Burtis did, Dr. Warren Boulden did -- although I hope the

21  Court is glad that we didn't bring yet another expert -- his

22  report actually used the words, "false positive."  But whether

23  you use the word or not, the concept has been there from the

24  beginning.

25         So before I get to the -- sort of the guts of this,

In re:  Air Cargo Shipping Services                    68

1    I think it's important to review the bidding a little bit,

2    about how we got where we are now, because I think it tells

3    you something about the -- shall I say reliability of the

4    respective expert analyses in the cases that the parties have

5    made here.  And basically, it shows the plaintiffs and their

6    experts kind of constantly morphing their claims and analysis

7    to patch holes that we point out, and that continued right up

8    to the hearing, when there were major changes and new

9    theories.

10           The motion was filed over two years ago, and we had

11   two slender reports.  Dr. McClave is like 15 pages.  Dr.

12   Tallison was maybe 35.  Dr. Tallison analyzed the industry

13   structure and surcharge announcement, but there is no analysis

14   of actual surcharges, and I think that's what they're

15   complaining about here is actual surcharges, not announcements

16   in a piece of paper.  There was no analysis by Dr. Tallison of

17   any actual price, even though McClave says that's the thing

18   you've got to look at.  And his analysis of the surcharges was

19   limited to like out in the U. S., from Europe and from Hong

20   Kong.  There are over two hundred countries involved, and his

21   surcharge announcement analysis dealt with three or four

22   maybe.

23           Dr. McClave -- who isn't an economist but a

24   statistician -- in his opening report, did have this global

25   estimate of classwide damages, which is different from

In re:  Air Cargo Shipping Services                    69

1    something that shows that all of the members were hurt.  This

2    is just some number that applies to all of those transactions

3    together when they're put through a blender and one number

4    comes out, because the equation only allows one number to come

5    out.

6              He had no analysis of individual customer prices.

7    In fact, his database didn't even have customer names in it.

8    He had no analysis of surcharges, actual or announced, even

9    though that's the complaint here.  He -- and he made no

10   attempt to connect his results to surcharges, which is the

11   conduct at issue here.

12             So all of these things were pointed out by the

13   defendants and their experts and then the plaintiffs regrouped

14   and came up with -- this time -- much longer expert reports,

15   where they tried to explain away Dr. Tallison's zero

16   surcharges, the fact that there were lots of transactions and

17   admitted time period when there were no surcharges.

18             And he tried to minimize the variability in actual

19   surcharges by his box plots and other analysis actually

20   confirms that there is substantial variability.  Maybe not

21   like a shotgun kind of blast, scattered shot variability, but

22   they show undisputedly that at -- in specific time periods,

23   given carriers on the same route are charging different

24   surcharges.  And that the time periods for his 28 events

25   overlap, so that they will be charging different amounts, and

In re:  Air Cargo Shipping Services                    70

1    some carriers didn't put in any surcharges or skipped them.

2    We'll get into that.

3         Dr. McClave in his reply report, the advent of the

4    customer lines.  He had never done anything like that before,

5    and then they appeared in his second report, although he

6    acknowledged even there that they really weren't reliability

7    at the level of individual customers, which is why he said,

8    but I still think my global model is better.

9         And he in his reply defended his global models

10   against the attacks of the expert by basically saying you

11   can't challenge them.  You can't see if they work for any

12   subset.  You just have to grant my premise, look at it

13   globally and any time you want to do anything different, it's

14   wrong.

15        Well, that's got to tell you I think something about

16   how confident he and the plaintiffs are in those models,

17   because you would allow somebody to test it, to see if it

18   worked, so that you can answer the yes or no question with

19   respect to all or virtually all of the class members, instead

20   of having it yes or no for the whole class, on average.

21        So defendants respond to all of those things,

22   showing that the customer models omit a lot of class members,

23   and that Dr. McClave did no statistic test -- no test of the

24   statistical significance of his customer models, and they

25   showed how it was proper to test pooled sets of data against

In re:  Air Cargo Shipping Services                    71

1    subsets.  That's what the Antitrust ABA book said, as well as

2    a lot of the economic literature that you saw in the hearing.

3    And that they showed that he kind of goofed in his

4    retransformation methodology.  I may leave it at that, because

5    that's a little bit above my paygrade sometimes.

6              So shockingly enough, with after all of that, then

7    the plaintiffs tried to exclude their evidence.  I guess

8    that's what we're going to hear about later this afternoon at

9    the *Daubert* motion.

10             But then at the hearing, we got some more changes.

11   For the first time -- over two years, five expert depositions,

12   five expert reports -- we hear for the first time, that, oh,

13   all of those small customers that are omitted from the

14   transaction -- I mean the customer database -- well, I

15   shouldn't say small.  They're one-time, one-sale customers,

16   you can just presume that they were hurt because they lacked

17   bargaining power, without any analysis beyond that, and we'll

18   talk about that in more detail.  Dr. McClave admitted that

19   that was an economic inference which he drew, although he's

20   not an economist.  So I think that tells you something about

21   his testimony on that score.

22             And then on this law of law transformation issue, he

23   kind of threw up his hands and said, well, it's complicated

24   and confusing.  Take that issue off the table.  Why don't we

25   just go with what I had done before.

In re:  Air Cargo Shipping Services                    72

1          So that's an overview of our case.  Let's kind of go
2     back and go through in a little more detail with some of the
3     pieces of that.
4          The first is the fact that the plaintiffs allege a
5     different conspiracy and a broader one than the ones -- than
6     the evidence on which they rely.  I don't know why they did
7     that.  They didn't have to.  I have a suspicion why.  But it's
8     aggressive.  Most -- most, but not always, plaintiffs'
9     antitrust cases, they piggyback on the government allegations.
10    Well, they didn't piggyback here.  They tried to expand them
11    to get the broadest possible class that they could come up
12    with, all transactions into and out of the United States.
13         But the pleas don't involve a conspiracy on all
14    routes to and from the United States.  This is -- the next few
15    slides are taken off of Exhibit 18 to my client's, NCA's brief
16    in opposition to the class initial brief.  But you can see
17    it's certain routes, certain services, but there's nothing in
18    there that says global or all routes into and out of the
19    United States.  They've got some, you know, press releases and
20    things that they rely on, but the pleas themselves don't say
21    that.  They allege a global conspiracy of all defendants, but
22    at least through the plea agreements, there isn't a plea
23    agreement for 15 of the defendants.  So that's like a third or
24    not quite a half of the defendants here.  And yet, all of --
25    all of their analysis, including Dr. McClave's model

In re:  Air Cargo Shipping Services                    73

1    apparently assume that all of the 15 defendants who didn't

2    plea are going to be found guilty and.  I guess he's entitled

3    to do that.  It shows you that there's some gaps here in the

4    connection between the proof of liability and their proof of

5    impact. These are the defendants who didn't plead.

6            They allege a global conspiracy from the period

7    January 1 to September 30, 2006, but no plea agreement covers

8    this period.  You know, they cover a large period, but four

9    plea agreements, only four of them have that as the starting

10   date.  None of the plea agreements go that far and some of the

11   pleas begin -- the periods, at least begin after the others

12   end.  And then, of course, the pleas aren't really as specific

13   as they would like the Court to believe.

14           This case, although it seems to be changing before

15   our eyes, involves a fuel and securities surcharge

16   price-fixing conspiracy.  The pleas aren't specific, the fuel

17   and securities surcharges.  They talk about one or more

18   components of price.  One of them even talks about base rate,

19   but they don't say that there is a plea to a conspiracy to fix

20   fuel and securities surcharges.

21           Okay.  Now, let's take a look at the composition --

22   oh, wait a second.  This was a good one.  I want to go back to

23   this one.  This was one of the evidence -- one of the slides

24   used in the opening about the foreign tribunals and that

25   evidence and how wonderful that is -- this was the one for

In re:  Air Cargo Shipping Services                74

1    Australia -- but as you can see, even the foreign tribunal

2    recognized that there are local differences.  They quoted the

3    first part of that paragraph.  The second part says, "Except

4    where local conditions prevented the imposition or full

5    imposition of a fuel surcharge from a particular port in a

6    particular geographic area."

7          Well, that's kind of our point, Your Honor.  They

8    haven't done the analysis.  They haven't tested the hypothesis

9    that Dr. McClave's analysis applies everywhere within the

10   global market that they have assumed.  They've just got one

11   global result which they ask you take you on faith applies

12   everywhere.

13         Okay.  Let's go now to the composition of the class,

14   which I think is an important fact to keep in mind.  These are

15   statistics from Mr. Kaplan's reply report.  It was like charts

16   or slide seven, I think, that he used in his direct testimony.

17   And I will go through them one at a time because they are

18   important to understand the claims of all of the absent class

19   members who the named plaintiffs have to prove on the basis of

20   common evidence.

21         Okay.  For the 80 -- 90 percent of proposed class

22   members from outside of the United States that shipped from

23   only one country, imagine their claim, shipped from like China

24   to the U. S.  That's all.  In proving -- if they were to prove

25   their own claim, they would have come in here on their own,

In re:  Air Cargo Shipping Services                    75

1    would they be looking at the aggregate prices of all inbound

2    shipments from Europe, South Africa, South America, everywhere

3    in the world to prove that the prices -- what the prices were

4    on the shipments from China to the United States and for their

5    "but for" world, would they be looking to see what aggregate

6    happened or would have happened or might have happened on the

7    prices from all of those other place?  No. Their claims depend

8    on what would have happened on the routes between China and

9    the United States, not everything.

10           The same point is made for the 80 percent of the

11   proposed class members who live in the United States and ship

12   only to one country.  Does a person in Chicago who only ships

13   to London care, would their claims depend in any way on what

14   the prices were on shipments from Los Angeles to Hong Kong or

15   high Miami to Rio De Janeiro or would they depend on what the

16   prices were on the shipments from Chicago to London?  I think

17   the latter.

18           Sixty percent of the class members had one

19   transaction -- one.  That didn't happen sort of amorphously

20   over the six-year class period.  It happened once.  And if

21   that customer were here and that customer were making a claim,

22   of what relevance to his claim would it be that on average

23   over six years -- maybe, assuming the evidence actually could

24   demonstrate this -- prices generally were six percent higher

25   or four percent or whatever the number is?  He wants to know

In re:  Air Cargo Shipping Services                    76

1    or she wants to know what the prices were on their transaction

2    and what the price would have been on that transaction.

3    That's their claim.

4            Forty percent of the class members had shipments in

5    only the two lightest weight categories, as developed by Dr.

6    McClave.  So for their claim, of what relevance is it that on

7    average, across all weight classes, prices may have been

8    whatever they were or the "but for" price on average for all

9    weight classes would have been different?  Those customers

10   depend on what the prices on their weight shipments would have

11   been.

12           And in particular, this is important because as you

13   will recall, Dr. McClave pooh-poohed those light weight

14   transactions because the price was -- the prices were so

15   variable.  But that's the point.  Their claims involve prices

16   that are variable.  And you need to prove their claims and

17   their damages and their impact, you have to look at all of

18   those things, not just assume that well, because Dr. McClave

19   weights the heavy transactions disproportionately, that says

20   something about the lighter transactions.  Okay.  And that is

21   a theme that you're going to be sick and tired of me saying

22   because I'm going to come back to it over and over again.

23           But let's take a brief look at the characteristics

24   of the industry.  The first one I want to talk about is supply

25   and demand conditions.  And again, I think there's really not

In re:  Air Cargo Shipping Services                    77

1    much doubt here that supply and demand varied by route and

2    country pattern.  The plaintiffs say it.  Their experts say

3    it.  Their industry consultant, Mr. Brooks said it.  There is

4    really no dispute about that.

5              The significance of it -- and Dr. McClave said it

6    again at the hearing -- the significance of that is it

7    undercuts the logical nexus for any inference that all or

8    virtually all class members were similarly affected or

9    impacted as a result of Dr. McClave's global model -- because

10   he acknowledges and Dr. Tallison acknowledges that there

11   aren't just global conditions of supply and demand that affect

12   price.  That are conditions that affect prices within smaller

13   geographic areas, whether it's routes or countries, doesn't

14   really matter for this purpose.  The fact of the matter is, it

15   isn't global.

16             There's really no dispute that there's vigorous

17   competition in price and services.  And again, it's from the

18   named plaintiffs we see here.  We see it in the internal

19   documents of the defendants, and we heard it at the hearing,

20   Dr. Tollison said it probably better than any of us could.

21   It's a cutthroat business.  People will change after they

22   signed a contract to ship if they get a lower price.  They

23   sign a contract and somebody offers them a lower price, bam,

24   they're gone.

25             Well, what's the significance of that?  Again, the

In re:  Air Cargo Shipping Services          78

1   significance is that there are a host of negotiations.  You

2   cannot simply assume that from some global result that

3   everyone was affected, because the business doesn't work like

4   that, especially when you have 60 percent of the class members

5   who only have one transaction.  They could have been the

6   people who got the benefit of this, and we'll go -- we'll talk

7   about that a little bit later.

8        The third undisputed fact -- well, there's another

9   example of other types of competition on service and price.

10  It's not just price.  It's service and we'll talk about that a

11  little later.

12        Another undisputed fact is the prices were

13  negotiated.  Rates are negotiable.  There's no dispute about

14  that.  Dr. McClave agrees.  Dr. Tallison agrees.  The

15  plaintiffs agree.  And they also agree that they could have

16  been negotiated to offset the surcharges.  In fact, that why's

17  Dr. Tallison started off in his first declaration saying

18  that's why we should look at all their prices, like Dr.

19  McClave did, to account for any possible reduction in the

20  rates to attempt to offset the surcharge.  Now, we don't think

21  that's what the global model of Dr. McClave does, but Dr.

22  Tollison acknowledges that competition on rates and "all in"

23  prices can erode away the surcharge charges, if they were

24  fixed.  We heard that in opening statement, as well.  And

25  Dr. McClave agreed.  He said, I haven't seen any evidence of

In re:  Air Cargo Shipping Services                79

1    it, but it's certainly possible.

2           Now, let's -- and you know if you negotiate the base

3    price, which is simply the base rate and the surcharge, if you

4    negotiate that down, you negotiate part of the surcharge down,

5    too.  They money is fungible.  We heard that.  And it's true

6    here.  I know there was a quarrel about using the word

7    "fungible" in other places, but it is true that at the end of

8    the day, the plaintiffs and their -- the named plaintiffs,

9    class members, have said, you know, price is what's important

10   to me.  I don't really care how it's divided up.

11          Now, more of examples of the fact that surcharges

12   were negotiated or waived.  Here are examples from -- in our

13   own documents, not just the testimony of the named plaintiffs

14   in their depositions.  Surcharges were occasionally negotiated

15   also, as well as the prices.  Here is some testimony from

16   Mr. Haack, one of the named plaintiffs.

17          Now, another important fact, another really

18   undisputed fact is that the surcharges weren't uniform.  They

19   varied.  And Doctor -- Mr. Kaplan has lot of examples of this,

20   but there's really no dispute.  Here's one which shows the

21   actual surcharges, field surcharges from Lufthansa, which they

22   vary.  They're all over.

23          And Dr. Tollison's box plots, if you look at them,

24   they show variation.  Now there may be a pattern there, maybe

25   not.  I don't know.  But they what show is that for Air

In re:  Air Cargo Shipping Services                80

1   France, U. S., inbound shipments, the surcharges in say March

2   of '05 or maybe that's April, I don't know -- range from like

3   zero to 40 cents.  That's variations, especially/when the

4   highest the surcharges, you know, announced surcharges ever

5   got, according to the class period, was 60 cents.  So here is

6   a period where the variation is almost as much as the maximum

7   surcharge that was ever part of that -- the conspiracy or the

8   alleged conspiracy.

9         Now, we heard a lot about zero surcharges.  We'll

10  talk a little bit more about that in another context, but the

11  fact remains that there are lot of zero surcharges.

12        And here is doctor -- this is a big problem for the

13  plaintiffs, and they try to minimize it.  They say, well, some

14  really weren't, and then they say, well, but sometimes they

15  were expected.  Well, whether they were expected or not, they

16  were still zero and if there's a zero surcharge, how can

17  someone be hurt by the conspiracy, which is supposed to be

18  based on the surcharges?

19        Finally, undisputed bargaining power, that there is

20  a difference.  We have been saying that all along, as counsel

21  for plaintiffs indicated.  Defendants resisted that, but now,

22  they agree.  And what does that mean?  That different entities

23  can affect whether or not they pay all or some or the

24  surcharge.  And that means that it is not possible to infer

25  that all or virtually all class members were affected or

In re:  Air Cargo Shipping Services                    81

1    impacted by the surcharge.

2            So let's move on quickly to the evidence of the

3    impact.  There are four types we heard about.  I'm probably

4    going to skip the announcements because that wasn't as big a

5    part of the presentation but let's talk about industry

6    structure.

7            Well, first of all, that the principal purpose of

8    industry structure in antitrust law is to infer from

9    circumstantial evidence whether there was or wasn't an

10   agreement or a conspiracy, not to demonstrate impact.  So it's

11   the wrong question.

12           But none -- more importantly -- well, the plaintiffs

13   ignore a number of the factors that we think the evidence

14   shows would affect the likelihood and extent of any impact,

15   the variation route by route, cutthroat price competition,

16   competition from non-defendants with differential bargaining

17   power.

18           Plaintiffs assume that these structural features are

19   uniform.  Well, that's an assumption.  Dr. Tollison relies on

20   some anecdotal evidence, you know, the stuff -- the British

21   Air shipments from Dulles, which were transshipped around the

22   world.  Well, you could say that about passenger air traffic,

23   too.  You can get anywhere from anywhere.  That doesn't mean

24   it's all one market or that the rates are all interdependant.

25   In fact, he, Dr. Tollison acknowledged in his deposition that

In re:  Air Cargo Shipping Services                    82

1   he did no analysis, statistical analysis to show that the

2   routes were, in fact, interdependent, which is what you would

3   need to do maybe at a minimum, to be able to make any

4   inference from some global model results.  You have to know

5   that the parts are related before you can make any inference

6   that the global results say anything about the parts.

7            And it's interesting.  Today, I think I heard

8   Mr. Landau say correctly what he was trying to demonstrate,

9   that they were all interrelated.  He said something very

10  important:  If the price was right, you might truck something

11  from New York to Washington.  That's key.  If the price was

12  right.  There has been no analysis here by any of the

13  plaintiffs' experts to show that the prices were interrelated,

14  but they have acknowledged that that is the key factor to

15  justify the assumption of global interdependance and all of

16  the analysis of all of their structural claims.

17           And in fact, they don't want to acknowledge this,

18  and Dr. Tollison at the hearing resisted the notion that he

19  had to define a relevant market.  Maybe he doesn't from the

20  standpoint of proving a Section 1 conspiracy, but you need to

21  know what the relevant market is to analyze whether there's an

22  impact.  And it's particularly critical and a double problem

23  for the plaintiffs because Dr. McClave testified that he

24  relied on Dr. Tollison for doing his global analysis, two

25  bases for that, one, well, that's what the complaint alleged,

In re:  Air Cargo Shipping Services                    83

1   and two, Dr. Tollison told me that he thought it was a global

2   market.

3          But their own theory is inconsistent with their

4   global analysis claim, because they agreed that customers

5   choose carriers on the basis of price, but they present no

6   evidence that longer routes or routes with multiple conditions

7   are equally cost effective.  And indeed, their industry

8   declarant Brooks acknowledged that, yeah, it's a worldwide

9   market in the sense that you can get anywhere from any place

10  else, but of course it takes longer and you would want a price

11  break if your product couldn't get there as quickly.

12         And the one example that we heard today, he quoted

13  from -- I can't remember if it was Mr. Beckett about, well, he

14  could ship from one airport to a location taking two routes,

15  but it was -- if you remember the example, the planes left at

16  the same time and arrived within 30 minutes of each other.

17  There has been no indication that that happened more than a

18  few flukish times on a few routes.  The idea that from that

19  example, you could say that a route from New York to Shanghai

20  to Los Angeles is interdependant with a route from New York to

21  Los Angeles is stretching logic beyond what it will bear.

22         They also agree that air freight is time-sensitive

23  and goods are perishable.  But they presented no evidence that

24  longer routes or routes with multiple connections are

25  protective options for those very types of transactions.

In re:  Air Cargo Shipping Services                    84

1        Their own expect analysis shows that they don't
2   really believe the global market.  Remember Dr. McClave's
3   excess capacity analysis was broken in halves.  It wasn't
4   global.  It was inbound or outbound.  That's significant.
5   There are problems with that because it actually isn't
6   uniform, and he made the assumption that it was.
7            I mean, if it's a significant fact to look at, which
8   he said it was, why limit it to all inbound or all outbound?
9   Why not look and see what happened on individual routes?  None
10  of which he did.  So his assumption was there was no excess
11  capacity on any of the inbound routes and there was excess
12  capacity on every outbound route for all time.  No analysis
13  for that.
14            Now, Dr. Tollison analyzed defendants' collective
15  market share.  In fact, that was kind of the cornerstone of
16  his basic opinion that we had the power to do what they claim.
17  Well, and -- but he did it on worldwide routes first but also
18  separately on routes into and out of the United States.  So he
19  recognized that there were differences, but he stopped.  He
20  stopped and didn't carry out the logic of his analysis and
21  we've seen and we saw it again in the opening here today, that
22  there are differences in defendants' market share from route
23  to route, and while there may be some explanation for some of
24  them, you can't just ignore the fact that there were
25  differences of market share and when they make market share

In re:  Air Cargo Shipping Services                    85

1    the sine qua non of our ability to carry out and implement the

2    conspiracy, then it's incumbent on them to show that the

3    market shares were similar, but they didn't do that.

4           And there is no doubt about that.  It's important.

5    Dr. Tollison said they're not like a monopoly and just set the

6    price.  They've got to get together.  If there are two

7    conspirators in a market with ten competitors, the two

8    conspirators really don't have very much power to do things or

9    they might be able to accomplish some of the conspiracy, but

10   not all.  But here, we have the assumption that it's the same

11   everywhere, when it -- there's no evidence that it is.

12          We heard about ocean shipping.  The issue there is

13   not whether ocean shipping is always competitive.  It's the

14   fact that it might very well be, and there's evidence in the

15   record from the named plaintiffs themselves that yes, they did

16   use ocean shipping from time to time or they could have and

17   Mr. Brooks from American Airlines said that.

18          So the issue is, could it affect some of the

19   thousands of class members for whom it could have been

20   relevant, because the -- because of the product that they're

21   shipping or because of the time or whatever.  It's not a

22   single conclusion that applies to everyone.

23          The service competition is also important.  He said

24   it was just price.  Certainly, price is important, but service

25   is, too, and he acknowledged -- Dr. Tollison -- that there

In re:  Air Cargo Shipping Services                           86

1    were differences in service.

2           And the last structural characteristic I'm going to

3    talk about is feasible.  There was a global statement and an

4    opinion by the plaintiffs' expert that new entry is very

5    difficult, defining a new entry as someone who has never been

6    in the air cargo business before, but when you have

7    substantial non-defendants, non-conspirators, 30, 40 percent

8    of the market, they can go to and start in a new market.

9    That's just as much entry as somebody, you know, coming in off

10   the street who has never done the job before.  In fact, that's

11   probably a more effective entry because they have done it.

12   And mr. Brooks, the industry declarant or affiant that they

13   used, acknowledged that they not only can, but they do.

14          Okay.  As I said, I'm not going spend much time on

15   the surcharge announcements because we did that a little bit,

16   but suffice it to say the analysis based on announcements,

17   they're just announcements.  They are asking prices, not

18   buying prices necessarily, and even the actual surcharges vary

19   dramatically and still, we don't have announcements from

20   everywhere.  We have it from some places.

21          Let's talk about Dr. McClave's global model.  I'm

22   running out of my time here, so I need to speed this up.

23          There are lots of problems.  The first big problem

24   is that it admittedly cannot differentiate between injured and

25   uninjured class members.  He said that at the hearing.  It's

In re:  Air Cargo Shipping Services                    87

1    not a customer-level model.  You've got to go to the

2    customer-level model, if you're going to try to do what you're

3    asking.

4           But his analysis that all or virtually all were

5    affected is based on the global model.  But he acknowledges

6    that he can't do that.  He also acknowledged in his deposition

7    that it can't identify which individual transactions were

8    impacted.  So he can't even do that.  And it's not surprising,

9    because he didn't include any customer information in the

10   model.  It's like blind.  And yet, the obligation is to

11   identify and demonstrate that all or virtually all customers

12   were affected, but the model doesn't identify a customer and

13   there's no way that you can identify them from the model.

14          The second big problem is that they're really -- it

15   yields an average -- and I don't want get into a semantic

16   dispute about whether -- it's not like a median or a mean or

17   mug, but it is one result.  And what is the significance of

18   that?  It doesn't actually -- the answer -- doesn't actually

19   apply to each class member.  It doesn't apply to each

20   transaction.  It doesn't apply to each country or route.  It

21   doesn't apply to each time period.  It doesn't apply -- and

22   why doesn't it do those things?  Because it's a single

23   equation with a single permitted result.

24          Coefficient of damages is a single estimate, single

25   estimate.  That's all.  And he gets that by lumping all of the

In re:  Air Cargo Shipping Services                    88

1    data, taking off the customer numbers, of course, into an

2    equation and running it to generate one number.  And what's

3    important is, it's not allowed to do anything else.  He

4    admitted that.  It's not allowed to vary by country.  It's not

5    allowed to vary by customer.  It's not allowed to vary by

6    product.  It's not allowed to vary by weight.  It's not

7    allowed to vary by carrier.  In other words -- and it's not

8    allowed to vary by time -- in other words, it can only

9    generate one number that tells you absolutely nothing about

10   what happened to all of the hundreds of thousands of customers

11   whose transactions go into the blender.

12          Now, if that weren't problem enough, the variables

13   in the equation were aggregate variables, and we heard that.

14   The demand variable was all inbound and all outbound, not all

15   the inbound traffic on a route or a country.  So what does

16   that say?  Even if the model somehow is allowed to vary, it

17   gives us different results when the input is this general

18   stuff that doesn't say anything about the demand in specific

19   routes.

20          The cost variable is the same way.  It's a single

21   aggregate for all carriers.  It had its own problems because

22   it was based on three cargo carriers because he said that's

23   the way you get the cargo, the value of how much it cost to

24   ship cargo.  By definition, it's not representative because

25   the other 34 carriers aren't pure cargo carriers.  That's not

In re:  Air Cargo Shipping Services                     89

1    their cost.

2            It omits variables and it has low predictive power.

3    I'll speed through this.  And assuming the common result by

4    the use of the single-form regression, the ABA's antitrust

5    section book on econometrics makes that very point.  This is

6    not something that we're making up.

7            We didn't have to go further.  We tested their

8    hypothesis, which is what you would expect one would do.  And

9    the model doesn't tell you anything about all or virtually

10   all.  That's just an inference that was drawn from it.  So we

11   tested that by looking at the named plaintiff, the country,

12   weight category and years.  It's a perfectly respectable

13   technique.  In fact, it would be shocking if you didn't do

14   something like this and you just had to take it on things.

15   This is important stuff, but yeah.  Okay.  The named

16   plaintiffs, four of them, when tested, didn't have an

17   overcharge, but they're representative.

18           We saw these.  There are issues they said about

19   insufficient data and things like that, but Kaplan tested

20   this, and large swaths of the countries didn't have

21   overcharges, and we heard that that some of them didn't have

22   very much data, but a lot of them did and I think it's chart

23   40 something in Kaplan's slides, you know, China.  There are

24   plenty of transactions, over a million, India, 800,000.  And

25   in fact, McClave acknowledged he wouldn't have expected it to

In re:  Air Cargo Shipping Services                    90

1    be the same if you looked at subsets.  So, again, he's

2    constructed this model which if you grant the premise that you

3    can't test it, well, of course it has a result.  But if you

4    actually want to see whether it applies to the constituent

5    part, he says, I wouldn't expect it to be the same.

6              Mr. Kaplan showed that there were also lots of lack

7    of entry and weight categories and time periods.  The

8    robustness test, we've heard about that today, they don't say

9    anything about testing the constituent parts.  All they do is

10   try to see is this a pretty good average.  I mean, maybe it

11   should be a little different, but they have all of the same

12   problems.  They have one coefficient.  They use the same

13   global variable or aggregate variables.

14             All they do is, you take a few pieces of information

15   out and not surprisingly, the average is pretty -- pretty much

16   the same.  Now, in some cases, it might be different.  And

17   that would be a real problem.  But it doesn't permit the

18   inference that all or virtually all members of the class were

19   affected by that global model.

20             The customer models, that's the thing that -- the

21   latecomer in Dr. McClave's analysis -- that they apply to only

22   two-thirds of the class.  That tells you something right

23   there.  They do not apply actually to two-thirds of the class,

24   only one-third.  They're based largely on the same global

25   variables.  They were an afterthought and they -- so because

In re:  Air Cargo Shipping Services          91

1   they are the same global model variables, they basically have

2   some of the same faults.  They use the same single coefficient

3   of conspiracy.

4        Now here, he admits that it doesn't include nearly

5   two-thirds of the proposed class.  The plaintiffs speculate

6   about two-thirds of their class were omitted from the customer

7   model, but they were probably harmed.  Well, maybe they were

8   and maybe they weren't, but this is something that nobody from

9   the plaintiffs ever talked about before the hearing.

10       They did no analysis.  McClave said it's an economic

11  opinion, and he didn't -- he's not an economist, so it's

12  speculation.  Whether it's right or wrong, I don't know, but

13  you can certainly imagine situations in which they would have

14  bargaining power.  It could be a big entity that happened to

15  have a one off-need to sell something and a carrier has cargo

16  room to fill up.  It's like, you know, a scalper after the

17  game has started.  The price goes down.  That is the point

18  that they still all use the same conspiracy theory, but

19  they're not allowed to vary.

20       Another problem with this is that there is -- they

21  assumed that a single positive overcharge on a single

22  transaction constitutes impact.  We heard that again today.

23  And that's the definition that Dr. McClave used.  But

24  Dr. McClave admitted that the positive overcharge, single

25  positive overcharge may be random noise.  He said that in his

In re:  Air Cargo Shipping Services                         92

1    reply declaration and he said it again in the hearing when he

2    said, you know, really those customer models there, I think

3    that they're not as reliable as the global model, but the

4    global model doesn't permit any inference of all or virtually

5    all from that single result which, by definition, must be a

6    single result.

7         And here, I went over with him the example of a

8    customer where who had -- who is a net positive customer --

9    had ten transactions or she did.  I don't know.  And only one

10   of them was positive.  That -- but that goes into McClave's

11   net positive baskets, because of one transaction, where if you

12   will see the overcharge on that must have been like two-thirds

13   of the total price, you know, hundreds of dollars, way more

14   than any possible surcharge, but he relies on that.  That

15   customer shows up in his net overcharge bucket.  But,

16   interestingly, his customer model kind of help our case,

17   actually, not theirs.  Two of the six named plaintiffs have

18   negative overcharges, as you can see over here (indicating,)

19   Olarte and FTNS here.

20        We heard about the number of overcharged

21   transactions and I'm not saying that they were, but according

22   to this evidence, they were, but that was a small fraction of

23   all of their transactions, yet we have heard over and over

24   again that defendants succeeded in imposing uniform

25   non-negotiable surcharges on every transaction without

In re:  Air Cargo Shipping Services                    93

1    exception and here, by Dr. McClave's own evidence, it's like

2    half or less of the transactions of the named plaintiffs did

3    not have overcharges.

4            And if you do the math, you'll see dividing the

5    overcharges by the damages, you will see that it comes out to

6    wildly different numbers having nothing to do with the six

7    percent.  And the idea that Dr. McClave said in his report,

8    and it was his slide, I think said it -- what he's going to do

9    is a reliable method of proving damages, estimating damages

10   for each class member.  This is the opposite of a reliable

11   method, his global model.  When he applies it to individual

12   customers, the results of all over the line.

13           Finally, let's turn to -- even assuming that they

14   could prove that something happened to all or virtually all

15   the customers, they still aren't home free here because they

16   haven't linked that with their substantive claims.  The

17   alleged conspiracy involves fuel and security surcharges, not

18   base rate.  We heard that over and over and over again.

19           But we also heard -- Dr. McClave said, but I didn't

20   try that to see what happened on the fuel surcharges.  I

21   didn't try to isolate any incremental effect.  He didn't try

22   to differentiate what might have happened to the fuel

23   surcharges versus the security surcharges, either singly or

24   collectively.  He simply hasn't done any analysis that would

25   connect the difference in price that he thinks he found to

In re:  Air Cargo Shipping Services                94

1    anything that bears any resemblance to the conspiracy that

2    they allege.  He has no opinion what the "but for" prices or

3    the "but for" security surcharges would be or the fuel

4    surcharges.

5            Now, let's talk about false positives a little bit.

6    And he is aware that there were periods, time periods when

7    there were no surcharges.  And he's aware of that, yet he

8    proposes to apply his model to all transactions.  That's how

9    he said, the best and most reasonable estimate of damages is

10   to multiply those percentage numbers by every class member's

11   transaction.

12           Does that make any sense for customers who had a

13   zero overcharge or a zero fuel surcharge?  Does it make any

14   sense for transactions with a zero fuel surcharge or zero

15   security surcharge?  No.  It's not measuring what they're

16   complaining about.

17           A related point is that -- let me go back here.  The

18   model shows overcharges that are completely unrelated to the

19   level of the thing they say has been fixed.  And we went

20   through this in the examination of Dr. McClave.  It showed his

21   analysis, if you were to buy it, would generate the same

22   overcharges on similarly-priced transactions when the

23   surcharges are completely different.  What kind of a

24   conspiracy is that?  And it generates different overcharges on

25   differently-priced transactions when the surcharges are the

In re:  Air Cargo Shipping Services                     95

1  same.

2          And we took an example.  We took various events

3  from -- I think it's Asiana -- and the level of the surcharge,

4  what you can see is the damage.

5          There.  Can you get me back to the end?  Okay.  Try

6  again.

7          If the price is two dollars, the damages are 12

8  cents on a unit basis, regardless of the level of the

9  surcharge.  When it's 60, 35, zero or 15.  When the surcharge

10  is 15 -- in other words, assuming it's the same, the unit

11  damages are dramatically different depending on the price, but

12  it's that on the unit basis that has been fixed.  But the

13  damages are completely unrelated to that.  When it's zero,

14  which shouldn't be any damages, but there they are.  When it's

15  35, the damages, again, bear no relationship to the surcharge

16  that has been there.

17          And so for multiple reasons, the methodology that

18  Dr. McClave has offered to prove impact and a reliable measure

19  of damages simply won't bear the weight that the plaintiffs

20  have asked you to put on it.  That's -- done with my part.

21          THE COURT:  Let me ask you one question.

22          MR. BROOKHISER:  Okay.

23          THE COURT:  Let's assume that the model does not

24  produce a reliable measure of damages for each of the class

25  members.  Does that defeat class certification?

In re:  Air Cargo Shipping Services                                96

1            MR. BROOKHISER:  Yes.

2            THE COURT:  Why?

3            MR. BROOKHISER:  Because as they have said, they

4    have to demonstrate -- I think it's slide two in Dr. McClave's

5    own --

6            THE COURT:  I thought they have to prove classwide

7    impact.

8            MR. BROOKHISER:  They have to --

9            THE COURT:  They don't have to prove -- they don't

10   have to prove classwide damages for each class member?

11           MR. BROOKHISER:  They have to show a way to do it

12   reliably, in which they themselves acknowledge.  And

13   Mr. Simmons will talk about this more than I do, but don't

14   take my word for it.

15           Can we flip on the Elmo?

16           This was Dr. McClave's assignment.

17           THE COURT:  No.  Forget about what Dr. McClave --

18   he's not the lawyer.

19           MR. BROOKHISER:  That's true.

20           THE COURT:  I'm talking about from a legal

21   standpoint.  I'm talking about from a class certification

22   analysis standpoint.  Class -- and I think this goes to the

23   heart of what Mr. Landau was saying about, perhaps I'm

24   misunderstanding it.  They have to show classwide impact.

25           MR. BROOKHISER:  Right.

In re:  Air Cargo Shipping Services                      97

1          THE COURT:  They don't have to show that this is

2    their argument.  They don't have to show the specific impact

3    on each class member.  And that's why when you're focusing on

4    an unreliable measure of damages for each class member, I'm

5    wondering if it's your position that that means that defeats

6    class certification.

7          MR. BROOKHISER:  Yes, it is our position.  And I'll

8    give you some practical reasons why that's true.  Mr. Simmons

9    will talk more about why that's what the law says.  *Comcast*

10   was among them, was a damages case, and the Supreme Court

11   there said that, gee, this is millions, a myriad of damage,

12   individual damages analysis that would be required.

13          But the fact of the matter is that at trial, each

14   class member, including the two hundred thousand absent ones,

15   are going to have to show their damages.  How do they do that

16   if the formula, the methodology doesn't say anything about

17   what any individual class member is harmed.  And this doesn't

18   it has nothing to do with any alleged harm.

19          (Continued on the next page.)

20

21

22

23

24

25

In re:  Air Cargo Shipping Services                98

1      MR. BROOKHISER:  But each class member would have to
2   -- if they were trying the case, would have to show that they
3   were hurt.  That requires a common methodology that yields
4   reliable damages estimates.  You know, maybe it doesn't have
5   to be absolutely perfect, but this doesn't even come close.
6      THE COURT:  Okay, thank you for the answer.  Let's
7   break for lunch.  We'll resume at 2 p.m.  See you then.  Thank
8   you.
9      (Luncheon recess.)
10      THE COURT:  All right.  We're ready to resume.  And
11   it's Mr. Simmons now; right?
12      MR. SIMMONS:  Thank you, Your Honor.  Ian Simmons of
13   O'Melveny & Myers for Asiana Airlines, the defendants.
14      Your Honor, I am not very good with PowerPoints, so
15   I hope you indulge me.  I may be doing a little bit of channel
16   surfing, consistent with what's happened today, but my
17   preference is really to talk.
18      THE COURT:  All right.
19      MR. SIMMONS:  But I would encourage you to please
20   interrupt me if you have any questions.
21      Let me go straight to the question that we broke
22   with, Your Honor.  We put up there on the board -- and I have
23   a slide on this later -- your question whether, you know,
24   damages, can't we just defer that and figure it out later.
25   Can't we just do that?  I put up there, Your Honor, a quote

In re:  Air Cargo Shipping Services                    99

1   from the Second Circuit in the McLaughlin versus American

2   Tobacco case, 522 F.3d 215, a Second Circuit 2008 case where

3   they reversed class certification, the granting of class

4   certification for this very reason.  This was a RICO case

5   involving whether tobacco companies engaged in various

6   misrepresentations.

7           RICO, the RICO private right statute was modeled

8   after the Clayton Act, the very statute in this case.  And

9   this is what the Second Circuit said, and I'm going to quote

10  here from page 231, 522 F.3d at 231.  "The total amount of

11  damages suffered would then be calculated based on this

12  estimate and presumably on an estimate of the average loss for

13  each plaintiff.  But such an aggregate determination is likely

14  to result in an astronomical damages figure that does not

15  accurately reflect the number of plaintiffs actually injured

16  by defendants and that bears little or no relationship to the

17  amount of economic harm actually caused by defendants.  This

18  kind of disconnect offends the Rules Enabling Act which

19  provides that Federal Rules of Procedure such as Rule 23

20  cannot be used to abridge, enlarge or modify any substantive

21  right."  28 U.S.C. 2072(b).

22          The Court of Appeals goes on to say:  "Roughly

23  estimating the gross damages to the class as a whole and only

24  subsequently allowing for the processing of individual claims

25  would inevitably alter defendants' substantive right to pay

In re:  Air Cargo Shipping Services                          100

1    damages reflective of their actual liability."

2              The Court of Appeals, what I've heard, the

3    invitation being delivered to the Court is we've shown an

4    impact.  I will be showing why they haven't.  But even on the

5    issue of damages, what they're asking you to do cannot be

6    reconciled with Second Circuit law and the Rules Enabling Act.

7              And let me also speak to the question before I move

8    on to my planned remarks, Your Honor.  The question that,

9    well, all we've got to show is a methodology.  The defendants

10   are really challenging the method or the merits of it.  You

11   heard Mr. Landau constantly use that kind of refrain with you,

12   Your Honor.  Respectfully, that's an obsolete standard.  The

13   EPDM cases that he cites, many of the other cases, what the

14   judges used to do is, oh, defendants are challenging the

15   merits, I'm going to defer that.

16             That's -- when I show you the cases, and let's go to

17   the Supreme Court case in Comcast.  US Supreme Court reversed

18   the Third Circuit for embracing that very kind of notion,

19   ducking an evaluation of the merits of the methodology.  Does

20   the methodology show class-wide impact through common proof.

21             We will show, and I will map onto the law for you

22   this afternoon, Your Honor, we've shown that it doesn't, that

23   it doesn't, that their method, when applied to the named

24   plaintiffs, four of the six come out with no impact.

25             What does the Supreme Court say about the Third

In re:  Air Cargo Shipping Services              101

1   Circuit?  Because when we go and read Comcast and we read what

2   the Third Circuit -- how it ducked it, it said the defendants

3   are challenging the merits, the jury will say yes or no.  No,

4   that's the district court's job.

5          They said the Court of Appeals saw no need for

6   respondents to tie their theory of antitrust impact to a

7   calculation of damages.  That, they said, would involve a

8   consideration of "merits," having no place in the class

9   certification inquiry.  The Supreme Court said, that reasoning

10  flatly contradicts our cases, requiring a determination that

11  Rule 23 is satisfied, even when that requires inquiry into the

12  merits of the claim.  And it cites the -- it cites the

13  Wal-Mart case.

14         The Supreme Court in Comcast goes on to say that, in

15  response to the refrain that, well, it's a common method

16  because everyone can use it.  The Supreme Court said, under

17  that logic, at the class certification stage, any method of

18  measurement is acceptable so long as it can be applied

19  class-wide, no matter how arbitrary the measurements may be.

20         I'm going to come back to Comcast, Your Honor, when

21  I talk about causation, because it's an attribution issue.

22  But I'd like you, as you reflect on this case, because the

23  parties, both of them, have worked hard on this.  They've put

24  a lot on your plate.  It's an important case.  But I'd like

25  you to reflect -- put aside the slides for a minute -- on a

In re:  Air Cargo Shipping Services                102

1   couple of things.

2          First, you will not see in the reported cases any

3   case of this magnitude.  It's just not there.  All routes into

4   and out of the United States over a six-year period,

5   everywhere in the world, Trinidad, Botswana, South Africa,

6   Egypt, Pakistan, India, Australia, Canada, where I'm from, you

7   won't see it.

8          Contrast this case with Wal-Mart, the Supreme Court

9   Wal-Mart case.  Wal-Mart was a single defendant, not 39, on

10  employment decisions made over a certain year period in the

11  United States where the plaintiff class admitted that

12  employment decisions were made discretionarily.  They were

13  made by discretion, not pursuant to central policy.  The

14  Supreme Court reversed the granting of certification there.

15         Here, you have 39 defendants.  And you don't just

16  have the United States where decisions are made

17  discretionarily, you have the entire world.  The plaintiffs

18  have admitted that the biggest component of price here, base

19  rates, was cutthroat competition and regionally set.

20         So when we -- I know how we all love to get into the

21  cases and the economics, but when we go through the cases,

22  Your Honor, and I'm going to try to show you district court

23  cases getting into the regressions, not throwing the hands up

24  and say it's merits and I'll let the jury figure it out,

25  because that's not what we're here to do.

In re:  Air Cargo Shipping Services                103

1          I'm going to show you district court cases getting

2    into regressions, weighing them in the balance and finding

3    them wanting.  Because regressions, the law says, do not show

4    anything about causation.  What was the buzz word we've

5    constantly heard from plaintiffs?  It's about inference.

6          Dr. McClave out of the gate submitted a 15-page

7    report that he said was solving for the problem of all or

8    virtually all class members.  It's people.  It's sticks.  It's

9    entities.  It's not weight.  It's not gross revenues.  They

10   need to stop changing the subject.  It is all or virtually all

11   class members.

12         Bear in mind what Mr. Brookhiser urged you to do

13   when you go back.  Look at the papers in chronological order.

14   Who's doing what?  They were the moving party.  They put in an

15   aggregate, what Mr. Kaplan called a cloud.  It's all 30

16   million data points, but I left out the names.  There's

17   nothing to link -- there's nothing to link that cloud of data

18   to what we're supposed to be solving for, class members.

19         My son's in grade five science and he's studying

20   Isaac Newton and the scientific method.  The scientific method

21   is about testing hypotheses.  You heard Mr. Landau say to you

22   the first time anyone heard about false positives is when Mr.

23   Kaplan was on the stand.  That's not right at all.

24         Mr. Kaplan went out and looked at this cloud, he

25   left out customer names, and, consistent with the

In re:  Air Cargo Shipping Services                104

1    econometrics, he tested the hypothesis.  When we're looking at

2    real people in real class members, what do the results show?

3    And we show negatives for four of the six named plaintiffs.

4    Four of six, under their global model, no injury.

5           What is their response?  Incredibly, what is their

6    response?  Their response is, Daubert, not allowed, not

7    allowed to do that.  Mr. Kaplan's not allowed to do that.

8    This is all by way of summary, Judge, because I'm going to

9    take you through and show you the cases.

10          Mr. Kaplan did in this case exactly what Judge Alsup

11   in the GPU case criticized the plaintiff's lawyer for not

12   doing, plaintiff's economist.  That lawyer did a cloud of

13   data.  And Judge Alsup wrote -- these are almost his exact

14   words in a very well-known published opinion -- the

15   plaintiff's economist evades the very burden he was supposed

16   to assume.

17          Why didn't McClave try to solve the problem in terms

18   of real class members?  You will see in his deposition, when

19   he's constantly asked does this cloud show that all or

20   virtually all class members were impacted, he says, no, it

21   shows class-wide, meaning aggregate injury, and from that, I

22   assume.  That's a logical non sequitur, Your Honor.  That's

23   like saying there's a hundred units of impact on ten class

24   members, so each one had to have been ten.

25          Mr. Brookhiser is absolutely right.  What they are

In re:  Air Cargo Shipping Services                    105

1    talking about is an average.  It's a single conspiracy

2    coefficient, inbound and outbound, to every class member for

3    six years in the world.  Regressions, as I will take you

4    through it, Your Honor, are weighed in the balance, and

5    they're weighed against all of these other things in the

6    record.

7            The Supreme Court in Dukes went to the effort of

8    looking at two regressions, saying that Wal-Mart had been

9    engaged in discriminatory conduct.  It found the regressions

10   wanting in light of all the record evidence, including the

11   admission that employment decisions were made regionally and

12   with discretion.  Let me -- so the answer is, Your Honor, an

13   emphatic no.  We can't duck the damages question.  McLaughlin

14   said that violates the rules.

15           Comcast is very important.  You know this, we know

16   this, and they know it.  Comcast is not just an impact case.

17   Comcast is about damages.  Comcast -- and I'm getting ahead of

18   my outline here, so this is all by way of the overture of the

19   opera.  You're going to hear -- hopefully I won't be like

20   Wagnerian, but you're going to hear this.  This is a theme in

21   the overture.

22           Comcast says the theory -- we start with what we

23   thought was an unremarkable premise.  This is the Supreme

24   Court.  The theory of recovery has to be tied to the theory of

25   the harm, attribution, what I like to call an attribution

In re:  Air Cargo Shipping Services                    106

1   issue.  And the courts have long said this.

2          Not only did McClave put just data in the cloud, no

3   customer names, but we're solving for all or virtually all

4   class members, but he kept that out.  Not only did he not do

5   that, but there's no isolation in that cloud of the illegal

6   increment.  That one cent Mr. Kaplan was talking about, the

7   illegal increment of the fuel surcharge.

8          No dispute between the parties that it's not

9   unlawful in and of itself to have a fuel surcharge.  I want to

10  come back to one of the slides Mr. Landau showed you on that

11  point, slide 140.  No dispute between the parties that

12  non-defendants had fuel surcharges, it's okay.  No dispute

13  it's not illegal in and of itself to have a security

14  surcharge.

15         But McClave didn't isolate the increment of a fuel

16  surcharge.  There's a lot probably rolling around your head.

17  That they say defendants admit that total price is what you

18  should be looking at, and so what's the issue here?  I would

19  put it to you this way, Your Honor, this is the way I think

20  about it:  Isolating the increment on the fuel surcharge is a

21  necessary but not sufficient condition for each named

22  plaintiff to recover here.  Necessary but not sufficient.  My

23  son's grade five science has been helping me think about this.

24  Necessary but not sufficient.

25         It's necessary, as Comcast says, to show a causal

In re:  Air Cargo Shipping Services                107

1    chain, but it's not sufficient, because the base rate could

2    have been offset to accommodate for it.  One is not a

3    substitute for the other.  McClave doesn't do the necessary

4    condition.

5              THE COURT:  The one question I have concerning that

6    argument is this:  Essentially, it's basically saying that

7    there is -- it seems to me it's saying that there's really no

8    way to prove that the price fixing here, the surcharge price

9    fixing can be proved in a class action, because basically,

10   you're saying it's going to -- people can be free to fix

11   prices as long as they do it on a component of price.

12             And then you can always argue that there's -- you

13   can adjust the other things to accommodate it and so,

14   therefore, you're going to have to have an -- every action has

15   to be by each purchaser individually.  There's no way that it

16   can be done on a class-wide basis.  I think that's the

17   inevitable result of your argument.

18             MR. SIMMONS:  Your Honor --

19             THE COURT:  What I'm inviting you to do is tell me

20   why that's not so.  Why it's not so.  Why if I accept your

21   argument I'm not basically saying that there's no way a class

22   action can be brought where the conspirators decide to fix one

23   component of price, but they can always make the argument, oh,

24   the other components can be -- you see what I'm saying?

25             The other components can be adjusted so that we can,

In re:  Air Cargo Shipping Services                    108

1    quote -- I'm arguing this from the plaintiff's standpoint --

2    to mask our price fixing.

3            MR. SIMMONS:  Two-part answer, and I've got slides

4    on this.  That's why I hate slides, because I'm like I'll get

5    to that.

6            THE COURT:  Maybe I should have waited.

7            MR. SIMMONS:  No.  Two-part answer.  First, most of

8    the cases denying class certification, most of them are

9    component price cases like this.  Blades versus Monsanto,

10   which affirmed the denial of a class certification in the

11   Eighth Circuit, because there it was just part of -- a premium

12   part of a seed that was fixed.  Most of the cases denying them

13   are component, but not all.  DRAM, class certification was

14   granted.  There are other cases where they were granted, some

15   of them under the older standard, standards, Your Honor.

16            But I would say to you, for example, in DRAM, the

17   plaintiff's economist in those cases -- for example, let's say

18   we had a case where a car is what we purchased and it had the

19   fixed transmission in it, so it's a component of a car.  The

20   economist in those cases do what was never done by either

21   Tollison or McClave here, which is called hedonic regression.

22   I don't want to get -- hedonic meaning how much of the whole

23   is represented by the part that was fixed.  They look at a

24   relationship.  Never done here.  Never done here.

25            So, Your Honor, I don't want you thinking I'm some,

In re:  Air Cargo Shipping Services                    109

1    you know, Attila the Hun defending, you can never have -- very

2    difficult, Your Honor.

3              THE COURT:  I'm not trying to put Attila's label on

4    you.

5              MR. SIMMONS:  But let me try to give -- I'm trying

6    to argue to you.  I also don't think that we should be hearing

7    I've got to certify a class here.

8              So the answer is, I'm going to show you some cases.

9    Most of the cases denying are this very kind of case, where

10   it's not the only thing that was fixed.  EPDM, which Mr.

11   Landau mentioned, he had a slide on this, the EPDM, Judge, was

12   this case:  Six price lists that were allegedly fixed, six,

13   not all these hundreds of thousands of decisions everywhere in

14   the world, only the United States.  There was no dispute that

15   the list price is what people negotiated off of.  And the guy

16   ran a regression.  And it was only the United States, and the

17   product is a fungible product.  Seems like maybe there, I can

18   do a class.

19             Class actions, Your Honor, is like, you know, the

20   Titanic hit the iceberg and it went down and the survivors and

21   the decedents' estates are suing.  There's no dispute that the

22   ship hit the iceberg, went down.  The question is was the

23   White Star Line negligent.  Should it have known?  How's the

24   radar doing?  Where was the Captain?  Those are all common

25   questions and they're all susceptible of a common answer, as

In re:  Air Cargo Shipping Services                    110

1    the Supreme Court said in Dukes.

2          It's not the question, because we can offer him

3    anything as a common question.  It's not her, it's the answer.

4    And as Mr. Brookhiser told you, proof as to one named

5    plaintiff tells you nothing about proof as to any others.

6          But back on the Rules Enabling Act, Your Honor.  I'm

7    going to get to my presentation.  I want you when you go back

8    and reflect on this, the chronology that Mr. Brookhiser urged

9    you to reflect upon, and reflect upon this Daubert motion.  We

10   are not -- the Court is being told, when Olarte or RIM or

11   whoever testifies in court, we're not allowed to take their

12   data and pour it into the Cuisinart, into the blender of

13   McClave's global model and see what happens.  No, no, no.  Got

14   to have 30 million data points.

15         No, Your Honor, respectfully, we are entitled to

16   cross-examine those plaintiffs, putting their data in that

17   blender.  And when you do that, their model, four of the six

18   come out without an overcharge.  Not our model, their model.

19         Let me say one thing, Your Honor, also, because you

20   got so much paper thrown around and I don't want to be

21   throwing more at you.  In front of all of our exhibits to our

22   opposition to motion to dismiss, we attached excerpts from the

23   record.  And Exhibit 9, Your Honor, Mr. Landau said there's no

24   evidence of offsetting.  Exhibit 9, I won't take you through

25   it, there --

In re:  Air Cargo Shipping Services                111

1          THE COURT:  Exhibit 9 to what?

2          MR. SIMMONS:  To the opposition, to defendants'

3    opposition to class certification.  We have appendices, and in

4    front of each one is a grid summarizing the documents and

5    depositions that follow it.

6          Exhibit 9 is where we put all the evidence on -- not

7    all, but it's loaded with evidence on offsetting.  So you can

8    assume I disagree with Mr. Landau when he said there's no

9    evidence that anyone ever offset base rate to deal with the

10   fuel surcharge.

11         This -- I beg pardon?  Oh, Your Honor, no, we've got

12   to pass out our slides.  I'm sorry.  We have a slide show, so

13   we'll hand that out.

14         Now, I just want to make clear, Your Honor -- I'm

15   sorry for the channel surfing here.  Mr. Landau says, you

16   know, we're not challenging the methodology, we're challenging

17   the merits.  Even if that was right, we've got to go to the

18   quality, to the merits of their methodology.

19         We're challenging their methodology.  So let there

20   be no ambiguity about that.  I've already referenced a Dukes

21   versus Wal-Mart.  There's no dispute that it's all or

22   virtually all.

23         Let's pause on this for a minute, the Rail Freight,

24   because this hews a little bit, Your Honor, to what I said a

25   moment ago on, you know, let's just duck this.  They're

In re:  Air Cargo Shipping Services          112

1   inviting you to duck, respectfully, not where we are now and

2   not, frankly, where we've ever been.

3            Look at what the DC Circuit says.  "It is not enough

4   to submit a questionable model whose unsubstantiated claims

5   cannot be refuted through a priori analysis.  It is now clear,

6   however, that Rule 23 not only authorizes a hard look at the

7   soundness of statistical models that purport to show

8   predominance – the rule commands it."

9            You've heard -- I won't belabor this.  McClave's --

10  you heard from Mr. Brookhiser, it's a single number.  It's a

11  single number.  They don't -- average is a buzz word.  It's a

12  single number, and the courts have called that an average.

13  I'll show you cases.

14           Here, Mr. Brookhiser had this up, but I think we

15  should pause on it.  Dr. Rausser, who, by the way, was the

16  expert for the plaintiffs in Rail Freight, in the Rail Freight

17  case, Dr. McClave, who was the expert in the Comcast case

18  which got reversed by the Supreme Court, Dr. Rausser admitted

19  that what Dr. McClave is doing is a reduced form pricing

20  equation.

21           And here's from the American Bar Association.  "The

22  reduced-form pricing equation assumes that a conspiracy has

23  the same effect on every purchaser and focuses on an average

24  effect, which may hide variation across class members.  If one

25  is attempting to test" -- again, the scientific method -- "to

In re:  Air Cargo Shipping Services                113

1    test whether there is an impact on all members of a proposed

2    class, however, that assumption is not valid, as it assumes

3    the very proposition that is being tested."

4            I'm sorry.  Let me just go back a minute here, sir.

5    Courts frequently -- I'm going to take you through some of

6    these cases and they're cited in our briefs, Your Honor, but

7    if I were a Judge, I would be, oh my God, regressions, can

8    somebody else deal with this?  The courts, Judge, coat in

9    Freeland, she went in and looked at the omitted variables that

10   the plaintiff's expert there, and she weighted up against the

11   other factual evidence.  She found it wanting.  Judge Alsup

12   said, when you go through GPU, he says, why is Dr. Burtis, the

13   plaintiff's expert, aggregating all the data and then looking

14   for correlations around aggregated?  Why didn't he

15   disaggregate and then look for correlations?

16           David Kaplan does exactly what Judge Alsup said the

17   plaintiff's expert in that case should have done.  The Judge

18   in the Reed case denying class certification said:  Use of

19   averages -- and this is all in the regression context -- hides

20   variation.  And the Judge in Reed goes on to say there's no

21   such thing as the average nurse.  That case dealt with whether

22   defendants suppressed the wages of nurses in a few counties in

23   Illinois.  And even in a small geographic region like that, it

24   said we can't do this on a class-wide basis.

25           Plastics Additives, David Kaplan did virtually the

In re:  Air Cargo Shipping Services                    114

1    same analysis here that he did there, and there the Judge

2    rejected Dr. Beyer's regressions.  Florida, the same thing.

3    Florida is an interesting case.  I should say the Cement case.

4    There, you'll see, Judge, when we read this opinion, it's like

5    there's way too much variation amongst these different Florida

6    counties.

7            Take all of these cases and map them up against our

8    case.  Every route into and out of the United States.  It's --

9    I think it speaks for itself.

10           Tollison I frankly think is entitled to no weight.

11   They say, well, they didn't move Daubert.  We'll save our

12   Daubert motions, you know, for down the road.  You know, we

13   don't have to do Dau -- Daubert at the -- sorry, that's my

14   French Canadian.

15           THE COURT:  I've heard it both ways.

16           MR. SIMMONS:  I went to school in French Canada, so

17   I see a French name like Daubert.

18           THE COURT:  I went to school in Louisiana.

19           MR. SIMMONS:  Tollison doesn't look at actual class

20   members himself.  He didn't look at actual transaction data.

21   And it's kind of like one of those Russian dolls.  And he

22   didn't even look at the actual fuel surcharges, much less the

23   increment on the fuel surcharges.

24           Remember, what we're talking about is not just the

25   fuel surcharge in and of itself; it's the illegal increment,

In re:  Air Cargo Shipping Services                    115

1    90 cent base rate, 10 cent fuel surcharge, that one penny.

2    That's what the case is about and that's where the causal flow

3    has to come from, and they haven't presented that to you.

4            Let me run to this slide, Your Honor.  Dr. McClave's

5    customer models.  And remember the chronology.  Dr. Kaplan --

6    Mr. Kaplan was the first to look at customers.  He does it

7    first and then McClave does it on reply.  You would have

8    thought he would have done it as a going-in proposition, but

9    he didn't.  He excludes 62 percent of the class.

10           This is entitled to no weight on that basis alone,

11   zero, excluding 62 percent of all or virtually all.  He admits

12   that one of his methods of doing it, the so-called dot above

13   the line, that those dots could be subject to random

14   variability.  That's entitled to no weight.

15           He did not test for statistical significance.  And

16   he can't retransform the results.  The law -- and we have this

17   in our briefs, Your Honor.  The law is clear that when you

18   heard Mr. McClave say, oh, let's deal with the log-log

19   conversion later, as the Supreme Court said in Dukes, as it

20   repeated in Comcast, as the Second Circuit has said, you have

21   to look to how the case will be tried now.  It's not kick the

22   can down the road.  That's not what this -- that's not what we

23   do here.

24           So, respectfully, his customer model is entitled to

25   no weight.  Look what he says, just to be clear.  The customer

In re:  Air Cargo Shipping Services                116

1   model doesn't address impact one way or the other.  No, not

2   directly.  That's right.  His mistakes in aggregating, it's

3   replete with errors.

4          And this is proving our point.  It's individualized.

5   There may be off digits here, big companies.  DHL.  They've

6   talked about how DHL is suing.  You know, it's not like there

7   won't be litigation here.  But he's proving our point on how

8   individualized this is.  I've already covered this.  He's

9   admitted that that one dot above the line may be subject to

10  random variability.

11         You heard Mr. Brookhiser tell you that when you do

12  Dr. McClave's customer model in the net-net, so when you net

13  things out, two out of the six come out with no overcharge,

14  negative overcharge.  You heard a lot about the transformation

15  formula and how he's doing the wrong formula.

16         And look at how the results vary dramatically.

17  Again, these are the percentages only as to the one-third that

18  he's even using it for.  Look, we can argue about that later.

19  What he said at the hearing, that's just wrong.  When we go to

20  the cases, that's just error.

21         Let me move to the second topic, Your Honor, I want

22  to cover with you, which is the false positives.  And one of

23  the most powerful -- one of the most powerful expressions I

24  think you have in the record of this, Your Honor, to me as a

25  litigant, because the named plaintiffs, trial for one in the

In re:  Air Cargo Shipping Services                117

1   class action is trial for all.  They're the six survivors of

2   the Titanic.  Their claims stand for those that lost their

3   lives and the estates.  Trial for them is trial for the absent

4   class members.

5            This cloud of data that plaintiffs have out there,

6   we go from the named plaintiffs to the absent class members.

7   They want to go from a cloud of disassociated data and go from

8   that to the other side of the ledger.  They would have us

9   going the wrong way on this.  The reasoning in a class action

10  is from the named plaintiffs to the absent class members, not

11  the other way around.

12           But even when we apply -- even if we take them on

13  their own terms, let's take this cloud and let's run this

14  model that created this cloud.  In the clean period, we

15  generate overcharges.  How can a model in the clean period,

16  just like in Rail Freight, being applied to legacy shippers

17  who are not subject -- admitted by the plaintiffs, not subject

18  to the conduct, if it's generating an overcharge for them,

19  there's a problem with the model.

20           You heard from Mr. Brookhiser.  We know -- I always

21  get this mixed up.  It's either 45 percent for, I think for

22  outbound and 32 percent of inbound is not accounted for in his

23  model.  The variability, 45 percent and 32 percent.  That's a

24  big chunk of price movement that he admits his model is not

25  accounting for.  When you apply his model to the clean period,

In re:  Air Cargo Shipping Services                   118

1    you get an overcharge.

2           The model purports to quantify injury-in-fact to all

3    customers attributable to the defendants' exclusive conduct,

4    but the same methodology also detects injury where none could

5    exist.  If accurate, this critique would shred plaintiffs'

6    case for certification.  Strong words from a court of appeals.

7           "Common questions of fact cannot predominate where

8    there exists no reliable means of providing class-wide

9    injury-in-fact."  A hypothetical injury.  They're looking at

10   reliable -- they're looking to the guts of this machine.

11   They've tendered a machine that would go of itself.  And

12   you're allowed to get inside and see what makes that machine

13   up.  If that machine renders false positives in the clean

14   period, there's a problem with that.  If that machine shows

15   negative overcharge with a named plaintiff, someone sitting

16   here in court, they say, under Daubert, you're not allowed to

17   do that.

18           We are not allowed to have the jury hear that when

19   you put the named plaintiff data into his blender, four of six

20   come out with -- they're not allowed to hear that.  That's a

21   revolutionary proposition in a class action, revolutionary,

22   because the Supreme Court has said time and time again, the

23   trial of the named representatives is trial for the absent

24   class members.

25           Let me -- here is Plastics Additives, and you see --

1    a lot of people like to say I think the courts and the Supreme

2    Court are -- and finally things are percolating upwards, but

3    you see as far back as three years ago in Plastics, this is

4    Judge Jenkins in the Eastern District of Pennsylvania.  Again,

5    only the United States in Plastics Additives, not all routes

6    in and out of the United States.

7            "Where we are presented with evidence showing that

8    plaintiffs' proposed method demonstrates impact where there in

9    fact was none, a motion for class certification will be

10   denied."

11           Plaintiffs like to confuse and engage in word games.

12   Oh, well, that's Kaplan's model.  And then they say, well, the

13   defendants didn't show any model.  The defendants didn't have

14   a model.  Kaplan used his blender.  He drove his car or

15   whatever metaphor.

16           We test drove it.  However you want to call it, we

17   tested the hypothesis of the cloud on country pairs, on the

18   named plaintiffs.  And that's like a rev -- we're not allowed

19   to do that.  And we show four of the six come out negative.

20   Motion's got to be denied.  Trial for one.

21           The jury on the question of impact, and I think even

22   Mr. Landau -- I would disagree with what he's saying about

23   damages, Comcast damages case, McLaughlin.  You can't just

24   outsource damages and we'll have someone figure it out.  No.

25   Damages go to the Rules Enabling Act and they go to

In re:  Air Cargo Shipping Services                    120

1    predominance of law.  But we clearly agree that impact has to

2    be answered yes or no for everybody.  Simultaneously, same

3    answer.  You got four of the six with no overcharge.

4          Here, and this is not -- you see, they like to --

5    this is not just because of the Rail Freight in the DC

6    Circuit.  That's a very powerful expression about it.  It's a

7    single line item.  Again, similar case, line item, fuel

8    surcharge in the railroad.  But the courts for years have been

9    looking at this, because they understand trial for one is

10   trial for all.

11         It's like a mass tort.  Everyone who purchased

12   Tylenol in 2006 was -- the allegations are that -- I'm making

13   this up, obviously -- that Tylenol was defective, that

14   Tylenol.  And so the answer will be yes or no, you know,

15   generally for everyone in the class on that issue.

16         The courts have routinely denied class certification

17   where you don't have -- where you have negative -- where you

18   have no overcharges.  It's very important on this point, very

19   important.  They like to say, oh, the defendants have shown

20   someone.  So maybe someone was lucky enough to get through the

21   minefield, never stepping on a land mine.  This is what they

22   like -- you haven't shown actual people, things, class members

23   that got through.  Well, that's wrong.  We have four of the

24   six under their model.  Not allowed to do that, you're told.

25         Second of all, so we have shown.  I've got more

In re:  Air Cargo Shipping Services          121

1    information on that.  But very importantly, when we go through

2    these cases, what they're focusing on is zero impact

3    transactions.  The Eighth Circuit is very clear on that.  And

4    the DC Circuit, a great expression on this, Your Honor, in

5    Rail Freight, it says -- because it goes on.  The plaintiffs

6    made the same argument on appeal there.  Defendants haven't

7    shown that someone got through, and the DC Circuit says,

8    yes -- let me see if I can find it.  They say the plaintiffs

9    are right that the defendants' critique does not disprove the

10   damages model as a claim for class-wide overcharges as a

11   matter of logical necessity.  Absence of evidence is not

12   evidence of absence, but they misapprehend their burden.  And

13   then they go on to say the defendants don't bear that burden.

14        We obviously do say McClave's model is entitled to

15   no weight.  I mean, if I were evaluating it and someone says

16   I'm solving for all or virtually all class members, and then

17   you read his deposition, Judge, before all this -- well, I

18   just decided to withhold the names.  My radar, my antenna

19   would go up on someone who withheld the names when he's

20   theoretically solving for that problem.

21        The weighting thing, the elasticity and all this

22   witchcraft, frankly, on numbers, I got to weight the heavy

23   things.  Why don't you just use the chargeable weight.  The

24   weight, he does weighting.  It all -- it just raises real

25   issues.

In re:  Air Cargo Shipping Services                    122

1          But separate and apart from that, when we apply his

2     model and we show no overcharge for China to U.S., they say

3     you're not allowed to do that, you're not allowed to test the

4     hypothesis.  I just -- I think that speaks for itself.  That

5     is flatly inconsistent with legal standards.

6          There's no dispute as to the number of zero

7     transactions, Your Honor, and we haven't even put in, if I can

8     find the chart -- we had this at the hearing, the chart of

9     blanks.  There are hundreds of thousands of entries with

10    nothing in there, which McClave's model would render an

11    overcharge on.

12         No dispute on the data that's presented -- and this

13    is all in your book, so you can take it back.  I thought Mr.

14    Brookhiser put it very well when he said they're doing word

15    games with you.  McClave said, well, these are expected zeros.

16    He says they're -- well, yeah, for three years, our

17    representative Korean client, Asiana Airlines, 2000 to 2006 is

18    the class period, all routes into and out of the United

19    States, from 2000 to 2003, it didn't have a fuel surcharge out

20    of Korea and yet their model renders damages on those

21    transactions.  It's not right.  It's not right.

22         Oh, well, they're expected.  I don't care if they're

23    expected, Dr. Tollison.  McClave's model still renders damages

24    on them.  It's not right and it's not consistent with how we

25    treat Rule 23.

In re:  Air Cargo Shipping Services                    123

1        In any event, Tollison has admitted that -- again,

2   here's the -- you've seen this probably ad nauseam.

3   Two-thirds of the country pairs in the class, no overcharge.

4   And, Judge, ask yourself if it's such a small increment of

5   price, isn't it -- wouldn't you -- these are not surprising.

6   Two out of five, McClave's weight category.

7        All of these underscore why that single number which

8   Mr. Brookhiser showed you doesn't carry plaintiffs' burden.

9   Something I don't have on slide 31, which I think is very

10  important, and the model nevertheless shows overcharges in the

11  clean period.  That's exactly what was happening in Rail

12  Freight.  That's a problem for them.  Mr. McClave -- Dr.

13  McClave, who's not an economist, he's a statistician, numbers,

14  I got to have 30 million, a million's not good enough.  You

15  know, that's entitled to no weight.

16       When he was deposed the first time, he was asked,

17  was there a model that you've ever done before which -- where

18  you withheld the customer names?  And in his deposition, he

19  said, yes, in Comcast.  This is when the case was on appeal to

20  the Supreme Court.  In that case, as you know, I'm going to

21  come to that, his model rendered the same result.

22       Plaintiffs originally alleged there were four

23  theories of harm, and his black box rendered X was the result

24  from the four.  They admitted that three out of the four

25  couldn't be proven on a class-wide basis, just one of them.

In re:  Air Cargo Shipping Services                    124

1    But his result was still X.  He did no attribution.  He's

2    agnostic on causes.  He says, I don't look at the increments.

3    He's agnostic, but we can't be agnostic in this case.

4            Again, in Plastics Additives, the courts have been

5    persuaded by these.  This is not a revolutionary proposition

6    that's being presented.  Here, Your Honor, I already alluded

7    to this.  This notion that we can't do something with the

8    named plaintiffs, we can't use their impact damages model.

9    They go back and forth on whether McClave's doing impact or

10   just damages.  He's doing neither, but he's certainly doing no

11   impact, and I'll be coming to that.  But the fact of the

12   matter is we are entitled to take the named plaintiffs' data

13   and put it inside that model and see what happens.

14           Look at what the Judge said, published opinion,

15   Northern District of Illinois.  "Plaintiffs' single estimated

16   average percentage" -- single estimate, Judge, and this is

17   just a few counties around, I think Cook County and some

18   others in Illinois -- "was subject to variation when evaluated

19   for individual class members; the court determined that the

20   model is not a methodology common to the class that can

21   determine impact with respect to each class member."

22           I've already kind of alluded to the header on this

23   slide, Your Honor.  If you look at all the briefing in the

24   Daubert, they've turned class actions on its head in this

25   case.  They're saying what we've done with the named

In re:  Air Cargo Shipping Services                    125

1    plaintiffs, running their data on his machine, putting their

2    data in his blender, not allowed to do that.

3              You reason -- and we litigate from the named

4    plaintiffs outwards to the absent class members.  They've got

5    this cloud and they say the cloud has -- and then I'll impute

6    the 6.4 percent.  That single number will be imputed

7    downwards, even though he admitted to Mr. Brookhiser in the

8    hearing that that number, it doesn't reflect something that

9    actually happened, cause in fact.  I'm going to come to

10   causation in the next model, very important.

11             So the Reed case court was not impressed.  Here, we

12   have to be able to -- that four of the six named plaintiffs is

13   virtually in and of itself dispositive.

14             Now, let me move to the third issue, causation.  I

15   want to show you, Your Honor, assuming I can find it, one

16   passage that I think was very -- if we can turn the ELMO on,

17   hopefully, maybe someone could help me.  Sorry.  Oh, is it on?

18   Oh, I see.  Sorry.  All right.  Sorry.

19             Your Honor, this is -- I think this kind of shows

20   you the disconnect, the real problem the plaintiffs have here,

21   problem.  And I asked Dr. Tollison this twice in the hearing.

22   Let's just read it, because we're on the causation element.

23   The plaintiffs need to show class-wide impact in fact caused

24   by the violation with common proof, that it is capable of that

25   and the methodology withstands critiques.  That's what they

In re:  Air Cargo Shipping Services                    126

1    need.  That's what we're doing here.

2         I asked Dr. Tollison:  "Would you agree with me that

3    when we say all or virtually all being impacted by the bad

4    act, what we are talking about is how that hundred dollars of

5    impact was actually distributed" -- how did it actually fall

6    upon them -- "to the ten people in the class.  That's what we

7    were talking about, right?

8         He said:  "I don't think so.  I think we are talking

9    about having an analysis, such as Dr. McClave's, which gives

10   you some formal econometric way to say yes or no about impact

11   and to devise a formula of damage methodology.  So, without

12   doing that, I don't think you would have satisfied the

13   requirements for class certification.  I have done that with

14   my analysis of the industry, and Dr. McClave has done that on

15   another part with his econometrics."

16        Question:  "Well, do you dispute that what matters

17   is whether all or virtually all class members suffered an

18   impact that was, in fact, caused by a violation?

19        Answer:  "Yeah, but I'm not arbitrarily going to

20   say" --

21        Question:  "Is that a yes or a no?  I'd like a clear

22   record."

23        Answer:  "Okay, I disagree.  We can put the slide

24   back on."

25        There's a theme here, Judge.  Out of the box, they

In re:  Air Cargo Shipping Services                127

1   put in all the data.  I withhold the customer names into the

2   cloud.  I don't control for or look at the fuel surcharge,

3   much less the increment on the fuel surcharge.  On those two

4   things alone, they're done.

5           The cases that -- when -- I could direct you to some

6   cases where DRAM, component that goes in the computer, the

7   plaintiffs' economist in those cases all isolated the cost of

8   the DRAM, this part of the computer, and then how much of the

9   total -- the computer's a hundred bucks, the DRAM is 20 bucks,

10  and they looked at relationships between the component and the

11  total.  Nowhere done here.  The plaintiffs in those cases also

12  looked at, you know, they propounded but-for prices for the

13  component.  Not done here.  Not done here.  Stunningly, not

14  done here.

15          Let me -- look here.  We've already discussed this,

16  Your Honor, on that point of that exchange with Tollison, I

17  think it says it all.  "We start with an unremarkable

18  premise."  I mean, it's incredible that the Supreme Court has

19  seen fit to talk about this in the class action context.

20          "A model purporting to serve as evidence of damages

21  in this class action must measure only those damages

22  attributable to that theory."  That one penny of the ten cent

23  fuel surcharge.  "The first step in a damages study is the

24  translation of the legal theory of the harmful event into an

25  analysis of the economic impact of that event."  Dr. McClave

In re:  Air Cargo Shipping Services                128

1   was the statistician there.  He's the statistician here.

2   They're doing the same thing.

3          Bell Atlantic, here, this goes to the standard.

4   "Establishing causation, or fact of damage, requires the

5   plaintiff to demonstrate a causal connection," something

6   flowing from that increment.  It's a chain reaction.  It's no

7   different than a tort.  I left the courthouse in Brooklyn, I

8   was hit by a car, I wasn't looking.  They said -- you know,

9   it's tort.  There's an injury and a causal flow leading up to

10  that injury.

11         "Must demonstrate a causal connection between the

12  specific antitrust violation at issue and an injury to the

13  business or property of the antitrust plaintiff.  This

14  requirement is in no way lessened by being raised in the

15  context of a class action."

16         You heard Mr. Brookhiser refer to that a moment ago,

17  that they don't get a hall pass just because, well, you know,

18  lump it all together and we'll figure it out.  Can't, no.

19  "Rather, the issue of fact of damage is a question unique to

20  each particular plaintiff," and it has to be shown with

21  certainty.

22         They don't run McClave's model on any of the named

23  plaintiffs.  This case right now is about six named

24  plaintiffs.  You know their names.  They were deposed.  Why

25  didn't he run?  We ran it, and they say we're not allowed to.

In re:  Air Cargo Shipping Services                129

1    That's a problem for them, Your Honor.

2            They allege, one -- here's the thing.  Sorry, here's

3    what they allege, but there's no tracing of this.  There's no

4    attribution.  Think back to the Comcast language.  This does

5    not map onto this in the case.  Tollison, time and again, the

6    conspiracy was not about rates.  He got tired of me asking him

7    this in deposition.

8            "Base rates remain negotiable and were negotiated."

9    They were the biggest part of price.  "You also testified that

10   you didn't analyze" -- why didn't they do this?  The people in

11   DRAM, your component cases, Your Honor, you know, that's the

12   cases -- it's my general rule.  It's really hard in these

13   component cases.  Usually, I bought the -- you know, I bought

14   the wheat and the wheat was price fixed or it's an output

15   restraint or something like that.  It's usually just the

16   product.  EPDM, there was no component issue, fixed list

17   price.  There are certain cases that are easy for class

18   certification.  This isn't one of them.

19           In the component cases that have been successfully

20   certified, the plaintiffs' economist took on that burden to

21   look at the percentage of the finished product where the

22   component resides, how much of that, and they also did

23   analysis on the component itself.  Nowhere here.  In fact,

24   we're told you're not allowed to.

25           Question:  "You have not tried to isolate any

In re:  Air Cargo Shipping Services                    130

1    incremental effects of the conspiracy" --

2              Answer:  "If I understand your question, I think

3    that is correct."

4              I think candidly, Your Honor, he's finished, they're

5    finished under the law.

6              Let me go to just a few words in Comcast when we

7    read that decision, Your Honor.  The Supreme Court time and

8    time again talks about attribution.  What are we attributing

9    this number to?  It has to be causally connected.  That's what

10   we're talking about here.

11             And the Supreme Court says:  "In light of the

12   model's inability to bridge the differences between

13   supra-competitive prices in general and supra-competitive

14   prices attributable to the deterrence of overbuilding, Rule

15   23(b)(3) cannot authorize treating subscribers within the

16   Philadelphia cluster of members as a single class."

17             Here we're dealing with a class, just the

18   Philadelphia urban region.  It's not every route into and out

19   of the United States.  And then it goes on to cite that famous

20   passage, that the first step in a damages model is the

21   translation of the harmful event into an analysis of the

22   economic impact of that event.

23             The Supreme Court criticizes the Third Circuit's

24   majority, because there was a split -- Comcast had a split

25   decision, two Court of Appeals judges wanting to affirm class

In re:  Air Cargo Shipping Services                    131

1    cert, one dissenting.  I'm going to read you the language of

2    the Supreme Court criticizing the Court of Appeals' majority.

3         The dissent is very interesting, because I don't

4    know who this quote is attributed to, Mark Twain or somebody,

5    but the dissent quotes a famous quote, where if you got one

6    foot in boiling water and one foot in freezing water, your

7    body temperature is just about right.  That's like -- that

8    doesn't tell you anything about actual experience.

9         This is what the Supreme Court court said about that

10   Court of Appeals majority, Your Honor.  The majority's only

11   response to this was that at the class certification stage, we

12   do not require that plaintiffs tie each theory of antitrust

13   impact to an exact calculation of damages, but instead, that

14   they assure us that if they can prove impact, the resulting

15   damages are capable of measurement and will not require

16   labyrinthine individual calculations, but such assurance is

17   not provided by a methodology that identifies damages that are

18   not the result of the wrong.  And that is what happened in

19   Comcast.  That's what we've demonstrated here.

20         I want to say a word, Your Honor, about -- just on

21   this attribution.  And I'm sorry, I guess let me see if I can

22   put this on ELMO.  You heard Mr. -- I want to get my notes so

23   I can see if I can just read it back correctly what I heard

24   Mr. Landau say about this slide.

25         This is page 140 of Mr. Landau's presentation.  He

In re:  Air Cargo Shipping Services                    132

1   said, here's all these security surcharges.  And so even if

2   you had zero fuel surcharges, you could have had a security

3   surcharge, and so on and so forth.  And what I wrote down on

4   my notes when I saw this, as I said, well, okay, so is he

5   asking you to assume that whatever security surcharge existed

6   and whatever fuel -- that they were fixed?

7        That's not -- there's no dispute between the

8   parties.  There's nothing illegal in and of itself on having a

9   fuel surcharge or a security surcharge.  There's nothing in

10  this which shows any -- which were the ones that were fixed?

11  Which were the ones?  You would think, Judge, that would be an

12  easy question for them to answer, but they don't.  And you see

13  all of these zeros.  Again, when you consult the cases in our

14  briefs and when we read Rail Freight, we're talking about

15  throwing in zero impact transactions.

16       Let me turn now, Your Honor -- we've already -- I've

17  pretty much already covered Comcast.  You're probably tired of

18  hearing it.  This is -- I really commend this opinion.  This

19  is a really detailed published opinion where Judge Cote

20  just -- she looks at these regressions tendered.  This was a

21  monopolization case, antitrust case, single defendant, heck of

22  a lot easier situation than what we're dealing with here.  And

23  she just said, he has a whole bunch of omitted variables,

24  you're not taking into account the quality of the handset, and

25  you must provide the jury with a reasonable basis.

In re:  Air Cargo Shipping Services          133

1          All of these opinions, First Circuit in New Motor

2     Vehicles that affirm the denial of class certification,

3     because it said you can't attribute the wrong, what you're

4     calling a wrong, to the bad act.  You can't -- you can't

5     attribute anything.

6          And the First Circuit in that case also said, you

7     know, the court below went on and on about conduct issues.

8     This is not about whether there was an agreement.  This is

9     about impact from the agreement.  Obviously, the defendants

10    here say proof as to the China -- what happened in China is

11    not common proof to whatever happened in the United States.

12    But these cases are all saying if causation is not satisfied,

13    and it's cause in fact, if no one is looking at a causal flow,

14    you can't do it for one, much less all or virtually all.

15         And when we go back and look at the record, Tollison

16    and McClave, neither one of them is connecting a bad act to an

17    increment on a fuel or security surcharge that they say was

18    the illegal increment to a causal flow to the named

19    plaintiffs, much less a whole group of them.  No one is

20    looking at that causal flow, none.  They kind of remind me,

21    Tollison and McClave, respectfully, kind of remind me of like

22    the scarecrow in the Wizard of Oz.  Well, he's doing it.  No,

23    he's doing it.

24         I just showed you the passage where Tollison's whole

25    thinking about it, where I asked him don't you agree that what

In re:  Air Cargo Shipping Services                    134

1    we have to be talking about is the causal injury to all or

2    virtually all caused in fact by a violation?  That's what

3    Comcast says.  That's what Dukes says.  That's what all

4    these -- all of these cases say.  This is not a 2013.  It's

5    gotten stronger, no doubt.

6            The courts of appeals and the Supreme Court has

7    taken -- absolutely.  Has it started getting solidified up

8    there?  Absolutely.  But it's not -- the Supreme Court even

9    wrote in -- took the effort to write -- you know, I kind of

10   thought this was unremarkable.  You got to connect your theory

11   of damages to the wrong act, to the bad act.  When did the

12   ship hit the iceberg and what happened after that?  Neither

13   Tollison nor McClave do it.  Neither one of them.

14           Again, I've touched on the variability or, sorry,

15   the poor explanatory power, what we've heard as the R-squared.

16   32 percent and 45 percent are not being explained.  Here

17   are -- and this is in the Kaplan slide then.  Competition from

18   non-defendants.  He doesn't control for that.  Individualized

19   negotiating, he doesn't control.  Localized demand and supply.

20           That one, two, three, fourth bullet in and of itself

21   is -- you know, is a significant, significant problem when

22   you're talking about every country in the world.  So if

23   someone gets up and says, my model accounts for it, I have a

24   country carrier, their model doesn't account for it.  And the

25   cases that I just showed you, the courts went through and

In re:  Air Cargo Shipping Services                    135

1    weighed the regression in light of the record evidence.

2          Here's -- you've heard Mr. Brookhiser talk about the

3    poor specification of his cost variables.  This to me is, you

4    know, a real problem.  Generating overcharges in a clean

5    period.  If this isn't a machine that goes of itself, then I

6    don't know what it was, but this is the same statistician

7    whose model produced the same result in Comcast, whether there

8    were four bad acts or just one.  Same thing.  He's agnostic.

9    My numbers are great.  Same thing.  No causal connection.

10   What was the bad act?  Tollison didn't tell him when did we

11   get in the room and what -- no one isolates an increment and

12   looks at a causal flow.  We would urge you to reject his

13   agnosticism.

14         Here's Reed.  "When the imprecise nature of his

15   multiple regression leaves up to half of the causes" -- up to

16   half, you saw 45 and 32 -- "in real-world wages unexplained,

17   it falls far short of satisfying plaintiffs' legal burden to

18   establish a means of demonstrating by common proof that the

19   members of the putative class were injured" -- that's

20   impact -- "and if so, by how much."  That's damages.  "Dr.

21   Rausser" -- this is their Daubert expert.  "Dr. Rausser's

22   regression is plainly too imprecise to avoid the need for

23   individualized hearings on impact and damages."  In this case,

24   the published opinion is about nurses in the various -- about

25   an alleged conspiracy to suppress wages for nurses in the

In re:  Air Cargo Shipping Services                    136

1   Chicago area.

2           Again, courts deny and reject regression when they

3   omit or mischaracterize important variables.  Judge Alsup, I

4   alluded to that opinion a minute ago, the Graphics Processing

5   case, he criticized the plaintiffs' expert for aggregating

6   data upwards and then looking for correlations.  He said why

7   don't you disaggregate it and look at what Mr. Brookhiser

8   called the constituent parts.  Why don't you look and see if

9   the constituent parts move together?

10          Kaplan does that, and they move -- Kaplan does

11  exactly what he did in Plastics and exactly what Judge Alsup

12  says should have been done in GPU and what Judge Cote in

13  Freeland said should have been done there.  Holding that

14  regression models must test.  There's that word, scientific

15  method, test for obvious and significant alternative

16  explanations.  They didn't do it.  Mr. Brookhiser -- this

17  point can't bear emphasis enough, so I'm sorry if I'm

18  repeating it unnecessarily.

19          They talk about the trimming and the robustness and

20  this, that and the other thing.  They're not -- that's just

21  the same model.  They're not testing it on panels.  On that

22  ABA quote that I think I may have that on a board, when we

23  talk about testing, what -- I mean, yeah, what we're talking

24  about is testing it on panels.  Run it.

25          And, you know, the way you would think it would work

In re:  Air Cargo Shipping Services                137

1    is I think everyone in the world, all routes into and out of

2    the United States, and you ran it and it always came out

3    positive on the various sub -- it's just common sense, you

4    test it on the subgroups and it gives you comfort that your

5    general hypothesis is right.  It's testing a hypothesis.  When

6    you test it on the subgroups here, it doesn't come out right

7    for them.  I've already covered that.

8            This is my -- the necessary and sufficient

9    condition, Your Honor, again.  That it's necessary for them to

10   isolate the increment in the fuel surcharge, but it's not

11   sufficient, because there's tons of evidence of offsetting.

12   I've already covered this with the -- he doesn't even think

13   about it in terms of causation.  I think that alone is very

14   troubling.  All right.

15           Now, yes, let me -- I've already touched on this

16   aggregated -- I've already touched on the McLaughlin case,

17   because that was your initial question.  So this is a little

18   bit out of place.  But it can't be emphasized, you know,

19   enough.  This is the Second Circuit just saying -- when you

20   read this case, it was the district judge saying, oh, we'll

21   deal with damages later.  That's not permitted, Your Honor.

22           The class action device cannot abridge or enlarge

23   the substantive rights of the defendant, and that goes to

24   damages, not just to injury.

25           Now, let me just go to -- you're probably sick to

In re:  Air Cargo Shipping Services                    138

1   death of all of this.  Let me go to this final kind of model I

2   want to mention.  Then let me just have a few cleanup things,

3   for myself, not for you.

4           This, I've already kind of covered a little bit, so

5   I'll try to move it along.  I'm told I have 25 minutes left,

6   so maybe I'll finish early.  This, Your Honor, is about, okay,

7   I've got this black box, this blender where defendants are

8   mixing their metaphors, this machine in my view that goes of

9   itself.  It just goes.  Well, there's no fuel surcharge, but

10  this model renders -- there's no fuel surcharges that are

11  created for three years.  I won't show you that chart; you got

12  it.  A whole bunch of different regions of the world, no fuel

13  surcharge for a significant period of time.  His model is

14  rendering damages, McLaughlin.  That's a problem.

15          But we think the model implodes in and of itself.  I

16  think running the named plaintiffs on it in and four of the

17  six come out, they're not proxies, so they're done, that

18  alone.

19          But even if you think this model, well, I don't know

20  where I come out on this model, the courts assess these models

21  in light of the record evidence.  You don't -- you got to

22  weigh it in the balance.  The Supreme Court, it's great, you

23  know.  Unfortunately, I really love to read cases and I want

24  to read -- getting back into them is so wonderful.

25          When we go through Dukes, so the Supreme Court's

In re:  Air Cargo Shipping Services                    139

1   gone through the Rule 23 saying, and then it's actually

2   looking at -- the Supreme Court is looking at these

3   regressions and it's juxtaposing them against the record.  The

4   Supreme Court, the justices are taking the time, not to be

5   spooked by the numbers, not to kick the can, not to defer.

6         The Supreme Court is getting into the regression.  I

7   think when you get into it, thumbs down.  We're not allowed to

8   do the named plaintiff data on it.  Thumbs down.  He didn't

9   even put names in it on the get-go.  Thumbs down.  He doesn't

10  isolate the incremental, the overcharge, thumbs down.

11        But even if whatever on those issues, even if we're

12  kind of agnostic on those issues, you weigh it against -- you

13  weigh the thing.  Because the courts are clear on this that a

14  regression does not prove causation.  It's -- a regression is

15  a glorified form of correlating.  And I really encourage us to

16  go and read the GPU case where Alsup asked the basic question,

17  why didn't they run -- why didn't they take -- why didn't you

18  work inductively?  Take subsets and see if they're correlated,

19  and then maybe -- what they want to do is work downwards from

20  the cloud of data, with no names associated with it, and have

21  that single number land, land on the six named plaintiffs and

22  land on everybody.  No actual causal flow.  They're reasoning

23  from a cloud to the named plaintiffs.  The law is you go the

24  other way, and they've, frankly, failed dramatically here.

25        So the Supreme Court in Brooke Group, this is a very

In re: Air Cargo Shipping Services                    140

1   famous quote: "Expert testimony is useful as a guide to

2   interpreting market facts, but it is not a substitute for

3   them." You've seen this obviously in the motion to strike

4   context, Your Honor. "Plaintiffs may not rely upon opinion

5   evidence which is only connected to existing data by ipse

6   dixit."

7          You know, you heard Mr. Landau say, well, they

8   didn't move to strike, so they must think it's -- no, we've

9   reserved our -- I think we even said that in a footnote. We

10  want you to do this on weight. We're not -- we don't need to

11  move to strike their experts. They are inadmissible.

12  Tollison and McClave are inadmissible. We said they're not

13  reliable. But I don't think you need to deal with Rule 702.

14  We think doing it on weight is more than sufficient here.

15          Here's what the --

16          THE COURT: I'm not sure I understand what you mean.

17  Are you saying that the Court has to basically make a

18  determination at this point about which expert the Court

19  should accept and which expert they should not accept? In

20  other words, it seems to me like that is ultimately a question

21  for the jury to decide.

22          And you say the weight. The Court has to assess

23  whether the model, it seems to me, or whatever it's being

24  asked, it has to determine whether there is sufficient

25  evidence to suggest that a common method of proof can be --

In re:  Air Cargo Shipping Services                    141

1    can show class-wide impact, but not to make the determination

2    that, in fact, that proof has carried the day.

3              MR. SIMMONS:  Well, I think if I'm understanding

4    your question, Your Honor, I think you have to reach the

5    merits.  You, the Court --

6              THE COURT:  Evaluate on the merits whether that

7    model has the capability, but not whether it does, in fact,

8    satisfy -- prove the case, so to speak.

9              MR. SIMMONS:  Well, I'm not so sure I agree with

10   that, Your Honor.  I think, you know --

11             THE COURT:  So then I'm basically making a finding

12   of fact that they have proved their case?

13             MR. SIMMONS:  No, Your Honor.  I think it's a middle

14   ground between what you're -- this is how I would say it, if I

15   can respectfully answer.

16             THE COURT:  That's why I'm asking you.

17             MR. SIMMONS:  The law is no longer -- where the

18   cases have gone and many of the cases that they cite, for

19   example, EPDM and a whole series of other cases, the law used

20   to be the plaintiff would move, tender a model.  The defendant

21   would attack that model and say it's not capable of showing

22   class-wide impact.  The courts, many of the courts would say,

23   wait, whether it does or it doesn't, that's a merits question

24   and I'm not going there.

25             Many of those cases are bad law, are obsolete.

In re:  Air Cargo Shipping Services                    142

1   Comcast, Dukes, I think you saw Rail Freight.  You have to

2   take a hard look and find, does this model, does it show

3   impact for anyone, much less all or virtually all?

4           I think it's not binding on the jury, but you

5   actually do have to find that.  That's where I think the law

6   is, Your Honor.  So your finding, just so I'm clear --

7           THE COURT:  What is the finding?  I'm saying, you're

8   saying my finding has to be what?

9           MR. SIMMONS:  Your finding has to be that does their

10  model --

11          THE COURT:  The model does do it?

12          MR. SIMMONS:  Does their model do it for the named

13  plaintiffs, because they're representatives, and does it do it

14  for the absent class members.

15          THE COURT:  But that's a question of fact that the

16  Court's then decided; right?

17          MR. SIMMONS:  You have to find the merits of that

18  question, Your Honor.

19          THE COURT:  And then but is that binding on the

20  defendants --

21          MR. SIMMONS:  It's not binding on the jury, Your

22  Honor.

23          THE COURT:  So who's it binding on?

24          MR. SIMMONS:  Well, it means -- that's what you have

25  to do to certify a class.

In re:  Air Cargo Shipping Services                    143

1    THE COURT:  Okay.  All right.  I think I get what
2  you're saying.  That's all I needed to know.
3    MR. SIMMONS:  But it's not like could it
4  hypothetically be?  It's not in this sort of neutral zone.
5  You actually have to find that this -- ask yourself this
6  question:  Does their model show injury-in-fact, what they've
7  tendered after all these years, injury-in-fact for the six,
8  for the absent class members?
9    If you say yes under the Rule 23 standard, then
10  that's kind of a merits -- the courts -- I won't bore you with
11  all the cases.  You got to get -- it's the Second Circuit in
12  IPO has expressly disavowed the -- so long as the model is not
13  fatally flawed, they said, you know, we got to get -- you got
14  to address merit on those issues.  But then that's for Rule
15  23, what happens happens.  That's not binding on the jury.
16  That's not res -- it's not like we can't argue.
17    But you do actually have to find it, yes.  You have
18  to reach the merits of that model and ask yourself does it
19  answer the question for the six named plaintiffs, much less
20  all of the hundreds of thousands of absent class members.
21  Here again, the most a correlation can do is give rise to an
22  inference.
23    THE COURT:  I'm not sure I followed that.  What did
24  you just say?  The most -- oh, basically, the concept is that
25  it rules, supposedly rules out all other explanations.  That's

In re:  Air Cargo Shipping Services                    144

1    the idea, is it not?

2           MR. SIMMONS:  Well, it's just that the regression --

3    I think, Your Honor, I have this up there.  And what this case

4    is saying is you got to put the regression in the ambient

5    environment of the record, all the evidence, the offsetting,

6    the negotiate -- I mean the cutthroat competition.  You got

7    to -- the regression has to be read in light of the record

8    evidence.

9           THE COURT:  Okay.

10          MR. SIMMONS:  And it has to be consistent with it.

11          McClave's job is to test if the alleged goal of the

12   conspiracy had the same effects everywhere, not assume it.  He

13   doesn't test it.  Tollison, you heard Tollison say he doesn't

14   have to define a relevant market.  Well, he talks about this

15   global -- this global marketplace, but he never did demand or

16   supply substitution analysis.

17          The plaintiffs keep referring to this Beckett quote

18   where he said you could ship product through Denmark if it's

19   going to China, but we've also showed you -- I won't bother

20   showing it to you here -- where he's asked if he ever did

21   that.  He says, no, I don't think so.

22          The fact of the matter, though, even if he did, when

23   you look at the exhibits we've attached to our opposition to

24   class cert, time after time the named plaintiff testified,

25   saying, look, if I'm shipping product from New York to

In re:  Air Cargo Shipping Services                    145

1    Santiago, Chile, what I care about is I care about that

2    country pair.  I don't care what the prices are doing LA to

3    Seoul, LA to Singapore.  That's common sense and that's, you

4    know -- there's volumes of that in this record.

5            Here, you know, we've got this up on the stand over

6    there.  The market isn't global.  It's country pairs.  There's

7    5.7 million zero fuel surcharges -- or, pardon me, 5.7 million

8    zero surcharges.  Testimony and records -- a fraction of

9    which, Your Honor, we were able to show you over those three

10   days, a fraction.

11           So it's really my -- I think the parties -- you'll

12   go back and look at the whole record here that has been

13   submitted.  Surcharges were waived and negotiated time and

14   again.  Based on the zeros, let's stick on that second box

15   from the top for a minute.  The time periods and the countries

16   that didn't have surcharges, their model is still rendering

17   damages.

18           That's an impact problem, that's an attribution

19   problem, and that's a problem under McLaughlin, which is just

20   damages.  It's a significant exit ramp.  The first one is an

21   exit ramp.  The second one is an exit ramp.

22           Surcharges being waived and negotiated, an exit

23   ramp.  Base rates being offset, the false positives, showing

24   an overcharge in the clean period.  How can that be?  Here are

25   all of the various ways you can generate zeros.  No impact for

In re:  Air Cargo Shipping Services                146

1    two-thirds of the country pairs, four of six named plaintiffs,

2    two of the five weight categories.

3            And all this makes sense when we actually go and

4    read the language of the pleas.  My client, Your Honor, Asiana

5    Airlines pled to certain shipments from the United States to

6    the Pacific.  Not all shipments and not global.  You've got it

7    in the exhibits.  We won't kind of give you a headache on

8    this.

9            My client was never named in the EU, ever.  It

10   operates out of the EU.  Many, many clients here never named

11   in the EU.  Lufthansa never reached an agreement with my

12   client, the amnesty candidate.

13           So when you look at this, what's happening is let's

14   put a class action together, a civil action, and let's engage

15   in overreaching and say everyone did it everywhere.  But

16   that's not -- that's not the facts.  And these market facts

17   can't be reconciled with it.

18           You've seen this from Mr. Kaplan, Kaplan's slide 17.

19           Again, I think this is one of the very first exit

20   ramps.  To me, the first is that McClave constructed a model

21   and withheld customer names.  The second is he didn't look at

22   the increment of the fuel surcharge.  But this to me is fatal,

23   being run on his model.  This isn't Kaplan's model; this is

24   his model.

25           Here's the percentage of customers with no

In re:  Air Cargo Shipping Services                    147

1    overcharges over there in the green.  Fatal.  40 percent of

2    the class shipped in weight categories for which there's no

3    overcharge.  Again, we've had this quote up from Judge Jenkins

4    in Plastics Additives.

5           Here, see, Judge, this goes a little bit to our

6    question just a moment ago.  Look at the bullet down there

7    from the court in Chicago.  "Measuring average base wage

8    suppression does not indicate whether each putative class

9    member suffered harm from the alleged conspiracy."

10          The courts are looking at -- we have six named --

11   this is like a test case, like a test drive.  Does the car

12   work?  So if you find it works or it doesn't, whatever your

13   finding is, it's not mine, it ultimately goes to the jury, but

14   you do have to find.  It's not whether it's capable of

15   working, maybe, or -- it's got to be injury-in-fact.  You've

16   got to satisfy yourself on that now, that it actually works

17   for the six and the absent class members.

18          Exhaust Unlimited, very interesting case, because

19   that case dealt with like an individual kind of line item,

20   like that environmental charge tax.  And there's also a really

21   important case out of the Fifth Circuit called Robinson which

22   dealt with cars where there was a vehicle inventory line item.

23   And the Fifth Circuit said, well, the line item could be

24   offset.

25          But these, the Exhaust Unlimited said the

In re:  Air Cargo Shipping Services                148

1   environmental charges varied by market.  Contract terms were

2   individually negotiated and you could be compensated for an

3   offset.  All of this is in our record.

4          The regional -- here I've already dealt with Dukes

5   probably sufficiently.  But, again, I think when we go back

6   and step back from these cases, re-reading all these cases,

7   sort of refreshing, because I kind of ask myself which one of

8   all these cases, these class actions.  DRAM, four years, in

9   the United States, just computers.  Dukes, one defendant, all

10  employment decisions in the United States.

11         Thirty-nine defendants, every route into and out of

12  the United -- I don't -- I can't -- it would be interesting to

13  know what the plaintiff's thinking.  What's an analogous class

14  action to try here in the Eastern District of New York when

15  the four named plaintiffs come out negative under their model,

16  and we're told we're not allowed to do that.

17         Cement.  "Plaintiffs have not shown the market

18  characteristics are such that all customers could not avoid

19  paying conspiratorially-inflated prices, and would experience

20  a common impact.  There are significant differences between

21  the markets for concrete throughout the different geographic

22  regions of Florida, between large-volume and small-volume

23  purchasers and between customers who have long-standing

24  relationships."  This is just in the state of Florida.

25         Here again, I don't want to spend too much time on

In re:  Air Cargo Shipping Services                    149

1    these.  These events that Tollison kind of came up with, it

2    was him who patched them together.  This is all in our

3    opposition, so you can look at these.  But he has events that

4    are overlapping with different prices.  He's grouping one

5    price into one event, even though it's concurrent with a prior

6    event, and then they're the same prices.

7           He has events which go on for -- look at these -- 13

8    months, 11 months, seven months, but this is sort of a single

9    act of everyone getting -- but it's lasting.  The cases on

10   conspiracy in the -- you know, and the economics of conspiracy

11   is they're fragile, but, you know, you agree and you got to do

12   it quickly.  Who has 13-month -- I'm not aware of a case

13   where -- you know, you have events.  Let's go out -- and what

14   he's calling the event is a decision was made to have price

15   acts at event two, and it took them 13 months to all do it.

16   It took on event three 11 months.  That's just not plausible.

17          Here, in a single event, he's got a whole bunch of

18   different fields.  And there's many, many examples of these.

19   This is all on that side of the ledger.  Whether this

20   narrative from them, whether it makes sense, whether it's

21   consistent with -- whether the record is consistent with this

22   narrative.

23          Again, you heard Mr. Brookhiser say, well, these

24   expected zeros.  Him attaching the label expected doesn't

25   detract from the fact that they would be awarding damages on

In re:  Air Cargo Shipping Services                    150

1    those zeros.  And if it's a zero, there can't be a fuel

2    surcharge —— there can't be a fuel surcharge illegal increment

3    in there.

4         Tollison at one point said, well, it might have been

5    incorporated into the base rates.  That's not their theory.

6    That's not their theory that the base rates were fixed.

7    They've said on page 54 of their brief that base rates were

8    competitive, always were competitive, and that the defendants

9    resorted to the fuel surcharge as a way because they couldn't

10   keep track of the base rates.

11        Tollison can nowhere say how many of these things

12   were incorporated into the base rates.  That is a complete

13   misattribution problem.  Finding an overcharge where there's

14   no fuel surcharge, whether it's expected, unexpected or just

15   made up or adjusted.

16        Look at the declaration of that KLM gentleman, which

17   is in the record which I cross-examined Mr. Tollison on, where

18   he says, oh, all the KLM ones were errors.  That's not what

19   Mr. Wittgen says in his declaration.

20        I want to go, Your Honor, to —— let me just go to

21   this slide right here.

22        Here's all of these factors.  And this is page 97 of

23   the book you have.  Model producing false positives.  That's

24   in this case.  Comcast, Rail Freight, Blades versus Monsanto,

25   single overcharge, a single number.  Plastics Additives, Reed,

In re:  Air Cargo Shipping Services                 151

1    one number, good for everybody.

2            A line-item charge, Rail Freight, Robinson.  This

3    case has that.  The conclusion of class-wide impact without

4    testing it on panels.  Not testing it.  All these courts

5    criticize the experts there.  Significant variation.  You have

6    all these factors here.

7            Characteristics generally where courts have granted

8    class certs.  Commodity-like product.  EPDM.  Uniform pricing.

9    EPDM, six price lists, that's it, and they fixed the price,

10   allegedly, of the six.  Not a line-item, highly concentrated

11   industry.  Chocolate, they talk about chocolate in their

12   briefs.  I don't know, four or five defendants, not 39, United

13   States.  Chocolate is chocolate.

14           So, you know, I just think the cases -- Mr. Landau

15   suggesting to the Court that, well, you know, you can just

16   defer on this.  I just think that's an obsolete standard and

17   it's not -- that's not good law.

18           Well, I think, Your Honor, I'm going to sit down.

19   I'm at 79 minutes.  So if you don't have any questions.

20           THE COURT:  I think you said there was a list of

21   component price cases.  Is that what you were referring to

22   that you had invited me to examine?  This is characterizing

23   this as a component of price case, that is the surcharge.

24           MR. SIMMONS:  Oh, here.  Here, Your Honor.  Wait.

25   Let me see if I can find it.

In re:  Air Cargo Shipping Services                152

1        THE COURT:  Is that the one you were talking about?

2   No, it has some of them, I suppose.

3        MR. SIMMONS:  This has some of them, yes.  That

4   Blades versus Monsanto is not on that list.  It should also be

5   there.  Blades, if I could get that opinion for --

6        THE COURT:  That's all right, we can find it.  If

7   it's cited, we'll find it.

8        MR. SIMMONS:  These are the cases where a component

9   price was held.  He couldn't -- didn't certify class, but

10  Blades dealt with a premium portion of the seed was fixed, but

11  not the total seed price.  And the Court of Appeals there, the

12  Eighth Circuit, one of the things it said is the premium part

13  of the seed could have been offset by the non-premium part.

14       THE COURT:  And DRAM was another one you cited,

15  but --

16       MR. SIMMONS:  But that was certified.

17       THE COURT:  That was certified.

18       MR. SIMMONS:  And so there are component -- just to

19  recap my answer, Your Honor, in most of the component cases,

20  you get into problems.  The party moving gets into real

21  problems.  My response to you is on the component cases that

22  were certified --

23       THE COURT:  Understood.  There was more of a link.

24       MR. SIMMONS:  -- by DRAM, the plaintiffs there,

25  hedonic, they looked at the relationship.  So if it was a case

In re:  Air Cargo Shipping Services                    153

1   about the transmission of cars being fixed, but the direct

2   purchaser bought the car, but it was a tran -- it's a

3   component, the plaintiff's economists typically do a

4   relationship between the total price and the component price,

5   what we call the hedonic.

6            But I would also say to you, Your Honor, many of

7   those component cases that were certified --

8            THE COURT:  Are obsolete.

9            MR. SIMMONS:  For example, LCD, Your Honor.  We

10  can't get into every single case.  LCD, what Judge Illston did

11  there is plaintiffs tendered an expert report, defendants

12  opposed, Judge Illston said this is a battle of the experts, I

13  have to defer this to the jury.

14           I think that's an obsolete standard, Your Honor,

15  that we do have to decide these.  The Supreme Court has made

16  it clear in Dukes, Comcast, and the courts of appeals I think

17  are looking at these questions.

18           So if you don't have any more questions, I'll turn

19  the mic off.

20           THE COURT:  All right.  What we'll do is we'll take

21  a brief recess.  We'll resume in ten minutes.

22           (Recess taken.)

23           (Continued on the next page.)

24

25

In re:  Air Cargo Shipping Services                     154

1          THE COURT:  I'm trying to do my calculations.  How

2    much time do you have left, Mr. Landau?

3          MR. LANDAU:  I think it is 56 minutes, Your Honor.

4          THE COURT:  56, okay.  That's fairly close to what I

5    have so we'll go with that.  I don't know if it is you that is

6    going to.

7          MR. LANDAU:  Yes, sir.

8          THE COURT:  Well, it is your turn.

9          MR. LANDAU:  All right.  Thank you, Your Honor.

10         I'd like to start with something that the Second

11   Circuit said just last year in 2012:  "Predominance under

12   Rule 23(b)(3) is a test readily met in certain cases alleging

13   consumer or securities fraud or violations of the antitrust

14   laws."  That's the AIG case, 689 F.3d 229, it's from just last

15   year, it's the Second Circuit, and that's quoting the Supreme

16   Court in Amgen.  This is exactly the kind of case that class

17   actions are designed for.

18         Can you find cases where courts have looked at the

19   particular facts of a case and denied class certification, of

20   course you can, but we've cited many cases in our briefs where

21   courts have granted class certification in price fixing cases

22   and I haven't tried to tally them all up but I feel pretty

23   confident saying that the majority of those get certified

24   because this is the kind of case that's supposed to be pursued

25   as a class action.

In re:  Air Cargo Shipping Services                    155

1           I want to be very clear, Your Honor, because we are

2      not asking you to duck any tough issues here.  We agree you

3      need to do a rigorous analysis to determine whether we have

4      satisfied our burden by a preponderance of the evidence.  You

5      need to determine that the model we've proposed is

6      sufficiently reliable.  Not just any model will do, we're not

7      saying that.  It has to be a sufficiently reliable model.  The

8      model has to use common evidence.  And the model needs to be

9      able to do what we say it will do which is if the jury accepts

10     it, it will have shown impact on all or virtually all class

11     members.

12          THE COURT:  So, the burden that you have to meet,

13     the way you articulate it, is to show by a preponderance of

14     the evidence that the model is capable of reliably showing

15     what you're asking it to show or it's reliably able to show

16     what you are asking it to show?

17          MR. LANDAU:  That's right, Your Honor.  And it's

18     not just me saying that, the Supreme Court this year in the

19     Amgen case, 133 S.Ct. 1184, says:  "Rule 23(b)(3) requires a

20     showing that questions common to the class predominate, not

21     that those questions will be answered on the merits in favor

22     of the class."

23          I think you asked Mr. Simmons about that.  But what

24     he told you is directly contrary to what the Supreme Court

25     said this year.  We still have to have a trial, we still have

In re:  Air Cargo Shipping Services                    156

1    to win but we don't have to win at the class certification

2    stage.  We have to show that the questions predominate, not

3    that the answers are going to be in our favor.  And what the

4    Supreme Court says this court has to do is select the method

5    best suited to adjudication of the controversy fairly and

6    efficiently.

7              And I referred Your Honor before to the High-Tech

8    Employee case which reviews all these cases, all the cases

9    Mr. Simmons talked about, Comcast, Rail Freight, everything,

10   and says, here's the standard, have the plaintiffs presented

11   a sufficiently reliable theory to demonstrate that common

12   evidence can be used to demonstrate impact and the court

13   looked at everything holistically, not bean counting,

14   holistically, looked at the documentary evidence, looked at

15   the economic theory, the data and the statistical modeling and

16   said, yes, common evidence could be used, the model was

17   sufficiently reliable and it could be used to show common

18   impact.  The jury still has to accept it but it could be used.

19             THE COURT:  When it was looking at the model, it was

20   looking at a multiple regression model or the multiple

21   regression model in the context of all of the other evidence

22   in the case?

23             MR. LANDAU:  Well, both, Your Honor.  It was looking

24   at the model.  The model has to be sufficiently reliable but

25   the model can't be looked at in isolation, divorced from all

In re:  Air Cargo Shipping Services                    157

1    the facts in the record, it has to be looked at holistically

2    in context.

3              THE COURT:  And are you relying on anything other

4    than the model --

5              MR. LANDAU:  Yes.

6              THE COURT:  -- to demonstrate impact, class-wide

7    impact?

8              MR. LANDAU:  Yes, Your Honor.  All of the common

9    evidence that we've talked about, the defendants' conspiracy,

10   how it worked, why it worked, Dr. Tollison's explanation of

11   why this market was conducive to a successful cartel and

12   Dr. McClave's model, obviously Dr. McClave's model is an

13   important part of what we're doing but it's by no means the

14   only evidence we have of common --

15             THE COURT:  The -- and I'll let you get on with the

16   argument in a moment but right now it seemed to me that the

17   concern of the Rail Freight case was that the legacy or the

18   contract -- those carriers who had, we'll call it legacy

19   contracts would be getting a recovery or might be getting a

20   recovery under the model or the model demonstrated that they

21   were entitled to a recovery when in fact it was clear they

22   were not and so there was a concern, it seemed to me, that the

23   court had that there would be, you know, windfalls to some

24   groups of class members and the defendants here say that

25   there's all sorts of opportunities for such windfalls to

In re:  Air Cargo Shipping Services                    158

1    occur, we've got zero surcharge airway bills, you know, how do

2    we know that those zero surcharge airway bills aren't, you

3    know, don't apply to single transaction customers who are now

4    going to be able to get a recovery.  I mean these are --

5    there's nothing here, at least I don't see anything here that

6    excludes the possibility that there are large numbers or, you

7    know, some substantial numbers of class members who aren't

8    entitled to any recovery because the impact is not

9    demonstrated as to them or there's a good chance they didn't

10   suffer any impact.  Have I articulated the question?

11          MR. LANDAU:  Yes, Your Honor, I understand.  I want

12   to talk about what Dr. McClave's model really does show --

13          THE COURT:  Okay.

14          MR. LANDAU:  -- about impact because it actually

15   does show impact on all or virtually all class members.  The

16   question of damages is a separate one and I want to keep that

17   distinction clear but I want to talk about both.  And as far

18   as the Rail Freight case, what was happening there with the

19   legacy shippers is that they actually were not members of the

20   class so they weren't going to be getting any recovery because

21   they weren't part of the class.  The issue there was was the

22   model sufficiently reliable.

23          The D.C. Circuit said we need the district judge to

24   address this issue, we think there's a potential issue there,

25   it hasn't been addressed below, send it back to be addressed

In re:  Air Cargo Shipping Services                159

1   below and that's what's happening now.  It didn't take issue

2   with any of the other parts of his lengthy analysis.

3          THE COURT:  So, what was the -- the court you would

4   say in Rail Freight was concerned that the model demonstrated

5   impact on the legacy carriers even though they were not a

6   member of the class?

7          MR. LANDAU:  That's what the Court of Appeals said

8   that that was the concern that it wanted to be --

9          THE COURT:  I see.

10         MR. LANDAU:  -- addressed but what was important, as

11  I said earlier, is that the plaintiffs' expert in that case

12  conceded that his model was showing an overcharge on those

13  non-class members.  We don't have anything like that here

14  where our expert is conceding that there are people outside

15  the class who his model shows to be impacted by the class.

16  Very different in that respect.

17         THE COURT:  Okay.

18         MR. LANDAU:  Impact, as I said more than a few times

19  this morning, is a yes or no question and Mr. Brookhiser

20  agreed that is the question, a yes or no question as to each

21  class member.  That means it is yes or no for each class

22  member, not yes or no for each transaction.  If you have a

23  class member with a million transactions, it's either yes or

24  no that class member was impacted.  You don't need to look to

25  see whether it's yes or no on each of a million transactions.

In re:  Air Cargo Shipping Services                    160

1    If it's yes, it's yes, if they were affected by the

2    conspiracy, then they were impacted.  So, we do need a

3    methodology capable of showing class-wide impact, that yes or

4    no question for all or virtually all class members.  That's

5    what Dr. McClave's model does, it answers the yes or no

6    question for everybody in that class or virtually everybody in

7    that class.

8            Damages are a separate issue and I want to respond

9    to the question that Your Honor asked right before lunch which

10   is do we need a class-wide damages methodology in addition to

11   class-wide impact methodology and the answer to that is we

12   don't need one, that's what the Butler case from the Seventh

13   Circuit just this year says, it would drive a stake through

14   the heart of the class action device to require everybody in a

15   class to have identical damages, there are other means that

16   courts have to deal with individualized damages issues if they

17   come up.

18           THE COURT:  Is that post-Comcast?

19           MR. LANDAU:  It is post-Comcast, it is talking about

20   Comcast, analyzes Comcast and reaches that decision.  What's

21   important to remember about this issue in Comcast, yeah, that

22   was a damages case but the dissent pointed out in Comcast it

23   was a very unusual case for this reason, the plaintiffs

24   conceded for some reason that they needed to show a class-wide

25   measure of damages, that that was a requirement, and the

In re:  Air Cargo Shipping Services                    161

1    dissenting justices said that makes this a very unusual case

2    because you're not going to have that concession most of the

3    time, and the law is very clear, it's always been clear that

4    damage issues alone don't preclude class certification.

5            And I could refer Your Honor to the Visa Check case

6    in the Second Circuit from 2001 where Judge Gleeson certified

7    a class and it was affirmed on appeal and the Second Circuit

8    explained that damage issues, to the extent individual damage

9    issues might arise, they can be dealt with separately, there

10   are many avenues available to the court, special masters,

11   individual hearings, other things, that individual damage

12   issues, if they exist, don't preclude class certification.

13           Now, here our model can be used as class-wide proof

14   of damages.  We don't have to have one.  We have one that can

15   be used.  In addition to showing class-wide impact, we have a

16   model for showing class-wide damages and Dr. McClave testified

17   that in his opinion his global model is the most appropriate

18   way to estimate damages for class members by taking that

19   percentage and applying it to their purchases.

20           Now, there's some approximation involved in that but

21   that's okay in an antitrust case and that law goes back all

22   the way to the Bigelow case that I mentioned, 327 U.S. 251,

23   Story Parchment and even older cases than that.  When the

24   defendants commit a wrongful act, they really can't be heard

25   to complain that the fact that they did that makes it

In re:  Air Cargo Shipping Services                    162

1   complicated for us to figure out exactly what the damages

2   would have been if they hadn't done what they did.

3            So, in an antitrust case damages don't need to be

4   proved with precision.  We can use an estimate, we can use an

5   estimate like the one that Dr. McClave has proposed and it is

6   very typical in antitrust price fixing cases for the

7   plaintiffs to use an aggregate damage model at trial.

8            And I could just refer Your Honor back to we had a

9   trial in this courthouse earlier this year, the Vitamin C

10  trial before Judge Cogan where the jury returned a damage

11  award for the class as a whole, it was one number for the

12  class, an aggregate award based on an expert's model.  So,

13  there's nothing wrong with a damage model that uses some

14  approximation estimates in light of the defendants' wrongful

15  conduct.  That's a separate issue though from impact and

16  whether or not the model that we proposed for damages is

17  class-wide, although ours is, the questions as to liability

18  and impact predominate separate from that because we can deal

19  with any individualized damages issues that arise.

20           The damages, just to say one more point about that,

21  are going to be -- to the extent that a class member has

22  damages, they've been damaged, how much were they damaged, we

23  answer that question if not for the class as a whole, at least

24  for the class member, you don't break it down and say, well,

25  are they being overpaid on this transaction and underpaid on

In re:  Air Cargo Shipping Services                    163

1   this transaction, are they getting a windfall here and a loss

2   here, you're looking at is the damage estimate a reasonable

3   approximation overall of how that class member has been

4   impacted.

5           But all that is separate from the use of

6   Dr. McClave's model as class-wide proof of impact.  He's got

7   his global model, it shows a highly statistically significant

8   overcharge when accounting for all the relevant factors and

9   the question is is that model representative of the individual

10  class members that make up the class.  The way to figure that

11  out, as Dr. McClave explained, is through appropriate

12  statistical tests of robustness.  That's why he did his nine

13  tests.  They all showed that the model was robust to various

14  types of changes like taking out months, taking out countries,

15  looking at origin destination pairs, looking at ocean

16  shipping, looking at individual customer characteristics.  He

17  did all those things and the model passed with flying colors.

18  That tells us something about the model, it tells us something

19  about everybody or virtually everybody who is in that class

20  because if it was not true that all or virtually all class

21  members were impacted, the model would not have passed those

22  nine robustness tests with flying colors.

23          THE COURT:  But they failed Mr. Kaplan's tests, did

24  they not?  In other words, as I understand their argument, if

25  you take the -- let's take the named plaintiffs.

In re:  Air Cargo Shipping Services                    164

1        MR. LANDAU:  Yes.

2        THE COURT:  You apply the model to the named

3   plaintiffs, four of them end up with a net non-overcharge,

4   let's put it that way, and so, what is the answer to that?

5        MR. LANDAU:  Well, the answer -- that's what

6   Mr. Kaplan says and that's what Dr. Burtis says but it's not

7   enough for an expert to just make something up and say I've

8   invented this test, I apply this test and, lo and behold, it

9   shows no impact.  You actually have to do it the right way.

10  There are statistical accepted methods for doing things and

11  you heard a lot of testimony about that and there's a lot more

12  of that in the Daubert motion but you have to test it the

13  right way.

14        The right way to test it is to do the kinds of

15  robustness tests that Dr. McClave did.  The wrong way to test

16  it is what Mr. Kaplan and Dr. Burtis did by taking tiny

17  subsets of the data, applying the whole model to it and then

18  being surprised that they get a different result but that's

19  how it is that Dr. Burtis has never found a regression model

20  to be appropriate, that's how it is that Mr. Kaplan never has

21  supported class certification in a case, it's because they use

22  tests like this which aren't really tests.  And we're not

23  saying they can't test the model, we're saying if they're

24  going to test the model, they have to do it in a statistically

25  appropriate way.

HOLLY DRISCOLL, CSR, OFFICIAL COURT REPORTER

In re:  Air Cargo Shipping Services                    165

1        When Dr. McClave tests the named plaintiffs, he told

2   Your Honor he found net positive overcharges for all six, just

3   like he found net positive overcharges for 93 percent of the

4   customers that were in the customer model.  So, the model, the

5   global model is passing all of these appropriate tests of

6   robustness showing that it is representative of all or

7   virtually all class members.  The customer model is showing

8   that of everybody you can test, everybody agrees they have to

9   have at least two for you to test them, everybody you can test

10  at the customer level, 93 percent have a net positive, 96

11  percent have at least one positive.  That's telling us quite a

12  lot about impact.  It's telling us not only about the

13  customers in the model but it's telling us that the overall

14  global model is robust and correct.

15        And I want to talk about the single transaction

16  customers.  The first thing I want to remind Your Honor of is

17  that we're talking here about 0.2 percent of the revenue at

18  issue in this case.

19        THE COURT:  But the analysis that the Court has to

20  undertake, if I understand correctly, is not a revenue

21  analysis but it's a class member analysis; am I right about

22  that?

23        MR. LANDAU:  Well, that's right, Your Honor, and the

24  question is all or virtually all --

25        THE COURT:  Of the members.

In re:  Air Cargo Shipping Services                    166

1        MR. LANDAU:  -- of the members but I want us to keep

2   in context who we're talking about here and how significant

3   they are to the total.

4        THE COURT:  We're talking about single transaction.

5        MR. LANDAU:  We're talking about single transaction

6   customers, 0.2 percent, we know all the names, they're all in

7   the database, we know who they are, they make up 0.2 percent

8   of the revenue, but they're all in Dr. McClave's global model.

9   You can't put them into the customer model, which is one of

10  nine robustness tests that he runs, that's the only thing you

11  can't put them in.  They're otherwise in the model and so

12  they're contributing to Dr. McClave's finding that the model

13  shows a class-wide overcharge that proves robust to all of

14  these different tests.

15        And you can make a reasonable inference even as to

16  the customer model that if you're finding 93 percent of

17  customers in that model with a net positive overcharge, that

18  it is going to be reflective of what's true for those single

19  transaction customers.  Maybe not all of the single

20  transaction customers were impacted but why would fewer than

21  93 percent of them have a net positive overcharge, why would

22  fewer than 96 percent of them have an overcharge.  These are

23  the customers who are going to be least able to avoid the

24  impact of the cartel so they should have the least likelihood

25  of impact than everyone else does.

In re:  Air Cargo Shipping Services                     167

1        I want to talk about zero surcharges because Your
2   Honor asked about it and because it's been a big part of the
3   discussion today and at the hearing.  If the question is how
4   can someone be impacted if one of their transactions had a
5   zero surcharge, there are several answers.  But, first, impact
6   again is a yes or no question for the class member, all that
7   class member's transactions, not each transaction that the
8   class member had, and the defendants agree with that.
9        So, it doesn't matter if some transactions of a
10  particular class member had a zero surcharge if other
11  transactions during the class period they paid a surcharge and
12  were impacted.  So, you can't just say there were some zero
13  surcharges because when they're paid by class members that
14  have numerous other transactions over the class period, the
15  question of impact is going to be answered as to that class
16  member's total transactions, not just some that you might pick
17  out.
18        But a zero often isn't a zero, as Your Honor saw.
19  There are examples like we saw with Air Canada where for
20  several months there's no fuel surcharge being imposed, that's
21  because the defendants' agreement required them to suspend the
22  fuel surcharges for a few months, then they agreed to start
23  them up again.  But those transactions didn't have no
24  surcharge at all, they had a security surcharge.  And we do
25  allege that the security surcharge was part of the very same

In re: Air Cargo Shipping Services                    168

1    conspiracy that we're talking about here, it's fuel and

2    security, and there's extensive evidence in our papers and we

3    touched on this a little bit at the hearing, that the security

4    surcharge was a subject of the defendants' global agreement,

5    they were fixing both.

6              And so, to have a period of time like several months

7    in the beginning of 2002 when the fuel surcharge is suspended

8    by agreement does not mean that there couldn't have been

9    impact even though you have zero fuel surcharges because

10   there's a security surcharge imposed on those same

11   transactions and that's a source of impact and there are

12   numerous examples of surcharges being incorporated into base

13   rates and we talked about a number of those this morning.

14   There are even more of those in our papers. That's just a

15   surcharge being called by another name and so it shows up as a

16   zero in the data but if we're talking about Japan in 2000 and

17   the defendants have all gotten together in a room, as they

18   did, and talked about imposing a rate increase because they

19   couldn't get the government to approve the surcharge in time,

20   it's no different from if they had imposed it as a separate

21   surcharge.

22             There are other examples of that too, we saw Air New

23   Zealand, Air China. It's not that they're not imposing a

24   surcharge, they're calling it something else. American

25   Airlines from Argentina couldn't have been clearer, other

In re:  Air Cargo Shipping Services                    169

1   places they add on a separate surcharge when that increases

2   five cents, for whatever reason in Argentina they didn't want

3   to do that but the rates went up five cents.  We just can't

4   ignore that and say it happened in the base rate so we don't

5   need to worry about it, it's part of the same conspiracy.  Our

6   claim is about higher total prices paid as a result of the

7   conspiracy, not just higher surcharges.  We're not saying if

8   they hadn't conspired there would have been lower surcharges

9   than there actually were.  What matters is the total price

10  paid by the class member and that's what Dr. McClave examined

11  and Mr. Kaplan agreed that's the right thing to examine, total

12  price.

13          THE COURT:  But what about the argument that the

14  analysis in a component -- where it's one component of price,

15  that the analysis here should have analyzed how that component

16  affected the total price?  I think that's, you know, linking

17  up the -- doing a more refined analysis, if I understood

18  Mr. Simmons' argument, to see how the various surcharges

19  affected the total price other than on a global basis, you're

20  saying it's globally 6 percent, but taking a more refined view

21  I think is what he was saying and as the increments change,

22  how that specifically has an impact on the price.

23          MR. LANDAU:  Right.  The first thing is that we have

24  to keep our eye on the question that we're answering and the

25  question that we're answering is as a result of defendants'

In re:  Air Cargo Shipping Services                    170

1   conspiracy, did the class members pay more than they would

2   have paid but for the conspiracy and that's not just about

3   what would the surcharge have been because, remember, the

4   defendants say, we could get into the evidence a little bit,

5   the defendants say maybe this was negotiated down in the base

6   rate, so we want to make sure that we're testing for that and

7   Dr. McClave does test for that by looking at total price and

8   just for the same reasons we want to make sure we're capturing

9   situations when they put the surcharge into the base rates as

10  we know they did on certain occasions over the course of the

11  conspiracy.

12          So, we're answering the right question which is what

13  happens to total price.  The mechanism may have been the

14  surcharge agreement but the harm, the goal was higher total

15  prices.  And there are some cases out there involving

16  components.  A lot of them come up in the indirect purchaser

17  context when you're talking about how much of a price has been

18  passed on through the chain.  We don't have that kind of case

19  here, we have a direct purchaser case.  And there are some

20  cases where courts have certified class actions involving

21  components of total price, the Currency Conversion Fee in the

22  Southern District, the Universal Service Fund case in the

23  District of Kansas, we cited both of those in our reply brief.

24          What do they cite, the Blades versus Monsanto case.

25  Well, that wasn't a line item case at all, contrary to what

HOLLY DRISCOLL, CSR, OFFICIAL COURT REPORTER

In re:  Air Cargo Shipping Services                 171

1   they say.  That was about a premium product, premium

2   genetically modified seed, it wasn't about a premium price

3   component and, in fact, one of the problems in that case, as

4   we talked about in footnote 190 of our reply brief, is that

5   there wasn't a separate component of that price that you could

6   measure and see how that was different from the non-premium

7   types of seeds.

8          The Exhaust case, which they also cited to Your

9   Honor, actually involved 1,000 different types of add-ons to

10  price and there was no analysis by the expert either in that

11  case or in the Monsanto case, statistical analysis like what

12  we have here where we're actually looking at total prices.  In

13  the Exhaust case the expert filed a 15 page double-spaced

14  report and said, well, we can just look at the fee and

15  whatever the fee was, that's the overcharge.  That's nothing

16  like what Dr. McClave did here with his analysis of 30 million

17  transactions.

18         You could say the same thing about the Robinson case

19  which is the other one they cite which involved a line item

20  when you buy cars in Texas, a certain fee, and again there was

21  no analysis of the sort that we have here.  There was an

22  assumption that because there was this extra charge it must

23  have resulted in higher prices.  So, we did the opposite of

24  assuming that, we tested it, Dr. McClave's model tested

25  whether total prices, after you account for all of the

In re: Air Cargo Shipping Services                    172

1  relevant factors, were in fact higher than they would have

2  been if the conspiracy had not occurred and he did that by

3  comparing the prices in the conspiracy period with the prices

4  outside the conspiracy period.

5          And I want to say a word about that because that

6  wasn't an arbitrary decision. He looked at the facts, looked

7  at the evidence, what's the period of time he should be

8  analyzing, January 2000 through September 30, 2006. That date

9  wasn't plucked out of thin air, he looked at the evidence.

10  October 1st, 2006 was when everything changed, new surcharge

11  methodology announced by Lufthansa, a decision that they

12  weren't going to share the information with all the other

13  carriers. So, the conspiracy had to stop because it wasn't --

14  the mechanism for it was no longer going to be available.

15          When Mr. Kaplan says, I divided up the clean period

16  into two and applied Dr. McClave's model to it and found an

17  overcharge in the clean period, that must be a false positive,

18  that's not sound statistical science because there was no

19  basis for him to just split the clean period in half and

20  compare prices from one to the other. There has to be a

21  reason why you pick a particular point in time other than to

22  give you the result that you're hoping to get to show that you

23  can't possibly have a class action.

24          The expert opinions need to be assessed in light of

25  the record evidence, Daubert says that when we're talking

In re:  Air Cargo Shipping Services                    173

1    about an expert's opinions fit to the facts, Comcast says that

2    when we're talking about whether the expert analysis is

3    consistent with the theory of harm that's alleged, and the

4    High-Tech case that I cited before says that too.

5           And what distinguishes our experts from the defense

6    experts here is that their opinions are divorced from the

7    facts, from the evidence, from our allegations.  You have to

8    examine the conspiracy that we've alleged and that we intend

9    to prove.  That's what Dr. McClave did with his model.

10          I think at bottom of the defense argument is you

11   can't use regressions to establish class-wide impact.  That's

12   certainly what the authors of that ABA book seemed to think,

13   contrary to the reference manual for judges, contrary to all

14   the courts that have accepted it.  That's just an ABA

15   publication.  I like ABA publications but they don't state the

16   law, they state whatever the authors of them wanted to convey.

17          The defense experts seem to think you can never have

18   a regression and satisfy class-wide impact.  That's why

19   Dr. Burtis said she's never found one appropriate.  Mr. Kaplan

20   said he's never supported class certification.

21          I wrote down something that Mr. Simmons said, I

22   think I wrote it down right, he said the regression has to be

23   read in light of the record evidence.  That is true.  That's

24   what our experts did, they base the regressions on the facts,

25   on the allegations.  They didn't chop up the regression into

In re:  Air Cargo Shipping Services          174

1   separate years as though we had alleged separate annual

2   conspiracies when we didn't.  They didn't exclude most of the

3   data.  They didn't challenge the fact that we've alleged a

4   global conspiracy here that had effect around the world,

5   that's what we're testing for, testing to see whether the

6   conspiracy that we've alleged has the effect on all or

7   virtually all the class members.

8            I want to go back to something Your Honor asked

9   which is are the defendants saying that you can never have a

10  class action where there's a component price being fixed.  I

11  think the answer was more or less yes, that's what they're

12  saying.  As I've said, there were cases like Currency

13  Conversion, like Universal Service Fund that have been

14  certified and they had Rail Freight up there as an example of

15  when you couldn't do it but, as I said earlier, that issue in

16  Rail Freight, there was a long discussion that Judge Friedman

17  had about fixing of component prices being suitable for class

18  certification.  That wasn't what the D.C. Circuit took issue

19  with when they remanded it for further consideration of that

20  one issue about potential false positives.

21            (Continued on next page.)

22

23

24

25

HOLLY DRISCOLL, CSR, OFFICIAL COURT REPORTER

In re:  Air Cargo Shipping Services                175

1          MR. LANDAU:  The case is now back before Judge

2    Friedman for a renewed decision on it.

3          On the negotiation of surcharges, we presented

4    substantial evidence in our papers, the hearing and today,

5    that surcharges were intended to be and were non-negotiable.

6          I want to talk about the defendants' evidence to he

7    contrary.  Here's what Mr. Brookhiser put up.  He put up

8    Mr. Kaplan's chart of the Lufthansa surcharges varying, but he

9    didn't really try to defend that as an accurate depiction of

10   what Lufthansa was doing.  And as Your Honor heard during the

11   hearing, uses the wrong weight measure, the wrong currency, to

12   present a distorted picture.  When you correct those things

13   you see surcharges really are being imposed consistent with

14   the announcements.

15         The one example Mr. Brookhiser put up about Air

16   France, Dr. Tollison had a box plot with Air France that at

17   first glance, seemed to show a little more variation.  But he

18   explained during the hearing and he explained in his reply

19   declaration that specific example is due to low weight

20   shipments on Air France that are causing the result to look a

21   little distorted.  And that when you exclude those low weight

22   shipments from the analysis, just to see if that's case, then

23   you do see the central tendency of the surcharges are being

24   imposed directly in accordance with the announcements.

25         Mr. Brookhiser referred to Roger Haack's testimony

In re:  Air Cargo Shipping Services                    176

1    one of the named plaintiffs from RIM and some excerpts -- out

2    of context excerpts, I would say -- from his deposition,

3    talking about negotiating surcharges.

4           But he was being questioned in his deposition -- all

5    this is in our reply brief -- he was being questioned in the

6    deposition about a printout from a RIM transaction data, not

7    the defendants' own data, a database that he had kept, that he

8    said he didn't know if it was going to be accurate.

9           And when he went back and checked it -- this is in

10   the record, too -- he found that in all but one case

11   identified the defendants.  He paid the correct surcharge on

12   those shipments and the ones that he didn't, he paid higher

13   than the correct price.  Mr. Haack wasn't negotiating

14   surcharges.  Nobody was negotiating surcharges.  These were

15   non-negotiable add-ons to price.

16          There's an ANA document that Mr. Brookhiser put up,

17   that if you read that ANA document carefully, you'll see

18   they're not saying what they're doing.  What they're saying

19   is, we heard in the market that other people are doing this.

20   And there's all sorts of hearsay evidence like that on which

21   the defendants are basing this argument.  The surcharges were

22   waived and negotiable in anything but the rarest of

23   situations.

24          Can they find some example when it got waived?  They

25   can.  We talked about the 59 times that American Airlines did

In re:  Air Cargo Shipping Services                177

1    it.  It's out there, but it's rare.  They're outliers.  They

2    don't mean that in the vast majority, nearly all

3    circumstances, surcharges were imposed as they were announced.

4         The defendants announced these surcharges for a

5    reason.  It was because the surcharges they announced were

6    actually going to be imposed.  They weren't just wasting their

7    time for nearly seven years, in numerous meetings, in various

8    places around the world, agreeing on the surcharge that they

9    were going to fix, while exposing them to the liability of

10   massive criminal fines, prison sentences.  The whole thing

11   wasn't going to work because it was just a component, then

12   they wouldn't have wasted their time.  They wouldn't have kept

13   doing it year after year after year.

14        Mr. Simmons referred to Exhibit 9 to the defendant's

15   opposition, was supposedly all this evidence and base rate

16   discounting.  We addressed that in our reply, the evidence

17   that they used, but a lot of it are things like a request for

18   a base rate discount.  Maybe someone asked, would you give me

19   a discount on my base rate to compensate for the surcharge?

20   If you read the examples in Exhibit 9, you usually don't get

21   to see what the response to that was.  There was some

22   testimony from the named plaintiffs on this.  The response was

23   that no, we don't negotiate surcharges.

24        So to the extent that this occurred and on the

25   record before Your Honor, if it occurred at all, it's very,

In re:  Air Cargo Shipping Services                178

1    very rare.  It's just outliers.  It's just examples of

2    cheating.  No cartel is perfect.  The participants cheat.  It

3    doesn't mean the cartel was a failure and it doesn't mean that

4    all or virtually all of their customers were able to avoid

5    impact.

6            On the industry factors that Dr. Tollison discussed

7    and Mr. Brookhiser addressed, with all due respect,

8    Mr. Brookhiser got it wrong.  Courts don't just use those

9    factors to determine whether a conspiracy occurred.  They use

10   it to determine classwide proof of impact.

11           If you read EPDN, if you read the titanium dioxide

12   case, that's exactly what those courts are doing.  Contrary to

13   what Mr. Simmons said, those courts aren't just deferring the

14   hard questions 'til later.  If you read them, they're

15   conducting a rigorous analysis.  They're looking at each of

16   these factors.  They're making determinations about what the

17   evidence actually is capable of showing.

18           And you heard Mr. Brookhiser basically agree as to

19   most of these factors.  Ocean shipping wasn't a close

20   substitute.  Maybe it's a substitute for somebody at sometime.

21   But the question is, was it a close enough substitute to

22   undermine the effectiveness of the cartel.  And Dr. McClave

23   tested in his models statistically for whether ocean shipping

24   had an effect and it did not effect the robustness of his

25   model.

In re:  Air Cargo Shipping Services                    179

1      Same point on interchangeability.  The services

2 offered by the various defendants, the various routes all

3 around the world, different ways to get from point A to point

4 B, were interchangeable enough that class members were able to

5 switch from one airline to another with no problem on the

6 basis of price.

7      And Mr. Brookhiser seemed to agree that there were

8 barriers to new entry.  All he said was maybe they could shift

9 around their routes, which of course they can do.  That's

10 supply side substitutability.  That's what we say.  But the

11 overall market share that the defendants had was sufficient to

12 sustain the cartel.  You didn't hear any evidence to the

13 contrary about that.

14      Are there supply and demand factors specific to

15 individual countries?  There may be, but Dr. McClave accounted

16 for that with his country carrier variable.  If there are any

17 idiosyncratic factors in one country where, for example,

18 you've got more competition from non-defendants.  You've got

19 strange supply and demand factors.  That's going to be

20 captured in the model.  He's testing for that.  He's

21 accounting for that factor.

22      As I listen to Mr. Simmons, it seems like what he's

23 saying is class certification is really for the small simple

24 price fixing conspiracies.  And the lesson may be from that if

25 you're a law breaker is just make your conspiracy really big

In re:  Air Cargo Shipping Services                    180

1    and bad.  Don't just have six price changes, have 28.  Don't

2    just have four participants, have more than that.  Don't just

3    involve the U. S., involve competitors located in northern

4    countries, too.

5           But that's not the law, and the methodologies that

6    we have proposed meet the standards that are required under

7    Rule 23, and the currently existing case law from the Supreme

8    Court, the Second Circuit, other courts of appeal, we're doing

9    it the way we're supposed to do it, and the way that courts

10   routinely accept.

11          I also want to say, Your Honor, that our evidence is

12   broader than just the guilty pleas.  In our papers, we set out

13   extensive evidence -- couldn't bring it all to the hearing,

14   but it's all in our papers -- that tie each defendant to the

15   global conspiracy that we allege.  The pleas are common

16   evidence, but they aren't the limit of what we're going to

17   prove.  And yes, the defendants negotiated the language in

18   each of their plea agreements.

19          But the fact remains that 21 airlines did plead

20   guilty, and all of them deferred the payment of restitution to

21   this case.  None of them paid criminal restitution to their

22   victims.  All of them said in light of this case going on,

23   they're not going to pay restitution there.  They're going to

24   pay it here.

25          Not all airlines pleaded guilty.  That's true.  But

In re:  Air Cargo Shipping Services                181

1    of the current defendants before Your Honor, all but three of

2    them did and none of those defendants have ever paid a penny

3    of restitution to their victims.

4           So the superior way -- we're talking about what the

5    superior method of adjudication -- the superior way to allow

6    the defendants' victims to be compensated is in this class

7    action.  This is the superior methods of adjudication to

8    compensate the victims of that illegal cartel.

9           Your Honor has no further questions?

10          THE COURT:  Nope.  Thank you.

11          MR. LANDAU:  Thank you, Your Honor.

12          THE COURT:  All right.  Let's take just a five

13   minute recess while we shuffle our gears or whatever the right

14   name for this is, pretty bad one.  But we'll resume at 4:25.

15          (Recess.)

16          THE COURT:  Please be seated.

17          All right.  Is everybody ready?

18          MR. ARENSON:  Yes, Your Honor.

19          THE COURT:  It's Mr. Arenson, I gather?

20          MR. ARENSON:  Yes, it is, Your Honor.

21          As you know, I'm Greg Arenson of Kaplan Fox and I'm

22   speaking on behalf of the plaintiffs with regard to three

23   motions under *Daubert*, or really actually to exclude evidence

24   of Mr. David Kaplan.  I almost called him Robert Kaplan, my

25   partner, which would be a huge mistake.

In re:  Air Cargo Shipping Services                182

1          Mr. David Kaplan, just as statistical evidence, Your

2    Honor and not, in fact, the other analyses that he has gotten

3    in his report, but also to exclude in toto, the evidence being

4    submitted by Dr. Michelle Burtis and also Dr. Frederick Warren

5    Boulton.

6          Now, we are not doing this as a matter of defense.

7    We're not doing this because an offense is the best defense.

8    We're doing this because we have fundamental questions about

9    the analysis that they performed.  We think that as a matter

10   of economics, econometrics and statistics, it should be

11   excluded.

12         Now, in the limited time that I have, I will not

13   touch on all of the bases for excluding their analyses.  I

14   will refer Your Honor to the declarations, the documents and

15   the briefs that we have submitted already in this matter.

16         But I would like to start with an issue that the

17   defendant Polar has raised which you heard already today,

18   which is why shouldn't Your Honor just weigh the relative

19   merits of the experts' analysis, rather than exclude the

20   defendant's consultants' analyses, as we are requesting.  And

21   the answer is that the methodology that the defendants'

22   consultants have used is improper.

23         Now, they claim that they are showing that the

24   overcharge is different from what Dr. McClave found for

25   individual customers and origin destination pairs.  That's

In re:  Air Cargo Shipping Services                183

1    their excuse for taking apart Dr. McClave's regression.  But

2    as Mr. Landau said this morning, they have gone about it the

3    wrong way.

4           Let me just pause a moment here.  We're not saying

5    there is no way they could have done this right.  That's not

6    the issue.  The issue is they did it the wrong way.  They took

7    regressions and tore it into little bits and pieces, which you

8    can't do because it starts to change the analysis.

9           And then as a result, they came up with answers that

10   are not economically sensible or statistically reliable and

11   when you do that, you get what is essentially an expected

12   result.  I think it's been called a guaranteed result here.

13   It was a guaranteed result, Your Honor.  And they say ah-ha.

14   Dr. McClave's analysis is no good.  That's the wrong way to go

15   about it.

16          If what you want to do is take a look at individuals

17   customers or individual countries or individual weights, if

18   that's what you want to do, you have to have a regression that

19   conforms to what it is that you're studying.  That is the

20   scientific methodology.  That is the hypothesis, as

21   Mr. Simmons would say.  You have to do it right.  And that's

22   what they did wrong.  And that's why what they have done is

23   excludable.

24          THE COURT:  Well, they defend their methods by

25   citing other expects, do they not, as support for the various

In re:  Air Cargo Shipping Services                    184

1    things that they do.  And if they do that, then why is the

2    Court -- I mean, how is the Court to decide which set of

3    experts it ought to follow?

4         MR. ARENSON:  Well, I think you can cite experts,

5    but you need to take a look at what they're citing those

6    experts for.

7         THE COURT:  All right.  So you're saying essentially

8    that their citation to those experts is faulty?

9         MR. ARENSON:  Yes, it is, in many instances, Your

10   Honor, as was discussed during the hearing here, as well.

11        THE COURT:  And in order for the Court to fully

12   analyze that, it seems to me the Court would have to actually

13   examine the text, would it not, of the various experts?

14        MR. ARENSON:  Sometimes yes, sometimes not.  Many of

15   the points that are being made by the experts have been

16   brought out.

17        Let me just take an example off of my head.  We had

18   the text of Dr. Wooldridge, which supposedly had a formula

19   that should be used to convert from the logarithm into

20   dollars, if you're going to do an analysis to compare actual

21   to "but for" price.  And the problem with that is you needed

22   to have a log -- I'm sorry, a normal distribution or bell

23   curve.  If you want me to go draw a bell curve on the easel --

24        THE COURT:  I do remember that.  I do remember that.

25        MR. ARENSON:  And Mr. Kaplan's testimony on cross

In re:  Air Cargo Shipping Services                185

1   was, we don't have that here.  But he and Dr. Moore say,

2   relying on Dr. Wooldridge, that's the right formula.  So Your

3   Honor because you can see that the facts don't conform to what

4   the basis is for that analysis can say, that's bad analysis.

5   In fact, it should be excluded because it's not relevant here.

6   It doesn't have anything to do with the facts of the case

7   because it is proposing a methodology -- and that's what we're

8   talking about is methodologies -- that is simply ineffable.

9   That's the wrong way to do it.

10          And so that one in particular, you'll remember that

11  Mr. Kaplan said, oh, those are absurd.  Bells went off in my

12  head.  That was the testimony.  And Dr. Burtis said, oh, yeah,

13  I put a little footnote in my declaration that said that they

14  were a little bit iffy.

15          So defendants' experts knew this, but they went

16  ahead anyway, and if you take a look at the text, as we have

17  pointed out, Your Honor can make the judgment.  It can throw

18  it out because it should be thrown out.

19          THE COURT:  Is it your proposal that the decision

20  here would be a decision that would apply not only for

21  purposes of class certification, but for purposes of trial as

22  well, if there was a trial?

23          MR. ARENSON:  If it gets thrown out as a matter of

24  law, then an interpretation, if somebody tried to do the same

25  kind of analysis, I would say that's the law of the case.  I'm

In re:  Air Cargo Shipping Services                    186

1    not sure I have to say that it would get thrown out.  Maybe a

2    different expert, they may do it a different way.

3              But this particular methodology, this methodology --

4    there's a right methodology.  Let me start with that.  The

5    right methodology, if you want to take a look at an individual

6    customer's analysis of prices, he used the individual customer

7    supply and demand.  You take a look at whether the excess

8    capacity on whatever route you're studying is in or out, you

9    take it down to that level.

10             That's what they did not do.  That's what they have

11   said and what the defendants have said, and what their experts

12   have said:  It's not their assignment.  Well, if it's not

13   their assignment, they didn't do it and they didn't do what

14   they had to do.

15             So it's not Mr. Simmons saying, we have nothing to

16   do here.  They had something to do.  They just didn't do it

17   for whatever reason.  The defendants counsel said don't do it

18   or the defendants' consultant said we're not going to do it,

19   but they didn't do it here.  They didn't do it the right way.

20   They did it the wrong way.  And because think did it the wrong

21   way, it should be tossed.

22             I have an analogy, since we have been talking about

23   cars, and I thought that I would share it with Your Honor --

24   which is that what the defendants have done in disaggregating

25   Dr. McClave's model is analogous to auto mechanic dismantling

In re:  Air Cargo Shipping Services                187

1   a model car, rearranging its component -- we're talking about

2   components always, it seems -- and then when the car does not

3   function properly, claiming that the car was deficient, not

4   what the work was that the mechanic did.

5          And that's what we have got here, too.  If you take

6   a look at what the defendants have done, they're trying to

7   rearrange the innards of the multiple regression model that

8   Dr. McClave ran, take little components of it, little bits and

9   pieces and say, oh, well, it doesn't work now.  It's all Dr.

10  McClave's fault -- but they did it the wrong way.  And if it

11  was a piece of junk when the mechanic got through with it,

12  with the car in my analogy or example, it's junk science here

13  and excludable.

14         Now, let me shift a little bit.  Mr. Kaplan is very

15  defensive about not using all of Dr. McClave's data.  That is

16  what we keep saying, that they shouldn't have taken it apart

17  in little bits and pieces.

18         And so Mr. Kaplan, as you may recall, testified that

19  he used 99 percent of Dr. McClave's data in his individual

20  customer regressions, but when I cross-examined him or it,

21  well, it wasn't in any single regression because that's his

22  problem.  He didn't use the right amount of data.  He tore it

23  up in bits and pieces.

24         Similarly, he claimed that he used a hundred percent

25  of Dr. McClave's data in his weight regressions, in terms of

In re:  Air Cargo Shipping Services                188

1    the one for each one of the weight categories, and I pressed

2    him with Your Honor's help to acknowledge that, well, no, you

3    don't use it all in any one of the weight regressions either.

4         And similarly, Mr. Kaplan claimed that he used

5    Dr. McClave's model for each separate customer or country

6    regression, ignoring -- and this is fundamental -- his claim

7    that you had to look at shipments to or from different

8    countries for different customers, demand an excess capacity

9    and cost, because they may be different.  We even heard that

10   this morning on the class certification argument -- maybe it

11   was this afternoon -- with Mr. Simmons.

12        And that, again, is their mistake because on

13   cross-examination, Mr. Kaplan admitted he never used cost

14   demand or where appropriate, excess capacity unique to the

15   customer or the country in his individual regressions.  That

16   testimony is at page 665, lines 13 through page 666, line 18

17   of the transcript.

18        THE COURT:  Amount I correct in understanding the

19   argument that if you go to subsets of the data, then you would

20   have to use -- have to, but you might well have to use

21   different factors or specify different variables to create an

22   effective model for that subset of data?  Is that the

23   argument?

24        MR. ARENSON:  The argument is, if you're going to go

25   to an individual customer and you want to define a model

In re:  Air Cargo Shipping Services                189

1    analogous to Dr. McClave's, because you're trying to show that

2    there are individual issues in this case -- remember, that's

3    Rule 23(b)(3) -- that the common issues have to predominate

4    over the individual issues.  If you want to show individual

5    issues, then run a proper individual regression and that means

6    that -- then Mr. Kaplan keeps telling me the answer is yes.

7              THE COURT:  Okay.  Good.

8              MR. ARENSON:  But what that means is that in an

9    individual regression, you have to take the demand for that

10   individual customer.  And as you saw during the hearing, that

11   demand is knowable.  So you can put that into the model if you

12   want.  It's analogous.  You've got global demand in

13   Dr. McClave's models.  You want to show what's going on for an

14   individual customer, individual demands, individual supply.

15   There is excess capacity.  Depending upon which way it's

16   going, you put that in.  There are other factors that you have

17   to take into account -- seasonality or no seasonality.  You

18   take that into account.  It's analogous.  You look at the same

19   kind of factors.

20             THE COURT:  Okay.

21             MR. ARENSON:  Okay?

22             THE COURT:  I think I understand.

23             MR. ARENSON:  And in fact what I think we're saying

24   here and what the error is that the defendants' consultants is

25   they didn't apply economic principles for their regressions.

In re:  Air Cargo Shipping Services                190

1  Mr. Kaplan ran a separate regression for the weight

2  categories, as we talked about.  But there's no evidence that

3  the alleged conspiracy treated shipments in each category

4  differently.  That surcharge applied for all five categories.

5  That's -- and it's both the security surcharge as well as the

6  fuel surcharge.  So again, Mr. Kaplan's analysis is not

7  connected to the allegations, and that's what's required by

8  Comcast.  And so therefore, he did it wrong.

9        Mr. Kaplan split the class of conspiracy variables

10  into annual variables, as Your Honor has already heard.  But

11  there is no allegation of seven separate annual conspiracies

12  here.  There's only one.  So again, he didn't conform to what

13  the evidence is and he didn't have a reason for doing that for

14  his so-called test.

15        And then we've heard a little bit about this

16  benchmark analysis.  This creation that's all -- there is a

17  false positive, as they keep calling it.  Well, there's no

18  allegation of any conspiracy in that time period, so

19  Mr. Kaplan made up one, which just happened to coincide with

20  the great recession.  And running a regression just during

21  that time period when there's no reason doesn't make

22  econometric sense.

23        And the invalidity of that was demonstrated by the

24  low R-squared that came out of those tests.  The two full

25  models, inbound and outbound, one had a R-squared of

In re:  Air Cargo Shipping Services          191

1    20 percent, and other one was 17 or 18 percent.

2         Now, Your Honor has heard about what an R squared

3    means.  It's measure of the overall price variability.  It

4    ranges from one percent to a hundred percent.  And if you want

5    to take a look at that, that's Dr. McClave's testimony on page

6    159, lines 12 to 14.

7         But an R-squared of 20 percent, that's very low.  It

8    means that the regression is explaining almost nothing at all.

9    And so therefore, if you don't have a reason for doing this,

10   it's not a good test.  And Mr. Kaplan had no reason whatsoever

11   for running that regression.

12        Now, I said earlier, that it wasn't part of their

13   assignment.  That's their excuse and why they didn't do it

14   right.  And I just want to point something out that Mr. Kaplan

15   said that here, at page 527, lines 15 to 18, and I might even

16   be able to put that up on the Elmo.  There we go.  Right side

17   up.  There we go.

18        Question:  "Mr. Kaplan, was it part of your

19   assignment to determine whether, in fact, any given class

20   member was impacted by the alleged conspiracy?"

21        Answer:  "No.  It wasn't his job to do that.  He

22   wasn't looking to inform see whether any individual class

23   member was impacted.  He didn't do that."

24        And that's the error of his ways, and that is why

25   it's excludable.  And that also led to some of the absurdity

In re:  Air Cargo Shipping Services                    192

1   that we saw, I already told you about, his retransformation

2   from logarithms to dollars.

3           Now, Mr. Kaplan also made other mistakes that we're

4   challenging, too.  He initially said that Dr. McClave's models

5   were two regressions, not one.  But as you heard Dr. McClave

6   then went to the SAS folks, the progenitors who actually have

7   the standard statistical package that everybody uses, and they

8   say run it on Linux rather than on Windows.  And sure enough,

9   it's one regression.  The results are identical.  Let's drop

10  out, but he shouldn't care about that anymore.

11          Perhaps more importantly, Mr. Kaplan in his Exhibit

12  22 of his first declaration, drew -- presented some grafts

13  which supposedly show that residuals from an ordinarily

14  squared model was very similar to the residuals from a

15  weighted lease squared model.

16          Now, Your Honor, I'll remind you what resides are.

17  Residuals are the differences between the actual prices and

18  the predicted prices from a multiple regression.

19          Dr. McClave drew grafts on an easel, which I think

20  Mr. Landau had up and maybe I can find a copy of, as well.

21          (Publishes exhibit.)  I don't know which way.  There

22  we go -- which looks like that.  Maybe we should do it this

23  way.  That's up.  Okay.

24          And remember those grafts, and you can see that at

25  the top, there was this sort of even distribution, the

In re:  Air Cargo Shipping Services                    193

1   constant distribution.  At the bottom, there's this

2   funnel-shaped distribution.  The funnel-shaped distribution

3   meant something because that's what we have here.  The funnel

4   shape meant ah, it's not an even distribution.  Ordinary lease

5   squared shouldn't be used or OLS.  Instead, it should be WLS,

6   weighted lease squared.

7            So Mr. Kaplan's grafts were wrong in his Exhibit 22,

8   because he showed that they were basically the same, pretty

9   much even though they were line grafts like the stuff at the

10  top.  So he wasn't using weighted lease squares.

11           But he made a mistake.  What he didn't do is he

12  didn't divide the weighted lease squares by the square root of

13  the chargeable weight.  When I pointed this out, he didn't do

14  it right.  Should be excluded because it was clearly wrong.

15           And that wasn't the only time he didn't do that.  He

16  also misleadingly presented in his Exhibit 7, the scale.

17  Remember Dr. McClave's box plot of the variation in prices and

18  I think I can even pull that one up.

19           (Exhibit published.) This time, I can do it this

20  way.  There we go.

21           So that's Dr. McClave's graft.  And then Mr. Kaplan

22  split it up into five and changed it to scales.  That's not

23  good econometrics, not good statistics.  It's not even honest.

24  And he tried to mislead this Court.  He tried to mislead us.

25  What he was trying to show, which was wrong, is that

In re:  Air Cargo Shipping Services                194

1  ordinarily lease squared is acceptable and not weighted lease

2  squared.

3          Finally, Mr. Kaplan suggested that there are a host

4  of additional variables that should be added.  That was slide

5  27.  We saw it again, but he didn't test it ever.  And you can

6  see that testimony at pages 722, line 21, through 726, line 9.

7  And he didn't acknowledge that Dr. McClave's carrier country

8  variables captured the differences between countries and

9  carrier combinations and price levels and demands and so on.

10 That was just not part of his assignment, as Dr. Moore said in

11 paragraph 86 of his declaration on the *Daubert* motion.

12          Let me turn to Dr. Burtis for a moment.  She doesn't

13 offer a rising model.  That's not plaintiffs burden.  Her

14 lawyer said that.  It's page eight of their *Daubert* brief.

15          She also mines the data for an absurd result and

16 then blames it on Dr.  McClave, let me quote from a case that

17 we have cited, *Lippe versus Bairnco*, 288 BR 678, page 701,

18 Southern District of New York, 2001.  The judge at that point

19 was Southern District Judge Denny Chin, who's been promoted,

20 even know though I'm sure you know -- where the experts had,

21 quote, only one goal in mind, to come up conclusions that

22 support plaintiffs' positions in this case, and they were

23 determined to get to that point any way they could, closed

24 quote.  And Judge Chin threw out those experts' analysis, just

25 as Your Honor should throw out Dr. Burtis' results oriented

In re:  Air Cargo Shipping Services                    195

1    analysis here, well as Mr. Kaplan's.

2            Now, Dr. Burtis has the same kind of individual

3    regressions.  They're invalid for the same reasons.  You can

4    take a look at the results.  They're not economically

5    sensible.  They're statistically reliable 58 percent of the

6    time.  That means that their methodology is not the right one

7    to use and it's on too little data.

8            It's also something that she did, that we should

9    discuss and that is the interaction models that she came up

10   with.  First of all, you've got these individual regressions.

11   And she says, oh, now I'm going to use my interaction model,

12   using all of Dr. McClave's data and the result's identical.

13   Well, how could the results be identical for those particular

14   analyses?  You've got more than a 15 million transactions on

15   the other and she's got an interaction variable over here, in

16   her interaction model.

17           Your Honor will remember what an interaction

18   variable is.  That's when you multiply two variables together.

19           So how did she do it?  It's very simply.  What she

20   did is, she multiplied every transaction that wasn't one of

21   her customers by zero, essentially eliminating them.

22           Now she claimed that's not what she did, and the

23   testimony is at page 818, lines 15 to 18.  With a little luck,

24   I'll get it up.  (Exhibit published.)

25           As you can see, that's in response to your question,

In re:  Air Cargo Shipping Services                    196

1   Your Honor.  She is saying, "I used all of his data, Dr.

2   McClave's data.  I didn't just use the customer's data.  And I

3   allowed all of the variables in Dr. McClave's regression to

4   have different coefficients for each one of these customers."

5            Now, let me emphasize that last part:  For each one

6   of these customers.  She was being very careful in her

7   testimony, because that only means that it was for the

8   customers for which she had already run individual

9   regressions.  The rest of them, she zeroed out.

10           That's not a good practice.  Dr. Rausser says it.

11   Dr. McClave says it.  And I think Your Honor can figure out

12   that's really an illusion.  She's trying to pull the wool over

13   our eyes and say, oh, they're really using all the data, when

14   she isn't even coming close.

15           And again, like Mr. Kaplan, Dr. Burtis found that

16   there were additional factors that should be included, but she

17   didn't test any of them and if you don't test it, you don't

18   know, and that's the problem with what she did.  It's

19   speculation.  You can't use speculation.  It's not the right

20   then for econometric experts to come in here and present to

21   Your Honor.  It is excludable.  It doesn't fit this case.

22   It's not relevant.

23           Let me go to Dr. Warren Boulton very briefly,

24   because I'm running out of time.  Dr. Warren Boulton's

25   regressions are no better.  He doesn't use

In re:  Air Cargo Shipping Services                    197

1    individually-tailored demand, cost or where applicable, excess

2    capacity.

3           Got small samples bias.  The R squares are

4    29 percent inbound, 22 percent outbound, again, very little.

5    It shows there is a problem with the regressions.

6           He ran a regression for just shipments by Japan

7    prior to May 2001, but that, as Mr. Landau has explained is

8    based on a false premise, like there was no fuel surcharge.

9    Sure there was a fuel surcharge.  It wasn't just called that.

10   It was put into the rates.  You saw a document from Lufthansa

11   up on the screen earlier, which said that in April -- sorry,

12   in January of 2000, they're going to put it onto the rates.

13   That's what they did.

14          If you take a look at the Coolidge declaration on

15   the Warren Boulton motion, Exhibits 20 and 22 demonstrate

16   that.  The record is different.  Dr. Warren Boulton didn't

17   comply with the record, and that's the problem.  They ignore

18   the record.  They tear things into bits and pieces.

19          Let me just try and close with one of the points

20   that they make.  You heard about how panel data, they want to

21   be able to test panel data, Mr. Simmons said.  You heard

22   during the hearing what Mr. Kaplan was saying, that you've got

23   to test on pooled data.  That's not right.

24          Let's go to Dr. McClave's testimony, page 189, even

25   though I have no time, I'm going to read through the whole

In re:  Air Cargo Shipping Services                    198

1    thing.

2              Question, my question:  "Are you aware that the

3    defendants' consultants have performed any regressions for

4    individual customers, individual carriers, individual routes,

5    individual countries, individual weights or combinations of

6    those?"

7              I apologize to the court reporter.

8              Answer:  "I am."

9              Question:  "Are those tests of the robustness of

10   your models?"

11             Answer:  "No.  In every case, they're dropping more

12   than ninety, often more than 99 percent of the data and

13   running them out and expecting this global model to produce

14   the same result.  That doesn't make any statical sense when

15   you go down to a particular country or a particular customer.

16   If you're going to" -- it should be "fit," not "pit," Your

17   Honor.

18             "Fit a global model, you need global data.  You can

19   put a customer indicator, as I did, but to expect the models

20   to work to produce the same result or five hundred or a

21   thousand observations that it did with 15 million, I don't

22   think that's a reasonable test.  If that's a test that is to

23   be applied, no model can stand up to that, no global model can

24   stand up to that.  The model simply -- a global model is a

25   global model and it is not going to work on a small fraction,

In re:  Air Cargo Shipping Services                    199

1   not going to produce exactly the same result on a small

2   fraction of the data.  And that's -- that forgone conclusion

3   is what the defendants did here and it's wrong.  Their citing

4   to panel data or pool data doesn't excuse what they did.

5           The disaggregated models are not valid econometrics

6   and there's lots of case law out there.  We cited in our reply

7   brief on the *Daubert* motion with regard to Mr. Kaplan.  And

8   Mr. Landau cited some of it earlier today.  It's not

9   consistent with the law.

10          What we did is proper.  What defendants' consultants

11  did was improper and it's excludable.  Thank you.

12          THE COURT:  Thank you, Mr. Arenson.  Did you mean to

13  reserve any time?

14          MR. ARENSON:  Whatever I've got left.

15          THE COURT:  You've got about three minutes.

16          MR. ARENSON:  That's what I figured.

17          MR. BRADSHAW:  Good afternoon, Your Honor.  Ben

18  Bradshaw for the defendants.

19          The plaintiffs know that they have a big problem,

20  Your Honor.  They have a model that utterly fails.  They have

21  a model, that as we heard today, doesn't even ask the right

22  questions, the questions that the law demands and that the law

23  requires.

24          And they have a model that Mr. Kaplan, when applying

25  a battery of standard accepted test that the leading

In re:  Air Cargo Shipping Services                    200

1    authorities in this area support and tests, Your Honor, that

2    he's used in multiple other cases, that have been admitted and

3    accepted by courts show that large segments of the proposed

4    class under Dr. McClave's model suffered no impact, and no

5    overcharge.

6          Now, what did the plaintiffs do in response to

7    Mr. Kaplan's opinions?  Well, they tried to fix their models.

8    Dr. McClave came in with new customer models, all right?  Then

9    what happened?  Well, Mr. Kaplan showed that those were

10   unreliable.  And so what happened yet again?  Three weeks

11   before the evidentiary hearing, they came in, with yet another

12   one -- yet another one that suffers from the same deficiencies

13   and in fact, has some additional deficiencies.

14         Your Honor, knowing the plaintiffs here, knowing

15   that they have a faulty and a flawed model, a model that fails

16   and a model that doesn't even ask the right questions, they

17   then do the only thing that they can, which is try to put a

18   gag order on the defendants' experts.

19         Your Honor, this is nothing more than an attempt to

20   salvage a deeply flawed and failed model.  The Second Circuit

21   didn't hear Mr. Arenson say a word about the relevant law for

22   exclusion under *Daubert*.  The Second Circuit endorses a

23   particularly broad standard for the admissibility of expert

24   testimony.

25         THE COURT:  And how do I apply that here?  What is

In re:  Air Cargo Shipping Services                    201

1   the appropriate way for this Court to examine the various

2   tests, let's put it that way, that are offered, both on the

3   plaintiffs' side and on the defendants' side, for evaluating

4   the McClave model.  Let's put it that way.

5          MR. BRADSHAW:  Well, two --

6          THE COURT:  Go ahead.

7          MR. BRADSHAW:  Two answers, Your Honor.  For

8   purposes of this *Daubert* motion, Your Honor should do exactly

9   what the law says, which is the primary issue is whether the

10  testimony will assist the trier of fact and there is a

11  presumption of admissibility with respect to *Daubert*.

12         Now, with respect to the question of how you analyze

13  these tests in the consideration of the class certification

14  inquiry, well, Your Honor, I would suggest to Your Honor that

15  let's look at the authorities.

16         Can you pull up?  (Exhibit published.)

17         What do the leading economic authorities, Your

18  Honor, say about the test?  Dan Rubinfeld, the Godfather of

19  modern regression and econometrics, that when you a pooled

20  data set, you have to test it on subsets, where the slope,

21  which is the conspiracy coefficient here, to see whether it

22  varied.

23         What Mr. Kaplan did here, Your Honor, is what is

24  commonly -- it is a standard test -- and to suggest that the

25  leading authorities do not support this, and Your Honor, not

In re:  Air Cargo Shipping Services                    202

1    only did Judge Jenkins in the Plastics Additives case accept

2    and rely upon the exact same thing, okay, that was done in

3    this case, you hard Mr. Simmons talk about the GPU case -- not

4    only do courts are they admitting it, in fact courts are

5    demanding it.  Judge Alsup said you have to do this.  The

6    courts are saying you have to do it.  The leading economic

7    authorities say this is what you do.

8              THE COURT:  I understand Mr. Arenson's argument, it

9    is not that you're not supposed to test, but it's how you go

10   about selecting your subsets upon the -- that you are testing.

11   I think that's what I understood.

12             MR. BRADSHAW:  There are three responses to that,

13   Your Honor.

14             THE COURT:  Okay.

15             MR. BRADSHAW:  First, there is absolutely nothing

16   econometrically that says that by applying global variables,

17   which are the variables which is -- Dr. McClave's.  That's the

18   model they're relying on, okay?  You can't go in and start

19   screwing around with the variables.  Okay?  There's nothing

20   econometrically that says that you should not be applying the

21   global variables to your subset.  That's point number one.

22             Point number two --

23             THE COURT:  Global variables being the various

24   coefficients that you've developed?

25             MR. BRADSHAW:  Being the cost and demand and the

In re:  Air Cargo Shipping Services          203

1   other variables.  Remember, the dependent variable here is

2   price.

3            THE COURT:  Right.

4            MR. BRADSHAW:  So what you're putting into the

5   transaction -- what you're putting into the equation is all of

6   the transactions on price.  You're trying to explain the

7   movement of price.

8            On the other side, you have cost and demand.  You

9   have the -- some factors which we contend and Mister -- so let

10  me just explain.  What the issue is here, they're saying,

11  okay, if you're going to test Dr. McClave's model, okay, by

12  running on specific countries, specific customers, specific

13  time frames, you have to go in and redo the variables.  So you

14  have to make those variables specific to a specific country or

15  specific to a specific customer.

16           That's completely wrong, with all due respect, as a

17  matter of economics, as a matter of science.  Okay?  And as a

18  matter of what the leading authorities in this -- because,

19  Your Honor, think about it, okay?  What would happen if you

20  went into Dr. McClave's model, which is the model that they

21  are relying on and you took one of his cost variables or his

22  demand variable, and instead of having it the way he wanted it

23  to be, you customize it for a specific country and then you

24  ran the model.

25           Well, then your results -- you don't know if your

In re:  Air Cargo Shipping Services                    204

1    results are being driven by the new variable.  It's completely

2    wrong to suggest that was the way that you test.  It's not.

3    The defendants have to test the model that's been presented.

4    That is the model -- we have heard all this talk today about

5    what's going to be relied on in the class cert, what's going

6    to be relied on at trial.  All these class members who are

7    going to be coming in and relying on their model, their model

8    is a global model with global demand, global cost, all of the

9    variables, the independent variables are global, okay?

10            For us, the test -- you can't go in change that

11   because then your results aren't going to be driven by what

12   the model's saying, it's going to be driven by how you change

13   the variables.  And I guarantee, if we had changed the

14   variables, they would be coming in and saying, oh, don't look

15   at -- they changed the variables, Your Honor.  They can't do

16   that.  It's not a matter of good science, Your Honor.  It's

17   not a matter of good economics and it's not the law, more

18   importantly.  Excuse me.

19            Now a number of observation, if I can just go,

20   because -- and Your Honor, these points about the pool test

21   and the appropriateness of the test, we have breached this.

22   Dr. Moore has submitted a very detailed declaration, where he

23   addresses these points, point by point.  I would refer Your

24   Honor to that where we go through each of the individual

25   criticisms, but I want to get at the big ones.

In re:  Air Cargo Shipping Services                    205

1        Okay.  Go back.  Okay.

2        Mr. Kaplan testified extensively about the criticism

3   about the number of observations, okay?  We've heard this for

4   years, okay?  What do the plaintiffs' own experts say about

5   the number of observations?  You don't know need 15 million

6   observations to run an appropriate regression.  In fact, the

7   economic literature and in fact, Mr. Kaplan authored a book

8   with the plaintiff's' expert that says a hundred is more than

9   sufficient.

10       Go to the next slide. (Publishing slide.)

11       And you heard Mr. Kaplan testify about his number of

12  observations.  All of these, Your Honor, were statistically

13  valid.  All of them have more than enough observations.  The

14  suggestion, Your Honor, that you need 15 million

15  observations -- and by the way, Your Honor, this is a big --

16  go back to the big cloud, okay?  You know, 15 million

17  observations, Dr. McClave puts it in a big cloud where he

18  pools it.  He doesn't -- he strips out the customer names and

19  he comes up with a single overcharge.  You heard Mr. Simmons

20  talk about how he is then taking that and applying it down,

21  okay?

22       These, you know, talk about testing and an

23  appropriate test.  Mr. Kaplan took that.  He tried to make

24  sense of it and he tested it and this is what he found and

25  these observations not only are more than sufficient under the

In re:  Air Cargo Shipping Services                206

1    economic literature, but you'll see --

2              And go to the next slide.

3              China, how many observations inbound?  1.1 million.

4    Okay?  Japan outbounds, 800,000.  This idea that it's one or

5    two observations, it's completely unsupported by Mr. Kaplan's

6    analysis.

7              Couple other points, Your Honor, and then I'm going

8    to reserve some time for my colleagues.

9              Okay.  The plaintiffs criticize Mr. Kaplan for

10   looking at specific years.  Okay?  Why is that important?

11   Well, what if one of the 60 percent of the class members in

12   this case who only have one transaction -- remember that?  60

13   percent -- what if they were in a year 2006 what if their

14   single transaction was in the year 2008, where under Dr.

15   McClave's model there was no overcharge?  That's why it's

16   important.  Sixty percent of the class had a single

17   transaction.

18             Okay.  Now, the clean period test, again, Your

19   Honor, what does it show?  It shows that Dr. McClave's model,

20   this model that he supposedly tested for robustness, Your

21   Honor -- and I'm going to get to that in a second.

22             When applied to the period where there should be no

23   overcharge because there's no conspiracy, it finds an

24   overcharge.  Okay?  A standard test, a standard test routinely

25   used by a econometricians and by economists in the area and

In re:  Air Cargo Shipping Services                207

1   Dr. Moore in his affidavit and his declaration cites to those
2   authorities.  It's a, well, they're can't any dispute about
3   these.  These are standard tests.  They can't cite a single
4   case and they can't cite a single authority to say otherwise.
5           Finally, Your Honor, with respect to the robustness
6   test, okay?  The plaintiffs claim, okay.  Yeah, even though
7   Mr. Kaplan was doing tests that have been supported by the
8   econometric authorities and supported by cases and by judges
9   and have been admitted.
10          Mr. Kaplan, remember, has never had any of his
11  tests, any of his testimony excluded ever.  Okay?  He's doing
12  exactly what the econometricians say you are supposed to do.
13          What Dr. McClave do?  He ran these quote, unquote
14  robustness test.  The robustness tests have all the same flaws
15  of his global model.  His robustness test assumes a single
16  average estimate for every single customer in those models.
17  It's the exact same flaw.
18          So with all due respect -- in the robustness test,
19  they don't look at individual customers.  They don't look at
20  individual countries.  And they suffer from these quote,
21  unquote robustness tests?  Suffer from the exact same
22  fundamental flaw in that he assumes that the overcharge --
23  There's a single overcharge that applies cross all customers.
24          Okay?  Finally, Your Honor, on the WLS issue,
25  plaintiffs -- Mr. Kaplan testified in this court very

In re:  Air Cargo Shipping Services                    208

1   specifically that a single factor in Dr. McClave's models

2   generated this overcharge.  His weighting procedure, his WLS

3   procedure, the application of that procedure with nothing

4   else, that minor little tweak, okay?  Took what was a no

5   overcharge to an overcharge.

6           And Mr. Kaplan testified that, yes, that would raise

7   alarm bells and he investigated it and he looked into it, and

8   he has testified and his report specifically suggests, Your

9   Honor, that there are other ways of dealing with the problems

10  that Mister -- or Dr. McClave found in his models.

11          But there are other ways to do it, at most, your

12  Honor.  That is an issue that goes to the weight of the

13  testimony, not to its admissibility.

14          So I will end there, Your Honor, but what I will end

15  with is to say what Mr. Kaplan did here, okay, is standard

16  econometrically- accepted test that many courts have accepted,

17  and many courts have said, you have to do this.

18          To suggest, under the standards of *Daubert* in the

19  Second Circuit, a liberal, particularly broad standard that

20  assumes the admissibility, and the primary factor is whether

21  it will assist the trier of fact.

22          Under that standard Your Honor, the plaintiffs come

23  nowhere near fulfilling their burden of having Mr. Kaplan's

24  testimony stricken under the *Daubert* standard.

25          THE COURT:  Is there any suggestion anywhere that

In re:  Air Cargo Shipping Services                209

1   the analysis at the class -- the *Daubert* analysis at the class

2   certification stage is any different from a *Daubert* analysis

3   that -- at a trial?

4          MR. BRADSHAW:  No, Your Honor, there is and the

5   parties have put this in the briefs.

6          There is some -- there is an open question about

7   whether *Daubert* applies at the class certification stage.

8          THE COURT:  You mean applies at all?

9          MR. BRADSHAW:  Applies at all.

10         That was a question that was raised in the *Comcast*

11  issue.  The Supreme Court did not decide the issue and the

12  parties have addressed that in their briefs.

13         THE COURT:  Okay.

14         MR. BRADSHAW:  But -- so that's it.  Thank you, Your

15  Honor.

16         MR. BENNETT:  Good afternoon, Your Honor.  Dan

17  Bennett from Ropes and Gray for all the defendants.  I'll be

18  talking a little bit about the plaintiffs' challenge to

19  Dr. Burtis, and her opinions in this case.

20         Dr. Burtis is an accomplished Ph.D.  Dr. Burtis has

21  been an accomplished Ph.D. economist for over 30 years.  Her

22  testimony and her opinions have been accepted in a number of

23  class certification cases.  There are a number of cases listed

24  here for Your Honor.

25         In each of these cases, Dr. Burtis provided opinions

In re:  Air Cargo Shipping Services                210

1   and testimony on class certification using techniques and

2   methodologies similar to what she's done here.  And in each of

3   these cases, the Court accepted Dr. Burtis' opinions and

4   relied upon them to deny class certification.

5           Just as an example, the bottom one, Your Honor, is

6   Graphics Processing Units, GPU is a case that's come up a

7   number of times during Mr. Simmons' presentation.

8           Dr. Burtis was the defendants' expert in that case.

9   About Judge, I also described Dr. Burtis' work in some detail,

10  work similar to what she did here.  Performing disaggregation

11  to evaluate whether an average effect found by plaintiffs'

12  experts in that case, apply to all class members.  Dr. Burtis

13  opined that it did not, and the class was not certified based

14  at least on part on Dr. Burtis' testimony.

15          Here, as in those other cases, Your Honor, Dr.

16  Burtis's opinions are extremely helpful to the Court in

17  deciding plaintiffs' class certification motion.  As my

18  colleague mentioned, that's the standard that applies here, is

19  the opinion being offered by the expert helpful to the Court?

20          THE COURT:  What's next?

21          MR. BENNETT:  Here, are briefly some of the opinions

22  that Dr. Burtis offered during the course of this proceeding.

23  Each one is helpful to the Court in resolving issues that are

24  presently pending before you.  And each one is based on

25  methodologies and techniques accepted in the field of

In re:  Air Cargo Shipping Services                    211

1   economics, as confirmed by Dr. Burtis' reports and in

2   Dr. Moore's declaration in opposition to the motion to strike.

3              I would like to respond to some of the specific

4   criticisms of Dr. Burtis that Mr. Arenson made.

5              As a preliminary matter, we adopt Mr. Bradshaw's

6   argument about the appropriateness of testing on subsets,

7   generally.  Those are tests Dr. Burtis did as well as

8   Mr. Kaplan, and Dr. Burtis likewise has economic literature

9   that supports what she did.

10             Plaintiffs assert, though, that Dr. Burtis engaged.

11  In some statistical trick in her regressions.  That assertion

12  is either the result of them not understanding what she did or

13  it's because they realize that what he did is damaging to

14  their case.

15             As Dr. Burtis testified and as Mr. Bradshaw just

16  explained, Dr. McClave's global model calculates a single

17  overcharge.  It only calculates the average effects on the

18  class.  It simply doesn't tell you what individual customers

19  and their -- about individual customers or their transactions.

20             So she tests that.  She tests whether or not

21  Dr. McClave's average overcharges applied to individual

22  customers and routes.  Her work is consistent with the

23  scientific method.  It's a testing and hypothesis.  And what

24  she did in her interaction model, as Mr. Arenson called it is

25  a standard test.  It's called a Chow test.  She testified

In re:  Air Cargo Shipping Services                    212

1    about that during the hearing.  The plaintiffs had the

2    opportunity to cross-examine her.

3          The Chow test is designed to test whether to what

4    extent the overcharge coefficient varied from Dr. McClave's

5    average for particular Polar customers.  What the Chow test

6    does is it allows the coefficients to vary for particular

7    customers and routes, instead of restricting the model like

8    Dr. McClave does, so that it only generates a single

9    coefficient for all customers and all transactions.  And as.

10         Dr. Burtis explained during her testimony, the

11   results of this test showed that the overcharge coefficients,

12   in fact, varied significantly when you conduct this test.  And

13   Dr. Burtis did, in fact, run a separate test, trying to get

14   out the same -- the same fundamental problem with

15   Dr. McClave's model, running individuals regressions.  It's a

16   different test, but it is likewise accepted in the industry,

17   and the results confirmed Dr. Burtis' conclusions about

18   that -- or that Dr. McClave's models do not apply when you

19   look at individual customers and individual routes.

20         Dr. Burtis provided the support for why she was

21   doing what she was doing.  She formed a hypotheses.  She

22   explained it, and it has support in the economic literature as

23   she explained, as does Dr. Moore in his the report.

24         There have been a number of attacks throughout the

25   day about Dr. Burtis rejecting regressions generally.  Her

In re:  Air Cargo Shipping Services                    213

1    opinions here, she didn't he opine here that regressions are

2    never acceptable.  She merely said that this regression does

3    not meet the plaintiffs' burden, in her opinion, to establish

4    impact to all or virtually all class members using common

5    evidence.  She don't reject regressions in all cases.  She

6    rejected the attempt to use this regression model to answer

7    the wrong question, using the wrong inputs.

8         Lastly, I just want to point out a response to some

9    of the criticism that Dr. Burtis didn't use enough data in the

10   various tests that she did.  As Mr. Bradshaw explained, Dr.

11   Burtis did not -- explain with respect to Mr. Kaplan, Dr.

12   Burtis did not endeavor to create her own alternative model

13   that could be used to assess impact.

14        Her work, as we've discussed, was designed to test

15   the assumptions reflected in Dr. McClave's model, and as she

16   explained in her direct testimony, she had sufficient data in

17   order to conduct the tests that she ran, and to provide the

18   opinions that she did gave you.

19        In any event, as Mr. Bradshaw just pointed out, the

20   plaintiffs are silent as to how much data is enough to run

21   some sort of regression or test that can be relied upon, and

22   Dr. Tollison himself has testified that he has run regressions

23   with fewer than a hundred data points.

24        Again, plaintiffs just wish to prevent defendants'

25   experts, including Dr. Burtis, from being able to tell you

In re:  Air Cargo Shipping Services                 214

1  what happens when you test Dr. McClave's model against subsets

2  of the data.  The results of those tests, as Mr. Kaplan

3  explained and Dr. Burtis explained are that the assumptions

4  embedded in Dr. McClave's model just do not hold up.

5           That's all I have.

6           And Mr. Brookhiser may have a few words.

7           MR. BROOKHISER:  At most, two minutes.

8           Not knowing exactly how this would go, I made a

9  PowerPoint, and since I've already killed the trees.  So they

10  didn't die in vain, can I pass these out?

11           THE COURT:  Yes.

12           MR. BROOKHISER:  But I'm probably not going to talk

13  about more than a page or two.

14           Your Honor, the statistical or alleged statistical

15  problems with Dr. Warren Boulton's analysis took up a very

16  tiny part of the plaintiffs' *Daubert* motion, and I'm not going

17  to get back into that.

18           But there were a couple of other non-statistical

19  challenges that they made, and I want to just say one or two

20  words about them, because there was evidence at the hearing

21  that supports what Dr. Warren Boulton did and thought and

22  opined on, and I'm just going to talk about that today.

23           The first opinion that he had was really a criticism

24  of the plaintiffs' experts for assuming there is a worldwide

25  market.  And he said no, it's country or route pair market.

In re:  Air Cargo Shipping Services                    215

1   And he relied on, among other things, an analogy to passenger

2   transportation.

3          And the defendants -- or the plaintiffs' principal

4   objection seems to be that he didn't do a statistical analysis

5   to show that that was a relevant market in the antitrust

6   terms.  Of course, their folks didn't do any analysis like

7   that either.  So if that's the problem for Dr. Warren Bouton,

8   it's a problem for their people.

9          But on page six and seven, you see some things that

10  I think came up at the hearing.  One is that Dr. McClave and

11  Dr. Tollison all define air cargo as the delivery from a point

12  of origin to a point of destination.  That's what passenger

13  transportation is, too.  Two of the three ways in which air

14  cargo is transported, according to their own declarant,

15  Mr. Brooks, involve passenger planes, which he said in his

16  declaration, paragraph four.  So passenger transportation is a

17  legitimate analogy.

18         Then on the next page, at the hearing, they tried to

19  get Dr. Tollison to distinguish passenger transport from

20  freight transport, and he said, "Well, it's hard to envision

21  how you could put people on a truck at the end of a trip and

22  take them somewhere else."  Well, maybe you don't put air

23  passengers on trucks, but at the end of every trip, they get

24  in a car or a bus or a train.  It's the same thing.

25         He just tried to distinguish air freight from

In re:  Air Cargo Shipping Services                216

1    passenger transportation because it's hard to envision how you

2    could tranship an air passenger.  Well, I guess he's never had

3    a connecting flight or flown through a hub.

4            He talks about all of the ways in which that there

5    is no substitute for the air freight, and he relies on all of

6    these factors that apply even more to air -- to passenger

7    transport.  High volume to weight?  That's pretty true.  Time

8    sensitive?  Most of us care about how long it takes us to get

9    somewhere.  Temperature sensitive?  We don't like it when the

10   passenger planes don't have a temperature range.  Security

11   sensitive?  Anyone who's gone through a TSA checkpoint knows

12   that that's an issue.

13           And then they try to suggest that Dr. Burtis might

14   have lacked relevant experience in this case because among

15   other things, she's never done anything in the air passenger

16   business before.  But they've kind of acknowledged the

17   strength or the relevance of the analogy.

18           The other point I wanted to make is with regard to

19   the market share evidence, and we heard this a couple of times

20   today.  At page 11, Dr. Rausser made the assumption that if

21   you have an agreement, you don't have to essentially prove

22   that it has an effect because why would you have an agreement

23   unless you do?  And therefore, it was irrelevant how much the

24   defendants share of any part.

25           Well, Dr. Tollison conceded at the hearing, there

In re:  Air Cargo Shipping Services          217

1    are no perfect cartels.  All cartels have their own issues.

2    They face different markets conditions, in other words, market

3    share, among other things.  They're not like a single firm

4    monopoly and just set a price.  We don't have a single firm

5    monopoly here, we have at best an alleged conspiracy, where

6    the potential share of the market reflected by the

7    conspirators may or may not vary.  That's something that they

8    never addressed.

9              Thank you, Your Honor.

10             THE COURT:  Thank you.

11             You want to take your three minutes?  You can take

12   your three minutes.

13             MR. ARENSON:  Okay.  Let me first of all start with

14   the last point on Dr. Warren Boulton's market definition.

15   First, he's done no independent analysis.  He said it was up

16   to plaintiffs' experts to do it.  He didn't do it.  The usual

17   excuse:  Plaintiffs' burden, not theirs.

18             He has four papers he summarizes in his papers, in

19   his declaration, but they're all for passenger error, in a

20   merger context for a particular short haul, United States

21   route, none of them worldwide, none of them applicable here.

22             He ignores the finding of the Australian Consumer

23   Competition Commission and the KFTC.  It's a worldwide market

24   for air cargo services.  His analysis isn't applicable and

25   should be rejected because it doesn't fit the facts of this

In re: Air Cargo Shipping Services          218

1  case.

2          The Chow test, very briefly, it isn't what Dr.

3  Burtis did.  With the Chow test, you actually do use all of

4  the data.  You multiply most of it by zero.  That's the

5  difference.  That's what she did wrong.  That's why it isn't

6  valid econometrics.

7          Last, we've got the standard test that they're using

8  here.  When you've got more than 15 million transactions and

9  you take even as much as a million -- if it is a million --

10  out of China, which is still less than about 7 percent of the

11  total, you get a different answer.

12          And the test that you can do here is take a piece of

13  it and get a different answer.  It's going to happen every

14  time when you've got something with as much data as we have

15  here.  That can't be the valid test that even those

16  authorities, Pindyck and Rubinfeld, are saying you should be

17  doing when you've got pooled data.  Pooled data that they're

18  talking about is a much different situation when you've got

19  more than 15 million transactions, as you have here.

20          You want to know about a false positive?  That's the

21  false positive.  That's what they're relying on, and that's

22  what's wrong.  They did the analysis right.

23          And let me just go to the end here.  This is from --

24  I think it's Mr. Brookhiser or perhaps in it isn't.  It's

25  from, in any event, it's Dr. McClave's testimony.  This was

In re:  Air Cargo Shipping Services                    219

1    one of their slides today, slide 79.  Let me see if I can get

2    the right one.  It's the record.

3              So it's Mr. Brookhiser:  "What they didn't

4    highlight, I suspect that if one wanted to do a lot of

5    research and come up with a China model, I certainly wouldn't

6    expect the specifications to be exactly the same as a global

7    inbound model."

8              That's the right way.  That's what they didn't do.

9    That's why their analysis should be excluded.

10             Thank you.

11             THE COURT:  All right.  Thank you very much.

12             I'm not ready to rule.  All right.  Thank you for

13   your efforts, and I'll have to consider it.

14             MR. ARENSON:  Thank you, Your Honor.

15             MR. KAPLAN:  Does Your Honor want to set a date for

16   another conference?

17             THE COURT:  Are there --

18             MR. SIMMONS:  I suggest we meet and confer.

19             THE COURT:  What else is going on here?  Is there

20   more -- I guess there's some clean up.

21             MR. KAPLAN:  Discovery.  There is a discovery.  You

22   can set a date.  If we don't need it --  we're all here.

23             THE COURT:  Okay.  I guess ninety days from now?

24             MR. SIMMONS:  That would be good.

25             MR. KAPLAN:  That would be good.

In re:  Air Cargo Shipping Services                    220

1           THE COURT:  How is the afternoon of February 26th?

2    Presidents week is the week before.  That's the week after

3    Presidents week.  It's a Wednesday afternoon.

4           MR. KAPLAN:  Two o'clock?

5           THE COURT:  Two o'clock.

6           MR. SIMMONS:  Two o'clock.

7           MR. BROOKHISER:  There may be one minor technical

8    procedural issue.  I guess the plaintiffs marked their slides

9    today for identification only as an exhibit.  I suppose we

10   need to do that.

11          THE COURT:  All right.

12          MR. BROOKHISER:  For completeness sake, if nothing

13   else.

14          THE COURT:  I forget what number they did.  I have

15   two defendants --

16          MR. SIMMONS:  That's right, Your Honor.

17          THE COURT:  And I don't have the plaintiffs' -- I'm

18   sorry.  I have two defendant's binders for class

19   certification, and one defendant's submission, I guess you

20   want to call it, for Mr. Brookhiser on *Daubert* or *Daubert*.  So

21   I don't know if there's anything else anybody wanted to give

22   me?  No?

23          MR. BENNETT:  Your Honor, we can mark just a couple

24   slides with respect to Dr. Burtis.

25          THE COURT:  All right.  I forget what designations

In re:  Air Cargo Shipping Services                221

1    we even gave to the plaintiffs' initial submission.

2              MR. LANDAU:  We had separate numbering for the

3    plaintiffs' exhibits and the defendants' exhibits.

4              THE COURT:  No, I'm talking about you marked for

5    identification some slides --

6              MR. LANDAU:  Yes.

7              THE COURT:  You remember what you designated?

8              MR. ARENSON:  Your Honor, my notes reflect 409.

9              THE COURT:  409?

10             Okay.  What do the defendants propose for their

11   various --

12             MR. BRADSHAW:  Your Honor, I think we're starting at

13   nine.

14             THE COURT:  Okay.

15             MR. BRADSHAW:  So you should have what now, four?

16   So it should start nine, ten, 11 and 12.

17             THE COURT:  I see.  So the law -- Class

18   Certification Arguments, Defendants' opposition to the law is

19   Defendants' Exhibit 9.

20             MR. BRADSHAW:  That's fine.

21             THE COURT:  The record is --

22             MR. BRADSHAW:  Dr. Burtis, two or three pages, that

23   should be a 11.  And then the Warren Boulton material is 2.

24             THE COURT:  All right.  All right.  Any other

25   housekeeping?  No?  Thank you.

In re:  Air Cargo Shipping Services                    222

1          MR. ARENSON:  Thank you, Your Honor.

2          MR. BROOKHISER:  Thank you, Judge.

3          (Proceedings concluded.)

In re:  Air Cargo Shipping Services                223

1                              INDEX

2

3   EXHIBITS                              PAGE

4

5   Plaintiff Exhibit Number 409          5

6   Defendant Exhibit Number 9            221

7   Defendant Exhibit Number 10           221

8   Defendant Exhibit Number 11           221

9   Defendant Exhibit Number 12           221

10

11  ORAL ARGUMENT

12  By Mr. Landau                         5

13  By Mr. Brookhiser                     59

14  By Mr. Simmons                        98

15  By Mr. Landau                         154

16  By Mr. Arenson                        181

17  By Mr. Bradshaw                       199

18  By Mr. Bennett                        209

19  By Mr. Brookhiser                     214

20  By Mr. Arenson                        221

21

22

23

24

25

## $

**$10** [1] - 27:22

## '

**'05** [1] - 80:2

## 0

**0.2** [4] - 34:9, 165:17, 166:6, 166:7
**02199** [1] - 2:7
**06-MD-1775(JG)( VVP** [1] - 1:3

## 1

**1** [5] - 35:13, 39:11, 51:12, 73:7, 82:20
**1,000** [1] - 171:9
**1,665** [1] - 35:24
**1,666** [1] - 35:24
**1,667** [2] - 35:19, 35:22
**1.1** [1] - 206:3
**1.5** [1] - 12:18
**1.8** [1] - 6:6
**10** [5] - 9:13, 53:9, 53:10, 115:1, 223:7
**100** [1] - 11:15
**10017** [1] - 2:10
**10022** [3] - 1:18, 1:22, 2:18
**1050** [1] - 3:2
**108** [1] - 43:23
**10:00** [1] - 1:8
**10:05** [1] - 4:24
**11** [6] - 149:8, 149:16, 216:20, 221:16, 221:23, 223:8
**1100** [2] - 2:13, 3:2
**11556** [1] - 3:6
**116** [1] - 46:3
**1184** [1] - 155:19
**12** [5] - 58:3, 95:7, 191:6, 221:16, 223:9
**1200** [1] - 3:9
**13** [4] - 14:19, 149:7, 149:15, 188:16
**13-month** [1] - 149:12
**133** [1] - 155:19
**134** [1] - 12:20
**1350** [1] - 2:13
**14** [1] - 191:6
**140** [2] - 106:11, 131:25
**1425** [1] - 3:5
**14th** [2] - 1:18, 3:6
**15** [19] - 25:25, 30:3,

41:24, 46:1, 68:11, 72:23, 73:1, 95:9, 95:10, 171:13, 191:15, 195:14, 195:23, 198:21, 205:5, 205:14, 205:16, 218:8, 218:19
**15-page** [1] - 103:6
**150** [1] - 2:10
**154** [1] - 223:15
**155** [1] - 24:5
**158** [1] - 8:20
**159** [1] - 191:6
**1625** [1] - 3:12
**17** [2] - 146:18, 191:1
**1700** [1] - 1:15
**18** [5] - 72:15, 188:16, 191:1, 191:15, 195:23
**181** [1] - 223:16
**189** [2] - 46:5, 197:24
**190** [1] - 171:4
**19106** [1] - 2:2
**197** [1] - 17:7
**199** [1] - 223:17
**19th** [1] - 3:9
**1st** [2] - 27:3, 172:10

## 2

**2** [6] - 6:10, 27:24, 30:25, 51:11, 98:7, 221:23
**20** [6] - 53:7, 53:13, 127:9, 191:1, 191:7, 197:15
**2000** [8] - 6:19, 53:19, 55:11, 122:17, 122:19, 168:16, 172:8, 197:12
**20004** [1] - 2:21
**20005** [1] - 2:14
**20006** [1] - 1:15
**20006-4001** [1] - 3:13
**2001** [3] - 161:6, 194:18, 197:7
**2002** [4] - 51:22, 52:7, 54:14, 168:7
**2003** [2] - 7:3, 122:19
**20036** [2] - 3:3, 3:10
**2006** [8] - 6:19, 27:3, 73:7, 120:12, 122:17, 172:8, 172:10, 206:13
**2008** [4] - 54:13, 54:14, 99:2, 206:14
**2012** [1] - 154:11
**2013** [3] - 1:7, 29:11, 134:4

## 3

**3** [2] - 30:24, 30:25
**30** [18] - 4:13, 4:19, 8:1, 13:17, 14:10, 30:4, 41:15, 66:8, 66:15, 73:7, 83:16, 86:7, 103:15, 110:14, 123:14, 171:16, 172:8, 209:21
**300** [1] - 3:9

**2072(b)** [1] - 99:21
**209** [1] - 223:18
**21** [3] - 15:25, 180:19, 194:6
**214** [1] - 223:19
**215** [1] - 99:2
**22** [4] - 192:12, 193:7, 197:4, 197:15
**221** [5] - 223:6, 223:7, 223:8, 223:9, 223:20
**223** [1] - 11:25
**224** [1] - 17:12
**229** [2] - 18:11, 154:14
**23** [11] - 56:16, 57:23, 61:10, 99:19, 101:11, 112:6, 122:25, 139:1, 143:9, 143:15, 180:7
**23(b)(3** [4] - 130:15, 154:12, 155:19, 189:3
**231** [2] - 99:10
**232** [1] - 54:1
**235** [1] - 55:9
**239** [1] - 54:19
**24** [1] - 27:13
**241** [1] - 55:1
**243** [1] - 55:3
**25** [3] - 1:7, 9:13, 138:5
**251** [1] - 161:22
**263** [1] - 28:9
**264** [1] - 23:17
**266** [1] - 23:17
**26th** [1] - 220:1
**27** [1] - 194:5
**275** [1] - 9:14
**276** [1] - 9:16
**278** [1] - 9:17
**279** [1] - 12:23
**28** [4] - 27:17, 69:24, 99:21, 180:1
**287** [1] - 13:5
**288** [1] - 194:17
**29** [1] - 197:4
**294** [2] - 20:14, 20:21
**298** [1] - 6:20

## 4

**4** [4] - 31:1, 34:11, 51:10, 51:12
**40** [7] - 26:17, 61:25, 62:5, 80:3, 86:7, 89:23, 147:1
**401** [1] - 35:14
**405** [1] - 44:18
**406** [1] - 38:1
**409** [5] - 5:5, 221:8, 221:9, 223:5
**42nd** [1] - 2:10
**43** [1] - 23:21
**45** [6] - 60:9, 66:15, 117:21, 117:23, 134:16, 135:16
**48** [1] - 40:24
**49** [1] - 16:3
**4:25** [1] - 181:14

## 5

**5** [3] - 27:23, 223:5, 223:12
**5.7** [2] - 145:7
**50** [1] - 11:6
**500** [2] - 2:2, 2:20
**510** [1] - 2:1
**52** [1] - 27:4
**522** [2] - 99:2, 99:10
**527** [1] - 191:15
**54** [3] - 55:18, 58:3, 150:7
**56** [2] - 154:3, 154:4
**5770992** [1] - 29:11
**58** [2] - 11:12, 195:5
**59** [7] - 8:19, 40:22, 40:24, 41:1, 41:3, 176:25, 223:13
**5th** [1] - 2:17

**31** [1] - 123:9
**311** [1] - 9:18
**32** [4] - 117:22, 117:23, 134:16, 135:16
**327** [1] - 161:22
**333** [1] - 2:23
**34** [1] - 88:25
**3400** [1] - 1:22
**35** [6] - 19:12, 24:16, 27:7, 68:12, 95:9, 95:15
**36** [1] - 15:13
**39** [6] - 8:8, 53:22, 67:19, 102:9, 102:15, 151:12

## 6

**6** [3] - 12:18, 31:12, 169:20
**6.0** [1] - 49:14
**6.4** [3] - 31:12, 49:14, 125:6
**60** [8] - 11:7, 11:12, 16:10, 78:4, 80:5, 95:9, 206:11, 206:12
**601** [1] - 1:21
**613-2636** [1] - 3:18
**62** [2] - 115:9, 115:11
**650** [1] - 1:15
**665** [1] - 188:16
**666** [1] - 188:16
**678** [1] - 194:17
**689** [1] - 154:14

## 7

**7** [2] - 193:16, 218:10
**70,000** [2] - 33:24, 40:3
**701** [1] - 194:17
**702** [1] - 140:13
**718** [1] - 3:18
**722** [1] - 194:6
**726** [1] - 194:6
**729** [1] - 43:23
**75** [1] - 2:17
**79** [2] - 151:19, 219:1
**790** [1] - 35:19

## 8

**80** [4] - 7:23, 61:20, 74:21, 75:10
**800** [1] - 2:6
**800,000** [2] - 89:24, 206:4
**81** [1] - 11:21
**818** [1] - 195:23
**850** [1] - 1:17
**86** [1] - 194:11

## 9

**9** [9] - 110:23, 110:24, 111:1, 111:6, 177:14, 177:20, 194:6, 221:19, 223:6
**90** [2] - 74:21, 115:1
**90071** [1] - 2:24
**93** [7] - 39:5, 39:19, 40:3, 165:3, 165:10, 166:16, 166:21
**96** [4] - 34:10, 39:19, 165:10, 166:22
**97** [1] - 150:22

**97.1** [1] - 33:23
**98** [2] - 39:12, 223:14
**99** [1] - 187:19, 198:12
**99.7** [1] - 16:16

**A**

**a.m** [1] - 1:8
**ABA** [5] - 71:1, 136:22, 173:12, 173:14, 173:15
**ABA's** [1] - 89:4
**abandon** [1] - 38:16
**aberration** [1] - 32:11
**ability** [1] - 85:1
**able** [18] - 21:13, 33:23, 40:1, 41:16, 55:13, 82:3, 85:9, 125:12, 145:9, 155:9, 155:15, 158:4, 166:23, 178:4, 179:4, 191:16, 197:21, 213:25
**abridge** [3] - 61:11, 99:20, 137:22
**absence** [3] - 20:10, 121:11, 121:12
**absent** [12] - 56:13, 74:18, 97:14, 117:3, 117:6, 117:10, 118:23, 125:4, 142:14, 143:8, 143:20, 147:17
**absolutely** [6] - 88:9, 98:5, 104:25, 134:7, 134:8, 202:15
**absurd** [3] - 38:17, 185:11, 194:15
**absurdity** [1] - 191:25
**accept** [8] - 12:3, 43:19, 107:20, 140:19, 156:18, 180:10, 202:1
**acceptable** [3] - 101:18, 194:1, 213:2
**accepted** [13] - 23:19, 31:24, 42:22, 164:10, 173:14, 199:25, 200:3, 208:16, 209:22, 210:3, 210:25, 212:16
**accepts** [3] - 43:5, 43:16, 155:9
**accommodate** [2] - 107:2, 107:13
**accomplish** [1] - 57:22, 85:9
**accomplished** [3] -

55:20, 209:20, 209:21
**accordance** [2] - 27:12, 175:24
**according** [10] - 7:6, 22:22, 26:17, 45:16, 49:4, 53:5, 53:8, 80:5, 92:21, 215:14
**account** [12] - 12:10, 47:21, 53:25, 56:1, 56:3, 56:6, 78:19, 132:24, 134:24, 171:25, 189:17, 189:18
**accounted** [6] - 8:1, 34:12, 51:3, 51:4, 117:22, 179:15
**accounting** [3] - 117:25, 163:8, 179:21
**accounts** [2] - 47:18, 134:23
**ACCS** [1] - 15:10
**accurate** [3] - 118:5, 175:9, 176:8
**accurately** [2] - 51:6, 99:15
**achieve** [1] - 55:13
**acknowledge** [4] - 82:17, 96:12, 188:2, 194:7
**acknowledged** [9] - 70:6, 81:25, 82:14, 83:8, 85:25, 86:13, 87:6, 89:25, 216:16
**acknowledges** [4] - 77:10, 78:22, 87:5
**Act** [5] - 99:8, 99:18, 100:6, 110:6, 119:25
**act** [8] - 126:4, 133:4, 133:16, 134:11, 135:10, 149:9, 161:24
**action** [25] - 11:13, 32:2, 57:11, 57:13, 57:19, 57:21, 61:4, 107:9, 107:14, 107:22, 117:1, 117:9, 118:21, 127:19, 127:21, 128:15, 137:22, 146:14, 148:14, 154:25, 160:14, 172:23, 174:10, 181:7
**actions** [5] - 109:19, 124:24, 148:8, 154:17, 170:20
**acts** [2] - 135:8, 149:15

**actual** [17] - 64:25, 68:14, 68:15, 68:17, 69:8, 69:18, 79:21, 86:18, 100:1, 114:19, 114:20, 114:22, 120:22, 131:8, 139:22, 184:20, 192:17
**ad** [2] - 23:22, 123:2
**add** [5] - 36:13, 47:16, 169:1, 171:9, 176:15
**add-ons** [2] - 171:9, 176:15
**added** [2] - 52:2, 194:4
**adding** [1] - 47:16
**addition** [3] - 66:12, 160:10, 161:15
**additional** [3] - 194:4, 196:16, 200:13
**Additives** [7] - 113:25, 118:25, 119:5, 124:4, 147:4, 150:25, 202:1
**address** [7] - 4:6, 30:18, 49:12, 59:9, 116:1, 143:14, 158:24
**addressed** [8] - 48:24, 158:25, 159:10, 177:16, 178:7, 209:12, 217:8
**addresses** [1] - 204:23
**adequate** [2] - 40:4, 56:23
**adjudicate** [1] - 42:10
**adjudication** [6] - 42:11, 57:12, 57:22, 156:5, 181:5, 181:7
**adjust** [1] - 107:13
**adjusted** [2] - 107:25, 150:15
**adjustments** [1] - 24:6
**admissibility** [4] - 200:23, 201:11, 208:13, 208:20
**admissible** [1] - 42:24
**admission** [1] - 105:11
**admit** [1] - 106:17
**admits** [3] - 91:4, 115:11, 117:24
**admitted** [26] - 16:18, 24:22, 25:4, 26:7, 48:13, 55:5, 65:13, 65:22, 65:25, 66:23, 65:24, 26:7, 126:2, 133:25, 141:9, 149:11, 155:2, 167:8, 178:18, 179:7

116:9, 117:17, 123:1, 123:24, 125:7, 188:13, 200:2, 207:9
**admittedly** [1] - 86:24
**admitting** [1] - 202:4
**adopt** [1] - 211:5
**adopted** [1] - 23:23
**advent** [1] - 70:3
**Aer** [5] - 15:4, 15:5, 15:7, 15:15
**affect** [5] - 77:11, 77:12, 80:23, 81:14, 85:18
**affected** [12] - 34:15, 62:14, 63:6, 77:8, 78:3, 80:25, 87:5, 87:12, 90:19, 160:1, 169:16, 169:19
**affiant** [1] - 86:12
**affidavit** [1] - 207:1
**affirm** [2] - 130:25, 133:2
**affirmed** [2] - 108:10, 161:7
**Africa** [4] - 6:9, 47:10, 75:2, 102:5
**afternoon** [7] - 71:8, 100:22, 188:11, 199:17, 209:16, 220:1, 220:3
**afterthought** [1] - 90:25
**agents** [2] - 12:2, 23:22
**aggregate** [10] - 75:1, 75:5, 88:13, 88:21, 90:13, 99:13, 103:15, 104:21, 162:7, 162:12
**aggregated** [2] - 113:14, 137:16
**aggregating** [3] - 113:13, 116:2, 136:5
**aggressive** [1] - 72:8
**agnostic** [5] - 124:2, 124:3, 135:8, 139:12
**agnosticism** [1] - 135:13
**ago** [9] - 29:11, 42:14, 44:3, 68:10, 111:25, 119:3, 128:16, 136:4, 147:6
**agree** [16] - 18:22, 35:3, 57:4, 78:15, 80:22, 83:22, 120:1, 126:2, 133:25, 141:9, 149:11, 155:2, 167:8, 178:18, 179:7

**agreed** [16] - 8:20, 15:12, 17:12, 18:17, 23:13, 24:17, 25:2, 28:3, 28:6, 34:3, 55:16, 78:25, 83:4, 159:20, 167:22, 169:11
**agreed-upon** [2] - 28:3, 28:6
**agreeing** [4] - 8:9, 8:17, 22:23, 177:8
**agreement** [18] - 7:13, 18:23, 24:5, 24:14, 25:1, 51:24, 72:23, 73:7, 81:10, 133:8, 133:9, 146:11, 167:21, 168:4, 168:8, 170:14, 216:21, 216:22
**agreements** [9] - 6:21, 6:22, 7:11, 8:24, 55:21, 72:22, 73:9, 73:10, 180:18
**agrees** [6] - 21:24, 43:7, 45:5, 78:14, 165:8
**ah-ha** [1] - 183:13
**ahead** [3] - 105:17, 185:16, 201:6
**Aid** [1] - 17:18
**aided** [1] - 3:20
**AIG** [1] - 154:14
**aim** [2] - 4:19, 28:14
**air** [40] - 6:6, 9:20, 12:15, 12:16, 15:23, 17:10, 17:15, 17:20, 18:2, 18:7, 18:11, 19:8, 19:13, 19:23, 20:1, 20:3, 20:15, 20:16, 20:18, 20:21, 21:1, 21:9, 28:11, 62:11, 64:15, 81:22, 83:22, 86:6, 172:9, 215:11, 215:13, 215:22, 215:25, 216:2, 216:5, 216:6, 216:15, 217:24
**AIR** [1] - 1:5
**Air** [30] - 2:5, 2:6, 2:9, 2:9, 2:13, 2:17, 3:5, 4:3, 11:25, 14:21, 15:10, 16:21, 20:25, 23:13, 24:1, 27:19, 51:21, 52:7, 53:24, 54:3, 54:24, 62:8, 79:25, 81:21, 167:19, 168:22, 168:23, 175:15, 175:16, 175:20
**airline** [8] - 14:25,

15:11, 21:13, 21:16, 21:17, 23:24, 41:4, 179:5
**airlines** [13] - 12:2, 12:4, 16:17, 18:2, 21:11, 21:21, 22:22, 25:8, 53:20, 55:10, 55:20, 180:19, 180:25
**Airlines** [17] - 3:1, 3:8, 3:12, 13:5, 16:5, 18:25, 24:1, 40:18, 41:3, 54:17, 59:5, 85:17, 98:13, 122:17, 146:5, 168:25, 176:25
**Airlines'** [1] - 40:22
**Airport** [1] - 17:5
**airport** [1] - 83:14
**airway** [2] - 158:1, 158:2
**Airway** [1] - 52:22
**Airways** [4] - 2:20, 2:23, 9:13, 17:4
**alarm** [1] - 208:7
**all-in** [2] - 25:24, 55:7
**allegation** [2] - 190:11, 190:18
**allegations** [9] - 46:13, 46:18, 46:25, 47:6, 72:9, 120:12, 173:7, 173:25, 190:7
**allege** [10] - 6:18, 55:19, 72:4, 72:21, 73:6, 94:2, 129:2, 129:3, 167:25, 180:15
**Alleged** [1] - 64:14
**alleged** [28] - 7:14, 30:12, 43:6, 43:24, 46:16, 47:1, 47:5, 55:24, 60:11, 60:19, 60:25, 80:8, 82:25, 93:17, 97:18, 123:22, 135:25, 144:11, 147:9, 173:3, 173:8, 174:1, 174:3, 174:6, 190:3, 191:20, 214:14, 217:5
**allegedly** [2] - 109:12, 151:10
**alleges** [1] - 15:6
**alleging** [2] - 46:15, 154:12
**allow** [2] - 70:17, 181:5
**allowed** [32] - 46:24, 49:23, 66:2, 66:3, 66:21, 88:3, 88:4,

88:5, 88:6, 88:7, 88:8, 88:16, 91:19, 104:6, 104:7, 110:11, 118:12, 118:16, 118:18, 118:20, 119:18, 120:24, 122:3, 125:2, 128:25, 129:24, 139:7, 148:16, 196:3
**allowing** [2] - 26:15, 99:24
**allows** [2] - 69:4, 212:6
**alluded** [3] - 124:6, 124:22, 136:4
**almost** [9] - 29:6, 45:21, 45:23, 46:8, 52:10, 80:6, 104:13, 181:24, 191:8
**alone** [6] - 50:9, 115:10, 127:4, 137:13, 138:18, 161:4
**Alsup** [8] - 104:10, 104:13, 113:11, 113:16, 136:3, 136:11, 139:16, 202:5
**alter** [1] - 99:25
**alternative** [3] - 57:12, 136:15, 213:12
**altogether** [1] - 34:23
**ambient** [1] - 144:4
**ambiguity** [1] - 111:20
**America** [2] - 15:20, 75:2
**American** [11] - 40:18, 40:19, 40:21, 41:2, 54:17, 54:20, 85:17, 99:1, 112:21, 168:24, 176:25
**American's** [1] - 40:22
**Amgen** [3] - 42:7, 154:16, 155:19
**amnesty** [1] - 146:12
**amorphous** [1] - 61:14
**amorphously** [1] - 75:19
**amount** [10] - 7:21, 23:1, 28:4, 31:17, 36:11, 53:8, 64:10, 99:10, 99:17, 187:22
**Amount** [1] - 188:18
**amounts** [3] - 27:25, 51:20, 69:25
**ANA** [2] - 176:16, 176:17
**analogize** [1] - 17:15

**analogous** [5] - 148:13, 186:25, 189:1, 189:12, 189:18
**analogy** [5] - 186:22, 187:12, 215:1, 215:17, 216:17
**analyses** [5] - 68:4, 182:2, 182:13, 182:20, 195:14
**analysis** [90] - 18:6, 22:18, 28:23, 28:24, 29:18, 31:5, 41:23, 46:21, 47:8, 47:13, 48:9, 48:10, 49:2, 68:6, 68:13, 68:16, 68:18, 68:21, 69:6, 69:8, 69:19, 71:17, 72:25, 74:8, 74:9, 82:1, 82:12, 82:16, 82:24, 83:4, 84:1, 84:3, 84:12, 84:20, 86:16, 87:4, 90:21, 91:10, 93:24, 94:21, 96:22, 97:12, 112:5, 114:1, 126:9, 126:14, 127:25, 129:23, 130:21, 144:16, 155:3, 159:2, 165:19, 165:21, 169:14, 169:15, 169:17, 171:10, 171:11, 171:16, 171:21, 173:2, 175:22, 178:15, 182:9, 182:19, 183:8, 183:14, 184:20, 185:4, 185:25, 186:6, 190:6, 190:16, 194:24, 195:1, 206:6, 209:1, 209:2, 214:15, 215:4, 215:6, 217:15, 217:24, 218:22, 219:9
**analyze** [5] - 55:15, 82:21, 129:10, 184:12, 201:12
**analyzed** [8] - 68:12, 84:14, 169:15
**analyzes** [2] - 50:6, 160:20
**analyzing** [1] - 172:8
**AND** [1] - 1:24
**ANDREWS** [1] - 2:13
**anecdotal** [1] - 81:20
**Angeles** [5] - 2:24, 19:11, 75:14, 83:20, 83:21

**announced** [11] - 27:1, 53:9, 64:24, 65:2, 69:8, 80:4, 172:11, 177:3, 177:4, 177:5
**announcement** [2] - 68:13, 68:21
**announcements** [13] - 27:13, 29:20, 29:22, 51:9, 51:18, 68:15, 81:4, 86:15, 86:16, 86:17, 86:19, 175:14, 175:24
**annual** [4] - 46:15, 174:1, 190:10, 190:11
**answer** [47] - 21:18, 30:24, 31:1, 31:20, 35:25, 37:1, 37:17, 38:5, 38:11, 38:19, 38:20, 45:14, 50:16, 54:9, 64:7, 64:12, 66:7, 70:18, 87:18, 98:6, 105:12, 108:3, 108:7, 109:8, 109:25, 110:3, 120:3, 120:14, 126:19, 126:23, 130:2, 132:12, 141:15, 143:19, 152:19, 160:11, 162:23, 164:4, 164:5, 174:11, 182:21, 189:6, 213:6, 218:11, 218:13
**Answer** [5] - 54:11, 54:16, 191:21, 198:8, 198:11
**answered** [7] - 9:1, 41:24, 42:8, 64:1, 120:2, 155:21, 167:15
**answering** [6] - 36:24, 38:4, 45:12, 169:24, 169:25, 170:12
**answers** [7] - 37:4, 37:20, 156:3, 160:5, 167:5, 183:9, 201:7
**antenna** [1] - 121:18
**Antitrust** [1] - 71:1
**antitrust** [20] - 6:5, 10:2, 31:14, 36:4, 56:24, 60:24, 61:1, 72:9, 81:8, 89:4, 101:6, 128:12, 128:13, 131:12, 132:21, 154:13, 161:21, 162:3, 162:6, 215:5

**ANTITRUST** [1] - 1:5
**anyway** [2] - 15:10, 185:16
**apart** [4] - 67:6, 122:1, 183:1, 187:16
**apologize** [1] - 198:7
**appeal** [4] - 121:6, 123:19, 161:7, 180:8
**Appeals** [7] - 99:22, 100:2, 101:5, 130:25, 131:10, 152:11, 159:7
**appeals** [2] - 118:6, 134:6, 153:16
**Appeals'** [1] - 131:2
**appear** [1] - 50:20
**appeared** [2] - 51:3, 53:13, 70:5
**appendices** [1] - 111:3
**applicable** [3] - 197:1, 217:21, 217:24
**application** [2] - 28:1, 208:3
**applied** [10] - 26:13, 29:21, 100:23, 101:18, 117:16, 172:16, 190:4, 198:23, 206:22, 211:21
**Applies** [1] - 209:9
**applies** [10] - 69:2, 74:9, 74:11, 85:22, 90:4, 93:11, 207:23, 209:7, 209:8, 210:18
**apply** [30] - 46:2, 53:24, 59:10, 65:22, 65:23, 65:24, 65:25, 66:1, 66:23, 87:19, 87:20, 87:21, 90:21, 90:23, 94:8, 117:12, 117:25, 122:1, 158:3, 164:2, 164:8, 185:20, 189:25, 200:25, 210:12, 212:18, 216:6
**applying** [8] - 49:24, 65:8, 161:19, 164:17, 199:24, 202:16, 202:20, 205:20
**approach** [2] - 44:17, 44:20
**appropriate** [16] - 41:25, 42:2, 43:24, 48:8, 49:17, 55:15, 161:17, 163:11, 164:20, 164:25, 165:5, 173:19, 188:14, 201:1,

205:6, 205:23
**appropriateness** [2] - 204:21, 211:6
**approval** [4] - 8:24, 55:2, 55:6, 55:10
**approve** [1] - 168:19
**approximation** [4] - 49:23, 161:20, 162:14, 163:3
**April** [3] - 7:2, 80:2, 197:11
**arbitrarily** [1] - 126:19
**arbitrary** [2] - 101:19, 172:6
**area** [4] - 74:6, 136:1, 200:1, 206:25
**areas** [1] - 77:13
**ARENSON** [18] - 1:19, 181:18, 181:20, 184:4, 184:9, 184:14, 184:25, 185:23, 188:24, 189:8, 189:21, 189:23, 199:14, 199:16, 217:13, 219:14, 221:8, 222:1
**Arenson** [9] - 37:25, 181:19, 181:21, 199:12, 200:21, 211:4, 211:24, 223:16, 223:20
**Arenson's** [1] - 202:8
**Argentina** [3] - 54:18, 168:25, 169:2
**argue** [6] - 8:22, 37:5, 107:12, 109:6, 116:18, 143:16
**arguing** [1] - 108:1
**argument** [22] - 4:1, 5:15, 49:12, 59:10, 97:2, 107:6, 107:17, 107:21, 107:23, 121:6, 157:16, 163:24, 169:13, 169:18, 173:10, 176:21, 188:10, 188:19, 188:23, 188:24, 202:8, 211:6
**ARGUMENT** [2] - 1:11, 223:11
**arguments** [5] - 4:12, 10:9, 28:7, 45:20, 60:1
**Arguments** [1] - 221:18
**arise** [2] - 161:9, 162:19
**arrive** [1] - 19:18
**arrived** [2] - 14:10, 83:16

**article** [1] - 38:8
**articulate** [1] - 155:13
**articulated** [1] - 158:10
**Asia** [3] - 13:16, 13:22, 14:6
**Asiana** [7] - 3:12, 24:2, 52:23, 95:3, 98:13, 122:17, 146:4
**Asiana's** [4] - 52:23, 53:4, 53:5, 53:13
**aside** [2] - 16:13, 101:25
**aspect** [1] - 8:14
**assert** [1] - 211:10
**asserting** [1] - 56:20
**assertion** [1] - 211:11
**assess** [4] - 65:7, 138:20, 140:22, 213:13
**assessed** [1] - 172:24
**assessment** [1] - 29:14
**assignment** [6] - 96:16, 186:12, 186:13, 191:13, 191:19, 194:10
**assist** [2] - 201:10, 208:21
**associated** [1] - 139:20
**association** [1] - 15:11
**Association** [1] - 112:21
**associations** [3] - 11:18, 11:19, 11:22
**assume** [11] - 62:24, 73:1, 76:18, 78:2, 81:18, 95:23, 104:16, 104:22, 111:8, 132:5, 144:12
**assumed** [4] - 30:11, 66:25, 74:10, 91:21
**assumes** [5] - 112:22, 113:2, 207:15, 207:22, 208:20
**assuming** [9] - 45:2, 47:6, 75:23, 89:3, 93:13, 95:10, 125:15, 171:24, 214:24
**assumption** [9] - 63:20, 81:19, 82:15, 84:6, 84:10, 85:10, 113:2, 171:22, 216:20
**assumptions** [2] - 213:15, 214:3
**assurance** [1] -

131:16
**assure** [1] - 131:14
**astronomical** [1] - 99:14
**Atlantic** [2] - 17:22, 128:3
**Atlas** [4] - 2:5, 20:14, 20:20, 21:5
**attached** [2] - 110:22, 144:23
**attaching** [1] - 149:24
**attack** [1] - 141:21
**attacking** [1] - 42:3, 42:4, 44:8
**attacks** [2] - 70:10, 212:24
**attempt** [4] - 69:10, 78:20, 200:19, 213:6
**attempting** [1] - 112:25
**Attila** [1] - 109:1
**Attila's** [1] - 109:3
**attributable** [1] - 118:3, 127:22, 130:14
**attribute** [2] - 133:3, 133:5
**attributed** [1] - 131:4
**attributing** [1] - 130:8
**attribution** [8] - 101:21, 105:25, 124:1, 129:4, 130:8, 131:21, 145:18
**AUSTIN** [1] - 2:3
**Australia** [5] - 6:9, 7:2, 47:10, 74:1, 102:6
**Australian** [2] - 18:11, 217:22
**authored** [1] - 205:7
**authorities** [9] - 200:1, 201:15, 201:17, 201:25, 202:7, 203:18, 207:2, 207:8, 218:16
**authority** [1] - 207:4
**authorize** [1] - 130:15
**authorizes** [1] - 112:6
**authors** [2] - 173:12, 173:16
**auto** [1] - 186:25
**available** [2] - 161:10, 172:14
**Avenue** [3] - 1:17, 1:21, 3:2
**avenues** [1] - 161:10
**average** [23] - 31:22, 61:25, 66:6, 70:20, 75:22, 76:7, 76:8, 87:15, 90:10, 90:15, 99:12, 105:1,

112:11, 112:12, 112:23, 113:21, 124:16, 147:7, 207:16, 210:11, 211:17, 211:21, 212:5
**averages** [1] - 113:19
**avoid** [7] - 25:20, 37:7, 41:16, 135:22, 148:18, 166:23, 178:4
**award** [2] - 162:11, 162:12
**awarding** [1] - 149:25
**aware** [4] - 94:6, 94:7, 149:12, 198:2
**Axel** [1] - 18:24

## B

**bad** [10] - 126:3, 133:4, 133:16, 134:11, 135:8, 135:10, 141:25, 180:1, 181:14, 185:4
**Bairnco** [1] - 194:17
**BAKER** [1] - 3:1
**balance** [3] - 103:2, 105:4, 138:22
**bam** [1] - 77:23
**BAMBERGER** [1] - 2:21
**Bangkok** [1] - 14:12
**Bar** [1] - 112:21
**bargaining** [8] - 39:22, 40:16, 41:11, 63:11, 71:17, 80:19, 81:16, 91:14
**barriers** [3] - 22:7, 22:14, 179:8
**base** [36] - 21:12, 22:25, 23:11, 23:23, 24:7, 24:23, 25:3, 25:9, 25:12, 54:20, 56:2, 56:4, 73:18, 79:2, 79:3, 93:18, 102:18, 107:1, 111:9, 115:1, 129:8, 145:23, 147:7, 150:5, 150:6, 150:7, 150:10, 150:12, 168:12, 169:4, 170:5, 170:9, 173:24, 177:15, 177:18, 177:19
**based** [24] - 7:21, 9:14, 10:15, 10:20, 36:2, 38:2, 43:7, 43:12, 45:9, 48:15, 51:9, 63:19, 66:20,

80:18, 86:16, 87:5, 88:22, 90:24, 99:11, 145:14, 162:12, 197:8, 210:13, 210:24
**bases** [2] - 82:25, 182:13
**basic** [2] - 84:16, 139:16
**basing** [1] - 176:21
**basis** [14] - 65:21, 74:19, 83:5, 95:8, 95:12, 107:16, 113:24, 115:10, 123:25, 132:25, 169:19, 172:19, 179:6, 185:4
**baskets** [1] - 92:11
**Bates** [3] - 7:8, 28:9, 57:18
**battery** [1] - 199:25
**battle** [1] - 153:12
**bean** [2] - 29:14, 156:13
**bear** [6] - 83:21, 95:15, 95:19, 103:12, 121:13, 136:17
**bears** [2] - 94:1, 99:16
**became** [1] - 40:13
**Beckett** [5] - 14:2, 14:9, 19:15, 22:1, 83:13, 144:17
**becomes** [1] - 20:1
**BEFORE** [1] - 1:12
**beg** [1] - 111:11
**begin** [3] - 4:25, 73:11
**beginning** [5] - 53:20, 54:13, 54:14, 67:24, 168:7
**behalf** [2] - 59:6, 181:22
**behold** [1] - 164:8
**belabor** [1] - 112:9
**bell** [2] - 184:22, 184:23
**Bell** [1] - 128:3
**bells** [1] - 208:7
**Bells** [1] - 185:11
**below** [4] - 28:4, 133:7, 158:25, 159:1
**Ben** [1] - 199:17
**Benchmark** [4] - 35:18, 35:20, 35:23, 36:1
**benchmark** [1] - 190:16
**benefit** [2] - 36:7, 78:6
**benefits** [1] - 39:1
**BENJAMIN** [1] - 3:14

**BENNETT** [4] - 2:8, 209:16, 210:21, 220:23
**Bennett** [2] - 209:17, 223:18
**BERMAN** [1] - 2:1
**best** [8] - 15:2, 25:7, 31:17, 42:11, 94:9, 156:5, 182:7, 217:5
**better** [4] - 37:8, 70:8, 77:20, 196:25
**between** [25] - 6:21, 11:5, 11:12, 14:20, 20:15, 24:14, 30:17, 35:16, 65:12, 73:4, 75:8, 86:24, 106:8, 106:11, 127:10, 128:11, 130:12, 132:7, 141:14, 148:20, 148:22, 148:23, 153:4, 192:17, 194:8
**Beyer's** [1] - 114:2
**beyond** [4] - 36:10, 66:13, 71:17, 83:21
**bias** [1] - 197:3
**bidding** [1] - 68:1
**big** [17] - 22:19, 44:18, 55:17, 80:12, 81:4, 86:23, 87:14, 91:14, 116:5, 117:24, 167:2, 179:25, 199:19, 204:25, 205:15, 205:16, 205:17
**Bigelow** [2] - 31:14, 161:22
**bigger** [2] - 37:22, 41:17
**biggest** [2] - 102:18, 129:9
**bill** [1] - 52:22
**billion** [1] - 6:6
**bills** [2] - 158:1, 158:2
**binders** [1] - 220:18
**binding** [5] - 142:4, 142:19, 142:21, 142:23, 143:15
**bit** [22] - 14:7, 40:25, 60:10, 60:20, 67:13, 68:1, 71:5, 78:7, 80:10, 86:15, 94:5, 98:15, 111:24, 137:18, 138:4, 147:5, 168:3, 170:4, 185:14, 187:14, 190:15, 209:18
**bits** [5] - 183:7, 187:8, 187:17, 187:23, 197:18

**black** [2] - 123:23, 138:7
**Blades** [2] - 108:9, 150:24, 152:4, 152:5, 152:10, 170:24
**blames** [1] - 194:16
**blanks** [1] - 122:9
**blast** [1] - 69:21
**blender** [8] - 69:3, 88:11, 110:12, 110:17, 118:19, 119:14, 125:2, 138:7
**blind** [1] - 87:10
**blink** [1] - 62:14
**block** [1] - 63:9
**Blood** [1] - 36:6
**blue** [1] - 12:12
**board** [3] - 55:17, 98:22, 136:22
**boat** [1] - 20:3
**Bob** [1] - 59:4
**body** [1] - 131:7
**boiling** [1] - 131:6
**book** [6] - 71:1, 89:5, 122:13, 150:23, 173:12, 205:7
**bootstrap** [1] - 33:6
**bootstrapping** [1] - 33:13
**bore** [1] - 143:10
**Boston** [3] - 2:7, 24:16, 44:2
**bother** [1] - 144:19
**Botswana** [1] - 102:5
**bottom** [4] - 60:4, 173:10, 193:1, 210:5
**bought** [3] - 129:13, 153:2
**Boulden** [1] - 67:20
**Boulton** [6] - 182:5, 196:23, 197:15, 197:16, 214:21, 221:23
**Boulton's** [3] - 196:24, 214:15, 217:14
**Bouton** [1] - 215:7
**box** [8] - 69:19, 79:23, 123:23, 126:25, 138:7, 145:14, 175:16, 193:17
**boxes** [1] - 27:19
**Boylston** [1] - 2:6
**BR** [1] - 194:17
**Bradshaw** [5] - 199:18, 211:15, 213:10, 213:19, 223:17
**BRADSHAW** [15] - 3:14, 199:17, 201:5,

201:7, 202:12, 202:15, 202:25, 203:4, 209:4, 209:9, 209:14, 221:12, 221:15, 221:20, 221:22
**Bradshaw's** [1] - 211:5
**breached** [1] - 204:21
**break** [4] - 62:23, 83:11, 98:7, 162:24
**breakdown** [1] - 4:9
**breaker** [1] - 179:25
**BRENT** [1] - 1:16
**Brent** [1] - 5:1
**bridge** [1] - 130:12
**brief** [14] - 52:12, 55:18, 59:9, 64:13, 72:15, 72:16, 76:23, 150:7, 153:21, 170:23, 171:4, 176:5, 194:14, 199:7
**briefing** [1] - 124:23
**briefly** [3] - 196:23, 210:21, 218:2
**briefs** [10] - 6:11, 41:12, 113:6, 115:17, 132:14, 151:12, 154:20, 182:15, 209:5, 209:12
**bring** [2] - 67:21, 180:13
**bringing** [1] - 57:14
**British** [3] - 9:13, 17:4, 81:20
**broad** [2] - 200:23, 208:19
**broader** [4] - 7:11, 60:11, 72:5, 180:12
**broadest** [1] - 72:11
**broke** [1] - 98:21
**broken** [1] - 84:3
**Bronx** [1] - 64:5
**Brooke** [1] - 139:25
**Brookhiser** [34] - 35:10, 35:18, 59:4, 103:12, 104:25, 110:4, 110:8, 112:10, 112:14, 116:11, 117:20, 122:14, 123:8, 125:7, 128:16, 135:2, 136:7, 136:16, 149:23, 159:19, 175:7, 175:15, 175:25, 176:16, 178:7, 178:8, 178:18, 179:7, 214:6,

218:24, 219:3, 220:20, 223:13, 223:19
**BROOKHISER** [19] - 3:3, 4:8, 59:4, 59:17, 59:19, 95:22, 96:1, 96:3, 96:8, 96:11, 96:19, 96:25, 97:7, 98:1, 214:7, 214:12, 220:7, 220:12, 222:2
**Brooklyn** [4] - 1:5, 30:25, 64:4, 128:7
**Brooks** [5] - 77:3, 83:8, 85:17, 86:12, 215:15
**brought** [6] - 30:7, 35:10, 36:17, 53:6, 107:22, 184:16
**BROWN** [1] - 3:15
**BRYANT** [1] - 3:17
**bucket** [1] - 92:15
**bucks** [2] - 127:9
**build** [1] - 25:19
**built** [1] - 40:24
**bullet** [2] - 134:20, 147:6
**bunch** [3] - 132:23, 138:12, 149:17
**burden** [13] - 60:6, 104:15, 121:12, 121:13, 123:8, 129:20, 135:17, 155:4, 155:12, 194:13, 208:23, 213:3, 217:17
**Burtis** [57] - 7:6, 8:4, 10:8, 14:5, 17:12, 17:15, 18:17, 21:24, 25:24, 26:7, 38:17, 40:15, 41:22, 42:3, 45:21, 46:6, 46:22, 47:22, 47:25, 48:4, 48:5, 67:20, 113:12, 164:6, 164:16, 164:19, 173:19, 182:4, 185:12, 194:12, 195:2, 196:15, 209:19, 209:20, 209:25, 210:8, 210:12, 210:22, 211:4, 211:7, 211:8, 211:10, 211:15, 212:10, 212:13, 212:20, 212:25, 213:9, 213:11, 213:12, 213:25, 214:3, 216:13, 218:3, 220:24, 221:22

**Burtis'** [6] - 194:25, 210:3, 210:9, 210:14, 211:1, 212:17
**Burtis's** [1] - 210:16
**bus** [1] - 215:24
**business** [7] - 19:17, 41:4, 77:21, 78:3, 86:6, 128:13, 216:16
**but-for** [1] - 127:12
**Butler** [2] - 32:1, 160:12
**buy** [2] - 94:21, 171:20
**buying** [2] - 40:8, 86:18
**buzz** [2] - 103:4, 112:11
**BY** [1] - 1:16, 1:19, 1:23, 2:11, 2:14, 2:18, 2:24, 3:3, 3:7, 3:10, 3:13

## C

**CA** [1] - 2:24
**calculate** [1] - 48:9
**calculated** [1] - 99:11
**calculates** [2] - 211:16, 211:17
**calculation** [4] - 49:22, 58:3, 101:7, 131:13
**calculations** [3] - 11:6, 131:16, 154:1
**Canada** [6] - 6:9, 47:9, 51:21, 102:6, 114:16, 167:19
**Canada's** [1] - 52:7
**Canadian** [1] - 114:14
**cancel** [1] - 24:24
**candidate** [1] - 146:12
**candidly** [1] - 130:4
**cannot** [9] - 65:11, 78:2, 86:24, 99:20, 100:5, 112:5, 118:7, 130:15, 137:22
**cap** [3] - 24:14, 25:2
**capability** [1] - 141:7
**capable** [7] - 125:24, 131:15, 141:21, 147:14, 155:14, 160:3, 178:17
**capacity** [6] - 84:3, 84:11, 84:12, 186:8, 188:8, 188:14, 189:15, 197:2
**Captain** [1] - 109:24
**captured** [2] - 179:20, 194:8
**capturing** [1] - 170:8

**car** [12] - 32:22, 108:18, 108:19, 119:14, 128:8, 147:11, 153:2, 187:1, 187:2, 187:3, 187:12, 215:24

**Caracas** [1] - 19:11

**care** [8] - 75:13, 79:10, 122:22, 145:1, 145:2, 192:10, 216:8

**cared** [2] - 13:15, 13:22

**careful** [3] - 49:2, 49:21, 196:6

**carefully** [1] - 176:17

**CARGO** [1] - 1:5

**Cargo** [5] - 2:6, 2:9, 3:1, 4:3, 59:5

**cargo** [50] - 6:6, 6:14, 7:24, 9:20, 12:15, 12:16, 13:4, 13:6, 13:20, 14:1, 14:20, 14:24, 15:24, 16:16, 16:19, 16:21, 16:23, 17:5, 17:7, 17:10, 17:15, 17:20, 18:2, 18:7, 18:11, 19:11, 19:12, 19:13, 19:23, 20:1, 20:2, 21:1, 21:2, 21:9, 21:14, 21:20, 23:22, 28:11, 62:8, 62:11, 64:15, 86:6, 88:22, 88:23, 88:24, 88:25, 91:15, 215:11, 215:14, 217:24

**carried** [1] - 141:2

**carrier** [17] - 13:3, 15:4, 18:15, 22:3, 47:20, 47:24, 65:2, 65:4, 65:25, 88:7, 91:15, 134:24, 179:16, 194:7, 194:9

**carriers** [23] - 8:8, 8:16, 8:19, 13:6, 15:10, 17:13, 18:16, 23:21, 51:24, 60:17, 62:21, 66:11, 69:23, 70:1, 83:5, 88:21, 88:22, 88:25, 157:18, 159:5, 172:13, 198:4

**carry** [3] - 84:20, 85:1, 123:8

**cars** [4] - 147:22, 153:1, 171:20, 186:23

**cartel** [32] - 5:25, 9:9, 11:15, 12:9, 12:25, 13:10, 16:12, 18:10, 19:3, 19:9, 19:23, 20:9, 20:24, 22:12, 22:15, 23:9, 25:14, 25:19, 25:22, 28:6, 28:8, 36:7, 39:2, 47:12, 57:20, 157:11, 166:24, 178:2, 178:3, 178:22, 179:12, 181:8

**cartels** [3] - 25:14, 217:1

**case** [165] - 5:12, 9:24, 16:6, 18:21, 20:11, 22:13, 22:19, 24:11, 29:2, 29:3, 29:5, 29:10, 30:9, 31:14, 32:1, 34:9, 35:7, 36:5, 36:6, 42:7, 42:10, 42:13, 42:14, 42:15, 43:2, 43:23, 44:3, 45:7, 46:22, 46:25, 47:1, 48:15, 48:16, 48:21, 48:23, 49:13, 50:2, 50:20, 54:23, 61:3, 61:14, 72:1, 73:14, 92:16, 97:10, 98:2, 99:2, 99:4, 99:8, 100:17, 101:13, 101:22, 101:24, 102:3, 102:8, 102:9, 104:10, 104:11, 105:16, 108:18, 109:9, 109:12, 112:17, 113:17, 113:18, 113:21, 114:3, 114:8, 115:2, 115:21, 118:6, 119:23, 120:7, 123:19, 123:20, 124:3, 124:25, 125:11, 128:23, 129:5, 132:21, 133:6, 135:23, 136:5, 137:16, 137:20, 139:16, 141:8, 141:12, 144:3, 147:11, 147:18, 147:19, 147:21, 149:12, 150:24, 151:3, 151:23, 152:25, 153:10, 154:14, 154:16, 154:19, 154:24, 155:19, 156:8, 156:22, 157:17, 158:18, 159:11, 160:12, 160:22, 160:23, 161:1, 161:5, 161:21, 161:22, 162:3, 164:21, 165:18, 170:18, 170:19, 170:22, 170:24, 170:25, 171:3, 171:8, 171:11, 171:13, 171:18, 173:4, 175:1, 175:22, 176:10, 178:12, 180:7, 180:21, 180:22, 185:6, 185:25, 189:2, 194:16, 194:22, 196:21, 198:11, 199:6, 202:1, 202:3, 206:12, 207:4, 209:19, 210:6, 210:8, 210:12, 211:14, 216:14, 218:1

**cases** [82] - 10:2, 10:3, 10:5, 31:15, 41:24, 44:11, 57:18, 62:16, 68:4, 72:9, 90:16, 100:13, 100:16, 101:10, 102:2, 102:21, 102:23, 103:1, 104:9, 108:8, 108:9, 108:12, 108:14, 108:17, 108:20, 109:8, 109:9, 112:13, 113:6, 114:7, 116:20, 121:2, 127:5, 127:6, 127:7, 127:11, 129:11, 129:12, 129:13, 129:17, 129:19, 132:13, 133:12, 134:4, 134:25, 138:23, 141:18, 141:19, 141:25, 143:11, 148:6, 148:8, 149:9, 151:14, 151:21, 152:8, 152:19, 152:21, 153:7, 154:12, 154:18, 154:20, 154:21, 156:8, 161:23, 162:6, 170:15, 170:20, 174:12, 200:2, 207:8, 209:23, 209:25, 210:3, 210:15, 213:5

**cash** [1] - 37:13

**cast** [1] - 16:13

**categories** [8] - 66:11, 76:5, 90:7, 146:2, 147:2, 188:1, 190:2, 190:4

**category** [5] - 26:2, 65:24, 89:12, 123:6, 190:3

**Cathay** [3] - 2:20, 20:25, 24:1

**CATHERINE** [1] - 2:11

**caught** [1] - 53:18

**causal** [12] - 106:25, 115:2, 128:5, 128:9, 128:11, 133:13, 133:18, 133:20, 134:1, 135:9, 135:12, 139:22

**causally** [1] - 130:9

**causation** [9] - 101:21, 103:4, 125:10, 125:14, 125:22, 128:4, 133:12, 137:13, 139:14

**caused** [6] - 24:20, 47:12, 99:17, 125:23, 126:18, 134:2

**causes** [2] - 124:2, 135:15

**causing** [1] - 175:20

**Cement** [1] - 114:3

**cement** [1] - 148:17

**cent** [4] - 106:6, 115:1, 127:22

**central** [3] - 56:25, 102:13, 175:23

**cents** [12] - 24:16, 53:7, 53:9, 53:10, 53:13, 54:19, 54:21, 80:3, 80:5, 95:8, 169:2, 169:3

**cert** [3] - 131:1, 144:24, 204:5

**certain** [8] - 72:17, 102:10, 129:17, 146:5, 154:12, 170:10, 171:20

**Certainly** [1] - 85:24

**certainly** [9] - 7:13, 40:4, 60:15, 62:12, 79:1, 91:13, 124:10, 173:12, 219:5

**certainty** [1] - 128:21

**certification** [59] - 4:2, 4:12, 5:14, 6:12, 10:2, 10:10, 10:19, 29:14, 35:6, 35:9, 41:13, 41:25, 42:2, 42:10, 42:20, 43:4, 44:12, 57:10, 57:25, 63:13, 95:25, 96:21, 97:6, 99:3, 99:4,

**Certification** [1] - 221:18

**certified** [12] - 46:7, 60:5, 129:20, 152:16, 152:17, 152:22, 153:7, 154:23, 161:6, 170:20, 174:14, 210:13

**certify** [3] - 109:7, 142:25, 152:9

**certs** [1] - 151:8

**chain** [3] - 107:1, 128:6, 170:18

**chairman** [1] - 23:21

**challenge** [3] - 70:11, 174:3, 209:18

**challenges** [1] - 214:19

**challenging** [8] - 44:9, 100:10, 100:14, 101:3, 111:16, 111:19, 192:4

**chance** [1] - 158:9

**change** [9] - 26:3, 35:24, 35:25, 44:3, 77:21, 169:21, 183:8, 204:10, 204:12

**changed** [5] - 27:2, 172:10, 193:22, 204:13, 204:15

**changes** [7] - 26:4, 33:13, 33:15, 68:8, 71:10, 163:14, 180:1

**changing** [2] - 73:14, 103:10

**channel** [2] - 98:15, 111:15

**characteristic** [1] - 86:2

**characteristics** [7] - 9:20, 64:15, 64:17,

**101:9**, 101:17, 102:14, 108:8, 108:10, 108:13, 111:3, 113:18, 118:6, 119:9, 120:16, 126:13, 129:18, 131:11, 133:2, 154:19, 154:21, 156:1, 161:4, 161:12, 164:21, 173:20, 174:18, 179:23, 185:21, 188:10, 201:13, 209:2, 209:7, 209:23, 210:1, 210:4, 210:17, 220:19

Case 1:06-md-01775-JG-VVP Document 1959 Filed 12/17/13 Page 230 of 261 PageID #: 55603

76:23, 148:18, 151:7, 163:16
**characterizing** [1] - 151:22
**charge** [3] - 147:20, 151:2, 171:22
**chargeable** [2] - 121:23, 193:13
**charges** [4] - 53:7, 53:14, 78:23, 148:1
**charging** [3] - 28:5, 69:23, 69:25
**chart** [9] - 15:13, 27:7, 34:8, 52:2, 89:22, 122:8, 138:11, 175:8
**charts** [13] - 12:11, 16:13, 16:14, 25:24, 26:1, 26:8, 26:10, 26:14, 26:25, 27:5, 29:19, 51:1, 74:15
**cheap** [1] - 19:10
**cheaper** [1] - 19:16
**cheat** [1] - 178:2
**cheating** [4] - 23:9, 25:14, 62:22, 178:2
**Check** [1] - 161:5
**check** [1] - 37:13
**checked** [2] - 53:3, 176:9
**checkpoint** [1] - 216:11
**CHEN** [1] - 2:11
**cherries** [5] - 14:3, 14:6, 14:12, 19:17, 19:20
**Chicago** [4] - 75:12, 75:16, 136:1, 147:7
**chief** [1] - 15:22
**Chile** [4] - 24:8, 24:13, 47:23, 145:1
**Chin** [2] - 194:19, 194:24
**china** [1] - 3:8
**China** [20] - 2:9, 2:9, 14:21, 14:22, 20:25, 23:25, 53:24, 54:3, 74:23, 75:4, 75:8, 89:23, 122:2, 133:10, 144:19, 168:23, 206:3, 218:10, 219:5
**Chiu's** [1] - 13:1
**chocolate** [4] - 151:11, 151:13
**choice** [1] - 21:10
**choose** [1] - 83:5
**chop** [1] - 173:25
**Chow** [5] - 211:25, 212:3, 212:5, 218:2, 218:3

**chronological** [1] - 103:13
**chronology** [2] - 110:8, 115:5
**chunk** [1] - 117:24
**CI** [1] - 23:25
**Cielos** [4] - 15:18, 15:20, 15:22, 16:1
**Circuit** [41] - 32:1, 35:7, 43:22, 48:14, 48:22, 49:3, 49:4, 49:7, 49:10, 99:1, 99:2, 99:9, 100:6, 100:18, 101:1, 101:2, 108:11, 112:3, 115:20, 120:6, 121:3, 121:4, 121:7, 133:1, 133:6, 137:19, 143:11, 147:21, 147:23, 152:12, 154:11, 154:15, 158:23, 160:13, 161:6, 161:7, 174:18, 180:8, 200:20, 200:22, 208:19
**Circuit's** [3] - 48:25, 49:6, 130:23
**circumstances** [1] - 177:3
**circumstantial** [1] - 81:9
**CIRESI** [1] - 1:21
**citation** [1] - 184:8
**cite** [7] - 130:19, 141:18, 170:24, 171:19, 184:4, 207:3, 207:4
**cited** [11] - 38:7, 113:6, 152:7, 152:14, 154:20, 170:23, 171:8, 173:4, 194:17, 199:6, 199:8
**cites** [4] - 100:13, 101:12, 207:1
**cities** [1] - 14:20
**citing** [3] - 183:25, 184:5, 199:3
**city** [3] - 13:13, 14:17, 26:2
**civil** [4] - 4:1, 7:10, 61:3, 146:14
**claim** [22] - 13:14, 56:10, 57:14, 60:15, 61:6, 61:16, 63:5, 74:23, 74:25, 75:21, 75:22, 76:3, 76:6, 83:4, 84:16, 101:12, 121:10, 169:6,

182:23, 188:6, 207:6
**claimed** [4] - 20:4, 187:24, 188:4, 195:22
**claiming** [1] - 187:3
**claims** [16] - 47:6, 56:19, 56:20, 56:21, 62:5, 68:6, 74:18, 75:7, 75:13, 76:15, 76:16, 82:16, 93:16, 99:24, 112:4, 117:2
**class** [344] - 4:2, 4:12, 5:13, 6:12, 9:3, 9:22, 10:2, 10:9, 10:19, 11:2, 13:21, 14:1, 14:21, 18:18, 22:8, 27:2, 27:3, 28:25, 29:4, 29:13, 30:4, 30:8, 30:13, 30:14, 31:11, 31:25, 32:2, 32:3, 32:6, 32:8, 32:10, 32:20, 33:5, 33:20, 34:11, 34:14, 34:15, 34:19, 34:22, 35:2, 35:5, 35:6, 35:8, 35:9, 36:3, 36:7, 39:6, 41:12, 41:19, 41:25, 42:2, 42:9, 42:19, 42:23, 43:3, 43:5, 43:9, 43:14, 43:17, 44:12, 45:12, 45:13, 46:7, 49:5, 49:18, 49:24, 50:6, 50:8, 50:11, 50:12, 50:13, 50:15, 50:17, 51:20, 56:8, 56:14, 56:18, 56:19, 56:20, 56:22, 56:23, 57:6, 57:10, 57:11, 57:12, 57:16, 57:19, 57:21, 57:25, 60:5, 60:14, 61:4, 61:5, 61:8, 61:14, 61:18, 61:19, 61:21, 61:24, 62:1, 62:5, 62:14, 63:5, 63:13, 63:17, 63:23, 63:25, 64:1, 64:12, 65:6, 65:8, 65:12, 65:15, 65:19, 66:1, 66:9, 66:24, 67:7, 70:19, 70:20, 70:22, 72:11, 72:16, 74:13, 74:18, 74:21, 75:11, 75:18, 75:20, 76:4, 77:8, 78:4, 79:9, 80:5, 80:25, 85:19, 86:25, 87:19, 90:18, 90:22, 90:23, 91:5, 91:6, 93:10, 94:10, 95:24, 95:25, 96:10, 96:21, 97:3,

97:4, 97:6, 97:14, 97:17, 98:1, 99:3, 99:23, 100:20, 101:8, 101:17, 101:19, 102:11, 103:8, 103:11, 103:18, 104:2, 104:18, 104:20, 104:21, 104:23, 105:2, 106:4, 107:9, 107:16, 107:21, 108:8, 108:10, 108:13, 109:7, 109:18, 109:19, 111:3, 112:24, 113:2, 113:18, 113:24, 114:19, 115:9, 117:1, 117:4, 117:6, 117:9, 117:10, 118:8, 118:21, 118:24, 119:9, 120:15, 120:16, 120:22, 121:10, 121:16, 122:18, 123:3, 123:25, 124:19, 124:20, 124:21, 124:24, 125:4, 125:23, 126:6, 126:13, 126:17, 127:19, 127:21, 128:15, 129:17, 130:16, 130:17, 130:25, 131:11, 133:2, 135:19, 137:22, 141:1, 141:22, 142:14, 142:25, 143:8, 143:20, 144:24, 146:14, 147:2, 147:8, 147:17, 148:8, 148:13, 151:3, 151:8, 152:9, 154:16, 154:19, 154:21, 154:25, 155:10, 155:20, 155:22, 156:1, 157:6, 157:24, 158:7, 158:15, 158:20, 158:21, 159:6, 159:13, 159:15, 159:21, 159:23, 159:24, 160:3, 160:4, 160:6, 160:7, 160:10, 160:11, 160:14, 160:15, 160:24, 161:4, 161:7, 161:12, 161:13, 161:15, 161:16, 161:18, 162:11,

162:12, 162:17, 162:21, 162:23, 162:24, 163:3, 163:6, 163:10, 163:19, 163:20, 164:21, 165:7, 165:21, 166:13, 167:6, 167:7, 167:8, 167:10, 167:11, 167:13, 167:14, 167:15, 169:10, 170:1, 170:20, 172:23, 173:11, 173:18, 173:20, 174:7, 174:10, 174:17, 179:4, 179:23, 181:6, 185:21, 188:10, 190:9, 191:19, 191:22, 200:4, 201:13, 204:5, 204:6, 206:11, 206:16, 209:1, 209:7, 209:23, 210:1, 210:4, 210:12, 210:13, 210:17, 211:18, 213:4, 220:18
**Class** [2] - 96:22, 221:17
**class-wide** [34] - 11:2, 30:13, 30:14, 31:25, 32:8, 33:5, 43:5, 43:17, 56:14, 100:20, 101:19, 104:21, 107:16, 113:24, 118:8, 121:10, 123:25, 125:23, 141:1, 141:22, 151:3, 157:6, 160:3, 160:10, 160:11, 160:24, 161:13, 161:15, 161:16, 162:17, 163:6, 166:13, 173:11, 173:18
**classes** [2] - 76:7, 76:9
**classwide** [6] - 65:16, 68:25, 96:6, 96:10, 96:24, 178:10
**Clayton** [1] - 99:8
**clean** [12] - 117:14, 117:15, 117:25, 118:13, 123:11, 135:4, 145:24, 172:15, 172:17, 172:19, 206:18, 219:20

cleanup [1] - 138:2
clear [14] - 111:14, 112:5, 115:17, 115:25, 121:3, 126:21, 139:13, 142:6, 153:16, 155:1, 157:21, 158:17, 161:3
clearer [3] - 26:24, 31:9, 168:25
clearly [2] - 120:1, 193:14
CLERK [1] - 4:1
client [4] - 122:17, 146:4, 146:9, 146:12
client's [1] - 72:15
clients [2] - 53:5, 146:10
close [13] - 19:6, 19:8, 19:22, 20:8, 20:16, 20:22, 21:4, 98:5, 154:4, 178:19, 178:21, 196:14, 197:19
closed [1] - 194:23
cloud [19] - 103:15, 103:17, 103:24, 104:12, 104:19, 106:2, 106:5, 117:5, 117:7, 117:13, 117:14, 119:17, 125:5, 127:2, 139:20, 139:23, 205:16, 205:17
cluster [1] - 130:16
Co [1] - 2:17
co [1] - 4:21
co-counsel [1] - 4:21
coat [1] - 113:8
coconspirator [1] - 16:7
coconspirators [1] - 15:7
codes [1] - 23:25
Coefficient [1] - 87:24
coefficient [6] - 90:12, 91:2, 105:2, 201:21, 212:4, 212:9
coefficients [4] - 196:4, 202:24, 212:6, 212:11
Cogan [2] - 29:1, 162:10
COHEN [1] - 2:3
coincide [1] - 190:19
colleague [1] - 210:18
colleagues [1] - 206:8
collective [5] - 11:4, 11:13, 11:20, 19:5, 84:14

collectively [3] - 12:2, 12:4, 93:24
collusion [2] - 21:7, 22:6
colors [3] - 33:9, 163:17, 163:22
combinations [2] - 194:9, 198:5
combine [1] - 38:23
Comcast [39] - 42:15, 43:22, 44:3, 46:20, 97:9, 100:17, 101:1, 101:14, 101:20, 105:15, 105:16, 105:17, 105:22, 106:25, 112:17, 115:20, 119:23, 123:19, 129:4, 130:6, 130:24, 131:19, 132:17, 134:3, 135:7, 142:1, 150:24, 153:16, 156:9, 160:18, 160:19, 160:20, 160:21, 160:22, 173:1, 190:8, 209:10
comfort [1] - 137:4
coming [5] - 86:9, 124:11, 196:14, 204:7, 204:14
commands [1] - 112:8
commend [1] - 132:18
commercial [1] - 15:22
Commission [5] - 7:19, 17:10, 21:1, 23:14, 217:23
commit [1] - 161:24
commodity [1] - 151:8
commodity-like [1] - 151:8
common [70] - 5:11, 5:12, 5:20, 5:21, 5:23, 6:1, 6:3, 6:17, 6:24, 7:12, 8:5, 9:1, 10:11, 10:15, 15:8, 21:8, 22:20, 24:5, 28:20, 28:25, 29:3, 29:8, 29:17, 30:4, 40:12, 41:23, 42:7, 42:18, 42:21, 43:8, 43:12, 43:24, 44:10, 44:25, 45:11, 48:11, 56:18, 56:25, 57:2, 57:6, 57:7, 57:15, 61:16, 74:20, 89:3, 98:3, 100:20, 101:15, 109:24, 109:25, 110:3, 118:7, 124:20,

125:24, 133:11, 135:18, 137:3, 140:25, 145:3, 148:20, 155:8, 155:20, 156:11, 156:16, 156:17, 157:8, 157:14, 180:15, 189:3, 213:4
commonly [1] - 201:24
communicated [1] - 18:21
communication [1] - 8:14
communications [1] - 7:4
companies [2] - 99:5, 116:5
company [1] - 20:14
compare [3] - 36:18, 172:20, 184:20
compared [1] - 22:4
comparing [1] - 172:3
comparison [2] - 37:4, 37:20
compensate [3] - 23:18, 177:19, 181:8
compensated [2] - 148:2, 181:6
compete [1] - 12:14
competes [1] - 62:11
Competition [1] - 217:23
competition [12] - 62:18, 62:24, 77:17, 78:9, 78:22, 81:15, 81:16, 85:23, 102:19, 134:17, 144:6, 179:18
competitive [6] - 55:19, 85:13, 130:13, 150:8
competitor [1] - 12:23
competitors [2] - 85:7, 180:3
complain [1] - 19:3, 161:25
complaining [3] - 67:9, 68:15, 94:16
complaint [3] - 15:6, 69:9, 82:25
complete [2] - 20:10, 150:12
completely [6] - 94:18, 94:23, 95:13, 203:16, 204:1, 206:5
completeness [1] - 220:12
complicated [2] - 71:23, 162:1

comply [1] - 197:17
component [34] - 32:9, 102:18, 107:11, 107:23, 108:9, 108:13, 108:19, 127:6, 127:10, 127:13, 129:11, 129:13, 129:16, 129:19, 129:22, 129:23, 151:21, 151:23, 152:8, 152:18, 152:19, 152:21, 153:3, 153:4, 153:7, 169:14, 169:15, 171:3, 171:5, 174:10, 174:17, 177:11, 187:1
components [7] - 73:18, 107:24, 107:25, 170:16, 170:21, 187:2, 187:8
composition [4] - 61:18, 62:19, 73:21, 74:13
computer [2] - 127:6, 127:8
Computer [1] - 3:20
computer's [1] - 127:9
Computer-aided [1] - 3:20
computerized [1] - 3:20
computers [1] - 148:9
conceded [4] - 49:8, 159:12, 160:24, 216:25
conceding [1] - 159:14
concentrated [1] - 151:10
concept [2] - 67:23, 143:24
concern [4] - 26:2, 157:17, 157:22, 159:8
concerned [1] - 159:4
concerning [1] - 107:5
concession [2] - 49:19, 161:2
concluded [1] - 222:3
conclusion [6] - 11:1, 18:10, 32:10, 85:22, 151:3, 199:2
conclusions [4] - 10:13, 11:9, 194:21, 212:17
concrete [1] - 148:21
concurrent [1] - 149:5
condition [4] - 19:18,

106:21, 107:4, 137:9
conditions [10] - 28:23, 62:6, 62:8, 62:10, 74:4, 76:25, 77:11, 77:12, 83:6, 217:2
conducive [1] - 157:11
conduct [16] - 6:15, 7:11, 7:19, 7:22, 29:7, 60:18, 67:9, 69:11, 105:9, 117:18, 118:3, 133:7, 162:15, 212:12, 213:17
conducting [1] - 178:15
confer [1] - 219:18
conference [1] - 219:16
confident [2] - 70:16, 154:23
confirmed [4] - 40:10, 54:3, 211:1, 212:17
confirms [1] - 69:20
conflate [1] - 49:21
conflated [1] - 30:20
conflicts [1] - 56:23
conform [2] - 185:3, 190:12
conforms [1] - 183:19
confuse [1] - 119:11
confusing [1] - 71:24
connect [3] - 69:10, 93:25, 134:10
connected [4] - 46:21, 130:9, 140:5, 190:7
Connecticut [1] - 3:2
connecting [2] - 133:16, 216:3
connection [4] - 73:4, 128:5, 128:11, 135:9
connections [1] - 83:24
conservative [1] - 40:8
consider [4] - 10:18, 29:16, 36:8, 219:13
consideration [4] - 54:7, 101:8, 174:19, 201:13
considered [1] - 29:12
consistent [16] - 28:1, 43:25, 47:13, 50:23, 54:22, 55:24, 98:16, 103:25, 122:24, 144:10, 149:21, 173:3, 175:13, 199:9, 211:22
consistently [2] -

26:21, 29:22
**conspiracies** [5] - 8:11, 46:16, 174:2, 179:24, 190:11
**conspiracy** [100] - 5:22, 5:24, 6:14, 6:19, 7:5, 7:7, 7:14, 8:13, 8:15, 9:5, 9:11, 9:21, 9:23, 12:13, 14:16, 15:16, 15:17, 15:21, 15:24, 16:2, 16:5, 16:8, 19:1, 25:1, 25:11, 26:12, 29:2, 30:12, 34:15, 34:20, 34:24, 35:25, 41:16, 43:10, 43:18, 47:1, 47:4, 49:7, 53:20, 55:14, 56:13, 60:10, 60:11, 60:14, 64:6, 66:22, 67:12, 72:5, 72:13, 72:21, 73:6, 73:16, 73:19, 80:7, 80:8, 80:17, 81:10, 82:20, 85:2, 85:9, 91:3, 91:18, 93:17, 94:1, 94:24, 105:1, 112:22, 129:6, 130:1, 135:25, 144:12, 147:9, 149:10, 157:9, 160:2, 168:1, 169:5, 169:7, 170:1, 170:2, 170:11, 172:2, 172:3, 172:4, 172:13, 173:8, 174:4, 174:6, 178:9, 179:25, 180:15, 190:3, 190:9, 190:18, 191:20, 201:21, 206:23, 217:5
**conspiracy's** [1] - 34:25
**conspiratorially** [1] - 148:19
**conspiratorially-inflated** [1] - 148:19
**conspirators** [5] - 85:7, 85:8, 86:7, 107:22, 217:7
**conspired** [1] - 169:8
**constant** [1] - 193:1
**constantly** [4] - 68:6, 100:11, 103:5, 104:19
**constituent** [4] - 90:4, 90:9, 136:8, 136:9
**constitutes** [1] - 91:22
**constrained** [1] - 7:10
**construct** [1] - 23:3

**constructed** [2] - 90:2, 146:20
**consult** [1] - 132:13
**consultant** [2] - 77:3, 186:18
**consultants** [9] - 32:16, 36:20, 41:21, 45:18, 46:12, 182:22, 189:24, 198:3, 199:10
**consultants'** [2] - 46:13, 182:20
**Consumer** [1] - 217:22
**consumer** [1] - 154:13
**contemporaneous** [1] - 28:20
**contend** [1] - 203:9
**contest** [1] - 10:5
**context** [12] - 29:13, 80:10, 113:19, 127:19, 128:15, 140:4, 156:21, 157:2, 166:2, 170:17, 176:2, 217:20
**continued** [4] - 58:10, 68:7, 153:23, 174:21
**Continued** [1] - 97:19
**contract** [4] - 77:22, 77:23, 148:1, 157:18
**contracts** [1] - 157:19
**contradicts** [1] - 101:10
**contrary** [6] - 155:24, 170:25, 173:13, 175:7, 179:13
**Contrary** [1] - 178:12
**contrast** [1] - 102:8
**contributing** [1] - 166:12
**control** [3] - 127:2, 134:18, 134:19
**controversial** [1] - 40:14
**controversy** [4] - 37:7, 42:12, 57:12, 156:5
**convenient** [1] - 61:10
**Conversion** [2] - 170:21, 174:13
**conversion** [1] - 115:19
**convert** [2] - 36:21, 184:19
**convey** [1] - 173:16
**Cook** [1] - 124:17
**cooler** [1] - 14:11
**Coolidge** [1] - 197:14
**cooperating** [1] - 28:22

**coordinated** [1] - 29:20
**Copenhagen** [3] - 14:4, 14:7, 14:12
**copies** [1] - 5:3
**copy** [1] - 192:20
**cornerstone** [1] - 84:15
**Corp** [1] - 2:23
**correct** [10] - 33:11, 33:16, 52:17, 54:16, 130:3, 165:14, 175:12, 176:11, 176:13, 188:18
**corrected** [2] - 26:25, 27:11
**correctly** [3] - 82:8, 131:23, 165:20
**correlated** [1] - 139:18
**correlating** [1] - 139:15
**correlation** [1] - 143:21
**correlations** [3] - 113:14, 113:15, 136:6
**cost** [15] - 20:19, 54:6, 83:7, 88:20, 88:23, 89:1, 127:7, 135:3, 188:9, 188:13, 197:1, 202:25, 203:8, 203:21, 204:8
**costs** [1] - 22:17
**Cote** [2] - 132:19, 136:12
**counsel** [6] - 4:21, 52:23, 56:22, 59:8, 80:20, 186:17
**counties** [3] - 113:22, 114:6, 124:17
**counting** [3] - 16:19, 29:15, 156:13
**countries** [18] - 33:7, 47:11, 54:20, 60:17, 66:10, 68:20, 77:13, 89:20, 145:15, 163:14, 179:15, 180:4, 183:17, 188:8, 194:8, 198:5, 203:12, 207:20
**country** [33] - 16:23, 47:9, 47:20, 47:24, 61:21, 62:10, 64:21, 64:22, 65:23, 66:21, 74:23, 75:12, 77:2, 87:20, 88:4, 88:15, 89:11, 119:17, 123:3, 134:22, 134:24, 145:2, 145:6, 146:1,

179:16, 179:17, 188:5, 188:15, 194:7, 198:15, 203:14, 203:23, 214:25
**County** [1] - 124:17
**couple** [7] - 42:14, 65:9, 65:18, 102:1, 214:18, 216:19, 220:23
**Couple** [1] - 206:7
**course** [20] - 4:14, 6:22, 9:5, 17:18, 21:13, 30:20, 42:24, 45:23, 46:4, 47:3, 53:4, 73:12, 83:10, 88:1, 90:3, 154:20, 170:10, 179:9, 210:22, 215:6
**court** [20] - 10:4, 10:9, 18:11, 102:22, 103:1, 110:11, 118:6, 118:16, 124:19, 125:11, 131:9, 133:7, 147:7, 156:4, 156:12, 157:23, 159:3, 161:10, 198:7, 207:25
**Court** [81] - 3:17, 3:17, 10:24, 10:25, 29:11, 29:16, 31:15, 42:14, 42:20, 43:19, 43:21, 48:10, 48:11, 57:19, 57:24, 61:10, 67:21, 73:13, 97:10, 99:22, 100:2, 100:3, 100:17, 100:25, 101:5, 101:9, 101:14, 101:16, 102:8, 102:14, 105:7, 105:24, 110:1, 110:10, 112:18, 115:19, 118:22, 119:2, 123:20, 127:18, 130:7, 130:11, 130:23, 130:25, 131:2, 131:9, 131:10, 134:6, 134:8, 138:22, 139:2, 139:4, 139:6, 139:25, 140:17, 140:18, 140:22, 141:5, 151:15, 152:11, 153:15, 154:16, 155:18, 155:24, 156:4, 159:7, 165:19, 180:8, 184:2,

184:11, 184:12, 193:24, 201:1, 209:11, 210:3, 210:16, 210:19, 210:23
**COURT** [117] - 1:1, 4:5, 4:9, 4:14, 4:18, 4:20, 4:24, 5:6, 52:11, 52:15, 52:19, 58:1, 58:7, 59:1, 59:15, 59:18, 95:21, 95:23, 96:2, 96:6, 96:9, 96:17, 96:20, 97:1, 98:6, 98:10, 98:18, 107:5, 107:19, 108:6, 109:3, 111:1, 114:15, 114:18, 140:16, 141:6, 141:11, 141:16, 142:7, 142:11, 142:15, 142:19, 142:23, 143:1, 143:23, 144:9, 151:20, 152:1, 152:6, 152:14, 152:17, 152:23, 153:8, 153:20, 154:1, 154:4, 154:8, 155:12, 156:19, 157:3, 157:6, 157:15, 158:13, 159:3, 159:9, 159:17, 160:18, 163:23, 164:2, 165:19, 165:25, 166:4, 169:13, 181:10, 181:12, 181:16, 181:19, 183:24, 184:7, 184:11, 184:24, 185:19, 188:18, 189:7, 189:20, 189:22, 199:12, 199:15, 200:25, 201:6, 202:8, 202:14, 202:23, 203:3, 208:25, 209:8, 209:13, 210:20, 214:11, 217:10, 219:11, 219:17, 219:19, 219:23, 220:1, 220:5, 220:11, 220:14, 220:17, 220:25, 221:4, 221:7, 221:9, 221:14, 221:17, 221:21, 221:24
**court's** [1] - 101:4
**Court's** [5] - 42:6,

42:9, 59:13, 138:25,
142:16
**courthouse** [2] -
128:7, 162:9
**Courthouse** [1] - 1:5
**Courts** [1] - 178:8
**courts** [37] - 10:1,
10:19, 106:1,
112:12, 113:5,
113:8, 119:1, 120:8,
120:16, 124:4,
134:6, 134:25,
136:2, 138:20,
139:13, 141:22,
143:10, 147:10,
151:4, 151:7,
153:16, 154:18,
154:21, 160:16,
170:20, 173:14,
178:12, 178:13,
180:8, 180:9, 200:3,
202:4, 202:6,
208:16, 208:17
**cover** [2] - 73:8,
116:22
**covered** [5] - 116:8,
132:17, 137:7,
137:12, 138:4
**covering** [1] - 38:25
**covers** [1] - 73:7
**create** [2] - 188:21,
213:12
**created** [2] - 117:14,
138:11
**creation** [1] - 190:16
**criminal** [9] - 6:7,
6:18, 7:8, 9:7, 28:16,
57:18, 61:3, 177:10,
180:21
**critical** [2] - 60:21,
82:22
**criticism** [5] - 44:13,
47:14, 205:2, 213:9,
214:23
**criticisms** [2] -
204:25, 211:4
**criticize** [3] - 49:1,
151:5, 206:9
**criticized** [2] - 104:11,
136:5
**criticizes** [1] - 130:23
**criticizing** [1] - 131:2
**critique** [2] - 118:5,
121:9
**critiques** [1] - 125:25
**cross** [14] - 8:18,
15:14, 16:18, 27:16,
35:11, 37:24, 52:21,
110:16, 150:17,
184:25, 187:20,

188:13, 207:23,
212:2
**cross-examination**
[7] - 8:18, 15:14,
16:18, 27:16, 35:11,
37:24, 188:13
**cross-examine** [2] -
110:16, 212:2
**cross-examined** [3] -
52:21, 150:17,
187:20
**CRR** [1] - 3:17
**Cuisinart** [1] - 110:12
**currencies** [1] - 26:14
**Currency** [2] - 170:21,
174:12
**currency** [1] - 175:11
**current** [1] - 181:1
**curve** [2] - 184:23
**customer** [67] - 8:10,
26:2, 26:5, 33:22,
33:23, 34:5, 34:10,
36:15, 38:24, 39:6,
39:14, 40:18, 62:23,
64:21, 65:25, 66:19,
67:4, 69:6, 69:7,
70:4, 70:22, 70:24,
71:14, 75:21, 87:1,
87:2, 87:9, 87:12,
88:1, 88:5, 90:20,
91:6, 92:2, 92:8,
92:15, 92:16,
103:25, 106:3,
115:5, 115:24,
115:25, 116:12,
123:18, 127:1,
146:21, 163:16,
165:4, 165:7,
165:10, 166:9,
166:16, 186:6,
187:20, 188:5,
188:15, 188:25,
189:10, 189:14,
198:15, 198:19,
200:8, 203:15,
205:18, 207:16
**customer's** [3] -
38:25, 186:6, 196:2
**customer-level** [2] -
87:1, 87:2
**customers** [75] - 19:2,
21:10, 21:15, 21:20,
26:8, 33:24, 34:1,
34:6, 34:7, 34:8,
34:10, 39:10, 39:18,
39:22, 39:25, 40:4,
40:9, 40:15, 40:23,
41:1, 41:4, 41:10,
41:11, 41:14, 41:17,
41:20, 49:4, 52:7,

55:7, 62:21, 63:10,
70:7, 71:13, 71:15,
76:9, 83:4, 87:11,
88:10, 93:12, 93:15,
94:12, 115:6, 118:3,
146:25, 148:18,
148:23, 158:3,
165:4, 165:13,
165:16, 166:6,
166:17, 166:19,
166:20, 166:23,
178:4, 182:25,
183:17, 188:8,
195:21, 196:4,
196:6, 196:8, 198:4,
203:12, 207:19,
207:23, 211:18,
211:19, 211:22,
212:5, 212:7, 212:9,
212:19
**customize** [1] -
203:23
**cutthroat** [6] - 62:19,
62:24, 77:21, 81:15,
102:19, 144:6
**CX** [1] - 24:1

## D

**D.C** [5] - 2:21, 3:13,
17:18, 158:23,
174:18
**damage** [17] - 31:7,
44:4, 49:22, 65:8,
95:4, 97:11, 126:11,
128:4, 128:19,
161:4, 161:8,
161:11, 162:7,
162:10, 162:13,
163:2
**damaged** [2] - 162:22
**damages** [87] - 6:3,
30:17, 30:18, 31:12,
31:16, 31:18, 32:3,
36:11, 38:14, 49:22,
50:1, 57:8, 57:9,
60:7, 60:16, 61:2,
65:7, 68:25, 76:17,
87:24, 93:5, 93:9,
94:9, 95:7, 95:11,
95:13, 95:14, 95:15,
95:19, 95:24, 96:10,
97:4, 97:10, 97:12,
97:15, 98:4, 98:24,
99:11, 99:14, 99:23,
100:1, 100:5, 101:7,
105:13, 105:17,
119:23, 119:24,
119:25, 121:10,
122:20, 122:23,
124:8, 124:10,

127:20, 127:21,
127:23, 130:20,
131:13, 131:15,
131:17, 134:11,
135:20, 135:23,
137:21, 137:24,
138:14, 145:17,
145:20, 149:25,
158:16, 160:8,
160:10, 160:15,
160:16, 160:22,
160:25, 161:14,
161:16, 161:18,
162:1, 162:3,
162:16, 162:19,
162:20, 162:22
**damaging** [1] - 211:13
**Dan** [2] - 201:18,
209:16
**DANIEL** [1] - 2:8
**data** [82] - 13:19,
29:21, 30:9, 33:16,
33:23, 45:22, 45:23,
46:8, 46:12, 50:21,
50:23, 50:24, 51:3,
51:5, 51:8, 52:8,
53:4, 53:6, 62:3,
70:25, 88:1, 89:19,
89:22, 103:16,
103:17, 104:13,
106:2, 110:12,
110:14, 110:16,
113:13, 114:20,
117:5, 117:7,
118:19, 122:12,
124:12, 125:1,
125:2, 127:1, 136:6,
139:8, 139:20,
140:5, 156:15,
164:17, 168:16,
174:3, 176:6, 176:7,
187:15, 187:19,
187:22, 187:25,
188:19, 188:22,
194:15, 195:7,
195:12, 196:1,
196:2, 196:13,
197:20, 197:21,
197:23, 198:12,
198:18, 199:2,
199:4, 201:20,
213:9, 213:16,
213:20, 213:23,
214:2, 218:4,
218:14, 218:17
**database** [6] - 53:13,
53:16, 69:7, 71:14,
166:7, 176:7
**date** [4] - 73:10, 172:8,
219:15, 219:22

**Dau** [1] - 114:13
**Daubert** [34] - 4:2,
4:13, 43:1, 45:3,
45:19, 46:14, 48:6,
71:9, 104:6, 110:9,
114:11, 114:12,
114:13, 114:17,
118:16, 124:24,
135:21, 164:12,
172:25, 181:23,
194:11, 194:14,
199:7, 200:22,
201:8, 201:11,
208:18, 208:24,
209:1, 209:2, 209:7,
214:16, 220:20
**DAVID** [1] - 2:21
**David** [4] - 113:16,
113:25, 181:24,
182:1
**days** [3] - 19:12,
145:10, 219:23
**DC** [17] - 1:15, 2:14,
3:3, 3:10, 17:21,
48:14, 48:22, 48:25,
49:3, 49:4, 49:6,
49:7, 49:10, 112:3,
120:5, 121:4, 121:7
**De** [1] - 75:15
**deal** [8] - 56:24, 111:9,
113:8, 115:18,
137:21, 140:13,
160:16, 162:18
**dealing** [3] - 130:17,
132:22, 208:9
**dealt** [7] - 68:21,
113:21, 147:19,
147:22, 148:4,
152:10, 161:9
**death** [1] - 138:1
**decedents'** [1] -
109:21
**decide** [5] - 107:22,
140:21, 153:15,
184:2, 209:11
**decided** [7] - 12:5,
25:2, 29:11, 48:15,
53:24, 121:18,
142:16
**deciding** [1] - 210:17
**decision** [12] - 8:3,
21:12, 42:6, 130:7,
130:25, 149:14,
160:20, 172:6,
172:11, 175:2,
185:19, 185:20
**decisions** [6] -
102:10, 102:12,
102:16, 105:11,
109:13, 148:10

**declarant** [5] - 24:22, 55:5, 83:8, 86:12, 215:14
**declaration** [23] - 11:7, 11:22, 12:20, 25:25, 27:5, 27:8, 27:14, 27:17, 51:14, 78:17, 92:1, 150:16, 150:19, 175:19, 185:13, 192:12, 194:11, 197:14, 204:22, 207:1, 211:2, 215:16, 217:19
**declarations** [1] - 182:14
**decreases** [2] - 25:9, 25:12
**deeply** [1] - 200:20
**defeat** [1] - 95:25
**defeats** [1] - 97:5
**defect** [1] - 63:10
**defective** [1] - 120:13
**defend** [2] - 175:9, 183:24
**Defendant** [4] - 223:6, 223:7, 223:8, 223:9
**defendant** [6] - 6:21, 7:19, 8:13, 10:8, 15:19, 16:6, 16:17, 35:13, 48:20, 102:9, 132:21, 137:23, 141:20, 148:9, 180:14, 182:17
**defendant's** [6] - 8:12, 10:5, 177:14, 182:20, 220:18, 220:19
**Defendants** [1] - 80:21
**defendants** [127] - 5:4, 6:5, 6:7, 8:7, 8:17, 8:22, 9:10, 9:25, 10:7, 10:12, 11:7, 11:17, 11:23, 12:7, 12:8, 12:12, 12:15, 13:12, 13:13, 13:16, 14:20, 15:1, 15:13, 15:15, 15:25, 16:4, 16:10, 16:13, 18:9, 18:21, 19:5, 19:7, 20:14, 20:25, 22:22, 23:11, 25:10, 25:20, 28:13, 29:9, 29:20, 30:10, 30:19, 31:22, 35:3, 39:12, 41:8, 42:25, 44:7, 45:6, 46:24, 48:7, 48:18, 50:19, 50:24, 51:3, 51:16, 53:11, 55:2,
55:17, 56:3, 59:3, 59:6, 61:12, 62:22, 69:13, 70:21, 72:21, 72:23, 72:24, 73:1, 73:5, 77:19, 81:16, 86:7, 92:24, 98:13, 99:16, 99:17, 100:9, 100:14, 101:2, 102:15, 106:12, 106:17, 113:22, 119:13, 120:19, 121:6, 121:13, 133:9, 134:18, 138:7, 142:20, 148:11, 150:8, 151:12, 153:11, 157:24, 161:24, 167:8, 168:17, 170:4, 170:5, 174:9, 176:11, 176:21, 177:4, 179:2, 179:11, 179:18, 180:17, 181:1, 181:2, 186:11, 186:17, 186:24, 187:6, 199:3, 199:18, 204:3, 209:17, 215:3, 216:24, 220:15, 221:10
**defendants'** [56] - 5:15, 5:22, 5:23, 6:25, 9:5, 11:14, 12:13, 13:19, 14:16, 14:18, 21:7, 22:6, 24:9, 25:16, 28:7, 28:10, 28:20, 28:21, 29:7, 36:20, 41:12, 41:21, 43:10, 44:13, 45:2, 45:18, 46:12, 50:22, 57:20, 62:18, 64:8, 84:14, 84:22, 99:25, 111:2, 118:3, 121:9, 157:9, 162:14, 167:21, 168:4, 169:25, 175:6, 176:7, 181:6, 182:21, 185:15, 186:18, 189:24, 198:3, 199:10, 200:18, 201:3, 210:8, 213:24, 221:3
**Defendants'** [2] - 221:18, 221:19
**defended** [1] - 70:9
**defending** [1] - 109:1
**defense** [14] - 5:17, 6:4, 8:25, 9:1, 32:16, 38:7, 46:12, 47:18, 67:16, 173:5,
173:10, 173:17, 182:6, 182:7
**defensive** [1] - 187:15
**defer** [5] - 98:24, 100:15, 139:5, 151:16, 153:13
**deferred** [3] - 57:18, 57:19, 180:20
**deferring** [1] - 178:13
**deficiencies** [2] - 200:12, 200:13
**deficient** [1] - 187:3
**define** [5] - 36:4, 82:19, 144:14, 188:25, 215:11
**defined** [2] - 32:4, 36:2
**defining** [1] - 86:5
**definition** [5] - 36:15, 88:24, 91:23, 92:5, 217:14
**definitional** [1] - 64:18
**delay** [1] - 55:1
**delivered** [1] - 100:3
**delivery** [1] - 215:11
**demand** [25] - 17:9, 17:23, 20:21, 21:6, 62:10, 76:25, 77:1, 77:11, 88:14, 88:18, 134:19, 144:15, 179:14, 179:19, 186:7, 188:8, 188:14, 189:9, 189:11, 189:12, 197:1, 202:25, 203:8, 203:22, 204:8
**demanding** [1] - 202:5
**demands** [3] - 189:14, 194:9, 199:22
**demonstrate** [14] - 42:18, 60:5, 60:23, 75:24, 81:10, 82:8, 87:11, 96:4, 128:5, 128:11, 156:11, 156:12, 157:6, 197:15
**demonstrated** [6] - 60:8, 131:19, 157:20, 158:9, 159:4, 190:23
**demonstrates** [1] - 119:8
**demonstrating** [1] - 135:18
**demonstratives** [1] - 59:12
**denial** [2] - 108:10, 133:2
**denied** [4] - 119:10, 119:20, 120:16,
154:19
**Denmark** [1] - 144:18
**Denny** [1] - 194:19
**deny** [2] - 136:2, 210:4
**denying** [4] - 108:8, 108:12, 109:9, 113:18
**Department** [1] - 6:13
**dependent** [1] - 203:1
**depiction** [1] - 175:9
**deposed** [2] - 123:16, 128:24
**deposition** [12] - 24:22, 54:4, 55:5, 81:25, 87:6, 104:18, 121:17, 123:18, 129:7, 176:2, 176:4, 176:6
**depositions** [3] - 71:11, 79:14, 111:5
**described** [6] - 6:13, 15:24, 210:9
**description** [1] - 221:7
**designated** [1] - 221:7
**designations** [1] - 220:25
**designed** [3] - 154:17, 212:3, 213:14
**despite** [2] - 25:23, 48:1
**destination** [10] - 17:13, 17:14, 18:4, 18:6, 19:18, 21:14, 50:14, 163:15, 182:25, 215:12
**destinations** [3] - 13:20, 17:5, 17:7
**detail** [5] - 62:9, 63:18, 71:18, 72:2, 210:9
**detailed** [2] - 132:19, 204:22
**detection** [1] - 25:20
**detects** [1] - 118:4
**deterioration** [1] - 19:16
**determination** [5] - 10:20, 99:13, 101:10, 140:18, 141:1
**determinations** [1] - 178:16
**determine** [10] - 32:13, 43:20, 65:5, 124:21, 140:24, 155:3, 155:5, 178:9, 178:10, 191:19
**determined** [2] - 124:19, 194:23
**determining** [1] - 31:25
**deterrence** [1] - 130:14
**detract** [1] - 149:25
**developed** [2] - 76:5, 202:24
**device** [4] - 32:2, 61:11, 137:22, 160:14
**devise** [2] - 31:7, 126:11
**devised** [1] - 15:8
**DHL** [3] - 16:3, 116:5, 116:6
**DICK** [2] - 2:11, 3:10
**DICKER** [1] - 2:9
**die** [1] - 214:10
**differed** [1] - 65:3
**difference** [10] - 20:11, 20:15, 30:16, 35:16, 54:22, 55:23, 66:14, 80:20, 93:25, 218:5
**differences** [12] - 25:15, 25:19, 25:21, 74:2, 84:19, 84:22, 84:25, 86:1, 130:12, 148:20, 192:17, 194:8
**different** [64] - 10:13, 18:3, 21:21, 31:3, 34:17, 39:17, 44:23, 45:23, 45:24, 46:4, 47:3, 47:4, 50:2, 50:13, 50:15, 60:16, 60:17, 60:18, 63:11, 67:10, 68:25, 69:23, 69:25, 70:13, 72:5, 76:9, 80:22, 88:17, 90:11, 90:16, 93:6, 94:23, 94:24, 95:11, 114:5, 128:7, 138:12, 148:21, 149:4, 149:18, 159:16, 164:18, 166:14, 168:20, 171:6, 171:9, 179:3, 182:24, 186:2, 188:7, 188:8, 188:9, 188:21, 196:4, 197:16, 209:22, 212:16, 217:2, 218:11, 218:13, 218:18
**differential** [1] - 81:16
**differentiate** [3] - 65:11, 86:24, 93:22
**differently** [2] - 94:25, 190:4
**differently-priced** [1] - 94:25

**difficult** [3] - 12:3, 86:5, 109:2

**digits** [1] - 116:5

**dioxide** [1] - 178:11

**Dioxide** [4] - 10:3, 10:4, 10:8, 44:12

**direct** [12] - 16:15, 16:19, 16:25, 17:6, 17:11, 27:8, 52:15, 74:16, 127:5, 153:1, 170:19, 213:16

**directly** [4] - 44:5, 116:2, 155:24, 175:24

**disaggregate** [2] - 113:15, 136:7

**disaggregated** [1] - 199:5

**disaggregating** [1] - 186:24

**disaggregation** [1] - 210:10

**disagree** [4] - 57:4, 111:8, 119:22, 126:23

**disagreed** [2] - 44:18, 44:19

**disassociated** [1] - 117:7

**disavowed** [1] - 143:12

**disconnect** [2] - 99:18, 125:20

**discount** [5] - 23:11, 25:3, 62:4, 177:18, 177:19

**discounted** [1] - 56:5

**discounting** [2] - 24:6, 177:16

**Discovery** [1] - 219:21

**discovery** [1] - 219:21

**discretion** [2] - 102:13, 105:12

**discretionarily** [2] - 102:12, 102:17

**discriminatory** [1] - 105:9

**discuss** [1] - 195:9

**discussed** [10] - 15:12, 23:12, 23:15, 24:3, 29:18, 33:12, 127:15, 178:6, 184:10, 213:14

**discussion** [3] - 14:18, 167:3, 174:16

**dismantling** [1] - 186:25

**dismiss** [1] - 110:22

**dispositive** [1] - 125:13

**disproportionately** [1] - 76:19

**disprove** [1] - 121:9

**dispute** [32] - 9:25, 10:12, 10:17, 11:5, 11:8, 11:14, 11:20, 13:11, 16:9, 22:16, 44:9, 56:17, 62:7, 62:9, 63:2, 63:3, 77:4, 77:16, 78:13, 79:20, 87:16, 106:8, 106:11, 106:12, 109:14, 109:21, 111:21, 122:6, 122:12, 126:16, 132:7, 207:2

**disputed** [1] - 22:18

**disregarded** [1] - 45:6

**dissent** [3] - 131:3, 131:5, 160:22

**dissenting** [2] - 131:1, 161:1

**distills** [1] - 42:16

**distinction** [1] - 158:17

**distinguish** [2] - 215:19, 215:25

**distinguishes** [1] - 173:5

**distorted** [2] - 175:12, 175:21

**distributed** [1] - 126:5

**distribution** [6] - 184:22, 192:25, 193:1, 193:2, 193:4

**district** [5] - 101:4, 102:22, 103:1, 137:20, 158:23

**DISTRICT** [2] - 1:1, 1:1

**District** [7] - 119:4, 124:15, 148:14, 170:22, 170:23, 194:18, 194:19

**diverted** [1] - 20:1

**divide** [4] - 27:22, 47:2, 59:8, 193:12

**divided** [2] - 79:10, 172:15

**dividing** [1] - 93:4

**divorced** [3] - 46:19, 156:25, 173:6

**dixit** [1] - 140:6

**DLA** [1] - 2:20

**doctor** [1] - 80:12

**Doctor** [1] - 79:19

**document** [7] - 8:18, 20:13, 21:5, 55:9, 176:16, 176:17, 197:10

**documentary** [2] - 29:13, 156:14

**documents** [9] - 9:10, 13:8, 26:24, 28:21, 57:2, 77:19, 79:13, 111:4, 182:14

**DOJ** [1] - 15:24

**dollar** [2] - 34:17, 37:1

**dollars** [12] - 6:6, 36:22, 36:25, 37:5, 37:13, 37:15, 37:20, 92:13, 95:7, 126:4, 184:20, 192:2

**dolls** [1] - 114:21

**domain** [8] - 35:15, 36:17, 37:4, 37:7, 38:6, 38:21, 39:5, 39:8

**done** [42] - 4:13, 10:7, 25:7, 41:4, 49:12, 55:25, 59:11, 61:17, 70:4, 71:25, 74:8, 86:10, 86:11, 93:24, 95:20, 107:16, 108:20, 108:24, 113:17, 115:8, 123:17, 124:25, 126:13, 126:14, 127:4, 127:11, 127:13, 127:14, 136:12, 136:13, 138:17, 162:2, 183:5, 183:22, 186:24, 187:6, 202:2, 210:2, 216:15, 217:15

**doomed** [1] - 22:12

**dot** [2] - 115:12, 116:9

**dots** [1] - 115:13

**double** [2] - 82:22, 171:13

**double-spaced** [1] - 171:13

**doubt** [3] - 77:1, 85:4, 134:5

**down** [25] - 5:15, 17:21, 22:25, 24:24, 79:4, 91:17, 109:20, 109:22, 114:12, 115:22, 132:3, 139:7, 139:8, 139:9, 139:10, 147:6, 151:18, 162:24, 170:5, 173:21, 173:22, 186:9, 198:15, 205:20

**downwards** [2] - 125:7, 139:19

**Dr** [335] - 5:25, 6:2, 7:6, 8:4, 8:18, 9:19,

10:8, 10:14, 11:1, 11:11, 11:17, 11:21, 12:20, 14:5, 15:14, 17:8, 17:12, 17:15, 18:1, 18:17, 18:20, 21:24, 22:6, 22:9, 22:18, 25:13, 25:24, 26:7, 26:13, 26:25, 27:4, 27:11, 27:13, 27:16, 27:18, 28:4, 28:22, 28:24, 29:18, 29:23, 29:24, 30:1, 30:10, 30:18, 31:5, 31:9, 31:16, 31:22, 32:4, 32:9, 32:15, 32:19, 33:2, 33:6, 33:9, 33:10, 33:12, 33:15, 33:17, 33:22, 35:11, 35:13, 36:14, 36:18, 36:21, 37:3, 37:6, 37:9, 37:12, 37:24, 38:6, 38:13, 38:15, 38:16, 38:17, 39:7, 39:21, 39:24, 40:2, 40:7, 40:10, 40:15, 41:18, 41:22, 42:1, 42:3, 43:25, 44:8, 44:13, 44:16, 44:19, 44:21, 44:24, 45:3, 45:5, 45:16, 45:21, 46:2, 46:5, 46:6, 46:9, 46:22, 47:14, 47:17, 47:19, 47:22, 47:25, 48:4, 48:5, 48:6, 48:10, 49:7, 49:13, 49:19, 49:23, 50:4, 50:5, 50:21, 51:1, 51:14, 52:22, 52:24, 55:25, 56:6, 56:13, 62:2, 65:7, 65:12, 65:14, 67:10, 67:20, 68:11, 68:12, 68:16, 68:23, 69:15, 70:3, 70:23, 71:18, 72:25, 74:9, 76:5, 76:13, 76:18, 77:5, 77:9, 77:10, 77:20, 78:14, 78:17, 78:18, 78:21, 78:25, 79:23, 81:19, 81:25, 82:18, 82:23, 82:24, 83:1, 84:2, 84:14, 85:5, 85:25, 86:21, 90:21, 91:23, 91:24, 93:1, 93:7, 93:19, 94:20, 95:18, 96:4, 96:16, 96:17, 103:6, 112:15, 112:17, 112:18, 112:19, 113:12, 114:2, 115:4, 115:5,

116:12, 122:23, 123:12, 125:21, 126:2, 126:9, 126:14, 127:25, 135:20, 135:21, 157:10, 157:12, 158:12, 160:5, 161:16, 162:5, 163:6, 163:11, 164:6, 164:15, 164:16, 164:19, 165:1, 166:8, 166:12, 169:10, 170:7, 171:16, 171:24, 172:16, 173:9, 173:19, 175:16, 178:6, 178:22, 179:15, 182:4, 182:24, 183:1, 183:14, 184:18, 185:1, 185:2, 185:12, 186:25, 187:8, 187:9, 187:15, 187:19, 187:25, 188:5, 189:1, 189:13, 191:5, 192:4, 192:5, 192:19, 193:17, 193:21, 194:7, 194:10, 194:12, 194:16, 194:25, 195:2, 195:12, 196:1, 196:3, 196:10, 196:11, 196:15, 196:23, 196:24, 197:16, 197:24, 200:4, 200:8, 202:17, 203:11, 203:20, 204:22, 205:17, 206:14, 206:19, 207:1, 207:13, 208:1, 208:10, 209:19, 209:20, 209:25, 210:3, 210:8, 210:9, 210:12, 210:14, 210:15, 210:22, 211:1, 211:2, 211:4, 211:7, 211:8, 211:10, 211:15, 211:16, 211:21, 212:4, 212:8, 212:10, 212:13, 212:15, 212:17, 212:18, 212:20, 212:23, 212:25, 213:9, 213:10, 213:11, 213:15, 213:22, 213:25,

214:1, 214:3, 214:4, 214:15, 214:21, 215:7, 215:10, 215:11, 215:19, 216:13, 216:20, 216:25, 217:14, 218:2, 218:25, 220:24, 221:22
**DRAM** [9] - 108:13, 108:16, 127:6, 127:8, 127:9, 129:11, 148:8, 152:14, 152:24
**dramatic** [2] - 33:13, 33:14
**dramatically** [5] - 62:8, 86:19, 95:11, 116:16, 139:24
**draw** [3] - 10:13, 11:9, 184:23
**drawing** [1] - 44:17
**drawn** [1] - 89:10
**drew** [4] - 44:16, 71:19, 192:12, 192:19
**drive** [3] - 32:1, 147:11, 160:13
**driven** [4] - 12:1, 204:1, 204:11, 204:12
**driving** [1] - 17:21
**drop** [1] - 192:9
**dropping** [1] - 198:11
**drove** [2] - 119:14, 119:16
**Dubai** [1] - 18:13
**Dublin** [5] - 14:19, 14:22, 15:1, 15:3, 15:17
**duck** [4] - 105:13, 111:25, 112:1, 155:2
**ducked** [1] - 101:2
**ducking** [1] - 100:19
**due** [5] - 38:9, 175:19, 178:7, 203:16, 207:18
**Dukes** [11] - 9:2, 105:7, 110:1, 111:20, 115:19, 134:3, 138:25, 142:1, 148:4, 148:9, 153:16
**Dulles** [3] - 17:5, 17:6, 81:21
**during** [33] - 8:18, 13:20, 14:20, 15:14, 16:15, 19:1, 22:8, 25:1, 25:18, 26:7, 28:5, 30:20, 31:10, 34:3, 34:11, 36:3,

37:23, 38:16, 40:11, 40:14, 51:23, 52:9, 167:11, 175:10, 175:18, 184:10, 189:10, 190:20, 197:22, 210:7, 210:22, 212:1, 212:10
**DYLAN** [1] - 3:15

# E

**e-mail** [2] - 8:8, 55:3
**early** [3] - 51:22, 52:7, 138:6
**easel** [1] - 44:16, 184:23, 192:19
**easier** [1] - 132:22
**East** [3] - 2:10, 2:17, 3:6
**Eastern** [2] - 119:4, 148:14
**EASTERN** [1] - 1:1
**easy** [3] - 22:11, 129:17, 132:12
**econometric** [6] - 31:6, 37:10, 126:10, 190:22, 196:20, 207:8
**econometrically** [3] - 202:16, 202:20, 208:16
**econometricians** [2] - 206:25, 207:12
**econometrics** [8] - 89:5, 104:1, 126:15, 182:10, 193:23, 199:5, 201:19, 218:6
**economic** [21] - 10:1, 11:11, 14:5, 14:14, 16:11, 17:8, 40:11, 71:2, 71:19, 91:10, 99:17, 127:25, 130:22, 156:15, 189:25, 201:17, 202:6, 205:7, 206:1, 211:8, 212:22
**economically** [2] - 183:10, 195:4
**economics** [6] - 102:21, 149:10, 182:10, 203:17, 204:17, 211:1
**economist** [11] - 68:23, 71:20, 91:11, 104:12, 104:15, 108:17, 108:20, 123:13, 127:7, 129:20, 209:21
**economists** [2] -

153:3, 206:25
**EDELMAN** [1] - 2:9
**Edward** [1] - 12:21
**effect** [15] - 28:11, 29:2, 30:13, 30:15, 52:8, 67:11, 93:21, 112:23, 112:24, 174:4, 174:6, 178:24, 210:11, 216:22
**effective** [4] - 11:16, 83:7, 86:11, 188:22
**effectiveness** [3] - 12:25, 16:1, 178:22
**effects** [4] - 34:25, 130:1, 144:12, 211:17
**efficiently** [2] - 42:12, 156:6
**effort** [7] - 13:17, 25:19, 25:20, 26:11, 48:17, 105:7, 134:9
**efforts** [1] - 219:13
**Egypt** [1] - 102:6
**eight** [1] - 194:14
**Eighth** [4] - 2:20, 108:11, 121:3, 152:12
**either** [14] - 11:21, 15:20, 30:24, 45:10, 48:4, 61:21, 93:23, 108:20, 117:21, 159:23, 171:10, 188:3, 211:12, 215:7
**elasticity** [1] - 121:21
**element** [2] - 60:14, 125:22
**elements** [4] - 60:7, 60:20, 61:5, 61:16
**eliminating** [1] - 195:21
**ELIZABETH** [1] - 2:25
**ELLIS** [1] - 2:23
**Elmo** [2] - 96:15, 191:16
**ELMO** [2] - 125:16, 131:22
**ELSER** [1] - 2:9
**elsewhere** [2] - 17:14, 54:20
**embedded** [1] - 214:4
**embraced** [1] - 63:13
**embracing** [1] - 100:18
**Emirates** [1] - 9:15
**emphasis** [1] - 136:17
**emphasize** [1] - 196:5
**emphasized** [1] - 137:18
**emphatic** [1] - 105:13

**Employee** [3] - 29:10, 42:13, 156:8
**employees** [2] - 28:21, 28:22
**employment** [4] - 102:10, 102:12, 105:11, 148:10
**Enabling** [4] - 99:18, 100:6, 110:6, 119:25
**encourage** [2] - 98:19, 139:15
**end** [10] - 54:16, 73:12, 79:7, 95:5, 164:3, 208:14, 215:21, 215:23, 218:23
**endeavor** [1] - 213:12
**endorses** [1] - 200:22
**ends** [1] - 27:4
**enforcement** [1] - 25:15
**engage** [3] - 64:18, 119:11, 146:14
**engaged** [3] - 99:5, 105:9, 211:10
**enlarge** [3] - 61:11, 99:20, 137:22
**enter** [1] - 22:11
**entire** [7] - 7:5, 7:23, 9:3, 19:2, 20:6, 28:11, 102:17
**entirely** [1] - 22:14
**entities** [2] - 80:22, 103:9
**entitled** [11] - 73:2, 110:15, 114:10, 115:10, 115:14, 115:24, 121:14, 123:15, 124:12, 157:21, 158:8
**entity** [1] - 91:14
**entrants** [2] - 22:9, 22:10, 22:11
**entries** [1] - 122:9
**entry** [11] - 22:7, 22:8, 22:14, 50:24, 86:4, 86:5, 86:9, 86:11, 90:7, 179:8
**envelopes** [1] - 12:16
**environment** [1] - 144:5
**environmental** [2] - 147:20, 148:1
**envision** [2] - 215:20, 216:1
**EPDM** [11] - 10:3, 20:11, 22:13, 44:12, 100:13, 109:10, 109:11, 129:16, 141:19, 151:8, 151:9

**EPDN** [1] - 178:11
**equally** [1] - 83:7
**equation** [7] - 69:4, 87:23, 88:2, 88:13, 112:20, 112:22, 203:5
**equations** [1] - 30:3
**equivalent** [1] - 55:11
**erode** [1] - 78:23
**error** [4] - 116:20, 189:24, 191:24, 217:19
**errors** [5] - 50:24, 116:3, 150:18
**escape** [3] - 34:22, 35:2, 40:1
**especially** [1] - 78:4
**especially/when** [1] - 80:3
**ESQ** [25] - 1:16, 1:19, 1:19, 1:23, 2:3, 2:3, 2:4, 2:7, 2:8, 2:11, 2:11, 2:14, 2:15, 2:15, 2:18, 2:21, 2:24, 2:25, 3:3, 3:7, 3:13, 3:14, 3:14, 3:15, 3:15
**essentially** [5] - 107:6, 183:11, 184:7, 195:21, 216:21
**establish** [8] - 6:24, 35:23, 42:19, 42:23, 61:5, 135:18, 173:11, 213:3
**established** [3] - 6:1, 31:13, 61:15
**establishing** [1] - 128:4
**estates** [2] - 109:21, 117:3
**estimate** [18] - 31:17, 37:8, 49:25, 50:1, 66:23, 68:25, 87:24, 87:25, 94:9, 99:12, 124:16, 161:18, 162:4, 162:5, 163:2, 207:16
**estimated** [1] - 124:15
**estimates** [3] - 38:2, 98:4, 162:14
**estimating** [3] - 57:7, 93:9, 99:23
**EU** [3] - 146:9, 146:10, 146:11
**Europe** [3] - 6:8, 68:19, 75:2
**European** [2] - 17:10, 21:1
**EVA** [1] - 2:23
**evades** [1] - 104:15

**evaluate** [2] - 141:6, 210:11
**evaluated** [1] - 124:18
**evaluating** [2] - 121:15, 201:3
**evaluation** [1] - 100:19
**event** [13] - 123:1, 127:24, 127:25, 130:21, 130:22, 149:5, 149:6, 149:14, 149:15, 149:16, 149:17, 213:19, 218:25
**events** [6] - 69:24, 95:2, 149:1, 149:3, 149:7, 149:13
**everywhere** [9] - 74:9, 74:12, 75:2, 85:11, 86:20, 102:5, 109:13, 144:12, 146:15
**evidence** [114] - 5:11, 5:20, 5:21, 5:23, 6:1, 6:15, 7:3, 7:13, 8:5, 8:16, 10:15, 10:21, 10:23, 21:8, 22:21, 23:6, 23:7, 23:10, 28:20, 28:25, 29:8, 29:13, 29:17, 30:4, 39:21, 42:18, 42:22, 43:8, 43:12, 44:11, 45:10, 45:11, 56:4, 57:5, 57:15, 60:10, 60:12, 61:17, 63:16, 63:25, 64:14, 64:23, 65:1, 65:3, 65:19, 71:7, 72:6, 73:23, 73:25, 74:20, 75:23, 78:25, 81:2, 81:9, 81:13, 81:20, 83:6, 83:23, 85:11, 85:14, 92:22, 93:1, 105:10, 110:24, 111:6, 111:7, 111:9, 113:11, 119:7, 121:11, 121:12, 127:20, 135:1, 137:11, 138:21, 140:5, 140:25, 144:5, 144:8, 155:4, 155:8, 155:14, 156:12, 156:14, 156:16, 156:21, 157:9, 157:14, 168:2, 170:4, 172:7, 172:9, 172:25, 173:7, 173:23, 175:4, 175:6, 176:20, 177:15,
177:16, 178:17, 179:12, 180:17, 180:13, 180:16, 181:23, 182:1, 182:3, 190:2, 190:13, 213:5, 214:20, 216:19
**evidentiary** [6] - 5:11, 11:14, 13:8, 30:20, 40:14, 200:11
**evil** [3] - 5:16, 5:17
**ex** [1] - 54:15
**Ex** [3] - 12:7, 12:19, 13:2
**exact** [5] - 104:13, 131:13, 202:2, 207:17, 207:21
**exactly** [21] - 20:24, 22:20, 23:1, 27:1, 31:11, 38:3, 53:8, 57:17, 104:10, 113:16, 123:11, 136:11, 154:16, 162:1, 178:12, 199:1, 201:8, 207:12, 214:8, 219:6
**examination** [11] - 8:18, 15:14, 16:15, 16:18, 27:8, 27:16, 29:21, 35:11, 37:24, 94:20, 188:13
**examine** [8] - 18:7, 110:16, 151:22, 169:11, 173:8, 184:13, 201:1, 212:2
**examined** [4] - 52:21, 150:17, 169:10, 187:20
**example** [31] - 7:1, 13:14, 15:3, 23:25, 24:9, 24:11, 25:7, 33:6, 46:14, 47:20, 53:10, 63:22, 64:3, 78:9, 83:12, 83:15, 83:19, 92:7, 95:2, 108:16, 108:17, 141:19, 153:9, 174:14, 175:15, 175:19, 176:24, 179:17, 184:17, 187:12, 210:5
**examples** [10] - 23:9, 79:11, 79:12, 79:19, 149:18, 167:19, 168:12, 168:22, 177:20, 178:1
**Except** [1] - 74:3
**except** [2] - 64:8, 64:18
**exception** [3] - 24:8,
25:9, 93:1
**exceptions** [5] - 25:14, 40:22, 40:23, 41:1, 41:3
**excerpt** [1] - 55:17
**excerpts** [3] - 110:22, 176:1, 176:2
**excess** [8] - 84:3, 84:10, 84:11, 186:7, 188:8, 188:14, 189:15, 197:1
**exchange** [1] - 127:16
**excludable** [5] - 183:23, 187:13, 191:25, 196:21, 199:11
**exclude** [10] - 35:1, 43:1, 45:22, 46:8, 71:7, 174:2, 175:21, 181:23, 182:3, 182:19
**excluded** [6] - 45:21, 182:11, 185:5, 193:14, 207:11, 219:9
**excludes** [2] - 115:9, 158:6
**excluding** [2] - 115:11, 182:13
**exclusion** [1] - 200:22
**exclusive** [1] - 118:3
**excuse** [4] - 183:1, 191:13, 199:4, 217:17
**Excuse** [1] - 204:18
**executives** [1] - 9:8
**exercise** [1] - 12:1
**Exhaust** [4] - 147:18, 147:25, 171:8, 171:13
**exhibit** [2] - 192:21, 220:9
**Exhibit** [59] - 5:5, 6:10, 6:20, 8:19, 9:13, 9:14, 9:15, 9:17, 9:18, 11:6, 11:21, 11:25, 12:23, 13:5, 17:12, 18:11, 20:14, 20:21, 23:17, 23:21, 24:5, 25:25, 26:17, 27:4, 27:7, 27:13, 27:17, 28:9, 35:13, 35:14, 38:1, 44:18, 53:22, 54:1, 54:19, 54:25, 55:3, 55:9, 72:15, 110:23, 110:24, 111:1, 111:6, 177:14, 177:20, 192:11, 193:7, 193:16,
193:19, 195:24, 201:16, 221:19, 223:5, 223:6, 223:7, 223:8, 223:9
**exhibits** [7] - 6:10, 51:13, 110:21, 144:23, 146:7, 221:3
**EXHIBITS** [1] - 223:3
**Exhibits** [1] - 197:15
**exist** [3] - 20:17, 118:5, 161:12
**existed** [2] - 56:3, 132:5
**existence** [3] - 12:24, 29:2, 60:13
**existing** [2] - 140:5, 180:7
**exists** [1] - 118:8
**exit** [5] - 145:20, 145:21, 145:22, 146:19
**expand** [1] - 72:10
**expect** [8] - 41:14, 50:24, 51:9, 84:1, 89:8, 90:5, 198:19, 219:6
**expected** [10] - 80:15, 89:25, 122:15, 122:22, 122:23, 149:24, 150:14, 183:11
**expecting** [1] - 198:13
**expects** [1] - 183:25
**experience** [3] - 131:8, 148:19, 216:14
**expert** [39] - 10:8, 11:2, 45:2, 46:18, 49:8, 57:3, 57:15, 62:18, 63:19, 67:21, 68:4, 69:14, 70:10, 71:11, 71:12, 86:4, 112:16, 112:17, 113:10, 113:13, 113:17, 135:21, 136:5, 140:1, 140:18, 140:19, 153:11, 159:11, 159:14, 164:7, 171:10, 171:13, 172:24, 173:2, 186:2, 200:23, 205:8, 210:8, 210:19
**expert's** [3] - 46:21, 162:12, 173:1
**experts** [36] - 10:13, 11:9, 11:14, 20:5, 43:1, 47:18, 64:8, 64:16, 67:16, 68:6, 69:13, 77:2, 82:13,
140:11, 151:5, 153:12, 173:5, 173:6, 173:17, 173:24, 184:3, 184:4, 184:6, 184:8, 184:13, 184:15, 185:15, 186:11, 194:20, 196:20, 200:18, 205:4, 210:12, 213:25, 214:24, 217:16
**experts'** [2] - 182:19, 194:24
**explain** [7] - 44:25, 66:7, 66:14, 69:15, 203:6, 203:10, 213:11
**explained** [32] - 9:19, 17:8, 22:6, 22:9, 26:13, 28:5, 29:12, 31:5, 33:6, 33:9, 37:3, 39:24, 44:16, 45:1, 47:17, 47:19, 47:20, 51:1, 134:16, 161:8, 163:11, 175:18, 197:7, 211:16, 212:10, 212:22, 212:23, 213:10, 213:16, 214:3
**explaining** [1] - 191:8
**explanation** [2] - 84:23, 157:10
**explanations** [2] - 136:16, 143:25
**explanatory** [1] - 134:15
**exposing** [1] - 177:9
**expression** [2] - 120:6, 121:4
**expressions** [1] - 116:23
**expressly** [1] - 143:12
**extensive** [3] - 29:13, 168:2, 180:13
**extensively** [1] - 205:2
**extent** [6] - 63:3, 81:14, 161:8, 162:21, 177:24, 212:4
**extra** [1] - 171:22
**extract** [1] - 60:23
**extremely** [2] - 50:23, 210:16
**eye** [1] - 169:24
**Eye** [1] - 3:12
**eyes** [2] - 73:15, 196:13

**F**

**F.3d** [4] - 43:23, 99:2, 99:10, 154:14
**face** [1] - 217:2
**facilitate** [1] - 11:13
**facilitated** [4] - 5:25, 9:20, 21:6, 22:5
**fact** [78] - 10:15, 15:21, 23:10, 25:18, 26:6, 31:18, 37:6, 42:22, 43:5, 56:18, 60:24, 61:20, 63:4, 63:9, 66:2, 69:7, 69:16, 72:4, 74:14, 77:14, 78:8, 78:12, 78:16, 79:11, 79:17, 79:18, 80:11, 81:25, 82:2, 82:17, 84:7, 84:15, 84:24, 85:14, 86:10, 89:13, 89:25, 97:13, 118:2, 118:7, 118:9, 119:9, 124:11, 125:9, 125:23, 126:18, 128:4, 128:19, 129:23, 133:13, 134:2, 141:2, 141:7, 141:12, 142:15, 143:6, 143:7, 144:22, 147:15, 149:25, 157:21, 161:25, 171:3, 172:1, 174:3, 180:19, 182:2, 185:5, 189:23, 191:19, 200:13, 201:10, 202:4, 205:6, 205:7, 208:21, 212:12, 212:13
**factor** [7] - 9:12, 21:23, 21:24, 82:14, 179:21, 208:1, 208:20
**factors** [33] - 5:24, 9:22, 10:1, 10:6, 10:11, 10:14, 10:18, 10:20, 10:21, 21:6, 22:5, 47:18, 47:21, 48:1, 66:4, 81:13, 150:22, 151:6, 163:8, 172:1, 178:6, 178:9, 178:16, 178:19, 179:14, 179:17, 179:19, 188:21, 189:16, 189:19, 196:16, 203:9, 216:6
**facts** [16] - 11:10,

46:19, 47:13, 48:21, 140:2, 146:16, 154:19, 157:1, 172:6, 173:1, 173:7, 173:24, 185:3, 185:6, 217:25
**factual** [2] - 11:8, 113:11
**fail** [1] - 25:17
**failed** [4] - 60:5, 139:24, 163:23, 200:20
**fails** [2] - 199:20, 200:15
**failure** [4] - 19:24, 22:12, 28:7, 178:3
**Fair** [2] - 7:18, 23:14
**fairly** [3] - 42:12, 154:4, 156:5
**faith** [1] - 74:11
**fall** [1] - 126:5
**falls** [1] - 135:17
**false** [19] - 48:12, 48:16, 48:17, 48:22, 50:19, 67:13, 67:22, 94:5, 103:22, 116:22, 118:13, 145:23, 150:23, 172:17, 174:20, 190:17, 197:8, 218:20, 218:21
**FALTISCHEK** [1] - 3:5
**famous** [3] - 130:19, 131:5, 140:1
**far** [4] - 73:10, 119:3, 135:17, 158:17
**fares** [2] - 22:3, 22:4
**fast** [3] - 19:13, 19:14, 20:20
**fatal** [3] - 63:10, 146:22, 147:1
**fatally** [1] - 143:13
**fault** [1] - 187:10
**faults** [1] - 91:2
**faulty** [2] - 184:8, 200:15
**favor** [3] - 42:9, 155:21, 156:3
**favorite** [2] - 13:3, 24:9
**feasible** [2] - 43:24, 86:3
**features** [1] - 81:18
**February** [2] - 6:19, 220:1
**Fed** [3] - 12:7, 12:19, 13:2
**Federal** [1] - 99:19
**Fee** [1] - 170:21
**fee** [3] - 171:14,

171:15, 171:20
**few** [13] - 29:11, 42:13, 72:14, 83:18, 90:14, 113:22, 124:17, 130:6, 138:2, 159:18, 167:22, 214:6
**fewer** [3] - 166:20, 166:22, 213:23
**field** [4] - 53:14, 53:15, 79:21, 210:25
**fields** [1] - 149:18
**Fifth** [2] - 147:21, 147:23
**figure** [8] - 98:24, 99:14, 102:24, 119:24, 128:18, 162:1, 163:10, 196:11
**figured** [1] - 199:16
**figures** [2] - 11:6, 12:19
**filed** [2] - 68:10, 171:13
**fill** [2] - 17:17, 91:16
**filling** [2] - 17:16, 17:19
**final** [1] - 138:1
**finally** [3] - 6:1, 67:6, 119:2
**Finally** [5] - 80:19, 93:13, 194:3, 207:5, 207:24
**findings** [2] - 10:25, 49:1
**fine** [5] - 7:21, 15:17, 52:19, 52:20, 221:20
**fined** [1] - 7:19
**fines** [4] - 6:7, 9:7, 28:16, 177:10
**finish** [1] - 138:6
**finished** [3] - 129:21, 130:4, 130:5
**firm** [2] - 217:3, 217:4
**first** [35] - 4:15, 5:21, 6:4, 12:10, 24:13, 37:16, 60:9, 63:12, 71:11, 71:12, 72:4, 74:3, 76:24, 78:17, 81:7, 84:17, 86:23, 102:2, 103:22, 108:7, 115:6, 115:7, 123:16, 127:23, 130:20, 145:20, 146:19, 146:20, 165:16, 167:5, 169:23, 175:17, 192:12, 214:23, 217:13
**First** [5] - 133:1,

133:6, 195:10, 202:15, 217:15
**FISHBEIN** [1] - 2:1
**fit** [5] - 127:19, 173:1, 196:21, 198:16, 217:25
**Fit** [1] - 198:18
**five** [17] - 25:1, 54:19, 54:21, 59:24, 71:11, 71:12, 103:19, 106:23, 123:6, 146:2, 151:12, 169:2, 169:3, 181:12, 190:4, 193:22, 198:20
**fix** [1] - 6:14, 8:9, 8:17, 18:22, 22:20, 22:23, 73:19, 107:10, 107:22, 177:9, 200:7
**fixed** [18] - 22:17, 78:24, 94:19, 95:12, 108:12, 108:19, 108:23, 109:10, 109:12, 129:14, 129:16, 132:6, 132:10, 150:6, 151:9, 152:10, 153:1, 174:10
**fixing** [13] - 6:6, 36:5, 36:7, 39:2, 73:16, 107:8, 107:9, 108:2, 154:21, 162:6, 168:5, 174:17, 179:24
**flatly** [2] - 101:10, 122:5
**flaw** [2] - 207:17, 207:22
**flawed** [3] - 143:13, 200:15, 200:20
**flaws** [1] - 207:14
**flight** [3] - 16:24, 17:6, 216:3
**flights** [3] - 14:9, 16:19, 16:25
**flip** [1] - 96:15
**Floor** [2] - 1:18, 3:6
**Florida** [5] - 114:2, 114:3, 114:5, 148:22, 148:24
**flow** [7] - 115:2, 128:9, 133:13, 133:18, 133:20, 135:12, 139:22
**flowing** [2] - 43:18, 128:6
**flown** [3] - 16:19, 16:21, 216:3
**flows** [2] - 43:6, 60:25

**flukish** [1] - 83:18
**flush** [1] - 32:25
**flying** [4] - 17:22, 33:9, 163:17, 163:22
**focus** [2] - 13:13, 59:20
**focused** [2] - 12:16, 60:6
**focuses** [1] - 112:23
**focusing** [2] - 97:3, 121:2
**folks** [2] - 192:6, 215:6
**follow** [2] - 111:5, 184:3
**followed** [1] - 143:23
**Following** [1] - 63:1
**following** [1] - 54:4
**Food** [1] - 43:23
**foot** [2] - 131:6
**footnote** [3] - 140:9, 171:4, 185:13
**force** [1] - 48:18
**forced** [1] - 66:3
**foreign** [3] - 7:17, 73:24, 74:1
**Forget** [1] - 96:17
**forget** [2] - 220:14, 220:25
**forgone** [1] - 199:2
**forgotten** [1] - 59:23
**form** [6] - 10:7, 89:4, 112:19, 112:22, 139:15
**formal** [2] - 31:6, 126:10
**formed** [1] - 212:21
**former** [1] - 28:21
**formula** [13] - 31:7, 36:21, 36:23, 38:15, 38:18, 47:19, 65:8, 97:16, 116:15, 126:11, 184:18, 185:2
**formulas** [1] - 62:4
**formulation** [1] - 35:4
**forsaking** [1] - 13:6
**forth** [2] - 124:9, 132:3
**Forty** [1] - 76:4
**forward** [1] - 42:21
**forwarders** [1] - 22:2
**four** [34] - 13:15, 13:18, 13:22, 64:4, 64:14, 68:21, 73:8, 73:9, 75:25, 81:3, 89:16, 100:24, 104:3, 104:4, 110:17, 118:19, 119:19, 120:3, 120:23, 123:22, 123:24, 125:12,

135:8, 138:16, 146:1, 148:8, 148:15, 151:12, 164:3, 180:2, 215:16, 217:18, 221:15
**fourth** [1] - 134:20
**FOX** [1] - 1:17
**Fox** [1] - 181:21
**fraction** [5] - 92:22, 145:8, 145:10, 198:25, 199:2
**fragile** [1] - 149:11
**frames** [1] - 203:13
**France** [5] - 16:21, 80:1, 175:16, 175:20
**FRANK** [1] - 2:18
**Frankfurt** [1] - 16:20
**frankly** [5] - 60:18, 112:2, 114:10, 121:22, 139:24
**fraud** [1] - 154:13
**Frederick** [1] - 182:4
**free** [2] - 93:15, 107:10
**Freedman** [1] - 49:12
**Freedman's** [1] - 49:1
**Freeland** [2] - 113:9, 136:13
**freezing** [1] - 131:6
**Freight** [21] - 42:15, 48:15, 48:19, 48:23, 111:23, 112:16, 117:16, 120:5, 121:5, 123:12, 132:14, 142:1, 150:24, 151:2, 156:9, 157:17, 158:18, 159:4, 174:14, 174:16
**freight** [11] - 19:15, 20:15, 20:16, 20:17, 20:18, 20:21, 20:22, 83:22, 215:20, 215:25, 216:5
**French** [3] - 114:14, 114:16, 114:17
**frequently** [1] - 113:5
**Friday** [1] - 30:23
**Friedman** [3] - 48:24, 174:16, 175:2
**front** [3] - 37:2, 110:21, 111:4
**Fructose** [1] - 22:19
**FTNS** [1] - 92:19
**FTS** [3] - 13:1, 35:19, 52:22
**fuel** [72] - 8:20, 9:14, 9:17, 12:1, 12:4, 15:8, 23:16, 23:23,

27:6, 27:8, 51:10, 51:22, 51:23, 52:4, 52:24, 53:9, 53:14, 53:21, 53:24, 54:6, 54:14, 54:19, 54:25, 55:21, 73:15, 73:16, 73:20, 74:5, 93:17, 93:20, 93:22, 94:3, 94:13, 94:14, 106:7, 106:9, 106:12, 106:15, 106:20, 111:10, 114:22, 114:23, 114:25, 115:1, 120:7, 122:19, 127:2, 127:3, 127:23, 132:2, 132:6, 132:9, 133:17, 137:10, 138:9, 138:10, 138:12, 145:7, 146:22, 150:1, 150:2, 150:9, 150:14, 167:20, 167:22, 168:1, 168:7, 168:9, 190:6, 197:8, 197:9
**fulfill** [1] - 21:16
**fulfilling** [1] - 208:23
**full** [3] - 37:25, 74:4, 190:24
**fully** [1] - 184:11
**function** [1] - 187:3
**Fund** [2] - 170:22, 174:13
**fundamental** [4] - 182:8, 188:6, 207:22, 212:14
**fungible** [5] - 22:24, 25:6, 79:5, 79:7, 109:17
**funnel** [3] - 193:2, 193:3
**funnel-shaped** [2] - 193:2
**fuss** [1] - 41:9

## G

**gag** [1] - 200:18
**game** [1] - 91:17
**games** [2] - 119:11, 122:15
**gaps** [1] - 73:3
**GARY** [1] - 1:19
**gate** [1] - 103:6
**gather** [1] - 181:19
**gears** [1] - 181:13
**gee** [1] - 97:11
**general** [6] - 13:4, 13:6, 88:17, 129:12,

130:13, 137:5
**generalities** [1] - 61:19
**generally** [6] - 17:11, 75:24, 120:15, 151:7, 211:7, 212:25
**generate** [5] - 88:2, 88:9, 94:21, 117:15, 145:25
**generated** [1] - 208:2
**generates** [2] - 94:24, 212:8
**generating** [2] - 117:18, 135:4
**genetically** [1] - 171:2
**gentleman** [1] - 150:16
**geographic** [4] - 74:6, 77:13, 113:23, 148:21
**George** [1] - 15:22
**Germany** [1] - 26:19
**get-go** [2] - 67:15, 139:9
**gingerly** [1] - 21:17
**given** [5] - 21:15, 34:20, 61:18, 69:23, 191:19
**glad** [1] - 67:21
**glance** [1] - 175:17
**Gleeson** [1] - 161:6
**global** [88] - 5:22, 6:14, 7:7, 9:9, 19:2, 29:24, 30:1, 30:12, 32:5, 32:8, 32:13, 32:19, 33:15, 33:19, 39:16, 49:16, 64:6, 64:17, 64:19, 65:11, 66:12, 66:20, 66:22, 67:4, 68:24, 70:8, 70:9, 72:18, 72:21, 73:6, 74:10, 74:11, 77:9, 77:11, 77:15, 78:2, 78:21, 82:4, 82:6, 82:15, 82:24, 83:1, 83:4, 84:2, 84:4, 86:3, 86:21, 87:5, 90:13, 90:19, 90:24, 91:1, 92:3, 92:4, 93:11, 104:4, 110:13, 144:15, 145:6, 146:6, 161:17, 163:7, 165:5, 165:14, 166:8, 168:4, 169:19, 174:4, 180:15, 189:12, 198:13, 198:18, 198:23, 198:24, 198:25, 202:16,

202:21, 204:8, 204:9, 207:15, 211:16, 219:6
**Global** [1] - 202:23
**globally** [5] - 30:9, 63:24, 64:16, 70:13, 169:20
**globe** [1] - 7:23
**glorified** [1] - 139:15
**goal** [4] - 55:13, 144:11, 170:14, 194:21
**God** [1] - 113:7
**Godfather** [1] - 201:18
**going-in** [1] - 115:8
**Gonzales** [1] - 15:22
**goods** [1] - 83:23
**goofed** [1] - 71:3
**government** [7] - 6:21, 8:24, 47:11, 60:22, 61:2, 72:9, 168:19
**Government** [1] - 15:9
**governmental** [3] - 6:8, 55:1, 61:3
**GPU** [6] - 104:11, 113:12, 136:12, 139:16, 202:3, 210:6
**grade** [2] - 103:19, 106:23
**graft** [1] - 193:21
**grafts** [5] - 192:12, 192:19, 192:24, 193:7, 193:9
**grant** [5] - 5:13, 57:24, 64:11, 70:12, 90:2
**granted** [6] - 10:9, 44:12, 108:14, 151:7, 154:21
**granting** [2] - 99:3, 102:14
**Graphics** [2] - 136:4, 210:6
**GRAY** [1] - 2:5
**Gray** [1] - 209:17
**great** [6] - 9:6, 56:24, 121:4, 135:9, 138:22, 190:20
**greater** [1] - 40:9
**green** [1] - 147:1
**Greg** [1] - 181:21
**GREGORY** [1] - 1:19
**grid** [1] - 111:4
**gross** [2] - 99:23, 103:9
**ground** [1] - 141:14
**group** [2] - 49:4, 133:19
**Group** [1] - 139:25
**grouping** [1] - 149:4
**groups** [1] - 157:24

**guarantee** [1] - 204:13
**guaranteed** [3] - 45:24, 183:12, 183:13
**guess** [8] - 71:7, 73:2, 131:21, 216:2, 219:20, 219:23, 220:8, 220:19
**guide** [1] - 140:1
**guilty** [8] - 6:5, 6:20, 15:23, 15:25, 73:2, 180:12, 180:20, 180:25
**guts** [2] - 67:25, 118:10
**guy** [1] - 109:15

## H

**Haack** [3] - 19:25, 79:16, 176:13
**Haack's** [1] - 175:25
**half** [7] - 4:11, 44:3, 72:24, 93:2, 135:15, 135:16, 172:19
**hall** [2] - 61:13, 128:17
**halves** [1] - 84:3
**HAMMACK** [1] - 3:14
**hand** [2] - 64:19, 111:13
**Handing** [1] - 59:14
**hands** [2] - 71:23, 102:23
**handset** [1] - 132:24
**happy** [1] - 52:17
**hard** [9] - 34:21, 101:23, 112:6, 129:12, 142:2, 178:14, 202:3, 215:20, 216:1
**hard-pressed** [1] - 34:21
**harm** [9] - 43:6, 47:12, 97:18, 99:17, 105:25, 123:23, 147:9, 170:14, 173:3
**harmed** [2] - 91:7, 97:17
**harmful** [2] - 127:24, 130:21
**harms** [1] - 43:24
**HARVEY** [1] - 2:7
**HASTINGS** [1] - 2:17
**hate** [1] - 108:4
**haul** [1] - 217:20
**Hausfeld** [1] - 5:2
**HAUSFELD** [1] - 1:14
**head** [4] - 106:16, 124:24, 184:17, 185:12

**headache** [1] - 146:7
**header** [1] - 124:22
**hear** [15] - 5:16, 32:17, 36:23, 45:19, 47:25, 60:1, 60:9, 71:8, 71:12, 105:19, 105:20, 118:18, 118:20, 179:12, 200:21
**heard** [64] - 24:10, 30:10, 33:1, 33:21, 60:20, 62:2, 62:22, 63:10, 67:14, 77:19, 78:24, 79:5, 80:9, 81:3, 82:7, 83:12, 85:12, 88:13, 89:21, 90:8, 91:22, 92:20, 92:23, 93:18, 93:19, 100:2, 100:11, 103:5, 103:21, 103:22, 112:9, 112:10, 114:15, 115:18, 116:11, 116:14, 117:20, 128:16, 131:22, 131:23, 134:15, 135:2, 140:7, 144:13, 149:23, 161:24, 164:11, 175:10, 176:19, 178:18, 182:17, 188:9, 190:10, 190:15, 191:2, 192:5, 197:20, 197:21, 199:21, 204:4, 205:3, 205:11, 205:19, 216:19
**hearing** [43] - 4:2, 5:11, 6:12, 7:8, 11:15, 13:9, 28:9, 30:20, 40:14, 41:9, 46:5, 59:21, 63:14, 68:8, 71:2, 71:10, 77:6, 77:19, 82:18, 86:25, 91:9, 92:1, 109:6, 116:19, 122:8, 125:8, 125:21, 132:18, 167:3, 168:3, 175:4, 175:11, 175:18, 180:13, 184:10, 189:10, 197:22, 200:11, 212:1, 214:20, 215:10, 215:18, 216:25
**hearings** [2] - 135:23, 161:11
**hearsay** [1] - 176:20
**heart** [3] - 32:2, 96:23,

160:14
**Heathrow** [1] - 17:6
**heavy** [2] - 76:19, 121:22
**heck** [1] - 132:21
**hedonic** [4] - 108:21, 108:22, 152:25, 153:5
**Heitmann** [1] - 18:25
**held** [1] - 152:9
**help** [4] - 19:12, 92:16, 125:17, 188:2
**helpful** [3] - 210:16, 210:19, 210:23
**helping** [1] - 106:23
**Hernandez** [1] - 12:21
**hews** [1] - 111:24
**hide** [1] - 112:24
**hides** [1] - 113:19
**hiding** [2] - 32:11, 32:24
**high** [6] - 22:15, 22:17, 24:19, 27:23, 56:11, 75:15
**High** [6] - 22:19, 29:10, 42:13, 156:7, 173:4, 216:7
**High-Tech** [4] - 29:10, 42:13, 156:7, 173:4
**higher** [10] - 24:21, 55:19, 56:8, 75:24, 169:6, 169:7, 170:14, 171:23, 172:1, 176:12
**highest** [1] - 80:4
**highlight** [1] - 219:4
**highly** [4] - 29:25, 30:1, 151:10, 163:7
**himself** [2] - 114:20, 213:22
**hit** [4] - 109:20, 109:22, 128:8, 134:12
**hoc** [1] - 23:22
**hold** [4] - 11:1, 17:20, 28:8, 214:4
**holding** [1] - 136:13
**Holdings** [1] - 2:6
**hole** [1] - 48:18
**holes** [1] - 68:7
**holistic** [1] - 29:14
**holistically** [3] - 156:13, 156:14, 157:1
**HOLLIS** [1] - 1:23
**home** [1] - 93:15
**honest** [1] - 193:23
**Hong** [9] - 7:19, 7:22, 7:23, 7:24, 7:25, 8:20, 18:13, 68:19,

75:14
**Honor** [210] - 4:7, 4:11, 4:17, 5:1, 5:3, 5:10, 5:13, 6:11, 8:11, 11:22, 12:19, 13:1, 14:2, 14:18, 15:2, 15:21, 16:3, 16:14, 17:23, 22:16, 23:6, 23:7, 23:25, 24:10, 25:18, 26:1, 26:11, 27:17, 28:2, 29:5, 29:18, 30:10, 30:16, 31:23, 32:17, 33:1, 33:21, 34:7, 35:10, 36:17, 37:14, 37:23, 38:8, 39:7, 39:24, 41:23, 43:10, 44:15, 45:1, 45:19, 51:2, 51:15, 55:16, 56:17, 57:23, 58:6, 59:4, 74:7, 98:12, 98:14, 98:22, 98:25, 100:8, 100:12, 100:22, 101:20, 102:22, 104:22, 105:4, 105:12, 106:19, 107:18, 108:15, 108:25, 109:2, 109:19, 110:6, 110:15, 110:19, 110:23, 111:11, 111:14, 111:24, 113:6, 115:4, 115:17, 116:21, 116:24, 121:4, 122:7, 124:6, 124:23, 125:15, 125:19, 127:16, 129:1, 129:11, 130:4, 130:7, 131:10, 131:20, 132:16, 137:9, 137:21, 138:6, 140:4, 141:4, 141:10, 141:13, 142:6, 142:18, 142:22, 144:3, 145:9, 146:4, 150:20, 151:18, 151:24, 152:19, 153:6, 153:9, 153:14, 154:3, 154:9, 155:1, 155:17, 156:7, 156:23, 157:8, 158:11, 160:9, 161:5, 162:8, 165:2, 165:16, 165:23, 167:2, 167:18, 171:9, 174:8, 175:10, 177:25,

180:11, 181:1, 181:9, 181:11, 181:18, 181:20, 182:2, 182:14, 182:18, 183:13, 184:10, 185:3, 185:17, 186:23, 190:10, 191:2, 192:16, 194:25, 195:17, 196:1, 196:11, 196:21, 198:17, 199:17, 199:20, 200:1, 200:14, 200:19, 201:7, 201:8, 201:14, 201:18, 201:23, 201:25, 202:13, 203:19, 204:15, 204:16, 204:20, 204:24, 205:12, 205:14, 205:15, 206:7, 206:19, 206:21, 207:5, 207:24, 208:9, 208:12, 208:14, 208:22, 209:4, 209:15, 209:16, 209:24, 210:5, 210:15, 214:14, 217:9, 219:14, 219:15, 220:16, 220:23, 221:8, 221:12, 222:1
**Honor's** [1] - 188:2
**HONORABLE** [1] - 1:12
**hope** [2] - 67:20, 98:15
**Hope** [1] - 2:23
**hopefully** [2] - 105:19, 125:17
**hoping** [1] - 172:22
**host** [2] - 78:1, 194:3
**HOSTETLER** [1] - 3:1
**hours** [1] - 4:11
**housekeeping** [1] - 221:25
**HOWARD** [2] - 2:3, 2:14
**hub** [1] - 216:3
**huge** [3] - 20:15, 28:16, 181:25
**Hun** [1] - 109:1
**hundred** [10] - 68:20, 97:14, 104:23, 126:4, 127:9, 187:24, 191:4, 198:20, 205:8, 213:23
**hundreds** [5] - 88:10,

92:13, 109:13, 122:9, 143:20
**hundredth** [1] - 34:12
**hurdle** [1] - 55:12
**hurt** [4] - 69:1, 71:16, 80:17, 98:3
**hypotheses** [2] - 103:21, 212:21
**hypothesis** [9] - 74:8, 89:8, 104:1, 119:17, 122:4, 137:5, 183:20, 211:23
**hypothetical** [6] - 22:24, 23:2, 23:3, 23:5, 118:9
**hypothetically** [1] - 143:4

---

**I**

**Ian** [1] - 98:12
**IAN** [1] - 3:13
**IATA** [1] - 15:7
**iceberg** [3] - 109:20, 109:22, 134:12
**idea** [5] - 18:2, 83:18, 93:7, 144:1, 206:4
**identical** [9] - 6:23, 15:15, 31:13, 32:3, 50:10, 160:15, 192:9, 195:12, 195:13
**identification** [4] - 5:5, 18:15, 220:9, 221:5
**identified** [3] - 5:25, 15:19, 176:11
**identifies** [1] - 131:17
**identify** [4] - 87:7, 87:11, 87:12, 87:13
**idiosyncratic** [2] - 47:21, 179:17
**iffy** [1] - 185:14
**ignore** [5] - 46:18, 81:13, 84:24, 169:4, 197:17
**ignores** [2] - 52:7, 217:22
**ignoring** [1] - 188:6
**illegal** [9] - 57:20, 106:5, 106:7, 106:13, 114:25, 132:8, 133:18, 150:2, 181:8
**Illinois** [3] - 113:23, 124:15, 124:18
**Illston** [2] - 153:10, 153:12
**illusion** [1] - 196:12
**imagine** [2] - 74:23, 91:13

**immediately** [1] - 27:3
**immune** [2] - 8:22, 34:25
**impact** [133] - 6:3, 10:12, 11:3, 23:1, 26:4, 26:6, 30:17, 31:7, 31:19, 31:25, 32:6, 32:8, 33:5, 34:22, 35:3, 35:23, 36:1, 36:2, 36:4, 36:10, 36:15, 36:25, 37:8, 37:18, 38:5, 38:11, 38:14, 38:19, 39:15, 41:16, 41:23, 42:19, 42:23, 43:5, 43:9, 43:13, 43:17, 47:9, 48:9, 49:18, 49:20, 49:21, 50:6, 50:14, 52:6, 53:2, 57:2, 60:15, 60:24, 63:14, 63:22, 67:9, 73:5, 76:17, 81:3, 81:10, 81:14, 82:22, 91:22, 95:18, 96:7, 96:24, 97:2, 100:4, 100:20, 100:24, 101:6, 104:23, 105:16, 113:1, 116:1, 119:8, 119:21, 120:1, 121:2, 124:8, 124:9, 124:11, 124:21, 125:23, 126:5, 126:10, 126:18, 127:25, 130:22, 131:13, 131:14, 132:15, 133:9, 135:20, 135:23, 141:1, 141:22, 142:3, 145:18, 145:25, 148:20, 151:3, 155:10, 156:12, 156:18, 157:6, 157:7, 158:8, 158:10, 158:14, 158:15, 159:5, 159:18, 160:3, 160:11, 161:15, 162:15, 162:18, 163:6, 164:9, 165:12, 166:24, 166:25, 167:5, 167:15, 168:9, 168:11, 169:22, 173:11, 173:18, 178:5, 178:10, 200:4, 213:4, 213:13
**impacted** [34] - 9:21, 26:8, 34:14, 34:19, 35:23, 35:25, 37:19, 39:23, 40:5, 40:10,
41:17, 49:6, 49:11, 49:21, 50:3, 50:11, 63:17, 65:19, 67:7, 77:9, 81:1, 87:8, 104:20, 126:3, 159:15, 159:24, 160:2, 163:4, 163:21, 166:20, 167:4, 167:12, 191:20, 191:23
**imperfections** [1] - 25:23
**implement** [2] - 19:1, 85:1
**implemented** [3] - 23:16, 55:4, 55:11
**implodes** [1] - 138:15
**important** [32] - 21:24, 22:1, 30:16, 61:9, 61:17, 65:14, 66:13, 68:1, 74:14, 74:18, 76:12, 79:9, 79:17, 82:10, 85:4, 85:23, 85:24, 88:3, 89:15, 101:24, 105:15, 120:18, 120:19, 123:10, 125:10, 136:3, 147:21, 157:13, 159:10, 160:21, 206:10, 206:16
**importantly** [4] - 81:12, 121:1, 192:11, 204:18
**impose** [4] - 26:21, 26:24, 51:16, 51:17
**imposed** [19] - 9:8, 15:9, 26:18, 26:23, 27:1, 27:11, 27:12, 27:20, 51:6, 51:20, 52:9, 53:8, 167:20, 168:10, 168:20, 175:13, 175:24, 177:3, 177:6
**imposing** [5] - 9:16, 53:20, 92:24, 168:18, 168:23
**imposition** [2] - 74:4, 74:5
**impossible** [2] - 40:15, 40:16
**imprecise** [2] - 135:14, 135:22
**impressed** [1] - 125:11
**improper** [2] - 182:22, 199:11
**improvement** [1] - 9:16
**impute** [1] - 125:5

**imputed** [1] - 125:6
**IN** [1] - 1:5
**inability** [1] - 130:12
**inadmissible** [2] - 140:11, 140:12
**inapplicable** [1] - 48:20
**inbound** [17] - 8:1, 29:24, 51:10, 51:11, 75:1, 80:1, 84:4, 84:8, 84:11, 88:14, 88:15, 105:2, 117:22, 190:25, 197:4, 206:3, 219:7
**Inc** [2] - 2:6, 3:12
**incentive** [1] - 22:20
**inches** [7] - 30:24, 30:25, 31:1, 64:4, 64:5
**include** [4] - 35:8, 48:2, 87:9, 91:4
**included** [7] - 11:23, 12:11, 47:15, 47:19, 47:22, 55:6, 196:16
**includes** [1] - 8:19
**including** [10] - 5:24, 26:1, 26:14, 34:6, 41:19, 62:17, 72:25, 97:14, 105:10, 213:25
**inconsistent** [4] - 7:7, 7:13, 83:3, 122:5
**incorporated** [4] - 54:24, 150:5, 150:12, 168:12
**incorrect** [1] - 38:18
**increase** [5] - 24:23, 25:8, 55:4, 55:12, 168:18
**increased** [3] - 23:12, 24:20, 54:20
**increases** [3] - 25:11, 26:9, 169:1
**increasing** [1] - 55:13
**incredible** [1] - 127:18
**incredibly** [1] - 104:5
**increment** [15] - 106:6, 106:7, 106:15, 106:20, 114:23, 114:25, 123:4, 127:3, 128:6, 133:17, 133:18, 135:11, 137:10, 146:22, 150:2
**incremental** [3] - 93:21, 130:1, 139:10
**increments** [2] - 124:2, 169:21
**incumbent** [1] - 85:2
**indeed** [2] - 35:8, 83:7

**independent** [2] - 204:9, 217:15
**INDEX** [1] - 223:1
**India** [3] - 3:5, 89:24, 102:6
**indicate** [2] - 11:12, 147:8
**indicated** [2] - 64:16, 80:21
**indicating** [1] - 92:18
**indication** [1] - 83:17
**indicator** [1] - 198:19
**indirect** [4] - 13:25, 16:23, 17:11, 170:16
**individual** [71] - 5:12, 9:3, 13:13, 14:17, 18:19, 30:7, 33:24, 45:13, 48:8, 48:9, 48:11, 57:8, 57:13, 65:23, 66:1, 66:9, 66:10, 66:11, 69:6, 70:7, 84:9, 87:7, 93:11, 97:12, 97:17, 99:24, 124:19, 131:16, 147:19, 161:8, 161:11, 163:9, 163:16, 179:15, 182:25, 183:17, 186:5, 186:6, 187:19, 188:15, 188:25, 189:2, 189:4, 189:5, 189:9, 189:10, 189:14, 191:22, 195:2, 195:10, 196:8, 198:4, 198:5, 204:24, 207:19, 207:20, 211:18, 211:19, 211:21, 212:19
**individualized** [6] - 116:4, 116:8, 134:18, 135:23, 160:16, 162:19
**individually** [3] - 107:15, 148:2, 197:1
**individually-tailored** [1] - 197:1
**individuals** [2] - 183:16, 212:15
**inductively** [1] - 139:18
**indulge** [1] - 98:15
**industry** [22] - 5:24, 9:20, 10:6, 10:22, 12:1, 18:2, 20:17, 20:18, 28:12, 62:18, 64:15, 68:12, 76:24, 77:3, 81:5, 81:8, 83:7, 86:12, 126:14,

151:11, 178:6, 212:16
**industry-driven** [1] - 12:1
**ineffable** [1] - 185:8
**inelastic** [2] - 20:22, 21:6
**inevitability** [1] - 35:8
**inevitable** [1] - 107:17
**inevitably** [1] - 99:25
**infer** [3] - 40:4, 80:24, 81:8
**inference** [11] - 63:19, 71:19, 77:7, 82:4, 82:5, 89:10, 90:18, 92:4, 103:5, 143:22, 166:15
**inferred** [2] - 65:18
**inflated** [1] - 148:19
**influencing** [1] - 33:17
**inform** [1] - 191:22
**information** [4] - 87:9, 90:14, 121:1, 172:12
**informations** [1] - 6:18
**inherent** [1] - 66:12
**initial** [3] - 72:16, 137:17, 221:1
**injured** [6] - 35:9, 65:12, 65:16, 86:24, 99:15, 135:19
**injury** [20] - 56:7, 60:24, 61:1, 67:1, 104:4, 104:21, 118:2, 118:4, 118:9, 128:9, 128:10, 128:12, 134:1, 137:24, 143:6, 143:7, 147:15
**injury-in-fact** [6] - 60:24, 118:2, 118:9, 143:6, 143:7, 147:15
**innards** [1] - 187:7
**input** [1] - 88:17
**inputs** [1] - 213:7
**inquiry** [2] - 101:9, 101:11, 201:14
**inside** [2] - 118:12, 124:13
**instance** [1] - 65:5
**instances** [3] - 23:8, 62:12, 184:9
**instead** [10] - 12:16, 44:14, 44:22, 45:4, 54:21, 55:4, 70:19, 131:13, 203:22, 212:7
**Instead** [1] - 193:5
**insufficient** [1] - 89:19
**integrators** [7] - 12:7,

12:10, 12:14, 12:22,
12:24, 13:6, 13:9
**integrators'** [1] -
12:17
**intend** [2] - 7:14,
173:8
**intended** [1] - 175:5
**interaction** [6] - 195:9,
195:11, 195:15,
195:16, 195:17,
211:24
**interchangeability** [1]
- 22:5, 179:1
**interchangeable** [3] -
21:10, 21:22, 179:4
**interconnected** [1] -
17:2
**interdependance** [1] -
82:15
**interdependant** [2] -
81:24, 83:20
**interdependent** [1] -
82:2
**interested** [1] - 37:12
**interesting** [6] - 53:12,
82:7, 114:3, 131:3,
147:18, 148:12
**interestingly** [1] -
92:16
**interlining** [2] - 13:25,
16:24
**internal** [1] - 77:18
**interpretation** [1] -
185:24
**interpreting** [1] -
140:2
**interrelated** [2] - 82:9,
82:13
**interrupt** [2] - 52:13,
98:20
**intra** [1] - 56:23
**intra-class** [1] - 56:23
**introduce** [1] - 10:16
**introduced** [3] - 6:12,
15:14, 26:11
**invalid** [1] - 195:3
**invalidity** [1] - 190:23
**invented** [1] - 164:8
**invention** [1] - 67:14
**inventory** [1] - 147:22
**investigated** [1] -
208:7
**investigation** [1] -
15:25
**invitation** [1] - 100:3
**invited** [1] - 151:22
**inviting** [2] - 107:19,
112:1
**involve** [6] - 72:13,
76:15, 101:7, 180:3,

215:15
**involved** [5] - 8:14,
68:20, 161:20,
171:9, 171:19
**involves** [3] - 60:16,
73:15, 93:17
**involving** [7] - 7:19,
8:3, 8:5, 28:11, 99:5,
170:15, 170:20
**IPO** [1] - 143:12
**ipse** [1] - 140:5
**Ireland** [1] - 15:4
**irrelevant** [1] - 216:23
**Isaac** [1] - 103:20
**Island** [1] - 31:1
**isolate** [5] - 93:21,
106:15, 129:25,
137:10, 139:10
**isolated** [1] - 127:7
**isolates** [1] - 135:11
**isolating** [1] - 106:20
**isolation** [2] - 106:5,
156:25
**issue** [49] - 7:22, 32:4,
34:9, 36:19, 38:12,
38:14, 48:16, 48:22,
48:24, 56:12, 56:25,
63:4, 63:21, 69:11,
71:22, 71:24, 85:12,
85:18, 100:5,
101:21, 106:1,
106:18, 120:15,
125:14, 128:12,
128:19, 129:16,
158:21, 158:24,
159:1, 160:8,
160:21, 162:15,
165:18, 174:15,
174:18, 174:20,
182:16, 183:6,
201:9, 203:10,
207:24, 208:12,
209:11, 216:12,
220:8
**issues** [25] - 29:3,
30:19, 48:8, 48:11,
51:5, 89:18, 121:25,
133:7, 139:11,
139:12, 143:14,
155:2, 160:16,
161:4, 161:8, 161:9,
161:12, 162:19,
189:2, 189:3, 189:4,
189:5, 210:23, 217:1
**item** [10] - 22:2, 120:7,
147:19, 147:22,
147:23, 151:2,
151:10, 170:25,
171:19
**itself** [16] - 10:17,

35:22, 57:9, 106:9,
106:13, 114:9,
114:25, 118:11,
122:4, 125:13,
129:23, 132:8,
134:20, 135:5,
138:9, 138:15

---

# J

**jail** [1] - 28:16
**JAMES** [2] - 2:11, 3:10
**Janeiro** [1] - 75:15
**January** [5] - 6:19,
53:19, 73:7, 172:8,
197:12
**Japan** [6] - 24:5, 55:6,
55:11, 168:16,
197:6, 206:4
**JASON** [1] - 2:24
**Jenkins** [3] - 119:4,
147:3, 202:1
**job** [6] - 48:5, 48:7,
86:10, 101:4,
144:11, 191:21
**John** [1] - 13:1
**JR** [1] - 2:14
**judge** [3] - 137:20,
158:23, 194:18
**JUDGE** [1] - 1:12
**Judge** [47] - 4:4, 7:8,
22:18, 28:8, 29:1,
44:2, 48:24, 49:1,
49:11, 57:18, 104:8,
104:10, 104:13,
109:11, 113:7,
113:8, 113:11,
113:16, 113:17,
113:20, 114:1,
114:4, 119:4,
121:17, 123:4,
124:14, 124:16,
126:25, 132:11,
132:19, 136:3,
136:11, 136:12,
147:3, 147:5,
153:10, 153:12,
161:6, 162:10,
174:16, 175:1,
194:19, 194:24,
202:1, 202:5, 210:9,
222:2
**judges** [4] - 100:14,
130:25, 173:13,
207:8
**judgment** [1] - 185:17
**junk** [2] - 187:11,
187:12
**jury** [25] - 43:7, 43:11,
43:15, 43:16, 43:18,

45:3, 45:5, 45:7,
45:9, 45:10, 57:3,
101:3, 102:24,
118:18, 119:21,
132:25, 140:21,
142:4, 142:21,
143:15, 147:13,
153:13, 155:9,
156:18, 162:10
**jury's** [1] - 45:13
**Justice** [1] - 6:13
**justices** [2] - 139:4,
161:1
**justify** [1] - 82:15
**juxtaposing** [1] -
139:3

---

# K

**Kansas** [1] - 170:23
**Kaplan** [106] - 15:18,
16:15, 16:18, 21:25,
22:7, 26:10, 26:15,
26:17, 26:19, 27:7,
32:4, 32:7, 34:3,
37:11, 37:23, 38:1,
38:10, 38:17, 40:17,
41:2, 41:7, 41:24,
42:2, 42:3, 44:18,
44:21, 45:1, 45:5,
45:21, 46:6, 46:14,
46:22, 47:5, 47:22,
47:25, 48:3, 48:12,
51:21, 52:3, 52:5,
55:16, 67:19, 79:19,
89:19, 90:6, 103:15,
103:23, 103:24,
104:10, 106:6,
113:16, 113:25,
115:5, 115:6,
119:14, 134:17,
136:10, 146:18,
164:6, 164:16,
164:20, 169:11,
172:15, 173:19,
181:21, 181:24,
182:1, 185:11,
187:14, 187:18,
188:4, 188:13,
189:6, 190:1, 190:9,
190:19, 191:10,
191:14, 191:18,
192:3, 192:11,
193:21, 194:3,
196:15, 197:22,
199:7, 199:24,
200:9, 201:23,
205:2, 205:7,
205:11, 205:23,
206:9, 207:7,
207:10, 207:25,

208:6, 208:15,
211:8, 213:11, 214:2
**KAPLAN** [6] - 1:17,
1:21, 219:15,
219:21, 219:25,
220:4
**Kaplan's** [23] - 11:6,
12:11, 26:25, 37:23,
38:7, 40:2, 47:8,
47:13, 74:15, 89:23,
104:7, 119:12,
146:18, 146:23,
163:23, 175:8,
184:25, 190:6,
193:7, 195:1, 200:7,
206:5, 208:23
**keep** [9] - 30:21,
74:14, 144:17,
150:10, 158:16,
166:1, 169:24,
187:16, 190:17
**keeps** [1] - 189:6
**KEITH** [1] - 2:4
**KELLY** [1] - 2:24
**kept** [5] - 9:5, 28:14,
106:4, 176:7, 177:12
**Kevin** [1] - 18:25
**key** [6] - 9:12, 9:15,
38:12, 50:5, 82:11,
82:14
**KFTC** [3] - 8:2, 22:2,
217:23
**kick** [1] - 39:17,
115:21, 139:5
**kicking** [1] - 32:21
**killed** [1] - 214:9
**kilogram** [8] - 24:16,
27:24, 28:3, 53:7,
53:9, 53:10, 53:13
**kilograms** [1] - 27:23
**KILSHEIMER** [1] -
1:17
**KIM** [1] - 2:25
**kind** [38] - 40:13,
59:25, 60:1, 63:16,
68:6, 69:21, 71:3,
71:23, 72:1, 74:7,
84:15, 92:16, 94:23,
99:18, 100:11,
100:18, 109:9,
114:21, 124:22,
125:19, 133:20,
133:21, 134:9,
138:1, 138:4,
139:12, 143:10,
146:7, 147:19,
148:7, 149:1,
154:16, 154:24,
170:18, 185:25,
189:19, 195:2,

216:16
**kinds** [1] - 164:14
**KIRKLAND** [1] - 2:23
**kitchen** [1] - 44:20
**KLM** [2] - 150:16, 150:18
**knowable** [1] - 189:11
**knowing** [3] - 200:14, 214:8
**known** [2] - 104:14, 109:23
**knows** [2] - 16:3, 216:11
**Kong** [9] - 7:20, 7:22, 7:23, 7:24, 7:25, 8:20, 18:13, 68:20, 75:14
**Korea** [8] - 6:8, 7:18, 7:22, 8:3, 23:14, 47:10, 55:6, 122:20
**Korean** [3] - 2:17, 23:13, 122:17
**KURTH** [1] - 2:13

**L**

**LA** [2] - 145:2, 145:3
**label** [2] - 109:3, 149:24
**labyrinthine** [1] - 131:16
**lack** [3] - 19:6, 21:4, 90:6
**lacked** [2] - 71:16, 216:14
**LAN** [1] - 24:14
**land** [4] - 120:21, 139:21, 139:22
**LANDAU** [36] - 1:16, 4:7, 4:11, 4:17, 4:19, 4:23, 5:1, 5:8, 52:14, 52:17, 52:21, 54:17, 58:5, 154:3, 154:7, 154:9, 155:17, 156:23, 157:5, 157:8, 158:11, 158:14, 159:7, 159:10, 159:18, 160:19, 164:1, 164:5, 165:23, 166:1, 166:5, 169:23, 175:1, 181:11, 221:2, 221:6
**landau** [1] - 223:12
**Landau** [23] - 5:1, 52:11, 58:1, 63:21, 82:8, 96:23, 100:11, 103:21, 106:10, 109:11, 110:23, 111:8, 111:15,

119:22, 131:24, 140:7, 151:14, 154:2, 183:2, 192:20, 197:7, 199:8, 223:15
**Landau's** [1] - 131:25
**Lane** [2] - 24:21, 55:5
**language** [5] - 38:9, 129:4, 131:1, 146:4, 180:17
**large** [5] - 73:8, 89:20, 148:22, 158:6, 200:3
**large-volume** [1] - 148:22
**largely** [2] - 66:20, 90:24
**larger** [2] - 41:10, 59:22
**Last** [1] - 218:7
**last** [11] - 29:1, 30:23, 31:2, 31:4, 36:6, 48:14, 86:2, 154:11, 154:14, 196:5, 217:14
**lasted** [1] - 34:20
**lasting** [1] - 149:9
**Lastly** [1] - 213:8
**late** [1] - 48:17
**latecomer** [1] - 90:21
**latter** [1] - 75:17
**law** [39] - 8:12, 42:15, 56:18, 59:11, 61:1, 71:22, 81:8, 97:9, 100:6, 100:21, 103:3, 115:16, 115:17, 120:1, 130:5, 139:23, 141:17, 141:19, 141:25, 142:5, 151:17, 161:3, 161:21, 173:16, 179:25, 180:5, 180:7, 185:24, 185:25, 199:6, 199:9, 199:22, 200:21, 201:9, 204:17, 221:17, 221:18
**laws** [2] - 6:5, 154:14
**lawsuits** [2] - 30:7, 57:13
**lawyer** [4] - 96:18, 104:11, 104:12, 194:14
**LCD** [3] - 46:25, 153:9, 153:10
**leading** [6] - 128:9, 199:25, 201:17, 201:25, 202:6, 203:18

**learned** [2] - 32:14, 51:5
**lease** [7] - 192:15, 193:4, 193:6, 193:10, 193:12, 194:1
**least** [19] - 6:19, 13:2, 34:11, 36:3, 39:18, 39:20, 39:25, 40:5, 44:14, 44:15, 72:22, 73:11, 158:5, 162:23, 165:9, 165:11, 166:23, 166:24, 210:14
**leave** [3] - 16:25, 66:15, 71:4
**leaves** [1] - 135:15
**led** [1] - 191:25
**ledger** [2] - 117:8, 149:19
**LEE** [1] - 2:18
**Lee** [1] - 23:13
**left** [14] - 14:9, 16:19, 16:20, 16:22, 34:2, 38:1, 58:4, 83:15, 103:16, 103:25, 128:7, 138:5, 154:2, 199:14
**legacy** [8] - 49:5, 49:9, 49:11, 117:16, 157:17, 157:18, 158:19, 159:5
**legal** [6] - 8:25, 56:21, 96:20, 122:5, 127:24, 135:17
**legitimate** [1] - 215:17
**lengthy** [1] - 159:2
**less** [11] - 40:16, 60:23, 93:2, 114:22, 127:3, 133:14, 133:19, 142:3, 143:19, 174:11, 218:10
**lessened** [1] - 128:14
**lesson** [2] - 44:11, 179:24
**level** [8] - 70:7, 87:1, 87:2, 94:19, 95:3, 95:8, 165:10, 186:9
**levels** [1] - 194:9
**IEVIN** [1] - 2:1
**Lexington** [1] - 1:21
**liability** [10] - 6:25, 7:11, 8:23, 29:7, 43:25, 44:6, 73:4, 100:1, 162:17, 177:9
**liberal** [1] - 208:19
**light** [10] - 76:13, 105:10, 130:11, 135:1, 138:21,

144:7, 162:14, 172:24, 173:23, 180:22
**lighter** [1] - 76:20
**lightest** [1] - 76:5
**likelihood** [2] - 39:25, 81:14, 166:24
**likely** [1] - 99:13
**likewise** [2] - 211:8, 212:16
**limit** [3] - 18:5, 84:8, 180:16
**limitations** [1] - 66:12
**Limited** [1] - 2:9
**limited** [3] - 7:1, 68:19, 182:12
**Line** [1] - 109:23
**line** [17] - 60:4, 93:12, 115:13, 116:9, 120:7, 147:19, 147:22, 147:23, 151:2, 151:10, 170:25, 171:19, 188:16, 193:9, 194:6
**line-item** [2] - 151:2, 151:10
**lines** [6] - 27:18, 70:4, 188:16, 191:6, 191:15, 195:23
**Lines** [1] - 2:17
**Lingus** [6] - 15:4, 15:5, 15:7, 15:10, 15:15, 15:16
**link** [3] - 103:17, 152:23
**linked** [1] - 93:16
**linking** [1] - 169:16
**Linux** [1] - 192:8
**Lippe** [1] - 194:17
**list** [5] - 8:19, 109:15, 129:16, 151:20, 152:4
**listed** [1] - 209:23
**listen** [1] - 179:22
**lists** [2] - 109:12, 151:9
**literature** [7] - 10:1, 11:11, 71:2, 205:7, 206:1, 211:8, 212:22
**litigant** [1] - 116:25
**litigate** [1] - 125:3
**LITIGATION** [1] - 1:5
**litigation** [1] - 116:7
**live** [1] - 75:11
**lives** [1] - 117:3
**LLP** [12] - 1:14, 1:17, 1:21, 2:5, 2:9, 2:13, 2:20, 2:23, 3:1, 3:8, 3:12, 5:2
**lo** [1] - 164:8

**loaded** [1] - 111:7
**loads** [1] - 21:17
**local** [2] - 74:2, 74:4
**localized** [1] - 134:19
**located** [1] - 180:3
**location** [1] - 83:14
**log** [16] - 35:15, 36:17, 37:4, 37:7, 37:12, 37:13, 37:15, 37:20, 38:2, 38:6, 38:21, 39:4, 39:8, 115:18, 184:22
**log-log** [1] - 115:18
**logarithm** [1] - 184:19
**logarithms** [3] - 36:18, 36:22, 192:2
**logic** [3] - 83:21, 84:20, 101:17
**logical** [3] - 77:7, 104:22, 121:11
**London** [2] - 75:13, 75:16
**long-standing** [1] - 148:23
**look** [83] - 9:7, 10:2, 10:20, 11:25, 14:8, 14:17, 16:25, 17:3, 17:13, 17:25, 18:18, 18:19, 28:8, 29:9, 30:8, 31:14, 35:17, 38:1, 55:25, 57:17, 64:7, 64:10, 64:13, 68:18, 70:12, 73:21, 76:17, 76:23, 78:18, 79:23, 84:7, 84:9, 103:13, 108:23, 112:3, 112:6, 113:15, 114:19, 114:20, 114:22, 115:6, 115:21, 115:25, 116:16, 116:18, 124:2, 124:14, 124:23, 127:2, 127:15, 129:21, 133:15, 136:7, 136:8, 142:2, 144:23, 144:25, 145:12, 146:13, 146:21, 147:6, 149:3, 149:7, 150:16, 159:24, 171:14, 175:20, 183:16, 184:5, 185:16, 186:5, 186:7, 187:6, 188:7, 189:18, 191:5, 195:4, 197:14, 201:15, 204:14, 207:19, 212:19
**looked** [20] - 15:2,

17:4, 56:7, 64:8,
90:1, 103:24, 113:9,
127:10, 127:12,
152:25, 154:18,
156:13, 156:14,
156:25, 157:1,
172:6, 172:9, 208:7
**looking** [33] - 10:2,
27:15, 33:24, 75:1,
75:5, 89:11, 104:1,
105:8, 106:18,
113:13, 118:9,
118:10, 120:9,
128:8, 133:13,
133:20, 136:6,
139:2, 147:10,
153:17, 156:19,
156:20, 156:23,
163:2, 163:15,
163:16, 170:7,
171:12, 178:15,
191:22, 206:10
**looks** [3] - 132:20,
135:12, 192:22
**Los** [5] - 2:24, 19:11,
75:14, 83:20, 83:21
**lose** [1] - 45:9
**loss** [2] - 99:12, 163:1
**lost** [1] - 117:2
**Louisiana** [1] - 114:18
**love** [3] - 15:1, 102:20,
138:23
**low** [9] - 27:20, 27:23,
50:23, 62:1, 89:2,
175:19, 175:21,
190:24, 191:7
**low-weight** [1] - 62:1
**lower** [6] - 23:22,
23:23, 56:13, 77:22,
77:23, 169:8
**lowered** [1] - 23:15
**lowest** [2] - 22:3
**Ltd** [2] - 2:13, 3:8
**luck** [1] - 195:23
**lucky** [4] - 34:22, 35:2,
35:5, 120:20
**Lufthansa** [14] - 9:12,
16:20, 18:25, 26:19,
26:20, 26:23, 27:2,
55:9, 79:21, 146:11,
172:11, 175:8,
175:10, 197:10
**lump** [1] - 128:18
**lumping** [1] - 87:25
**lunch** [2] - 98:7, 160:9
**luncheon** [1] - 98:9
**LYNNE** [1] - 2:15

## M

**MA** [1] - 2:7
**machine** [8] - 118:10,
118:11, 118:12,
118:13, 118:14,
125:1, 135:5, 138:8
**MAGISTRATE** [1] -
1:12
**Magistrate** [1] - 4:4
**magnitude** [1] - 102:3
**mail** [2] - 8:8, 55:3
**Mainland** [1] - 14:22
**maintain** [1] - 12:4
**major** [2] - 15:4, 68:8
**majority** [5] - 130:24,
131:2, 131:10,
154:23, 177:2
**majority's** [1] - 131:10
**managed** [1] - 35:2
**Manhattan** [2] - 30:25,
64:4
**Manning** [1] - 37:12
**Manning's** [1] - 37:24
**manual** [1] - 173:13
**map** [5] - 13:24, 26:20,
100:21, 114:7, 129:5
**March** [1] - 80:1
**mark** [2] - 5:4, 220:23
**Mark** [1] - 131:4
**marked** [4] - 5:7, 38:1,
220:8, 221:4
**market** [50] - 10:6,
11:5, 11:12, 11:20,
12:9, 12:11, 13:12,
16:8, 16:10, 17:2,
18:8, 18:9, 22:11,
23:15, 23:18, 28:23,
62:6, 62:8, 74:10,
81:24, 82:19, 82:21,
83:2, 83:9, 84:2,
84:15, 84:22, 84:25,
85:3, 85:7, 86:8,
140:2, 144:14,
145:6, 146:16,
148:1, 148:17,
157:11, 176:19,
179:11, 214:25,
215:5, 216:19,
217:2, 217:6,
217:14, 217:23
**marketplace** [2] -
28:11, 144:15
**markets** [2] - 148:21,
217:2
**Mart** [8] - 9:2, 42:15,
101:13, 102:8,
102:9, 105:8, 111:21
**mask** [1] - 108:2
**mass** [1] - 120:11

**massive** [2] - 33:25,
177:10
**masters** [1] - 161:10
**match** [1] - 46:13
**material** [1] - 221:23
**math** [1] - 93:4
**matter** [25] - 14:14,
33:3, 35:17, 35:20,
39:17, 50:8, 53:22,
77:14, 97:13,
101:19, 121:11,
124:12, 144:22,
167:9, 182:6, 182:9,
182:15, 185:23,
203:17, 203:18,
204:16, 204:17,
211:5
**mattered** [1] - 53:23
**matters** [3] - 4:6,
126:16, 169:9
**maximum** [1] - 80:6
**McCAFFREY** [1] -
1:23
**McClave** [114] - 30:10,
31:9, 31:16, 31:22,
32:15, 33:2, 33:6,
33:9, 33:12, 33:17,
33:22, 36:21, 37:3,
37:6, 37:9, 38:6,
38:13, 38:15, 38:16,
39:7, 39:21, 39:24,
40:2, 40:7, 42:1,
44:13, 44:16, 44:20,
44:21, 44:24, 45:3,
45:17, 46:5, 47:14,
47:17, 47:19, 49:13,
49:23, 50:4, 55:25,
56:6, 56:13, 62:2,
65:12, 65:14, 67:10,
68:11, 68:17, 68:23,
70:3, 70:23, 71:18,
76:6, 76:13, 76:18,
77:5, 78:14, 78:19,
78:21, 78:25, 82:23,
89:25, 91:10, 91:23,
91:24, 93:7, 93:19,
94:20, 95:18, 96:17,
103:6, 104:17,
106:2, 106:15,
107:3, 108:21,
112:17, 112:19,
115:7, 115:18,
122:15, 123:12,
123:13, 126:14,
127:25, 133:16,
133:21, 134:13,
140:12, 146:20,
161:16, 162:5,
163:11, 164:15,
165:1, 169:10,

170:7, 171:16,
173:9, 178:22,
179:15, 182:24,
187:8, 192:5,
192:19, 194:16,
196:11, 200:8,
201:4, 205:17,
207:13, 208:10,
212:8, 215:10
**McClave's** [93] - 6:2,
28:24, 29:23, 29:24,
30:1, 30:18, 31:5,
32:5, 32:9, 32:19,
33:10, 33:15, 33:22,
35:11, 35:14, 36:14,
36:18, 41:18, 42:3,
43:25, 44:8, 45:6,
46:2, 46:10, 48:10,
49:19, 50:5, 72:25,
74:9, 77:9, 84:2,
86:21, 90:21, 92:10,
93:1, 96:4, 96:16,
110:13, 112:9,
115:4, 116:12,
121:14, 122:10,
122:23, 123:6,
124:9, 126:9,
128:22, 144:11,
157:12, 158:12,
160:5, 163:6, 166:8,
166:12, 171:24,
172:16, 183:1,
183:14, 186:25,
187:10, 187:15,
187:19, 187:25,
188:5, 189:1,
189:13, 191:5,
192:4, 193:17,
193:21, 194:7,
195:12, 196:2,
196:3, 197:24,
200:4, 202:17,
203:11, 203:20,
206:15, 206:19,
208:1, 211:16,
211:21, 212:4,
212:15, 212:18,
213:15, 214:1,
214:4, 218:25
**McClean** [2] - 65:7
**McLaughlin** [6] - 99:1,
105:13, 119:23,
137:16, 138:14,
145:19
**MD-06-1775** [1] - 4:3
**mean** [27] - 15:20,
16:7, 21:9, 21:15,
21:17, 39:14, 52:15,
71:14, 80:22, 81:23,
84:7, 87:16, 90:10,

121:15, 127:18,
136:23, 140:16,
144:6, 158:4, 168:8,
177:2, 178:3, 184:2,
199:12, 209:8
**meaning** [2] - 104:21,
108:22
**means** [21] - 18:7,
21:10, 34:14, 35:4,
44:23, 45:7, 48:7,
80:24, 97:5, 118:8,
135:18, 142:24,
157:13, 159:21,
160:15, 189:5,
189:8, 191:3, 191:8,
195:6, 196:7
**meant** [3] - 21:15,
193:3, 193:4
**measure** [12] - 36:13,
39:1, 67:11, 95:18,
95:24, 97:4, 127:21,
160:25, 171:6,
175:11, 191:3
**measured** [1] - 49:8
**measurement** [2] -
101:18, 131:15
**measurements** [1] -
101:19
**measures** [1] - 26:15
**measuring** [2] - 94:15,
147:7
**mechanic** [3] -
186:25, 187:4,
187:11
**mechanism** [5] - 8:20,
55:20, 57:20,
170:13, 172:14
**median** [1] - 87:16
**MEENA** [1] - 2:15
**meet** [5] - 44:1,
155:12, 180:6,
213:3, 219:18
**meeting** [3] - 8:14,
24:2, 24:4
**meetings** [3] - 7:4,
23:15, 177:7
**member** [43] - 9:3,
15:7, 15:10, 23:21,
30:8, 32:3, 34:14,
34:15, 34:19, 34:22,
35:2, 45:13, 50:12,
50:15, 50:17, 63:24,
64:12, 87:19, 93:10,
96:10, 97:3, 97:4,
97:14, 97:17, 98:1,
105:2, 124:21,
147:9, 159:6,
159:21, 159:22,
159:23, 159:24,
162:21, 162:24,

163:3, 165:21,
167:6, 167:8,
167:10, 169:10,
191:20, 191:23
**member's** [7] - 49:25,
60:14, 61:6, 65:8,
94:10, 167:7, 167:16
**members** [108] - 9:22,
11:18, 11:19, 11:23,
14:1, 30:5, 32:6,
32:20, 33:20, 35:5,
36:7, 39:6, 41:19,
42:23, 43:9, 43:14,
45:12, 49:9, 49:10,
49:18, 49:20, 50:7,
50:8, 50:11, 51:20,
56:8, 56:19, 56:20,
57:6, 61:8, 61:21,
61:24, 62:1, 62:5,
62:14, 63:5, 63:17,
64:1, 65:6, 65:12,
65:16, 65:19, 66:1,
66:10, 67:7, 69:1,
70:19, 70:22, 74:19,
74:22, 75:11, 75:18,
76:4, 77:8, 78:4,
79:9, 80:25, 85:19,
86:25, 90:18, 95:25,
103:8, 103:11,
103:18, 104:2,
104:18, 104:20,
104:24, 106:4,
112:24, 113:1,
114:20, 117:4,
117:6, 117:10,
118:24, 120:22,
121:16, 124:19,
125:4, 126:17,
130:16, 135:19,
142:14, 143:8,
143:20, 147:17,
155:11, 157:24,
158:7, 158:15,
158:19, 159:13,
160:4, 161:18,
163:10, 163:21,
165:7, 165:25,
166:1, 167:13,
170:1, 174:7, 179:4,
204:6, 206:11,
210:12, 213:4
**memo** [1] - 8:8
**mention** [1] - 138:2
**mentioned** [4] - 63:21,
109:11, 161:22,
210:18
**merely** [1] - 213:2
**merger** [1] - 217:20
**merit** [1] - 143:14
**merits** [18] - 57:4,

100:10, 100:15,
100:19, 101:3,
101:8, 101:12,
102:24, 111:17,
111:18, 141:5,
141:6, 141:23,
142:17, 143:10,
143:18, 155:21,
182:19
**Messner** [1] - 35:7
**met** [4] - 24:16, 46:6,
57:23, 154:12
**metaphor** [1] - 119:15
**metaphors** [1] - 138:8
**method** [22] - 31:25,
42:11, 56:14, 57:7,
57:21, 62:11, 93:9,
93:11, 100:10,
100:23, 101:15,
101:17, 103:20,
112:25, 119:8,
136:15, 140:25,
156:4, 181:5, 211:23
**methodologies** [4] -
180:5, 185:8, 210:2,
210:25
**methodology** [38] -
10:17, 15:8, 27:3,
31:7, 39:15, 42:4,
42:21, 43:4, 44:8,
44:25, 57:15, 71:4,
95:17, 97:16, 98:3,
100:9, 100:19,
100:20, 111:16,
111:18, 111:19,
118:4, 124:20,
125:25, 126:11,
131:17, 160:3,
160:10, 160:11,
172:11, 182:21,
183:20, 185:7,
186:3, 186:4, 186:5,
195:6
**methods** [5] - 57:11,
115:12, 164:10,
181:7, 183:24
**Miami** [1] - 75:15
**mic** [1] - 153:19
**Michelle** [1] - 182:4
**middle** [2] - 52:12,
141:13
**might** [22] - 14:18,
14:23, 19:18, 30:22,
31:3, 41:7, 50:24,
53:15, 55:16, 75:6,
82:10, 85:9, 85:14,
90:16, 93:22, 150:4,
157:19, 161:9,
167:16, 188:20,
191:15, 216:13

**MILLER** [1] - 1:21
**million** [26] - 30:3,
30:4, 41:15, 46:1,
50:12, 50:15, 66:8,
89:24, 103:16,
110:14, 123:14,
145:7, 159:23,
159:25, 171:16,
195:14, 198:21,
205:5, 205:14,
205:16, 206:3,
218:8, 218:9, 218:19
**million's** [1] - 123:14
**millions** [1] - 97:11
**mind** [4] - 67:15,
74:14, 103:12,
194:21
**mine** [2] - 120:21,
147:13
**minefield** [1] - 120:21
**mines** [1] - 194:15
**minimize** [3] - 63:8,
69:18, 80:13
**minimum** [4] - 27:20,
27:22, 28:2, 82:3
**minor** [5] - 25:15,
25:21, 25:23, 208:4,
220:7
**minute** [8] - 40:20,
58:2, 101:25,
111:23, 113:4,
136:4, 145:15,
181:13
**minutes** [17] - 4:13,
4:19, 14:10, 14:11,
23:20, 58:3, 59:24,
60:9, 83:16, 138:5,
151:19, 153:21,
154:3, 199:15,
214:7, 217:11,
217:12
**misapprehend** [1] -
121:12
**misattribution** [1] -
150:13
**mischaracterize** [1] -
136:3
**misconduct** [2] -
28:10
**mislead** [2] - 193:24
**misleading** [1] - 26:10
**misleadingly** [1] -
193:16
**misrepresentations**
[1] - 99:6
**mistake** [3] - 181:25,
188:12, 193:11
**mistakes** [2] - 116:2,
192:3
**Mister** [2] - 203:9,

208:10
**misunderstanding** [1]
- 96:24
**mixed** [1] - 117:21
**mixing** [1] - 138:8
**mode** [1] - 20:21
**model** [258] - 6:2,
29:24, 30:1, 30:6,
31:24, 32:5, 32:8,
32:9, 32:11, 32:13,
32:15, 32:16, 32:18,
32:19, 32:22, 33:8,
33:10, 33:11, 33:14,
33:22, 33:24, 34:5,
34:10, 36:15, 36:18,
37:12, 38:24, 39:6,
39:14, 39:16, 42:24,
43:10, 43:23, 44:5,
44:10, 45:6, 45:8,
45:16, 46:1, 46:2,
46:9, 47:15, 47:17,
49:8, 49:16, 49:19,
50:5, 65:14, 66:2,
66:18, 67:4, 67:5,
70:8, 72:25, 77:9,
78:21, 82:4, 86:21,
87:1, 87:2, 87:5,
87:10, 87:12, 87:13,
88:16, 89:9, 90:2,
90:19, 91:1, 91:7,
92:3, 92:4, 92:16,
93:11, 94:8, 94:18,
95:23, 104:4,
110:13, 110:17,
110:18, 112:4,
115:24, 116:1,
116:12, 117:14,
117:15, 117:19,
117:23, 117:24,
117:25, 118:2,
119:12, 119:13,
119:14, 120:24,
121:10, 121:14,
122:2, 122:10,
122:20, 122:23,
123:10, 123:17,
123:21, 124:8,
124:13, 124:20,
125:10, 127:20,
128:22, 130:20,
134:23, 134:24,
135:7, 136:21,
138:1, 138:10,
138:13, 138:15,
138:19, 138:20,
140:23, 141:7,
141:20, 141:21,
142:2, 142:10,
142:11, 142:12,
143:6, 143:12,

143:18, 145:16,
146:20, 146:23,
146:24, 148:15,
150:23, 155:5,
155:6, 155:7, 155:8,
155:14, 156:16,
156:19, 156:20,
156:21, 156:24,
156:25, 157:4,
157:12, 157:20,
158:12, 158:22,
159:4, 159:12,
159:15, 160:5,
161:13, 161:16,
161:17, 162:7,
162:12, 162:13,
162:16, 163:6,
163:7, 163:9,
163:13, 163:17,
163:18, 163:21,
164:2, 164:17,
164:19, 164:23,
164:24, 165:4,
165:5, 165:7,
165:13, 165:14,
166:8, 166:9,
166:11, 166:12,
166:16, 166:17,
171:24, 172:16,
173:9, 178:25,
179:20, 186:25,
187:1, 187:7, 188:5,
188:22, 188:25,
189:11, 192:14,
192:15, 194:13,
195:11, 195:16,
198:13, 198:18,
198:23, 198:24,
198:25, 199:20,
199:21, 199:24,
200:4, 200:15,
200:16, 200:20,
201:4, 202:18,
203:11, 203:20,
203:24, 204:3,
204:4, 204:7, 204:8,
206:15, 206:19,
206:20, 207:15,
211:16, 211:24,
212:7, 212:15,
213:6, 213:12,
213:15, 214:1,
214:4, 219:5, 219:7
**model's** [3] - 33:25,
130:12, 204:12
**modeled** [1] - 99:7
**modeling** [1] - 156:15
**models** [40] - 29:12,
30:2, 30:18, 33:15,
33:19, 38:2, 41:18,
44:1, 44:4, 45:22,

48:3, 65:11, 66:13, 66:19, 67:3, 67:11, 70:9, 70:16, 70:22, 70:24, 90:20, 92:2, 112:7, 115:5, 136:14, 138:20, 178:23, 189:13, 190:25, 192:4, 195:9, 198:10, 198:19, 199:5, 200:7, 200:8, 207:16, 208:1, 208:10, 212:18
**modern** [1] - 201:19
**modifications** [1] - 46:3
**modified** [1] - 171:2
**modify** [2] - 61:11, 99:20
**molehills** [1] - 25:22
**moment** [6] - 111:25, 128:16, 147:6, 157:16, 183:4, 194:12
**money** [4] - 19:19, 22:24, 79:5
**money's** [1] - 25:6
**monopolization** [1] - 132:21
**monopoly** [3] - 85:5, 217:4, 217:5
**Monsanto** [5] - 108:9, 150:24, 152:4, 170:24, 171:11
**month** [1] - 48:14
**months** [14] - 33:7, 51:22, 51:25, 52:1, 52:10, 149:8, 149:15, 149:16, 163:14, 167:20, 167:22, 168:6
**Moore** [6] - 48:6, 185:1, 194:10, 204:22, 207:1, 212:23
**Moore's** [1] - 211:2
**morning** [7] - 5:1, 30:22, 30:23, 159:19, 168:13, 183:2, 188:10
**morphing** [1] - 68:6
**MOSCOU** [1] - 3:5
**Moscow** [1] - 18:13
**MOSKOWITZ** [1] - 2:9
**MOSKVINA** [1] - 3:7
**Most** [2] - 72:8, 216:8
**most** [23] - 17:5, 20:21, 22:4, 38:20, 39:5, 72:8, 94:9, 108:7, 108:8,

108:12, 109:9, 116:23, 143:21, 143:24, 152:19, 161:2, 161:17, 174:2, 178:19, 208:11, 214:7, 218:4
**motion** [17] - 4:13, 5:13, 57:25, 68:10, 71:9, 110:9, 110:22, 119:9, 140:3, 164:12, 194:11, 197:15, 199:7, 201:8, 210:17, 211:2, 214:16
**motion's** [1] - 119:20
**motions** [5] - 4:2, 4:3, 4:15, 114:12, 181:23
**Motor** [1] - 133:1
**mountains** [1] - 25:21
**mouths** [1] - 65:20
**move** [13] - 18:2, 18:16, 81:2, 100:7, 114:11, 116:21, 125:14, 136:9, 136:10, 138:5, 140:8, 140:11, 141:20
**moved** [1] - 43:1
**movement** [2] - 117:24, 203:7
**moving** [2] - 103:14, 152:20
**MR** [123] - 4:7, 4:8, 4:11, 4:17, 4:19, 4:23, 5:1, 5:8, 52:14, 52:17, 52:21, 54:17, 58:5, 59:4, 59:17, 59:19, 95:22, 96:1, 96:3, 96:8, 96:11, 96:19, 96:25, 97:7, 98:1, 98:12, 98:19, 107:18, 108:3, 108:7, 109:5, 111:2, 114:16, 114:19, 141:3, 141:9, 141:13, 141:17, 142:9, 142:12, 142:17, 142:21, 142:24, 143:3, 144:2, 144:10, 151:24, 152:3, 152:8, 152:16, 152:18, 152:24, 153:9, 154:3, 154:7, 154:9, 155:17, 156:23, 157:5, 157:8, 158:11, 159:7, 159:10, 159:18, 160:19, 164:1,

164:5, 165:23, 166:1, 166:5, 169:23, 175:1, 181:11, 181:18, 181:20, 184:4, 184:9, 184:14, 184:25, 185:23, 188:24, 189:8, 189:21, 189:23, 199:14, 199:16, 199:17, 201:5, 201:7, 202:12, 202:15, 202:25, 203:4, 209:4, 209:9, 209:14, 209:16, 210:21, 214:7, 214:12, 217:13, 219:14, 219:15, 219:18, 219:21, 219:24, 219:25, 220:4, 220:6, 220:7, 220:12, 220:16, 220:23, 221:2, 221:6, 221:8, 221:12, 221:15, 221:20, 221:22, 222:1, 222:2
**mug** [1] - 87:17
**MULTIMEDIA** [1] - 1:24
**multiple** [11] - 21:11, 41:22, 83:6, 83:24, 95:17, 135:15, 156:20, 187:7, 192:18, 200:2
**multiplied** [1] - 195:20
**multiply** [3] - 94:10, 195:18, 218:4
**multitude** [1] - 57:13
**must** [11] - 61:4, 61:5, 92:5, 92:12, 127:21, 128:11, 132:25, 136:14, 140:8, 171:22, 172:17
**MYERS** [1] - 3:12
**Myers** [1] - 98:13
**myriad** [1] - 97:11

### N

**N.W** [2] - 2:20, 3:12
**NAGARAJAN** [1] - 3:15
**name** [7] - 53:18, 54:2, 55:23, 56:2, 114:17, 168:15, 181:14
**named** [52] - 7:17, 7:18, 13:2, 13:14, 35:12, 39:8, 74:19, 77:18, 79:8, 79:13,

79:16, 85:15, 89:11, 89:15, 92:17, 93:2, 100:23, 104:3, 106:21, 110:4, 116:25, 117:6, 117:10, 118:15, 118:19, 118:23, 119:18, 124:8, 124:12, 124:25, 125:3, 125:12, 128:22, 128:23, 133:18, 138:16, 139:8, 139:21, 139:23, 142:12, 143:19, 144:24, 146:1, 146:9, 146:10, 147:10, 148:15, 163:25, 164:2, 165:1, 176:1, 177:22
**names** [14] - 69:7, 103:16, 103:25, 106:3, 121:18, 121:19, 123:18, 127:1, 128:24, 139:9, 139:20, 146:21, 166:6, 205:18
**narrative** [2] - 149:20, 149:22
**narrow** [1] - 13:13
**NATASHA** [1] - 3:7
**nature** [1] - 135:14
**nauseam** [1] - 123:2
**NCA** [1] - 53:19
**NCA's** [1] - 72:15
**near** [1] - 208:23
**nearly** [11] - 6:18, 9:6, 28:15, 31:11, 34:16, 41:16, 49:15, 52:3, 91:4, 177:2, 177:7
**necessarily** [3] - 53:16, 63:14, 86:18
**necessary** [7] - 106:21, 106:22, 106:24, 106:25, 107:3, 137:8, 137:9
**necessity** [1] - 121:11
**need** [45] - 8:13, 9:23, 11:15, 19:12, 20:10, 20:20, 22:10, 22:13, 25:15, 30:21, 31:13, 36:25, 37:19, 38:18, 42:8, 56:11, 58:5, 76:16, 82:3, 82:20, 86:22, 91:15, 101:5, 103:10, 125:23, 126:1, 135:22, 140:10, 140:13, 155:3, 155:5,

158:23, 159:24, 160:2, 160:10, 160:12, 162:3, 169:5, 172:24, 184:5, 198:18, 205:5, 205:14, 219:22, 220:10
**needed** [3] - 143:2, 160:24, 184:21
**needs** [1] - 155:8
**negative** [7] - 38:23, 92:18, 116:14, 118:15, 119:19, 120:17, 148:15
**negatives** [2] - 36:14, 104:3
**negligent** [1] - 109:23
**negotiable** [6] - 78:13, 92:25, 129:8, 175:5, 176:15, 176:22
**negotiate** [5] - 79:2, 79:4, 144:6, 177:23
**negotiated** [17] - 6:22, 7:1, 24:24, 63:1, 63:2, 78:13, 78:16, 79:12, 79:14, 109:15, 129:8, 145:13, 145:22, 148:2, 170:5, 180:17
**negotiating** [4] - 134:19, 176:3, 176:13, 176:14
**negotiation** [1] - 175:3
**negotiations** [1] - 78:1
**net** [23] - 24:6, 36:8, 36:12, 38:22, 39:4, 39:6, 39:8, 39:19, 40:3, 92:8, 92:11, 92:15, 116:12, 164:3, 165:2, 165:3, 165:10, 166:17, 166:21
**net-net** [2] - 24:6, 116:12
**neutral** [1] - 143:4
**never** [30] - 34:23, 41:4, 41:22, 41:25, 42:2, 46:6, 70:4, 86:5, 86:10, 108:20, 108:24, 109:1, 120:21, 144:15, 146:9, 146:10, 146:11, 164:19, 164:20, 173:17, 173:19, 173:20, 174:9, 188:13, 207:10, 213:2, 216:2, 216:15, 217:8
**nevertheless** [2] - 54:6, 123:10

**new** [12] - 22:9, 22:14, 32:21, 48:13, 68:8, 86:4, 86:5, 86:8, 172:10, 179:8, 200:8, 204:1
**NEW** [1] - 1:1
**New** [30] - 1:5, 1:18, 1:22, 2:10, 2:13, 2:18, 3:6, 6:9, 11:25, 14:19, 14:23, 15:1, 15:17, 17:17, 17:21, 24:1, 27:19, 47:10, 54:24, 82:11, 83:19, 83:20, 133:1, 144:25, 148:14, 168:22, 194:18
**Newton** [1] - 103:20
**Nexium** [1] - 44:3
**next** [12] - 31:2, 47:14, 58:10, 72:14, 97:19, 125:10, 153:23, 174:21, 205:10, 206:2, 210:20, 215:18
**nexus** [1] - 77:7
**night** [3] - 30:23, 31:2, 31:4
**nine** [11] - 33:1, 33:18, 45:17, 46:10, 58:2, 148:11, 163:12, 163:22, 166:10, 221:13, 221:16
**ninety** [2] - 198:12, 219:23
**nippon** [1] - 3:1
**Nippon** [1] - 59:5
**Nobody** [2] - 64:24, 176:14
**nobody** [5] - 12:23, 39:1, 39:2, 64:8, 91:8
**noise** [3] - 62:3, 67:2, 91:25
**non** [21] - 11:23, 12:12, 15:19, 16:17, 62:22, 81:16, 85:1, 86:7, 92:25, 104:22, 106:12, 134:18, 152:13, 159:13, 164:3, 171:6, 175:5, 176:15, 179:18, 214:18
**non-class** [1] - 159:13
**non-conspirators** [1] - 86:7
**non-defendant** [2] - 15:19, 16:17
**non-defendants** [8] - 11:23, 12:12, 62:22, 81:16, 86:7, 106:12, 134:18, 179:18
**non-negotiable** [3] - 92:25, 175:5, 176:15
**non-overcharge** [1] - 164:3
**non-premium** [2] - 152:13, 171:6
**non-statistical** [1] - 214:18
**nonclass** [3] - 49:9, 49:10, 49:20
**noncontroversial** [1] - 31:15
**none** [9] - 4:8, 60:2, 81:12, 118:4, 119:9, 133:20, 181:2, 217:21
**None** [3] - 73:10, 84:9, 180:21
**normal** [2] - 50:24, 184:22
**Northern** [1] - 124:15
**northern** [1] - 180:3
**note** [1] - 11:22
**noted** [6] - 6:14, 7:10, 9:13, 9:16, 29:1, 43:22
**notes** [3] - 131:22, 132:4, 221:8
**nothing** [20] - 72:17, 88:9, 93:6, 97:18, 103:17, 110:5, 122:10, 132:8, 132:9, 158:5, 162:13, 171:15, 186:15, 191:8, 200:19, 202:15, 202:19, 208:3, 220:12
**notion** [3] - 82:18, 100:18, 124:7
**November** [1] - 1:7
**nowhere** [4] - 127:11, 129:23, 150:11, 208:23
**number** [43] - 11:23, 22:2, 23:24, 27:5, 31:20, 37:5, 38:24, 65:16, 66:8, 66:17, 69:2, 69:3, 69:4, 75:25, 81:13, 88:2, 88:9, 92:20, 99:15, 112:10, 112:11, 112:12, 122:6, 123:7, 125:6, 125:8, 130:9, 139:21, 150:25, 151:1, 162:11, 168:13, 202:21, 202:22, 204:19, 205:3,

205:5, 205:11, 209:22, 209:23, 210:7, 212:24, 220:14
**Number** [5] - 223:5, 223:6, 223:7, 223:8, 223:9
**numbering** [1] - 221:2
**numbers** [11] - 16:10, 50:25, 88:1, 93:6, 94:10, 121:22, 123:13, 135:9, 139:5, 158:6, 158:7
**numerosity** [1] - 56:17
**numerous** [5] - 6:7, 8:16, 167:14, 168:12, 177:7
**nurse** [1] - 113:21
**nurses** [3] - 113:22, 135:24, 135:25
**NW** [3] - 2:13, 3:2, 3:9
**NY** [1] - 2:18
**NZ** [1] - 24:1

## O

**o'clock** [3] - 220:4, 220:5, 220:6
**O'Melveny** [1] - 98:13
**O'MELVENY** [1] - 3:12
**objection** [1] - 215:4
**objective** [1] - 57:22
**obligation** [1] - 87:10
**observation** [1] - 204:19
**observations** [11] - 198:21, 205:3, 205:5, 205:6, 205:12, 205:13, 205:15, 205:17, 205:25, 206:3, 206:5
**observed** [1] - 10:4
**obsolete** [5] - 100:12, 141:25, 151:16, 153:8, 153:14
**obvious** [1] - 136:15
**obviously** [6] - 59:21, 120:13, 121:14, 133:9, 140:3, 157:12
**Obviously** [1] - 60:4
**occasionally** [1] - 79:14
**occasions** [1] - 170:10
**occur** [1] - 158:1
**occurred** [4] - 172:2, 177:24, 177:25, 178:9
**ocean** [22] - 19:7, 19:11, 19:15, 19:20,

19:21, 19:22, 19:24, 20:1, 20:5, 20:7, 20:8, 20:19, 20:22, 20:23, 62:15, 63:12, 85:12, 85:13, 85:16, 163:15, 178:23
**Ocean** [1] - 178:19
**October** [2] - 27:3, 172:10
**OF** [2] - 1:1, 1:11
**off-need** [1] - 91:15
**offends** [1] - 99:18
**offense** [1] - 182:7
**offer** [5] - 23:22, 46:19, 63:16, 110:2, 194:13
**offered** [5] - 95:18, 179:2, 201:2, 210:19, 210:22
**offers** [1] - 77:23
**officer** [1] - 15:22
**Official** [1] - 3:17
**offloaded** [1] - 13:4
**offset** [9] - 25:9, 78:16, 78:20, 107:2, 111:9, 145:23, 147:24, 148:3, 152:13
**offsetting** [5] - 25:11, 110:24, 111:7, 137:11, 144:5
**often** [3] - 30:20, 167:18, 198:12
**Olarte** [3] - 19:10, 92:19, 110:10
**older** [2] - 108:15, 161:23
**OLS** [5] - 44:15, 44:21, 45:4, 45:12, 193:5
**omit** [3] - 66:13, 70:22, 136:3
**omits** [1] - 89:2
**omitted** [4] - 71:13, 91:6, 113:9, 132:23
**once** [4] - 4:12, 24:25, 27:11, 75:20
**One** [2] - 73:18, 215:10
**one** [201] - 6:4, 6:23, 9:2, 13:1, 13:14, 14:1, 14:21, 16:4, 16:23, 17:25, 18:22, 18:23, 20:13, 21:20, 22:2, 22:17, 24:15, 25:7, 26:2, 26:3, 27:15, 33:21, 34:8, 34:11, 34:12, 34:17, 34:18, 35:13, 35:17, 35:21, 36:3, 36:19, 37:12, 39:20, 40:5,

40:19, 41:3, 41:5, 44:11, 45:14, 50:16, 53:6, 55:15, 59:13, 61:21, 61:24, 61:25, 66:3, 66:8, 66:22, 66:25, 67:2, 67:8, 67:16, 69:3, 69:4, 71:15, 72:5, 73:17, 73:22, 73:23, 73:25, 74:10, 74:17, 74:23, 75:12, 75:18, 75:19, 76:24, 78:5, 79:16, 79:20, 81:24, 82:25, 83:12, 83:14, 87:17, 88:2, 88:9, 89:8, 90:12, 90:24, 91:15, 92:9, 92:11, 95:21, 104:24, 106:6, 106:10, 107:2, 107:5, 107:22, 110:4, 110:19, 111:4, 112:24, 114:21, 115:1, 115:12, 116:1, 116:9, 116:17, 116:22, 116:23, 116:25, 119:20, 120:9, 123:25, 125:15, 127:22, 129:2, 129:18, 131:1, 131:5, 131:6, 133:13, 133:14, 133:16, 133:19, 134:13, 134:20, 135:8, 135:11, 145:20, 145:21, 146:19, 148:7, 148:9, 149:4, 149:5, 150:4, 151:1, 152:1, 152:12, 152:14, 158:16, 160:12, 161:14, 162:5, 162:11, 162:20, 165:11, 166:9, 167:4, 169:14, 171:3, 171:19, 172:20, 173:19, 174:20, 175:15, 176:1, 176:10, 179:5, 179:17, 181:14, 185:10, 188:1, 188:3, 190:12, 190:19, 190:25, 191:1, 191:4, 192:5, 192:9, 193:18, 194:21, 195:6, 195:20, 196:4, 196:5, 197:19, 200:12, 202:21, 203:21, 206:4, 206:11,

206:12, 210:5, 210:23, 210:24, 214:19, 219:1, 219:2, 219:4, 220:7, 220:19
**one-hundredth** [1] - 34:12
**one-sale** [1] - 71:15
**one-third** [2] - 90:24, 116:17
**one-time** [1] - 71:15
**ones** [11] - 41:9, 60:21, 62:2, 72:5, 97:14, 132:10, 132:11, 150:18, 176:12, 204:25
**ons** [2] - 171:9, 176:15
**open** [1] - 209:6
**opening** [9] - 7:16, 20:4, 23:4, 25:18, 55:18, 68:24, 73:24, 78:24, 84:21
**opera** [1] - 105:19
**operates** [1] - 146:10
**operations** [1] - 15:19
**operative** [1] - 46:21
**opine** [1] - 213:1
**opined** [2] - 210:13, 214:22
**opinion** [20] - 45:4, 48:25, 57:3, 84:16, 86:4, 91:11, 94:2, 104:14, 114:4, 124:14, 132:18, 132:19, 135:24, 136:4, 140:4, 152:5, 161:17, 210:19, 213:3, 214:23
**opinions** [15] - 46:13, 46:19, 133:1, 172:24, 173:1, 173:6, 200:7, 209:19, 209:22, 209:25, 210:3, 210:16, 210:21, 213:1, 213:18
**opportunities** [1] - 157:25
**opportunity** [1] - 212:2
**opposed** [1] - 153:12
**opposite** [3] - 33:19, 93:10, 171:23
**opposition** [10] - 41:12, 72:16, 110:22, 111:2, 111:3, 144:23, 149:3, 177:15, 211:2, 221:18
**option** [2] - 13:7,

14:15
**options** [3] - 13:25, 21:20, 83:25
**oral** [1] - 4:1
**ORAL** [2] - 1:11, 223:11
**order** [4] - 103:13, 184:11, 200:18, 213:17
**ordinarily** [2] - 192:13, 194:1
**ordinary** [1] - 44:14
**Ordinary** [1] - 193:4
**oriented** [1] - 194:25
**origin** [8] - 17:13, 18:6, 24:15, 50:13, 163:15, 182:25, 215:12
**original** [1] - 67:19
**originally** [1] - 123:22
**otherwise** [2] - 166:11, 207:4
**ought** [2] - 46:7, 184:3
**outbound** [13] - 27:9, 30:1, 33:10, 51:10, 51:12, 84:4, 84:8, 84:12, 88:14, 105:2, 117:22, 190:25, 197:4
**outbounds** [1] - 206:4
**outliers** [3] - 23:9, 177:1, 178:1
**outline** [1] - 105:18
**output** [1] - 129:14
**outside** [3] - 74:22, 159:14, 172:4
**outsource** [1] - 119:24
**outwards** [1] - 125:4
**outweighed** [1] - 20:19
**overall** [7] - 32:10, 59:10, 63:18, 163:3, 165:13, 179:11, 191:3
**overarching** [1] - 7:7
**overbuilding** [1] - 130:14
**overcharge** [63] - 29:25, 30:2, 31:12, 33:4, 34:11, 34:17, 36:3, 36:9, 36:13, 39:20, 40:1, 44:22, 47:8, 49:14, 50:9, 50:10, 50:18, 66:25, 89:17, 91:21, 91:24, 91:25, 92:12, 92:15, 94:13, 110:18, 116:13, 116:14, 117:18, 118:1, 118:15, 120:3,

122:2, 122:11, 123:3, 139:10, 145:24, 147:3, 150:13, 150:25, 159:12, 163:8, 164:3, 166:13, 166:17, 166:21, 166:22, 171:15, 172:17, 182:24, 200:5, 205:19, 206:15, 206:23, 206:24, 207:22, 207:23, 208:2, 208:5, 211:17, 212:4, 212:11
**overcharged** [7] - 35:13, 35:19, 35:20, 35:22, 39:3, 92:20
**overcharges** [24] - 36:8, 38:22, 38:23, 39:7, 39:9, 39:19, 49:9, 67:18, 89:21, 92:18, 93:3, 93:5, 94:18, 94:22, 94:24, 117:15, 120:18, 121:10, 123:10, 135:4, 147:1, 165:2, 165:3, 211:21
**overlap** [1] - 69:25
**overlapping** [1] - 149:4
**overpaid** [1] - 162:25
**overreaching** [1] - 146:15
**overriding** [1] - 47:1
**overture** [2] - 105:18, 105:21
**overview** [3] - 59:9, 59:25, 72:1
**own** [21] - 9:10, 48:2, 48:3, 50:21, 62:18, 64:16, 65:20, 74:25, 79:13, 83:3, 84:1, 88:21, 93:1, 96:5, 117:13, 176:7, 205:4, 213:12, 215:14, 217:1
**owns** [1] - 16:3
**Oz** [1] - 133:22
**OZ** [1] - 24:1

---

# P

**p.m** [1] - 98:7
**PA** [1] - 2:2
**Pacific** [4] - 2:20, 20:25, 24:1, 146:6
**package** [2] - 21:17, 192:7
**packages** [2] - 12:16,

13:3
**PAGE** [1] - 223:3
**page** [24] - 46:5, 55:18, 58:10, 67:19, 97:19, 99:10, 131:25, 150:7, 150:22, 153:23, 171:13, 174:21, 188:16, 191:5, 191:15, 194:14, 194:17, 195:23, 197:24, 214:13, 215:9, 215:18, 216:20
**pages** [3] - 68:11, 194:6, 221:22
**paid** [12] - 34:23, 34:24, 56:9, 167:11, 167:13, 169:6, 169:10, 170:2, 176:11, 176:12, 180:21, 181:2
**pair** [3] - 26:3, 145:2, 214:25
**pairs** [12] - 13:13, 14:17, 17:13, 18:4, 18:6, 50:14, 119:17, 123:3, 145:6, 146:1, 163:15, 182:25
**Pakistan** [1] - 102:6
**panel** [3] - 197:20, 197:21, 199:4
**panels** [3] - 136:21, 136:24, 151:4
**paper** [3] - 51:19, 68:16, 110:20
**papers** [11] - 5:10, 13:9, 48:6, 103:13, 168:2, 168:14, 175:4, 180:12, 180:14, 217:18
**paragraph** [5] - 12:20, 54:5, 74:3, 194:11, 215:16
**Paraguay** [1] - 54:18
**Parchment** [1] - 161:23
**pardon** [2] - 111:11, 145:7
**parent** [1] - 20:14
**Paris** [1] - 16:21
**part** [35] - 10:11, 15:21, 15:24, 32:24, 37:24, 61:13, 74:3, 79:4, 80:7, 81:5, 90:5, 95:20, 108:3, 108:7, 108:11, 108:12, 108:23, 126:15, 127:8, 129:9, 152:12,

152:13, 157:13, 158:21, 167:2, 167:25, 169:5, 191:12, 191:18, 194:10, 196:5, 210:14, 214:16, 216:24
**participants** [4] - 9:7, 11:24, 178:2, 180:2
**participating** [3] - 9:9, 15:23, 16:5
**participation** [4] - 5:22, 7:4, 8:12, 11:15
**particular** [22] - 10:22, 18:15, 24:19, 33:16, 34:2, 38:25, 61:16, 74:5, 74:6, 76:12, 128:20, 154:19, 167:10, 172:21, 185:10, 186:3, 195:13, 198:15, 212:5, 212:6, 217:20
**particularly** [3] - 82:22, 200:23, 208:19
**parties** [10] - 11:5, 61:12, 68:4, 101:23, 106:8, 106:11, 132:8, 145:11, 209:5, 209:12
**partner** [1] - 181:25
**parts** [7] - 59:8, 82:5, 82:6, 90:9, 136:8, 136:9, 159:2
**party** [2] - 103:14, 152:20
**pass** [6] - 45:2, 59:12, 61:13, 111:12, 128:17, 214:10
**passage** [3] - 125:16, 130:20, 133:24
**passed** [4] - 33:8, 163:17, 163:21, 170:18
**passenger** [12] - 81:22, 215:1, 215:12, 215:15, 215:16, 215:19, 216:1, 216:2, 216:6, 216:10, 216:15, 217:19
**passengers** [1] - 215:23
**passing** [1] - 165:5
**patch** [1] - 68:7
**patched** [1] - 149:2
**pattern** [2] - 77:2, 79:24
**PAUL** [2] - 1:23, 2:17

**Pause** [1] - 59:16
**pause** [3] - 111:23, 112:15, 183:4
**pay** [6] - 64:25, 80:23, 99:25, 170:1, 180:23, 180:24
**paygrade** [1] - 71:5
**paying** [4] - 6:6, 55:19, 56:8, 148:19
**payment** [1] - 180:20
**pays** [1] - 64:24
**peg** [1] - 48:18
**pending** [1] - 210:24
**Pennsylvania** [1] - 119:4
**penny** [4] - 34:23, 115:1, 127:22, 181:2
**People** [1] - 77:21
**people** [13] - 78:6, 103:8, 104:2, 107:10, 109:15, 119:1, 120:22, 126:6, 129:10, 159:14, 176:19, 215:8, 215:21
**per** [5] - 4:11, 4:13, 27:24, 28:3
**per-kilogram** [2] - 27:24, 28:3
**percent** [78] - 7:23, 8:1, 9:13, 11:7, 11:12, 11:15, 12:18, 16:3, 16:10, 16:16, 31:12, 33:23, 34:9, 34:10, 34:12, 34:13, 39:5, 39:11, 39:12, 39:19, 39:20, 40:3, 49:14, 51:10, 51:11, 51:12, 51:13, 61:20, 61:23, 61:25, 62:5, 66:15, 74:21, 75:10, 75:18, 75:24, 75:25, 76:4, 78:4, 86:7, 93:7, 115:9, 115:11, 117:21, 117:22, 117:23, 125:6, 134:16, 147:1, 165:3, 165:10, 165:11, 165:17, 166:6, 166:7, 166:16, 166:21, 166:22, 169:20, 187:19, 187:24, 191:1, 191:4, 191:7, 195:5, 197:4, 198:12, 206:11, 206:13, 206:16, 218:10
**percentage** [9] - 12:17, 40:10, 49:24,

50:22, 94:10, 124:16, 129:21, 146:25, 161:19
**percentages** [3] - 31:17, 36:19, 116:17
**percolating** [1] - 119:2
**perfect** [7] - 7:9, 25:14, 62:12, 62:16, 98:5, 178:2, 217:1
**perfectly** [1] - 89:12
**performed** [3] - 33:2, 182:9, 198:3
**Performing** [1] - 210:10
**Perhaps** [1] - 192:11
**perhaps** [4] - 27:18, 63:4, 96:23, 218:24
**period** [45] - 13:21, 14:21, 18:18, 22:8, 27:2, 27:4, 31:11, 34:11, 36:3, 50:13, 51:23, 54:13, 54:25, 69:17, 73:6, 73:8, 75:20, 80:5, 80:6, 87:21, 102:4, 102:10, 117:14, 117:15, 117:25, 118:14, 122:18, 123:11, 135:5, 138:13, 145:24, 167:11, 167:14, 168:6, 172:3, 172:4, 172:7, 172:15, 172:17, 172:19, 190:18, 190:21, 206:18, 206:22
**periods** [11] - 60:18, 64:11, 65:23, 66:4, 69:22, 69:24, 73:11, 90:7, 94:6, 145:15
**perishable** [1] - 83:23
**permission** [1] - 59:13
**permit** [2] - 90:17, 92:4
**permitted** [2] - 87:23, 137:21
**person** [1] - 75:12
**persons** [1] - 35:8
**perspective** [1] - 18:12
**persuaded** [1] - 124:5
**pervasive** [1] - 6:16
**Pete** [1] - 14:2
**Ph.D** [2] - 209:20, 209:21
**pharmacy** [2] - 17:16, 17:19
**Philadelphia** [3] - 2:2, 130:16, 130:18
**phone** [1] - 21:18

**phrase** [1] - 48:13
**pick** [3] - 47:24, 167:16, 172:21
**picked** [1] - 53:11
**picture** [2] - 63:19, 175:12
**pie** [1] - 34:7
**piece** [3] - 68:16, 187:11, 218:12
**pieces** [8] - 51:19, 72:3, 90:14, 183:7, 187:9, 187:17, 187:23, 197:18
**piggyback** [2] - 72:9, 72:10
**Pindyck** [1] - 218:16
**PIPER** [1] - 2:20
**pit** [1] - 198:16
**place** [8] - 14:1, 21:21, 24:4, 61:24, 75:7, 83:9, 101:8, 137:18
**places** [5] - 62:21, 79:7, 86:20, 169:1, 177:8
**plainly** [1] - 135:22
**Plaintiff** [2] - 35:14, 223:5
**plaintiff** [16] - 30:7, 35:12, 57:14, 89:11, 99:13, 102:11, 106:22, 110:5, 118:15, 118:19, 128:5, 128:13, 128:20, 139:8, 141:20, 144:24
**Plaintiff's** [5] - 5:5, 6:10, 6:20, 8:19, 53:22
**plaintiff's** [12] - 46:13, 49:8, 104:11, 104:12, 104:15, 108:1, 108:17, 113:10, 113:13, 113:17, 148:13, 153:3
**plaintiff's** [1] - 205:8
**Plaintiffs** [5] - 1:14, 1:21, 63:7, 81:18, 211:10
**plaintiffs** [105] - 4:14, 5:2, 6:24, 7:10, 7:12, 13:2, 13:15, 30:12, 39:8, 42:21, 46:15, 55:18, 60:4, 60:12, 60:22, 61:4, 61:12, 62:14, 63:16, 68:5, 69:13, 70:16, 71:7, 72:4, 74:19, 77:2, 77:18, 78:15, 79:8, 79:13, 79:16, 80:13,

80:21, 81:12, 82:23, 85:15, 89:16, 91:5, 91:9, 92:17, 93:2, 95:19, 99:15, 100:24, 102:17, 103:5, 104:3, 110:16, 112:16, 116:25, 117:5, 117:6, 117:10, 117:17, 119:11, 119:18, 121:5, 121:8, 123:22, 124:8, 125:1, 125:4, 125:12, 125:20, 125:23, 127:11, 128:23, 128:24, 131:12, 133:19, 138:16, 139:21, 139:23, 140:4, 142:13, 143:19, 144:17, 146:1, 148:15, 148:17, 152:24, 153:11, 156:10, 160:23, 162:7, 163:25, 164:3, 165:1, 176:1, 177:22, 181:22, 194:13, 199:19, 200:6, 200:14, 206:9, 207:6, 207:25, 208:22, 212:1, 213:20, 213:24, 220:8
**Plaintiffs'** [1] - 217:17
**plaintiffs'** [34] - 10:11, 42:17, 46:25, 59:7, 61:7, 65:11, 67:15, 72:8, 82:13, 86:4, 118:5, 119:8, 123:8, 124:12, 124:15, 127:7, 129:20, 135:17, 136:5, 159:11, 194:22, 201:3, 205:4, 209:18, 210:11, 210:17, 213:3, 214:16, 214:24, 215:3, 217:16, 220:17, 221:1, 221:3
**plane** [1] - 21:18
**planes** [5] - 13:4, 18:3, 83:15, 215:15, 216:10
**planned** [1] - 100:8
**Plastics** [13] - 113:25, 118:25, 119:3, 119:5, 124:4, 136:11, 147:4, 150:25, 202:1
**plate** [1] - 101:24

**plausible** [1] - 149:16
**played** [1] - 54:4
**Plaza** [1] - 3:5
**plea** [15] - 6:20, 7:2, 7:6, 7:9, 7:10, 7:13, 60:23, 72:22, 73:2, 73:7, 73:9, 73:10, 73:19, 180:18
**plead** [2] - 73:5, 180:19
**pleaded** [4] - 6:5, 15:23, 15:25, 180:25
**pleas** [9] - 60:16, 72:13, 72:20, 73:11, 73:12, 73:16, 146:4, 180:12, 180:15
**pled** [1] - 146:5
**plenty** [2] - 67:16, 89:24
**plot** [2] - 175:16, 193:17
**plots** [2] - 69:19, 79:23
**plucked** [1] - 172:9
**Poh** [1] - 18:25
**Pohorelsky** [1] - 4:4
**POHORELSKY** [1] - 1:12
**Point** [1] - 202:22
**point** [43] - 14:15, 19:13, 31:15, 34:16, 34:18, 35:11, 35:18, 38:4, 40:2, 40:14, 41:11, 50:5, 68:7, 74:7, 75:10, 76:15, 89:5, 91:17, 94:17, 106:11, 116:4, 116:7, 120:18, 127:16, 136:17, 140:18, 150:4, 162:20, 172:21, 179:1, 179:3, 191:14, 194:18, 194:23, 202:21, 204:23, 213:8, 215:11, 215:12, 216:18, 217:14
**pointed** [7] - 11:17, 67:16, 69:12, 160:22, 185:17, 193:13, 213:19
**pointing** [1] - 50:20
**pointless** [1] - 25:11
**points** [8] - 103:16, 110:14, 184:15, 197:19, 204:20, 204:23, 206:7, 213:23
**Poland** [3] - 16:16, 16:20, 16:22

**Polar** [19] - 2:6, 7:1, 7:9, 7:17, 7:18, 7:24, 8:2, 8:5, 9:16, 12:21, 12:22, 16:4, 16:5, 18:17, 20:14, 24:14, 55:3, 182:17, 212:5
**Polar's** [7] - 7:6, 7:9, 7:25, 24:21, 25:4, 28:9, 55:5
**policy** [2] - 23:23, 102:13
**polite** [2] - 21:18, 62:23
**pooh** [1] - 76:13
**pooh-poohed** [1] - 76:13
**poohed** [1] - 76:13
**pool** [2] - 199:4, 204:20
**pooled** [4] - 70:25, 197:23, 201:19, 218:17
**Pooled** [1] - 218:17
**pools** [1] - 205:18
**poor** [2] - 134:15, 135:3
**port** [1] - 74:5
**portion** [3] - 12:12, 66:14, 152:10
**position** [2] - 97:5, 97:7
**positions** [1] - 194:22
**positive** [28] - 29:25, 33:3, 38:22, 38:23, 39:4, 39:6, 39:8, 39:19, 48:16, 48:22, 67:22, 91:21, 91:24, 91:25, 92:8, 92:10, 92:11, 137:3, 165:2, 165:3, 165:10, 165:11, 166:17, 166:21, 172:17, 190:17, 218:20, 218:21
**positives** [13] - 36:14, 40:4, 48:12, 48:17, 50:19, 67:13, 94:5, 103:22, 116:22, 118:13, 145:23, 150:23, 174:20
**Posner** [1] - 22:18
**possibility** [5] - 20:23, 35:1, 35:7, 56:3, 158:6
**possible** [6] - 19:21, 72:11, 78:19, 79:1, 80:24, 92:14
**possibly** [1] - 172:23
**post** [2] - 160:18, 160:19

**post-Comcast** [2] - 160:18, 160:19
**potential** [5] - 18:12, 48:16, 158:24, 174:20, 217:6
**pour** [1] - 110:12
**power** [16] - 11:4, 11:20, 19:5, 39:22, 122:12, 124:6, 156:10, 175:3, 192:12, 193:16, 204:3
**powerful** [3] - 116:23, 120:6
**PowerPoint** [1] - 214:9
**PowerPoints** [1] - 98:14
**practical** [1] - 97:8
**practice** [2] - 45:16, 196:10
**practices** [2] - 25:16, 28:23
**precise** [4] - 38:3, 38:5, 38:11
**precision** [2] - 31:13, 162:4
**preclude** [5] - 35:6, 35:9, 57:9, 161:4, 161:12
**predicted** [1] - 192:18
**predictive** [1] - 89:2
**predominance** [5] - 56:24, 60:7, 112:8, 120:1, 154:11
**predominant** [1] - 21:22
**predominate** [9] - 5:12, 42:7, 48:11, 57:1, 118:7, 155:20, 156:2, 162:18, 189:3
**preference** [1] - 98:17
**preliminary** [2] - 4:5, 211:5
**premise** [5] - 70:12, 90:2, 105:23, 127:18, 197:8
**premium** [8] - 108:11, 152:10, 152:12, 152:13, 171:1, 171:2, 171:6
**prepared** [2] - 5:2, 20:13
**preponderance** [3] - 10:21, 155:4, 155:13
**prescription** [3] - 17:16, 17:17, 17:19
**present** [9] - 9:23, 10:6, 10:22, 10:24, 11:1, 43:8, 45:11,

83:5, 175:12, 196:20
**presentation** [4] - 81:5, 110:7, 131:25, 210:7
**presented** [12] - 23:10, 57:5, 83:23, 115:3, 119:7, 122:12, 124:6, 156:10, 175:3, 192:12, 193:16, 204:3
**presently** [1] - 210:24
**presents** [1] - 9:1
**president** [1] - 25:4
**Presidents** [2] - 220:2, 220:3
**presiding** [1] - 4:4
**press** [1] - 72:19
**pressed** [2] - 34:21, 188:1
**presumably** [1] - 99:12
**presume** [1] - 71:16
**presumed** [1] - 63:15
**presumption** [1] - 201:11
**pretty** [9] - 14:13, 90:10, 90:15, 132:17, 154:22, 181:14, 193:8, 216:7
**prevent** [2] - 61:1, 213:24
**prevented** [1] - 74:4
**price** [101] - 14:13, 17:22, 20:11, 20:15, 21:12, 21:22, 21:24, 21:25, 24:19, 28:6, 36:5, 36:7, 39:2, 55:11, 55:16, 56:7, 62:19, 64:25, 66:14, 68:17, 73:16, 73:18, 76:2, 76:8, 76:14, 77:12, 77:17, 77:22, 77:23, 78:9, 78:10, 79:3, 79:9, 81:15, 82:10, 82:11, 83:5, 83:10, 85:6, 85:24, 91:17, 92:13, 93:25, 95:7, 95:11, 102:18, 106:17, 107:8, 107:11, 107:23, 108:2, 108:9, 109:12, 109:15, 117:24, 123:5, 129:9, 129:14, 129:17, 149:5, 149:14, 151:9, 151:21, 151:23, 152:9, 152:11, 153:4, 154:21,

162:6, 169:9, 169:12, 169:14, 169:16, 169:19, 169:22, 170:7, 170:13, 170:17, 170:21, 171:2, 171:5, 171:10, 174:10, 176:13, 176:15, 179:6, 179:24, 180:1, 184:21, 191:3, 194:9, 203:2, 203:6, 203:7, 217:4
**price-fixing** [4] - 36:5, 36:7, 39:2, 73:16
**priced** [2] - 94:22, 94:25
**prices** [59] - 6:6, 6:14, 11:4, 19:6, 22:1, 22:4, 22:20, 24:21, 28:13, 55:14, 55:19, 56:1, 56:8, 56:12, 63:1, 69:6, 75:1, 75:3, 75:7, 75:14, 75:16, 75:24, 76:1, 76:7, 76:10, 76:14, 76:15, 77:12, 78:12, 78:18, 78:23, 79:15, 82:13, 86:17, 86:18, 94:2, 107:11, 127:12, 130:13, 130:14, 145:2, 148:19, 149:4, 149:6, 169:6, 170:15, 171:12, 171:23, 171:25, 172:3, 172:20, 174:17, 186:6, 192:17, 192:18, 193:17
**pricing** [3] - 112:19, 112:22, 151:8
**primary** [2] - 201:9, 208:20
**prime** [1] - 29:2
**principal** [2] - 81:7, 215:3
**principally** [2] - 59:20, 64:24
**principles** [2] - 42:16, 189:25
**printout** [1] - 176:6
**priori** [1] - 112:5
**priority** [1] - 13:3
**prison** [2] - 9:8, 177:10
**private** [2] - 60:21, 99:7
**problem** [35] - 37:22, 46:11, 80:12, 82:22,

86:23, 87:14, 88:12, 90:17, 91:20, 103:7, 104:17, 117:19, 118:14, 121:20, 123:12, 125:20, 125:21, 129:1, 134:21, 135:4, 138:14, 145:18, 145:19, 150:13, 179:5, 184:21, 187:22, 196:18, 197:5, 197:17, 199:19, 212:14, 215:7, 215:8
**problems** [13] - 25:25, 26:1, 26:13, 33:14, 84:5, 86:23, 88:21, 90:12, 152:20, 152:21, 171:3, 208:9, 214:15
**procedural** [2] - 61:10, 220:8
**Procedure** [1] - 99:19
**procedure** [3] - 208:2, 208:3
**proceeding** [1] - 210:22
**Proceedings** [1] - 222:3
**proceedings** [4] - 3:20, 7:17, 8:4, 59:16
**Processing** [2] - 136:4, 210:6
**processing** [1] - 99:24
**produce** [4] - 95:24, 198:13, 198:20, 199:1
**produced** [2] - 3:20, 135:7
**producing** [1] - 150:23
**product** [14] - 18:14, 19:16, 24:19, 83:11, 85:20, 88:6, 109:17, 129:16, 129:21, 144:18, 144:25, 151:8, 171:1
**Professor** [1] - 65:7
**profitability** [2] - 9:14, 9:15
**progenitors** [1] - 192:6
**promised** [1] - 23:6
**promoted** [1] - 194:19
**prompt** [2] - 4:21, 4:22
**proof** [23] - 6:3, 6:24, 10:11, 11:2, 29:7, 45:13, 57:2, 60:13, 60:15, 73:4, 100:20,

110:4, 110:5, 125:24, 133:10, 133:11, 135:18, 140:25, 141:2, 161:13, 163:6, 178:10
**proper** [3] - 70:25, 189:5, 199:10
**properly** [2] - 50:6, 187:3
**property** [1] - 128:13
**proportion** [1] - 40:6
**proposal** [1] - 185:19
**propose** [1] - 221:10
**proposed** [11] - 57:7, 74:21, 75:11, 91:5, 113:1, 119:8, 155:5, 162:5, 162:16, 180:6, 200:3
**proposes** [1] - 94:8
**proposing** [2] - 57:16, 185:7
**proposition** [6] - 40:11, 46:20, 113:3, 115:8, 118:21, 124:5
**propounded** [1] - 127:12
**prosecuted** [2] - 15:23, 47:12
**prosecutions** [1] - 6:8
**protective** [1] - 83:25
**prove** [31] - 5:11, 5:19, 5:20, 7:15, 21:7, 28:19, 28:20, 30:9, 41:23, 46:17, 55:25, 57:5, 67:6, 67:8, 74:19, 74:24, 75:3, 76:16, 93:14, 95:18, 96:6, 96:9, 96:10, 107:8, 131:14, 139:14, 141:8, 173:9, 180:17, 216:21
**proved** [5] - 39:17, 49:16, 107:9, 141:12, 162:4
**proven** [1] - 123:25
**proves** [3] - 24:9, 25:10, 166:13
**provide** [4] - 8:5, 21:11, 132:25, 213:17
**provided** [7] - 10:23, 27:5, 39:15, 43:20, 131:17, 209:25, 212:20
**provides** [2] - 31:6, 99:19
**providing** [1] - 118:8
**proving** [8] - 7:11,

29:6, 56:14, 74:24, 82:20, 93:9, 116:4, 116:7
**proxies** [1] - 138:17
**prudent** [1] - 13:7
**Prudential** [1] - 2:6
**publication** [1] - 173:15
**publications** [1] - 173:15
**published** [7] - 104:14, 124:14, 132:19, 135:24, 193:19, 195:24, 201:16
**Publishes** [1] - 192:21
**Publishing** [1] - 205:10
**pull** [3] - 193:18, 196:12, 201:16
**purchased** [2] - 108:18, 120:11
**purchaser** [5] - 107:15, 112:23, 153:2, 170:16, 170:19
**purchasers** [1] - 148:23
**purchases** [1] - 161:19
**pure** [1] - 88:25
**purport** [1] - 112:7
**purporting** [2] - 27:9, 127:20
**purports** [1] - 118:2
**purpose** [3] - 35:16, 77:14, 81:7
**purposes** [7] - 31:12, 31:16, 49:22, 49:25, 185:21, 201:8
**pursuant** [1] - 102:13
**pursued** [1] - 154:24
**put** [53] - 24:6, 37:11, 37:24, 44:24, 47:9, 47:11, 50:25, 55:17, 56:2, 61:6, 69:3, 70:1, 95:20, 98:22, 98:25, 101:23, 101:25, 103:14, 106:2, 106:19, 109:3, 111:6, 118:19, 122:7, 122:14, 124:13, 126:23, 127:1, 131:22, 139:9, 144:4, 146:14, 164:4, 166:9, 166:11, 170:9, 175:7, 175:15, 176:16, 185:13,

189:11, 189:16, 191:16, 197:10, 197:12, 198:19, 200:17, 201:2, 201:4, 209:5, 215:21, 215:22
**putative** [2] - 135:19, 147:8
**puts** [1] - 205:17
**putting** [4] - 110:16, 125:1, 203:4, 203:5

**Q**

**qua** [1] - 85:1
**qualitative** [1] - 29:14
**quality** [2] - 111:18, 132:24
**Quantas** [2] - 9:17, 23:17
**quantify** [1] - 118:2
**quarrel** [1] - 79:6
**quarreling** [1] - 21:25
**quarter** [2] - 58:3, 58:8
**questionable** [1] - 112:4
**questioned** [3] - 52:21, 176:4, 176:5
**questions** [28] - 5:12, 5:13, 30:19, 31:8, 42:7, 42:8, 50:16, 56:18, 57:1, 57:4, 57:9, 98:20, 109:25, 118:7, 151:19, 153:17, 153:18, 155:20, 155:21, 156:2, 162:17, 178:14, 181:9, 182:8, 199:22, 200:16
**quickly** [3] - 81:2, 83:11, 149:12
**quite** [5] - 72:24, 165:11
**quote** [17] - 23:21, 37:11, 37:25, 98:25, 99:9, 108:1, 131:4, 131:5, 136:22, 140:1, 144:17, 147:3, 194:16, 194:21, 194:24, 207:13, 207:20
**quoted** [2] - 74:2, 83:12
**quotes** [1] - 131:5
**quoting** [1] - 154:15

**R**

**R-squared** [4] -

134:15, 190:24, 190:25, 191:7
**radar** [2] - 109:24, 121:18
**Rail** [21] - 42:15, 48:15, 48:19, 48:22, 111:23, 112:16, 117:16, 120:5, 121:5, 123:11, 132:14, 142:1, 150:24, 151:2, 156:9, 157:17, 158:18, 159:4, 174:14, 174:16
**railroad** [1] - 120:8
**raise** [3] - 11:4, 19:5, 208:6
**raised** [4] - 41:8, 128:14, 182:17, 209:10
**raises** [1] - 121:24
**raising** [1] - 28:13
**RAMESH** [1] - 3:15
**ramification** [1] - 60:15
**ramp** [4] - 145:20, 145:21, 145:23
**ramps** [1] - 146:20
**ran** [9] - 109:16, 128:25, 137:2, 187:8, 190:1, 197:6, 203:24, 207:13, 213:17
**random** [5] - 33:7, 67:2, 91:25, 115:13, 116:10
**range** [2] - 80:2, 216:10
**ranges** [1] - 191:4
**rare** [4] - 23:8, 25:4, 177:1, 178:1
**rarest** [1] - 176:22
**rate** [18] - 22:25, 23:18, 24:24, 25:9, 25:12, 55:4, 73:18, 79:3, 93:18, 107:1, 111:9, 115:1, 168:18, 169:4, 170:6, 177:15, 177:18, 177:19
**Rates** [1] - 78:13
**rates** [33] - 23:12, 23:15, 23:22, 23:23, 24:6, 24:7, 25:3, 25:24, 40:24, 54:1, 54:7, 54:21, 54:25, 55:7, 56:2, 56:4, 78:20, 78:22, 81:24, 102:19, 129:6, 129:8, 145:23,

150:5, 150:6, 150:7, 150:10, 150:12, 168:13, 169:3, 170:9, 197:10, 197:12
**rather** [5] - 44:15, 52:13, 128:19, 182:19, 192:8
**ratio** [1] - 22:17
**Rausser** [6] - 49:7, 112:15, 112:18, 135:21, 196:10, 216:20
**Rausser's** [1] - 135:21
**re** [2] - 4:3, 148:6
**RE** [1] - 1:5
**re-reading** [1] - 148:6
**reach** [2] - 141:4, 143:18
**reached** [8] - 8:23, 18:10, 146:11
**reaches** [1] - 160:20
**reaction** [1] - 128:6
**read** [25] - 30:21, 35:12, 38:8, 101:1, 114:4, 121:17, 125:22, 130:7, 131:1, 131:23, 132:14, 137:20, 138:23, 138:24, 139:16, 144:7, 146:4, 173:23, 176:17, 177:20, 178:11, 178:14, 197:25
**readily** [2] - 65:22, 154:12
**reading** [1] - 148:6
**ready** [4] - 59:17, 98:10, 181:17, 219:12
**Reagents** [1] - 36:6
**real** [16] - 13:11, 23:5, 28:10, 51:19, 53:3, 63:9, 64:25, 90:17, 104:2, 104:18, 121:24, 125:20, 135:4, 135:16, 152:20
**real-world** [1] - 135:16
**reality** [2] - 23:3, 53:16
**realize** [1] - 211:13
**really** [47] - 12:14, 12:22, 22:9, 22:16, 24:10, 41:2, 42:4, 44:8, 46:9, 50:20, 62:7, 65:20, 70:6, 73:12, 76:25, 77:4, 77:14, 77:16, 79:10,

79:17, 79:20, 80:14, 84:2, 85:8, 87:14, 92:2, 98:17, 100:10, 107:7, 129:12, 132:18, 132:19, 138:23, 139:15, 145:11, 147:20, 158:12, 161:24, 164:22, 175:9, 175:13, 179:23, 179:25, 181:23, 196:12, 196:13, 214:23
**rearrange** [1] - 187:7
**rearranging** [1] - 187:1
**reason** [19] - 14:5, 14:14, 18:5, 20:18, 24:18, 40:13, 55:15, 99:4, 125:3, 160:23, 160:24, 169:2, 172:21, 177:5, 186:17, 190:13, 190:21, 191:9, 191:10
**reasonable** [6] - 50:1, 94:9, 132:25, 163:2, 166:15, 198:22
**reasoning** [3] - 101:9, 117:9, 139:22
**reasons** [4] - 95:17, 97:8, 170:8, 195:3
**rebuttal** [1] - 4:16
**recap** [1] - 152:19
**recast** [1] - 46:24
**receiving** [1] - 61:23
**recent** [2] - 9:12, 67:14
**Recess** [1] - 181:15
**recess** [7] - 52:12, 58:2, 58:9, 98:9, 153:21, 153:22, 181:13
**recession** [1] - 190:20
**recognize** [1] - 64:20
**recognized** [5] - 9:11, 32:20, 60:6, 74:2, 84:19
**reconciled** [2] - 100:6, 146:17
**record** [34] - 23:7, 40:21, 48:10, 59:9, 59:11, 59:20, 59:22, 85:15, 105:6, 105:10, 110:23, 116:24, 126:22, 133:15, 135:1, 138:21, 139:3, 144:5, 144:7, 145:4, 145:12, 148:3,

149:21, 150:17, 157:1, 172:25, 173:23, 176:10, 177:25, 197:16, 197:17, 197:18, 219:2, 221:21
**recorded** [1] - 3:20
**records** [1] - 145:8
**recover** [1] - 106:22
**recovery** [7] - 105:24, 157:19, 157:20, 157:21, 158:4, 158:8, 158:20
**redo** [1] - 203:13
**redress** [1] - 43:24
**reduced** [2] - 112:19, 112:22
**reduced-form** [1] - 112:22
**reducing** [1] - 23:18
**reduction** [1] - 78:19
**Reed** [5] - 113:18, 113:20, 125:11, 135:14, 150:25
**refer** [5] - 128:16, 161:5, 162:8, 182:14, 204:23
**reference** [1] - 173:13
**referenced** [2] - 8:2, 111:20
**referencing** [1] - 7:2
**referred** [3] - 156:7, 175:25, 177:14
**referring** [2] - 144:17, 151:21
**refined** [2] - 169:17, 169:20
**reflect** [8] - 99:15, 101:22, 101:25, 110:8, 110:9, 125:8, 221:8
**reflected** [2] - 213:15, 217:6
**reflecting** [1] - 51:6
**reflective** [2] - 100:1, 166:18
**reflects** [1] - 44:5
**refrain** [2] - 100:11, 101:15
**refreshing** [1] - 148:7
**refuted** [1] - 112:5
**regard** [3] - 181:22, 199:7, 216:18
**regarding** [2] - 18:11, 48:8
**regardless** [2] - 53:21, 95:8
**region** [2] - 113:23, 130:18
**regional** [3] - 11:18,

11:19, 148:4
**regionally** [2] - 102:19, 105:11
**regions** [2] - 138:12, 148:22
**regression** [44] - 31:24, 41:22, 89:4, 108:21, 109:16, 113:19, 135:1, 135:15, 135:22, 136:2, 136:14, 139:6, 139:14, 144:2, 144:4, 144:7, 156:20, 156:21, 164:19, 173:18, 173:22, 173:25, 183:1, 183:18, 187:7, 187:21, 188:6, 189:5, 189:9, 190:1, 190:20, 191:8, 191:11, 192:9, 192:18, 196:3, 197:6, 201:19, 205:6, 213:2, 213:6, 213:21
**regressions** [32] - 29:23, 102:23, 103:2, 103:3, 105:3, 105:8, 105:9, 113:7, 114:2, 132:20, 139:3, 173:11, 173:24, 183:7, 187:20, 187:25, 188:3, 188:15, 189:25, 192:5, 195:3, 195:10, 196:9, 196:25, 197:5, 198:3, 211:11, 212:15, 212:25, 213:1, 213:5, 213:22
**regrouped** [1] - 69:13
**regulators** [1] - 47:11
**regulatory** [3] - 7:17, 8:4, 55:12
**reinforced** [1] - 11:19
**reject** [4] - 43:15, 135:12, 136:2, 213:5
**rejected** [6] - 10:9, 15:9, 45:7, 114:2, 213:6, 217:25
**rejecting** [1] - 212:25
**related** [2] - 82:5, 94:17
**relationship** [5] - 95:15, 99:16, 108:24, 152:25, 153:4
**relationships** [2] - 127:10, 148:24

**relative** [1] - 182:18
**relatively** [1] - 66:16
**releases** [1] - 72:19
**relevance** [3] - 75:22, 76:6, 216:17
**relevant** [15] - 38:9, 38:10, 60:13, 65:10, 82:19, 82:21, 85:20, 144:14, 163:8, 172:1, 185:5, 196:22, 200:21, 215:5, 216:14
**reliability** [3] - 66:18, 68:3, 70:6
**reliable** [22] - 38:20, 39:5, 42:18, 43:12, 67:3, 92:3, 93:9, 93:10, 95:18, 95:24, 98:4, 118:8, 118:10, 140:13, 155:6, 155:7, 156:11, 156:17, 156:24, 158:22, 183:10, 195:5
**reliably** [3] - 96:12, 155:14, 155:15
**relied** [6] - 82:24, 204:5, 204:6, 210:4, 213:21, 215:1
**relies** [4] - 12:23, 81:19, 92:14, 216:5
**rely** [6] - 4:21, 60:12, 72:6, 72:20, 140:4, 202:2
**relying** [6] - 157:3, 185:2, 202:18, 203:21, 204:7, 218:21
**remain** [1] - 129:8
**remains** [4] - 61:20, 80:11, 180:19
**remanded** [1] - 174:19
**remarks** [1] - 100:8
**Remember** [3] - 84:2, 193:17, 203:1
**remember** [29] - 14:18, 16:9, 17:4, 19:25, 27:18, 31:19, 36:18, 37:14, 38:17, 39:16, 42:1, 44:15, 45:15, 57:18, 83:13, 83:15, 114:24, 115:5, 160:21, 170:3, 184:24, 185:10, 189:2, 192:24, 195:17, 206:12, 207:10, 221:7
**remind** [5] - 4:9, 133:20, 133:21,

165:16, 192:16
**remove** [1] - 12:5
**render** [2] - 25:10, 122:10
**rendered** [2] - 123:21, 123:23
**rendering** [2] - 138:14, 145:16
**renders** [4] - 118:13, 122:20, 122:23, 138:10
**renewed** [1] - 175:2
**repeated** [1] - 115:20
**repeatedly** [1] - 8:2
**repeating** [1] - 136:18
**replete** [1] - 116:3
**reply** [18] - 11:21, 12:20, 27:4, 27:13, 27:17, 48:20, 51:14, 70:3, 70:9, 74:15, 92:1, 115:7, 170:23, 171:4, 175:18, 176:5, 177:16, 199:6
**report** [13] - 67:19, 67:22, 68:24, 70:3, 70:5, 74:15, 93:7, 103:7, 153:11, 171:14, 182:3, 208:8, 212:23
**reported** [2] - 59:21, 102:2
**reporter** [1] - 198:7
**Reporter** [2] - 3:17, 3:17
**reports** [5] - 48:14, 68:11, 69:14, 71:12, 211:1
**represent** [1] - 34:8
**representative** [16] - 32:5, 32:6, 32:10, 32:14, 32:19, 32:23, 33:20, 34:6, 40:2, 41:18, 56:22, 88:24, 89:17, 122:17, 163:9, 165:6
**representatives** [4] - 56:19, 61:15, 118:23, 142:13
**represented** [1] - 108:23
**representing** [1] - 59:5
**request** [2] - 57:24, 177:17
**requesting** [1] - 182:20
**require** [6] - 32:3, 37:1, 45:12, 131:12, 131:15, 160:14
**required** [7] - 43:21,

44:4, 46:14, 97:12, 167:21, 180:6, 190:7
**requirement** [2] - 128:14, 160:25
**requirements** [4] - 21:16, 56:16, 57:24, 126:13
**requires** [8] - 8:12, 9:2, 44:5, 98:3, 101:11, 128:4, 155:19, 199:23
**requiring** [1] - 101:10
**res** [1] - 143:16
**research** [1] - 219:5
**resemblance** [1] - 94:1
**reserve** [3] - 4:15, 199:13, 206:8
**reserved** [1] - 140:9
**resides** [2] - 129:22, 192:16
**Residuals** [1] - 192:17
**residuals** [2] - 192:13, 192:14
**resisted** [3] - 63:12, 80:21, 82:18
**resolve** [1] - 11:8
**resolving** [1] - 210:23
**resorted** [1] - 150:9
**respect** [12] - 38:9, 70:19, 124:21, 159:16, 178:7, 201:11, 201:12, 203:16, 207:5, 207:18, 213:11, 220:24
**respectable** [1] - 89:12
**respectfully** [7] - 57:24, 100:12, 110:15, 112:1, 115:24, 133:21, 141:15
**respective** [1] - 68:4
**respond** [3] - 70:21, 160:8, 211:3
**respondents** [1] - 101:6
**response** [11] - 101:15, 104:5, 104:6, 131:11, 152:21, 177:21, 177:22, 195:25, 200:6, 213:8
**responses** [1] - 202:12
**rest** [2] - 17:1, 196:9
**restitution** [6] - 57:21, 57:22, 180:20, 180:21, 180:23,

181:3
**restraint** [1] - 129:15
**restricting** [1] - 212:7
**result** [36] - 30:11, 33:13, 35:14, 35:15, 66:3, 67:2, 74:11, 77:9, 78:2, 87:17, 87:23, 89:3, 90:3, 92:5, 92:6, 99:14, 107:17, 123:21, 123:23, 124:1, 131:18, 135:7, 164:18, 169:6, 169:25, 172:22, 175:20, 183:9, 183:12, 183:13, 194:15, 198:14, 198:20, 199:1, 211:12
**result's** [1] - 195:12
**resulted** [2] - 28:2, 171:23
**resulting** [2] - 43:9, 131:14
**results** [34] - 29:24, 33:17, 37:13, 38:17, 38:24, 39:4, 42:4, 44:9, 44:10, 44:23, 45:24, 45:25, 46:4, 47:3, 47:4, 65:22, 69:10, 82:4, 82:6, 88:17, 93:12, 104:2, 115:16, 116:16, 192:9, 194:25, 195:4, 195:13, 203:25, 204:1, 204:11, 212:11, 212:17, 214:2
**resume** [5] - 58:2, 98:7, 98:10, 153:21, 181:14
**retransform** [3] - 38:15, 38:19, 115:16
**retransformation** [5] - 36:21, 37:7, 38:13, 71:4, 192:1
**retransformed** [1] - 35:14
**returned** [1] - 162:10
**rev** [1] - 119:18
**revenue** [6] - 8:1, 34:9, 39:12, 165:17, 165:20, 166:8
**revenues** [4] - 12:18, 12:19, 103:9
**reversed** [4] - 99:3, 100:17, 102:14, 112:18
**review** [1] - 68:1
**reviews** [1] - 156:8

**revolutionary** [3] - 118:21, 124:5
**RFSS** [1] - 23:20
**RICO** [3] - 99:4, 99:7
**rights** [1] - 137:23
**rigorous** [2] - 155:3, 178:15
**RIM** [4] - 19:25, 110:10, 176:1, 176:6
**Rio** [1] - 75:15
**rise** [1] - 143:21
**rising** [1] - 194:13
**risk** [3] - 9:6, 19:16, 19:19
**Rite** [1] - 17:18
**RMR** [1] - 3:17
**road** [2] - 114:12, 115:22
**roadmap** [1] - 59:25
**Robert** [1] - 181:24
**ROBERT** [1] - 3:3
**ROBINS** [1] - 1:21
**Robinson** [3] - 147:21, 151:2, 171:18
**robust** [13] - 32:22, 33:11, 33:15, 38:3, 38:5, 38:11, 39:17, 46:9, 49:17, 163:13, 165:14, 166:13
**robustness** [28] - 32:21, 32:25, 33:1, 33:3, 33:10, 33:18, 33:21, 33:25, 34:2, 45:17, 46:10, 90:8, 136:19, 163:12, 163:22, 164:15, 165:6, 166:10, 178:24, 198:9, 206:20, 207:5, 207:14, 207:15, 207:18, 207:21
**Roger** [2] - 19:25, 175:25
**rolling** [1] - 106:16
**Ron** [2] - 24:21, 55:4
**room** [3] - 91:16, 135:11, 168:17
**root** [1] - 193:12
**ROPES** [1] - 2:5
**Ropes** [1] - 209:17
**ROSCOE** [1] - 2:14
**rotten** [1] - 19:20
**roughly** [3] - 54:13, 99:22
**round** [1] - 48:18
**route** [32] - 14:22, 17:11, 18:8, 18:16, 18:23, 31:11, 34:18, 62:10, 64:21, 65:1,

65:4, 69:23, 77:1, 81:15, 83:19, 83:20, 84:12, 84:22, 84:23, 87:20, 88:15, 114:8, 130:18, 148:11, 186:8, 214:25, 217:21
**routes** [42] - 8:3, 13:15, 13:18, 13:22, 17:2, 17:12, 17:24, 18:3, 18:16, 18:18, 18:19, 21:19, 26:5, 60:17, 64:11, 72:14, 72:17, 72:18, 75:8, 77:13, 82:2, 83:6, 83:14, 83:18, 83:24, 84:9, 84:11, 84:17, 84:18, 88:19, 102:3, 119:5, 122:18, 137:1, 179:2, 179:9, 198:4, 211:22, 212:7, 212:19
**routinely** [3] - 120:16, 180:10, 206:24
**RPR** [1] - 3:17
**Rubinfeld** [2] - 201:18, 218:16
**rule** [7] - 24:9, 25:10, 42:9, 44:4, 112:8, 129:12, 219:12
**Rule** [16] - 56:16, 57:23, 61:10, 99:19, 101:11, 112:6, 122:25, 130:14, 139:1, 140:13, 143:9, 143:14, 154:12, 155:19, 180:7, 189:3
**Rules** [5] - 99:18, 99:19, 100:6, 110:6, 119:25
**rules** [3] - 105:14, 143:25
**run** [19] - 19:16, 33:3, 33:7, 33:23, 44:10, 115:4, 117:13, 128:22, 128:25, 136:24, 139:17, 146:23, 189:5, 192:8, 196:8, 205:6, 212:13, 213:20, 213:22
**running** [10] - 86:22, 88:2, 125:1, 138:16, 190:20, 191:11, 196:24, 198:13, 203:12, 212:15
**runs** [1] - 166:10
**RUSKIN** [1] - 3:5
**Russian** [1] - 114:21

**RXR** [1] - 3:5

**S**

**S.Ct** [1] - 155:19
**sake** [2] - 47:16, 220:12
**sale** [1] - 71:15
**sales** [1] - 34:13
**salmon** [3] - 24:8, 24:13, 24:15
**salvage** [1] - 200:20
**SALZMAN** [1] - 1:23
**sample** [1] - 40:3
**samples** [1] - 197:3
**SANDERS** [1] - 3:8
**Santiago** [1] - 145:1
**SAS** [1] - 192:6
**SAT** [6] - 13:14, 13:20, 13:22, 14:1, 14:3, 22:1
**SAT's** [1] - 13:17
**satisfied** [5] - 36:15, 101:11, 126:12, 133:12, 155:4
**satisfy** [3] - 141:8, 147:16, 173:18
**satisfying** [1] - 135:17
**save** [3] - 19:19, 66:19, 114:11
**savings** [1] - 20:19
**saw** [23] - 9:15, 13:1, 15:22, 21:5, 21:20, 25:18, 37:23, 48:15, 59:21, 71:2, 84:21, 89:18, 101:5, 132:4, 135:16, 142:1, 167:18, 167:19, 168:22, 189:10, 192:1, 194:5, 197:10
**sbryant102@verizon .net** [1] - 3:18
**scale** [1] - 193:16
**scales** [1] - 193:22
**scalper** [1] - 91:16
**scarecrow** [1] - 133:22
**scattered** [1] - 69:21
**scheme** [3] - 6:16, 6:17
**school** [2] - 114:16, 114:18
**science** [6] - 103:19, 106:23, 172:18, 187:12, 203:17, 204:16
**scientific** [6] - 103:20, 112:25, 136:14, 183:20, 211:23
**scope** [1] - 60:13

**score** [1] - 71:21
**SCOTT** [1] - 3:14
**screen** [2] - 5:8, 197:11
**screwing** [1] - 202:19
**script** [1] - 10:5
**sea** [2] - 20:15, 21:2
**Seafood** [1] - 24:16
**seasonality** [2] - 189:17
**seated** [2] - 59:1, 181:16
**Second** [16] - 43:22, 99:1, 99:2, 99:9, 100:6, 115:20, 137:19, 143:11, 154:10, 154:15, 161:6, 161:7, 180:8, 200:20, 200:22, 208:19
**second** [11] - 12:14, 70:5, 73:22, 74:3, 87:14, 116:21, 120:25, 145:14, 145:21, 146:21, 206:21
**Section** [1] - 82:20
**section** [1] - 89:5
**securities** [4] - 73:15, 73:17, 73:20, 154:13
**Security** [1] - 216:10
**security** [26] - 26:18, 51:11, 51:12, 52:2, 52:5, 52:8, 52:9, 52:25, 53:10, 55:21, 93:17, 93:23, 94:3, 94:15, 106:13, 132:1, 132:2, 132:5, 132:9, 133:17, 167:24, 167:25, 168:2, 168:3, 168:10, 190:5
**SEDRAN** [2] - 2:1, 2:3
**see** [77] - 5:16, 23:7, 26:20, 28:2, 33:3, 33:4, 33:8, 34:7, 51:22, 51:24, 52:3, 52:24, 54:7, 58:7, 58:8, 61:9, 64:10, 70:11, 70:17, 72:16, 74:1, 75:5, 77:18, 84:9, 90:4, 90:10, 92:12, 92:18, 93:4, 93:5, 93:20, 95:4, 98:7, 102:2, 102:7, 104:18, 107:24, 110:13, 114:4, 114:17, 118:12, 118:25, 119:3, 120:4, 121:8,

124:13, 125:18, 131:21, 131:23, 132:12, 136:8, 139:18, 147:5, 151:25, 158:5, 159:9, 159:25, 169:18, 171:6, 174:5, 175:13, 175:22, 175:23, 176:17, 177:21, 185:3, 191:22, 192:24, 194:6, 195:25, 201:21, 206:1, 215:9, 219:1, 221:17
**seed** [5] - 108:12, 152:10, 152:11, 152:13, 171:2
**seeds** [1] - 171:7
**seeks** [1] - 61:1
**seem** [3] - 26:15, 53:15, 173:17
**segments** [1] - 200:3
**select** [3] - 22:3, 42:11, 156:4
**selecting** [1] - 202:10
**sell** [1] - 91:15
**sellers** [1] - 22:19
**selling** [2] - 54:1, 54:7
**semantic** [1] - 87:15
**send** [2] - 19:21, 158:25
**sense** [13] - 40:12, 41:6, 41:18, 83:9, 94:12, 94:14, 137:3, 145:3, 146:3, 149:20, 190:22, 198:14, 205:24
**sensible** [2] - 183:10, 195:5
**sensitive** [5] - 22:4, 83:22, 216:8, 216:9, 216:11
**sentence** [2] - 37:25, 38:2
**sentences** [1] - 177:10
**sentencing** [2] - 7:8, 28:9
**Seoul** [1] - 145:3
**separate** [27] - 8:3, 30:7, 30:19, 30:21, 31:8, 31:18, 33:1, 46:15, 53:14, 54:14, 57:14, 122:1, 158:16, 160:8, 162:15, 162:18, 163:5, 168:20, 169:1, 171:5, 174:1, 188:5, 190:1,

190:11, 212:13, 221:2
**separated** [1] - 46:14
**separately** [4] - 9:3, 53:25, 84:18, 161:9
**September** [2] - 73:7, 172:8
**sequitur** [1] - 104:22
**series** [1] - 141:19
**serve** [2] - 11:2, 127:20
**Service** [3] - 43:23, 170:22, 174:13
**service** [13] - 18:3, 18:13, 18:14, 21:11, 21:15, 62:19, 62:20, 78:9, 78:10, 85:23, 85:24, 86:1
**SERVICES** [1] - 1:5
**services** [6] - 21:9, 21:22, 72:17, 77:17, 179:1, 217:24
**Services** [1] - 4:3
**set** [13] - 10:1, 20:2, 29:17, 29:19, 44:24, 85:5, 102:19, 180:12, 184:2, 201:20, 217:4, 219:15, 219:22
**sets** [1] - 70:25
**seven** [13] - 8:10, 9:6, 28:15, 31:11, 34:16, 34:18, 49:15, 61:25, 74:16, 149:8, 177:7, 190:11, 215:9
**seven-year** [1] - 31:11
**Seventh** [3] - 31:25, 35:7, 160:12
**several** [5] - 11:19, 67:10, 167:5, 167:20, 168:6
**Shakespeare** [1] - 53:17
**shall** [1] - 68:3
**Shanghai** [1] - 83:19
**shape** [1] - 193:4
**shaped** [2] - 193:2
**share** [21] - 11:5, 11:8, 11:12, 12:9, 12:11, 12:12, 13:12, 16:8, 16:10, 18:9, 84:15, 84:22, 84:25, 172:12, 179:11, 186:23, 216:19, 216:24, 217:3, 217:6
**shares** [1] - 85:3
**sheer** [1] - 65:21
**SHERRY** [1] - 3:17
**shift** [2] - 179:8, 187:14

**shifted** [1] - 18:17
**ship** [11] - 14:6, 17:14, 20:7, 61:21, 75:11, 77:22, 83:14, 88:24, 109:22, 134:12, 144:18
**shipment** [9] - 12:15, 14:19, 19:7, 21:16, 50:9, 50:10, 52:22, 53:1, 53:6
**shipments** [27] - 7:2, 7:22, 7:25, 13:25, 15:16, 26:19, 27:21, 50:13, 54:15, 54:18, 61:23, 75:2, 75:4, 75:14, 75:16, 76:4, 76:10, 80:1, 81:21, 146:5, 146:6, 175:20, 175:22, 176:12, 188:7, 190:3, 197:6
**shipped** [8] - 7:24, 13:20, 14:20, 16:16, 40:18, 74:22, 74:23, 147:2
**shippers** [8] - 12:3, 13:7, 22:3, 49:5, 49:9, 49:11, 117:16, 158:19
**Shipping** [1] - 4:3
**shipping** [23] - 14:3, 19:7, 19:8, 19:11, 19:17, 19:20, 19:22, 19:23, 19:24, 20:5, 20:8, 20:23, 21:20, 61:22, 62:15, 85:12, 85:13, 85:16, 85:21, 144:25, 163:16, 178:19, 178:23
**SHIPPING** [1] - 1:5
**ships** [1] - 75:12
**shocking** [1] - 89:13
**shockingly** [1] - 71:6
**short** [2] - 135:17, 217:20
**shorthand** [1] - 61:6
**shortly** [1] - 36:12
**shot** [2] - 11:16, 69:21
**shotgun** [1] - 69:21
**Show** [1] - 24:16
**show** [85] - 8:12, 8:13, 13:17, 13:19, 13:24, 16:14, 20:10, 22:10, 22:13, 23:6, 26:8, 26:11, 27:10, 36:10, 37:14, 39:6, 39:15, 42:8, 43:2, 43:4, 43:5, 43:13, 51:8, 52:8, 56:11, 61:15, 63:17, 63:25, 69:22,

79:24, 79:25, 82:1, 82:13, 85:2, 96:11, 96:24, 97:1, 97:2, 97:15, 98:2, 100:9, 100:16, 100:20, 100:21, 102:22, 103:1, 103:3, 104:2, 104:3, 104:9, 104:19, 106:25, 109:8, 111:12, 112:7, 112:13, 119:13, 119:19, 122:2, 125:15, 125:23, 138:11, 141:1, 142:2, 143:6, 145:9, 155:13, 155:15, 155:16, 156:2, 156:17, 158:12, 158:15, 160:24, 172:22, 175:17, 189:1, 189:4, 189:13, 192:13, 193:25, 200:3, 206:19, 215:5
**showed** [20] - 13:16, 25:24, 33:2, 33:11, 33:19, 37:25, 50:21, 70:25, 71:3, 90:6, 94:20, 106:10, 123:8, 133:24, 134:25, 144:19, 163:13, 193:8, 200:9, 212:11
**showing** [22] - 5:21, 5:23, 27:8, 48:8, 49:17, 49:20, 70:22, 100:4, 119:7, 141:21, 144:20, 145:23, 155:14, 155:20, 159:12, 160:3, 161:15, 161:16, 165:6, 165:7, 178:17, 182:23
**shown** [14] - 5:10, 39:18, 43:8, 56:4, 56:13, 100:3, 100:22, 120:19, 120:22, 120:25, 121:7, 128:20, 148:17, 155:10
**shows** [40] - 8:8, 15:14, 17:24, 22:21, 23:7, 26:18, 26:25, 27:12, 29:21, 32:8, 39:15, 40:3, 40:21, 51:17, 55:3, 55:9, 63:14, 65:3, 65:19, 67:1, 68:5, 69:1, 73:3, 79:20, 81:14, 84:1, 92:15, 94:18,

Case 1:06-md-01775-JG-VVP   Document 1959   Filed 12/17/13   Page 255 of 261 PageID #: 55628

104:21, 118:14, 123:10, 125:19, 132:10, 159:15, 163:7, 164:9, 166:13, 168:15, 197:5, 206:19
**shred** [1] - 118:5
**shuffle** [1] - 181:13
**sick** [2] - 76:21, 137:25
**side** [14] - 4:12, 4:13, 17:9, 17:23, 18:1, 18:6, 18:12, 117:8, 149:19, 179:10, 191:16, 201:3, 203:8
**sign** [2] - 37:2, 77:23
**signed** [1] - 77:22
**significance** [9] - 62:4, 63:8, 70:24, 77:5, 77:6, 77:25, 78:1, 87:17, 115:15
**significant** [20] - 28:10, 29:25, 30:2, 33:4, 62:20, 63:6, 63:11, 66:14, 66:17, 84:4, 84:7, 134:21, 136:15, 138:13, 145:20, 148:20, 151:5, 163:7, 166:2
**significantly** [1] - 212:12
**silages** [1] - 63:21
**silent** [1] - 213:20
**similar** [5] - 85:3, 120:7, 192:14, 210:2, 210:10
**similarly** [3] - 77:8, 94:22, 188:4
**Similarly** [1] - 187:24
**similarly-priced** [1] - 94:22
**SIMMONS** [33] - 3:13, 98:12, 98:19, 107:18, 108:3, 108:7, 109:5, 111:2, 114:16, 114:19, 141:3, 141:9, 141:13, 141:17, 142:9, 142:12, 142:17, 142:21, 142:24, 143:3, 144:2, 144:10, 151:24, 152:3, 152:8, 152:16, 152:18, 152:24, 153:9, 219:18, 219:24, 220:6, 220:16
**Simmons** [23] - 27:16, 52:21, 52:23, 52:25,

53:4, 59:10, 96:13, 97:8, 98:11, 98:12, 155:23, 156:9, 173:21, 177:14, 178:13, 179:22, 183:21, 186:15, 188:11, 197:21, 202:3, 205:19, 223:14
**Simmons'** [1] - 210:7
**simmons'** [1] - 169:18
**simple** [2] - 25:6, 179:23
**simply** [10] - 61:13, 64:2, 78:2, 79:3, 93:24, 95:19, 185:8, 195:19, 198:24, 211:18
**simultaneously** [1] - 120:2
**sine** [1] - 85:1
**SINFELT** [1] - 2:15
**Singapore** [6] - 13:5, 14:3, 14:10, 18:25, 23:20, 145:3
**single** [76] - 6:13, 31:10, 34:1, 34:4, 34:6, 35:21, 36:8, 36:9, 38:24, 39:10, 39:21, 40:8, 40:18, 41:15, 41:20, 47:1, 49:15, 49:24, 50:3, 50:9, 50:10, 52:10, 66:7, 67:15, 85:22, 87:22, 87:23, 87:24, 88:20, 89:4, 91:2, 91:21, 91:24, 92:5, 92:6, 102:9, 105:1, 112:10, 112:11, 112:12, 120:7, 123:7, 124:15, 124:16, 125:6, 130:16, 132:21, 139:21, 149:8, 149:17, 150:25, 153:10, 158:3, 165:15, 166:4, 166:5, 166:18, 166:19, 187:21, 205:19, 206:14, 206:16, 207:3, 207:4, 207:15, 207:16, 207:23, 208:1, 211:16, 212:8, 217:3, 217:4
**single-form** [1] - 89:4
**singly** [1] - 93:23
**sink** [1] - 44:20
**sit** [1] - 151:18
**sitting** [1] - 118:15

**situation** [4] - 24:25, 25:5, 132:22, 218:18
**situations** [4] - 56:1, 91:13, 170:9, 176:23
**six** [34] - 39:8, 75:20, 75:23, 75:24, 92:17, 93:6, 100:24, 102:4, 104:3, 104:4, 105:3, 109:12, 110:17, 116:13, 117:1, 118:19, 119:19, 120:3, 120:24, 125:12, 128:23, 138:17, 139:21, 143:7, 143:19, 146:1, 147:10, 147:17, 151:9, 151:10, 165:2, 180:1, 215:9
**six-year** [2] - 75:20, 102:4
**Sixty** [1] - 61:23, 75:18, 206:16
**skip** [1] - 81:4
**skipped** [1] - 70:1
**slender** [1] - 68:11
**slide** [23] - 13:16, 13:17, 15:13, 74:16, 93:8, 96:4, 98:23, 106:11, 109:11, 111:12, 115:4, 123:9, 124:23, 126:23, 131:24, 134:17, 146:18, 150:21, 194:4, 205:10, 206:2, 219:1
**slides** [14] - 5:3, 51:14, 72:15, 73:23, 89:23, 101:25, 106:10, 108:3, 108:4, 111:12, 219:1, 220:8, 220:24, 221:5
**slight** [1] - 64:19
**slight-of-hand** [1] - 64:19
**slope** [1] - 201:20
**slow** [1] - 19:10
**small** [14] - 12:16, 12:17, 13:3, 40:15, 71:13, 71:15, 92:22, 113:23, 123:4, 148:22, 179:23, 197:3, 198:25, 199:1
**small-volume** [1] - 148:22
**smaller** [2] - 41:11, 77:12
**smallest** [4] - 39:25, 41:3, 41:14, 41:19

**snow** [6] - 30:22, 30:23, 31:2, 31:4, 63:22, 64:3
**snowed** [4] - 30:25, 64:4, 64:6, 64:10
**snowing** [1] - 64:9
**so-called** [3] - 46:8, 115:12, 190:14
**solidified** [1] - 134:7
**solve** [1] - 104:17
**solving** [5] - 103:7, 103:18, 106:3, 121:16, 121:20
**someone** [18] - 14:6, 20:7, 34:23, 34:24, 41:4, 80:17, 86:5, 118:15, 119:24, 120:20, 121:7, 121:15, 121:19, 125:17, 134:23, 167:4, 177:18
**sometime** [1] - 178:20
**sometimes** [6] - 20:1, 55:1, 55:22, 71:5, 80:14, 184:14
**Sometimes** [1] - 184:14
**somewhere** [6] - 19:13, 19:14, 20:20, 32:11, 215:22, 216:9
**son's** [2] - 103:19, 106:23
**Soon** [1] - 23:13
**sorry** [16] - 54:13, 67:4, 111:12, 111:15, 113:4, 114:13, 125:17, 125:18, 129:2, 131:21, 134:14, 136:17, 184:22, 197:11, 220:18
**sort** [12] - 10:15, 32:21, 60:25, 64:18, 67:25, 75:19, 143:4, 148:7, 149:8, 171:21, 192:25, 213:21
**sorts** [2] - 157:25, 176:20
**sound** [1] - 172:18
**soundness** [1] - 112:7
**source** [1] - 168:11
**South** [8] - 2:23, 6:9, 15:19, 47:10, 75:2, 102:5
**Southern** [3] - 170:22, 194:18, 194:19
**spaced** [1] - 171:13
**speaking** [2] - 59:5, 181:22

**speaks** [2] - 114:9, 122:4
**special** [1] - 161:10
**SPECIALIST** [1] - 1:24
**specific** [21] - 13:15, 13:22, 65:17, 69:22, 73:12, 73:16, 88:18, 97:2, 128:12, 175:19, 179:14, 203:12, 203:14, 203:15, 203:23, 206:10, 211:3
**specifically** [3] - 169:22, 208:1, 208:8
**specification** [1] - 135:3
**specifications** [1] - 219:6
**specify** [2] - 46:1, 188:21
**SPECKS** [1] - 1:19
**speculate** [1] - 91:5
**speculating** [1] - 48:1
**speculation** [4] - 65:21, 91:12, 196:19
**speed** [2] - 86:22, 89:3
**spend** [4] - 29:6, 62:6, 86:14, 148:25
**split** [5] - 130:24, 172:19, 190:9, 193:22
**spooked** [1] - 139:5
**square** [2] - 48:18, 193:12
**squared** [11] - 134:15, 190:24, 190:25, 191:2, 191:7, 192:14, 192:15, 193:5, 193:6, 194:1, 194:2
**squares** [5] - 44:14, 44:15, 193:10, 193:12, 197:3
**SQUIRE** [1] - 3:8
**stage** [9] - 10:19, 42:10, 43:3, 43:19, 101:17, 131:11, 156:2, 209:2, 209:7
**stake** [2] - 32:2, 160:13
**stamina** [1] - 59:7
**stand** [6] - 65:13, 103:23, 117:2, 145:5, 198:23, 198:24
**standard** [24] - 10:5, 37:10, 44:1, 100:12, 108:15, 128:3, 143:9, 151:16, 153:14, 156:10,

192:7, 199:25, 200:23, 201:24, 206:24, 207:3, 208:15, 208:19, 208:22, 208:24, 210:18, 211:25, 218:7
**standards** [4] - 108:15, 122:5, 180:6, 208:18
**standing** [1] - 148:23
**standpoint** [4] - 82:20, 96:21, 96:22, 108:1
**stands** [1] - 46:20
**Star** [1] - 109:23
**start** [12] - 11:4, 59:24, 86:8, 105:22, 127:17, 154:10, 167:22, 182:16, 186:4, 202:18, 217:13, 221:16
**started** [5] - 4:6, 59:19, 78:17, 91:17, 134:7
**starting** [2] - 73:9, 221:12
**starts** [1] - 183:8
**state** [3] - 148:24, 173:15, 173:16
**statement** [7] - 7:16, 20:4, 23:4, 54:10, 54:12, 78:24, 86:3
**STATES** [2] - 1:1, 1:12
**States** [28] - 1:5, 7:25, 61:22, 72:12, 72:14, 72:19, 74:22, 75:4, 75:9, 75:11, 84:18, 102:4, 102:11, 102:16, 109:14, 109:16, 114:8, 119:5, 119:6, 122:19, 130:19, 133:11, 137:2, 146:5, 148:9, 148:10, 151:13, 217:20
**statical** [1] - 198:14
**statistic** [1] - 70:23
**statistical** [25] - 6:2, 28:24, 29:12, 29:16, 30:3, 32:20, 44:17, 45:16, 49:17, 70:24, 82:1, 112:7, 115:15, 156:15, 163:12, 164:10, 171:11, 172:18, 182:1, 192:7, 211:11, 214:14, 214:18, 215:4
**statistically** [10] -

29:25, 30:2, 33:4, 34:4, 163:7, 164:24, 178:23, 183:10, 195:5, 205:12
**statistician** [5] - 68:24, 123:13, 128:1, 135:6
**statistics** [4] - 32:14, 74:15, 182:10, 193:23
**statute** [2] - 99:7, 99:8
**stay** [1] - 38:20
**staying** [1] - 37:6
**stenography** [1] - 3:20
**step** [3] - 127:23, 130:20, 148:6
**Stephen** [1] - 54:3
**stepping** [1] - 120:21
**stick** [1] - 145:14
**sticks** [1] - 103:8
**still** [20] - 8:7, 31:2, 33:3, 33:4, 35:6, 43:3, 50:16, 55:13, 70:8, 80:16, 86:19, 91:18, 93:15, 122:23, 124:1, 145:16, 155:25, 156:18, 218:10
**Stock** [1] - 37:10
**stop** [5] - 17:6, 52:17, 55:2, 103:10, 172:13
**stopped** [2] - 84:19, 84:20
**Story** [1] - 161:23
**story** [1] - 53:3
**straight** [1] - 98:21
**strange** [1] - 179:19
**strategy** [1] - 45:24
**street** [1] - 86:10
**Street** [10] - 1:15, 2:1, 2:6, 2:10, 2:13, 2:17, 2:20, 2:23, 3:9, 3:12
**strength** [2] - 12:2, 216:17
**stretching** [1] - 83:21
**stricken** [1] - 208:24
**strike** [4] - 140:3, 140:8, 140:11, 211:2
**strips** [1] - 205:18
**stroke** [2] - 9:2, 45:14
**strong** [2] - 39:20, 118:6
**stronger** [1] - 134:5
**structural** [4] - 64:14, 81:18, 82:16, 86:2
**structure** [3] - 68:13, 81:6, 81:8
**study** [1] - 127:23
**studying** [3] - 103:19, 183:19, 186:8

**stuff** [4] - 81:20, 88:18, 89:15, 193:9
**stumbling** [1] - 63:9
**stunningly** [1] - 127:13
**sub** [1] - 137:3
**subgroups** [2] - 137:4, 137:6
**subject** [9] - 6:7, 67:2, 103:10, 115:13, 116:9, 117:17, 124:18, 168:4
**submission** [2] - 220:19, 221:1
**submit** [1] - 112:4
**submitted** [6] - 6:11, 103:6, 145:13, 182:4, 182:15, 204:22
**subscribers** [1] - 130:15
**subsequently** [1] - 99:24
**subset** [4] - 33:16, 70:12, 188:22, 202:21
**subsets** [10] - 46:11, 71:1, 90:1, 139:18, 164:17, 188:19, 201:20, 202:10, 211:6, 214:11
**substantial** [6] - 7:3, 23:10, 69:20, 86:7, 158:7, 175:4
**substantive** [5] - 61:12, 93:16, 99:20, 99:25, 137:23
**substitutability** [1] - 17:9, 17:24, 18:1, 18:7, 21:19, 179:10
**substitutable** [2] - 17:11, 21:2
**substitute** [14] - 18:13, 19:8, 19:22, 20:9, 20:22, 62:12, 62:16, 107:3, 140:2, 178:20, 178:21, 216:5
**substitutes** [5] - 17:24, 19:6, 20:11, 20:16, 21:4
**substitution** [1] - 144:16
**succeed** [3] - 9:23, 19:4, 60:23
**succeeded** [2] - 28:13, 92:24
**success** [6] - 9:12, 13:10, 16:8, 19:9, 20:9, 20:24

**successful** [7] - 5:25, 9:11, 9:21, 21:7, 22:6, 34:21, 157:11
**successfully** [1] - 129:19
**sue** [2] - 15:5, 15:20
**sued** [1] - 16:4
**Suffer** [1] - 207:21
**suffer** [2] - 158:10, 207:20
**suffered** [4] - 99:11, 126:17, 147:9, 200:4
**suffers** [1] - 200:12
**suffice** [1] - 86:16
**sufficient** [20] - 10:23, 11:13, 12:9, 12:13, 13:12, 16:12, 18:9, 41:23, 106:21, 106:22, 106:24, 107:1, 137:8, 137:11, 140:14, 140:24, 179:11, 205:9, 205:25, 213:16
**sufficiently** [9] - 42:18, 43:11, 148:5, 155:6, 155:7, 156:11, 156:17, 156:24, 158:22
**suggest** [8] - 52:6, 140:25, 201:14, 201:24, 204:2, 208:18, 216:13, 219:18
**suggested** [1] - 194:3
**suggesting** [2] - 52:25, 151:15
**suggestion** [2] - 205:14, 208:25
**suggests** [3] - 31:16, 49:24, 208:8
**suing** [2] - 109:21, 116:6
**suitable** [1] - 174:17
**suite** [2] - 2:2, 3:2
**Suite** [4] - 1:15, 1:22, 2:13, 3:9
**suited** [2] - 42:11, 156:5
**summarizes** [1] - 217:18
**summarizing** [1] - 111:4
**summary** [2] - 64:13, 104:8
**superior** [6] - 57:11, 57:21, 181:4, 181:5, 181:7
**supplied** [1] - 18:14
**supply** [14] - 18:1,

18:6, 18:12, 62:10, 76:24, 77:1, 77:11, 134:19, 144:16, 179:10, 179:14, 179:19, 186:7, 189:14
**support** [9] - 6:12, 43:17, 48:6, 183:25, 194:22, 200:1, 201:25, 212:20, 212:22
**SUPPORT** [1] - 1:23
**supported** [4] - 164:21, 173:20, 207:7, 207:8
**supports** [3] - 24:11, 211:9, 214:21
**suppose** [2] - 152:2, 220:9
**supposed** [10] - 30:13, 51:4, 51:25, 80:17, 103:18, 104:15, 154:24, 180:9, 202:9, 207:12
**supposedly** [6] - 47:21, 143:25, 177:15, 184:18, 192:13, 206:20
**suppress** [1] - 135:25
**suppressed** [1] - 113:22
**suppression** [1] - 147:8
**supra** [3] - 55:19, 130:13
**supra-competitive** [3] - 55:19, 130:13
**Supreme** [42] - 31:15, 42:6, 43:21, 61:10, 97:10, 100:17, 100:25, 101:9, 101:14, 101:16, 102:8, 102:14, 105:7, 105:23, 110:1, 112:18, 115:19, 118:22, 119:1, 123:20, 127:18, 130:7, 130:11, 130:23, 131:2, 131:9, 134:6, 134:8, 138:22, 138:25, 139:2, 139:4, 139:6, 139:25, 153:15, 154:15, 155:18, 155:24, 156:4, 180:7, 209:11
**sur** [1] - 48:20
**sur-reply** [1] - 48:20
**surcharge** [126] - 8:20,

12:1, 12:4, 15:8, 18:23, 22:25, 23:16, 23:23, 24:15, 24:20, 24:23, 25:2, 25:3, 25:8, 25:11, 25:16, 26:3, 26:4, 26:9, 26:21, 27:22, 27:24, 27:25, 28:23, 29:19, 40:20, 40:22, 40:23, 41:6, 51:17, 51:18, 51:23, 52:4, 52:5, 52:8, 52:9, 52:24, 52:25, 53:1, 53:15, 53:18, 53:24, 54:1, 54:6, 54:15, 54:19, 55:10, 68:13, 68:21, 73:15, 74:5, 78:20, 78:23, 79:3, 79:4, 80:7, 80:16, 80:24, 81:1, 86:15, 92:14, 94:13, 94:14, 94:15, 95:3, 95:9, 95:15, 106:7, 106:9, 106:14, 106:16, 106:20, 107:8, 111:10, 114:25, 115:1, 120:8, 122:19, 127:2, 127:3, 127:23, 132:3, 132:5, 132:9, 133:17, 137:10, 138:9, 138:13, 146:22, 150:2, 150:9, 150:14, 151:23, 158:1, 158:2, 167:5, 167:10, 167:11, 167:20, 167:24, 167:25, 168:4, 168:7, 168:10, 168:15, 168:19, 168:21, 168:24, 169:1, 170:3, 170:9, 170:14, 172:10, 176:11, 177:8, 177:19, 190:4, 190:5, 190:6, 197:8, 197:9

**surcharge/security** [1] - 53:14
**surcharges** [118] - 8:10, 8:17, 9:14, 9:15, 9:17, 15:11, 15:15, 18:22, 22:23, 23:12, 23:24, 24:7, 26:12, 26:18, 26:23, 27:1, 27:6, 27:9, 27:10, 27:12, 27:20, 28:3, 40:24, 50:22, 51:2, 51:6, 51:7, 51:10, 51:11, 51:12,

51:22, 52:2, 53:9, 53:21, 54:25, 55:2, 55:6, 55:7, 55:21, 55:22, 56:1, 56:5, 56:10, 56:11, 63:7, 64:23, 64:24, 64:25, 65:2, 67:12, 67:17, 68:14, 68:15, 68:18, 69:8, 69:10, 69:16, 69:17, 69:19, 69:24, 70:1, 73:17, 73:20, 78:16, 79:11, 79:18, 79:21, 80:1, 80:4, 80:9, 80:11, 80:18, 86:18, 92:25, 93:17, 93:20, 93:23, 94:3, 94:4, 94:7, 94:23, 94:25, 106:12, 114:22, 114:23, 132:1, 132:2, 138:10, 145:7, 145:8, 145:13, 145:16, 145:22, 167:1, 167:13, 167:22, 168:9, 168:12, 169:7, 169:8, 169:18, 175:3, 175:5, 175:8, 175:13, 175:23, 176:3, 176:14, 176:21, 177:3, 177:4, 177:5, 177:23
**Surcharges** [2] - 63:2, 79:14
**surfing** [1] - 98:16, 111:15
**surprise** [2] - 44:19, 60:2
**surprised** [2] - 47:2, 164:18
**surprising** [4] - 41:8, 51:24, 87:8, 123:5
**surprisingly** [1] - 90:15
**survivors** [2] - 109:20, 117:1
**susceptible** [1] - 109:25
**suspect** [1] - 219:4
**suspend** [1] - 167:21
**suspended** [2] - 51:23, 168:7
**suspicion** [1] - 72:7
**sustain** [4] - 12:9, 16:12, 18:9, 179:12
**swaths** [1] - 89:20
**switch** [1] - 179:5
**Switzerland** [1] - 15:11
**Sydney** [1] - 18:14

**systematic** [1] - 6:16

# T

**table** [1] - 71:24
**tailored** [1] - 197:1
**talks** [4] - 73:18, 130:8, 144:14, 216:4
**Tallison** [6] - 68:12, 68:16, 77:10, 78:14, 78:17
**Tallison's** [1] - 69:15
**tally** [1] - 154:22
**tandem** [1] - 29:17
**tariffs** [1] - 65:23
**tax** [1] - 147:20
**tear** [1] - 197:18
**Tech** [4] - 29:10, 42:13, 156:7, 173:4
**technical** [1] - 220:7
**technique** [1] - 89:13
**techniques** [2] - 210:1, 210:25
**Telephone** [1] - 3:18
**temperature** [2] - 131:7, 216:10
**Temperature** [1] - 216:9
**ten** [11] - 14:9, 58:2, 59:24, 85:7, 92:9, 104:23, 104:24, 126:6, 127:22, 153:21, 221:16
**ten-minute** [1] - 58:2
**tendency** [1] - 175:23
**tender** [1] - 141:20
**tendered** [4] - 118:11, 132:20, 143:7, 153:11
**tenths** [1] - 39:11
**terminology** [1] - 53:19
**terms** [10] - 4:10, 17:8, 32:6, 53:21, 104:17, 117:13, 137:13, 148:1, 187:25, 215:6
**test** [89] - 32:15, 32:18, 32:22, 32:25, 33:3, 33:7, 33:25, 34:2, 45:3, 45:16, 49:17, 70:17, 70:23, 70:25, 90:3, 90:8, 112:25, 113:1, 115:15, 119:16, 122:3, 136:14, 136:15, 137:4, 137:6, 144:11, 144:13, 147:11, 154:12, 164:8, 164:12, 164:14,

164:15, 164:23, 164:24, 165:8, 165:9, 170:7, 190:14, 191:10, 194:5, 196:17, 197:21, 197:23, 198:22, 199:25, 201:18, 201:20, 201:24, 202:9, 203:11, 204:2, 204:3, 204:10, 204:20, 204:21, 205:23, 206:18, 206:24, 207:6, 207:14, 207:15, 207:18, 208:16, 211:25, 212:3, 212:5, 212:11, 212:12, 212:13, 212:16, 213:14, 213:21, 214:1, 218:2, 218:3, 218:7, 218:12, 218:15
**tested** [15] - 30:11, 32:15, 74:8, 89:7, 89:11, 89:16, 89:19, 104:1, 113:3, 119:17, 171:24, 178:23, 205:24, 206:20
**testified** [21] - 11:11, 16:16, 19:25, 23:13, 25:13, 39:21, 40:3, 42:1, 66:20, 82:23, 129:9, 144:24, 161:16, 187:18, 205:2, 207:25, 208:6, 208:8, 211:15, 211:25, 213:22
**testifies** [1] - 110:11
**testify** [1] - 205:11
**testifying** [1] - 51:15
**testimony** [44] - 11:2, 13:1, 13:8, 14:2, 16:11, 26:7, 28:5, 28:21, 33:12, 34:3, 38:16, 40:11, 57:3, 62:17, 63:19, 71:21, 74:16, 79:13, 79:15, 140:1, 145:8, 164:11, 175:25, 177:22, 184:25, 185:12, 188:16, 191:5, 194:6, 195:23, 196:7, 197:24, 200:24, 201:10, 207:11, 208:13, 208:24, 209:22, 210:1,

210:14, 212:10, 213:16, 218:25
**testing** [17] - 48:2, 90:9, 103:21, 136:21, 136:23, 136:24, 137:5, 151:4, 170:6, 174:5, 179:20, 202:10, 205:22, 211:6, 211:23
**tests** [37] - 32:21, 33:2, 33:11, 33:13, 33:18, 33:21, 45:17, 46:8, 46:10, 163:12, 163:13, 163:22, 163:23, 164:15, 164:22, 165:1, 165:5, 166:10, 166:14, 190:24, 198:9, 200:1, 201:2, 201:13, 207:3, 207:7, 207:11, 207:14, 207:21, 211:7, 211:20, 213:10, 213:17, 214:2
**Texas** [1] - 171:20
**text** [4] - 37:10, 184:13, 184:18, 185:16
**THE** [118] - 1:12, 4:1, 4:5, 4:9, 4:14, 4:18, 4:20, 4:24, 5:6, 52:11, 52:15, 52:19, 58:1, 58:7, 59:1, 59:15, 59:18, 95:21, 95:23, 96:2, 96:6, 96:9, 96:17, 96:20, 97:1, 98:6, 98:10, 98:18, 107:5, 107:19, 108:6, 109:3, 111:1, 114:15, 114:18, 140:16, 141:6, 141:11, 141:16, 142:7, 142:11, 142:15, 142:19, 142:23, 143:1, 143:23, 144:9, 151:20, 152:1, 152:6, 152:14, 152:17, 152:23, 153:8, 153:20, 154:1, 154:4, 154:8, 155:12, 156:19, 157:3, 157:6, 157:15, 158:13, 159:3, 159:9, 159:17, 160:18, 163:23, 164:2,

165:19, 165:25, 166:4, 169:13, 181:10, 181:12, 181:16, 181:19, 183:24, 184:7, 184:11, 184:24, 185:19, 188:18, 189:7, 189:20, 189:22, 199:12, 199:15, 200:25, 201:6, 202:8, 202:14, 202:23, 203:3, 208:25, 209:8, 209:13, 210:20, 214:11, 217:10, 219:11, 219:17, 219:19, 219:23, 220:1, 220:5, 220:11, 220:14, 220:17, 220:25, 221:4, 221:7, 221:9, 221:14, 221:17, 221:21, 221:24

**theirs** [3] - 24:12, 92:17, 217:17

**theme** [3] - 76:21, 105:20, 126:25

**themselves** [4] - 56:10, 72:20, 85:15, 96:12

**theoretically** [1] - 121:20

**theories** [2] - 68:9, 123:23

**theory** [22] - 42:17, 43:6, 43:25, 44:5, 46:22, 54:22, 55:18, 83:3, 91:18, 101:6, 105:22, 105:24, 127:22, 127:24, 131:12, 134:10, 150:5, 150:6, 156:11, 156:15, 173:3

**therefore** [5] - 67:18, 107:14, 190:8, 191:9, 216:23

**They've** [4] - 63:13, 72:19, 74:10, 85:6

**they've** [11] - 64:14, 101:23, 116:5, 118:11, 124:24, 125:4, 139:24, 143:6, 150:7, 162:22, 216:16

**thin** [1] - 172:9

**thinking** [3] - 108:25, 133:25, 148:13

**thinks** [3] - 41:7, 45:9,

93:25

**Third** [5] - 1:17, 100:18, 100:25, 101:2, 130:23

**third** [6] - 54:5, 72:23, 78:8, 90:24, 116:17, 125:14

**thirds** [8] - 66:23, 90:22, 90:23, 91:5, 91:6, 92:12, 123:3, 146:1

**thirty** [1] - 148:11

**thirty-nine** [1] - 148:11

**thousand** [3] - 33:8, 97:14, 198:21

**thousands** [6] - 40:23, 85:19, 88:10, 109:13, 122:9, 143:20

**Three** [1] - 200:10

**three** [20] - 5:15, 41:12, 64:5, 68:21, 88:22, 119:3, 122:16, 123:24, 134:20, 138:11, 145:9, 149:16, 181:1, 181:22, 199:15, 202:12, 215:13, 217:11, 217:12, 221:22

**threw** [2] - 71:23, 194:24

**throughout** [5] - 7:5, 27:1, 54:12, 148:21, 212:24

**throw** [2] - 185:17, 194:25

**throwing** [3] - 102:23, 110:21, 132:15

**thrown** [4] - 110:20, 185:18, 185:23, 186:1

**thumbs** [4] - 139:7, 139:8, 139:9, 139:10

**thwarted** [1] - 22:14

**tie** [3] - 101:6, 131:12, 180:14

**tied** [1] - 105:24

**ties** [1] - 6:15

**time-sensitive** [1] - 83:22

**tiny** [3] - 46:11, 164:16, 214:16

**tired** [3] - 76:21, 129:6, 132:17

**tires** [2] - 32:21, 39:18

**Titanic** [2] - 109:20, 117:2

**Titanium** [4] - 10:3, 10:4, 10:8, 44:12

**titanium** [1] - 178:11

**Tobacco** [1] - 99:2

**tobacco** [1] - 99:5

**today** [18] - 5:3, 13:7, 59:6, 83:12, 84:21, 90:8, 91:22, 98:16, 167:3, 175:4, 182:17, 199:8, 199:21, 204:4, 214:22, 216:20, 219:1, 220:9

**Today** [1] - 82:7

**together** [11] - 6:15, 8:9, 8:17, 69:3, 85:6, 128:18, 136:9, 146:14, 149:2, 168:17, 195:18

**Tollison** [58] - 5:25, 9:19, 10:14, 11:11, 11:17, 17:8, 18:1, 18:20, 22:6, 22:9, 25:13, 26:13, 26:25, 27:11, 27:18, 28:4, 31:5, 40:10, 50:21, 51:1, 52:22, 52:24, 77:20, 78:22, 81:19, 81:25, 82:18, 82:24, 83:1, 84:14, 85:5, 85:25, 108:21, 114:10, 114:19, 122:23, 123:1, 125:21, 126:2, 127:16, 129:5, 133:15, 133:21, 134:13, 135:10, 140:12, 144:13, 149:1, 150:4, 150:11, 150:17, 175:16, 178:6, 213:22, 215:11, 215:19, 216:25

**Tollison's** [15] - 8:18, 11:1, 11:21, 12:20, 15:14, 22:18, 27:4, 27:13, 27:16, 28:22, 29:18, 51:14, 79:23, 133:24, 157:10

**tons** [1] - 137:11

**Took** [2] - 59:1, 208:4

**took** [18] - 13:3, 14:22, 24:4, 37:14, 51:2, 53:25, 61:24, 95:2, 129:20, 134:9, 149:15, 149:16, 174:18, 183:6, 203:21, 205:23, 214:15

**tool** [7] - 43:11, 43:15, 43:16, 43:17, 43:19, 43:20

**top** [3] - 145:15, 192:25, 193:10

**topic** [1] - 116:21

**tore** [2] - 183:7, 187:22

**tort** [3] - 120:11, 128:7, 128:9

**tossed** [1] - 186:21

**total** [32] - 24:21, 28:13, 30:4, 34:13, 55:13, 55:16, 55:19, 56:1, 56:7, 56:8, 56:12, 92:13, 99:10, 106:17, 127:9, 127:11, 152:11, 153:4, 166:3, 167:16, 169:6, 169:9, 169:11, 169:16, 169:19, 170:7, 170:13, 170:14, 170:21, 171:12, 171:25, 218:11

**totally** [3] - 34:25, 46:19, 54:22

**toto** [1] - 182:3

**touch** [1] - 182:13

**touched** [4] - 134:14, 137:15, 137:16, 168:3

**tough** [1] - 155:2

**Tower** [2] - 2:6, 3:6

**tracing** [1] - 129:3

**track** [1] - 150:10

**Trade** [2] - 7:18, 23:14

**traffic** [2] - 81:22, 88:15

**train** [1] - 215:24

**tran** [1] - 153:2

**transaction** [54] - 27:25, 28:1, 31:10, 34:1, 34:4, 34:7, 34:8, 34:18, 36:9, 39:10, 39:22, 40:5, 40:9, 40:18, 41:15, 41:20, 49:15, 50:3, 50:16, 50:21, 50:23, 52:10, 53:5, 61:24, 65:9, 66:25, 71:14, 75:19, 76:1, 76:2, 78:5, 87:20, 91:22, 92:11, 92:25, 94:11, 114:20, 158:3, 159:22, 162:25, 163:1, 165:15, 166:4, 166:5, 166:19, 166:20, 167:7, 176:6, 195:20, 203:5, 206:12, 206:14,

206:17

**transactions** [55] - 30:3, 30:4, 35:21, 38:25, 39:19, 46:2, 46:3, 50:7, 50:17, 52:4, 62:1, 63:7, 66:8, 66:10, 66:17, 67:17, 69:2, 69:16, 72:12, 76:14, 76:19, 76:20, 83:25, 87:7, 88:11, 89:24, 92:9, 92:21, 92:23, 93:2, 94:8, 94:14, 94:22, 94:25, 121:3, 122:7, 122:21, 132:15, 159:23, 159:25, 167:4, 167:7, 167:9, 167:11, 167:14, 167:16, 167:23, 168:11, 171:17, 195:14, 203:6, 211:19, 212:9, 218:8, 218:19

**transcript** [2] - 46:5, 188:17

**Transcript** [1] - 3:20

**TRANSCRIPT** [1] - 1:11

**Transcription** [1] - 3:20

**transformation** [2] - 71:22, 116:14

**tranship** [1] - 216:2

**translated** [1] - 51:19

**translation** [2] - 127:24, 130:21

**transmission** [2] - 108:19, 153:1

**transport** [6] - 21:1, 21:2, 62:11, 215:19, 215:20, 216:7

**transportation** [4] - 215:2, 215:13, 215:16, 216:1

**transported** [1] - 215:14

**transshipped** [1] - 81:21

**treat** [1] - 122:25

**treated** [1] - 190:3

**treating** [1] - 130:15

**trees** [1] - 214:9

**trial** [34] - 10:16, 29:5, 29:6, 29:7, 29:9, 42:25, 43:3, 43:8, 43:16, 44:11, 44:24, 45:2, 45:8, 45:11, 56:25, 57:16, 97:13, 116:25, 117:1, 117:3, 118:23,

119:20, 120:9, 120:10, 155:25, 162:7, 162:9, 162:10, 185:21, 185:22, 204:6, 209:3
**TRIAL** [1] - 1:23
**tribunal** [1] - 74:1
**tribunals** [1] - 73:24
**trick** [1] - 211:11
**tried** [18] - 17:15, 52:6, 61:14, 63:8, 69:15, 69:18, 71:7, 72:10, 115:21, 129:25, 154:22, 185:24, 193:24, 200:7, 205:23, 215:18, 215:25
**trier** [5] - 10:14, 42:22, 43:5, 201:10, 208:21
**trimming** [1] - 136:19
**Trinidad** [1] - 102:5
**trip** [2] - 215:21, 215:23
**troubling** [1] - 137:14
**truck** [4] - 17:14, 17:21, 82:10, 215:21
**trucked** [2] - 16:20, 16:22
**trucking** [2] - 13:25, 16:24
**trucks** [1] - 215:23
**true** [16] - 10:7, 15:4, 17:20, 26:22, 47:6, 54:10, 54:12, 79:5, 79:7, 96:19, 97:8, 163:20, 166:18, 173:23, 180:25, 216:7
**truly** [1] - 20:16
**truth** [1] - 25:22
**try** [16] - 66:7, 80:13, 87:2, 90:10, 93:20, 93:21, 102:22, 104:17, 109:5, 138:5, 148:14, 175:9, 197:19, 200:17, 216:13
**Try** [1] - 95:5
**trying** [14] - 37:17, 65:5, 65:6, 82:8, 98:2, 109:3, 109:5, 154:1, 187:6, 189:1, 193:25, 196:12, 203:6, 212:13
**TSA** [1] - 216:11
**turn** [6] - 93:13, 125:16, 132:16, 153:18, 154:8, 194:12
**turned** [2] - 67:1,

124:24
**Twain** [1] - 131:4
**tweak** [1] - 208:4
**twenty** [1] - 6:4
**twenty-one** [1] - 6:4
**twice** [2] - 17:20, 125:21
**two** [58] - 4:11, 14:9, 14:20, 20:24, 30:19, 30:21, 35:16, 39:11, 39:18, 59:8, 60:21, 63:12, 64:4, 66:23, 68:10, 68:11, 68:20, 71:11, 76:5, 82:24, 83:1, 83:14, 85:6, 85:7, 90:22, 90:23, 91:5, 91:6, 92:12, 95:7, 96:4, 97:14, 105:8, 108:3, 108:7, 116:13, 123:3, 123:6, 127:3, 130:25, 134:20, 146:1, 146:2, 149:15, 165:9, 172:16, 190:24, 192:5, 195:18, 201:5, 202:22, 206:5, 214:7, 214:13, 214:19, 220:15, 220:18, 221:22
**Two** [6] - 92:17, 201:7, 215:13, 220:4, 220:5, 220:6
**two-part** [2] - 108:3, 108:7
**two-tenths** [1] - 39:11
**two-thirds** [8] - 66:23, 90:22, 90:23, 91:5, 91:6, 92:12, 123:3, 146:1
**Tylenol** [3] - 120:12, 120:13, 120:14
**type** [1] - 57:15
**types** [7] - 64:14, 78:9, 81:3, 83:25, 163:14, 171:7, 171:9
**typical** [2] - 56:19, 162:6
**typically** [1] - 153:3

## U

**U.S** [9] - 7:25, 9:9, 15:9, 16:17, 26:19, 27:9, 43:23, 122:2, 161:22
**U.S.C** [1] - 99:21
**ultimately** [3] - 9:8, 140:20, 147:13

**under** [20] - 43:1, 101:16, 104:4, 108:15, 118:16, 120:24, 130:5, 143:9, 145:19, 148:15, 154:11, 157:20, 180:6, 181:23, 200:4, 200:22, 205:25, 206:14, 208:18, 208:24
**Under** [1] - 208:22
**undercharged** [1] - 39:2
**undercuts** [1] - 77:7
**undermine** [9] - 12:13, 12:24, 13:9, 16:1, 19:9, 20:9, 20:23, 28:6, 178:22
**undermined** [2] - 16:8, 22:15
**undermining** [1] - 15:16
**underpaid** [1] - 162:25
**underscore** [1] - 123:7
**understood** [6] - 24:18, 48:22, 55:7, 152:23, 169:17, 202:11
**undertake** [1] - 165:20
**undisputed** [8] - 11:10, 16:11, 61:20, 65:1, 78:8, 78:12, 79:18, 80:19
**undisputedly** [1] - 69:22
**unexpected** [4] - 50:22, 51:7, 51:13, 150:14
**unexplained** [2] - 66:16, 135:16
**unfortunately** [1] - 138:23
**uniform** [5] - 63:15, 64:17, 79:18, 81:19, 84:6, 92:24, 151:8
**UNIMAN** [1] - 2:15
**uninjured** [2] - 65:12, 86:25
**Uniondale** [1] - 3:6
**unique** [3] - 24:25, 128:19, 188:14
**unit** [3] - 95:8, 95:10, 95:12
**UNITED** [2] - 1:1, 1:12
**United** [31] - 1:5, 7:24, 16:4, 16:6, 61:22, 72:12, 72:14, 72:19, 74:22, 75:4, 75:9,

75:11, 84:18, 102:4, 102:11, 102:16, 109:14, 109:16, 114:8, 119:5, 119:6, 122:18, 130:19, 133:11, 137:2, 146:5, 148:9, 148:10, 148:12, 151:12, 217:20
**Units** [1] - 210:6
**units** [1] - 104:23
**Universal** [2] - 170:22, 174:13
**unlawful** [1] - 106:9
**unless** [2] - 64:7, 216:23
**Unlimited** [2] - 147:18, 147:25
**unnamed** [1] - 15:6
**unnecessarily** [1] - 136:18
**unnecessary** [1] - 36:8
**unquote** [2] - 207:13, 207:21
**unrelated** [2] - 94:18, 95:13
**unreliable** [2] - 97:4, 200:10
**unremarkable** [3] - 105:23, 127:17, 134:10
**unrepresentative** [2] - 32:12, 32:24
**unsubstantiated** [1] - 112:4
**unsupported** [2] - 63:19, 206:5
**unusual** [3] - 47:23, 160:23, 161:1
**up** [108] - 5:8, 12:17, 19:12, 20:2, 22:25, 23:24, 24:7, 25:8, 27:2, 27:19, 30:22, 36:13, 36:17, 37:9, 37:11, 37:24, 39:11, 41:5, 43:18, 44:16, 45:3, 47:2, 47:9, 47:11, 47:25, 51:8, 53:6, 53:18, 54:19, 55:17, 56:4, 56:5, 57:3, 59:3, 63:1, 65:16, 66:3, 68:7, 69:14, 71:23, 72:11, 79:10, 86:22, 89:6, 91:16, 92:15, 98:22, 98:25, 102:23, 112:14, 113:10, 114:7, 117:21, 118:13, 120:13,

121:19, 128:9, 134:7, 134:23, 135:15, 144:3, 145:5, 147:3, 149:1, 150:15, 154:22, 160:17, 163:10, 164:3, 164:7, 166:7, 167:23, 168:15, 169:3, 169:17, 170:16, 172:15, 173:25, 174:14, 175:7, 175:15, 176:16, 183:9, 187:23, 190:19, 191:16, 191:17, 192:20, 192:23, 193:18, 193:22, 194:21, 195:9, 195:24, 197:11, 198:23, 198:24, 201:16, 205:19, 210:6, 214:4, 214:15, 215:10, 217:15, 219:5, 219:20
**UPS** [2] - 12:8, 12:18
**upwards** [1] - 119:2, 136:6
**urban** [1] - 130:18
**urge** [1] - 135:12
**urged** [3] - 23:21, 103:12, 110:8
**urgent** [1] - 20:2
**Uruguay** [1] - 54:18
**US** [3] - 2:20, 3:8, 100:17
**USA** [1] - 54:15
**useful** [1] - 140:1
**uses** [4] - 36:18, 162:13, 175:11, 192:7
**usual** [1] - 217:16
**utterly** [1] - 199:20

## V

**vain** [1] - 214:10
**valid** [5] - 113:2, 199:5, 205:13, 218:6, 218:15
**value** [1] - 88:23
**variability** [9] - 62:3, 69:18, 69:20, 69:21, 115:14, 116:10, 117:23, 134:14, 191:3
**variable** [14] - 22:17, 47:24, 66:22, 76:15, 76:16, 88:14, 88:20, 90:13, 179:16,

195:15, 195:18, 203:1, 203:22, 204:1
**variables** [39] - 47:15, 47:16, 47:17, 47:20, 48:3, 66:1, 66:13, 66:21, 88:12, 88:13, 89:2, 90:13, 90:25, 91:1, 113:9, 132:23, 135:3, 136:3, 188:21, 190:9, 190:10, 194:4, 194:8, 195:18, 196:3, 202:16, 202:17, 202:19, 202:21, 202:23, 203:1, 203:13, 203:14, 203:21, 204:9, 204:13, 204:14, 204:15
**variation** [14] - 26:16, 26:18, 27:10, 67:2, 79:24, 80:6, 81:15, 112:24, 113:20, 114:5, 124:18, 151:5, 175:17, 193:17
**variations** [1] - 80:3
**varied** [8] - 26:13, 27:25, 77:1, 79:19, 148:1, 201:22, 212:4, 212:12
**various** [17] - 29:19, 95:2, 99:5, 135:24, 137:3, 145:25, 163:13, 169:18, 177:7, 179:2, 183:25, 184:13, 201:1, 202:23, 213:10, 221:11
**vary** [20] - 62:8, 62:10, 63:2, 65:1, 66:2, 66:4, 66:21, 79:22, 86:18, 88:4, 88:5, 88:6, 88:7, 88:8, 88:16, 91:19, 116:16, 212:6, 217:7
**varying** [1] - 175:8
**vast** [1] - 177:2
**vehicle** [1] - 147:22
**Vehicles** [1] - 133:2
**verdict** [1] - 45:14
**VERRIER** [1] - 2:4
**versus** [10] - 9:2, 45:12, 93:23, 99:1, 108:9, 111:21, 150:24, 152:4, 170:24, 194:17
**viable** [1] - 20:5
**vice** [1] - 25:4
**vice-president** [1] -

25:4
**victims** [5] - 57:20, 180:22, 181:3, 181:6, 181:8
**video** [2] - 54:4, 54:16
**view** [5] - 12:22, 24:11, 49:6, 138:8, 169:20
**vigorous** [1] - 77:16
**VIKTOR** [1] - 1:12
**violates** [1] - 105:14
**violation** [8] - 6:5, 56:25, 60:14, 60:25, 125:24, 126:18, 128:12, 134:2
**violations** [1] - 154:13
**virtually** [59] - 9:22, 32:5, 32:20, 33:20, 35:4, 41:19, 42:23, 43:9, 43:14, 49:18, 50:6, 50:7, 50:8, 50:11, 61:7, 61:8, 62:13, 63:5, 63:17, 64:1, 65:6, 65:15, 65:18, 67:7, 70:19, 77:8, 80:25, 87:4, 87:11, 89:9, 90:18, 92:4, 93:14, 103:8, 103:10, 104:20, 106:3, 111:22, 113:25, 115:11, 121:16, 125:13, 126:3, 126:17, 133:14, 134:2, 142:3, 155:10, 158:15, 160:4, 160:6, 163:19, 163:20, 165:7, 165:24, 174:7, 178:4, 213:4
**Visa** [1] - 161:5
**vitamin** [1] - 29:1
**Vitamin** [1] - 162:9
**Vitamins** [1] - 47:1
**volume** [3] - 148:22, 216:7
**volumes** [1] - 145:4

## W

**wage** [1] - 147:7
**wages** [3] - 113:22, 135:16, 135:25
**Wagnerian** [1] - 105:20
**wait** [3] - 73:22, 141:23, 151:24
**waited** [1] - 108:6
**waive** [1] - 41:5
**waived** [4] - 40:19,

79:12, 145:13, 145:22, 176:22, 176:24
**wake** [1] - 30:22
**Wal** [8] - 9:2, 42:15, 101:13, 102:8, 102:9, 105:8, 111:21
**Wal-Mart** [8] - 9:2, 42:15, 101:13, 102:8, 102:9, 105:8, 111:21
**walks** [1] - 41:5
**wallet** [1] - 37:14
**Walnut** [1] - 2:1
**wants** [2] - 75:25, 76:1
**Warren** [11] - 67:20, 182:4, 196:23, 196:24, 197:15, 197:16, 214:15, 214:21, 215:7, 217:14, 221:23
**Washington** [8] - 1:15, 2:14, 2:21, 3:3, 3:10, 3:13, 17:18, 82:11
**wasted** [1] - 177:12
**wasting** [2] - 22:23, 177:6
**water** [3] - 28:8, 131:6
**Watson** [1] - 37:10
**ways** [11] - 16:22, 39:17, 67:10, 114:15, 145:25, 179:3, 191:24, 208:9, 208:11, 215:13, 216:4
**weaker** [1] - 40:9
**weakest** [1] - 39:22
**Wednesday** [1] - 220:3
**week** [6] - 30:22, 44:3, 220:2, 220:3
**weeks** [3] - 29:11, 42:14, 200:10
**weigh** [4] - 138:22, 139:12, 139:13, 182:18
**weighed** [3] - 105:4, 105:5, 135:1
**weighing** [1] - 103:2
**weight** [42] - 26:2, 26:15, 27:20, 27:23, 62:1, 65:24, 66:11, 76:5, 76:7, 76:9, 76:10, 76:13, 88:6, 89:12, 90:7, 95:19, 103:9, 114:10, 115:10, 115:14, 115:25, 121:15, 121:22, 121:23,

121:24, 123:6, 123:15, 140:10, 140:14, 140:22, 146:2, 147:2, 175:11, 175:19, 175:21, 187:25, 188:1, 188:3, 190:1, 193:13, 208:12, 216:7
**weighted** [8] - 44:14, 62:3, 113:10, 192:15, 193:6, 193:10, 193:12, 194:1
**weighting** [3] - 121:21, 121:24, 208:2
**weights** [4] - 26:4, 76:19, 183:17, 198:5
**well-accepted** [1] - 31:24
**well-known** [1] - 104:14
**Westlaw** [1] - 29:11
**whatsoever** [1] - 191:10
**wheat** [2] - 129:14
**whiskers** [1] - 27:19
**White** [1] - 109:23
**whole** [27] - 13:22, 17:3, 17:25, 18:9, 18:19, 19:13, 20:18, 25:16, 29:6, 36:19, 38:7, 57:16, 70:20, 99:23, 108:22, 132:23, 133:19, 133:24, 138:12, 141:19, 145:12, 149:17, 162:11, 162:23, 164:17, 177:10, 197:25
**why's** [1] - 78:16
**wide** [36] - 11:2, 26:18, 27:10, 30:13, 30:14, 31:25, 32:8, 33:5, 43:5, 43:17, 56:14, 100:20, 101:19, 104:21, 107:16, 113:24, 118:8, 121:10, 123:25, 125:23, 141:1, 141:22, 151:3, 157:6, 160:3, 160:10, 160:11, 160:24, 161:13, 161:15, 161:16, 162:17, 163:6, 166:13, 173:11, 173:18
**wildly** [1] - 93:6

**WILSON** [1] - 2:9
**win** [5] - 43:2, 45:7, 45:9, 156:1
**windfall** [1] - 163:1
**windfalls** [2] - 157:23, 157:25
**Windows** [1] - 192:8
**wish** [1] - 213:24
**witchcraft** [1] - 121:22
**withheld** [3] - 121:19, 123:18, 146:21
**withhold** [2] - 121:18, 127:1
**withstands** [1] - 125:25
**witnesses** [1] - 28:22
**Wittgen** [1] - 150:19
**Wizard** [1] - 133:22
**WLS** [8] - 44:15, 44:17, 44:22, 45:1, 45:12, 193:5, 207:24, 208:2
**WOLKOFF** [1] - 2:7
**Wolkoff** [3] - 7:16, 20:4, 23:4
**wonder** [1] - 46:6
**wonderful** [2] - 73:25, 138:24
**wondering** [1] - 97:5
**wool** [1] - 196:12
**Wooldridge** [2] - 184:18, 185:2
**word** [15] - 32:7, 62:23, 66:6, 66:7, 67:23, 79:6, 96:14, 103:4, 112:11, 119:11, 122:14, 131:20, 136:14, 172:5, 200:21
**words** [16] - 10:18, 32:8, 34:23, 43:7, 67:22, 88:7, 88:8, 95:10, 104:14, 118:6, 130:6, 140:20, 163:24, 214:6, 214:20, 217:2
**works** [2] - 147:12, 147:16
**world** [35] - 6:8, 6:15, 7:4, 8:21, 13:17, 13:21, 13:23, 17:3, 17:8, 17:25, 18:3, 18:8, 18:17, 18:19, 19:2, 20:6, 23:5, 29:21, 61:22, 61:23, 64:9, 75:3, 75:5, 81:22, 102:5, 102:17, 105:3, 109:14, 134:22, 135:16, 137:1,

138:12, 174:4, 177:8, 179:3

**worldwide** [14] - 7:14, 8:3, 11:8, 13:11, 14:16, 16:9, 16:13, 18:24, 83:8, 84:17, 214:24, 217:21, 217:23

**Worldwide** [3] - 2:5, 2:6, 16:4

**worry** [1] - 169:5

**worse** [1] - 47:5

**worth** [5] - 19:19, 19:20, 27:15, 28:16

**worthless** [1] - 51:19

**write** [1] - 134:9

**written** [1] - 53:17

**wrongful** [2] - 161:24, 162:14

**wrote** [11] - 12:21, 13:5, 18:25, 20:21, 21:5, 54:5, 104:13, 132:3, 134:9, 173:21, 173:22

## Y

**year** [24] - 28:14, 28:15, 29:1, 31:11, 32:1, 36:6, 42:6, 43:22, 46:15, 75:20, 102:4, 102:10, 154:11, 154:15, 155:18, 155:25, 160:13, 162:9, 177:13, 206:13, 206:14

**years** [26] - 8:10, 9:6, 9:12, 25:1, 28:15, 34:16, 34:18, 49:15, 61:25, 63:12, 68:10, 71:11, 75:23, 89:12, 105:3, 119:3, 120:8, 122:16, 138:11, 143:7, 148:8, 174:1, 177:7, 205:4, 206:10, 209:21

**yes/no** [5] - 63:21, 63:22, 63:23, 63:24, 64:12

**yield** [1] - 9:16

**yields** [2] - 87:15, 98:3

**YORK** [1] - 1:1

**York** [21] - 1:5, 1:18, 1:22, 2:10, 2:18, 3:6, 14:19, 14:23, 15:2, 15:17, 17:17, 17:21, 82:11, 83:19, 83:20, 144:25, 148:14, 194:18

**Young** [2] - 23:13, 44:2

**yourself** [4] - 123:4, 143:5, 143:18, 147:16

## Z

**Zealand** [8] - 2:13, 6:9, 11:25, 24:1, 27:20, 47:10, 54:24, 168:23

**zero** [41] - 22:11, 50:22, 51:1, 51:4, 51:7, 51:22, 52:4, 53:15, 53:16, 69:15, 80:3, 80:9, 80:11, 80:16, 94:13, 94:14, 95:9, 95:13, 115:11, 121:2, 122:6, 132:2, 132:15, 145:7, 145:8, 150:1, 158:1, 158:2, 167:1, 167:5, 167:10, 167:12, 167:18, 168:9, 168:16, 195:21, 218:4

**zeroed** [1] - 196:9

**zeros** [13] - 50:20, 51:2, 51:8, 51:13, 51:21, 51:25, 122:15, 132:13, 145:14, 145:25, 149:24, 150:1

**zone** [1] - 143:4