# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
| --- | --- |
| IN RE | Master File 06-MD-1775 (BMC)(VVP) |
| AIR CARGO SHIPPING SERVICES ANTITRUST LITIGATION | THIS DOCUMENT RELATES TO: All Actions |
| MDL No. 1775 | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' COUNSEL'S JOINT APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Dated:   August 19, 2016

**TABLE OF CONTENTS**

TABLE OF CONTENTS...............................................................................................i

TABLE OF AUTHORITIES ......................................................................................ii

I.      INTRODUCTION ..........................................................................................1

II.     BACKGROUND ............................................................................................1
        A.      Fee and Expense Award History.........................................................1
        B.      The Fifth Settlements .........................................................................4

III.    ARGUMENT ..................................................................................................5
        A.      The Requested Percentage Is Reasonable...........................................6
                1.      Time and Labor of Plaintiffs' Counsel ...................................7
                2.      The Litigation's Complexities and Magnitude ........................7
                3.      The Risks of the Litigation .....................................................8
                4.      Quality of Representation .....................................................10
                5.      Relationship Between the Requested Fees and the Settlements ............12
                6.      Public Policy Considerations ................................................15
        B.      The Requested Fee Is Reasonable Under the Lodestar "Cross-Check"...............17
        C.      Objections from Class Members.......................................................20
        D.      The Requested Expenses Are Reasonable and Should Be Reimbursed ..............21
        E.      Class Counsel Should Be Given Authority to Distribute the Awarded Attorneys'
                Fees ...................................................................................................21

IV.     CONCLUSION.............................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Allapattah Servs., Inc. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..................................................... 13, 15

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.*,
    481 F.2d 1045 (2d Cir. 1973).................................................................... 16

*Anixter v. Home-Stake Prod. Co.*,
    77 F.3d 1215 (10th Cir. 1996) ..................................................................... 9

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of*
    *Elections*, 522 F.3d 182 (2d Cir. 2007)......................................................... 15

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990) .......................................................................... 9

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
    96 Civ. 0583, 2002 WL 1315603 (S.D.N.Y. June 17, 2002)............................... 6

*Beckman v. KeyBank, N.A.*,
    293 F.R.D. 467 (S.D.N.Y. 2013) ................................................................ 19

*Blum v. Stenson*,
    465 U.S. 886 (1984)................................................................................. 14

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................................... 5

*Dahl v. Bain Capital Partners, LLC*,
    No. 1:07-cv-12388-WGY (D. Mass. Feb. 2, 2015).......................................... 13

*Daubert v. Merrell Dow Pharmas., Inc.*,
    509 U.S. 579 (1993) .............................................................................. 8, 9

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)........................................................ 5, 6, 7, 8, 10, 22

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06–MD–1775 (JG)(VVP), 2009 WL 3077396 (E.D.N.Y. Sep. 25, 2009) .... 2, 7, 8, 21

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06–MD–1775 (JG)(VVP),
    2011 WL 2909162 (E.D.N.Y. July 15, 2011)........................... 3, 6, 8, 10, 11, 21

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1775 (JG)(VVP), 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012)............ 3-4, 21

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    697 F.3d 154 (2d Cir. 2012)......................................................................................... 2

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
    Master File No. 06-MD-1775 (JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014),
    *adopted in its entirety*, 2015 WL 5093503 (July 10, 2015),
    amended August 3, 2015........................................................................................ 8, 9, 11

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1775 (JG)(VVP), 2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015) ............... 4, 11

*In re Amaranth Nat. Gas Commodities Litig.*,
    No. 07 Civ. 6377 (SAS), 2012 WL 2149094 (S.D.N.Y. June 11, 2012)........................ 12

*In re Arakis Energy Corp. Sec. Litig.*,
    No. 95 CV 3431 (ARR), 2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001) ......................... 21

*In re Buspirone Antitrust Litig.*,
    MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003)........... 13

*In re Checking Account Overdraft Litig.*,
    830 F. Supp. 2d 1330 (S.D. Fla. 2011) ......................................................................... 13

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13-MD-2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016).................. 16, 20

*In re Currency Conversion Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009),
    *aff'd sub nom. Priceline.com, Inc. v. Silberm*an,
    405 F. App'x. 532 (2d Cir. 2010)...................................................................................... 7

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) .......................................................................... 20

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    681 F. Supp. 2d 141 (D. Conn. 2009)........................................................................... 17

*In re Flonase Antitrust Litig.*,
    951 F. Supp. 2d 739 (E.D. Pa. 2013) ..................................................................... 14, 20

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ....................................................................................... 17

iii

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000).................................................................................... 15

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)..................................................................... 12-13

*In re Linerboard Antitrust Litig.*,
    No. MDL 1261, Nos. Civ. A. 98-5055, Civ. A. 99-1000, Civ. A. 99-1341,
    2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................................................ 13-14

*In re Med. X-Ray Film Antitrust Litig.*,
    No. CV-93-5904, 1998 U.S. Dist. LEXIS 14888 (E.D.N.Y. Aug. 7, 1998).................... 13

*In re Neurontin Antitrust Litig.*,
    Civil Action No. 02-1830, Civil Action No. 02-2731 (D.N.J. Aug. 6, 2014) ........... 14, 20

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005).......................................................................................... 15

*In re Rite Aid Corp. Sec. Litig.*,
    362 F. Supp. 2d 587 (E.D. Pa. 2005) ........................................................................... 20

*In re Southeastern Milk Antitrust Litig.*,
    No. 2:07-CV-208, Master File No. 2:08-MD-1000, 2013 WL 2155387
    (E.D. Tenn. May 17, 2013) .....................................................................................14, 16

*In re TFT-LCD [Direct Purchaser] Antitrust Litig.*,
    No. 07-md-01827, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) .................................. 13

*In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*,
    No. 07-md-01827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)................................ 13

*In re Titanium Dioxide Antitrust Litig.*,
    Master Docket No. 10-CV-00318(RDB), 2013 WL 6577029
    (D. Md. Dec. 13, 2013) ................................................................................................ 14

*In re Tricor Direct Purchaser Antitrust Litig.*,
    No. 05-cv-00340 (D. Del. Apr. 23, 2009)..................................................................... 20

*In re Urethane Antitrust Litig.*,
    MDL No. 1616, No. 04-MD-1616-JWL-JPO (D. Kan. July 29, 2016) .....................13, 20

*In re U.S. Foodservice, Inc. Pricing Litig.*,
    No. 3:07-md-1894 (AWT) (D. Conn. Dec. 9, 2014) ................................................. 12, 20

*In re Visa Check/Mastermoney Antitrust Litig.*,
      297 F. Supp. 2d 503 (E.D.N.Y. 2003),
      *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., In*c.,
      396 F.3d 96 (2d Cir. 2005)............................................................... 6, 11, 16, 21

*In re Vitamin C Antitrust Litig.*,
      No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514
      (E.D.N.Y. Oct. 23, 2012) .................................................... 6, 7, 10, 21

*In re Vitamins Antitrust Litig,*
      No. MISC. 99-197 (TFH), MDL No. 1285,
      2001 WL 34312839 (D.D.C. July 16, 2001).................................... 13

*In re Vitamins Antitrust Litig.*,
      398 F. Supp. 2d 209 (D.D.C. 2005) .............................................21

*In re Warner Commc'n Sec. Litig.*,
      618 F. Supp. 735 (S.D.N.Y. 1985),
      *aff'd*, 798 F.2d 35 (2d Cir. 1986) (S.D.N.Y. 1985) ......................... 10

*In re WorldCom Inc. Sec. Litig.,*
      388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................ 16

*Kurzweil v. Philip Morris Co.*,
      Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105
      (S.D.N.Y. Nov. 30, 1999) ............................................................ 13

*Massiah v. Metroplus Health Plan, Inc.*,
      No. 11-cv-5669 (BMC), 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)......................... 6

*Missouri v. Jenkins*,
      491 U.S. 274 (1989).................................................................... 14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
      473 U.S. 614 (1985)................................................................15-16

*Montague v. Dixie Nat. Life Ins. Co.*,
      Civil Action No. 3:09-00687-JFA, 2011 WL 3626541 (D.S.C. Aug. 17, 2011).............. 14

*Sheppard v. Consol. Edison Co. of N.Y., Inc.*,
      No. 94-cv-0403 (JG), 2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002) ................................ 6

*Standard Iron Works v. ArcelorMittal*,
      Case No. 08 C 5214 (N.D. Ill. Oct. 22, 2014) ................................................. 14

*Tyson Foods, Inc. v. Bouaphakeo*,
      __ U.S. __, 136 S. Ct. 1036 (2016)............................................................... 9

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
      396 F.3d 96 (2d Cir. 2005) .................................................................................. 6, 7, 20

*Weseley v. Spear, Leeds & Kellogg*,
      711 F. Supp. 713 (E.D.N.Y. 1989) ............................................................................. 7

*Westerfield v. Wash. Mut. Bank*,
      Nos. 06-cv-2817 (JMA), 08 Civ. 00287 (CBA) (JMA),
      2009 WL 5841129 (E.D.N.Y. Oct. 8, 2009) ............................................................. 12

**Statutes and Rules**

Federal Rule of Civil Procedure 23(f) .......................................................................... 9

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ............................ 9

**Other Authorities**

Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*,
      1 J. Empirical Legal Stud. 27 (2004) ....................................................................... 14

## I.    INTRODUCTION

After more than a decade of hard-fought litigation against more than 30 defendant groups, including court orders granting class certification and summary judgment in favor of plaintiffs, plaintiffs' counsel request a final award of attorneys' fees and expenses from the last seven settlements in the case (the "Fifth Settlements"). Plaintiffs' counsel seek an attorneys' fee of 25% of the $387,850,000 settlement funds from those settlements and reimbursement of $2,496,900.30 in unreimbursed expenses.[1] The fee request, if granted, would result in a multiplier of 1.99 of plaintiffs' counsel's lodestar. And the fact that plaintiffs' counsel have several more years of work ahead in handling future distributions of the remaining and yet-to-be-paid portions of the settlement funds (but will not make another fee request) in effect lowers the multiplier of this final requested award. Both the percentage and the multiplier are well in line with attorneys' fees awarded in other class actions in this district and around the country.

Facing every possible challenge from experienced, aggressive, and well-funded defense counsel, plaintiffs' counsel have obtained numerous commendable victories over more than the last ten years, culminating in a total of $1.236 billion in settlements, the last of which were reached close to trial. In light of this significant recovery on behalf of the class, plaintiffs' counsel are entitled to this reasonable requested award.

## II.    BACKGROUND

### A.    Fee and Expense Award History

On September 11, 2006, direct and indirect purchasers entered into a first settlement with Lufthansa in the amount of $85 million. Special Master Daniel Weinstein, a former judge who

---

[1] The notice disseminated to class members stated that plaintiffs' counsel would seek up to 25% of the settlement proceeds and reimbursement of expenses not to exceed $4 million.

was appointed by Magistrate Judge Pohorelsky, recommended an allocation of the settlement amount between direct and indirect purchases. ECF Nos. 668-2 and 712. On April 4, 2008, the Court accepted the Special Master's recommendation. ECF No. 727. The Lufthansa settlement was then approved by the Court on September 25, 2009. ECF No. 963.

Plaintiffs moved for an interim award of attorneys' fees and for reimbursement of expenses from this early settlement. ECF No. 819. Regarding that request, Judge Gleeson held that only pre-September 11, 2006 work performed by plaintiffs' counsel devoted to negotiating the Lufthansa settlement and post-September 11 work relating to executing the final settlement, such as preparing for and participating in mediation and arbitration meetings and court conferences with respect to the plan of allocation or notice, could be compensated from the Lufthansa settlement. ECF No. 884. As a result, Judge Gleeson awarded plaintiffs' counsel (for both direct and indirect purchasers) attorneys' fees of $12,750,000 and expenses of $1,572,100.94, all of which were related to the Lufthansa settlement. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06–MD–1775 (JG)(VVP), 2009 WL 3077396, at *16 (E.D.N.Y. Sep. 25, 2009) ("2009 Fee Opinion"). Special Master Weinstein then allocated the fees between direct and indirect purchaser counsel, awarding $9,553,632.68 to direct purchaser counsel.[2]

Prior to the instant fee application, plaintiffs have reached settlements with more than twenty other defendant groups. The Second Settlements totaling $193,430,000 were with Société Air France; Koninklijke Luchtvaart Maatschappij N.V.; Martinair Holland N.V.; Japan Airlines International Co., Ltd.; AMR Corporation; American Airlines, Inc.; Scandinavian Airlines

---

[2] The claims of indirect purchasers were dismissed on preemption grounds (ECF No. 938), and the Second Circuit affirmed the dismissal, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154 (2d Cir. 2012).

2

System; SAS Cargo Group A/S; All Nippon Airways Co., Ltd.; Cargolux Airlines International S.A.; Qantas Airways, Ltd.; and Thai Airways International Public Co., Ltd. In connection with the Second Settlements, plaintiffs' counsel requested 25% of the settlement funds, which equated to less than the lodestar (hours multiplied by fees) incurred at that time. On July 15, 2011, Judge Gleeson granted this request, noting that 25% of the settlement fund represented only 63% of plaintiffs' lodestar, and that plaintiffs' counsel had conducted "tireless work over the course of four years." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06–MD–1775 (JG)(VVP), 2011 WL 2909162, at *7 (E.D.N.Y. July 15, 2011) ("2011 Fee Opinion").

The Third Settlements totaling $207,135,000 were with British Airways Plc; Lan Airlines, S.A.; Lan Cargo, S.A.; Aerolinhas Brasileiras, S.A.; Malaysia Airlines; South African Airways Ltd.; Saudi Arabian Airlines, Ltd.; Emirates; El Al Israel Airlines, Ltd.; Air Canada; and AC Cargo LP. At the hearing on plaintiffs' fee request from these settlements, Judge Gleeson expressed concern that interim fee requests throughout the case could complicate the determination of the fairness and reasonableness of attorneys' fees requested, suggesting for example, "discounting the interim fee by a fraction that represents the remaining defendants." Fairness Hearing Tr. at 17:1-7; 18:18-19:1 (July 27, 2012) (Aug. 2016 Joint Decl.[3] ¶ 121, Ex. E). However, on August 2, 2012, Judge Gleeson granted plaintiffs' request for attorneys' fees of 25% of the Third Settlements with an overall multiplier of 1.11 of the lodestar incurred by plaintiffs' counsel through December 2011. *See In re Air Cargo Shipping Servs. Antitrust Litig.*,

---

[3] The "Aug. 2016 Joint Decl." is the Joint Declaration of Class Counsel in Support of (1) Final Approval of the Settlements with Polar Air Cargo LLC, Polar Air Cargo Worldwide, Inc., Atlas Air Worldwide Holdings, Inc., Air China Limited, Air China Cargo Company Limited, Air New Zealand Limited, and Air India Ltd.; (2) the Plan of Allocation of the Settlement Proceeds from These Settlements and the Asiana, NCA, and EVA Settlements; and (3) Plaintiffs' Counsel's Joint Application for an Award of Attorneys' Fees and Reimbursement of Expenses, dated August 19, 2016.

No. 06-MD-1775 (JG)(VVP), 2012 WL 3138596, at *5 (E.D.N.Y. Aug. 2, 2012) ("2012 Fee Opinion").

The Fourth Settlements totaling $362,492,442 were with Korean Air Lines Co., Ltd.; Singapore Airlines Limited; Singapore Airlines Cargo PTE Ltd.; China Airlines, Ltd.; and Cathay Pacific Airways Ltd. Mindful of Judge Gleeson's expressed concerns about calibrating the fee award percentage prior to the completion of the case, plaintiffs' counsel tempered their request for interim attorneys' fees from the Fourth Settlements to 22%, amounting to an overall multiplier of 1.45 for the period through June 30, 2014. ECF No. 2082-1, at 1-2. On October 9, 2015, Judge Gleeson approved the attorneys' fee and litigation expense request with respect to the Fourth Settlements. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2015 WL 5918273, at *6-7 (E.D.N.Y. Oct. 9, 2015) ("2015 Fee Opinion"). Judge Gleeson found the requested attorneys' fees to be fair and reasonable considering, among other things: (1) the litigation was nine years old and counsel spent hundreds of thousands of hours prosecuting it; (2) the time and energy spent on the litigation was directly related to the factual and legal complexity of the action; (3) antitrust cases are highly complex, protracted, and bitterly fought; (4) the litigation was risky; and (5) plaintiffs' counsel were highly experienced and the settlements were the result of vigorous arm's-length negotiations. *See id.*

## B.     The Fifth Settlements

The Fifth Settlements from which the final award of attorneys' fees and litigation expenses are requested total $387,850,000 from the following defendants: Nippon Cargo Airlines Co., Ltd. ("NCA")—$36,500,000; EVA Airways Corporation ("EVA")—$99,000,000, of which $39,000,000 is to be paid by January 6, 2017; Asiana Airlines, Inc. ("Asiana")— $55,000,000; Polar Air Cargo LLC, Polar Air Cargo Worldwide, Inc., and Atlas Air Worldwide Holdings, Inc. (collectively "Polar")—$100,000,000, of which $35,000,000 is to be paid by

4

January 15, 2017, and $30,000,000 is to be paid by January 15, 2018; Air China Limited and Air China Cargo Company Limited ("Air China")—$50,000,000; Air New Zealand Limited ("ANZ")—$35,000,000; and Air India Ltd. ("Air India")—$12,500,000.[4] In addition, NCA, EVA, and Asiana each paid $200,000 toward the costs of notice and administration, which, if not used, will become part of the settlement fund.

A description of the work performed since the last fee petition during the period July 1, 2014, through July 31, 2016, is set forth in the Aug. 2016 Joint Decl. Previously filed Joint Declarations describe the work performed from December 6, 2006, through June 30, 2014, in connection with the Second, Third, and Fourth Settlements.[5]

## III.   ARGUMENT

Over the last decade of hard-fought litigation victories and with more than one billion dollars in settlements, plaintiffs' counsel have created substantial benefits for the class, entitling counsel to recover reasonable attorneys' fees. The Supreme Court in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), recognized that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Id.* at 478; *see Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). Having achieved excellent settlements with these seven defendant groups, plaintiffs' counsel respectfully submit that they are entitled to an award of attorneys' fees of 25% of the settlement funds.

---

[4] While Class Counsel are requesting an award of attorneys' fees on the entire amount of the Fifth Settlements, they will not distribute the fees awarded on future settlement payments from EVA and Polar until the payments are received.
[5] The prior joint declarations are dated May 10, 2011 (the "May 2011 Joint Decl.") (ECF No. 1474-3); June 22, 2012 (the "June 2012 Joint Decl.") (ECF No. 1717-2); and December 1, 2014 (the "Dec. 2014 Joint Decl.") (ECF No. 2082-2).

To determine attorneys' fees in a common fund case, the Second Circuit favors "set[ting] some percentage of the recovery as a fee." *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("[t]he trend in this Circuit is toward the percentage method"); *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514, at *9 (E.D.N.Y. Oct. 23, 2012) ("the trend in the Second Circuit is to utilize the percentage method"); *Sheppard v. Consol. Edison Co. of N.Y., Inc.*, No. 94-cv-0403 (JG), 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) ("'[t]he trend . . . in the Second Circuit appears to be the utilization of the percentage method'" (quoting *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, 96 Civ. 0583, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002))); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 520 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., In*c., 396 F.3d 96 (2d Cir. 2005) (the percentage-of-the-fund approach "spares the court and the parties the 'cumbersome, enervating, and often surrealistic process' of lodestar computation" (quoting *Goldberger*, 209 F.3d at 50)). "The lodestar method can then be used as a 'cross-check.'" *Vitamin* C, 2012 WL 5289514, at *9, citing 2011 Fee Opinion at *5.

## A.     The Requested Percentage Is Reasonable

The criteria used to determine whether a common fund fee is reasonable include:
(1)      the time and labor expended by counsel;
(2)      the magnitude and complexities of the litigation;
(3)      the risk of the litigation;
(4)      the quality of the representation;
(5)      the requested fee in relation to the settlement; and
(6)       public policy considerations.

*Vitamin* C, 2012 WL 5289514, at *9-10 (quoting 2011 Fee Opinion (quoting *Goldberger*, 209 F.3d at 50)). *See also Massiah v. Metroplus Health Plan, Inc.*, No. 11-cv-5669 (BMC), 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012) (applying the *Goldberger* factors in an FLSA case).

6

In applying these factors, the Court should "not [] blindly follow a one-size-fits-all 'benchmark.'" 2009 Fee Opinion, at *13 (*citing Goldberger,* 209 F.3d at 52). "[T]he key consideration in awarding fees is what is reasonable under the circumstances." *Id*. (citing *Goldberger*, 209 F.3d. at 47).

### 1.   Time and Labor of Plaintiffs' Counsel

Plaintiffs' counsel have spent 289,650.87 hours prosecuting the litigation from December 6, 2006, through July 31, 2016, 31,155.6 hours of which were performed from July 1, 2014, through July 31, 2016. Aug. 2016 Joint Decl. ¶ 126. Plaintiffs' extensive efforts are detailed in the May 2011, June 2012, Dec. 2014, and Aug. 2016 Joint Decls. In addition, plaintiffs' counsel will continue to devote time to this case through the final distribution of all settlements (in 2018, at the earliest).

### 2.   The Litigation's Complexities and Magnitude

Antitrust price-fixing conspiracy cases are notoriously complex and difficult to litigate. *See, e.g., Wal-Mart*, 396 F.3d at 122 (acknowledging that "antitrust cases, by their nature, are highly complex"); *Vitamin C*, 2012 WL 5289514, at *4 ("federal antitrust cases are complicated, lengthy, and bitterly fought, as well as costly") (internal quotations and citations omitted); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberm*an, 405 F. App'x. 532 (2d Cir. 2010) (noting that "antitrust cases are typically complex"); *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought").

This more than ten-year-old litigation has involved an unusually large number of defendants (30 defendant groups), millions of documents, more than 90 depositions, extensive motion practice, class certification after a three-day evidentiary hearing, 16 summary judgment motions, and well-advanced preparations for trial. Among the issues addressed in the course of

7

the litigation were the extraterritorial applicability of the Sherman Act; defenses such as foreign sovereign compulsion, act of state, and filed rate; the effect of the French blocking statute on discovery; and access to grand jury testimony contradicting or supplementing deposition testimony. *See* the May 2011, June 2012, Dec. 2014, and Aug. 2016 Joint Decls. Magistrate Judge Pohorelsky's October 15, 2014 Report and Recommendation on class certification and *Daubert* issues covered 114 pages. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, Master File No. 06-MD-1775 (JG) (VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *adopted in its entirety*, 2015 WL 5093503 (July 10, 2015), amended August 3, 2015. Judge Gleeson has previously found that "[t]his litigation is irrefutably complex." 2009 Fee Opinion at *14; 2011 Fee Opinion at *6.

### 3.    The Risks of the Litigation

"It is well-established that litigation risk must be measured as of when the case is filed." *Goldberger*, 209 F.3d at 55. At the time this case was filed, plaintiffs and their counsel had only the little information that existed in the public domain on which to rely. There were immense risks in embarking on a large-scale litigation against nearly every major airline; it is certainly vastly harder to litigate against 30 defendant groups than against five or six defendants. Moreover, plaintiffs' counsel could not have known which, if any, of the 30 groups of defendants would plead guilty to any violation of the Sherman Act. In fact, none of the most recent settling defendants—Air China, Air New Zealand, and Air India—have been charged with wrongdoing by the United States Department of Justice. And even those defendants that pled guilty still fought tooth and nail in asserting that the conspiracy allegations were not plausible, that the conspiracy was not as widespread as plaintiffs alleged, and that, even if they did violate the antitrust laws, the conspiracy was ineffective and plaintiffs could not have been injured.

Further, because most of the defendants were foreign airlines and the conspiracy was alleged to be world-wide, there were additional legal risks at each stage of the case. Defendants argued that the plaintiffs could not recover damages for shipments into the United States (more than half of the defendants' commerce in the case) as a result of the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a (an argument plaintiffs defeated at the motion-to-dismiss stage and at summary judgment). Similarly, plaintiffs faced (and defeated) affirmative defenses of foreign sovereign compulsion, act of state, and filed rate, as well as the statute of limitations.

Plaintiffs' risk at class certification was no less. The parties submitted hundreds of pages of expert reports, hundreds of exhibits, and presented evidence and argument to the Court over four days before Magistrate Judge Pohorelsky's issued his 114-page Report and Recommendation to certify a class (later adopted in its entirety by Judge Gleeson (ECF No. 2282)), and which the Second Circuit refused to hear under Fed. R. Civ. P. 23(f)). And there remained some risk that the pending Supreme Court decision in *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036 (2016), would create new class certification burdens. Even at the time the last settlement was reached, plaintiffs still risked *Daubert* challenges against their trial experts.

Moreover, even if plaintiffs succeeded through trial, there is always a risk that a judgment would be overturned on appeal. *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1218-19 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) (*en banc*) (reversing plaintiffs' verdict and ordering entry of judgment for defendants).

In addition, plaintiffs have faced the considerable risk of collectability of any judgment. The air cargo industry has experienced severe financial difficulties. JAL, Alitalia, and American

filed for bankruptcy protection after the case commenced. And the settlements with Korean Air, China Air, and NCA took their stressed financial conditions into account. *See* 2011 Fee Opinion, at *6 ("The airline industry is experiencing especially difficult times." "[I]n light of the current economic climate . . . this action is obviously risky."). The risks associated with collecting any judgment from the last three defendants to settle were particularly acute. All were foreign defendants owned by sovereign governments. Air China, Air India, and Air New Zealand have few assets in the United States.

As the Court recognized earlier this year in noting that plaintiffs' counsel were not requesting fees at the time of the final approval hearing for the Asiana, EVA, and NCA settlements, plaintiffs' counsel took on these challenges at great financial risk to themselves for years. Mar. 24, 2016 Tr. 13:15-17 (Aug. 2016 Joint Decl. ¶ 72, Ex. D) ("Frankly, it surprises me in these cases sometimes if plaintiffs' firms have the financing to carry these cases this long."). Throughout the litigation, plaintiffs' counsel often went two to three years without being compensated for their work or reimbursed for the expenses they incurred on behalf of the class.

Overall, this factor supports plaintiffs' counsel's reasonable fee request of 25% of the settlement funds.

### 4.     Quality of Representation

This factor is intended to take into consideration the role that plaintiffs' counsel played in obtaining the results achieved. *Goldberger*, 209 F.3d at 55. Courts typically consider the experience, reputation, and ability of class counsel in evaluating counsel's fee request. *See, e.g., In re Warner Commc'n Sec. Litig.*, 618 F. Supp. 735, 748-49 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) (S.D.N.Y. 1985)). The quality of representation is best measured by results. *See Goldberger*, 209 F.3d at 55 (discussing results); *Vitamin C*, 2012 WL 5289514, at *10 (noting that "Class Counsel is abundantly qualified and has been victorious on a number of motions

10

before the Court"). Over the last decade, plaintiffs' counsel defeated motions to dismiss, prevailed at class certification, won the summary judgment motions they filed, defeated the summary judgment motions defendants filed, and obtained more than $1 billion in settlements for the class. These results speak for themselves, particularly in light of the very high quality of opposing counsel from the country's top defense firms. *See Visa Check*, 297 F. Supp. 2d at 524 (measuring quality of plaintiffs' representation in light of the quality of opposing counsel).

Judge Gleeson recognized the quality of the representation by plaintiffs' counsel. In his 2015 Fee Opinion at *7, he stated, "As noted in my previous decisions, class counsel are highly experienced practitioners in complex litigation generally and antitrust litigation specifically." *See also* 2011 Fee Opinion at *6-7 ("Settlement Class Counsel are highly experienced practitioners in complex litigation generally and antitrust litigation specifically" – counsel's work has been "tireless"). Similarly, at the summary judgment hearing, Judge Gleeson commented:

> Well, first of all, thank you for your advocacy both in writing and orally. You travel in different circles than the ones I travel in so you probably don't appreciate how unusual it is to have such excellent lawyering so I am grateful for it.

Aug. 31, 2015 Tr. at 91 (Aug. 2016 Joint Decl. ¶ 34, Ex. C). According to Magistrate Judge Pohorelsky in his class certification Report and Recommendation: "Each counselor [Class Counsel] . . . ha[s] consistently proven their competence and expertise throughout the life of this extended litigation." *In re Air Cargo Shipping Servs. Antitrust Litig.,* 2014 WL 7882100, at *34 (ECF No. 2055 at 58). And this Court at the fairness hearing on the first tranche of the Fifth Settlements added: "I know the plaintiffs' counsel by experience. They are all top-end lawyers. Judge Gleeson has recognized that in approving the prior settlement[s]." Mar. 24, 2016 Tr. 13:8-11. (Aug 2016 Joint Decl. ¶ 72, Ex. D).

As is evident from the timing of when these last seven settlements were reached, without these numerous victories throughout the litigation, such exceptional settlement values would not

have been possible. Not until after the class certification Report and Recommendation did any of these defendants agree to settle. And it required victories at summary judgment and substantial trial preparation before settlements could be reached with the final four defendants. The Fifth Settlements required skilled negotiating and the involvement of experienced mediators. Aug. 2016 Joint Decl. ¶¶ 73-83, 89-93, 98-102, 107-08, 111-12, Ex. D at 13:20-22. Faced with the prospect of an upcoming trial in which plaintiffs' counsel were fully armed with persuasive facts, favorable witness testimony, and strong expert opinions, the remaining defendants, even those who had not previously pled guilty, finally settled at amounts very favorable to the class.

### 5. **Relationship Between the Requested Fees and the Settlements**

The requested fee represents 25% of the Fifth Settlements resulting in a modest overall multiplier of 1.99. The overall blended percentage would be 22.85%. *See* Aug. 2016 Joint Decl., ¶ 127. The requested award from the Fifth Settlements is fair given the extensive overall high-level effort that was required to achieve these excellent results.

In this case, plaintiffs' counsel have consistently submitted requests of 25% or less of settlement funds, even though many courts in this circuit have awarded attorneys' fees of more than 25%. *See In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT), ECF No. 521 (D. Conn. Dec. 9, 2014) (attached as Ex. 1[6]) (one-third fee from $297 million fund in a case that settled before summary judgment); *In re Amaranth Nat. Gas Commodities Litig.*, No. 07 Civ. 6377 (SAS), 2012 WL 2149094, at *2 (S.D.N.Y. June 11, 2012) (awarding 30% of fund of $77.1 million); *Westerfield v. Wash. Mut. Bank*, Nos. 06-cv-2817 (JMA), 08 Civ. 00287 (CBA) (JMA), 2009 WL 5841129, at *3-4 (E.D.N.Y. Oct. 8, 2009) (granting 30% of $38 million fund in an FLSA action); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515-16 (S.D.N.Y.

---

[6] Numerical exhibits, which are unreported court papers, are attached to this memorandum.

2009) (one-third award from net settlement fund of about $510 million); *In re Buspirone Antitrust Litig.*, MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (one-third fee); *Kurzweil v. Philip Morris Co.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% award from a $123 million settlement fund in a securities action); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 U.S. Dist. LEXIS 14888, at *20 (E.D.N.Y. Aug. 7, 1998) (awarding 33-1/3% of an approximately $40 million settlement fund as "well within the range accepted by courts in this circuit").

Many courts in other circuits have also awarded fees of more than 25% of settlement funds in class actions. *See In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*, No. 07-md-01827 SI, 2013 WL 1365900, at *8 & n.11 (N.D. Cal. Apr. 3, 2013) (28.5% fee from $1.08 billion fund); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (awarding 31.33% fee from $1.075 billion settlement); *In re Urethane Antitrust Litig.*, MDL No. 1616, No. 04-MD-1616-JWL-JPO, ECF Nos. 3251, 3276 (D. Kan. July 29, 2016) (attached as Ex. 2) (awarding attorneys' fees of one-third of the settlement funds of $835 million); *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388-WGY, ECF Nos. 1051, 1095 (D. Mass. Feb. 2, 2015) (attached as Ex. 3) (33% fee from $590.5 million fund in an antitrust case that settled before class certification); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (30% fee from $410 million fund in case that settled before class certification); *In re TFT-LCD [Direct Purchaser] Antitrust Litig.*, No. 07-md-01827, 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) (30% fee from $405 million fund); *In re Vitamins Antitrust Litig*, No. MISC. 99-197 (TFH), MDL No. 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (approving fee award of 34.6% of $365 million fund); *In re Linerboard Antitrust Litig.*, No. MDL 1261, Nos. Civ. A. 98-5055, Civ. A. 99-1000, Civ. A. 99-1341, 2004 WL

1221350, at *17 (E.D. Pa. June 2, 2004) (approving fee award of 30% of a $202.5 million fund); *In re Neurontin Antitrust Litig.*, Civil Action No. 02-1830, Civil Action No. 02-2731, ECF No. 114 (D.N.J. Aug. 6, 2014) (attached as Ex. 4) (awarding attorneys' fees of 33 1/3% of $190 million fund); *Standard Iron Works v. ArcelorMittal*, Case No. 08 C 5214, ECF No. 539 (N.D. Ill. Oct. 22, 2014) (attached as Ex. 5) (awarding attorneys' fees of 33% of settlement funds of $163.9 million); *In re Titanium Dioxide Antitrust Litig.*, Master Docket No. 10-CV-00318(RDB), 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund); *In re Southeastern Milk Antitrust Litig.*, No. 2:07-CV-208, Master File No. 2:08-MD-1000, 2013 WL 2155387, at *8 (E.D. Tenn. May 17, 2013) (one-third fee from $158.6 million fund); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) (granting attorneys' fees of one-third from a $150 settlement fund after commenting that, "in the last two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees").

If this were a non-representative action, the customary fee arrangement would be contingent and in the range of 30% to 40% of any recovery. *See Blum v. Stenson*, 465 U.S. 886, 903 (1984) (concurring opinion) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery."); *Montague v. Dixie Nat. Life Ins. Co.*, Civil Action No. 3:09-00687-JFA, 2011 WL 3626541, at *2-3 (D.S.C. Aug. 17, 2011) ("[i]n non-class contingency fee litigation, a 30% to 40% contingency fee is typical"); see also Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 35 (2004) ("[s]ubstantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases"). The Supreme Court recognizes that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for their services in the marketplace. *See Missouri v. Jenkins*, 491 U.S. 274, 285 (1989). "[A] district court should consider the rate [a]

14

reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 193 (2d Cir. 2007). Because a contingency fee negotiated at the outset of this litigation, given the risks at that time, would have been in the range of 33-1/3% to 40% of the recovery, an attorneys' fee of 25% is reasonable.

The 25% percentage is reasonable and need not be further reduced. Reducing the award because plaintiffs have successfully recovered large sums from the defendants would be "antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained." *Allapattah*, 454 F. Supp. 2d at 1213.[7] And Judge Gleeson's concern that interim fee awards could "complicate the determination" of appropriate attorneys' fees to avoid a windfall to counsel is no longer present. This request is not an interim one; it is a final fee request, looking back at more than a decade of time, effort, and resources that plaintiffs' counsel have devoted to their representation of the class (as well as the future work that counsel will do on behalf of the class, for which they will not be further compensated). This percentage is eminently reasonable as a final fee request.

### 6.     **Public Policy Considerations**

The Supreme Court has recognized "the fundamental importance to American democratic capitalism of the regime of the antitrust laws," and the "central role" that private causes of action play in enforcing this regime. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473

---

[7] *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund"); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (Refusing to reduce requested percentage fee in large-recovery case because "[s]uch an approach . . . fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give sufficient weight to the fact that large attorney's fees serve to motivate capable counsel to undertake these actions.") (citation and internal quotation marks omitted).

U.S. 614, 635 (1985); *see also Southeastern Milk*, 2013 WL 2155387, at *5 ("[s]ociety's

interests are clearly furthered by the private prosecution of civil cases which further important

public policy goals, such as vigorous competition by marketplace competitors").

Here, due to the complexities of defendants' world-wide cartel and the decade-long,

scorched-earth defense up to the point of trial, plaintiffs' counsel have devoted very substantial

resources for more than a decade on behalf of victims of this conspiracy. Public policy favors the

award of reasonable attorneys' fees in antitrust class actions such as this one. As the Second

Circuit has noted, "In the absence of adequate attorneys' fee awards, many antitrust actions

would not be commenced, since the claims of individual litigants, when taken separately, often

hardly justify the expense of litigation." *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.,* 481 F.2d

1045, 1050 (2d Cir. 1973); *see also In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476

(DLC), 2016 WL 2731524, at *18 (S.D.N.Y. Apr. 26, 2016) ("It is important to encourage top-

tier litigators to pursue challenging antitrust cases such as this one. Our antitrust laws address

issues that go to the heart of our economy. Our economic health, and indeed our stability as a

nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and

transparency of our marketplace."); *In re WorldCom Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 359

(S.D.N.Y. 2005) (it is necessary to provide appropriate financial incentives to well qualified

plaintiffs' counsel); *Visa Check.,* 297 F. Supp. 2d at 524 ("[t]he fees awarded must be

reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the

future"); *Southeastern Milk*, 2013 WL 2155387, at *5 ([F]ailing to fully compensate class

counsel for the excellent work done and the various substantial risks taken would undermine

society's interest in the private litigation of antitrust cases. . . . Simply put, anti-competitive

conduct such as that alleged in this case would likely go unchallenged absent the willingness of

attorneys to undertake the risks associated with such expensive and complex litigation.").

Rather than providing a windfall, the requested award serves the public policy goal of encouraging private enforcement of the antitrust laws, while fairly compensating those counsel who made a substantial commitment of time and resources on behalf of the class.

## B.      The Requested Fee Is Reasonable Under the Lodestar "Cross-Check"

The "lodestar cross-check" supports the request for a 25% attorneys' fee from the Fifth Settlements. The proposed lodestar cross-check period is December 6, 2006 (the date co-lead counsel were first appointed), through July 31, 2016, and excludes all work related to the Lufthansa settlement. The work performed in the earlier periods since December 6, 2006, should be considered by the Court in determining the reasonableness of the present request. *See supra* n.4. All of this work was directly related to plaintiffs' counsel's efforts to prove that all defendants, including these last seven defendant groups, participated in the global conspiracy and damaged all or virtually all members of the class.

As in most cases involving antitrust conspiracies, discovery from one defendant directly bore on showing the participation of other defendants in the conspiracy. It was one mosaic with the various pieces of evidence laying out the complete picture. The document review, depositions, and expert analysis were directed towards proving the global conspiracy and damages. *See, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 160-61 (D. Conn. 2009) (evidence found in competitors' files was considered important evidence against another defendant); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662-63 (7th Cir. 2002) (evidence of statements from competitor employees and documents used to oppose ADM's motion for summary judgment).

For example, discovery from defendants Korean Air and Cathay Pacific concerning their price-fixing activities in Hong Kong helped prove the participation of other defendants, such as settling defendants Polar, Air China, ANZ, and Air India in the Hong Kong portion of the global

conspiracy. *See* Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion for Partial Summary Judgment on Plaintiffs' Security Surcharge Claims at 10-16 (ECF No. 2296); Plaintiffs' Memorandum in Opposition to Defendant Polar Air Cargo LLCs' Motion for Summary Judgment with Respect to Plaintiffs' Fuel Surcharge Claims at 10-12 (ECF No. 2300); Plaintiffs' Memorandum in Opposition to Air New Zealand's Motion for Summary Judgment at 13-14 (ECF No. 2302); Plaintiffs' Memorandum in Opposition to Air China Limited and Air China Cargo Company Limited's Motion for Summary Judgment at 6-11 (ECF No. 2292); Plaintiffs' Memorandum in Opposition to Air India's Motion for Summary Judgment at 4-5 (ECF No. 2301). Similarly, discovery from China Air helped prove the case against its fellow Taiwan airline EVA, and discovery from Korean Air helped prove the case against its fellow South Korean airline Asiana. And discovery from Qantas helped prove the case against ANZ. *See* Plaintiffs' Memorandum in Opposition to Air New Zealand's Motion for Summary Judgment at 3-11 (ECF No. 2302).

The extensive work done on behalf of the class before July 2014 is documented in prior declarations (*supra* n.4), and the last two years of litigation have been no less intense. A full explication of the litigation history during this phase is set forth in the Aug. 2016 Joint Declaration, which included:

- Engaging in arm's-length settlement negotiations that led to these seven settlement agreements, including multiple meetings and mediations with top executives of the settling defendants;

- Preparing, filing, and arguing before the Court six summary judgment motions;

- Responding to and arguing before the Court nine summary judgment motions filed by defendants;

- Working with economic consultants and experts on liability and damages analyses and expert reports concerning the same;

18

- Preparing for and defending three expert depositions of plaintiffs' expert witnesses;

- Engaging in extensive pre-trial preparation;

- Preparing for and conducting a two-day mock trial with multiple panels of jury participants;

- Reviewing more than 21,000 pages of deposition transcripts for relevant testimony to be included in plaintiffs' deposition designations to be read or shown at trial;

- Reviewing thousands of documents, including class certification filings and exhibits, summary judgment filings and exhibits, deposition transcripts and exhibits, expert documents, and an electronic database for relevant documents to be included in plaintiffs' proposed trial exhibit list;

- Making nine appearances before Magistrate Judge Pohorelsky, two appearances before Judge Gleeson, and two appearances before Judge Cogan;

- Implementing two extensive programs to provide notice to class members of the certification of the Litigation Class and the seven most recent settlements;

- Conducting legal and factual research regarding pertinent issues; and

- Substantially advancing a trial plan and order of proof.

*See* August 16, 2016 Joint Decl., ¶ 4.

The requested fee represents an overall multiple of 1.99 times the lodestar during the cross-check period. However, Plaintiffs' counsel will continue to perform additional work beyond July 31, 2016, including preparing and filing necessary papers in connection with the final approval hearing and distribution of these settlement funds, which will not be complete until the last settlement payment is made in 2018 at the earliest.

Plaintiffs' counsel's requested fee and its multiplier is a modest request in comparison to the multipliers for attorneys' fees awarded in other class action cases in the Second Circuit and elsewhere. *See, e.g., Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481-82 (S.D.N.Y. 2013) ("[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some

cases, even higher multipliers"—listing cases); *Wal-Mart*, 396 F.3d at 123 (multiple of 3.46 for attorneys' fees of $220 million); *Credit Default Swaps*, 2016 WL 2731524, at *17 (multiple of about 6.0 on attorneys' fees of $253.8 million); *U.S. Foodservice*, ECF No. 521 (attached as Ex. 1) (2.23 multiplier on attorneys' fees of $99 million); *Urethane*, ECF Nos. 3251, 3276 (attached as Ex. 2) (multiplier of 3.2 on attorneys' fees of $278.33 million); *Neurontin*, ECF No. 114 (attached as Ex. 4) (multiplier of 1.99 on attorneys' fees of $63.5 million); *Flonase*, 951 F. Supp. 2d at 750-51 (2.99 multiplier on attorneys' fees of $50 million); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, ECF No. 543 (D. Del. Apr. 23, 2009) (attached as Ex. 6) (multiplier of 3.93 on an award of $80.33 million in attorneys' fees); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 799-803 (S.D. Tex. 2008) (5.2 multiplier on a $688 million fee award and collecting similar cases); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (6.96 multiplier on attorneys' fees of $31.6 million).

Accordingly, an award of 25% of these Fifth Settlements that provides an overall lodestar multiple of 1.99 is fair and reasonable.

### C.    Objections from Class Members

Objections from class members, if any, are due to be filed by September 15, 2016. To date, no objections have been received from class members. On August 11, 2016, Class Counsel received what purported to be an objection from Carl Fuhr GmbH & Co. KG (ECF No. 2471), asking for confirmation that it would be excluded from all settlements, the Litigation Class, and the payment of attorneys' fees. Class Counsel have responded to the entity, confirming that, by definition, Carl Fuhr is not a party to the settlements or the Litigation Class, and it is not required to pay attorneys' fees, because it is an indirect purchaser and not a member of the Litigation Class. For the same reasons, Carl Fuhr does not have standing to object.

If there are any objections from class members, plaintiffs' counsel will respond before the October 5, 2016 hearing.

### D.      The Requested Expenses Are Reasonable and Should Be Reimbursed

Notice disseminated to the class stated that counsel would seek reimbursement for up to $4 million in expenses incurred in the prosecution of the litigation. Plaintiffs' counsel request reimbursement of all remaining unreimbursed litigation costs and expenses only in the amount of $2,496,900.30, principally to pay experts and a jury consultant to conduct a mock jury trial. *See* Aug. 2016 Joint Decl., ¶¶ 16, 19, 41-46, 128, Exs. A, B; Compendium of Declarations in Support of Plaintiffs' Counsel's Joint Application for Award of Attorneys' Fees and Reimbursement of Expenses (the "Compendium"). These expenses were reasonable and necessary in this litigation and have been expended for the direct benefit of the class. *See* Aug. 2016 Joint Decl., ¶¶ 134-37, Exs. A, B; Compendium. "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *In re Arakis Energy Corp. Sec. Litig.,* No. 95 CV 3431 (ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001); *see, e.g., Visa Check*, 297 F. Supp. 2d at 525 (common practice to grant expense request); 2009 Fee Opinion at *16; 2012 Fee Opinion at *6; *Vitamin C*, 2012 WL 5289514, at *11.

### E.      Class Counsel Should Be Given Authority to Distribute the Awarded Attorneys' Fees

As before, Class Counsel also request that the Court authorize them to distribute any attorneys' fees awarded from the settlements in a manner which, in the opinion of Class Counsel fairly compensates plaintiffs' counsel for their services described in the declarations. *See, e.g.,* 2011 Fee Opinion at *7 (Class Counsel authorized to distribute the attorneys' fee award in a manner that in Class Counsel's opinion fairly compensates counsel); *In re Vitamins Antitrust Litig.,* 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (discussing co-lead counsel allocation in the first

21

instance and citing cases). To the extent that there are any disputes that cannot be resolved, the Court has the authority to resolve them.

## IV.    CONCLUSION

For the reasons set forth above, the requested attorneys' fees are reasonable and satisfy the *Goldberger* factors, and the expenses incurred were reasonable and necessary to the litigation. Whether judged on a percentage basis or under a lodestar cross-check, the requested fees are reasonable and should be granted. Facing numerous obstacles, plaintiffs' counsel obtained an excellent result for the class. There are no windfalls—only fair compensation to counsel who committed more than ten years to recovering more than a billion dollars for the class.

Dated: August 19, 2016

Howard J. Sedran
Austin B. Cohen
Keith J. Verrier
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500

By:     */s/ Howard J. Sedran*

Respectfully Submitted,

Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Gary L. Specks
KAPLAN FOX & KILSHEIMER LLP
423 Sumac Road
Highland Park, IL 60035
(847) 831-1585
By:     */s/ Robert N. Kaplan*

22

Michael D. Hausfeld
Brent W. Landau
Melinda R. Coolidge
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
(202) 540-7200

Hollis L. Salzman
Meegan F. Hollywood
ROBINS KAPLAN LLP
601 Lexington Avenue, Suite 3400
New York, NY 10022
212-980-7400

By:    */s/ Michael D. Hausfeld*

By:    */s/ Hollis L. Salzman*

*Class Counsel*

# Exhibit 1

Case 1:06-md-01775-BMC   Document 2472-1   Filed 08/19/16   Page 32 of 143 PageID #:
111865
Case 3:07-md-01894-AWT   Document 521   Filed 12/09/14   Page 1 of 9

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| *In re U.S. Foodservice, Inc. Pricing Litigation* | Case No. 3:07-md-1894 (AWT) |
| This Document Relates To: All Matters | |

## ORDER APPROVING SETTLEMENTS

This matter came before the Court for a fairness hearing on December 9, 2014, pursuant to Federal Rule of Civil Procedure 23 and the Preliminary Approval Orders of the Court dated July 14, 2014 [Dkt. Nos. 508 and 509] (the "Preliminary Approval Orders"), and on the October 26, 2014 application of Plaintiffs for final approval of the Settlements set forth in (i) the Settlement Agreement (the "USF Settlement Agreement") executed May 20, 2014 by Plaintiffs and Defendant U.S. Foods, Inc. f/k/a U.S. Foodservice, Inc. ("USF"), and (ii) the Settlement Agreement (the "Redgate Settlement Agreement") executed on July 13, 2014 by Plaintiffs and Defendant Gordon Redgate.   Notice having been given to the Class as required in the Preliminary Approval Orders, and the Court having considered the USF Settlement Agreement and the Redgate Settlement Agreement, and all papers filed and proceedings held herein, and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. Capitalized terms not otherwise defined in this Order shall have the same meanings given to them in the USF Settlement Agreement.

2.  The Court has jurisdiction over the subject matter of this Action and over all parties to this Action, including all members of the Class certified by the Court pursuant to Fed. R. Civ. P. 23 to include:

Any person (individual or entity) in the United States who purchased products from USF pursuant to an arrangement that defined a sale price in terms of a cost component plus a markup ("cost-plus contract"), and for which USF used a VASP transaction to calculate the cost component.

The following potential class members have timely requested exclusion from the Class (and not withdrawn that request): Clossman Catering, LLC, The Estate of Bryan Fogle, and The University of Washington.  These entities are hereby excluded from the Class and are not subject to this Order.

3.  The Court determines that Plaintiffs are alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., as well as breach of contract claims.   The Court also determines that Defendants deny and, in entering the USF Settlement Agreement and the Redgate Settlement Agreement, have not admitted Plaintiffs' allegations.

4.   The Court determines that the USF Settlement Agreement and the Redgate Settlement Agreement have been negotiated vigorously and at arm's length by the parties, that the settlements arise from a genuine controversy between the parties and not as a result of collusion, and were not procured by fraud or misrepresentation.

5.  Pursuant to Federal Rule of Civil Procedure 23, and there being no objection to the USF Settlement Agreement or the Redgate Settlement Agreement, the Court hereby approves and confirms the USF Settlement Agreement and the Redgate Settlement Agreement as being

fair, reasonable, and adequate settlements and compromises of the Action, adopts the USF Settlement Agreement and the Redgate Settlement Agreement as its judgment, and orders that the USF Settlement Agreement and the Redgate Settlement Agreement shall herewith be effective, binding, and enforced according to their terms and conditions.

6. Notice of the pendency of this Action as a class action and of the USF Settlement Agreement and the Redgate Settlement Agreement has been provided and made in accordance with the Preliminary Approval Orders, and the Court finds as follows:

    a. Such notices and the method by which they were provided to the Class were appropriate and reasonable;

    b. Such notices included individual notice to all members of the Class that could be identified through reasonable efforts, publication of such notice in *the Wall Street Journal*, and banner notice placed in various foodservice industry journals and websites;

    c. Such notices provided valid, due and sufficient notice of these proceedings and of the matters set forth therein, including the settlements described in the USF Settlement Agreement and the Redgate Settlement Agreement, and including information regarding the procedure for making objections by all persons to whom such notices were directed; and

    d. Such notices fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.

7. The Action is hereby dismissed as against all Defendants, with prejudice and without costs, except as set forth in the USF Settlement Agreement, the Redgate Settlement Agreement, and this Order.  Any other matter filed in or transferred to *In re U.S. Foodservice Inc. Pricing*

Case 1:06-md-01775-BMC  Document 2472-1  Filed 08/19/16  Page 35 of 143 PageID #:
um1868
Case 3:07-md-01894-AWT  Document 521  Filed 12/09/14  Page 4 of 9

*Litig.*, Nos. 3:07-md-1894, 3:06-cv-1657, 3:08-cv-4, 3:08-cv-5 (D. Conn.) (the "MDL") shall be dismissed as against all Defendants, with prejudice and without costs.

8.  Each member of the Class, on its own behalf and on behalf of those who directly, indirectly, derivatively, or in any other capacity ever had, now have, or hereafter may have Released Claims, as defined in section 11 of the USF Settlement Agreement and the Redgate Settlement Agreement, shall be deemed to have and shall have absolutely and unconditionally released and forever discharged with prejudice the Released Parties from all Released Claims.  Each member of the Class is hereby permanently barred and enjoined from asserting any Released Claims.

9.  The "Released Parties" are Koninklijke Ahold N.V. ("Ahold"), US Foods, Gordon Redgate, and any of their respective past, present, and future parents, subsidiaries, divisions, business units, associated and affiliated companies, agents, directors, officers, members, general partners, limited partners, employees, affiliates, subsidiaries, divisions, representatives, advisors, attorneys, associates, associations, consultants, successors, shareholders, heirs, executors, and administrators.

10. All members of the Class are permanently barred and enjoined from the institution and prosecution, either directly or indirectly, of any other actions in any court asserting any and all Released Claims against any Released Party.

11. Payments shall be made to the Class Members in accordance with the Plan of Allocation described in Plaintiffs' Memorandum of Law in Support of Plaintiffs Motion for Final Approval of the Settlements ("the Plan of Allocation").  The Plan of Allocation is hereby approved as fair, reasonable, and adequate.  The Court directs that the entire Settlement

4

Fund, less attorney's fees, expenses, incentive payments, and administration fees, be distributed to the claimants pro rata.   The pro rata distribution shall be calculated by comparing each claimant's purchases of relevant products to the total amount of purchases of relevant products by all claimants submitting valid claims, providing each claimant with a proportion of the Settlement Fund equal to its portion of the relevant purchases validly claimed.

12. Class Counsel has moved for an award of attorney's fees and reimbursement of expenses. Pursuant to Rules 23(h)(3) and 54(d) of the Federal Rules of Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), the Court makes the following findings of fact and conclusions of law:

    a.   There were no objections by Class Members to the requested fee award of one-third of the Settlement Fund;

    b.   Class Counsel expended significant time and labor (approximately 94,000 hours) on behalf of the Class;

    c.   The magnitude and complexity of the litigation warrant payment to Class Counsel of the amount requested;

    d.   Class Counsel undertook numerous and significant risks of non-payment in the representation;

    e.   Class Counsel provided the Class with high quality representation;

Case 1:06-md-01775-BMC   Document 2472-1   Filed 08/19/16   Page 37 of 143 PageID #:
Case 3:07-md-01894-AWT   Document 521   Filed 12/09/14   Page 6 of 9
11870

f.  The "percentage-of-the-fund" method is the preferred method for
    calculating attorney's fees in common fund actions in this Circuit (*see, e.g.
    In re Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124, 136
    (S.D.N.Y. 2008)).

g.  The requested fee is reasonable in relation to the settlement;

h.  Public policy considerations support awarding Class Counsel its requested
    fee award;

i.  Class Members were advised in the Notice of Class Action Settlement
    with USF, which was approved by the Court, that Class Counsel intended
    to move for an award of attorney's fees of up to one-third of the gross
    Settlement Fund, plus reimbursement of reasonable costs and expenses
    incurred in the prosecution of this action;

j.  Class Counsel did, in fact, move for an award of attorney's fees in the
    amount of one-third of the Settlement Fund, plus reimbursement of
    reasonable costs and expenses incurred in the prosecution of this action,
    incentive payments to class representatives, and administration expenses,
    which motion has been publicly available on the docket and on the class
    website at www.usfoodservicepricinglitigation.com since August 29, 2014
    [Dkt. No. 510];

k.  As detailed in the Joint Declaration of Richard L. Wyatt, James E. Hartley,
    R. Laurence Macon, and Joe R. Whatley in Support of Class Counsel's

6

Motion for Award of Fees and Expenses from The Common Fund and for Award of Incentive and Reimbursement Payment for Class Representatives [Dkt. No. 510], a one-third fee would equate to a lodestar multiplier of approximately 2.23. In comparison with similar common fund cases, the multiplier requested here is well within the acceptable range;

1.  In light of factors and findings described above, the requested one-third (33 1/3 %) fee award is within the applicable range of reasonable percentage fund awards.

13. Accordingly, Class Counsel is hereby awarded attorney's fees of one-third of the Settlement Fund ($99 million) from the Settlement Fund. The Court finds this award to be fair and reasonable.

14. Class Counsel is hereby additionally awarded $8,081,443.80 out of the Settlement Fund as reimbursement for the expenses incurred in the prosecution of this lawsuit, which expenses the Court finds to be fair, and reasonably incurred to achieve the benefits to the Class obtained in the USF Settlement Agreement and the Redgate Settlement Agreement.

15. The awarded fees and expenses shall be paid to Class Counsel in accordance with the terms of the Settlement Agreement. Lead Class Counsel shall allocate the fees and expenses among all Class Counsel.

16. The Court finds that the class representatives, Catholic Healthcare West, Waterbury Hospital, Thomas & King, Inc., and Frankie's Franchise Systems Inc., provided benefit to the Class by

their participation in the Action, and hereby awards $40,000 in incentive and reimbursement payments to each of the representatives ($160,000 total), in addition to whatever monies each Class Representative will receive from the Settlement Fund pursuant to the Plan of Allocation, to compensate the Class Representatives for the effort, time, and expense spent by them in connection with the prosecution of the Action.

17. The Court finds that Lizard's Thicket of South Carolina provided benefit to the Class and is hereby awarded an incentive and reimbursement payment of $20,000, in addition to whatever monies Lizard's Thicket will receive from the Settlement Fund pursuant to the Plan of Allocation, to compensate it for the effort, time, and expense spent by it in connection with the prosecution of the Action.

18. The Court will approve payment to the court-approved Claims and Notice Administrator, Gilardi, Inc. ("Gilardi") for reasonable costs and expenses associated with providing notice to the Class and administration of the Settlement Fund.  Class Counsel shall submit a request for Gilardi's fees and expenses with its Motion for Approval of Distribution of the Settlement Fund.

19. Neither the USF Settlement Agreement, the Redgate Settlement Agreement, nor the terms of such agreements shall be offered or received into any action or proceeding for any purposes, except: (a) in an action or proceeding arising under the USF Settlement Agreement and the Redgate Settlement Agreement or arising out of or relating to the Preliminary Approval Order or the Final Order; or (b) in any action or proceeding where the releases provided pursuant to the USF Settlement Agreement and the Redgate Settlement Agreement may serve as bars to recovery.

Case 1:06-md-01775-BMC   Document 2472-1   Filed 08/19/16   Page 40 of 143 PageID #:
urnent 3
Case 3:07-md-01894-AWT   Document 521   Filed 12/09/14   Page 9 of 9

20. Without affecting the finality of this Judgment in any way, the Court hereby retains continuing and exclusive jurisdiction over the USF Settlement Agreement and the Redgate Settlement Agreement, including (a) the administration, consummation, interpretation and enforcement of the USF Settlement Agreement and the Redgate Settlement Agreement, (b) the implementation of the Settlement and any award or distribution of the Settlement Fund; (c) the disposition of the Settlement Fund and implementation of the Plan of Allocation; and (d) all Parties hereto for the purpose of construing, enforcing, and administering the Settlement.

## ENTRY OF JUDGMENT

The Clerk of Court is directed to enter the Final Judgment in the form attached to this Order dismissing all Released Claims with prejudice.

It is so ordered.

Dated this 9th day of December 2014, at Hartford, Connecticut.


_____/s/_____
Alvin W. Thompson
United States District Judge

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| IN RE: URETHANE ANTITRUST ) | MDL No. 1616 | |
| LITIGATION ) | No. 04-MD-1616-JWL | |
| ———————————————— ) | | |
| ) | | |
| This Document Relates To: ) | | |
| Polyether Polyol Cases ) | | |
| ———————————————— ) | | |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S
PETITION FOR AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND
AWARD OF INCENTIVE PAYMENTS TO CLASS REPRESENTATIVES**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................1

II.    A ONE-THIRD FEE AWARD IS FAIR AND REASONABLE ..................................3

    A.    The Amount Involved and Result Obtained .................................................5

    B.    The Time and Labor Involved ...................................................................7

        1.    The Complaint and Motions to Dismiss ..........................................8

        2.    Class Certification...........................................................................9

        3.    Merits and Expert Discovery .........................................................10

        4.    Trial Preparation ...........................................................................13

        5.    The Trial........................................................................................15

        6.    Appeal ...........................................................................................16

    C.    The Difficulty of the Litigation.................................................................19

    D.    The Skill and Experience of Class Counsel ...............................................24

    E.    Preclusion of Other Employment...............................................................26

    F.    The Customary Contingent Fee .................................................................26

    G.    Awards in Similar Cases............................................................................29

    H.    Lodestar Cross-Check................................................................................32

III.    THE COURT SHOULD AWARD REIMBURSEMENT OF CLASS COUNSEL'S LITIGATION EXPENSES ...........................................35

IV.    INCENTIVE PAYMENTS.....................................................................................36

V.    CONCLUSION......................................................................................................40

## TABLE OF AUTHORITIES

__Cases__                                                                       __Page__

*Allapattah Services, Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ........................................................ passim

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty.*
   *Bd. of Elections,* 522 F.3d 182 (2d Cir. 2007) ................................................26

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988) ..........................................................................28

*Blum v. Stenson*,
   465 U.S. 886 (1984) ..............................................................................................4

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ..............................................................................................3

*Brown v. Phillips Petroleum Co.*,
   838 F.2d 451 (10th Cir. 1988) ................................................................5, 24, 26

*Brown v. Pro Football, Inc.*,
   839 F. Supp. 905 (D.D.C. 1993) .........................................................................36

*Bussie v. Allmerica Financial Corp.*,
   No. 97-40204-NMG, 1999 WL 342042 (D. Mass. May 19, 1999) .......................4

*Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*,
   No. 89-822, 1993 WL 355466 (W.D. Okla. June 8, 1993)..................................30

*Comcast Corp. v. Behrend*,
   133 S.Ct. 1426 (2013).............................................................................16, 17, 22

*Dahl v. Bain Capital Partners, LLC*,
   No. 1:07-cv-12388-WGY, Dkt. Nos. 1051, 1095 (D. Mass. Feb. 2, 2015)........31

*Flournoy v. Honeywell Int'l, Inc.*,
   No. Civ. A. 205-184, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007)................27, 36

*Gottlieb v. Barry*,
   43 F.3d 474 (10th Cir. 1994) ................................................................................3

*Gudenkauf v. Stauffer Commc'ns, Inc.*,
   158 F.3d 1074 (10th Cir. 1998) ............................................................................5

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ........................................................................................6

*In re AmerisSoft Corp. Sec. Litig.,*
210 F.R.D. 109 (D.N.J. 2002) ......................................................................30

*In re Automotive Refinishing Paint Antitrust Litig.,*
MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ................................ 20, 35, 38-40

*In re Checking Account Overdraft Litig.,*
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............................................................31

*In re Copley Pharm., Inc., "Albuterol" Prod. Liability Litig.,*
1 F. Supp. 2d 1407 (D. Wyo. 1998) ................................................................25

*In re Credit Default Swaps Antitrust Litig.,*
No. 1:13-md-02476-DLC, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ........................34

*In re Enron Corp.,*
586 F. Supp. 2d 732 (S.D. Tex. 2008) ........................................................ 32-34

*In re Flonase Antitrust Litig.,*
951 F. Supp. 2d 739 (E.D. Pa. 2013) ..............................................................29

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995) ............................................................................35

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
142 F.R.D. 588 (S.D.N.Y. 1992) ....................................................................20

*In re High-Tech Employee Antitrust Litig.,*
No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)...........................39

*In re Ikon Office Solutions, Inc. Securities Litigation,*
194 F.R.D. 166 (E.D. Pa. 2000) .....................................................................33

*In re Initial Pub. Off. Sec. Litig.,*
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ..............................................................31

*In re Linerboard Antitrust Litig.,*
No. CIV. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004).........................6, 38

*In re Marsh ERISA Litig.,*
265 F.R.D. 128 (S.D.N.Y. 2010) ....................................................................19

*In re Neurontin Antitrust Litig.*,
    Civ. A. No. 02-1830, Dkt. No. 114 (D.N.J. Aug. 6, 2014)...................................................39

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    991 F. Supp. 2d 431 (E.D.N.Y. 2014) ............................................................................25, 34

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
    09-cv-07666, Dkt. Nos. 693, 697, 697-1, 701 (N.D. Ill. 2014) ...........................................31

*In re Puerto Rican Cabotage Antitrust Litig.*,
    815 F. Supp. 2d 448 (D.P.R. 2011)......................................................................................19

*In re Ready-Mixed Concrete Antitrust Litig.*,
    1:05-CV-00979, 2010 WL 3282591 (S.D. Ind. Aug. 17, 2010).........................................27

*In re Remeron Direct Purchaser Antitrust Litig.*,
    No. Civ. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ......................................27, 30

*In re Ravisent Tech., Inc. Sec. Litig.*, No. Civ.
    A. 00-cv-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005)................................................30

*In re Rent–Way Securities Litig.*,
    305 F. Supp. 2d 491, 517 (N.D. Pa. 2003)..........................................................................33

*In re Rite Aid Corp. Securities Litig.*,
    396 F.3d 294 (3d Cir. 2005)...........................................................................................31, 32

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
    CIV.A. 08-397 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013),
    appeal dismissed (Apr. 17, 2014) .......................................................................................33

*In re Southeastern Milk Antitrust Litig.*,
    No. 07-cv-1000, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) ............................4, 29, 31

*In re Sprint Corp. ERISA Litig.*,
    443 F. Supp. 2d 1249 (D. Kan. 2006) ...................................................................................3

*In re Synthroid Marketing Litig.*,
    264 F.3d 712 (7th Cir. 2001) .......................................................................................... 26-27

*In re TFT-LCD Antitrust Litig.*,
    No. M-07-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ...........................................31

*In re TFT-LCD Antitrust Litig.*,
    No. 07-md-01827, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ......................................31

*In re Titanium Dioxide Antitrust Litig.,*
    10–CV–00318(RDB), 2013 WL 6577029 (D. Md. Dec. 13, 2013) ............................31, 39

*In re Tricor Direct Purchaser Antitrust Litig.,*
    No. 05-cv-00340, Dkt. No. 543 (D. Del. Apr. 23, 2009)................................31, 34

*In re United Telecommc'ns Sec. Litig.,*
    No. 90-2251-0, 1994 WL 326007 (D. Kan. June 1, 1994) ....................................30

*In re Universal Service Fund Tel. Billing Practices Litig.,*
    No. 02-MD-1468-JWL, 2011 WL 1808038 (D. Kan. May 12, 2011)................. 3, 27-30, 35

*In re Urethane Antitrust Litig.,* 768 F.3d 1245 (10th Cir. 2014) ............................................11

*In re Urethane [Polyester Polyol] Antitrust Litig.,*
    No. 04-md-1616-JWL, 2008 WL 696244 (D. Kan. Mar. 13, 2008)....................................39

*In re U.S. Foodservice, Inc. Pricing Litig.,*
    No. 3:07-md-1894 (AWT), Dkt. No. 521 (D. Conn. 2014)....................................31

*In re Vitamins Antitrust Litig.,* No. Misc. 99-197(TFH),
    2001 WL 34312839 (D.D.C. July 16, 2001) .......................................................31

*In re WorldCom, Inc. Sec. Litig.,*
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)..............................................................4

*Ivax Corp. v. Aztec Peroxides, LLC,*
    No. 1:02CV00593, Dkt. No. 78 (D.D.C. Aug. 24, 2005) ....................................39

*Johnson v. Georgia Highway Express, Inc.,*
    488 F.2d 714 (5th Cir. 1974) .........................................................................5, 35

*Klein v. PDG Remediation, Inc.,*
    No. 95 Civ. 4954, 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999)..............................30

*Knight v. Red Door Salons, Inc.,*
    No. 08-01520, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ..................................28

*Lazy Oil Co. v. Witco Corp.,*
    95 F. Supp. 2d 290 (W.D. Pa. 1997) ..............................................................36

*Lewis v. Wal-Mart Stores, Inc.,*
    No. 02-CV-0944, 2006 WL 3505851 (N.D. Okla. Dec. 4, 2006)........................30

*Lucas v. Kmart Corp.,*
    No. 99-cv-01923, 2006 WL 2729260 (D. Colo. July 27, 2006)..........................28

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
  Case No. 07–CV–1078, Dkt. No. 713 (E.D. Pa. July 14, 2014)............................................39

*McNeely v. Nat'l Mobile Health Care, LLC*,
  No. 07-933, 2008 WL 4816510 (W.D. Okla. Oct. 27, 2008) ................................................6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614, 635 (1985).............................................................................................28-29

*Montague v. Dixie Nat. Life Ins. Co.*,
  CIV.A. 3:09-00687, 2011 WL 3626541 (D.S.C. Aug. 17, 2011)........................................27

*Moore v. United States*,
  63 Fed. Cl. 781 (2005) .........................................................................................................30

*New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*,
  234 F.R.D. 627 (W.D. Ky. 2006).........................................................................................30

*Perez v. Asurion Corp.*,
  No. 06-20734-Civ, 2007 WL 2591180 (S.D. Fla. Aug. 8, 2007) ........................................28

*Pillsbury Co. v. Conboy*,
  459 U.S. 248 (1983)..............................................................................................................29

*Rosenbaum v. MacAllister*,
  64 F.3d 1439 (10th Cir. 1995) ...............................................................................................3

*Schwartz v. TXU Corp.*,
  No. 3:02-cv-2243-K, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ....................................24

*Shaw v. Interthinx, Inc.*,
  No. 13-CV-01229-REB-NYW, 2015 WL 1867861 (D. Colo. Apr. 22, 2015)....... 3-4, 30, 37

*Smith v. Krispy Kreme Doughnut Corp.*,
  No. 1:05cv00187, 2007 WL 119157 (M.D.N.C. Jan. 10, 2007) .........................................24

*Smith v. Vill. of Maywood*,
  17 F.3d 219 (7th Cir. 1994) ..................................................................................................33

*Standard Iron Works v. ArcelorMittal*,
  No. 08-C-5214, Dkt. No. 539 (N.D. Ill. Oct. 22, 2014)......................................................31

*Stanley v. U.S. Steel Co.*,
  04-74654, 2009 WL 4646647 (E.D. Mich. Dec. 8, 2009) ...................................................28

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
No. Civ. A. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ....................................20

*Tyson Foods, Inc. v. Bouaphakeo*,
No. 14-1146, 135 S. Ct. 2806 (2015)..................................................................17, 18, 22

*Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*,
352 F. App'x 232 (10th Cir. 2009) ........................................................................37

*Uselton v. Commercial Lovelace Motor Freight*,
9 F.3d 849 (10th Cir. 1993) .......................................................................................5

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ........................................................................6, 32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)...............................................................................16, 17, 22

*Williams v. Sprint/United Mgmt. Co.*,
No. 03-2200-JWL, 2007 WL 2694029 (D. Kan. Sept. 11, 2007).........................................30

## **Rules and Statutes**

Rule 23(b)(3)...........................................................................................................17, 22

## **Other Authorities**

MANUAL FOR COMPLEX LITIGATION, Fourth §21:66 (2004)...................................................7

MANUAL FOR COMPLEX LITIGATION, Fourth §14.121 (2004)...............................................4, 6

MANUAL FOR COMPLEX LITIGATION, Fourth §21.724 (2004)...............................................32

4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 14:6 (4th ed. 2002)..32

5 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 15:85 (5th ed. 2015) ...................32

5 William B. Rubenstein, Newberg NEWBERG ON CLASS ACTIONS § 15:87 (5th ed. 2015).....34

5 William B. Rubenstein, Newberg NEWBERG ON CLASS ACTIONS § 17:1 (5th ed. 2015).......36

*Report of Third Circuit Task Force: Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985) .4

*Report of Third Circuit Task Force: Selection of Class Counsel*, 208 F.R.D. 340 (2002).......4

Eisenberg, Theodore & Miller, Geoffrey P., *Attorney Fees in Class Action Settlements:  An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004) ...............................*27*

Eisenberg, Theodore & Miller, Geoffrey P., *Incentive Awards to Class Action Plaintiffs:  An Empirical Study*, 53 UCLA Law Rev. 1303 (2006)..........................................*40*

Allyson N. Ho, *Getting Down to Business:  Early Observations on the Roberts Court's Business Cases*, 9 ENGAGE: JOURNAL OF THE FEDERALIST SOCIETY PRACTICE GROUPS (2008) .......................................................................................23

Brendan S. Maher, *The Affordable Care Act, Remedy, and Litigation Reform*, 63 American Univ. L. Rev. 649 (2014) ...................................................................23

Mark S. Popofsky and Douglas H. Hallward-Driemeier, *Antitrust and the Roberts Court*, 28-SUM ANTITRUST 26 (2014) ....................................................23

## I.    INTRODUCTION

After more than a decade of litigation, the *Urethane* Plaintiffs have recovered almost a billion dollars in total settlements.  Class Counsel deserve substantial credit for this result, having represented the Class skillfully from start to finish.  The risks were enormous, yet were surmounted at every stage, culminating in the $835 million settlement with The Dow Chemical Company ("Dow")—one of the largest recoveries in Sherman Act history.  Given the exceptional results, and the risks, costs, and quality of Class Counsel's work, a one-third fee is fair and reasonable.

A brief recap of the case highlights what Class Counsel accomplished in this unusually complex litigation:

- *Development of the Claims.*  The original complaint was filed in November 2004, and stemmed not from a prior government investigation but rather from Lead Counsel's independent work to uncover and develop the claims.

- *Motions to Dismiss.*  Plaintiffs defeated two rounds of motions to dismiss challenging, *inter alia*, the conspiracy and fraudulent concealment allegations, and the inclusion of certain products in the case.

- *Contested Class Certification Proceedings.*  The Court's July 2008 class certification order followed extensive discovery and hundreds of pages of briefing and expert reports. Class Counsel also successfully opposed Defendants' petition for Rule 23(f) review.

- *Costly and Protracted Merits Discovery.*  Merits discovery involved years of work, more than 14 million pages of document review, more than 100 domestic and international depositions, liability and damage reports from multiple experts, and thousands of docket entries as the parties prepared the case for trial.

- *Summary Judgment and **Daubert** Motions.*  Using the fruits of discovery, Class Counsel successfully defeated Dow's Rule 56 and *Daubert* motions.

- *Trial.*  The case went to trial in early 2013—one of the few large price-fixing class actions ever to do so.  It would be difficult to overstate the costs, complexity, risks, and work at this stage, or the success achieved for the Class.  Class Counsel ultimately secured the largest jury verdict in the United States in 2013, and what is reported to be the largest price-fixing jury verdict ever.

- **Post-Trial Motions.**  Dow moved on numerous grounds for judgment notwithstanding the verdict and/or class decertification.  Class Counsel successfully opposed these motions, resulting in a $1.06 billion final judgment.

- **Tenth Circuit Appeal.**  Class Counsel prevailed in the Court of Appeals and defeated Dow's petition for rehearing *en banc*.  The quality of Class Counsel's representation, and willingness to bear risk, increased the settlement value of the case substantially when the Tenth Circuit upheld the judgment in all respects.

- **Supreme Court.**  Class Counsel navigated a series of complex risks in the United States Supreme Court, the details of which are described at pages 17-18 and 21-24, *infra*.  Ultimately, despite considerable uncertainty, Class Counsel secured a settlement for nearly 80% of the final judgment—more than twice the damages awarded at trial.

In short, this case has involved more than a decade of litigation, a successful four-week jury trial, proceedings in the Tenth Circuit and the U.S. Supreme Court, and nearly a billion dollars in settlements.  The extraordinary time, skill and resources devoted to the case, the extraordinary risk borne by Class Counsel, and the extraordinary result all support the requested fee award of one-third of the Dow settlement fund.

A one-third fee falls within the range of percentage fee awards approved by this Court, others in this Circuit, and courts across the country, including in large cases with unusual risks and exceptional class-wide recoveries.  This Court awarded one-third fees from the prior *Urethane* settlements (Dkt. Nos. 995, 2210), and case law has long recognized that class/lawyer interests should be aligned in this type of matter, such that counsel are both compensated for risk and rewarded for success.  *See* Part II, *infra*.

In addition, Class Counsel move for reimbursement of $1,545,872.58 in costs and expenses incurred from July 1, 2011 through the present, including costs for experts, document management, deposition services, transcripts, trial expenses, and electronic research.  All of these costs were necessary to the prosecution of the case, were reasonable in amount, and accordingly are reimbursable under the common fund doctrine.

Plaintiffs further request that the Court approve total incentive awards of $500,000 for the three Class Representatives to be apportioned as follows:  $200,000 for Seegott Holdings, Inc. ("Seegott"), $150,000 for Quabaug Corporation ("Quabaug"), and $150,000 for Industrial Polymers, Inc. ("Industrial Polymers").  These awards are justified in light of the services performed for the Class, the business risks incurred, and the fact that, had the Class Representatives not stepped forward, the case would not exist at all.

For all of these reasons, and those that follow, Class Counsel respectfully request that the Court grant their petition and award the requested attorneys' fees, reimbursement of litigation expenses, and incentive payments.

## II.    A ONE-THIRD FEE AWARD IS FAIR AND REASONABLE

It is well-settled that a fee award is appropriate when a common fund is created for class members through the efforts of counsel.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("this Court has recognized consistently that a [lawyer] who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (same).

In this Circuit, a percentage-of-the-fund is the preferred method for awarding fees in a common fund case.  *See* Dkt. Nos. 995, 2210 (prior *Urethane* fee awards); *In re Universal Serv. Fund Telephone Billing Practices Litig.*, No. 02-MD-1468-JWL, 2011 WL 1808038, *2 (D. Kan. May 12, 2011); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1269 (D. Kan. 2006) ("preferred method"); *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995); *Gottlieb*, 43 F.3d at 482-83.  "The Tenth Circuit favors the common fund approach, as opposed to the lodestar method, because a percentage of the common fund is less subjective than the lodestar plus multiplier approach, matches the marketplace most closely, and is the better suited approach

when class counsel were retained on a contingent fee basis, as in this case." *Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *5 (D. Colo. Apr. 22, 2015) (internal quotations, citation omitted).

The percentage methodology comports with class action practice nationwide, where the "vast majority" of courts of appeal now direct or permit district courts to award a percentage fee from a common fund. MANUAL FOR COMPLEX LITIGATION, Fourth § 14.121 (2004); *see also Blum v. Stenson*, 465 U.S. 886, 899 n.16 (1984) ("under the common fund doctrine . . . a reasonable fee is based on a percentage of the fund bestowed on the class"). The percentage method provides "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005). "From a public policy standpoint," moreover, "the [percentage] method of calculating fees more appropriately aligns the interests of the class with the interests of class counsel—the larger the value of the settlement, the larger the value of the fee award." *Bussie v. Allmerica Financial Corp.*, No. 97-40204-NMG, 1999 WL 342042, at *2 (D. Mass. May 19, 1999) (internal quotation, citation omitted); *accord In re Southeastern Milk Antitrust Litig.*, No. 07-cv-1000, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) ("percentage-of-the-fund method . . . clearly appears to have become the preferred method in common fund cases" and properly "reflects the results achieved by class counsel"). The percentage method also has the endorsement of commentators, including the Third Circuit task forces on class action attorney fees. *See Report of Third Circuit Task Force: Court Awarded Attorney Fees*, 108 F.R.D. 237, 255-56 (1985); *Report of Third Circuit Task Force: Selection of Class Counsel*, 208 F.R.D. 340, 355 (2002) ("A percentage fee, tailored to the realities of the particular case, remains superior to

- 4 -

any other means of determining a reasonable fee for class counsel."). *Accord* Report of

Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of

Attorneys' Fees, Ex. A hereto, ("Silver Rept."), at ¶ 14.

In determining an appropriate percentage fee, courts in the Tenth Circuit focus on the

twelve factors originally articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714,

717-19 (5th Cir. 1974):

> (1) the time and labor involved; (2) the novelty and difficulty of
> the questions; (3) the skill requisite to perform the legal service
> properly; (4) the preclusion of other employment by the attorney
> due to acceptance of the case; (5) the customary fee; (6) any
> prearranged fee – this is helpful but not determinative; (7) time
> limitations imposed by the client or the circumstances; (8) the
> amount involved and the results obtained; (9) the experience,
> reputation, and ability of the attorneys; (10) the undesirability of
> the case; (11) the nature and length of the professional relationship
> with the client; and (12) awards in similar cases.

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988). Because of differences

among cases, the weight given to each factor varies, and "rarely are all of the *Johnson* factors

applicable" to the analysis. *Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849, 854

(10th Cir. 1993); *see also Gudenkauf v. Stauffer Commc'ns, Inc.*, 158 F.3d 1074, 1083 (10th Cir.

1998) ("We have never held that a district court abuses its discretion by failing to specifically

address each *Johnson* factor."); *Brown*, 838 F.2d at 456 (citation omitted).

Examination of the relevant *Johnson* factors demonstrates that an award of one-third of

the Dow Settlement Fund is appropriate here.

**A. The Amount Involved and Result Obtained**

The most important factor in determining an appropriate fee in this case is the result

achieved for the Class. *See Brown*, 838 F.2d at 456 ("the amount involved and the results

obtained may be given greater weight when, as in this case, the trial judge determines that the

recovery was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class").[1]  As the *Manual for Complex Litigation* explains, the factor generally "given the greatest emphasis is the size of the fund created, because a common fund is itself the measure of success and represents the benchmark from which a reasonable fee will be awarded." MANUAL FOR COMPLEX LITIGATION, Fourth § 14:121 (2004) (citation and internal quotation marks omitted).  *See also Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204-05 (S.D. Fla. 2006) ("Factors indicating 'exceptional success' include success achieved under unusually difficult or risky circumstances and the size of plaintiffs' recovery.").

The result obtained strongly supports the requested fee.  The $835 million paid by Dow is one of the largest settlements ever recovered from a single defendant in an antitrust class action. It is more than twice the jury's approximately $400 million damage award, and far exceeds the normal range of recovery in similar cases, which typically settle before trial for a fraction of single damages.  *See, e.g., In re Linerboard Antitrust Litig.*, No. CIV. 98-5055, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004), *amended*, 2004 WL 1240775 (E.D. Pa. June 4, 2004) (collecting cases approving settlements of 5.35% to 28% of potential damages).

Indeed, the jury's damage award appears to be the largest price-fixing verdict in history. *See* Margaret Cronin Fisk, *Bloomberg*, "Dow Loses $1.2 Billion Verdict as Top 2013 Award" (Jan. 14, 2014) (reporting that *Urethane* was the largest jury award of any kind in 2013 and "the largest ever in a price-fixing case"), *available at* http://www.bloomberg.com/news/articles/2014-01-14/dow-loses-1-2-billion-verdict-as-top-2013-award.  Based on that historic context—or

---

[1] *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) ("Exceptional results are a relevant circumstance."); *McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-933, 2008 WL 4816510, at *18 n.9 (W.D. Okla. Oct. 27, 2008) (counsel's "willingness to prosecute this matter on a contingent basis . . . ordinarily shifts the analytical focus away from hours spent on the case to the ultimate result class counsel has obtained").  *See generally Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (the "critical factor is the degree of success obtained").

indeed by any other measure—the $835 million settlement represents an extraordinary result for the Class given the uncertainties of continued litigation and the specific risks described below.

In addition, the Dow settlement provides for a guaranteed cash recovery payable upon final approval, with no funds reverting to Dow at any time or for any reason. That is, all settlement money will go directly to the Class in cash after deducting court-approved attorneys' fees and expenses. As with other *Urethane* settlements, moreover, Class members will be able to recover from the Dow Settlement Fund without having to locate their own urethane purchase records. Instead, Class members will be permitted to rely on the work done by Class Counsel and their experts to process and summarize the purchase data produced by Defendants in discovery, which will allow Class members to receive and accept a claim form with pre-tabulated figures showing their qualifying purchase amounts. *Compare* MANUAL FOR COMPLEX LITIGATION, Fourth §21.66 (settlements often require submission of detailed backup and records). This is an important benefit and will allow nearly every Class member to receive a settlement distribution simply by returning the claim form and cashing a check. *Cf. Allapattah*, 454 F. Supp. 2d at 1208 (counsel's work to facilitate claims process supports requested fee award).

For all of these reasons, the extraordinary results achieved and benefits conferred on the Class strongly support Class Counsel's fee application.

## B. The Time and Labor Involved

Class Counsel's fee request is reasonable in light of the time and effort devoted to the case over the past eleven years, which involved not only the typical challenges associated with direct purchaser antitrust litigation—including motions to dismiss, class certification, merits and expert discovery, summary judgment, *Daubert*, and other pretrial motions—but also the work

associated with a complex trial and years of post-trial proceedings and appeals.

## 1.   The Complaint and Motions to Dismiss

The initial *Seegott* complaint was filed in the District of New Jersey on November 23, 2004.  Unlike many antitrust cases in which a criminal investigation laid the foundation for subsequent civil actions, Class Counsel built this case from the ground up.

In June 2005, the JPML panel transferred the *Polyether Polyols* cases to this Court for consolidation or coordination with the then-pending *Polyester Polyols* cases.  After briefing and argument, this Court determined that the *Polyether* cases should be coordinated, not consolidated, with the *Polyester Polyols* cases, because the cases involved distinct products and conspiracies.  Dkt. Nos. 128, 132, 133 136, 157.

On November 10, 2005, the Defendants moved to dismiss for failure to state a claim, after which Plaintiffs filed a comprehensive response brief (Dkt. No. 180) and argued the motion.  The Court subsequently denied Defendants' motion as to the antitrust claims, but granted it with respect to fraudulent concealment, with leave to amend.  Dkt. No. 198.

In January 2006, after months of negotiations, Plaintiffs reached a significant icebreaker settlement with Bayer for $55.3 million, which the Court approved on August 30, 2006.  *See* Joint Declaration of Donald L. Perelman and Richard A. Koffman in Support of Class Counsel's Petition for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl."), Ex. B hereto at ¶ 12; *see also* Dkt. No. 425.  Not a single Class member objected.

Plaintiffs then moved to amend their complaint, supplementing their allegations of fraudulent concealment and alleging that the conspiracy impacted not just basic chemicals (MDI, TDI and polyether polyols), but also systems containing the basic chemicals.  Dkt. Nos. 206, 207.  Defendants in turn moved to dismiss on statute of limitations grounds and vigorously

opposed the amended systems allegations.  Dkt. Nos. 238 to 240.  Plaintiffs filed two separate response briefs (Dkt. No. 270 & 271) and argued the issues before the Court.  Dkt. No. 288.  On April 14, 2006, the Court granted Plaintiffs' motion to amend and denied Defendants' motion to dismiss.  *See* Joint Decl. ¶ 15; Dkt. No. 295.

### 2.  Class Certification

With discovery bifurcated, Plaintiffs pursued extensive discovery on class certification issues—including document and data requests, interrogatories, depositions, and expert discovery—and reviewed approximately 750,000 pages of Defendants' documents at the pre-certification stage.  Defendants served their own discovery requests, and Class Counsel worked with their clients to produce documents, respond to Defendants' interrogatories, and defend class representative depositions.  *See* Joint Decl. ¶ 16.  Class Counsel also negotiated with Defendants to obtain extensive transaction data and worked with their expert consultants to understand the data and process it for empirical analysis.  *See* Joint Decl. ¶ 17.

Class Counsel retained and worked closely with their expert economist for class certification, Dr. John Beyer (who filed extensive expert reports), and defended him at his three-day deposition.   Class Counsel and their experts also reviewed Defendants' expert reports and deposed Defendants' economist for two days.  *See* Joint Decl. ¶ 18.

Class certification was hotly contested and briefing was voluminous.  In addition to Plaintiffs' moving brief and supporting exhibits, Class Counsel filed three separate response briefs, thousands of pages of exhibits, an expert reply report, and prepared for oral argument.  These efforts laid the groundwork for the Court's detailed opinion and Order granting Plaintiffs' motion for class certification (Dkt. No. 708, July 29, 2008), including class certification for

"systems" products, which Defendants fiercely opposed.[2]  Class Counsel then successfully

opposed Defendants' petition for Rule 23(f) review, and oversaw notice to the class.  *See* Joint

Decl. ¶ 20.

### 3.  Merits and Expert Discovery

Merits discovery commenced in the fall of 2008.  After serving document requests and

interrogatories, Class Counsel held dozens of meet-and-confer calls with defense counsel on

various objections and issues.  The parties resolved most disputes without Court intervention, but

many others required legal research and drafting of discovery motions and responses.  *See* Joint

Decl. ¶¶ 22-24.

Defendants began producing merits documents in February 2009.  Rolling productions

continued through 2009 and 2010, yielding almost 14 million pages of discovery in total.  Class

Counsel developed a protocol to efficiently review and synthesize these documents, focusing, for

example, on the records of executives with top-level responsibilities and/or suspected

involvement in the cartel.  Class Counsel also (1) assigned experienced attorneys to conduct

targeted searches for information about key witnesses, facilities, trade association meetings, price

increase announcements, and other important events; (2) supplemented these efforts by searching

for conspiracy "keyword" terms likely to appear in relevant documents, a technique that is

common today but was cutting edge at the time; and (3) retained an American lawyer fluent in

German to assist in reviewing documents produced from European custodians.

To organize the fruits of discovery, the Plaintiffs' team created chronologies and

summary memos to map out the conspiracy.  The case chronologies, for example, revealed the

---

[2] By fighting to include systems in the amended complaint and the class certification Order, Class Counsel added considerable value to the case—including for many class members that purchased systems products exclusively or primarily.  These class members would have recovered little or nothing absent Class Counsel's work to advance the systems claims.

- 10 -

extent to which Defendants' phone records, expense reports, and competitor meetings were connected systematically to the industry's price increase decisions, announcements, and other relevant acts.  This type of detective work allowed Class Counsel to identify and connect the key evidence introduced in depositions and at trial.[3]  Joint Decl. ¶¶ 27-28.

From September 2009 through January 2011, Plaintiffs noticed and took 57 depositions, mostly of Defendants' current and former employees.  Direct Action Plaintiffs ("DAPs") noticed 3 depositions, and Defendants noticed another 39, for a total of 99 merits depositions (in 17 different states and 3 foreign countries), all of which Class Counsel prepared for and attended. Joint Decl. ¶ 29.[4]

It goes without saying that these depositions required exhaustive preparation and planning, including the creation of detailed outlines and exhibit lists.  Moreover, many key witnesses were beyond this Court's subpoena power, meaning their video depositions were the only chance to secure admissible testimony for trial.  Accordingly, merits depositions often required the type of advance preparation (and assignment of experienced counsel) typically reserved for a trial witness.  Examples included the "trial-style" depositions of several key Bayer witnesses, including Larry Stern, as well as Dow's Stephanie Barbour, who testified directly about Dow's involvement in the cartel.  The testimony of these individuals featured prominently at trial.

---

[3] One example was cited by the Tenth Circuit in rejecting Dow's challenge to the sufficiency of the evidence as to Lyondell's involvement in the conspiracy: "First, the plaintiffs presented evidence that Mr. Mario Portela (Lyondell) had communicated with Mr. Marco Levi (Dow) immediately before at least three lockstep price-increase announcements."  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1266 (10th Cir. 2014).

[4] Class Counsel attended an additional 49 depositions of DAP former and current employees relating to "downstream discovery" and other issues relating to a possible price-fixing conspiracy between certain of the DAP entities.

For many other witnesses, in contrast, Class Counsel anticipated denials of any involvement in price-fixing, which created its own challenges in terms of preparing cross-examination to undercut their testimony. One example occurred in the deposition of William Bernstein, the head of urethanes for BASF. Plaintiffs had uncovered in discovery an internal email from Mr. Bernstein stating, "I have tried to determine what Huntsman's response [to a price increase] will be but have not connected." By itself, the email was suspicious, but Class Counsel expected that Mr. Bernstein would deny any wrongdoing. On the day of Mr. Bernstein's deposition, however, BASF produced Mr. Bernstein's cell phone records which showed eight phone calls to his Huntsman counterpart, Tony Hankins, shortly before and after this email and a price increase letter issued by BASF the day after Mr. Bernstein and Mr. Hankins "connected" by phone. When confronted with these documents and phone records at his deposition, Mr. Bernstein had no explanation—a powerful image for the jury at trial. *See* Bernstein Dep. at pp. 205-226, copy attached as Ex. C hereto.

Class Counsel managed the expert work in parallel. Throughout merits discovery, the lawyers worked closely with Plaintiffs' expert econometrician, Dr. James McClave, and expert economist, Dr. John Solow, to assist in providing relevant data and documents. This process culminated in several merits reports from Drs. McClave and Solow as well as fourteen total days of expert depositions—Dow's two experts for five days, Class Plaintiffs' two experts for six days, and DAP's expert for three days.

After merits discovery closed in December 2010, Class Counsel negotiated the Huntsman and BASF settlements for $33 million and $51 million, respectively. As with the Bayer settlement, no class member objected to either settlement. The Court approved these settlements in 2011, leaving Dow as the last remaining defendant.

Plaintiffs opposed Dow's motion for summary judgment in the fall of 2012, filing 181 pages of briefing supported by 295 exhibits (Dkt. No. 2436), as well as a 47-page response to Dow's Rule 56.1 Statement (Dkt. No. 2470). Plaintiffs also opposed Dow's *Daubert* motions, which sought to exclude Drs. Solow and McClave (Dkt. Nos. 2428, 2430). The Court denied Dow's motions in all respects after oral argument (Dkt. Nos. 2637, 2649).

### 4. Trial Preparation

Trial preparation was a massive undertaking, which began years before the trial date. Plaintiffs' deposition strategy, for example, focused heavily on developing credible sponsoring witnesses for key facts and documents. Class Counsel also engaged in protracted negotiations with defense counsel (beginning in 2010) for a stipulation that certain documents would qualify as business records—an evidentiary agreement that later paid dividends at trial. Dkt. No. 2486.

Trial preparations began in earnest in the summer of 2012 with the negotiation of the pretrial order with Dow. The parties attended the final pretrial conference before Magistrate Judge O'Hara and the Court entered the Pretrial Order in July 2012. Dkt. No. 2374. Pursuant to the Court's deadlines, the trial team worked to distill the discovery record to identify trial exhibits, witnesses, and initial designations—a process informed by many rounds of internal discussion and analysis (and a comprehensive multi-day mock trial) to identify the most compelling evidence and arguments for the jury.

Plaintiffs eventually designated 2,137 trial exhibits and disclosed the list to Dow. Dkt. Nos. 2555, 2598. Class Counsel then reviewed the 1,737 exhibits on Dow's initial exhibit list (Dkt. No. 2556), plus 1,537 additional exhibits on its supplemental exhibits list (Dkt. No. 2599), and presented objections thereto (Dkt. Nos. 2660, 2679). Class Counsel next reviewed Dow's objections to Plaintiffs' exhibit list (Dkt. No. 2671), and engaged in lengthy negotiations to

- 13 -

resolve as many issues as possible without Court involvement. The parties eventually reached a stipulation for the pre-admissibility of more than 1,200 trial exhibits (Dkt. No. 2714).

A similar process was followed for deposition designations. The team performed a high-level review of the deposition testimony, designating testimony from 41 witnesses and all five defendant companies.[5] After the parties exchanged initial designations, Class Counsel submitted counter-designations for Dow's 34 witnesses (Dkt. No. 2550); reviewed Dow's counter-designations and objections to Plaintiffs' initial designations (Dkt. No. 2551); and prepared responsive objections and completeness designations (Dkt. No. 2621).

As the docket reflects, the parties engaged in a flurry of pre-trial motion practice. Plaintiffs, for their part, filed nine motions *in limine* and opposed Dow's eight motions *in limine*, addressing important issues such as ensuring that Dow's live witnesses would be made available for live testimony in plaintiffs' case-in-chief (Dkt. Nos. 2568, 2581, 2597), along with several motions to compel Dow's compliance with the pretrial order (Dkt. Nos. 2582, 2620).

At the same time, Class Counsel researched and drafted a proposed verdict form and jury instructions, exchanged proposals with Dow, and met and conferred with opposing counsel to identify areas of agreement and dispute. For contested instructions, Plaintiffs filed a 59-page brief in support of their proposals (Dkt. No. 2689), plus similar briefing on the verdict form (Dkt. No. 2695). The Court's ultimate instructions and verdict form adopted many of Plaintiffs' proposals, including on the key issues of conspiratorial agreement, antitrust impact, and joint and several liability. Dkt. Nos. 2797, 2799. The verdict form and the text of the jury instructions featured prominently in the closing arguments of both sides at trial. Dkt. No. 2876, 2/19/2013 Trial Tr. 5198:15 to 5300:18.

---

[5] The mechanical process of cutting deposition videos to match the designations was an enormous undertaking, as a choppy presentation or a missed sentence could be damaging at trial.

- 14 -

In December 2012, the parties held a last-ditch settlement mediation before Magistrate Judge O'Hara. Plaintiffs prepared a mediation statement and key decision-makers on both sides convened in the Kansas courthouse. Dkt. Nos. 2684, 2692. Despite best efforts, the mediation was unsuccessful and the parties left to prepare for trial.

### 5.    The Trial

Dow moved to decertify the class literally on the eve of trial, and attempted to support that motion with detailed and previously undisclosed expert analysis. Dow's motion challenged, among other things, Dr. McClave's use of extrapolation to estimate damages for Class members for which data was unavailable, an issue not raised by Dow in its earlier *Daubert* motion. The timing of the motion forced Plaintiffs to respond in the midst of trial (Dkt. No. 2752), including the submission of a responsive report from Dr. McClave.

After several weeks of round-the-clock preparation, trial began on January 23, 2013, and lasted four weeks. Closing arguments were held on February 19, 2013, and the jury rendered its verdict on February 20, 2013. All told, the parties introduced 450 exhibits (242 by Plaintiffs and 208 by Dow) and testimony from 39 witnesses (20 by Plaintiffs and 19 by Dow). But the numbers only begin to tell the story of the time and effort involved.

Other tasks at this stage included, *inter alia*, jury pool research and selection; preparing opening statements, demonstratives, and Plaintiffs' order of proof; briefing and arguing outstanding evidentiary issues; daily negotiations and correspondence with Dow; finalizing and organizing trial exhibits; preparing experts and fact witnesses; finalizing cross-examination outlines; continuously reviewing, cutting, and re-cutting video deposition designations; managing trial vendors (trial technology, consultants, logistics, etc.); daily trial team strategy meetings; and of course appearing in court throughout the trial day.

The scope of the back-office operation bears emphasis.  In the weeks before trial, the trial team shifted operations from home offices into a large commercial space a few blocks from the Kansas City courthouse.  Staffed with an army of experienced lawyers, paralegals and support staff—many of whom worked seven days a week for grueling hours before and throughout the four-week trial—the trial office was the hub for all the work that enabled a polished presentation in court.  This type of 24/7 effort allowed Plaintiffs' trial counsel to present the evidence in an efficient, coherent, and compelling way and to anticipate Dow's arguments and defenses, an effort that paid off with a $400 million verdict for the Class.

Post-trial challenges followed.  Dow renewed its motion to decertify the class, challenging Dr. McClave's methodology under *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) and *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), and asserting the existence of "zero injury" class members that, according to Dow, defeated class certification.  Dow also moved for judgment as a matter of law and/or for a new trial, challenging the sufficiency of the evidence, jury instructions, the verdict form, and more.  On May 15, 2013, after extensive briefing, the Court denied these post-trial motions.  After further briefing on motions to amend the judgment, the Court offset prior settlement amounts and entered final judgment in the amount of $1.06 billion, which is reported to be the largest post-trial price-fixing judgment in the history of the Sherman Act.

### 6.    Appeal

After the trial, Class Counsel made the strategic decision to retain former Solicitor General Paul Clement to handle the matter on appeal.  Mr. Clement is one of the most experienced and respected appellate and Supreme Court lawyers in the country, and his work and guidance proved invaluable to the Class going forward.

Dow retained its own experienced high-stakes appellate counsel, Carter Phillips of the Sidley Austin firm, to advance an array of arguments on appeal.  After a lengthy Tenth Circuit briefing process—handled principally by Mr. Clement and his team at the Bancroft firm, with assistance from other Class Counsel—and exhaustive preparation for oral argument, the Class prevailed across-the-board.  In a thorough Court of Appeals opinion that rejected each and every one of Dow's challenges to class certification, evidentiary and *Daubert* rulings, damages calculations, sufficiency of the evidence, the jury verdict, and allocation of damages under the Seventh Amendment, the panel affirmed the judgment unanimously in all respects.

Dow moved for rehearing or rehearing *en banc*, and the Tenth Circuit requested a response.  After Class Counsel and Bancroft filed a comprehensive opposition brief addressing Dow's challenges to the panel's decision, the Court of Appeals denied Dow's motion for rehearing or rehearing *en banc*, with no Judge dissenting.

The case then took a series of unexpected twists and turns in the Supreme Court.  Dow petitioned for *certiorari* on March 9, 2015, arguing principally that urethane prices and products were too diverse to support Rule 23(b)(3) class certification; that Dr. McClave's damage model used "average" statistical estimates in a manner foreclosed by the Supreme Court's *Wal-Mart* decision; and that Dr. McClave's statistical analysis was inconsistent with *Comcast*, a case in which the Supreme Court rejected a different antitrust damage model of Dr. McClave's.  Dow's petition for *certiorari* was supported by numerous business group *amici*, including the U.S. Chamber of Commerce, which has a successful record in terms of convincing the Court to grant review in this type of high-stakes business matter.  Class Counsel, with Mr. Clement taking the lead, filed a brief in opposition to Dow's petition on May 11, 2015.

On June 8, 2015, before the Supreme Court could consider Dow's petition, the Court granted *certiorari* in a different class action, *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146, 135 S.Ct. 2806 (2015) (granted June 8, 2015). At the time, many Supreme Court experts and commentators believed the Court was likely to issue a ruling in *Tyson* that would move Rule 23 in a pro-defendant direction and potentially jeopardize other pending class actions, including the *Urethane* judgment.[6] Those concerns were further heightened when the Court removed the *Urethane* case from its scheduled conference list, which was a clear sign that the case was being held in abeyance for *Tyson*. That, of course, created additional risk and uncertainty for the Class, because if the Supreme Court had changed the law in a pro-defendant direction in *Tyson*, there was significant risk that the Tenth Circuit's *Urethane* decision would have been vacated and remanded, or even reversed outright on the merits.

Dow in turn filed an *amicus* brief in *Tyson* in the summer of 2015, characterizing the issues in *Tyson* as similar to those in *Urethane*. Class Counsel worked throughout this period to understand the *Tyson* issues and prepare a responsive *amicus* brief, which was filed in September 2015. More generally, the *Urethane* team worked closely with their appellate counsel throughout the post-trial years to understand and manage appellate risks. With a billion dollars at stake, it was critical to grasp the nuances of what was happening in the Supreme Court—in *Tyson* and other pending matters—to make the best decisions possible for the Class.

After the *Tyson* oral argument, held on November 10, 2015, settlement discussions intensified with Dow. After serious negotiations over several months—a continuation of many

---

[6] The *Wall Street Journal* weighed in with an editorial urging the Court to issue a pro-defendant ruling in *Tyson* and to grant *certiorari* and reverse in *Urethane*. *See* "Class Action Spring Cleaning" (June 12, 2015), *available at* http://www.wsj.com/articles/class-action-spring-cleaning-1434150614.

years of settlement negotiations between Plaintiffs and Dow—the parties agreed to resolve the case for $835 million, at a time when *Tyson* could have been decided in a matter of days.

### C.     The Difficulty of the Litigation

When Class Counsel undertook to represent the Class in November 2004, the case posed considerable risk. *See* Joint Decl. ¶ 5. As the litigation draws to a close in 2016, it is safe to say the risks were even more serious than originally anticipated. Most significantly, Class Counsel overcame not only the usual pre-trial obstacles but also the unique challenges of a four-week jury trial, post-trial attacks on the verdict and class certification, a Tenth Circuit appeal, and extensive briefing and proceedings in the Supreme Court. Given the complexities, and the skill, time, and experience required to navigate the issues, this factor strongly supports the requested fee. *Allapattah*, 454 F. Supp. 2d at 1193 ("The most apparent feature distinguishing this class action from virtually every other class action in the reported federal decisions is obviously that it did not settle before trial.").

The pre-trial challenges were significant by themselves. In particular, this was not a case that stemmed from or was assisted by criminal charges, findings, or guilty pleas, which often serve as the catalyst for a related civil class action and/or assist in its prosecution by allowing civil plaintiffs to follow in government footsteps.[7] In fact, Plaintiffs were forced to rebut Dow's repeated assertions that the absence of criminal prosecution was tantamount to a government finding of innocence.

---

[7] *Compare In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 460-61 (D.P.R. 2011) (noting that counsel's risk was mitigated by preceding DOJ investigation and FBI raids); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 147 (S.D.N.Y. 2010) ("Risk is not uniform in all class actions" and for "certain antitrust class actions filed in the wake of a Department Justice consent decree… the risk is limited.").

Here, Class Counsel developed this case entirely on their own, a fact that supports a substantial fee award to account for the heightened risk of the case. *See, e.g.*, *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) ("The risk of nonpayment is even higher when a defendant's *prima facie* liability has not been established by the government in a criminal action" and thus "warrants approval" of class counsel's one-third fee request.); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005) ("[T]his action was riskier than many other antitrust class actions because there was no prior government investigation, or prior finding of civil or criminal liability based on antitrust violations, in this case."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own.").

The risks continued after the litigation was underway.  For example, Defendants filed multiple motions to dismiss, insisted on a protracted class certification discovery schedule, and vigorously opposed class certification on numerous grounds.  Class Counsel nevertheless secured class certification for three different basic chemical groups and, significantly, for systems, but only after years of document discovery, expert reports and depositions, hundreds of pages of briefing, and a petition for Rule 23(f) appeal.  At the merits stage, Class Counsel overcame the challenges of international discovery, Fifth Amendment invocations by certain Bayer witnesses, aggressive motion practice by the remaining defendants, dangerous collateral issues raised by the DAPs' alleged price-fixing in downstream markets, and much more, all to develop a factual record showing that the five major manufacturers of urethane chemicals conspired to fix prices,

- 20 -

and that the conspiracy caused class-wide injury and damages. Class Counsel navigated each and every one of these pre-trial challenges and eventually defeated Dow's summary judgment and *Daubert* motions on the eve of trial.

The trial, post-trial, and appellate risks, however, are what truly distinguish this case. At the trial stage, Plaintiffs' task was to convince a lay jury that professional executives of the largest chemical companies in the world were willing to put their careers and liberty at risk to engage in *per se* unlawful price-fixing. While a few witnesses provided direct evidence of the conspiracy, many others denied wrongdoing, forcing Class Counsel to rebut their testimony in a convincing yet understandable way with circumstantial, documentary, economic, and other types of proof—often introduced through video deposition testimony rather than live witnesses. The elements of classwide impact and damages presented their own challenges in terms of communicating technical and econometric concepts in a jury-friendly manner. But Class Counsel overcame these obstacles and prevailed, as the verdict confirms.

Moreover, the courtroom presentation was the product of a much larger effort. The record in this case was massive, and the trial team understood the importance of having it organized for instant access throughout the trial day, both for affirmative presentation and to rebut Dow's positions. Doing so required careful planning and advance work, organizational skill, mastery of technology, and close coordination between the courtroom and back-office trial teams. The conduct of the trial and the verdict demonstrate that Class Counsel were successful in this endeavor.

Post-trial, Dow reacted as one would expect from a large, sophisticated defendant seasoned in litigation and facing a billion-dollar judgment. It raised numerous legal and evidentiary challenges, but the attacks on class certification posed the most serious risk. Relying

heavily on *Wal-Mart* and *Comcast*—two major class action precedents decided *after* this Court's original class certification decision—Dow argued vigorously in post-trial motions and on appeal that (1) the class action prevented them from raising individual defenses against class members (*e.g.*, each class member's individual negotiations), thereby submerging important differences and violating due process; (2) the use of averages and extrapolation of damages by Dr. McClave constituted a "trial by formula" forbidden by *Wal-Mart*; and (3) Dr. McClave's methodology could not be squared with *Comcast*. The Tenth Circuit unanimously rejected these arguments, but the outcome was far from certain in either the Tenth Circuit or the Supreme Court. Class actions are both controversial and a topic of substantial interest for the Justices, making a billion-dollar judgment the type of result likely to receive close scrutiny at the *certiorari* stage.

These risks were further heightened when the Supreme Court granted *certiorari* in the *Tyson* case, and held the *Urethane* case in abeyance pending the Court's decision in *Tyson*. Indeed, the questions presented in *Tyson* involved a strikingly familiar framing of the issues, namely, a class that (according to Tyson) was too diverse to support Rule 23(b)(3) certification and that (according to Tyson) ran afoul of *Wal-Mart* by relying on "average" statistical proof and "trial by formula." The defendant in *Tyson* was represented by the same Supreme Court counsel as Dow; was supported (as Dow was supported) by the U.S. Chamber of Commerce and other business group *amici*; and the *Tyson* defendant even cited *Urethane* directly in its *certiorari* petition as a similar case in which the lower courts supposedly "refus[ed] to follow *Wal-Mart*." No. 14-1146, Pet. at 4, copy attached as Ex. D hereto.

While Class Counsel believed the Class would prevail in the Supreme Court, the risks were serious at the time of settlement. In particular, many Supreme Court experts and observers believed that the Court was likely to issue a decision in *Tyson* that moved the law in a pro-

- 22 -

defendant direction. For example, the widely read SCOTUSBlog noted in an argument preview in the *Tyson* case that "lawyers who have groups of clients pursuing common grievances—often against big corporations—have known for years that their cases are an endangered species in the Supreme Court."[8] And the *Wall Street Journal* made the point even more directly, encouraging the Court to "clean up the mess of class-action law" by reversing in *Tyson* and "pairing it with *Dow* [to] send an even stronger message" to class action plaintiffs. *See* note 6, *supra*. The risks of this actually happening were significant. As Professor Silver explains, "the Roberts Court has been almost three times as active in the antitrust area as the Rehnquist Court," and has shown a notable "hostil[ity] to broad antitrust liability." Silver Rept. at ¶¶ 47-48 (quoting academic reviews).[9]

Class Counsel (advised by Mr. Clement) thus reasonably believed at the time of settlement that the outcome in *Tyson* was uncertain at best, and could have yielded a devastating merits decision that would have effectively foreclosed class certification in *Urethane*. Moreover, no matter the outcome in *Tyson*, several major litigation risks remained, including the risk of: (1) a post-*Tyson* grant-vacate-remand ("GVR") order from the Supreme Court that would have

---

[8] Lyle Denniston, "Argument Preview: New woe for class-action lawsuits?" SCOTUSBlog (Nov. 7, 2015), *available at* http://www.scotusblog.com/2015/11/argument-preview-new-woe-for-class-action-lawsuits/.

[9] *See, e.g.*, Allyson N. Ho, *Getting Down to Business: Early Observations on the Roberts Court's Business Cases*, 9 ENGAGE: JOURNAL OF THE FEDERALIST SOCIETY PRACTICE GROUPS 92, 94 (2008) ("[t]he Roberts Court has decided a remarkable number of antitrust cases" and has "rejected the claims of antitrust plaintiffs by a combined 46-5 vote." There exists "a broad consensus in the middle of the Court [that is] generally hostile to broad antitrust liability"); Mark S. Popofsky and Douglas H. Hallward-Driemeier, *Antitrust and the Roberts Court*, 28-SUM ANTITRUST 26 (2014) (noting Court's appetite for antitrust cases and that "the Roberts Court has consistently raised the threshold for plaintiffs seeking to pursue class actions"); Brendan S. Maher, *The Affordable Care Act, Remedy, and Litigation Reform*, 63 American Univ. L. Rev. 649, 651 (2014) ("Since John G. Roberts, Jr. became Chief Justice in 2005, the Court has issued landmark decisions regarding pleading, arbitration, and class actions that have significantly curtailed plaintiffs' abilities to bring and win lawsuits.").

required additional Tenth Circuit proceedings in *Urethane*; (2) a continued *Urethane* hold pending other class action cases in the Supreme Court pipeline; or (3) a *certiorari* grant in *Urethane* that could have led to outright reversal of the judgment in this case.

These substantial trial and post-trial risks—at a time of great uncertainty about the direction of Supreme Court precedent in Rule 23 class actions—support the requested fee award. The ultimate recovery for the Class is all the more extraordinary in light of the countless risks and pitfalls that Class Counsel had to manage and overcome in order to achieve that result.

**D.     The Skill and Experience of Class Counsel**

This case required lawyering at the highest level. The Defendants were large, sophisticated corporations represented by skilled, nationally-respected trial and appellate attorneys with extraordinary resources at their disposal. Joint Decl. ¶ 54. Indeed, Dow was the largest and most aggressive of all.[10] After the other defendants settled, Dow fought every issue tooth and nail throughout the pre- and post-trial stages described above. Overcoming these challenges required skill and diligence by Class Counsel at every step.[11]

---

[10] As Anthony Carbone, Dow's former Vice Chairman of the Board, testified at trial: "When I joined Dow in 1962 our sales were less than a billion dollars, we were the 14th or 15th largest chemical company in the U.S., and maybe the 25th in the world. *And when I retired in 2005, we were the largest chemical and plastics company in the world.*" Carbone Trial Testimony at pp. 1463-64, copy attached as Ex. E hereto (emphasis added).

[11] *See Brown*, 838 F.2d at 455 ("quality of opposing counsel" supports fee application); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *2 (M.D.N.C. Jan. 10, 2007) ("Additional skill is required when the opponent is a sophisticated corporation with sophisticated counsel."); *Schwartz v. TXU Corp.*, No. 3:02-cv-2243-K, 2005 WL 3148350, at *29-30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys. The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.") (internal citation omitted).

By qualifications and experience, the *Urethane* team was impressive. Co-Lead Counsel Fine Kaplan and Cohen Milstein are among the most experienced class-action litigators in the country.[12] These two firms built the case from the ground up; managed all discovery and class certification efforts; directed every aspect of day-to-day and strategic case management; and took primary drafting responsibility for all major briefs before this Court, including briefing on motions to dismiss, class certification, summary judgment, *Daubert* and the post-trial motions.

Co-Lead Counsel also assembled an exceptional trial team of respected antitrust trial counsel from the Freedman Boyd and Kellogg Huber law firms, both of which are nationally recognized for their high-stakes trial practices.[13] The appellate work was led by former Solicitor General Paul Clement and his colleagues at the Bancroft firm, whose peerless skill and advocacy preserved the judgment on appeal. *See* Ex. I (Bancroft PLLC firm resume). In short, Class Counsel's qualifications, experience, and quality of work throughout the case support the requested fee award.

Most fundamentally, however, the bottom line result—an $835 million recovery from Dow and $975 million in total settlements—speaks for itself and provides the best metric for evaluating Class Counsel's skill and advocacy on behalf of the Class. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 991 F. Supp. 2d 431, 441 (E.D.N.Y. 2014) ("[T]he quality of representation . . . may be measured in large part by the results that counsel achieved for the classes."); *In re Copley Pharm., Inc., "Albuterol" Prod. Liability Litig.,* 1 F. Supp. 2d 1407, 1414 (D. Wyo. 1998) ("While it is beyond dispute that class counsel are among

---

[12] *See* Ex. F (Fine Kaplan and Black, R.P.C. firm resume) and Ex. G (Cohen Milstein Sellers & Toll, PLLC firm resume).

[13] *See* Ex. H (firm resumes of Freedman Boyd Hollander Goldberg Urias & Ward, P.A., and Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC).

the nation's most experienced, reputable, and skilled plaintiff's attorneys, class counsel's skill is further demonstrated by the result achieved.").

### E.     Preclusion of Other Employment

Class Counsel handled this matter for more than eleven years, far longer than the vast majority of class actions. *See* Joint Decl. ¶¶ 4-51; Silver Rept. ¶¶ 62-63. Owing to the substantial demands and long duration of the case, they also have forgone other litigation opportunities. *See* Joint Decl. ¶ 56. Co-Lead Counsel Fine, Kaplan and Black, for example, is a small firm with ten attorneys and three paralegals. For substantial periods during the past decade, more than half the firm's attorneys and all of the firm's paralegals spent the majority of their time on the *Urethane* matter, leaving little room for other opportunities (and further highlighting the risks borne by the firm). This factor likewise supports the requested fee award. *See Brown*, 838 F.2d at 455 (granting fee application and emphasizing that substantial work on the litigation "precluded or reduced their opportunity for other employment"); *Allapattah*, 454 F. Supp. 2d at 1209 ("Taking on this resource-sapping, risk-based venture also precluded Class Counsel from accepting other contingent matters during the period of representation."); Silver Rept. ¶¶ 58-63.

### F.     The Customary Contingent Fee

To compensate counsel for the risks and delay inherent in contingent antitrust class actions, and to ensure vigorous enforcement of the antitrust laws, attorney's fees should reflect, at a minimum, what is typically agreed to by clients and attorneys. "[A] district court should consider the rate [a] reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections*, 522 F.3d 182, 193 (2d Cir. 2007). *See also In re*

*Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); Silver Rept. ¶¶ 20-36.

A one-third fee from the Dow settlement fund is consistent with what is typically agreed to by clients and attorneys. As one study concluded: "Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases." Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004), at 35. "In non-class contingency fee litigation, a 30% to 40% contingency fee is typical." *Montague v. Dixie Nat. Life Ins. Co.*, CIV.A. 3:09-00687, 2011 WL 3626541, at *2 & *3 (D.S.C. Aug. 17, 2011). "Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation." *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005). *See also In re Ready-Mixed Concrete Antitrust Litig.*, 1:05-CV-00979, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) ("[T]he market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time is a contingent fee in the amount of one-third (1/3) of the common fund recovered.") (internal quotations, citation omitted); *Flournoy v. Honeywell Int'l, Inc.*, No. Civ. A. 205-184, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("The most common contingent fee is one third of the recovery. Forty percent fee contracts are common for complex and difficult litigation. . . ."); Silver Rept. ¶ 2 and *passim*.

The reason one-third fees are relatively standard, of course, is risk. Contingent fee litigation is risky in general and particularly so in matters like this one, which is why courts in the Tenth Circuit and elsewhere view the uncertainty of contingent litigation—and the risk of non-payment—as supporting the requested fee award. *See In re Universal Service Fund Tel.*

*Billing Practices Litig.*, No. 02-MD-1468-JWL, 2011 WL 1808038, at *2 (D. Kan. May 12, 2011) (awarding one third of the judgment fund where "any fee recovery by counsel was contingent on success in the litigation"); *Stanley v. U.S. Steel Co.,* 04-74654, 2009 WL 4646647, at *3 (E.D. Mich. Dec. 8, 2009) ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees[.]") (internal quotations, citation omitted); *Lucas v. Kmart Corp.*, No. 99-cv-01923, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006) ("Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee.") (citation omitted).[14]

Class Counsel accepted this case on a completely contingent basis. If the case had failed, they would have gotten nothing. At each stage, moreover, Class Counsel's investment of time and expense has been at risk, with recovery dependent on success. Since July 1, 2011, for example, Class Counsel have invested substantial time and money on behalf of the Class—including the extraordinary efforts devoted to trial and appeal—an investment that would have been lost had Dow prevailed. *See* Joint Decl. ¶¶ 36-51. Given the considerable risk, with no guarantee of recovery, the legal team should be compensated for their efforts in securing excellent results for the Class.

Antitrust policy favors this result. The Supreme Court has emphasized repeatedly that "the private cause of action plays a central role in enforcing this [antitrust] regime." *Mitsubishi*

---

[14] *See also Knight v. Red Door Salons, Inc.,* No. 08-01520, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009) ("This substantial outlay [of time and expenses], when there was a risk that none of it would be recovered, further supports the award of the requested fees."); *Perez v. Asurion Corp.*, No. 06-20734-Civ, 2007 WL 2591180, at *4 (S.D. Fla. Aug. 8, 2007) ("Class Counsel prosecuted this class action on a purely contingent basis, thereby assuming the risk of non-payment for a considerable amount of work over an extended period of time. Thus, the contingency risk in this case was substantial."); *Allapattah,* 454 F. Supp. 2d at 1215 (finding this factor weighs "heavily in favor of" granting the requested fee); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988) (recognizing that if a "'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing").

*Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 635 (1985); *Pillsbury Co. v. Conboy,* 459 U.S. 248, 262-63 (1983) (same). It is thus important to incentivize skilled class counsel by rewarding them for success, and for upholding the core goals of the Sherman Act, in this type of complex contingent case—particularly where, as here, the conduct at issue went uncharged by the government. *See generally Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5 ("[F]ailing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases. Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors. Simply put, anti-competitive conduct such as that alleged in this case would likely go unchallenged absent the willingness of attorneys to undertake the risks associated with such expensive and complex litigation.") (internal citations omitted).

### G. Awards in Similar Cases

As the preceding history of the case makes clear, this was one-of-a-kind litigation in light of the work done, risks surmounted, duration, and results for the Class—making any comparison to fee awards in "similar" matters a difficult challenge. Nevertheless, one-third of the Settlement Fund is typical, reasonable, and justified by extensive Rule 23 authority. This Court awarded one-third attorneys' fees from the prior *Urethane* settlements based on risks, obstacles, and results achieved, and a one-third fee is equally appropriate at this final stage of the case, particularly given the enormous costs and risks at trial and throughout the appellate process, and the outstanding results secured for the Class.

The law is well-established that a one-third fee is reasonable in this type of litigation. *See, e.g., In re Flonase Antitrust Litig.,* 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) ("in the last

two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees").

Moreover, this Court and many others have approved one-third fee awards in a wide range of

class action matters. *See, e.g., Universal Service Fund*, 2011 WL 1808038, at *2 ("an award of

one-third of the fund falls within the range of awards deemed reasonable by courts") (citation

omitted); *Shaw*, 2015 WL 1867861, at *6 ("The customary fee awarded to class counsel in a

common fund settlement is approximately one third of the total economic benefit bestowed on

the class.") (citation omitted).[15]

A one-third fee is reasonable in certain so-called "megafund" cases as well, which are

well-known to be among the most complex and risky matters to handle on contingency. Where,

as here, class counsel achieved superior results in the face of exceptional risks, courts have not

hesitated to award fees of 30% or more from nine-figure recoveries and, indeed, many courts

---

[15] *See also Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (awarding 35% of $57 million common fund) (Lungstrum, J.); *Lewis v. Wal-Mart Stores, Inc.*, No. 02-CV-0944, 2006 WL 3505851, at *1 (N.D. Okla. Dec. 4, 2006) (awarding one-third of the settlement fund and noting that a "one-third [fee] is relatively standard in lawsuits that settle before trial"); *In re United Telecommc'ns Sec. Litig.*, No. 90-2251-0, 1994 WL 326007, at *3 (D. Kan. June 1, 1994) (awarding 33.3% of settlement fund); *Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*, No. 89-822, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) ("Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 635 (W.D. Ky. 2006) ("[A] one-third fee from a common fund case has been found to be typical by several courts.") (citations omitted); *Remeron*, 2005 WL 3008808, at *15 ("A one third fee from a common fund has been found to be typical by several courts within this Circuit which have undertaken surveys of awards within the Third Circuit and others.") (citation omitted); *In re Ravisent Tech., Inc. Sec. Litig.*, No. Civ. A. 00-cv-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) ("[C]ourts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses."); *In re AmerisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134 (D.N.J. 2002) ("Scores of cases exist where fees were awarded in the one-third to one-half of the settlement fund.") (citations omitted); *Klein v. PDG Remediation, Inc.*, No. 95 Civ. 4954, 1999 WL 38179, at *4 (S.D.N.Y. Jan. 28, 1999) ("33% of the settlement fund . . . is within the range of reasonable attorney fees awarded in the Second Circuit"); *Moore v. United States*, 63 Fed. Cl. 781, 787 (2005) ("one-third is a typical recovery").

have rejected arguments that percentage fees should be reduced in a large-recovery case because doing so would be "antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained." *Allapattah*, 454 F. Supp. 2d at 1213 (awarding 31.33% fee from $1.06 billion settlement); Silver Rept. ¶¶ 66-74 (collecting cases).[16]

This authority strongly supports the requested fee. In fact, few if any of these cases involved the unique combination of risks, obstacles, and ultimate result presented here. Few of these cases lasted more than eleven years. Few involved a lengthy trial or three years of appeals

---

[16] *See also In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund"); *In re TFT-LCD [Direct Purchaser] Antitrust Litig.*, No. 07-md-01827, 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) (30% fee from $405 million fund in case that settled before trial and was assisted by numerous guilty pleas); *In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*, 2013 WL 1365900, at *8 & n.11 (N.D. Cal. Apr. 3, 2013) (30% fee to all counsel including state attorneys from $1.08 billion fund in case that settled before trial and was assisted by numerous guilty pleas); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (30% fee from $410 million fund in case that settled before class certification, with court explaining that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements"); *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388-WGY, Dkt. Nos. 1051 and 1095 (D. Mass. Feb. 2, 2015) (33% fee from $590.5 million fund in antitrust case that settled before class certification) (unreported decisions are collected at Ex. J hereto); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197(TFH), 2001 WL 34312839, at *10, *14 (D.D.C. July 16, 2001) (34% fee from $359 million fund in cartel case that settled before trial and was assisted by criminal prosecutions and guilty pleas); *In re Initial Pub. Off. Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (one-third fee from $510 million fund in case that settled before trial); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. No. 543 at p. 10 (D. Del. 2009) (one-third fee from $250 million fund in case that settled before verdict), Ex. J hereto; *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT), Dkt. No. 521 (D. Conn. 2014) (one-third fee from $297 million fund in case that settled before summary judgment), Ex. J hereto; *Standard Iron Works v. ArcelorMittal,et al.*, No. 08-C-5214, Dkt. No. 539 at p. 2 (N.D. Ill. 2014) (33% fee from $163.9 million fund in case that settled before class certification), Ex. J hereto; *In re Titanium Dioxide Antitrust Litig.*, 10–CV–00318(RDB), 2013 WL 6577029, *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund in case that settled before trial); *Southeastern Milk, 2013* WL 2155387, *8 (one-third fee from $158.6 million fund in case that settled before trial); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 1:09-cv-07666, Dkt. Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) (one-third fee from $128 million fund in case that settled before class certification), Ex. J hereto.

reaching the Supreme Court. Few were pursued without the benefit of government prosecutions

or guilty pleas. And only a small handful produced a comparable recovery for the Class.

**H.    Lodestar Cross-Check**

Courts sometimes use a lodestar "cross-check" analysis to confirm the reasonableness of

a requested common fund fee award. MANUAL FOR COMPLEX LITIGATION, Fourth §21.724;

*Newberg on Class Actions* § 15:85 (5th ed. 2015). The cross-check involves calculating class

counsel's total lodestar and applying a case-specific "multiplier" to account for risk, outcome,

quality of work, and other case-specific factors. *Id. See also Rite Aid*, 396 F.3d at 305-06

(explaining cross-check method and emphasizing that it requires "neither mathematical precision

nor bean-counting").

Typical multipliers range from 1-4 depending on the facts, with many courts awarding

multipliers larger than four on case-specific grounds. *See, e.g., Vizcaino*, 290 F.3d at 1050-51 &

n.6 (awarding 3.65 multiplier from $96.9 million settlement fund, and noting standard 1-4

multiplier range); *Newberg on Class Actions* § 14.6 (4th ed. 2009) ("multiples ranging from one

to four frequently are awarded in common fund cases when the lodestar method is applied"); *In

re Enron Corp.*, 586 F. Supp. 2d 732, 799-803 (S.D. Tex. 2008) (approving 5.2 multiplier and

$688 million fee award, and collecting similar cases); Silver Rept. ¶¶ 75-76.

At this stage of the *Urethane* case, the Court is in a position to evaluate the full body of

Class Counsel's work by comparing the lodestar for the entire litigation to the total fees

requested for all settlements combined.[17] To perform the lodestar cross-check on this basis, the

---

[17] The Court previously suggested this methodology. In particular, the Court and Class Counsel discussed how future fee petitions would be considered in connection with the initial Bayer settlement. After counsel explained that we would present "cumulative time" and "cumulative fee" information for the Court's consideration in connection with any future (post-Bayer settlement) fee awards, the Court emphasized that future multipliers would be tied to the

following pieces of information are necessary: (1) the total lodestar from the beginning of the case to the end; and (2) the total requested fee (*i.e.*, the requested fee from the Dow settlement plus the fees awarded previously from prior settlements).

1. Since the case began in 2004, Class Counsel have devoted more than 193,000 hours to representing the Class. *See* Joint Decl. ¶ 53.[18] Based on current hourly rates—which is the appropriate metric in a protracted case such as this one[19]—the total lodestar from inception to March 31, 2016 is $100.8 million.[20]

2. The requested fee from the Dow settlement fund is $278.33 million, plus $47.46 million in fees awarded from prior settlements, for an overall total of $325.79 million.

---

overall success of the case. *See* Ex. K, 7/20/2009 Hearing Tr. at pp. 31-32 (The Court: "the proof in a way will be in the pudding with regard to the ultimate result in the other cases. That's another way to check. If the ultimate settlements, assuming there were settlements with the other defendants, were disappointing, that perhaps is an appropriate place to say, multiplier, what's that? in looking at what the fee is at that end.").

[18] Class Counsel are prepared to submit more detailed records accounting for the time and efforts devoted to this litigation. Given that the litigation is not over until the settlement is finally approved by the Court, Class Plaintiffs request that any such submission be made *in camera*, subject to an appropriate confidentiality order, to avoid providing Dow insight into Plaintiffs' litigation strategy. Accordingly, today Class Plaintiffs also filed their Motion To Permit *In Camera* Submission Of Fee And Expense Declarations. *See* Joint Decl. ¶ 60.

[19] Use of current billing rates is appropriate to account for the delay of payment when a case is protracted (as distinct from the risk of loss, quality of work, and results obtained, which are compensated by the "multiplier"). *See Smith v. Vill. of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994). "To compensate for delay in receiving fees, counsel have properly used their current billing rates." *Enron*, 586 F. Supp. 2d at 779. *See also Vizcaino*, 290 F.3d at 1050-51 (awarding 3.65 multiplier based on current rates); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-397 DMC, 2013 WL 5505744, at *33 n.28 (D.N.J. Oct. 1, 2013), *appeal dismissed* (Apr. 17, 2014); *In re Rent–Way Sec. Litig.*, 305 F. Supp. 2d 491, 517, n. 10 (W.D. Pa. 2003); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000).

[20] The $100.8 million lodestar figure consists of $59.63 million for the period from the start of the case through the BASF and Huntsman settlements (July 1, 2011) and $41.17 million for the period from July 1, 2011 to March 31, 2016.

Using the total case lodestar as a cross-check, the fee requested from the Dow settlement yields an aggregate multiplier of 3.2 at current hourly rates (calculated by dividing $325.79 million in total requested fees by the $100.8 million lodestar figure). This method provides an accurate picture of the fee request in the context of the work performed and success achieved over the life of the case.[21]

The requested multiplier is fair and reasonable under the circumstances. A multiplier of 3.2 at current rates and 4.2 at historical rates is appropriate for all the case-specific reasons explained at length above, including the work done, risks surmounted, quality of Class Counsel's representation, and results secured over more than a decade of exceptionally complex litigation. *See Newberg on Class Actions* §15:87 (5th ed. 2015) (substantial multiplier is appropriate where case was risky, time-consuming, involved wrongdoing uncovered by counsel in first instance, and delivered exceptional results). Class Counsel respectfully submit that if any case belongs at the high end of the typical multiplier range, it is this one. And ample authority supports that result.[22]

\* \* \* \*

---

[21] The total lodestar based on hourly rates in place at the time the work was performed—known as "historical" hourly rates—is $77.53 million (Joint Decl. ¶ 53), yielding a 4.2 multiplier when calculated from that baseline.

[22] *See Newberg, supra*; *Enron*, 586 F. Supp. 2d at 799-803 (5.2 multiplier and $688 million fee award justified by "the unmatched size of the recovery, the obstacles and risks . . . and the skill and commitment exhibited by counsel") (collecting similar cases); *Payment Card Interchange Fee*, 991 F. Supp. 2d at 448 ($544.8 million fee and 3.41 multiplier, which is "comparable to multipliers in other large, complex cases"); *In re Credit Default Swaps Antitrust Litig.*. No. 1:13-md-02476-DLC, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) ($253.8 million fee and multiplier "just over 6" in case that settled *before* class certification); *Tricor*, Dkt. No. 543 (one-third fee and 3.93 multiplier from $250 million fund), Ex. J hereto; *Flonase*, 951 F. Supp. 2d at 750-51 (one-third fee and 2.99 multiplier from $150 million fund, explaining that 1-4 is the standard multiplier range).

For all of the reasons explained above, the requested fee—one-third of the recovery from Dow—is well within the range of awards in similar cases, is the same percentage fee previously awarded in this case, is supported by the *Johnson* factors, and is fair and reasonable compensation for Class Counsel's outstanding work on behalf of the Class.[23]

## III.   THE COURT SHOULD AWARD REIMBURSEMENT OF CLASS COUNSEL'S LITIGATION EXPENSES

Class Counsel respectfully request that the Court also award reimbursement of reasonable costs and expenses incurred since July 1, 2011.  It is well settled under the common fund doctrine that a lawyer "whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation…." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n.39 (3d Cir. 1995) (citation omitted).   The Settlement Agreement with Dow likewise expressly authorizes payment to counsel of "all expenses" from the Settlement Fund.[24]

Since July 1, 2011, Class Counsel have incurred reasonable costs and expenses totaling $1,545,872.58.  *See* Joint Decl. ¶ 57.  These unreimbursed expenses include items typically billed to fee-paying clients, such as expert costs, jury consultant and mock trial costs, document

---

[23] As was done in connection with prior settlements in this case, Co-Lead Counsel request that the Court authorize them to distribute the fees in a manner that, in the opinion of Co-Lead Counsel, fairly compensates each firm in view of its contribution to the prosecution of Plaintiffs' claims.  *See* Dkt. Nos. 995 ¶ 4 and 2210 ¶ 5.  *See also Universal Service Fund*, 2011 WL 1808038, at *3 ("Co-Lead Counsel for plaintiffs shall determine the uses and distribution of the fee award in their good faith best judgment.").  Here, Co-Lead Counsel have directed this case from its inception and are best able to assess the weight and merit of each Plaintiffs' counsel's contribution.  *See* Joint Decl. ¶ 55.  "Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."  *Auto. Refinishing Paint,* 2008 WL 63269, at *7.

[24] *See* Dow Settlement Agreement ¶ 33 (Ex. L hereto); Notice of Dow Settlement at Question 12 (Ex. M hereto).

repository rent, document management, travel, photocopying, overnight mail, deposition services and transcripts, long-distance telephone, and electronic research, among others. *Id.* ¶ 59. All of these reasonable costs and expenses were directly related and necessary to Class Counsel's efforts to litigate this matter and to achieve the best possible result for the Class.[25]

Class Counsel have advanced the funds necessary to pay these costs and maintained careful records to document them. A summary is set forth in the Joint Declaration.[26] *See* Joint Decl. ¶¶ 57-59. Other courts have found such evidence provides an adequate basis to award reimbursement of costs, *see Flournoy*, 2007 WL 1087279, at *3, as did this Court when it awarded reimbursement of expenses in response to earlier requests in this litigation. *See* Dkt. Nos. 995 ¶ 3; 2210 ¶ 4.

Accordingly, the Court should award reimbursement of Class Counsel's reasonable expenses of $1,545,872.58 incurred since July 1, 2011.

## IV. INCENTIVE PAYMENTS

"At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class." *Newberg on Class Actions* § 17:1 (5th ed. 2015). In the Tenth Circuit, "[i]ncentive awards to class representatives are justified when necessary to induce individuals to become named representatives, but there is no need for such

---

[25] *See Brown v. Pro Football, Inc.*, 839 F. Supp. 905, 916 (D.D.C. 1993) ("Plaintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, Westlaw research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee") (citations omitted); *see also Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 344 (W.D. Pa. 1997) (awarding costs for "copying expenses, travel and lodging expenses, telephone and telecopy expenses and other litigation expenses").

[26] Subject to an appropriate Order, and if requested by the Court, Class Counsel will submit for *in camera* inspection more detailed records accounting for the requested expenses. *See* Joint Decl. ¶ 60; Motion To Permit *In Camera* Submission Of Fee And Expense Declarations (filed concurrently with this Memorandum).

an award if at least one class member would have stepped forward without the lure of an incentive award.  Moreover, a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class." *UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*, 352 F. App'x 232, 235 (10th Cir. 2009) (internal quotation, citation omitted).  In applying this standard, district courts in this Circuit have considered the following factors: "1) the actions that the class representative took to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the class representative expended in pursuing the litigation." *Shaw*, 2015 WL 1867861, at *8.

The *Urethane* Class Representatives should be compensated appropriately for their work on behalf of the Class, which was instrumental in achieving this historic recovery.  The three named plaintiffs—Seegott, Quabaug, and Industrial Polymers—stepped forward in the first instance to bring large, fiercely-disputed claims against the most powerful urethane manufacturers in the world, after which they devoted more than a decade of attention to the case. Seegott, for example, shouldered significant discovery obligations, and served as an active and engaged class representative throughout the case, including full-day court appearances for much of the trial.  The discovery burdens were serious, requiring Seegott to preserve and collect a mountain of documents and data from archives and warehouse locations, and to disclose highly sensitive financial information to a group of hostile defendants.  Seegott eventually produced over three hundred thousand pages of documents, and further assisted the Class by (1) consulting on factual and strategy issues throughout the litigation, including at the pre-complaint investigation stage, (2) providing declarations in support of motions and briefs, (3) working with Plaintiffs' experts on technical and industry issues, (4) submitting to multiple depositions, (5)

attending pre-trial witness preparation and trial team strategy sessions, (6) testifying at trial, and

(7) representing the class throughout the settlement process. *See* Declaration of Paul Seegott on

Behalf of Seegott Holdings, Inc. ("Seegott Decl."), attached as Ex. N hereto. In total, Seegott

devoted approximately 570 hours to the case. *Id.* ¶ 9.

Quabaug and Industrial Polymers also devoted substantial time to the case, including the

work involved with preserving and producing tens of thousands of pages of documents and data;

providing information to Plaintiffs' experts; submitting to depositions; and reviewing settlement

materials. *See* Declaration of Eric Rosen on Behalf of Quabaug Vibram Innovation LLC

("Rosen Decl."), attached as Ex. O hereto; Declaration of Carl Boddie on Behalf of Industrial

Polymers, Inc., attached as Ex. P hereto. Importantly, moreover, Quabaug and Industrial

Polymers were operational businesses throughout the case, putting them at significant risk of

retaliation from their suppliers. Rosen Decl. ¶ 5; Boddie Decl. ¶ 4. Incentive awards "are

particularly appropriate" in this situation, where "there was no preceding governmental action

alleging a conspiracy and taking a high-profile role threatened to jeopardize class

representatives' relationships with their suppliers." *Linerboard*, 2004 WL 1221350, at *18. *See*

*also Auto. Refinishing Paint*, 2008 WL 63269, at *7 (finding that incentive awards were

appropriate where "[t]he Class Representatives not only conferred benefits on all of the Class

members, but also risked jeopardizing their existing relationships with their suppliers of

automotive refinishing paint products").[27]

Most importantly, the Class Representatives' decade-long commitment to the case

resulted in extraordinary benefits for the Class. Without named plaintiffs willing to step forward

---

[27] Indeed, another proposed class representative, the Elliott Company, withdrew as a class representative out of concern that its business relationship with defendants would be adversely affected. Dkt. No. 665.

and undertake the responsibilities summarized above, the $975 million class-wide recovery would not exist, and these results fully support the requested incentive awards. *See, e.g., In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *17-18 (N.D. Cal. Sept. 2, 2015) (awarding $100,000 to $140,000 to each of five class representatives following final approval of settlements amounting to $415 million); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, Case No. 07–CV–1078, Dkt. No. 713 at 2, 8 (E.D. Pa. July 14, 2014) (approving $130 million settlement of antitrust class action, including service award of $150,000 to one class representative and service awards of $75,000 to each of two other class representatives), Ex. J hereto; *In re Neurontin Antitrust Litig.*, Civ. A. No. 02-1830, Dkt. No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) (approving $190 million settlement and granting incentive awards of $100,000 to each class representative), Ex. J. hereto; *Titanium Dioxide*, 2013 WL 6577029, at *1 (awarding $125,000 to lead class representative out of $163.5 million settlement); *Ivax Corp. v. Aztec Peroxides, LLC*, Case No. 1:02CV00593, Dkt. No. 78 at 2 (D.D.C. Aug. 24, 2005) (awarding service awards of $100,000 to each class representative in an antitrust price-fixing class action, to be paid out of the $21 million in settlement funds), Ex. J. hereto.

Indeed, the total requested incentive award of $500,000 represents just 0.05% of all settlement funds, a small percentage when compared to similar matters. *See, e.g., In re Urethane [Polyester Polyol] Antitrust Litig.*, No. 04-md-1616-JWL, 2008 WL 696244, at *1 (D. Kan. Mar. 13, 2008) (approving $30,000 in incentive awards, which represented 0.091% of the $33 million in settlement funds); *Titanium Dioxide*, 2013 WL 6577029, at *1 (awarding $175,000 to class representatives, which represented 0.11% of the $163.5 million in settlement funds); *In re High-Tech Employee*, 2015 WL 5158730, at *17-18 (awarding $540,000 to class representatives, which represented 0.13% of the $415 million in settlement funds); *Auto. Refinishing Paint*, 2008

WL 63269, at *7 (awarding $120,000 to class representatives, which represented 0.11% of the $105.75 million total settlement fund). *See also* Eisenberg, Theodore and Miller, Geoffrey P., "Incentive Awards to Class Action Plaintiffs: An Empirical Study," 53 UCLA Law Review 1303, at 1338-39 (2006) (analyzing incentive awards in cases from 1993-2002 and concluding that "[w]hen given, incentive awards constituted, on average, 0.16 percent of the class recovery").

In sum, the incentive awards are fair and reasonable in light of what the Class Representatives did and achieved on the Class's behalf.

## V.    CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court grant their petition, award the requested attorneys' fees and expenses, award the requested incentive payments to the named plaintiffs, and authorize Co-Lead Counsel to distribute the attorneys' fees in a manner that, in their opinion, fairly compensates each firm in view of its contribution to the prosecution of Class Plaintiffs' claims.

Dated:  June 1, 2016                              Respectfully submitted,


                                         /s/ Robert W. Coykendall
                                        Robert W. Coykendall, #10137
                                        Roger N. Walter, #08620
                                        Morris, Laing, Evans, Brock & Kennedy, Chartered
                                        Old Town Square
                                        300 North Mead - Suite 200
                                        Wichita, KS  67202
                                        Tel:  (316) 262-2671
                                        Fax: (316) 262-5991

                                        **Class Plaintiffs' Liaison Counsel**

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2016, I caused the foregoing **Class Counsel's Memorandum of Law in Support of Class Counsel's Petition For Award Of Attorneys' Fees, Reimbursement Of Litigation Expenses, And Award Of Incentive Payments To Class Representatives** to be filed electronically with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.

                                        _/s/  Robert W. Coykendall_____
                                        Robert W. Coykendall

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: URETHANE ANTITRUST | ) | MDL No. 1616 |
| LITIGATION | ) | No. 04-MD-1616-JWL-JPO |
| | ) | |
| | ) | |
| This Document Relates To: | ) | |
| Polyether Polyol Cases | ) | |
| | ) | |

## ORDER AWARDING ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE PAYMENTS

Upon consideration of Class Counsel's Petition For Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Incentive Payments to Class Representatives (Doc. #3250), and all papers submitted in support thereof or in opposition thereto, and after a July 27, 2016 hearing thereon, it is hereby ORDERED that the Petition is GRANTED. It is specifically ORDERED that:

1.      The Notice provided to the Class of Class Counsel's petition for award of attorneys; fees, reimbursement of litigation expenses, and award of incentive payments to class representatives complied with this Court's April 27, 2016 Order (Dkt. No. 3243), meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process, was the best notice practicable under the circumstances, and constitutes due and sufficient notice to all persons entitled thereto.

2.      Co-Lead Counsel Fine, Kaplan and Black, R.P.C. and Cohen Milstein Sellers & Toll PLLC ("Co-Lead Counsel") are awarded attorneys' fees in the amount of one third (1/3) of the funds held in the Escrow Account (as defined by paragraph 12 of the Dow Settlement Agreement dated February 25, 2016), including interest earned thereon for the same time period

and at the same rate as that earned by the Settlement Fund until disbursed to Co-Lead Counsel, less the amount of expenses awarded pursuant to Paragraph 3 below. These fees shall be payable to Class Counsel as soon as practicable after entry of this Order.

3.      Co-Lead Counsel are awarded reimbursement of litigation costs and expenses in the amount of  $1,545,872.58 which shall be paid from the funds held in the Escrow Account as defined by paragraph 12 of the Dow Settlement Agreement dated February 25, 2016.  The reimbursement of costs and expenses from the Escrow Account shall be made as soon as practicable after entry of this Order.

4.      The award of attorneys' fees shall be allocated among plaintiffs' counsel by agreement among Co-Lead Counsel in a manner that, in Co-Lead Counsel's good-faith judgment, reflects each plaintiffs' counsel's contribution to the institution, prosecution and resolution of the litigation against Defendants.

5.      Class Representatives shall receive a total of $500,000 in incentive awards to be apportioned as follows:  Seegott Holdings, Inc. shall receive $200,000; Quabaug Vibram Innovation LLC shall receive $150,000; and Industrial Polymers, Inc. shall receive $150,000. The incentive awards shall be paid from the Escrow Account defined by paragraph 12 of the Dow Settlement Agreement dated February 25, 2016.

6.      The Court retains jurisdiction over matters that are the subject of this Order until after full disbursement of the Escrow Accounts, and/or as necessary to effectuate the terms of the Settlement Agreements relating to attorneys' fees and litigation costs and expenses.

ENTERED THIS 29th day of July, 2016.

s/ John W. Lungstrum
Honorable John W. Lungstrum
United States District Judge

- 2 -

# Exhibit 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRK DAHL, et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs, <br><br> vs. <br><br> BAIN CAPITAL PARTNERS, LLC, et al., Defendants. | Lead Case No. 1:07-cv-12388-WGY <br><br> **PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND NAMED PLAINTIFF SERVICE AWARDS** |

Lead Counsel, on behalf of all Plaintiffs' Counsel, respectfully submit this Motion for an Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards. As set forth in the accompanying Memorandum in Support of an Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards ("Fee Memorandum"); Declaration of Co-Lead Counsel in Support of Named Plaintiffs' Motions for Final Approval of Settlements and Supplemental Plan of Allocation of Settlement Proceeds and for an Award of Attorneys' Fees and Expenses; and Declaration of Daryl F. Scott in Support of Co-Lead Counsel's Application for Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards, Plaintiffs' Counsel ask that this Court award fees in the amount of $194,865,000 (33% of the $590,500,000 common fund), as well as costs and expenses totaling $12,028,514.99. In addition to fees and expenses, Plaintiffs' Counsel also request that the Court approve total service awards in the amount of $25,000 each for Police and Fire Department Retirement System of the City of Detroit ("Detroit PFRS") and Omaha Police and Fire Department Retirement System (Omaha PFRS"), as well as $10,000 for Dr. Dahl and $5,000 for Mr. Wojno. Named Plaintiffs made significant time commitments on behalf of the Class during the seven-year litigation. The total amount of incentive awards requested for all Named Plaintiffs is $65,000.

In further support of this Motion, Plaintiffs' Counsel have filed herewith the aforementioned Fee Memorandum. For the reasons stated therein, Plaintiffs' Counsel request

Christopher M. Burke (admitted *pro hac vice*)
Walter W. Noss (admitted *pro hac vice*)
Kristen M. Anderson (admitted *pro hac vice*)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
cburke@scott-scott. com
wnoss@scott-scott.com
kanderson@scott-scott. com

David R. Scott
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
(860) 537-3818

*Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2014, I caused the foregoing to be served via the
Electronic Filing System on all of Settling Defendants' counsel of record and via email on all
attorneys who have agreed to accept service via email at defendantsprivatequity@scott-
scott.com.

I certify under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct. Executed on November 13, 2014.

*s/ Stacey P. Slaughter*
Stacey P. Slaughter (admitted *pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
2800 LaSalle Plaza
800 LaSalle A venue South
Minneapolis, MN 55402-2015
(612) 349-8500
spslaughter@rkmc.com

85363346.1

CLOSED,CONSOLIDATED,LEAD

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:07-cv-12388-WGY

Klein et al v. Bain Capital Partners, LLC et al
Assigned to: Judge William G. Young
Cause: 15:1 Antitrust Litigation

Date Filed: 12/28/2007
Date Terminated: 09/30/2014
Jury Demand: Both
Nature of Suit: 430 Banks and Banking
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2015 | 1095 | Judge William G. Young: ELECTRONIC ORDER entered granting re <u>1051</u> MOTION for Attorney Fees *Plaintiffs' Motion for an Award of Attorneys' Fees, Litigation Expenses, And Named Plaintiff Service Awards* filed by City of Omaha Police and Fire Retirement System, Police and Fire Retirement System of the City of Detroit, Michael Wojno, Kirk Dahl (Paine, Matthew) (Entered: 02/02/2015) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/10/2016 16:13:06 | | |
| **PACER Login:** | kaplanfox:2581070:0 | **Client Code:** air cargo |
| **Description:** Docket Report | | **Search Criteria:** 1:07-cv-12388-WGY Starting with document: 1095 Ending with document: 1095 |
| **Billable Pages:** 1 | | **Cost:** 0.10 |

# Exhibit 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| *In re Neurontin Antitrust Litigation* | |
| THIS DOCUMENT RELATES TO: | Civil Action No. 02-1830 |
| **LOUISIANA WHOLESALE DRUG COMPANY, INC., MEIJER, INC. and MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,** | Civil Action No. 02-2731 |
| **Plaintiffs,** | |
| v. | |
| **PFIZER, INC. and WARNER-LAMBERT CO.,** | |
| **Defendants.** | |

### FINAL JUDGMENT AND ORDER OF DISMISSAL APPROVING
### PROPOSED CLASS SETTLEMENT AND DISMISSING ACTIONS

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, and in accordance with

the terms of the Settlement Agreement dated April 17, 2014, it is hereby ORDERED as follows:

1.      This Final Judgment and Order of Dismissal hereby incorporates by reference the

definitions in the Settlement Agreement among the parties to these actions on file with this

Court, and all capitalized terms used and not otherwise defined herein shall have the meanings

set forth in the Settlement Agreement.

2.      The Court has jurisdiction over these actions and over each of the parties and over

1

all members of the Class.

      3.     The notice of settlement (in the forms presented to this Court as Exhibits B-1 and

B-2 to the Settlement Agreement) (the "Notice") directed to the members of the Class,

constituted the best notice practicable under the circumstances.   In making this determination,

the Court finds that the Notice provided for individual notice to all Class members who were

identified through reasonable efforts.   Pursuant to, and in accordance with, Rule 23 of the

Federal Rules of Civil Procedure, the Court hereby finds that the Notice provided Class members

due and adequate notice of the Settlement, the Settlement Agreement, these proceedings and the

rights of Class members to object to the Settlement.

      4.     The Court held a preliminary fairness hearing on May 1, 2014 and a final fairness

hearing on July 31, 2014, regarding the reasonableness of the parties' settlement. Pursuant to

Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement, and

finds that the Settlement is, in all respects, fair, reasonable and adequate to Class members.

Accordingly, the Settlement shall be consummated in accordance with the terms and provisions

of the Settlement Agreement.[1]

---

[1] The Court has fully considered the *Girsh* factors and finds that, considered together, the factors
overwhelming favor approval of the Class settlement. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d
Cir. 1975); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d
283, 323 (3d Cir. 1998). As the Court indicated at the fairness hearing, every issue in this
complex antitrust case has been vigorously litigated by both sides for over twelve years. Class
Plaintiffs faced significant risks in taking the case to trial, which this Court has discussed in its
opinions on dispositive motions and recent status conferences. This Court agrees with counsel's
position, as discussed in the extensive briefing and supporting affidavits, that the Settlement
Agreement is fair and reasonable for all Class members. The value of the settlement to the Class
is confirmed by the fact that no members of the Class of identifiable, sophisticated business

2

5.      The Court hereby approves the Plan of Allocation of the Settlement Fund as proposed by Class Counsel (the "Plan"), which was summarized in the Notice of Proposed Settlement. The Claims Administrator is directed to distribute the net Settlement Fund as provided in the Plan.

6.      The Court has certified a Class consisting of "[a]ll persons or entities in the United States that purchased Neurontin from Pfizer at any time during the period of December 11, 2002 through August 31, 2008 and who have purchased generic gabapentin.   Excluded from the Class are Defendants and each of their respective parents, employees, subsidiaries, affiliates, and franchisees, and all government entities."

7.      Also excluded from the Class are CVS Pharmacy Inc., Caremark, L.L.C., Rite Aid Corporation, Rite Aid HDQTRS Corp., Walgreen Co., American Sales Co, Inc., HEB Grocery Co. LP, Safeway Inc., SuperValu Inc., and The Kroger Co., in their own right as direct purchasers of Neurontin from Pfizer and as assignees limited to their purchases of Neurontin from Class members.

8.      The Court has found that the Class meets all the requirements of Fed. R. Civ. P. 23.  The Class, made up of sophisticated business entities, had a full and fair opportunity to request exclusion at the time of class certification and, therefore, there is no reason for the Court to afford a new opportunity to individual Class members to request exclusion who had an earlier opportunity to request exclusion but did not do so.

_____

entities have objected, rather many have explicitly approved of the Settlement.

3

9.      The Court has appointed Louisiana Wholesale Drug company, Inc., Meijer, Inc.,

and Meijer Distribution, Inc. as class representatives (the "Class Representatives").

10.     The Court has found that Co-Lead Counsel, listed below, along with other Class

Counsel, have fairly and adequately represented the interests of the Class and satisfied the

requirements of Fed. R. Civ. P. 23(g):

> Bruce E. Gerstein, Esq.
> GARWIN GERSTEIN & FISHER LLP
> 88 Pine Street, 10th Floor
> New York, NY 10005
>
> Richard J. Kilsheimer, Esq.
> KAPLAN FOX & KILSHEIMER LLP
> 850 Third Avenue, 14th Floor
> New York, NY 10022

11.     The following actions are hereby dismissed with prejudice, as provided in the

Settlement Agreement, and without costs, except as provided for herein and in the Settlement

Agreement:

- *Louisiana Wholesale Drug Company, Inc., et al. v. Pfizer, Inc. and Warner-Lambert*, No. 2:02-cv-01830-FSH (D.N.J.)

- *Meijer, Inc., et al. v. Pfizer, Inc. and Warner-Lambert*, No. 2:02-cv-02731 (D.N.J.)

12.     Each of the foregoing dismissals shall become effective upon the date the

Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.

13.     Upon this Settlement becoming final in accordance with paragraph 4 of the

Settlement Agreement, Defendants and their past, present and future parents, subsidiaries,

divisions, affiliates, joint ventures, stockholders, officers, directors, management, supervisory

4

boards, insurers, general or limited partners, employees, agents, trustees, associates, attorneys

and any of their legal representatives (and the predecessors, heirs, executors, administrators,

successors and assigns of each of the foregoing) (the "Released Parties") are and shall be

unconditionally, fully and finally released and forever discharged from all manner of claims,

debts, obligations, demands, actions, suits, causes of action, damages whenever incurred,

liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees,

known or unknown, suspected or unsuspected, accrued in whole or in part, in law or equity, that

Plaintiffs or any member or members of the Class (including any of their past, present or future

officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys,

employees, legal representatives, trustees, parents, associates, affiliates, joint ventures,

subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their

capacity as such) (the "Releasors"), whether or not they object to the Settlement and whether or

not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter

can, shall or may have, directly, representatively, derivatively or in any other capacity, arising

out of or relating in any way to any conduct alleged or asserted in any of Plaintiffs' complaints

filed   in this Class Action, relating to any alleged delay in the marketing, sale, manufacture,

pricing, or purchase of, or the enforcement of intellectual property related to Neurontin or its

generic equivalents, prior to the date hereof, except the Settlement does not release any claims

between Plaintiffs, members of the Class and the Released Parties concerning product liability,

breach of contract, breach of warranty or personal injury (the "Released Claims").

14.     In addition, Plaintiffs and each Class member, on behalf of themselves and all

other Releasors, hereby expressly waive, release and forever discharge, upon the Settlement

becoming final, any and all provisions, rights and benefits conferred by § 1542 of the California

Civil Code, which reads:

> Section 1542.  General Release; extent.   A general release does not extend
> to claims which the creditor does not know or suspect to exist in his or her
> favor at the time of executing the release, which if known by him or her
> must have materially affected his or her settlement with the debtor;

or by any law of any state or territory of the United States or other jurisdiction, or principle of

common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code.

Each Class member may hereafter discover facts other than or different from those which he, she

or it knows or believes to be true with respect to the claims which are the subject matter of this

paragraph 13, but each Class member hereby expressly waives and fully, finally and forever settles,

releases and discharges, upon this Settlement becoming final, any known or unknown, suspected

or unsuspected, asserted or un-asserted, contingent or non-contingent claim that would otherwise

fall within the definition of Released Claims, whether or not concealed or hidden, without regard

to the subsequent discovery or existence of such different or additional facts.   Each Class member

also hereby expressly waives and fully, finally and forever settles, releases and discharges any and

all claims it may have against any Released Party under § 17200, *et seq*, of the California Business

and Professions Code or any similar, comparable or equivalent provision of the law of any other

state or territory of the United States or other jurisdiction, which claims are expressly incorporated

into the definition of Released Claims.

15.    The releases set forth in paragraphs 13 and 14 of this Order shall not release any

claims between Plaintiffs, Class members and the Released Parties concerning product liability,

6

breach of contract, breach of warranty, or personal injury.

16.     Upon consideration of Class Counsel's petition for fees, costs and expenses, Co-Lead Counsel, on behalf of all counsel for the Class, are hereby awarded attorneys' fees in the amount of 33⅓% of the Settlement Fund and costs and expenses totaling $2,213,537.35, together with a proportionate share of the interest thereon from the date the funds are deposited in the Escrow Account until payment of such attorneys' fees, costs and expenses, at the rate earned by the Settlement Fund, to be paid solely from the Settlement Fund and only if and after the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.   Upon consideration of Class Counsel's petition for incentive payments for Plaintiffs in these actions, LWD and Meijer are each hereby awarded an incentive award in the amount of $100,000.00, to be paid solely from the Settlement Fund, and only if and after the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.   Co-Lead Counsel shall allocate and distribute such attorneys' fees, costs and expenses among the various Class Counsel that have participated in this litigation.   Co-Lead Counsel shall distribute such incentive awards to the Plaintiffs as provided herein.   The Released Parties (as defined in paragraph 10 of the Settlement Agreement) shall have no responsibility for, and no liability whatsoever with respect to, any payment or disbursement of attorneys' fees, expenses, costs or incentive awards among Class Counsel and/or Plaintiffs, or with respect to any allocation of attorneys' fees, expenses, costs or incentive awards to any other person or entity who may assert any claim thereto.   The attorneys' fees, costs and expenses, and incentive award authorized and approved by this Final Judgment and Order shall be paid to Co-Lead Counsel within five (5) business days after this

Settlement becomes final pursuant to paragraph 4 of the Settlement Agreement and in accordance with the terms of the Settlement Agreement and the Escrow Agreement.   The attorneys' fees, costs and expenses, and incentive awards authorized and approved by this Final Judgment and Order shall constitute full and final satisfaction of any and all claims that Plaintiffs and any Class member, and their respective counsel, may have or assert for reimbursement of fees, costs, and expenses, and incentive awards, and Plaintiffs and members of the Class, and their respective counsel, shall not seek or demand payment of any fees and/or costs and/or expenses and/or incentive awards from any source other than the Settlement Fund.   The Court retains exclusive jurisdiction over the Settlement and the Settlement Agreement as described therein, including the award of attorneys' fees to Plaintiffs' Counsel, the reimbursement of expenses, the award of incentive payments to Plaintiffs, and the administration and consummation of the Settlement, and over this Final Judgment and Order.

17.   The Court finds that this Final Judgment and order adjudicates all of the claims, rights and liabilities of the parties to the Settlement Agreement (including the members of the Class), and is final and shall be immediately appealable.   Neither this Order nor the Settlement Agreement nor any other Settlement-related document shall constitute any evidence or admission of liability by Defendants or any other Released Party, nor shall either the Settlement Agreement or this Order or any other Settlement-related document be offered in evidence or used for any other purpose in this or any other matter or proceeding except as may be necessary to consummate or enforce the Settlement Agreement of the terms of this Order or if offered by any Released Party in responding to any action purporting to assert Released Claims.

8

18.     Class Counsel for the Direct Purchaser Class Plaintiffs have moved for an award of attorneys' fees, reimbursement of expenses, and incentive awards for class representatives. (Doc. No. 749).   Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), this Court makes the following findings of fact and conclusions of law with respect to Class Counsel's request for an award of attorneys' fees, reimbursement of expenses, and incentive awards for Class Representatives:

19.     The Settlement of $190,416,438.36 million (the "Settlement Fund"), representing the agreed-upon $190 million plus 1% per annum interest that had accrued from March 14, 2014 (the date that the parties first orally agreed to the Settlement's terms) to June 2, 2014 (the date that defendants deposited such amount into an escrow account held in trust by UBS AG that is earning interest for the benefit of the Class), plus interest on the Settlement Fund from June 2, 2014, confers a monetary benefit on the Direct Purchaser Class that is substantial, both in absolute terms and when assessed in light of the risks of establishing liability and damages in this case.   The Settlement was reached following negotiations held in good-faith and in the absence of collusion, with the aid of a highly-renowned mediator, over the course of three mediation sessions, covering six days.

20.     The Court-approved Notice of Proposed Settlement of Class Action (Doc. No. 727) advised Class Members that Class Counsel intended to move for an award of attorneys' fees in an amount up to 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action.

21.     Class Counsel have moved for an award of attorneys' fees in the amount of 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action, which such motion has been on the docket and publicly available since July 1, 2014.

22.     In prosecuting this action, Class Counsel expended over 60,570 hours of uncompensated time, and incurred substantial out of pocket expenses, with no guarantee of recovery.   Class Counsel's hours were reasonably expended in this complex case that was vigorously litigated for over twelve years, and their time was expended at significant risk of nonpayment.

23.     No Class Members objected to Class Counsel's fee request.   In fact, as described below, the reaction of the Class has been entirely positive and supportive of the Settlement generally and Class Counsel's requested fee award specifically.

24.     The Settlement achieved for the benefit of the Direct Purchaser Class was obtained as a direct result of Class Counsel's skillful advocacy.   This is confirmed by the entirely positive reaction of the Class Members to the Settlement and Class Counsel's request for a fee award of 33-1/3% of the Settlement.   Outside antitrust counsel for the country's three largest pharmaceutical distributors, who made in excess of 70% of the branded and generic Neurontin purchases at issue in this case, wrote to the Court on behalf of their clients to express their clients' support for the Settlement and Class Counsel's request for an award of one-third of the Settlement amount. *See* Exhibits 2-4 to the Joint Declaration of Bruce E. Gerstein and Richard J. Kilsheimer in Support of Direct Purchaser Class Plaintiffs' Motions for Final Approval of Settlement and for

an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to Class

Representatives (the "Joint Declaration" or "Joint Decl.," Doc. No. 748-5) (Doc. Nos. 748-7 –

748-9) (letters to the Court from outside counsel to AmerisourceBergen Corporation, Cardinal

Health, Inc., and McKesson Corporation). In addition, a number of other Class Members wrote

directly to the Court stating their belief that Class Counsel's requested fees are justified in light of

the time and expense that Class Counsel expended prosecuting and favorably resolving this

complex litigation. *See* Exhibits 5-12 to the Joint Declaration (Doc. Nos. 748-9 – 748-17) (letters

from Class Members Burlington Drug Company, Inc., Dakota Drug, Inc., Drogueria Betances,

Inc., King Drug Company of Florence, Inc., Miami-Luken, Inc., Prescription Supply, Inc., J M

Smith Corporation d/b/a Smith Drug Co., and Value Drug Co.). All of the above-mentioned Class

Members who have written to the Court to express their support for the Settlement and Class

Counsel's fee request account for approximately 93% of the purchases at issue in this litigation.

25.      The "percentage-of-the-fund" method is the proper method for calculating

attorneys' fees in common fund class actions in this Circuit. *See, e.g., In re Rite Aid Sec. Litig.*,

396 F.3d 294, 305 (3d Cir. 2005). The Court concludes that that the fees requested by Class

Counsel are comparable to recent awards in similar cases in the Third Circuit and elsewhere,

including direct purchaser class actions similarly alleging anticompetitive practices in the

pharmaceutical industry.

26.      The Court finds that Class Counsel's request for a 33-1/3% fee is consistent with

what would have been negotiated for a contingent-fee case of this complexity. For example, the

current and former presidents of class representative Louisiana Wholesale Drug Co., Inc. ("LWD")

attested that "had LWD retained the law firms and/or attorneys . . . to represent it in an individual action in this complex litigation, LWD would have retained these same attorneys based on a 33 1/3% contingency fee in the event of settlement or compromise without trial and/or based on a 40% contingency fee in the event of trial, with any applicable contingency fee percentage computed in addition to out-of-pocket expenses." Exhibit 13 to the Joint Decl., Declaration of Chad Gielen, President/Chief Executive Office of LWD, at ¶ 6, and Exhibit 14 to the Joint Decl., Declaration of Gayle White, former President and General Manager of LWD, at ¶ 3. Furthermore, the letters from the Class Members supporting Class Counsel's fee award is further evidence that the 33-1/3% fee award is consistent with what those entities would have assented to had they retained Class Counsel in private litigation.

27.     As detailed in Class Counsel's affidavits, a one-third fee award would equate to a lodestar multiplier of approximately 1.99.     The Court concludes that, based on recently-approved multipliers in other Third Circuit antitrust class actions alleging similar anticompetitive practices in the pharmaceutical market, the multiplier requested here is well within the acceptable range. *See, e.g., In re Flonase Antitrust Litigation*, 951 F. Supp. 2d 739, 750 (E.D. Pa. 2013) (approving 33 1/3% fee award of $150 million settlement that amounted to multiplier of 2.99).

28.     In light of the factors and findings described above, the Court finds that the requested 33-1/3% fee award is within the applicable range of reasonable percentage fund awards.

29.     The Court finds this fee award is reasonable pursuant to Federal Rule of Civil Procedure 23(h). The Court orders that Class Counsel request for attorneys' fees of 33-1/3% of the Settlement Fund, which equates to $63,472,146.12, plus one-third of the interest earned on the

Settlement Fund from June 2, 2014 (the date of funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund, is granted.

30.     Further, the Court orders that Class Counsel is awarded $2,213,537.35 out of the Settlement Fund to reimburse them for the expenses incurred in prosecution of this case, which such expenses the Court finds to be fair and reasonably incurred to achieve the benefits to the Direct Purchaser Class obtained by the Settlement.

31.     Further, the Court orders payment of two incentive awards of $100,000 each for each of the Class Representatives – one incentive award of $100,000 to LWD and one incentive award to "Meijer", which consists of Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer") – for their active participation and assistance in the prosecution of this case, including responding to document requests and interrogatories, appearing for deposition and keeping apprised of the progress of the case, including settlement efforts.   The Class Representatives' efforts contributed to the benefits conferred upon the Class through the Settlement.   In addition, no Class Member has objected to the awarding of these incentive awards.   Moreover, the three largest pharmaceutical distributors have specifically supported granting incentive awards in the requested amounts.   *See* Exhibits 2-4 to the Joint Decl. (Doc. Nos. 748-7 – 748-9) (letters to the Court from outside counsel to AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation).

IT IS SO ORDERED.

Dated: 8-6-14

Hon. Faith S. Hochberg, U.S.D.J.

13

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| STANDARD IRON WORKS, on behalf of itself and all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>ARCELORMITTAL; ARCELORMITTAL USA, INC.; UNITED STATES STEEL CORPORATION; NUCOR CORPORATION; GERDAU AMERISTEEL CORPORATION; STEEL DYNAMICS, INC.; AK STEEL HOLDING CORPORATION; SSAB SWEDISH STEEL CORPORATION; COMMERCIAL METALS, INC.,<br><br>    Defendants. | Case No. 08 C 5214<br><br>Judge James B. Zagel |

**ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES TO CLASS COUNSEL FROM THE COMMON SETTLEMENT FUNDS, AND APPROVING PLAN OF ALLOCATION AND DISTRIBUTION**

The Court, having considered Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the Memorandum of Law and exhibits in support thereof (Dkt. No. 519); having held hearings on October 17, 2014 and October 21, 2014 concerning final settlement approval, attorneys' fees and other related issues; and having considered all of the submissions and arguments with respect thereto, pursuant to Rules 23 and 54 of the Federal Rules of Civil Procedure it is hereby ORDERED, ADJUDGED AND DECREED that Class Counsel's Motion for Attorneys' Fees and Reimbursement of Litigation Expenses is GRANTED as follows:

1.      Settlement Class Counsel have moved for attorneys' fees and reimbursement of
litigation expenses out of the total common settlement funds in this litigation.  As a result of the
Settlements with ArcelorMittal and U. S. Steel, and prior settlements with Defendants
Commercial Metals, AK Steel, and Gerdau Ameristeel, Class Counsel has secured a total
common fund recovery of $163.9 million for the benefit of the Settlement Class.

2.      After two appropriate notices to the Settlement Class of their intention to seek up
to one-third of the total common settlement fund as attorneys' fees and to seek reimbursement of
litigation expenses, and after a third notice to the Class providing a third opportunity to object to
Class Counsel's motion for attorneys' fees after that motion was filed, and upon consideration of
the motion and all related submissions and argument, and the response of the Settlement Class
thereto; now therefore pursuant to Rules 23(h) and 54(d) of the Federal Rules of Civil Procedure,
this Court awards Settlement Class Counsel 33% of the total Settlement Fund (*i.e.*, 33% of the
sum of all five settlements obtained to date) as a fair and reasonable attorneys' fee.

3.      The Court finds that a 33% fee comports with the prevailing market rate for legal
services of similar quality in similar cases.  The Court rests this conclusion on, *inter alia*, data
provided by Class Counsel concerning market rates; the Court's consideration of fee awards in
similar complex litigation, including many recent antitrust class actions in which 33% fees were
awarded for similar work; the nature and complexity of this particular litigation; the substantial
risks of non-recovery borne by Class Counsel in prosecuting this matter on a purely contingent
basis while advancing all litigation costs; the amount and quality of Class Counsel's work; and
the results obtained on behalf of the Class.

4.      Class Counsel initiated and developed this case with no assistance from any prior
government investigation or prosecution, and handled the matter effectively and without

compensation through more than six years of hard-fought litigation. The issues were risky and difficult, and Class Counsel's ultimate success in recovering $163.9 million for the Class—payable promptly in cash—supports the requested fee award.

5.     A lodestar "cross check" further supports a 33% fee award. Class Counsel devoted more than $27.7 million in professional time at current billing rates (or approximately $23.6 million at historical rates) to litigating this case. The work involved, *inter alia,* extensive pre-complaint investigation; motion to dismiss and case management briefing; litigating numerous discovery issues with all eight Defendants; reviewing over 3.5 million pages of documents produced in class certification discovery; collecting, reviewing and producing documents from the five class representatives; preparing for and taking the depositions of defendants' expert and lay witnesses; preparing for and defending the depositions of the class representatives; preparing for and conducting a 3-day class certification hearing and numerous other hearings, arguments and conferences over the past six years; preparing thousands of pages of class certification, *Daubert* and expert submissions; and much more. All of this work led directly to the creation of the common Settlement Fund.

6.     The Court finds that Class Counsel performed their work reasonably and efficiently, that their billing rates are appropriate and consistent with market rates for attorneys of similar skill doing similar work, and that the lodestar totals are reasonable.

7.     Based on current billing rates, the requested lodestar "multiplier" is approximately 1.97, which the Court finds is well within the range of reasonable multipliers awarded in similar contingent cases. The requested multiplier is further supported by the fact that Class Counsel bore all the risk of litigating this complex case (including millions of dollars in litigation expenses) with no guarantee of reimbursement. Having shouldered these risks, and

having achieved outstanding results for the Class, Class Counsel have earned their requested

multiplier.

8.      The reaction of the Class supports the requested fee award.  The Settlement Class

in this case includes approximately 5,300 direct purchasers, many of which are sophisticated

business entities.  The absence of objections indicates that the fee is fair and reasonable and

consistent with prevailing market rates.

9.      The Court directs that Co-Lead Counsel allocate the fee award among co-counsel

in a reasonable manner consistent with Co-Lead Counsel's assessment of each firm's

contribution to the prosecution of the case.

10.      Class Counsel also requests reimbursement for $406,850.08 in expenses they have

advanced in the prosecution of this lawsuit.  The Court grants that request and finds the expenses

to be fair and reasonably incurred to achieve the benefits to the Settlement Class obtained in the

Settlement, as well as the continued litigation of this Action against non-settling Defendants.

11.      After deducting Court-approved attorneys' fees and expenses (including the

previously approved costs of notice and settlement administration), the balance of the common

settlement funds shall be distributed to Class members in accordance with Plaintiffs' proposed Plan

of Allocation and Distribution, attached hereto as Exhibit 1.  The Court finds that the Plan of

Allocation and Distribution is fair, reasonable and adequate, and the Court therefore approves the

proposed Plan of Allocation and Distribution as submitted.  After final approval of the Settlements

and entry of this order awarding attorneys' fees and expenses, the claims administrator (Garden City

Group) will mail pre-printed claim forms to all Class members identified as direct purchasers in

Defendants' transaction data.  The pre-printed claim forms shall be in a format substantially similar

to the proposed claim form contained in Exhibit 1.  Class members will be asked to verify the

accuracy of certain purchase information on the pre-printed claim forms and return those forms to the

4

claims administrator, and they will be given an opportunity to submit additional or corrective

information if they wish.  Following expiration of the deadline for the return of claim forms, and

after consideration of any supplemental information submitted by Class members, the claims

administrator will calculate each claiming Class member's *pro rata* share of the Settlement Funds,

net of then-due and estimated future settlement administration costs.  Class Counsel will supervise

the claims process, and Class Counsel will file a motion to update the Court on the claims process

and to request approval of the final schedule of distributions prior to any checks being mailed to the

Class.

WHEREFORE the Court grants an attorneys' fee award of 33% of the total common

settlement funds (*i.e.*, 33% of $163.9 million, or a total fee of $54,087,000), authorizes Co-Lead

Counsel to allocate the fee award among co-counsel at Co-Lead Counsel's discretion, awards

Class Counsel reimbursement of their requested "out of pocket" litigation costs and expenses

from the Settlement funds in the amount of $406,850.08 (in addition to the reimbursement of

$5,064,908.97 in litigation expenses approved in connection with the earlier Settlements), and

approves the proposed Plan of Allocation and Distribution for the Settlement funds.

SO ORDERED this the 22nd day of October, 2014.


Honorable James B. Zagel
United States District Judge

5

EXHIBIT 1

**CLASS COUNSEL'S PROPOSED PLAN OF ALLOCATION AND DISTRIBUTION FOR THE *STEEL ANTITRUST* SETTLEMENT FUNDS RECOVERED FROM DEFENDANTS ARCELORMITTAL, U.S. STEEL, GERDAU, COMMERCIAL METALS, AND AK STEEL**

### 1.  Distribution and Submission of Personalized Claim Forms

After final approval of the Settlements and entry of an order awarding attorneys' fees and expenses, The Garden City Group, Inc. ("Garden City Group"), the claims administrator approved by the Court, will prepare and mail proof of claim forms, substantially in the form attached as Appendix A to this Plan, to all members of the Class. The mailing list was derived from the Defendants' transactional databases, as synthesized by Plaintiffs' expert consultants and Garden City Group. Garden City Group and Co-Lead Counsel have updated the mailing list in the course of administering earlier notice programs in this matter, and will further update it as necessary.

The proof of claim form explains that members of the certified Settlement Class ("Class Members") will be entitled to a distribution from the Settlement Funds, and identifies Class Members as those who purchased Steel Products (defined in the form) directly from a Defendant (defined in the form) in the United States and its territories at any time from April 1, 2005 through December 31, 2007, except for Defendants, governmental entities, and purchasers who timely elected to exclude themselves from the Class.

The proof of claim form further explains that Class Members will be entitled to a *pro rata* distribution of the Net Settlement Funds. Net Settlement Funds are the monies deposited into escrow pursuant to the approved Settlement agreements, plus all accrued interest on those accounts, minus all attorneys' fees and expenses awarded by the Court, minus reasonable anticipated fees and costs associated with settlement administration, and minus anticipated tax payments and tax preparation fees associated with the Escrow Accounts.

The claim form states that Class Members' recovery will be a function of their purchase volume (in dollars) of eligible Steel Products from all of the Defendants during the Class Period. Using data obtained from sales records provided by the Defendants, Garden City Group will prepare a personalized claim form for each Class Member that includes the dollar value of the Class Member's purchases of eligible Steel Products during the Class Period.

*Class Members will be advised that they must submit a claim form to be eligible to receive a distribution from the Settlement funds.* Class Members will have two options for doing so. First, they can simply sign and return their claim form if they accept the pre-printed tabulation of qualifying purchases. Alternatively, they can return the claim form along with backup data supporting a different estimated dollar value of eligible purchases.

Using the pre-printed claim form will save most Class Members substantial time and effort they might otherwise have to devote to tracking down, compiling and submitting documentation in support of their claim, and will reduce the time necessary for reviewing and processing claims and hence advance the date of ultimate distribution of funds. If Class Members believe the pre-printed purchase data is inaccurate, however, they will have the option of submitting their own purchase data so long as it is supported by adequate proof.

To make a claim and receive a distribution from the Net Settlement Funds, a Class Member must return a properly completed claim form to Garden City Group postmarked no later than forty-five (45) days from the date of the initial claim form mailing to the Class Member.

### 2. Processing and Review of Claims

Garden City Group will review and process all submitted claims, under the supervision and guidance of Class Counsel. Garden City Group first will determine whether a claim form is timely, properly completed, and signed.

If Garden City Group determines that it needs further information or documentation to properly process a claim, the claimant will be notified in writing. The notification will explain how the claimant can cure the deficiency and provide a reasonable deadline (generally twenty (20) days from the mailing date of the deficiency notification) for submitting a curing response. If a claimant fails to correct the deficiency within the time specified, the claim may be rejected in whole or in part.

Garden City Group will classify all claims as either "Eligible" or "Ineligible." "Eligible Claims" will be further classified as: (i) claims recommended for approval as filed; (ii) claims recommended for approval but with modification; or (iii) late claims recommended for acceptance because they would have been Eligible Claims if filed on time and their acceptance will not substantially delay claims administration. Garden City Group will classify as "Ineligible Claims" those claims that it recommends for rejection and will identify the basis.

Class Counsel will review the list of Eligible and Ineligible Claims and may accept, reject, or modify the Class Administrator's decisions.

### 3. Calculation of Class Member *Pro Rata* Shares and Distribution Amounts

Once Class Counsel and Garden City Group determine which claims are recommended for approval (as submitted or as modified), Garden City Group will calculate each claimant's *pro rata* share of the settlements. Each claimant's share will be in proportion to the total amount of approved purchases of Steel Products, calculated as a fraction—the numerator being the sum of that claimant's eligible purchases in dollars, and the denominator being the sum of all approved claimants' eligible purchases in dollars. Garden City Group will multiply the resulting fraction

for each claimant by the dollar amount of the monies to be distributed from the Net Settlement Funds to obtain the dollar value of each claimant's distribution payment.[1]

### 4. Submission of a Recommended Schedule of Distribution

After Garden City Group calculates each claimant's *pro rata* share and estimated distribution from the Net Settlement Funds, Class Counsel will file a motion with the Court to approve the final plan of distribution and will provide the Court a report on (i) the status of the claims process, (ii) the proposed distribution amounts for individual Class Members (the "Schedule of Distribution"), and (iii) any outstanding disputes on which the Court's guidance is sought.

### 5. Payment to the Claimants

After entry of the Court's order approving a Schedule of Distribution (whether as presented or as modified by the Court), the Escrow Agent for the Settlement Funds will release the Net Settlement Funds to Garden City Group, which will deposit them into a single Distribution Account.  Garden City Group will then issue a check payable to each claimant in an amount corresponding to its *pro rata* share of the funds, as approved by the Court, and will use reasonable efforts to locate any claimants whose checks are returned as undeliverable.

All settlement checks issued by Garden City Group will bear an expiration date.  Garden City Group will use reasonable efforts to encourage claimants to cash checks before they expire and may reissue checks to claimants whose checks have expired.  Garden City Group will void expired checks that are not cleared within a commercially reasonable period of time (generally

---

[1] For Class Members who opted out of one or more, but not all, of the Settlements, their *pro rata* share will be adjusted downward by the percentage share of the Settlement Funds contributed by Defendants from whose Settlements the Class Member opted out, and the amount by which such Class Members' distribution amount is reduced will be reallocated across the rest of the Class.

90 or 120 days).  The monies represented by voided checks that are not reissued shall revert to the Distribution Account, at which time Class Counsel will provide a status report to the Court on the status of the distribution, the amount of any unclaimed funds, and a recommendation on what to do with such funds.

### 6.  Payment of Garden City Group's Invoices

Garden City Group will submit monthly invoices to Class Counsel detailing the work performed and the expenses incurred in the prior month in the course of administering the Settlements.  Class Counsel will review such invoices, seek clarification or modification as needed, and submit invoices for reasonable and necessary fees and expenses to the Escrow Agents with a written request that the invoices be paid from the appropriate Escrow Account(s). Class Counsel will update the Court on these expenses in the aforementioned status report, and Class Counsel will submit any additional status reports that the Court may request.

# APPENDIX A

To Class Counsel's Proposed Plan Of Allocation And Distribution For The *Steel Antitrust* Settlement Funds Recovered from Defendants ArcelorMittal, U.S. Steel, Gerdau, Commercial Metals, and AK Steel:

Proposed Proof of Claim Form

Steel Antitrust Litigation c/o
GCG
P.O. Box 9349
Dublin, OH 43017-4249

**IMPORTANT COURT-ORDERED DOCUMENT**

| For Official Use Only |
|---|
| 01 |

# <<BARCODE>>

Claimant ID #(<Claimant_ID)) - (<Sequence))
(<Name_1))
(<Address_1))
(<City)), (<State)) (<Zip5)) (<Zip4))

### IN RE: STEEL ANTITRUST LITIGATION
United States District Court for the Northern District of Illinois
Civil No. 08-cv-5214

## PROOF OF CLAIM FORM — ARCELORMITTAL, U.S. STEEL, GERDAU, COMMERCIAL METALS, AK STEEL SETTLEMENTS

<u>Important Notice</u>:   If you are a Settlement Class Member, you can submit a claim without collecting any documentation from your files.

To receive your share of the Settlement funds, you must send a completed, signed, and certified proof of claim to the Claims Administrator, postmarked on or before --------, -----, to the following address:

Steel Antitrust Litigation
c/o GCG
P.O. Box 9349
Dublin, OH 43017-4249

You are only entitled to a distribution if you are a member of the Settlement Class. You are a member of the Settlement Class if you purchased Steel Products (as defined below) directly from a defendant (defined below) at any time from April 1, 2005 through December 31, 2007 in the United States.   Excluded from the Class are any defendants, their employees, and their respective parents, subsidiaries and affiliates; all who timely elected to exclude themselves from the Class; and all governmental entities.

**"Steel Products"** are defined as products derived from raw carbon steel and sold directly by any of the Defendants or their subsidiaries or controlled affiliates in the United States, including all carbon steel slabs, plates, sheet and coil products, galvanized and other coated sheet products; billets, blooms, rebar, merchant bar, beams and other structural shapes; and all other steel products derived from raw carbon steel and sold by Defendants except as specifically excluded below.

**"Steel Products"** specifically <u>exclude</u> the following product categories:   stainless steel; grain-oriented electrical steel; tin mill products; clad plate (i.e., nickel, stainless or copper clad plate); steel pipe and other tubular products; "special bar quality" products; wire rod and other wire products; grinding balls; fabricated rebar products; fabricated steel joist, decking, fence posts and other fabricated building products; welded steel blanks; and steel products purchased under toll processing agreements.

The term **"Purchased"** includes all transactions for which pricing was negotiated during the period April 1, 2005 through December 31, 2007 **and** delivery was received during that period.   Qualifying purchases also include Steel Product transactions for which a sales contract was negotiated before April 1, 2005 but (i) delivery was received between April 1, 2005-December 31, 2007 **and** (ii) the actual transaction price under the contract was adjusted (or indexed) based on market pricing that prevailed during the period April 1, 2005-December 31, 2007.

**"Defendants"** are:   ArcelorMittal S.A. and ArcelorMittal USA LLC (collectively "ArcelorMittal"), United States Steel Corporation ("U.S. Steel"), Nucor Corporation ("Nucor"), AK Steel Holding Corporation ("AK Steel"), Gerdau Ameristeel Corporation ("Gerdau"), Steel Dynamics, Inc. ("Steel Dynamics"), Commercial Metals Company ("CMC"), and SSAB Swedish Steel Corporation ("SSAB").

If you are *not* a Class Member, *e.g.,* because you did not purchase Steel Products directly from a Defendant during the period April 1, 2005-December 31, 2007, or because you previously excluded yourself from the Settlement Class, you are not entitled to a distribution and should *not* submit this Proof of Claim form.

This Proof of Claim, even if prepared by a third party, must be completed, signed and certified by the Class Member. The Claims Administrator is authorized to request from persons or entities submitting proofs of claim any documentation necessary to verify information appearing in the Proof of Claim and to prevent claim duplication. Failure to provide requested information may constitute grounds for rejection of the Proof of Claim.

---

## PART 1: CLAIMANT IDENTIFICATION
(Please type or neatly print all information – use blue or black ink)

Class Member Name and Address:

**[PRE-PRINTED CLAIMANT NAME]**
**ADDRESS**
**CITY, STATE ZIP**

If necessary, use the following box to correct your name and address information:

|  |
|  |
|  |
|  |

Federal Employer Tax ID Number (FEIN)

Person to contact if there are questions regarding this claim:

Daytime phone number:

Email address:

Any other names by which you have been known, including FEIN, during the period April 1, 2005-December 31, 2007:

## PART 2: CLAIMANTS' PURCHASE DATA

As described in the Plan of Allocation, which is available at the Steel Settlement website, www.steelantitrustsettlement.com, each Class Member's claim is based on the amounts each Class Member paid for purchases of qualifying Steel Products during the period April 1, 2005-December 31, 2007. The Net Settlement Funds will be distributed to Class Members on a *pro rata* basis, with Class Members' purchases of Steel Products from all of the Defendants serving as the basis for the calculation.

**To submit a claim based on Defendants' purchase data, which is summarized in the table below, all you have to do is complete Part 4 below, and return the claim form.  In other words, if you accept the purchase figures in the box immediately below, there is no need to complete Part 3 of this claim form and no need to search your own records or produce any backup to receive your share of the Settlement Funds.**

| Defendant-Supplier | Direct Purchase Amount |
|---|---|
| ArcelorMittal | |
| U.S. Steel | |
| Nucor | |
| AK Steel | |
| Gerdau | |
| Steel Dynamics | |
| CMC | |
| SSAB | |
| **Total** | |

**The totals above were obtained directly from the Defendants' sales records and summarize your total payments for Steel Products during the period April 1, 2005-December 31, 2007.  If you accept this estimate, you can simply skip Part 3 below and proceed to Part 4, and your share of the Steel Settlement Fund will be calculated based on this amount.**

**Please Note**:  If you appeared in Defendants' records under other names or at different locations, you and related entities and locations may receive multiple but non-duplicative Proof of Claim forms, each with a unique Claimant ID Number (located in the address block on the first page).

## PART 3: CLAIMANTS' CORRECTED PURCHASE DATA

**(To be completed ONLY if you disagree with, and do not wish to accept, the totals presented in Part 2)**

If you disagree with the pre-printed information contained in Part 2, please enter the corrected purchase totals in the table below and attach documentation in support of the revised total.   **You MUST attach documentation in support of any corrected amounts.**

| Defendant-Supplier | Direct Purchase Amount |
|---|---|
| ArcelorMittal | |
| U.S. Steel | |
| Nucor | |
| AK Steel | |
| Gerdau | |
| Steel Dynamics | |
| CMC | |
| SSAB | |
| **Total** | |

To support any corrected purchase amounts, you **must** provide proof to support the corrected amount and identify the Defendant-supplier, product names and types, dates of purchase, and net purchase amounts (in U.S. dollars). Electronic transaction summaries or similar records are preferred. Only purchases made directly from one of the Defendants qualify. Purchases through an intermediary such as a service center, wholesaler or distributor **do not qualify**.

If you received and are correcting multiple Proof of Claim forms, please provide supporting documentation for all of them.

**PART 4: SUBMISSION TO JURISDICTION OF THE COURT AND VERIFICATION**

By signing below, you are submitting to the jurisdiction of the United States District Court for the Northern District of Illinois with respect to the claim you are making as a Class Member.

By signing below, you are verifying that you are the proper recipient of the funds sought and that you have not assigned or transferred (or purported to assign or transfer) any of the claims in this matter. You are further verifying that the information provided in this Proof of Claim is accurate and complete.

Name and Capacity/Title:

Signature:

Date:

The completed Proof of Claim and the information it contains will be treated as confidential and will be used solely for purposes of administering the settlement.

# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) ) ) | CASE NO. 05-340 (SLR) (consolidated) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| *Louisiana Wholesale Drug. Co., Inc. (05-340)* *Rochester Drug Co-Operative, Inc. (05-351)* *Meijer, Inc., et al. (05-358)* | ) ) ) ) | |

## [PROPOSED] ORDER AND FINAL JUDGMENT APPROVING SETTLEMENT, AWARDING ATTORNEYS' FEES AND EXPENSES, AWARDING REPRESENTATIVE PLAINTIFF INCENTIVE AWARDS, APPROVING PLAN OF ALLOCATION, AND ORDERING DISMISSAL AS TO ALL DEFENDANTS

The Court, having considered (a) the Direct Purchaser Class's Motion for Final Settlement Approval; (b) the Brief in Support of the Direct Purchaser Class's Motion for Final Settlement Approval; (c) the Plan Of Allocation For Direct Purchaser Class; (d) the Declaration Of Jeffrey J. Leitzinger, Ph.D. Regarding Classwide Damages and the Proposed Plan Of Allocation ("Leitzinger Declaration"); (d) the Direct Purchaser Class's Motion for an Award Of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Class Representatives; (e) the Brief in Support of the Direct Purchaser Class's Motion For An Award Of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards To The Class Representatives; (f) the Affidavit of Lead Counsel Barry S. Taus, Esq.; (g) the Corrected Supplemental Affidavit of Lead Counsel Barry S. Taus, Esq.; and (h) the Affidavit of Adam M. Steinfeld dated March 9, 2009; and having held a

Case 1:06-md-01775-BMC Document 2472-1 Filed 08/18/16 Page 133 of 143 PageID #:
Case 1:05-cv-00340-SLR Document 543 Filed 04/23/09 Page 2 of 12 PageID #: 7968
111966

hearing on April 23, 2009; and having considered all of the submissions and arguments

with respect thereto; pursuant to Rules 23 and 54 of the Federal Rules of Civil Procedure,

and in accordance with the terms of the settlement agreement between Direct Purchaser

Class Plaintiffs ("Plaintiffs") and Abbott Laboratories ("Abbott") and Fournier Industrie

et Santé and Laboratories Fournier S.A. (together, "Fournier") (collectively,

"Defendants") dated January 6, 2009 (the "Settlement Agreement"), it is hereby

**ORDERED, ADJUDGED and DECREED that:**

1.        This Order and Final Judgment incorporates by reference the definitions in

the Settlement Agreement, and all terms used herein shall have the same meanings set

forth in the Settlement Agreement.  As set forth in the Preliminary Approval Order (D.I.

No. 529), dated January 8, 2009, the previously certified Class is defined as follows:

> The Direct Purchaser Class includes all persons or entities in the United
> States who purchased TRICOR® in any form directly from Abbott
> Laboratories ("Abbott"), Fournier Industrie et Sante, or Laboratories
> Fournier S.A. ("Fournier") (Abbott and Fournier collectively are
> "Defendants") at any time during the period April 9, 2002 through August
> 18, 2008.  Excluded from the Class are Defendants and their officers,
> directors, management, employees, subsidiaries, or affiliates, all federal
> governmental entities, and the following entities that opted out of the
> Class: Ahold a/k/a American Sales Corp., Albertson's Inc., CVS
> Pharmacy, Inc., CVS Corporation, Eckerd Corporation, Maxi Drug, Inc.
> d/b/a Brooks Pharmacy, Hy-Vee, Inc., Kroger Co., Rite Aid Corporation,
> Rite Aid Hdqtrs. Corp., Safeway, Inc., Walgreen Co., State of Oregon (all
> government entities), State of Washington (all government entities),
> Maryland State Employee and Retiree Health and Welfare Benefits
> Program and the Maryland Pharmacy Program, Connecticut Department
> of Social Services, State of New York (all government entities), State of
> Texas Heath and Human Services Commission, Commonwealth of
> Massachusetts Executive Office of Health and Human Services Office of
> Medicaid (MassHealth), Pennsylvania Department of Public Works and
> Department of Aging, and Overman & Stevenson Pharmacists.

2.        The Court has jurisdiction over these actions and over each of the parties

and over all members of the Class.

3.      As required by this Court in the Preliminary Approval Order, notice of the proposed Settlement was mailed by first-class mail to all members of the Class.  Such notice to members of the Class is hereby determined to be fully in compliance with requirements of Fed. R. Civ. P. 23(e) and due process of law and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto.

4.      Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in the fairness hearing, it is hereby determined that all Class members are bound by this Final Order and Judgment.

5.      The Settlement of this Direct Purchaser Class Action was not the product of collusion between Plaintiffs and Defendants or their respective counsel, but rather was the result of *bona fide* and arm's-length negotiations conducted in good faith between Class Counsel[1] and Defendants' counsel.

6.      The Court has held a hearing to consider the fairness, reasonableness and adequacy of the proposed Settlement, and has been advised that there have been no objections to the Settlement from any members of the Class, and also that several members of the Class have explicitly indicated their support for the Settlement and Class Counsel's requested attorneys' fees.

7.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court

---

[1] The Court appointed Garwin Gerstein & Fisher, L.L.P., as Lead Counsel and as a member of the Executive Committee, along with the firms of Berger & Montague, P.C., Odom & Des Roches, L.L.P., The Smith Foote Law Firm (formerly Percy, Smith & Foote), and Cohen, Milstein, Hausfeld & Toll (which is now known as Cohen Milstein Sellers & Toll). Kaplan, Fox & Kilsheimer, L.L.P., was substituted for Cohen Milstein midway through the litigation. Additional class counsel that actively participated in the case include Heim Payne & Chorush, L.L.P. (formerly Conley, Rose & Tayon), Vanek, Vickers & Masini, L.L.P., and Delaware counsel Rosenthal, Monhait & Goddess, P.A.

hereby approves the Settlement, and finds that the Settlement is, in all respects, fair, reasonable and adequate to Class members.  Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement. The Settlement is fair, reasonable and adequate in light of the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir 1975), as follows:

(a) this case was highly complex, expensive and time consuming, and would have continued to be so if the case had not settled;

(b) there were no objections to the Settlement by Class members, and several Class members expressed affirmative support for the Settlement;

(c) because the case settled after the parties had completed discovery and commenced trial, Class Counsel had a full appreciation of the strengths and weaknesses of their case before negotiating the Settlement;

(d) Class Counsel and the Class would have faced numerous and substantial risks in establishing both liability and damages if they had decided to continue to litigate rather than settle;

(e) the Settlement amount is well within the range of reasonableness in light of the best possible recovery and the risks the parties would have faced if the case had continued to verdicts as to both liability and damages; and,

(f) the Settlement also satisfies the additional factors set forth in *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d. Cir 1998), *cert. denied*, 525 U.S. 1114 (1999).

8.    The Court approves the Plan of Allocation of the Settlement proceeds (net of attorneys' fees, reimbursed expenses and incentive awards) as proposed by Class

Counsel in the Plan of Allocation (the "Plan") (attached hereto as Ex. A), and supported by the Leitzinger Declaration. The Plan, which had previously been summarized in the Notice of Proposed Settlement, proposes to distribute the net Settlement proceeds *pro rata* based on Class member purchases of Tricor, and does so fairly and efficiently. It directs Epiq Systems, Inc., the firm retained by Class Counsel as the claims administrator, to distribute the net Settlement proceeds in the manner provided in the Plan.

9.      All claims in the above-captioned action against Defendants are hereby dismissed with prejudice, and without costs.

10.      In accordance with the Settlement Agreement, upon the Settlement's becoming final in accordance with its terms:

(a)      Defendants and their past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, insurers, general or limited partners, employees, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") are and shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages, and liabilities, of any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages, or liabilities arise or are incurred before, during or after the date hereof), including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that Plaintiffs or any member or members of the Class who has (have) not timely excluded itself (themselves) from the Class (including any past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents,

5

attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such), whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, to the extent arising out of or relating to any conduct:

    (1)    alleged in the Actions,

    (2)    alleged in any other complaint filed in any action currently consolidated or coordinated, or subject to a pending request for consolidation or coordination with the Actions, or

    (3)    relating to any alleged change in formulation or withdrawal of TRICOR 200 or TRICOR160 or any conduct relating to the change to TRICOR 160 or the change to TRICOR 145, or any generic equivalents of TRICOR 200 or TRICOR 160 (reference to any formulation of TRICOR or any generic equivalent shall in each instance include any associated lower doses),

provided only that such conduct occurred or allegedly occurred prior to the date hereof, except as expressly provided for in paragraph 12 of the Settlement Agreement (the "Released Claims"). Plaintiffs and each member of the Class shall not sue or otherwise seek to establish or impose liability against any Released Party based, in whole or in part, on any of the Released Claims.

    (b)    In addition, the Court finds that each class member has expressly

Case 1:06-md-01775-BMG    Document 2432-1    Filed 08/19/16    Page 138 of 143 PageID #:
Case 1:05-cv-00340-SLR    Document 5432    Filed 04/23/09    Page 7 of 12 PageID #: 79973
111971

waived and released, upon the Settlement Agreement becoming final, any and all

provisions, rights, benefits conferred by §1542 of the California Civil Code, which reads:

> **Section 1542. <u>General Release--Claims Extinguished</u>.**
> **A general release does not extend to claims which the**
> **creditor does not know or suspect to exist in his or her**
> **favor at the time of executing the release, which if**
> **known by him or her must have materially affected his**
> **or her settlement with the debtor.**

or by any law of any state or territory of the United States or other jurisdiction, or

principle of common law, which is similar, comparable or equivalent to §1542 of the

California Civil Code. Each Class member may hereafter discover facts other than or

different from those which he, she or it knows or believes to be true with respect to the

claims which are the subject matter of this Paragraph 10, but each Class member hereby

expressly waives and fully, finally and forever settles and releases, upon the Settlement

Agreement's becoming final, any known or unknown, suspected or unsuspected,

contingent or non-contingent claim that would otherwise fall within the definition of

Released Claims, whether or not concealed or hidden, without regard to the subsequent

discovery or existence of such different or additional facts. For the avoidance of doubt,

the Court finds that each Class member has expressly waived and fully, finally and

forever settled and released any and all claims it may have against any Released Party

under §17200, *et seq.,* of the California Business and Professions Code or any similar,

comparable or equivalent provision of the law of any other state or territory of the United

States or other jurisdiction, which claims are hereby expressly incorporated into the

definition of Released Claims.

11.    Class Counsel have moved for an award of attorneys' fees and

reimbursement of expenses. Pursuant to Rules 23(h)(3) and 54(d) of the Federal Rules of

Case 1:06-md-01775-BMC   Document 2472-1   Filed 08/19/16   Page 139 of 143 PageID #:
Case 1:05-cv-00340-SLR   Document 543   Filed 04/23/09   Page 8 of 12 PageID #: 9974
111972

Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class

action fee request as set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195

n.1 (3d Cir. 2000), this Court makes the following findings of fact and conclusions of

law:

        (a)     the Settlement confers a monetary benefit on the Class that is

substantial, both in absolute terms and when assessed in light of the risks of establishing

liability and damages in this case;

        (b)     there were no objections by Class members to the requested fee

award of one-third of the Settlement Fund, and in fact, numerous Class members, with

purchases of Tricor during the relevant period in excess of 70% of the aggregate Class

purchases, have affirmatively expressed their support for and/or lack of objection to the

requested fee;

        (c)     Class Counsel have effectively and efficiently prosecuted this

difficult and complex action on behalf of the members of the Class for over three and

one-half years, with no guarantee they would be compensated;

        (d)     Class Counsel undertook numerous and significant risks of

nonpayment in connection with the prosecution of this action;

        (e)     Class Counsel have reasonably expended tens of thousands of

hours, and incurred millions of dollars in out of pocket expenses, in prosecuting this

action, with no guarantee of recovery;

        (f)     fee awards similar to the fee requested by Class Counsel here have

been awarded in similar cases, including numerous Hatch-Waxman antitrust class actions

similarly alleging impeded entry of generic drugs;

Case 1:06-md-01775-BMG   Document 2432-1   Filed 08/10/16   Page 140 of 143 PageID #:
111973
Case 1:05-cv-00340-SLR   Document 5432-1   Filed 04/23/09   Page 9 of 12 PageID #: 79973

(g)     the Settlement achieved for the benefit of the Class was obtained

as a direct result of Class Counsel's skillful advocacy;

(h)     the Settlement was reached following negotiations held in good-

faith and in the absence of collusion;

(i)     the "percentage-of-the-fund" method is the proper method for

calculating attorneys' fees in common fund class actions in this Circuit (*see, e.g., In re*

*Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005));

(j)     Class members were advised in the Notice of Proposed Settlement

of Class Action, which notice was approved by this Court, that Class Counsel intended to

move for an award of attorneys' fees in an amount up to 33-1/3% of the gross Settlement

Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and

expenses incurred in the prosecution of this action;

(k)     Class Counsel did, in fact, move for an award of attorneys' fees in

the amount of 33-1/3% of the gross Settlement Fund (including the interest accrued

thereon), plus reimbursement of reasonable costs and expenses incurred in the

prosecution of this action, which motion has been on the docket and publicly available

since March 9, 2009;

(l)     As detailed in Class Counsel's affidavits, a one-third fee award

would equate to a lodestar multiplier of approximately 3.93. An examination of recently

approved multipliers in other Hatch-Waxman class actions similarly alleging impeded

generic competition reveals that the multiplier requested here is well within the

acceptable range;

(m)     in light of the factors and findings described above, the requested

9

Case 1:06-md-01775-BMC Document 2432-1 Filed 08/19/16 Page 141 of 143 PageID #:
Case 1:05-cv-00340-SLR Document 543 Filed 04/23/09 Page 10 of 12 PageID #: 7976
111974

33-1/3% fee award is within the applicable range of reasonable percentage fund awards.

Accordingly, Class Counsel are hereby awarded attorneys' fees in the amount of $**83,333,333.33** from the Settlement Fund, plus one-third of the interest earned on the Settlement proceeds from January 27, 2009 (the date of funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund. The Court finds this award to be fair and reasonable.

Further, Class Counsel are hereby awarded $**3,590,415.82** out of the Settlement Fund to reimburse them for the expenses they incurred in the prosecution of this lawsuit, which expenses the Court finds to be fair, and reasonably incurred to achieve the benefits to the Class obtained in the Settlement to the Class.

The awarded fees and expenses shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement. Lead Counsel shall allocate the fees and expenses among all of the Class Counsel.

12.     Neither this Final Order and Judgment, the Settlement Agreement, nor any and all negotiations, documents and discussions associated with it shall be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by Defendants, or of the truth of any of the claims or allegations contained in any complaint or any other pleading or document, and evidence thereof shall not be discoverable, admissible or otherwise used directly or indirectly, in any way by or against Plaintiffs or Defendants, whether in this Direct Purchaser Class Action or in any other action or proceeding.

13.     Without affecting the finality of this judgment, the Court retains exclusive jurisdiction over the Settlement, and the Settlement Agreement, including the

10

administration and consummation of the Settlement Agreement, the Plan of Allocation, and in order to determine any issues relating to attorneys' fees and expenses and any distribution to members of the Class. In addition, without affecting the finality of this judgment, Defendants and each member of the Class hereby irrevocably submit to the exclusive jurisdiction of the Court for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement, including, without limitation any suit, action, proceeding or dispute relating to the release provisions herein, except that this submission to the Court's jurisdiction shall not prohibit (a) the assertion of the forum in which a claim is brought that the release included in the Settlement Agreement is a defense, in whole or in part, to such claim or, (b) in the event that such a defense is asserted in that forum, the determination of its merits in that forum.

14. The three Class Representatives are each hereby awarded $50,000 out of the Settlement Fund, for representing the Class, which amount is in addition to whatever monies these plaintiffs will receive from the Settlement Fund pursuant to the Plan of Allocation. The Court finds these awards to be fair and reasonable.

15. In the event the Settlement does not become final in accordance with paragraph 5 of the Settlement Agreement, this Order and Final Judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

16. The Court hereby directs that this judgment be entered by the clerk forthwith pursuant to Federal Rule of Civil Procedure 54(b). The direction of the entry of

Case 1:06-md-01775-BMG  Document 2472-1  Filed 08/19/16  Page 143 of 143 PageID #: 79978
Case 1:05-cv-00340-SLR  Document 543  Filed 04/23/09  Page 12 of 12 PageID #: 7978
111976

final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment

fully and finally adjudicates the claims of the Plaintiffs and the Class against all

Defendants in this action, allows consummation of the Settlement, and will expedite the

distribution of the Settlement proceeds to the Class members.

SO ORDERED this the 23d day of April _____, 2009.


_____
Hon. Sue L. Robinson
U.S. District Court for the District of Delaware